IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP,<br><br>Plaintiff,<br><br>v.<br><br>SS&C TECHNOLOGIES INC.<br><br>Defendant. | Civil Action No. _____<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff, ARMOUR Capital Management LP ("ACM"), sues Defendant, SS&C Technologies Inc. ("SS&C"), and states:

## INTRODUCTION

ACM is a registered investment advisor focusing on mortgage-related securities. To assist it with managing its clients' portfolios, ACM sought a "turnkey solution" for portfolio accounting software. SS&C marketed its CAMRA software to ACM as such a turnkey solution, and central to it was SS&C's implementation of the software for ACM. Indeed, any software and services SS&C might provide ACM are worthless without implementation. Based upon SS&C's representations, in December 2014 ACM agreed to license CAMRA and SS&C agreed to implement it by May 2015, a deadline SS&C repeatedly extended. Under the parties' contract, implementation is considered complete when ACM is able to process one month of transactions using CAMRA.

Almost immediately, there were problems with SS&C's implementation. SS&C delayed completion by three months shortly after the contract became effective. Then, SS&C failed to meet its revised deadline—and many later deadlines it set for itself. As ACM's frustrations grew over the following months, SS&C brought in a revolving door of "experts" in an attempt to implement the software, all to no avail. Over *two years* later, implementation has not occurred.

All the while, SS&C repeatedly assured ACM that its CAMRA software was capable of fulfilling ACM's needs and a resolution to SS&C's ongoing problems was just around the corner. Based on these representations, ACM paid SS&C more than $1.78 million under the contract but has received nothing of value in return. In fact, SS&C's software and services have been so worthless to ACM that it has been forced to continue relying on the software it used before the contract. SS&C has materially breached the contract by failing to deliver the turnkey solution it promised and failing to cure its inability to do so, and ACM has been damaged by SS&C's conduct.

## PARTIES, JURISDICTION AND VENUE

1. This is a civil action for breach of contract, violations of the Connecticut Unfair Trade Practices Act, breach of express warranty, unjust enrichment, conversion, and rescission.

2. ACM is a limited partnership organized under the laws of Delaware, with its principal office in Florida. ACM's general partners, Remmiz LLC and Stacumny LLC, are limited liability companies organized under the laws of Florida, with their principal offices in Florida; all of the members of such limited liability companies are residents of Florida.

3. SS&C is a corporation organized and existing under the laws of Delaware, with its principal office in Connecticut.

4. This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332 because the parties are domiciliaries of different states and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interest, and costs.

5. This Court has personal jurisdiction over SS&C because its principal office is located in this District and it conducts business in this District.

6. Venue is proper under 28 U.S.C. § 1391(b) because SS&C is a resident of this District and a substantial part of the events giving rise to ACM's claims occurred in this District.

**GENERAL ALLEGATIONS**

*The CAMRA Software*

7. SS&C is a provider of financial services software and software-enabled services. SS&C claims it has "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operations." SS&C markets CAMRA as a "flexible software application that streamlines, automates, and simplifies the investment process by providing immediate access to decision-making data."

8. In 2014, ACM sought to upgrade its accounting portfolio ledger to a full service investment accounting platform that would provide a turnkey solution, including the necessary software licenses and implementation. SS&C represented to ACM that its CAMRA product could provide ACM such a turnkey solution. SS&C's implementation of the software was a material—indeed, fundamental—component because ACM could not implement CAMRA itself.

9. SS&C represented that its personnel had the expertise to ensure timely installation and implementation of CAMRA and that ACM would not have to engage any third-party consultants. This was one of the major selling points for ACM—to not only license software from SS&C, but also to receive the benefit of SS&C's services and expertise, including implementation.

10. ACM vetted other service providers but ultimately chose SS&C because of SS&C's representations and assurances that it understood ACM's requirements and current systems and had software products, personnel, and the expertise to effectively and reliably install, implement, maintain, and support that software. In fall 2014, SS&C's Jeff Fectau and Dennis Moore demonstrated CAMRA for ACM and made representations regarding its capabilities, performance, and ease of implementation. Fectau and Moore also made representations to ACM at that time about

SS&C's technical expertise and experience in installing, configuring, and implementing CAMRA, particularly for customers like ACM who invest in mortgage-related securities. A week before the contract was signed, SS&C represented in writing that the project would start in January 2015 and end by May 2015. These representations were material to ACM's decision to sign the contract.

### *The Master Agreement and Related Sub-Agreements*

11. Based upon SS&C's representations, ACM agreed to license CAMRA and related software and to engage SS&C to install, implement, test, maintain, and support the software.

12. On December 19, 2014, ACM entered into a Master Agreement for Software, Maintenance and Support, Professional Services and Other Services, which incorporates each attachment and Work Request thereto (collectively, the "Master Agreement"). (*See* Ex. A, attached.)

13. The first attachment is the License and Maintenance Program Agreement ("Maintenance Program"), which provides that ACM would perpetually license from SS&C the following software: CAMRA for Microsoft SQL Server, including CI Manager, Impairments Manager, Report Express, Extend, and TBA Dollar Roll, and Debt & Derivatives, including Swaps ("CAMRA Software"). Additionally, SS&C agreed to provide maintenance in the form of

> telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades.

(*Id.* § 3.1.)

14. In exchange, ACM agreed to pay SS&C (a) $500,000 to license the CAMRA Software and (b) a $100,000 annual maintenance fee, subject to increase. (*See id.* Attach. A.1.)

15. The Maintenance Program ran from December 30, 2014, through December 31, 2015, and automatically renewed for one-year terms starting on January 1, 2016. (*See id.* § 3.5.)

16. In December 2014, ACM paid the $500,000 license fee and the initial $100,000 maintenance fee, plus tax. Subsequently, ACM paid $200,000 plus tax for the 2016 and 2017 maintenance fees. Including tax, ACM has paid $322,568 in maintenance fees to SS&C.

17. The Maintenance Program contains a limited warranty that the CAMRA Software would perform in substantial accordance with SS&C's representations. (*See id.* Attach. A.1.)

18. The Master Agreement also attaches a Hosting, Process Automation, and Data Management Services Agreement ("Hosting Agreement"), under which SS&C agreed to provide and maintain a hosted software processing environment in exchange for ACM's payment of a $10,000 monthly hosting fee, subject to increase. (*See id.* Attach. B.1.)

19. To date, ACM has paid SS&C $260,000 in hosting fees.

20. The parties entered into three Work Requests under the Master Agreement. Work Request One explains the terms of the initial setup of the CAMRA Software, testing, and support; provides that implementation will take from four to six months; and authorizes 1,850 hours of SS&C support at the rate of $225 per hour for on-site and remote implementation services, including business workflow analysis, environment setup, data conversion analysis, interface development, and testing in support of implementation. (*Id.* § 3.1, 15-16.)

21. Work Request Two, attached at Exhibit B and effective as of March 31, 2016, further defines SS&C's obligations with respect to implementation and caps the fees set out in Work Request One at $728,725. (*See* Ex. B at 1.) Implementation is considered complete when ACM is able to successfully process one complete month of transactions using the CAMRA Software. (*Id.*) This never happened. Thus, by the Master Agreement's express terms, SS&C breached a material term of the agreement and is liable for ACM's damages.

22.     Work Request Three, attached at Exhibit C and effective as of April 20, 2016, provides for onsite and remote implementation services relating to the accounting for what SS&C referenced as "PGAAP," the purchase method of accounting under Generally Accepted Accounting Principles, and authorizes 120 hours of support at $225 per hour.  (*See* Ex. C at 1.)

23.     To date, ACM has paid $695,370 to SS&C under the Work Requests.[1]

### *SS&C Fails to Implement the CAMRA Software for ACM*

24.     Almost from inception, SS&C had problems implementing the CAMRA Software. Beginning in January 2015, ACM and SS&C held weekly status meetings regarding implementation.  Adriana Johnson was an SS&C project manager who led most of the meetings.  Initially, Johnson represented that SS&C would have the CAMRA Software installed, implemented, and ready for use in four to six months.  In February 2015, Johnson informed ACM at a weekly status meeting that the planned launch date would be delayed to early August 2015.  SS&C thereafter continually delayed this date, including from mid-August 2015, to late August 2015, and beyond.

25.     SS&C employees, including Johnson, Scott Rice, Andrew Voutinas, David Russell, Jason Holmes, Fathima Mahamoon, and Donald Johnson, often gave conflicting reasons for SS&C's difficulties implementing the CAMRA Software.  For instance, in late 2015, almost a year after the Master Agreement was executed, SS&C informed ACM that it could not configure data from ACM's custodian, BNY Mellon, and that this issue was obstructing implementation.  Before signing the Master Agreement, ACM received assurances from SS&C that it had other clients that used BNY Mellon as custodian and SS&C was able work with its data.  SS&C took many months to correct this issue; all the while, SS&C induced ACM to continue paying it substantial sums.

---

[1] ACM terminated the Master Agreement on May 1, 2017, and thus does not owe SS&C any additional amounts under the Master Agreement, including any hosting fees or monies that would be due upon SS&C's completion of implementation (which, again, has never occurred).

26. In fall 2015, Russell told ACM that the CAMRA Software implementation again was delayed because of an issue relating to the way ACM accounted for par and premium values for certain transactions. ACM changed its accounting method solely to accommodate SS&C. But shortly thereafter, SS&C brought in a new team to work on implementation, which instructed ACM to return to its prior accounting method. ACM agreed, but SS&C's failures continued. Around this time, in an effort to spur SS&C to complete the implementation, ACM began to withhold payment due to SS&C's failure to live up to the deadline for implementation that SS&C set for itself. In response, Timothy Reilly, SS&C's Senior Vice President for Institutional and Investment Management, and others at SS&C made more misrepresentations concerning SS&C's expertise and its ability to complete the project. These misrepresentations caused ACM to continue making payments believing that the project was nearing completion. But given its large investment in the project to date, ACM desired to see it through to completion, and Reilly and others at SS&C serially provided ACM assurances that SS&C finally would implement the CAMRA Software.

27. Another glaring problem with the CAMRA Software was its inability to reliably replicate data. ACM attempted to manually verify the data generated by the CAMRA Software, but on numerous occasions the software was incorrect. Other errors also arose in the software. As just one example, the software incorrectly calculated "business days" as "calendar days." The data contained so many errors, so often, that it was entirely unreliable.

28. ACM repeatedly notified SS&C of these problems in writing throughout 2015, 2016, and 2017 and provided SS&C countless opportunities to cure them, including and especially and SS&C's failure to implement the CAMRA Software. As one example, on or around October 2, 2015, SS&C's Johnson proposed to effect a "re-initialization as of 8/31/15 in order to be book of record for 1/31/16." A "re-initialization" was essentially a do-over of the entire implementation

7

process; SS&C deleted the data it had compiled to date and started from scratch. SS&C has requested, and ACM has agreed to, multiple re-initializations, but none has resulted in successful implementation. Two months following Johnson's email, little progress was made, despite the "grave concerns" that ACM had expressed to SS&C.

29.     SS&C also routinely and falsely assured ACM that SS&C's deficiencies would be corrected, including income calculations and book value progressions. More than once, SS&C deployed new "expert" personnel to address these deficiencies. For more than two years, ACM diverted key employees from their regular work responsibilities to assist SS&C's struggling implementation teams, all while SS&C told ACM that it would complete the implementation. For instance, on October 11, 2016, Daniel Pallone, SS&C's Vice President of Mortgage REITs and Loan Servicing, wrote to ACM that while he was "disappointed" that SS&C had not achieved implementation, "SS&C [was] committed to satisfying the criteria" for completion. Based on statements like this, ACM granted SS&C additional payments and time to finish implementation.

30.     With more than two years and millions of dollars wasted on SS&C, ACM, in early 2017, sought to elevate SS&C's deficiencies to the highest levels of its organization and make a last attempt to obtain the benefit of ACM's bargain by meeting with SS&C's president and COO, Normand Boulanger. The meeting did not take place, but Reilly assured ACM that Boulanger was aware of SS&C's implementation failures. On February 6, 2017, Reilly wrote to ACM, "[h]opefully your team is seeing steady improvement soon." This, too, was false.

31.     Finally, on March 29, 2017, Pallone acknowledged in writing that SS&C had not "fully met" the "condition of a clean monthly process," the objective contractual measure set for SS&C's completion of implementation by the Master Agreement. To this day, implementation is not complete, and SS&C has admitted it has not satisfied that material obligation under the Master

Agreement. By all accounts, SS&C is unable to cure its inability to implement the CAMRA Software, despite numerous opportunities (and millions of dollars in payments by ACM) to do so.

32. ACM has paid SS&C more than $1.78 million under the Master Agreement, all of which was lost due to SS&C's failure to implement the CAMRA Software. ACM also has incurred other losses, including but not limited to at least about $500,000, based on 4,000 hours of employee time wasted on trying to assist SS&C's struggling teams with the implementation of the CAMRA Software, including significant time spent in countless meetings and hundreds of telephone calls, and damages flowing from ACM's inability to use the unimplemented CAMRA Software.

## COUNT I - BREACH OF CONTRACT

33. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

34. The Master Agreement constitutes a valid and binding contract between ACM and SS&C, under which SS&C was obligated to license the CAMRA Software to ACM, implement it, and provide hosting, maintenance, and support services, among others, to ACM.

35. ACM performed its obligations under the Master Agreement, including but not limited to payment of more than $1.78 million to SS&C.

36. SS&C breached material terms of the Master Agreement by, among other things, failing to implement the CAMRA Software for ACM and failing to cure its inability to do so, rendering all of SS&C's goods and services worthless.

37. SS&C's breach of the Master Agreement has directly and proximately caused and continues to cause ACM damages.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2 million, together with pre- and post-judgment interest.

## COUNT II - VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. §§ 42-110A, *ET SEQ.*)

38. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

39. This is a consumer fraud action by ACM against SS&C under Connecticut General Statutes § 42-110b.

40. SS&C engaged in unfair and deceptive trade practices by, among other things:

- Making false and misleading statements in the act of marketing the CAMRA Software to ACM that the software was a viable turnkey solution for ACM and that SS&C had the expertise and capability to implement it;

- Making false and misleading statements after the inception of the Master Agreement that SS&C could and would implement the CAMRA Software;

- Causing significant and continued delay with implementation; and

- Continuously misleading ACM into believing that SS&C could cure its deficiencies with the implementation of the CAMRA Software.

41. ACM has suffered damages as a result of SS&C's unfair and deceptive trade practices.

42. A causal nexus exists between SS&C's unfair and deceptive trade practices and the damages ACM has sustained.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.

## COUNT III – BREACH OF EXPRESS WARRANTY

43. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

44. During the sales process, in the Master Agreement, and while SS&C tried and failed to implement the CAMRA Software, SS&C specifically represented and warranted that ACM could use the CAMRA Software following implementation, which SS&C repeatedly re-affirmed would take only a few months.

45. SS&C specifically represented and warranted that the CAMRA Software was capable of complete integration and implementation with ACM's systems and that the software would perform in substantial accordance with SS&C's representations.

46. Despite SS&C's express warranties and representations that the CAMRA Software would function, the CAMRA Software never was implemented nor functioned, damaging ACM.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2 million, together with pre- and post-judgment interest.

## COUNT IV - UNJUST ENRICHMENT

47. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

48. SS&C has benefitted from ACM's payments to it totaling in excess of $1.78 million under the terms of the Master Agreement.

49. In return, SS&C did not provide anything of value to ACM because SS&C failed to implement the CAMRA Software.

50. ACM has been damaged by SS&C's retention of its payments totaling in excess of $1.78 million and by SS&C's failure to implement the CAMRA Software.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2 million, together with pre- and post-judgment interest.

### COUNT V – CONVERSION

51. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

52. ACM made timely payments totaling more than $1.78 million to SS&C under the Master Agreement, but ACM did not receive anything in exchange.

53. SS&C kept ACM's payments in spite of its failure to implement the CAMRA Software, which rendered all of the goods and services SS&C provided to ACM worthless.

54. ACM has been damaged by SS&C's actions.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2 million, together with pre- and post-judgment interest.

### COUNT VI – RESCISSION

55. The allegations in paragraphs 1 through 32 are incorporated by reference as though fully set forth herein.

56. In the alternative, ACM elects to rescind the Master Agreement as a result of SS&C's false representations about its ability to perform under the terms of the agreement, which misrepresentations have rendered the agreement wholly without value and resulted in a total failure of consideration to support ACM's purchase of the CAMRA Software license and related services.

WHEREFORE, as an alternative remedy to a judgment for money damages as requested in Counts I-III, ACM demands rescission of the Master Agreement and restitution of all amounts it paid to SS&C thereunder, plus interest at the statutory rate.

**JURY TRIAL DEMANDED**

ACM requests a trial by jury for all issues so triable.

Dated: May 15, 2017              Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ Christopher M. Cerrito*
   Christopher M. Cerrito (ct17183)
   chris.cerrito@hklaw.com
   One Stamford Plaza
   263 Tressler Boulevard, Suite 1400
   Stamford, CT 06901
   Telephone: (203) 905-4500

and

By: */s/ Joseph Mamounas*
   Joseph Mamounas (Florida Bar No. 41517)
   *Pro Hac Vice* application forthcoming
   joseph.mamounas@hklaw.com
   Allison Kernisky (Florida Bar No. 41160)
   *Pro Hac Vice* application forthcoming
   allison.kernisky@hklaw.com
   701 Brickell Avenue
   Suite 3300
   Miami, FL 33131
   Telephone: (305) 374-8500
   Facsimile: (305) 789-7799

   *Attorneys for ARMOUR Capital Management LP*