**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | July 13, 2017 |
| SS&C TECHNOLOGIES INC. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff, ARMOUR Capital Management LP ("ACM"), sues Defendant, SS&C Technologies Inc. ("SS&C"), and states:

## INTRODUCTION

ACM is a registered investment advisor focusing on mortgage-related securities. In 2014, ACM sought a comprehensive, turnkey solution for portfolio accounting, a sophisticated package of software and services that would assist ACM with managing its clients' portfolios.

SS&C marketed its "CAMRA" software as such an "end-to-end solution." Beginning in May 2014, ACM and SS&C had at least seven months of meetings and telephone calls about that solution. ACM explained to SS&C that fundamental to the solution was SS&C's "implementation" of CAMRA for ACM. In response, SS&C serially and emphatically represented to ACM that it had the qualifications and capabilities to implement CAMRA successfully; the "hosting" option for CAMRA was appropriate, and could be implemented, for ACM; and SS&C was capable of implementing CAMRA within four to six months of ACM's and SS&C's contract execution.

All of these representations were false, which SS&C knew or, alternatively, at least should have known. But the misrepresentations also were material to ACM's decision, in December 2014, to contract with SS&C to implement, supply, and service CAMRA.

SS&C had problems implementing CAMRA almost immediately.  SS&C first delayed implementation by three months and then failed to meet that revised deadline—and many later deadlines it set for itself.  All the while, SS&C repeatedly gave ACM false assurances that implementation was just around the corner.  SS&C made these false assurances to induce ACM to not terminate the contract, not make a warranty claim, release to SS&C substantial payments to which SS&C was not entitled, and authorize SS&C to perform additional work for significant fees.

The parties agreed that implementation is complete when CAMRA is able to process one month of transactions for ACM.  Over *two years* later, there is no dispute this never occurred.  In May 2017, enough was enough:  ACM terminated the parties' contract and, later, filed this lawsuit, but not before being induced by SS&C to pay SS&C more than $1.78 million in fees and incurring more than $500,000 in other losses.  These are the damages ACM seeks in this case.

## PARTIES, JURISDICTION AND VENUE

1.      This is a civil action for breach of contract, violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), intentional and negligent misrepresentation, and rescission.

2.      ACM is a limited partnership organized under the laws of Delaware with 11 partners:  (1) Remmiz LLC (General Partner); (2) Stacumny LLC (General Partner); (3) Jeffrey J. Zimmer (Limited Partner); (4) Scott J. Ulm (Limited Partner); (5) Buford H. Ortale (Limited Partner); (6) Susan E. Zimmer (Limited Partner); (7) Alexander R.A. Ulm (Limited Partner); (8) Carolyn M. Zimmer Irrevocable Trust ("CMZ Trust") (Limited Partner); (9) Isabella L. Zimmer Irrevocable Trust ("ILZ Trust") (Limited Partner); (10) Emanon Investments 1 LLC (Limited Partner); and (11) DM Bell Blank Check Family LP (Limited Partner).

3.      Jeffrey J. Zimmer, Scott J. Ulm, Susan E. Zimmer, and Alexander R.A. Ulm are citizens of Florida, and Buford H. Ortale is a citizen of Tennessee.

4.      Remmiz LLC is a Florida limited liability company; its sole member, Jeffrey Zimmer, is a citizen of Florida.  Remmiz LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

5.      Stacumny LLC is a Florida limited liability company; its sole member, Scott Ulm, is a citizen of Florida.  Stacumny LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

6.      CMZ Trust is a Florida trust; its co-trustees are Jeffrey J. Zimmer and Susan E. Zimmer, both citizens of Florida.  CMZ Trust therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

7.      ILZ Trust is a Florida trust; its co-trustees are Jeffrey J. Zimmer and Susan E. Zimmer, both citizens of Florida.  ILZ Trust therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

8.      Emanon Investments 1 LLC is a Nevada limited liability company; its members are Marc Bell, a citizen of Florida, and Emanon LLLP, a limited liability limited partnership organized under the laws of Nevada.  Emanon LLLP's only partners are (1) limited partner the Bell 2014 Family Trust, a Nevada trust whose trustee is Ruti K. Bell, a citizen of Florida, and (2) general partner Emanon LLC, a Nevada limited liability company whose members are (i) Marc Bell, a citizen of Florida, and (ii) the Marc H. Bell 2014 Family Irrevocable Trust, a Florida trust whose trustee is Ruti K. Bell, a citizen of Florida.  Emanon Investments 1 LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

9.      DM Bell Blank Check Family LP is a limited partnership organized under the laws of Wyoming; its partners are general partners (1) DS Blank Check LLC, a limited liability company organized under the laws of Delaware whose sole member is Daniel C. Staton, a citizen of

Florida, (2) MS Blank Check LLC, a limited liability company organized under the laws of Delaware whose sole member is Maria V. Staton, a citizen of Florida; and limited partners (3) Daniel C. Staton, (4) Maria V. Staton, (5) Arianna E.B. Staton, (6) George E.B. Staton III, (7) John C. B. Staton, and (8) Daniela V.B. Staton, all citizens of Florida.  DM Bell Blank Check Family LP therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

10.     SS&C is a corporation organized and existing under the laws of Delaware, with its principal office in Connecticut.

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interest, and costs.

12.     This Court has personal jurisdiction over SS&C because its principal office is located in this District and it conducts business in this District.

13.     Venue is proper under 28 U.S.C. § 1391(b) because SS&C is a resident of this District and a substantial part of the events giving rise to ACM's claims occurred in this District.

## GENERAL ALLEGATIONS

### *SS&C's Pre-Contractual Misrepresentations about CAMRA*

14.     SS&C is a provider of financial services software and software-enabled services. SS&C claims it "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operations."  SS&C markets CAMRA as a "flexible software application that streamlines, automates, and simplifies the investment process by providing immediate access to decision-making data."

4

15.     In 2014, ACM sought to upgrade its portfolio accounting to a full-service invest-ment accounting platform that would provide a turnkey solution, including the necessary software licenses and implementation.  To that end, Jim Mountain, ACM's Chief Financial Officer, and Mark Gruber, its Chief Operating Officer and Head of Portfolio Management, researched possible providers of such a solution, contacted them, and explained ACM's needs.

16.     SS&C was one such possible provider.  In June 2014, Mountain and Gruber met with SS&C representatives, including Timothy Reilly, Dennis Moore, Jeffrey Fectau, and Josh Brown, for SS&C to introduce ACM to CAMRA and to learn about ACM's business, processes, and its staff's capabilities.  At that meeting, these SS&C representatives made a presentation to ACM extolling SS&C's "accounting and reporting expertise," describing CAMRA as a "proven accounting engine," and proclaiming that a "large portion" of SS&C's client base had significant exposure to mortgage-backed securities, including real-estate investment trusts ("REITS") familiar to ACM.  The presentation ended with the following slide, reiterating SS&C's purported expertise:

## Why SS&C


- ■ Unique ability to leverage knowledge and expertise across organization
  - — Development, licensed clients, outsourcing, professional services

- ■ Highly skilled consulting
  - — Process improvements / automation
  - — Ability to provide tailored / customized solutions

- ■ Relevant Mortgage REIT expertise and public company reporting

- ■ Dedicated REIT Services team supporting technical accounting, regulatory and tax needs

- ■ Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs



9

17.     Mountain and Gruber had several follow-up calls and meetings with Fectau and Moore over summer 2014, during which SS&C emphatically and repeatedly represented to ACM that SS&C's CAMRA was a sophisticated, highly customizable product that could provide ACM the "end-to-end solution" it desired.  SS&C's implementation of CAMRA was a fundamental component of that solution because as ACM told SS&C, ACM itself could not implement CAMRA.

18.     SS&C was aware of the importance of its—and not ACM's—implementation of CAMRA to ACM's decision to engage SS&C.  As such, throughout the sales process, SS&C represented that its personnel had the expertise to ensure the successful and timely implementation of CAMRA and that ACM would not have to engage any third-party consultants for this purpose. For example, in marketing materials SS&C provided to ACM, SS&C touted its "unique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting."  SS&C further represented that its staff had "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage backed securities and structured products."  Indeed, SS&C shared with ACM an April 2014 press release announcing its formation of a REIT servicing group, in which Reilly described SS&C as "the only integrated Mortgage REIT end-to-end solution" and Brown proclaimed that SS&C would "help mortgage REITS be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets."  This expertise, particularly with mortgage-backed securities, was one of the major selling points for ACM—to not only license software from SS&C, but also to receive the benefit of SS&C's expert services, including and especially implementation, which was critical given the sophisticated, highly customizable nature of CAMRA.

19.     In addition to SS&C's representations that it was fully capable of implementing CAMRA for ACM, SS&C also offered ACM different options regarding the type of implementation it would receive.  These options were: (1) an "in-house license," under which ACM would host CAMRA in its own data center and operate CAMRA alone; (2) "hosting," under which SS&C would host CAMRA but, following implementation, ACM would operate CAMRA; and (3) "full-service outsourcing," under which SS&C would both host and operate CAMRA for ACM.

20.     ACM advised SS&C it was not interested in an "in-house license" or "full-service outsourcing," leaving "hosting" as the only implementation option that ACM was willing to purchase from SS&C.  This meant that if SS&C were unable to implement the hosting option at ACM, there would be no deal between ACM and SS&C.  This incentivized SS&C to sell hosting to ACM and represent to ACM that hosting was appropriate, and could be implemented, for ACM.

21.     SS&C did so.  For example, in July 2014, SS&C sought to use sample ACM test-trade data to compare CAMRA's output with the output generated by ACM's existing processes.  SS&C then provided ACM with a written "proof of concept," which SS&C represented as evidence that CAMRA could achieve the same output as ACM's existing processes, the technical specifications of which SS&C had evaluated by then.  On August 27, 2014, Fectau and Moore, knowing that ACM was not interested in full-service outsourcing, demonstrated CAMRA for ACM using hosting and again represented to ACM that hosting was appropriate for ACM.  Fectau and Moore also represented to ACM that SS&C had the expertise to implement CAMRA for ACM and cited SS&C's own experience using CAMRA for other customers that invest in mortgage-related securities as support.  At a meeting at ACM's offices in September 2014, SS&C provided ACM with additional written "proofs of concept" to show that hosting for CAMRA was appropriate for ACM.

22.    Importantly, SS&C also represented that it was capable of implementing CAMRA for ACM quickly and efficiently.  In SS&C's "Implementation Budget" and "Proposed Migration Timeline," which it provided to ACM on December 10 and 11, 2014, SS&C represented that it could complete implementation within four to six months of contract execution.  To underscore this point, SS&C claimed that it could implement CAMRA between January and May 2015.

23.    All of these representations—regarding SS&C's capabilities and qualifications, the appropriateness of hosting CAMRA for ACM, and the time in which SS&C was capable of implementing CAMRA—were material to and induced ACM's decision to hire SS&C over the other service providers ACM vetted.  And ACM had every reason to believe SS&C's representations; after all, SS&C emphatically and repeatedly held itself out to ACM as having superior knowledge and expertise about CAMRA, including its implementation and use for other customers like ACM.

24.    All of these representations were false, which SS&C knew or, alternatively, at least should have known:  SS&C did not have the capabilities and qualifications to successfully implement CAMRA for ACM; hosting CAMRA was not appropriate, and could not be implemented, for ACM; and SS&C could not implement within two years of contract execution, much less the four to six months that SS&C had represented to ACM.

### *The Master Agreement and Related Sub-Agreements*

25.    Based upon SS&C's misrepresentations, ACM was induced to enter into a multi-million-dollar contract with SS&C to license CAMRA and related software and for SS&C to implement, maintain, and support the software.

26.     Effective December 30, 2014, ACM entered into a Master Agreement for Software, Maintenance and Support, Professional Services and Other Services, which incorporates each attachment and Work Request thereto (collectively, the "Master Agreement").  (*See* Ex. A, attached.) But for SS&C's misrepresentations, ACM never would have entered into the Master Agreement.

27.     Implementation was central to the Master Agreement.  Indeed, the goods and services SS&C sold to ACM under the Master Agreement were worthless to ACM without SS&C's implementation of CAMRA.  And in dollar terms, SS&C's failed implementation of CAMRA accounted by far for the largest portion of the total fees SS&C induced ACM to pay.

28.     The first attachment to the Master Agreement is the License and Maintenance Program Agreement ("Maintenance Program"), which provides that ACM would perpetually license from SS&C the following software: CAMRA for Microsoft SQL Server, including CI Manager, Impairments Manager, Report Express, Extend, and TBA Dollar Roll, and Debt & Derivatives, including Swaps (collectively, "CAMRA").  SS&C also agreed to provide maintenance, including

> telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades.

(*Id.* § 3.1.)

29.     In exchange, ACM agreed to pay SS&C (a) $500,000 to license CAMRA and (b) a $100,000 annual maintenance fee, subject to increase.  (*See id.* Attach. A.1.)

30.     The Maintenance Program ran from December 30, 2014, through December 31, 2015, and automatically renewed for one-year terms starting on January 1, 2016.  (*See id.* § 3.5.)

31.     In December 2014, ACM paid the $500,000 license fee and the initial $100,000 maintenance fee, plus tax.  Subsequently, ACM paid $200,000 plus tax for the 2016 and 2017 maintenance fees.  Including tax, ACM has paid $322,568 in maintenance fees to SS&C.

32.     The Maintenance Program contains a limited, 364-day warranty that CAMRA would perform in substantial accordance with SS&C's representations.  (*See id.* Attach. A.1.)

33.     The Master Agreement also attaches a Hosting, Process Automation, and Data Management Services Agreement ("Hosting Agreement"), under which SS&C agreed to provide and maintain a hosted software environment—the hosting option for implementation that SS&C repeatedly represented to ACM in 2014 as appropriate, and capable of successful implementation, for ACM—for a $10,000 monthly hosting fee, subject to increase.  (*See id.* Attach. B.1.)

34.     To date, ACM has paid SS&C $260,000 in hosting fees.

35.     The parties entered into three Work Requests under the Master Agreement.  Work Request One was contemporaneous to the Master Agreement and sets forth the terms of the initial setup of CAMRA, testing, and support; provides that implementation will require four to six months; and authorizes 1,850 hours of SS&C support at the rate of $225 per hour for on-site and remote implementation services, including business workflow analysis, environment setup, data conversion analysis, interface development, and testing.  (*Id.* § 3.1, 15-16.)

36.     Work Request Two, attached at Exhibit B and effective as of March 31, 2016, further defines SS&C's obligations with respect to implementation and caps the fees set forth in Work Request One at $728,725.  (*See* Ex. B at 1.)  Implementation is considered complete when ACM is able to successfully process one complete month of transactions using CAMRA.  (*Id.*)  This never happened.  Thus, by the Master Agreement's express terms, SS&C breached a material term of the agreement and is liable for ACM's damages.

37.     Work Request Three, attached at Exhibit C and effective as of April 20, 2016, provides for onsite and remote implementation services relating to the accounting for what SS&C

referenced as "PGAAP," the purchase method of accounting under Generally Accepted Accounting Principles, and authorizes 120 hours of support at $225 per hour.  (*See* Ex. C at 1.)

38.    To date, ACM has paid $695,370 to SS&C under the Work Requests.[1]

### *Despite its Representations, SS&C Fails to Implement CAMRA for ACM*

39.    Almost from inception, SS&C had difficulty implementing CAMRA.

40.    Beginning in January 2015, ACM and SS&C held weekly status meetings regarding implementation.  Adriana Johnson was an SS&C project manager who led most of the weekly meetings, which she followed with status emails.  In an initial email, Johnson repeated what SS&C had represented to ACM in December 2014:  SS&C could successfully implement CAMRA for ACM in four to six months.  In February 2015, however, Johnson informed ACM at a weekly meeting that SS&C had delayed the implementation completion date to early August 2015.  SS&C thereafter continually delayed this date, including from mid-August 2015, to late August 2015, to October 2015, and beyond, until SS&C stopped providing revised deadlines altogether.

41.    SS&C employees, including Johnson, Scott Rice, Andrew Voutinas, David Russell, Jason Holmes, Fathima Mahamoon, and Donald Johnson, gave seemingly endless excuses for SS&C's failure to implement CAMRA.  For instance, in fall 2015, Russell informed ACM that SS&C could not configure data from ACM's custodian, BNY Mellon, even though before signing the Master Agreement, SS&C falsely represented to ACM that it was able to integrate BNY Mellon's data into CAMRA.  Russell also told ACM that the CAMRA implementation again was delayed because of ACM's accounting methodology, about which SS&C also knew prior to entering into the Master Agreement.  ACM changed its accounting method upon SS&C's insistence,

---

[1] ACM terminated the Master Agreement on May 1, 2017, and thus does not owe SS&C any additional amounts under the Master Agreement, including any hosting fees or monies that would be due upon SS&C's completion of implementation (which, again, never occurred).

but SS&C's failures continued.  Finally, CAMRA was unable to reliably replicate basic data; as just one example, CAMRA incorrectly calculated "business days" as "calendar days."  These excuses alone demonstrate the falsity of SS&C's representations regarding its qualifications and capabilities to implement CAMRA for ACM before entering into the Master Agreement.

42.     Despite its ongoing failure to implement CAMRA, SS&C routinely and repeatedly provided ACM assurances that SS&C would succeed in doing so, as described below.  These representations were false, which SS&C knew or, alternatively, at least should have known.  SS&C made such misrepresentations with the present intention not to deliver on its obligations under the Master Agreement, because, among other things, SS&C made such representations to induce ACM not to terminate the Master Agreement, not make a warranty claim under the Master Agreement, which warranty expired without ACM making a claim due to SS&C's misrepresentations, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees, and also because of SS&C's pre-contract misrepresentations regarding its capabilities and qualifications, the appropriateness of hosting CAMRA for ACM, and the time in which SS&C could implement CAMRA.

43.     In its March 31, 2015 "Implementation Roadmap," SS&C stated to ACM:

Through a series of in-person and WebEx meetings during the week of February 17, 2015, as well as the [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications.

Such assurances that SS&C would implement CAMRA for ACM were false, which SS&C knew or, alternatively, at least should have known.  In the Implementation Roadmap, SS&C further represented that it had "insight and knowledge" regarding CAMRA because it "is the single biggest user of its own software and services" and detailed the backgrounds and experience of its staff, including Johnson, who SS&C claimed had experience "working closely with internal and external

partners to ensure projects are completed on time, on budget and meeting client's expectations." These representations underscored SS&C's repeated representations that it would implement CAMRA for ACM, which was false.

44.     In fall 2015, ACM began to withhold payment due to SS&C's failure to implement CAMRA.  In response, SS&C's Reilly, Daniel Pallone, and Tony Gonzalez stated that SS&C had the superior qualifications and capability necessary to implement CAMRA.  SS&C did so to induce ACM to believe that implementation was nearly complete and thus release to SS&C substantial payments to which SS&C was not entitled.

45.     ACM repeatedly notified SS&C of its failure to implement CAMRA in writing throughout 2015, 2016, and 2017 and provided SS&C countless opportunities to cure that failure. As one example, on or around October 2, 2015, SS&C's Johnson proposed to effect a "re-initialization as of 8/31/15."  A "re-initialization" was a do-over of the entire attempt at implementation and SS&C's requests misrepresented that by "re-initializing," SS&C would achieve implementation of CAMRA for ACM.  Based on SS&C's repeated misrepresentations, ACM was induced to agree to—and pay for—multiple re-initializations, at SS&C's request, but none resulted in successful implementation.  Two months following Johnson's statement, little progress was made, but SS&C's false assurances induced ACM to not terminate the Master Agreement.

46.     SS&C's false representations also convinced ACM not to make a claim under the Master Agreement's 364-day limited warranty.  Given that the Master Agreement became effective on December 30, 2014, the limited warranty expired on December 29, 2015.

47.     Less than two weeks before this expiration date, on December 18, 2015, Mountain expressed to Reilly ACM's "grave concerns" concerning implementation, which still was not complete and thus provided ACM grounds to make a warranty claim under the Master Agreement.

Three days later, Reilly acknowledged that implementation had been difficult but assured Mountain that SS&C was committed to making it work, the problems with CAMRA were fixable, and implementation was close to being completed successfully.  Based on these false assurances, ACM did not make a claim under the warranty, which subsequently expired.

48.     In April 2016, ACM revisited the warranty issue in negotiating Work Request 3, which arose in response to SS&C's demands for payment in spite of its continued failure to implement CAMRA.  As part of the negotiations, Mountain asked Reilly to consider extending the warranty, to which Reilly replied that SS&C would not do so because ACM had "recourse on functionality under the maintenance agreement" and that ACM's maintenance agreement "addresses defects, corrections, improvements, enhancements, fixes, patches and upgrades."  Two days later, Mountain wrote to remind Reilly (and Gonzalez) that Reilly had told ACM that "the maintenance agreement also included the right to terminate the license and receive a refund of the license fee if [SS&C] never get[s] the software installed and working satisfactorily."  Based on these misrepresentations, which SS&C knew or, alternatively, at least should have known, were false, SS&C induced ACM not to terminate the Master Agreement and agree to Work Request 3.

49.     More than once, SS&C deployed new "expert" personnel to falsely assure ACM that implementation would be complete and address SS&C's protracted failure to do so.  For example, on September 22, 2016, Pallone wrote to Mountain and Gruber:  "I understand the daily processing and month end August closing is not going smoothly.  I can offer a senior experienced staff accountant Fathima Mahamoon . . . to be on the ground next week to assist your team.  She is very experienced in the day to day processing of CAMRA in her daily support of a west coast based mREIT."  Such false assurances induced ACM not to terminate the Master Agreement.

50.     For more than two years, ACM diverted key employees from their regular work responsibilities to assist SS&C's struggling implementation teams, all while SS&C told ACM that it would complete the implementation.  For instance, on October 11, 2016, Pallone wrote to ACM that although he was "disappointed" that SS&C had not achieved implementation, he demanded that ACM make a $200,000 "progress payment" to SS&C because "SS&C [was] committed to satisfying the criteria" for completion.  Based on statements like this, which SS&C knew or, alternatively, at least should have known, were false, ACM granted SS&C other payments and time to finish implementation.  SS&C regularly asked for payment in spite of its complete failure to implement CAMRA—including on March 28, 2016, April 6, 2016, and March 28, 2017, among other instances—and ACM made multiple "good faith" payments to SS&C based on its representations that it could implement CAMRA.  ACM would have terminated the Master Agreement much sooner were it not for SS&C's repeated false assurances.

51.     With more than two years and millions of dollars wasted on SS&C, ACM, in early 2017, sought to elevate SS&C's deficiencies to the highest levels of its organization and make a last attempt to obtain the benefit of ACM's bargain by meeting with SS&C's President and Chief Operating Officer, Normand Boulanger.  The meeting did not take place, but Reilly assured ACM that Boulanger was aware of SS&C's implementation failures.  On February 6, 2017, Reilly wrote to ACM, "[h]opefully your team is seeing steady improvement soon."  This, too, was false.

52.     Finally, on March 29, 2017, Pallone acknowledged in writing that SS&C had not "fully met" the "condition of a clean monthly process," the objective contractual measure set for SS&C's completion of implementation by the Master Agreement.  To this day, implementation is not complete, and SS&C has admitted it has not satisfied that material obligation under the Master

Agreement.  By all accounts, SS&C is unable to cure its inability to implement CAMRA, despite numerous opportunities (and millions of dollars in payments by ACM) to do so.

53.     ACM has paid SS&C more than $1.78 million under the Master Agreement, all of which was lost due to SS&C's repeated false assurances prior to and after signing the contract, as detailed above, and SS&C's failure to implement CAMRA.  ACM also has incurred other losses, including but not limited to at least about $500,000, based on 4,000 hours of employee time wasted on trying to assist SS&C's struggling teams with the implementation of CAMRA, including significant time spent in countless meetings and hundreds of telephone calls, and damages flowing from ACM's inability to use the unimplemented CAMRA.

54.     ACM terminated the Master Agreement on May 1, 2017.  But for SS&C's serial misrepresentations, including its false assurances that SS&C would succeed in implementing CAMRA, ACM would have terminated the Master Agreement far earlier (or at least have made a warranty claim under the Master Agreement while that warranty was still effective, not released to SS&C substantial payments to which it was not entitled, or authorized SS&C to perform additional work), saving it all, or at least a large portion of, the more than $2.28 million in damages SS&C has caused ACM.  Because of SS&C's conduct, however, ACM was induced not to do so.

## COUNT I - BREACH OF CONTRACT

55.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

56.     The Master Agreement constitutes a valid and binding contract between ACM and SS&C, under which SS&C was obligated to license CAMRA to ACM, implement it, and provide hosting, maintenance, and support services, among others, to ACM.

57.    ACM performed its obligations under the Master Agreement, including but not limited to payment of more than $1.78 million to SS&C.

58.    SS&C serially breached material terms of the Master Agreement by, among other things, failing to implement CAMRA for ACM and failing to cure its inability to do so, rendering all of SS&C's goods and services worthless.

59.    ACM has suffered, and continues to suffer, significant damages as a result of SS&C's serial material breaches of the Master Agreement.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest.

## COUNT II - VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. §§ 42-110A, *ET SEQ.*)

60.    The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

61.    This is a consumer fraud action by ACM against SS&C under Connecticut General Statutes § 42-110b.

62.    SS&C engaged in unfair and deceptive trade practices by making false and misleading representations to ACM, which SS&C knew or, alternatively, at least should have known to be false.  These statements include but not are not limited to the following, as fully detailed above:  (a) prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution, and (b) after the execution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the

Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

63.     SS&C's misrepresentations also are immoral, unethical, and unscrupulous within the meaning of CUTPA and SS&C's conduct offends public policy.  This is because SS&C's misrepresentations made (a) prior to the execution of the Master Agreement were made solely to induce ACM to enter into the Master Agreement and (b) after the execution of the Master Agreement were made solely to induce ACM not to terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

64.     As a result of SS&C's false and misleading representations and its immoral, unethical, and unscrupulous conduct, which offends public policy, ACM paid over $1.78 million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly incurred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

65.     ACM has suffered, and continues to suffer, significant damages as a result of SS&C's unfair and deceptive trade practices.

66.     A causal nexus exists between SS&C's unfair and deceptive trade practices and the damages ACM has sustained.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.

## COUNT III – INTENTIONAL MISREPRESENTATION

67.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

68.     SS&C made false and misleading representations to ACM, which SS&C knew to be false.  These statements include but not are not limited to the following, as fully detailed above: (a) prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution, and (b) after the execution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

69.     ACM reasonably relied on SS&C's false and misleading representations made (a) prior to the execution of the Master Agreement, when ACM was induced by SS&C to enter into the Master Agreement and (b) after the execution of the Master Agreement, when ACM was induced by SS&C to not terminate the Master Agreement, not make a warranty claim under the

Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

70.     As a result of SS&C's false and misleading representations, ACM paid over $1.78 million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly incurred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

71.     ACM has suffered, and continues to suffer, significant damages as a result of SS&C's false and misleading representations.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.

## COUNT IV – NEGLIGENT MISREPRESENTATION

72.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

73.     SS&C made false and misleading representations to ACM, which SS&C should have known to be false.  These statements include but are not are not limited to the following, as fully detailed above:  prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution.

74.     SS&C failed to exercise reasonable care or competence in obtaining or communicating the information in the false and misleading representations SS&C made to ACM.  SS&C

had the means of knowing, ought to have known, and/or had the duty to know the truth of its false

and misleading representations to ACM, but SS&C failed to communicate the truth to ACM.

75.    ACM reasonably relied on SS&C's false and misleading representations made prior

to the execution of the Master Agreement when ACM was induced by SS&C to enter into the

Master Agreement.

76.    As a result of SS&C's false and misleading representations, ACM paid over $1.78

million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly in-

curred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

77.    ACM has suffered, and continues to suffer, significant damages as a result of

SS&C's false and misleading representations.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be de-

termined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, puni-

tive damages, and attorney's fees and costs.

## COUNT V – RESCISSION

78.    The allegations in paragraphs 1 through 54 are incorporated by reference as though

fully set forth herein.

79.    In the alternative, ACM elects to rescind the Master Agreement as a result of

SS&C's false and misleading representations to ACM, which SS&C knew to be false or, alterna-

tively, at least should have known to be false, and thus made intentionally or at least negligently.

These statements include but not are not limited to the following, as fully detailed above:  (a) prior

to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i)

SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting

option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could

implement CAMRA within four to six months of contract execution, and (b) after the execution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

80.     These misrepresentations have rendered the Master Agreement wholly without value and resulted in a total failure of consideration to support the Master Agreement.

81.     ACM sent a letter to SS&C on May 1, 2017, in which it offered to return SS&C to the *status quo ante*, in exchange for SS&C's agreement to do the same with respect to ACM, including the return of its $1.78 million.  SS&C did not accept ACM's offer.  As a result, ACM has complied with any conditions precedent to the rescission of the Master Agreement.

WHEREFORE, as an alternative remedy to a judgment for money damages as requested in Counts I-IV, ACM demands rescission of the Master Agreement and restitution of all amounts it paid to SS&C thereunder, plus interest at the statutory rate.

## <u>JURY TRIAL DEMANDED</u>

ACM requests a trial by jury for all issues so triable.

Dated: July 13, 2017                     Respectfully submitted,

                                         **HOLLAND & KNIGHT LLP**

                              By: */s/ Christopher M. Cerrito*
                                  Christopher M. Cerrito (ct17183)
                                  chris.cerrito@hklaw.com
                                  One Stamford Plaza
                                  263 Tressler Boulevard, Suite 1400
                                  Stamford, CT 06901
                                  Telephone: (203) 905-4500

                       and
                              By: */s/ Joseph Mamounas*
                                  Joseph Mamounas (phv09010)
                                  joseph.mamounas@hklaw.com
                                  Allison Kernisky (phv09011)
                                  allison.kernisky@hklaw.com
                                  701 Brickell Avenue, Suite 3300
                                  Miami, FL 33131
                                  Telephone: (305) 374-8500
                                  Facsimile: (305) 789-7799

                                  *Attorneys for ARMOUR Capital Management LP*

                          **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 13, 2017, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by mail or email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                              By: */s/ Joseph Mamounas*
                                  Joseph Mamounas (phv09010)