IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | ) | Civil Case No. 3:17cv00790 (JAM) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SS&C TECHNOLOGIES, INC., | ) | |
| Defendant. | ) | August 16, 2017 |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Defendant SS&C Technologies, Inc. ("SS&C"), by and through undersigned

counsel, respectfully submits this memorandum of law in support of its Motion to

Dismiss First Amended Complaint and Demand for Jury Trial pursuant to Fed. R. Civ. P.

12(b)(6).

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case involves a dispute between two sophisticated businesses regarding the

implementation of asset-accounting software and related services.  SS&C provides

financial services software and software-enabled services.  AC, ¶14.  Plaintiff Armour

Capital Management LP ("ACM") is a registered investment advisor that focuses on

complex, "mortgage-related securities," particularly mortgage-backed securities.  *E.g.*,

*id.*, p.1 (Introduction), and ¶ 18.

In 2014, ACM sought to upgrade its accounting portfolio ledger to a full-service

investment accounting platform, including any necessary software licenses and

implementation.  *Id.*, ¶ 15.  In connection with that effort, ACM's's Chief Financial Officer

("CFO") and its Chief Operating Officer ("COO") researched and "vetted" possible

providers of such a platform.  *Id.*, ¶¶ 15, 23.  Based on those independent efforts, ACM

contacted SS&C in May of 2014 to discuss SS&C's asset-accounting solutions.  *Id.*, ¶¶ 15 – 16.

The parties executed a written "Master Agreement" and related "Work Request" on December 19, 2014.  *Id.*, ¶ 26 and Ex. A.[1]  Under the Master Agreement, ACM purchased a license for SS&C's CAMRA software; 1,850 hours of implementation services and training **"in support of [ACM's] implementation of the Software"**; and related maintenance and support.  *Id.*, Ex. A.  The Master Agreement, which includes all related Work Requests, *id.*, Ex. A § 1.5, has a merger clause in which the parties disclaim all extrinsic representations and agreements, *id.*, § 6.7.4, and requires the parties to set forth any amendments in a written agreement signed by both parties, *id.*, § 6.7.5.  The parties also stipulated in the Master Agreement that neither of them could bring any action "arising out of any breach or claimed breach of th[e] Master Agreement or transactions contemplated by th[e] Master Agreement … more than one (1) year after the cause of action has accrued."  *Id.*, § 6.7.16 (the "Contractual Limitations Period").  Under the Contractual Limitations Period, "a cause of action will be deemed to have accrued when a party knew or reasonably known of the breach or claimed breach."  *Id.*

ACM alleges in Count I of the Amended Complaint that SS&C breached the Master Agreement "by failing to implement CAMRA for ACM and failing to cure its inability to do so[.]"  *Id.*, ¶ 58.  In disregard of the plain language of the Master Agreement, ACM claims that SS&C committed to unilaterally implement its CAMRA software within ACM's information technology system.  *Id.*  ACM also alleges that SS&C

---

[1]  A copy of the Master Agreement and related attachments and Work Orders are attached to the Amended Complaint as Ex. A – C.  Exhibit A contains the Master Agreement and Work Order One. Exhibits B and C contain Work Orders Two and Three, respectively.

agreed in the Master Agreement to implement CAMRA for ACM within four to six months of the December 30, 2014 "Effective Date" of that agreement.  *Id.*, ¶ 35.

In an effort to create a claim – and avoid the plain language of its freely-negotiated Master Agreement – Plaintiff also tacks four additional counts onto its Amended Complaint that sound in fraud or misrepresentation.  In Count II, Plaintiff claims that it is the victim of "consumer fraud" in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes § 42-110b.  *Id.*, ¶ 61. Count III, a claim for intentional misrepresentation, tracks *verbatim* the core allegations of the CUTPA fraud claim.  In both Counts II and III, ACM – *after having sought out SS&C based on ACM's independent research and vetting* – asserts that SS&C intentionally misrepresented that it "had the qualifications and capabilities to implement CAMRA for ACM[.]"  *Id.*, ¶¶ 62, 68.  Plaintiff also alleges that SS&C falsely represented that the software solution ACM chose was "appropriate, and could be implemented, for ACM"; that SS&C could implement CAMRA within four to six months of contract execution; and, after the parties executed the Master Agreement, "that SS&C would implement CAMRA for ACM."  *Id.*, ¶¶ 62, 68.  And with dramatic excess, Plaintiff alleges that all of these representations about future performance were allegedly made by SS&C with "present intent not to deliver on its obligations under the Master Agreement[.]"  *Id.*, ¶¶ 62, 68.

In Counts IV and V, ACM asserts a claim for negligent misrepresentation and requests the relief of rescission, respectively.  ACM alleges in Count IV that, prior to execution of the Master Agreement, SS&C made essentially the same representations

alleged in Counts II and III.  *See id.*, ¶ 73.  With respect to SS&C's alleged state of mind, however, Plaintiff alleges that SS&C made the representations without exercising "reasonable care or competence."  *Id.*, ¶ 74.  And in Count V, ACM requests that the Court rescind the Master Agreement because the same allegedly false and misleading representations were made "intentionally or at least negligently."  *Id.*, ¶ 79.  ACM also alleges in Count V – as in Counts II and III – that SS&C's representations about future performance were made with "present intent not to deliver on its obligations under the Master Agreement[.]"  *Id.*, ¶¶ 62, 68, 79.

As demonstrated below, all five counts of the Amended Complaint should be dismissed with prejudice:

- *First,* **all five counts of the Amended Complaint are barred by the one-year, Contractual Limitations Period;**

- *Second*, **Plaintiff fails to plead its claims that sound in fraud or misrepresentation (Counts II – V) with particularity;**

- *Third,* **Plaintiff's CUTPA count fails to state a claim for the additional reason that, aside from conclusory assertions, it alleges mere breach of contract;**

- *Fourth*, **the "economic loss doctrine" precludes Plaintiff from recovering damages based on its misrepresentation claims in Count III and IV; and**

- *Fifth*, **ACM's alternative request in Count V for the remedy of rescission should be dismissed for the additional reason that SS&C cannot restored to its pre-contractual position.**

## PROCEDURAL HISTORY

Plaintiff commenced this action on May 15, 2017.  Dkt. No. 1.  The original complaint contained six counts:  (i) breach of contract; (ii) violation of CUTPA; (iii)

breach of express warranty; (iv) unjust enrichment; (v) conversion, and (vi) rescission. *Id.*

SS&C filed a motion to dismiss on June 22, 2017, seeking dismissal of all but one of Plaintiff's claims.  Dkt. No. 22.  Plaintiff opted not to oppose SS&C's motion to dismiss and amended its complaint on July 13, 2017.  Dkt. No. 35 (the "Amended Complaint," or "AC").

The Amended Complaint abandons Plaintiff's prior claims for breach of express warranty, unjust enrichment, and conversion, and adds claims for intentional and negligent misrepresentation.  Plaintiff also added allegations of fraud, which were not present in the initial complaint, and admissions as to when ACM knew of SS&C's breach.

Through the instant motion, SS&C seeks dismissal of all counts of the Amended Complaint.

## PLAINTIFF'S ALLEGATIONS

### *The Parties*

Headquartered in Windsor, Connecticut, Defendant SS&C provides financial services software and software-enabled services.  AC, ¶¶ 10, 14.

Plaintiff Armour Capital Management LP ("ACM") is a Florida-based, registered investment advisor that focuses on mortgage-related securities, including – of particular focus – mortgage-backed securities.  AC, p. 1 and ¶¶ 2, 4 – 5, 18.

***Plaintiff Initiates Contact With SS&C/***
***Pre-Contractual Communications in Summer 2014***

As discussed above, in 2014 – after independently researching and "vett[ing]" vendors who could provide ACM with a full-service investment accounting platform – Plaintiff contacted SS&C in or about May 2014 to discuss SS&C's CAMRA software solution. *Id.*, ¶¶ 15 – 16, 23; *see also id.* at p. 1 (Introduction).

In June 2014, four representatives of SS&C met with Plaintiff's CFO and COO "to introduce ACM to CAMRA and to learn about ACM's business, processes, and its staff capabilities." *Id.,* ¶ 16. At the meeting, the SS&C representatives made a presentation referring to SS&C's "accounting and reporting expertise," described CAMRA as a "proven accounting engine," and stated words to the effect that "'a large portion' of SS&C's client base had significant exposure to mortgage-backed securities, including real-estate investment trusts ('REITS') familiar to ACM." *Id.* According to the Amended Complaint, the sales presentation ended with a slide entitled "Why SS&C," which contained the bullet points such as the following:

- "Unique ability to leverage knowledge and expertise across organization"

- "Highly skilled consulting";

- "Relevant Mortgage REIT expertise and public company reporting";

- "Dedicated REIT Services team supporting technical accounting, regulatory and tax needs"; and

- "Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs[.]"

*Id.*

6

Plaintiff's CFO and COO had "several follow up calls" with two of the SS&C representatives "over summer [sic] 2014[.]"   *Id.*, ¶ 17.   In those calls on unspecified dates, SS&C allegedly made statements to the effect that "SS&C's CAMRA was a sophisticated, highly customizable product that could provide ACM the 'end-to-end' solution it desired."   *Id.*   According to Plaintiff, "SS&C's implementation of CAMRA was a fundamental component of that solution because as ACM told SS&C, ACM itself could not implement CAMRA."   *Id.*   The Amended Complaint does not explain through whom, or when specifically, ACM told SS&C that ACM could not implement CAMRA.

Plaintiff further alleges that "throughout the sales process, SS&C represented that its personnel had the expertise to ensure the successful and timely implementation of CAMRA …."   *Id.*, ¶ 18.   The "examples" of such representations offered in the Amended Complaint include the following:

- In unspecified "marketing materials" SS&C provided to ACM at some point in the sales process, SS&C "touted" its "unique expertise, world-class technology, and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting[;]"

- SS&C represented at some point in the sales process that its staff had "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage backed securities and structured products[;]" and

- SS&C shared with ACM an April 2014 press release announcing SS&C formation of a REIT servicing group, in which an SS&C executive described SS&C as "the only integrated Mortgage REIT end-to-end solution[.]"

- In the same April 2014 press release, SS&C stated that it could "help mortgage REITs be better equipped to produce more fully auditable accounting and reporting processes and eliminate the use of spreadsheets."   *Id.*

The parties also discussed three different options regarding – as Plaintiff characterizes it – "the type of implementation [ACM] would receive."   *Id.*, ¶ 19.   The

7

Amended Complaint states that the options presented were (1) an "in-house license," under which ACM "would host CAMRA on its own data center and operate CAMRA alone;" (2) "hosting," which involved SS&C hosting CAMRA but, "following implementation, ACM would operate CAMRA; and (3) "full-service outsourcing," under which "SS&C would both host and operate CAMRA for ACM."  *Id.*  Plaintiff indicated that it was only interested in the second option – "hosting."  *Id.*, ¶ 20.  According to Plaintiff, this choice "incentivized SS&C to sell hosting to ACM and represent to ACM that hosting was appropriate and could be implemented for ACM."  *Id.*  In other words, SS&C – a for-profit corporation – had a profit motive related to the potential sale of its products and services, as do virtually all businesses.

On August 27, 2014, SS&C sales representatives Jeff Fecteau and Dennis Moore provided a demonstration of CAMRA for ACM.  *Id.*, ¶ 21.  Plaintiff alleges that Messrs. Fecteau and Moore stated in the meeting that the hosting option was "appropriate" for ACM and that SS&C had the "expertise" to implement CAMRA.  *Id.* With respect to the latter point, the SS&C sales representatives allegedly "cited SS&C's own experience using CAMRA for other customers that invest in mortgage-related securities as support."  *Id.*[2]

Plaintiff further alleges that SS&C provided "proof of concept" documents to ACM.  *Id.*  According to the Amended Complaint, these documents were used to show that, given the technical specifications ACM had provided SS&C, "hosting" for CAMRA

---

[2]  As discussed above, according to Plaintiff, SS&C's use of CAMRA to serve other clients would fall under the "full-service outsourcing" option that Plaintiff had already allegedly rejected by August 27, 2014. The Amended Complaint does not explain why the parties would have been discussing full-service outsourcing at the August 27, 2014, meeting if, as Plaintiff alleges, ACM had already ruled out that option.

was "appropriate" for ACM.  *Id.*  The last "proofs of concept" were provided to ACM in September 2014.  *Id.*

The Amended Complaint does not contain any allegations rooted in particular dates in the time period from October through early December 2014.  Plaintiff alleges that on December 10 and 11, 2014, SS&C provided ACM with an "Implementation Budget" and "Proposed Migration Timeline," in which SS&C allegedly represented that it could complete implementation within four to six months of contract execution.  *Id.*, ¶ 22.

According to Plaintiff, "[a]ll of these representations – regarding SS&C's capabilities and qualifications, the appropriateness of hosting CAMRA for ACM, and the time in which SS&C was capable of implementing CAMRA – were material to and induced ACM's decision to hire SS&C over other service providers ACM vetted."  *Id.*, ¶ 23.  Plaintiff further alleges that SS&C "knew or, alternatively, at least should have known," (1) that it did not have the "capabilities and qualifications to successfully implement CAMRA for ACM;" (2) that "hosting CAMRA was not appropriate, and could not be implemented for ACM;" and (3) that SS&C could not implement within two years of contract execution, much less the four to six months that SS&C had represented to ACM."  *Id.*

### ACM Contracts with SS&C
### for CAMRA Software and Certain Services

On December 19, 2014, the parties executed a written agreement entitled "Master Agreement," which expressly includes all attachments and Work Requests appended thereto (collectively, the "Master Agreement").  *Id.*, ¶ 26 and Ex. A (signature

9

page).[3]  Under the Master Agreement, SS&C agreed to provide a limited license of

CAMRA to ACM, and provide software maintenance and support consistent with the

terms of the contract.  *Id.*, Ex. A §§ 2 – 5.  ACM committed in the Master Agreement to

pay an up-front licensing fee of $500,000.  *Id.*, ¶ 29; Ex. A, Attachment A.1. § C.  The

parties further agreed that ACM would pay SS&C for an initial $100,000 Maintenance

Program Fee, which would automatically renew annually, *id.*, Ex. A, Attachment A.1. §

II.A, and a monthly hosting fee of $10,000, *id.,* Ex. A, Attachment B.1, § C.

The Master Agreement also includes certain Work Requests.  Work Request

One, included at the time of contract signing, details the assistance SS&C would

provide on **Plaintiff's implementation** of the CAMRA software, and authorized **1,850**

**hours** of SS&C assistance at a rate of $225 per hour.  *Id.*, Ex. A, p. 15.  Work Request

Two, effective March 31, 2016, added certain additional implementation assistance

SS&C would provide and capped the fees for implementation services at $728,725.  *Id.*,

Ex. B.  And Work Request Three, effective April 20, 2016, involves the purchase by

ACM of 120 additional hours of on-site and remote implementation services for the

"application" of a product called "PGAAP … due to the Javelin acquisition by Armour."

*Id.*, Ex. C.

Although the Amended Complaint asserts that SS&C was solely responsible for

implementing CAMRA for ACM, *see e.g., id.*, p. 1 (Introduction), the Master Agreement

---

[3]  ACM has attached the Master Agreement and two subsequent work requests as Exhibits A - C to its
Amended Complaint.  For purposes of the instant Motion to Dismiss to Dismiss, the allegations of the
Amended Complaint include those documents attached thereto as exhibits.  *See Chambers v. Time
Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002).

and incorporated Work Requests expressly provide otherwise.[4]  In Work Request One,

which governs "Initial Implementation Services," the parties agreed as follows:

> Description of Services to be Performed:  SS&C will provide on-site and remote implementation services including business workflow analysis, environmental setup, data conversion analysis, interface development and testing **in support of *Client's implementation* of the Software**.

*Id.*, Ex. A (Work Request One) (emphasis added, original underline).  Consistent with

the unequivocal language providing that ACM would be ultimately responsible for

implementation, Work Request One further states that SS&C will provide, among other

services, "Implementation training" for ACM.  *Id.*  If, as Plaintiff suggests, SS&C were

solely responsible for the implementation of CAMRA, there would be no need for ACM

to purchase "Implementation training" in the Work Request.  Work Request One also

contains a series of stated "Assumptions," which include a "[p]roject duration of 4-6

months[,]" as well as at least **five different implementation-related activities that**

**were the primary or exclusive responsibility of ACM**, not SS&C.  *Id.*  For example,

Work Request One states that

- "The Client will create and support the required SS&C file formats to load the static data, security masters, security attributes, cash flows, yield curves, floating rates, initial conversion positions, ongoing transactions, custodian and market data to the Software;" and

- "Client will be responsible for completion, review and signoff of monthly reconciliations.  SS&C will be available to assist."

*Id.*

---

[4] The Second Circuit has noted that courts "are not obliged to accept the allegations of the complaint as to how to construe" a contract.  *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) (affirming dismissal of breach of contract claim for failure to state a claim).

Similarly, Work Request Two states that "[i]mplementation will be considered complete when **Client personnel** have successfully processed one month of transactions using CAMRA."  (Emphasis added).  Consistent with the understanding that ACM bore ultimate responsibility for implementation, the parties further agreed that "**Client, including any requisite vendors, will have knowledgeable staff to participate in the project as required**."  *Id.* (Work Request One – Assumptions).

The Master Agreement contains several other provisions that are also material to the instant motion.  *First*, the parties agreed that the Master Agreement, and the attachments and addenda thereto, "contain[] the entire agreement of the parties with respect hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect to the subject matter thereto."  *Id.*, ¶ 6.7.4.  *Second*, the parties stipulated that the Master Agreement could "be amended only by written agreement signed by both parties."  *Id.*, ¶ 6.7.5.  *Third*, in the event of material breach, either party could terminate upon 30 days written notice if the breach was curable, and immediately if the breach was not curable.  *Id.*, Ex. A ¶ 6.4.2.  *Fourth*, the parties agreed to a one-year limitation period for making any claim "arising out of any breach or claimed breach" of the Master Agreement or any transactions contemplated therein (the "Contractual Limitations Period").  *Id.*, Ex. A ¶ 6.7.16.

Specifically, the Contractual Limitations Period provision in the Master Agreement states the following:

> **No action *arising out of* any breach or claimed breach of this Master Agreement or transactions contemplated by this Master Agreement**

**may be brought by either party more than one (1) year after the cause of action has accrued.**  For purposes of this Master Agreement, a cause of action will be deemed to have **accrued when a party knew or reasonably should have known of the breach or claimed breach**. (Emphasis added.)

### *Plaintiff's Allegations of Breach of the Master Agreement*

Plaintiff admits that beginning in January 2015, SS&C regularly held weekly status meetings with ACM about implementation of CAMRA.  *Id.*, ¶ 40.  The Amended Complaint identifies by name no fewer than 11 SS&C employees who communicated with ACM about the implementation effort, and does not suggest in any way that SS&C did not work diligently on the engagement in all material respects from the effective date of the Master Agreement, December 30, 2014, until Plaintiff purported to terminate the Master Agreement on May 1, 2017.  *See id.*, ¶¶ 40 -52.  Plaintiff also does not contest that SS&C, as articulated in the Master Agreement and related Work Orders, in fact provided at least 1,850 hours of implementation services as agreed by the parties, including, among other efforts, implementation training to assist ACM in ACM's efforts to implement CAMRA.  *See id.*, generally.

Plaintiff alleges, nevertheless, that SS&C breached the Master Agreement because SS&C did not implement CAMRA within ACM's information technology system within six months of the Master Agreement's effective date, or thereafter, notwithstanding the plain language of the Master Agreement to the contrary.  *Id.*, ¶ 58. According to the Amended Complaint, in February 2015, SS&C "delayed the implementation completion date to early August 2015."  *Id.*, ¶ 40.  Thereafter, SS&C

allegedly ran into various problems with the implementation that were allegedly entirely the fault of SS&C.  *Id.*, ¶ 41.

In the fall of 2015, "ACM began to **withhold payments** [owed under the Master Agreement] due to SS&C's failure to implement CAMRA."  *Id.*, ¶ 44 (emphasis added).  Plaintiff further alleges that it "notified SS&C of [SS&C's] failure to implement CAMRA in writing throughout 2015, 2016, and 2017 and provided SS&C countless opportunities to cure that failure."  *Id.*, ¶ 45.  In other words, Plaintiff contended that SS&C breached the contract by failing to implement CAMRA for ACM during or before the fall of 2015 – more than 18 months before Plaintiff filed this action.  According to Plaintiff, SS&C never cured its alleged breach of the Master Agreement in response to any of ACM's withholding of payment or written notifications of breach in 2015.  *Id.*

Plaintiff does not allege that before, upon, or after SS&C's alleged breach of the Master Agreement in the fall of 2015, the parties ever amended the Master Agreement to extend, or toll, the one-year Contractual Limitations Period.  *See id.,* generally.  The parties chose, at all relevant times, to leave that express, freely-negotiated, limitation period in place.

### *Alleged Post-Execution "Misrepresentations"/ Termination*

Plaintiff complains that after the parties executed the Master Agreement, SS&C, "[d]espite its ongoing failure to implement CAMRA, SS&C routinely and repeatedly provided ACM assurances that [SS&C] would succeed in doing so."  *Id., ¶* 42.  As an "example" to support that allegation, Plaintiff asserts that in a March 31, 2015

"Implementation Roadmap" – three months after the effective date of the Master

Agreement – SS&C stated to ACM that

> [t]hrough a series of in person and WebEx meetings during the week of February 17, 2015, as well as [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications.

*Id.*, ¶ 43.

Plaintiff further alleges that in the same Implementation Roadmap, SS&C

represented had "insight and knowledge" regarding CAMRA because SS&C "is the

single biggest user of its own its own software and services," and that an SS&C project

manager assigned to the engagement had experience "working closely with internal and

external partners to ensure projects are completed on time, on budget and meeting

client's expectations." *Id.* According to Plaintiff, these statements somehow amounted

to representations that "SS&C would implement CAMRA for ACM," and "were false,

which SS&C knew or, alternatively, at least should have known." *Id.*

In the fall of 2015, after ACM's intentional withholding of payments discussed

above, two SS&C representatives allegedly stated in an apparently unwritten

communication words to the effect that SS&C had the "superior qualifications" and

"capabilities" necessary to implement CAMRA. *Id.*, ¶ 44. And in December 2015 – with

Plaintiff fully aware that a limited, one-year warranty on the satisfactory performance of

CAMRA (the "Limited Warranty") was due to expire at the end of that month – an SS&C

executive allegedly stated in an unwritten communication that SS&C was "committed to

making [CAMRA] work," the "problems with CAMRA were fixable," and "implementation

was close to being completed successfully." *Id.*, ¶ 47. Although the Limited Warranty

provided for a notice and cure period, and failing cure, a full refund of the $500,000

License Fee, *see id.*, Ex. A (Attachment A.1.I.E), Plaintiff did not provide notice or

otherwise invoke, reserve, or obtain tolling of any rights under the Limited Warranty, and

knowingly allowed it to expire.  *See id.*, ¶ 47.  Indeed, four months after it knowingly

allowed the Limited Warranty to expire, ACM purchased 120 hours of additional

implementation services in Work Request Three, which does not in any way modify the

parties' other rights and obligations under the Master Agreement.  *Id.*, Ex. C.

Plaintiff also alleges that SS&C assigned "expert" personnel to the engagement

to the ACM project for the supposed purpose of "falsely assur[ing] ACM that

implementation would be complete and address SS&C's protracted failure to do so."

*Id.*, ¶ 49.  As an example of this allegedly "fraudulent" tactic by SS&C, Plaintiff cites a

September 22, 2016 email from an SS&C executive to ACM's CFO and COO stating

the following:

> I understand the daily processing and month end August closing is not
> going smoothly.  I can offer a senior experienced staff accountant Fathima
> Mahamoon … to be on the ground next week **to assist your team**.  She
> is very experienced in the day to day processing of CAMRA in her daily
> support of a west coast based mREIT.

*Id.* (emphasis added).  SS&C clearly offered in the communication **to assist ACM's**

**employees** with processing that they, not SS&C, were supposed to perform.  Indeed,

as discussed above, Work Request One expressly contemplates that "**Client will be**

**responsibl**e for completion, review and signoff of monthly reconciliations.  **SS&C will**

**be available to assist**."  *Id.*, Ex. A (emphasis added).

16

Plaintiff also alleges that on October 11, 2016, an SS&C representative "wrote to ACM that although he was 'disappointed' that SS&C had not achieved implementation, he demanded that ACM make a $200,000 'progress payment' to SS&C because 'SS&C [was] committed to satisfying the criteria' for completion." *Id.,* ¶ 50. According to Plaintiff, "*[b]ased on statements like this*, which SS&C knew or, alternatively, at least should have known, were false, ACM granted SS&C other payments and time to finish implementation." *Id.* (emphasis added). Plaintiff does not allege who or when SS&C made those other statements.

On May 1, 2017, ACM purported to terminate the Master Agreement. *Id.,* ¶ 38.

## **ARGUMENT**

"To survive a motion to dismiss for failure to state a claim, a complaint must contain factual allegations that, if accepted as true, state a plausible claim for relief." *Weldon v. MTAG Services, LLC*, No. 3:16-cv-783(JCH), 2017 WL 776648, *3 (D. Conn. February 28, 2017). In ruling on a Rule 12(b)(6) motion, a court may consider only the allegations made in the complaint, documents attached to the complaint, documents incorporated into the complaint by reference, and any facts of which judicial notice may be taken. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir. 1996).[5]

---

[5]  Section 6.7.9 of the Master Agreement specifies that all aspects of the Contract shall be construed under the laws of Connecticut.  This Memorandum of Law will, therefore, apply Connecticut law.

17

# I. ACM'S CLAIMS ARE ALL BARRED OR OTHERWISE RELEASED BY THE CONTRACTUAL LIMITATIONS PERIOD

According to Plaintiff, SS&C breached the Master Agreement by "failing to implement CAMRA for ACM and failing to cure its inability to do so …."  AC, ¶ 58. Section 6.7.16 of the Master Agreement bars or otherwise releases any "action *arising out of* any breach or claimed breach of th[e] Master Agreement or transactions contemplated by th[e] Master Agreement" if not brought within one year of when "a party knew or reasonably should have known of the breach or claimed breach."  (Emphasis added).  Plaintiff's Amended Complaint unequivocally admits that Plaintiff knew of SS&C's alleged breach by the fall of 2015.  *Id.*, ¶ 44.  Plaintiff failed, however, to bring this action until May 15, 2017 – well after that Contractual Limitations Period had expired.

## A. Connecticut Courts Recognize and Enforce Contractual Limitations Periods.

Both the federal and state courts of Connecticut have recognized the validity of contractual limitations periods for "more than a century."  *Air Brake Sys., Inc. v. TUV Rheinland of N. Am., Inc.*, 699 F. Supp. 2d 462, 471 (D. Conn. 2010) (citing *Bocchino v. Nationwide Mut. Fire Ins. Co.,* 246 Conn. 378, 382-83 (1998); *Monteiro v. Am. Home Assur. Co.,* 177 Conn. 281, 283 (1979); *Chichester v. N.H. Fire Ins. Co.,* 74 Conn. 510 (1902)).  Such "periods of limitation that the parties create by *contract* are not susceptible to statutes and doctrines that toll the relevant period of limitation that arises by *statute.*"  *Id.* (citing *Monteiro,* 177 Conn. at 283 ("This condition is a part of the contract so that it controls the rights of the parties under the contract and, hence, such rights must be governed by the rules of law applicable to contracts.")).

18

**B. The Contractual Limitations Provision Bars Plaintiff's Breach of Contract and Rescission Counts.**

The facts admitted by Plaintiff in the Amended Complaint bar Plaintiff's breach of contract claim under the Contractual Limitations Period.  The Contractual Limitations Provision specifies that claims must be brought promptly – no later than one year after the claim "has accrued."  *Id.*, § 6.7.16.  As discussed above, a claim accrues for purposes of the Master Agreement's Contractual Limitations Period as soon as a party knows, or reasonably should know, of the "breach or claimed breach."  AC, Ex. A § 6.7.16.

According to Plaintiff, SS&C breached the Master Agreement by "failing to implement CAMRA for ACM and failing to cure its inability to do so …."  AC, ¶ 58.  Plaintiff admits that it knew of this claimed breach in the fall of 2015.  *Id.*, ¶ 44.  Indeed, on that basis, Plaintiff "began to withhold payments" owed under the Master Agreement.  *Id.*  By withholding payment, ACM was treating SS&C as if it were in breach of the Master Agreement.  Thus, it is clear that, by that time, ACM "knew or reasonably should have known of the breach or claimed breach."  AC, Ex. A § 6.7.16.  Under the plain language of the Contractual Limitations Period, Plaintiff's breach of contract claim accrued in the fall of 2015 and had to be asserted within a year thereafter.  Plaintiff commenced this action on May 15, 2017, Dkt. No. 1, and thereby missed the Contractual Limitations Period by more than eight months.

Further, according to the Amended Complaint, Plaintiff "repeatedly notified SS&C of its failure to implement CAMRA in writing" starting in 2015.  AC, ¶ 58.  Plaintiff also alleges that SS&C failed to cure the claimed breach in 2015, or at any time thereafter.

19

*Id.*  As early as December 18, 2015, ACM admits that it then had "grounds to make a warranty claim under the Master Agreement."  *Id.*, ¶ 47.  Thus, by ACM's own admission, the outermost limit upon which it could have brought a claim would have been December 18, 2016.

Because, however, ACM failed to bring a timely claim under the Contractual Limitations Period, ACM's breach of contract claim is barred and Count I should be dismissed.

### C.  Plaintiff's CUTPA and Misrepresentation Claims Have Been Released by the Contractual Limitations Period.

A contractual limitations period can also "release" or "discharge" liability for allegedly tortious conduct if an action is not brought within the applicable timeframe.  *Air Brake Sys., Inc.*, 699 F. Supp. 2d at 477.  The language of such a provision does not necessarily need to refer expressly to a particular type of action "for courts to give effect to an exculpatory agreement" that covers such claims.  *Id.* at 478.  Indeed, when – as in this case – the parties are "sophisticated business entities … less precise language than would normally be required" is sufficient to hold that certain claims are released by the terms of the contractual limitations provision.  *Id.*

Here, the Contractual Limitations Period uses the language "arising out of" and also covers other "contemplated" transactions.  Master Agreement, § 6.7.16.  "The term 'arising out of' … is to be given a very broad interpretation" under Connecticut law.  *Town of Manchester v. Vermont Mut. Ins. Co.*, No. CV044004859, 2006 WL 164886, at *3 (Conn. Super. Ct. Jan. 3, 2006). "[T]he use of 'arising out of' language in a contract is considered unambiguous and viewed as reasonably supporting only a broad reading."

*Nycal Corp. v. Inoco PLC*, 166 F.3d 1201, at *2 (2d Cir. 1998).  "[I]t is generally understood that for liability . . .  to be said to 'arise out of' [an offense], it is sufficient to show only that the . . .  injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' [that offense], in order to meet the requirement that there be a causal relationship between the . . . injury and [that occurrence or offense]." *Hogle v. Hogle,* 167 Conn. 572, 577 (1975).

All of the allegations that ACM claims support its CUTPA and misrepresentation claims "arise out of" the Master Agreement and alleged breaches thereof (or at the very least, obligations that were apparently "contemplated" by the Master Agreement).  Each of these claims contains the same three allegations as the negligent misrepresentation claim:   "(i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for AM, and (iii) SS&C could implement CAMRA within four to six months of contract execution." AC, ¶¶ 62, 68, 73.  These obligations are all either explicitly or necessarily implied—as alleged by Plaintiff[6]—to be a part of the Master Agreement itself.  ACM's attempts to characterize these as statements made "prior to the execution of the Master Agreement" does not alter the fact that – according to Plaintiff – all of these statements are actually contained within the agreement itself, and therefore, "arise out of" the obligations contained within the Master Agreement and are subject to the Contractual Limitations Period.

---

[6] SS&C explicitly reserves its rights to contest an allegations regarding the scope of each party's respective obligations under the Master Agreement.  However, for the purposes of this Motion to Dismiss, SS&C must confront these particular allegations as they are alleged.

The intentional misrepresentation and CUTPA counts add only conclusory statement that SS&C made promises "with the present intent not to deliver on its obligations," and the allegations that SS&C made "false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees."  AC, ¶¶ 62, 68.

As the Second Circuit has recognized, "the language 'arising out of' a specified contract is considered broadly worded, and hence, encompasses [a plaintiff's] claims of fraudulent inducement directed at the agreement itself."  *Nycal Corp.*, 166 F.3d 1201, at *2. (internal quotation marks and citations omitted).  It follows that the language "arising out of" encompasses ACM's CUTPA and misrepresentation claims, which ACM has suggested induced it to enter the Master Agreement.  AC, ¶¶ 62, 68, 73.

Moreover, all of this alleged conduct not only arises out of the contractual relationship, but it also all "accrued" more than a year prior to ACM's filing of the original complaint on May 15, 2017.  In fall of 2015, ACM had already begun to "withhold payment due to SS&C's failure to implement CAMRA."  AC, ¶ 44.  By December 18, 2015, ACM admitted it already had "grounds to make a warranty claim under the Master Agreement."  *Id.*, ¶ 47.  In April 2016, ACM was allegedly induced into not terminating the Master Agreement and agreeing to the last work request.  *Id.*, ¶ 48.  These events all occurred more a year prior to filing of the complaint on May 15, 2017, and are therefore, barred or otherwise have been released by the contractual limitations period.

22

Accordingly, Count II – CUPTA, Count III – Intentional Misrepresentation, and Count IV – Negligent Misrepresentation (and Count V – Rescission) [7] of the Amended Complaint should be dismissed.

## II.    ACM FAILS TO PLEAD ITS MISREPRESENTATION AND CUTPA COUNTS WITH SUFFICIENT PARTICULARITY

Plaintiff's CUTPA count, AC, ¶ 64, and its misrepresentation counts, *id.*, ¶¶ 68, 73, all are based on the assertion that SS&C made "false and misleading misrepresentations" to ACM.  Though these claims are all merely attempts to re-package ACM's breach of contract claim into a more menacing posture, even as characterized, these claims still all fail because they are not plead with sufficient particularity.

"Claims that sound in fraud are subject to the heightened pleading standards of Fed.R.Civ.P. 9(b), which requires that averments of fraud be stated with particularity." *Aldi v. Wells Fargo Bank, NA*, No. 3:14-CV-00089-WWE, 2015 WL 3650297, at *4 (D. Conn. Feb. 17, 2015)(citing *Cohen v. S.A.C. Trading Corp,* 711 F.3d 353, 359 (2d Cir. 2013)).  "Intentional misrepresentation sounds in fraud and is subject to the Rule 9 heightened pleading requirements."  *Catalano v. Bedford Assocs., Inc.*, 9 F. Supp. 2d 133, 136 (D. Conn. 1998).  *See Gabrielle v. Law Office of Martha Croog*, No. 3:10CV1798 WWE, 2012 WL 460264, at *4 (D. Conn. Feb. 9, 2012), *aff'd sub nom. Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 F. App'x 89 (2d Cir. 2012) ("A claim of intentional misrepresentation sounds in fraud and is subject to Federal Rule of Civil

---

[7] ACM's rescission count, Count V, is a remedy, not a substantive count.  *See infra* V.  Accordingly, the rescission count depends on the viability of the insufficient counts discussed above, it too fails.

Procedure Rule 9(b).").  Connecticut federal courts have also held that the particularity requirements of Rule 9(b) have "apply to claims for negligent misrepresentation." *Catalano*, 9 F. Supp. 2d at 136 (citation omitted); *see Master-Halco, Inc. v. Picard*, No. 3:04-CV-131RNC, 2004 WL 1897015, at *1 (D. Conn. Aug. 18, 2004).  Likewise, the particularity requirements of Rule 9(b) apply with equal force to CUTPA claims asserted in federal court that allege fraud or mistake.  *Aviamax Aviation Ltd v. Bombardier Aerospace Corp.,* No. 3:08-cv-1958 (CFD), 2010 WL 1882316, at *9 (D. Conn. 2010) (citing *Tatum v. Oberg,* 650 F. Supp. 2d 185, 195 (D. Conn. 2009); *Lentini v. Fid. Nat'l Title Ins. Co. of N.Y.,* 479 F. Supp. 2d 292, 298 n.2 (D. Conn. 2007) ("[T]o the extent that the [CUTPA claims] rely on affirmative statements or omissions involving fraud or mistake, Rule 9(b) applies.")).

"Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks and citation omitted). In order to comply with Rule 9(b), a claim must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006)(internal quotation marks omitted). "Although malice, intent, knowledge and other condition of mind of a person may be averred generally, the plaintiff must allege facts that give rise to a strong inference of fraudulent intent."  *Aviamax,* 2010 WL 1882316, at *5 (internal quotation marks omitted).

To establish the requisite "strong inference" of fraud, there must be either "facts to show that defendants had both motive and opportunity to commit fraud" or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128.

Each of these claims asserts that SS&C "ma[de] false and misleading representations" that "SS&C had the qualifications and capabilities to implement CAMRA for ACM," "the hosting option for CAMRA was appropriate, and could be implemented, for ACM," and "SS&C could implement CAMRA within four to six months of contract execution."  AC, ¶¶ 62, 68, 73.  ACM's CUTPA claim merely adds the boilerplate phrases that SS&C "engaged in unfair and deceptive trade practices," id., ¶ 62, and that SS&C's conduct was "immoral, unethical, and unscrupulous within the meaning of CUTPA and SS&C's conduct offends public policy."  *Id.*, ¶ 63.

In similar conclusory fashion, ACM alleges in its CUTPA and intentional misrepresentation counts that "after the execution of the Master Agreement," SS&C made "false assurances to induce ACM to not terminate the Master Agreement."  AC, ¶¶ 62, 68.  In an effort to try to cure the deficiencies of its allegations from its original Complaint, ACM has sprinkled in the names of various SS&C employees and tries to attribute certain comments to them, often at unspecified times.  Still, however, ACM fails to plead with sufficient particularity context to demonstrate that these statements were fraudulent, rather than merely erroneous.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Aviamax,* 2010 WL 1882316, at *9 (dismissing

plaintiff's claim for failure to meet the Rule 9(b) standard where it did not "specifically identify which [of the defendant's] employees made the claimed representations [to the plaintiff] or when and where these representations were made.").

Moreover, the Amended Complaint is bereft of allegations sufficient to plausibly establish a "strong inference" of fraud.  SS&C's stated belief that the project with ACM would be successful does not in any way suggest to fraud.  "For forward looking statements, such as projections about . . . future performance . . . , Rule 9(b) requires that a complaint allege particular facts demonstrating that the defendant knew or recklessly disregarded that the projections were false *at the time* that such projections were made."  *E. Point Sys., Inc. v. Steven Maxim, S2k, Inc.*, 133 F. Supp. 3d 430, 435 (D. Conn. 2015) (quoting *In re Colonial Ltd. P'ship Litig.*, 854 F.Supp. 64, 97 (D.Conn.1994) (emphasis in original)).

Simply put, "[t]o establish fraudulent intent through motive and opportunity, one cannot rely on motives possessed by virtually all corporate entities and insiders, such as the motive to maintain an appearance of profitability and success."  *E. Point Sys., Inc.*, 133 F. Supp. 3d at 436.  Here, ACM's allegations that SS&C entered into an arms-length contractual relationship with ACM—one in which ACM actively sought out and "vetted" SS&C for its capabilities—and that SS&C sought to make a profit, are insufficient to establish a fraudulent motive and opportunity.  Indeed, if seeking to obtain a profit through a commercial transaction gave rise to a fraudulent motive, every transaction could arguably provide a basis to support a fraud claim.

To establish fraudulent intent through "strong circumstantial evidence of conscious misbehavior or recklessness," there must be an ample factual basis to support an allegation of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *E. Point Sys., Inc.*, 133 F. Supp. 3d at 436 (citation omitted).  An entity, like SS&C, can be confident in its ability to perform without being labeled reckless.  *See  Shields*, 25 F.3d 1124, 1129–30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").

This Court's recent decision in *East Point Systems, Inc.*, is directly on point. There, a software developer was accused of engaging in fraudulent conduct (including violation of CUTPA) because the software developer alleged "assured" an investor that the developer was capable of providing a software program that could satisfy the needs of a customer.  *E. Point Sys., Inc.*, 133 F. Supp. 3d at 438.  The developer was ultimately not successful in producing software that satisfied the customer's needs.  *Id.* This Court recognized that the mere fact that the developer was confident in its capabilities to produce a product, but was ultimately unable to do so, could not give rise to a fraud-based CUTPA claim.  *Id.* at 438-39.

Indeed, as this Court cited appropriately, "[t]he breach of an honest promise to perform can never support an action of fraud."  *Sallies v. Johnson*, 85 Conn. 77 (1911). "Management's optimism that is shown only after the fact to have been unwarranted

27

does not, by itself, give rise to an inference of fraud." *E. Point Sys., Inc.*, 133 F. Supp. 3d at 439 (citation omitted). Likewise, and most appropriately to ACM's allegations, "[a] representation that one is capable of doing something is not false simply because the speaker later fails to execute." *Id.* To hold otherwise, this Court affirmed, would be to impermissibly allow a plaintiff "to proceed on the prohibited theory of "fraud by hindsight." *Id.* (citation omitted).

Here, ACM similarly tries to cobble together an impermissible theory of "fraud by hindsight."  It tries to bootstrap on the fact that implementation of CAMRA did not come to fruition to advance a narrative of deceit, which is wholly unsupported by the allegations of the Amended Complaint.  The lack of successful implementation—while unfortunate and unexpected—does not provide any basis to support a strong inference of fraud.  In fact, there are myriad reasons, including ACM's own deficiencies and inabilities, which may have contributed to the lack of successful implementation.

Accordingly, Count II – CUPTA, Count III – Intentional Misrepresentation, and Count IV – Negligent Misrepresentation of the Amended Complaint should be dismissed

## III.   ACM'S CUTPA COUNT IS MERELY ONE FOR BREACH OF CONTRACT AND FAILS TO STATE CLAIM UPON WHICH RELIEF CAN BE GRANTED

Plaintiff's CUTPA claim in Count II should be dismissed because ACM fails to offer factual allegations that, if accepted as true, would establish that SS&C acted in the immoral, unethical, oppressive or unscrupulous manner necessary to elevate a contract claim to a violation of the statute.

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  In determining whether conduct violates CUTPA, "the following criteria are to be employed: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businessmen]."  *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 345 (Conn.1987) (internal quotations omitted).  "To violate CUTPA, an unfair business practice can either strongly satisfy one of these criteria or satisfy all of the criteria to a lesser degree."  *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.,* 531 F.Supp.2d 226, 232 (D. Conn. 2007).

As demonstrated above, Plaintiff fails to plead fraudulent conduct with particularity.  Indeed, the Amended Complaint contains no particularized allegations supporting a claim of immoral, unethical, oppressive or unscrupulous conduct.  Similarly, the Amended Complaint contains only a conclusory, boilerplate allegation[8] that SS&C entered the Master Agreement "with the present intent not to deliver on its obligations under the Master Agreement."  AC, ¶ 62.  This bald assertion is not only nonsensical but also belied by the allegations of the Amended Complaint.  Quite to the contrary of ACM's suggestion, the facts, even as acknowledged by ACM, reflect

continuous effort and commitment of resources by SS&C to assist ACM with implementation.   The Complaint fails as a matter of law, therefore, to state a claim under CUTPA.

It is well established that a "simple breach of contract" does not offend traditional notions of fairness and does not constitute a violation of CUTPA.  *See Omni Corp. v. Sonitrol Corp.,* 476 F. Supp. 2d 125, 129 (D. Conn. 2007) (dismissing a CUTPA claim where the plaintiff's allegations, if true, amounted to merely a breach of contract, and not "immoral, unethical, or unscrupulous behavior.").  *See also Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1039 (2d Cir. 1995) ("simple contract breach is not sufficient to establish a violation of CUTPA")(citing *Chaspek Mfg. Corp. v. Tandet,* No. CV9309-2714, 1995 WL 447948, *12 (Conn. Super. Ct. June 16, 1995) (quoting *Aussenhandel v. Grant AirMass Corp.,* 2 Conn.L.Rptr. 590, 1990 WL 283750 (Conn. Super. Ct.1990)); *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,* 41 Conn. Supp. 575, 580 (1991) ("**A simple breach of contract, <u>even if intentional, does not amount to a violation</u> of the Act; a [claimant] must show <u>substantial aggravating circumstances</u> attending the breach to recover under the Act**. . . .") (emphasis and underline added).

In order to state a claim under CUTPA involving an alleged breach of contract, a plaintiff must allege *with particularity* the required, "substantial aggravating circumstances."  *See Birbarie v. C & H Shoreline, LLC,* No. NNHCV146045884S, 2014 WL 5394593, at *11 (Conn. Super. Ct. Sept. 22, 2014)("the plaintiff has not pleaded, with particularity, the required elements under . . . a CUTPA claim [.]").  *See also Ferrari*

*v. U.S. Equities Corp.,* No. 3:13-CV-00395 JAM, 2014 WL 5144736, at *3 (D. Conn.

Oct. 14, 2014)(Meyer, J.) *aff'd*, 661 F. App'x 47 (2d Cir. 2016) ("A CUTPA claim must be

pleaded with particularity to allow evaluation of the legal theory upon which the claim

lies.")(citing *Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 962 (D. Conn. 1988)).

Of direct relevance here, "CUTPA liability should *not* be imposed ... when a

defendant merely has not delivered on a promise unless the defendant made a

representation as to a future act coupled with a present intent not to fulfill the promise."

*Webster Financial Corp. v. McDonald,* No. CV–08–4016026–S, 2009 WL 416059, *14

(Conn. Super Ct. Jan. 28, 2009) (emphasis added). As one Connecticut court reasoned

in dismissing a CUTPA claim under similar circumstances:

> **[i]f not for the requirement that the promise be coupled with a
> present intent <u>not</u> to deliver, "every simple breach of contract claim
> would constitute a CUTPA violation** since in every breach of contract
> claim the party who is accused of the breach has not performed on a prior
> representation ... made at the time of contract formation."

*Cavaiuolo v. Ahearn*, No. NNHCV1460496508, 2015 WL 4430822, * 5 (Conn. Super.

Ct. June 17, 2015) (quoting *Designs on Stone, Inc. v. Brennan Construction Co., Inc.,*

No. CV–97–059997, 1998 WL 182406 (Conn. Super. Ct. April 9, 1998) (emphasis and

underline added).

In SS&C's motion to dismiss ACM's original complaint, SS&C highlighted the

deficiencies in ACM's complaint, which rendered it unable to support a CUTPA claim.

Now, in a transparent attempt to correct such deficiencies, ACM simply adds the phrase

that SS&C made false statements that were "made with the present intent not to

deliver."  AC, ¶ 62.  The specific allegations throughout the factual recitation in the

Amended Complaint, however, acknowledge that SS&C continued at all relevant times

to work with, and provide diligent assistance to, ACM on its implementation of CAMRA.

*See supra* at pp. 9-12; AC, ¶¶ 40-43.  As this Court has noted, "it is well established that

a complaint may not survive a motion to dismiss if its general allegations are

contradicted by its specific allegations of fact."  *Gibilisco v. Wells Fargo Bank, N.A.*, No.

3:14-CV-00294 JAM, 2015 WL 2383746, at *5 (D. Conn. May 19, 2015) (Meyer, J.)

Similarly, besides a bare recitation that SS&C's conduct was "immoral, unethical,

and unscrupulous," the specific conduct alleged does not support a plausible inference

of the sort of behavior that may rise to the level of a CUTPA violation.  *See e.g., Lavy v.*

*W&M Const. Corp.,* No. X08CV010187185S, 2003 WL 21494198 (Conn. Super. Ct.

June 10, 2003)(striking CUTPA claim based on alleged false statements in solicitation

of plaintiff's business, in part because there were "no factual allegations of deceit". . . .

The only allegation is that which was represented did not occur.  That is not sufficient to

support a claim that requires some unfairness, deception, immorality, unethical behavior

or oppressive or unscrupulous conduct.").

Accordingly, Count II of the Amended Complaint should be dismissed.

## IV.   THE "ECONOMIC LOSS" DOCTRINE BARS ACM'S MISREPRESENTATION CLAIMS

"The economic loss doctrine … prohibits recovery in tort where the relationship

between the parties is contractual in nature and the only losses alleged are purely

economic."  *Doherty, Beals & Banks, P.C. v. Sound Cmty. Servs., Inc.*, No.

CV106005795, 2011 WL 2177257, at *5 (Conn. Super. Ct. May 19, 2011).  In the

seminal case of *Flagg Energy Dev. Corp. v. Gen. Motors Corp.*, 244 Conn. 126, 153

(1998),the Connecticut Supreme Court held that the economic loss doctrine barred claims for "commercial losses arising out of the defective performance of contracts." "Most [Connecticut] Superior Court cases hold that . . . the economic loss doctrine broadly . . . preclude[s] tort claims seeking economic losses emanating from any contractual transactions involving commercial or 'sophisticated' parties." *Doherty, Beals & Banks, P.C.*, 2011 WL 2177257, at *5 (citation omitted).

The Connecticut Supreme Court's decision in *Ulbrich v. Groth*, 310 Conn. 375, 404 (2013), clarified that the economic loss doctrine applies to all types of contracts and bars all "tort claims that **_arise out of_** and are dependent on the contractual relationship between the parties." (emphasis added).  Here, both parties are sophisticated commercial entities that were engaged in a complex commercial transaction.  This fact alone precludes the misrepresentation claims.  *See Doherty, Beals & Banks, P.C.*, 2011 WL 2177257, at *5.  Moreover, ACM's misrepresentation claims merely try to state that the terms of the contract themselves induced ACM.  This does not state a claim for misrepresentation.  Rather, "[w]hat the plaintiff has alleged is conduct that, if proven, would establish the breach of a contract between two corporate, sophisticated parties." *Id.; cf. Drill Masters-Eldorado Tool, Inc. v. PCC Specialty Prod., Inc.*, 49 F. Supp. 3d 188, 204 (D. Conn. 2014) ("[[T]he plaintiff] may not convert [the defendant]'s contract liability into one sounding in tort merely by 'talismanically' phrasing its counts in terms of duties, breaches of those duties, causation, and injury.").  That is, where—like here— the "factual underpinnings" of the misrepresentation counts are the same as those for a breach-of-contract claim, "a plaintiff is limited to a breach-of-contract claim." *Alstom*

33

*Power, Inc. v. Schwing Am., Inc.*, No. 3:04 CV 1311 JBA, 2006 WL 2642412, at *6 (D.

Conn. Sept. 14, 2006) (quoting *Flagg Energy Dev. Corp.*, 244 Conn. at 155).

Because of this, the economic loss doctrine bars ACM's claims for

misrepresentation, and counts III and IV should be dismissed.

## V.   PLAINTIFF'S RESCISSION COUNT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

ACM's claim for rescission should be dismissed because ACM has not

sufficiently alleged that rescission is warranted under the facts at issue.  Furthermore,

rescission is inappropriate and impossible under the circumstances.

### A. ACM Has Failed to Plead Fraud with Particularity to Warrant Rescission of the Contract.

Rescission is not warranted because—as explained *supra*—ACM has failed to

plead fraud with the requisite particularity.  "Rescission of a contract is an appropriate

remedy if there has been a material misrepresentation of *fact* upon which a party relied

and which caused her to enter the contract."  *Dorsey v. Mancuso*, 23 Conn. App. 629,

635 (1990)(citing *Kavarco v.  T.J.E., Inc.,* 2 Conn. App. 294, 298 (1984), *overruled in*

*part on other grounds*) (emphasis added).  For a material misrepresentation to render a

contract voidable under Connecticut law, however, "the misrepresenting party must

*know* that he is making a false statement."  *Pinette v. Assurance Co. of Am.*, 52 F.3d

407, 409–10 (2d Cir. 1995) (emphasis added).  "'Innocent' misrepresentations – those

made because of ignorance, mistake, or negligence are not sufficient grounds for

rescission."  *Id.* (citing *Middlesex Mut. Assurance Co. v. Walsh,* 218 Conn. 681, 691-92

(1991)).  "When Connecticut courts speak of 'innocent' misrepresentations, they

generally have in mind the situation in which the applicant does not know that the information he is providing is false."  *Id*. at 410 (citing *Lazar v. Metropolitan Life Ins. Co.,* 290 F.Supp. 179, 181 (D. Conn. 1968) (finding an applicant's misrepresentations on an application not "knowing" as a matter of law where the agent stated that the false answers were not within the scope of the question)).

As discussed *supra*, ACM has failed to plead fraud with sufficient particularity.  The allegation that ACM was not able to implement and run the software as anticipated does not support an inference that SS&C knowingly misrepresented any facts.  *See Aviamax,* 2010 WL 1882316, at *6 (allegations in the complaint that a contract was not completed within time frame anticipated did not give rise to an inference that the defendant did not intend to honor its obligations).

In the absence of sufficiently pled allegations of fraudulent misrepresentation, Plaintiff fails to state a claim for rescission, and Count V should be dismissed.

### B.  Rescission is Inappropriate and Impossible Under the Circumstances.

"The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides, and hence the general rule, which is to be reasonably applied ... is that a party who wishes to rescind a contract must place the opposite party in statu[s] quo."  *Emerald Investments, LLC v. Porter Bridge Loan Co.*, No. CIV.A. 3:05-CV-1598J, 2007 WL 1834507, at *1 (D. Conn. June 25, 2007) (citation omitted).

In circumstances here, where, at least in part, "one party transfers intangible property, such as services and proprietary information, the transferee cannot return the

35

property but only its cash value." *Aurigemma v. Arco Petroleum Prod. Co.*, 734 F. Supp. 1025, 1033 (D. Conn. 1990).  ACM's suggestion that it could effectuate a rescission by receiving back the monies it paid without giving back anything in return necessitates that its demand for rescission must fail.  It would be impossible for SS&C and the vast amounts of time, energy, and information it expended on this project to be considered restored to status quo as ACM suggests.  Indeed, at the very least, ACM would be required to compensate SS&C for all of its time, energy, and information, which would frustrate the very purpose of a rescission.

## CONCLUSION

For the foregoing reasons, Defendant SS&C Technologies, Inc. respectfully requests that the Court **GRANT** Defendant's Motion to Dismiss First Amended Complaint with prejudice, and without leave to amend.

Respectfully submitted,

THE DEFENDANT,

SS&C TECHNOLOGIES, INC.

By_____/s/ Jeffrey J. Mirman_____
Jeffrey J. Mirman (ct05433)
Alexa T. Millinger (ct29800)
HINCKLEY ALLEN & SNYDER, LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
jmirman@hinckleyallen.com
Telephone: (860) 331-2762
Facsimile: (860) 278-3802

Kevin J. O'Connor (phv09058)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
koconnor@hinckleyallen.com
Telephone: (617) 378-4394
Facsimile: (617) 345-9020

Its Attorneys

## CERTIFICATION

I hereby certify that on August 16, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be send by email to all parties by operation of the Court's electronic filing system or by mail to any counsel or self-represented party unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____/s/  Jeffrey J. Mirman_____
Jeffrey J. Mirman (ct05433)