**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | September 20, 2017 |
| | ORAL ARGUMENT REQUESTED |
| SS&C TECHNOLOGIES INC., | |
| Defendant. | |

**<ins>OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT</ins>**

Plaintiff, ARMOUR Capital Management LP ("ACM"), opposes Defendant, SS&C Technologies Inc.'s ("SS&C"), Motion to Dismiss First Amended Complaint ("MTD"), and states:

**INTRODUCTION**

This case is about a bait and switch perpetrated by SS&C—and causing ACM millions of dollars in damages.  For seven months in 2014, SS&C made a full-court sales pitch to convince ACM it had the qualifications to timely deliver an "end-to-end" portfolio-accounting software solution SS&C deemed appropriate for ACM.  Convinced, ACM hired SS&C in December 2014.  But more than two years—and nearly $2 million in fees and at least $500,000 more in losses—later, SS&C's pitch turned out to be false and its services and unimplemented software, useless.

SS&C's bait and switch has continued in this lawsuit.  While not a basis for the MTD, SS&C argues nonsensically that the duty to implement fell on ACM, even though ACM hired SS&C to do so.  Then, after ACM gave SS&C endless chances to implement its own software and millions of dollars in fees, SS&C seeks dismissal of this lawsuit because ACM purportedly waited too long to file it.  Finally, SS&C raises meritless procedural challenges to escape the serial false inducements it made first to secure ACM's business and then to keep it from slipping away.

ORAL ARGUMENT REQUESTED

The Court should not allow SS&C to leave ACM holding the proverbial bag of worthless software and services.  ACM timely filed this lawsuit within the terms of the parties' agreements and in light of SS&C's own misrepresentations, assuming that issue even can be resolved at this early stage.  And ACM adequately has alleged that SS&C misled ACM over three years, causing ACM millions of dollars in losses.  The MTD should be denied.

## ACM'S RELEVANT ALLEGATIONS OF FACT

SS&C devotes much of its MTD to a one-sided recitation of ACM's First Amended Complaint and Demand for Jury Trial (ECF No. 35) (the "Amended Complaint").  But far fewer allegations are material to the Court's disposal—and denial—of the MTD.

The Amended Complaint lays out a story of numerous wrongs committed by SS&C against ACM, which give rise to two distinct sets of causes of action:  ACM's contract claims, and its misrepresentation claims, against SS&C.  ACM will briefly address the facts supporting each.

*As to ACM's contract claims against SS&C:*

In December 2014, the parties signed the Master Agreement,[1] which sets a framework for a series of further agreements about the several components of software and related services that ACM purchased from SS&C.  (Am. Compl. Ex. A at 1-12.)  Attachment A.1 provides ACM a license for the CAMRA software, including a warranty for the software's performance, and enrolls ACM in SS&C's "Maintenance Program."  (*Id.* at 10-11.)  Attachment B.1 provides for CAMRA to be "hosted"—that is, installed and physically located—at SS&C's "Data Center," from which SS&C agreed to provide ACM certain "Data Management Services."  (*Id.* at 12-16.)

For CAMRA to be functional for ACM, it needed to be "implemented"—that is, set up at SS&C's "Data Center," made accessible by ACM's staff at ACM's offices, and configured to work

---

[1] All capitalized terms have the same meaning as ascribed to them in the Amended Complaint.

with ACM's data and for its accounting needs.  Otherwise, all of SS&C's software and services for ACM would have no value.  Implementation was so important that all three of the parties' "Work Requests"—i.e., scope of work amendments to the Master Agreement—concern implementation.  (*See id.* at 15-16; Am. Compl. Ex. B; Am. Compl. Ex. C.)

SS&C does not dispute that implementation never occurred.  (*See, e.g.*, MTD at 28.)  But previewing[2] its principal factual defense, SS&C argues repeatedly in the MTD that "ACM bore ultimate responsibility for implementation."  (*See, e.g.*, *id.* at 12.)  SS&C cites no contractual provision under which ACM undertook the duty to implement, and none exists.  Nor does SS&C's claim make sense.  If ACM could implement CAMRA, it would have had no need to hire SS&C, execute three separate Work Requests for implementation, and pay it millions of dollars.[3]

SS&C's argument also is contradicted by the terms of the Master Agreement.

In Work Request 1, SS&C agreed to "provide on-site and remote implementation services including business workflow analysis, environment setup, data conversion analysis, interface development, and testing."  (Am. Compl. Ex. A at 15.)  Work Request 1 then spelled out 17 discrete tasks SS&C agreed to perform to implement CAMRA, including "Software installation," "creating Client required interfaces," "mapping of static data," "establishment of a general ledger chart," "[c]reating an extract of open positions," "conversion of initial open positions," "mapping of source data," and "[p]roduction conversion assistance."  (*Id.*)

---

[2] SS&C represents in the MTD that it does not move to dismiss the Amended Complaint on the basis of ACM's purported (and non-existent) obligation to implement.  (*See* MTD at 21 n.6.)  In light of this representation, ACM reserves for the appropriate time its full presentation of the facts and legal grounds showing that SS&C (not ACM) was the party obligated to implement CAMRA for ACM.  In the event SS&C changes its mind when replying in support of the MTD, ACM respectfully requests leave to file a sur-reply to address this issue in full.

[3] In Connecticut, courts must interpret contracts so that they make sense.  *See TransAtlantic Lines LLC v. U.S.*, No. 06-CV-354, 2007 WL 735705, at *2 (D. Conn. Mar. 5, 2007).

SS&C tries to make much in the MTD of "five different implementation-related activities that were the primary or exclusive responsibility of ACM." (MTD at 11.) But these "activities" required ACM not to implement, but rather to provide SS&C proprietary data to import into CAMRA, access to third-party data sources, and approval for CAMRA's end product. (Am. Compl. Ex. A at 16.) As with any software package, SS&C needed input from its customer to implement CAMRA, and ACM provided it. And if there were any doubt, Work Request 1 required ACM only to "participate in the project as required," not to complete it. (*See id.*)

By April 2016, SS&C had not implemented CAMRA and also had exceeded the budget set by Work Request 1. (*See* Am. Compl. Ex. A at 15 & Ex. B at 1.) In fact, by that time, ACM had paid SS&C more than $1.2 million toward an "end-to-end" portfolio-accounting software solution that had yet to work. (*Id.*, ¶¶29-34.) At risk of losing this substantial investment if it fired SS&C, and based on SS&C's false assurances that it could implement CAMRA (as detailed below), ACM agreed to amend and restructure the Master Agreement and entered into Work Requests 2 and 3 on April 20, 2016. Both agreements contain an integration clause and provide that the Master Agreement "remain[ed] in full force and effect." (Am. Compl. Ex. B; Am. Compl. Ex. C.)

Work Request 2 recognizes that ACM had paid SS&C $421,425 for implementation and sets a "fixed fee" for the "Completion of Implementation" of $728,725. (Am. Compl. Ex. B at 1.) "Completion of Implementation" is defined as occurring when "Client personnel have successfully processed one complete month of transactions using CAMRA as implemented." (Am. Compl. Ex. B at 1.) SS&C again agreed to "provide on-site and remote implementation services," including four "addition[al]" tasks to implement CAMRA: "Daily Processing," "Month end Reconciliations," "GL Processing," and "Generating Trial Balances." (*Id.*)

Notably, Work Request 2 makes ACM's payment to SS&C of the balance of the "fixed fee"—i.e., $307,300—contingent on the "Completion of Implementation." (*Id.*) In other words, SS&C expressly agreed not to receive another dollar for implementation until CAMRA had been implemented for ACM. If, as SS&C now claims, ACM "bore ultimate responsibility for implementation," (MTD at 12), this contractual provision also makes no sense.

In March 2017, an SS&C executive admitted that SS&C bore the duty to implement. (*See, e.g.*, *id.* ¶¶50, 51 (writing, "SS&C [was] committed to satisfying the criteria" for "Completion of Implementation" and admitting SS&C had not "fully met" it).) But by May 2017, SS&C had not implemented CAMRA and clearly was incapable of ever doing so. ACM declared a material breach, terminated the Master Agreement, and filed this lawsuit. (*Id.* ¶54.)

> *As to ACM's misrepresentation claims against SS&C:*

Both before and after ACM entered into the Master Agreement, SS&C made repeated misrepresentations to induce ACM to take actions that proved to be detrimental to it.

> *Misrepresentations preceding the Master Agreement:*

SS&C does not merely sell CAMRA but claims to be an expert in its implementation and use, specifically for REITs that, like ACM, focus on mortgage-backed securities. (Am. Compl. at ¶16.) SS&C touts its REIT servicing group as "the only integrated Mortgage REIT end-to-end solution." (*Id.* ¶18.) Such a solution is exactly what ACM sought, and ACM told SS&C that it was only interested in the "hosting" option, in which, following implementation, ACM would operate CAMRA on a platform hosted by SS&C. SS&C also offered "in-house licensing," or "full-service out-sourcing," but ACM made clear it was not interested in either. (*Id.* ¶19.)

With knowledge that ACM was only interested in hosting, SS&C provided ACM with written "proofs of concept" purporting to show that CAMRA could replicate ACM's existing

processes using the "hosted" version of CAMRA, and gave a demonstration of that version of CAMRA to ACM, all the while representing to ACM that hosting was appropriate.  (*Id.* ¶21.)

Based on what SS&C represented, ACM wanted to start using CAMRA, and SS&C stated, in documents it gave to ACM entitled  "Implementation Budget" and "Implementation Timeline," that CAMRA could be implemented quickly, by no later than May 2015.  (*Id.* ¶22.)  Based on SS&C's representations as to its qualifications, the appropriateness of hosting, and the time SS&C was capable of implementing CAMRA, ACM signed the Master Agreement in December 2014.

*Misrepresentations following the Master Agreement:*

In January 2015, SS&C began trying to implement CAMRA and soon after delayed the deadline to do so from May 2015 to mid-August 2015, and several times thereafter.  (*Id.* ¶40.)

SS&C was never able to reach "Completion of Implementation."  But rather than tell ACM the truth and admit defeat, SS&C—for more than two years—repeatedly misrepresented to ACM that implementation would occur.  As just examples, these misrepresentations include SS&C's claims that it had "sufficient information . . . for a successful implementation" (March 31, 2015); "is the single biggest user of its own software and services" and thus had "insight and knowledge" to facilitate implementation (March 31, 2015); "re-initializations"—or "do-over[s]" of all of SS&C's work—would lead to implementation (October 2, 2015); the problems with CAMRA were fixable and implementation was close to completion (December 21, 2015); SS&C was deploying a revolving door of "'expert' personnel" to ensure implementation occurred (September 22, 2016); and SS&C was "committed to satisfying the criteria" to complete implementation (October 11, 2016).  All of these representations were false.  (*E.g.*, *id.* ¶¶43, 45, 47, 49-50.)

The reason for SS&C's ongoing misrepresentations now is obvious.  The Master Agreement required ACM to pay SS&C for services on a going-forward basis, (*see, e.g.*, Am.

Compl. Ex. A at 10-12, 15, Ex. C at 1), meaning that ACM's investment of significant fees (and time) into SS&C's work—and, correspondingly, SS&C's revenue from ACM, and ACM's potential loss if it fired SS&C—increased as time proceeded.  It thus is no surprise that when SS&C demanded a $200,000 "progress payment" to which it was not entitled under Work Request 2, ACM granted the request on SS&C's claim that it was "committed to satisfying the criteria" for completion.  (*Id.* ¶50.)  Had SS&C ever told ACM the truth—that it was incapable of implementing CAMRA—ACM would have terminated the Master Agreement far earlier, saving it millions of dollars wasted on SS&C's useless software and services.  (*Id.* ¶54.)

## LEGAL STANDARD

In deciding SS&C's MTD, the Court must accept all factual allegations in the Amended Complaint as true and draw all reasonable inferences in ACM's favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Dismissal is appropriate "only where [ACM] can prove no set of facts consistent with the complaint that would entitle [it] to relief."  *Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 249 (2d Cir. 2014).  The issue "is not whether a [ACM] will ultimately prevail but whether [ACM] is entitled to offer evidence to support the claims."  *Desiano v. Warner–Lambert Co.*, 326 F.3d 339, 347 (2d Cir. 2003).

## ARGUMENT

## I.   ACM'S CLAIMS ARE NOT TIME-BARRED.

SS&C asserts that all of ACM's claims should be dismissed due to a one-year limitations provision in the Master Agreement.  This is because, SS&C argues, ACM did not file this lawsuit until May 2017 but complained, withheld payments (which were made anyway), and could have made a warranty claim in late 2015.  (*See* MTD at 19-23.)  SS&C is wrong, for numerous reasons.

Limitations is an affirmative defense that the Court generally cannot consider on a motion to dismiss.  *See, e.g.*, *Healthcare Strat., Inc. v. ING Life Ins. & Annuity Co.*, No. 11-cv-282, 2012

WL 162361, at *3 (D. Conn. Jan. 18, 2012).  This is because the analysis whether a plaintiff's suit is timely is "generally riddled with questions of fact which the [d]efendants must establish in order to bar [p]laintiffs' claims."  *Bartold v. Wells Fargo Bank, N.A.,* No. 14-CV-00865, 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015).  Thus, *first*, the Court should reject SS&C's limitations argument without further review.  *See Canon U.S.A., Inc. v. Cavin's Bus. Sol., Inc.*, 208 F.3d 494, 500 (E.D.N.Y. 2016) (refusing to dismiss complaint because "factual issues remain[ed]").

The only exception to this rule is where "'the running of the [limitations period] is apparent from the face of the complaint.'"  *Healthcare Strat., Inc.*, 2012 WL 162361, at *3.  Connecticut courts have explained that "[d]efendants bear the burden of establishing the expiration of the [limitations period] as an affirmative defense."  *Bartold*, 2015 WL 7458504, at *4.

Here, SS&C cannot meet this standard.  A cause of action is complete "at the time the breach occurs, that is, when the injury has been inflicted."  *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 10-CV-01539, 2014 WL 7270160, at *11 (D. Conn. Dec. 18, 2014) (Meyer, J.).  "The true test for determining the appropriate date when . . . limitations begins to run is to establish the time when the plaintiff first successfully could have maintained an action."  *Id.*  Applied to the Master Agreement, the limitations period applicable to ACM's claims did not begin, at the earliest, until ACM "knew or reasonably should have known" of its ability to "successfully . . . maintain[] an action."[4]  (Am. Compl. Ex. A at 9.)

Here, all the dates SS&C cites for its limitations argument occur in 2015, but SS&C overlooks Work Requests 2 and 3, which were not fully executed until April 20, 2016.

---

[4] Whether ACM "knew or reasonably should have known" of its ability to "successfully" sue SS&C, as the Master Agreement and Connecticut law require, inherently is a question of fact that is inappropriate for resolution on motion to dismiss.  *See Bartold*, 2015 WL 7458504, at *4.  For this additional, *sixth* reason, the MTD should be denied.

Work Request 2 amended and restructured the Master Agreement and gave SS&C another chance at and basis to earn additional fees for reaching "Completion of Implementation," despite SS&C's failure to implement, and Work Request 3 hired SS&C for additional implementation work. (Am. Compl. Ex. B at 1; Am. Compl. Ex. C at 1.) Both of these Work Requests contain integration clauses providing that they "contain the entire agreement of the parties with respect to its subject matter"—i.e., implementation—and state that the Master Agreement "remains in full force and effect." (*Id.*) In other words, the parties reaffirmed the Master Agreement and their desire to continue working together, notwithstanding SS&C's prior failures, and SS&C did not make any reservations for any limitations period that may have begun to run.

So, as of April 20, 2016, ACM could not have known or reasonably believed that it could "successfully . . . maintain[] an action" against SS&C. *See AT Controls Ltd.*, 2014 WL 7270160, at *11. Had ACM tried, SS&C surely would have pointed to Work Requests 2 and 3 and argued that ACM was estopped from doing so, and SS&C likewise now should be estopped from asserting limitations against ACM for events occurring in 2015 based on its own representations in Work Requests 2 and 3. And in any event, ACM did not sue SS&C until after these Work Requests were executed, and so the contract that ACM claims SS&C breached—the Master Agreement, including and as amended by the Work Requests—did not even arise until April 20, 2016.

This means that, as a matter of law, the earliest date that the Master Agreement's limitations period began for purposes of this case is April 20, 2016. Even following SS&C's logic that any complaint by ACM is grounds for a lawsuit, (*see, e.g.*, MTD at 19), the next date appearing in the Amended Complaint is September 22, 2016, when SS&C made yet further false assurances about implementation. (Am. Compl. ¶49.) ACM brought suit less than a year later, on May 15, 2017. Thus, for this reason, *second*, the Amended Complaint does not "demonstrate . . . facial infirmity,"

and the MTD should be denied.  *See Healthcare Strat., Inc.*, 2012 WL 162361, at *3; *Young v. Citimortgage, Inc.*, No. 11-cv-01363, 2012 WL 4371532, at *3 (D. Conn. Sept. 24, 2012) (limitations "require[d] factual inquiry beyond the face of the complaint").

*Third*, SS&C's limitations argument also fails because SS&C misconstrues ACM's claims against it.  The breach for which ACM sues SS&C gave rise to ACM's May 1, 2017 termination of the Master Agreement, which was based on SS&C's "material" breach of that agreement "by failing to implement CAMRA for ACM and for failing to cure its inability to do so," rendering all of SS&C's "goods and services worthless."  (*See, e.g.*, Am. Compl. ¶¶54, 58.)

ACM's declaration of a material breach and termination of the Master Agreement was governed by the terms of that agreement.  The Master Agreement defines only two situations applicable here in which a party can terminate: (1) the non-breaching party provides written notice to the breaching party of its material breach and the party fails to cure within 30 days; or (2) if a breach is incapable of being cured, the non-breaching party may declare a material breach without waiting for cure.  (*See* Am. Compl. Ex. A at 6.)  Prior to May 1, 2017, ACM did not provide SS&C written notice of a material breach under the Master Agreement and threaten to terminate it, and ACM does not sue SS&C for any breach prior to that time.  (*Cf., e.g., id.* ¶¶54, 58.)

Rather, May 1, 2017, is the date of the breach for which ACM sues SS&C, because it was then that the incurability of SS&C's material breach became apparent, as required by the Master Agreement, and ACM could have "successfully . . . maintained an action" on that basis.  This conclusion is the sum total of SS&C's failed efforts to implement CAMRA—which were punctuated by SS&C's frequent misrepresentations that implementation would occur and which culminated with the admission, on March 29, 2017, by an SS&C executive that SS&C still had not "fully met" the measure for "Completion of Implementation" under Work Request 2.  (Am. Compl.

¶¶39-54, Ex. B at 1.)  ACM filed this lawsuit on May 15, 2017—two weeks after it declared SS&C to be in material breach, and less than two months after SS&C's fatal admission.

*Fourth*, SS&C cannot raise a timeliness defense because of its own inequitable conduct and deceit, i.e., its repeated false assurances to ACM that SS&C could and would implement CAMRA imminently, which caused ACM to delay termination of the Master Agreement.

In Connecticut, "[w]here a defendant has, through inequitable conduct or deceit, induced a plaintiff into missing a deadline, [the] defendant cannot raise that deadline as a defense." *Fabcon East, LLC v. Stegla Group, Inc.,* No. 10-4601, 2011 WL 2293454, at *4 (D. Conn. June 8, 2011). This is because a defendant who, because of its own bad conduct, prevents a plaintiff from bringing suit should not benefit.  *Fabcon East,* 2011 WL 2293454, at *4 (rejecting defendant's argument that complaint was untimely under contractual limitations period).

The Amended Complaint is replete with allegations that SS&C serially misrepresented to ACM that it could implement CAMRA.  SS&C did so to mask the incurability of its failure to implement—under the guise, for example, of supplying ACM with new "'expert' personnel" and effectuating "re-initialization[s]"—and induce ACM to continue paying SS&C.  At risk of walking away from the millions of dollars ACM already had paid, this misconduct convinced ACM to not terminate the Master Agreement and sue sooner.  (*See, e.g.*, Am. Compl. ¶¶34, 45, 47, 49-51, Ex. B at 1.)  Having pocketed more than $1.78 million and enjoyed more than two years of chances to implement CAMRA due to its misrepresentations, SS&C should not be rewarded by enforcing the Master Agreement's limitations provision against ACM.  *See Fabcon East*, 2011 WL 2293454, at *4.

*Fifth and finally*, SS&C argues that ACM's non-contract claims also are barred by the limitations period in the Master Agreement.  (MTD at 23.)  To the extent that limitations period even could work as a bar here (which, again, it cannot), SS&C again is wrong.

SS&C's final argument relies on the use of "arising out of" in the Master Agreement's limitations provision.  (MTD at 20-23.)  But SS&C overlooks that provision's express limitation to any "breach" of the Master Agreement or "transactions contemplated" by it (*e.g.*, the Work Requests).  (Am. Compl. Ex. A at 9.)  Thus, ACM's non-contract claims—which do not rise and fall with ACM's contract claims, as argued *infra*—are subject to the distinct, three-year statute of limitations provided by Connecticut law.  *See Conn. Educ. Ass'n, Inc. v. Milliman USA, Inc.*, No. X04CV020103472S, 2005 WL 531563, at \*6 (Conn. Super. Ct. Feb. 1, 2005); *FDIC v. Speedboat Racing Ltd.*, 200 F. Supp. 3d 312, 341 n.46 (D. Conn. 2016); *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 90 (D. Conn. 1994).  SS&C does not claim that ACM violated that limitations period.

Thus, ACM's claims are not time barred, or at a minimum, issues of fact exist such that the Court cannot make that finding in resolving the MTD.  In either case, the MTD must be denied.

## II.   ACM'S CUTPA AND MISREPRESENTATION CLAIMS ARE WELL-PLED.

SS&C's principal challenge to ACM's non-contractual claims in Counts II-IV essentially is that they are reiterations of ACM's contract claim (Count I).  (MTD at 24-36.)  SS&C is wrong, and its remaining miscellaneous procedural attacks on ACM's non-contractual claims, (*id.* at 23-36), likewise fail.  The Court should deny the MTD for the following reasons.

### A.   ACM States a Cognizable and Distinct CUTPA Claim.

SS&C is wrong that ACM's CUTPA claim (Count II) is a repackaged contract claim.

ACM has stated claims for CUTPA and intentional and negligent misrepresentation based on: (a) SS&C's misrepresentations made before and to induce ACM to enter into the Master

Agreement that SS&C (i) was qualified to implement CAMRA successfully, (Am. Compl. ¶¶16, 18), (ii) had determined, under the guise of its claim expertise, that hosting was appropriate for ACM and could be implemented, (*id.* ¶¶20-21), and (iii) was capable of implementing CAMRA within four to six months, (*id.* ¶24), and (b) SS&C's repeated false assurances that kept ACM from terminating the Master Agreement and coerced ACM to continue making payments to SS&C for implementation of CAMRA that SS&C never completed, (*id.* ¶¶42-50).

"Where . . . a defendant made a misrepresentation during the course of [its] business practice, with or without the intent to deceive or fraud, and that misrepresentation led a plaintiff to lose money or property, that plaintiff has alleged a cause of action under CUTPA." *Brannigan v. Cusick*, No. CV054020023S, 2008 WL 2930200, at *3 (Conn. Super. Ct. July 2, 2008).

Here, while the misrepresentations ACM has alleged in the Amended Complaint concern the Master Agreement and the parties' relationship, that does not mean those representations are duplicative of ACM's contract claim. This is because SS&C's pre-contractual misrepresentations cannot form the basis for ACM's claim for breach of the Master Agreement since that agreement did not exist when the misrepresentations were made. *See Ulbrich v. Groth*, 78 A.3d 76, 99 (Conn. 2013). And ACM's post-contractual misrepresentations adequately reflect misconduct perpetrated by SS&C separate from its breach of contract. *See, e.g.*, *Assoc. Constr./AP Constr., LLC v. Hanover Ins. Co.,* No, 3:15-CV-1600 (MPS), 2017 WL 1190363, at *7 (D. Conn. Mar. 30, 2017) (extracontractual negligent misrepresentations that defendant had adequate funds to complete project as required by contract supported CUTPA claim).[5]

---

[5] The integration clause in the Master Agreement does not bar ACM's misrepresentation claims. "It is well established under Connecticut law that a plaintiff asserting misrepresentation claims may allege statements made prior to the execution of an integrated writing . . ., even in the presence of a merger or integration clause." *Trefoil Park, LLC v. Key Holdings, LLC*, No. 14-CV-364, 2015 WL 1138542, at *7 (D. Conn. Mar. 13, 2015); *Pearsall Holdings, LP v. Mountain High Funding,*

Further, even if the Court determines that ACM's CUTPA claim is based on the same facts that support its breach of contract claim, the CUTPA claim still withstands dismissal. *See Lanese Constr., Inc. v. Nat. Markets Food Grp., Inc.*, No. FBTCV166059326S, 2017 WL 3469887, at \*6 (Conn. Super. Ct. July 10, 2017) (citing *Lester v. Resort Camplands Int'l, Inc.,* 605 A.2d 550,  557 (Conn. 1992)).  This is because under Connecticut law, breach allegations may be coupled with aggravating factors to support a CUTPA claim.  *Empower Health LLC v. Providence Health Solutions LLC*, No. 10-CV-1163, 2011 WL 2194071, at \*6 (D. Conn. June 3, 2011).

A misrepresentation—whether intentional, negligent, or innocent—is an aggravating factor to support a CUTPA claim.  *LESMSD, LLC v. R&J Props., LLC*, No. CV030177537S, 2005 WL 3509659, at \*6 (Conn. Super. Ct. Nov. 22, 2005); *Dispazio v. Oakleaf Waste Mgmt., LLC*, No. NNHCV106012650, 2011 WL 1026094, at \*19 (Conn. Super. Ct. Feb. 18, 2011); *Bartold*, 2015 WL 7458504, at \*6; *Brannigan*, 2008 WL 2930200, at \*3.

SS&C's pre-contractual misrepresentations, (Am. Compl. ¶¶16-24), are aggravating factors, (*id.* ¶¶53, 62-63).  *Dreamcatcher Assocs. LLC v. Interface Mgmt.*, No. CV040185410S, 2005 WL 529932, at \*5 (Conn. Super. Ct. Jan. 27, 2005) (misrepresentation to induce plaintiff to sign contract aggravating factor); *Milford Paintball, LLC v. Wampus Milford Assocs., LLC*, 115 A.3d 1107, 1112, 1113 n.8 (Conn. App. 2015), *cert. denied*, 116 A.3d 812 (Conn. 2015) (repeated misrepresentations that defendant would meet timetable deceitful within meaning of CUTPA).

Likewise, SS&C's post-contractual misrepresentations are aggravating factors because SS&C promised a future act it had no intention of fulfilling.  *Webster Fin. Corp. v. McDonald*, No. CV-08-4016026, 2009 WL 416059, at \*14 (Conn. Super. Ct. Jan. 28, 2009) ("[A] promise to

---

*LLC*, No. 13-CV-437, 2014 WL 7270334, at \*6 (D. Conn. Dec. 18, 2014); *Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus, Inc.*, No. 10-CV-437, 2012 WL 4471258, at \*4 (D. Conn. Sept. 27, 2012); *Hull v. Fonck*, 999 A.2d 775, 779 (Conn. App. 2010).

do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."); *Kelly v. Noble Env't Power, LLC*, No. CV 08 500 5444, 2009 WL 3087217, at *2-4 (Conn. Super. Ct. Sept. 2, 2009) (inferring present intent not to fulfill promise on allegations that misrepresentations were made and they were false and intended to induce plaintiff).

### B.     ACM's Intentional Misrepresentation Claim Alleges Adequate Intent.

SS&C also attacks ACM's intentional misrepresentation claim[6] (Count III) as an effort "to bootstrap on the fact that implementation of CAMRA did not come to fruition to advance a narrative of deceit."  (MTD at 28.)  SS&C claims its "contractual relationship with ACM" and profit motive are "insufficient to establish a fraudulent motive and opportunity."  (*Id.* at 26.)

But SS&C overlooks settled law providing that ACM's allegations adequately establish "motive and opportunity" for purposes of the Court's disposition of the MTD.

*First*, the Court may infer SS&C's intent from the misrepresentations SS&C made both before and after ACM signed the Master Agreement.  *Casting Supply House, Inc. v. Elf Atochem NA, Inc.*, 234 F. App'x 412, 414 (2d Cir. 2002) (citing *Mitchell v. Mitchell*, 625 A.2d 828, 831 (Conn. 1993)) ("The Court may consider the circumstances surrounding a defendant's conduct to infer fraudulent intent.").  This is because fraudulent intent "is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom."  *Goshen Litho, Inc. v. Kohls*, 582 F. Supp. 1561, 1564 (S.D.N.Y. 1983).

---

[6] ACM's CUTPA claim (Count II) does not require allegations of intent.  *See Brannigan*, 2008 WL 2930200, at *3.  Neither does ACM's negligent misrepresentation claim (Count IV), which pleads that SS&C knew or should have known that its statements were false, (Am. Compl. ¶¶74-75).  *See Centimark Corp. v. Village Manor Assoc. Ltd. P'ship*, 967 A.2d 550, 559-60 (Conn. App. 2009) (affirming negligent misrepresentation claim where defendant promised highly qualified installer to induce plaintiff to sign contract, knowing that it would use lesser subcontractor); *Prof. Sys. Corp. v. Opex Postal Techs.*, No. Civ. A. 05-2689, 2006 WL 573798, at *4 (E.D. Pa. Mar. 8, 2006) (refusing dismissal where seller misrepresented ability to handle volume to induce).

*Second*, SS&C's intent can be inferred from the repetitiousness of its misrepresentations and the length of time over which they were made. *Kopperl v. Bain*, No. 09-CV-1754, 2010 WL 3490980, at *7 (D. Conn. Aug. 30, 2010) ("At least for the purpose of pleading a plausible claim, fraudulent intent may be inferred from [defendant's] alleged stonewalling of [plaintiff's] repeated efforts to get him to discuss the final contract terms."); *Hadami, S.A. v. Xerox Corp.*, No. 16 Civ. 5726, 2017 WL 3085338, at *9 (S.D.N.Y. July 19, 2017) (at pleading stage, repeated false statements and motive to defraud to keep and gain business suffice to infer intent); *Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87 Civ. 6125, 1992 WL 309613, at *12 (S.D.N.Y. Oct. 15, 1992) ("pattern of fraudulent activities," including "repeated delays," enough to infer intent).

*Third*, as the self-proclaimed "unrivaled expert[]" on CAMRA with "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage backed securities and structured products" and the provider of "the only integrated Mortgage REIT end-to-end solution," (*see* Am. Compl. ¶¶14, 16, 18), SS&C had a "heightened ability to know the truth" in making representations to ACM about these issues. *Petrucelli v. Palmer*, 596 F. Supp. 2d 347, 369 (D. Conn. 2009).

*Fourth*, Connecticut courts have upheld fraud claims where the defendant "asserts that he knows what he does not know." *Id.* (citing *Clark v. Haggard*, 109 A.2d 358, 361 (Conn. 1954)); *Warman v. Delaney*, 172 A.2d 188, 189–90 (Conn. 1961) (misrepresentations to induce plaintiffs, even if believed by defendant, sufficient to find fraud).

Applying these factors here, and accepting ACM's factual allegations in the Amended Complaint as true and drawing all reasonable inferences in ACM's favor, as the Court must, *Tellabs*, 551 U.S. at 322, SS&C's misrepresentations evince the requisite level of intent.

For seven months—from April 2014 through December 2014—SS&C undertook a full-court sales pitch to convince ACM to enter into the Master Agreement.  This included SS&C's repeated misrepresentations that as the "expert," it was qualified to implement CAMRA for ACM, hosting was appropriate, and CAMRA could be timely implemented for ACM.  (Am. Compl. ¶¶16-24.)  These misrepresentations were false, as evidenced at least by the fact that after ACM devoted more than two years and $1.78 million in fees, among other resources, SS&C nonetheless was incapable of implementing CAMRA, as it had represented.  (*Id.* ¶¶24, 53, 64, 70.)  Even assuming SS&C made representations about matters it did not know simply to secure ACM's business, they still are actionable and sufficient to support ACM's intentional misrepresentation claim.

The  Connecticut Superior Court's decision in *Milltex Properties v. Johnson*, is instructive. There, the defendants claimed that they were "highly skilled" to "knowingly induc[e] the plaintiff's reliance upon the defendants' expertise," which the plaintiff alleged to be false because the defendants' work was defective.  No. cv-565866, 2004 WL 615748, at *1, 6 (Conn. Super. Ct. Mar. 15, 2004).  These allegations were actionable because the plaintiff was not merely alleging an "inability to perform," but also "that the defendants knowingly misrepresented their ability to perform the contract . . . to induce the plaintiff into entering into the contract."  *Id.* at *6.

Further, after ACM signed the Master Agreement, SS&C's repeated misrepresentations continued, including at least six misrepresentations alleged in the Amended Complaint that SS&C could implement CAMRA and would do so; ACM also alleges these misrepresentations to be false.  (Am. Compl. ¶¶43, 45, 47, 49-50.)  SS&C made these statements repeatedly over a period exceeding two years, during which the Master Agreement provided that the millions of dollars in fees that SS&C received from ACM would continue to increase.  (*Id.* Ex. A at 10-12, 15, Ex. C at 1.)  So, SS&C was incentivized to falsely assure ACM that implementation would occur, and even

to use these misrepresentations to extract payments from ACM to which SS&C was not entitled,

because ACM had significant exposure if it fired SS&C and walked away from CAMRA.  (*Id.*

¶50.)  SS&C never admitted defeat and never told ACM the truth:  that SS&C could not implement

CAMRA for ACM.  But had SS&C done so, ACM would have terminated the Master Agreement

sooner than May 1, 2017—and saved itself millions of dollars.  (*Id.* ¶54.)

Connecticut law recognizes that misrepresentations to falsely assure a plaintiff are

actionable.  In *Kelly v. Noble Environment Power, LLC*, the Connecticut Superior Court held:

> In the present case, the plaintiff has alleged that the defendant assured him that
> there was no cause for concern regarding the defendant's early termination of the
> contract in order to induce the plaintiff to continue working for the defendant.
> Thus, by alleging the misrepresentations that were made, that they were false, and
> made with the intention of inducing the plaintiff to act to his detriment, the plaintiff
> has sufficiently alleged conduct from which an inference that the defendant had the
> present intention not to fulfill his promise to uphold certain terms of the . . .
> agreement can be made.

2009 WL 3087217, at *2-4 ("When [a present intent not to fulfill a promise is] applied to the

representations of one inducing an act to another's injury, it implies a purpose to deceive.").  Here,

ACM's allegations about SS&C's serial misrepresentations to falsely assure it that SS&C would

implement exceed those in *Kelly* and support ACM's intentional misrepresentation claims.

SS&C relies heavily on *East Point Systems, Inc. v. Maxim*, 133 F. Supp. 3d 430, 438-39

(D. Conn. 2015), which it claims is "directly on point."  (MTD at 27.)  But that case involved false

financial projections to induce investment in an IPO and misrepresentations regarding plaintiffs'

ability to *develop* and *produce* non-existent software.  *Maxim*, 133 F. Supp. 3d at 438-39.  Here,

by contrast, CAMRA already existed and SS&C was an "unrivaled expert" on it when SS&C made

its pre- and post-contractual misrepresentations to ACM.  (*See* Am. Compl. ¶18.)  In other words,

SS&C's misrepresentations were not based on an untested, theoretical "representation that [it was]

capable of doing something" or simply "optimism" that it could deliver on its obligations under

the Master Agreement, as in *Maxim*. 133 F. Supp. 3d at 349. Rather, SS&C, by its own telling, had the "extensive knowledge and experience," (Am. Compl. ¶18), to verify the accuracy of its misrepresentations and, thus, to form the intent not to deliver on its promises.

### C.    The Economic Loss Doctrine Does Not Bar ACM's Claims.

ACM's intentional and negligent misrepresentation claims (Counts III and IV) are not barred by the economic loss doctrine ("ELD").[7] (MTD at 32-34.)

First, at the motion to dismiss stage, this Court generally permits "a plaintiff [to] pursue contract and tort claims simultaneously as long as the plaintiff has alleged sufficient facts and damages to maintain separate contract and tort causes of action." *Factory Mut. Ins. Co. v. Pike Co, Inc.*, No. 08-cv-1775, 2009 WL 1939799, at *3 (D. Conn. July 6, 2009).

ACM has done so. The ELD does not bar tort claims that are independent of a contract claim. This includes ACM's claims involving SS&C's pre-contractual misrepresentations, which by definition are independent of the Master Agreement. *Shanshan Shao v. Beta Pharma, Inc.*, No. 14-cv-01177, 2017 WL 1752932, at *13 (D. Conn. May 4, 2017); *Ulbrich*, 78 A.3d at 98, 102.

Further, the ELD also does not bar ACM's claims involving SS&C's post-contractual misrepresentations because ACM's tort claims also are separate from its breach of contract allegations. *Coldform, Inc. v. Faurecia Automotive Seating Canada, LTD*, No. CV085022854S, 2011 WL 383925, at *4 (Conn. Super. Ct. Jan. 5, 2011) (misrepresentation claim not barred where plaintiff claimed, in addition to breach of contract, that defendant "knowingly misrepresented its willingness to purchase parts in order to drive the plaintiff out of business"); *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. 1995).

---

[7] SS&C does not argue that ACM's CUTPA claim (Count II) is barred by the ELD. (MTD at 4.)

SS&C's reliance on *Doherty, Beals & Banks, P.C. v. Sound Community Services, Inc.*, No. CV106005795, 2011 WL 2177257, at *5 (Conn. Super. Ct. May 19, 2011), is misplaced. There, the court found that the ELD barred misrepresentation claims stemming from the defendant's contractual obligation to pay the plaintiff money. *Id.* Here, by contrast, the thrust of ACM's misrepresentation claims is that SS&C made misrepresentations to induce ACM to enter into the Master Agreement in the first place and then to take and refrain from taking other actions to its detriment. (*See, e.g.*, Am. Compl. ¶54.) These claims thus are independent from ACM's breach of contract claim and are not barred by the ELD.

### D.     ACM Has Plead Its Non-Contract Claims with Particularity.

SS&C also is wrong that ACM has not plead its non-contract claims (Counts II-V) with particularity as required by Federal Rule of Civil Procedure 9(b). (MTD at 23-28.)

It is well-settled that ACM's negligent misrepresentation claim and those grounds for its CUTPA claim need not be plead with particularity. *See Assoc. Constr./AP Constr.*, 2017 WL 1190363, at *10 n.17 ("[C]ourts in this district have concluded that Rule 9(b) does not apply to claims of negligent misrepresentation under Connecticut law."); *Garcia v. Crabtree Imports*, No. 05-CV-1324, 2006 WL 1646158, at *2 (D. Conn. June 14, 2006) ("Since fraud is not a necessary element of a state CUTPA claim . . . a plaintiff does not need to meet the heightened pleading requirements of . . . 9(b), when asserting a state CUTPA claim in federal court.").

With respect to ACM's intentional misrepresentation claims and those grounds for its CUTPA claim, the Amended Complaint provides the "who, what, where, when, and how" for each of SS&C's misrepresentations and provides SS&C adequate notice of ACM's claims against it. (*See, e.g.*, Am. Compl. at ¶¶ 16, 18, 21- 22, 40, 43, 45, 48-52.) *See Sovereign Bank v. ACG II, LLC*, No. 08-CV-1600, 2010 WL 363336, at *5 (D. Conn. Jan. 25, 2010) (particularity sufficient where plaintiff alleged who, when, and where for each statement but not "exact quotations"); *In*

*re U.S. Foodservice Inc. Pricing Litig.*, No. 07-MD-1894, 2009 WL 5064468, at *18 (D. Conn. Dec. 15, 2009) ("[D]ates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice . . . ."). Apart from claiming that ACM made other allegations "[i]n . . . conclusory fashion," (MTD at 25), SS&C makes no effort to challenge these misrepresentations. Thus, ACM has satisfied Rule 9(b) for these claims.

## III. ACM IS ENTITLED TO SEEK RESCISSION OF THE MASTER AGREEMENT.

ACM seeks, in the alternative, rescission of the Master Agreement (Count V). "Connecticut law clearly allows and even encourages rescission as a remedy for a complaint that sounds in breach of contract." *Petrucelli*, 596 F. Supp. 2d at 367.

SS&C argues that ACM's rescission claim fails because it does not adequately allege that SS&C knew it was making a false statement. (MTD at 34-35.) But the cases SS&C cites to support this proposition are inapposite because they all involve insurance contracts, as opposed to commercial contracts like the Master Agreement here. *See Charter Oak Oil Co., Inc. d/b/a Aiello Home Svcs. v. Applied Underwriters, Inc.*, No. 17-cv-00689, 2017 WL 4018845, at *8 (D. Conn. Sept. 12, 2017); *cf. Pinette v. Assurance Co. of Am.*, 52 F.3d 407, 409-10 (2d Cir. 1995); *Middlesex Mut. Assurance Co. v. Walsh*, 590 A.2d 957, 962-63 (Conn. 1991); *Lazar v. Metropolitan Life Ins. Co.*, 290 F. Supp. 179, 181 (D. Conn. 1968). On the contrary, rescission is allowed in Connecticut for non-insurance contracts where consent "was procured either by the other party's fraudulent representations, or by the other party's nonfraudulent material misrepresentations." *Munroe v. Great Am. Ins. Co.*, 661 A.2d 581, 584 n.4 (Conn. 1995). As described *supra*, ACM has made adequate allegations to meet this standard. (*See generally* Am. Compl. ¶¶16-54.)

SS&C also argues that rescission is not appropriate because it cannot be restored to the *status quo ante*. (MTD at 35-36.) This argument is a red herring, for two reasons.

First, as ACM alleges in the Amended Complaint, ACM offered to return SS&C to the *status quo ante* (with respect to the return of certain items and other acts identified by the Master Agreement) on May 1, 2017, but SS&C did not accept ACM's offer.  (*Id.* ¶84.)

Second, and in any event, rescission is available if restoration to the *status quo ante* is not possible due to the defendant's wrongful acts.  *Gannett Co., Inc. v. Register Pub. Co.*, 428 F. Supp. 818, 826 (D. Conn. 1977).   Here, SS&C's misrepresentations induced ACM to enter into the Master Agreement, not terminate the contract sooner, or bring a warranty claim.  (*See* Am. Compl. ¶79.)  So, it is SS&C's own fault that it incurred time and expense providing worthless services to ACM—which it now claims it cannot receive back.  (*See* MTD at 35-36.)   ACM, on the other hand, paid SS&C $1.78 million and received no benefit from SS&C.  *See, e.g.*, *Emerald Inv., LLC v. Porter Bridge Loan Co.*, No. 3:05-CV-1598 (JCH), 2007 WL 1834507, at *3 (D. Conn. June 25, 2017).  ACM is entitled to seek the return of those funds through rescission.

## CONCLUSION

For all the foregoing reasons, the Court should deny SS&C's MTD in its entirety.   In the alternative, should the Court dismiss any of ACM's claims, ACM respectfully requests leave to file an amended pleading and all other relief the Court deems just and appropriate.

Dated: September 20, 2017     Respectfully Submitted,


**HOLLAND & KNIGHT LLP**

By: */s/ Christopher M. Cerrito*
Christopher M. Cerrito (ct17183)
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Phone: (203) 905-4500
Fax: (203) 724-3944
E-mail: chris.cerrito@hklaw.com

and

By: */s/ Joseph Mamounas*
Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
701 Brickell Avenue
Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

*Counsel for ARMOUR Capital Management LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be send by email to all parties by operation of the Court's electronic filing system or by mail to any counsel or self-represented party unable to accept electronic filing, as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By: */s/ Joseph Mamounas*
Joseph Mamounas (phv09010)