

20 Church Street
Hartford, CT 06103-1221

p: 860-725-6200  f: 860-278-3802
hinckleyallen.com

September 28, 2017

VIA CM/ECF ELECTRONIC FILING

Honorable Jeffrey Alker Meyer
Richard C. Lee United States Courthouse
141 Church Street
New Haven, Connecticut 06510

>   Re: <u>Civil Docket No. 17cv790</u>
>   <u>*Armour Capital Management, LP v. SS&C Technologies, Inc.*</u>

Dear Judge Meyer:

This letter brief addresses SS&C's position with respect to the discovery dispute to be heard by the Court on Friday, September 29, 2017 at 3 p.m. between Plaintiff Armour Capital Management, LP ("ACM") and Defendant SS&C Technologies, Inc. ("SS&C").

**I.    Brief History of the Case**

This action arises out of a contractual relationship between ACM and SS&C whereby SS&C agreed to license to ACM an asset-accounting software known as CAMRA, hosting of that software on SS&C's servers, and certain professional services. Plaintiff ACM is a registered financial advisor that manages to publicly-traded Real Estate Investment Trusts ("REITs"). ACM invests in mortgage-related assets, including complex instruments such as the "mortgage-backed securities" that gained renown during the financial crisis in 2008. Founded in 1986 and publicly traded on the NASDAQ Global Select Market, SS&C is a leading provider of services and software for the global financial services industry. SS&C has offered, licensed, used, and provided implementation services relating to CAMRA across various sectors of the financial services industry for more than 25 years.

The parties' memorialized their agreement in a written, fully-integrated Master Agreement dated December 19, 2014, and three related "Work Requests." The Work Requests set forth, among other terms, the specific professional services SS&C would provide. Work Request One, which the parties executed on the same day as the Master Agreement, provides that "SS&C will provide on-site and remote implementation services including business workflow analysis, environment setup, data conversion analysis, interface development and testing **in support of <u>client's implementation</u> of the software**." The parties projected that ACM's implementation of CAMRA would take four to six months, with *ACM* performing roughly 20 - 25% of the projected implementation that SS&C initially proposed to perform. The Master Agreement and Work Requests do not, however, contain a deadline for ACM to complete its implementation.

▶ ALBANY ▶ BOSTON ▶ HARTFORD ▶ MANCHESTER ▶ NEW YORK ▶ PROVIDENCE

HINCKLEY, ALLEN & SNYDER LLP, ATTORNEYS AT LAW

57192792 v1

Honorable Jeffrey A. Meyer
September 28, 2017
Page 2

ACM's complaint, filed May 15, 2017 alleged claims for breach of contract, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), breach of express warranty, unjust enrichment, conversion, and seeking rescission. On June 22, 2017, SS&C moved to dismiss all of but the breach of contract claim under Fed. R. Civ. P. 12(b)(6). Rather than oppose the motion to dismiss, ACM filed an Amended Complaint on July 13, 2017.

In its Amended Complaint, ACM asserts claims for breach of contract, fraud and negligent misrepresentation. On August 20, 2017, SS&C moved to dismiss all of ACM's claims due to pleading defects and contractual limitations and disclaimers. These limitations and disclaimers include, among others, a "merger" clause prohibiting reliance on representations outside the Master Agreement work requests, and a one-year limitation in the Master Agreement on claims.

SS&C further contends that it did not breach the Master Agreement by failing to implement CAMRA, per the contract's explicit provisions. SS&C also contends that it did not fraudulently or negligently induce ACM to sign the Master Agreement or delay materially ACM's termination of the relationship. SS&C has also advised the Court that it will assert a counterclaim for breach of the Master Agreement for fees that became due and owing before the effective date of ACM's termination, which amount to approximately $175,000.

The parties have been actively engaged in discovery. To date, each party has served one set of document requests and one set of interrogatories. SS&C has reviewed more than 100,000 documents and produced more than 66,000 pages of those to ACM, and plans to produce several thousand additional documents. ACM has produced roughly 45,000 documents to date.

ACM will be taking two upcoming depositions. The scheduled deponents are Dennis Moore and Jeff Fecteau of SS&C. Messrs. Fecteau and Moore are the primary salesmen in the ACM relationship. Their depositions are scheduled for October 4 and 5, respectively. SS&C has produced all non-privileged documents related to those two witnesses.

## II.   Background Regarding Discovery Dispute

ACM served its discovery requests on SS&C on June 26, 2017. The requests that are the subject of the present dispute are Requests for Production Nos. 19 and 20, and Interrogatory Nos. 3-6. Those requests seek information and documents related to SS&C's customers other than ACM. Namely, the document requests seek all documents related to "uncompleted implementations" of CAMRA and "complaints, failures, accidents, incidents, problems, damages, or similar occurrences" with CAMRA from other clients. The interrogatories seek a list of mortgage REITs (real estate investment trusts) that have ever used CAMRA, a list of SS&C's clients for which CAMRA was ultimately not fully implemented, a list of all clients that have complained about or discontinued use of CAMRA, and a list of SS&C's clients that use CAMRA on an outsourced basis. As those requests were overbroad and sought a range of range of documents and information not proportionate to the needs of the case, SS&C objected accordingly on July 26, 2017.

The parties held a telephonic meet-and-confer on August 1, 2017 at which point SS&C explained the basis for its objections. On August 7, 2017, ACM emailed SS&C with a proposal to narrow the scope of the requests,

requesting: 1) the identity and contact information of any REITs who have used or are using CAMRA and 2) documents relating to any SS&C customers (not limited to REITs) who had "problems" with CAMRA.

On August 17, the parties held another phone conference on outstanding discovery issues. SS&C agreed to provide documents relating to various outstanding requests. As to the requests relating to other customers, SS&C informed ACM that during the relevant time period – which the parties agree is from April 1, 2014 until May 1, 2017 – SS&C had more than 500 clients across various sectors of the financial services industry that directly utilized CAMRA or relied upon CAMRA on an "outsourced" basis through SS&C. The request that SS&C look into at least 500 distinct relationships to inquire as to any "problems" with CAMRA was simply not reasonable. ACM requested a proposal from SS&C to narrow the scope of the requests relating to other customers.

On August, 23, 2017, SS&C provided a counter-proposal agreeing to the following: (1) SS&C would provide a list of its REIT clients in 2014 leading up to the parties' execution of the Master Agreement; and (2) SS&C would produce non-technical documents and information concerning any actual or threatened litigation from SS&C's REIT customers based on performance failures or implementation (or non-implementation) or CAMRA, or the termination of any contract based on the performance failures or the implementation (or non-implementation) of CAMRA. On August 28, 2017, ACM sought to modify part (2) of the above to include "documents relating to *threatened* contract termination or instances in which CAMRA was not implemented for customers within four months of the beginning of the contract."

On September 18, 2017, after conferring with the relevant custodians within the company, SS&C responded that the counter-proposal was unduly burdensome and disproportionate to the controversy. In addition to the arbitrary time limit, the request covers all implementations across all financial services sectors – including, among others, insurance companies, mutual fund managers, hedge funds – regardless of whether there were any "issues" at all regarding CAMRA or implementation. SS&C reiterated its position that it has more than 500 CAMRA clients, and the nature and scope of each implementation is the result of each's client choice and the parties' negotiations. The documents SS&C offered to produce would provide visibility into all terminations and actual or threatened disputes over the performance or implementation of CAMRA in the REIT space, which provides clear and reasonable lines for relevant searches.

The parties held a phone call on Friday, September 22, 2017 on the outstanding issues. At this call, SS&C promised to speak with the relevant officers in the company and come back with another reasonable counter-proposal by Monday, September 25. However, on Sunday, August 24, 2017, ACM emailed SS&C requesting a conference with the Court on the discovery issues. SS&C promptly responded next morning that its counsel was traveling, but would be available the next day. Instead, ACM prematurely and unilaterally requested assistance from the Court. That same day, SS&C sent another proposal to ACM stating that it would agree to produce the following on an attorneys' eyes only basis: (1) A list of SS&C's REIT clients that used CAMRA (licensed, hosted or outsourced) from May 1, 2014 until May 1, 2017; and (2) non-technical documents concerning any actual or

Honorable Jeffrey A. Meyer
September 28, 2017
Page 4

threatened lawsuits, or actual or threatened termination, during the same time period by any REIT client based on the performance or implementation of CAMRA.

Finally, on Monday September 25, 2017, the parties were able to reach a compromise on much of the dispute, with only one outstanding issue: ACM still requests a list of (a) the number of those total clients that were hosted (as opposed to licensed or outsourced), (b) the identity of such clients for which implementation of CAMRA as hosted never occurred (and the dates of contract inception and when efforts to implement stopped), and (c) the identity of such clients for which implementation did not occur within 6 months of contract inception (and the dates of contract inception and when implementation finally occurred).

### III.     SS&C's Position

As the above record makes clear, SS&C has made efforts to work with ACM to tailor the requests to a scope that is more reasonable and less burdensome to SS&C, but ACM has refused and continued to push for a fishing expedition into SS&C and its customers' confidential information. SS&C's reasons for pushing back on ACM's requests, as well as SS&C's proposed offer, are outlined below.

First, ACM's remaining requests regarding other clients do not relate to the allegations of the Amended Complaint, and are not proportionate to the needs of the case. ACM's allegations center primarily on a breach of contract claim based on the fact that CAMRA was not implemented. The related allegations of fraud allege that ACM represented it could implement CAMRA, when ACM alleges SS&C knew it could not. Aside from the facts that SS&C has been in business for more than 30 years and has been offering CAMRA for more than twenty-five years, ACM's allegations also do not reference statements SS&C made regarding other customers that were allegedly fraudulent, that would serve as a basis for the requested information.

ACM's request is also arbitrary in requesting names of customers for which implementation did not occur or took longer than six months. ACM agreed to perform as many as 650 of the 2,500 hours of implementation work that SS&C had proposed to perform (and ACM then failed to perform that work competently), which substantially contributed to the delay in ACM's implementation. Nevertheless, the length of time an implementation takes depends on a wide range of factors that vary from customer needs, the complexity and variety of the customer's assets and positions, the level and consistency of effort the customer commits to the implementation, to name a few. Therefore, CAMRA implementations for other customers has no bearing on ACM's case.

Further, the requested information would be unduly burdensome for SS&C to collect and provide. As explained to ACM on numerous occasions, there are no pending or threatened lawsuits, or actual or threatened terminations, among mortgage REIT clients based on the performance or implementation of CAMRA. Such a request across the entire customer base would necessarily require SS&C to examine payments from all CAMRA customers over the course of three years, see when payments stopped, and the investigate the reasons for the

Honorable Jeffrey A. Meyer
September 28, 2017
Page 5

cessation of payment in each instance. This process could take countless hours, and would vastly exceed the scope of discovery.

Finally, but of foremost importance, the information ACM seeks is confidential information belonging to SS&C and its clients, which SS&C is obligated to protect. The CAMRA users, particularly the mortgage REITs for which ACM requests information and documents, are direct competitors of ACM, therefore SS&C will not turn over information relating to their business where they are not parties or otherwise related to this action.

As a proposed solution, SS&C will agree to provide ACM the following: (1) a list of mREIT clients from April 1, 2014 until May 1, 2017; (2) a list of the number of CAMRA clients that are licensed (including hosted), not outsourced; (3) the names, on an Attorneys' Eyes Only basis, of any REITs that went from a hosted arrangement plan to outsourced.

We look forward to conferring with the Court to resolve this matter.  Thank you for your time.

Very Truly Yours,

/s/ *Kevin O'Connor*

Kevin O'Connor

cc:     All counsel of record