

20 Church Street
Hartford, CT 06103-1221

p: 860-725-6200  f: 860-278-3802
hinckleyallen.com

March 1, 2018

**VIA CM/ECF ELECTRONIC FILING**

Honorable Jeffrey Alker Meyer
Richard C. Lee United States Courthouse
141 Church Street
New Haven, Connecticut 06510

> Re: <u>Civil Docket No. 17cv790</u>
> <u>*Armour Capital Management, LP v. SS&C Technologies, Inc.*</u>

Dear Judge Meyer:

This letter brief addresses SS&C's position with respect to the discovery dispute to be heard by the Court on Friday, March 2, 2018 at 3 p.m. between Plaintiff Armour Capital Management, LP ("ACM") and Defendant SS&C Technologies, Inc. ("SS&C").

**I.    Brief History of the Case**

This action arises out of a contractual relationship between ACM and SS&C whereby SS&C agreed to license to ACM an asset-accounting software known as CAMRA, hosting of that software on SS&C's servers, and certain professional services. ACM's complaint, filed May 15, 2017 alleged claims for breach of contract, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), breach of express warranty, unjust enrichment, conversion, and seeking rescission. In response to a motion to dismiss by filed by SS&C, ACM filed an Amended Complaint on July 13, 2017 asserting claims for breach of contract, fraud and negligent misrepresentation. On August 20, 2017, SS&C moved to dismiss all of ACM's claims due to inadequately pled claims and contractual limitations and disclaimers. That latest motion to dismiss is pending.

**II.    Background Regarding Discovery Disputes**

ACM served its first set of discovery requests on SS&C on June 26, 2017. In response to those requests, SS&C gathered and reviewed more than 100,000 documents relating to 19 email custodians (requested by ACM) for a three-year period. SS&C produced more than 65,000 documents to ACM, including more than 150,000 pages of information.

SS&C objected to many of ACM's requests, particularly requests seeking information and documents related to SS&C clients other than ACM. After attempting to resolve the objections on their own, the parties sought this Court's assistance and held a telephonic discovery conference on September 29, 2017. With respect

to ACM's request for documents related to SS&C's implementations for other clients, Your Honor stated that SS&C had valid concerns about producing documents related to its other clients and ruled that SS&C need only produce "documents concerning any uncompleted implementation during [the designated] time period in which ***the uncompleted implementation was by reason of a claim by the customer that CAMRA was not functioning or implementing as anticipated by the customer.***" Subsequently, SS&C provided supplemental discovery responses stating in relevant part that there were no such implementations.

Four months later, on January 29, 2018, ACM sent SS&C an affidavit from Hunter Haas, President of Bimini Capital Management, Inc. ("Bimini"). Bimini, like ACM, is a mortgage REIT manager located in Vero Beach, Florida. The two entities were previously under mutual ownership and still share at least the same Head of Information Technology. Bimini, in September 2015, entered into an agreement with SS&C for licensing and hosting of the CAMRA software. As numerous SS&C witnesses can attest, Bimini was fully implemented, but before the software went live, Bimini decided to switch to an outsourcing contract with SS&C to better suit their desire for increased automation. Bimini remains an SS&C client and is successfully operating, and paying fully, on an outsourcing basis. Haas – who is admittedly a personal friend of Armour's senior management – claims in his January 29th affidavit that "SS&C never fully implemented CAMRA for Bimini on a hosted basis" and that "[o]ut of frustration with the failed implementation process, Bimini renegotiated its agreement with SS&C and opted to switch from hosting to outsourcing." SS&C fundamentally disagrees with the characterization that CAMRA was not implemented on a hosting basis for Bimini, as well as Bimini's characterization of its reasons for switching from hosting to outsourcing. Regardless, SS&C acknowledges that this affidavit – which Armour could easily have obtained back in September – approaches the standard propounded at the September 29, 2017 hearing, and SS&C has agreed to provide certain discovery regarding Bimini's implementation.

Despite the vast documentation SS&C has reviewed and produced, ACM served a second set of written discovery requests on SS&C on December 22, 2017 ("Second Requests"). The Second Requests sought information and documents that again relate SS&C's business relationships with its other clients. SS&C provided thorough interrogatory responses and objected to the document requests to the extent they concern other SS&C clients, but did provide limited document production on SS&C's contractual relationship with Bimini. The subject of the present discovery dispute does not directly relate to the Second Requests, but rather what ACM characterized as "follow-on requests." The "follow-on requests" were an informal list of seven *additional* categories of documents that ACM requested from SS&C by email on February 22, 2018, outside the formal written discovery process. ACM claims these requests are encompassed within the scope of their written discovery requests. SS&C has agreed to produce documents as to two of the categories, but the parties have not been able to agree on the remaining five.

The outstanding written discovery issues consist of the following requests by ACM to SS&C: (1) documents relating to the leadership changes in SS&C's of Professional Services unit; (2) weekly status reports for SS&C mortgage REIT clients Bimini, Fortress, and Resource' (3) documents relating to resource allocation issues or lack of client commitment regarding the implementations of ACM, Bimini, Resource, and Fortress; (4)

documents relating to the relationship between professional services and sales in 2014; and (5) profit and loss statements for professional services, the REIT Servicing Group, and Institutional and Investment Management. SS&C's position on each of these issues is discussed below.

Simultaneously, the parties began conducting depositions in the fall of 2017, which are still ongoing. On October 4th and 5th, ACM took the depositions of two of SS&C's sales represntatives, Jeff Fecteau and Dennis Moore in Stamford, Connecticut. On November 28th, 29th, and 30th, SS&C took the depositions of ACM employees Jonna Terry, Mark Gruber, and Jim Mountain in Vero Beach, FL. On February 13th, 15, and 16th, ACM took the depositions of SS&C employees Iwona Olszewska, Dan Pallone, and Tim Reilly, again in Stamford. The parties have shared with one another the intent to conduct additional depositions. SS&C plans to depose third parties Armour Residential REIT, Inc. ("Armour REIT") and Deloitte, LLP ("Deloitte"), as well as ACM employees Kristen Davies, Trevor Spicer, Jeff Zimmer, Scott Ulm, and a 30(b)(6) corporate representative of ACM. SS&C also seeks additional time with James Mountain and Jonna Terry, for which it did not complete seven hours of testimony. ACM objects to SS&C taking the deposition of Armour REIT and Deloitte, arguing that those entities do not have relevant information. Additionally, ACM seeks additional time beyond the permissible seven hours to continue its depositions of SS&C's Dan Pallone and Iwona Olszewska. SS&C's position on each of these issues is discussed below.

### A. SS&C's Position on Discovery Issues

#### 1. Written Discovery

As was the case prior to the September discovery conference, SS&C has made efforts to work with ACM to tailor the requests to a scope that is more proportionate to the needs of the case. But ACM continues to push for unnecessary and duplicative discovery in what can only be viewed as an unwarranted fishing expedition in search of something to support their unfounded allegations.

First, ACM is not entitled to discovery related to the implementations of SS&C's clients other than ACM and Bimini. ACM requests weekly status reports for the implementations for mortgage REITs Bimini, Fortress, and Resource, as well as documents relating to resource allocation issues or lack of client commitment to those implementations. In accordance with Your Honor's September 29, 2017 ruling, the affidavit of Hunter Haas supports SS&C producing documents related to Bimini. ACM has not, however, made a similar showing with respect to any of the other clients for which it requests extensive documents. Further, as was discussed at the September conference and formed the basis for Your Honor's ruling, documents relating to SS&C's implementations for other clients is simply not probative of any issue in the present case. ACM chose the three aforementioned clients because SS&C's discovery responses revealed that those implementations were among the longest. But the length of time an implementation takes depends on a wide range of factors that vary from customer needs, the complexity and variety of the customer's assets and positions, the level and consistency of effort the customer commits to the implementation, to name a few. Therefore, CAMRA implementations for

other customers has no bearing on ACM's case. Further, but of foremost importance, the information ACM seeks is confidential information belonging to SS&C and its clients, who are direct competitors of ACM, which SS&C is obligated to protect.

In addition to the foregoing, ACM's request relating to other clients is immensely burdensome. As part of its request, ACM proposed a set of more than 40 search terms across nine custodians. SS&C ran these terms and they yielded nearly 350,000 documents as results, the overwhelming majority of which have not been produced.

Second, notwithstanding the Haas affidavit, ACM is not entitled to unlimited discovery into Bimini's implementation. ACM's Second Requests initially asked for all documents related to Bimini's implementation, but ACM appears to have narrowed that to encompass it within the aforementioned search terms. But for the same reasons mentioned above, merely Bimini's alleged dissatisfaction with its implementation of CAMRA has little if any relevance to ACM's implementation. Furthermore, ACM has already served a subpoena on Bimini, received a document production from Bimini, and has scheduled a third-party deposition of Mr. Haas. ACM has also had the opportunity to depose three high-level, SS&C employees involved in the Bimini implementation. Allowing ACM continued and unfettered discovery into SS&C's contract with Bimini is not proportionate to the needs of this case. In light of the foregoing, SS&C proposes the following as a compromise: (1) regarding Bimini, SS&C will run searches across the following five custodians – Reilly, Pallone, Olszewska, Gonzalez, and LaMonica – for a total of ten search terms of ACM's choosing, not including the term "Bimini," which will also be applied.

Third, ACM requests documents relating to "the relationship between professional services and sales in 2014." With that request, ACM proposed about twenty search terms across eight SS&C custodians. Those proposed terms yielded close to 90,000 document results. Aside from the burden, the request is vague and SS&C cannot reasonably ascertain what ACM is seeking, let alone whether the requested information has any relevance to the present case. There is no indication that the "relationship between professional services and sales" caused ACM's alleged injuries.

Fourth, ACM requests documents relating to the leadership changes in Professional Services. These documents are another clear example of a fishing expedition that is simply not relevant to the present action. ACM seeks to learn whether there was some hypothetical link between staffing changes within SS&C for select employees that worked on, among many contracts, ACM's, and the delays ACM's implementation experienced. There is no basis for such a connection. SS&C is a business, like any other, that makes staffing decisions regarding its roughly 8,000 employees based on a wide variety of factors. ACM cannot point to any indication, through testimony or otherwise, that any of these employees was terminated based on poor performance, let alone poor performance related to ACM's implementation. Moreover, as with ACM's other requests, this request would be burdensome for SS&C due to the vague nature of the request seeking "documents relating to the leadership changes in Professional Services."

Finally, ACM's request for profit and loss statements for three of SS&C's internal groups. ACM's stated basis for requesting this information is that SS&C made representations to ACM that its REIT servicing groups were highly profitable prior to signing the contract. Despite the fact that ACM could not point to any of these representations, it is again highly dubious what relevance the requested information has to this case. Giving ACM the benefit of the doubt, even if SS&C made these representations, ACM does not allege that it relied on SS&C's *profitability* as a basis for signing the CAMRA contract. Such an assertion would be nonsensical.

### 2. Depositions

On February 23, 2018, SS&C issued subpoenas to third parties Deloitte and Armour Residential REIT. ACM has indicated that it intends to move to quash both subpoenas based on relevance. As a threshold matter, ACM's threatened motion to quash regarding SS&C's Armour Residential REIT subpoena is improperly brought before this Court. ACM is required to bring their motion before "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(3)(A), For Armour Residential REIT, that would be the Southern District of Florida. Regardless, the Federal Rules mandate that a party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1) was recently amended, but still "is broadly and liberally construed… ." *Wells Fargo Bank, N.A. Tr. v. Konover,* No. 3:05-CV-1924, 2010 WL 11561491, at *2 (D. Conn. June 22, 2010). Here, admissible evidence shows that Armour disclosed to SS&C during the sales process that Armour needed to improve its asset-accounting practices and controls, which were used to report the Armour REIT's financial results to its public shareholders. Third-party Deloitte is likely to have information and documents about the individuals, procedures, and the technology platform that led to those concerns, as well as the status of implementation at all relevant points. Further, ACM admitted that the Armour REIT *paid* for the CAMRA license and other services. Thus – unless there were no governance controls in place – the REIT and its directors are highly likely to have information about the negotiation of, and the parties' respective performance under, the Master Agreement, as well as the accounting personnel, process and control issues that caused Armour to seek out SS&C in the first place. SS&C is entitled to documents and testimony to further substantiate its theory.

ACM also requests additional time beyond that contemplated by Rule 30. Federal Rule of Civil Procedure 30 provides that, "[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours." Fed. R. Civ. P. 30(d)(2). Moreover, a party seeking a court order to extend the time for examination or otherwise alter the limitations is expected to show good cause to justify such an order. ACM has not met this burden. ACM complains that it wants additional time—beyond which it is entitled to—in order to complete the depositions of Mr. Pallone and Ms. Olszeweska. The Court should reject this improper request. The record shows that ACM wasted time asking irrelevant questions during the depositions of both witnesses, and now requests additional time to go on further fishing expeditions. SS&C is not opposed to ACM using its remaining time allotted under the Federal Rules, but ACM has not shown good cause for additional time. Moreover, ACM's lament that it needs additional time for Ms. Olszeweska based on the subsequent testimony of Mr. Pallone is too improper, as ACM had direct control of the order and the scheduling of both witnesses.

Honorable Jeffrey A. Meyer
March 1, 2018
Page 6

We look forward to conferring with the Court to resolve this matter.  Thank you for your time.

Very Truly Yours,

*/s/ Kevin J. O'Connor*

Kevin J. O'Connor

cc:     All counsel of record