UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


```
- - - - - - - - - - - - - - - x
                              :
ARMOUR CAPITAL MANAGEMENT LP, :  No. 3:17CV790(JAM)
                              :
            Plaintiff         :
                              :
         v.                   :
                              :
SS&C TECHNOLOGIES, INC.,      :
                              :  New Haven, Connecticut
            Defendant         :  March 2, 2018
                              :
- - - - - - - - - - - - - - - x
```


TELEPHONIC DISCOVERY CONFERENCE


B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

1   A P P E A R A N C E S:

2

3        FOR THE PLAINTIFF:

4             HOLLAND & KNIGHT
                  701 Brickell Ave., Suite 3000
                  Miami, Florida 33131
5             BY:  JOSEPH J. MAMOUNAS, ESQ.
                   ALLISON KERNISKY, ESQ.

6

7        FOR THE DEFENDANT:

8             HINCKLEY ALLEN & SNYDER LLP
                  28 State Street
9                 Boston, Massachusetts 02109-1775
              BY:  KEVIN J. O'CONNOR, ESQ.
10                 JASON C. WILLIAMS, ESQ.

11            HINCKLEY ALLEN & SNYDER LLP
                  20 Church Street, 18th Floor
12                Hartford, Connecticut 06103
              BY:  ALEXA TALIN MILLINGER, ESQ.
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **3:06 P.M.**

2              THE COURT:  Good afternoon.  This is Judge

3    Jeffrey Meyer.  We're here for a status

4    conference/discovery conference in the matter of ARMOUR

5    Capital Management v. SS&C Technologies.

6              Appearance of counsel, please, for ARMOUR or

7    ACM?

8              MR. MAMOUNAS:  Good afternoon, Judge.  You have

9    Joe -- (phone cuts out) -- the plaintiff.

10             THE COURT:  Okay.  And I'm sorry, you didn't

11   quite come through.  We couldn't hear you.  Could you

12   repeat that, please.  We have a court reporter here.

13             MR. MAMOUNAS:  I'm sorry, Judge.  This is Joe

14   Mamounas and Allison Kernisky of Holland & Knight.  Good

15   afternoon.

16             THE COURT:  Thank you.  Good afternoon.

17             MR. O'CONNOR:  Good afternoon, Your Honor.

18   Kevin O'Connor --

19             THE COURT:  Kevin O'Connor, okay, great.

20             MR. O'CONNOR:  -- Jason Williams, and Alexa

21   Millinger from Hinckley Allen on behalf of SS&C

22   Technologies.

23             THE COURT:  Great, okay.

24             So a couple of things to cover here.

25             First of all, you've all filed a joint motion to

1    extend the pretrial deadlines.  And I intend to grant that

2    motion.  I think it's reasonable under the circumstances.

3    So we will enter in due course an order adopting your

4    joint motion to extend the pretrial deadlines.

5         And then I also wanted to address the discovery

6    dispute.  And it looks to me from the various letters here

7    that there are a lot of discovery issues at issue here.

8    And I'm not, given the time frame here, the rapid time

9    frame in which this has surfaced, I'm not going to try to

10   resolve all of these discovery disputes today.  And my

11   intent is to try to get a better sense from you to make

12   sure I understand exactly what the flashpoints are and

13   then to set a date for in-person oral argument on the

14   discovery disputes.  They're complex enough, seem to me to

15   go to issues of possible substantial expense, and I am

16   going to need to have you all come to court in person, and

17   possibly I may need some supplemental briefing.

18        I'm also anticipating within the next short

19   period of time, within -- never exactly certain, but I do

20   anticipate a ruling within the next month or shorter than

21   that on the pending motion to dismiss.

22        So my plan, as far as what I think I'd like to

23   do, is to have you all come in for a discovery conference

24   on the outstanding discovery issues in the first few days

25   of April.  And I'm looking at April 3 or April 4.  Is

1    there any reason why you can't do it either of those days?

2              MS. KERNISKY:  Checking now, Your Honor.

3              MR. MAMOUNAS:  Judge, did you say April 3 and 4?

4              THE COURT:  Yes, those are the days I'm

5    eyeballing on the calendar here.

6              MR. MAMOUNAS:  That works on our end.

7              THE COURT:  Is that Mr. O'Connor?

8              MR. MAMOUNAS:  No, this is Mr. Mamounas.

9              MR. O'CONNOR:  It works for me as well.

10              THE COURT:  So it works for Mr. O'Connor and

11    Mr. Mamounas and all other counsel involved, I take it?

12              MS. KERNISKY:  Yes.

13              THE COURT:  So we'll check and nail down one of

14    those two dates and enter that as a docket order.

15              So let me sort of, as a run-up to that day when

16    we get together in person, try to understand a little bit

17    more about the discovery issues, essentially mostly trying

18    to identify what's at stake here.

19              It seems to me that the key dispute or the one

20    that's most prominently featured in your papers is ACM's

21    request to try to obtain information about the other REIT

22    clients, Bimini, Fortress, and Resource.  And that

23    essentially SS&C's position is, as to Fortress and

24    Resource, those are not relevant and should not be

25    discoverable at all; and as to Bimini, it seems that

 1    there's been some agreement already by SS&C to produce

 2    some subset of the documents as to Bimini.  Does that

 3    sound right, basically?

 4              MR. O'CONNOR:  Yes.  This is Mr. O'Connor.

 5              THE COURT:  Okay.  And have you all reached an

 6    agreement about when those documents will be produced as

 7    to Bimini?

 8              MS. KERNISKY:  Well, Your Honor, this is

 9    Ms. Kernisky for plaintiff, if I could, briefly.

10              We've reached agreement, SS&C has agreed to

11    provide documents.  We have not reached agreement on the

12    scope of those documents.  We have, as you've seen,

13    proposed a very narrow set of custodians and very narrowly

14    tailored search terms based on words that we pulled

15    directly from SS&C's emails on these issues.  And SS&C has

16    objected to that and they've attempted to further reduce

17    the number of custodians, and they said they would agree

18    to 10 of our search terms.  The reason for that, according

19    to them, is the burden of the search that we proposed.

20    When they ran that search, they found hundreds of

21    thousands of documents.

22              So we would propose, rather than them

23    arbitrarily pick terms and custodians, that we would

24    together look at the search reports, see which of the

25    terms they ran are overbroad.  You can tell by each term

1   how many documents were found, and if some of the terms

2   had 100,000 documents or are obviously not working, then

3   we would eliminate those terms or try to edit them in a

4   way that would make the results more manageable.  It seems

5   like, you know, working together, that makes sense as

6   opposed to SS&C arbitrarily picking the terms, but that's

7   the progress we've made.  We haven't gotten any further

8   down that road other than that.

9           And I would just remind Your Honor that these

10  are documents that we've been waiting on since back in

11  September.  So we're bringing it before you now to try to

12  expedite what's been a very lengthy process.

13          THE COURT:  Mr. O'Connor, looking at your letter

14  of March 1, you state, middle of Page 2, that SS&C has

15  agreed to provide certain discovery regarding Bimini's

16  implementation.  What is that certain discovery that you

17  believe you've agreed to?

18          MR. O'CONNOR:  Yes, so we would agree to three

19  to four custodians, as opposed to nine, and more narrow

20  search terms so that we would get it down to 400,000

21  documents and that we would work in collaboration with the

22  other side.

23          Right now there are nine custodians, which is

24  half of the total custodians for the case.  And then

25  again, you know, I think 20, 30 search terms that they

1    wanted, so we would narrow it down to 10 to try to get it

2    to a manageable number.

3              Your Honor, just to be absolutely clear, every

4    time ARMOUR was mentioned in any documents in any concept,

5    any resource issue, anything, those documents have been

6    produced.  So this is -- this is -- we would go to a level

7    of abstractions and to other clients where they want to

8    either duplicate or triplicate or quadruple the amount of

9    discovery.

10             THE COURT:  Okay.

11             MS. KERNISKY:  Your Honor --

12             THE COURT:  Hold on a second.

13             So Mr. O'Connor, Ms. Kernisky is proposing

14   essentially that she collaborate with you to try to figure

15   out, given the fact that you're conceding that you will

16   produce some Bimini documents or, as you say, certain

17   discovery regarding Bimini implementation --

18             MR. O'CONNOR:  Yes.

19             THE COURT:  -- she's essentially saying maybe

20   you have a point about there being too much of a burden

21   and she wants to sit with you and work through that and

22   try to come to some sensible compromise.  Can you not do

23   that?

24             MR. O'CONNOR:  Fair enough.  Yes.  We will agree

25   to that.

1          THE COURT:  Ms. Kernisky, does that satisfy you

2    there at least in the interim?

3          MS. KERNISKY:  Yes, Judge.

4          I would ask, though, for possibly a time limit

5    on such an agreement and a time limit for producing those

6    documents.

7          I mean, I will tell you that we have been trying

8    to work with Bimini -- I'm sorry, SS&C.  And what happened

9    is after the hearing, the initial hearing in September

10   when we first brought this to Your Honor's attention, they

11   told us that they had an issue with the search term

12   "uncompleted," with the term that we had put in our

13   request "uncompleted implementation."  And I can go into,

14   you know -- I think it sounds to me like you're not

15   wanting to hear the reasons about that right now, but I

16   can go into them.  But let me just say on that, we agreed

17   that -- they told us that if we issued a new request for

18   documents that didn't use the term "uncompleted

19   implementation" that they would produce what they had for

20   Bimini.  So we did that.  We issued a new request.  It's

21   Number 3 in our December 22 request.  And you'll see it

22   simply says documents relating to Bimini implementation.

23         In response to that request, what we finally

24   ultimately got from them were simply the external

25   communications, meaning emails that SS&C had sent to

 1    Bimini, and not the internal communications talking about

 2    Bimini and these resource allocation issues and the

 3    problems with the implementation that are at the very

 4    heart of our dispute here.  And the external

 5    communications were further limited by they only were for

 6    the year of 2017 even though our relevant period here is

 7    2014 to 2017.

 8         So I'm a little -- I'm more than willing and

 9    happy to cooperate with opposing counsel.  I'm a little

10    hesitant to agree without some sort of direction because

11    they have a habit of agreeing to work with us and then

12    giving us things that have been parsed in a way that were

13    not part of the original understanding.

14         THE COURT:  Okay.

15         And Mr. O'Connor?

16         MR. O'CONNOR:  That's absolutely false.

17         In terms of Bimini, Bimini is still a customer

18    of SS&C's, paying customer.  And we fundamentally disagree

19    with any characterization that they have to suggest that

20    we didn't produce in accordance with the Court's original

21    order.

22         And what I would note, Your Honor, is that they

23    were -- so Bimini and ARMOUR were formerly the same

24    company.  And the executives are close friends.  They live

25    in the same town.  They used to share offices.  And they

1   share the same IT director.

2           So when we were back in September arguing before

3   Your Honor, ARMOUR had every bit of information that it

4   now presents as this case is -- where it's expanded

5   discovery.  They had every bit of it.  And so they've been

6   playing games with us.

7           Our position is that Bimini was -- that

8   everything that needed to happen on the SS&C end for

9   Bimini happened, you know, in terms of my client's

10  performance, as is the case with ARMOUR.  And the reality

11  is that Bimini, like the other three customers, are all

12  paying clients of SS&C, all remain paying clients of SS&C.

13  And it's an undisputed fact that this dominant asset

14  accounting platform in the mortgage real estate market is

15  SS&C's and there's no other competitor that's even close.

16  So that the suggestion that this is, you know, that we've

17  been peddling something that doesn't work or can't be

18  implemented is preposterous.  This is a 30-year-old

19  product that's been implemented with hundreds of clients

20  across --

21           THE COURT:  Okay.

22           MR. O'CONNOR:  -- every class --

23           THE COURT:  Okay.  So I think I've heard enough

24  at this point.

25           What I'm going to do is require within the next

1   ten days, by a week from Monday, for you, Mr. O'Connor and

2   Ms. Kernisky, to negotiate an agreement concerning the

3   search terms I think that Ms. Kernisky referred to and the

4   number of custodians, try your best efforts to identify

5   that.

6          I'm not going to limit the time frame to just

7   2017.  I think 2014 to 2017 is an appropriate time frame.

8   And I'm not going to allow limitation only to external

9   documents, but that they should reflect and the search

10  terms may inquire into internal documents, internal

11  correspondence, communications about any problems with

12  implementation of the product as to Bimini.

13         So I'm giving you that guidance, basically a

14  guidepost.  You all are going to have to work out more of

15  the details there in good faith.

16         Any documents to be produced shall be produced

17  within two weeks from the deadline that you have to reach

18  an agreement.  So in other words, ten days, a week from

19  Monday, to reach an agreement.  And then a two-week

20  deadline to produce the Bimini documents as you agree to.

21         And then I'm going to be holding off

22  consideration, further consideration of more production of

23  any Bimini documents as well as the Resource and Fortress

24  documents until we get together in person.

25         Anything else on that aspect?

1            MR. O'CONNOR:  No, Your Honor.

2            THE COURT:  All right.

3            MS. KERNISKY:  No.

4            THE COURT:  Okay.  The next part is the request

5    concerning -- it looks like the next major dispute is that

6    SS&C is subpoenaing ARMOUR and Deloitte for a number of

7    documents.

8            And maybe you can talk a little about that,

9    Mr. O'Connor.  What are you seeking there, your need to do

10   that?

11           MR. O'CONNOR:  Your Honor, we've issued

12   subpoenas to the ARMOUR REIT, which is a separate entity,

13   which, by the way, paid for all of this.  So that is all

14   expenses incurred by ARMOUR, the plaintiff, were

15   transferred to ARMOUR, the REIT.  And then we also have a

16   subpoena for Deloitte.

17           With respect to ARMOUR, the REIT, we think it's

18   logical that it pass on $2 million in expenses.  ARMOUR,

19   the asset manager, would have explained what it was doing,

20   why it was doing it, and then what the status was.  And we

21   hope and expect, given that the ARMOUR REIT is a publicly

22   traded real estate investment fund, that they would

23   respond in candor.  And we hope with appropriate corporate

24   oversight they would have a candid explanation.  We simply

25   want that information from them.

1           We've received nothing.  If you're to believe

2   the production we've gotten so far from ARMOUR, they never

3   communicated anything whatsoever to the publicly traded

4   REIT and its board of directors in any way regarding SS&C

5   or CAMRA.  And we think that that's untenable and so we

6   want to hear from that third party.

7           With respect to Deloitte --

8           THE COURT:  Hold on just a second before you get

9   to Deloitte.

10          So your suspicion is that there's going to be

11  communications there by ACM with the REIT, ARMOUR REIT,

12  that is relevant to what, exactly?

13          MR. O'CONNOR:  Relevant to why they wanted to --

14  you know, what the shortcomings were within their asset

15  accounting reporting that caused them to seek out SS&C,

16  what the terms of the contract were, what the anticipated

17  timetable was, what the parties' responsibilities were,

18  and what the status was along the way.  In other words,

19  you know, what we're asking for is to hear what the person

20  who was at the first level was saying to the overseer that

21  was actually paying for everything.

22          THE COURT:  Why does it matter to this lawsuit

23  the reasons why ACM was seeking the service from SS&C?

24          MR. O'CONNOR:  Ultimately, with any accounting

25  platform, you're looking at people, process, and then the

1    technology and any identification of weakness with respect

2    to that.  So an auditor would come in and say, who are

3    your people?  Are they adequate?  What are your processes?

4    Are they adequate and appropriate for public investors,

5    other people's money?  And what is the technology?  And so

6    those communications should have happened from the asset

7    manager, which is ARMOUR, to the REIT in connection with

8    what they were doing previously, why they were making the

9    proposed move, and then why they decided not to pursue.

10   So all of those things.

11          And same thing with Deloitte.  Deloitte would

12   have, as an outside auditor, been saying who are your

13   people, what are your processes, and what's the technology

14   platform that you're operating from.  And we just want

15   visibility into what those communications were.

16          There's no question that ARMOUR was dissatisfied

17   with where it was in terms of an asset accounting set of

18   procedures and technology, and the mortgage real estate,

19   you know, that asset class, had suffered a number of

20   misstatements, some of the major players in that state

21   have misstated their numbers, and that prompted a flight

22   to SS&C, meaning that the solutions that they relied upon

23   previously were inadequate and that rolled business to

24   SS&C.  And so we want to see what was going on at ARMOUR

25   and whether they were like our other clients who flocked

1  to SS&C.

2            THE COURT:  So I'm trying to figure out again --

3  I know you'd like to learn this information, but, you

4  know, if I go to a car dealer and I buy a car and it turns

5  out to be what I think is a lemon, why does the car

6  dealer, if I sue the car dealer, get to get discovery from

7  me about why it is I went in to buy a car?  Aren't I, as

8  the customer, entitled to simply say you shouldn't sell me

9  a lemon of a car?

10            MR. O'CONNOR:  No, Your Honor, because it's not

11  driving a car.  It's -- this is enterprise software.  It

12  is company mission critical software upon which ARMOUR

13  represents to public shareholders the value of its assets,

14  opaque assets that are extremely complicated.  They're the

15  assets, in large part, the lack of clarity as to which led

16  to financial crisis in 2008, 2009.  These are

17  mortgage-backed securities.  And more than 10 percent of

18  ARMOUR's portfolio was not government backed and it's

19  substantially increased since 2014.

20            And so if you look at -- so, in other words,

21  we're not handing off a device that operates on its own.

22  And that's the central premise of this case, Your Honor.

23  If you read the complaint and the amended complaint, they

24  talk about a turnkey solution --

25            THE COURT:  Okay.

1          MR. O'CONNOR:  -- and we would submit that

2    that's utterly preposterous.  And that any overseer of a

3    publicly traded asset accounting reporting procedure will

4    tell you its people, its process, and its technology

5    platform.  And we want visibility of all three.  And we

6    believe that ARMOUR's failure to implement this software

7    was due to its people, its process, not the platform.  And

8    usually the reporting through the parties paying the REIT

9    and the reporting for the -- for the -- to the auditor and

10   the analysis of the auditor are highly likely to lead to

11   relevant information.

12          THE COURT:  If we look at just the REIT here,

13   the communications with the REIT, why wouldn't it -- why

14   wouldn't it make sense to limit the communication simply

15   to any communications to the REIT about ACM's intent and

16   plans to do business with SS&C or to have a CAMRA-like

17   product?

18          MR. O'CONNOR:  Well, we would like to see why

19   they wanted to make that decision.  So we want to --

20          THE COURT:  I think that's what I said though.

21   Okay.  I get your point.

22          MR. O'CONNOR:  Yeah, I can't -- I can't imagine

23   that that's very -- that that's burdensome.  That's not a

24   lot of information.  I would imagine that's one or two

25   reports.

1          THE COURT:  All right.  I got your point there.

2          So Ms. Kernisky or Mr. Mamounas, help me

3   understand why it wouldn't be legitimate to seek

4   information in the form of communications between ACM to

5   ARMOUR REIT concerning the need for the CAMRA product.

6          MS. KERNISKY:  Yes, Judge.

7          As we explicitly stated, the pieces about what

8   happened to ARMOUR after it contracted with SS&C, the

9   reason why they knock on SS&C's door in the first place is

10  not relevant to anything.

11         The other issue is that, you know, they've

12  established -- even if we could agree that these documents

13  have some relevance, they've established no predicate for

14  them.  The REIT was managed by ACM.  So they have had

15  opportunity and they have deposed several of ACM's people

16  and asked them questions.  They've also asked us for board

17  minutes, for audit committee minutes from ACM, and to see

18  if there were these kinds of written communications

19  between the REIT and ARMOUR.  And we did search, Judge,

20  and there aren't any.  They just don't exist.  They just

21  didn't talk about SS&C, which was a software vendor.

22  They're providing a service, they're buying a product for

23  their accounting system, it didn't come up in board

24  meetings.  SS&C had a chance to depose ARMOUR's COO and

25  CFO and the person in charge of its accounting, and they

1    asked questions and they were told that they didn't

2    recall, they didn't think that they had had these kinds of

3    conversations with the REIT.  So I think they have their

4    answer.  And to allow them to have unfettered access to

5    the REIT when it's not a party to the case, it's not a

6    signatory to the agreement between the parties, and I

7    don't see that it would have anything relevant to SS&C or

8    to CAMRA or to why that product wasn't able to be

9    implemented for ACM.

10              THE COURT:  Okay.

11              MR. O'CONNOR:  Well, Your Honor, I don't know

12   that we've gotten those documents.

13              If the answer is that there was no oversight or

14   reporting whatsoever, that will be a short deposition and

15   there will be no documents produced, and it will be

16   substantial proof for us.

17              You know, we're not interested in spending long

18   hours doing something if the answer is they never bothered

19   to report to the REIT any issues regarding this, then

20   that's relevant evidence and we would like to have it.

21              MS. KERNISKY:  Your Honor, may I, briefly?

22              This is, to use a phrase what I've heard before,

23   simply a fishing expedition.  There is absolutely no

24   predicate for any of these documents and for these

25   depositions.

1          THE COURT:  Okay.  Here's what I'm going to rule

2     on this here, because it does seem to me that at least

3     part of this is a proper inquiry.

4          As to the subpoena to the ARMOUR residential

5     REIT, I'm going to enforce the subpoena to the extent that

6     it would require the production of any documents

7     reflecting communications between ACM and the ARMOUR REIT

8     concerning SS&C and ACM's plans to purchase or contract

9     with SS&C about the CAMRA product and concerning any

10     difficulties encountered by ACM with respect to the

11     implementation of the CAMRA product.  Again, this is just

12     designed to narrowly capture by subject matter a

13     particular category of communications there.  I'm

14     deferring for now whether I would require the production

15     of any other documents or allow the enforcement of the

16     subpoena as to any other documents.  And so I'm going to

17     proceed on that basis alone.  That's my view of what is

18     properly discoverable.

19          The parties don't really go into the contention

20     about how ACM is required to bring a motion before the

21     Southern District of Florida.  If there's something else I

22     need to consider there, I'm going to have to have more

23     briefing from you with respect to that.  But I'll tell you

24     ultimately to the extent that I have authority to rule on

25     the subject matter scope, I do think that it's appropriate

1    to inquire into those subject matter categories.  And it

2    sounds like, from Ms. Kernisky's description, that ACM

3    doesn't think that there are any.  Perhaps there aren't

4    any documents responsive to that.  And that means it won't

5    be very burdensome to comply.

6             I hope that the parties would ensure the

7    production of those documents within 30 days.  Again, this

8    is bracketing the issue of this Court's authority to enter

9    this order, because I don't have much briefing from the

10   parties about whether ACM is required to go pursue a

11   remedy in the Southern District of Florida.  If that's

12   going to be the argument here, then I may need to

13   reconsider this issue when you appear before me in early

14   April.

15            With respect to Deloitte, I'm going to hold off

16   on that right now.  As I understand it, the arguments are

17   pretty similar, are they not, Mr. O'Connor?

18            MR. O'CONNOR:  Yes, Your Honor.  Although -- so

19   as far as we understand it, based on the productions,

20   ARMOUR, the management company, never communicated ever,

21   never had a single document transmitted to Deloitte about

22   any issue related to CAMRA.  It seems preposterous and

23   certainly would have been captured by our other document

24   requests.

25            THE COURT:  I see.

 1              And Ms. Kernisky or Mr. Mamounas, on Deloitte?

 2              MS. KERNISKY:  Yes, Judge.

 3              Well, first on Deloitte, we have sensitivity

 4    issues.  This is confidential financial information

 5    between ARMOUR and its client, and we would be seeking

 6    whatever protection is available for us on that basis as

 7    an initial matter.

 8              Secondly, I can't imagine that there were

 9    communications with the auditor if there weren't

10    communications with Deloitte talking about this particular

11    product that they didn't purchase, that never came to

12    fruition, but, you know, I don't think that those

13    documents exist.  And I still have yet to understand the

14    basis for them.  I mean, you know, the REIT is a publicly

15    traded company.  It's never had a statement, it's never

16    had a financial concern, no accounting deficiencies as

17    mention in the subpoena by SS&C.  So there's not really an

18    issue there.  And I don't see, even if there were, how

19    that would link to ACM's decision to purchase an

20    accounting portfolio product.

21              THE COURT:  Okay.

22              MR. O'CONNOR:  Well, Your Honor, what we're

23    hearing is that there's no assurance they haven't

24    communicated about people, process, and technology

25    platforms which would have highly -- the likelihood of

1    which would be very grave and would be directly on point.

2    And it may help them; it may help us.

3                    THE COURT:  Do you believe, Mr. O'Connor, that

4    they were communicating with Deloitte specifically

5    concerning their dealings with SS&C and the CAMRA product

6    or the software --

7                    MR. O'CONNOR:  Yes.  Yes.

8                    THE COURT:  -- and difficulties with

9    implementation?

10                   MR. O'CONNOR:  We think it's inconceivable that

11   they wouldn't have communicated about the decision to

12   evaluate a new asset accounting platform.

13                   They are reporting to public investors the value

14   of their assets.  And what they were using previously was

15   Bernie Madoff-level Excel spreadsheets that an individual

16   was plugging in the numbers and could pull the numbers

17   out.  This is a mission critical issue in terms of their

18   fiduciary duties to their public investors.  It's

19   inconceivable that they did not communicate about it.  All

20   of these documents should have been captured in our

21   initial request.  And if they'll tell you now they never

22   spoke to their auditors or the board about it, we'll be

23   surprised, but that will also be evidence that we will use

24   at trial.

25                   THE COURT:  I have your point.

1          Ms. Kernisky, anything else on this point with

2     Deloitte?

3          MS. KERNISKY:  Yes.

4          SS&C doesn't have to guess, Your Honor, whether

5     or not there have been documents.  They've deposed several

6     ARMOUR people and could have asked them directly.  I don't

7     see why we would burden Deloitte now for their failure to

8     do so.

9          Secondly, as SS&C well knows, the suggestion

10    that there is something wrong with using spreadsheets as a

11    way to account for these mortgage-backed securities is

12    laughable at best, Your Honor.  SS&C's press release

13    itself when they announced the formation of their REIT

14    division was from 2014 and it says specifically we

15    acknowledge that the standard in the industry is the use

16    of these spreadsheets and we have a product that can help

17    you upgrade from that.  So that wasn't limited to ARMOUR.

18    That has no basis in anything at issue here.  And the

19    suggestion that the REIT or ARMOUR is up to accounting

20    shenanigans and that's why they went looking for SS&C,

21    there's no basis for that.  Like any customer buying a

22    product, they chose to make an upgrade.  It wasn't because

23    there was something wrong with their underlying product or

24    the underlying people that were needing the product.

25          MR. O'CONNOR:  Well --

1        THE COURT:  Hold on a second, folks.  I'm going
2   to stop you for a second.
3        I'm going to allow enforcement of the subpoena
4   as to Deloitte to the same subject matter as I described,
5   limited subject matter that I described with respect to
6   ARMOUR REIT, that is any documents that reflect
7   communications between ACM and Deloitte concerning SS&C
8   and the plans by ACM to contract with SS&C for the CAMRA
9   product and any difficulties with implementation as to the
10  CAMRA product.  I think that that's at the least going to
11  be at the core of what should be discoverable from
12  Deloitte.
13       I'm not more broadly, as to either Deloitte or
14  to the ARMOUR REIT, requiring production of all
15  information about people, process, and technological
16  platforms.  That strikes me at this point as too broad to
17  require at this juncture.
18       So that's my ruling there as to that.
19       If there's going to be more with respect to
20  requests as to ARMOUR residential REIT and Deloitte, I can
21  take that up again when we get together in early April.
22       And the last, I think, basket of discovery
23  issues that you have is with respect to the additional
24  hour of time for two of the witnesses, Pallone and
25  Olszeweska, I'm not sure how to pronounce that.  I'm not

1    going to require that at this time, without prejudice to

2    reconsideration when we get together in April.

3             I have to break off for another matter at this

4    time, so is there anything else to take up?

5             MR. O'CONNOR:  No, Your Honor.

6             MS. KERNISKY:  No, Your Honor.

7             THE COURT:  So I think hopefully you have enough

8    guidance from me in terms of the preliminary or interim

9    discovery resolution knowing that it sounds like we may

10   need to revisit some of this in early April and also

11   insofar as any of the discovery may be affected by the

12   Court's ruling on the motion to dismiss, which it does

13   anticipate issuing prior to our getting together in early

14   April.  Okay.

15            All right.  Thank you all for calling in.

16            MR. O'CONNOR:  Thank you, Your Honor.

17            THE COURT:  Have a good weekend.  Take care.

18            MS. KERNISKY:  Thank you, Your Honor.

19                 (Proceedings adjourned at 3:48 p.m.)

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3

4          RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
               TECHNOLOGIES, INC., No. 3:17CV790(JAM)

5

6              I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 1 through 26 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                  _____/s/_____

17                     DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
18                     United States District Court
                       141 Church Street, Room 147
19                     New Haven, Connecticut 06510
                           (860) 463-3180
20

21

22

23

24

25