**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, <br> *Plaintiff*, <br><br> v. <br><br> SS&C TECHNOLOGIES, INC., <br> *Defendant*. | No. 3:17-cv-00790 (JAM) |

## ORDER ON MOTION TO DISMISS

This case arises from a contractual relationship between ARMOUR Capital Management LP (ACM), a registered investment advisor focusing on mortgage-related securities, and SS&C Technologies Inc. (SS&C), a provider of financial services software and software-enabled services. ACM alleges in essence that SS&C made misrepresentations and failed to comply with its contractual obligations to implement a new software system for ACM. SS&C now moves to dismiss the amended complaint. For the reasons set forth below, I will grant in part and deny in part SS&C's motion to dismiss.

### BACKGROUND

The following facts as alleged in the amended complaint are assumed to be true for purposes of this ruling. In 2014, ACM sought to upgrade its portfolio accounting to a full-service investment accounting platform, including software licenses and implementation. Doc. #35 at 5. To achieve this, ACM's executives researched several financial services software providers to find a platform that would serve ACM's needs. *Ibid.* ACM and SS&C engaged in a series of discussions about using SS&C's CAMRA software for the full-service investment accounting platform that ACM sought. *Id.* at 5–6.

1

During a series of pre-contractual communications, SS&C allegedly made a series of misrepresentations that induced ACM to enter into a contract. ACM identifies three categories of pre-contract misrepresentations. First, SS&C represented that it had extensive experience and expertise regarding complex accounting operations, including those involving mortgage real estate investment trusts. *Ibid.* Second, SS&C represented that the "hosting" option for utilizing the CAMRA software would be appropriate for ACM's needs. *Id.* at 7. To that end, SS&C provided a written "proof of concept" to demonstrate that the CAMRA hosting option satisfied ACM's requirements. *Ibid.* Finally, SS&C represented that it was capable of implementing the software in a successful and timely fashion. *Id.* at 8. For example, in December of 2014, SS&C provided ACM with an implementation budget and proposed migration timeline which represented that SS&C could complete implementation within four to six months after contract execution. *Ibid.* ACM alleges that these misrepresentations induced it to enter into a contract with SS&C. *Ibid.*

The parties entered into a "Master Agreement" on December 19, 2014. *Id.* at 9; Doc. #35-1 at 2–17. Under this agreement, ACM purchased a license for the CAMRA software and for implementation services and training for the software. Doc. #35-1 at 2. ACM maintains that SS&C was obligated under the contract to successfully implement the software, while SS&C contends that it was ACM who retained the ultimate responsibility for implementing CAMRA.

The Master Agreement includes a "Time Limit to Claim Breach" provision stating that any court action for breach must be brought within one year of when a party knew or reasonably should have known of a breach:

> No action arising out of any breach or claimed breach of this Master Agreement or transactions contemplated by this Master Agreement may be brought by either party more than one (1) year after the cause of action has accrued. For purposes of this Master

Agreement, a cause of action will be deemed to have accrued when a party knew or reasonably should have known of the breach or claimed breach.

*Id.* at 10 (¶ 6.7.16).

The Master Agreement also includes a provision regarding "Termination for Material Breach or Insolvency" which states that if either party materially breaches the contract, the non-breaching party may terminate the agreement after providing written notice to the breaching party and the breaching party fails to cure within 30 days. *Id.* at 7 (¶ 6.4.2.). In addition, the Agreement incorporates several attachments, including the License and Maintenance Program Agreement providing that ACM would perpetually license the software from SS&C and that SS&C would provide maintenance and support. *Id.* at 11–12. The Maintenance Program contains a limited 364-day warranty that CAMRA would perform in substantial accordance with SS&C's representations. *Id*. at 12.

Apart from the Master Agreement, the parties entered into three Work Request Agreements, the first of which was contemporaneous with the Master Agreement. The first Work Request provides for the initial setup of CAMRA and includes the description of services to be performed. *Id.* at 16.

After SS&C failed to implement the software, the parties agreed to Work Request Two effective as of March 21, 2016. This second work request further defines SS&C's obligations with respect to implementing the software and caps the fees set forth in Work Request One. Doc. #35-2 at 2–3. Work Request Two also "incorporates the terms of" the Master Agreement. *Id.* at 2.

The parties then entered Work Request Three effective as of April 20, 2016, which provides for further onsite and remote implementation services. Doc. #35-3 at 2. Work Request Three states that "the Master Agreement remains in full force and effect." *Ibid.* Additionally, under

the terms of the Master Agreement, "The terms and conditions of this Master Agreement are incorporated into and made a part of each Work Request." Doc. #35-1 at 5 (¶ 4.1).

ACM alleges that SS&C continuously misrepresented that it was capable of implementing CAMRA and would do so in the near future but that it failed. At the start of the Master Agreement term, SS&C represented that it could successfully implement CAMRA in four to six months. Doc. #35 at 11. On March 31, 2015, three months after the effective date of the Master Agreement, SS&C provided an "Implementation Roadmap" that confirmed that it had "obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications." *Id.* at 12.

But then, after confronting difficulty with implementing CAMRA, SS&C delayed the deadline for implementation completion until early August 2015. *Id.* at 11. SS&C continued to delay this date until SS&C stopped providing a revised deadline altogether. *Ibid.* SS&C provided multiple reasons for the implementation failure to and continually assured ACM that it would soon complete the implementation. *Id*. at 11–12.

In Fall of 2015, ACM began to withhold payments due to SS&C's failure to implement CAMRA. *Id.* at 13. ACM repeatedly notified SS&C in writing of its failure to implement CAMRA throughout 2015, 2016, and 2017. *Ibid.*

ACM alleges that SS&C made specific misrepresentations to induce ACM to not make a warranty claim under the Master Agreement, to not terminate the Master Agreement, to release payments to which SS&C was not entitled, and to enter into further Work Requests. For instance, on December 18, 2015, two weeks before the expiration date of the warranty on December 29, 2015, ACM expressed concerns regarding the implementation of CAMRA and noted that ACM

had a claim under the warranty. *Id.* at 13. SS&C reassured ACM that the problems with CAMRA were fixable and implementation was close to being completed. *Id.* at 14.

In April 2016, ACM requested that SS&C extend the warranty, but SS&C declined because ACM had recourse under the Maintenance Agreement. *Ibid.* Based on this misrepresentation, ACM agreed to Work Request Three. *Ibid.* SS&C also induced ACM not to terminate the master agreement by providing new experts who would assure ACM that their expertise would solve the problems with CAMRA. *Ibid.* SS&C never successfully implemented CAMRA, and ACM eventually terminated the Master Agreement on May 1, 2017. *Id.* at 16.

ACM has now filed this lawsuit alleging several claims in its amended complaint. Count One alleges breach of contract. Count Two alleges violation of the Connecticut Unfair Trade Practices Act (CUTPA). Count Three alleges intentional misrepresentation. Count Four alleges negligent misrepresentation. Count Five alleges a claim for rescission. SS&C now moves to dismiss the amended complaint.

## DISCUSSION

The background principles governing a Rule 12(b)(6) motion to dismiss are well established. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Because the focus must be on what facts a complaint alleges, a court is "not bound to accept as true a legal conclusion couched as a factual allegation" or "to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). In

short, my role in reviewing a motion to dismiss under Rule 12(b)(6) is to determine if the complaint—apart from any of its conclusory allegations—alleges enough facts to state a plausible claim for relief.

### *Breach of Contract*

SS&C argues that all of ACM's claims, including its breach of contract claim, are barred by the contractual time limit provision in the Master Agreement. Connecticut courts recognize the validity of contractual provisions that limit the time within which a party to the contract may bring suit. *See Air Brake Sys., Inc. v. TUV Rheinland of N. Am., Inc.*, 699 F. Supp. 2d 462, 471 (D. Conn. 2010). The contractual time limit provision in this case sets a one-year limit on bringing suit "after the cause of action has accrued," and it defines the time the action begins to accrue as "when a party knew or reasonably should have known of the breach or claimed breach." Doc. #35-1 at 10.

ACM argues that the action accrued only from the time ACM chose to terminate the contract after "the incurability of SS&C's material breach became apparent." Doc. #49 at 10. To support this contention, ACM points to the "Termination for Material Breach or Insolvency" provision that allows a non-breaching party to terminate the agreement after providing written notice to the breaching party and the breaching party fails to cure within 30 days. Doc. #35-1 at 7. ACM appears to read this provision to mean that the cause of action accrues from the time of termination. But this provision only defines the rights of each party to terminate the contract upon breach; it does not define when the action accrues or what constitutes a breach.

Furthermore, ACM's reading is not sustainable in light of the contract's clear statement that the action accrues "when a party knew or reasonably should have known of the breach or claimed breach." At oral argument, ACM averred that these words should be interpreted as

"termination or claimed termination." Such an interpretation ignores the plain and unambiguous meaning of the words "breach or claimed breach." Moreover, ACM's interpretation renders the phrase "claimed breach" nonsensical, because there is no such thing as a "claimed termination"—either one party has terminated the agreement or it did not.  It is therefore clear that the action began to accrue at the time ACM knew or should have known of the breach or claimed breach and not at the point of termination.

Taking all of ACM's allegations as true, it is nonetheless clear that ACM deemed SS&C to be in breach at least as early as Fall of 2015 when—as ACM itself alleges in the amended complaint—it "began to withhold payments *due to SS&C's failure to implement CAMRA.*" Doc. #35 at 13 (emphasis added). ACM's amended complaint describes SS&C's failure to implement CAMRA as "SS&C's *serial material breaches* of the Master Agreement." *Id.* at 17 (emphasis added).

Thus, based on ACM's own account, a breach occurred at least as early as Fall of 2015, and the breach was so significant that ACM began to withhold payments. By ACM's own reckoning, there can be no doubt that a cause of action accrued by the Fall of 2015. Because the instant suit was filed on May 15, 2017, this lawsuit falls well outside of the one-year timeframe allowed under time limit provision of the Master Agreement.

Although ACM argues that it opted not to file suit within this timeframe in hopes that SS&C would cure the claimed breach, there is nothing in the contract that provides this reason for delaying the accrual date or tolling the one-year limitations period. As such, any of ACM's claims that arise out of a breach or claimed breach of the Master Agreement are time-barred by this contractual provision.

ACM next argues that even if the breach of the original Master Agreement and Work Request One occurred more than one year before this suit was filed, ACM may still pursue this suit based on SS&C's breaches of Work Requests Two and Three. I agree. Work Requests Two and Three may be plausibly read as new contracts that imposed a renewed obligation on SS&C to implement the software in exchange for its receipt of further funds. Work Request Two expressly incorporated the terms of the Master Agreement. This incorporation includes the terms of the one-year time limit provision. Because the work requests are "transaction[s] contemplated by [the] Master Agreement," a claim arising out of a breach or claimed breach of the work requests may be brought within one year after a party knew or reasonably should have known of a breach or claimed breach of the work requests. Work Request Two was effective as of March 31, 2016. ACM has plausibly alleged that it did not and could not have known of a breach or claimed breach of Work Requests Two or Three one year before this lawsuit was filed on May 15, 2017. Accordingly, for purposes of this initial pleading stage of whether ACM has pleaded plausible grounds for relief, I conclude that ACM may pursue a breach of contract claim for any breach of Works Requests Two and Three.

ACM further argues that to the extent its suit is untimely, I should toll the limitation period based on the unjust conduct of SS&C. Doc. #49 at 11. So far as I can tell, Connecticut law does not allow for equitable tolling of a contractually agreed-upon statute of limitations, as distinct from a legislative statute of limitations. Multiple courts have held that "periods of limitation that the parties create by *contract* are not susceptible to statutes and doctrines that toll the relevant period of limitation that arises by *statute*." *Air Brake Sys., Inc.*, 699 F. Supp. 2d at 474; *see also Known Litig. Holdings, LLC v. Navigators Ins. Co*., 934 F. Supp. 2d 409, 419 n.5 (D. Conn. 2013) ("tolling doctrines are inapplicable to contractual suit-limitation provisions

unless the contract provides for tolling of the limitation period"); *Lopez v. Charter Oak Fire Ins. Co.*, 2013 WL 1111346, at *6 (Conn. Super. Ct. 2013) ("[I]n the limited cases which allowed equitable tolling, the courts excused legislatively imposed statutes of limitations. In this case, it is a contractual limitation which was bargained for by the defendant . . . . The court can find no cases which impose an equitable excuse for a plain and unambiguous contract term.").

There is a distinction, however, between the doctrines of equitable *tolling* and equitable *estoppel. See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) (Posner, J.). Equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Id.* at 450-51. And equitable estoppel is "a general equity principle not limited to the statute of limitations context." *Id.* at 450.

"Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct." *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 60 (2005). Accordingly, notwithstanding the inapplicability of equitable tolling principles to a contractual time-limit to bring suit, equitable estoppel principles may indeed apply to counter a defendant's invocation of a contractual time-for-suit limitation provision. *See, e.g.*, *VP Elec., Inc. v. Graphic Arts Mut. Ins. Co*., 2013 WL 4737327, at *4 (D. Conn. 2013); *D.L.M. Mech., Inc. v. Konover Const. Corp*., 2007 WL 1521061, at *2 (D. Conn. 2007) (same).

Still, ACM does not allege the requisite facts to support equitable estoppel. Under Connecticut law, there are two essential elements to an equitable estoppel: (1) that the adverse party "must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief," and (2) that the injured party "must change its

position in reliance on those facts, thereby incurring some injury." *Boyce v. Allstate Ins. Co*., 236 Conn. 375, 385 (1996); *Glazer*, 274 Conn. at 60. "Moreover, it is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." *Boyce*, 236 Conn. at 385-86; *see also Celentano v. Oaks Condo. Ass'n*, 265 Conn. 579, 615 (2003) (same).

ACM cannot meet that standard as to its claim that the contractual time limit should not apply. It was fully aware of SS&C's continuing failures to implement CAMRA within the time limitation period. As much as ACM may believe that it was snookered by SS&C into signing up for the CAMRA product, ACM points to no facts suggesting that SS&C did anything to mislead ACM about the applicability of the contractual limitations period. ACM knew of the alleged breach and had the choice to sue on the Master Agreement and/or Work Request One before the time limitation period ended, but instead chose to continue to allow SS&C to attempt to implement CAMRA. Although ACM argues that it only chose not to sue based on SS&C's repeated assurances that implementation was imminent, ACM made the knowing decision not to sue within the timeframe and without receiving from SS&C any waiver or forbearance of the contractual limitations period.

Accordingly, I will grant SS&C's motion to dismiss Count One for breach of contract to the extent that the claim relies on a breach of the Master Agreement or Work Request One. I will deny the motion to dismiss to the extent that Count One relies solely on a breach of Work Request Two or Three, including ACM's claim of a breach of the duty to subsequently implement CAMRA under those later contracts.

### *Intentional Misrepresentation*

SS&C contends that ACM has failed to plead its intentional misrepresentation with sufficient particularity. Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud." This requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc*., 865 F.3d 71, 81 (2d Cir. 2017). Although ACM can allege intent generally, ACM must still "allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A*., 459 F.3d 273, 290 (2d Cir. 2006). This strong inference can be shown "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 290-91. When pleading that a defendant had a motive and opportunity to commit fraud, a plaintiff cannot rely on "a general profit motive common to all corporations." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co*., 478 F. App'x 679, 681 (2d Cir. 2012).

The heightened pleading requirements of Rule 9(b) apply to a claim for intentional misrepresentation under Connecticut law. *See Catalano v. Bedford Assocs*., *Inc*., 9 F. Supp. 2d 133, 136 (D. Conn. 1998). I conclude that ACM has not met its burden under Rule 9(b) as to its intentional misrepresentation claim. The amended complaint lacks a "strong inference" of fraud as ACM fails to show that SS&C had the "motive and opportunity" to commit fraud. The only motive pled by ACM is SS&C's general motive to make a profit. *See, e.g.*, Doc. #35 at 7 (alleging that SS&C was "incentivized" to represent that hosting was appropriate and could be implemented because otherwise "there would be no deal" between ACM and SS&C); *see also E.*

*Point Sys., Inc. v. Steven Maxim, S2k, Inc*., 133 F. Supp. 3d 430, 438–39 (D. Conn. 2015) (allegations that defendant assured plaintiff that it "possessed the capability of providing a computer software program that could satisfy the needs" of plaintiff were insufficient and did not support a plausible inference that the "statement was false when made" because "a representation that one is capable of doing something is not false simply because the speaker later fails to execute."). Nor has ACM pled sufficient facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. As such, ACM has not adequately pled intentional misrepresentation under Rule 9(b). I will therefore grant SS&C's motion to dismiss Count Three for intentional misrepresentation based on insufficient pleading under Rule 9(b).[1]

### *Negligent Misrepresentation*

SS&C argues that ACM's negligent misrepresentation claim should also be dismissed under Rule 9(b). Courts are deeply split within this District and elsewhere about whether Rule 9(b) applies to negligent misrepresentation claims. *See, e.g.*, *Associated Constr./AP Constr., LLC v. Hanover Ins. Co*., 2017 WL 1190363, at *10 n.17 (D. Conn. 2017) (Rule 9(b) does *not* apply to negligent misrepresentation claims under Connecticut law; citing cases); *McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 561 (D. Conn. 2016) (Rule 9(b) applies to negligent misrepresentation claims under Connecticut law; citing cases); *see also* Michael L. Roberts, *et al.*, 6 Litigating Tort Cases § 68:31 (discussing circuit split); Kimball Dean Parker, Comment, *A Historical Approach to Negligent Misrepresentation and Federal Rule of Civil Procedure 9(b)*, 80 U. Chi. L. Rev. 1461 (2013) (same).

Even if I assume that Rule 9(b) applies to negligent misrepresentation claims, ACM's allegations are sufficient under this heightened standard. ACM's amended complaint details the

---

[1] Because I am dismissing this count for insufficient pleading under Rule 9(b), I will not address SS&C's remaining arguments as to Count Three.

particular statements that serve as the basis for its claim, specifies the relevant speakers, and states the times that the statements were made. ACM has also alleged sufficient facts explaining why the statements were negligent. And because a negligent misrepresentation only requires a showing of negligent intent, ACM need only plead "the factual basis which gives rise to a strong inference" of negligence rather than a particular motive or opportunity to lie. *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009). Accordingly, I find that ACM's negligent misrepresentation claim is adequately pled under Rule 9(b).

SS&C further argues that ACM's negligent misrepresentation claims are precluded by the economic loss doctrine. The economic loss doctrine bars negligence tort claims that "arise out of and are dependent on the contractual relationship between the parties." *Ulbrich v. Groth*, 310 Conn. 375, 404 (2013). The doctrine does not prohibit tort claims that "are independent of the plaintiff's contract claim, and that can survive even if the contract claim fails." *Ibid*. The test of whether a tort claim is dependent on a contract claim is whether it is "premised on the same alleged conduct with respect to the same . . . property and rel[ies] on the same evidence" and if there is "no theory under which" a plaintiff could succeed on its tort claim if its contract claim fails. *Id.* at 405.

Importantly, the economic loss doctrine does not bar a fraudulent inducement claim—a claim that a pre-contractual misrepresentation induced a plaintiff to enter into a contract with a defendant. *Id.* at 406. In such a fraudulent inducement context, the tort pre-exists the contract, and it cannot be said the tort claim wholly arises from the breach of any contractual obligation. *See Shanshan Shao v. Beta Pharma, Inc.*, 2017 WL 1752932, at *12 (D. Conn. 2017).

Count Four of ACM's amended complaint appears to rely exclusively on pre-contractual misrepresentations that allegedly induced ACM to enter into the Master Agreement with SS&C.

Doc. #35 at 4-8, 20-21. Such a claim is precisely the type of pre-contractual inducement that is not barred by the economic loss doctrine. To the extent that ACM intends to incorporate post-contractual misrepresentations into its negligent misrepresentation claim, such claims are barred under the economic loss doctrine.

Nor is there merit to SS&C's argument that ACM's negligent misrepresentation claim is time barred by the Master Agreement's contractual time limit provision. That provision places a time limit solely on claims arising from a breach of the contract, not on tort claims that are independent of any breach of contract and not barred by the economic loss doctrine. Accordingly, I will deny SS&C's motion to dismiss Count Four for negligent misrepresentation.[2]

### *CUTPA*

SS&C argues that ACM's CUTPA claim should be dismissed for failure to plead with particularity under Rule 9(b). "[T]o the extent that a CUTPA claim does allege fraud, the Rule 9(b) requirements apply." *Zito v. United Techs. Corp.*, 2016 WL 2946157, at *3 (D. Conn. 2016). ACM's CUTPA claim is based solely on SS&C's "false and misleading representations to ACM, which SS&C knew or, alternatively, at least should have known to be false." Doc. #35 at 17. In light of my discussion above, to the extent that ACM's CUTPA claim relies on intentional misrepresentations, the claim is not adequately pled under Rule 9(b). But to the extent that the CUTPA claim relies on negligent misrepresentations, ACM has adequately alleged its claim under the heightened 9(b) standards.

SS&C further argues that the CUTPA claim is essentially a breach of contract claim masquerading as an unfair practices claim. CUTPA bars the use of "unfair or deceptive acts or

---

[2] At oral argument on this motion, counsel for SS&C stated that Sections 6.7.4 and 6.7.5. of the Master Agreement would possibly bar ACM's misrepresentation claims. But this argument was not briefed in the papers, and I will not consider it in this ruling.

practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). In determining whether conduct violates CUTPA, the following criteria are applied: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons." *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 880 (2015) (internal brackets omitted).

A breach of contract alone is insufficient to state a CUTPA claim absent substantial aggravating circumstances. *See Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 247-48 (2007). On the other hand, Connecticut case law is clear that "negligent misrepresentation suffices . . . as an aggravating factor making a breach of contract action also the basis of a CUTPA claim." *Bartold v. Wells Fargo Bank, N.A.*, 2015 WL 7458504, at *6 (D. Conn. 2015) (quoting *Romulan Realty, LLC v. Old Lyme Prods., Inc.*, 2011 WL 6934754, at *2 (Conn. Super. Ct. 2011)); *Jolen, Inc. v. Brodie & Stone, PLC*, 2016 WL 3179753, at *4 (Conn. Super. Ct. 2016); *Friedlander Ltd. P'ship v. Cohen*, 2005 WL 1091449, at *3 (Conn. Super. Ct. 2005). ACM's CUTPA claim is not based on mere breach of contract, but relies as well on SS&C's alleged negligent misrepresentations. Therefore, the CUTPA claim is not merely a repackaged contract claim and suffices for purposes of the pleading stage of this case.

Finally, SS&C contends that the CUTPA claim is barred as an action "arising out of" a breach or claimed breach under the contractual time limit provision. ACM's CUTPA claim relies on both pre- and post-contractual representations. I agree with SS&C that the post-contractual misrepresentations "arise out of" the breach or claimed breach, and that any claim premised on

these misrepresentations would be subject to the time limit imposed by the contract. But, as discussed above, any pre-contractual misrepresentations would not "arise out of" any breach and would not be subject to this bar.

I will therefore grant SS&C's motion to dismiss Count Two to the extent that ACM's CUTPA claim relies on any intentional misrepresentations and to the extent that it relies on any post-contractual misrepresentations. ACM's CUTPA claim may proceed to the extent that it relies on negligent misrepresentations prior to the execution of the Master Agreement.[3]

### Rescission

SS&C argues that ACM has failed to allege that rescission is warranted. "The remedy of rescission . . . is simply the unmaking of an agreement, *i.e.*, a renouncement of the contract and any property obtained pursuant to the contract and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." *Emerald Investments, LLC v. Porter Bridge Loan Co*., 2007 WL 1834507, at *1 (D. Conn. 2007) (internal quotations omitted). A party to a contract may rescind the contract "if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." *Munroe v. Great Am. Ins. Co*., 234 Conn. 182, 188 n.4 (1995). "Accordingly, the party seeking to rescind need not demonstrate that the other party's misrepresentations were made intentionally, provided that they are material to the contract." *Ibid.* SS&C cites several cases suggesting the misrepresentation must be knowing, but these cases are limited to the insurance context. Because ACM has adequately pled pre-contract negligent misrepresentations, these misrepresentations could plausibly serve as the basis for rescission.

---

[3] To the extent that ACM's CUTPA claim relies on negligent misrepresentations subsequent to Work Requests Two or Three, they would not be time barred for the reasons I discussed earlier. But Count Two of ACM's amended complaint does not mention any misrepresentations that occurred after the execution of the work requests.

SS&C also moves to dismiss the rescission count because it is "inappropriate and impossible" under the circumstances. Doc. #43-1 at 35. To support this claim, SS&C cites *Aurigemma v. Arco Petroleum Prod. Co*., 734 F. Supp. 1025, 1033 (D. Conn. 1990), for the proposition that when "one party transfers intangible property, such as services and proprietary information, the transferee cannot return the property but only its cash value." SS&C argues that "at the very least" this would require ACM "to compensate SS&C for all of its time, energy, and information, which would frustrate the very purpose of a rescission." Doc. #43-1 at 36. Even if this is true, this only challenges the wisdom of ACM's request for rescission; it does not show that ACM has failed to state a claim for rescission. Accordingly, I will deny SS&C's motion to dismiss Count Five.

**CONCLUSION**

For the reasons stated above, I GRANT in part and DENY in part SS&C's motion to dismiss the amended complaint. I grant the motion to dismiss Count Three (intentional misrepresentation). I grant in part and deny in part the motion to dismiss Counts One (breach of contract), Two (CUTPA), and Four (negligent misrepresentation). I deny the motion to dismiss Count Five (rescission).

It is so ordered.

Dated at New Haven this 16th day of March 2018.

*/s/ Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge