UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


```
- - - - - - - - - - - - - - - - x
                                 :
ARMOUR CAPITAL MANAGEMENT LP,    :  No. 3:17CV790(JAM)
                                 :
                 Plaintiff       :
                                 :
           v.                    :
                                 :
SS&C TECHNOLOGIES, INC.,         :
                                 :  New Haven, Connecticut
                 Defendant       :  November 14, 2017
                                 :
- - - - - - - - - - - - - - - - x
```


MOTION HEARING


B E F O R E:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

1   A P P E A R A N C E S:

2

3       FOR THE PLAINTIFF:

4           HOLLAND & KNIGHT
                701 Brickell Ave., Suite 3000
                Miami, Florida 33131
5           BY:  JOSEPH J. MAMOUNAS, ESQ.
                 ALLISON KERNISKY, ESQ.
6
7           HOLLAND & KNIGHT
                263 Tresser Boulevard Stamford, 1400
                Stamford, Connecticut 06901
8           BY:  CHRISTOPHER M. CERRITO, ESQ.

9

10      FOR THE DEFENDANT:

11          HINCKLEY ALLEN & SNYDER LLP
                28 State Street
                Boston, Massachusetts 02109-1775
12          BY:  KEVIN J. O'CONNOR, ESQ.
                 JASON C. WILLIAMS, ESQ.
13
14          HINCKLEY ALLEN & SNYDER LLP
                20 Church Street, 18th Floor
                Hartford, Connecticut 06103
15          BY:  ALEXA TALIN MILLINGER, ESQ.

16

17

18

19

20

21

22

23

24

25

1                        **2:06 P.M.**

2              THE COURT:  We're here today for purposes of

3    argument in the motion to dismiss in ARMOUR Capital

4    Management v. SS&C.

5                  Appearance of counsel, please, for ARMOUR.

6              MR. MAMOUNAS:  Good afternoon, Judge.  Joe

7    Mamounas, Chris Cerrito, and Allison Kernisky of Holland &

8    Knight on behalf of the plaintiff.

9              THE COURT:  Good afternoon.

10             MR. O'CONNOR:  Good afternoon, Your Honor.

11   Kevin O'Connor and with me Alexa Millinger from Hinckley

12   Allen on behalf of defendant SS&C Technologies.

13             THE COURT:  Okay, good enough.

14             So obviously I have your papers.  Would you like

15   to proceed, Mr. O'Connor?

16             MR. O'CONNOR:  Yes, Your Honor.  Would

17   Your Honor prefer --

18             THE COURT:  Up to the lectern, please.

19             MR. O'CONNOR:  May it please the Court:

20             Your Honor, this case involves a dispute

21   between --

22             THE COURT:  I know what the case is about.  I

23   guess my issue that I have concerning what I think is your

24   main argument, the statute of limitations argument, is if

25   I accepted your argument on the statute as to the initial

1    Master Agreement, December 19, 2014 agreement, would that

2    mean that there's no remedy for a claim with respect to a

3    breach of subsequent obligations undertaken in connection

4    with Work Request No. Two and Work Request No. Three, both

5    of which seem to expressly incorporate the terms of the

6    Master Agreement?

7            MR. O'CONNOR:  I think the answer is no,

8    Your Honor, that it wouldn't necessarily preclude those

9    claims.

10           The fundamental claim is the breach of the

11   contract for failure to implement.  And we, of course,

12   dispute that it was our client's duty to implement.  But

13   that issue was clear and present for all of the parties

14   right away by plaintiff's own admission on the face of its

15   complaint.

16           THE COURT:  I know that, and I get your argument

17   on that.  But I guess what I'm saying is if you've got two

18   parties to a contract, things don't go well, one party

19   lets the sort of time limit for suing go by for the

20   initial contract team to build a better mousetrap, but

21   they do enter into a new contract, actually you could say

22   two different new contracts that are essentially geared

23   towards the very same thing, towards let's get this

24   mousetrap built, it strikes me -- and those two new

25   contracts expressly reference the earlier one, I think the

1    words that are used in both those are incorporate --

2                MR. O'CONNOR:  Yes, Your Honor.

3                THE COURT:  -- and it strikes me then, I'm

4    trying to figure out, all right, well, once the parties

5    have essentially refreshed the contractual relationship,

6    it would seem to lend itself to the argument that now they

7    have another one year to complain about the breach of an

8    agreement that's undertaken pursuant to Work Request

9    No. Two and Work Request No. Three.  I don't know if I'm

10   making sense.  Do you see what I'm saying?

11               MR. O'CONNOR:  You are, yes, Your Honor.

12               THE COURT:  If you didn't have Work Request

13   No. Two and Work Request No. Three, I think it would be

14   hard in a lot of ways for the other side to answer your

15   argument.  So that's what I'm confused about.

16               MR. O'CONNOR:  And Your Honor, it would have

17   been easy enough for the parties to have amended the

18   agreement to extend the one-year statute of limitations

19   that the parties agreed to contractually.  They did not.

20   They agreed to these additional provisions as a way to

21   work forward.

22                To the extent that the allegation is that SS&C

23   breached by failing to implement, ACM was on notice of

24   that as of 2015, the complaint says serially breached or

25   that my clients serially breached, and they did not act.

1          THE COURT:  I get that.

2          Do you have the Master Agreement with you there?

3          MR. O'CONNOR:  I do, Your Honor.

4          THE COURT:  Go to Page 9 of 16, Section -- the

5   time limit clause which is 6.7.16.

6          MR. O'CONNOR:  Yes.

7          THE COURT:  The reference there is to "No action

8   arising out of any breach or claimed breach of this Master

9   Agreement" and then it adds "or transactions contemplated

10  by this Master Agreement."

11         Do we know what that means, the reference to

12  transactions that are contemplated?

13         MR. O'CONNOR:  I think it's unambiguous on the

14  face of the contract, Your Honor.  It's any transaction,

15  any conduct on the part of the parties wherein things are

16  supposed to be exchanged.

17         THE COURT:  So if to the extent that some of

18  those transactions then include the subsequent Work

19  Request Nos. Two and Three, wouldn't that suggest that

20  there could be a claim under the separate -- or under the

21  contracts that are established by Work Requests Two and

22  Three?

23         MR. O'CONNOR:  The subsequent contracts, yes,

24  Your Honor.

25         THE COURT:  Okay.

1              Now, look, I know that the complaint itself in

2   the breach of contract claim claimed a breach of contract

3   of the Master Agreement.  It doesn't say for Work Request

4   No. Two, Work Request No. Three.  I know there's

5   references elsewhere in the complaint, but in terms of its

6   charging language it seems to, I think, just says Master

7   Agreement there.  So where does that -- so when you're

8   seeking dismissal of the complaint in this case, it sounds

9   to me you're saying, well, at least as to time bar issues,

10  an action for a breach of Work Request No. Two and Work

11  Request No. Three is not time barred.

12              MR. O'CONNOR:  Potentially.  The allegations in

13  the complaint are insufficient to support any claim we

14  would contend but, yes, potentially.

15              THE COURT:  Potentially what?

16              MR. O'CONNOR:  Claims under the second and third

17  work requests could conceivably have been violated within

18  a year.

19              THE COURT:  Okay.

20              MR. O'CONNOR:  If it's a separate and distinct

21  violation from any alleged violation of the agreement as a

22  whole.

23              THE COURT:  Well, that's talking about giving

24  with one hand and taking away with the other.  It seems

25  like that the separate and distinct violation would be --

1    so it would have to be something traceable to a specific

2    representation in Work Request Two or Three --

3              MR. O'CONNOR:  Yes.

4              THE COURT:  -- as distinct from the

5    resuscitation of some prior duty that was created solely

6    under the terms of the Master Agreement.

7              MR. O'CONNOR:  Yes, Your Honor.  And the

8    parties' clear intent was, to the extent there's a breach,

9    either side needs to bring it properly within a year.  The

10   parties chose not to amend that or to extend that.  They

11   chose to deal to create these separate work requests.  The

12   plaintiff can seek a violation of those particular work

13   requests.  But the breach of the Master Agreement and the

14   first work request are outside, clearly outside the

15   contractual limitations period.

16             THE COURT:  And do you read the -- for Work

17   Request No. -- let me back up.

18             The contract, none of these contracts, I take

19   it, or agreements seem to have a time frame for completion

20   of the implementation, do they?

21             MR. O'CONNOR:  That's correct, Your Honor.

22   Ultimately, what the parties chose was to leave

23   implementation in the hands, the ultimate hands of the

24   customer.  And so ACM intended the parties -- and the

25   reason there's not a deadline and it would have been easy

1    enough to establish a deadline, but ACM under this

2    agreement retained control and ultimate responsibility for

3    implementation, and the structure of the agreement

4    reflects that.

5              And even the second work request talks about ACM

6    being able to do things.  Now, that necessarily requires

7    ACM to put forth effort which it can choose to do or to

8    not do, but ultimately these parties agreed that the

9    implementation rested in the final hands of ACM, not SS&C.

10             THE COURT:  Okay.  So would your argument be

11   then that to the extent that there is a claim for breach

12   of the obligations undertaken in Work Request Two and Work

13   Request Three, it would have to be simply for failure to

14   provide essentially those supplemental services?

15             MR. O'CONNOR:  Yes.

16             THE COURT:  Okay.

17             MR. O'CONNOR:  And then related to those,

18   Your Honor, the fraud claim and the CUTPA claim we

19   respectfully submit are classic fraud by hindsight claims.

20   If you focus on the second and third work orders, they

21   demonstrate that SS&C -- and there's no dispute among the

22   parties, SS&C for years worked diligently at weekly status

23   meetings in an effort to have this software implemented.

24   So the notion that SS&C would have engaged in conduct that

25   would rise to the level of a CUTPA claim is essentially

1    discredited on the face of the complaint.  It's an

2    illogical theory.  SS&C caps its hours, continues to work

3    diligently.  And the suggestion of the plaintiff is that

4    at all relevant times SS&C had a present intent not to

5    implement the software, never believed it could, never

6    intended that it could.  That fact is also discredited by

7    the fact that the plaintiff initiated the contact here.

8    The chief financial officer and chief operating officer of

9    ACM went out, conducted an independent search, and

10   identified SS&C as a suitable provider.  So the notion,

11   again, that there was any present intent to bait and

12   switch ACM is completely discredited.

13           THE COURT:  Would that hold true though in every

14   case in which you have a prospective customer going to a

15   business, walking in the business door and saying, hey,

16   we've done all our internet research here, we think you

17   are the company to do what we want.  If the company knows,

18   huh-uh, we're not the company, we can't get the job done

19   given the type of whatever network you already have or

20   business model you already have, I don't think the fact

21   that the customer has walked in the door in the first

22   instance relieves the company from some obligation of

23   truthfulness.

24           MR. O'CONNOR:  I absolutely agree, Your Honor.

25   I don't mean to suggest that.

1          THE COURT:  I can see why that would be an

2     evidentiary argument that you would make to a jury or fact

3     finder and say the fact that one sought out the other and

4     it wasn't the other way around, but I'm not sure as a

5     matter of law or necessary logic it means that the company

6     could not have engaged in a misrepresentation.

7          MR. O'CONNOR:  Absolutely.  I agree with that,

8     Your Honor.

9          What's at issue with the CUTPA claim and the

10     fraud claim are whether the facts are sufficient to allege

11     a strong inference of scienter.  And that fact cuts

12     against a strong inference of scienter.  SS&C's undisputed

13     continuous extensive efforts to try to make this

14     implementation work, including capping fees, strongly

15     undercut any inference of scienter.

16          So the plaintiff here wants to elevate a breach

17     of contract or an alleged breach of contract between two

18     sophisticated parties to a CUTPA claim.  In seeking to do

19     so, that plaintiff has to allege facts that create the

20     strong inference and that rise above mere fraud by

21     hindsight.

22          And it's important to note that this plaintiff

23     didn't even allege fraud initially.  This plaintiff in its

24     initial complaint, having worked for two and a half years

25     with SS&C, does not allege fraud in its initial complaint.

1    And it's only when it learns in the face of a motion to

2    dismiss that its CUTPA claim will be disabled that the

3    fraud claim is added.

4           I would respectfully submit that that pleading

5    history, that the circumstances under which the parties

6    were engaged, and the undisputed substantial continuous

7    commitment by SS&C to try to make this work eviscerates

8    any inference of fraud.

9           THE COURT:  Can a CUTPA claim rely on a

10   negligent misrepresentation?

11          MR. O'CONNOR:  No, Your Honor.  In order to

12   convert a mere contract to a CUTPA claim, there have to be

13   sufficient aggravating circumstances.  And what the

14   Connecticut courts have found is that it needs to rise to

15   the level of recklessness or fraud, not mere negligence.

16          THE COURT:  Okay.  All right.

17          Anything else?

18          MR. O'CONNOR:  No, Your Honor.

19          This is a pretty straightforward agreement --

20   just to wrap up, the parties allocated the responsibility

21   for implementation.  It's clear and unambiguous that the

22   plaintiff ultimately took on that responsibility.  There's

23   no dispute that SS&C provided all of the hours that were

24   purchased and that SS&C worked tirelessly to make this

25   happen.  The case does not support any inference of fraud,

1    it doesn't support a CUTPA claim, and the economic loss

2    doctrine bars the two tort claims, which are really just

3    contract claims that are repackaged in an effort to

4    survive a motion to dismiss.

5         THE COURT:  So essentially were the parties

6    agreeing simply to use best efforts to implement or to --

7    I guess to implement this software of SS&C?

8         MR. O'CONNOR:  They didn't use the language

9    "best efforts."

10        THE COURT:  I'm just trying to figure out what

11   it is ultimately that plaintiff was buying here.  Were

12   they buying just the rights of SS&C to give it its best

13   college try and try to implement this, and if it doesn't

14   work out, well, tough luck on plaintiff?  Because that's

15   not -- ordinarily if I go to the computer store as a

16   consumer -- I realize it's different, consumer versus

17   business business -- I go to the computer store and I buy

18   a particular program, I think I expect it to work

19   ultimately.  And especially if I'm told on the outside

20   this can be used in my Mac Pro notebook.  Wasn't that

21   ultimately the agreement between the parties, to get a

22   software program that was going to work?

23        MR. O'CONNOR:  That was the intent, certainly,

24   Your Honor.  Absolutely.  And there's no evidence that the

25   software doesn't work.  The question was:  What were the

1   level of hours that would be required for successful

2   implementation?  Implementation is a bilateral activity.

3   It requires the client to provide some contribution.  And

4   ultimately these parties agreed.  They could easily have

5   said we guarantee it would be done by this date; they

6   could have taken another implementation option where it

7   would be outsourced; they could have had other metrics

8   where they established other benchmarks that would have

9   put more responsibility on SS&C.  But they did not do

10  that.  They left implementation ultimately in control of

11  the client.  The client wanted it that way and essentially

12  reserved the right not to go forward with the

13  implementation if it chose not to.  But they did not in

14  any way embed within these agreements any of the

15  provisions that would have created a deadline or --

16          THE COURT:  Or they didn't contract for a

17  successful implementation really is what you're saying.

18          MR. O'CONNOR:  Yes.

19          Your Honor, ACM bought what it bought.  It

20  bought 1850 hours of implementation.  The parties believed

21  in good faith --

22          THE COURT:  They bought a license to the

23  software.

24          MR. O'CONNOR:  License, yes.

25          THE COURT:  And they bought implementation

1    services.

2                 MR. O'CONNOR:  Implementation services.  They

3    bought a warranty, a one-year warranty which they passed

4    on knowingly.  And they could have purchased additional

5    services.  SS&C agreed to cap the services in order to get

6    this done.  Your Honor, it's like saying I'm going to

7    throw a pass and someone has to catch it.  And ultimately

8    the quarterback can be accurate, but the receiver still

9    has to catch the ball and execute the play.  And they

10   reserved the right to control that activity on their end.

11   They guarded that control under the contract.  And they

12   got what they were promised.  And they do not have a claim

13   under this contract for breach of contract, let alone

14   CUTPA or a fraud claim as their initial complaint

15   tacitly --

16                 THE COURT:  Are you challenging the negligent

17   representation?

18                 MR. O'CONNOR:  On the economic loss doctrine.

19                 THE COURT:  Just under the economic loss

20   doctrine.

21                 MR. O'CONNOR:  Yes.

22                 THE COURT:  Anything else?

23                 MR. O'CONNOR:  No.  Thank you, Your Honor.

24                 MR. MAMOUNAS:  Good afternoon, Judge.  Joe

25   Mamounas, may it please the Court.

1          I'm going to pick up somewhat where Mr. O'Connor

2     left off and that was on the point of CUTPA requiring

3     scienter.  I think it's pretty clear from the *Bartold*

4     decision from this district citing Connecticut case law

5     that negligent misrepresentations may serve as a basis for

6     substantial aggravating factors under the CUTPA.

7          THE COURT:  I thought so, I'll look at that

8     again.

9          MR. MAMOUNAS:  That's in the CUTPA decision

10    that's in our papers, Judge.

11          There was another point that was made, and I

12    think this went to what Your Honor characterized as the

13    main argument from SS&C on motion to dismiss, and that is

14    the limitations argument.  And I believe Mr. O'Connor

15    characterized what SS&C did as substantial continuous

16    commitment.  And on that I think we agree on the reading

17    of the complaint, that is that from the time the contract

18    was signed through the time that it was terminated in

19    May 2017 there was continuous commitment from both sides.

20    And I think that that issue is very important because it

21    reflects what the reality was on the ground.  That is,

22    that even if SS&C says there was upset and potentially

23    even injury by ARMOUR in the fall of 2015, the parties

24    continued throughout time to work together in order to try

25    to make sure implementation happened, putting aside

1   whoever's obligation that was.  We don't agree who bore

2   that obligation.  We clearly say that we went out,

3   purchased implementation, and expected SS&C to do it; and

4   they have a different viewpoint.  But the reality is that

5   during that time period they continued to invoice us, we

6   continued to pay, and we expected that they continue to

7   work.

8           And --

9           THE COURT:  So what should I make of the time

10  limit for one year under Section 6.7.16?  Tell me how is

11  it that that has no effect here when you acknowledge in

12  your own complaint, you plead it, essentially, that they

13  had breached to the point where you guys were even

14  withholding payments more than a year before you filed the

15  complaint.

16          MR. MAMOUNAS:  Understood, Judge.

17          And we don't take issue with the fact that the

18  limitations period exists.  It would be recognized by

19  Connecticut law.  But the question is:  When does the

20  cause of action accrue?

21          In preparing for today's hearing, there were a

22  couple of decisions that really stood out from Connecticut

23  courts in applying that set of principles to these exact

24  facts, essentially.  In other courts in the software

25  context make clear exactly how that limitations period

1    should play out.

2         Going to the issue of continuity, that is the

3    parties' continuing to work together, the Connecticut

4    Superior Court in *Calabrese v. Finno Dev.* cited to another

5    decision, *Skidmore Owens*, and I have copies for counsel

6    because I apologize, these --

7         THE COURT:  Were these not in your pleadings?

8         MR. MAMOUNAS:  These weren't in our pleadings,

9    Judge.  As I said --

10        THE COURT:  It's not really helpful for me to

11   hear about cases that weren't in the pleadings.  If you

12   want to file a letter that says what the case says, you're

13   welcome to do that.

14        MR. MAMOUNAS:  I'd be happy to, Judge.

15        THE COURT:  And the other side to respond to

16   that letter.

17        MR. MAMOUNAS:  And we have no objection.  That's

18   fine.

19        Suffice it to say when there is a continuing

20   course of treatment or a continuing course of work by a

21   service provider for a client, a breach does not occur and

22   a cause of action does not accrue until the contract is

23   either completed or until a termination is called by the

24   client or by the service provider.  And so --

25        THE COURT:  Well, you know, I haven't looked at

1    these new cases you found, but I'll bet they didn't have

2    this kind of contractual language in them.

3            MR. MAMOUNAS:  They do, Judge.

4            THE COURT:  Do they?

5            MR. MAMOUNAS:  They do.

6            THE COURT:  They weren't just reliance on

7    general statute?

8            MR. MAMOUNAS:  No, Judge.  These are contractual

9    limitations cases in the software context where

10   implementation did not occur within the time period during

11   which it was expected where the software provider came

12   back and said but you had injury as of the date that we

13   promised you and therefore, gotcha, you can't bring this

14   claim because it's beyond the one-year contractual

15   limitations period.  And the Fourth Circuit as well as

16   New York state court both have found -- and we will put

17   these in our letter brief -- that the contractual

18   limitations period did not become effective and a claim

19   did not first accrue until the contract was terminated,

20   and that's when the breach was declared.

21           THE COURT:  So you're equating breach to

22   termination.

23           MR. MAMOUNAS:  It would have to be, Judge.

24   Because otherwise it would lead to, at a minimum, what I

25   think we could agree would be awkward circumstances.

1              Let's assume in late 2015 SS&C and ARMOUR said,

2    yes, we'd love to continue cooperating and working

3    together to make sure implementation happened regardless

4    of whose obligation it is, again.  But then we were faced

5    with I guess a fateful decision a year afterward; that is,

6    we would either have to give up all recourse and continue

7    moving forward with our relationship, at which point we

8    would have no ability to sue because SS&C says at that

9    point the one-year contractual limitations period had

10   lapsed or we would have to say, I'm sorry, SS&C, we're not

11   interested in continuing to cooperate, we're going to

12   terminate the contract and sue today because we're

13   concerned about losing recourse.

14              THE COURT:  Or option three is you say we're

15   thinking about filing a lawsuit because you are not doing

16   what you're supposed to be doing.  We would rather

17   cooperate with you, but we have a time limit here that we

18   have to file a lawsuit under; so we'd be happy to

19   cooperate with you, but you need to extend this time

20   limit.

21              MR. MAMOUNAS:  Well, I think, Judge, that goes

22   to the question of whether ACM at that point knew or

23   reasonably should have known, as the contract requires in

24   Section 6.7.16, that there had actually been a breach such

25   that they could successfully maintain a suit in court.  I

1    think at that point their position was, yes, we are

2    dissatisfied, but we're looking to continue to cooperate

3    even to the point where we're going to return to the

4    negotiating table and come up with --

5            THE COURT:  Let's just pay attention to the

6    language, specific contractual language here.  And that

7    refers to no action arising out of any breach or claimed

8    breach, right?  A breach or claimed breach.

9            MR. MAMOUNAS:  That's what it says, Judge.

10           THE COURT:  And I think what you're telling me

11   is what that really means is termination or claimed

12   termination.

13           MR. MAMOUNAS:  Given the circumstances of the

14   services that were being rendered and the fact that it was

15   an ongoing cooperative relationship, that's what it would

16   have to mean.  In other words, there would have to be some

17   sort of completion to the relationship in order for a

18   breach to occur such that ARMOUR could have successfully

19   maintained suit.

20           THE COURT:  Do you think if that were in fact

21   the parties' intent, that they might have just said any

22   party may sue within one year of the termination or the

23   notice of default of termination of this agreement?

24   Wouldn't that have been what the parties would have agreed

25   to?

1          MR. MAMOUNAS:  That could have been better

2    language, Judge, agreed.

3          THE COURT:  These are lawyers working on these

4    agreements, right?  These are I think somewhat

5    sophisticated business entities, right?

6          MR. MAMOUNAS:  In fairness, Judge, this is

7    SS&C's form contract, as we understand it.

8          THE COURT:  But you have a legal department up

9    in Windsor Locks, right, don't you?

10          MR. MAMOUNAS:  I think --

11          THE COURT:  No, SS&C, right.

12          Do you have a legal department?

13          MR. MAMOUNAS:  We do not.  We do not.  We're a

14    small outfit in Vero Beach, Florida, that, Judge, as I

15    said, sought out SS&C for these services and ended up with

16    this form contract and this time period.

17          And I think under the case law, the nature of

18    the relationship was such that it was not until

19    termination.  And that tracks the practical reality that

20    ARMOUR believed that it -- believed or reasonably could be

21    assumed to believe that it had a claim that it could

22    successfully maintain in court, which is the standard set

23    forth in Your Honor's decision in the *AT Engine* case.

24          THE COURT:  I remember that decision, but I

25    don't recall that involving this kind of contractual

1    language.

2           MR. MAMOUNAS:  Your Honor, it involved the

3    standard as far as accrual.

4           THE COURT:  Under the legal standard, the

5    background default standard for an accrual.  I'm dealing,

6    though, here with parties in their contractual choice to

7    put in not only a one-year time limit but also an accrual

8    clause that defines accrual.  I think I'm guided by what I

9    understand the parties to have agreed to in terms of when

10   the cause of action accrues.

11          MR. MAMOUNAS:  And we would agree with that,

12   Judge.

13          And as I said at the outset, we don't take issue

14   with the validity of Section 6.7.16, it's its application.

15   And that is when is it the party in this case, ARMOUR,

16   knew or reasonably should have known that a claim arose.

17   And under the case law, we don't believe it made any sense

18   or that it is consistent with Connecticut law that ARMOUR

19   would have known as of the time in fall of 2015 when it

20   had, you know, a concern or a complaint that it could

21   successfully maintain a claim in court --

22          THE COURT:  So you thought at that point in

23   time, "In fall 2015" -- and I'm just tracking your own

24   complaint, Paragraph 44 -- "ACM began to withhold payment

25   due to SS&C's failure to implement CAMRA."

1          So I think your argument then is while we had

2    every right to withhold payment then, but, gosh, under the

3    terms of this agreement, we didn't have the right to sue

4    because the whole agreement wasn't formally terminated.

5          MR. MAMOUNAS:  Well, I think what's important is

6    what happens in the subsequent paragraphs.  And that is

7    that the relationship continued; that is, those payments

8    were ultimately made; that is, Work Request Two was

9    ultimately negotiated; that is, because Work Request Two

10   was negotiated and ARMOUR didn't claim a breach, didn't

11   file a lawsuit, SS&C continued enjoying the contract and

12   its benefits.  They say that the fees were capped and

13   that's true.  And our position is that Work Request Two

14   makes it abundantly clear that it was their obligation to

15   implement.  But it also means that the hosting agreement

16   continued to be paid, the maintenance agreement for

17   $100,000 a year continued to be paid, and the licensing

18   fees weren't returned, which was a half million dollars.

19   So SS&C continued to enjoy the benefits of the contract

20   all the while we continued to pay those fees on the

21   expectation that implementation would happen.

22          THE COURT:  Okay.  So do you read -- is your

23   complaint here for breach of contract for breach of the

24   master contract or for breach of Work Order Two and Three,

25   or some combination of all of those?

1          MR. MAMOUNAS:  It is for breach of the Master

2     Agreement including its work requests thereto, which is

3     how the Master Agreement defines itself and how we've

4     defined it in Paragraph 26, Judge.  That is, that the

5     Master Agreement incorporates by reference its work

6     requests, the work requests themselves incorporate by

7     reference the Master Agreement.  The purpose, as expressed

8     on the face of the documents, is that the parties'

9     agreement is meant to be memorialized in that one set of

10    materials; and that is that as the relationship moved

11    forward, so too did the contractual documentation

12    reflecting what it is that they were to do.

13          The nub of our claim, and I don't think it's any

14    secret, is that implementation was supposed to have been

15    provided by SS&C and it was not.  Implementation was set

16    at the beginning by Work Request One.  Work Request Two is

17    what established a benchmark for when the parties could

18    objectively agree that implementation was complete.

19          THE COURT:  So when we look at Work Request

20    I think No. Two, it's Exhibit B to the Amended Complaint,

21    it refers there -- do you have it, by chance?

22          MR. MAMOUNAS:  I do.  I'm there, Judge.

23          THE COURT:  It says, "This Work Request No. Two

24    is issued pursuant to, and incorporates the terms of" --

25    and then it says "the Processing Services Agreement."  Do

1  you see where it says that?

2           MR. MAMOUNAS:  I see that, Judge.

3           THE COURT:  Right.

4           And can you remind me, what is the Processing

5  Services Agreement?  It seems to be dated the same day as

6  the Master Agreement, but I wasn't sure if there's some

7  distinction there between -- was there some other contract

8  that was signed that day called the Processing Services

9  Agreement?

10          MR. MAMOUNAS:  There was not, Judge.  I can only

11  deduce that that was a scrivener's error, and I think that

12  would probably create a fact issue as far as what

13  agreement it was, if anything distinct from the Master

14  Agreement.  The December 19 Master Agreement is the only

15  agreement executed between the parties as of that date,

16  including of course the attachments in Work Request One

17  which were part of the Master Agreement as of December 19,

18  2014.

19          THE COURT:  I see.

20          All right.  So bottom line, your argument on

21  statute of limitations is you had a year from the date

22  that a party elected to terminate the agreement.

23          MR. MAMOUNAS:  That's right, Judge, because we

24  continued to cooperate.  Until that point in time, we

25  continued to pay, they continued purportedly to work.  We

1  declared a breach on May 1, 2017, and filed within two

2  weeks of that date such that it was clearly timely within

3  the contractual limitations period.  And we will submit

4  case law if Your Honor would allow in a letter brief.

5            And then with respect to the balance of our

6  claims, Judge, may I be heard or does Your Honor have

7  questions?

8            THE COURT:  Tell me a little about Rule 9 and

9  the specificity and why this isn't fraud by hindsight.

10            MR. MAMOUNAS:  Okay, Judge.

11            There are two buckets of misrepresentations with

12  respect to our noncontract claims, that is CUTPA and

13  negligent misrepresentation and fraud.  There are

14  pre-contractual misrepresentations that we allege were

15  made to induce us over a period of seven months and a bit

16  more, I believe, to enter into the contract.  They namely

17  concerned SS&C's qualifications.  And we cited case law in

18  our brief on that issue in particular and why it's

19  material to a party's inducement to enter into a contract.

20  Those are the *Milltex* and *Centimark* cases.

21            We also were told that the hosting

22  implementation option of the three that were available to

23  us were very important and were appropriate for the

24  implementation process.  The appropriateness comes from a

25  number of cases in our brief as well.

1        And then finally, we were made

2   misrepresentations about the time period within which SS&C

3   would implement, and the timing comes from the *Milford*

4   case which was also in our brief.

5        THE COURT:  So your basic idea is -- you guys

6   sought out SS&C, right?

7        MR. MAMOUNAS:  That's correct, based on internet

8   research.

9        THE COURT:  You go in to SS&C.  And SS&C is

10   essentially like kind of the spider here, now a bug has

11   landed in its web and it starts to commit fraud all over

12   the place to try to snooker you into signing a contract,

13   that's right, that SS&C knew from day one it wasn't going

14   to effectuate; that's basically your fraud claim, right?

15        MR. MAMOUNAS:  I think, Judge, if you look at

16   their representations as alleged in the contract, they

17   were not true.  They were not a proven leader for

18   implementing CAMRA software within the mortgage REIT

19   space.  And that is an issue that, as Your Honor knows,

20   we've begun to take discovery on and that we should be

21   able to continue and complete discovery and to present our

22   proofs whether at trial or summary judgment.  Because SS&C

23   made very, very bold statements right around the time that

24   it launched its mortgage REIT division as we allege in

25   order to secure our business.  And they worked for seven

1    months making representations, doing demonstrations, doing

2    proofs of concept in order to show ARMOUR how well this

3    software would work for them.  They had people flying to

4    south Florida.  They had people setting up meetings in

5    New York.  They were making what we call a full-court

6    marketing and sales process in order to try to secure the

7    business.

8              THE COURT:  Could that be because they thought

9    they could do the job?  Or is your thought that they're

10   just leading you down the prim rose path and they know

11   nothing's ever going to work at the end of this, and maybe

12   you guys won't sue them and nothing will be the worse for

13   it?

14             MR. MAMOUNAS:  Judge, I think this is a case, as

15   we cited in our brief, where SS&C was saying things that

16   it did not know.  It was saying that it knew what it did

17   not know.  And you've heard many representations at this

18   hearing and the prior discovery hearing about how SS&C is

19   the market leader, but the reality is, as we alleged in

20   our papers, they had just entered this space, they were

21   trying to build the business.  They made

22   misrepresentations about having qualifications and

23   experience with mortgage REITs that they just didn't have.

24   They said that they were proven in this space when the

25   reality is that we were the first ones they tried to

1    implement hosting for.  There's no way you could be proven

2    on the one hand but have absolutely no experience with

3    hosting a mortgage REIT on the other.  So SS&C was putting

4    itself out there as someone who knew something that, as

5    the case law says, they didn't know.  And that's

6    sufficient on a motion to dismiss to infer fraud or

7    certainly a CUTPA claim or a negligent misrepresentation

8    claim.

9             THE COURT:  Do you want to say anything about

10    the economic loss doctrine?

11             MR. MAMOUNAS:  Absolutely, Judge.  Thank you

12    very much.

13             I think it's pretty clear from the cases that we

14    cited in our breach that the pre-contractual

15    misrepresentations are entirely separate and distinct from

16    whatever is bound up and wrapped in the contract.

17    Connecticut case law is very clear that a merger and

18    integration clause does not preclude a claim for

19    inducement.  And we've, I think, alleged more than enough

20    under 9(b) in order to substantiate our fraud claim and

21    certainly negligent misrepresentation under CUTPA as far

22    as pre-contractual misrepresentations.

23             During the course of the parties' contractual

24    relationship, and we do make I think a number of

25    allegations about these representations in our complaint,

1    there was significant pressure from SS&C for ARMOUR just

2    to stay the course.  ARMOUR had been told that this was

3    going to be a four- to six-month process.  It ended up

4    going beyond 24 months.  During that time period, in order

5    to keep us engaged after having spent millions of dollars

6    on this project, having invested more than half a million

7    dollars of our client's own time, and having wasted tons

8    of money on what is considered a mission critical software

9    package, this is essentially how ARMOUR was going to

10   account for all of its work.  They knew we couldn't turn

11   back.  And so they made false assurances in order to keep

12   us engaged and keep us involved in the relationship.

13           And I would just direct the Court to the *Kelly*

14   decision from the Connecticut Superior Court that talks

15   exactly to the idea of false assurances made during the

16   course of a relationship.  In that case, a company had

17   brought in an independent contractor who himself was

18   concerned that the contract was going to be terminated

19   just as we were concerned, as we've alleged, that

20   implementation might never happen.  And he was told time

21   and again, "Just keep working, just keep working, don't

22   worry, we'll keep paying you, we won't terminate your

23   contract, everything will end up fine."  And ultimately

24   after the defendants in that case was able to secure

25   important business deals and to make the money that it had

1    hoped off of this gentleman, they terminated his contract.

2    And the Connecticut Superior Court said that the

3    allegation of the representations were false, were

4    knowingly false and were made to induce the gentleman to

5    continue working, were sufficient for there to be

6    post-contractual false assurance misrepresentations, and

7    that's what we've alleged here.

8                So as far as the economic loss rule is

9    concerned, those are separate and distinct from the actual

10   obligations that are bound up in the contract.  These

11   instead are intentional representations that were made to

12   continue to induce ARMOUR to pay money, to not terminate

13   the contract, to not make a warranty claim so that SS&C

14   could continue enjoying the benefits of the contract.

15               THE COURT:  Okay.

16               MR. MAMOUNAS:  Anything else, sir?

17               THE COURT:  No, that's it.  Thank you.

18               MR. MAMOUNAS:  Thank you very much.

19               MR. O'CONNOR:  Your Honor, may I be heard

20   quickly?

21               THE COURT:  Yes.  And I have another question

22   for you, Mr. O'Connor, I think on the integration clause.

23               MR. O'CONNOR:  Yes.

24               THE COURT:  Section 6.7.4.

25               MR. O'CONNOR:  Yes.

1          THE COURT:  And 6.7.5, the modification.

2          MR. O'CONNOR:  Yes.

3          THE COURT:  What effect -- to the extent that

4   there's a claim of post-contractual misrepresentations,

5   inducements, does this really affect or foreclose those?

6          MR. O'CONNOR:  Your Honor, yes.  We would submit

7   that it does.  The parties agreed that the terms of their

8   relationship would be set forth in the written agreement.

9          And I would just add that with respect to ACM,

10   Your Honor, it's a registered investment advisor that

11   offers mortgage-backed securities to public investors.  It

12   is the epitome of a sophisticated party.  And so the

13   suggestion that somehow they were subject to someone's

14   form is not tenable.

15          THE COURT:  I see.

16          But just back on 6.7.4 and 6.7.5 -- and I don't

17   know if you have them there in front of you.

18          MR. O'CONNOR:  I do.

19          THE COURT:  It strikes me that the entire

20   agreement clause 6.7.4 essentially is backward looking, it

21   goes to all previous communications.  And then 6.7.5 is

22   forward looking, it says "This Master Agreement may be

23   amended only by written agreement signed by both parties."

24   It doesn't seem to say, as sometimes contracts say, the

25   parties shall enter into no further agreements absent

1    putting them in writing.  So that's -- I'm wondering if I

2    can really read this Master --

3             MR. O'CONNOR:  It's not as broad as some

4    language, I see that, yes, absolutely.  But what it does

5    say is this is the entire agreement and we intend to amend

6    the entire agreement only by a writing signed by both

7    parties.  I recognize that there are broader phrasings in

8    some cases, but I would submit that it's clear that the

9    intent of the parties is that the entire agreement be set

10   forth here.

11            THE COURT:  Okay.

12            MR. O'CONNOR:  And then, Your Honor, with

13   respect to the plain language of this agreement,

14   sophisticated party, suggesting that termination is what

15   the parties intended when they said breach is simply not

16   tenable.  It would have been easy enough to say that.

17   They chose not to do that.  And in fact, it talks about

18   when a party reasonably should have known of a breach.  So

19   reasonably should have known of termination makes no sense

20   based on the plain reading of that language.

21            THE COURT:  Or the reference to claimed breach,

22   right, because you can't have a claimed termination; you

23   have a termination or you don't.

24            MR. O'CONNOR:  Yes, exactly, Your Honor.

25            And this complaint -- with respect to my

1    brother, there are multiple -- there's a lot in the

2    argument today that's not included in the four corners of

3    the complaint.  What the complaint says is that SS&C

4    starting in 2015 serially breached the agreement, and that

5    ACM was aware of it as of 2015 and withheld money.  And

6    ACM chose nevertheless never to extend those terms or any

7    limitation period or any warranty.  So those decisions

8    confirm that the intent of the parties was to limit to the

9    one year and to live by the intent of this written

10   agreement.

11              THE COURT:  Thank you.

12              MR. O'CONNOR:  Thank you, Your Honor.

13              THE COURT:  Anything else from any party?  I

14   allow kind of free back-and-forth, although I always give

15   the movant the last word.

16              MR. MAMOUNAS:  I only rise because I have a

17   question, Judge, and that is with respect to the letter

18   brief.

19              THE COURT:  I'll ask the parties submit any

20   letter brief by noon tomorrow and any response to each

21   other's letter briefs by Friday.

22              MR. MAMOUNAS:  Very well, Judge.

23              THE COURT:  Close of business on Friday.

24              MR. MAMOUNAS:  We'll do that.  Thank you, Judge.

25              THE COURT:  I'm going to hold the motion under

1    advisement and await your letter briefs and endeavor to

2    rule as soon as I can.  Thank you all.

3              MR. O'CONNOR:  Thank you, Your Honor.

4              MR. MAMOUNAS:  Thank you, Judge.

5                   (Proceedings adjourned at 2:51 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3

4         RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
               TECHNOLOGIES, INC., No. 3:17CV790(JAM)

5

6              I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 1 through 36 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                    _____
                              /s/

17                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
18                    United States District Court
                      141 Church Street, Room 147
19                    New Haven, Connecticut 06510
                          (860) 463-3180
20

21

22

23

24

25