

20 Church Street
Hartford, CT 06103-1221

p: 860-725-6200   f: 860-278-3802
hinckleyallen.com

April 2, 2018

**VIA CM/ECF ELECTRONIC FILING**

Honorable Jeffrey Alker Meyer
Richard C. Lee United States Courthouse
141 Church Street
New Haven, Connecticut 06510

> Re:   <u>Civil Docket No. 17cv790</u>
>        <u>*Armour Capital Management, LP v. SS&C Technologies, Inc.*</u>

Dear Judge Meyer:

This letter brief addresses SS&C's position with respect to the discovery dispute to be heard by the Court on Tuesday, April 3, 2018 at 10 a.m. between Plaintiff Armour Capital Management, LP ("ACM") and Defendant SS&C Technologies, Inc. ("SS&C").[1]

### I.   Introduction and Brief History of the Case

The present discovery dispute is a result of ACM's efforts to obtain documents and testimony that are not relevant to any of its claims against SS&C, particularly as they have been limited by this Court's ruling on SS&C's motion to dismiss.

This action arises out of a contractual relationship between ACM and SS&C whereby SS&C agreed to license to ACM an asset-accounting software called CAMRA, hosting of that software on SS&C's servers, and certain professional services. ACM's complaint, filed May 15, 2017 alleged claims for breach of contract, CUTPA violation, breach of express warranty, unjust enrichment, conversion, and seeking rescission. In response to a motion to dismiss by filed by SS&C, ACM filed an Amended Complaint on July 13, 2017 asserting claims for breach of contract, fraud and negligent misrepresentation. On March 16, 2018, this Court issued a ruling on SS&C's motion to dismiss the Amended Complaint which dismissed several of ACM's claims and significantly limited the scope of this litigation. The Court dismissed ACM's fraud claim and CUTPA claim to the extent it alleges fraud or negligent misrepresentations after the parties executed the Master Agreement on December 19, 2014,

---

[1] Some of the content of this letter brief is repeated from SS&C's previous letter brief in advance of the March 2, 2018 discovery conference. SS&C does this only for the Court's convenience so that all relevant facts and arguments are encompassed in one document.

Honorable Jeffrey A. Meyer
April 2, 2018
Page 2

dismissed ACM's breach of contract claim to the extent it alleges a breach of the Master Agreement or Work Request One, and dismissed ACM's negligent misrepresentation claim to the extent it relates to misrepresentations made after the execution of the Master Agreement. ACM has not re-pled.

Meanwhile, ACM has continued to push for superfluous discovery in an effort to prop up its failed claims. As discussed below, ACM should not be entitled to the additional discovery in dispute. SS&C has already undertaken a massive burden in reviewing and producing a huge number of documents and making all of the requested witnesses available for deposition. ACM now pushes beyond the bounds of what is proportionate to the needs of the case or reasonably calculated to lead to admissible evidence, particularly in light of its now-narrowed claims.

Finally, while pushing open the door to excess discovery with one hand, ACM's seeks to block SS&C's reasonable discovery with the other. ACM opposes SS&C's requests to depose ACM's managing member Jeffrey Zimmer, Armour Residential REIT, Inc. and Deloitte & Touche, LLC. All of these entities have direct relevance to ACM's claims and SS&C's defense, as supported by testimony and documents in the case, therefore any objection should be overruled.

## II.   Background Regarding Discovery Disputes

### A. SS&C Responds to ACM's Written Discovery

ACM served its first set of discovery requests on SS&C on June 26, 2017. In response to those requests, SS&C gathered and reviewed more than 100,000 documents relating to 19 email custodians (requested by ACM) for a three-year period.  SS&C produced more than 65,000 documents to ACM, including more than 150,000 pages of information. SS&C objected too many of ACM's requests, particularly requests seeking information and documents related to SS&C clients other than ACM.

After attempting to resolve the objections on their own, the parties sought this Court's assistance and held a telephonic discovery conference on September 29, 2017. With respect to ACM's request for documents related to SS&C's implementations for other clients, Your Honor stated that SS&C had valid concerns about producing documents related to its other clients and ruled that SS&C need only produce "documents concerning any uncompleted implementation during [the designated] time period in which *the uncompleted implementation was by reason of a claim by the customer that CAMRA was not functioning or implementing as anticipated by*

*the customer.*" Subsequently, SS&C provided supplemental discovery responses stating in relevant part that there were no such implementations.

### B. ACM Seeks Documents Related to SS&C's Client Bimini

Four months later, on January 29, 2018, ACM sent SS&C an affidavit from Hunter Haas, President of Bimini Capital Management, Inc. ("Bimini"). Bimini, like ACM, is a mortgage REIT manager located in Vero Beach, Florida. The two entities were previously under mutual ownership and still share the same Head of Information Technology. Bimini, in September 2015, entered into an agreement with SS&C for licensing and hosting of CAMRA. As numerous SS&C witnesses can attest, Bimini was fully implemented, but before the software went live, Bimini decided to switch to an outsourcing contract with SS&C to suit their desire for increased automation. Bimini remains an SS&C client and is successfully operating, and paying fully, on an outsourcing basis. Haas – who is admittedly a personal friend of ACM's senior management – claims in his January 29th affidavit that "SS&C never fully implemented CAMRA for Bimini on a hosted basis" and that "[o]ut of frustration with the failed implementation process, Bimini renegotiated its agreement with SS&C and opted to switch from hosting to outsourcing." SS&C fundamentally disagrees with the characterization that CAMRA was not implemented on a hosting basis for Bimini, as well as Bimini's characterization of its reasons for switching from hosting to outsourcing. Regardless, SS&C acknowledges that this affidavit – which ACM could easily have obtained back in September – approaches the standard propounded at the September 29, 2017 hearing, and agreed to provide certain discovery regarding Bimini.

### C. ACM Serves Second Set of Discovery Requests and "Follow-On" Discovery Requests

Despite the vast documentation SS&C has reviewed and produced, ACM served a second set of written discovery requests on SS&C on December 22, 2017 (the "Second Requests"). The Second Requests sought information and documents that again relate SS&C's business relationships with its other clients. SS&C provided thorough interrogatory responses and limited document production, and objected to the document requests to the extent they concern other SS&C clients. The present discovery dispute does not directly relate to the Second Requests, but rather what ACM characterized as "follow-on requests." The "follow-on requests" were an informal list of seven additional categories of documents that ACM requested from SS&C by email on February 22, 2018. ACM claims these requests are encompassed within the scope of their written discovery requests.

Honorable Jeffrey A. Meyer
April 2, 2018
Page 4

### D. March 2 Discovery Conference and Remaining Issues

On March 2, 2018, the parties held a telephonic discovery conference with Your Honor. At that conference, you ordered the parties to reach an agreement as to search terms regarding ACM's proposed Bimini production, and produce responsive documents related to Bimini by March 26, 2018. SS&C complied and produced more than 13,500 pages of documents on March 26, 2018.

Your Honor reserved the remaining written discovery issues for the present hearing. Removing the Bimini issues, the outstanding written discovery issues consist of the following requests by ACM to SS&C: (1) documents relating to the leadership changes in SS&C's of Professional Services unit; (2) weekly status reports for SS&C mortgage REIT clients Fortress and Resource' (both current SS&C clients) (3) documents relating to resource allocation issues or lack of client commitment regarding the implementations of Resource and Fortress; (4) documents relating to the relationship between professional services and sales in 2014; and (5) profit and loss statements for professional services, the REIT Servicing Group, and Institutional and Investment Management. SS&C's position on each of these issues is discussed below.

### E. New Issues Since March Discovery Conference

At the March 2nd conference, Your Honor also heard argument on SS&C's ability to subpoena Armour Residential REIT, Inc. (the "REIT") and Deloitte & Touche, LLC ("Deloitte"). Your Honor ruled that SS&C could subpoena these two entities, but limited the scope of the subpoenas. Subsequently, when the parties began to discuss deposition dates, a disagreement arose as to whether the Court allowed SS&C to take the deposition of the REIT and Deloitte, in addition to written discovery. A review of the transcript of the March 2, 2018 hearing shows that Your Honor did not explicitly address the issue of SS&C's deposition subpoena, but did not make any ruling that deposition testimony was prohibited.

On March 16, 2018, this Court issued a decision on SS&C's Motion to Dismiss. Following that decision, what remains of ACM's claims are the following: (1) ACM claims it was improperly induced to enter into the contract by SS&C's negligent misrepresentations about SS&C's experience with mortgage REITs, the suitability of hosting as a deployment option for ACM's use of CAMRA, and SS&C's ability to implement CAMRA for (or with) ACM; and (2) ACM claims that SS&C breached Work Request Two and/or Work Request Three.

In addition to narrowing the scope of relevant discoverable material, the Court's decision also renders objectionable ACM's notice of deposition to Normand Boulanger whatsoever, SS&C's President and Chief Operating Officer, on the grounds that Mr. Boulanger had no

Honorable Jeffrey A. Meyer
April 2, 2018
Page 5

involvement in negotiating or completing work on the Master Agreement or Work Requests Two and Three.

### III.   SS&C's Position on Discovery Issues

*ACM's Requested Discovery*

#### A.   ACM is Not Entitled to Discovery on SS&C's Other Clients.

First, ACM is not entitled to discovery related to the implementations of SS&C's clients other than ACM and Bimini. The present request is yet another attempt by ACM to gain access into SS&C's extensive and confidential records regarding its other mortgage REIT clients, who are competitors of ACM. Particularly, ACM requests weekly status reports for the implementations for mortgage REITs Fortress and Resource, as well as documents relating to resource allocation issues or lack of client commitment to those implementations. ACM has not made any showing or relevance with respect to either of these entities, nor why these implementations would be probative of any of ACM's claims. Further, in light of the ruling on the motion to dismiss, which has limited ACM's claims to pre-contractual inducement and breaches of Work Requests Two and Three, discovery related to these other clients is outside the scope. The contract for Fortress was signed December 31, 2014, *after* ACM's contract was signed. SS&C's contract with Resource was signed September 22, 2014, less than three months before ACM's. ACM's theory into the relevance of these other clients appears to be that alleged issues on those implementations should have informed SS&C's comments to ACM. But the timing shows that one implementation had not yet begun, and the other was only three months into a multi-year implementation involving a substantially more complex portfolio than that of ACM. Any relevance is highly dubious if not non-existent. Notably, both Fortress and Resource remain CAMRA clients of SS&C.

Further, as SS&C has reiterated throughout discovery, documents relating to SS&C's implementations for other clients are simply not probative of any issue in the present case. ACM chose the aforementioned clients because SS&C's discovery responses revealed that those implementations were among the longest in duration. But the length of time an implementation takes depends on a wide range of factors that vary from customer needs, the complexity and variety of the customer's assets and positions, the level and consistency of effort the customer commits to the implementation, to name a few. Therefore, CAMRA implementations for other customers have no bearing on ACM's case. Further, but of foremost importance, the information ACM seeks is confidential information belonging to SS&C and its clients, who are direct competitors of ACM, which SS&C is obligated to protect.

Honorable Jeffrey A. Meyer
April 2, 2018
Page 6

### B. ACM's Requested Documents Regarding Leadership Changes and Profit and Loss Statements are Unduly Burdensome and Not Relevant to Any of ACM's Claims.

ACM also requests documents relating to the "leadership changes in Professional Services," another category of documents that has no link to ACM's claims. ACM seeks to learn whether there was some hypothetical link between staffing changes within SS&C for select employees that worked on, among many contracts, ACM's, and the delays ACM's implementation experienced. First, ACM cannot tie this theory to any of its now-limited claims (inducement to enter into the contract, or breach of Work Requests Two and Three). Moreover, there is no basis for the alleged connection. SS&C is a business, like any other, that makes staffing decisions regarding its roughly 8,000 employees based on a wide variety of factors. ACM cannot point to any indication, through testimony or otherwise, that any of these employees was terminated based on poor performance, let alone poor performance related to ACM's implementation. Moreover, this request would be burdensome for SS&C as it is vague and overbroad seeking "documents relating to the leadership changes in Professional Services."

Finally, ACM requests for profit and loss statements for three of SS&C's internal groups. ACM's stated basis for these requests is that SS&C made representations to ACM that it's REIT servicing groups were "profitable" prior to signing the contract. Yet ACM could not point to any of these representations in discovery. Given that ACM's claims related to misrepresentations are now limited to pre-contractual negligent misrepresentations that induced ACM into signing the Master Agreement, ACM cannot point to any reasonable basis for entitlement to SS&C's profit information by internal unit.

### C. ACM Should Not Be Entitled to Take Normand Boulanger's Deposition.

In light of the limited scope of ACM's claims following the motion to dismiss decision, deposition testimony from Normand Boulanger, SS&C's President and Chief Operating Officer, is not relevant to any issue in the case and would be only serve to burden SS&C. Mr. Boulanger runs an 8,000-person company and was not directly involved with ACM's contract. He has no particular, let alone unique, knowledge as to any issue being litigated.

As stated above, ACM's claims are now limited to inducement to enter into the Master Agreement and breaches of Work Requests Two and Three. Mr. Boulanger was not involved in any pre-contractual conversations between ACM and SS&C, and was not involved in the negotiations or work under any Work Request. ACM relies solely on the fact that Mr. Boulanger signed the Master Agreement and Work Requests as the basis for his testimony's relevance. However, Mr. Boulanger routinely signs multiple contracts daily by virtue of his position as

Honorable Jeffrey A. Meyer
April 2, 2018
Page 7

COO, but was not involved in the creation or performance under the contract. Further, there are no documents, and indeed ACM cannot identify any, that implicate Mr. Boulanger in any relevant issue in litigation. Mr. Boulanger only became involved shortly before litigation commenced in an attempt to salvage SS&C's relationship with ACM. SS&C is willing to submit an affidavit to the effect that Mr. Boulanger has no knowledge of any issue relating to the claims in litigation.

Many courts have observed that subpoenas to high-ranking corporate officers in Mr. Boulanger's position create a tremendous potential for abuse or harassment. *See, e.g., Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C05-4374, 2007 WL 205067, at *3 (N.D. Cal. 2007) ("[v]irtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment.") (citations omitted). This is particularly true where, as here, a high-level executive does not have unique and personal knowledge of the claims or issues in the case. *See, e.g., Celerity*, 2007 WL 205067, at *3 (listing cases) (noting less intrusive discovery methods include "depositions of lower-level employees with more direct knowledge of the facts at issue"). In such situations where the executive does not have unique or direct knowledge, courts have refused to permit subpoenas or depositions to go forward. *See, e.g., Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995); *Filetech, S.A. v. France Telecom, S.A.*, No. 95 Civ. 1848, 1999 U.S. Dist. LEXIS 4693, at *3-4 (S.D.N.Y. Feb. 16, 1999); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 333-35 (M.D. Ala. 1991); *Community Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983). Indeed, courts have refused to allow depositions of high-level executives even though they might have made isolated statements about the subject matter of the litigation or have general knowledge of corporate operations. *See, e.g., Lin v. Benihana Nat'l Corp.*, No. 10-cv-1335, 2010 WL 4007282, at *2 (S.D.N.Y. 2010) (though high-level official may have general knowledge about corporate structure at issue, he had no "special personal knowledge of the facts alleged" and defendant offered testimony of another executive).

Finally, any testimony from Mr. Boulanger would be cumulative given that ACM has already had broad access, in the form of both depositions and documents, to information regarding witnesses who actually worked on ACM's contract and implementation, the people who supervised them, as well as Tim Reilly, the person who supervised the supervisors.

*SS&C's Requested Discovery*

    **A. SS&C Is Entitled to Depose the REIT and Deloitte.**

        **1. ACM Has Waived its Objections to the REIT's Subpoena.**

Honorable Jeffrey A. Meyer
April 2, 2018
Page 8

On February 23, 2018, SS&C issued and notified ACM of subpoenas to third parties Deloitte the REIT. Counsel for ACM subsequently indicated that they are also representing the REIT. On behalf of the REIT, ACM's counsel has waived any and all objections to SS&C's subpoena to the REIT by not raising them in a timely manner. Fed. R. Civ. P. 45(d)(2)(B) requires that all objections to a subpoena be served "***the earlier of*** the time specified for compliance or 14 days after the subpoena is served." (emphasis added). The subpoena was served on the REIT on February 27, 2018. The time initially set for compliance in the subpoena was March 9, 2018. ACM's counsel served objections on behalf of the REIT on March 29, 2018. Regardless of the fact that Your Honor ordered compliance with the subpoena 30-days from the March 2nd conference, the objections are still untimely under Rule 45. All objections to the REIT's subpoena have been waived.

### 2. Deposition Testimony from the REIT and Deloitte is Relevant to Issues in Litigation.

Regardless of objections, the Federal Rules mandate that a party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1) was recently amended, but still "is broadly and liberally construed… ." *Wells Fargo Bank, N.A. Tr. v. Konover,* No. 3:05-CV-1924, 2010 WL 11561491, at *2 (D. Conn. June 22, 2010). Here, admissible evidence shows that Armour disclosed to SS&C during the sales process that Armour needed to improve its asset-accounting practices and controls, which were used to report the Armour REIT's financial results to its public shareholders. Third-party Deloitte is likely to have information and documents about the individuals, procedures, and the technology platform that led to those concerns, as well as the status of implementation at all relevant points. Further, ACM admitted that the Armour REIT *paid* for the CAMRA license and other services. Thus – unless there were no governance controls in place – the REIT and its directors are highly likely to have information about the negotiation of, and the parties' respective performance under, the Master Agreement, as well as the accounting personnel, process and control issues that caused Armour to seek out SS&C in the first place. SS&C is entitled to deposition testimony to further substantiate its theory.

SS&C has no desire to protract depositions of these third parties to the extent they do not have relevant information. But it would be premature and prejudicial to SS&C to preclude them outright.

Honorable Jeffrey A. Meyer
April 2, 2018
Page 9

### B. SS&C is Entitled to Take the Deposition of Jeffrey Zimmer.

Finally, ACM has indicated that if SS&C contests the deposition of Mr. Boulanger, it will contest SS&C's deposition of Jeffrey Zimmer, managing member of ACM and Co-CEO, Vice Chairman, and President of the REIT. But drawing similarities between Messrs. Zimmer and Boulanger is a false comparison. In contrast to SS&C's 8,000-person company, ACM, according to its own website, has only *twenty-two* employees. Mr. Zimmer, as head of a significantly smaller company, had involvement in the decision to enter into a contract with SS&C, a key event in ACM's claims. Indeed, in response to SS&C's concerns regarding ACM's lack of written communications about the CAMRA implementation, ACM has represented that ACM's employees communicate primarily orally since there are a small number of employees all in one office.

Further, Mr. Zimmer is relevant as the supervisor to ACM's head of implementation. Mark Gruber, project manager at ACM during the CAMRA implementation, testified that he reported directly to Mr. Zimmer. Meanwhile, ACM has already deposed the SS&C employees who implemented CAMRA, the supervisors of those employees, and even the supervisor to those supervisors. There more than sufficient basis for relevance of Mr. Zimmer's testimony, and SS&C should not be foreclosed the opportunity to depose him.

We look forward to conferring with the Court to resolve this matter. Thank you for your time.

Very Truly Yours,


*/s/ Kevin O'Connor*
Kevin O'Connor


cc:   All counsel of record