UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - x
                              :
ARMOUR CAPITAL MANAGEMENT LP, :  No. 3:17CV790(JAM)
                              :
              Plaintiff       :
                              :
         v.                   :
                              :
SS&C TECHNOLOGIES, INC.,      :
                              :  New Haven, Connecticut
              Defendant       :  April 3, 2018
                              :
- - - - - - - - - - - - - - - x


DISCOVERY CONFERENCE


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

          HOLLAND & KNIGHT
              701 Brickell Ave., Suite 3000
              Miami, Florida 33131
          BY:  JOSEPH J. MAMOUNAS, ESQ.

    FOR THE DEFENDANT:

          HINCKLEY ALLEN & SNYDER LLP
              28 State Street
              Boston, Massachusetts 02109-1775
          BY:  KEVIN J. O'CONNOR, ESQ.
               JASON C. WILLIAMS, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1                            **10:06 A.M.**

2              THE COURT:  We're here today for purposes of a

3    discovery conference in the matter of ARMOUR Capital

4    Management v. SS&C Technologies.

5              Appearance of counsel, please, for ARMOUR?

6              MR. MAMOUNAS:  Good morning, Judge.  Joe

7    Mamounas on behalf of the plaintiff, ARMOUR Capital

8    Management LP.

9              THE COURT:  Good morning.

10             MR. O'CONNOR:  Good morning, Your Honor.  Kevin

11   O'Connor on behalf of SS&C Technologies, Inc.

12             MR. WILLIAMS:  Good morning, Your Honor.  Jason

13   Williams on also on behalf of SS&C.

14             THE COURT:  Good morning.

15             So I want to make sure I understand what I need

16   to try to address today in terms of the universe of

17   issues.

18             On ACM's side, at least on my checklist here, it

19   looks like there's a question about whether the production

20   for Bimini documents is complete; is that right?

21             MR. MAMOUNAS:  That's right, Judge.

22             THE COURT:  If I could ask you to stand.  In

23   federal court we stand usually.

24             MR. MAMOUNAS:  Of course.  Understood.

25             THE COURT:  And then we've also got the Fortress

1   and Resource request which I left open from the last.

2           Then the deposition of the president and chief

3   operating officer, Mr. -- I'm not sure if I'm pronouncing

4   it correctly -- Boulanger?

5           MR. O'CONNOR:  He actually pronounces it

6   Boulanger.

7           THE COURT:  Not the French pronunciation, but

8   Boulanger, all right.

9           And then it looks like there's issues about

10  document requests about the SS&C leadership changes,

11  profit and loss statements for the internal REITs.

12          MR. MAMOUNAS:  If I may, Judge, what we had done

13  to focus those issues was to roll them up within the

14  discovery concerning the, quote/unquote, problem REITs,

15  which would include the Bimini, Fortress, and Resource

16  category, so that it was focused and limited.  And I can

17  expand on that.

18          THE COURT:  Okay, great.

19          And then I think something about an

20  implementation playbook.

21          MR. MAMOUNAS:  That's right.  We raised that as

22  well.

23          THE COURT:  And I think you also had an issue

24  about the attorneys' eyes designations.

25          MR. MAMOUNAS:  That's right.  That emerged with

1  respect to discovery concerning the other clients, namely

2  Bimini.

3          And if I may add to one of the issues that you

4  raised initially, Judge, that was on the completeness of

5  production, there's also a question whether the production

6  of ARMOUR-related documents is complete as born out by the

7  recent production of Bimini documents.

8          THE COURT:  So are there other issues that you

9  need to pursue?

10          MR. MAMOUNAS:  No, Judge.  Just for sake of

11  completeness, we also raised in the brief we filed

12  yesterday the issue concerning objections to the two

13  third-party subpoenas that are outstanding, but the

14  principal issues are those that you listed earlier.

15          THE COURT:  Okay.  The waiver objection?

16          MR. MAMOUNAS:  Well, they were focused primarily

17  on the subpoenas to ARMOUR Residential REIT and as well

18  Deloitte & Touche.

19          THE COURT:  Okay.  All right.  So that's it for

20  your issues?

21          MR. MAMOUNAS:  That's it from our side, Judge.

22          THE COURT:  Mr. O'Connor, I have you down for

23  you want to depose representatives of the REIT and

24  Deloitte.  And also you want to depose Mr. Zimmer,

25  although I don't think that's contested.

1          MR. MAMOUNAS:  That's not contested, Judge,

2    pursuant to the parties' prior agreement.

3          THE COURT:  I can take that off my list.

4          Okay.  Is that it, Mr. O'Connor?  Anything else

5    you need to raise?

6          MR. O'CONNOR:  I believe that's it, Your Honor.

7          THE COURT:  All right.  So let's talk about,

8    first, on Bimini, the completeness of the document

9    productions.  Tell me a little bit about what the concern

10   is there, Mr. Mamounas.

11         MR. MAMOUNAS:  Judge, the concern is that the

12   documents that were produced last week reflected

13   significant communications relating to ARMOUR particularly

14   by name.  The way that the production has emerged from

15   the --

16         THE COURT:  These are Bimini documents?

17         MR. MAMOUNAS:  These are Bimini documents that

18   also contain reference to ARMOUR documents.  And this is

19   reflective, I think, of a broader issue that we've had in

20   discovery, namely that SS&C has tried to parse its

21   production based on whether the documents actually contain

22   by name reference specifically to ARMOUR and then now to

23   Bimini.  And what the discovery to date has shown is that

24   at the point in time when this implementation was taking

25   place -- 2015, 2016, into 2017 -- there were issues that

1    affected not only ARMOUR and Bimini, but also Fortress and

2    Resource, as the four licensed CAMRA implementations that

3    were going on at the time.  And there were problematics

4    that we submit are systematic, and we can get into those

5    later, but for purposes of responding to your question,

6    Judge, the issue that we've seen is that with the recent

7    Bimini production there have also emerged unique ARMOUR

8    documents that would have been part of the prior

9    production.  So the fact that they weren't produced in the

10   fall and summer of last year has given us pause as far as

11   the completeness of the ARMOUR documents as well as the

12   completeness of the Bimini documents.

13            THE COURT:  What am I supposed to do?  I can't

14   go, you know, and scan their files.  What order could I

15   fashion that would satisfy the concerns?

16            MR. MAMOUNAS:  Well, Judge, I think, for one

17   thing, we didn't have an opportunity to confer on this,

18   given when the documents were produced and the filing date

19   of our brief yesterday.  But I do think that it's

20   important for us to maintain that there is, once and for

21   all, completeness as far as the Court's prior orders on

22   Bimini --

23            THE COURT:  Why don't you make a list of the

24   concerns and write to Mr. O'Connor.  And then if you guys

25   can't solve this, and it may be he has an explanation for

1   it or not, then, you know, we can do yet another discovery

2   conference on that.

3        MR. MAMOUNAS:  I'm happy to do that, Judge.

4   Where it really comes up is in the context of the

5   additional discovery that we're seeking as far as Fortress

6   and Resource and issues more broadly concerning those four

7   that don't reference ARMOUR or Bimini by name.  Continue

8   to have that challenge as far as the completeness of the

9   production and what we're entitled to, which is why it's a

10  feature of the brief we filed.

11       THE COURT:  I'm going to withhold trying to

12  resolve anything about the completeness of the existing

13  production with respect to Bimini and to ARMOUR without

14  prejudice to your writing to Mr. O'Connor and saying

15  there's discrepancies here and documents that should have

16  been produced.

17       Let's turn now to Fortress and Resource.  Help

18  me understand, Mr. Mamounas, why, in light of the Court's

19  ruling and in light of the timing of the Fortress and

20  Resource contracts here, that this is appropriate to order

21  the production that you're requesting as to Fortress and

22  Resource.

23       MR. MAMOUNAS:  Sure.

24       And if I'm understanding the Court's order on

25  the motion to dismiss correctly, Judge, the

1    pre-contractual misrepresentation claims still remain

2    under either the CUTPA, common law, or recision theories,

3    and our theories with respect to misrepresentations as

4    negligence.  So the question is:  What did SS&C know or

5    what should it have known at the time it was making the

6    misrepresentations that were material to ARMOUR's decision

7    to enter into the master agreement and purchase the CAMRA

8    software?

9         ARMOUR was told -- just in summary, ARMOUR was

10   told that hosting was the appropriate deployment option

11   for it or an appropriate deployment option.  It was told

12   SS&C had the qualifications and experience to conduct the

13   implementation, and also that it could be completed in

14   four months -- four to six months, excuse me.  ARMOUR

15   submits all of those are false and SS&C knew or should

16   have known --

17        THE COURT:  I got all that.  So I just want to

18   know why Fortress and Resource.  I don't quite understand

19   why -- you got the Bimini documents and the basis of

20   essentially the affidavits that you got.  But I don't know

21   why Fortress and Resource you need those documents.

22        MR. MAMOUNAS:  If I could, just in a brief

23   timeline, Judge, the Mortgage REIT Division started in

24   2014.  Sales efforts with respect to ARMOUR with respect

25   to Fortress and with respect to Resource all begin during

1    that time period.  The contract for Resource is signed

2    prior to ARMOUR's contract; the contract for Fortress is

3    signed right around the time of ARMOUR's contract.  That

4    means that those sales processes were taking place in

5    parallel and in tandem.  So if there were issues raised by

6    Fortress or Resource or internally SS&C concerning the

7    representations that were being made as part of sales --

8    that is the appropriateness of the deployment options to a

9    client, that is the time period in which implementation

10   could occur -- all of those issues are relevant to the

11   notice and the inquiry that SS&C should have made in order

12   to verify the veracity of the statements that were being

13   made to ARMOUR as part of sales.

14           From the sales process and from what we submit

15   are misrepresentations as well as others that have emerged

16   in discovery that I can speak to as well, then there's a

17   domino effect that one sees in the discovery that's

18   emerged already that shows that there were systemic

19   broader issues that were affecting all four of these

20   mortgage REIT clients together.  The internal emails from

21   SS&C show repeatedly that executives and others were

22   blowing the whistle, waving a red flag concerning the

23   problems that they were having.  In an email that was just

24   produced last week that we submit should have been

25   produced last year as part of production, an SS&C

1   executive says, "Professional Services" -- which is the

2   group that's responsible for implementation -- "is in

3   trouble.  I can't get any answers.  Implementation

4   projects are starting from scratch and can't get any help

5   from Professional Services resources, nor is anything

6   documented."

7           So what it is showing is there are, from a

8   causation perspective, there are ongoing issues internally

9   at SS&C that reflect they could not get the job done.

10  What we're trying to understand is why it could not get

11  the job done so as to demonstrate the causation between

12  either the breach of contract or the misrepresentations

13  that SS&C made during the sales process and the fact that

14  implementation didn't occur and ARMOUR was damaged.

15          We believe that the documents that we've seen so

16  far and that continue to emerge, as pointed out at the

17  outset, there were documents that were just produced

18  concerning Bimini that reflect broader issues internally

19  with respect to the implementation team as well as the

20  mortgage REIT team more broadly that bear directly on

21  ARMOUR's implementation, the reason that it could not get

22  off the ground and could not be complete.  The documents,

23  I mean, go through basically a month-by-month timeline

24  about the fact that internally SS&C, they didn't have the

25  resources, they didn't have the management, they didn't

1    have the manpower in order to make sure implementations

2    were completed.

3           The problem that I mentioned at the outset about

4    parsing is what's really problematic for us.  We're not

5    looking to investigate every last detail about SS&C's

6    implementations for its clients or even for its CAMRA

7    clients.  SS&C internally grouped these four mortgage

8    REITs together and identified them as problematic.

9    There's a reason for that.  It's only logical to assume

10   that those REITs were experiencing the same or similar

11   issues.

12          And with respect to the personnel changes, I

13   mean, the symptoms -- it's a symptom of what was going on

14   with respect to implementation.  Within 2015 and 2016,

15   there were four personnel changes that affected

16   implementations directly.  In April of 2015, a gentleman

17   by the name of Daniel Pallone, whose career has been spent

18   in rescuing failed businesses, was hired to run the

19   mortgage REIT practice.  In the fall of that year, Iwona

20   Olszewska, who had been with the company for years and was

21   running Professional Services, was removed.  The company

22   at that time hired someone new, who was described by

23   witnesses so far in deposition as an upgrade.  He was

24   removed and then someone else was put in, Judge.  This

25   does not suggest or have the hallmarks of a stable

1   practice.  And the consequence of that is what we saw.

2   ARMOUR's implementation never occurred.

3            So what we're trying to accomplish here is not a

4   full-scale investigation of SS&C's implementation efforts

5   for the other clients.  We've been trying to limit it to

6   what happened in the sales process, what was the

7   relationship with Professional Services during sales, and

8   what was the resource allocation or manpower issue that's

9   been identified so far in the discovery by SS&C's own

10  witnesses and own documents that caused our implementation

11  not to succeed.

12           THE COURT:  I see.  Okay.

13           Mr. O'Connor, with respect to Fortress and

14  Resource?

15           MR. O'CONNOR:  Yes, Your Honor.

16           We would submit that those documents should not

17  be produced based on burden and relevance.

18           THE COURT:  They're current clients of yours,

19  right?

20           MR. O'CONNOR:  Current clients.  All three

21  entities are current paying clients of SS&C.  Resource,

22  for example, is a vastly larger mortgage REIT.

23           THE COURT:  And you don't have a lawsuit pending

24  with them?

25           MR. O'CONNOR:  We don't have a lawsuit pending

1    with them.

2              THE COURT:  They haven't filed a claim against

3    you?

4              MR. O'CONNOR:  No, Your Honor.  No claim.

5              THE COURT:  They don't have the affidavit of a

6    chief officer of the type that was submitted with respect

7    to Bimini?

8              MR. O'CONNOR:  Correct, Your Honor.

9              THE COURT:  Okay.

10             MR. O'CONNOR:  So they're absolutely different

11   in kind.  A stray reference to problem REITs doesn't mean

12   all the problems are the same; it means that there are

13   implementation issues.  That statement, Your Honor, is not

14   pre-contractual; it's well into 2015.  And it says nothing

15   about the core issue here, and that is what did people

16   know in 2015 or 2014 during the sales process.

17             There are statements that SS&C misled ARMOUR as

18   to its qualifications.  It's undisputed that CAMRA has

19   been in existence for 30 years.  It's undisputed.

20   Mr. Mountain, the CFO, and Mr. Gruber, the chief operating

21   officer, both testified that SS&C is the dominant asset

22   accounting product in this market.  Mr. Gruber actually

23   worked with the product when he was at Penn Mutual and had

24   familiarity with it, and actually said, "well, I heard

25   that sometimes it's hard to use," but he never disclosed

1    that to anybody at ARMOUR.  And so the dominant product.

2    If you were to take the top ten mortgage REITs, publicly

3    traded mortgage REITs, six of them are SS&C clients.  And

4    so in enterprise software implementation, it is inevitable

5    in these complex exercises that problems arise.  It

6    doesn't mean they're all the same.  We haven't attempted

7    to block them from it.

8         And what we produced, Your Honor -- and this

9    goes to a point that Mr. Mamounas raised, where he

10   suggested that there could be documents out there where

11   ARMOUR is mentioned by name.  Now, we searched, with their

12   approval, 19 custodians, produced more than 100,000 pages

13   of documents.  And there are a number of instances where

14   there are references to we did this in this other REIT and

15   so let's try it for ARMOUR.  Or any mentioning of -- any

16   analytical connection, those documents are all produced.

17   They point to a single document not caught in the initial

18   production.  We know that we just received documents from

19   ARMOUR, 6,000 documents that were supplemented based on us

20   following up on requests, and they all contain search

21   terms that we previously sought.

22        This exercise has cost hundreds of thousands of

23   dollars with respect to ARMOUR and now Bimini.  And what

24   plaintiff proposes, really on a fishing expedition, is

25   that we spend hundreds of thousands of dollars more in

1    hopes that they'll find some reference to documents that

2    don't contain the word "ARMOUR" that could somehow be

3    relevant.  We would submit that's just grossly

4    disproportionate and not a good use of the parties'

5    resources and really not likely at all to lead to

6    admissible evidence.

7              THE COURT:  And Mr. Mamounas.

8              MR. MAMOUNAS:  Judge, if I may, nobody's asking

9    or even suggesting that SS&C spend hundreds of thousands

10   of dollars on follow-up discovery.  As I understand it,

11   these processes are meant to be iterative.  They are meant

12   to be cooperative.  They are meant to involve sharing

13   search term hit reports so that searches that extend to

14   hundreds of thousands of dollars are either limited or

15   discarded entirely so you can focus on the core issues.

16             The problem that we're having here is that the

17   documents that have emerged have reflected a compelling

18   case for the existence of systemic issues affecting CAMRA

19   licensed clients in implementation.  We're not questioning

20   or even seeking to take discovery on the software.  It's

21   simply on the process of implementation.  It was so bad

22   that Mr. Pallone, who I mentioned earlier, says over and

23   over, "This is going to lead to the end of the mortgage

24   REIT practice.  We should stop CAMRA implementations for

25   licensed clients," in an email that was produced just last

1    week.   Those issues and those symptoms have a direct

2    relationship on the causation.

3            THE COURT:   When was this email?   What is the

4    date of the email?

5            MR. MAMOUNAS:   That email, Judge, was in

6    November 17th of 2016 where Mr. Pallone says we will lose

7    the REIT franchise.

8            THE COURT:   November of 2016?

9            MR. MAMOUNAS:   In May of 2016.  He says, "I'm

10   getting very concerned.  This should be our last one."

11           Those are causations issues.  SS&C has contested

12   the breach.  They've contested causation claiming that it

13   was ARMOUR's fault that implementation didn't occur.  Our

14   position is it's the exact opposite.

15           If you look at this discovery as well as the

16   discovery we've produced, there's no mention of ongoing

17   systemic issues caused or perpetrated by ACM.  It's just

18   the opposite.  SS&C is saying repeatedly, "We're the ones

19   who are having internal problems here, we can't get our

20   act together."  And that's all that we're asking for,

21   Judge.

22           THE COURT:   Okay.  So I'm going to sustain the

23   objection to the production of documents concerning

24   Fortress and Resource.  I'm amply satisfied that, for the

25   reasons stated by SS&C, that these documents, to the

1    extent that they are relevant, they are very well beyond

2    additional probative value.  And I think it would be very

3    burdensome concerning existing clients.  I don't think

4    there's an adequate foundation here, in light of the

5    proportionality or rules of discovery, for the production

6    of Fortress and Resource documents in light of other

7    discovery in this case, extensive as it is, and in light

8    of the production of Bimini documents.  I think ACM is

9    amply positioned to make its point here concerning

10   systemic problems without essentially requiring what

11   appears to me to be a very burdensome production of

12   documents concerning Fortress and Resource.  So I will

13   sustain that objection.

14          That gets us next to I think the documents -- I

15   want to stick to documents here -- on SS&C profit and loss

16   as well as the leadership changes, implementation

17   playbook.  Do you want to say something about that?

18          MR. MAMOUNAS:  I do, Judge.

19          One of the requests that we made in the middle

20   of 2017, very shortly after this case was filed, was a

21   standard request for policies and procedures with respect

22   to implementations.  Again, our focus being strictly on

23   implementation.  SS&C insisted that there were no policies

24   or procedures, which was a bit of a head scratcher given

25   that it's such a large company and always talks about its

1    size in mortgage capitalization.  It wasn't until a

2    deposition in February of 2018 did we learn that SS&C

3    indeed had what it describes as an implementation

4    playbook.  One template copy of that has been produced to

5    us.  We were told that the document, somewhat

6    surprisingly, wasn't used for ARMOUR or Bimini's

7    implementations; however, documents relating to the

8    creation of the playbook or documents relating to the use

9    of the playbook would be probative of the reasons it was

10   created in the first place.  In other words --

11           THE COURT:  So you've got the implementation

12   playbook now?

13           MR. MAMOUNAS:  It is a spreadsheet that

14   identifies tasks.  It is a document sort of --

15           THE COURT:  So what more do you want?

16           MR. MAMOUNAS:  What we're looking for are

17   documents relating to its creation or to its use.  If

18   there are emails that reflect why it was created, the

19   reasons for its creation, that's probative of the issues

20   and the problems going on with respect to ARMOUR's

21   implementation.  If there were suggestions from people

22   internally that the playbook be used for ARMOUR but it

23   wasn't, those also would be probative as well of the

24   reason ARMOUR's implementation didn't conclude.

25           THE COURT:  I see.  So basically you're looking

```
 1    for any surrounding documents discussing the creation and

 2    use of this particular implementation

 3    playbook/spreadsheet; is that right?

 4              MR. MAMOUNAS:  That's correct.  We've only been

 5    provided with an Excel spreadsheet.

 6              THE COURT:  I see.

 7              MR. MAMOUNAS:  And it would seem to us there are

 8    other documents that are related to it.

 9              THE COURT:  Mr. O'Connor.

10              MR. O'CONNOR:  Yes, Your Honor.  We agreed to

11    produce the implementation playbook and are not looking to

12    withhold --

13              THE COURT:  Is it actually called an

14    implementation playbook?

15              MR. O'CONNOR:  I don't think that's the title of

16    the document.  That's the vernacular that's used.  The

17    witness who testified about it testified that it was

18    created I think well into 2016.  And my sense is it's sort

19    of a dormant document.  It was started.  There are no

20    references, as far as we're aware, to ARMOUR having

21    anything to do with the creation of that document.  And to

22    the extent it would have mentioned ARMOUR, it would have

23    been previously produced by agreement of the search terms

24    of the parties.

25              THE COURT:  But you were asked for policies and
```

1   procedures, I take it --

2               MR. O'CONNOR:  Yes.

3               THE COURT:  -- for implementation.  So wouldn't

4   this fit within that category?

5               MR. O'CONNOR:  I don't know that it was ever

6   adopted, Your Honor.  We are producing everything related

7   to it.  It's simply a spreadsheet that people then plug

8   information into.

9               THE COURT:  Okay.  Well, I guess the question,

10  though, is:  Are you producing any documents or -- when

11  you say you're producing all documents relating to it,

12  what do you mean by that?

13              MR. O'CONNOR:  We'll produce any iteration of

14  it.  I don't know that there are additional iterations.

15  And we'll produce any version of it that contains ARMOUR,

16  the word "ARMOUR."  But I'm not aware of --

17              THE COURT:  It wouldn't surprise you, though, if

18  it's just a basic playbook, it's not necessarily going to

19  reference each and every one of the client names, right?

20              MR. O'CONNOR:  Yes.  It's really a spreadsheet.

21  It lays out here's a task, plug in the names.  It's not

22  prescriptive in nature.

23              THE COURT:  So here's a particular task.  That

24  doesn't plug in, necessarily, the client name, does it?

25              MR. O'CONNOR:  Yes, Your Honor, that's correct.

1          THE COURT:  So I don't know what significance to

2    attach to the fact that a particular spreadsheet or

3    playbook doesn't reference ARMOUR.

4          MR. O'CONNOR:  No, what I'm saying is we're

5    going to produce every version of it that we can find.

6    This is all we've been able to find.  It's not, as we

7    understand it, an actively used document.  But we will

8    produce every version of it that we can find.

9          THE COURT:  How about communications concerning

10   the creation of this playbook?

11         MR. O'CONNOR:  We'd be happy to look --

12         THE COURT:  I think those should be produced as

13   well.  Any prior versions or evolution of the playbook and

14   any communications concerning the creation of the

15   playbook, I'll order those produced.

16         Okay, Mr. Mamounas?

17         MR. MAMOUNAS:  That's fine, Judge.  The only

18   thing I would add, if there are communications concerning

19   its use.  For example, someone internally saying we should

20   use this with all of the implementations that are failing

21   and someone objecting and saying --

22         THE COURT:  I'm saying any communications

23   concerning this playbook.

24         MR. MAMOUNAS:  That's fine, Judge.

25         THE COURT:  Expressly referencing the playbook.

1          MR. MAMOUNAS:  That's fine, Judge.

2          MR. O'CONNOR:  Your Honor, is it --

3          THE COURT:  To the extent -- I realize it can be

4   difficult to search those terms, but you need to make a

5   good faith effort to search.

6          MR. O'CONNOR:  With respect to the creation or

7   the modification of it is my understanding.  But not can

8   you get me the playbook for this case or --

9          THE COURT:  No, not just a stray reference to

10  it, but in terms of its creation and use.  Creation and

11  use.

12         MR. O'CONNOR:  Use, meaning modification?

13         THE COURT:  As a guidebook, essentially, for how

14  it's implemented.  That's the concern, right?

15         MR. MAMOUNAS:  That's right, Judge.  That works.

16         THE COURT:  I'm not looking for every stray

17  reference to the playbook other than its creation and its

18  use.

19         MR. MAMOUNAS:  Thank you.

20         THE COURT:  Okay.  The next I think is SS&C

21  profit and loss statements.

22         Do you want to say something about that,

23  Mr. Mamounas?

24         MR. MAMOUNAS:  I do, Judge.  And those aren't

25  focused on the company more broadly.  Those were focused

1    on these particular units; that is, the implementation

2    group and the mortgage REIT group.

3            The reason for it, we submit it would be

4    symptomatic of the problems we were seeing in the emails

5    and, again, in an effort to try to condense this as much

6    as possible and alleviate the burden issues that

7    Mr. O'Connor raised.  It emerged from the testimony --

8            THE COURT:  So -- I'm sorry.  Help me

9    understand.  I may have missed something here.  Your

10   letter or the reference at least in Mr. O'Connor's letter

11   to PnL statements for three of SS&C's internal groups,

12   what are those groups exactly?

13           MR. MAMOUNAS:  I can only think of two as of

14   right now.  I don't know what the third is.  One would be

15   Mortgage REIT Division.  And another is the implementation

16   team itself --

17           THE COURT:  Okay.

18           MR. MAMOUNAS:  -- which is called Professional

19   Services.

20           THE COURT:  All right.  And tell me why you need

21   the PnL statements for these groups?

22           MR. MAMOUNAS:  Sure.  And again, this is not an

23   effort to investigate the financial condition of the

24   group.  Instead, rather, to test what Mr. Pallone

25   testified to at his deposition.  Again, that's the

1   gentleman that I mentioned earlier who was hired for

2   purposes of fixing, we submit, the group.  And Mr. Pallone

3   had said that the resource strain was so significant that

4   there were not enough people in order to do the work in

5   order to complete these implementations.  And one

6   possibility that he proposed was even that the group hire

7   outside consultants.  They determined not to do so and

8   instead they paid overtime and they extended their people

9   on staff as much as they possibly could.

10          Another executive internal email said the sales

11  group was underselling, I suppose is the term, the

12  implementations for SS&C's clients such that the

13  implementation team was being required to accomplish more

14  with less people at the outset and wasn't able to actually

15  conclude that kind of work.  And so what that did is it

16  put a significant resource strain on the implementation

17  team and the Mortgage REIT Division, we would submit, both

18  because of the profitability of the group was decreased

19  because the sales group was pushing to close these deals

20  without adequately involving the implementation team such

21  that the proposals realistically reflected the amount of

22  work it would take.  And then also on the back end, that

23  SS&C didn't have what it took to get the job done, so they

24  needed to squeeze more time and more work from their

25  people and pay them more money in order to try to

1    accomplish these tasks.

2              So what we're looking for is to test whether

3    there was that kind of an impact, only the implementation

4    group and the Mortgage REIT Division.

5              THE COURT:  All right.

6              Mr. O'Connor.

7              MR. O'CONNOR:  Your Honor, we would submit this

8    is yet another fishing expedition.  In terms of the

9    implementation group, there's no evidence whatsoever that

10   there were any issues regarding the implementation.

11             THE COURT:  Can I ask you just at the outset,

12   are there such things as PnL statements?

13             MR. O'CONNOR:  I don't think there are PnL

14   statements for the mortgage REIT group, and I don't think

15   there are for the implementation group either.  So it

16   would be pulling information from unaudited --

17             THE COURT:  When you say you don't think, have

18   you made an inquiry of your client?

19             MR. O'CONNOR:  I'm sorry?

20             THE COURT:  Have you inquired of your client

21   whether there is such a document?

22             MR. O'CONNOR:  There are not in the mortgage

23   REIT group.  I believe for the implementation, they may

24   track what their hours are and the amount of time that

25   they're spending, but they're not doing it with internal

1    costs or things of that nature.  They're tracking the

2    progress of the group, the level of activity.

3         But none of that activity, Your Honor, is

4    relevant to what this case is about, which is was there a

5    representation beforehand, before the sale, that wasn't

6    true and was there a violation of Work Request Two.

7    That's the only work request that's at issue.  Anything

8    else that's going on, SS&C either performed on Work

9    Request Two or didn't.  We submit that it did.  Causation,

10   those things don't matter.  We had a set of obligations;

11   we performed those obligations.  We think it's abundantly

12   clear.

13        Then with respect to the communications in

14   advance, profit and loss statements regarding the mortgage

15   REIT team or the implementation team would have nothing to

16   do with anything.  The mortgage REIT group was formed I

17   believe in April of 2014 as a formal group, and that press

18   release was sent to ARMOUR so they were aware of the fact

19   that it was created at that point.  But at that point, as

20   Mr. Mamounas' chief financial officer was involved in the

21   decision noted and he told this to one of SS&C's

22   competitors, they're the ones who work with mortgage

23   REITs.  There's no other competitor that has the

24   experience, so we're going with SS&C on that basis.

25   That's the basis they chose.  A budget for the

1    implementation group really has nothing to do with

2    anything that extends far beyond this.  Our implementation

3    team either performed or didn't perform.

4              The fact is, Your Honor, that in 2016 this

5    project ceased to be run by the implementation team and

6    was turned over to direct services.  The reason for that

7    is so implementation was done.  And the direct services

8    group was brought in.  They are the people who run CAMRA

9    for people who outsource services from SS&C.  So they're

10   users of CAMRA themselves but they don't license the

11   software; they licensed the output from the software and

12   the services that can be provided.  And that group was

13   brought in at no charge to ARMOUR, Professional Services

14   is done.  And at no charge to ARMOUR, three people were

15   brought in to teach them to run the software and to teach

16   them to follow the monthly practices that they needed to

17   follow.  And so the budget of the implementation team

18   would be completely irrelevant to that.  It wasn't the

19   group that worked with them throughout the time.  There's

20   really -- we don't see any connection whatsoever to the

21   costs incurred on a macro level by a group that serves not

22   merely mortgage REITs but serves all implementations of

23   CAMRA.

24              THE COURT:  Mr. Mamounas.

25              MR. MAMOUNAS:  Judge, the reason I rose is

1    because my recollection of the testimony is that in fact

2    these were two groups did track at least their revenues

3    and their costs such that it was possible to determine

4    whether the group was heading in a direction that was

5    profitable or not as a result of what was going on with an

6    implementation.

7            And I think -- and I hate to use the cliche, but

8    the proof is in the pudding.  The group stopped selling

9    CAMRA to mortgage REIT clients after these

10   implementations.  I mean, the strategy was heading in a

11   direction that was not positive.  And what that reflects

12   are the reasons that the implementation did not occur for

13   ARMOUR and the reason that's relevant is because SS&C has

14   insisted that implementation failed not because of

15   anything SS&C did, but because of ARMOUR's own faults.

16   You heard it just now in Mr. O'Connor's response.  And so

17   what that does is it puts the obligation on us to

18   demonstrate that it was indeed SS&C's own failures that

19   led to implementation not occurring.

20           We've been trying to keep this as narrow and

21   focused as we possible my can, taking the discovery and

22   limiting it as much as possible.  We think these

23   documents, based on the testimony from the witnesses, are

24   reflective of the true state of the resource allocation

25   and other problems within SS&C's mortgage REIT and

1  implementation teams as born out by the testimony and the

2  discover which we've seen so far.

3          MR. O'CONNOR:  Your Honor, the statement that

4  SS&C stopped selling to mortgage REITs is absolutely

5  false.  That's not true.  What SS&C has done is achieve

6  significant market penetration.  There's been no one who's

7  caught up.  The clients you asked about have all stayed

8  except for ARMOUR.  All those clients have stayed.  These

9  are all just fishing expeditions on the state of a

10 business and has nothing to do with what was represented

11 to them.

12         THE COURT:  Okay.

13         Mr. Mamounas, anything else?

14         MR. MAMOUNAS:  If I may clarify, what I said was

15 that CAMRA was no longer sold to mortgage REITs after

16 these --

17         MR. O'CONNOR:  That's not true.

18         THE COURT:  Don't cut him off, please.

19         MR. MAMOUNAS:  It's born out by an email that

20 was produced just last week, Judge, where Mr. Pallone

21 says, the senior vice president of the group, "We need to

22 change the implementation approach for CAMRA REIT clients.

23 I think this should be our last one."

24         THE COURT:  Okay.  Did you have anything else

25 you want to say in response to that, Mr. O'Connor?

1          MR. O'CONNOR:  Yes, Your Honor.

2          That's taken out of context.  Mr. Pallone was

3   deposed all day.  He absolutely did not testify that SS&C

4   was stopping selling mortgage REITs or selling to mortgage

5   REITs.  It is again the dominant player in that market.

6   It has all the customers, all the six customers that were

7   given as references to ARMOUR before ARMOUR signed the

8   contract, none of which ARMOUR even bothered to call.

9          THE COURT:  Okay.

10          All right.  With respect to the request for

11   profit and loss statements or budgets concerning the

12   mortgage REIT and implementation group, I'm going to

13   sustain SS&C's objection to that.  I think it's too far

14   afield here in terms of its likely probative value to the

15   issues in this case for substantially the reasons stated

16   by SS&C.

17          That gets us to our next category of documents

18   which are SS&C leadership changes in the Professional

19   Services field.  I understand that's an issue of dispute.

20          Mr. Mamounas.

21          MR. MAMOUNAS:  Thanks, Judge.

22          The issue there is that with respect to the

23   implementation team, as I mentioned earlier, there were

24   four significant leadership changes or personnel changes

25   that we submit, based on the documents and the testimony

1 | that's been elicited so far, are symptomatic of

2 | significant issues within that team focused on --

3 |         THE COURT:  So you know about these changes,

4 | right?

5 |         MR. MAMOUNAS:  We know about the changes.

6 | However, when we've inquired, we've been given vague

7 | answers such as "we wanted to upgrade the talent" without

8 | any sort of indication that it's linked to implementation.

9 | We're not interested whether these people were taking pay

10 | cuts or perhaps were better suited for other roles.  We

11 | simply want to test whether it actually had anything to do

12 | with the state of the implementation of these four

13 | licensed CAMRA clients at the time.

14 |         It strikes us as no coincidence that right after

15 | these clients come on line and hire SS&C, Mr. Pallone is

16 | hired.  Within six months, Ms. Olszewska, who is a

17 | longstanding employee of SS&C, is removed from

18 | Professional Services.  Someone new is brought in who is

19 | very short lived as Mr. Pallone tries to manage the group

20 | after being told in various emails that just were produced

21 | last week that he could and then he could not.  The

22 | replacement for Ms. Olszewska is then removed and someone

23 | else is brought in to run Professional Services.

24 |         It strikes us that if this is the team that is

25 | meant to implement CAMRA for the mortgage REIT clients,

1    this was a ship without a rudder.  It didn't have a

2    leader.  For a defendant that has insisted that ARMOUR

3    didn't have the leadership to run the implementation

4    project on its side, it seems to us only fair and

5    proportionate that we should be able to take limited

6    discovery to understand why these leadership changes

7    happened within the implementation team and their

8    connection to the failing implementations at the time.

9              THE COURT:  So what do you think you're going to

10   find?  You know that there was leadership changes.  You

11   got to ask Mr. Pallone about them, right?

12             MR. MAMOUNAS:  We asked about them, Judge, but

13   it's the response that we're looking to test.

14             THE COURT:  And so what are you thinking you're

15   going to find here?  You already have documents from SS&C

16   about its own implementation, right, or attempted efforts

17   to -- I know you all have a dispute about whose duty it

18   was to implement.  But you have internal documents already

19   from SS&C.  What are you trying -- I'm not clear on what

20   you're trying to get at.  You're trying to get like at

21   some personnel document?

22             MR. MAMOUNAS:  No, Judge.  I would think, in the

23   ordinary course, there would be email communications that

24   say, for example, Mr. Pallone is a good fit and someone we

25   should hire because the implementation team for mortgage

1    REITs needs to be rescued.  Ms. Olszewska needs to be

2    removed because she doesn't know what she's doing, based

3    on some of the other documents.

4            THE COURT:  And is this not already within the

5    scope of document requests you've already made about

6    troubles and communication?

7            MR. MAMOUNAS:  I believe it is, but it hasn't

8    been produced, Judge.  That's the problem with parsing

9    that I mentioned earlier.  There could be references --

10   and I would imagine there are because that's what the

11   natural language of these documents reflects.  There would

12   be references to what's going on without referring to

13   specific clients.

14           So I think the category of communications that

15   we would seek would be very, very narrow and limited to

16   the time periods when these personnel changes happened

17   within a span of weeks or months or a month, I would

18   imagine.  And that would time back to the implementation

19   of what was going on for mortgage REIT CAMRA clients,

20   particularly these licensed clients that were so

21   problematic.

22           THE COURT:  Thank you.

23           MR. O'CONNOR:  Your Honor, I'd like to address

24   the four personnel changes.  And again, we submit it's a

25   fishing expedition.

1          Mr. Pallone, I'm looking at his LinkedIn page,

2    he spent 20 years at JPMorgan, which is not a turnaround.

3    He was then at Freddie Mac.  Then he worked with a

4    mortgage REIT that did not end up going public.  Then he

5    was at Met Life.  And then at Citigroup.  And then he

6    worked for Doral Bank which was failing.  He helped Doral

7    Bank basically liquidate.  That was it.  That's the sole

8    reference.

9          So the suggestion that Mr. Pallone was somehow

10   hired for turnaround purposes is completely unfounded in

11   the documents.  His resume, like every corporate leader's

12   resume, says things to the effects of "leads

13   transformation," things of that nature, so he's hired not

14   to direct implementation.  He's hired because he has

15   institutional knowledge that SS&C deemed to be helpful.

16   He's hired in May of --

17          THE COURT:  You know what?  I guess I don't want

18   to really sort of go through all the reasons that you say

19   exist.  Because I think, as Mr. Mamounas says, he wants to

20   test these reasons.  But help me understand why -- well,

21   whether -- if Mr. Mamounas were correct that any of the

22   changes in leadership or changes in personnel for the

23   implementation for the Professional Services group were

24   because of concerns about the implementation of CAMRA,

25   troubles that CAMRA had with respect to implementation

1    regardless of whose duty it was, essentially customer

2    dissatisfaction issues, would those documents have already

3    been produced by you?

4         MR. O'CONNOR:  It would -- I think it would

5    depend on whether they were discussed in the context --

6         THE COURT:  -- of why they put in leadership?

7         MR. O'CONNOR:  -- of ARMOUR, that sort of thing.

8    To the extent, if ARMOUR were a reason in any way for any

9    change.  And ARMOUR was not.

10        So Ms. Olszewska, she's the head of the

11   Professional Services; she doesn't run this

12   implementation.  There's a person on the ground, there's a

13   project manager, they're both still in place, they don't

14   ever get replaced.  Ms. Olszewska is moved to a different

15   position and replaced by a person named Tony Gonzalez who

16   was part of the team that Mr. Reilly, who was their

17   supervisor, was bringing in.  He brought in Dan Pallone,

18   he brought in a man named Tony Gonzalez.  He was

19   assembling his own team.  There was no suggestion that it

20   was because implementations were not working.  SS&C has

21   been implementing this product for 30 years.

22        Ms. Olszewska testified as to the reasons she

23   was given.  Mr. Reilly testified, full-day deposition, and

24   gave complete answers why he made the decision regarding

25   any head of Professional Services.  So digging into what

1    are, in effect, personnel files we would submit is unduly

2    intrusive.  Mr. Reilly made the determination.

3           THE COURT:  They may not be personnel files,

4    right?  They would be ordinary business documents, I would

5    think, which would reflect upper management decisions that

6    we need new leadership and probably some statement of

7    reasons why.  And that wouldn't necessarily go into like a

8    personnel file, would it?

9           MR. O'CONNOR:  Not necessarily, Your Honor.  But

10   if, for example, the problem REITs, that one document, if

11   that were the issue, then that -- it's overwhelmingly

12   likely that that would have been captured because the

13   discussion would have been "we're having difficulties with

14   implementations regarding these clients or this type of

15   client and it's important that we correct this."  And what

16   we see in the documents is the people who are advocating

17   for any position are specific.  They give examples.  They

18   say this is it, that's it.

19          Ms. Olszewska was not removed for any

20   performance reason.  What Mr. Reilly testified to was he

21   thought that they could sell to a higher tier of

22   institutions if they had the benefit of someone with

23   Mr. Gonzalez's resume.

24          So searching around for those documents,

25   again -- and we've asked opposing counsel what the search

1    terms would be.  How do we cast about this?  Is it every

2    document that refers to Iwona Olszewska?  Is it every

3    document that refers to Tony Gonzalez?  It's just vague.

4    It's amorphous.  The people who made the decisions have

5    all testified.

6              THE COURT:  And they've all been questioned

7    about the leadership changes?

8              MR. O'CONNOR:  Ms. Olszewska's been questioned

9    and Mr. Reilly has been questioned.  Mr. Pallone has been

10   questioned.  And Mr. Gonzalez is scheduled to be deposed.

11   And they've all given fairly innocuous answers, frankly.

12   And no objection as to lack of responsiveness or anything

13   of that nature.  They've been very candid.

14             THE COURT:  All right.  Are there internal

15   documents at SS&C that reflect on the reasons why these

16   leadership changes were made?

17             MR. O'CONNOR:  Not in any formal file.  There

18   may be a personnel file for Mr. Gonzalez.  There would not

19   be for the other people.

20             And for Mr. Gonzalez, again, it's unrelated

21   to --

22             THE COURT:  All right.

23             Mr. Mamounas, anything else on this?

24             MR. MAMOUNAS:  I would just add, Judge, that I

25   think we were dealing in terms of a number of different

1  hypotheticals there as far as what the documents would, or

2  what the overwhelming chance of it would be.  I don't

3  think Counsel's actually looked at those documents, and

4  we're happy to be cooperative as to how they would be sort

5  of identified.

6          THE COURT:  You've deposed a bunch of these

7  witnesses, right, and you've asked them -- and I know you

8  want to test them.  Have you asked these witnesses what

9  are the documents that existed?

10         MR. MAMOUNAS:  As far as the documents

11  concerning the hiring decisions, I don't believe so,

12  Judge.  We asked about the hiring decisions, but I mean it

13  speaks for itself, there's no coincidence that three

14  different people are running the implementation team for

15  this software within a roughly 12- to 14-month period

16  while four implementations, the only CAMRA licensed

17  implementations were all failing.  It really sticks out to

18  us.

19         THE COURT:  I'm going to sustain the objection

20  to the leadership changes at the Professional Services

21  group.  I do think it's quite speculative that there would

22  be these particular documents that are hypothesized.

23         And I will say, you're welcome to -- it doesn't

24  sound like you have, but you're welcome, to the extent

25  that you're going to depose it sounds like Mr. Gonzalez,

1    you can ask him:  Are there documents that are created

2    that memorialize why somebody is brought in to head the

3    Professional Services group?

4              MR. MAMOUNAS:  But --

5              THE COURT:  To me -- don't cut me off, please.

6              But to me it's really speculative that there are

7    such documents.  And I don't have -- I don't have an

8    adequate basis, I think, to compel that production, and I

9    don't know exactly what those search terms would be.

10             MR. MAMOUNAS:  If I might, just to clarify

11   something, Judge?

12             THE COURT:  Yes.

13             MR. MAMOUNAS:  The suggestion that we ask

14   Mr. Gonzalez about the reasons he was hired I don't think

15   would necessarily reflect and relate the reasons SS&C

16   hired him.  An employee oftentimes doesn't know the

17   reasons that he or she is hired for a position, which is

18   why we were asking for SS&C's documents, to the extent

19   they exist.  And I don't believe that we would need to run

20   search terms or the request propounded to us.  I would

21   just ask the person in charge of hiring:  Were there

22   documents and communications on this?  And that's a

23   question to which we don't know the answer.

24             The deposition testimony that came out was very,

25   as Mr. O'Connor said, innocuous and political.  These

1    people were being upgraded without giving us reasons that

2    anybody could recall in their deposition testimony.  And

3    the only way that we could know is the documents.

4              THE COURT:  All right.  So that's my ruling.

5              And the next issue, we have the deposition for

6    Mr. Boulanger, who I take is yet another person who could

7    be asked about the existence of these documents, no less

8    than the president and COO.  And there's a request for the

9    deposition of him.  Tell me why is it necessary.

10             MR. MAMOUNAS:  Well, Judge, a few things.  And

11   you're right, Mr. Boulanger is someone we could ask about

12   the hiring decisions.  As I understand it, he was the one

13   who was responsible for making those hiring decisions and

14   he was involved in these issues.

15             There are three reasons for his deposition.

16             The first is that we had an agreement with

17   respect to the production of --

18             THE COURT:  Let's move past that.

19             MR. MAMOUNAS:  Fine, Judge.

20             The second is that SS&C has not moved for a

21   protective order.  They've simply indicated they're not

22   going to produce him.  And yesterday is the first that we

23   heard of SS&C's invocation of the apex doctrine in

24   opposition to the deposition.  They didn't cite any

25   District of Connecticut decisions.

1            THE COURT:  It's pretty common.  It's a pretty

2    common doctrine.  So let's move past that.

3            Tell me what is it that is of particular value.

4            MR. MAMOUNAS:  Sure.  Mr. Boulanger is not at

5    the apex.  There is someone who is a higher-ranking

6    executive than he is.  But he had personal involvement in

7    the facts and circumstances of the case.

8            And the first, and I think probably one of the

9    most important reasons, is he has a personal belief that

10   SS&C should have -- his words -- should have sold

11   outsourcing to ARMOUR; in other words, should not have

12   sold hosting to ARMOUR.

13           THE COURT:  Where is that from again?  I know

14   that's referenced in your letter.

15           MR. MAMOUNAS:  Mr. Boulanger communicated that

16   to ARMOUR representatives in May of 2017 on a telephone

17   call.

18           MR. O'CONNOR:  In a settlement conference,

19   Your Honor.

20           THE COURT:  Hold on a second, okay?

21           Go ahead.

22           I'll hear from you in a moment.

23           MR. MAMOUNAS:  Of course, the fact that it

24   happened in a settlement conference under Rule 408 doesn't

25   make it any less discoverable than any other comment.

1          But the fact that Mr. Boulanger made the

2    statement obviously carries significant weight because he

3    used to run Professional Services.  And Dennis Moore, who

4    is a witness of SS&C's that's been deposed in this case,

5    says that in his believe no one at SS&C is more

6    knowledgable about implementations than Mr. Boulanger.

7    Now, Mr. Boulanger also, of course, is the president/COO,

8    so the fact that he would communicate to a client that it

9    should have sold a different product than the one it

10   actually sold would carry a lot of weight.  And we can't

11   get the basis for that belief from anyone but

12   Mr. Boulanger himself.

13          THE COURT:  And he signed the documents, right?

14          MR. MAMOUNAS:  He also signed Work Request Two,

15   he signed the master agreement, he signed Work Request

16   Three.  So this is relevant, we believe, to our negligent

17   misrepresentation claims concerning the appropriateness of

18   hosting and causation.

19          Separate and apart from that, Mr. Boulanger also

20   was personally very involved in the business including

21   with respect to ARMOUR.  He was involved in the creation

22   of the Mortgage REIT Division which was an important move

23   for SS&C that also involved him in the sales process to

24   start the division.  He was involved in the assignment of

25   the sales lead to ARMOUR that went to the sales folks.

1   He's involved in biweekly sales calls at which sales folks

2   are questioned by him on a biweekly basis at SS&C,

3   obviously very important issues with respect to launching

4   the Mortgage REIT Division.  He signed the master

5   agreement and subsequent work requests, as I mentioned.

6   He was involved with ARMOUR's unpaid bills, as disclosed

7   by SS&C in interrogatory answers.  SS&C has admitted that

8   he was updated on a periodic basis about the status of

9   implementation.  Since it was failing along with three

10  others, Mr. Boulanger logically would have had reactions

11  and given directions to improve the situation.  Of course,

12  if he didn't, that would also be significant for our

13  purposes.  He was also aware that ARMOUR wanted to meet

14  with him to discuss its concerns.  That meeting never

15  occurred.  His personal involvement is information that we

16  could only get from him.

17         He was also very involved personally with

18  respect to implementations and to Professional Services

19  itself.  Again, I mentioned the personnel decisions

20  earlier, and I would submit that if we're not going to be

21  able to take discovery on the documents, we at a minimum

22  should be able to ask Mr. Boulanger about those hiring

23  decisions since he was responsible for approving them and

24  making them as well as interviewing the candidates for it.

25         The testimony has also emerged that

1    Mr. Boulanger has an individual who formerly ran

2    Professional Services counsel Ms. Olszewska with respect

3    to running Professional Services when she was in charge of

4    it.   Again, we can only get those things from him.

5              I mentioned that Counsel hasn't cited any

6    District of Connecticut cases, but I do have others I can

7    cite on the apex doctrine, if you'd like.   But I think his

8    personal involvement, the personal belief he had with

9    respect to the products SS&C should have sold ARMOUR but

10   did not are enough of a basis for a deposition of

11   Mr. Boulanger.

12             THE COURT:   How long is it going to take to

13   depose?

14             MR. MAMOUNAS:   I don't believe that it will be

15   the full seven hours, Judge.   I would in fact think it

16   would be much less than that.

17             We have made similar inquiry of SS&C with

18   respect to depositions of our folks and have been told to

19   reserve the entirety of the seven hours, but I would

20   endeavor to be much briefer than that with Mr. Boulanger.

21             THE COURT:   Mr. O'Connor.

22             MR. O'CONNOR:   Yes, Your Honor.

23             Mr. Boulanger is the president and chief

24   operating officer of a company with 8,000 people in a case

25   that involves alleged negligent misrepresentations in

```
 1   advance of the contract being signed.  There is not a
 2   piece of paper, not a word of testimony indicating that he
 3   was involved in any way in any communications with ARMOUR,
 4   the ARMOUR sales pitch, anything at all.  Absolutely no
 5   documents.  There's been no testimony whatsoever.
 6              The other issue is the performance of Work
 7   Request Two.  And there's no indication that Mr. Boulanger
 8   had any involvement with the performance of Work Request
 9   Two.
10              THE COURT:  Hold on a second.
11              So Mr. Mamounas is saying in his letter, he's
12   saying that Mr. Boulanger participated in the sales
13   process for ACM and other mortgage REITs.  Not true?
14              MR. O'CONNOR:  Not true.
15              THE COURT:  No involvement at all on that?
16              MR. O'CONNOR:  To the best of my knowledge, no,
17   Your Honor.  I personally reviewed thousands upon
18   thousands of documents.  They were not -- he was not
19   involved in the sales process.
20              I think what Mr. Mamounas is referring to is
21   that there were periodic meetings where the sales team may
22   get together and say this is coming down the pike, and
23   Mr. Boulanger and Mr. Stone might be there, but it would
24   be one among many clients.
25              THE COURT:  But he did sign these contracts.
```

1          MR. O'CONNOR:  He signs all contracts,

2     Your Honor.  That is part of his responsibility.  We'd be

3     happy to provide an affidavit that he has no recollection

4     of this contract or I believe Work Request Two at all.  He

5     had no involvement in any of those things.  And to the

6     extent that there's anything that is supposedly relevant,

7     it was made during the settlement conference.

8          I would add, Your Honor, that to the extent

9     performance regarding this agreement is to be tested in

10    any way, that would go to the implementation team, that

11    would go to the head of implementation, that would go to

12    Mr. Reilly or Mr. Pallone, all of whom have been deposed.

13    So Mr. Boulanger's testimony would be cumulative and

14    purely derivative of those percipient witnesses.

15          THE COURT:  I see.

16          Anything else?

17          MR. MAMOUNAS:  Two points.  I don't believe that

18    Mr. Boulanger had no involvement in the sales process.

19    The testimony was that when the Mortgage REIT Division was

20    launched, which was a sales effort, he was consulted and

21    had to give approval with Mr. Reilly.  When the lead came

22    in, Mr. Boulanger was copied on the email that assigned it

23    to the sales folks.  The testimony has been that

24    Mr. Boulanger frequently is involved in these sales calls

25    with respect to making sure that these deals were actually

1    closed and questions SS&C's sales folks about it.

2            But again getting back to a point --

3            THE COURT:  Did he ever meet with or communicate

4    with anybody from ACM?

5            MR. MAMOUNAS:  He did.

6            THE COURT:  He did not?

7            MR. MAMOUNAS:  He did.

8            THE COURT:  He did?

9            MR. MAMOUNAS:  He did.

10           THE COURT:  Describe that.

11           MR. MAMOUNAS:  That was in a May 2017 telephone

12   call at the termination of the relationship when he

13   indicated that it was his personal belief that ARMOUR

14   should never have been --

15           THE COURT:  But during the process from the one

16   the master work agreement or master agreement is signed

17   and his later signature, he was not dealing with ACM at

18   that point?

19           MR. MAMOUNAS:  He was -- on a direct basis, he

20   was not.  According to SS&C, he was frequently updated and

21   periodically involved.  And the position we would take is

22   that he obviously would have reactions to what was going

23   on.  And if he didn't, that would be equally significant.

24   The fact that he's not on many emails I think is an

25   argument that has to work in both directions here, because

1    SS&C has said the reason they want to depose Mr. Zimmer is

2    because he's not copied on many emails.  That is the point

3    for taking Mr. Boulanger's deposition.  We need to

4    understand the basis for his opinion that ARMOUR should

5    not have been sold hosting and said should have been sold

6    outsourcing.  The performance of the agreements and the

7    updating his reactions and his activities with respect to

8    a group that the documents reflect was failing, it was not

9    able to complete these implementations.  And then,

10   foremost, the sales process at the outset, Judge.

11            THE COURT:  I see.  Okay.

12            Anything else on this?

13            MR. O'CONNOR:  No, Your Honor.

14            THE COURT:  I'm going to overrule the objection

15   to the deposition of Mr. Boulanger, but I'm going to limit

16   it to a two-hour deposition in light of the I think lack

17   of additional evidence other than his signing of the

18   contracts at issue.  I think in terms of what I heard from

19   Mr. Mamounas in terms of the scope of the deposition, it

20   would be a pretty limited one and also concerning the

21   personnel there, and I think you can get your job done in

22   two hours, Mr. Mamounas.  And I'll impose the same time

23   restrictions as to Mr. Zimmer.  If the parties want to

24   agree to additional time, reciprocally, for each other's

25   witnesses there, they're welcome to do that.  But I'll put

1   the two-hour limit on the depositions for.

2             MR. O'CONNOR:  Your Honor, may I be heard on

3   that?  There's really no equivalence between the two.

4   They're both presidents, but beyond that --

5             THE COURT:  Was Mr. Zimmer personally involved

6   in the negotiations then?

7             MR. MAMOUNAS:  He was not, Judge.  And the only

8   time that he ever interacted with ARMOUR -- excuse me.

9             THE COURT:  Hold on a second.  I'm asking

10  Mr. O'Connor.

11            MR. O'CONNOR:  No, he's not.  Here's how he was

12  involved.  We had a project manager.  The other side has

13  deposed the supervisor of the project manager, the

14  supervisor of the supervisor, someone else who was

15  involved.

16            Mr. Gruber, the chief operating officer, was

17  supposed to be the project manager, it's a deemed position

18  in the agreement that the parties agreed to.  And the

19  supervisor was supposed to be Mr. Zimmer.  And so we're

20  going one level up to find out what, if anything, did

21  ARMOUR do to supervise the project manager.  We submit

22  that there were never any project management reports.

23  There were never any written communications.  The

24  explanation we've gotten is that ARMOUR, in stark contrast

25  to SS&C's 22 people, they all sit in a single office and

 1   we've been told that they communicate orally.  And so

 2   Mr. Zimmer is supervising the project or supervising the

 3   person who is running the project, it's allegedly an

 4   important project, it's a project that is expending public

 5   investors' money.  It is likely that during the course of

 6   this engagement he would have been discussing with

 7   Mr. Gruber what was going on and why.  And we don't need a

 8   full seven hours.

 9            THE COURT:  Why wouldn't it be equally likely as

10   to the comparable leader?

11            MR. O'CONNOR:  For the reasons that I've

12   explained.  He's supervising the person who is the project

13   manager.  Mr. Boulanger has 8,000 employees.

14            THE COURT:  I know he's got a lot.  So how many

15   steps removed is Mr. Boulanger from --

16            MR. O'CONNOR:  Three.

17            THE COURT:  Three steps removed from there.  I

18   see.

19            Do you dispute that, Mr. Mamounas?

20            MR. MAMOUNAS:  Well, I would submit that the

21   person ultimately responsible was the senior vice

22   president, Tim Reilly, and Mr. Boulanger is one step

23   removed from him.

24            And with respect to ARMOUR's employees, if I may

25   be heard, I think we're comparing apples and oranges in

1   that sense.  ARMOUR was the client that hired SS&C for

2   this.  SS&C is the vendor that's meant to be the

3   deliverer.  Their job, as we've heard, is software and

4   implementation.  Mr. Boulanger's personal beliefs about it

5   and his involvement with the performance of the contract

6   are significant issues that I think, you know, outweigh

7   the probative value of what Mr. Zimmer, as the ultimate

8   responsible person on the ARMOUR Capital Management side,

9   might have.  But we've agreed to that deposition.  And we

10  do think that the time limit should be reciprocal for the

11  reasons including, but not limited to, the fact that the

12  only time Mr. Zimmer interacted on a personal basis with

13  SS&C was on the same call with Mr. Boulanger in May of

14  2017.

15              THE COURT:  All right.

16              I'm going to allow three hours for Zimmer, a

17  slight bit more because of the relative position and size

18  of the organizations and also case proximity.  So three

19  hours for Zimmer and two hours for Boulanger.

20              MR. O'CONNOR:  Thank you, Judge.

21              MR. MAMOUNAS:  Thank you.

22              THE COURT:  That gets us to the attorneys' eyes

23  designation issue, which was kind of raised for the first

24  time here.

25              Tell me, Mr. Mamounas, what's going on there?

1    What is exactly the concern there?

2            MR. MAMOUNAS:  Well, Judge, all of the documents

3    that have been produced to us concerning implementations

4    in response to our requests have either been -- well, have

5    variously been heavily redacted as well as have been

6    designated attorneys' eyes only.

7            The attorneys' eyes only designation we don't

8    think is appropriate in this case.  For one thing, it

9    prevents us from discussing these documents with our

10    client.  They are not trade secret or confidential

11    materials.  Instead, these are documents concerning

12    implementations that took place years ago, and it

13    prejudices our ability to prepare and prosecute the case.

14            SS&C's obligation to its clients, as far as

15    confidentiality, if the other REIT -- and at this point

16    the only one that's at issue is Bimini -- if the contracts

17    are similar, the obligation is to give them notice so that

18    they can come into court and seek a protective order.

19    There's been no evidence that that has happened or no

20    evidence that Bimini is interested in protecting the

21    confidentiality of its implementation.  Quite the

22    opposite.  The declaration that was put in by Mr. Haas

23    authorized the full release of the Bimini documents to

24    ARMOUR.  So we think that the attorneys' eyes only

25    designation is extreme and not appropriate under the

1    circumstances.

2            As well, I would also raise the fact that, as I

3    said, these documents are heavily redacted.  There are

4    issues that are very closely related to the substance of

5    the records, but we aren't able to see what's behind the

6    redactions.  And we don't believe that that's an

7    appropriate use of redaction for purposes of document

8    production when those documents are clearly responsive to

9    our request or have been ordered by the Court already.

10           THE COURT:  I see.

11           MR. O'CONNOR:  Your Honor, this is the first

12   I've heard of this issue was as of yesterday.  So there

13   was no attempt whatsoever by counsel to push this issue

14   with regard to redactions.

15           The documents, in our view, have not been

16   heavily redacted.  In many instances, all that's redacted

17   is the name and there's other contacts that's revealed

18   that would enable ARMOUR to push in the event that it

19   wanted to see redacted information.

20           The information that's been redacted is the

21   information largely of direct competitors of ARMOUR.  And

22   to the extent we've enforced the attorneys' eyes only

23   provision in depositions, it's been when they were

24   discussing the business of their direct competitors.  We

25   submit that's an entirely appropriate use of the

1    attorneys' eyes only designation.  They have made no

2    proposal as to any sort of a workaround at all.  And so we

3    would submit at this late date that it would be unduly

4    burdensome to go back and undue all of those designations,

5    unless there's something more specific or a more

6    constructive suggestion as to how to go about this.

7              And then with respect to Bimini, Your Honor,

8    we've taken the affidavit and we've produced accordingly.

9              THE COURT:  But with respect to Bimini, if

10   you're doing attorneys' eyes designations as to documents

11   concerning Bimini --

12             MR. O'CONNOR:  No, no.  To the extent we're

13   producing now, Bimini has said that it does not object.

14             THE COURT:  Right, okay.  So that's not the

15   issue.

16             MR. O'CONNOR:  So that's not an issue at all.

17             MR. MAMOUNAS:  As I understand it, the documents

18   that were produced last week were designated attorneys'

19   eyes only.  That was the, quote/unquote, Bimini

20   production.

21             THE COURT:  Well, let's not have that then.  It

22   seems there's an agreement that as to Bimini documents,

23   there should not be an attorneys' eyes designation.

24             Mr. Mamounas, if you have additional issues

25   concerning scope of redactions or attorneys' eyes

1    designations, I think you need to consult again with

2    Mr. O'Connor before we pursue this further.  I can't rule

3    in the abstract at this point.  But it sounds like we've

4    got clarity on the Bimini documents since there is no

5    objection from Bimini, right?

6              MR. MAMOUNAS:  That's right.

7              I would just make the Court aware of the

8    procedural challenge really of trying to divine what's

9    behind redactions.  They have not been produced with a

10   log.  We don't have an understanding of what's behind

11   them.  This has been an issue previously in the case.

12   It's now been brought --

13             THE COURT:  Well, I'll tell you what.  Go to the

14   particular documents that you have a concern about with

15   respect to redactions and have a discussion with

16   Mr. O'Connor to try to understand what the basis for

17   redacting is.  He's saying now that the basis is it

18   reveals information about direct competitors of ACM.  So

19   it seems there would be a valid concern there.  But if you

20   have a concern about particular documents that you would

21   like to be sharing with your client, especially about

22   other redactions you have concerns about, you should raise

23   those.

24             Mr. O'Connor, you should be prepared to quite

25   promptly respond to any kind of inquires about redactions

 1    there.  And also if there are reasons for redactions other

 2    than that you're protecting information concerning a

 3    direct competitor, then you should also state what that

 4    principle is, or the reason or the rationale for doing

 5    redactions is.

 6                    MR. O'CONNOR:  Understood, Your Honor.

 7                    MR. MAMOUNAS:  Very well, Judge.

 8                    THE COURT:  I think that's it in terms of ARMOUR

 9    issues.

10                    And then that gets us to I think the last --

11    only one issue here is the deposition of the REIT and

12    Deloitte.

13                    MR. O'CONNOR:  Yes, Your Honor.

14                    With respect to Deloitte, Your Honor, we haven't

15    received the full production from Deloitte yet.  We've

16    been working with them.  So I don't want to be

17    inefficient, but I think it would be best if we waited to

18    see what we got from them to determine whether there

19    really is something worth fighting over.  It's possible

20    that we'll get documents that will persuade Mr. Mamounas

21    that we should proceed with the deposition; and it's

22    possible that we'll be persuaded that it's not a worthy

23    investment of time.  If I could, I would prefer to hold on

24    that one.

25                    THE COURT:  All right.

1          MR. O'CONNOR:  With respect to the ARMOUR REIT,

2     Your Honor, that's the entity, as we've indicated, that

3     paid for this.  It's the public shareholders who paid for

4     this.  It is highly unlikely that there would not have

5     been communications with the --

6          THE COURT:  But you don't have those documents

7     either, yet, do you?

8          MR. O'CONNOR:  No, they haven't produced those.

9     We just recently received I think 6,000 documents by way

10    of follow-up requests.

11         THE COURT:  Okay.  So I think it's premature at

12    this point to order the deposition of folks at Deloitte

13    and the ARMOUR REIT until you have documents and if

14    there's a basis at that point why depositions would be

15    productive, don't you think?

16         MR. O'CONNOR:  Well, I think that they're

17    different in kind, Your Honor.  It's conceivable to me

18    that, for the -- that the Deloitte partner didn't deem

19    that material to the audit.  It's inconceivable that the

20    REIT would consider a $2 million transaction immaterial.

21    And there certainly would have been communication as to

22    the purpose of it and why the project was undertaken, what

23    the status was, what the reports were, things of that

24    nature.

25         I would submit, Your Honor, all of that, to the

1    extent it came from plaintiff, should have been produced

2    in the first place.  And we got none of that.

3                THE COURT:  So I understand -- and I understand

4    why you're making the distinction between Deloitte and the

5    REIT.  I just would like to wait until you have your

6    documents and then I can figure out at that point in time

7    is there grounds to be doing a deposition.

8                MR. O'CONNOR:  I would ask Mr. Mamounas, have

9    you produced the ARMOUR REIT documents?

10               MR. MAMOUNAS:  May I, Judge?

11               THE COURT:  Yes, go ahead.

12               MR. MAMOUNAS:  We did.  The production

13   compliance deadline I believe was last week, if I'm not

14   mistaken, pursuant to Your Honor's order.  Not only did we

15   produce the documents, but we specified the Bates numbers

16   between which they appear.  That was provided to counsel

17   last week.  It's a handful of documents that we would

18   submit don't provide a predicate for the depositions.  We

19   heard a lot of argument earlier today about fishing

20   expeditions and being far afield.  I don't believe that

21   ARMOUR's accounting practices are on trial here.  The core

22   issues, as you deemed it during the March 2nd hearing,

23   Your Honor, were about the decision to purchase to the

24   extent it discusses SS&C and CAMRA and the implementation

25   issues concerning SS&C and CAMRA.  That's what we

1    produced.

2          THE COURT:  So when you get through those

3    documents, Mr. O'Connor, if you have a basis to seek the

4    deposition, consult there.  And if I have to resolve this

5    issue, I'll resolve it at that point.  I need more of a

6    factual predicate than I have right now.

7          MR. O'CONNOR:  Understood.  Thank you,

8    Your Honor.

9          THE COURT:  I think that's it then in terms of I

10    think I've addressed the outstanding discovery issues.

11          MR. O'CONNOR:  Yes.

12          THE COURT:  And I wanted to talk about, it looks

13    like we've got -- did you just file an answer with

14    counterclaims as well?

15          MR. O'CONNOR:  Yes.

16          THE COURT:  Is this going to start to change

17    things here in terms of the scope of litigation in this

18    case?

19          MR. O'CONNOR:  Your Honor, I don't know that it

20    substantially changes the scope of the litigation.

21          THE COURT:  Is it going to require different

22    production, scope of discovery?  I can't imagine it would,

23    but I don't know.

24          MR. O'CONNOR:  I don't think so.

25          MR. MAMOUNAS:  I wouldn't expect so, Judge.

1   There may be motion practice directed at the counts in the

2   counterclaims.  But I don't believe that will change the

3   scope of discovery.

4        THE COURT:  So if that's going to happen, we'll

5   need to talk about our scheduling order in the case.  I'm

6   inclined, if at all possible, to try to adhere to where

7   our scheduling order is.  I know we've got, it looks like,

8   discovery closing at the end of May.  So the parties

9   should consult about that.

10        MR. O'CONNOR:  The fact discovery?

11        THE COURT:  I believe so.  I'm looking at the

12   scheduling entry I had from July 2017.

13        MR. O'CONNOR:  That's been amended, Your Honor.

14        THE COURT:  Okay.  Hold on a second.

15        MR. O'CONNOR:  It was amended --

16        MR. MAMOUNAS:  It was amended in March, Judge,

17   when we had our March 2nd hearing by phone.

18        THE COURT:  And I don't know if you have the

19   docket handy.  Do we have a docket entry on the dates?

20        MR. O'CONNOR:  May 11 is fact discovery,

21   Your Honor.

22        THE COURT:  Okay.  All right.  So according to

23   the amended dates, and I have it here on the schedule

24   which I entered.

25        So do the parties anticipate issues there at

1    this point in terms of compliance?

2              MR. MAMOUNAS:  With respect to the schedule?

3              THE COURT:  Yes.

4              MR. MAMOUNAS:  Not from the plaintiff.

5              MR. O'CONNOR:  No, Your Honor.

6              THE COURT:  I know you met with Judge Margolis

7    once before.  Would it be helpful to meet with Judge

8    Margolis again at this point or do you need more time to

9    litigate?

10             MR. O'CONNOR:  Your Honor, we're happy to talk

11   any time.

12             MR. MAMOUNAS:  We're always happy to talk as

13   well, Judge.  I know Judge Margolis is retiring very soon.

14   I don't know what her schedule is like.

15             THE COURT:  She's around this afternoon and

16   she'd be available to meet with you.  Since some of you

17   have traveled here to get here, it might make sense.

18   Would you go up after this and check with her chambers

19   about trying to squeeze in at least a little bit of time

20   this afternoon.

21             MR. MAMOUNAS:  Happy to, Judge.

22             MR. O'CONNOR:  Yes.

23             THE COURT:  Anything else?

24             MR. O'CONNOR:  No.

25             THE COURT:  Great.  Thank you all.  Stand in

1    recess.

2                    (Proceedings adjourned at 11:22 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
                TECHNOLOGIES, INC., No. 3:17CV790(JAM)

5

6              I, Diana Huntington, RDR, CRR, Official Court

7      Reporter for the United States District Court for the

8      District of Connecticut, do hereby certify that the

9      foregoing pages 1 through 62 are a true and accurate

10     transcription of my shorthand notes taken in the

11     aforementioned matter to the best of my skill and ability.

12

13

14

15

16                       _____/s/_____

17                     DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
18                     United States District Court
                       141 Church Street, Room 147
19                     New Haven, Connecticut 06510
                           (860) 463-3180
20

21

22

23

24

25