# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - x
                                  :
ARMOUR CAPITAL MANAGEMENT LP,     :  No. 3:17CV790(JAM)
                                  :
              Plaintiff           :
                                  :
       v.                         :
                                  :
SS&C TECHNOLOGIES, INC.,          :
                                  :  New Haven, Connecticut
              Defendant           :  April 27, 2018
                                  :
- - - - - - - - - - - - - - - - - x
```

TELEPHONIC DISCOVERY CONFERENCE

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

```
 1  A P P E A R A N C E S:

 2
        FOR THE PLAINTIFF:
 3
            HOLLAND & KNIGHT
 4              701 Brickell Ave., Suite 3000
                Miami, Florida 33131
 5          BY: ALLISON KERNISKY, ESQ.

 6
        FOR THE DEFENDANT:
 7
            HINCKLEY ALLEN & SNYDER LLP
 8              28 State Street
                Boston, Massachusetts 02109-1775
 9          BY: KEVIN J. O'CONNOR, ESQ.
                JASON C. WILLIAMS, ESQ.
10
            HINCKLEY ALLEN & SNYDER LLP
11              20 Church Street, 18th Floor
                Hartford, Connecticut 06103
12          BY: ALEXA TALIN MILLINGER, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           **10:00 A.M.**
2           THE COURT:  Good morning.  This is Judge Jeffrey
3   Meyer.  We're here for a discovery teleconference in the
4   matter of ARMOUR Capital Management v. SS&C Technologies.
5           May I have appearance of counsel for ARMOUR,
6   please.
7           MS. KERNISKY:  Good morning.  Allison Kernisky
8   on behalf of plaintiff, Your Honor.
9           THE COURT:  Good morning.
10          And for SS&C?
11          MR. WILLIAMS:  Good morning, Your Honor.  Jason
12  Williams.  And with me is Kevin O'Connor and Alexa
13  Millinger.
14          THE COURT:  Great.
15          All right.  So it sounds like, Ms. Kernisky, you
16  want to get some more information about Fortress; is that
17  right?
18          MS. KERNISKY:  Well, different information,
19  Your Honor, that's correct.  Different information than
20  what was before Your Honor at the April 3rd hearing.
21          THE COURT:  Okay.  Do you want to elaborate?
22          MS. KERNISKY:  Absolutely.
23          So we had subpoenaed Fortress back in January,
24  and we've revised the subpoena recently.  What we are now
25  seeking are very limited categories of documents extremely

1   tailored.  We are only interested in any pre-contractual
2   sales materials, you know, between Fortress and SS&C, as
3   well as the contracts that were ultimately signed, as well
4   as a very limited deposition of Fortress's chief
5   technology officer who was the person responsible at
6   Fortress and mostly involved in the sales process with
7   SS&C and those communications.
8             THE COURT:  Okay.  Go on.  I'm sorry, I didn't
9   mean to cut you off.
10            MS. KERNISKY:  Oh, that's fine.  You asked me
11  what we were seeking, and that's what it was.  Do you want
12  me to elaborate on why we'd like those documents?
13            THE COURT:  If you'd like to.
14            MS. KERNISKY:  Absolutely.
15            As you know, ARMOUR purchased this CAMRA product
16  from SS&C and Fortress purchased the CAMRA product from
17  SS&C.  The sales processes happened at the same time, same
18  product, they had the same salesman at SS&C.  They both
19  bought a license and contracted for implementation
20  services.  And also we had testimony from a vice president
21  at SS&C, Tim Reilly, that before Fortress contracted, they
22  spoke to SS&C about hosting, which is the same choice that
23  ARMOUR made.  ARMOUR ultimately contracted for hosting.
24  And Fortress ultimately contracted for in-house license.
25  So they chose a different methodology than ARMOUR

1 ultimately.  So those conversations, those things that
2 were told to Fortress, you know, what Fortress learned
3 about hosting, about, you know, any questions they asked
4 about how long it would take to be employed, what would be
5 required in the effort, how many people would be involved,
6 the time, those sorts of things, they're all probative of
7 at the exact same time what SS&C was telling to ARMOUR
8 about all of those things.
9       And so we would like to, you know, get this
10 limited discovery from Fortress to probe the truthfulness
11 of the statements that were made to ARMOUR.
12       THE COURT:  Okay.
13       All right.  And from SS&C?  Counsel?
14       MR. WILLIAMS:  Yes.  This is Mr. Williams,
15 Your Honor.
16       And just to start, you know, at the Court's
17 April 3rd hearing or April 2nd hearing, rather, we
18 discussed at length as to why all Fortress documents are
19 not relevant and extremely burdensome to be produced.  And
20 then subsequent to that, Your Honor entered an order
21 basically sustaining our objection saying we did not have
22 to produce these documents.
23       And then subsequent to that, now ARMOUR is
24 trying to do an end around the Court's order and get the
25 same documents that were encompassed in the original

1  request from Fortress, a second bite of the apple, so to
2  speak.  It's still our position that these documents are
3  not relevant.
4       What SS&C said to Fortress -- who, by the way,
5  is still a current client of SS&C -- is not relevant as to
6  what we told ARMOUR because, for example, the length of
7  implementation that it would take to implement CAMRA on
8  Fortress is going to be vastly different than what it is
9  for ARMOUR based on the size of the company, based on the
10 custodian, based on the complexity of the work request, so
11 on and so forth.  This is just a complete fishing
12 expedition that we've gone through or that they're
13 attempting to go through.  It's extremely burdensome,
14 which is why back January of 2018 Fortress objected to
15 these very requests, right?  The documentation that we
16 submitted with our brief, I think Exhibit A, outlines that
17 Fortress ran search terms that came back with six or 7,000
18 hits and objected to that being too burdensome.  So at
19 this point, ARMOUR then sat on their hands for two months
20 requesting the documents from us.  They did get the
21 documents.  Now not only are they requesting the same
22 documents, but they're also requesting deposition
23 testimony.  We just feel that this is in complete
24 violation of the Court's order.
25      THE COURT:  All right.

1             MS. KERNISKY:  Your Honor, there are several
2  incorrect statements that Mr. Williams made.  May I have a
3  chance to address then?
4             THE COURT:  Certainly.
5             MS. KERNISKY:  First, as you realize from
6  reviewing the papers submitted, these are not at all the
7  same requests that were in front of the Court at the
8  earlier hearing.  The earlier hearing spoke solely to
9  documents relating to the implementation of Fortress,
10 which is necessarily something that occurred after the
11 contract was signed.  We are seeking with this subpoena to
12 Fortress documents pre-contract and the contracts
13 themselves.
14            The other thing that was at issue at the hearing
15 with Your Honor was documents relating internally to the
16 relationship between the sales department and the
17 professional services department, the team responsible for
18 implementation.  We had testimony from the head of the
19 professional services unit that there was tension between
20 those two units.  And the purpose of the subpoena to --
21 the document request to SS&C was to probe that
22 relationship, sort of internal politics at SS&C, if you
23 will.  Again, something -- those are internal SS&C
24 documents.  Those are things that necessarily Fortress
25 wouldn't have, and so we have not requested.  We've

1   requested pre-contractual communication with Fortress.
2           Mr. Williams also said that Fortress will be
3   burdened by responding to the subpoena.  Again, that's not
4   correct, Your Honor.  The initial request to Fortress,
5   like I said, were for broader categories.  The initial
6   subpoena to Fortress in January was for the contracts.  It
7   had two requests: contracts; and then also any problems,
8   issues, delays, failures with implementation.  Again,
9   post-contractual documents.  That was a much broader
10  category.  And they only found roughly six to 7,000
11  documents.  We said we would work with them to narrow the
12  search terms, we came up with a revised search request,
13  and have been working with them to tailor the searches
14  since then.  We were not sitting on our hands.
15          Also, Fortress's legal counsel had told us that
16  they would produce the contracts without problem.  They
17  just had never gotten around to it, and we are following
18  up on that issue.
19          So the request that we're looking at now is not
20  burdensome.  It's very tailored.  We're talking about a
21  period prior to when Fortress signed the contract
22  January 2015; the sales process, we don't know how long
23  Fortress's sales process lasted but, for example, ARMOUR's
24  sales process we know lasted seven months.  So we're
25  talking at the most about a few-month period, six months

1   to a year of a period of a sales process where the search
2   terms would not be hard to run.  It would literally be
3   "SS&C" or "CAMRA."  And any discussions prior to signing
4   the contract, those would be the hits, and that is what
5   would be responsive.  And based on what ARMOUR has
6   pre-contract in its materials, we have roughly, I don't
7   know, a couple of hundred documents that are from that
8   time period that are not duplicative.  So about 2 percent
9   or less of our overall production from SS&C is this time
10  period.
11              So if we're looking at a few hundred documents,
12  I assume Fortress would be looking at the same quantity,
13  which is hardly a burden.  The burden that Fortress raised
14  with us is that they have to -- their emails are archived
15  and they're owned by a contract called Global Relay.  They
16  have to get Global Relay to run the search and that would
17  cost I think they told us $500, which it's hard to imagine
18  that's a burden for a company of Fortress's stature.  So
19  we don't see a burden argument here, Your Honor, with
20  these limited categories of documents that we're
21  requesting from Fortress.
22              And the deposition of Fortress's chief
23  technology officer is extremely important because we know
24  there are conversations that occurred with Fortress and
25  the sales staff at SS&C about hosting.  Mr. Reilly from

1   SS&C testified to those conversation, but he couldn't
2   recall, you know, what the substance of them was.  None of
3   the representatives that we deposed from SS&C can recall
4   the substance of those conversations.  And Mr. Socher, the
5   CTO of Fortress, very well might.
6           MR. WILLIAMS:  And Your Honor, just to respond
7   briefly, if I may?
8           THE COURT:  All right.
9           MR. WILLIAMS:  Ms. Kernisky stated that the
10  documents requested at the April 2nd hearing were
11  specifically in regards to SS&C's implementation, which
12  would necessarily include the pre-contractual
13  communications that we had with Fortress, right?  So the
14  documents that they're requesting now, although they are
15  claiming are more narrowly tailored, are absolutely
16  encompassed in the earlier request.
17          As to the communications between her and counsel
18  for Fortress back in January, Mr. Meisels, who is counsel
19  for Fortress, essentially said that the six or 7,000 hits
20  were not including documents.  These were just email
21  requests.
22          And Ms. Kernisky mentioned that even if they
23  searched "SS&C" and "CAMRA," those are going to produce a
24  bunch of hits, which then have to be culled through and
25  then produced and then reviewed, which is very burdensome

1  and very costly.

2  　　　　　Mr. Meisels also mentioned that each time they
3  run these search reports, it costs them money.  The
4  basic -- or the alleged relevance of these documents is
5  completely disproportionate to the needs of the case.
6  Ms. Kernisky cannot articulate any justification as to why
7  these documents are relevant.  It's a complete fishing
8  expedition as to try to find something that will
9  substantiate the remaining claims based on the Court's
10 order on our motion to dismiss.

11 　　　　　So, you know, at this juncture, we just feel
12 that it's completely unnecessary and unwarranted.

13 　　　　　THE COURT:  Anything else, Ms. Kernisky?

14 　　　　　MS. KERNISKY:  Yes, Your Honor.

15 　　　　　We are entitled to test, you know, what these --
16 the statements made to ARMOUR by SS&C, the truthfulness of
17 them.  The statements that were made at the same time to a
18 REIT that was buying CAMRA with a license from the same
19 salesman are highly relevant and very probative of the
20 representations they were making to us.  You know, it
21 could be that Fortress had their CTO involved in their
22 sales process, so he could have asked all manner of
23 technical questions that would bear on what SS&C knew
24 about the requirements for hosting at the same exact time
25 that they're telling ARMOUR what is required for hosting.

1   If they told them something different that conflicted with
2   something that they told us, if they said to them, for
3   example, yeah, you know, hosting is really not -- it's
4   really hard and it's for -- you need about 15 full-time
5   employees to make it work, so I suggest you guys go with
6   the license.  Or if they said, we can do hosting but you
7   know it's going to take four years and we know you don't
8   want to wait that long.  I mean, there's all manner of
9   things that could have been represented that would
10  evidence that the representations that were made to ARMOUR
11  were not truthful or accurate.
12          In terms of burden --
13          MR. O'CONNOR:  Your Honor, this is Kevin --
14          THE COURT:  Hold on a second.  Let Ms. Kernisky
15  finish, please.
16          Please continue.
17          MS. KERNISKY:  Oh, yes.  I was going to say in
18  terms of burden, you know, Fortress has been subpoenaed
19  and we don't -- again, as far as we understand it, it's a
20  few hundred dollars to run these searches through Global
21  Relay.  If it comes down to the cost of it, we'll pay for
22  it.  I don't think that's a burden.  I don't see a burden
23  argument.
24          And the relevance, I think -- it goes to what
25  they knew at the time they were making the representations

1  to us.
2          And the last thing, Your Honor, is we don't have
3  evidence in the record, there's not much that we've seen
4  in the record to point to -- you know, SS&C doesn't have
5  policies and procedures on sales.  They don't have written
6  documentation on what their sales process is supposed to
7  look like or what they're supposed to say about hosting or
8  licensing or their other deployment options.  So the way
9  for ARMOUR to be able to understand, you know, what the
10 standard of care there is to look at our own documents and
11 to look at and to ask for testimony from other REITs that
12 were similarly situated at the same time, and that is
13 Fortress.
14         THE COURT:  And you've had this, though, from
15 Bimini, right?
16         MS. KERNISKY:  Yes.  Well, we have documents
17 from Bimini, but have not yet had a chance to depose
18 Bimini.  We're doing that next week or two weeks.
19         THE COURT:  Anybody else have anything else to
20 say on this?
21         MR. O'CONNOR:  Yes, Your Honor.  This is Kevin
22 O'Connor.  I'm in the car, so I apologize if there's
23 any -- I'm travel to a hearing in New York.
24         What Ms. Kernisky is talking about is really
25 just rank speculation, the possibility that there might be

1  different statements made to one REIT versus another, not
2  acknowledging in any way that all REITs are not the same.
3  As Your Honor has repeatedly pointed out, these are highly
4  client-specific determinations as to what the client
5  wants, what the client needs, what the portfolio is.  And
6  we submit that what's really going on here is that ARMOUR,
7  almost a year into this case, is just casting about trying
8  to disrupt relationships with other clients.  And there's
9  no -- there's no indication whatsoever from any salesman
10 that anything was ever said differently to any client.
11 There's no indication whatsoever that there's any
12 connection or relevance between the Fortress portfolio and
13 the ARMOUR portfolio.
14         And to the extent that they're looking for
15 contemporaneous communications, they've gotten that from
16 Bimini, and that has been fruitless so far.  And if they
17 had anything from Bimini that suggested that there was
18 some inconsistency, that was also a contemporaneous sales
19 process and implementation, that would have been produced.
20         So this is a fishing expedition, we submit, and
21 designed to just tarnish our relationships with other
22 clients.
23         MS. KERNISKY:  Your Honor, may I respond very
24 briefly?
25         THE COURT:  Certainly.  And then that will be

1  the last.

2  MS. KERNISKY: Thank you, Judge.

3  This is not speculation. We have SS&C's senior
4  vice president testifying that there was a conversation
5  with Fortress about hosting. And we know that Fortress
6  ultimately did not choose hosting. It might be that that
7  conversation has no bearing on our case; it might be that
8  it has huge bearing. But under the discovery rules, under
9  Rule 26, we are entitled to find out what that
10 conversation was and to test whether or not it impacts the
11 representations that were made to us at the same time.

12 MR. O'CONNOR: Your Honor --

13 THE COURT: I'm done, thank you. Thank you. I
14 said that I just heard the last of it.

15 So I'm going to rule at this time.

16 I'm going to sustain the objection of SS&C to
17 the enforcement of the subpoena for documents and
18 testimony from Fortress substantially for the reasons set
19 forth in SS&C's papers. I feel like I've been down this
20 road before with respect to the discovery that I was going
21 to allow with respect to Fortress and Resource. I'm a
22 little surprised to see it coming back before me.

23 And I believe that this lawsuit is about a
24 broken relationship between ARMOUR Capital and SS&C, and
25 it is not a lawsuit in which it privileges ARMOUR to

Case 3:17-cv-00790-JAM   Document 156-1   Filed 10/03/18   Page 17 of 18
16

1  inquire into many other client relationships of SS&C
2  beyond what I've already allowed here, and I made my
3  determination about what's proportional in terms of what
4  is appropriate here with respect to discovery as to other
5  clients of SS&C.  And I don't find grounds to reconsider
6  that here.  I don't think there's anything new that I'm
7  hearing that causes me to reconsider that, so I'm
8  sustaining the objection to that.
9              All right.  So thank you all for calling in.
10             Is there anything else to take up at this time?
11             MS. KERNISKY:  No, Your Honor.  Thank you.
12             THE COURT:  Thank you all for calling.  Take
13 care.
14             (Proceedings adjourned at 10:20 a.m.)

1
2           C E R T I F I C A T E
3
4     RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
           TECHNOLOGIES, INC., No. 3:17CV790(JAM)
5
6          I, Diana Huntington, RDR, CRR, Official Court
7  Reporter for the United States District Court for the
8  District of Connecticut, do hereby certify that the
9  foregoing pages 1 through 16 are a true and accurate
10 transcription of my shorthand notes taken in the
11 aforementioned matter to the best of my skill and ability.
12
13
14
15
16                      _____/s/_____
17               DIANA HUNTINGTON, RDR, CRR
                    Official Court Reporter
18               United States District Court
                 141 Church Street, Room 147
19               New Haven, Connecticut 06510
                       (860) 463-3180
20
21
22
23
24
25