# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
ARMOUR CAPITAL MANAGEMENT LP,    :  No. 3:17CV790(JAM)
                                 :
              Plaintiff          :
                                 :
          vs.                    :
                                 :
SS&C TECHNOLOGIES, INC.,         :
                                 :  New Haven, Connecticut
              Defendant          :  September 29, 2017
                                 :
- - - - - - - - - - - - - - - - x
```

TELEPHONIC DISCOVERY CONFERENCE

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

1   A P P E A R A N C E S:

2

3       FOR THE PLAINTIFF:

4           HOLLAND & KNIGHT
                701 Brickell Ave., Suite 3000
                Miami, Florida 33131

5           BY:  JOSEPH J. MAMOUNAS, ESQ.
                ALLISON KERNISKY, ESQ.

6

7           HOLLAND & KNIGHT
                263 Tresser Boulevard Stamford, 1400
                Stamford, Connecticut 06901

8           BY:  CHRISTOPHER M. CERRITO, ESQ.

9

10      FOR THE DEFENDANT:

11          HINCKLEY ALLEN & SNYDER LLP
                28 State Street
                Boston, Massachusetts 02109-1775

12          BY:  KEVIN J. O'CONNOR, ESQ.

13          HINCKLEY ALLEN & SNYDER LLP
                20 Church Street, 18th Floor

14              Hartford, Connecticut 06103
            BY:  ALEXA TALIN MILLINGER, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1                           **3:01 P.M.**

2              THE COURT:  Good afternoon.  This is Judge

3    Jeffrey Meyer.  We're here for a discovery conference in

4    ARMOUR Capital Management vs. SS&C Technologies.

5              Appearance of counsel, please, for ARMOUR?

6              MR. MAMOUNAS:  Good afternoon.  This is Joe

7    Mamounas, Allison Kernisky, and I believe my partner Chris

8    Cerrito is also on the line on behalf of the plaintiff

9    ARMOUR Capital Management LP.

10             THE COURT:  I'm sorry, I couldn't quite --

11   you're very soft.  Can you repeat your names one more

12   time, please?

13             MR. MAMOUNAS:  On behalf of ARMOUR, Judge?

14             THE COURT:  Yes.  Mr. Mamounas?

15             MR. MAMOUNAS:  Yes, I apologize.  Joe Mamounas,

16   Allison Kernisky, and Chris Cerrito.

17             THE COURT:  Great.

18             And for SS&C?

19             MR. O'CONNOR:  Yes, Your Honor, hello.  Kevin

20   O'Connor and Alexa Millinger on behalf of SS&C.

21             THE COURT:  Great.

22             I've looked at both of your letters.  They look

23   a little bit like they're ships passing in the night in

24   some senses, but maybe I'll get a better understanding.

25             As I understand it, there's really these five

1    discovery issues in dispute here with respect to two of

2    the interrogatories, if I have that right, and three of

3    the requests for production?

4              MR. MAMOUNAS:  That's right, Judge.

5              THE COURT:  So maybe we can start off looking at

6    the two requests for production, Number 19 and Number 20,

7    they seem similar.  Maybe I'll hear you on that, whoever

8    wants to speak on behalf of plaintiff.

9              MR. MAMOUNAS:  Thank you, Judge.  This is Joe

10   Mamounas again.

11             Just to give Your Honor some background because

12   this is our first appearance before you on the case, the

13   essence of our claim is that ACM had sued SS&C for having

14   sold it a worthless software product and services, told

15   ARMOUR that the hosting option on the software was

16   appropriate, SS&C had the qualifications and expertise to

17   implement it --

18             THE COURT:  Hold on.  Just a second.  Can you

19   pick up the handset, please?  Your speaker phone is not

20   coming well through here.  Go a little bit slower because

21   we have a court reporter.

22             MR. MAMOUNAS:  I apologize.  If we can take one

23   moment to figure that out because I'm on one of those

24   phones that only has a speaker.

25             THE COURT:  Well, do this.  Just slow your

1    speech down so we can follow and our court reporter can

2    follow, okay?

3           MR. MAMOUNAS:  I'm happy to do that, Judge.

4           As I was saying, ARMOUR has sued SS&C

5    essentially on the allegation that SS&C had sold a

6    worthless software product and services.  Namely, SS&C

7    told ARMOUR that the hosting option of the software was

8    appropriate, SS&C had the qualifications and expertise to

9    implement the software for ARMOUR, and SS&C had the

10   qualifications and expertise to do so within four to six

11   months.

12          Implementation was significant to the

13   transaction because ARMOUR couldn't implement the software

14   product, which I think everyone would agree is

15   sophisticated on its own.  The parties agree

16   implementation never occurred.  And after wasting upwards

17   of $2 million and more than two years on the project,

18   ARMOUR filed suit.

19          The defense essentially is that SS&C had no

20   obligation to implement and instead somehow it fell on

21   ARMOUR, even though it was the party that contracted with

22   the vendor for these services, to implement and undertake

23   that duty itself.  Then SS&C also claims that ARMOUR fell

24   short of its obligations, whatever they may have been, and

25   therefore implementation didn't occur, at least in part

1    for that reason.

2            Going back to June of 2017, we served the

3    document requests and the interrogatories that are before

4    the Court that were directed at essentially at SS&C's

5    experiences with other customers.  These requests didn't

6    seek information about all of SS&C customers, of course;

7    instead, it was limited to a three-year period.  SS&C in

8    their brief likes to talk about their 30-year history and

9    the fact that this product has been on the market for more

10   than a couple of decades, but we're really just focused on

11   the three years that are at issue in the case.

12           THE COURT:  Okay, slow down again, sir.  A

13   little slower.

14           MR. MAMOUNAS:  I apologize.  I apologize.

15           I was saying that our time period for the

16   subject request is limited to three years, the three years

17   that are at issue, namely April 2014 through May of 2017.

18           But also we're limited to the CAMRA product and

19   no other product of SS&C's.  And from there our requests

20   are limited to a few discreet issues.  And as far as these

21   particular document requests are concerned, what we're

22   talking about are instances where CAMRA was not

23   implemented.  In other words, there was an uncompleted

24   implementation that failed with other customers or where

25   there is what we could consider the traditional language

1   on other customer failures, namely complaints, failures,

2   accidents, et cetera, which appears in Document

3   Request 20.

4           These requests are relevant for at least two

5   important reasons.

6           First, we've alleged misrepresentation claims,

7   including violations of the Connecticut Unfair Trade

8   Practices Act, and we're entitled to test the basis for

9   SS&C's misrepresentation.  SS&C points out in their brief

10  that we haven't alleged fraud against other customers of

11  SS&C, but of course that isn't the essence of our claim.

12  We're not trying to uncover a massive fraud scheme

13  involving other SS&C customers, but are rather focused on

14  the representations made to us.  But those statements have

15  to have had some basis, we would think.  If they don't,

16  that would also be something that would be very

17  interesting to know in discovery, but the basis for those

18  representations mentioned at the outset could only have

19  come from SS&C's experiences with these other customers.

20  So if SS&C was on notice that it could not implement

21  within four to six months as they promised or that hosting

22  was inappropriate, given the circumstances, then the

23  statements it made were false and they may have been made

24  knowingly.

25          Second, SS&C's defenses have put in issue the

1    chain of causation.  In their brief they claim that ACM

2    had 20 to 25 percent responsibility for the implementation

3    project.  In other words, SS&C has admitted for purposes

4    of this case that implementation would only occur,

5    regardless of whose obligation it was, if ARMOUR did

6    25 percent of the work and SS&C did the remaining

7    75 percent.  SS&C hasn't given us, in the course of trying

8    to resolve this discovery dispute, much detail about its

9    internal processes and how the decision to come up with a

10   proposal on implementation and how it crunches the numbers

11   and the factors in order to reach that calculus occurred.

12   But from reviewing the more than 62,000 pages of documents

13   they have produced over the past month or so, we noticed

14   pretty clearly that SS&C relies on other customers'

15   experiences to determine exactly the issues that we're

16   talking about here; namely, how they come up with the

17   amount of time and expense and work that is going to go

18   into implementation.  We also know that SS&C has a

19   responsibility matrix which hasn't been produced in

20   discovery that SS&C uses exactly for this calculus.

21   Ostensibly, it's based on its experience with other

22   customers.

23            Finally, SS&C's brief insists that

24   implementation depends on a wide variety of factors that

25   vary on customer needs, complexity of their assets,

1   et cetera.

2          So those reasons make it pretty clear that if

3   SS&C had bad experiences with other customers, if there

4   were what we're talking about from Doc. Requests 19 and

5   20, namely a failed implementation or some sort of other

6   incident or complaint, that would be probative and would

7   have a direct bearing on the chain of causation here;

8   namely, what SS&C says we failed to do in order for

9   implementation to occur, and also the misrepresentations

10  that we claim they made pre-contract during the course of

11  the contract.

12         And so, for those reasons, we think that those

13  Requests 19 and 20 are targeted directly to that issue.

14  We think that they should be relatively easy to gather.

15         Now, SS&C has raised a burdensome objection

16  that's predicated simply on the fact that they have 500

17  customers.  And we really can't put that in context

18  because we don't know how many customers maybe SS&C's

19  other products have or how many documents they retained

20  with respect to those customers.  But what I think is

21  probably a safe presumption is that, like any company,

22  SS&C is pretty much focused on making sure its customers

23  are happy.  And in order to do that, they need to be able

24  to identify which customers aren't happy.  And

25  implementation is a specific division within SS&C.  They

1    have teams for hosting, they have teams for

2    implementation, and they also have teams for the very same

3    industry that we are in.  So it seems -- it stands to

4    reason that SS&C's counsel could inquire of those people

5    what are the problems, what are the issues.  And in fact

6    that's exactly what happened in the *Bartold v. Wells Fargo*

7    case which we cited in our brief where there was a

8    burdensomeness obligation and the court said, look, it is

9    not an unreasonable request to go back to the appropriate

10   people who are responsible for these aspects of your

11   processes and to inquire what the relevant burden might

12   be.

13            We've had three months since these requests have

14   been served, in fact they've been outstanding more than

15   three months at this stage.  We haven't received any more

16   detail except to say there are 500 customers.  And

17   respectfully, Judge, that doesn't get us where we need to

18   go in order to reach some sort of resolution.

19            THE COURT:  Okay.

20            (Phone interruption.)

21            THE COURT:  Were you cut off, Mr. O'Connor?

22            MR. O'CONNOR:  Yes, Your Honor, I was, probably

23   a minute ago.

24            THE COURT:  Okay.  So Mr. Mamounas, could you

25   maybe summarize what you covered in the last minute?

1            MR. MAMOUNAS:  Sure, Judge.

2            I'll just sum up to say SS&C's principal

3    response to this has focused on burden.  I think we all

4    can agree that the issue of other customers is relevant to

5    issues of notice when you're talking about fraud claims.

6    And certainly, given that the chain of causation has been

7    put at issue, questions about causation and also what

8    defects, for example, in the product itself as far as

9    ability to be implemented under these circumstances are

10   relevant.  And so what we have been struggling with over

11   the past several months is a very steadfast objection from

12   SS&C on burden.  These requests have been outstanding for

13   that long.  And during that time, the only insight that

14   we've got into SS&C's objections is that they've got 500

15   or more customers.

16           And what I was saying, and I'll repeat for

17   Mr. O'Connor's benefit, is that we know from the outside

18   looking in that SS&C is divided into divisions and teams

19   that handle the exact issues that we're talking about

20   here.  And so as in the *Bartold* case which we cited in our

21   brief, we don't believe that it's an unreasonable request

22   for SS&C to speak to the appropriate heads of their

23   department or perhaps even a quality control division that

24   is in charge of monitoring problem customers who have had

25   issues with implementation or other problems similar to

1    ARMOUR's experience here, and to produce that information

2    to us.  That's what we believe the law in this district

3    and indeed in the Second Circuit would require given the

4    liberal discovery standards that are applicable.

5         THE COURT:  Okay.  When you say in Request

6    Number 19 uncompleted implementation, tell me what exactly

7    you mean by that.

8         MR. MAMOUNAS:  That, Judge, essentially tees off

9    of exactly what happened to us.  ARMOUR engaged SS&C to

10   implement, and implementation was not completed.  The

11   reason we used the word "uncompleted" instead of "failed"

12   is because we didn't want to give it a pejorative

13   connotation and didn't want to assign blame to anyone.

14   What we wanted to understand was why after implementation

15   that occurred did it fail to complete.  What we refer to

16   in 19 are instances in which SS&C entered into a contract

17   with a customer to implement the CAMRA product and then

18   implementation did not occur.

19        THE COURT:  Okay.  And would that be including

20   cases in which there's been an uncompleted implementation

21   but it didn't occur for reasons that are not -- or not,

22   according to the customer, SS&C's fault?  So the customer

23   themselves, right, might say it turns out this product is

24   not the right one for us or we have changing needs or the

25   like.  You're asking for that as well?

1          MR. MAMOUNAS:  If there's an issue that turns on

2     a customer's preference, for example, they've been

3     acquired and their new parent company has a different

4     software preference or something unrelated to the

5     technical nature of the implementation process, then I

6     believe that would be excluded.

7          THE COURT:  Okay.

8          MR. MAMOUNAS:  But when we're talking about

9     issues in the chain of causation that would prevent

10    implementation from occurring, the customer fell down on

11    whatever assumed obligations it had in the process or SS&C

12    supposedly gave it its all and the best college try it

13    could but wasn't able to connect to a completed

14    implementation, that would be covered by the scope of the

15    request.

16         THE COURT:  I see.  All right.

17         So you can see as well --

18         MR. O'CONNOR:  Your Honor --

19         THE COURT:  Is this Mr. O'Connor?  Hello?

20         MR. O'CONNOR:  Yes, Your Honor.

21         THE COURT:  I'll get to you in just a moment,

22    sir.

23         MR. O'CONNOR:  Yes, Your Honor.  Oh, sure.

24         THE COURT:  So I'll get to you in just a moment.

25         On Request Number 20, it appears it's looking

1    for complaints, failures, accidents, incidents, problems,

2    damages, or similar occurrences.  So essentially it's

3    saying any time that SS&C gets a phone call or an e-mail

4    from one of its customers saying, you know, the system's

5    not working today or it's a little bit slow today, I guess

6    that would be an incident and you're looking for that.

7    Basically every single bit of feedback from all 500

8    customers raising any concern about the functioning of the

9    CAMRA software.  That's how broadly Paragraph 20 is

10   phrased, as I understand it.

11            MR. MAMOUNAS:  Judge, and I think that's a fair

12   reading of it.  And the reason it's crafted as such is

13   because at the time that these requests were served, we

14   didn't have the inside know-how insight to SS&C's

15   functioning to be able to more narrowly tailor it other

16   than similar occurrences.  So we included what might be

17   considered standard language on a causation or a notice

18   issue such as this.  However, you know, through the

19   meet-and-confer process, that's something that we've tried

20   to work on, what our similar occurrences that have

21   precluded implementation from occurring in the past.

22            If there is an issue, for example, we can't

23   connect today to the software because it was being hosted

24   by SS&C's server, not at ARMOUR's offices, then that would

25   be something that would be excluded.  But it's an issue

1    that bears on the implementation for our customer, a

2    similar occurrence in this case really going to the issue

3    of unconcluded implementation, so it may be a little bit

4    broader to say what are the issues that led to that

5    uncompleted implementation; what were the complaints, the

6    inference, the failures either in your implementation

7    service or in the product itself that caused

8    implementation not to occur in a similar way to ARMOUR.

9              THE COURT:  Okay.  All right.

10             And Mr. O'Connor, now I'll hear you on 19 and

11   20, please.

12             MR. O'CONNOR:  Thank you, Your Honor.

13             I just want to point out what Mr. Mamounas just

14   described is not what the requests call for.  In terms of

15   facts, it's undisputed on that on the face of the

16   contract, the parties agree that SS&C would provide 1850

17   hours of implementation services in support of ACM's

18   implementation.  That's Work Request 1, and it's clear and

19   unambiguous language.

20             With respect to the process as to how we reached

21   that proposed implementation budget that the parties

22   worked on together, as ACM knows, ACM's chief operating

23   officer and chief financial officer conferred with the

24   head of professional services at SS&C.  ACM was provided

25   with a 30-question questionnaire and provided responses as

1    to its financial positions and technical systems.  It went

2    through a standard process to assess what the

3    implementation needs were.

4            On December 10, nine days before the parties

5    executed the agreement, SS&C proposed a budget of 2500

6    hours for implementation, made clear in that budget that

7    the ability to deliver depended to some extent or depended

8    considerably on the customer's contribution to the effort.

9            In a meeting on December 10 -- and this is

10   undisputed -- ACM pushed back and said we want to reduce

11   the number of hours of implementation, we want to pay for

12   less, we can take on more.  So the next day a written

13   implementation budget was written where ACM agreed to take

14   on up to 650 of the implementation hours task individually

15   signed and worked out between the parties.  And through

16   that interactive process, the parties then reached the

17   agreement.  That process for each client is individual.

18           With respect to the CAMRA product, Your Honor,

19   SS&C has 500 clients during the relevant time that were

20   using CAMRA, whether hosted through an outsourced

21   solution.  And so they're asking for three years of

22   information regarding 500 different clients.  And as

23   Your Honor pointed out, the request as written asks for

24   every comment expressed in any level of dissatisfaction

25   with respect to any aspect of the CAMRA or the

1   implementation.  It's a widely overbroad request and I

2   would submit it's not standard, it's not appropriate.  And

3   through discovery, through depositions, which would be the

4   normal process, a party can find out what documents are

5   out there and then narrow the request.  What we got here

6   was a wildly overbroad request and we proposed solutions

7   along the way.  And what we essentially proposed is as to

8   the relevant industry, which is the mortgage REIT

9   industry.  As I indicated, there are about 500 different

10  CAMRA clients.  That includes some of the largest

11  financial institutions in America.  SS&C is a 30-year-old

12  company.  This product has been offered for 25 years.  The

13  notion that it's a bait-and-switch and SS&C fraudulently

14  licensed the product with the intent that it could never

15  implement it, 15-year limitation on making the client

16  successful is farfetched, to put it mildly.  Our sense,

17  Your Honor, is that this is a complete fishing expedition.

18  Plaintiff didn't even allege fraud in its initial

19  complaint.  And now it's a critical element of their

20  discovery.

21          So, Your Honor, we would submit it's a fishing

22  expedition.  But in any event, what they're looking for is

23  relationships with our insurance companies, hedge funds,

24  mutual fund companies, entities that are in entirely

25  different industries.  We've offered to give them the

1    names of our mortgage REIT customers.  We've offered to --

2    in an effort to help them draw an appropriate line, the

3    mortgage REIT customers.  We offered to provide ACM with

4    nontechnical documents relating to any terminations,

5    threatened terminations, lawsuits or threatened lawsuits

6    related to performance problems or implementation problems

7    with respect to CAMRA; and that was declined.

8             And the other thing I would add, Your Honor,

9    with respect to the suggestion that we've been not

10   cooperative, the requests, if Your Honor looks at them,

11   actually sought information from December 1st, 2014.  And

12   by our account, the plaintiffs exhausted all areas

13   allotted to the sub-part in their initial set of their

14   interrogatories, they came back to us in August and said

15   would you please reconsider the date to be not December

16   1st, 2014, but back to April 1st, 2014.  And we agreed to

17   do that, we agreed to accommodate them.

18            So, Your Honor, we've been trying to focus on

19   the relevant industry.  We've been trying to focus on the

20   relevant time period.  We've helped them out in a number

21   of ways in which we were not required but we felt it was

22   appropriate and in the spirit of cooperative discovery.

23   But these requests, as written, particularly the Document

24   Requests 19 and 20, are just wildly overbroad and

25   constitute fishing expeditions.

1       THE COURT:  So help me understand, I know

2  obviously this is REIT in the mortgage area.  Why is that

3  industry-specific limitation important here with respect

4  to the functioning of the CAMRA software?

5       MR. O'CONNOR:  Well, it makes it more

6  manageable, Your Honor, but it also focuses on the type of

7  products that companies invest in.  So what CAMRA does is

8  it's an access-accounting software solution.  So it helps

9  companies account for a wide range of financial

10  instruments, but in the mortgage REIT has a very specific

11  set of requirements.  And as indicated in the letter, ACM

12  deals extensively in very complicated instruments such as

13  mortgage-backed securities where everything swaps and

14  things of that nature.  So those are the implementations

15  that present similar issues through ACM.

16       THE COURT:  And approximately how many mortgage

17  REITs in that three-year subject period?

18       MR. O'CONNOR:  That would be in the ten or

19  eleven companies, Your Honor, ten to twelve.

20       THE COURT:  Ten to twelve with whom there were

21  at the least contracts for implementation?

22       MR. O'CONNOR:  Yes.

23       THE COURT:  Is that right?  Okay.

24       And so --

25       MR. O'CONNOR:  Well, customers during that time

1    period.

2              THE COURT:  During that time period, right.

3              So what would be unduly burdensome about looking

4    at those twelve companies, those twelve customer

5    relationships, and evaluating, if I just look at

6    Number 19, that document request, an uncompleted

7    implementation that was in some manner due to a claim by

8    the customer that CAMRA did not function as anticipated?

9              MR. O'CONNOR:  Your Honor, we've agreed to do

10   that.

11             THE COURT:  Well, you've agreed to, according

12   to -- and I'm looking at page 3, bottom of your letter of

13   September 28 --

14             MR. O'CONNOR:  With respect to mortgage REITs.

15             THE COURT:  I'm sorry?

16             MR. O'CONNOR:  I'm sorry, we agreed to do that

17   with respect to mortgage REITs.

18             THE COURT:  Right.  And I think you've agreed to

19   provide a list of the mortgage REITs and you've agreed to

20   provide non-technical documents about lawsuits or

21   threatened lawsuits or actual or threatened termination,

22   but I don't know that that's as broad as documents about

23   customers for whom there was an uncompleted implementation

24   due to a claim that SS&C or that the software had not

25   functioned as anticipated by the customer.  Or maybe you

1    were thinking that's what is included within that.

2              MR. O'CONNOR:  Yes, Your Honor.  If it was an

3    uncompleted implementation that led to threatened

4    termination.

5              THE COURT:  Okay.

6              MR. O'CONNOR:  Or threatened lawsuit or file a

7    lawsuit, yes, that would be included.

8              What it doesn't include is the assertions that

9    Mr. Mamounas said he did not want, which is if there were

10   an acquisition or something of nature, the customer

11   changed its mind as to technology solution.

12             MR. MAMOUNAS:  Judge, may I be heard briefly on

13   that issue?

14             THE COURT:  Hold on just a second.

15             Mr. O'Connor, do you have anything else to say

16   on Numbers 19 and 20?  Mr. O'Connor?

17             MR. O'CONNOR:  Yes, Your Honor.

18             With respect to 20, again, it's overbroad and

19   we've done what we can to try to limit it to the

20   appropriate industry sector and to try to put some

21   parameters on it.

22             THE COURT:  Okay.

23             So now, Mr. Mamounas, you can speak.

24             MR. MAMOUNAS:  Very briefly, thank you, Judge.

25             As I said a moment ago, you know, with respect

1    to Request Number 20, we have tried to work in

2    meet-and-confer to limit it.  The reason, for the Court's

3    information, that we have found trouble with the industry

4    limitation is because you're looking at a particular

5    snapshot in time, that is 2014 to 2017, when there may not

6    have been any implementations going on.  And I think, you

7    know, from a burden perspective, because I think the

8    relevance is pretty clear, but from a burden perspective,

9    it's really important to note what O'Connor said a moment

10   ago, and that is that SS&C has a department called

11   professional services which is dedicated specifically to

12   the process of implementing CAMRA for customers.  And so

13   those would be the folks to talk to to ask, hey, when you

14   supplied the information concerning implementation

15   pre-contract or during the course of contract execution

16   when implementation was ongoing, what was the information

17   that we relied on?  Who were the problem customers that

18   were out there?  Or what were the experiences that allowed

19   us to reach the conclusion that four to six months was

20   appropriate as a time limit?  Those would be the folks

21   that would have that information.  And that would extend

22   across all of the product lines -- I'm sorry, not the

23   product lines, the industry groups or segments within the

24   CAMRA user groups.  So we wouldn't be talking about 500

25   customers, but we also wouldn't fall into the trap of

1  saying, okay, there are ten or eleven, but guess what,

2  guys, there aren't any responsive documents.  And in fact

3  that's exactly what happened.  In Mr. O'Connor's letter at

4  the bottom of page 3, the same letter that the Court was

5  looking at, the same line the Court was looking at, offers

6  to provide documents concerning any actual or threatened

7  lawsuits, but Mr. O'Connor has told us that there aren't

8  any.  It's a hollow compromise in that respect.

9          And, you know, I have some concerns about using

10  the language "actual or threatened termination" because it

11  could be subjected to SS&C what termination means.  Does

12  that require a demand letter or a lawyer letter?  Which is

13  why, going back to the text of our request, we focused on

14  uncompleted implementation.  If implementation did not

15  work out and you try to sell the customer another product,

16  or they walked away, they stopped paying you, there wasn't

17  a termination, per se, but the project just came to an

18  end, implementation wasn't concluded, that would be

19  covered, and that information would be probative for

20  exactly the reasons we were talking about a moment ago.

21          MR. O'CONNOR:  Your Honor, but --

22          THE COURT:  Hold on a second.  Hold on, hold on.

23          So, Mr. Mamounas, why would you need documents

24  outside of the mortgage REIT sector?

25          MR. MAMOUNAS:  Because, Judge, I mean we're talk

1    about a standalone software product.  That product, as we

2    understand it, provides for accounting tools to customers,

3    as Mr. O'Connor said, generally in the financial sector.

4    And so it has at its core is those accounting functions.

5    And the people at SS&C on the implementation team are the

6    ones who are equipped and deployed to go implement this.

7    So we aren't aware, and we haven't heard on the call or in

8    the briefing leading up to it, of any specific nuance

9    about the product that would set mortgage REITs off to the

10    side.  We don't know it.  And we don't believe it to

11    exist.  Instead, this is tantamount to, you know, to use a

12    consumer example, Microsoft Windows, that product extends

13    to a number of different industries.  And if there were to

14    be some sort of implementation process for it, and we were

15    talking about a universe of customers like we are here,

16    then what I think our position would be is that this is a

17    product that at its core does X function, just like CAMRA

18    does an accounting function.  If there are any issues with

19    respect to implementation, it would apply to an insurance

20    company or a mutual fund manager just as it would to a

21    mortgage REIT.

22             THE COURT:  Okay.

23             Mr. O'Connor.

24             MR. O'CONNOR:  Your Honor, if I may be heard on

25    that?

```
 1              Couple of things.  First --
 2              (Telephone cuts out.)
 3              THE COURT:  You've dropped out, sir.
 4              Is anybody there?  We seem to have lost contact.
 5              MR. MAMOUNAS:  Judge, on behalf of ARMOUR, we're
 6  still on the line.
 7              THE COURT:  Okay.  It sounds like
 8  Mr. O'Connor --
 9              MS. MILLINGER:  Alexa Millinger is still here
10  for SS&C.
11              THE COURT:  We'll need to wait and see if
12  Mr. O'Connor wants to re-join us.  He probably got cut off
13  again.
14              MR. MAMOUNAS:  Judge, our line is available for
15  him to dial back in.  We're happy to stand by.
16              THE COURT:  We'll wait.
17                  (Pause.)
18              THE COURT:  And I'm just checking back now to
19  see if Mr. O'Connor has rejoined?
20              MR. MAMOUNAS:  Judge, we hadn't heard him dial
21  in.  This is Joe Mamounas on behalf of ARMOUR.
22              MS. MILLINGER:  Your Honor, I'm reaching out to
23  him now.  This is Alexa Millinger on behalf of SS&C.
24              THE COURT:  Is he calling from Boston?
25              MS. MILLINGER:  I believe he was on a cellphone.
```

```
 1              MR. O'CONNOR:  Hello, Your Honor.

 2              THE COURT:  Okay.  Mr. O'Connor, are you in a

 3    place where you have reliable service, telephone service?

 4              MR. O'CONNOR:  Yes, I normally do, Your Honor.

 5    I don't know what's happening.

 6              THE COURT:  Okay.

 7              All right.  Well, I think we had left off, I had

 8    been asking about the proposed limitation on mortgage

 9    REITs.

10              And another question I had was I take it that,

11    and I think I heard you, Mr. O'Connor, suggest that to the

12    extent that there might be deposition questions, those

13    deposition questions could be broader to the witnesses,

14    for example, the ones who are coming up who are the sales

15    people in terms of asking if they know generally of any

16    problems with implementation of CAMRA outside, right, of

17    even the mortgage REITs; isn't that right?

18              MR. O'CONNOR:  Yes, Your Honor.

19              THE COURT:  Yeah, okay.  Or if they know of any

20    complaints, failures, accidents, incidents, if they know

21    of them, they're going to be free to be asked that, I take

22    it, right?

23              MR. O'CONNOR:  Well, yes, Your Honor.

24              THE COURT:  I'm suggesting they should be,

25    because that's important to me in the event that I do
```

1    limit the proposed discovery.  I don't think that if, you

2    know, you have a witness sitting at a table being deposed

3    and that witness knows of a particular problem and is

4    asked about it, that witness should be able to answer

5    questions about that and not to have an objection saying,

6    well, the Court, with respect to the documents it ordered

7    produced in this case, barred or implicitly barred any

8    questions about that same subject area.

9          Okay.  So I'm going to -- what I'm going to do

10   at this point is I'm going to rule with respect to 19 and

11   20 as follows:

12         I start from the proposition that SS&C has

13   understandable concerns about not producing information

14   about its other customers, even subject to, you know, I

15   understand the limits or the protections of a protective

16   order, but still these are other customers and can be

17   customers even who compete with ACM, so I think that SS&C

18   has that legitimate concern there.  I can understand, even

19   without a more particularized showing of burden, why SS&C

20   would be concerned about and could validly assert concerns

21   about burden.  And I also think that, in terms of

22   relevance, the relevance to me seems possible here in

23   terms of issues with other customers.  And I put possible

24   kind of with some of a question mark because when dealing

25   with what I think everybody acknowledges is highly complex

1   software and that has to be very specifically implemented

2   with particular businesses, it's to the extent that

3   there's peculiarities of businesses and different

4   businesses and multiple factors can make a difference in

5   terms of the problems that arise.  It's not so clear to

6   me, it's not self-evident that the fact that there's been

7   a problem with another customer means that there's also a

8   like problem with the parties in this case or that it

9   supports the claim of essentially a fraud or

10  misrepresentation.  So that's kind of the way I start

11  thinking about this.

12          I am convinced, for purposes of the document

13  requests, now that there should be a limitation.  The

14  parties have agreed on the time limitation over that

15  three-year period from 2014 to 2017.  And I also do think

16  at this time that there should be a limitation as to the

17  mortgage REITs.

18          And so I'm going to order the production as

19  suggested, with some modification, at the bottom of page 3

20  and 4 of Mr. O'Connor's letter, I'm going to require

21  production of a list of SS&C's REIT clients that used

22  CAMRA, licensed, hosted, or outsourced from May 1, 2014,

23  to May 1, 2017.  And secondly, I'll require the production

24  of non-technical documents concerning any or actual

25  threatened lawsuits.  And I understand that there may be

1     no documents responsive to that.  And I'll also order as

2     to those mortgage REIT customers any documents,

3     non-technical documents concerning any uncompleted

4     implementation during that time period in which the

5     uncompleted implementation was by reason of a claim by the

6     customer that CAMRA was not functioning or implementing as

7     anticipated by the customer.  So that's meant to exclude

8     the circumstances in which there might have been an

9     uncompleted implementation for reasons idiosyncratic to

10    the customer itself as opposed to a reason that's

11    attributable potentially to SS&C.

12            So that's the ruling on 19 and 20.

13            Let's turn, if we can, to the interrogatories at

14    this point.  And I'll hear from you, if I can,

15    Mr. Mamounas, on Number 3.

16            MR. MAMOUNAS:  Judge, before we move on, may I

17    ask a brief question?

18            THE COURT:  Yes.

19            MR. MAMOUNAS:  And that is whether Your Honor's

20    ruling is without prejudice to further development on the

21    record, including what we learn at the upcoming

22    depositions and also with these document requests.

23            THE COURT:  It is without prejudice.  As I made

24    clear, I think that you would be permitted to ask

25    questions at depositions that go within the broader scope

1    of your proposed 19 and 20.  And if it turns out that

2    there is a reason to think that there is some other

3    company out there, that there were similar kinds of

4    complaints or concerns, then you'll have a fuller record

5    to make.  But right now I'm not going to err on requiring

6    the production of large numbers of records that could well

7    turn out not to be relevant.  And that's what I think --

8    and Mr. O'Connor's point is good on this, I think that's

9    what depositions are for, to do more exploration in that

10   area.

11          MR. MAMOUNAS:  Very well, Judge.  We're ready to

12   proceed on Number 3.

13          THE COURT:  Okay.  So is there a continuing

14   dispute on Number 3?

15          MR. MAMOUNAS:  Well, in light of Your Honor's

16   order with respect to 19 and 20, I think the principal

17   part of Number 3 would be taken care of because it seeks

18   an identification of the mortgage REITs that used or had

19   used CAMRA subject to time limitations.  And it does

20   request a little bit more information in what we would

21   describe as not subparts, because they're directly related

22   to the question, but they ask for length of time it took

23   to reach implementation and whether they were on what's

24   called hosted or outsourced for a fully licensed basis.

25   Because that's important for us, as we understand it.

```
 1    When SS&C was not able to achieve implementation for us,

 2    they suggested that we move to an outsourced basis, which

 3    is a far more expensive product and obviously would have

 4    kept the relationship alive as well as flowing in their

 5    direction.  That identification for the ten and eleven

 6    mortgage REITs that Your Honor has ordered would be

 7    helpful.

 8              THE COURT:  Okay.

 9              Mr. O'Connor?

10              MR. O'CONNOR:  Your Honor, it's outside the

11    scope here as written, any mortgage REITs that have ever

12    used or tried using CAMRA.  We think that's unduly

13    burdensome.  We think the information is client

14    confidential and irrelevant.

15              As ACM knows, the amount of time that was

16    determined for its implementation budget was set based on

17    its needs and a comprehensive questionnaire and the amount

18    of work that ACM offered to contribute and then did not

19    contribute.  So listing the length of other

20    implementations against the date of the original contract

21    is irrelevant, it's unduly invasive, competitors'

22    information is unwarranted here and would be burdensome.

23              THE COURT:  Okay.

24              MR. MAMOUNAS:  Judge, if I may, briefly?

25              THE COURT:  Go ahead.
```

```
 1              MR. MAMOUNAS:  To this exact point, SS&C has

 2    produced documents that reflect on their faith.  In the

 3    course of preparing the implementation budget for ACM,

 4    they reference other customer's implementation in

 5    calculating the amount of time, effort, and responsibility

 6    from both parties that it would take in order for CAMRA to

 7    be implemented for ACM.  So that's exactly what we're

 8    talking about.  The experiences of other customers were

 9    the sole base and the grounds on which SS&C made the

10    representations pre-contract, as we allege in the

11    complaint.

12              THE COURT:  How does --

13              MR. O'CONNOR:  Your Honor -- I'm sorry.

14              THE COURT:  Hold on a second.

15              And I'd like to know and understand how the

16    parties think, is there something in the contract that

17    provides that there is a date certain in which the parties

18    will deem the software to be fully implemented?  I'm not

19    sure exactly how that's measured.

20              MR. MAMOUNAS:  Judge, if I may?

21              MR. O'CONNOR:  Your Honor, there is no date.

22              THE COURT:  And Mr. Mamounas?

23              MR. MAMOUNAS:  Judge, if I may be heard on that

24    issue.

25              One of the assumptions in what's called Work
```

1    Request 1, which is the implementation services work

2    request, is that implementation will take four to six

3    months.  It is defined as an assumption upon which the

4    implementation project was predicated.

5              MR. O'CONNOR:  Again, Your Honor, there was no

6    deadline and these were two very sophisticated parties and

7    consciously did not set a date certain for implementation

8    because it was in fact the customer's ultimate

9    responsibility to achieve implementation.

10             THE COURT:  And Mr. Mamounas, tell us why it

11   makes a difference to you to know whether CAMRA was hosted

12   by the mortgage REIT or hosted by SS&C or on an outsourced

13   basis?

14             MR. MAMOUNAS:  SS&C has taken the position since

15   implementation failed that hosting somehow was not the

16   right fit for ARMOUR and that instead outsourced would

17   have been better because in that case SS&C would have been

18   doing all of the work for ARMOUR, that is all of the work

19   beyond implementation, and actually on the accounting

20   execution of the software package.  And so one of the

21   representations that we claim was fundamental to this

22   transaction was SS&C's repeated representation that

23   hosting was appropriate for ARMOUR.  And the reason that

24   that was so interesting is because we told SS&C

25   pre-contract that the only way that we could proceed with

1    them was on a hosted basis.  And that was made abundantly

2    clear pre-contract.  So SS&C represented, we say falsely,

3    that hosting was appropriate for us and could be capable

4    of implementation.  And then two years and more than

5    $2 million into the project, they started this thing from

6    a different set of music, that was, oh, outsourced was

7    probably what would work better for you, and attempted to

8    transition to outsourced, at which time we declined and

9    terminated the contract.

10            THE COURT:  Okay.  Mr. O'Connor, do you have

11   anything else?

12            MR. O'CONNOR:  Yes, Your Honor -- (telephone

13   cuts out) -- publicly traded entity and they didn't nearly

14   agree that hosting was appropriate.  They, through their

15   own assertiveness, shifted all but a quarter of the

16   implementation.  And so any questions regarding other

17   clients outsourcing we think are irrelevant.

18            THE COURT:  Okay.

19            MR. O'CONNOR:  And then furthermore, Your Honor,

20   based on what Mr. Mamounas has said, there's really no

21   basis for ACM to be seeking documents regarding customers

22   after the date of the contract or information regarding

23   customers after the date of the contract.  What we're

24   hearing in the argument is that SS&C made representations

25   and ACM wants to know what the basis of those

1    representations was.  And if that's the basis, the

2    appropriate cutoff point is December 19, 2014.

3              MR. MAMOUNAS:  Judge, just on that final point,

4    if I may be heard?

5              THE COURT:  Okay.

6              MR. MAMOUNAS:  Our complaint makes pretty clear,

7    and without making our opening statements for the jury, I

8    think it's clear that we seek information both related to

9    pre-contract and post-contract misrepresentations.  The

10   nature of this relationship was that there was an ongoing

11   series of invoices and payments that extended out over a

12   period of years, misrepresentations regarding capabilities

13   throughout the contract execution period in order to

14   secure additional payments and we allege to prevent

15   termination and a warranty claim and also to secure

16   payments to which they weren't due under the contract.

17             Work Request 2, which was signed in April of

18   2016, was the product of SS&C's inability to implement to

19   that date.  And the parties negotiated a new payment

20   structure in which the completion of implementation was

21   going to be measured by a certain set standard.  And

22   SS&C's payment of all of its work after that Work

23   Request 2 were going to be continued on achievement of

24   that standard.

25             Now, as you can tell, we have polar opposite

1   views of this case, but the words and work requests were

2   quite clear, so it makes little sense that SS&C would

3   agree to make its payment of what was in excess of

4   $300,000 contingent on what ACM was doing.  What we're

5   saying is that there were misrepresentations during the

6   life of the contract.  They concern many of the same

7   issues we've been talking about.  And that is the reason

8   that the discovery period extends to 2017, but we submit

9   continues to be quite limited because we were focused on

10  what is essentially a three-year period.

11          THE COURT:  So --

12          MR. O'CONNOR:  Your Honor --

13          THE COURT:  Hold on a second.  I'm sorry.

14          So Mr. Mamounas, your request here the

15  interrogatory says essentially is without a time limit.

16  Are you saying that the time limit, the three-year time

17  limit is the appropriate time limit?

18          MR. MAMOUNAS:  Judge, I believe that we should

19  follow from Your Honor's order regarding the list of the

20  mortgage REITs which were ordered with respect to

21  Requests 19 and 20.  So that focuses on that three-year

22  time period, ten, eleven customers that we're talking

23  about.

24          THE COURT:  Understood.

25          MR. MAMOUNAS:  With the caveat that the

1   information that's requested in 3(a) and 3(b) should be

2   provided because it's probative of exactly what we're

3   talking about, causation and misrepresentations.

4           THE COURT:  Mr. O'Connor, anything else on that,

5   Number 3?

6           MR. O'CONNOR:  No, Your Honor.

7           THE COURT:  Okay.

8           So here's my ruling on Number 3.  I'm going to

9   overrule the objection by SS&C.  I'm going to require the

10  production of the response to the Interrogatory Number 3,

11  however, only with respect to the subject time period that

12  we've been talking about, basically May 2014 to May 2017.

13  But I do conclude that the rest of the information sought

14  here is relevant and appropriate or potentially relevant

15  and appropriate for disclosure, subject to the protections

16  of the protective order and with the understanding that

17  SS&C will make its best efforts to identify what it means

18  when a project is fully implemented.

19          Okay.  And that gets us --

20          MR. O'CONNOR:  Your Honor, the last sentence I

21  didn't hear.

22          THE COURT:  And that SS&C will make its best

23  efforts to ascertain its view of when a project was fully

24  implemented because it's not -- to the extent that it may

25  not be a date certain that one can look at and say on

```
 1    exactly that date the project was fully implemented.
 2              Okay.  That gets us to Number 4.
 3              Mr. Mamounas, do you want to be heard on that?
 4              MR. MAMOUNAS:  Yes, please, Judge.
 5              Number 4 I think puts us into a bit of an
 6    awkward position given the earlier order concerning the
 7    list of clients that --
 8              THE COURT:  Hold on just a second.  And I'm
 9    sorry I didn't make this clear.
10              With respect to Number 3, I'm limiting that not
11    to all -- I'm limiting that to just the mortgage REITs and
12    not all persons, but just the mortgage REITs for that
13    subject three-year time period.
14              MR. MAMOUNAS:  Understood.
15              THE COURT:  Number 4, proceed, please.
16              MR. MAMOUNAS:  I was going to say that I think
17    it may answer the question for us in the sense that what
18    we had requested was an identification of the customers
19    from which full implementation was not achieved.  But
20    subject to the earlier request that has limited us to the
21    mortgage REITs and the identification of the time period
22    in which implementation occurred, then I believe we may
23    have answered that question, because within the subject
24    time period if SS&C is going to identify all of the
25    mortgage REITs and the times to complete implementation,
```

1    if it was unable to effectuate implementation or to

2    achieve implementation, then I would imagine that would be

3    answered within the scope of Number 3.

4              THE COURT:  Okay.

5              Mr. O'Connor, do you agree?

6              MR. MAMOUNAS:  With the caveat, Judge -- I'm

7    sorry for the pause -- that 4(c) asks for the reasons that

8    CAMRA was not fully implemented.  So if there were a

9    mortgage REIT identified on the list contracting let's say

10   in 2015 that was not fully implemented, we would ask that

11   SS&C provide the reasons for that so we can actually see

12   if that happened to us.

13             THE COURT:  And Mr. O'Connor?

14             MR. O'CONNOR:  That's fine, Your Honor.

15             THE COURT:  Okay.  So I will then overrule the

16   objection to Number 4 consistent with understanding that

17   it's limited to just the mortgage REITs during the

18   relevant three-year time period, but I will require

19   responsive as to (a), (b) and (c) of that, okay?

20             MR. O'CONNOR:  Your Honor, that was not -- what

21   I understood was that 3 would provide the answers, and

22   then that 4(c) would be added to 3.

23             THE COURT:  Hold on a second.

24             Well -- yes, I understand that.  It sounds like

25   it's more cut and paste, really, the answers there from 3?

1           MR. MAMOUNAS:  Right.  I think the slight

2    difference with 4(a) is that if there were a customer

3    again falling along on the example I offered a moment ago

4    that started implementation in 2015 and then

5    implementation never occurred and work stopped in 2016,

6    then it would be identification of work having stopped in

7    2016 under 4(a).  The information from 4(b) would be the

8    same.  And 4(c) is the reasons.

9           THE COURT:  Okay.  So again, I'll require

10   separate responses to (a), (b), and (c), but again within

11   the three-year time period.

12           Anything else on that interrogatory?

13           MR. MAMOUNAS:  Not from us.

14           MR. O'CONNOR:  No, Your Honor.

15           THE COURT:  And that gets us to Number 5.

16           Do we still have a dispute there?

17           MR. MAMOUNAS:  Judge, I think that we had worked

18   with Mr. O'Connor on limiting similar occurrences, and it

19   has taken some refining to get it to the point where we're

20   talking about incomplete implementation.  Our request

21   initially had been for all incomplete implementations

22   across the board, but we understand and respect

23   Your Honor's ruling with respect to the mortgage REITs

24   limitations.

25           THE COURT:  So I'm going to sustain the

```
 1   objection to Number 5 because I do think it's
 2   inconsistent -- or rather, I should say consistent with my
 3   ruling as to Document Request Number 20.  And I don't
 4   think that there's a further need for an identification of
 5   specific contact people.  I think that should be clear
 6   from the documents, if any, that get produced with respect
 7   to Document Request Number 19 and what I've ordered in
 8   terms of production there.
 9             So that gets us, lastly, to Number 6.
10             MR. MAMOUNAS:  Judge, Number 6 asks for contact
11   information for people, namely customers other than ARMOUR
12   that use CAMRA on an outsourced basis in which -- and we
13   describe what outsourced basis means there and whether
14   they previously attempted to use CAMRA on some other basis
15   of operation.  And essentially what that's getting at is
16   what was proposed to ARMOUR when it became apparent to all
17   parties that implementation was not going to occur, and
18   that is we will happily switch you to the outsourced
19   option.  And I think that that is probably easy enough to
20   identify for SS&C in conjunction with the response to
21   Interrogatories 3 and 4.
22             THE COURT:  So if I understand you, then you're
23   saying SS&C offers to switch you to the outsourced basis;
24   is that right?
25             MR. MAMOUNAS:  Right.  Could you please identify
```

1    for us -- I guess, could you please identify for us

2    customers who were on a different basis, either hosted

3    like us or licensed, and then were transitioned to

4    outsourced.

5             THE COURT:  Okay.  Why do you need that?  How is

6    that helpful?

7             MR. MAMOUNAS:  Well, Judge, it's probative,

8    again, of the causation and representation notice issues

9    that we're claiming is the basis for our case here.  SS&C,

10   you know, reached a certain point where it determined that

11   implementation wasn't going to occur and tried to

12   transition us to outsourced.  If that happened with other

13   customers, I think their experience, as SS&C was aware, is

14   probative of the reasons that they, you know, were unable

15   to meet their implementation obligations in the first

16   instance.  What was it that SS&C knew at the time of its

17   misrepresentations concerning implementation that would

18   have told it that implementation wasn't going to happen

19   for us earlier or ever, pre-contract.

20            THE COURT:  Okay.

21            And Mr. O'Connor, anything on this one?

22            MR. O'CONNOR:  Yes, Your Honor.

23            Mr. Mamounas is making the outsourcing proposal

24   sounding like something sinister.  SS&C stayed on this

25   project for two and a half years, devoted more than a

1    million dollars of free service hours in an effort to get

2    ACM up and running.  ACM never devoted adequate resources,

3    never devoted competent personnel, never made a sustained

4    commitment to the implementation.  SS&C, as Mr. Mamounas

5    knows full well, and for all times, maintained their

6    implementation was achievable.  It made an offer to ACM to

7    try on a free basis the outsourced service to see if that

8    would be preferable, a better option for ACM, but that

9    offer is not a basis to petition other relationships.

10              MR. MAMOUNAS:  Judge, if I might?

11              By the time of that offer, I think SS&C had been

12   paid nearly $2 million for a product that didn't work.

13   Anyone could understand why ARMOUR would have declined the

14   offer to move to yet another product.  But I think the

15   point here is pretty clear.  Pre-contract ARMOUR made it

16   abundantly clear to SS&C that hosted was the only option

17   it would consider.  And SS&C, understanding that

18   limitation, represented that hosted would be appropriate

19   and that it would be achievable.  And lo and behold, it

20   wasn't, despite SS&C, by Mr. O'Connor's telling, having

21   been in business 30 years and offering CAMRA more than 20

22   years.  You would think with all of that experience it

23   would know when certain implementation types are

24   appropriate and when it could implement and when it

25   couldn't.  But somehow after two years, SS&C determined to

1    try to move ARMOUR with $2 million in its pocket to a more

2    expensive product.  Of course, it wasn't going to be free

3    in perpetuity.

4            So what we're asking for is what other customers

5    has that happened for.  If there aren't any, I think it

6    should be easy enough to tell us as much.  If there are

7    other customers that have been transitioned from another

8    implementation to outsourced, it's probative of what

9    happened in their implementation, what did SS&C know when

10   they told us that they could implement within the time

11   period that they said they would and on that basis.

12           THE COURT:  Okay.

13           MR. O'CONNOR:  As of the contract date.  And

14   that would be as of the contract date.

15           THE COURT:  So here's what I'm going to do.

16           On Number 6, it seems a bit borderline to me on

17   the relevance, but I am going to allow it solely as to

18   mortgage REITs within that three-year time period that

19   we've been talking about from May 2014 to May 2017.  And

20   I'll allow and require a response to Number 6 just for

21   mortgage REITs during that time period if there's going to

22   be -- I don't know what the response will be.  But

23   otherwise than that, I think going into all the other

24   customers over boundless time period would be unduly

25   burdensome compared to the possible relevance of the

1   information obtained.

2           Okay.  So that's the Court's rulings on the

3   discovery matters.

4           I know there was an issue with respect to a

5   request with respect to the time.  And I think that ACM

6   had requested responses by the 2nd of October.

7           Do you want to be heard on that?

8           MR. MAMOUNAS:  I would, Judge.  And it really

9   goes to the fact that we have depositions that have been

10  set for quite some time of the folks at SS&C who made the

11  pre-contract misrepresentations that we allege in the

12  complaint.  Those are set to occur next Wednesday and

13  Thursday after a settlement conference with Magistrate

14  Margolis.

15          Again, these requests have been outstanding for

16  three months.  And as limited by the Court today, we

17  submit that they should be relatively easy to collect and

18  to provide that information to us.  In fact, certain

19  components of it were items that we had talked about in

20  our meet-and-confer conferences in order to come to a

21  resolution.  And so we would respectfully submit that they

22  be ordered to be provided to us on an expedited basis by

23  the end of the day on Tuesday so that we have that

24  information for the depositions commencing Wednesday.

25          THE COURT:  I see.

```
 1              And Mr. O'Connor?

 2              MR. O'CONNOR:  Your Honor, that's -- we'll

 3   provide the information as soon as possible.  We've been

 4   negotiating in good faith, as I indicated, agreed to

 5   modify the request, but to turn it around in one day is

 6   unreasonable.  These witnesses will be available if there

 7   are follow-up questions necessary.  A one-day turnaround

 8   is not feasible.  I would ask for ten days, Your Honor.

 9              THE COURT:  Okay.

10              I agree that one day is not feasible and it

11   actually could come at the cost of ensuring accuracy and

12   thoroughness in the responses.  I don't think that the

13   objections that SS&C have lodged here have been

14   obstructive.  I think there were matters of good faith

15   disagreement between counsel.  I do think that the

16   depositions, there's rich grounds for proceeding with the

17   depositions, and it's just not practicable to think that

18   the kind of document production could occur and the

19   remainder of the interrogatories could be thoroughly

20   vetted and done within just essentially one business day

21   or two business days.  So I'm going to require that there

22   be production in ten days; in other words, a week from

23   this coming Monday.

24              MR. MAMOUNAS:  Judge, may I ask a question?

25              THE COURT:  Yes.
```

1           MR. MAMOUNAS:  Does that include service of the

2   interrogatory responses that Your Honor has ordered as

3   well as production of the responsive documents that

4   Your Honor has ordered?

5           THE COURT:  Yes, yes.  All of the discovery that

6   I'm ordering at this time I think is going to take some

7   time.  It's just not practicable to think it could happen

8   quite as quickly as you'd like it to happen.  It's

9   regrettable and it may end up being that there's a need to

10  possibly see a witness again in the event that that

11  showing is made at a later time.  Hopefully, that won't be

12  the case.

13          Okay, anything else to take up?

14          MR. O'CONNOR:  Your Honor, just one thing.  The

15  Monday after next Monday is Columbus Day.

16          THE COURT:  I'm sorry.  Tuesday, the 11th.

17          MR. O'CONNOR:  All right.  Thank you very much.

18          THE COURT:  Expect very complete responses there

19  since I'm giving you the time, Mr. O'Connor.

20          MR. O'CONNOR:  Thank you, Your Honor.

21          THE COURT:  All right.

22          MR. O'CONNOR:  Your Honor, one other request.

23  With respect to contention interrogatories, we've served

24  contention interrogatories and we've received a response

25  to the effect that those interrogatories were premature.

48

1    And I was wondering if Your Honor has a view as to whether

2    a plaintiff should be required in a contention

3    interrogatory to set forth as of the date of interrogatory

4    all the material facts upon which it's basing its

5    allegations in a particular count.

6              THE COURT:  I'm not going to handle additional

7    issues right now.  If you end up not reaching an agreement

8    on that, we'll have to set up another call when I have

9    appropriate letters from you on the issue and background

10   law.  Okay.

11             Thank you all for calling in.  Have a good day.

12             MR. MAMOUNAS:  Thank you, Your Honor, for your

13   time.

14             MR. O'CONNOR:  Thank you, Your Honor.

15                  (Proceedings adjourned at 4:14 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2

3                          C E R T I F I C A T E

4

5        RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
            TECHNOLOGIES, INC., No. 3:17CV790(JAM)

6

7              I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 48 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____
                              /s/

18                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
19                    United States District Court
                       141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25