# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2                    NEW HAVEN DIVISION

 3

 4         DOCKET NUMBER:  17-CV-00790-JAM

 5

 6  ----------------------------)
                                )
 7  ARMOUR CAPITAL MANAGEMENT,  )
    LP                          )
 8                              )
              Plaintiff(s),     )
 9                              )
    VS                          )
10                              )
    SS&C TECHNOLOGIES, INC.     )
11                              )
              Defendant(s).     )
12                              )
    ----------------------------)
13

14
         VIDEO DEPOSITION OF:  NORMAND BOULANGER
15

16  DATE:     May 3, 2018
    TIME:     1:00 p.m.
17  HELD AT:  Hinckley Allen
              20 Church Street
18            Hartford, Connecticut

19                     - - -

20

21

22

23

24    Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030

25
```

Page 78
1  we went off we were talking about the opinion,
2  your opinion, that is, that outsourcing would have
3  been a better solution for CAMRA -- for Armour.
4  Remember that?
5          MR. O'CONNOR:  Objection.
6          THE WITNESS:  I think I said that
7      all the solutions would have been
8      appropriate for Armour, but that I
9      thought outsourcing would be a good one
10     for them.
11 BY MR. MAMOUNAS:
12    Q   The better one?
13         MR. O'CONNOR:  Objection.
14         THE WITNESS:  The better one.
15 BY MR. MAMOUNAS:
16    Q   Do you recall when it was that you first
17 formed that opinion?
18    A   It was after doing -- you know, I
19 basically got that demand letter, and as I am
20 trying to read it and I'm trying to understand it,
21 talked to my guys, and it wasn't right away, but
22 over time as I started researching it and looking
23 at it, and I thought if the problem is what it
24 appears to be, that we have a Catch 22 resource
25 wise, that they are unwilling to put the

Page 79
1  commitments on it long enough to keep it current,
2  once we are current, but I thought outsourcing
3  would be a good option for them.
4          So that was shortly after that, you know,
5  that letter.
6     Q   Okay.  Prior to that letter had you ever
7  heard that Armour was unhappy with SS&C?
8     A   I got a heads up, I don't remember what
9  month it was.  It was in the fourth quarter of
10 2016.  I was in Tim's office talking about a
11 number of business things, and he gave me a heads
12 up that we were having some challenges with
13 Armour, thought we were going to be okay, and that
14 one of the gentlemen, I can't remember who it was,
15 at Armour thought it would be a good idea if I
16 came to visit them in Florida because of that.
17    Q   Prior to that time you had never heard
18 that Armour was unhappy with SS&C?
19    A   I don't recall Armour over escalating to
20 me or anybody else, no.
21    Q   Okay.  Prior to that time did you hear
22 that any other mortgage REITs that were in
23 licensed implementation for CAMRA were unhappy
24 with SS&C?
25         MR. O'CONNOR:  Objection.

Page 80
1          THE WITNESS:  You know, my team is
2      responsible for dealing with
3      implementations and generally handle most
4      of the escalations, but the clients are
5      welcome to call me, and welcome to call
6      Bill Stone.
7          So occasionally a client calls to
8      express concern.  So, the only one I
9      recall --
10         MR. O'CONNOR:  I am going to
11 instruct you not to answer at this point.
12 It would be Attorney Eyes Only, and ask
13 Mr. Gruber to leave the room.
14         MR. MAMOUNAS:  We don't even know
15 what the testimony is.
16         MR. O'CONNOR:  Okay.  I want to be
17 safe rather than sorry.  So, I am
18 instructing him not to answer, and you
19 can ask the next question.
20         MR. MAMOUNAS:  No.  He can answer
21 that question.
22         MR. O'CONNOR:  No.
23         MR. MAMOUNAS:  There no basis that
24 you to instruct him not to answer the
25 question.

Page 81
1          (Talking on top of each other.)
2          MR. O'CONNOR: You shouldn't
3      identify --
4          MR. MAMOUNAS:  He is just saying
5      that a customer called him.
6          MR. O'CONNOR:  Yes.
7          MR. MAMOUNAS:  You have to be
8      kidding me.
9          MR. O'CONNOR:  No. I am not kidding
10     you.
11         MR. MAMOUNAS:  All right.
12     Mark, if you wouldn't mind.
13         (Mr. Gruber left the room.)
14         MR. O'CONNOR:  All of this has been
15     deemed irrelevant by the court, so --
16     okay.  Go ahead.
17         MR. MAMOUNAS:  I am going to have to
18     disagree with you on that one, but I'm
19     not going to waste my time on the record.
20 BY MR. MAMOUNAS:
21    Q   Sir, please go ahead.
22         THE WITNESS:  Do I use the name of
23     the client or not?
24         MR. O'CONNOR:  No.
25

Page 82

1  BY MR. MAMOUNAS:
2   Q   Absolutely.
3          MR. O'CONNOR:  Go ahead and answer
4       the question.
5          THE WITNESS:  It was Annaly Capital
6       Management.
7  BY MR. MAMOUNAS:
8   Q   Okay.  You are telling me that --
9   A   They didn't call to say they were
10 unhappy.
11  Q   Okay.  What did they call to tell you?
12  A   They called that they had some important
13 deadlines coming up, they really loved Gary Leyva,
14 one of our resources on the account, wanted to
15 make sure they had more of his time, right, and
16 SS&C's commitment to, to make sure that they hit
17 their deadline.  Something to that effect.
18  Q   They called you directly?
19  A   They called me directly.
20  Q   Okay.  Other than Armour, prior to the
21 filing of this lawsuit, did you learn that any
22 other mortgage REITs were unhappy in any way?
23  A   Prior to the lawsuit?
24  Q   Correct.
25         MR. O'CONNOR:  Objection.

Page 83

1          THE WITNESS:  Before the window or
2       not the window?
3  BY MR. MAMOUNAS:
4   Q   What's the window?
5   A   2014, whenever we started here.
6   Q   At any point in time, sir.
7   A   At any point in time?
8   Q   Correct.
9   A   So, I don't remember the date, right, so
10 the first REIT we had was Apollo.  It was a very
11 large REIT, a complicated REIT.  And I spoke to
12 the lady about production, not implementation.
13      Questions on amortization on nonagency
14 securities.
15  Q   Okay.
16  A   That is it.
17  Q   Let's focus on the window, that is 2014
18 to 2017.  You don't recall apart from the one time
19 when Mr. Really told you Armour wanted to meet
20 with you, any other mortgage REITs being unhappy?
21  A   Again, you are characterizing "unhappy."
22 So whether it's in production or implementation,
23 if a client has a question or they want to talk to
24 me, they do.
25      So the only other one I can think of is

Page 84

1  Western Asset Management.
2   Q   Okay.  Do you recall that in the first
3  quarter of 2017 Fortress owed SS&C over seven
4  hundred and twenty-five thousand dollars of which
5  more than half a million was more than 90 days
6  old?
7          MR. O'CONNOR:  Objection.
8          THE WITNESS:  I don't know the time
9       frame, but I do recall a receivable that
10      Tim was working on collecting, yes.
11 BY MR. MAMOUNAS:
12  Q   You consider that a significant
13 receivable.  Right?
14         MR. O'CONNOR:  Objection.
15         THE WITNESS:  We are -- we are, you
16      know, a multi billion dollar company.
17      Nothing is immaterial, but it's a
18      receivable that we want to collect.  If
19      we earned it, we want to get paid.
20 BY MR. MAMOUNAS:
21  Q   Okay.  Did Mr. Reilly not tell you that
22 that was because the implementation for Fortress
23 was delayed?
24         MR. O'CONNOR:  Objection.
25         THE WITNESS:  No, I don't recall

Page 85

1       that.
2  BY MR. MAMOUNAS:
3   Q   Do you recall the reason that, that the
4  receivable was outstanding?
5          MR. O'CONNOR:  Objection.
6          THE WITNESS:  I believe -- I don't
7       recall specifically the reason.  Right.
8       Other than Armour -- I mean not Armour --
9       Fortress was questioning what they paid
10      us so far and what they had left to pay
11      us, and Tim was negotiating what he
12      thought was an appropriate approach to go
13      forward.
14 BY MR. MAMOUNAS:
15  Q   Okay.
16  A   And he wasn't done negotiating, and that
17 is why they hadn't paid.
18  Q   Okay.  At any point in time did you come
19 to learn that the Fortress implementation was
20 delayed?
21         MR. O'CONNOR:  Objection.
22         THE WITNESS:  I don't know what you
23      mean by "delayed."
24 BY MR. MAMOUNAS:
25  Q   Did you come to learn that there were any