# EXHIBIT B
# (First Am. Compl., Dkt#35, dated July 13, 2017, FN 2)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | July 13, 2017 |
| SS&C TECHNOLOGIES INC. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff, ARMOUR Capital Management LP ("ACM"), sues Defendant, SS&C Technologies Inc. ("SS&C"), and states:

## INTRODUCTION

ACM is a registered investment advisor focusing on mortgage-related securities. In 2014, ACM sought a comprehensive, turnkey solution for portfolio accounting, a sophisticated package of software and services that would assist ACM with managing its clients' portfolios.

SS&C marketed its "CAMRA" software as such an "end-to-end solution." Beginning in May 2014, ACM and SS&C had at least seven months of meetings and telephone calls about that solution. ACM explained to SS&C that fundamental to the solution was SS&C's "implementation" of CAMRA for ACM. In response, SS&C serially and emphatically represented to ACM that it had the qualifications and capabilities to implement CAMRA successfully; the "hosting" option for CAMRA was appropriate, and could be implemented, for ACM; and SS&C was capable of implementing CAMRA within four to six months of ACM's and SS&C's contract execution.

All of these representations were false, which SS&C knew or, alternatively, at least should have known. But the misrepresentations also were material to ACM's decision, in December 2014, to contract with SS&C to implement, supply, and service CAMRA.

SS&C had problems implementing CAMRA almost immediately. SS&C first delayed implementation by three months and then failed to meet that revised deadline—and many later deadlines it set for itself. All the while, SS&C repeatedly gave ACM false assurances that implementation was just around the corner. SS&C made these false assurances to induce ACM to not terminate the contract, not make a warranty claim, release to SS&C substantial payments to which SS&C was not entitled, and authorize SS&C to perform additional work for significant fees.

The parties agreed that implementation is complete when CAMRA is able to process one month of transactions for ACM. Over *two years* later, there is no dispute this never occurred. In May 2017, enough was enough: ACM terminated the parties' contract and, later, filed this lawsuit, but not before being induced by SS&C to pay SS&C more than $1.78 million in fees and incurring more than $500,000 in other losses. These are the damages ACM seeks in this case.

## PARTIES, JURISDICTION AND VENUE

1.      This is a civil action for breach of contract, violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), intentional and negligent misrepresentation, and rescission.

2.      ACM is a limited partnership organized under the laws of Delaware with 11 partners: (1) Remmiz LLC (General Partner); (2) Stacumny LLC (General Partner); (3) Jeffrey J. Zimmer (Limited Partner); (4) Scott J. Ulm (Limited Partner); (5) Buford H. Ortale (Limited Partner); (6) Susan E. Zimmer (Limited Partner); (7) Alexander R.A. Ulm (Limited Partner); (8) Carolyn M. Zimmer Irrevocable Trust ("CMZ Trust") (Limited Partner); (9) Isabella L. Zimmer Irrevocable Trust ("ILZ Trust") (Limited Partner); (10) Emanon Investments 1 LLC (Limited Partner); and (11) DM Bell Blank Check Family LP (Limited Partner).

3.      Jeffrey J. Zimmer, Scott J. Ulm, Susan E. Zimmer, and Alexander R.A. Ulm are citizens of Florida, and Buford H. Ortale is a citizen of Tennessee.

Case 3:17-cv-00790-JAM  Document 162-3  Filed 10/04/18  Page 4 of 46
Case 3:17-cv-00790-JAM  Document 88-3  Filed 07/13/18  Page 3 of 23

Case No. 17-cv-00790-JAM

4.     Remmiz LLC is a Florida limited liability company; its sole member, Jeffrey Zimmer, is a citizen of Florida.  Remmiz LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

5.     Stacumny LLC is a Florida limited liability company; its sole member, Scott Ulm, is a citizen of Florida.  Stacumny LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

6.     CMZ Trust is a Florida trust; its co-trustees are Jeffrey J. Zimmer and Susan E. Zimmer, both citizens of Florida.  CMZ Trust therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

7.     ILZ Trust is a Florida trust; its co-trustees are Jeffrey J. Zimmer and Susan E. Zimmer, both citizens of Florida.  ILZ Trust therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

8.     Emanon Investments 1 LLC is a Nevada limited liability company; its members are Marc Bell, a citizen of Florida, and Emanon LLLP, a limited liability limited partnership organized under the laws of Nevada.  Emanon LLLP's only partners are (1) limited partner the Bell 2014 Family Trust, a Nevada trust whose trustee is Ruti K. Bell, a citizen of Florida, and (2) general partner Emanon LLC, a Nevada limited liability company whose members are (i) Marc Bell, a citizen of Florida, and (ii) the Marc H. Bell 2014 Family Irrevocable Trust, a Florida trust whose trustee is Ruti K. Bell, a citizen of Florida.  Emanon Investments 1 LLC therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

9.     DM Bell Blank Check Family LP is a limited partnership organized under the laws of Wyoming; its partners are general partners (1) DS Blank Check LLC, a limited liability company organized under the laws of Delaware whose sole member is Daniel C. Staton, a citizen of

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 5 of 46
Case 3:17-cv-00790-JAM Document 86-3 Filed 07/13/18 Page 4 of 23
Case No. 17-cv-00790-JAM

Florida, (2) MS Blank Check LLC, a limited liability company organized under the laws of Delaware whose sole member is Maria V. Staton, a citizen of Florida; and limited partners (3) Daniel C. Staton, (4) Maria V. Staton, (5) Arianna E.B. Staton, (6) George E.B. Staton III, (7) John C. B. Staton, and (8) Daniela V.B. Staton, all citizens of Florida. DM Bell Blank Check Family LP therefore is a citizen of Florida for purposes of determining federal diversity jurisdiction.

10.     SS&C is a corporation organized and existing under the laws of Delaware, with its principal office in Connecticut.

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interest, and costs.

12.     This Court has personal jurisdiction over SS&C because its principal office is located in this District and it conducts business in this District.

13.     Venue is proper under 28 U.S.C. § 1391(b) because SS&C is a resident of this District and a substantial part of the events giving rise to ACM's claims occurred in this District.

## GENERAL ALLEGATIONS

### *SS&C's Pre-Contractual Misrepresentations about CAMRA*

14.     SS&C is a provider of financial services software and software-enabled services. SS&C claims it "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operations." SS&C markets CAMRA as a "flexible software application that streamlines, automates, and simplifies the investment process by providing immediate access to decision-making data."

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 6 of 46
Case 3:17-cv-00790-JAM Document 85-3 Filed 07/13/18 Page 6 of 23

Case No. 17-cv-00790-JAM

15.     In 2014, ACM sought to upgrade its portfolio accounting to a full-service invest-ment accounting platform that would provide a turnkey solution, including the necessary software licenses and implementation.  To that end, Jim Mountain, ACM's Chief Financial Officer, and Mark Gruber, its Chief Operating Officer and Head of Portfolio Management, researched possible providers of such a solution, contacted them, and explained ACM's needs.

16.     SS&C was one such possible provider.  In June 2014, Mountain and Gruber met with SS&C representatives, including Timothy Reilly, Dennis Moore, Jeffrey Fectau, and Josh Brown, for SS&C to introduce ACM to CAMRA and to learn about ACM's business, processes, and its staff's capabilities.  At that meeting, these SS&C representatives made a presentation to ACM extolling SS&C's "accounting and reporting expertise," describing CAMRA as a "proven accounting engine," and proclaiming that a "large portion" of SS&C's client base had significant exposure to mortgage-backed securities, including real-estate investment trusts ("REITS") familiar to ACM.  The presentation ended with the following slide, reiterating SS&C's purported expertise:

## Why SS&C 

- Unique ability to leverage knowledge and expertise across organization
    - Development, licensed clients, outsourcing, professional services
- Highly skilled consulting
    - Process improvements / automation
    - Ability to provide tailored / customized solutions
- Relevant Mortgage REIT expertise and public company reporting
- Dedicated REIT Services team supporting technical accounting, regulatory and tax needs
- Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs

SS&C

9

Case 3:17-cv-00790-JAM  Document 162-3  Filed 10/04/18  Page 7 of 46
Case 3:17-cv-00790-JAM  Document 85-3  Filed 07/13/17  Page 6 of 23

Case No. 17-cv-00790-JAM

17.     Mountain and Gruber had several follow-up calls and meetings with Fectau and Moore over summer 2014, during which SS&C emphatically and repeatedly represented to ACM that SS&C's CAMRA was a sophisticated, highly customizable product that could provide ACM the "end-to-end solution" it desired.  SS&C's implementation of CAMRA was a fundamental component of that solution because as ACM told SS&C, ACM itself could not implement CAMRA.

18.     SS&C was aware of the importance of its—and not ACM's—implementation of CAMRA to ACM's decision to engage SS&C.  As such, throughout the sales process, SS&C represented that its personnel had the expertise to ensure the successful and timely implementation of CAMRA and that ACM would not have to engage any third-party consultants for this purpose. For example, in marketing materials SS&C provided to ACM, SS&C touted its "unique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting."  SS&C further represented that its staff had "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage backed securities and structured products."  Indeed, SS&C shared with ACM an April 2014 press release announcing its formation of a REIT servicing group, in which Reilly described SS&C as "the only integrated Mortgage REIT end-to-end solution" and Brown proclaimed that SS&C would "help mortgage REITS be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets."  This expertise, particularly with mortgage-backed securities, was one of the major selling points for ACM—to not only license software from SS&C, but also to receive the benefit of SS&C's expert services, including and especially implementation, which was critical given the sophisticated, highly customizable nature of CAMRA.

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 8 of 46
Case 3:17-cv-00790-JAM Document 85 Filed 01/19/18 Page 7 of 23

Case No. 17-cv-00790-JAM

19.     In addition to SS&C's representations that it was fully capable of implementing CAMRA for ACM, SS&C also offered ACM different options regarding the type of implementation it would receive.  These options were: (1) an "in-house license," under which ACM would host CAMRA in its own data center and operate CAMRA alone; (2) "hosting," under which SS&C would host CAMRA but, following implementation, ACM would operate CAMRA; and (3) "full-service outsourcing," under which SS&C would both host and operate CAMRA for ACM.

20.     ACM advised SS&C it was not interested in an "in-house license" or "full-service outsourcing," leaving "hosting" as the only implementation option that ACM was willing to purchase from SS&C.  This meant that if SS&C were unable to implement the hosting option at ACM, there would be no deal between ACM and SS&C.  This incentivized SS&C to sell hosting to ACM and represent to ACM that hosting was appropriate, and could be implemented, for ACM.

21.     SS&C did so.  For example, in July 2014, SS&C sought to use sample ACM test-trade data to compare CAMRA's output with the output generated by ACM's existing processes.  SS&C then provided ACM with a written "proof of concept," which SS&C represented as evidence that CAMRA could achieve the same output as ACM's existing processes, the technical specifications of which SS&C had evaluated by then.  On August 27, 2014, Fectau and Moore, knowing that ACM was not interested in full-service outsourcing, demonstrated CAMRA for ACM using hosting and again represented to ACM that hosting was appropriate for ACM.  Fectau and Moore also represented to ACM that SS&C had the expertise to implement CAMRA for ACM and cited SS&C's own experience using CAMRA for other customers that invest in mortgage-related securities as support.  At a meeting at ACM's offices in September 2014, SS&C provided ACM with additional written "proofs of concept" to show that hosting for CAMRA was appropriate for ACM.

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 9 of 46
Case 3:17-cv-00790-JAM Document 85-3 Filed 07/13/18 Page 9 of 23

Case No. 17-cv-00790-JAM

22.     Importantly, SS&C also represented that it was capable of implementing CAMRA for ACM quickly and efficiently. In SS&C's "Implementation Budget" and "Proposed Migration Timeline," which it provided to ACM on December 10 and 11, 2014, SS&C represented that it could complete implementation within four to six months of contract execution. To underscore this point, SS&C claimed that it could implement CAMRA between January and May 2015.

23.     All of these representations—regarding SS&C's capabilities and qualifications, the appropriateness of hosting CAMRA for ACM, and the time in which SS&C was capable of implementing CAMRA—were material to and induced ACM's decision to hire SS&C over the other service providers ACM vetted. And ACM had every reason to believe SS&C's representations; after all, SS&C emphatically and repeatedly held itself out to ACM as having superior knowledge and expertise about CAMRA, including its implementation and use for other customers like ACM.

24.     All of these representations were false, which SS&C knew or, alternatively, at least should have known: SS&C did not have the capabilities and qualifications to successfully implement CAMRA for ACM; hosting CAMRA was not appropriate, and could not be implemented, for ACM; and SS&C could not implement within two years of contract execution, much less the four to six months that SS&C had represented to ACM.

### *The Master Agreement and Related Sub-Agreements*

25.     Based upon SS&C's misrepresentations, ACM was induced to enter into a multi-million-dollar contract with SS&C to license CAMRA and related software and for SS&C to implement, maintain, and support the software.

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 10 of 46
Case 3:17-cv-00790-JAM Document 63-5 Filed 07/13/17 Page 9 of 23

Case No. 17-cv-00790-JAM

26.     Effective December 30, 2014, ACM entered into a Master Agreement for Software, Maintenance and Support, Professional Services and Other Services, which incorporates each attachment and Work Request thereto (collectively, the "Master Agreement"). (*See* Ex. A, attached.) But for SS&C's misrepresentations, ACM never would have entered into the Master Agreement.

27.     Implementation was central to the Master Agreement. Indeed, the goods and services SS&C sold to ACM under the Master Agreement were worthless to ACM without SS&C's implementation of CAMRA. And in dollar terms, SS&C's failed implementation of CAMRA accounted by far for the largest portion of the total fees SS&C induced ACM to pay.

28.     The first attachment to the Master Agreement is the License and Maintenance Program Agreement ("Maintenance Program"), which provides that ACM would perpetually license from SS&C the following software: CAMRA for Microsoft SQL Server, including CI Manager, Impairments Manager, Report Express, Extend, and TBA Dollar Roll, and Debt & Derivatives, including Swaps (collectively, "CAMRA"). SS&C also agreed to provide maintenance, including

> telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades.

(*Id.* § 3.1.)

29.     In exchange, ACM agreed to pay SS&C (a) $500,000 to license CAMRA and (b) a $100,000 annual maintenance fee, subject to increase. (*See id.* Attach. A.1.)

30.     The Maintenance Program ran from December 30, 2014, through December 31, 2015, and automatically renewed for one-year terms starting on January 1, 2016. (*See id.* § 3.5.)

31.     In December 2014, ACM paid the $500,000 license fee and the initial $100,000 maintenance fee, plus tax. Subsequently, ACM paid $200,000 plus tax for the 2016 and 2017 maintenance fees. Including tax, ACM has paid $322,568 in maintenance fees to SS&C.

32.     The Maintenance Program contains a limited, 364-day warranty that CAMRA would perform in substantial accordance with SS&C's representations.  (*See id.* Attach. A.1.)

33.     The Master Agreement also attaches a Hosting, Process Automation, and Data Management Services Agreement ("Hosting Agreement"), under which SS&C agreed to provide and maintain a hosted software environment—the hosting option for implementation that SS&C repeatedly represented to ACM in 2014 as appropriate, and capable of successful implementation, for ACM—for a $10,000 monthly hosting fee, subject to increase.  (*See id.* Attach. B.1.)

34.     To date, ACM has paid SS&C $260,000 in hosting fees.

35.     The parties entered into three Work Requests under the Master Agreement.  Work Request One was contemporaneous to the Master Agreement and sets forth the terms of the initial setup of CAMRA, testing, and support; provides that implementation will require four to six months; and authorizes 1,850 hours of SS&C support at the rate of $225 per hour for on-site and remote implementation services, including business workflow analysis, environment setup, data conversion analysis, interface development, and testing.  (*Id.* § 3.1, 15-16.)

36.     Work Request Two, attached at Exhibit B and effective as of March 31, 2016, further defines SS&C's obligations with respect to implementation and caps the fees set forth in Work Request One at $728,725.  (*See* Ex. B at 1.)  Implementation is considered complete when ACM is able to successfully process one complete month of transactions using CAMRA.  (*Id.*)  This never happened.  Thus, by the Master Agreement's express terms, SS&C breached a material term of the agreement and is liable for ACM's damages.

37.     Work Request Three, attached at Exhibit C and effective as of April 20, 2016, provides for onsite and remote implementation services relating to the accounting for what SS&C

referenced as "PGAAP," the purchase method of accounting under Generally Accepted Accounting Principles, and authorizes 120 hours of support at $225 per hour. (*See* Ex. C at 1.)

38.     To date, ACM has paid $695,370 to SS&C under the Work Requests.[1]

### *Despite its Representations, SS&C Fails to Implement CAMRA for ACM*

39.     Almost from inception, SS&C had difficulty implementing CAMRA.

40.     Beginning in January 2015, ACM and SS&C held weekly status meetings regarding implementation.  Adriana Johnson was an SS&C project manager who led most of the weekly meetings, which she followed with status emails.  In an initial email, Johnson repeated what SS&C had represented to ACM in December 2014:  SS&C could successfully implement CAMRA for ACM in four to six months.  In February 2015, however, Johnson informed ACM at a weekly meeting that SS&C had delayed the implementation completion date to early August 2015.  SS&C thereafter continually delayed this date, including from mid-August 2015, to late August 2015, to October 2015, and beyond, until SS&C stopped providing revised deadlines altogether.

41.     SS&C employees, including Johnson, Scott Rice, Andrew Voutinas, David Russell, Jason Holmes, Fathima Mahamoon, and Donald Johnson, gave seemingly endless excuses for SS&C's failure to implement CAMRA.  For instance, in fall 2015, Russell informed ACM that SS&C could not configure data from ACM's custodian, BNY Mellon, even though before signing the Master Agreement, SS&C falsely represented to ACM that it was able to integrate BNY Mellon's data into CAMRA.  Russell also told ACM that the CAMRA implementation again was delayed because of ACM's accounting methodology, about which SS&C also knew prior to entering into the Master Agreement.  ACM changed its accounting method upon SS&C's insistence,

---

[1] ACM terminated the Master Agreement on May 1, 2017, and thus does not owe SS&C any additional amounts under the Master Agreement, including any hosting fees or monies that would be due upon SS&C's completion of implementation (which, again, never occurred).

but SS&C's failures continued.  Finally, CAMRA was unable to reliably replicate basic data; as just one example, CAMRA incorrectly calculated "business days" as "calendar days."  These excuses alone demonstrate the falsity of SS&C's representations regarding its qualifications and capabilities to implement CAMRA for ACM before entering into the Master Agreement.

42.     Despite its ongoing failure to implement CAMRA, SS&C routinely and repeatedly provided ACM assurances that SS&C would succeed in doing so, as described below.  These representations were false, which SS&C knew or, alternatively, at least should have known.  SS&C made such misrepresentations with the present intention not to deliver on its obligations under the Master Agreement, because, among other things, SS&C made such representations to induce ACM not to terminate the Master Agreement, not make a warranty claim under the Master Agreement, which warranty expired without ACM making a claim due to SS&C's misrepresentations, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees, and also because of SS&C's pre-contract misrepresentations regarding its capabilities and qualifications, the appropriateness of hosting CAMRA for ACM, and the time in which SS&C could implement CAMRA.

43.     In its March 31, 2015 "Implementation Roadmap," SS&C stated to ACM:

Through a series of in-person and WebEx meetings during the week of February 17, 2015, as well as the [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications.

Such assurances that SS&C would implement CAMRA for ACM were false, which SS&C knew or, alternatively, at least should have known.  In the Implementation Roadmap, SS&C further represented that it had "insight and knowledge" regarding CAMRA because it "is the single biggest user of its own software and services" and detailed the backgrounds and experience of its staff, including Johnson, who SS&C claimed had experience "working closely with internal and external

12

partners to ensure projects are completed on time, on budget and meeting client's expectations." These representations underscored SS&C's repeated representations that it would implement CAMRA for ACM, which was false.

44.     In fall 2015, ACM began to withhold payment due to SS&C's failure to implement CAMRA.  In response, SS&C's Reilly, Daniel Pallone, and Tony Gonzalez stated that SS&C had the superior qualifications and capability necessary to implement CAMRA.  SS&C did so to induce ACM to believe that implementation was nearly complete and thus release to SS&C substantial payments to which SS&C was not entitled.

45.     ACM repeatedly notified SS&C of its failure to implement CAMRA in writing throughout 2015, 2016, and 2017 and provided SS&C countless opportunities to cure that failure. As one example, on or around October 2, 2015, SS&C's Johnson proposed to effect a "re-initialization as of 8/31/15."  A "re-initialization" was a do-over of the entire attempt at implementation and SS&C's requests misrepresented that by "re-initializing," SS&C would achieve implementation of CAMRA for ACM.  Based on SS&C's repeated misrepresentations, ACM was induced to agree to—and pay for—multiple re-initializations, at SS&C's request, but none resulted in successful implementation.  Two months following Johnson's statement, little progress was made, but SS&C's false assurances induced ACM to not terminate the Master Agreement.

46.     SS&C's false representations also convinced ACM not to make a claim under the Master Agreement's 364-day limited warranty.  Given that the Master Agreement became effective on December 30, 2014, the limited warranty expired on December 29, 2015.

47.     Less than two weeks before this expiration date, on December 18, 2015, Mountain expressed to Reilly ACM's "grave concerns" concerning implementation, which still was not complete and thus provided ACM grounds to make a warranty claim under the Master Agreement.

Three days later, Reilly acknowledged that implementation had been difficult but assured Mountain that SS&C was committed to making it work, the problems with CAMRA were fixable, and implementation was close to being completed successfully. Based on these false assurances, ACM did not make a claim under the warranty, which subsequently expired.

48.    In April 2016, ACM revisited the warranty issue in negotiating Work Request 3, which arose in response to SS&C's demands for payment in spite of its continued failure to implement CAMRA. As part of the negotiations, Mountain asked Reilly to consider extending the warranty, to which Reilly replied that SS&C would not do so because ACM had "recourse on functionality under the maintenance agreement" and that ACM's maintenance agreement "addresses defects, corrections, improvements, enhancements, fixes, patches and upgrades." Two days later, Mountain wrote to remind Reilly (and Gonzalez) that Reilly had told ACM that "the maintenance agreement also included the right to terminate the license and receive a refund of the license fee if [SS&C] never get[s] the software installed and working satisfactorily." Based on these misrepresentations, which SS&C knew or, alternatively, at least should have known, were false, SS&C induced ACM not to terminate the Master Agreement and agree to Work Request 3.

49.    More than once, SS&C deployed new "expert" personnel to falsely assure ACM that implementation would be complete and address SS&C's protracted failure to do so. For example, on September 22, 2016, Pallone wrote to Mountain and Gruber: "I understand the daily processing and month end August closing is not going smoothly. I can offer a senior experienced staff accountant Fathima Mahamoon . . . to be on the ground next week to assist your team. She is very experienced in the day to day processing of CAMRA in her daily support of a west coast based mREIT." Such false assurances induced ACM not to terminate the Master Agreement.

50.     For more than two years, ACM diverted key employees from their regular work responsibilities to assist SS&C's struggling implementation teams, all while SS&C told ACM that it would complete the implementation.  For instance, on October 11, 2016, Pallone wrote to ACM that although he was "disappointed" that SS&C had not achieved implementation, he demanded that ACM make a $200,000 "progress payment" to SS&C because "SS&C [was] committed to satisfying the criteria" for completion.  Based on statements like this, which SS&C knew or, alternatively, at least should have known, were false, ACM granted SS&C other payments and time to finish implementation.  SS&C regularly asked for payment in spite of its complete failure to implement CAMRA—including on March 28, 2016, April 6, 2016, and March 28, 2017, among other instances—and ACM made multiple "good faith" payments to SS&C based on its representations that it could implement CAMRA.  ACM would have terminated the Master Agreement much sooner were it not for SS&C's repeated false assurances.

51.     With more than two years and millions of dollars wasted on SS&C, ACM, in early 2017, sought to elevate SS&C's deficiencies to the highest levels of its organization and make a last attempt to obtain the benefit of ACM's bargain by meeting with SS&C's President and Chief Operating Officer, Normand Boulanger.  The meeting did not take place, but Reilly assured ACM that Boulanger was aware of SS&C's implementation failures.  On February 6, 2017, Reilly wrote to ACM, "[h]opefully your team is seeing steady improvement soon."  This, too, was false.

52.     Finally, on March 29, 2017, Pallone acknowledged in writing that SS&C had not "fully met" the "condition of a clean monthly process," the objective contractual measure set for SS&C's completion of implementation by the Master Agreement.  To this day, implementation is not complete, and SS&C has admitted it has not satisfied that material obligation under the Master

Case 3:17-cv-00790-JAM Document 92-3 Filed 07/13/18 Page 16 of 23

Agreement. By all accounts, SS&C is unable to cure its inability to implement CAMRA, despite numerous opportunities (and millions of dollars in payments by ACM) to do so.

53. ACM has paid SS&C more than $1.78 million under the Master Agreement, all of which was lost due to SS&C's repeated false assurances prior to and after signing the contract, as detailed above, and SS&C's failure to implement CAMRA. ACM also has incurred other losses, including but not limited to at least about $500,000, based on 4,000 hours of employee time wasted on trying to assist SS&C's struggling teams with the implementation of CAMRA, including significant time spent in countless meetings and hundreds of telephone calls, and damages flowing from ACM's inability to use the unimplemented CAMRA.

54. ACM terminated the Master Agreement on May 1, 2017. But for SS&C's serial misrepresentations, including its false assurances that SS&C would succeed in implementing CAMRA, ACM would have terminated the Master Agreement far earlier (or at least have made a warranty claim under the Master Agreement while that warranty was still effective, not released to SS&C substantial payments to which it was not entitled, or authorized SS&C to perform additional work), saving it all, or at least a large portion of, the more than $2.28 million in damages SS&C has caused ACM. Because of SS&C's conduct, however, ACM was induced not to do so.

## COUNT I - BREACH OF CONTRACT

55. The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

56. The Master Agreement constitutes a valid and binding contract between ACM and SS&C, under which SS&C was obligated to license CAMRA to ACM, implement it, and provide hosting, maintenance, and support services, among others, to ACM.

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 18 of 46
Case 3:17-cv-00790-JAM Document 63 Filed 07/13/18 Page 17 of 23

Case No. 17-cv-00790-JAM

57.     ACM performed its obligations under the Master Agreement, including but not limited to payment of more than $1.78 million to SS&C.

58.     SS&C serially breached material terms of the Master Agreement by, among other things, failing to implement CAMRA for ACM and failing to cure its inability to do so, rendering all of SS&C's goods and services worthless.

59.     ACM has suffered, and continues to suffer, significant damages as a result of SS&C's serial material breaches of the Master Agreement.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest.

## COUNT II - VIOLATION OF THE CONNECTICUT UNFAIR
## TRADE PRACTICES ACT (CONN. GEN. STAT. §§ 42-110A, *ET SEQ.*)

60.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

61.     This is a consumer fraud action by ACM against SS&C under Connecticut General Statutes § 42-110b.

62.     SS&C engaged in unfair and deceptive trade practices by making false and misleading representations to ACM, which SS&C knew or, alternatively, at least should have known to be false.  These statements include but not are not limited to the following, as fully detailed above:  (a) prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution, and (b) after the execution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the

Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

63.     SS&C's misrepresentations also are immoral, unethical, and unscrupulous within the meaning of CUTPA and SS&C's conduct offends public policy.  This is because SS&C's misrepresentations made (a) prior to the execution of the Master Agreement were made solely to induce ACM to enter into the Master Agreement and (b) after the execution of the Master Agreement were made solely to induce ACM not to terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

64.     As a result of SS&C's false and misleading representations and its immoral, unethical, and unscrupulous conduct, which offends public policy, ACM paid over $1.78 million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly incurred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

65.     ACM has suffered, and continues to suffer, significant damages as a result of SS&C's unfair and deceptive trade practices.

66.     A causal nexus exists between SS&C's unfair and deceptive trade practices and the damages ACM has sustained.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be de-termined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, puni-tive damages, and attorney's fees and costs.

## COUNT III – INTENTIONAL MISREPRESENTATION

67.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

68.     SS&C made false and misleading representations to ACM, which SS&C knew to be false.  These statements include but not are not limited to the following, as fully detailed above: (a) prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution, and (b) after the exe-cution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C sub-stantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

69.     ACM reasonably relied on SS&C's false and misleading representations made (a) prior to the execution of the Master Agreement, when ACM was induced by SS&C to enter into the Master Agreement and (b) after the execution of the Master Agreement, when ACM was in-duced by SS&C to not terminate the Master Agreement, not make a warranty claim under the

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 21 of 46
Case 3:17-cv-00790-JAM Document 62-3 Filed 07/13/17 Page 20 of 23

Case No. 17-cv-00790-JAM

Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

70.     As a result of SS&C's false and misleading representations, ACM paid over $1.78 million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly incurred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

71.     ACM has suffered, and continues to suffer, significant damages as a result of SS&C's false and misleading representations.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.

## COUNT IV – NEGLIGENT MISREPRESENTATION

72.     The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

73.     SS&C made false and misleading representations to ACM, which SS&C should have known to be false.  These statements include but not are not limited to the following, as fully detailed above:  prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could implement CAMRA within four to six months of contract execution.

74.     SS&C failed to exercise reasonable care or competence in obtaining or communicating the information in the false and misleading representations SS&C made to ACM.  SS&C

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 22 of 46
Case 3:17-cv-00790-JAM Document 125-3 Filed 07/13/18 Page 22 of 23

Case No. 17-cv-00790-JAM

had the means of knowing, ought to have known, and/or had the duty to know the truth of its false and misleading representations to ACM, but SS&C failed to communicate the truth to ACM.

75. ACM reasonably relied on SS&C's false and misleading representations made prior to the execution of the Master Agreement when ACM was induced by SS&C to enter into the Master Agreement.

76. As a result of SS&C's false and misleading representations, ACM paid over $1.78 million to SS&C, expended at least about $500,000 in wasted employee time, and needlessly incurred other amounts flowing from ACM's inability to use the unimplemented CAMRA.

77. ACM has suffered, and continues to suffer, significant damages as a result of SS&C's false and misleading representations.

WHEREFORE, ACM demands judgment against SS&C for damages in an amount to be determined at trial, but no less than $2.28 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.

## COUNT V – RESCISSION

78. The allegations in paragraphs 1 through 54 are incorporated by reference as though fully set forth herein.

79. In the alternative, ACM elects to rescind the Master Agreement as a result of SS&C's false and misleading representations to ACM, which SS&C knew to be false or, alternatively, at least should have known to be false, and thus made intentionally or at least negligently. These statements include but are not limited to the following, as fully detailed above: (a) prior to the execution of the Master Agreement and to induce ACM to enter into that agreement, that (i) SS&C had the qualifications and capabilities to implement CAMRA for ACM; (ii) the hosting option for CAMRA was appropriate, and could be implemented, for ACM, and (iii) SS&C could

implement CAMRA within four to six months of contract execution, and (b) after the execution of the Master Agreement, (iv) false assurances that SS&C would implement CAMRA for ACM, which SS&C made with the present intent not to deliver on its obligations under the Master Agreement based on, among other things, its pre-contract misrepresentations and the fact that it made such false assurances to induce ACM to not terminate the Master Agreement, not make a warranty claim under the Master Agreement before such warranty expired, release to SS&C substantial payments to which SS&C was not entitled, and enter into Work Requests authorizing SS&C to perform additional work in exchange for substantial fees.

80.     These misrepresentations have rendered the Master Agreement wholly without value and resulted in a total failure of consideration to support the Master Agreement.

81.     ACM sent a letter to SS&C on May 1, 2017, in which it offered to return SS&C to the *status quo ante*, in exchange for SS&C's agreement to do the same with respect to ACM, including the return of its $1.78 million.  SS&C did not accept ACM's offer.  As a result, ACM has complied with any conditions precedent to the rescission of the Master Agreement.

WHEREFORE, as an alternative remedy to a judgment for money damages as requested in Counts I-IV, ACM demands rescission of the Master Agreement and restitution of all amounts it paid to SS&C thereunder, plus interest at the statutory rate.

## <u>JURY TRIAL DEMANDED</u>

ACM requests a trial by jury for all issues so triable.

Case 3:17-cv-00790-JAM Document 162-3 Filed 10/04/18 Page 24 of 46
Case 3:17-cv-00790-JAM Document 62-3 Filed 07/13/17 Page 23 of 23

Case No. 17-cv-00790-JAM

Dated: July 13, 2017                    Respectfully submitted,

                                        **HOLLAND & KNIGHT LLP**

                                    By: */s/ Christopher M. Cerrito*
                                        Christopher M. Cerrito (ct17183)
                                        chris.cerrito@hklaw.com
                                        One Stamford Plaza
                                        263 Tressler Boulevard, Suite 1400
                                        Stamford, CT 06901
                                        Telephone: (203) 905-4500

                    and
                                    By: */s/ Joseph Mamounas*
                                        Joseph Mamounas (phv09010)
                                        joseph.mamounas@hklaw.com
                                        Allison Kernisky (phv09011)
                                        allison.kernisky@hklaw.com
                                        701 Brickell Avenue, Suite 3300
                                        Miami, FL 33131
                                        Telephone: (305) 374-8500
                                        Facsimile: (305) 789-7799

                                        *Attorneys for ARMOUR Capital Management LP*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2017, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by mail or email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                    By: */s/ Joseph Mamounas*
                                        Joseph Mamounas (phv09010)

#52310814_v5

Case 3:17-cv-00790-JAM   Document 98-3   Filed 07/03/17   Page 1 of 16

# EXHIBIT A

# SS&C TECHNOLOGIES, INC.
## Master Agreement

This Master Agreement for Software, Maintenance and Support, Professional Services, and Other Services (the "Master Agreement") is entered into by and between ARMOUR Capital Management LP, having its principal office at 3001 Ocean Drive, Vero Beach, FL 32963 ("Client") and SS&C Technologies, Inc., a Delaware corporation having its principal office at 80 Lamberton Road, Windsor, CT 06095 ("SS&C"), and describes the terms and conditions pursuant to which SS&C shall license to Client certain Software and provide certain maintenance and other services.

In consideration of the mutual promises and upon the terms and conditions set forth herein, the parties agree as follows:

## 1. Certain Definitions
Capitalized terms are defined as follows unless otherwise indicated:

1.1     "Application Service" means Software hosted by SS&C provided to Client as a service.

1.2     "Confidential Information" means this Master Agreement, all Software, Documentation, information, data, drawings, benchmark tests, specifications, trade secrets, object code and machine-readable copies of the Software, source code relating to the Software (whether or not supplied to Client pursuant to this Master Agreement), and any other proprietary information supplied to Client by SS&C.

1.3     "Documentation" means any instructions regarding the use and functions of the Software, which may be printed manuals, or may be in electronic format, including "on-line" help files that may be included in the disc or other media on which the Software is delivered.

1.4     "Effective Date" means December 30, 2014 in the case of this Master Agreement and the Attachments and Work Request enumerated in Section 6.7.18. The Effective Date of any additional subsequent Attachment or Work Request shall be the date on which it has been signed by both the Client and SS&C, unless otherwise specified therein.

1.5     "Master Agreement" means (i) this Master Agreement, (ii) each Attachment, and (iii) each Work Request.

1.6     "Software" means SS&C's proprietary off-the-shelf computer software program(s) specified in an Attachment to this Master Agreement.

1.7     "Use" has the meaning given to it in the relevant Attachment or Work Request, as the case may be.

## 2. Software Licensing

2.1     From time to time SS&C may, subject to the terms and conditions of this Master Agreement, grant licenses to Client for the Software. Such Software licenses will be set forth in attachments attached to this Master Agreement numbered in sequence starting from A.1 (collectively, "Attachment A.x").

2.2     Limited License.  Software licensed by SS&C to Client is specified and restricted in Attachment A.1 or any subsequently added attachment in the Attachment A.x series. Unless specified otherwise in an Attachment A.x, subject to the terms and conditions of this Master Agreement, SS&C hereby grants to Client a limited, perpetual, nonexclusive and nontransferable license to Use the software set forth in Attachment A.x and Documentation only at the designated installation address. Except for the rights expressly granted herein, this license does not transfer to Client title to any proprietary or intellectual property rights to the Software or Documentation, or any copyrights, patents, or trademarks, embodied or used in connection therewith. The license granted to Client hereunder does not include the Software source code.

2.3     Restrictions.  Client will not directly, or indirectly through any affiliate, agent or other third party:  (a) sell, lease, license or sublicense the Software or the Documentation to any third party; (b) decompile, disassemble, or reverse engineer the Software, in whole or in part; (c) write or develop any derivative software or any other software program based upon the Software or any Confidential Information; (d) use the Software to provide processing services to third parties, or otherwise use the Software on a 'service bureau' basis; (e) provide, disclose, divulge or make available to, or permit use of the Software by any third party without SS&C's prior written consent.  The above stated restrictions shall also apply to all Third Party Software if provided by SS&C. Additional restrictions for specific Software are set forth in the relevant Attachment A.x to this Master Agreement.

2.4     Right to Copy.  Client may make one (1) machine-readable copy of the Software for backup or archival purposes. Client may not copy the Software, except as permitted by this Master Agreement.  Client shall maintain accurate and up-to-date records

## SS&C TECHNOLOGIES, INC.
## Master Agreement

of the number and location of all copies of the Software and inform SS&C in writing of such location(s). All copies of the Software and Documentation will be subject to all terms and conditions of this Master Agreement. Whenever Client is permitted to copy or reproduce all or any part of the Software or Documentation, all titles, trademark symbols, copyright symbols and legends, and other proprietary markings must be reproduced.

2.5    Distribution. SS&C shall issue to Client, as soon as practicable for Client's Use: (i) one (1) machine-readable copy of the Software, which shall include one (1) electronic copy of the appropriate Documentation. All Software, interim releases, version releases, error corrections, improvements, enhancements, fixes, patches and upgrades to the Software and related Documentation are only delivered electronically. Delivery occurs at Client's location.

2.6    Third Party Software. Unless otherwise specified, Client is responsible for licensing all third party software required to use the Software ("Third Party Software").

2.7    Outside Services and Other Third Party Software. Client may use outside data services and other third party software products in connection with the Software. Client is responsible for procuring these services and software and for the fees related to their installation and use.

2.8    Indemnification for Infringement. SS&C shall, at its expense, defend or settle any claim, action or allegation brought against Client that the Software, when used within the scope of this Master Agreement, infringes any patent or copyright, misappropriates any trade secret or otherwise infringes any proprietary or intellectual property right of any third party ("Indemnified Claim") and shall pay any final judgments awarded or settlements entered into in connection therewith. Client shall give prompt written notice to SS&C of any such Indemnified Claim and give SS&C the authority to proceed as contemplated herein, provided that settlement of any Indemnified Claim on terms that include an admission of liability by Client or a restriction on the operation of Client's business other than as it relates to the Software shall require Client's prior written consent, which shall not be unreasonably withheld or delayed. SS&C will have the exclusive right to defend any Indemnified Claim and make settlements thereof at its own discretion, and Client may not settle or compromise any Indemnified Claim, except with the prior written consent of SS&C. Client shall give such assistance and information, at SS&C's expense, as SS&C may reasonably require to settle or oppose such Indemnified Claim. In the event any such Indemnified Claim is brought or threatened, SS&C may, at its sole option and expense: (a) procure for Client the right to continue use of the Software or infringing part thereof; or (b) modify or amend the Software or infringing part thereof, or replace the Software or infringing part thereof with other software having substantially the same or better capabilities; or, if neither of the foregoing is commercially practicable, (c) terminate the license granted with respect to the relevant Software and, in the case of a pre-paid perpetual license, refund to Client a portion, if any, of the corresponding License Fee(s) paid by Client equal to the amount paid by Client less one forty-eighth (1/48) thereof for each month or portion thereof that such license has been in effect. SS&C and Client will then be released from any further obligation to the other under this Master Agreement, except for the obligations of indemnification provided for above and such other obligations that survive termination. The foregoing obligations of SS&C shall not apply to the extent any infringement of a third party's intellectual property rights arises as a result of modifications to the Software made by any party other than SS&C or a duly authorized representative of SS&C or Use of the Software other than in accordance with the Documentation. The foregoing states the entire liability of SS&C with respect to any Indemnified Claim.

2.9    Source Code. For purposes of this Master Agreement, the Software source code shall include machine and any related human-readable computer programming code in the programming language in which the source code was written, corresponding to the Software and all subsequent updates and enhancements made generally available in versions of the Software furnished to Software licensees ("Source Code"). The Source Code does not include any source code or object code of third party software, including without limitation, the programming language software used to write the Source Code, and software that may be integrated with the Software.

(a)    Escrow of the Source Code. SS&C shall deposit in escrow with an escrow agent, a copy of the Source Code, reflecting the then current version of the Software, and shall keep such Source Code current by making future deposits in escrow reflecting updates, enhancements and modifications made to the Software, and the escrow agent shall hold the Source Code in accordance with the terms of a written escrow agreement ("Escrow Agreement"). The Escrow Agreement may be a tri-party agreement among SS&C, Client and the escrow agent, or an agreement between SS&C and the escrow agent that provides for the escrow for the benefit of Client and other clients. SS&C reserves the right to terminate any Escrow Agreement, or Client's escrow thereunder, and substitute the escrow with another escrow agent. If (i), (ii), (iii), (iv), or (v) below are not withdrawn, rescinded or corrected, as the case may be, within sixty (60) days of their occurrence, then the Source Code may be released to Client from escrow only upon (i) SS&C's entry of an order for relief under Title 11 of the United States Code; (ii) the making by SS&C of a general assignment for the benefit of creditors; (iii) the appointment of a general receiver or trustee in bankruptcy of SS&C's business or property; or (iv) action by SS&C under any state insolvency or similar law for the purpose of its bankruptcy, reorganization, or liquidation.

## SS&C TECHNOLOGIES, INC.
### Master Agreement

SS&C is party to a certain Software Escrow Agreement with EscrowTech International, Inc. (the "EscrowTech Escrow Agreement") pursuant to which SS&C may deposit into escrow certain software code for the benefit of clients of SS&C. The escrow of the Source Code shall be pursuant to the EscrowTech Escrow Agreement, subject to SS&C's right to terminate the EscrowTech Escrow Agreement, or Client's escrow thereunder, and to substitute the escrow with another escrow agent provided, however, that at no time will the Source Code not be escrowed with an escrow agent for the benefit of the Client. In addition, if the Escrow Agreement (including the EscrowTech Escrow Agreement) is terminated by the escrow agent, other than for Client's breach, or if the escrow agent suffers bankruptcy, insolvency or the appointment of a receiver or assignee for the benefit of creditors or ceases to provide the escrow services, SS&C shall use reasonable efforts to appoint another escrow agent to hold the Source Code in escrow, in accordance with another Escrow Agreement.

(b) Client's use of the Source Code. If the Source Code is released to Client in accordance with the Escrow Agreement, Client shall treat the Source Code as Confidential Information and shall provide the Source Code the security and protection required by Section 6.3 hereof. Under all circumstances, the Source Code shall remain the property of SS&C and Client shall have no proprietary or intellectual property rights to such Source Code, or any copyrights, patents, or trademarks, embodied or used in connection therewith, except for the rights expressly granted therein. The Source Code shall be subject to the restrictions set forth in Sections 2.2 and 2.3 hereof applicable to Software, except Client may use the Source Code solely to maintain the Software and for no other purpose. Maintaining the Software includes making corrections and fixes to Software bugs and errors and any modifications reasonably necessary in order to use the Software in light of industry developments and Client's internal needs. Client understands and agrees that, upon its release, the Source Code shall be provided "as is" and SS&C shall have no obligation to maintain the Source Code. SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Source Code. SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the Source Code provided hereunder and with respect to the use of any of the foregoing. Client shall have the right to retain possession of and use the Source Code in accordance herewith, and to continue to maintain the Software in-house for five years from the time that the Source Code is released to the Client as set forth herein ("The Period") except under circumstances where satisfactory provision has been made for the continued support of Client or where the cessation of support services is due to material breach of this Master Agreement by Client or Client terminates the maintenance and support services for its convenience. At the end of The Period, Client shall (i) return the Source Code, and all copies, in whole or in part, all documentation relating thereto, and any other information related thereto its possession that is in tangible form, (ii) purge all copies of the Source Code from all computer storage media, and (iii) furnish SS&C with a certificate signed by an executive officer of Client verifying that (i) and (ii) above have been done.

### 3.  Maintenance and Support

3.1     Software licensed under an Attachment A.x (or provided as an Application Service under and Attachment B.x) shall be accompanied with a Maintenance and Support Program ("Maintenance Program"). As part of a Maintenance Program, SS&C will provide telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades (collectively "Updates") to the Software and related documentation. SS&C reserves the right, however, (i) to develop and market new modules and add-on modules to the Software and/or new versions of the Software, which in SS&C's judgment contain such added functionality that an additional fee for such modules and/or versions is warranted; and (ii) to exclude such modules and versions from coverage as Updates under the Maintenance Program. Client's Use of the Updates is subject to the terms, conditions and disclaimers of this Master Agreement, but such Updates shall not be covered by any warranty in the Master Agreement. SS&C does not provide maintenance or support for any Third Party Software or any other third party products. All Updates provided by SS&C under the Maintenance Program are owned by SS&C and are Confidential Information.

3.2     Software Releases to be Supported. SS&C will, during the term of the relevant Maintenance Program, support two releases of the Software at any one time: (i) SS&C's generally available current production version of the Software and (ii) the production version immediately preceding such version.

3.3     Telephone Support. Telephone support consists of: (i) providing Software problem resolution, as described below, (ii) responding to Client's questions regarding implementation of such enhancements and modifications as SS&C may provide from time to time; and (iii) responding to Client's questions about use of the Software on a limited basis. Client may not use telephone support about Software use as a substitute for training in the use of the Software. SS&C charges additional fees for such training. SS&C will provide telephone consultation to Client as set forth in the relevant Attachment.

3.4     Problem in Using the Software. If, during the term of the relevant Maintenance Program, Client encounters a problem in using the Software, Client shall notify SS&C. SS&C will diagnose the problem. If SS&C determines that the problem is caused by an error in the Software, SS&C will correct it. If SS&C determines that the problem is not caused by an error in the Software, Client shall pay

# SS&C TECHNOLOGIES, INC.
## Master Agreement

SS&C, at SS&C's then current rates, for all work performed to diagnose and determine its cause plus travel time and reasonable expenses incurred in performing such work.

3.5     Maintenance Program Term and Termination. Unless otherwise specified in the relevant Attachment, for a perpetual license the initial Maintenance Program term for any Software licensed under an Attachment A.x will be effective on the Effective Date (the "Maintenance Program Effective Date") through and including the following December 31st. Thereafter, the Maintenance Program term shall be renewed automatically on an annual basis on each January 1st ("Renewal Date"), on the same terms and conditions subject to fee increase, unless terminated by either party by prior written notice of at least thirty (30) days prior to the expiration of the initial term or any renewal term.

In the case of a term license or an Application Service, the term of the Maintenance Program shall be concurrent with the term of the relevant Attachment and renewal shall be in accordance with the terms of Attachment.

3.6     Maintenance Program Fees. Initial annual Maintenance Program fees will be specified in the relevant Attachment A.x.   SS&C will invoice Client annually on or about the Renewal Date, and Client will pay the Maintenance Program fee within thirty (30) days of receipt of each invoice. The annual Maintenance Program fee payable hereunder for the second and each subsequent term may increase from the prior year's non pro-rated Maintenance Program fee by an amount which shall not exceed the percentage change in the United States Consumer Price Index (All Urban Consumers) as published by the United States Department of Labor, Bureau of Labor Statistics for the one year ending two months prior to the end of the initial Term or each renewal term (as appropriate) (US CPI). In no event will the Maintenance Program fee be less than the prior year's non-pro-rated Maintenance Program fee.

In the case of a term license or an Application Service, the Maintenance Program shall be included with the fees and increases shall be in accordance with the terms of Attachment.

3.7     Reinstatement After Client Termination. After Client has terminated the Maintenance Program for any Software, Client may notify SS&C that it desires to reinstate the Maintenance Program. SS&C may, in its sole discretion, determine whether or not to reinstate the Maintenance Program. If SS&C permits reinstatement, Client shall pay SS&C the full Maintenance Program Fees that Client would have paid if such Maintenance Program had remained in effect from the date of termination through and including the date of reinstatement. After such payment, SS&C will provide Client with the latest generally available release of the Software and related Documentation.

4.     **Professional Services**

4.1     Services. From time to time SS&C may, subject to the terms and conditions of this Master Agreement, perform certain services and/or provide or develop certain software or other products pursuant to work requests (each a "Work Request"). The terms and conditions of this Master Agreement are incorporated into and made a part of each Work Request. In the event of any inconsistency between the terms and conditions of this Master Agreement and any Work Request, the terms and conditions of the Work Request shall control.

4.2     Changes. Client may at any time request a change in any Work Request under this Master Agreement.

4.3     Change Procedure. To request a change, Client will request a change to a Work Request in writing. If the change requested is acceptable to SS&C, SS&C will estimate the resources required by the change and the effect of the change on any work in process. SS&C will then prepare a Work Request or amendment thereto and return it to Client. No action will be taken by SS&C on any requested change until a Work Request or amendment is signed by both parties.

4.4     SS&C Retains Ownership. All software, products, and/or deliverables provided by SS&C under any Work Request are owned by SS&C and are Confidential Information. Client's Use of the software, products, and/or deliverables developed under a Work Request is subject to the terms, conditions and disclaimers of the Master Agreement but such software, products, and/or deliverables shall not be covered by any warranty in the Master Agreement.

4.5     Fees. All fees are due and payable as specified in each Work Request hereunder. Where appropriate, each Work Request shall set forth estimated fees for the services to be performed.

4.6     Expenses. Client shall reimburse SS&C for expenses incurred by SS&C for reasonable travel, lodging, meals, telephone, shipping, duplicating and other direct expenses. SS&C will provide such supporting documentation for expenses as Client may from time to time reasonably request.

## SS&C TECHNOLOGIES, INC.
## Master Agreement

4.7    Timing of Billing.  Fees and expenses incurred will be billed to Client on a monthly basis or as stated on the applicable Work Request.  Fees and expenses are due and payable by Client upon receipt of SS&C's invoice.

### 5.    Other Services.

From time to time SS&C may, subject to the terms and conditions of this Master Agreement, provide other services such as Application Service, hosting service, data service or business process outsourcing service.  Such other services will be described in attachments attached to this Master Agreement numbered in sequence starting from B.1 (collectively, "Attachment  B.x").

### 6.    General Terms and Conditions

The following terms and conditions apply with respect to any licenses or services covered by this Master Agreement.

6.1    Fees and Expenses

6.1.1.    Fees and Late Days.  Client shall pay SS&C the fees specified in the relevant Attachment or Work Requests issued pursuant to this Master Agreement.

All amounts described herein are in United States dollars and are net of all sales, use, property and related taxes and customs duties.  All fees are due and payable as set forth in any Attachment or Work Requests.  A late payment charge of one and one-half percent (1½%) per month (annual rate of 18%), or the maximum rate allowed by law, whichever is less, will be added to (i) the License Fee if not paid on the due date and (ii) all amounts due under this Master Agreement if not paid within thirty (30) days of the due date.  If it should become necessary to turn this account over for collection, Client is responsible for all of SS&C's collection costs, including reasonable attorney's fees.

6.1.2    Taxes.  In addition to all other amounts required by this Master Agreement, Client shall pay or reimburse SS&C for all federal, state, and local sales, excise, use, or similar taxes based on payments to be made hereunder.  All taxes owed by Client hereunder shall become due and payable when billed by SS&C to Client, or when assessed, levied or billed by the appropriate tax authority, even if such billing occurs subsequent to expiration or termination of this Master Agreement.

6.2.    Disclaimer and Limitation of Liability

6.2.1    Disclaimer.  Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation.  SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the Software and the Documentation.

6.2.2    Exclusion of Consequential Damages and Absolute Limitation of SS&C's Liability.  SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for breach of this Master Agreement, whether alleged as a breach of contract or tortious conduct, even if SS&C has been advised of the possibility of such damages.  SS&C's liability under this Master Agreement for damages will not, in any event, exceed three times  in the aggregate the fees paid by Client to SS&C under the relevant Attachment or Work Request giving rise  to the claim for damages.

6.2.3    No Third Party Beneficiaries.  SS&C shall have no contractual or other obligations or liability to (i) ARMOUR Residential REIT, Inc. or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.

6.2.4    Allocation of Risk.  The provisions of this Section allocate risks under this Master Agreement between Client and SS&C.  SS&C's pricing reflects this allocation of risks and limitation of liability.

6.2.5    No Other Warranty.  Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid.  No employee, agent, representative or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

6.3.    Confidential Information

# SS&C TECHNOLOGIES, INC.
## Master Agreement

6.3.1    Client's Responsibilities.  The Confidential Information constitutes valuable trade secrets of SS&C.  Client shall use Confidential Information solely in accordance with the provisions of this Master Agreement.  Client shall use its best efforts to prevent unauthorized use or disclosure of Confidential Information.  Client will not disclose Confidential Information, or permit it to be disclosed, directly or indirectly, to any third party without SS&C's prior written consent.  Client bears no responsibility for safeguarding information that is (i) publicly available, (ii) already in Client's possession and not subject to a confidentiality obligation, (iii) obtained by Client from third parties without restrictions on disclosure, or (iv) independently developed by Client without reference to Confidential Information.  If Client is legally required to disclose Confidential Information, prior to such disclosure Client shall give notice to SS&C to permit SS&C to seek a protective order requiring that the Confidential Information be kept confidential.

6.3.2    SS&C's Responsibilities.  In the course of SS&C's performance of this Master Agreement, it may become privy to certain Client trade secrets and Client proprietary and confidential information ("Client Confidential Information").  SS&C shall use the Client Confidential Information solely in accordance with the provisions of this Master Agreement.  SS&C shall use its best efforts to prevent unauthorized use or disclosure of Client Confidential Information.  SS&C will not disclose Client Confidential Information or permit it to be disclosed, directly or indirectly, to any third party without Client's prior written consent.  SS&C bears no responsibility for safeguarding the confidentiality of information that is (i) publicly available, (ii) already in SS&C's possession and not subject to a confidentiality obligation, (iii) obtained by SS&C from third parties without restrictions on disclosure, or (iv) independently developed by SS&C without reference to Client Confidential Information.  If SS&C is legally required to disclose Client Confidential Information, prior to such disclosure SS&C shall give notice to Client to permit Client to seek a protective order requiring that the Client Confidential Information be kept confidential.

6.3.3    Notification of Unauthorized Access.  In the event that either party learns that a person or entity has gained unauthorized access to, or made an unauthorized disclosure of, the Confidential Information or the Client Confidential Information, as the case may be, the party learning of such access or disclosure shall immediately notify the other party in writing, providing the full particulars of such access or disclosure.

6.3.4    Injunctive Relief.  In the event of actual or threatened breach of the provisions of Section 6.3.1 or 6.3.2, the nonbreaching party will have no adequate remedy at law and will be entitled to immediate and injunctive and other equitable relief, without bond and without the necessity of showing actual money damages.

## 6.4.    Term and Termination

6.4.1    Term.  This Master Agreement will take effect on the Effective Date and will remain in force for so long as any attachment is in force or until terminated as set forth below in Section 6.4.2.  An Attachment may be terminated in accordance with its terms without terminating the Master Agreement. The Maintenance Program for any Software licensed on a perpetual basis may be terminated as set forth in the relevant Attachment A.x without terminating this Master Agreement or the perpetual Software license to which such Maintenance Program relates.

6.4.2    Termination for Material Breach or Insolvency.  SS&C or Client may, by written notice to the other party,  terminate this Master Agreement if any of the following events ("Termination Events") occur:  (a) Either SS&C or Client is in breach of any material term, condition or provision of this Master Agreement, or of any other agreement between SS&C (or any affiliate of SS&C) and Client (or any affiliate of Client), which breach, if capable of being cured, is not cured within thirty (30) days after the non-breaching party gives written notice of such breach; or (b) SS&C or Client (i) terminates or suspends its business, (ii) becomes insolvent, admits in writing its inability to pay its debts as they mature, makes an assignment for the benefit of creditors, or becomes subject to direct control of a trustee, receiver or similar authority, or (iii) becomes subject to any bankruptcy or insolvency proceeding under federal or state statutes.  If any Termination Event occurs, termination will become effective immediately or on the date set forth in the written notice of termination.  The provisions of Sections 1, 2.2 (second to last sentence only), 2.3, 2.8, 4.4, and 6 (except for Sections 6.7.14 and 6.7.15) will survive termination of this Master Agreement.

6.4.3    Obligations Upon Termination.   Within thirty (30) days after the date of termination of this Master Agreement or a license granted under an Attachment A.x for any reason whatsoever, Client shall (i) return the Software, and all copies, in whole or in part, all Documentation relating thereto, and any other Confidential Information in its possession that is in tangible form, (ii) purge all copies of the Software from all computer storage media, and (iii) furnish SS&C with a certificate signed by an executive officer of Client verifying that (i) and (ii) above have been done.

## 6.5.    Assignment

## SS&C TECHNOLOGIES, INC.
### Master Agreement

6.5.1    No Assignment.  Neither this Master Agreement nor any rights under this Master Agreement may be assigned or otherwise transferred by Client, in whole or in part, whether directly or by operation of law, without the prior written consent of SS&C, which consent shall not be unreasonably withheld.  For purposes of this Master Agreement: (i) a change of control of Client, sale of substantially all of the assets of Client and/or a merger or consolidation involving Client or any affiliate of Client effecting, directly or indirectly, a change of control of Client, shall be deemed to be an assignment or transfer of this Master Agreement and the rights under it by operation of law requiring the written consent of SS&C; (ii) a "change of control" shall be deemed to have occurred if any person or entity not in control of the Client before the Effective Date of this Master Agreement, thereafter acquires control of the Client; (iii) an affiliate of a person or entity is a person or entity that controls, is under common control with or is controlled by such other person or entity; (iv) control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise; (v) the terms "person" and "entity" include an individual, a corporation, partnership, association, trust, fund or any organized group of persons, whether incorporated or not and any receiver, bankruptcy trustee or similar official.

Any assignment or other transfer of this Master Agreement or the Software without the prior written consent of SS&C as required above shall constitute a material breach of this Master Agreement under Section 6.4.2(a). Subject to the foregoing, this Master Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and assigns.  Any attempted delegation, transfer or assignment prohibited by this Master Agreement shall be null and void.

6.6.    Notices

6.6.1    Notices.  Any notice required or permitted under the terms of this Master Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by first class certified mail, (c) sent by overnight courier, in each of (b) and (c) properly posted and fully prepaid to the appropriate address set forth below, (d) sent by facsimile, or (e) sent by e-mail.  Either party may change its facsimile number, e-mail address or its postal address for notice by notice to the other party given in accordance with this Section.  Notices will be considered to have been given at the time of actual delivery in person, three (3) business days after deposit in the mail as set forth above, or one (1) day after delivery to an overnight courier service, if sent by facsimile, notice will be considered delivered upon confirmation that the facsimile transmission has been successful by the transmission report denoting "OK" or any similar notation or if sent by e-mail, notice will be considered delivered upon confirmation of transmission.

If to SS&C:
SS&C Technologies, Inc.
80 Lamberton Road
Windsor, CT 06095
Attn: Legal Department
Fax: 860-298-4969
Phone: 860-298-4832
E-mail: notices@sscinc.com

If to Client:                                          Client's Billing Address:
ARMOUR Capital Management LP          ARMOUR Capital Management LP
3001 Ocean Drive                                3001 Ocean Drive
Vero Beach, FL 32963                          Vero Beach, FL 32963
Attn:    Chief Operating Officer            Attn: Accounts Payable
Fax:    +1 561-348-2408                       Fax: +1 561-348-2408
Phone:  +1 772-617-4340                     Phone: +1 772-617-4340
E-mail:  mrg@armourllc.com               E-mail:  accountspayable@armourllc.com

6.7.    Miscellaneous

6.7.1    Force Majeure.  Neither party will incur any liability to the other party on account of any loss or damage resulting from any delay or failure to perform all or any part of this Master Agreement if such delay or failure is caused, in whole or in part, by events, occurrences, or causes beyond its control and without its negligence, including without limitation, blackouts, acts of God, strikes, lockouts, riots, acts of war, terrorism, cyber-terrorism, earthquake, fire and explosions.  The inability to meet financial obligations is not a force majeure event.

6.7.2    Waiver.  Any waiver of the provisions of this Master Agreement or of a party's rights or remedies under this Master Agreement must be in writing to be effective.  Failure, neglect, or delay by a party in enforcing the provisions of this Master Agreement

## SS&C TECHNOLOGIES, INC.
### Master Agreement

or its rights or remedies will not be construed and will not be deemed to be a waiver of such party's rights under this Master Agreement and will not in any way affect the validity of the whole or any part of this Master Agreement or prejudice such party's right to take subsequent action.

6.7.3   Partial Invalidity.  If any term, condition, or provision in this Master Agreement is found to be invalid, unlawful or unenforceable to any extent, the parties shall endeavor in good faith to agree to such amendments that will preserve, as far as possible, the intentions expressed in this Master Agreement.  If the parties fail to agree on such an amendment, such invalid term, condition or provision will be severed from the remaining terms, conditions and provisions, which will continue to be valid and enforceable to the fullest extent permitted by law.

6.7.4   Entire Agreement.  This Master Agreement (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect thereto.

6.7.5   Modification.  This Master Agreement may be amended only by written agreement signed by both parties.

6.7.6   Headings.  The headings used in this Master Agreement are for convenience of reference only and are not to be used for interpreting it.

6.7.7   Export Control.  Client shall comply with all applicable export, re-export and foreign policy laws that may be imposed by the Canadian or United States government.

6.7.8   Counterparts.  This Master Agreement and any addendum or Work Request may be executed in counterparts, each of which when so executed will be deemed to be an original.  Such counterparts together will constitute one agreement.  Signatures may be exchanged via facsimile or electronic mail and the parties hereto agree that signatures so exchanged shall be binding to the same extent as if original signatures were exchanged.

6.7.9   Choice of Law; Choice of Forum.  This Master Agreement shall be interpreted, construed and in all respects governed under the laws of the State of Connecticut without regard to conflicts of law principles.  Any action, suit or proceeding related to any dispute, claim or controversy or otherwise related to the rights and obligations of the parties under this Master Agreement shall be brought in the Superior Court of the State of Connecticut, Hartford County or in the United States District Court for the District of Connecticut.  The parties hereto submit to the exclusive jurisdiction of such court.

6.7.10   No Solicitation.  SS&C and Client agree not to directly or indirectly solicit any employee of the other to leave the employ of the other.  The foregoing shall not prohibit either party from soliciting employment through newspaper advertisements or Internet postings so long as such means are not targeted specifically at the other party's employees.

6.7.11   Independent Contractors.  The parties are, and shall remain, independent contractors.  Except as provided herein, each party is not, and will not act as, an agent of the other party, nor shall either party or any of its employees be deemed to be employees of the other party and nothing in this Master Agreement shall be construed as creating a partnership, joint venture, an employer/employee relationship, an agent-principal relationship, or any similar relationship.

6.7.12   Authority to enter into Agreement.  Each party warrants that it has all necessary power and authority to enter into this Master Agreement and that this Master Agreement and performance hereunder does not violate the terms of any contract, covenant or agreement between it and any unrelated third party.  Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

6.7.13   Disclosure; Use of Client's Name.  SS&C is subject to United States federal and state securities laws.  SS&C may make disclosures required by such laws.  Subject to the confidentiality provisions of Section 6.3, SS&C may (i) refer to Client in generic client lists, new client announcements and product brochures and marketing materials indicating that Client is a client of SS&C; and (ii) issue a press release, subject to Client's prior reasonable review and consent, announcing that Client has engaged SS&C to provide software.  SS&C may disclose to third party vendors (including software vendors) that provide products and/or services that may be used by Client, or that are used in conjunction with SS&C's products or services, that Client is a client of SS&C and such other information that is reasonably needed by such third party vendors.

6.7.14   Right to Subcontract.  SS&C may subcontract or delegate the performance of any services under this Master Agreement or any Attachment or Work Request.  SS&C shall remain responsible for all its obligations under this Master Agreement or

## SS&C TECHNOLOGIES, INC.
### Master Agreement

any Attachment or Work Request, as the case may be, notwithstanding any subcontracting or delegation of the performance of such obligations. SS&C shall ensure that any third party performing services under this Master Agreement or any Attachment or Work Request on SS&C's behalf complies with all of SS&C's obligations hereunder.

6.7.15    Use of Affiliates.  In carrying out its duties pursuant to this Master Agreement or any Attachment or Work Request, some of the services for the Client may be delegated by SS&C to one or more of its affiliates.

6.7.16    Time Limit to Claim Breach.  No action arising out of any breach or claimed breach of this Master Agreement or transactions contemplated by this Master Agreement may be brought by either party more than one (1) year after the cause of action has accrued.  For purposes of this Master Agreement, a cause of action will be deemed to have accrued when a party knew or reasonably should have known of the breach or claimed breach.

6.7.17    Voidability at SS&C's Option.  This Master Agreement shall be voidable at SS&C's option if Client does not enter into and deliver it on or before December 19, 2014.

6.7.18    Attachments and Work Request as of the Master Agreement Effective Date:
- A.1
- B.1
- Work Request One

IN WITNESS WHEREOF, the parties have executed this Master Agreement as of the dates set forth below.

ARMOUR Capital Management LP                    SS&C Technologies, Inc.

By _____             By _____

Name    James R. Mountain                       Name    _Normand A Salonge_

Title    Chief Financial Officer                Title    _President + 100_

Date    December 19, 2014                        Date    _12/19/14_

Address    3001 Ocean Drive, Suite 201          Address _____

Vero Beach, FL 32963                            _____

# SS&C TECHNOLOGIES, INC.
## Master Agreement

### ATTACHMENT A.1- License and Maintenance Program

## I. SOFTWARE LICENSE

### A. Software Licensed under this Attachment A.1 (the "Software" for purposes of this Attachment A.1):

CAMRA™ for Microsoft® SQL Server™
The following product modules are included:
- CI Manager™
- Impairments Manager™
- Report Express™
- Extend™
- TBA Dollar Roll™

Debt & Derivatives™
The following product module is included:
- Swaps™

**B. License Term:** Perpetual as set forth in Section 2.2 of the Master Agreement.

**C. License Fees:** $500,000, which sum is due and payable prior to the Effective Date of the Master Agreement. The License Fee is based on the total dollar value of the assets to be managed from time to time by Client using the Software (the "Asset Value"). For the purpose of this Attachment A.1, "manage" shall mean use of the Software in any fashion whatsoever in connection with any asset(s), and "asset(s)" shall mean any long, third-party financial interest of any nature whatsoever managed by the Software.

Additional License Fees: If the Asset Value appreciates or increases as a result of the operation of Client's business in the ordinary course, then no additional License Fee will be due hereunder. For purposes of clarity raising of additional capital through the issuance of stock or the use of leverage by ARMOUR Residential REIT, Inc. or JAVELIN Mortgage Investment Corp. shall be considered business in the ordinary course.

However, if the Asset Value increases as a result of the addition of new assets to be managed by Client using the Software resulting from or in connection with (i) a merger, or acquisition of substantially all the stock or assets of another entity, (ii) entering into a management agreement with a new entity where Client will manage assets using the Software, or (iii) any other extraordinary acquisition or occurrence, involving or effected by Client or any affiliate of Client, or otherwise (such new assets shall be referred to herein as the "Incremental Assets", and each such addition a "Triggering Event"), then an additional, incremental license fee (plus an increase in annual maintenance equal to twenty percent (20%) of such license fee regardless of any limitation which may exist in Section 3.6 of the Master Agreement) will be immediately due and owing in an amount equal to SS&C's then standard license fee to use the Software to manage assets equal in amount to the Incremental Assets value (as determined jointly by SS&C and Client based upon the parties' pre-determined criteria). In the event that Client merges with or acquires substantially all the stock or assets of another entity which is also a licensee of the Software, then no additional license fee shall be owed, but the maintenance fees for each entity shall continue.

Client will report to SS&C the occurrence of a Triggering Event and the Incremental Assets value within thirty (30) days after such an event. Client will provide SS&C with all backup documentation and other substantiating information of the Incremental Assets value upon request by SS&C. If Client fails to report a Triggering Event and/or fails to report or underreports the Incremental Assets value, then SS&C may terminate this Attachment A.1 for material breach after the cure period, pursuant to the provisions of Section 6.4.2 of the Master Agreement.

### D. Additional Restrictions:

1) Use means use by Client of the Hosted Software and all Third Party Software provided by SS&C, for Client's own internal information processing services and computing needs and for Client to support of ARMOUR Residential REIT, Inc. and JAVELIN Mortgage Investment Corp.

2) Installation Address:
- If the Software is hosted pursuant to Attachment B.1:
SS&C Technologies, Inc.
80 Lamberton Rd.

## SS&C TECHNOLOGIES, INC.
### Master Agreement

Windsor, CT 06095

- If the Client takes delivery of the Software pursuant to section G below:
  ARMOUR Capital Management LP*
  3001 Ocean Drive
  Vero Beach, FL 32963

*Use is restricted to a single active server at the installation address above or such other installation address as Client may provide from time to time. Simultaneous use at multiple Sites or on separate servers is authorized only upon payment of SS&C's then standard multi-site licensing fees.*

**E. Limited Warranty:** SS&C warrants that as of the Effective Date and for three hundred sixty-four (364) days thereafter, the Software will perform in substantial accordance with the Documentation. If during such period, Client believes that the Software does not perform as warranted, Client shall notify SS&C of the purported failure to perform. SS&C shall investigate such purported failure to perform, and if SS&C determines that the Software does not substantially perform in accordance with the Documentation, then SS&C shall undertake to correct the Software, or replace the Software free of charge. If neither of the foregoing is commercially practicable for either SS&C or Client or is not completed within a reasonable time from the date of the Client's notification of the failure to perform, upon thirty (30) days advance written notice, Client may terminate the license granted with respect to the Software and receive a refund of the corresponding License Fee and any additional license fees paid by the Client, unless otherwise agreed by the parties.    The warranty set forth above is made to and for the benefit of Client only.  The warranty will apply only if:  (a) the Software has been properly installed and used at all times and in accordance with the instructions for Use; and (b) no alteration, modification or addition has been made to the Software by persons other than SS&C.

**F. Third Party Software Provided by SS&C.**  SS&C is providing the following Third Party Software:

Crystal Reports Version 2011 (five named user license). Provided by SS&C for no additional fee..  The SAP terms and conditions found on the Crystal Reports software will apply.

Included with the Software for no additional fee is a runtime license in the database management software PFXplus™, which is required to Use the Software (PFXplus is a registered trademark of the POWERflex Corporation of Victoria, Australia).

**G. Delivery of Software:**  Provided that the Client's license to the Software has not been terminated pursuant to the terms of the Master Agreement, Client may request delivery of the Software at any time.

## II.    MAINTENANCE PROGRAM

**A. Maintenance Program Fees:**  The initial annual maintenance program fee is $100,000, which sum is due and payable prior to the Effective Date of the Master Agreement.  The first Renewal Date is January 1, 2016.

**B. Support Hours:**  SS&C will provide telephone support to Client with respect to the Software for no additional charge during SS&C's business hours of 8:30 a.m. to 5:30 p.m. Eastern Time Monday through Friday, excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).

# SS&C TECHNOLOGIES, INC.
## Master Agreement

**ATTACHMENT B.1- Hosting, Process Automation and Data Management Services ("Hosting Services")**

**A. Hosted Software:**   CAMRA™ 'S'™ for Microsoft® SQL Server™ (15 named users)
The following product modules are included:
- CI Manager™
- Impairments Manager™
- Report Express™
- Extend™
- TBA Dollar Roll™

Debt & Derivatives™ (15 named users)
The following product module is included:
- Swaps™

**B. Term:** This Attachment B.1 shall remain in full force and effect for a term of five (5) years from the Effective Date (the "Initial Term") and will thereafter automatically renew for additional one (1) year periods (the "Renewal Term"), unless otherwise terminated as provided by the Master Agreement or this Attachment B.1. Either party may terminate this Attachment B.1 following the Initial Term or any Renewal Term by giving the other party written notice at least thirty (30) days prior to the end of the Initial Term or any Renewal Term. Notwithstanding the foregoing, the Client may terminate this Attachment B.1 for any reason or no reason at all by giving SS&C one hundred twenty (120) days prior written notice.

**C. Fees:** The monthly fee for the Hosting Services in Attachment B.1 is $10,000 USD. The first month's payment is due prio to the Effective Date. Subsequent payments are due and payable monthly in advance. If Client requires additional users for the Hosted Software, then an additional, incremental monthly fee will be immediately due and owing in an amount equal to SS&C's then standard fee.

Following the Initial Term, beginning with the first Renewal Term, the Hosting Services fees may be increased by SS&C at the commencement of each Renewal Term. SS&C shall notify Client of any such increase in the Hosting Services fees in writing at least ninety (90) days prior to commencement of the Renewal Term in which such an increase is effective.

**D. Hosting, Process Automation and Data Management Services:** SS&C will maintain for Client the Hosted Software processing environment through SS&C's processing center in Windsor, CT. The Client will have on-line access to the Hosted Software. The description below specifies the Hosting, Process Automation and Data Management Services that SS&C will provide under this Attachment B.1.

1. Provisioning and Maintenance of the Hosted Software in SS&C's Data Center, including:
   - Physical and virtual technology infrastructure for hosting of licensed software as described in this Attachment B.1.
   - Physical and virtual infrastructure allowing network connectivity and remote (user level) access to hosted environments
   - Segregated databases for Client, in a shared infrastructure environment, up to an aggregate total of 50 GB of storage
   - Data center operations staffing and support, including periodic infrastructure maintenance and availability monitoring
   - Environmental support for infrastructure operations including but not limited to data center floor space, power, heating and cooling, physical security systems, UPS systems and diesel generator back-up
   - Data backup and storage as described in this Attachment B.1. Standard services include nightly tape backup stored onsite, weekly tape backup stored at an offsite facility for a rotating five weeks, monthly tape backup stored offsite for twelve months and yearly tape backups stored offsite for ten years and disposed of shortly after the eleventh anniversary. Increased levels of data protection and backup are available at additional cost.
   - Disaster recovery to an alternate data center site (within 48 hours of an outage)

2. System Access Controls
   - Ongoing administration of user access rights in response to client requests. Client is responsible for timely notification to SS&C of relevant user account additions and deletions.
   - Network password administration in accordance with Client standards
   - Network security in accordance with SS&C security policy and standards

## SS&C TECHNOLOGIES, INC.
## Master Agreement

3. Communications
   - Maintenance of internet connectivity for Client access
   - Provisioning of secure, internet-based CITRIX software connectivity for access to the Hosted Software

4. Database and Operating System Maintenance
   - Periodic maintenance updates of operating system and database platform software
   - Installation of database and operating system software releases in accordance with SS&C platform currency standards.

5. Licensed Software Release and Upgrade Support
   - Coordination of upgrade schedules in conjunction with Client
   - Installation of new Hosted Software releases and updates provided that Maintenance Program services pursuant to Section 3 of the Master Agreement have not been terminated
   - Migration of Hosted Software releases and updates to production environment
   - Provide an environment for Client testing of releases

6. Monitoring Services
   - System availability monitoring
   - Network monitoring
   - Server and storage utilization monitoring
   - Antivirus and security monitoring

7. Batch Processing Data Management Operations and Support
   - Daily import and load of trades from Client and AVM
   - Daily import of market pricing from Bloomberg and IDC
   - Daily import of Client-provided cash flows
   - Daily import of transactions from Citibank as custodian
   - Daily export of holdings information to BlackRock Solutions
   - Daily extract of open positions to AVM
   - Monitoring of the nightly process and timely response to interruptions
   - Notification to Client of nightly process status
   - Proactive issue resolution and escalation to Client as required

8. Disaster Recovery
   - Disaster recovery infrastructure will be maintained at an alternate physical location from the primary production data center hosting facility. In the event of a critical primary data center failure, the Client's infrastructure will be made available for access in the alternate location within 48 hours of critical failure declaration, with a maximum data loss of 24 hours worth of processing.
   - SS&C will accommodate one annual DR testing event in partnership with Client, with a minimum of 30 days of notification of the testing event.

### E. Service levels:

SS&C shall deliver its Services under this Attachment B.1 in a professional and workmanlike manner.
   - "System Availability" is defined as the percentage of time that the Hosted Software is available for processing during Business Hours during a calendar month, outside of scheduled maintenance periods.
   - Regular maintenance periods with corresponding scheduled system unavailability will occur on a monthly basis, every second Sunday of the month, from 6:00AM to 12:00PM Eastern US time.
   - Scheduled Exception maintenance may occur infrequently in addition to regular maintenance periods, and will be performed with a minimum 30 days notice to Client.
   - Unscheduled exception maintenance, with 24 hours of notice or less, may occur in emergency change situations.
   - The System Availability standard shall be 99%.
   - If SS&C fails to provide 99% System Availability for two consecutive months, Client may notify SS&C in writing regarding the specific failure by SS&C. If SS&C fails to provide 98 % System Availability for three consecutive months,

## SS&C TECHNOLOGIES, INC.
## Master Agreement

and Client previously provided SS&C with written notice following the second consecutive month of failed delivery in accordance with this paragraph, then Client may terminate this Attachment B.1 for breach.
- Support for hosting issues is available 24x7 on regular business days
- Application support services are available from 5:00AM to 11:59 PM Eastern US time
- Problem Identification and Resolution

SS&C and Client will each take direct responsibility for notification of selected personnel for the purpose of prompt resolution of processing problems. In the event that Client reports a severe or critical issue, SS&C will respond as quickly as practicable and continue to work with the Client to resolve the issue or develop a work around that allows the Client to continue processing. SS&C and Client will mutually develop and agree to a problem identification process and procedure after execution of the Agreement.

### F. Client Responsibilities:

- Designate responsible system administration liaison with SS&C
- Designate and maintain Client primary and secondary escalation contacts for batch operations issue escalation
- Maintain Hosted Software trained operations staff
- Validate financial results of each new release of the Hosted Software prior to its being placed into production
- Maintain and support appropriate communication facilities at Client site for hosting connectivity
- For Client provided, and client-managed data sources, prepare and upload all required input data in CAMRA™ 'S™ for Microsoft® SQL Server™ / Debt & Derivatives™, in standard SS&C-defined formats to a designated secure FTP site according to agreed-upon processing schedules.

### G. Return of Data:
- Following termination of this Attachment B.1 SS&C shall upon written request, promptly return to Client, in the format and on the media in use as of the date of request, all, or any requested portion of, the Client Data.

# SS&C TECHNOLOGIES, INC.
## Master Agreement

### WORK REQUEST ONE- Initial Implementation Services

Description of Services to be Performed. SS&C will provide on-site and remote implementation services including business workflow analysis, environment setup, data conversion analysis, interface development and testing in support of Client's implementation of the Software.

Assistance will include the following:
- Project Management, Governance and Business Process Review
  - o Project Governance including assistance with project management, issue tracking, status reporting, and project and steering committee meetings.
  - o Project kickoff and review of the SS&C file formats and conversion processes.
  - o Business process review, operational model confirmation and assistance with development of process and procedures for Software usage.
  - o Technical Accounting Support to assist the Client in establishing the proper accounting treatments for each asset class.

- Environment Set-up, Configuration and Data Conversion
  - o Software installation including technical assistance in the establishment of the operating environment supporting the Software.
  - o Assistance with creating Client required interfaces / connections for receiving daily trades, market data, custody feeds, and swaps transactions.
  - o Assistance with the mapping of static data to support Clients use of the Software to include, but not limited to; Security Masters, Issuers, Brokers, Security Types, Custodians, etc.
  - o Assistance with the establishment of a general ledger chart of accounts and associated posting rules.
  - o Create an extract of open positions for BlackRock.
  - o Assistance with the conversion of initial open positions as of 12/31/2014.
  - o Implementation training.
  - o Provide assistance with mapping of source data to SS&C documented upload file formats to facilitate data conversion.
  - o Implementation and training support for the Software and following modules:
    - CI Manager™ - Consult with Client on establishing connectivity with Client's custodian for the receipt of daily cash and holdings files.
    - Impairments Manager™ - Assist and consult with Client on establishing their impairment rules in CAMRA.
    - Crystal/Report Express™ - train the Client on the database schema, Crystal Reports and the Report Express module.
    - Extend™ - Configure and train on the implementation of Extend and consult with Client on custom data storage and reporting requirements.
    - TBA Dollar Roll™ - train the Client on the use of the TBA module in CAMRA.
    - Swaps – training on the setup and use of the Swaps module.
  - o Perform a production financial analysis and reconciliation of yields and book values as of 12/31/2014 with the Client.
  - O Testing support for core software products and module including support for interfaces, cash flow updates, Bloomberg feeds, general ledger and reporting.
  - o Production conversion assistance with the loading of 12/31/2014 open positions as provided by Client into the CAMRA database.
  - o Transaction catch-up support for an estimated two months until transactions are being processed daily by Client.

Applicable Rate. SS&C shall provide an estimated 1,850 hours of support in relation to the services described above on a time and material basis at a rate of $225 per person per hour and based on the assumptions set forth below. Travel time to and from Client's site will not be billable.

#### Assumptions

The services described above are based on the following assumptions:
- Project duration of 4-6 months
- This is a point in time conversion; no historical activity will be loaded as part of this conversion (all open trade lots as of the agreed upon point in time conversion date will be loaded).
- 2 accounting bases are required by Client, US GAAP and Tax.

## SS&C TECHNOLOGIES, INC.
## Master Agreement

- The Client will create and support the required SS&C file formats to load the static data, security masters, security attributes, cash flows, yield curves, floating rates, initial conversion positions, ongoing transactions, custodian and market data to the Software.
- The Client will provide the initial positions in the SS&C electronic format.
- A similar General Ledger chart of accounts is being used for each entity.
- Client will obtain all necessary third party data licenses (e.g. Bloomberg, IDC, Intex).
- Client will provide access to month end bank and reconciliation statements for the transaction catch-up process.
- Client will be responsible for completion, review and signoff of monthly reconciliations. SS&C will be available to assist.
- Development of a general ledger interface is not required as part of this effort.
- Standard Report Express reports will be used. Any additional interfaces or reports will be reviewed during the implementation and developed on a time and materials basis.
- Client, including any requisite vendors, will have knowledgeable staff to participate in the project as required.

SS&C will provide information related to the usage of billable hours as part of our project reporting.

If there is a change in the services described in this Work Request One that is requested by Client and requires SS&C to perform additional work, such additional work shall be billed to Client on a time and materials basis at the rates set forth above. All fees and expenses incurred will be billed to Client monthly and are due and payable upon receipt of SS&C's invoice.

Other Services. If Client requests any services in addition to the services specified in this and any other consulting engagement under the Master Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another Work Request.

# EXHIBIT B

DocuSign Envelope ID: 9FDA39FD-1FF0-43AF-933F-D723CB46484D

# SS&C Technologies Inc
# Work Request Two

This Work Request No. Two ("WR") is issued pursuant to, and incorporates the terms of, the Processing Services Agreement dated December 19, 2014 as amended (the "Agreement") by and between ARMOUR Capital Management LP, ("Client") SS&C Technologies Inc. ("SS&C"). The parties intend that this WR establishes a cap on fees for the services set out herein and in Work Request One, which was attached to the Agreement.

<u>Effective Date of this WR.</u>  This WR will be effective as of March 31, 2016.

<u>Description of Services to be Performed.</u>  In addition to the services and assumptions set out in Work Request One, SS&C will provide on-site and remote implementation services for the rolling forward through March and the assistance of April processing.

Assistance will include the following:
- Implementation Services:
    - Daily Processing
    - Month end Reconciliations
    - GL Processing
    - Generating Trial Balances

<u>Fixed Fee for Completion.</u>  SS&C shall provide implementation services described above for a fixed fee of $728,725.  The breakdown of this fixed fee is as follows:

- $421,425 has been paid thru  April 15, 2016
- $307,300 will be invoiced and payable upon Completion of the Implementation

If there is a change in the services described in this WR that is requested by Client and requires SS&C to perform additional work, such additional work shall be billed to Client on a time and materials basis at the rates set forth above and described in a new or updated work request.

Out-of-pocket expenses incurred will be capped at $25,000.  All fees and expenses incurred will be billed to Client as set out above and are due and payable upon receipt of SS&C's invoice.

<u>Completion of Implementation.</u>  Implementation will be considered complete when Client personnel have successfully processed one complete month of transactions using CAMRA as implemented ("Completion of Implementation").

<u>SS&C Obligation.</u>  As part of the Maintenance Program, SS&C is obligated to correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades (collectively "Updates") to the Software and related documentation.

<u>Counterparts</u>.  This WR shall be executed in counterparts, each of which when so executed will be deemed to be an original.  Such counterparts together will constitute one agreement.  Signatures may be exchanged via facsimile or electronic email and the parties hereto agree that signatures so exchanged shall be binding to the same extent.

<u>Other Services.</u>  If Client requests any services in addition to the services specified in this and any other consulting engagement under the Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another Work Request.

<u>Entire Agreement</u>.  This WR (including any attachments and addenda hereto), along with Work Request One and the Agreement, contains the entire agreement of the parties with respect to its subject matter.  Unless otherwise agreed by this WR, the Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this WR as of the date of the last signatory hereof.  Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

*(Signatures Follow)*

1

DocuSign Envelope ID: 9FDA39FD-1FF0-43AF-933F-D723CB46484D

## SS&C Technologies Inc
## Work Request Two

ARMOUR Capital Management LP

BY

NAME:  James R. Mountain

TITLE:  Chief Financial Officer

DATE:  April 19, 2016

SS&C TECHNOLOGIES, INC.

DocuSigned by:

B6590EB70930465...

BY:

NAME: Normand Boulanger

TITLE: President & COO

DATE:  April 20, 2016

2

# EXHIBIT C

DocuSign Envelope ID: 202DF643-C2F6-4C65-9340-526A9B2FC436

## SS&C Technologies Inc
## Work Request Three

Work Request No. Three ("WR Three") pursuant to the Processing Services Agreement dated December 19, 2014 as amended (the "Agreement") by and between ARMOUR Capital Management LP, ("Client") SS&C Technologies Inc. ("SS&C").

Effective Date of this WR Three. This WR Three will be effective on the later of the dates on which the Client and SS&C have signed it.

Description of Services to be Performed. SS&C will provide on-site and remote implementation services for the application of PGAAP due to the Javelin acquisition by ARMOUR

Assistance will include the following:

- The MGMT basis will be set up to amortize based upon the original purchase yield
- Update workflow to include review of the MGMT basis due to the need to maintain a GAAP book of record prior to the PGAAP adjustment
- GAAP Basis will be adjusted to the market value on 4/07/16 and yields on holdings will be reset as of the new book value
- Ensure that the Tax basis rolls year to date thru 4/6/16 utilizing yields equivalent to the GAAP basis prior to the PGAAP adjustment.
- Create manual General Ledger sweep entries for the GAAP basis to account for the PGAAP adjustment (PGAAP upload does not generate general ledger entries)
- ARMOUR will need to provide sign off before April processing can continue post 4/07/16. Any delay in sign off will result on a delay in completing April processing

Fixed Fee for Completion. SS&C shall provide an estimated 120 hours of support in relation to the services described above on a time and material basis at a rate of $225 per person per hour. All fees and expenses incurred will be billed to Client as set out above and are due and payable upon receipt of SS&C's invoice

Counterparts. This WR Three shall be executed in counterparts, each of which when so executed will be deemed to be an original. Such counterparts together will constitute one agreement. Signatures may be exchanged via facsimile or electronic email and the parties hereto agree that signatures so exchanged shall be binding to the same extent.

Other Services. If Client requests any services in addition to the services specified in this and any other consulting engagement under the Master Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another Work Request.

Entire Agreement. This WR Three (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to its subject matter. Unless otherwise agreed by this WR Three, the Master Agreement remains in full force and effect.

Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

| ARMOUR Capital Management LP. | | SS&C Technologies Inc. | |
|---|---|---|---|
| By | | By | |
| Name | James R. Mountain | Name | Normand A. Boulanger |
| Title | CFO | Title | President, COO |
| Date | April 19, 2016 | Date | April 20, 2016 |
| Address | | Address | 80 Lamberton Road, Windsor, CT 06095 |