# EXHIBIT H
# (Excerpted Hrg Transcript, Dkt#74, dated Mar. 2, 2018, FNs 9,10, & 20)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                           :
ARMOUR CAPITAL MANAGEMENT LP,    :   No. 3:17CV790(JAM)
                           :
               Plaintiff    :
                           :
         v.               :
                           :
SS&C TECHNOLOGIES, INC.,       :
                           :   New Haven, Connecticut
            Defendant    :   March 2, 2018
                           :
- - - - - - - - - - - - - - - x

TELEPHONIC DISCOVERY CONFERENCE

B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

 

Diana Huntington, RDR, CRR
Official Court Reporter

1    there any reason why you can't do it either of those days?

2              MS. KERNISKY:  Checking now, Your Honor.

3              MR. MAMOUNAS:  Judge, did you say April 3 and 4?

4              THE COURT:  Yes, those are the days I'm

5    eyeballing on the calendar here.

6              MR. MAMOUNAS:  That works on our end.

7              THE COURT:  Is that Mr. O'Connor?

8              MR. MAMOUNAS:  No, this is Mr. Mamounas.

9              MR. O'CONNOR:  It works for me as well.

10             THE COURT:  So it works for Mr. O'Connor and

11   Mr. Mamounas and all other counsel involved, I take it?

12             MS. KERNISKY:  Yes.

13             THE COURT:  So we'll check and nail down one of

14   those two dates and enter that as a docket order.

15             So let me sort of, as a run-up to that day when

16   we get together in person, try to understand a little bit

17   more about the discovery issues, essentially mostly trying

18   to identify what's at stake here.

19             It seems to me that the key dispute or the one

20   that's most prominently featured in your papers is ACM's

21   request to try to obtain information about the other REIT

22   clients, Bimini, Fortress, and Resource.  And that

23   essentially SS&C's position is, as to Fortress and

24   Resource, those are not relevant and should not be

25   discoverable at all; and as to Bimini, it seems that

Case 3:17-cv-00790-JAM Document 162-9 Filed 10/04/18 Page 4 of 42
Case 3:17-cv-00790-JAM Document 74-9 Filed 03/09/18 Page 6 of 74

6

1    there's been some agreement already by SS&C to produce

2    some subset of the documents as to Bimini.  Does that

3    sound right, basically?

4            MR. O'CONNOR:  Yes.  This is Mr. O'Connor.

5            THE COURT:  Okay.  And have you all reached an

6    agreement about when those documents will be produced as

7    to Bimini?

8            MS. KERNISKY:  Well, Your Honor, this is

9    Ms. Kernisky for plaintiff, if I could, briefly.

10           We've reached agreement, SS&C has agreed to

11   provide documents.  We have not reached agreement on the

12   scope of those documents.  We have, as you've seen,

13   proposed a very narrow set of custodians and very narrowly

14   tailored search terms based on words that we pulled

15   directly from SS&C's emails on these issues.  And SS&C has

16   objected to that and they've attempted to further reduce

17   the number of custodians, and they said they would agree

18   to 10 of our search terms.  The reason for that, according

19   to them, is the burden of the search that we proposed.

20   When they ran that search, they found hundreds of

21   thousands of documents.

22           So we would propose, rather than them

23   arbitrarily pick terms and custodians, that we would

24   together look at the search reports, see which of the

25   terms they ran are overbroad.  You can tell by each term

1     how many documents were found, and if some of the terms

2     had 100,000 documents or are obviously not working, then

3     we would eliminate those terms or try to edit them in a

4     way that would make the results more manageable.  It seems

5     like, you know, working together, that makes sense as

6     opposed to SS&C arbitrarily picking the terms, but that's

7     the progress we've made.  We haven't gotten any further

8     down that road other than that.

9          And I would just remind Your Honor that these

10    are documents that we've been waiting on since back in

11    September.  So we're bringing it before you now to try to

12    expedite what's been a very lengthy process.

13         THE COURT:  Mr. O'Connor, looking at your letter

14    of March 1, you state, middle of Page 2, that SS&C has

15    agreed to provide certain discovery regarding Bimini's

16    implementation.  What is that certain discovery that you

17    believe you've agreed to?

18         MR. O'CONNOR:  Yes, so we would agree to three

19    to four custodians, as opposed to nine, and more narrow

20    search terms so that we would get it down to 400,000

21    documents and that we would work in collaboration with the

22    other side.

23         Right now there are nine custodians, which is

24    half of the total custodians for the case.  And then

25    again, you know, I think 20, 30 search terms that they

Case 3:17-cv-00790-JAM Document 162-9 Filed 10/04/18 Page 6 of 42
Case 3:17-cv-00790-JAM Document 74-9 Filed 03/09/18 Page 6 of 7

8

1    wanted, so we would narrow it down to 10 to try to get it

2    to a manageable number.

3            Your Honor, just to be absolutely clear, every

4    time ARMOUR was mentioned in any documents in any concept,

5    any resource issue, anything, those documents have been

6    produced.  So this is -- this is -- we would go to a level

7    of abstractions and to other clients where they want to

8    either duplicate or triplicate or quadruple the amount of

9    discovery.

10           THE COURT:  Okay.

11           MS. KERNISKY:  Your Honor --

12           THE COURT:  Hold on a second.

13           So Mr. O'Connor, Ms. Kernisky is proposing

14   essentially that she collaborate with you to try to figure

15   out, given the fact that you're conceding that you will

16   produce some Bimini documents or, as you say, certain

17   discovery regarding Bimini implementation --

18           MR. O'CONNOR:  Yes.

19           THE COURT:  -- she's essentially saying maybe

20   you have a point about there being too much of a burden

21   and she wants to sit with you and work through that and

22   try to come to some sensible compromise.  Can you not do

23   that?

24           MR. O'CONNOR:  Fair enough.  Yes.  We will agree

25   to that.

Case 3:17-cv-00790-JAM Document 162-9 Filed 10/04/18 Page 7 of 42
Case 3:17-cv-00790-JAM Document 74 Filed 03/09/18 Page 9 of 27

9

1          THE COURT:  Ms. Kernisky, does that satisfy you

2    there at least in the interim?

3          MS. KERNISKY:  Yes, Judge.

4          I would ask, though, for possibly a time limit

5    on such an agreement and a time limit for producing those

6    documents.

7          I mean, I will tell you that we have been trying

8    to work with Bimini -- I'm sorry, SS&C.  And what happened

9    is after the hearing, the initial hearing in September

10   when we first brought this to Your Honor's attention, they

11   told us that they had an issue with the search term

12   "uncompleted," with the term that we had put in our

13   request "uncompleted implementation."  And I can go into,

14   you know -- I think it sounds to me like you're not

15   wanting to hear the reasons about that right now, but I

16   can go into them.  But let me just say on that, we agreed

17   that -- they told us that if we issued a new request for

18   documents that didn't use the term "uncompleted

19   implementation" that they would produce what they had for

20   Bimini.  So we did that.  We issued a new request.  It's

21   Number 3 in our December 22 request.  And you'll see it

22   simply says documents relating to Bimini implementation.

23          In response to that request, what we finally

24   ultimately got from them were simply the external

25   communications, meaning emails that SS&C had sent to

1     Bimini, and not the internal communications talking about

2     Bimini and these resource allocation issues and the

3     problems with the implementation that are at the very

4     heart of our dispute here.  And the external

5     communications were further limited by they only were for

6     the year of 2017 even though our relevant period here is

7     2014 to 2017.

8             So I'm a little -- I'm more than willing and

9     happy to cooperate with opposing counsel.  I'm a little

10    hesitant to agree without some sort of direction because

11    they have a habit of agreeing to work with us and then

12    giving us things that have been parsed in a way that were

13    not part of the original understanding.

14            THE COURT:  Okay.

15            And Mr. O'Connor?

16            MR. O'CONNOR:  That's absolutely false.

17            In terms of Bimini, Bimini is still a customer

18    of SS&C's, paying customer.  And we fundamentally disagree

19    with any characterization that they have to suggest that

20    we didn't produce in accordance with the Court's original

21    order.

22            And what I would note, Your Honor, is that they

23    were -- so Bimini and ARMOUR were formerly the same

24    company.  And the executives are close friends.  They live

25    in the same town.  They used to share offices.  And they

1    share the same IT director.

2              So when we were back in September arguing before

3    Your Honor, ARMOUR had every bit of information that it

4    now presents as this case is -- where it's expanded

5    discovery.  They had every bit of it.  And so they've been

6    playing games with us.

7              Our position is that Bimini was -- that

8    everything that needed to happen on the SS&C end for

9    Bimini happened, you know, in terms of my client's

10   performance, as is the case with ARMOUR.  And the reality

11   is that Bimini, like the other three customers, are all

12   paying clients of SS&C, all remain paying clients of SS&C.

13   And it's an undisputed fact that this dominant asset

14   accounting platform in the mortgage real estate market is

15   SS&C's and there's no other competitor that's even close.

16   So that the suggestion that this is, you know, that we've

17   been peddling something that doesn't work or can't be

18   implemented is preposterous.  This is a 30-year-old

19   product that's been implemented with hundreds of clients

20   across --

21              THE COURT:  Okay.

22              MR. O'CONNOR:  -- every class --

23              THE COURT:  Okay.  So I think I've heard enough

24   at this point.

25              What I'm going to do is require within the next

1    ten days, by a week from Monday, for you, Mr. O'Connor and

2    Ms. Kernisky, to negotiate an agreement concerning the

3    search terms I think that Ms. Kernisky referred to and the

4    number of custodians, try your best efforts to identify

5    that.

6              I'm not going to limit the time frame to just

7    2017.  I think 2014 to 2017 is an appropriate time frame.

8    And I'm not going to allow limitation only to external

9    documents, but that they should reflect and the search

10   terms may inquire into internal documents, internal

11   correspondence, communications about any problems with

12   implementation of the product as to Bimini.

13             So I'm giving you that guidance, basically a

14   guidepost.  You all are going to have to work out more of

15   the details there in good faith.

16             Any documents to be produced shall be produced

17   within two weeks from the deadline that you have to reach

18   an agreement.  So in other words, ten days, a week from

19   Monday, to reach an agreement.  And then a two-week

20   deadline to produce the Bimini documents as you agree to.

21             And then I'm going to be holding off

22   consideration, further consideration of more production of

23   any Bimini documents as well as the Resource and Fortress

24   documents until we get together in person.

25             Anything else on that aspect?

```
1              MR. O'CONNOR:  No, Your Honor.
2              THE COURT:  All right.
3              MS. KERNISKY:  No.
4              THE COURT:  Okay.  The next part is the request
5    concerning -- it looks like the next major dispute is that
6    SS&C is subpoenaing ARMOUR and Deloitte for a number of
7    documents.
8              And maybe you can talk a little about that,
9    Mr. O'Connor.  What are you seeking there, your need to do
10   that?
11             MR. O'CONNOR:  Your Honor, we've issued
12   subpoenas to the ARMOUR REIT, which is a separate entity,
13   which, by the way, paid for all of this.  So that is all
14   expenses incurred by ARMOUR, the plaintiff, were
15   transferred to ARMOUR, the REIT.  And then we also have a
16   subpoena for Deloitte.
17             With respect to ARMOUR, the REIT, we think it's
18   logical that it pass on $2 million in expenses.  ARMOUR,
19   the asset manager, would have explained what it was doing,
20   why it was doing it, and then what the status was.  And we
21   hope and expect, given that the ARMOUR REIT is a publicly
22   traded real estate investment fund, that they would
23   respond in candor.  And we hope with appropriate corporate
24   oversight they would have a candid explanation.  We simply
25   want that information from them.
```

# EXHIBIT H
# (Excerpted Hrg Transcript, Dkt#99, dated Apr. 3, 2018, FNs 9&10)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                 :
ARMOUR CAPITAL MANAGEMENT LP,    :   No. 3:17CV790(JAM)
                                 :
               Plaintiff         :
                                 :
        v.                       :
                                 :
SS&C TECHNOLOGIES, INC.,         :
                                 :   New Haven, Connecticut
               Defendant         :   April 3, 2018
                                 :
- - - - - - - - - - - - - - - - x


DISCOVERY CONFERENCE


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

          HOLLAND & KNIGHT
               701 Brickell Ave., Suite 3000
               Miami, Florida 33131
          BY:  JOSEPH J. MAMOUNAS, ESQ.

   FOR THE DEFENDANT:

          HINCKLEY ALLEN & SNYDER LLP
               28 State Street
               Boston, Massachusetts 02109-1775
          BY:  KEVIN J. O'CONNOR, ESQ.
               JASON C. WILLIAMS, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

Case 3:17-cv-00790-JAM Document 163-9 Filed 10/04/18 Page 14 of 42
Case 3:17-cv-00790-JAM Document 139 Filed 05/07/18 Page 5 of 63

5

1        MR. MAMOUNAS:  That's not contested, Judge,

2   pursuant to the parties' prior agreement.

3        THE COURT:  I can take that off my list.

4        Okay.  Is that it, Mr. O'Connor?  Anything else

5   you need to raise?

6        MR. O'CONNOR:  I believe that's it, Your Honor.

7        THE COURT:  All right.  So let's talk about,

8   first, on Bimini, the completeness of the document

9   productions.  Tell me a little bit about what the concern

10  is there, Mr. Mamounas.

11       MR. MAMOUNAS:  Judge, the concern is that the

12  documents that were produced last week reflected

13  significant communications relating to ARMOUR particularly

14  by name.  The way that the production has emerged from

15  the --

16       THE COURT:  These are Bimini documents?

17       MR. MAMOUNAS:  These are Bimini documents that

18  also contain reference to ARMOUR documents.  And this is

19  reflective, I think, of a broader issue that we've had in

20  discovery, namely that SS&C has tried to parse its

21  production based on whether the documents actually contain

22  by name reference specifically to ARMOUR and then now to

23  Bimini.  And what the discovery to date has shown is that

24  at the point in time when this implementation was taking

25  place -- 2015, 2016, into 2017 -- there were issues that

Case 3:17-cv-00790-JAM Document 163-9 Filed 10/04/18 Page 15 of 42
Case 3:17-cv-00790-JAM Document 139 Filed 05/07/18 Page 6 of 63

6

1    affected not only ARMOUR and Bimini, but also Fortress and

2    Resource, as the four licensed CAMRA implementations that

3    were going on at the time.  And there were problematics

4    that we submit are systematic, and we can get into those

5    later, but for purposes of responding to your question,

6    Judge, the issue that we've seen is that with the recent

7    Bimini production there have also emerged unique ARMOUR

8    documents that would have been part of the prior

9    production.  So the fact that they weren't produced in the

10   fall and summer of last year has given us pause as far as

11   the completeness of the ARMOUR documents as well as the

12   completeness of the Bimini documents.

13          THE COURT:  What am I supposed to do?  I can't

14   go, you know, and scan their files.  What order could I

15   fashion that would satisfy the concerns?

16          MR. MAMOUNAS:  Well, Judge, I think, for one

17   thing, we didn't have an opportunity to confer on this,

18   given when the documents were produced and the filing date

19   of our brief yesterday.  But I do think that it's

20   important for us to maintain that there is, once and for

21   all, completeness as far as the Court's prior orders on

22   Bimini --

23          THE COURT:  Why don't you make a list of the

24   concerns and write to Mr. O'Connor.  And then if you guys

25   can't solve this, and it may be he has an explanation for

1   it or not, then, you know, we can do yet another discovery

2   conference on that.

3           MR. MAMOUNAS:  I'm happy to do that, Judge.

4   Where it really comes up is in the context of the

5   additional discovery that we're seeking as far as Fortress

6   and Resource and issues more broadly concerning those four

7   that don't reference ARMOUR or Bimini by name.  Continue

8   to have that challenge as far as the completeness of the

9   production and what we're entitled to, which is why it's a

10  feature of the brief we filed.

11          THE COURT:  I'm going to withhold trying to

12  resolve anything about the completeness of the existing

13  production with respect to Bimini and to ARMOUR without

14  prejudice to your writing to Mr. O'Connor and saying

15  there's discrepancies here and documents that should have

16  been produced.

17          Let's turn now to Fortress and Resource.  Help

18  me understand, Mr. Mamounas, why, in light of the Court's

19  ruling and in light of the timing of the Fortress and

20  Resource contracts here, that this is appropriate to order

21  the production that you're requesting as to Fortress and

22  Resource.

23          MR. MAMOUNAS:  Sure.

24          And if I'm understanding the Court's order on

25  the motion to dismiss correctly, Judge, the

Case 3:17-cv-00790-JAM Document 163-9 Filed 07/04/18 Page 17 of 42
Case 3:17-cv-00790-JAM Document 163-9 Filed 05/07/18 Page 8 of 33

8

1     pre-contractual misrepresentation claims still remain

2     under either the CUTPA, common law, or recision theories,

3     and our theories with respect to misrepresentations as

4     negligence.  So the question is:  What did SS&C know or

5     what should it have known at the time it was making the

6     misrepresentations that were material to ARMOUR's decision

7     to enter into the master agreement and purchase the CAMRA

8     software?

9            ARMOUR was told -- just in summary, ARMOUR was

10    told that hosting was the appropriate deployment option

11    for it or an appropriate deployment option.  It was told

12    SS&C had the qualifications and experience to conduct the

13    implementation, and also that it could be completed in

14    four months -- four to six months, excuse me.  ARMOUR

15    submits all of those are false and SS&C knew or should

16    have known --

17            THE COURT:  I got all that.  So I just want to

18    know why Fortress and Resource.  I don't quite understand

19    why -- you got the Bimini documents and the basis of

20    essentially the affidavits that you got.  But I don't know

21    why Fortress and Resource you need those documents.

22            MR. MAMOUNAS:  If I could, just in a brief

23    timeline, Judge, the Mortgage REIT Division started in

24    2014.  Sales efforts with respect to ARMOUR with respect

25    to Fortress and with respect to Resource all begin during

1    that time period.  The contract for Resource is signed

2    prior to ARMOUR's contract; the contract for Fortress is

3    signed right around the time of ARMOUR's contract.  That

4    means that those sales processes were taking place in

5    parallel and in tandem.  So if there were issues raised by

6    Fortress or Resource or internally SS&C concerning the

7    representations that were being made as part of sales --

8    that is the appropriateness of the deployment options to a

9    client, that is the time period in which implementation

10   could occur -- all of those issues are relevant to the

11   notice and the inquiry that SS&C should have made in order

12   to verify the veracity of the statements that were being

13   made to ARMOUR as part of sales.

14          From the sales process and from what we submit

15   are misrepresentations as well as others that have emerged

16   in discovery that I can speak to as well, then there's a

17   domino effect that one sees in the discovery that's

18   emerged already that shows that there were systemic

19   broader issues that were affecting all four of these

20   mortgage REIT clients together.  The internal emails from

21   SS&C show repeatedly that executives and others were

22   blowing the whistle, waving a red flag concerning the

23   problems that they were having.  In an email that was just

24   produced last week that we submit should have been

25   produced last year as part of production, an SS&C

1  executive says, "Professional Services" -- which is the

2  group that's responsible for implementation -- "is in

3  trouble.  I can't get any answers.  Implementation

4  projects are starting from scratch and can't get any help

5  from Professional Services resources, nor is anything

6  documented."

7          So what it is showing is there are, from a

8  causation perspective, there are ongoing issues internally

9  at SS&C that reflect they could not get the job done.

10  What we're trying to understand is why it could not get

11  the job done so as to demonstrate the causation between

12  either the breach of contract or the misrepresentations

13  that SS&C made during the sales process and the fact that

14  implementation didn't occur and ARMOUR was damaged.

15          We believe that the documents that we've seen so

16  far and that continue to emerge, as pointed out at the

17  outset, there were documents that were just produced

18  concerning Bimini that reflect broader issues internally

19  with respect to the implementation team as well as the

20  mortgage REIT team more broadly that bear directly on

21  ARMOUR's implementation, the reason that it could not get

22  off the ground and could not be complete.  The documents,

23  I mean, go through basically a month-by-month timeline

24  about the fact that internally SS&C, they didn't have the

25  resources, they didn't have the management, they didn't

1   have the manpower in order to make sure implementations

2   were completed.

3          The problem that I mentioned at the outset about

4   parsing is what's really problematic for us. We're not

5   looking to investigate every last detail about SS&C's

6   implementations for its clients or even for its CAMRA

7   clients. SS&C internally grouped these four mortgage

8   REITs together and identified them as problematic.

9   There's a reason for that. It's only logical to assume

10  that those REITs were experiencing the same or similar

11  issues.

12         And with respect to the personnel changes, I

13  mean, the symptoms -- it's a symptom of what was going on

14  with respect to implementation. Within 2015 and 2016,

15  there were four personnel changes that affected

16  implementations directly. In April of 2015, a gentleman

17  by the name of Daniel Pallone, whose career has been spent

18  in rescuing failed businesses, was hired to run the

19  mortgage REIT practice. In the fall of that year, Iwona

20  Olszewska, who had been with the company for years and was

21  running Professional Services, was removed. The company

22  at that time hired someone new, who was described by

23  witnesses so far in deposition as an upgrade. He was

24  removed and then someone else was put in, Judge. This

25  does not suggest or have the hallmarks of a stable

Case 3:17-cv-00790-JAM  Document 169-9  Filed 05/04/18  Page 21 of 42
Case 3:17-cv-00790-JAM  Document 99-9  Filed 05/07/18  Page 21 of 63

12

1   practice.  And the consequence of that is what we saw.

2   ARMOUR's implementation never occurred.

3           So what we're trying to accomplish here is not a

4   full-scale investigation of SS&C's implementation efforts

5   for the other clients.  We've been trying to limit it to

6   what happened in the sales process, what was the

7   relationship with Professional Services during sales, and

8   what was the resource allocation or manpower issue that's

9   been identified so far in the discovery by SS&C's own

10  witnesses and own documents that caused our implementation

11  not to succeed.

12          THE COURT:  I see.  Okay.

13          Mr. O'Connor, with respect to Fortress and

14  Resource?

15          MR. O'CONNOR:  Yes, Your Honor.

16          We would submit that those documents should not

17  be produced based on burden and relevance.

18          THE COURT:  They're current clients of yours,

19  right?

20          MR. O'CONNOR:  Current clients.  All three

21  entities are current paying clients of SS&C.  Resource,

22  for example, is a vastly larger mortgage REIT.

23          THE COURT:  And you don't have a lawsuit pending

24  with them?

25          MR. O'CONNOR:  We don't have a lawsuit pending

1   with them.

2           THE COURT:  They haven't filed a claim against

3   you?

4           MR. O'CONNOR:  No, Your Honor.  No claim.

5           THE COURT:  They don't have the affidavit of a

6   chief officer of the type that was submitted with respect

7   to Bimini?

8           MR. O'CONNOR:  Correct, Your Honor.

9           THE COURT:  Okay.

10          MR. O'CONNOR:  So they're absolutely different

11  in kind.  A stray reference to problem REITs doesn't mean

12  all the problems are the same; it means that there are

13  implementation issues.  That statement, Your Honor, is not

14  pre-contractual; it's well into 2015.  And it says nothing

15  about the core issue here, and that is what did people

16  know in 2015 or 2014 during the sales process.

17          There are statements that SS&C misled ARMOUR as

18  to its qualifications.  It's undisputed that CAMRA has

19  been in existence for 30 years.  It's undisputed.

20  Mr. Mountain, the CFO, and Mr. Gruber, the chief operating

21  officer, both testified that SS&C is the dominant asset

22  accounting product in this market.  Mr. Gruber actually

23  worked with the product when he was at Penn Mutual and had

24  familiarity with it, and actually said, "well, I heard

25  that sometimes it's hard to use," but he never disclosed

1    that to anybody at ARMOUR.  And so the dominant product.

2    If you were to take the top ten mortgage REITs, publicly

3    traded mortgage REITs, six of them are SS&C clients.  And

4    so in enterprise software implementation, it is inevitable

5    in these complex exercises that problems arise.  It

6    doesn't mean they're all the same.  We haven't attempted

7    to block them from it.

8              And what we produced, Your Honor -- and this

9    goes to a point that Mr. Mamounas raised, where he

10   suggested that there could be documents out there where

11   ARMOUR is mentioned by name.  Now, we searched, with their

12   approval, 19 custodians, produced more than 100,000 pages

13   of documents.  And there are a number of instances where

14   there are references to we did this in this other REIT and

15   so let's try it for ARMOUR.  Or any mentioning of -- any

16   analytical connection, those documents are all produced.

17   They point to a single document not caught in the initial

18   production.  We know that we just received documents from

19   ARMOUR, 6,000 documents that were supplemented based on us

20   following up on requests, and they all contain search

21   terms that we previously sought.

22             This exercise has cost hundreds of thousands of

23   dollars with respect to ARMOUR and now Bimini.  And what

24   plaintiff proposes, really on a fishing expedition, is

25   that we spend hundreds of thousands of dollars more in

1    hopes that they'll find some reference to documents that

2    don't contain the word "ARMOUR" that could somehow be

3    relevant.  We would submit that's just grossly

4    disproportionate and not a good use of the parties'

5    resources and really not likely at all to lead to

6    admissible evidence.

7            THE COURT:  And Mr. Mamounas.

8            MR. MAMOUNAS:  Judge, if I may, nobody's asking

9    or even suggesting that SS&C spend hundreds of thousands

10   of dollars on follow-up discovery.  As I understand it,

11   these processes are meant to be iterative.  They are meant

12   to be cooperative.  They are meant to involve sharing

13   search term hit reports so that searches that extend to

14   hundreds of thousands of dollars are either limited or

15   discarded entirely so you can focus on the core issues.

16           The problem that we're having here is that the

17   documents that have emerged have reflected a compelling

18   case for the existence of systemic issues affecting CAMRA

19   licensed clients in implementation.  We're not questioning

20   or even seeking to take discovery on the software.  It's

21   simply on the process of implementation.  It was so bad

22   that Mr. Pallone, who I mentioned earlier, says over and

23   over, "This is going to lead to the end of the mortgage

24   REIT practice.  We should stop CAMRA implementations for

25   licensed clients," in an email that was produced just last

Case 3:17-cv-00790-JAM Document 169-9 Filed 05/07/18 Page 25 of 42
Case 3:17-cv-00790-JAM Document 162-9 Filed 03/04/18 Page 16 of 63

16

1   week.  Those issues and those symptoms have a direct

2   relationship on the causation.

3              THE COURT:  When was this email?  What is the

4   date of the email?

5              MR. MAMOUNAS:  That email, Judge, was in

6   November 17th of 2016 where Mr. Pallone says we will lose

7   the REIT franchise.

8              THE COURT:  November of 2016?

9              MR. MAMOUNAS:  In May of 2016.  He says, "I'm

10  getting very concerned.  This should be our last one."

11             Those are causations issues.  SS&C has contested

12  the breach.  They've contested causation claiming that it

13  was ARMOUR's fault that implementation didn't occur.  Our

14  position is it's the exact opposite.

15             If you look at this discovery as well as the

16  discovery we've produced, there's no mention of ongoing

17  systemic issues caused or perpetrated by ACM.  It's just

18  the opposite.  SS&C is saying repeatedly, "We're the ones

19  who are having internal problems here, we can't get our

20  act together."  And that's all that we're asking for,

21  Judge.

22             THE COURT:  Okay.  So I'm going to sustain the

23  objection to the production of documents concerning

24  Fortress and Resource.  I'm amply satisfied that, for the

25  reasons stated by SS&C, that these documents, to the

1   extent that they are relevant, they are very well beyond

2   additional probative value.  And I think it would be very

3   burdensome concerning existing clients.  I don't think

4   there's an adequate foundation here, in light of the

5   proportionality or rules of discovery, for the production

6   of Fortress and Resource documents in light of other

7   discovery in this case, extensive as it is, and in light

8   of the production of Bimini documents.  I think ACM is

9   amply positioned to make its point here concerning

10  systemic problems without essentially requiring what

11  appears to me to be a very burdensome production of

12  documents concerning Fortress and Resource.  So I will

13  sustain that objection.

14          That gets us next to I think the documents -- I

15  want to stick to documents here -- on SS&C profit and loss

16  as well as the leadership changes, implementation

17  playbook.  Do you want to say something about that?

18          MR. MAMOUNAS:  I do, Judge.

19          One of the requests that we made in the middle

20  of 2017, very shortly after this case was filed, was a

21  standard request for policies and procedures with respect

22  to implementations.  Again, our focus being strictly on

23  implementation.  SS&C insisted that there were no policies

24  or procedures, which was a bit of a head scratcher given

25  that it's such a large company and always talks about its

EXHIBIT H
(Excerpted Hrg Transcript,
Dkt#100, dated Apr. 27, 2018,
FNs 9,10, & 20)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                :
ARMOUR CAPITAL MANAGEMENT LP,   :   No. 3:17CV790(JAM)
                                :
                Plaintiff       :
                                :
        v.                      :
                                :
SS&C TECHNOLOGIES, INC.,        :
                                :   New Haven, Connecticut
                Defendant       :   April 27, 2018
                                :
- - - - - - - - - - - - - - - - x


TELEPHONIC DISCOVERY CONFERENCE


B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

Case 3:17-cv-00790-JAM Document 162-9 Filed 05/04/18 Page 29 of 42
Case 3:17-cv-00790-JAM Document 160 Filed 05/07/18 Page 3 of 17

3

1      **10:00 A.M.**

2          THE COURT:  Good morning.  This is Judge Jeffrey

3    Meyer.  We're here for a discovery teleconference in the

4    matter of ARMOUR Capital Management v. SS&C Technologies.

5          May I have appearance of counsel for ARMOUR,

6    please.

7          MS. KERNISKY:  Good morning.  Allison Kernisky

8    on behalf of plaintiff, Your Honor.

9          THE COURT:  Good morning.

10          And for SS&C?

11          MR. WILLIAMS:  Good morning, Your Honor.  Jason

12    Williams.  And with me is Kevin O'Connor and Alexa

13    Millinger.

14          THE COURT:  Great.

15          All right.  So it sounds like, Ms. Kernisky, you

16    want to get some more information about Fortress; is that

17    right?

18          MS. KERNISKY:  Well, different information,

19    Your Honor, that's correct.  Different information than

20    what was before Your Honor at the April 3rd hearing.

21          THE COURT:  Okay.  Do you want to elaborate?

22          MS. KERNISKY:  Absolutely.

23          So we had subpoenaed Fortress back in January,

24    and we've revised the subpoena recently.  What we are now

25    seeking are very limited categories of documents extremely

1  tailored.  We are only interested in any pre-contractual

2  sales materials, you know, between Fortress and SS&C, as

3  well as the contracts that were ultimately signed, as well

4  as a very limited deposition of Fortress's chief

5  technology officer who was the person responsible at

6  Fortress and mostly involved in the sales process with

7  SS&C and those communications.

8           THE COURT:  Okay.  Go on.  I'm sorry, I didn't

9  mean to cut you off.

10          MS. KERNISKY:  Oh, that's fine.  You asked me

11  what we were seeking, and that's what it was.  Do you want

12  me to elaborate on why we'd like those documents?

13          THE COURT:  If you'd like to.

14          MS. KERNISKY:  Absolutely.

15          As you know, ARMOUR purchased this CAMRA product

16  from SS&C and Fortress purchased the CAMRA product from

17  SS&C.  The sales processes happened at the same time, same

18  product, they had the same salesman at SS&C.  They both

19  bought a license and contracted for implementation

20  services.  And also we had testimony from a vice president

21  at SS&C, Tim Reilly, that before Fortress contracted, they

22  spoke to SS&C about hosting, which is the same choice that

23  ARMOUR made.  ARMOUR ultimately contracted for hosting.

24  And Fortress ultimately contracted for in-house license.

25  So they chose a different methodology than ARMOUR

1    ultimately.  So those conversations, those things that

2    were told to Fortress, you know, what Fortress learned

3    about hosting, about, you know, any questions they asked

4    about how long it would take to be employed, what would be

5    required in the effort, how many people would be involved,

6    the time, those sorts of things, they're all probative of

7    at the exact same time what SS&C was telling to ARMOUR

8    about all of those things.

9              And so we would like to, you know, get this

10   limited discovery from Fortress to probe the truthfulness

11   of the statements that were made to ARMOUR.

12             THE COURT:  Okay.

13             All right.  And from SS&C?  Counsel?

14             MR. WILLIAMS:  Yes.  This is Mr. Williams,

15   Your Honor.

16             And just to start, you know, at the Court's

17   April 3rd hearing or April 2nd hearing, rather, we

18   discussed at length as to why all Fortress documents are

19   not relevant and extremely burdensome to be produced.  And

20   then subsequent to that, Your Honor entered an order

21   basically sustaining our objection saying we did not have

22   to produce these documents.

23             And then subsequent to that, now ARMOUR is

24   trying to do an end around the Court's order and get the

25   same documents that were encompassed in the original

1    request from Fortress, a second bite of the apple, so to

2    speak.  It's still our position that these documents are

3    not relevant.

4          What SS&C said to Fortress -- who, by the way,

5    is still a current client of SS&C -- is not relevant as to

6    what we told ARMOUR because, for example, the length of

7    implementation that it would take to implement CAMRA on

8    Fortress is going to be vastly different than what it is

9    for ARMOUR based on the size of the company, based on the

10   custodian, based on the complexity of the work request, so

11   on and so forth.  This is just a complete fishing

12   expedition that we've gone through or that they're

13   attempting to go through.  It's extremely burdensome,

14   which is why back January of 2018 Fortress objected to

15   these very requests, right?  The documentation that we

16   submitted with our brief, I think Exhibit A, outlines that

17   Fortress ran search terms that came back with six or 7,000

18   hits and objected to that being too burdensome.  So at

19   this point, ARMOUR then sat on their hands for two months

20   requesting the documents from us.  They did get the

21   documents.  Now not only are they requesting the same

22   documents, but they're also requesting deposition

23   testimony.  We just feel that this is in complete

24   violation of the Court's order.

25          THE COURT:  All right.

1           MS. KERNISKY:  Your Honor, there are several

2  incorrect statements that Mr. Williams made.  May I have a

3  chance to address then?

4           THE COURT:  Certainly.

5           MS. KERNISKY:  First, as you realize from

6  reviewing the papers submitted, these are not at all the

7  same requests that were in front of the Court at the

8  earlier hearing.  The earlier hearing spoke solely to

9  documents relating to the implementation of Fortress,

10  which is necessarily something that occurred after the

11  contract was signed.  We are seeking with this subpoena to

12  Fortress documents pre-contract and the contracts

13  themselves.

14           The other thing that was at issue at the hearing

15  with Your Honor was documents relating internally to the

16  relationship between the sales department and the

17  professional services department, the team responsible for

18  implementation.  We had testimony from the head of the

19  professional services unit that there was tension between

20  those two units.  And the purpose of the subpoena to --

21  the document request to SS&C was to probe that

22  relationship, sort of internal politics at SS&C, if you

23  will.  Again, something -- those are internal SS&C

24  documents.  Those are things that necessarily Fortress

25  wouldn't have, and so we have not requested.  We've

1  requested pre-contractual communication with Fortress.

2        Mr. Williams also said that Fortress will be

3  burdened by responding to the subpoena.  Again, that's not

4  correct, Your Honor.  The initial request to Fortress,

5  like I said, were for broader categories.  The initial

6  subpoena to Fortress in January was for the contracts.  It

7  had two requests: contracts; and then also any problems,

8  issues, delays, failures with implementation.  Again,

9  post-contractual documents.  That was a much broader

10  category.  And they only found roughly six to 7,000

11  documents.  We said we would work with them to narrow the

12  search terms, we came up with a revised search request,

13  and have been working with them to tailor the searches

14  since then.  We were not sitting on our hands.

15        Also, Fortress's legal counsel had told us that

16  they would produce the contracts without problem.  They

17  just had never gotten around to it, and we are following

18  up on that issue.

19        So the request that we're looking at now is not

20  burdensome.  It's very tailored.  We're talking about a

21  period prior to when Fortress signed the contract

22  January 2015; the sales process, we don't know how long

23  Fortress's sales process lasted but, for example, ARMOUR's

24  sales process we know lasted seven months.  So we're

25  talking at the most about a few-month period, six months

1    to a year of a period of a sales process where the search

2    terms would not be hard to run.  It would literally be

3    "SS&C" or "CAMRA."  And any discussions prior to signing

4    the contract, those would be the hits, and that is what

5    would be responsive.  And based on what ARMOUR has

6    pre-contract in its materials, we have roughly, I don't

7    know, a couple of hundred documents that are from that

8    time period that are not duplicative.  So about 2 percent

9    or less of our overall production from SS&C is this time

10   period.

11          So if we're looking at a few hundred documents,

12   I assume Fortress would be looking at the same quantity,

13   which is hardly a burden.  The burden that Fortress raised

14   with us is that they have to -- their emails are archived

15   and they're owned by a contract called Global Relay.  They

16   have to get Global Relay to run the search and that would

17   cost I think they told us $500, which it's hard to imagine

18   that's a burden for a company of Fortress's stature.  So

19   we don't see a burden argument here, Your Honor, with

20   these limited categories of documents that we're

21   requesting from Fortress.

22          And the deposition of Fortress's chief

23   technology officer is extremely important because we know

24   there are conversations that occurred with Fortress and

25   the sales staff at SS&C about hosting.  Mr. Reilly from

Case 3:17-cv-00790-JAM   Document 163-9   Filed 05/04/18   Page 36 of 42
Case 3:17-cv-00790-JAM   Document 160   Filed 05/07/18   Page 136 of 142

10

 1   SS&C testified to those conversation, but he couldn't

 2   recall, you know, what the substance of them was.  None of

 3   the representatives that we deposed from SS&C can recall

 4   the substance of those conversations.  And Mr. Socher, the

 5   CTO of Fortress, very well might.

 6        MR. WILLIAMS:  And Your Honor, just to respond

 7   briefly, if I may?

 8        THE COURT:  All right.

 9        MR. WILLIAMS:  Ms. Kernisky stated that the

10   documents requested at the April 2nd hearing were

11   specifically in regards to SS&C's implementation, which

12   would necessarily include the pre-contractual

13   communications that we had with Fortress, right?  So the

14   documents that they're requesting now, although they are

15   claiming are more narrowly tailored, are absolutely

16   encompassed in the earlier request.

17        As to the communications between her and counsel

18   for Fortress back in January, Mr. Meisels, who is counsel

19   for Fortress, essentially said that the six or 7,000 hits

20   were not including documents.  These were just email

21   requests.

22        And Ms. Kernisky mentioned that even if they

23   searched "SS&C" and "CAMRA," those are going to produce a

24   bunch of hits, which then have to be culled through and

25   then produced and then reviewed, which is very burdensome

Case 3:17-cv-00790-JAM Document 163-9 Filed 10/04/18 Page 37 of 42
Case 3:17-cv-00790-JAM Document 136-3 Filed 05/07/18 Page 13 of 14

11

1   and very costly.

2          Mr. Meisels also mentioned that each time they

3   run these search reports, it costs them money.  The

4   basic -- or the alleged relevance of these documents is

5   completely disproportionate to the needs of the case.

6   Ms. Kernisky cannot articulate any justification as to why

7   these documents are relevant.  It's a complete fishing

8   expedition as to try to find something that will

9   substantiate the remaining claims based on the Court's

10  order on our motion to dismiss.

11         So, you know, at this juncture, we just feel

12  that it's completely unnecessary and unwarranted.

13         THE COURT:  Anything else, Ms. Kernisky?

14         MS. KERNISKY:  Yes, Your Honor.

15         We are entitled to test, you know, what these --

16  the statements made to ARMOUR by SS&C, the truthfulness of

17  them.  The statements that were made at the same time to a

18  REIT that was buying CAMRA with a license from the same

19  salesman are highly relevant and very probative of the

20  representations they were making to us.  You know, it

21  could be that Fortress had their CTO involved in their

22  sales process, so he could have asked all manner of

23  technical questions that would bear on what SS&C knew

24  about the requirements for hosting at the same exact time

25  that they're telling ARMOUR what is required for hosting.

Case 3:17-cv-00790-JAM Document 163-9 Filed 10/04/18 Page 38 of 42
Case 3:17-cv-00790-JAM Document 100 Filed 05/07/18 Page 12 of 14

12

1    If they told them something different that conflicted with

2    something that they told us, if they said to them, for

3    example, yeah, you know, hosting is really not -- it's

4    really hard and it's for -- you need about 15 full-time

5    employees to make it work, so I suggest you guys go with

6    the license.  Or if they said, we can do hosting but you

7    know it's going to take four years and we know you don't

8    want to wait that long.  I mean, there's all manner of

9    things that could have been represented that would

10   evidence that the representations that were made to ARMOUR

11   were not truthful or accurate.

12            In terms of burden --

13            MR. O'CONNOR:  Your Honor, this is Kevin --

14            THE COURT:  Hold on a second.  Let Ms. Kernisky

15   finish, please.

16            Please continue.

17            MS. KERNISKY:  Oh, yes.  I was going to say in

18   terms of burden, you know, Fortress has been subpoenaed

19   and we don't -- again, as far as we understand it, it's a

20   few hundred dollars to run these searches through Global

21   Relay.  If it comes down to the cost of it, we'll pay for

22   it.  I don't think that's a burden.  I don't see a burden

23   argument.

24            And the relevance, I think -- it goes to what

25   they knew at the time they were making the representations

Case 3:17-cv-00790-JAM Document 162-9 Filed 10/04/18 Page 39 of 42
Case 3:17-cv-00790-JAM Document 130-9 Filed 05/07/18 Page 13 of 14

13

1    to us.

2             And the last thing, Your Honor, is we don't have

3    evidence in the record, there's not much that we've seen

4    in the record to point to -- you know, SS&C doesn't have

5    policies and procedures on sales.  They don't have written

6    documentation on what their sales process is supposed to

7    look like or what they're supposed to say about hosting or

8    licensing or their other deployment options.  So the way

9    for ARMOUR to be able to understand, you know, what the

10   standard of care there is to look at our own documents and

11   to look at and to ask for testimony from other REITs that

12   were similarly situated at the same time, and that is

13   Fortress.

14             THE COURT:  And you've had this, though, from

15   Bimini, right?

16             MS. KERNISKY:  Yes.  Well, we have documents

17   from Bimini, but have not yet had a chance to depose

18   Bimini.  We're doing that next week or two weeks.

19             THE COURT:  Anybody else have anything else to

20   say on this?

21             MR. O'CONNOR:  Yes, Your Honor.  This is Kevin

22   O'Connor.  I'm in the car, so I apologize if there's

23   any -- I'm travel to a hearing in New York.

24             What Ms. Kernisky is talking about is really

25   just rank speculation, the possibility that there might be

Case 3:17-cv-00790-JAM Document 163-9 Filed 10/04/18 Page 40 of 42
Case 3:17-cv-00790-JAM Document 160-9 Filed 05/07/18 Page 14 of 42

14

1    different statements made to one REIT versus another, not

2    acknowledging in any way that all REITs are not the same.

3    As Your Honor has repeatedly pointed out, these are highly

4    client-specific determinations as to what the client

5    wants, what the client needs, what the portfolio is.  And

6    we submit that what's really going on here is that ARMOUR,

7    almost a year into this case, is just casting about trying

8    to disrupt relationships with other clients.  And there's

9    no -- there's no indication whatsoever from any salesman

10   that anything was ever said differently to any client.

11   There's no indication whatsoever that there's any

12   connection or relevance between the Fortress portfolio and

13   the ARMOUR portfolio.

14          And to the extent that they're looking for

15   contemporaneous communications, they've gotten that from

16   Bimini, and that has been fruitless so far.  And if they

17   had anything from Bimini that suggested that there was

18   some inconsistency, that was also a contemporaneous sales

19   process and implementation, that would have been produced.

20          So this is a fishing expedition, we submit, and

21   designed to just tarnish our relationships with other

22   clients.

23          MS. KERNISKY:  Your Honor, may I respond very

24   briefly?

25          THE COURT:  Certainly.  And then that will be

Case 3:17-cv-00790-JAM   Document 162-9   Filed 10/04/18   Page 41 of 42
Case 3:17-cv-00790-JAM   Document 130   Filed 05/07/18   Page 15 of 42

15

1    the last.

2            MS. KERNISKY:  Thank you, Judge.

3            This is not speculation.  We have SS&C's senior

4    vice president testifying that there was a conversation

5    with Fortress about hosting.  And we know that Fortress

6    ultimately did not choose hosting.  It might be that that

7    conversation has no bearing on our case; it might be that

8    it has huge bearing.  But under the discovery rules, under

9    Rule 26, we are entitled to find out what that

10   conversation was and to test whether or not it impacts the

11   representations that were made to us at the same time.

12           MR. O'CONNOR:  Your Honor --

13           THE COURT:  I'm done, thank you.  Thank you.  I

14   said that I just heard the last of it.

15           So I'm going to rule at this time.

16           I'm going to sustain the objection of SS&C to

17   the enforcement of the subpoena for documents and

18   testimony from Fortress substantially for the reasons set

19   forth in SS&C's papers.  I feel like I've been down this

20   road before with respect to the discovery that I was going

21   to allow with respect to Fortress and Resource.  I'm a

22   little surprised to see it coming back before me.

23           And I believe that this lawsuit is about a

24   broken relationship between ARMOUR Capital and SS&C, and

25   it is not a lawsuit in which it privileges ARMOUR to

1    inquire into many other client relationships of SS&C

2    beyond what I've already allowed here, and I made my

3    determination about what's proportional in terms of what

4    is appropriate here with respect to discovery as to other

5    clients of SS&C.  And I don't find grounds to reconsider

6    that here.  I don't think there's anything new that I'm

7    hearing that causes me to reconsider that, so I'm

8    sustaining the objection to that.

9              All right.  So thank you all for calling in.

10             Is there anything else to take up at this time?

11             MS. KERNISKY:  No, Your Honor.  Thank you.

12             THE COURT:  Thank you all for calling.  Take

13   care.

14             (Proceedings adjourned at 10:20 a.m.)

15

16

17

18

19

20

21

22

23

24

25