UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - x
                              :
ARMOUR CAPITAL MANAGEMENT LP, : No. 3:17CV790(JAM)
                              :
                 Plaintiff    :
                              :
          v.                  :
                              :
SS&C TECHNOLOGIES, INC.,      :
                              : New Haven, Connecticut
                 Defendant    : October 18, 2018
                              :
- - - - - - - - - - - - - - - x



MOTION HEARING AND DISCOVERY HEARING


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.











                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1  A P P E A R A N C E S:

2

3        FOR THE PLAINTIFF:

4              HOLLAND & KNIGHT
                    701 Brickell Ave., Suite 3000
                    Miami, Florida 33131
5              BY:  JOSEPH J. MAMOUNAS, ESQ.
                    ALLISON KERNISKY, ESQ.

6

7        FOR THE DEFENDANT:

8              HINCKLEY ALLEN & SNYDER LLP
                    28 State Street
9                   Boston, Massachusetts 02109-1775
               BY:  KEVIN J. O'CONNOR, ESQ.

10
               PAUL WEISS RIFKIND WHARTON & GARRISON LLP
11                  1285 Avenue of the Americas
                    Suite 3543
12                  New York, New York 10019
               BY:  JOHN F. BAUGHMAN, ESQ.
13                  NORA AHMED, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1                        **9:07 A.M.**

2              THE COURT:  We're here on some pending motion

3    and discovery matters in the case of ARMOUR Capital

4    Management v. SS&C Technologies.

5              May I have appearance of counsel, please, for

6    ARMOUR.

7              MR. MAMOUNAS:  Good morning, Judge.  Joe

8    Mamounas and Allison Kernisky of the Holland & Knight law

9    firm here on behalf of the plaintiff.

10             THE COURT:  All right.

11             MR. BAUGHMAN:  Good morning, Your Honor.  I'm

12   Jack Baughman.  With me is my colleague Nora Ahmed.  We're

13   newly counsel for SS&C.

14             MR. O'CONNOR:  Good morning, Your Honor.  Kevin

15   O'Connor on behalf of SS&C from Hinckley Allen.

16             THE COURT:  You're kind of teaming up, double

17   teaming.

18             MR. BAUGHMAN:  Something like that.

19             THE COURT:  All right.

20             So what I'd like to do, I think, is hear the

21   motion to dismiss on the counterclaims, maybe Mr. Mamounas

22   or Ms. Kernisky.  And then we'll talk about the discovery

23   issues.

24             MR. MAMOUNAS:  Very well, Judge.

25             Judge, our motion to dismiss is directed to the

1    counterclaims, the amended counterclaims that were filed

2    by SS&C.  And I will be brief because SS&C already has

3    withdrawn some of the grounds for the breach claim, that

4    is as to the maintenance contract; they've clarified

5    others as to the hosting contract; and the final ground

6    for the breach of contract claim concerns an area that we

7    discussed extensively before, including at a hearing

8    before Your Honor in November of last year.

9            And that final breach grounds concerns --

10           THE COURT:  Why don't you say what you think has

11   been withdrawn.  Maybe that will help me.

12           MR. MAMOUNAS:  That's right, Judge.  As I

13   understand it, the breach of the maintenance contract has

14   been withdrawn by SS&C in their response to our motion to

15   dismiss.

16           And they also, as I said, clarified the breach

17   on the hosting contract.  And that's in our papers.

18           THE COURT:  With respect to the applicable time

19   frame.

20           MR. MAMOUNAS:  With respect to the applicable I

21   suppose they call it a penalty or the termination time

22   frame, that's correct, Judge.

23           THE COURT:  The four-month period.

24           MR. MAMOUNAS:  120 days of the contract.

25           THE COURT:  All right.

1          MR. MAMOUNAS:  That leaves the final grounds for

2    breach of contract claim as the Work Request Two breach.

3    And Work Request Two, according to SS&C, was breached in

4    2016, and that's at Paragraph 22 of their amended

5    counterclaim.

6          The Court previously found that Section 6.7.16

7    of the parties' Master Agreement is incorporated by

8    reference and operates as to Work Request Two, that was in

9    Your Honor's order of March of this year on SS&C's motion

10   to dismiss our amended complaint.

11         So the counterclaims were not filed in this case

12   until April 2nd of 2016.  And obviously, the end of 2016,

13   giving SS&C the benefit of all doubt, brings them beyond

14   the one-year contractual limitations provision in Section

15   6.7.16 of the Master Agreement as incorporated in Work

16   Request Two.

17         So our argument is that the breach predicated on

18   Work Request Two is barred by the parties' one-year

19   limitations provision.

20         There were a number of comments made by SS&C

21   both in papers and at the hearing about how the parties

22   could have entered into a tolling agreement, they could

23   have entered into an amendment, they could have done

24   anything in order to have avoided the one-year limitations

25   provision.  But in this case, as Your Honor knows, that

1  did not happened and SS&C has exceeded the one-year breach

2  period.

3          SS&C says that that breach should be saved by

4  tolling under Rule 13 in the relation back doctrine.  Of

5  course, in the Court's order of March of this year the

6  Court found Section 6.7.16, as a contractual limitations

7  provision, is not subject to tolling, whether equitable or

8  otherwise.  But second, even if it were, the relation back

9  doctrine does not apply here and that's because --

10          THE REPORTER:  Excuse me, "does" or "does not"

11  apply?

12          MR. MAMOUNAS:  Does not apply.

13          THE COURT:  If she's asking you for

14  clarification, that's probably a good sign to slow down a

15  little bit.

16          MR. MAMOUNAS:  Will do, Judge.  Will do.

17          The relation back doctrine doesn't apply in this

18  case and wouldn't apply to save SS&C's counterclaim

19  predicate on Work Request Two, reason being that in

20  diversity cases state law is what controls the timeliness

21  of state claims.  That's the *Diffley v. Allied-Signal*

22  decision out of the Second Circuit, as well as the *Aramony*

23  decision which was cited by SS&C in its papers.

24          THE COURT:  You're just motoring along.  Why

25  don't you try to go just a bit slower.  Can you do that?

1            MR. MAMOUNAS:  I'm happy to, Judge.  I'm just

2    very passionate.

3            THE COURT:  I'll understand your arguments

4    better even if you go a little bit slower.

5            MR. MAMOUNAS:  Sure.  I take the point, Judge.

6            As I was saying, in diversity cases, state law

7    governs the timeliness of state counterclaims.  And that's

8    from the *Diffley* decision.

9            THE COURT:  So what Connecticut state law tells

10   me that there's no relation back?

11           MR. MAMOUNAS:  Okay.  The first, Judge, is that

12   there is no state statute or other common law that

13   provides for relation back.  That stands in contrast to

14   New York, for example, which, by statute, says that

15   relation back applies both to compulsory as well as

16   permissive counterclaims.  That does not exist in

17   Connecticut.  Connecticut is the controlling law under the

18   parties' agreement.

19           Second, in a decision that we've cited in our

20   papers, *Bache Halsey* -- I hope I'm pronouncing that

21   correctly -- citing to several Connecticut decisions,

22   including the *Consol. Motor* decision as well as the

23   *Seletskey* decision, the Connecticut courts as well as the

24   Southern District of New York following Connecticut law

25   make clear that the relation back doctrine does not apply;

1    rather, the date of a counterclaim is the time at which it

2    is filed, not the time at which the complaint is filed.

3            So under both arguments, that is tolling, SS&C

4    fails because Your Honor has already found that tolling

5    does not apply to the contractual limitations provision.

6    Also, in Connecticut, the timeliness for purposes of the

7    filing counterclaim is as of the time the counterclaim is

8    filed, not as of the time the complaint is filed.

9            So on that basis, we believe that claim should

10   be dismissed, Judge.

11           THE COURT:  All right.

12           MR. MAMOUNAS:  Would you like to hear from us on

13   the second count?

14           THE COURT:  If you could, that would be great.

15           MR. MAMOUNAS:  The second count, Your Honor,

16   concerns Count Two, which is unjust enrichment.

17           SS&C pleads what is essentially a contingent

18   theory; namely, that they are entitled to unjust

19   enrichment for certain hours of work that they purportedly

20   rendered for ARMOUR in the event, and as they say, should

21   ARMOUR succeed on its recision claim.  Namely, ARMOUR

22   first has to succeed on its affirmative recision claim in

23   order for SS&C to accomplish relief under unjust

24   enrichment.

25           From SS&C's papers, there's no dispute that that

1   counterclaim is contingent.  But that means, of course,

2   that SS&C hasn't suffered any injury that's now capable of

3   adjudication by judicial power.  They first need the

4   recision to be accomplished by ARMOUR in its affirmative

5   claim.  Until that happens, there's no recision.

6              THE COURT:  Does that mean essentially, then,

7   that I should dismiss that claim altogether and then

8   basically hear this lawsuit and then let them file a new

9   lawsuit?

10             MR. MAMOUNAS:  That's correct, Judge.

11             THE COURT:  That's the way I should do it?

12             MR. MAMOUNAS:  That's the way that the case law

13   would address it.  Again, Connecticut state law controls

14   as far as whether there's an actual case or controversy.

15   We've cited in our papers a number of decisions as far as

16   whether a claim that is contingent is capable of

17   adjudication.  That includes the *Sosin* decision where

18   claims were styled as seeking damages "to the extent the

19   plaintiffs cannot recover in arbitration."  There's also

20   the *Town of Wallingford* decision out of the Connecticut

21   Supreme Court.

22             THE COURT:  So we should basically have a whole

23   litigation here and then, you know, when we're done if

24   recision is ordered, wait around and wait until another

25   lawsuit is filed and get to have the same process go.

1      MR. MAMOUNAS:  I think, Judge, as it stands

2  right now, SS&C's claim is purely hypothetical.  That's

3  why the case law says there's no actual case or

4  controversy capable of adjudication.  But even if the

5  Court were to assume that there were a --

6      THE COURT:  Is the case of controversy

7  requirement something that's under Article III of the U.S.

8  Constitution?

9      MR. MAMOUNAS:  There is an Article III

10  requirement for case in controversy, and then state law

11  would apply as far as whether there's something that's

12  justiciable as far as the case law refers to it.

13      So I would cite the Court to the *Brown v. Stone*

14  decision which reflects that counterclaims can't be

15  contingent on the plaintiff's main lawsuit.  But even if

16  the Court were to say -- and I understand Your Honor's

17  argument to be a practical one -- even if the Court were

18  to say, well, let's consider it potentially justiciable

19  for present purposes, the claims are mutually exclusive.

20  That is, what SS&C essentially is saying is that a trier

21  of fact would have to first find that ARMOUR is entitled

22  to recision.  In order to be able to award recision, the

23  trier of fact would have to find that SS&C made

24  misrepresentations that go to the heart of the contract

25  such that recision is appropriate.  But then SS&C's

1    contingent claims says, well, that same trier of fact

2    would have to turn around and say, "SS&C, you engaged in

3    all these misrepresentations, you essentially defrauded

4    ARMOUR, but we're still going to award you an equity."

5    And the case law says that that's not permissible.  I

6    would cite the Court to the *Vanacore* decision out of the

7    District of Connecticut.

8              THE COURT:  And I'm familiar with that.

9              So why doesn't it make sense here, take a

10   common sense approach to this and not try to multiply the

11   proceedings, why doesn't it make sense simply to hold on

12   to this claim for now?  It doesn't seem to affect any

13   conduct that's going to occur between now and trial.

14   It's, as you say, even taking you, your statement it's

15   contingent, it's basically like having -- and I have this

16   all the time -- I have indemnification claims essentially

17   that are sitting in a case that depend upon there being

18   some sort of finding of liability.  I don't dismiss those.

19   I don't say, "Go file a whole new lawsuit."  So that a

20   whole new lawsuit can get filed and then the parties can

21   start litigating, as I'm sure you would, you'd say, "Well,

22   a new lawsuit, time barred, waited too long."  So why

23   doesn't -- what's the harm just to leaving this

24   counterclaim in here?  Is there an iota of harm to you?

25             MR. MAMOUNAS:  Well, I think two things on that

1  point, Judge.

2          The first is that we're essentially litigating a

3  hypothetical.  And we're litigating a hypothetical, point

4  two, that is inconsistent mutually exclusive.  And I think

5  that's the problem that we're having because the

6  plausibility standards that apply on motions --

7          THE COURT:  Are you litigating it in any way

8  that you're not already litigating the existing claims?

9          MR. MAMOUNAS:  I take the point, Judge.

10          THE COURT:  So it's just seems to me it's a

11  paper concern at this point in time.  And you know, it

12  strikes me that I can take a look later on in the case

13  depending upon what -- you know, in the event there is a

14  recision judgment, at that argument that you're making,

15  well, you know, the findings that would have to be made to

16  support recision basically negative any possible finding

17  of unjust enrichment, and maybe then I dismiss the case at

18  trial on those grounds or I give a jury instruction to

19  that effect.  It just seems like there's been so much

20  litigation in this case, so much back-and-forth.  Why are

21  we complicating things?

22          MR. MAMOUNAS:  Well, Judge, if I might.  I take

23  the point that it may be just a paper issue, but it's an

24  important paper issue.

25          Reason being, first, that the Court's subject

1    matter jurisdiction is obviously important to the extent

2    there is not subject matter jurisdiction and there isn't a

3    claim capable of adjudication.  And the fact that it's

4    pled as a contingent counterclaim is what's problematic

5    here, and the case law speaks to that.  There is not a

6    dispute that is capable of adjudication by court power.

7    SS&C has set it up that way.  There is a contract that

8    governs the hours that they're trying to seek recovery

9    for.  And now they're saying, "Well, if you succeed on

10   recision, somehow we would be able to recover."

11            THE COURT:  So if you succeed on recision,

12   recision basically puts the parties back to where they

13   were, right?  Status quo?

14            MR. MAMOUNAS:  That is the intent, Judge.

15            THE COURT:  So would you then have to

16   essentially, part of the status quo, essentially give them

17   a remedy?

18            MR. MAMOUNAS:  I don't believe so, because of

19   the nature of the recision that we're seeking and because

20   of the nature of the conduct.  Recision obviously being an

21   equitable remedy, unjust enrichment being equitable,

22   that's why the case law speaks to this mutual exclusivity.

23   Because on the one hand, the recision is predicated on

24   SS&C's own misconduct, and the Connecticut case law says

25   they can't be rewarded for their own misconduct.  So the

1    recision would be to unwind the agreement and for ARMOUR

2    to be returned the monies that it paid and to be put back

3    in the status quo.  But the case law says, well, SS&C,

4    because we're only here because of your misconduct and

5    that is what our recision claim is predicated on --

6            THE COURT:  Okay.

7            MR. MAMOUNAS:  -- then there would be no way for

8    it to recover.  And that's the second reason, Judge, why

9    we think --

10           THE COURT:  So if I hold off for now deciding

11   that, wait until a fact finder would decide that there's

12   been misconduct of the type that it would warrant

13   recision, then at that point I can get rid of this claim,

14   right, I can dismiss the claim?

15           MR. MAMOUNAS:  If I take Your Honor's question

16   to mean is this the only opportunity for the claim to be

17   jettison, it's certainly not.

18           THE COURT:  And so deferring that until some

19   later point in time doesn't matter, doesn't cost the

20   parties extra time, you're done with discovery for the

21   most part.  It seems to me it's basically an academic

22   issue at this point.

23           MR. MAMOUNAS:  Well, Judge, speaking to the

24   academic issue, again I think there are the two reasons.

25   First is the subject matter jurisdiction, the lack of it.

1   And the second is the mutual exclusivity.  It doesn't hold

2   up to the plausibility standard to have a claim that is so

3   mutually exclusive they are at opposite ends of the

4   spectrum.

5          THE COURT:  I see.

6          So subject matter jurisdiction under Article III

7   requires an injury in fact.  Now, their claim is that they

8   have an injury in fact.  You disagree, I know that.  Their

9   claim is they have an injury in fact from having spent the

10   amount of time that they did.  So I'm not sure what you

11   mean by the lack of subject matter jurisdiction except to

12   the extent that you're saying that it's temporally only

13   contingent upon a certain remedy.

14          MR. MAMOUNAS:  And I think that temporal

15   limitation is an important one, reason being that as of

16   today in recision they have no injury in fact.  Their

17   injury in fact is in contract, and that's barred by the

18   one-year limitations provision.  As of today.  That's why

19   it's contingent.  Now, if different events transpire in

20   the future, then that might give rise to a claim.

21          THE COURT:  That's subject matter jurisdiction

22   as to a single claim, right?  Otherwise have subject

23   matter jurisdiction over this case.

24          MR. MAMOUNAS:  Correct, Judge.

25          THE COURT:  Right, okay.

1          MR. MAMOUNAS:  As to that claim, as to the

2   recision claim, because there's no injury in fact.  And

3   under Connecticut case law, there's no case or controversy

4   that's subject to adjudication by a judicial power.

5          THE COURT:  Okay.

6          Anything else?

7          MR. MAMOUNAS:  Nothing from our end, Judge.  If

8   I may just reserve for rebuttal.

9          THE COURT:  Of course.

10         MR. BAUGHMAN:  Good morning, Your Honor.  Jack

11  Baughman on behalf of SS&C.

12         Does Your Honor happen to have a copy of the

13  answer and counterclaims there on the bench?

14         THE COURT:  I think so.

15         MR. BAUGHMAN:  Because I need to clarify a

16  couple things that were said.

17         The interesting thing about the motion is a lot

18  of the arguments that were made came up for the first time

19  in the reply brief.  And so I need to sort of go through

20  the record on a couple things.

21         Your Honor, may I approach?  I'd like to hand

22  something up if I could.

23         THE COURT:  Sure.  What it is?

24         MR. BAUGHMAN:  It's just some things in the

25  record.

1          THE COURT:  Hand it to my clerk, please.

2          MR. BAUGHMAN:  I gave a copy to counsel.

3          So the first thing I want to talk about is the

4     assertion was made that SS&C had withdrawn part of its

5     claim.  And that's just factually incorrect.

6          The counterclaim pleads at Paragraph 19 two

7     types of -- I didn't actually put the counterclaim in what

8     I gave you.

9          THE COURT:  You went to all the trouble with the

10    binding and everything and didn't give me the first

11    document you refer to.  All right.  I've got that.

12         MR. BAUGHMAN:  So Paragraph 19 of the

13    counterclaim, which is in the second half, pleads for

14    amounts due under the Master Agreement for hosting

15    services, that's the monthly fee.  Then Paragraph 22

16    pleads for $107,300 under Work Request Two.  And that's

17    what we were seeking.  And we still are.  We haven't

18    withdrawn anything like that.

19         THE COURT:  So the Hosting Agreement and Working

20    Request Two.

21         MR. BAUGHMAN:  Correct, Your Honor.  I just want

22    to clarify that point.

23         And the first argument that was made in the

24    brief which was not addressed in the argument but I'll

25    respond to very briefly was essentially that that should

1    be dismissed because the assertion was made that payments

2    had been made.  And respectfully, that's just a factual

3    disagreement.  That's not an appropriate motion to

4    dismiss.  We obviously dispute that.  I could go into the

5    reasons why they're misconstruing the record, but that's

6    what the trial is for.  So I think the first argument

7    there is not a legitimate one.

8              So let me turn now to the limitations issue

9    which is the core of what's going on.  As I said, I want

10   to talk about a couple of things that are important

11   backdrop.

12             The first thing that's important is there is no

13   dispute that the counterclaim relates to the same

14   transaction or occurrence that's the subject matter of the

15   plaintiffs' claims.  There's no dispute that if Rule 15

16   applies, that the requirements are met, that it's the same

17   transaction occurrence.  Plaintiffs have not identified

18   any way that they would be prejudiced if that counterclaim

19   is included other than the prejudice that they might lose,

20   but they haven't identified additional witnesses or

21   anything like that.  They haven't identified any

22   additional discovery they would need.  They haven't sought

23   to reopen discovery to deal with the counterclaim, nothing

24   like that at all.  So the efficient thing is to try it

25   together with the claim at the same time.

1          And here's the most important thing and what I

2   wanted to go through with the documents that I handed up

3   to Your Honor.  There's no dispute and it is completely

4   clear in the record that plaintiffs have been on notice

5   and there have been discussions about permitting this

6   counterclaim since the very beginning of the case.

7          So the complaint was originally filed in May of

8   last year.  If I could ask Your Honor to turn to Tab A of

9   the binder, this is a copy of defendant's initial

10  disclosures which were provided on July 10th of last year.

11         THE COURT:  So if you're going to take me all

12  through these documents to make a point that they were on

13  notice, are you also going to address whether being on

14  notice of the possibility by itself essentially addresses

15  or ameliorates the statute of limitations?

16         MR. BAUGHMAN:  Absolutely.  Yes.

17         Your Honor, just to -- I'll tell you why.  And

18  Your Honor has already said in your order of March 16, you

19  discuss the difference between equitable tolling and

20  equitable estoppel.  And you discussed the difference and

21  you talked about how an estoppel is a matter of federal

22  law.  And an estoppel applies -- estoppel can apply in

23  this circumstance when one party has made a statement or

24  representation of existing fact and the other side has

25  relied on it.  And I'm going to show to Your Honor how

1    that is exactly what has occurred.

2            What has occurred was there was a discussion

3    about the parties about the scheduling of the

4    counterclaims.  It was discussed between the parties and

5    agreed that the counterclaims would be filed after the

6    motion on the motion to dismiss, and SS&C relied on it.

7    And that's what the record shows.

8            THE COURT:  And I'm happy to have you take me

9    through there.  Just one initial other question.  Is there

10   anything that stopped you from filing the counterclaims

11   when you first answered?

12           MR. BAUGHMAN:  They did file them when they

13   first answered.  The answer and counterclaims was filed --

14           THE COURT:  You could not have done it earlier

15   because of the pending motion to dismiss.

16           MR. BAUGHMAN:  Correct.

17           THE COURT:  Okay.

18           MR. BAUGHMAN:  The complaint was filed in May of

19   last year.  The parties had their initial disclosures,

20   which is Tab A.

21           If Your Honor turns to Page 3 of the initial

22   disclosures, this is directed to SS&C and the Category 3

23   is any computation of damages claimed by the disclosing

24   party.  So the disclosing party is SS&C, it's disclosing

25   that it has damages.  And it says it's owed money from

1  SS&C for two reasons and it says that SS&C believes ARMOUR

2  is liable.  Okay.  So it's saying we have a claim.

3         The next document, Your Honor, is the Rule 26

4  report.  This is filed on the docket as Document Entry 36,

5  it's the Rule 26(f) report of the parties' planning

6  meeting.

7         If Your Honor would turn to Page 6, it says in

8  the last sentence of the first paragraph on Page 6,

9  "Following the Court's ruling on SS&C's motion to dismiss,

10  SS&C will assert affirmative defenses to any surviving

11  claims and may also assert counterclaims for damages

12  arising out of ACM's breach of the parties' agreement."

13  And it actually says the same thing at the bottom of the

14  page as well.  Again, SS&C will assert affirmative

15  defenses to whatever claims were made following the

16  Court's ruling on the anticipated motion to dismiss and

17  may also assert counterclaims.

18         So the contemplation, the discussion of the

19  parties was that the counterclaim would be filed following

20  Your Honor's ruling.  That was submitted to the Court.

21  And Your Honor actually so ordered it as a court order in

22  Docket Entry Number 38 on July 21st of last year.

23         The litigation continued.  And then in March of

24  this year, on March 1st, the parties submitted a joint

25  motion to extend the trial deadlines.

1           And if Your Honor sees, this is signed by both

2    parties.  It was ultimately so ordered by Your Honor in

3    Docket Entry 73.  And if Your Honor looks here in the box

4    on the first page under Discovery, it says Fact Discovery

5    Cutoff and Deadlines, look over at Proposed Deadline.  The

6    box says they propose a deadline of May 11 subject to a

7    reasonable time to conduct discovery on any answering

8    counterclaims SS&C files following ruling on its motion to

9    dismiss.  So again, reflecting the discussion and the

10   agreement between the parties that that's when the

11   counterclaims would be filed.

12           So if we go to the issue of the law, I'm going

13   to assume that plaintiffs' analysis of the interplay

14   between federalism and the state law of Connecticut, the

15   sort of fed court's exam, let's assume for a minute that

16   that's correct.  And Your Honor in an ordinary case would

17   be required to apply the Connecticut rule that does not

18   allow a relation back.

19           Under the circumstances here, the Court should

20   not do that.  First of all, that is not a very common rule

21   as far as I understand researching it here.  It applies in

22   two states: Connecticut and West Virginia.  I would submit

23   that it's not a good rule.  It is inequitable because it's

24   a procedural track.  And it's a procedural track of

25   exactly the kind that is being sprung here.  The parties

 1   litigated for ten months.  And under plaintiffs' theory,

 2   during that time the time is running on the counterclaims

 3   even though the ordinary rule in most places would be that

 4   time does not run.  And the record reflects here

 5   understanding of that.  As I say, the record clearly shows

 6   that it was discussed by the parties, it was agreed by the

 7   parties, that was sent to the Court, and the Court

 8   commented on it.

 9          So under those circumstances, I think there is

10   grounds for Your Honor to find an estoppel, as is

11   reflected in your March 16 order, and it is the just thing

12   to do here because they've identified no prejudice, no

13   additional discovery.  And I absolutely guarantee you that

14   Mr. O'Connor and his colleagues who were here before me

15   relied on the setting of this schedule.  If anyone had

16   ever said, "Oh, by the way, just so we're clear, you know,

17   we're going to move to dismiss your counterclaims, ha-ha,

18   because we're going to let the statute run," obviously we

19   would have run to court and filed right away.  They don't

20   change the case, they don't do anything; it's just a

21   procedural track.  That's the argument that I want to make

22   on that.

23          THE COURT:  I see.  Okay.

24          MR. BAUGHMAN:  With respect to the unjust

25   enrichment, Your Honor, Your Honor has got it exactly

1    right.

2             First of all, what's the rush?  There's no harm

3    in keeping these claims in the case.  And I think

4    conceptually Your Honor is thinking of it correctly, which

5    is recision is an equitable remedy.  Don't forget they're

6    pleading the recision claim in the alternative.  So

7    they're saying in an alternative universe, we want to be

8    put back status quo.  Okay.  What's good for the goose is

9    good for the gander, then we will present our arguments as

10   to what happens in that status quo world too.

11            There's no case or controversy requirement here

12   at all, Your Honor.  Clearly SS&C, as Your Honor said, has

13   suffered an injury and there's no contingency.

14            I want to make the one point about all of their

15   cases.  Every single Connecticut case that they cite on

16   this contingency point, the contingency was in a different

17   lawsuit.  They don't have a single case where it's in the

18   same lawsuit.  Those are all cases where A sued B --

19            THE COURT:  I've looked at those cases.

20            MR. BAUGHMAN:  So you understand the point.

21            Here, it's the same thing.  It's efficient.  It

22   makes sense.  You keep it in the same place.

23            THE COURT:  I guess the recision claim is

24   contingent too.  Same grounds I dismissed that.

25            MR. BAUGHMAN:  Exactly.

1            So Your Honor, unless you have further

2    questions, I'll submit it.

3            THE COURT:  I don't think so.  Thank you.

4            MR. BAUGHMAN:  Thank you.

5            THE COURT:  Anything else?

6            MR. MAMOUNAS:  If I might, Judge, briefly.

7            I believe Mr. Baughman made the point first that

8    SS&C hasn't withdrawn anything.  But I would point the

9    Court to Page 6 of their opposition to the motion to

10   dismiss in Footnote 4 which says they do not assert a

11   counterclaim based on the Maintenance and Support

12   Agreement within the Master Agreement, which is the point

13   I made in my opening presentation.

14           The second point concerned notice, and I believe

15   there was discussion about that when we first addressed

16   with the Court the contractual limitations provision.  Of

17   course, equitable tolling would not operate to prevent

18   application of that here.  The argument now that we've

19   heard -- and I don't believe it was raised in the

20   papers -- but it's now that there was an equitable

21   estoppel.  And I would point the Court to its order at

22   page 9 where it says equitable estoppel comes into play if

23   the defendant takes active steps to prevent the plaintiff

24   from suing in time as by promising not to plead the

25   statute of limitations.  That's Page 9 of the Court's

1    March 16, 2018, order on SS&C's motion to dismiss.  And of

2    course, SS&C can point to no active steps that ARMOUR took

3    to prevent it from pleading in time such as promising not

4    to plead limitations or entering into any kind of tolling

5    or offering any kind of tolling agreement during the

6    course of this case.  The fact is that tolling does not

7    apply to bar the operation of Section 6.7.16.

8              THE COURT:  So what do I make of the fact that

9    you did enter, basically you filed this 26(f) report, you

10   were plainly on notice of counterclaims coming.  It was

11   really the first procedural vehicle to do so because of

12   the pending motion to dismiss.  It's hard, you know, if

13   I'm looking at equity here, and I see where you're quoting

14   from my prior order, it doesn't strike me that the

15   language there from Judge Posner's decision in *Baxter*

16   *Healthcare* is necessarily limited to when a defendant

17   takes active steps.  We have a defendant or the plaintiff

18   here, counter-defendant, here essentially engaging in

19   steps, joint submissions, say, of a 26(f) report, that

20   kind of lead down the prim rose path, it seems, of

21   suggesting, well, it's going to be fine then to file the

22   counterclaims at that point.  In my order, the very next

23   sentence there says, "And equitable estoppel is 'a general

24   equity principle not limited to the statute of limitations

25   context.'"

1          Why in equity wouldn't I say in light of the

2   fact that SS&C was so clear about its intentions, even

3   identifying some aspects of it in the initial disclosures

4   of its intent to do counterclaims, why isn't it the right

5   thing to allow the counterclaims to go forward?

6          MR. MAMOUNAS:  First of all, Judge, estoppel

7   requires a representation from the party against whom the

8   estoppel is being argued.  So it would have to be

9   representations by ARMOUR that indicated that it was not

10  intending to assert the contractual limitations

11  provisions.  As I said, SS&C hasn't pointed to any such

12  representations, for one thing.

13         Second of all, this is SS&C's own prevision.

14  This appears in their form contract.  And Your Honor will

15  remember that there was a lot of litigation and briefing

16  over this issue when SS&C tried to assert the provision

17  against ARMOUR and succeeded with respect to certain

18  portions of the contractual relationship between the

19  parties.  So SS&C certainly knew how the provision

20  operated because it was its own.  And they never brought

21  to the Court or they never gave any notice to ARMOUR to

22  indicate that they had a concern about their own

23  limitations provision.  They could have filed a separate

24  lawsuit and indicated on the civil cover sheet that it

25  should be consolidated with this case or it should be

1    transferred to Your Honor.  They could have raised the

2    issue in many different ways.  But they did nothing and

3    sat on their hands, Judge.  And that's why at this point

4    that provision is affective such as to bar the breach of

5    contract claim.

6              THE COURT:  I see.

7              MR. MAMOUNAS:  As far as unjust enrichment, I

8    believe, as I understood it, the only argument from SS&C

9    was that their claim really is alternative and not

10   contingent, and ARMOUR's claim is contingent and not

11   alternative.  And that is, I think, a big difference.  In

12   fact, I don't agree that that is correct, reason being

13   that ARMOUR's injury in fact stems from the

14   misrepresentations that SS&C made to it, it pleads

15   alternative forms of relief and alternative remedies based

16   on SS&C's injurious conduct.  As it stands now, as I

17   indicated before, SS&C has no form of relief in equity

18   under recision.  And that's why it's a purely contingent

19   claim.

20             And we did cite in our brief to the *Brown*

21   decision admittedly from the Eastern District of New York

22   that indicated that a contingent counterclaim is

23   impermissible where it is dependent on the outcome of the

24   plaintiff's lawsuit.  There is no subject matter

25   jurisdiction over that claim such that the Court can

 1    adjudicate it right now because the facts and

 2    circumstances giving rise to it as a matter of law have

 3    not occurred.  That is, SS&C says, Paragraph 34 to their

 4    counterclaim, they need to have ARMOUR's success first in

 5    order to have an unjust enrichment claim.  And that hasn't

 6    occurred, Judge.

 7            THE COURT:  Are they time barred?

 8            MR. MAMOUNAS:  Is what time barred?

 9            THE COURT:  If I dismiss it now and they have to

10    then file another lawsuit at some later time, will you be

11    back to say there's a one-year statute of limitations, no

12    equitable estoppel, no equitable tolling, good-bye.  Is

13    that what's happening?

14            MR. MAMOUNAS:  Judge, I wish I could say that we

15    could make that argument.  But I think that at that point

16    logically the contract would have been rescinded at that

17    point.  And so the general Connecticut statute of

18    limitations for recision would be what would be

19    applicable.  And so SS&C would certainly, once the

20    conditions giving rise to a recision claim arose -- I'm

21    sorry, an unjust enrichment claim arose --

22            THE COURT:  I thought the conditions were that

23    there was an unjust enrichment, the elements of an unjust

24    enrichment.  I don't know that there has to be proved as

25    an element of an unjust enrichment claim a prior recision,

 1   right?  It just happens to be this context.

 2              MR. MAMOUNAS:  That's correct, Judge.  Exactly

 3   right.  In this context.

 4              SS&C has created the condition that they only

 5   have unjust enrichment if ARMOUR has recision.  So that

 6   condition, having not yet arisen, I think the answer would

 7   probably be, just sort of thinking out loud on it, that

 8   the claim would not arise until the recision arises if

 9   it's ultimately awarded.

10              THE COURT:  I see.  Thank you.

11              MR. MAMOUNAS:  Thank you, Judge.

12              THE COURT:  And I take it, Mr. Baughman, your

13   argument would be that any statute of limitations that

14   applies, the contractual statute of limitations which SS&C

15   has previously relied would apply and have begun running

16   at the least from the date that the lawsuit was filed in

17   this case?

18              MR. BAUGHMAN:  I think it would have stopped is

19   what you're saying.  Maybe I misunderstood.

20              THE COURT:  So in terms of evaluating the

21   timeliness of the counterclaims --

22              MR. BAUGHMAN:  I don't think there's a dispute

23   that the counterclaims would be timely had they been filed

24   on the date the lawsuit was filed.

25              THE COURT:  Thank you.  That's what I need to

```
 1   know.  All right.  Okay.
 2            Let's turn if we can -- I'm going to hold this
 3   under advisement with respect to the counterclaims motion
 4   to dismiss.  And frankly, with the understanding that
 5   there's not -- I mean, I know we have other issues going
 6   on in the case, there's discovery and the like.  But these
 7   seem to be wholly encompassed within the scope of what has
 8   occurred so far in the discovery, so there's not an urgent
 9   need for me to rule immediately on the counterclaims.
10            MR. MAMOUNAS:  The only point I would raise,
11   Judge, is that there is a summary judgment deadline on the
12   1st of November.  So we may move for summary judgment to
13   the extent that the Court hasn't ruled on the motion to
14   dismiss by that stage.
15            THE COURT:  I see.  All right.
16            MR. BAUGHMAN:  With respect to that, Your Honor,
17   I would like an opportunity to address the schedule at
18   some point, because we have sort of overrun many of the
19   deadlines.
20            THE COURT:  I understand.  Let's take that up at
21   the end.
22            MR. BAUGHMAN:  That makes sense.
23            THE COURT:  Let's talk about the discovery
24   issues.  As I understand, there are three issues.
25            There's the what we'll call the Mountain emails,
```

```
 1    I suppose, the emails that are sent from James Mountain to
 2    employees of ACM concerning hours that were worked.  And I
 3    understand that SS&C is seeking just the production of
 4    those emails and the responses received from -- is it just
 5    six employees?
 6            MS. KERNISKY:  It's six employees, Your Honor,
 7    yes.
 8            THE COURT:  Six employees.
 9            And the claim by ACM is that the emails that
10    we're talking about are work product privileged.
11            MS. KERNISKY:  That's correct.
12            THE COURT:  Because they were sent at the behest
13    of counsel.
14            MS. KERNISKY:  They were created solely at the
15    request of counsel for the benefit of Mr. Mountain to be
16    able to develop a spreadsheet that the parties agreed SS&C
17    would accept --
18            THE COURT:  Do you want to come up to the
19    lectern so I can understand the claim.
20            MS. KERNISKY:  Certainly.
21            THE COURT:  So for the purposes of Mr. Mountain
22    doing a spreadsheet essentially itemizing those damages.
23            MS. KERNISKY:  Exactly.
24            Counsel asked Mr. Mountain to prepare the
25    spreadsheet to quantify the lost employee time.  That was
```

1    in response to SS&C agreeing, as part of the Rule 30(b)(6)

2    deposition, to accept a document such as the spreadsheet

3    in lieu of testimony about the employee time.  And so at

4    the direction of counsel, Mr. Mountain endeavored to

5    prepare the spreadsheet.  To assist him with that, he

6    requested that the six employees -- well, actually, all of

7    the employees that dealt with the CAMRA implementation to

8    let him know how much time they had spent.  Six of them

9    responded in email form.

10            THE COURT:  Okay.

11            MS. KERNISKY:  And those are the emails that

12   we're talking about.

13            THE COURT:  So Mr. Mountain prepared the

14   spreadsheet at the direction of counsel.

15            MS. KERNISKY:  That's correct.

16            THE COURT:  So that's clearly also work product

17   privilege.  I hope you're not producing that, are you?

18            MS. KERNISKY:  The spreadsheet has been

19   produced, Your Honor.

20            THE COURT:  You produced it even though it's

21   work product privilege?

22            MS. KERNISKY:  Yes, because the spreadsheet was

23   prepared specifically for the purpose of sharing with SS&C

24   the amount of lost employee time that ARMOUR is claiming.

25            THE COURT:  I see.

1          Is there a bit of a fairness issue here in terms

2    of a one-sidedness rule of completeness concern here where

3    an employee of ACM can produce this spreadsheet and

4    completely insulate the opponent from looking at the

5    underlying data or information?

6          MS. KERNISKY:  I understand Your Honor's point.

7    And I don't believe there is unfairness here.  The

8    information that is in the spreadsheet encapsulates

9    everything that's in the emails.  If you've seen the

10   spreadsheet which has been produced, you've seen the

11   contents of the emails.  There's nothing extraordinary

12   about the emails.

13         THE COURT:  Then that surprises me that we're

14   spending all this time talking about this if it turns out

15   it's really nothing at all, the spreadsheet is the same as

16   the emails.  You've already waived work product privilege

17   as to the spreadsheet because your sole grounds for

18   asserting work product privilege is the creation of a

19   document at instruction of counsel.  Gosh, a whole lot of

20   bother, it seems to me, don't you think?

21         MS. KERNISKY:  Well, respectfully, Your Honor, I

22   think that ARMOUR is trying to preserve its work product

23   and that is worth bothering for.

24         THE COURT:  You've waived it already, right?

25   You produced the spreadsheet.

1           MS. KERNISKY:  We never claimed the spreadsheet
2    was work product.
3           THE COURT:  The usual rule on privilege waiver
4    is you waived everything concerning the same subject
5    matter.
6           MS. KERNISKY:  Well, I don't believe that's the
7    case here, Your Honor.  I mean, the spreadsheet -- I take
8    Your Honor's point.  There's nothing in the spreadsheet
9    that isn't in the emails.
10           THE COURT:  So what's the harm here?
11           MS. KERNISKY:  The harm is that -- excuse me, I
12    didn't mean as to interrupt.
13           THE COURT:  What's the harm from producing these
14    fact-laden emails that I take it reflect no mental
15    impressions of counsel or trial strategy, basically just
16    saying how many hours did you work or log in?
17           MS. KERNISKY:  That's correct, Your Honor.  The
18    harm is that if ARMOUR begins having to produce its work
19    product, then ARMOUR has to produce its work product.  And
20    ARMOUR doesn't want to produce more work product.
21           THE COURT:  I see.  Okay.  All right.
22           Anything else?
23           MS. KERNISKY:  Not on the emails, Your Honor.
24           THE COURT:  Just on this issue, Mr. O'Connor or
25    Mr. Baughman or Ms. Ahmed?

1          MR. O'CONNOR:  Your Honor, I have very little to

2     add.

3          They've opened the door in terms of waiver.  We

4     would submit the witness is testifying that he based his

5     testimony on what's contained in those emails, but he

6     won't show us what the emails provide for.  And the

7     witnesses had all previously testified that they couldn't

8     reconstruct the amount of time that they'd spent.  So it's

9     possible that there's something in those emails that may

10    be material to the parties' damages calculations.

11         I would further note that the initial damages

12    calculation that was submitted under oath by Mr. Mountain

13    was I believe one-third of the amount that ultimately

14    comes forward with the spreadsheet as to which the work

15    product has been waived.

16         THE COURT:  Anything else on this issue?

17         MS. KERNISKY:  Yes, Your Honor, if you don't

18    mind.

19         THE COURT:  If you want to consult with

20    Mr. Mamounas.

21         MR. MAMOUNAS:  Judge, if I might, because I was

22    involved with Mr. O'Connor reaching the agreement as to

23    the spreadsheet, I thought I might be able to add context.

24         THE COURT:  That's fine.

25         MR. MAMOUNAS:  The genesis of this was that

1    there were a couple of designated subjects on the 30(b)(6)

2    topics as to which we reached agreement that in lieu of

3    the testimony we were going to provide a spreadsheet that

4    wasn't going to be work product at the outset because it

5    was part of a discovery agreement.

6              THE COURT:  Right.

7              MR. MAMOUNAS:  So far from subject matter

8    waiver -- and I want to be cautious about that -- the

9    purpose was to avert a discovery dispute rather than to

10   create one.

11             What then happened afterward is that there was a

12   follow-up on the 30(b)(6) deposition such that

13   Mr. Mountain was subject to intense questioning by

14   Mr. O'Connor concerning that very spreadsheet.  So SS&C

15   certainly had a full opportunity in order to vet

16   everything that was in the spreadsheet separate and apart

17   from whatever might be in underlying documents.

18             Mr. O'Connor raised the point that the witnesses

19   said they couldn't reconstruct testimony.  That's

20   incorrect, and we addressed that in our papers.  But I

21   think the broader point that he makes is the most

22   important one, and that is that every email that was

23   authored by these individuals was authored by employees

24   all of which were subject to seven hours of deposition

25   testimony by SS&C.  They had full opportunity to question

1    them as far as the amount of time that they spent.

2    However they spent their file is how they spent their

3    time, Judge.

4              So the emails are work product; the spreadsheet

5    was part of the discovery agreement.

6              THE COURT:  Okay, appreciate that.

7              Okay.  So I'm going to rule on this at this

8    time.

9              I'm going to overrule ACM's objection to

10   production of the Jim Mountain emails.  Even assuming that

11   these emails should qualify as attorney work product, I

12   think that's a bit dubious here in view that they're not

13   communications of counsel or reflect attorney mental

14   impressions.  It's evident to me, for all the reasons

15   stated by SS&C here, that there's substantial need for the

16   documents and that SS&C is unable, for the reasons stated

17   at length in the submissions, to obtain the content of

18   this submission elsewhere without undue hardship.  And I

19   also conclude that there's been no showing of genuine

20   prejudice here from the disclosure of this information.

21             So that's it for the first issue.  The second is

22   the chat evidence.

23             I understand there that there's an objection or

24   a concern there about the production of the chats.

25             MS. KERNISKY:  Yes, Your Honor, if I may address

1    that.

2              The chats are an entire repository of data that

3    SS&C never disclosed, never produced, and later certified

4    that their document production was complete without

5    mentioning the chats.

6              THE COURT:  Did ACM produce all of its chats?

7              MS. KERNISKY:  ACM produced all the chats that

8    it had that were responsive, yes.  ACM is an investment

9    advisor, so they have Bloomberg chats.  Those were

10   searched.  Those were produced.  And they don't have an

11   internal -- they don't have the equivalent of the

12   Microsoft Lync chats that SS&C has.  So, yes, they were.

13             The chats that SS&C did not produce are

14   responsive based on the search terms that SS&C has used

15   throughout this litigation:  ARMOUR, ACM, and Bimini,

16   which is the other REIT that Your Honor allowed discovery

17   on.  They ran those search terms only after -- well, let

18   me go back, excuse me.

19             The chats came to light because an employee of

20   SS&C pasted a chat conversation into an email.  And we

21   found that in the email.  And we were able to depose one

22   of the individuals authoring the chat and asked if that

23   was a chat in fact, it wasn't clear otherwise.  He

24   confirmed.

25             THE COURT:  Did you get that email back in

1    October, though?

2            MS. KERNISKY:  We did produce the email in

3    October.

4            THE COURT:  2017?

5            MS. KERNISKY:  That's correct.  They produced

6    the email in October, yes.

7            We asked about the chat.  We confirmed that it

8    was a chat.  The very next day we asked for the rest of

9    the responsive chats.

10           THE COURT:  You asked for that in June of 2018.

11           MS. KERNISKY:  Yes.

12           THE COURT:  So basically eight months or so

13   after the document had been produced.

14           MS. KERNISKY:  Well, Your Honor, let me go back

15   a little further than that even.

16           THE COURT:  Okay.

17           MS. KERNISKY:  In ARMOUR's very first document

18   request, its very first request for production of

19   June 2017 right after the lawsuit was filed, on the same

20   day that ARMOUR filed its amended complaint, we had a

21   document request, ARMOUR had a document request asking for

22   communications including all internal communications at

23   SS&C relating to ACM, relating to ARMOUR.  And so the

24   chats were responsive to that request.  And that was our

25   very first request for production.

```
1              SS&C didn't identify chats in its initial
2    disclosures, it didn't identify them in response to that
3    document request, and it certified later that its
4    production was complete without ever mentioning the chats.
5              So when we confirmed that there were chats, we
6    sought the production.  SS&C delayed in producing and here
7    we are.
8              THE COURT:  So you're seeking -- and I know SS&C
9    talks about there being some 200,000 lines of chat text.
10   And SS&C I think has offered to basically allow you to do
11   ten search terms, right?
12             MS. KERNISKY:  That's correct, Your Honor.
13   There are two problems with that.
14             THE COURT:  Tell me about that.
15             MS. KERNISKY:  The first is that SS&C has
16   insisted throughout this litigation on three search terms:
17   ACM, ARMOUR, and Bimini.  That's it.  When we tried to
18   expand, they resisted.  And to now prejudice ARMOUR by
19   trying to limit the terms when SS&C has used ACM, ARMOUR,
20   and Bimini as responsive terms throughout --
21             THE COURT:  But I thought they were allowing you
22   to use ten different terms.
23             MS. KERNISKY:  Right.
24             What they would do is they've located 200,000
25   lines of text with ARMOUR, ACM, or Bimini.  On top of
```

1   that, they would run a search in there with ten terms that

2   we choose.

3           The second problem, Your Honor, is that -- what

4   terms?  There's no clear way -- in looking at the one chat

5   that SS&C has produced, there are no terms other than ACM,

6   ARMOUR, or Bimini that jump to mind.  There's no real way

7   to capture everything that might potentially be responsive

8   to ARMOUR's implementation or to all of our claims with

9   ten terms.  And it seems that, based on SS&C's failure to

10  timely produce the chats, to limit to ten terms would

11  prejudice ARMOUR, not SS&C, which doesn't seem fair.

12          THE COURT:  I see.

13          So you just basically want all of these chats

14  because, by definition, all 200,000 lines relate to ACM,

15  ARMOUR, or Bimini?

16          MS. KERNISKY:  Yes.  By SS&C's definition, these

17  are all responsive documents.  We have no other -- we

18  don't know what's in them, frankly.  But based on the

19  terms that SS&C has used to govern their production so

20  far, these documents should be produced.

21          THE COURT:  I see.  Okay.

22          And when did you first ask for all of the

23  internal communications about ARMOUR?

24          MS. KERNISKY:  Our very first request for

25  production, June of 2017 when we filed the amended

1    complaint.

2            THE COURT:  And what was the reason, since

3    you -- chats are very commonly used in the corporate

4    world.  What would be the reason why you didn't insist at

5    an earlier time or press for disclosure or discovery of

6    chat?

7            MS. KERNISKY:  Well, Your Honor, SS&C identified

8    four or five repositories of sources of information in its

9    initial disclosures and did not include chats.  If chats

10   were a repository, if they had chats, we would have

11   expected -- ARMOUR would have expected that to appear

12   there.  ARMOUR asked for all internal communications which

13   includes chats by definition and, again, we're told that

14   there's nothing.  So ARMOUR did ask for these and was told

15   that, you know, they weren't there.

16           Then when SS&C was confronted with the email

17   with the chat in it and had to acknowledge that there were

18   chats, you know, they again tried to delay finding out how

19   many more, finding out if they were responsive.  I mean,

20   it was conceivable, Your Honor that SS&C didn't archive

21   chats.  Chats are not quite like email, they're not

22   automatically archived.  The Microsoft Lync feature, you

23   have to configure it for archiving.  Some businesses do

24   that; some do not.  So without representations from SS&C

25   one way or the other, ARMOUR wasn't in a position to know

1     that chats existed.

2               THE COURT:  Okay.  Thank you.  I think I have

3     your argument.

4               Mr. O'Connor.

5               MR. O'CONNOR:  Thank you, Your Honor.

6               I just would like to review for the Court the

7     timetable.

8               The initial disclosures were made on July 10,

9     2017.  They are very clear, and the Court can see as to

10    what categories of documents have been determined to

11    contain relevant information.  It's clear on the face of

12    those disclosures that chats were not being included.

13              THE COURT:  Were you asked for all internal

14    communications?

15              MR. O'CONNOR:  Yes.

16              THE COURT:  So you would have -- I assume you

17    looked at emails?

18              MR. O'CONNOR:  Yes.  And related to that,

19    Your Honor, we've produced at this point more than 600,000

20    pages.

21              THE COURT:  I read 700,000.

22              MR. O'CONNOR:  Yes.

23              THE COURT:  So why wouldn't you essentially

24    say -- why wouldn't chats basically be the same as emails?

25              MR. O'CONNOR:  We just didn't understand that

1    they were being used for purposes related to this

2    engagement.

3           On October 3, the document that apparently

4    revealed to plaintiffs' counsel that there were chats

5    available was produced.

6           THE COURT:  Should that have put you on notice,

7    though?  I know you said it should have put plaintiffs on

8    notice, but shouldn't that have put you on notice that,

9    wait a second, we do have an issue with respect to a

10   reservoir of chats that may be responsive to a request for

11   internal communications?

12          MR. O'CONNOR:  Potentially, Your Honor.

13   Potentially.

14          But that document -- it's worth noting the

15   plaintiffs took 11 depositions.  They did not depose the

16   person who sent the chat.  He was a 30(b)(6) witness.  He

17   was only asked on the last day of extended discovery about

18   chats.  They didn't depose the person who received the

19   chat.  And they didn't depose the person --

20          THE COURT:  That's probably all good reason why

21   if I ordered production of the chats, I wouldn't allow

22   them to depose witnesses now if they came back to you and

23   said, "Hey, now we've got this chat and now I want to ask

24   witnesses questions about that."

25          MR. O'CONNOR:  Yes, Your Honor.  But in

1    addition, it demonstrates the redundant nature of what

2    they'd be looking for.  The fact that it really wasn't

3    material and the cases that we've cited make clear that to

4    the extent an issue arises, it's incumbent upon them, if

5    you can't reach an agreement, to move to compel.  The

6    reality is a year after receiving a document that clearly

7    put them on notice, they didn't bother pursuing the chats

8    at all.  And even after we told them we weren't going to

9    do it, they waited two months.  We had five different

10   discovery disputes during that time, Your Honor.

11            THE COURT:  Oh, yes, I know.

12            MR. O'CONNOR:  So there's a recurring theme of

13   attempting to go back and redo things.

14            THE COURT:  So the chats that you have now, just

15   so I understand, you've got 200,000-plus lines --

16            MR. O'CONNOR:  Yes.

17            THE COURT:  -- of chats that are within the

18   scope of when you've done a search for the terms "ARMOUR,"

19   "ACM," and "Bimini."

20            MR. O'CONNOR:  So a chat could be 50 lines.

21   Somewhere it may show that.

22            And ACM, it turns out, Your Honor, was not the

23   term that SS&C used for ARMOUR.  So we have this vast

24   amount of chats, I would submit that they would be

25   entirely cumulative of the hundreds upon hundreds of

1    thousands of pages of emails that we've already produced.

2              THE COURT:  What was the term that was used then

3    if it wasn't "ACM"?

4              MR. O'CONNOR:  "ARMOUR," "ACM," and "Bimini."

5              So we've reviewed massive amounts of documents

6    to get to 700,000 pages.  And a lot of that was completely

7    irrelevant.

8              THE COURT:  Okay.

9              MR. O'CONNOR:  Those were the gathering terms.

10   The same gathering of terms would generate an enormous

11   amount of material to be reviewed at great burden in a

12   case where the amount of discovery has exceeded, on a

13   proportionality perspective, the amount in controversy.

14   There's $1.8 million in contract damages here.  We would

15   be pushing close to a million pages in documents.

16   Discovery is complete.  The plaintiffs do not deem this to

17   be important when the witnesses were available to be

18   questioned, they waived it.  We respectfully submit it's

19   an attempt to reopen things after having had an expert who

20   did not perform well.

21             THE COURT:  I see.  Okay.  Thank you.

22             Ms. Kernisky.

23             MS. KERNISKY:  Thank you, Your Honor.  Just a

24   few things in response.

25             As Mr. O'Connor knows and as SS&C knows,

1    reliance is not the standard under Rule 26 and Rule 34.

2    These are relevant.  This is a repository of relevant

3    information and relevant and responsive based on the very

4    terms that SS&C has insisted are the responsive terms

5    throughout this entire litigation.  These documents are no

6    different than the emails that SS&C produced.  They are

7    just simply from a different source.

8         It would be as if they had failed to produce

9    archived emails because they didn't look where the

10   archived emails live.  That wouldn't stop those from being

11   responsive.  It shouldn't stop the chats from being

12   responsive.  It's an entire repository that has not been

13   produced.

14        The chats are highly responsive, at least based

15   on the terms and also based on the one chat that we have

16   seen which is from the head of professional services to a

17   subordinate in professional services, to a gentleman Scott

18   Rice who did the primary work on ARMOUR's implementation.

19   They are discussing the implementation.  They are

20   discussing SS&C's failures with the implementation.  They

21   relay directly to our claims.  And there's good reason,

22   based on that particular chat, to think that other chats

23   would have similar information.  It seems that at least

24   people in professional services, at least Scott Rice who

25   principally worked on it, at least David LaMonica who was

1    head of professional services used chats as a forum to

2    discuss ARMOUR's implementation.

3         So to prevent ARMOUR from being able to review

4    those documents, use those documents in its case because

5    of SS&C's failure to disclose -- you know, there's a case

6    we cited to in our letter brief, Your Honor, *Star Direct*

7    *Telecom*, from the Western District of New York that says a

8    party cannot profit by hoping to -- by concealing a

9    relevant source of discovery and hoping to just live past

10   the discovery cutoff and make it and never have to

11   disclose and then essentially get away with it.  These

12   chats should have been produced.  There's no ground not to

13   produce them.  And there's no burden at this point in

14   producing them.

15        Your Honor is correct that we've used up our

16   number of depositions and, you know, the chats will speak

17   for themselves.

18        The burden on SS&C is minimal.  They have -- as

19   we understand it, SS&C has already produced the chats to

20   its counsel, so it's not a matter of having to go find

21   them or spending money to dig through archives or things

22   like that.  The chats are in possession of counsel.  They

23   can be readily reviewed and produced.  ARMOUR was willing

24   to work to try to ameliorate that burden to the extent

25   there is a burden, which we don't think there is --

 1              THE COURT:  How would you ameliorate it?

 2              MS. KERNISKY:  Well, ARMOUR has suggested, as

 3    one way to go about it, to allow SS&C to produce all of

 4    the chats designated attorneys' eyes only.  And only at

 5    such time as ARMOUR locates a chat that it would like to

 6    use in litigation, it would then have to seek permission

 7    from SS&C or seek leave of Court to remove that

 8    designation so that the document would be available.  That

 9    would relieve a review burden because all of the documents

10    would be protected as attorneys' eyes only until such time

11    as ARMOUR thought that they might need to be unprotected.

12              THE COURT:  I see.

13              And do you have anything else?  I have one more

14    question of Mr. O'Connor.

15              MS. KERNISKY:  No, Your Honor.

16              THE COURT:  Mr. O'Connor, have you looked at

17    these chats yourself?

18              MR. O'CONNOR:  No, Your Honor.

19              THE COURT:  You have not.  Okay.

20              It sounds to me like -- sometimes chats go in

21    lengthy strings.

22              MR. O'CONNOR:  Yes.

23              THE COURT:  They're informal sometimes in nature

24    so tend to kind of go from, you know, the ball game score

25    to something else.

1          MR. O'CONNOR:  Yes.

2          THE COURT:  I take it that to the extent you're

3   seeking chat production, you're seeking just those

4   portions of the chat that actually concern implementation

5   of the CAMRA system?

6          MS. KERNISKY:  That's hard to say, Your Honor.

7   If a chat has "ARMOUR" as a term, they could be discussing

8   things other than the implementation.

9          THE COURT:  The aspect of the chat that talks

10  about ARMOUR, ACM, or Bimini?

11         MS. KERNISKY:  Yes.  We're not interested in the

12  baseball scores.  Although, the way I understand the chats

13  are maintained in Excel spreadsheets, it might be more

14  burdensome to pull stuff that is not responsive out.

15         THE COURT:  I see.

16         Anything else, Mr. O'Connor, on this?

17         MR. O'CONNOR:  No, Your Honor.

18         THE COURT:  So I'm going to rule on this.

19         I'm going to overrule SS&C's objection to the

20  production of the chat evidence.  I don't think there's

21  been bad faith, I'm not saying that, but I do think that

22  the chat information basically reveals internal

23  communications that is fair to think would have been

24  relevant and is the kind of information that just probably

25  should have been identified as potentially producible and

1    was within the scope of ACM's request for internal

2    communications of employees.  It's regrettable that we're

3    at this late date, but I think in fairness it's

4    appropriate to require that chat evidence that's been

5    identified so far that contains references to ARMOUR, ACM,

6    or Bimini with the understanding that that's about 200,000

7    lines overall for review to be produced, subject to

8    redaction for aspects of any chat information that's not

9    pertinent to ACM, Bimini, or ARMOUR so that it might be

10   talking about other customers or other matters that are

11   not within the scope of a request here.

12              MR. O'CONNOR:  Thank you, Your Honor.

13              THE COURT:  And I very much doubt I would allow

14   subsequent deposition because, again, I think it's also

15   something -- although I think SS&C should have perhaps

16   undertaken more diligence to identify this, I also think

17   that ACM bears some responsibility here in terms of not

18   pursuing the issue at an earlier point in the litigation.

19   So I'm trying to make the fairest call at this point where

20   we are right now.

21              MS. KERNISKY:  Thank you.

22              THE COURT:  I'm going to require that to be

23   produced within 30 days.  I know we're going to have a

24   broader discussion about schedule.

25              MR. O'CONNOR:  Thank you, Your Honor.

1          THE COURT:  On the understanding that you say

2     it's going to take about 100 attorney hours, hopefully

3     with more than one attorney who can dedicate themselves to

4     the review.

5          Anything else?

6          MS. KERNISKY:  On the timing, Your Honor, we

7     would ask the Court to consider something less than 30

8     days.  SS&C has known about this --

9          THE COURT:  No, 30 days.  It's a lot of data to

10    go through and I want to make sure they do it right, and

11    30 days will be the time I allow for that.

12         MS. KERNISKY:  Thank you, Judge.

13         THE COURT:  That gets us to our third and last

14    area, which is the expert report issue.  I've reviewed the

15    parties' submissions on that.  Maybe I'll hear from ACM

16    first.

17         MR. MAMOUNAS:  Thank you, Judge.

18         THE COURT:  And just by way of background here,

19    re-reading the complaint, it looks like in Paragraph 23 of

20    the complaint that ACM filed, one of the specific

21    misrepresentations in the case is that you were told

22    during the pre-contractual discussions about CAMRA's

23    implementation -- and I'm just quoting from Paragraph 23

24    of the complaint -- "and use for other customers like

25    ACM."

1          So as I understand it, a core part, or one of

2    the predicates for your misrepresentation and negligent

3    misrepresentation claim, is essentially that you're told

4    by SS&C about other customers like ACM; is that right?

5          MR. MAMOUNAS:  Judge, there's no denying that

6    SS&C certainly touted its experience with other customers.

7          THE COURT:  So other successful customers, I

8    assume.

9          MR. MAMOUNAS:  I don't know if they were

10   successful or not, Judge, to be quite honest with you,

11   reason being -- and it comes back to Rule 26 and we heard

12   some discussion on that on the prior issue -- there was

13   never any disclosure that SS&C entitled to rely in its

14   defense on other customers.  That would have been

15   important because Your Honor will remember our discovery

16   disputes in the past concerning other customers at which

17   point SS&C I think pretty vigorously resisted production

18   concerning any other customers.  And I think Your Honor

19   would agree with me that were there disclosure that the

20   defense was going to rely on other customers, those

21   conversations would have gone in a much different

22   direction, reason being the standard under Rule 26(a) is

23   an identification of witnesses or documents on which a

24   party may rely for its claims or defenses.  That never

25   happened here.

1              ARMOUR, in seeking information about other

2     customers, was seeking information that would relate to

3     questions of knowledge, of notice, of intent, and of

4     causation.  We had a lot of discussion about that.  SS&C

5     had multiple disclosure points throughout the course of

6     this case during which they could have informed ARMOUR,

7     they could have informed the Court that while they were

8     resisting production of any other customer information

9     concerning ARMOUR's case, they were going to rely on what

10    they characterize as successful implementations and

11    satisfied customers, and that never happened.

12             Rule 26(a) is the -- let's say the North Star on

13    this issue, Judge.  The case law all says that it is about

14    giving fair warning and fair notice.  It is what is meant

15    to guide the course of discovery such that the parties

16    know what the other side is going to rely on.  That's a

17    basic issue of due process and fundamental fairness, for

18    ARMOUR to have known that SS&C was going to rely on other

19    customers.  Instead, SS&C said nothing.  They were silent

20    throughout the history of the case.

21             THE COURT:  So have you had access to the

22    documents that were relied upon by the two experts at

23    issue?

24             MR. MAMOUNAS:  I'm sorry, Judge?

25             THE COURT:  So the experts have issued reports

1   here.  And I know you've not deposed them, but have you

2   been given access to documents that they cite or rely on

3   in their report?

4          MR. MAMOUNAS:  So, Judge, what happened was

5   after fact discovery cut off -- in fact, discovery has

6   been closed since May 11 -- SS&C in the middle of

7   September produced its expert reports and they provided

8   approximately ten summary spreadsheets purportedly

9   identifying the CAMRA customers, mortgage REITs and

10  otherwise, that supposedly have used CAMRA successfully.

11  Now, that was a shock and a surprise to us given that

12  we've asked for that information in discovery many a time,

13  and Your Honor will recall that, and we were denied access

14  to it.  But we were provided with those summary

15  spreadsheets, the basis for which we have no opportunity

16  to test.

17         We were also advised in the expert reports that

18  it seems a lot of the information that the experts rely on

19  concerning other customers came from SS&C witnesses.  And

20  so there's extensive discussion -- and I'm happy to point

21  Your Honor to the cites -- but there's extensive

22  discussion of issues concerning satisfaction, concerning

23  success, concerning the sales process, concerning the

24  experience with the software, concerning functionality,

25  concerning custodians, et cetera, as to which we had no

1    access whatsoever.  So it's not only a matter of the

2    documents themselves being summaries for which we can't

3    test the underlying information; it's also a matter of

4    SS&C taking the institutional knowledge it had even before

5    this case started and now trying to use it affirmatively

6    against ARMOUR.  And in order to do that, they also

7    recruited someone else from the outside of the

8    organization, that's Mr. Maffattone, who is basically a

9    fact witness in expert witness clothing who had this

10   experience with Annaly and Chimera, two other SS&C

11   customers, as far as the sales process with SS&C and the

12   implementation of the software.  Now he now purports that

13   his experience with the implementation was perfectly fine

14   and that it was satisfactory and successfully implemented.

15   We have no basis to test that.  We have no idea.  When the

16   question of Annaly or Chimera or any of the other

17   customers came up in discovery, it was consistently

18   resisted and it was resisted vigorously.  We made requests

19   for production, we made interrogatory requests, there was

20   letter briefing on discovery disputes, there were

21   hearings, there were tons of opportunities, Judge --

22            THE COURT:  So at what point in the discovery

23   disputes -- I remember certainly dealing with Fortress and

24   Resource and Bimini, essentially the unsuccessful

25   implementations.  At what point did we cover specifically

1   requests with respect to successful implementations?

2             MR. MAMOUNAS:  So, Judge, the very first request

3   for production asked for persons, including mortgage

4   REITs, that ever used CAMRA as a for instance.  We also

5   asked for documents concerning the defenses that SS&C

6   intended to raise or expert witnesses it intended to

7   raise.  We made other requests -- and these are listed at

8   Footnote 4 of Docket Entry 161 -- where we identified at

9   least 15 separate occasions in which we asked in written

10  discovery for information if SS&C was intending to rely on

11  other customers in its defense it would have told us.  But

12  Your Honor will remember the very first starting point for

13  all of this in discovery was when we had a hearing with

14  you, I believe it was in August or September of 2017 on

15  our initial request, and we asked for the preliminary

16  information that one would expect about other customers.

17  Who were they?  Tell us who these other customers were.

18  It wasn't limited to mortgage REITs at the time.  We said

19  tell us who your other folks are so we can assess, from an

20  affirmative perspective, whether it's worthwhile for us to

21  seek discovery.  SS&C opposed all of those requests.  They

22  objected in writing.  And they opposed them at the

23  discovery hearing such that Your Honor's ruling ultimately

24  said, well, you'll get a list of mortgage REITs.  And then

25  at deposition you will be able to establish a predicate

1    whether they meet a particular standard, that is whether

2    the implementations failed for reasons not idiosyncratic

3    to the customer.  We were able to do that with respect to

4    one:  Bimini.

5         We had three follow-up hearings concerning other

6    customers.  SS&C stood silent every single time in respect

7    to whether they remember going to rely on purportedly

8    satisfied customers.

9         When they tried to take discovery at depositions

10   even within the scope of Your Honor's limited order to ask

11   questions about customers that they now claim were

12   purportedly satisfied, we were told:  "This is an

13   overreach, you are exceeding the Court's order, this is

14   irrelevant information, you need to be cautious about what

15   you're asking."  They designated it attorneys' eyes only.

16   They made ARMOUR's corporate representatives leave the

17   rooms unceremoniously every time because they stood on

18   Your Honor's orders affirmatively against ARMOUR to deny

19   us discovery concerning other customers.

20        And here we are, Judge, now past fact discovery.

21        THE COURT:  Was there ever a point in time in

22   which you raised with me, the Court, your wish to

23   specifically inquire into essentially satisfied customers?

24   My recollection is the focus was always on unsatisfied

25   customers.  You wanted to show kind of a pattern of, you

1    know, that they should have known better.  And that you

2    weren't trying to delve into whether they in fact had some

3    satisfied customers before.

4              MR. MAMOUNAS:  And that would make sense because

5    I'm trying to prosecute the case.

6              THE COURT:  I understand why you would have

7    focused on unsatisfied customers.  I'm just trying to sort

8    out this notion that you're saying you're surprised that

9    they're coming at you now and saying in fact we have

10   satisfied customers.  They're a large company that you

11   know have many customers.  You've pled here that they told

12   you in Paragraph 23 of the complaint that they have

13   satisfied customers.  I'm just trying to sort out why you

14   would be surprised that they would then come forward and

15   say, well, there's satisfied customers.

16             MR. MAMOUNAS:  For three reasons, Judge.

17             The first, it was never in the Rule 26

18   disclosures.  If they intended to rely on them in their

19   defense, they had to say it in their Rule 26 disclosures,

20   it's clear on the face of the rule.

21             Number two, we did not limit our initial request

22   only to customers of SS&C that were unsatisfied.  We

23   asked, "Tell us everybody who uses the product so we can

24   identify further discovery," which immediately

25   precipitated the hearing before Your Honor where they said

1   no other customer discovery is fair game.

2              At that stage, reason number three, Your Honor

3   put in place a standard that said, okay, I am going to

4   allow you discovery of other customers with the not

5   idiosyncratic standard.  From that stage, we were on our

6   way looking at only dissatisfied customers because those

7   are the only ones that would fit within the standard

8   established by Your Honor at I believe the December 17

9   hearing.

10             THE COURT:  How is it that SS&C is supposed to

11  be able to respond then to the allegations of

12  Paragraph 23, you know, when they have a witness on the

13  stand talking about the initial conversations that were

14  occurring with ACM and you're, you know, delving into it?

15  Are you going to stop anybody from saying in fact CAMRA's

16  an established product, successfully installed it with

17  many other customers?  I'm trying to foresee where you're

18  going with this.

19             MR. MAMOUNAS:  I take the point, Judge.  I think

20  the important consideration is that the misrepresentations

21  have been alleged to have been negligently made and there

22  is a standard of knew or should have known as far as the

23  truth or falsity of what they said.

24             And the point that we made and what has emerged

25  from discovery has nothing to do with who those other

1    customers are, it has nothing to do with whether their

2    implementations were successful or not.  Our point is that

3    taking SS&C at its word, it has made key admissions.  It

4    has admitted no other mortgage REIT was implemented within

5    four to six months.  That doesn't require any kind of

6    proof of who those other mortgage REITs were or whether

7    they even were implemented successfully.  SS&C, if it

8    wanted to put on that proof in its defense, could have

9    noticed it in the Rule 26 disclosures or it could have

10   identified in response to our repeated requests for

11   information about their defense.

12           We also say they never implemented any mortgage

13   REITs on hosting.  Again, it's an undisputed fact.  It's

14   an admission by SS&C.  The personnel from SS&C that were

15   involved in planning out our implementation, she admitted

16   that all the prior implementations that she sketched out

17   were lengthy and over budget.  Now, it's immaterial, from

18   our perspective, whether those implementations ultimately

19   were successful or not.  What we're saying is that when

20   SS&C made representations to us about what it was going to

21   be able to do, it did not act reasonably because of the

22   admissions that have emerged in discovery.  If SS&C in

23   response wanted to rebut that or characterize it in a

24   different way with additional proofs, they had to produce

25   that in discovery.

1           And again, I come back to the fact that, apart

2      from the Rule 26 disclosures, there were multiple serial

3      points of disclosure.  We were here on four discovery

4      disputes at which SS&C could have said, "Your Honor, I

5      just want to make it entirely clear that while we are

6      resisting producing on dissatisfied customers, we will be

7      relying on satisfied customers," so that there wasn't any

8      kind of miscommunication at best is what they say.

9           I come back to Rule 26 disclosures.  It was

10      never mentioned, never identified.  And here we are,

11      Judge, after fact discovery, learning that SS&C now is

12      going to rely on this library of information that only

13      they have.

14           THE COURT:  So you're essentially seeking at

15      this point -- the remedy you're seeking now is to strike

16      the expert report.

17           MR. MAMOUNAS:  Judge, I don't think that the

18      entirety of the expert reports need to be struck.  I would

19      leave that to SS&C.  I think what Rule 37(c)(1) speaks to

20      is a preclusionary remedy.  That's what the case law says.

21      A decision that Magistrate Judge Margolis issued in the

22      Innis Golf Club [sic] decision v. Pitney Bowes speaks to

23      the automatic nature of the 37(c)(1) preclusionary remedy.

24      And the burden falls on SS&C to make its case as far as

25      why there's no prejudice or why the failure to disclose is

1    harmless.  And I don't believe they can do that here.

2    They've set up a situation in which they've taken with one

3    hand and now they try to give with the other.

4            And we had a hearing the last before Your Honor

5    on this issue, and Your Honor said that the scope of this

6    case is about a broken relationship between SS&C and

7    ARMOUR and you weren't going to allow any other customer

8    discovery beyond what's already been given.  So the

9    information that they're seeking for purposes of this

10   case, it's not significant, it's not material as far as

11   the way Your Honor has characterized the discovery.  And

12   we believe that SS&C should be precluded from relying on

13   those other customers.

14           THE COURT:  I see.

15           MR. MAMOUNAS:  And I would be remiss if I didn't

16   mention there were a number of witnesses that their

17   experts also relied on and documents that are in our

18   papers that for the same reasons we believe SS&C should

19   not be entitled to rely on at a hearing, motion, or trial,

20   as 37(c)(1) says.

21           THE COURT:  Thank you.

22           MR. MAMOUNAS:  Thank you, Judge.

23           MS. AHMED:  Hi, Your Honor.  Nora Ahmed for

24   SS&C.

25           So I would just like to go back a little in time

 1   in history.  You pointed out Paragraph 23.  I want to go

 2   back to Paragraph 16 in the amended complaint.  And if

 3   Your Honor looks at -- it looks like you may have the

 4   Ahmed declaration up there, it's Exhibit B, or if you have

 5   the First Amended Complaint up there.

 6              THE COURT:  Okay.

 7              MS. AHMED:  I'm also happy to give you a copy.

 8              THE COURT:  I have a lot of documents up here.

 9   If you have something to direct me to, go ahead.

10              MS. AHMED:  So if we look, Your Honor, at

11   Paragraph 16 of the First Amended Complaint that appears

12   on Page 5, you're going to see at the bottom here that

13   there is a picture of a presentation that had been

14   provided.  And Paragraph 16 talks about how in June 2014

15   SS&C made a presentation to ARMOUR about CAMRA.  And this

16   is implicated right here in Paragraph 16 and is directly

17   tied to the paragraph that Your Honor read which was

18   Paragraph 23 of the amended complaint.  But I think what

19   would be helpful is for us to actually take a look at this

20   presentation.  And that is Exhibit A to the Ahmed

21   declaration, but I also have this for you here to look at.

22              All right.  So this is the presentation that's

23   being discussed in Paragraph 16 of the amended complaint.

24   And this is, you know, for ARMOUR, Introduction to SS&C

25   Technologies, and this is one of the first discussions of

1    CAMRA.

2              I'd like to turn Your Honor's attention to

3    Slide 4.  Slide 4 at the very top indicates Expertise

4    Supporting MBS.  And then we have this line here that's

5    important because it's repeated in Paragraph 16 of the

6    amended complaint.  It says here, "A large portion of our

7    compliant base has significant exposure to MBS."  Then it

8    says "REITs."  And then we actually list the names of

9    seven REITs right here:  Annaly/Chimera, Western Asset,

10   Apollo, CYS, Ares, New York Mortgage Trust.  These REIT

11   customers are those that our experts discuss in their

12   expert reports.  There's no question about that.

13             But this information was in this June 2, 2014,

14   presentation that then became an issue in their amended

15   complaint.  And in their amended complaint, they tease out

16   this language from this very slide that list these very

17   customers.  They say, if we go up to Paragraph 16, that:

18   At this meeting, these SS&C representatives made a

19   presentation to ACM extolling SS&C's "accounting and

20   reporting expertise," describing CAMRA as a "proven

21   accounting engine," and proclaiming that a "large portion"

22   of SS&C's client base had significant exposure to MBS,

23   including real estate investment REITs familiar to ACM.

24             And this allegation then becomes part and parcel

25   of Paragraph 23 of their amended complaint.

1          But if we go to our answer, Your Honor, we deny

2    the veracity of Paragraph 23.  We deny that anything we

3    said in this June 2014 presentation was a

4    misrepresentation.  So we put ACM clearly on notice from

5    the very beginning of this case that this presentation was

6    an issue for us because they were accusing us of a

7    misrepresentation and we were going to defend ourself

8    against any misrepresentation here including anything that

9    we said about these seven customers being an example for

10   ACM to turn to about why we believed CAMRA was an

11   appropriate product for ACM.

12          THE COURT:  And just to be clear, your experts

13   are limiting themselves to those seven customers?

14          MS. AHMED:  Our experts are limiting themselves

15   to these seven customers and these are deemed, quote, the

16   successful customers.

17          But it doesn't really just stop there,

18   Your Honor, because Dr. Kursh, who is plaintiffs' expert,

19   calls into question once again this very slide and these

20   very customers.

21          So I would like to hand Your Honor up an excerpt

22   of Dr. Kursh's report, which is Exhibit L to the Ahmed

23   declaration.

24          THE COURT:  I've got a fairly thick submission.

25          MS. AHMED:  So if we go to Exhibit L.  Thank you

1   so much, I've got it here.  This is an excerpt.

2            I would like to draw Your Honor's attention to

3   Paragraph 53.  And that's Page 9 of Mr. Kursh's expert

4   report.

5            THE COURT:  Okay.

6            MS. AHMED:  So if we look at Paragraph 53, once

7   again Mr. Kursh, now plaintiffs' expert, is taking issue

8   with this very presentation.  And he says, "SS&C also

9   promoted its 'expertise supporting MBS' and claimed

10  that" -- and here's that language again -- "a 'large

11  portion of our client base has a significant exposure to

12  MBS.'"  And he goes on to say in support, "SS&C provided

13  ACM a list of six mortgage REIT clients that purportedly

14  were using CAMRA."  And in this paragraph he goes on to

15  say that these mortgage REITs were not sufficiently

16  similar to ACM in terms of assets under management or

17  employee size.  So he's making the allegation that this

18  was a misrepresentation that we, SS&C, should not have

19  listed these customers as examples of why we believed

20  CAMRA would be successful because they were too different

21  from SS&C.  And our experts respond to this.

22           Mr. Brooks Hilliard goes to the 10Ks and he

23  looks at the assets under management of these mortgage

24  REITs.  And he comes to a different conclusion than

25  Dr. Kursh and he says, in fact, these mortgage REITs were

1    sufficiently similar to ACM when you look at assets under

2    management and when you look at employee size.

3              When we talk about Mr. Maffattone,

4    Mr. Maffattone has expertise specifically related to not

5    just software implementation generally but to the

6    implementation of CAMRA specifically and at mortgage

7    REITs.  And that matters here because at the core of

8    plaintiffs' allegation is that there's something different

9    about implementing CAMRA on a hosted basis versus

10   implementing CAMRA on an outsource basis.  Mr. Maffattone

11   takes issue with that and says, in fact, based on his 30

12   years of experience and his time implementing CAMRA at

13   Annaly and Chimera that that's just not true, that if

14   you're looking at implementing CAMRA on a hosted basis or

15   an outsource basis it's effectively the same.  And that's

16   his expert opinion.

17             And in Paragraph 99 of this same report from

18   Dr. Kursh he once again takes issue with this very slide

19   and he footnotes the names of these mortgage REITs we were

20   talking about, and he says, "Specifically, in its

21   Proposal, SS&C told ACM that hosting was appropriate for

22   it.  This is significant because SS&C had mortgage REIT

23   clients on a strictly licensed basis and on an entirely

24   outsourced basis, but it had never implemented a mortgage

25   REIT on a hosted basis before."  And then he footnotes

 1    information from this slide, again, effectively saying

 2    that these mortgage REITs that we discussed in June that

 3    they took issue with in their amended complaint are not

 4    sufficiently similar.  And those are the issues that our

 5    experts then contend with, Your Honor.

 6              So we are here at this point where we need to

 7    determine whether there's been a Rule 37 violation.  And

 8    for there to be a Rule 37 violation, there has to be some

 9    discovery order violation or a violation of the Federal

10    Rules of Civil Procedure.

11              If we go back to Your Honor's order when you

12    were discussing the broken relationship between ACM and

13    SS&C and how that's the crux of this litigation, we agree

14    with that, Your Honor.  We also agree that this is not

15    about auditing the details of the distinct

16    implementations, the technical aspects of implementing

17    CAMRA at these other mortgage REITs.  But Your Honor's

18    statement about how this is about a broken relationship

19    doesn't preclude SS&C from defending itself against the

20    allegation that it made a misrepresentation in this

21    June 2, 2014, presentation.

22              Now, turning to this notion that our initial

23    disclosures were not sufficiently detailed, respectfully,

24    Your Honor, we have to disagree.

25              And if you have Mr. Baughman's packet again, but

1    I can also offer it to you, we can take another look at

2    the initial disclosures, just so we can closely look at

3    that language.

4             So if we're on the very first page of the

5    initial disclosures and SS&C is listing the former and

6    current employees that it may use in supporting its claims

7    and defenses, you'll see here many names, but I'd like to

8    draw you Your Honor's attention to the names Tim Reilly

9    and Jeff Fecteau, two individuals who were in fact

10   deposed.  And the topics that they were, you know, told

11   would be the subject of information that we may discuss in

12   our defense had to do with the negotiation, purchase, and

13   sale of a license CAMRA software.

14            If we go back to that very presentation that we

15   were looking at earlier, Your Honor, and we flip to the

16   very last page, we're going to see Mr. Reilly's name and

17   Mr. Fecteau's name.  So if Your Honor has that

18   presentation again, on the very last page of that June

19   presentation, with you today you'll see the names J.

20   Timothy Reilly, CPA, and we also see the name Jeff

21   Fecteau.

22            So they were informed on June 2, 2014, that it

23   was SS&C's view that we were aware of sufficiently similar

24   customers and we thought CAMRA would be a great product

25   for them.  This is long before we entered into a contract,

1    long before there was any dispute.  They raise as an issue

2    this very presentation.

3           And in our initial disclosures we were very

4    clear that we were then going to make sure anything

5    related to the sales process was going to be defended

6    against.  And we listed Tim Reilly and Jeff Fecteau who

7    provided this very presentation.  And they deposed Tim

8    Reilly and Jeff Fecteau and they asked them questions

9    about these very customers.  And they asked questions

10   about whether these implementations were, quote,

11   successful or whether there was anything related to these

12   implementations that made them unhappy.  They asked these

13   questions, Your Honor.

14          THE COURT:  Did you block those questions?

15          MS. AHMED:  We did not block any questions,

16   Your Honor.  The issue here is there was a concern when we

17   discussed other customers that this was directly related

18   to ACM's competitors and so we did not want anyone from

19   the business side of ACM in the room when those

20   discussions were taking place.  So what ACM is referring

21   to here is there were objections when the client from ACM

22   was in the room and they were asked to leave, but that

23   questioning was allowed to proceed, the questioning wasn't

24   stopped despite the fact that, you know, any individual

25   from ACM was asked to leave the room.  So those questions

1    were not -- SS&C didn't say, "You're not allowed to ask

2    those questions."  We just said, "Please make sure your

3    client leaves the room."

4              THE COURT:  Okay.

5              MS. AHMED:  So we're at a point where,

6    Your Honor, we don't believe there's been any Rule 37

7    violation, that we even need to move to analysis whether a

8    motion to strike here is possible.

9              But we'll assume, for the sake of argument,

10   we'll assume that there has been some violation of

11   Rule 26.  But even if we are to take that at face value,

12   we then need to look at the four *Softel* factors, and we

13   need to consider these four factors, each of which are not

14   dispositive, and then come to a conclusion about whether

15   this remedy here is appropriate.

16             As Your Honor knows, this is an extreme remedy.

17   If we look at *Lab Crafters*, this is a remedy that applies

18   when there is flagrant bad faith.  This is a remedy that

19   applies when there is callous disregard for the federal

20   rules.  So it's an extreme remedy that is implemented.

21             If we look at the first factor, we need to

22   consider what SS&C's, quote, excuse would be for having

23   failed to disclose information about, quote, other

24   customers or whether that failure to disclose was

25   harmless.  And Your Honor, what we would say is if ACM

1    somehow was not on notice based on all the information we

2    just discussed, they asked the correct questions at their

3    depositions.  They asked whether these particular

4    customers had successful implementations, and they were

5    told by Mr. Reilly, yes, these were successful

6    implementations by SS&C's standard.

7         So if they are going to claim that there was

8    some kind of discovery violation -- and we say there was

9    not -- they were sufficiently put on notice of this

10   information through the discovery process.  They were

11   privy to the fact that there were successful customers and

12   they knew the identities of them and they even asked

13   questions about them.

14        But even, Your Honor, if we fail at that first

15   prong of the *Softel* test, that doesn't end the inquiry.

16   As Your Honor knows, there are cases, for example,

17   *Powerweb*, where the Court says there's actually been a

18   violation here.  And that may militate in favor of

19   preclusion, but then it moves to the other factors and it

20   says, but on balance, I'm still going to make the

21   determination that striking an expert report here is not

22   possible.

23        So now we need to turn to whether the expert

24   reports are substantial even if not essential.  And we

25   submit, Your Honor, that these expert reports go to the

1   very heart of the case.  This is a case where experts are

2   necessary.  This is a technical case.  We're going to be

3   talking to a jury about how a highly sophisticated

4   software by a vendor is then implemented at a client.

5   We're going to talk about the difference between licensing

6   a software, we're going to be talking about the difference

7   between hosting a software.  And that type of information

8   needs to come from experts and people who have been in the

9   field hopefully for decades.  And both experts here have

10  been working in the software implementation business or

11  been working with implementing even CAMRA specifically for

12  a number of years.  So this gets to the very heart of the

13  information that we would need to provide to a jury,

14  including whether CAMRA is a viable product or an outdated

15  product.

16          Dr. Kursh says CAMRA, defunct, outdated.  Our

17  experts provide a rationale as to why that's not true,

18  that it's been around 30 years and it's been implemented

19  among hundreds of customers, and they're here to explain

20  why the implementations --

21          THE COURT:  Maybe just limit your remarks at

22  this point to just the issues at dispute here.

23          MS. AHMED:  Sure.

24          And they both also get to the nature of a

25  contract, what's a contract supposed to look like between

1   a vendor and a client in this industry.  So when we're

2   talking about these very issues, we know that these expert

3   reports are important.

4           They also opine on an issue that ACM raises

5   which is could CAMRA have been implemented during a four-

6   to six-month period.  And our experts both deal with that.

7           THE COURT:  Let me just stop you there.

8           I understand those points of issues.  I don't

9   think that they're looking to strike the entire report so

10  much as striking information, aspects of it that relate to

11  other positive implementation --

12          MS. AHMED:  Understood.

13          And we would just continue to say that the other

14  customer issue, it does go to the heart of this dispute as

15  well because there are allegations that we made

16  misrepresentations about them.  And that is the focus of

17  their reports.

18          THE COURT:  I understand that.

19          MS. AHMED:  So then we would need to move to the

20  third prong of the *Softel* analysis, which is prejudice.

21          And even the cases that plaintiffs rely on,

22  Your Honor, indicate that if a deposition is on the table

23  and an opportunity to take a deposition is there, then

24  there's no claim of prejudice with respect to an expert

25  report that has been provided.

1            And they cite to one case in particular, which

2     is *Wal-Mart*, where they discuss on a motion for summary

3     judgment an affiant that had never been disclosed appends

4     an affidavit to that motion for summary judgment.  And

5     there the Court says, look, this is new information, there

6     was no opportunity for a deposition, I'm going to strike

7     this affidavit, but I'm not going to preclude this witness

8     from testifying at trial because the problem here is that

9     no deposition was made available, but if this witness is

10    deposed prior to trial, then she can become a trial

11    witness.

12            THE COURT:  So in terms of prejudice here, have

13    you produced to ACM all of the documents that the experts

14    have relied on?

15            MS. AHMED:  We did, Your Honor.  There were ten

16    of them, and they were produced along with the reports.

17            So ACM unilaterally decided to cancel these

18    depositions, SS&C can't speak to that.  What needed to be

19    on the table were depositions.  Our experts were prepared

20    to show up on October 2nd --

21            THE COURT:  I understand that.

22            MS. AHMED:  -- and October 4th.

23            And the last factor that we need to look to here

24    is whether trial date has yet been set such that --

25            THE COURT:  I understand that.

 1                MS. AHMED:  And that's not at issue here.

 2                So we would say the motion to strike here really

 3     needs to be denied.

 4                THE COURT:  Thank you.

 5                MR. MAMOUNAS:  May I, Judge, very briefly?

 6                THE COURT:  Of course.

 7                MR. MAMOUNAS:  Judge, just a couple quick

 8     points.

 9                THE COURT:  Our court reporter is very

10     graciously working very hard right now.  So just re-double

11     our efforts to speak slowly.

12                MR. MAMOUNAS:  Of course.  Of course.  To the

13     extent that anyone needs a break, we're happy to take one.

14                THE COURT:  She will tell me as soon as she

15     wants to take a break.  Please, she won't hesitate to do

16     so.

17                MR. MAMOUNAS:  Very well.

18                Judge, a quick few points.

19                The first, I think there was a representation

20     that the experts only rely on these particular seven

21     customers, and that's not true.  I think we've cited to

22     that in our briefs, but I can also point Your Honor to the

23     fact that SS&C relies on all of the customers, mortgage

24     REITs, asset managers, and insurance companies that

25     purportedly use CAMRA, use CAMRA on a hosted basis, and

1    that's what these spreadsheets that are purported

2    compilations are supposedly reflective of.

3            The second is the allegation that Mr. --

4    Professor Kursh, excuse me, refers to other customers.

5    And those references are what I described in my opening

6    presentation, they are admissions by SS&C.  When SS&C puts

7    out information in discovery that says we haven't done an

8    implementation for a mortgage REIT in four to six months,

9    we can take that as an admission for affirmative purposes

10   of proof.  In our case, if they want to do something with

11   that, they have to give notice in their case.  It doesn't

12   work this way where just because we speak to admissions

13   now suddenly it's opened the door, reason being the

14   Rule 26 violation.  And there's no dispute of that.  I

15   mean, we looked, and I think the most Ms. Ahmed was able

16   to point you to was the identification of Mr. Reilly and

17   Mr. Fecteau.  There's no indication there was going to be

18   reliance on other customers, satisfied or otherwise.  We

19   know this because of the document requests, the

20   interrogatories, the discovery dispute briefings, the

21   hearings.  Even, Judge, I'll offer this:  When they

22   produced documents concerning ARMOUR and to the extent

23   there was cross talk concerning other customers, they

24   redacted out the information concerning them.  They

25   redacted out their names.  We asked them, "What are these

1   redactions?"  They said, "They're other customers, you're

2   not entitled to it."  We find out that now suddenly these

3   people are purportedly at issue and their experts are

4   entitled to rely on it.

5           And I think the biggest point is our hands were

6   tied behind our backs.  We don't have discovery to plan

7   our case.  We had no indication they were going to be

8   relying on those people so that we could have planned out

9   the discovery over the past year much less the depositions

10  of these experts.  Because even the spreadsheets or even

11  the representation that the implementations were

12  successful are premises upon which we've had no

13  opportunities to test.  There's been no opportunity for

14  discovery because of the violation.  Everything stems from

15  that, Judge.  Not only did they not tell us, but they

16  didn't ask.

17          And I would read from the decision out of the

18  Southern District of New York, the *Adloox* decision that

19  was in our papers, to address Ms. Ahmed's principal

20  argument which is that purportedly this information was

21  floating out in the ether in the course of this case.

22          And in that decision, I believe it's at Page 1,

23  the Court writes (Reading):

24          Plaintiffs try to distract from their lack of

25  any legitimate explanation for their delay by noting that

1     the witnesses' names were known to defendants in one way

2     or another.  But that argument misses the crucial point.

3     Knowledge of the existence of a witness does not satisfied

4     the Rule 26(a)(1)(A) disclosure obligation; that

5     obligation is fulfilled only if plaintiffs inform

6     defendants that they might call the witness in support of

7     their claims or defenses.  The purpose of the

8     requirement --

9               THE COURT:  Can I stop you there?  I don't need

10    you to read more from another decision.

11              But as I understand it, this is an expert who

12    was disclosed to you, the expert itself.  To the extent

13    that the expert's relying on other information, that's

14    ordinarily what experts do.  And so, in part, your

15    objection here is essentially that they didn't give you

16    the names of every single person who is not going to be

17    called as a witness but who was within the scope of

18    consideration of the expert.

19              MR. MAMOUNAS:  I think just to clarify that a

20    bit, Judge, the objection is that the expert relies on

21    facts.  And of course, an expert opinion, it's

22    fundamental, has to rely on facts.  And the expert

23    opinions are subject to Rule 26.  They rely on facts that

24    were communicated to them by witnesses and in documents

25    concerning the purported success of these other

1    implementations.  And from there it spans out a number of

2    different directions.  They say, you know, we have

3    information about the sales process, we have information

4    about functionality, we have information essentially about

5    everything you would want to know if you were allowed to

6    take discovery on Annaly's implementation, which is where

7    Mr. Maffattone used to work, or on the New York Mortgage

8    Trust implementation.  Everything we would want to know,

9    everything we wanted to take in discovery and find out

10   whether those implementations truly were successful or

11   whether they do or don't line up to our implementation, as

12   Mr. O'Connor argued for SS&C on April 27th of this year,

13   lines up such that it might have some sort of relevance so

14   that we could challenge the expert on that issue.  But we

15   can't even get out of the starting gate because we weren't

16   able to take discovery on whether the implementations were

17   successful in the first place because every time there was

18   a disclosure obligation, SS&C said nothing.  And in the

19   Rule 26 disclosures, which are fundamental, they said

20   nothing about reliance on other customers, successful or

21   otherwise, and they tried to preclude us at every stage,

22   Judge.

23            THE COURT:  What do I make of the fact that your

24   own expert refers to these other specific positive

25   implementation companies that appear on that slide show?

1           MR. MAMOUNAS:  Sure.  There's a big difference

2    there between what Dr. Kursh says, Judge, and what their

3    experts are saying, reason being that Dr. Kursh has taken

4    very limited focused admissions by SS&C:  We never

5    implemented a mortgage REIT on hosting before.  We never

6    implemented a mortgage REIT in four to six months before.

7    All of our prior implementations, we told you were lengthy

8    and over budget.  We couldn't get them done.  Those are

9    admissions that our expert is saying those are things that

10   you should have considered when you made representations

11   to ARMOUR such that a trier of fact can determine whether

12   they were reasonably made or not.

13          When SS&C tries to come back in its defense and

14   say, wait a minute, these were all done successfully,

15   we're talking two separate worlds.  We've taken what they

16   said as admissions and used them affirmatively in our

17   case.  But to the extent that their case in defense they

18   want to use something else, they had to have given notice.

19          THE COURT:  I see.  Okay.

20          MR. MAMOUNAS:  Thank you, Judge.

21          THE COURT:  Thank you.

22          We're going to take a brief recess at this

23   point.  I'm going to hear more on this and then we'll

24   expect to try to rule and then we will turn to scheduling

25   matters.  Okay.  Ten-minute recess or possibly more.

1          (Whereupon, a recess followed.)

2          THE COURT:  I just want to hear anything else

3     that you have to say now on this last issue of the

4     discovery.

5          MS. AHMED:  May I approach?

6          THE COURT:  Yes.

7          MS. AHMED:  One minor point, Your Honor, I want

8     to clarify.

9          You asked if there were any other customers

10    mentioned in our expert reports.  There is one.  It's

11    Anworth.

12         But I want to draw your attention to our

13    October 10, 2017, interrogatory response.  That is

14    Exhibit F to the Ahmed declaration.  And this was an

15    interrogatory response provided after you had ruled on

16    September 29, 2017, that we needed to disclose the names

17    of other mortgage REIT customers and the length of those

18    implementation times.

19         So if we turn to Page 3 of Exhibit F, you'll see

20    a client list, and you'll New York Mortgage Trust, you'll

21    see Apollo, you'll see Western Asset, you'll see a number

22    of those that appeared in that June 2nd presentation.

23         THE COURT:  Anworth on Page 4.

24         MS. AHMED:  And Anworth on page 4.  I just

25    wanted to clarify that's the other customer that we named

 1   specifically in the expert reports.

 2           There's also reference, Your Honor, right to the

 3   spreadsheets that we produced along with those expert

 4   reports that there are 46 active CAMRA customers.  We

 5   don't specify those names in the actual reports, but we

 6   actually do produce the names of those CAMRA customers in

 7   the spreadsheet that Your Honor was provided with.

 8           THE COURT:  Is Anworth referred to in the Kursh

 9   report?

10           MS. AHMED:  That is a question off the top of my

11   head I don't know, Your Honor.  I'll have to check.

12           THE COURT:  What's the importance for your

13   expert testimony as to Anworth?

14           MS. AHMED:  Just looking at similarities of

15   mortgage REITs for us to be able to have said we believe

16   CAMRA could have been properly implemented.  And we just

17   talk about implementation times and similarities and

18   assets under management.  And it's the same analysis, it's

19   just an additional client that is mentioned.

20           THE COURT:  I see.  Okay.

21           MS. AHMED:  And then we just want to be clear

22   that ACM appears to be saying that because our experts

23   spoke to other individuals at the company when they had

24   questions, that those individuals all of a sudden become

25   witnesses.  Those are not witnesses that we plan to offer

1    at trial, Your Honor.  Our experts, in rebutting

2    Dr. Kursh's expert report, they asked for additional

3    information, and we provided them with individuals that

4    they could talk with.  Mr. Hilliard asked for a

5    demonstration of CAMRA that we then provided to him.  A

6    similar demonstration had been provided to ACM prior to

7    the sale of that software to them.  I just want to be

8    clear we're not talking about disclosure of new witnesses

9    who are all of a sudden going to appear at trial.  We're

10   talking about our two experts.

11            I lastly want to rebut one point about

12   Mr. Maffattone being some kind of fact witness in

13   disguise.  He is an expert in the implementation of asset

14   accounting software over a broad sweep of different

15   clients for different vendors.  So it's not just with

16   respect to Annaly and Chimera.  That expertise just allows

17   him to talk at issue here with how CAMRA specifically was

18   implemented at a mortgage REIT.

19            I'll just close with, you know, the issues that

20   are being raised here more properly seem as though a

21   Daubert challenge should be brought or potentially a

22   motion in limine, but a motion to strike without any clear

23   specification and indicating that SS&C knows what it

24   should strike from these reports, we just have to say we

25   believe these reports may stand as is and there's nothing

1    for us to strike.

2              THE COURT:  Are you inviting a Daubert

3    challenge?

4              MS. AHMED:  We're not trying to invite a Daubert

5    challenge.  But if there are issues, for example, they're

6    claiming Mr. Maffattone is not an appropriate expert

7    because he's a disguised fact witnesses, those types of

8    challenges about his expertise or whether he is capable of

9    speaking to the issues here, that's really a Daubert

10   challenge.

11             THE COURT:  Okay.

12             MS. AHMED:  Thank you.

13             THE COURT:  Anything else?

14             MR. MAMOUNAS:  May I, Judge, very briefly, if

15   you don't mind?

16             If these folks aren't going to be called as

17   witnesses, then there's no business for them to appear in

18   the expert report.  The experts say we spoke to these

19   people, they gave us information, and we are relying on it

20   in rendering opinions.  If they're not going to be

21   witnesses and they weren't disclosed before such that we

22   had no notice, then they have no business being in the

23   expert reports.

24             I have to take issue with what Ms. Ahmed says

25   with respect to other customers.  Exhibits I believe E and

1      D to our initial submission include a spreadsheet that

2      SS&C provided titled Active Clients by Licensed Product,

3      and there's a whole host of additional individual entities

4      on which their experts purport to rely in rendering their

5      testimony, customers that are mortgage REITs that aren't

6      mortgage REITs.  They have spreadsheets that have some

7      customers in disguise, others that are identified as

8      mortgage REITs as to which we had no opportunity to take

9      discovery.  We had no opportunity because there was no

10     notice, we could not plan our case as a result, and now we

11     can't go forward unless we reopen fact discovery and

12     essentially double the length of this case, if not longer,

13     and start over because SS&C has suddenly decided that they

14     want to rely on the successful customers purportedly that

15     they implemented for, and it's just not fair.

16              THE COURT:  I see.  Okay.

17              Is that correct, Ms. Ahmed, that you've listed

18     many more companies' successful implementations?

19              MS. AHMED:  In the expert reports there is a

20     footnote that indicates that there are 46 active licensed

21     CAMRA customers and we produced the spreadsheet that has

22     those names on it.  The number 46 does appear in the

23     expert report.

24              THE COURT:  Just in terms of the number of

25     customers.

1           MS. AHMED:  Just in terms of the number of

2    customers.

3           And this is all our experts' -- and we're not

4    planning, Your Honor, to talk about Fatco Holdings or

5    North Star Realty.  This is really just information our

6    experts asked us how many active CAMRA licenses are out

7    there.  We gave them this information.  It was in their

8    report.

9           And similarly, the other spreadsheets that

10   Your Honor has, we didn't give our experts any additional

11   details.  They just wanted to know some numbers.  We

12   create the these spreadsheets, we gave them to our

13   experts, and we're disclosing that.  To the extent they

14   want to take the deposition, which for whatever reason

15   they didn't want to, they can ask about this information.

16          THE COURT:  And to the extent that your experts

17   would intend to testify about successful

18   implementations --

19          MS. AHMED:  It's --

20          THE COURT:  -- your experts -- let me finish, if

21   you don't mind.

22          Your experts will be limiting themselves to, by

23   your proffer, those indicated in the June 2014 PowerPoint

24   presentation, and then you've also said Anworth as well?

25          MS. AHMED:  Correct.

1          And the number, you know, the number of

2   customers we've said.

3          THE COURT:  Without name identification.

4          MS. AHMED:  Without name identification.

5          MR. MAMOUNAS:  Judge, if I might, who knows if

6   any of it's true.  There was never any opportunity to take

7   discovery on it.  They thwarted the discovery every time

8   they could.  There were countless opportunities to

9   disclose that they would rely on it.  But the reason we

10  didn't take discovery on it is because they never said

11  they would.  They never said that they would use it to

12  support their claims.  We tried countless times to test

13  their defenses.  We asked them, "What is the basis for

14  your defense?"  They had five threadbare affirmative

15  defenses.  We asked them what's the basis.  They didn't

16  respond with any of this information.  We came in front of

17  Your Honor multiple times and asked them, "Can we get

18  information on other customers?"  And we couldn't do it.

19         So there's no way to test whether any of the

20  information that their experts are putting in, whether

21  regarding the mortgage REIT names that were floating out

22  in discovery before or all these other customers, asset

23  managers or otherwise, is true simply because they never

24  gave notice that they might rely on it in the first place.

25         THE COURT:  All right.  So I'm prepared to rule

1    at this time on this issue concerning the expert reports.

2         The Court will overrule in large part ACM's

3    objections to the expert reports.  I'm most persuaded by

4    SS&C submissions here.  I understand ACM's objection to be

5    principally based on its contention that the experts rely

6    on SS&C's successful implementations of CAMRA with certain

7    other customers.  To me, this is clearly a very important

8    part of the dispute in this case and it's integral

9    actually to ACM's own claims in the case, as I indicated

10   already in Paragraph 23, also Paragraph 16 of the amended

11   complaint in which there's specific reference to the fact

12   of other customers.  And now it's also equally clear from

13   the PowerPoint presentation from June 2, 2014, just

14   exactly who those customers were.  And in my view, SS&C

15   has every right to defend against the alleged claim of

16   misrepresentation and to explain why it believed CAMRA

17   could be successfully implemented with ACM on the basis of

18   what was known to it at the time.

19        Although I did previously, and we have had prior

20   discovery conferences concerning other entities here,

21   those discovery conferences were focused, very much

22   focused on claims of unsuccessful implementations, not

23   successful implementations.  And I'm just not convinced

24   that it comes as any surprise at all to ACM that SS&C

25   would defend by saying that in fact it had had successful

1  implementations specifically as to those seven -- I

2  believe it's seven -- entities identified in its June 2,

3  2014 presentation.

4          My ruling is reinforced by the fact that the

5  Kursh report also specifically identifies and put those at

6  issue.  And this is in the nature of rebuttal expert

7  testimony, so I think that SS&C also has every right to

8  respond to Dr. Kursh's claims concerning those companies

9  as well.

10          My ruling is without prejudice at trial to, in

11  addition, in light of whatever's disclosed as a result of

12  the deposition of the experts of SS&C -- and I do believe

13  that those depositions should go forward.  I know the

14  parties have postponed them, but I believe that they

15  should go forward in light of this ruling.  And it's

16  without prejudice to the right of seeking evidentiary

17  limitation, further evidentiary limitations with respect

18  to successful implementations, especially with respect to

19  the Anworth which was not identified in the specific slide

20  presentation.  So I will at the time of trial, in terms of

21  what the expert will be permitted to testify to, be

22  prepared to consider additional renewed motion with

23  respect to the scope of expert testimony at trial.  But

24  I'm declining at this time to strike the experts' reports

25  or their reliance at this time on the successful

1    implementations that are identified in the June 2, 2014,

2    presentation in light of representations of counsel for

3    SS&C today.

4              So that's the Court's ruling.

5              Let's talk scheduling.

6              MR. MAMOUNAS:  Judge, before we get there, may I

7    move for reconsideration and also to make my record?

8              THE COURT:  Go ahead.

9              MR. MAMOUNAS:  Reason being, I understand and

10   respect the Court's order, but I also heard the Court to

11   say that there was no way that we could be surprised.  And

12   I would point to June 2017 document request asking

13   specifically for everything supporting SS&C's defense.

14   And from then until the expert reports in September of

15   this year there was no indication of anything concerning

16   other customers, successful or otherwise.  And in the

17   intervening period we had tremendous discovery hearings,

18   conferences, and debates about whether other customers

19   should be produced to the point where the Court set in

20   place the not idiosyncratic standard, and we were denied

21   every opportunity.  The prejudice is tremendous to us

22   because we were denied the opportunity to take the very

23   discovery now that their experts are relying on.  I don't

24   know if anything that they're saying is true.  I don't

25   know if they were implemented successfully.  I don't know

1   what the characteristics of those implementations are.  I

2   do know that had we known that they were going to rely on

3   it in their defense, whether in Rule 26 disclosures or in

4   response to our repeated discovery requests, we would have

5   taken that discovery because we brought the discovery

6   dispute before Your Honor on four separate occasions and

7   were denied every time.

8            So I want to make my record on reconsideration

9   of the severe and supreme prejudice that's going to be

10  effected on ARMOUR because we haven't had a chance to take

11  this discovery.  I understand we can move forward with the

12  expert depositions, but I won't be able to cross-examine

13  them because I don't have the discovery since they never

14  relied on it in the first place.

15           THE COURT:  Okay.  The Court adheres to its

16  ruling in light of the ruling it's made and in light of

17  the submissions from SS&C and the representations of SS&C

18  today.

19           Okay.  So let's get to discovery.

20           We have 30 days to produce, I know, the chat

21  evidence.

22           I'm going to require as well, I think that it's

23  reasonable to have the experts deposed within 30 days as

24  well.

25           And then do the parties have other proposals

1   here in terms of going forward in the Court setting

2   dispositive motions and the like?

3            MR. MAMOUNAS:  Judge, I would ask within that 30

4   days for the expert testimony that I be permitted to serve

5   document requests geared towards the implementations that

6   SS&C is now putting in in their experts, so I at least

7   have an opportunity to try to cross-examine the experts

8   when we depose them.

9            MR. BAUGHMAN:  Well, fact discovery closed back

10  in May, as was said before.

11            THE COURT:  I'll decline that, deny that.  To

12  the extent -- my understanding is that all of the

13  documents relied upon and referenced by the experts have

14  been produced and disclosed at this time.  So I'm not

15  going to allow another round of fact discovery

16  essentially.

17            MR. MAMOUNAS:  Well, Judge, I would say that

18  SS&C put in these spreadsheets that are summaries of

19  information on which the experts are purporting to rely,

20  and affirmatively against us they used the same argument

21  to get Mr. Mountain's emails when they said that we

22  effectuated some sort of a waiver.  So how can we give

23  with one hand and take with the other when SS&C is relying

24  on summaries, the underlying source materials of which we

25  don't have and the truth of which we can't possibly hope

1    to test?

2              MR. BAUGHMAN:  He's right, they're analogous,

3    but they're analogous in favor of us.  Because what our

4    expert relied on is the ten documents that we produced.

5    In their case, their expert relied on materials that they

6    wanted to withhold.  So there's not a point for them.

7              THE COURT:  So you have my ruling on that.

8              Let's talk about scheduling then in terms of

9    going forward.

10             Do you have a proposal, Mr. Baughman?

11             MR. BAUGHMAN:  Well, if we're going to go 30

12   days from today, that would be take us to -- the 18th is a

13   Sunday, which is the Sunday before Thanksgiving.  Perhaps

14   if we had dispositive motions maybe served on the 14th of

15   December.  And then, you know, 28 days for reply and 14

16   days -- 28 days for opposition and 14 days for reply sort

17   of wouldn't be too bad.  That would make the opposition

18   due, I guess, on January 12.

19             THE COURT:  All right.

20             MR. BAUGHMAN:  Sorry, January 11 and January 25.

21             THE COURT:  That's your proposal?

22             MR. BAUGHMAN:  Yeah.

23             THE COURT:  Mr. Mamounas?

24             MR. MAMOUNAS:  We have no opposition, Judge.

25   That's fine.

1          THE COURT:  We'll go ahead and put that into a

2    docket order there.

3          MR. BAUGHMAN:  Your Honor, because I fumbled,

4    can I just restate the dates?

5          THE COURT:  Okay.

6          MR. BAUGHMAN:  So summary judgment motion would

7    be due on the 14th of December, opposition would be due to

8    the 11th of January, and the reply would be due on

9    January 25th.

10          THE COURT:  We'll put that into a docket order.

11          I'm also going to ask the parties to -- have you

12    met with a magistrate judge to date for settlement

13    conference?

14          MR. MAMOUNAS:  We did meet with Magistrate Judge

15    Margolis prior to her retirement twice.

16          THE COURT:  When did that occur?  Remind me.

17          MR. MAMOUNAS:  The last time I believe was in

18    April of this year prior to her retirement.

19          THE COURT:  Would it be productive for the

20    parties to meet with Judge Margolis again?

21          MR. MAMOUNAS:  Judge, I can't say without

22    checking with my client.  We're always available to do

23    anything that we think might be productive.

24          MR. BAUGHMAN:  I think I'd probably say the same

25    thing.  Hope springs eternal, but --

1          THE COURT:  I'm going to go ahead, I'll ask

2     Judge Margolis to be back in touch with you about that.

3     You should consult with your clients about that as well.

4     But it strikes me that it always makes sense to be having

5     a conversation here.  Judge Margolis still does handle

6     some cases, and I'll be in touch with her about that.  If

7     for some reason she were not available, I work full-time

8     now with Judge Spector, Robert Spector.  But in light of

9     the size of the case and the amount of attorney hours,

10    court hours and the like, I think it makes sense to at

11    least have the listening lines open here in terms of

12    settlement.

13          All right.  Is there anything else to take up?

14          MR. MAMOUNAS:  Not from our standpoint.

15          THE COURT:  Thank you all.

16          Stand in recess.

17               (Proceedings adjourned at 11:26 p.m.)

18

19

20

21

22

23

24

25

```
1

2                         C E R T I F I C A T E

3

4           RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
                 TECHNOLOGIES, INC., No. 3:17CV790(JAM)
5

6               I, Diana Huntington, RDR, CRR, Official Court

7     Reporter for the United States District Court for the

8     District of Connecticut, do hereby certify that the

9     foregoing pages 1 through 98 are a true and accurate

10    transcription of my shorthand notes taken in the

11    aforementioned matter to the best of my skill and ability.

12

13

14

15

16                      _____/s/_____

17                      DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
18                      United States District Court
                         141 Church Street, Room 147
19                      New Haven, Connecticut 06510
                             (860) 463-3180
20

21

22

23

24

25
```