UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARMOUR CAPITAL MANAGEMENT LP,

                              Plaintiff,

                - against -                                    3:17-cv-00790-JAM

SS&C TECHNOLOGIES, INC.,

                              Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
John F. Baughman
Nora Ahmed
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
jbaughman@paulweiss.com
nahmed@paulweiss.com

Kevin J. O'Connor
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 378-4394
koconnor@hinckleyallen.com

Jeffrey J. Mirman
Alexa T. Millinger
Hinckley, Allen & Snyder LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
(860) 331-2762
jmirman@hinckleyallen.com
amillinger@hinckleyallen.com

*Attorneys for Defendant*
*SS&C Technologies, Inc.*

# Table of Contents

**Page**

Preliminary Statement ............................................................................................... 1

Plaintiff's Allegations ............................................................................................... 2

Statement of Facts ..................................................................................................... 3

I.     There Were Extensive Negotiations Prior to the Signing of the Master Agreement .......... 4

     A.     Early Discussions:  May-June 2014 ................................................................ 4

     B.     Proofs of Concept and a Demonstration:  June-September 2014 ........................... 8

     C.     Discussions Focus on the Hosting Option:  September-November 2014 ............... 8

     D.     Final Negotiations:  November-December 2014 ................................................ 10

II.     The Master Agreement Is an Integrated Contract That Limits SS&C's Liability ........... 12

III.     The Master Agreement Precludes Plaintiff's Claimed Damages ................................... 14

     A.     Section 6.2.3 Bars ACM's Claim to Recover Fees Paid by Armour and Javelin ................................................................................................... 14

     B.     Section 6.2.2 Bars ACM's Claim for Consequential Damages for Purported Lost Employee Time ................................................................................... 16

Argument ................................................................................................................. 17

I.     The Court Should Enter Summary Judgment on ACM's Negligent Misrepresentation Claim ................................................................................... 17

     A.     The Merger Clause Bars ACM's Negligent Misrepresentation Claim ................ 18

     B.     Alternatively, None of the Representations ACM Advances Qualify as Negligent Misrepresentations ...................................................................... 20

            1.     Statements of Opinion Are Not Actionable ........................................... 21

            2.     Pre-Contract Proposals and Demonstrations Are Not Actionable ........... 23

            3.     True Statements, By Definition, Are Not Negligent Misrepresentations ............................................................................ 31

II.     The Court Should Enter Summary Judgment on the Breach of Contract Claim Because ACM Has No Cognizable Damages ........................................................ 33

     A.     ACM Suffered No Loss Because Armour and Javelin Paid the Contract Costs and Fees Due Under the Master Agreement ................................................ 33

     B.     The Master Agreement Bars ACM's Claim for Consequential Damages (Lost Employee Time) ............................................................................. 35

III.     The Court Should Enter Summary Judgment on ACM's CUTPA Claim ........................ 35

IV.     The Court Should Enter Summary Judgment on ACM's Rescission Claim ................... 36

Conclusion ............................................................................................................... 37

Doc#: US1:12494020v1

# Table of Authorities

**Page(s)**

CASES

*American Italian Pasta Co. v. New World Pasta Co.*,
371 F.3d 387 (8th Cir. 2004) ................................................................................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................................17

*Asher v. Unarco Material Handling, Inc.*,
862 F.Supp.2d 551 (E.D. Ky. 2012) .....................................................................................34

*Associated Catalog Merchandisers, Inc. v. Chagnon*,
210 Conn. 734 (1989) ...........................................................................................................28

*Associated Construction/AP Construction, LLC v. Hanover Ins. Co.*,
2018 WL 39989968 (D. Conn. 2018) ...................................................................................19

*ATSI Communications, Inc. v. Shaar Fund Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................................................................................................19

*Barton v. City of Bristol*,
291 Conn. 84 (2009) .............................................................................................................21

*Blaszczak v. Slomkowski*,
2003 WL 23178003 (Conn. Super. Ct. 2003) .......................................................................34

*Channing Real Estate, LLC v. Gates*,
326 Conn. 123 (2012) ...........................................................................................................29

*Chase Manhattan Bank v. Edwards*,
450 N.Y.S.2d 76 (3d Dep't 1982), *aff'd*, 59 N.Y.2d 817 (1983)...........................................19

*Chestnut v. Kent*,
1998 Conn. Super. LEXIS 1086 (Conn. Super. Ct. 1998)....................................................30

*Dickau v. Mingrone*,
2018 Conn. Super. LEXIS 2587 (Conn. Super. Ct. 2018)....................................................24

*Hoffman v. L&M Arts*,
838 F.3d 568 (5th Cir. 2016) ................................................................................................21

*Larobina v. Wells Fargo Bank, N.A.*,
2012 WL 1032953 (D. Conn. 2012) .....................................................................................22

Doc#: US1:12494020v1

**Page(s)**

*Lashin v. Corcoran*,
  146 Conn. 512 (1959) ...................................................................................................34

*Liberty Bay Credit Union v. Open Solutions, Inc.*,
  905 F.Supp. 2d 389 (D. Mass. 2012) ..........................................................................36

*Management Assistance, Inc. v. Computer Dimensions, Inc.*,
  546 F.Supp. 666 (N.D. Ga. 1982), *aff'd sub nom. Computer Dimensions v.
  Basic Four*, 747 F.2d 708 (11th Cir. 1984)................................................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)......................................................................................................17

*McGuire* v. *Schneider, Inc.*,
  368 Pa. Super. 344 (1987)............................................................................................29

*McPhee Elec., Ltd., LLC v. Konover Construction Corp.*,
  2009 WL 4846555 (Conn. Super. Ct. 2009)................................................................20

*Munroe* v. *Great American Ins. Co.*,
  234 Conn. 182 (1995)....................................................................................................36

*Nazami v. Patrons Mut. Ins. Co.*,
  280 Conn. 619 (2006) .............................................................................20, 27, 30, 31

*NPS, LLC v. Ambac Assur. Corp.*,
  706 F.Supp.2d 162 (D. Mass. 2010) .....................................................................20, 24

*O'Reilly v. BJ's Wholesale Club, Inc.*,
  2018 WL 1336128 (D. Conn. 2018) ............................................................................35

*Olympic Dreams, LLC v. Clark*,
  2014 WL 4267499 (D. Conn. 2014) ............................................................................22

*Ormsby v. Nationwide Mut. Fire Ins. Co.*,
  2000 WL 739606 (Conn. Super. Ct. 2000)..................................................................23

*Passiglia v. Northwell Health, Inc.*,
  252 F.Supp.3d 129 (E.D.N.Y. 2017) ..........................................................................24

*Peck v. Jacquemin*,
  196 Conn. 53 (1985) .....................................................................................................34

*Plotkin v. Barot*,
  1999 WL 439291 (Conn. Super. Ct. 1999)..................................................................30

Doc#: US1:12494020v1

**Page(s)**

*Schifano v. Bank of N.Y. Co.*,
  2013 WL 1715731 (Conn. Super. Ct. 2013) ........................................................30

*Snyder v. Cedar*,
  2006 WL 539130 (Conn. Super. Ct. 2006) ..........................................................20

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ...........................................................................................17

*Torringford Farms Ass'n v. City of Torrington*,
  75 Conn.App. 570 (2003) ...................................................................................34

*Vezina v. Nautilus Pools, Inc.*,
  27 Conn. App. 810 (1992) ...................................................................................22

*Warman v. Delaney*,
  148 Conn. 469 (1961) .........................................................................................29

*Weiss v. Smulders*,
  313 Conn. 227 (2014) .........................................................................................34

*Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*,
  146 Conn. App. 169 (2013), *aff'd*, 322 Conn. 541 (2016) ..............................2, 18, 19, 20, 29

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370 (4th Cir. 2008) ..............................................................................20

*Wilson v. Marquette Electronics, Inc.*,
  630 F.2d 575 (8th Cir. 1980) ..............................................................................36

*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013) ...............................................................................17

**STATUTES**

Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110b) ..........................2, 35, 36

Fed. R. Civ. P. 56(a) ...........................................................................................17

Local Rule 56(a)1 ................................................................................................1

**OTHER AUTHORITIES**

37 Am.Jur.2d 161, Fraud and Deceit § 130 (2001) ...........................................................19

*Restatement (Second) of Contracts* .............................................................................34

iv

Defendant SS&C Technologies, Inc. ("SS&C") respectfully submits this memorandum of law in support of its motion for summary judgment on all of Plaintiff Armour Capital Management LP's ("ACM") claims.  SS&C relies on the accompanying Local Rule 56(a)1 Statement of Undisputed Material Facts (the "56(a)1"), the accompanying Declaration of Nora Ahmed, dated December 17, 2018 (the "Ahmed Dec."), and the accompanying Declaration of J. Timothy Reilly, dated December 15, 2018 (the "Reilly Dec.").

## Preliminary Statement

This case should never get to trial.  Plaintiff ACM wants to argue that SS&C somehow failed to "implement" accounting software for ACM's asset management business.  If necessary, at trial, SS&C will show that the reality is that ACM did not keep up its end of the bargain and ignored its own implementation responsibilities.  A trial in this case will involve finger-pointing and allocating blame.  But there is no reason for the Court to ever hear that dispute, because Plaintiff's case is fundamentally flawed.

*First*, three of ACM's four remaining claims depend on the assertion that SS&C made pre-contractual "negligent misrepresentations."  SS&C vigorously denies this, and the Court will quickly see that ACM is complaining about completely legitimate statements.  They are a grab bag of estimates, proposals, opinions, and truisms, not the sort of statement that can give rise to liability.  Moreover, the law prohibits ACM from bringing its claim at all.  The parties' agreement has a merger clause, which supersedes *all* prior representations.  Thus, under Connecticut law, SS&C has no claim:

> Where the very instrument that created the required relationship to support a claim of negligent misrepresentation expressly provides that neither party is relying upon representations in statements not contained in the contract, ***there can be no cause of action based on negligent statements or promises allegedly made before such a contract is executed.***

*Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 196 (2013), *aff'd*, 322 Conn. 541 (2016) (emphasis added) (citations omitted).  The *Western Dermatology* rule is controlling and dispositive.  Under that rule, the Court should enter summary judgment on all of Plaintiff's claims based on alleged negligent misrepresentations.

*Second*, Sections 6.2.2 and 6.2.3 of the Master Agreement specifically bar the types of damages Plaintiff seeks (consequential damages and reimbursement for third parties).  And, in any event, Plaintiff has no actual damages.  The undisputed facts show that it has not lost a penny.

The Court should enter judgment against ACM and dismiss the First Amended Complaint ("FAC").

**Plaintiff's Allegations**

All of Plaintiff's claims relate to ACM's December 2014 contract relating to SS&C's CAMRA accounting software.  Dissatisfied with the implementation of the product, ACM terminated the parties' "Master Agreement" in May 2017, and filed this case shortly thereafter.

ACM has four remaining claims:

**Count I—Breach of Contract:**  ACM alleges that SS&C "breached material terms of the Master Agreement by, among other things, failing to implement CAMRA."  (FAC ¶ 58.)

**Count II—CUTPA:**  ACM contends that SS&C violated the Connecticut Unfair Trade Practices Act ("CUTPA") "by making false and misleading representations."  (FAC ¶ 62.)

**Count IV—Negligent Misrepresentation:**  ACM contends that SS&C made negligent misrepresentations that induced it to enter into the Master Agreement.  (FAC ¶ 75.)  By prior order of this Court, ACM's claim is limited to statements made *before* the Master Agreement was signed on December 19, 2014.  (ECF No. 75 at 14.)

**Count V—Rescission:**  As an alternate remedy, in the event it is able to prove that SS&C made negligent misrepresentations, ACM pleads a claim for rescission.

2

Given that three of ACM's four claims depend on proof of negligent misrepresentations, it was critical during discovery that ACM identify the specific statements it contends give rise to liability. Thus, in response to an interrogatory, ACM identified twenty-two alleged negligent misrepresentations ["ANMs"].[1]

Broadly speaking, the ANMs are plucked from a handful of documents prepared by SS&C during the six months of negotiation that led to the Master Agreement. They are, for the most part, proposals the parties exchanged and discussed. We describe all of them below to place them in the proper context: very small pieces of a long, detailed negotiation between sophisticated commercial parties. Each of these alleged misrepresentations is identified in the pages that follow with the legend "ANM #."

### Statement of Facts

SS&C was established in 1986. (56(a)1 ¶ 2.) It is a software company specializing in servicing the financial services industry. (*Id*.) As the Company's website explains:

> Over the past 30 years, we have created the most comprehensive powerhouse of software technology in the financial services industry—technology that complements our unrivaled expertise and professionalism in fund administration, insurance and pension funds, and asset and wealth management accounting and operations.

(Ex. 3 at 1.)[2] For reasons it does not explain, ACM claims this is a misrepresentation. [ANM 1.][3]

---

[1]   *See* Plaintiff's Amended Objections and Responses to SS&C's Interrogatory Nos. 5-10, dated January 19, 2018. (Ahmed Dec. Ex. 36, at 24-27.) ANM 6 contains two distinct representations. ANM 22 is not an independent representation. It is just a catch-all alleging that the other twenty-one items qualify as a single negligent misrepresentation.

[2]   "Ex. ___" refers to exhibits to the Ahmed Dec.

[3]   Ex. 3 is a printout of a portion of the SS&C website as of December 3, 2018. It is Plaintiff's burden to prove that ANM 1 was on the Company's website prior to December 19, 2014, the date the Master Agreement was signed. Defendant does not believe that it was. Plaintiff did not produce in discovery any evidence on the topic.

SS&C's flagship product is an off-the-shelf accounting solution called CAMRA. (56(a)1 ¶¶ 4–5.)   According to Plaintiff, in 2014, SS&C's website described CAMRA as a "flexible software application that streamlines, automates and simplifies the investment process by providing immediate access to decision-making data."  [ANM 2.][4]  SS&C has successfully implemented CAMRA for hundreds of customers.  (56(a)1 ¶ 6.)  As of the relevant time, 500 companies used the software.  (56(a)1 ¶ 14.)  SS&C's client roster includes insurance companies, asset managers, and mortgage real estate investment trusts ("mREITs").  (56(a)1 ¶ 6.)  As of 2014, over 95% of SS&C's CAMRA customers used the product to process transactions involving mortgage-backed securities.  (56(a)1 ¶ 7.)

Plaintiff Armour Capital Management ("ACM") is a registered investment advisor that managed over $19 billion in assets as of the date of the parties' agreement.  (56(a)1 ¶ 17.) ACM's clients at that time included two mREITs:  ARMOUR Residential REIT, Inc. ("Armour") and JAVELIN Mortgage Investment Corp. ("Javelin").  (56(a)1 ¶ 16.)

I.      **There Were Extensive Negotiations Prior to the Signing of the Master Agreement**

Between May and December 2014, representatives of Armour, Javelin, ACM, and SS&C discussed implementing accounting software for the REITs.  Those lengthy negotiations culminated in the signing of the Master Agreement.  Put another way, all of the parties' discussions, proposals, counter-proposals, drafts, and markups *merged* into an integrated contract.

A.      **Early Discussions:  May-June 2014**

In April 2014, SS&C issued a press release announcing a new group dedicated to servicing real estate investment trusts ("REITs").  (Ex. 5.)  The announcement identified this new

---

[4]     As with ANM 1, Plaintiff has produced no evidence that ANM 2 was on SS&C's website prior to the signing of the Master Agreement.

4

group as equipped to "help mortgage REITs" produce "fully auditable accounting and reporting processes and eliminate the use of spreadsheets."  [ANM 3.]  The press release also described SS&C's "unique expertise, world-class technology and more than 10 years of experience (and leadership) in Mortgage REIT accounting and reporting."  [ANM 4.]

The following month, on May 13, 2014, SS&C was contacted by a man named Jim Mountain.  (56(a)1 ¶ 21.)  Mr. Mountain's introductory email identified him as the Chief Financial Officer of both Armour and Javelin.  (Ex. 13 at 1.)  It did not mention ACM.

That same day, a director of SS&C's business development team, Dennis Moore, responded to Mr. Mountain and asked to "schedule a time for us to speak so I can learn a little more about what you might be looking for."  (56(a)1 ¶ 22.)  In response, Mr. Mountain explained that Armour and Javelin were "interested in learning about all technologies/services that would potentially be applicable."  (*Id.*)  Mr. Moore told Mr. Mountain that he would get back to him shortly (*id.*); in the interim, he provided a brochure, titled "Mortgage REIT Accounting and Financial Reporting Specialists"  (Ex. 13-A).  The brochure noted that SS&C had "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage-backed securities and structured products."  [ANM 5.]

On June 2, 2014, four SS&C representatives met with Mr. Mountain and a colleague of his named Mark Gruber.  (56(a)1 ¶ 23.)  At that meeting, SS&C presented a PowerPoint (the "June PowerPoint"), titled "Introduction to SS&C Technologies."  (Ex. 15.)  The June PowerPoint was addressed to Armour, not to Plaintiff ACM.

The June PowerPoint was, of course, a sales document.   Thus, it gave basic information about the Company and its products, using slides like this:



**Why SS&C**

- Unique ability to leverage knowledge and expertise across organization
  - Development, licensed clients, outsourcing, professional services
- Highly skilled consulting
  - Process improvements / automation
  - Ability to provide tailored / customized solutions
- Relevant Mortgage REIT expertise and public company reporting
- Dedicated REIT Services team supporting technical accounting, regulatory and tax needs
- Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs

(*Id.* at 9.)  According to Plaintiff, however, the bullet points referring to SS&C's "dedicated" team and its "proven systems" were misrepresentations.  [ANMs 7, 9.]  Plaintiff also complains about references elsewhere in the June PowerPoint to SS&C's "proven accounting engine" and its "accounting and reporting expertise."  [ANM 6.]

Doc#: US1:12494020v1

On a different slide, the June PowerPoint provided information about SS&C's prior experience, including with REITs and mortgage-backed securities ("MBS"):



(Ex. 15 at 4.)  Notwithstanding that there is no dispute that all of the information in all of the bullet points on the slide is true (56(a)1 ¶ 27), ACM tries to make the case that this slide is a misrepresentation by taking issue with the words "large" and "significant."  [ANM 16.]

The June PowerPoint also described three deployment options:   (1) "In-House License," described as "[t]he CAMRA application is run in Armour's data center"; (2) "Hosting," described as "SS&C hosts the hardware and software in its Tier 3 data center," along with optional additional services;  and (3) "Full Service Outsourcing," described as "SS&C provides comprehensive investment accounting and reporting services on an outsourced basis."  (Ex. 15 at 2.)

Two days after the June PowerPoint presentation, on June 4, 2014, Mr. Moore emailed Messrs. Mountain and Gruber.  (Ex. 16 at 4.)  Mr. Moore conveyed his opinion that, "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for ARMOUR."  (56(a)1 ¶ 31.)  [ANM 8.]

**B.      Proofs of Concept and a Demonstration:  June-September 2014**

The next step was three "proofs of concept," testing CAMRA using Armour's data.  (56(a)1 ¶ 32.)  Although Plaintiff labels printouts of the first two tests as "misrepresentations" [ANMs 10 & 14], it does not identify any particular words or statements it contends were false.  Plaintiff does not complain about the third exercise.

At about the same time, on August 27, 2014, SS&C representatives visited Armour's offices in Vero Beach, Florida.  (56(a)1 ¶ 33.)  The meeting lasted two-and-a-half hours and included a forty-five minute demonstration of the CAMRA system.  (*Id.*)  Plaintiff contends that the demonstration was a misrepresentation [ANM 11], although there is no record of what was said or shown during the presentation.  (*Id.*)  There is, however, a lengthy PowerPoint (the "August PowerPoint") that was used at the meeting.  (Ex. 20.)  Plaintiff does not contend that anything in the August PowerPoint was false.

As was the June PowerPoint, the August PowerPoint is addressed to Armour.  Plaintiff ACM is not mentioned.

**C.      Discussions Focus on the Hosting Option:  September-November 2014**

As talks continued, Armour focused its attention on CAMRA's hybrid "Hosting" format.  On September 9, 2014, SS&C discussed this option at length with Trevor Spicer and Cory Graley, both of whom worked in IT for Armour.  (56(a)1 ¶ 38.)  Plaintiff does not allege that SS&C made any misstatements at this meeting.

8

The next day, Mr. Moore emailed Messrs. Mountain and Gruber.  (Ex. 23.)  He offered his opinion that:  "Based on the feedback from Trevor and Corey, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR."  [ANM 13.]

At various points in the parties' discussions, SS&C introduced members of its Professional Services team.  SS&C stated that these employees—including Shiv Sivadas (Director of Professional Services) and Iwona Olszewska (Head of Professional Services)—had "extensive" and "significant" experience implementing CAMRA and were qualified to do so.  [ANM 12, 20.] SS&C had a substantial basis for those statements.  As of 2014, Mr. Sivadas had worked at SS&C for over eighteen years.  (56(a)1 ¶ 35.)  During his tenure at the company, he had a substantive role (*i.e.,* worked over 200 hours) on at least eight CAMRA implementations.  (56(a)1 ¶ 36.)  His duties included processing day-to-day CAMRA client transactions and performing custodial data reconciliations.  (*Id.*)  Ms. Olszewska was also very experienced.  She began work at SS&C in 2008, and during the relevant period was the Vice President of Institutional Professional Services. (56(a)1 ¶ 37.)   In that capacity, she oversaw approximately fifty CAMRA implementations, including four for REITs.  (*Id.*)

As part of the negotiations, the parties had at least one conversation about whether to hire a third party consultant to assist in implementing CAMRA.  (56(a)1 ¶ 48.)  According to Plaintiff, it was a misrepresentation for SS&C to tell ACM that a consultant was unnecessary because SS&C was qualified to implement CAMRA for ACM on its own.  [ANM 17.]  In actual fact, however, it would have been extremely uncommon to involve a third party.  In almost all new outsourced and hosted implementations, SS&C and the client do the project together (56(a)1 ¶ 12.)

Over 90% of new CAMRA projects during the relevant time were implemented without the assistance of a third party.  (*Id.*)

### D.     Final Negotiations:  November-December 2014

At some point, SS&C and Plaintiff ACM started communicating directly.[5]

On November 13, 2014, SS&C provided ACM with a "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" (the "November Proposal"). (Ex. 24-A.)  This eleven-page document includes sections on "Overview and Assumptions," "Proposed Solution Overview," and "Fee Schedule."  Plaintiff lifts three short statements out of the proposal and labels them misrepresentations.

(1)     The proposal includes a table entitled "Systems Overview."  (*Id.* at 5.) Plaintiff contends that this one row of that table is a negligent misrepresentation [ANM 16]:[6]

| Custodian | Citi (may add BONY in future) | SS&C will manage the interface and uploading of information from custodians of choice. |
|-----------|-------------------------------|----------------------------------------------------------------------------------------|

(2)     In the section on "Proposed Solution Overview" (*Id.* at 8.), Plaintiff points to a single bullet point [ANM 16], which states:

- Import transactions from custodians Citi, and potentially BONY

(3)  In the Fee Schedule, SS&C proposed a "one-time implementation fee" and described proposed "implementation services."  (Ex. 24-A at 11.)  According to Plaintiff, these

---

5    In 2014, Plaintiff was named Armour Residential Management LLC.  It changed its name to ACM on December 19, 2014, which—coincidentally—is the date the Master Agreement was signed.  The connection between these two events is unknown.  (56(a)1 ¶ 19.)

6    Plaintiff's citations for ANM 16 are confused.  They cite to a draft of the November Proposal. Since the final document contains the statements about which Plaintiff complains, for simplicity, we have cited only to the final version.  Doing so actually helps ACM's cause.  If it insists on citing the draft then it would be attempting to prove a misrepresentation case based on a statement in a document it never saw.

proposals are also misrepresentations.  [ANM 15.]   However, the November Proposal was just

that:  a *proposal*, subject to further negotiation.  This is evident from the cover email under which

it was transmitted.  (Ex. 24 at 1.)  That email stated:

- We are open to discussions regarding the expansion or contraction of any operational support services contained in our proposal.

> \*        \*        \*

- We understand our assumptions may not be 100% correct and also that you may have questions.

> \*        \*        \*

- We look forward to your feedback and the opportunity to prove ourselves as the best possible partner for ensuring your success with this initiative.

Of the three statements in the November Proposal that Plaintiff contends were

"misrepresentations," *none* appears in the final Master Agreement signed more than a month later.

This is because the parties had not yet reached a deal and negotiations were continuing.

As part of those negotiations, on December 8, 2014, SS&C's Dennis Moore

emailed people at Armour and ACM.  (Ex. 25.)  He noted that he and a colleague (Jeff Fecteau)

"have been working with a professional services team to prepare an implementation estimate for

transitioning ARMOUR to our CAMRA solution."  [ANM 18.]   Although Plaintiff brands this

update as a negligent misrepresentation, it is unquestionably true.  An "implementation estimate"

is a "standard document" prepared at SS&C and, in this case, Mr. Moore prepared it in consultation

with Mark Gruber at Armour.  (56(a)1 ¶ 44.)  Indeed, just two days later, Mr. Moore sent Armour

and ACM "a draft implementation budget for our discussion tomorrow."  (56(a)1 ¶ 45.)  The

attachment (the "December 10 Draft Budget") is labeled "*Draft*—for discussion," and lists

"*Estimated* Budget Hours."[7]   (*Id.*)   Nevertheless, Plaintiff contends that this proposal was a misrepresentation.  [ANM 19, 21.]  (A picture of the document is at p. 25, below.)

SS&C's Mr. Moore discussed the December 10 Draft Budget with ACM's Mr. Gruber.  And, based specifically on Mr. Gruber's comments, SS&C sent a revised proposal on December 11, 2014 (the "December 11 Draft Budget").  (Ex. 28-A.)  This one too was marked "*Draft*—for discussion."  (*Id.* at 1-2.)  SS&C also provided a "*Proposed* Migration Timeline," which similarly was subject to further discussion.  (*Id.* at 3.)  Indeed, Mr. Moore invited ACM to ask questions about all of the proposals provided.  (Ex. 28 at 1.)

All of the December 10 Draft Budget, the December 11 Draft Budget, and the Proposed Migration Timeline are listed in ANM 19.  Plaintiff does not, however, identify any specific statement in any of the documents that it contends was false.

## II.      The Master Agreement Is an Integrated Contract That Limits SS&C's Liability

Negotiations continued between the parties for a full week after SS&C sent the December 11 Draft Budget.  During that time, there was a series of emails, calls, and drafts.  (56(a)1 ¶ 49.)  Plaintiff does not contend that SS&C made any misrepresentations during the final week of negotiations, a period during which at least four separate drafts were exchanged, with both sides proposing and rejecting various provisions.  (*Id.*)  The parties did not reach agreement until December 19, 2014.  (56(a)1 ¶ 51.)

The signed Master Agreement is an integrated agreement.  Section 6.7.4 provides:

> Entire Agreement.  ***This Master Agreement*** (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and ***supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties*** with respect thereto.

---

[7]   Unless noted otherwise, all emphasis in quoted record materials is added.

In addition, the Master Agreement (Ex. 1) contains other provisions that significantly limit SS&C's potential liability.

*First*, the parties agreed that SS&C was not making any warranties or other promises about CAMRA or its capabilities. Sections 6.2.1 and 6.2.5 provide:

> Disclaimer.  Except as set forth in this Master Agreement or a relevant attachment, ***SS&C makes no warranties***, whether express, implied, or statutory, regarding or ***relating to the Software*** or Documentation.  SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the software and the Documentation.

> No Other Warranty.  ***Any written representation or warranty not expressly contained in this Master Agreement*** or a relevant Attachment or Work Request ***is not authorized or valid.***  No employee, agent, representative or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

*Second*, the parties agreed that ACM's remedy in the event of breach was strictly limited to direct contract damages.  Section 6.2.2 provides:

> Exclusion of Consequential Damages and Absolute Limitation on SS&C's Liability.  ***SS&C is not liable for any indirect, special, incidental or consequential damages of any kind***, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement . . . .

*Third*, the parties agreed that SS&C had no obligations or potential liability to ACM's REIT clients, Armour and Javelin.  Section 6.2.3 provides:

> No Third Party Beneficiaries.   SS&C shall have ***no contractual or other obligations or liability*** to (i) ARMOUR Residential REIT, Inc. or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.

Other Sections of the parties' agreement specifically define SS&C's obligations.  For example, Attachment B-1 of the Master Agreement identified specific "Hosting, Process Automation and Data Management Services" that SS&C would provide; and the attached "Work Request One" identified specific "Initial Implementation Services."  (Ex. 1 at 12–16.)

Work Request One makes clear that the implementation of CAMRA was a joint undertaking between ACM and SS&C.  It assigned specific tasks to each party and noted that SS&C would be providing services "in support of Client's [*i.e.*, ACM's] implementation of the software." (Ex. 1 at 15.)

The Work Request also listed various "Assumptions," including a "Project Duration of 4-6 months." (*Id.*)  Based on that assumption, it set an "Applicable Rate" specifying that SS&C will "provide an estimated 1,850 hours of support in relation to the services described [ ] at a rate of $225 per person per hour." (*Id.*)

ACM terminated the Master Agreement on May 1, 2017.  (FAC ¶ 54.)

## III.    The Master Agreement Precludes Plaintiff's Claimed Damages

ACM seeks two types of damages:  (1) $ 1.78 million to recover supposed out of pocket losses; and (2) $500,000 to compensate it for purported lost employee time.  (FAC ¶ 53.) The Master Agreement bars both claims.  And, as a matter of fact, ACM is not actually out a penny. It has no damages.

### A.    Section 6.2.3 Bars ACM's Claim to Recover Fees Paid by Armour and Javelin

ACM's REIT clients—Armour and Javelin—bore all of the costs charged under the Master Agreement.  As a result, ACM did not suffer any loss.

ACM provides services to Armour and Javelin under "Management Agreements." (56(a)1 ¶ 56.)  Those agreements authorized ACM to retain third parties (such as SS&C) "for and on behalf of the REIT." (*Id.*)  With limited exceptions, "costs and expenses related to the retention of third parties shall *be the sole cost and expense of the REIT*." (*Id.*)  In the actual event, this is

14

what happened.  One of Armour's co-CEO's, Jeff Zimmer, testified unequivocally that the REITs

paid all of the charges due under the Master Agreement.  Here is his testimony:

> Q:     Okay.  But your understanding is that that cost was ultimately borne by
>        Armour Residential REIT, correct?
>
> A:     That's what I said, correct.
>
> Q:     And all the professional services fees that were charged in connection with
>        Armour's contractual arrangement with SS&C were all passed on to the
>        Armour REIT, correct?
>
> THE WITNESS:  Correct.

(Ex. 35 at 16:8-20 (objections omitted).)  Further, Mr. Zimmer emphasized that it was irrelevant

whether the REITs paid SS&C directly or whether they reimbursed ACM (a detail as to which he

was uncertain).  (*Id*. at 15:12-13, 16:4-5.)  Rather, he testified, "it doesn't matter whether the LP

or the REIT pays directly.  It only matters who's ultimately responsible.  In this case, the REIT

was ultimately responsible."  (*Id*. at 15:10-12.)  In short, there is no evidence that ACM is out of

pocket a single cent as a result of fees due under the Master Agreement.

Indeed, ACM does not try to hide that it is attempting to recover damages for

Armour and Javelin, not for itself.  Mr. Zimmer testified that the case concerned "the damages *to

the REIT* for the fees that they have paid SS&C."  (*Id*. at 13:19-20.)  And ACM's Rule 30(b)(6)

witness testified that ACM was "here today" to get things "sorted out *for the benefit of th[e]

ultimate payors* [*i.e.*, Armour and Javelin]."  (Ex. 34 at 33:1-3.)

The fact that Armour and Javelin—not ACM—were responsible for charges due

under the Master Agreement was no accident.  As noted above, there are a handful of exceptions

to the rule that the REITs pay third-party expenses.  One of those is when ACM retains a third

party to provide "data processing or clerical services."  (56(a)1 ¶ 56.)  This is a subtle but important

point.  As Mr. Mountain explained at his deposition, Armour and Javelin would only reimburse

ACM for purchasing CAMRA on a hosted or a licensed basis.  (Ex. 14 at 168:14-23.)  If ACM had purchased CAMRA on an outsourced basis, *it* would have been responsible for all fees paid to SS&C, absent specific approval from Armour's and Javelin's Board of Directors.  (*Id*.) In other words, ACM specifically negotiated for a type of service ("Hosting") so that it could pass the cost on to its customers.  ACM was *never* at risk of losing money under the Master Agreement.

There is *no evidence* the parties agreed that, in these circumstances, ACM could recover damages for Armour and Javelin.  As noted above, Section 6.2.3 of the Master Agreement specifically provides that "SS&C shall have no contractual or other obligations or liability" to Armour and Javelin. (Ex. 1 at 5.)  There is nothing in the record suggesting that the parties agreed that this provision would not apply to claims such as the ones in this lawsuit.

**B.      Section 6.2.2 Bars ACM's Claim for Consequential Damages for Purported Lost Employee Time**

ACM also claims it is entitled to be reimbursed for lost employee time.  The record reveals, however, that ACM did not incur any expenses that it can recover here.

*First*, there is no evidence that working on CAMRA implementation issues prevented any ACM employee from meeting all of his or her job responsibilities.  (56(a)1 ¶ 64.) The employees would have been paid what they were paid no matter what.  (*Id.*)  As ACM's Mr. Gruber testified, "I don't believe anybody received a bonus specifically due to SS&C's CAMRA implementation."   (Ex. 37 at 247:7-8.)   In other words, whatever happened with CAMRA, ACM incurred no additional expense.

*Second*, there is no evidence that the parties ever agreed—let alone discussed— repealing Section 6.2.2 of the Master Agreement.  As noted above, that clause prohibits ACM from recovering any indirect or consequential damages of *any kind*.  There is no testimony and no

Doc#: US1:12494020v1

document even suggesting that this provision is inapplicable to this lawsuit.  It is undisputed that the Master Agreement is an enforceable contract and *all* of its provisions are fully applicable.

## Argument

Summary judgment shall be granted where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  While a court "must view the evidence in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks omitted), it must also inquire whether the evidence "is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  If there is not sufficient evidence for a jury to return a verdict for that party, summary judgment is proper. *Anderson* 477 U.S. at 249–50.

## I.    The Court Should Enter Summary Judgment on ACM's Negligent Misrepresentation Claim

There are numerous problems with a claim based on Plaintiff's twenty-two alleged negligent misrepresentations.  For example:

- Many were not made to ACM at all, but rather to Armour.

- Some are not even statements at all:  in several instances ACM cannot even quote words or statements that were supposedly false.

And, taken collectively, the twenty-two ANMs do not support a cause of action.  SS&C is entitled to summary judgment on ACM's negligent misrepresentation claim for two reasons.  *First*, the merger clause in the Master Agreement precludes ACM from claiming it reasonably relied on *any*

pre-contractual representations made by SS&C.  *Second*, none of the twenty-two statements support a negligent misrepresentation claim because they fall into one of three nonactionable categories: (i) opinions, (ii) proposals, or (iii) true statements.

A.    **The Merger Clause Bars ACM's Negligent Misrepresentation Claim**

A significant Connecticut Appellate Court decision, one affirmed by the Connecticut Supreme Court, lays out a roadmap that explains why ACM's negligent misrepresentation claim fails:  *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169 (Conn. App. Ct. 2013), *aff'd*, 322 Conn. 541 (2016).  In *Western Dermatology*, the plaintiff ("Western") purchased software from defendant VitalWorks.  Unfortunately, the installation did not go well and plaintiff's staff "encountered numerous issues."  *Id.* at 173.  Western also alleged that VitalWorks employees "misrepresented material facts" to induce Western to purchase the VitalWorks software.  *Id.* at 134.  These allegations—and theories of liability—are indistinguishable from those ACM brings in this case.

In *Western Dermatology*, Western's claims failed because of the merger clause in its contract with VitalWorks.  That clause stated that the parties' written agreement:

> [c]onstitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral . . . .

*Id.* at 179.  The court held that this clause barred Western's negligent misrepresentation claim.

Laying out the applicable law, the *Western Dermatology* court explained: "Where the very instrument that created the required relationship to support a claim of negligent misrepresentation expressly provides that neither party is relying upon representations or statements not contained in the contract, there can be no cause of action based on negligent statements or promises allegedly made before such a contract is executed."  *Id*. at 196 (internal modifications omitted).  Turning to the facts before it, the court then held: "Given the presence of

18

the merger clause in the contract and the fact that [the alleged misrepresentations] were made prior to the signing of the contract, however, it would be unreasonable for the plaintiff to rely on these representations." *Id*. at 196–97.  It then ordered entry of judgment for defendant VitalWorks.

The *Western Dermatology* rule—a merger clause bars a misrepresentation claim based on pre-contract statements—is broadly accepted.  In adopting it, the *Western Dermatology* court cited decisions from the Second Circuit, New York, and a standard hornbook.  *Id*.; *see ATSI Communications, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) ("to the extent [plaintiff's] causes of action are based on alleged misrepresentations made during negotiations preceding the defendant's investment, those claims are barred by the merger clauses"); *Chase Manhattan Bank v. Edwards*, 450 N.Y.S.2d 76, 78 (3d Dep't 1982) ("no cause of action based on negligent statements" in face of merger clause), *aff'd*, 59 N.Y.2d 817 (1983); 37 Am.Jur.2d 161, Fraud and Deceit § 130 (2001) (same).

The *Western Dermatology* decision is binding and directly on point.  It is a clear, definitive statement of Connecticut law about merger clauses in contracts.  *See, e.g.*, *Associated Construction/AP Construction, LLC v. Hanover Ins. Co.,* 2018 WL 39989968, at *10, n.4 (D. Conn. 2018) (citing *Western Dermatology* for proposition that a merger clause bars claims for "an oral misrepresentation made prior to a contract").

Turning to the facts in *this* case, Section 6.7.4 of the ACM-SS&C Master Agreement is a merger clause.  It reads:

> Entire Agreement.  **This Master Agreement** (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and **supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties** with respect thereto.

This clause is functionally identical to the one in *Western Dermatology*.  By agreeing to this clause, the parties bound themselves to the terms of the Master Agreement and not any prior

19

representations.  Thus, ACM's negligent misrepresentation claim collapses.  All of ACM's twenty-two supposed misrepresentations were made *before* ACM signed the Master Agreement and agreed to the merger clause.  Under *Western Dermatology*, therefore, it is "unreasonable" for ACM to claim reliance on them.  146 Conn. App. at 196-197.  Summary judgment should be granted on the negligent misrepresentation claim.

### B.   Alternatively, None of the Representations ACM Advances Qualify as Negligent Misrepresentations

Under *Western Dermatology*, this Court does not need to substantively consider ACM's list of twenty-two allegedly negligent misrepresentations.  Reliance would have been unreasonable *as a matter of law*, regardless of what the statement was.  Nevertheless, if the Court does consider these statements, it will be reassured that none supports a negligent misrepresentation claim.

A negligent misrepresentation claim "requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006).  However, the law limits the types of statements that can lead to liability.  To begin with, the statement must be one of testable fact; it must be capable of being proved true or false.[8]  Thus,

---

[8]   Connecticut courts, like courts around the country in a variety of contexts, recognize that determining whether an assertion is one of fact includes considering, "whether the statement is objectively capable of being proved true or false."  *McPhee Elec., Ltd., LLC v. Konover Construction Corp.,* 2009 WL 4846555, at * 38 (Conn. Super. Ct. 2009) (citation omitted); *see Snyder v. Cedar,* 2006 WL 539130, at *12 (Conn. Super. Ct. 2006) ("In order for a statement to be defamatory, it must be understood to convey an objective fact, reasonably capable of being proved true or false"); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir. 2008) (in fraud action, "the statement or conduct alleged must represent an objective falsehood"); *NPS, LLC v. Ambac Assur. Corp.*, 706 F.Supp.2d 162, 174 (D. Mass.

Doc#: US1:12494020v1

statements of opinion are not negligent misrepresentations. (Section I.B.1, below).  Proposals subject to further negotiation cannot be relied upon and therefore are not a basis for a claim. (Section I.B.2, below.)  Similarly, the parol evidence rule bars negligent misrepresentation claims premised on pre-contractual statements where the subject matter is addressed in the final written agreement.  (pp. 27–28, below.)  And, obviously, true statements are not actionable at all.  All of Plaintiff's twenty-two ANMs fall into one of these non-actionable categories.

### 1.    Statements of Opinion Are Not Actionable

Opinions cannot be negligent misrepresentations.  *See*, *e.g.*, *Barton v. City of Bristol*, 291 Conn. 84, 104–105 (2009) (finding that the trial court properly determined, as a matter of law, that expressions of opinion do not constitute statements of fact for the purposes of stating a negligent misrepresentation claim).  Nine of Plaintiff's ANMs are non-actionable opinions:

- SS&C has "unrivaled expertise and professionalism" in "asset and wealth management accounting and operation."  [ANM 1.]

- CAMRA "simplifies the investment process."  [ANM 2.]

- SS&C can "help" mREITs.  [ANM 3.]

- SS&C has "unique expertise, world-class technology."  [ANM 4.]

- SS&C has "extensive knowledge and experience meeting the needs of organizations that invest heavily in MBS and structured products."  [ANM 5.]

---

2010) (dismissing misrepresentation claim based on statements "too general and vague to be capable of being proven true or false").

As one court neatly summarized the rule:  "A representation of fact can constitute actionable fraudulent inducement only if it (1) admits of being adjudged true or false in a way that (2) admits of empirical verification.'"  *Hoffman v. L&M Arts,* 838 F.3d 568, 579 (5th Cir. 2016), *quoting Presidio Enters, Inc. v. Warner Bros. Distrib. Corp.,* 784 F.2d 674, 679 (5th Cir. 1986); *American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (same).

Doc#: US1:12494020v1

- SS&C has "accounting and reporting expertise," and CAMRA is a "proven accounting engine."  [ANM 6.]

- "SS&C has "proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs."  [ANM 7.]

- "We are confident CAMRA is the right fit for ARMOUR."  [ANM 8.]

- "Based on the feedback from Trevor and Corey, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR."  [ANM 13.]

Abundant case law provides on-point precedents demonstrating why none of these statements can be a basis for liability.

In *Larobina v. Wells Fargo Bank, N.A.*, 2012 WL 1032953 (D. Conn. 2012), the court qualified a bank's announcement that it was "a professional and stalwart bank, making conservative and wise investments" as "statements of opinion—not fact."  *Id.* at *4.  Reasoning that "opinions" cannot satisfy the elements of a negligent misrepresentation claim, the court dismissed the claim.   Here, SS&C's statements, that it had "unrivaled expertise and professionalism," "world-class technology," "extensive knowledge and experience," and "accounting and reporting expertise," fall within the *Larobina* rubric.  [ANMs 1, 4, 5, 6.]  The same is true of the opinion that CAMRA is a "proven accounting engine."  [ANM 6.]

Similarly, the court in *Olympic Dreams, LLC v. Clark*, 2014 WL 4267499 (D. Conn. 2014), characterized statements from defendants that particular horses would be "a good fit" and "a wonderful match" for plaintiff's daughters as statements of "opinion."  *Id.* at *6.  The court thus dismissed plaintiff's negligent misrepresentation claim with respect to these statements. *Id.*  Here, SS&C's statements that CAMRA was "the right fit" and "a good deployment option" for ACM mirror the "opinion" statements in *Olympic Dreams*.  [ANMs 8, 13.]

Lastly, *Vezina v. Nautilus Pools, Inc.*, 27 Conn. App. 810 (1992), establishes that "favorable comments by sellers with respect to their products are universally accepted and expected in the market place and do not give rise to liability." *Id.* at 816 (internal quotation marks omitted); *see also Ormsby v. Nationwide Mut. Fire Ins. Co.*, 2000 WL 739606, at *7 (Conn. Super. Ct. 2000) (finding in the context of a fraud analysis that Nationwide's slogan, "Nationwide is on your side," and Nationwide's assurances of "fast, fair and friendly service" were statements of opinion, not fact). ACM faults a purported statement on SS&C's website that describes CAMRA as a "flexible software application that streamlines, automates and simplifies the investment process." [ANM 2.][9] ACM likewise targets SS&C's assertions that (i) CAMRA has the ability to "help" REITs meet their "accounting and reporting processes," (ii) CAMRA is a "proven accounting engine," and (iii) SS&C has "proven systems." [ANMs 3, 6, 7.] These "favorable" statements are nothing more than run-of-the-mill positive comments that sellers make about their products and services. They do not give rise to liability.

## 2.    Pre-Contract Proposals and Demonstrations Are Not Actionable

ACM asserts that four pre-contractual proposals SS&C made about implementation cost estimates, timelines, and available services are negligent misrepresentations. [ANMs 15, 16, 19, 21.] ACM also argues that SS&C's CAMRA demonstration and two related proofs of concept qualify as negligent misrepresentations. [ANMs 10, 11, 14.] But none of these seven "statements" can support a claim.

---

[9]    The Court should also grant summary judgment on all claims based on ANMs 1 and 2 because there is no evidence these statements actually were on SS&C's website prior to the date the Master Agreement was signed.

Doc#: US1:12494020v1

### (a)   ACM Cannot Base Its Claim on Pre-Contractual Proposals about Fees, Timelines, and Services

Over a period of more than six months, SS&C exchanged numerous proposals with Armour and ACM.  That is what negotiation is:  a back and forth.  Four of Plaintiff's ANMs come from proposals made during that perfectly ordinary process.   Two ANMs are in the November Proposal.  The others are in the December 10 Draft Budget, the December 11 Draft Budget and the Proposed Migration Timeline (collectively, the "Four Proposals").[10]

As an initial matter, none of the ANMs in these documents is actually a testable statement of fact that could support a misrepresentation claim.  *See Dickau v. Mingrone*, 2018 Conn. Super. LEXIS 2587, at *14 (Conn. Super. Ct. 2018) ("Without a misrepresentation there can be no basis for a claim."); *Passiglia v. Northwell Health, Inc.*, 252 F.Supp.3d 129, 137 (E.D.N.Y. 2017) (dismissing fraud claim:  a statement cannot be considered a misrepresentation if it "has no express or implied context that may be regarded, in the context in which it was made, as either true or false"); *NPS, LLC*, 706 F.Supp. at 173 (dismissing claim where there was "no ascertainable standard by which to judge the truth or falsity of these statements.")

The documents themselves state that they are drafts, estimates, and proposals.  For example, the cover email transmitting the November Proposal to ACM stated:  "We understand our assumptions may not be 100% correct," and asked for "feedback" on the "proposal."  (Ex. 24 at 1.)  Similarly, here is the relevant portion of the December 10 Draft Budget:

---

[10]   Confusingly, ANM 19 alleges misrepresentations in two documents.

Doc#: US1:12494020v1



**SS&C Implementation Budget**

December 10, 2014
DRAFT – for discussion

| Start Date | End Date | Estimated Budget Hours |
|---|---|---|
| January 2015 | May 2015 | |
| **IMPLEMENTATION** | | |
| **1. Environment set-up, conversion & configuration** | | |
| Environment set-up | | 16 |
| Software configuration/installation | | 24 |
| Static data/initial positions/financial impact | | 340 |
| Set-up GL, chart of accounts, initialize GL reconciliation process | | 240 |
| Tax configuration, set-up and initialization | | 40 |
| ReportExpress set-up, configuration and reporting process deployment | | 80 |
| Catch-up assistance (1 FTE for 8 weeks) | | 320 |
| Reconciliation process (Cash/Par) | | 120 |
| **Environment set-up, conversion & configuration sub-total** | | **1,180** |

As is obvious, the document is a ***DRAFT—for discussion*** that is based on ***estimates***.  According to Plaintiff, however, the December 10 Draft Budget is a misrepresentation because SS&C "committed to completing implementation by May 2015 and listed the tasks SS&C agreed to perform to accomplish this." [ANM 19.]  That just is not true.  As the Court can see, the document does not contain a commitment to do anything.  It is a proposal; part of an ongoing negotiation.[11]

---

[11]   The same analysis applies to the December 11 Draft Budget.

As another example of Plaintiff's overreaching, here is the Proposed Migration Timeline, yet another document that ACM contends is a negligent misrepresentation:



That is the entire document.  It does not make a positive statement of fact about anything, let alone contain a commitment, an agreement or a promise.  Like so many of Plaintiff's ANMs, it does not contain a "misrepresentation of *fact*," and cannot be the basis of a claim.

Someone participating in a negotiation might accept or decline a proposal, but it makes no sense to say that someone "relied" on a proposal, particularly one that was rejected.  And that is what happened here.  In no sense did ACM "accept" any of the Four Proposals.  Instead, the parties continued negotiating and *only later* agreed to specific terms addressing all of the topics covered in the ANMs.  Under these circumstances, pre-contract proposals are not a basis for

26

liability, because ACM cannot establish key elements of its claim.  *See Nazami*, 280 Conn. at 626 (plaintiff has burden of proving reasonable reliance on a misstatement of fact).

If ACM actually was relying on statements in the Four Proposals, it had an obligation to make sure that they were included in the parties' final agreement.  In an analogous case also involving a dispute over the sale of a computer system, the court noted, "everyone is charged with the responsibility of reading and knowing the contents of a contract which he signs." *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 673 (N.D. Ga. 1982), *aff'd sub nom. Computer Dimensions v. Basic Four,* 747 F.2d 708 (11th Cir. 1984).  The court then granted summary judgment against the party claiming reliance:  "the evidence produced through the depositions of [plaintiffs] clearly establishes that both read the written agreement and understood that it contained terms materially different from the purported oral assurances.  In such a situation, any continued reliance on the purported oral assurances was clearly unreasonable." *Id*. at 672.[12]  The same reasoning applies here.  It is unreasonable for ACM to claim reliance on the Four Proposals when the final Master Agreement does not include the statements at issue.

As to the specific ANMs at issue:

***Fee Proposals:***   ANM 15 concerns the November Proposal's discussion of a proposed "one-time implementation fee" that would cover certain "implementation services." This was not a statement of positive fact; it is incapable of being proven true or false.  In any event, the "subject matter" of fees to be charged, and the services to be provided, is covered extensively in the final Master Agreement.  ACM did not rely on the November Proposal; it agreed to the terms of the Master Agreement.

---

[12]   In the quoted section, the *Management Assistance* court is quoting and adopting the reasoning of a prior unreported case.  Thus, the court concluded that it was "unreasonable as a matter of law" for a plaintiff to rely on pre-contractual representations.  546 F.Supp. at 675.

*Descriptions of Interface and Import Services:*   ANM 16 also comes from the November Proposal, where SS&C offered to "manage the interface" and "import transactions from custodians."   Again, ACM did not accept this proposal (let alone rely on it).   Rather, the parties negotiated specific terms to address these issues, and the Master Agreement includes a specific "Description of Services to Be Performed."   (Ex. 1 at 15.)   There is also a requirement for "Daily import of transactions from Citibank."   (*Id.* at 13.)   What matters is the contract's actual requirements about importing transactions, not a different proposal made a month earlier.

*Proposed Timelines:*   ANMs 19 and 21 concern proposed timelines contained in the December 10 Draft Budget, the December 11 Draft Budget, and the Proposed Migration Timeline.   Once more, ACM did not accept or rely on those proposals.   The parties continued to negotiate.   The only timeline that matters is the one agreed to in the parties' final agreement, which is an "assumption" of "4-6 months."   (Ex. 1 at 15.)[13]

In short, none of the statements in the Four Proposals can support a negligent misrepresentation claim.

Separately, the parol evidence rule leads to the same result with respect to the Four Proposals and offers yet another independent reason to grant summary judgment.   The parol evidence rule is well-settled:   "A written agreement is integrated and operates to exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing."   *Associated Catalog Merchandisers, Inc. v. Chagnon*, 210 Conn. 734, 740 (1989) (internal quotations and citations excluded).   Although the parol evidence rule is a doctrine of contract law, it also has been applied to bar tort claims based on misrepresentations.   *See*

---

[13]   The Court should also grant summary judgment on ANMs 19 and 21 because ACM never identifies what specifically it contends was false.   Connecticut law requires a plaintiff to prove "what the representations were."   *See*, *infra*, p. 30.

Doc#: US1:12494020v1

*McGuire* v. *Schneider, Inc.*, 368 Pa. Super. 344, 352-353 (1987) ("[w]here assertions put forth by one party are specifically contradicted by written agreement . . . parol evidence is admissible only to prove fraud in the execution, not the inducement.").  Whether the parol evidence rule applies in this way in Connecticut is unclear.  Although there is contrary prior authority, in a very recent decision, the Connecticut Supreme Court relied on the parol evidence rule to affirm dismissal of a negligent misrepresentation claim.  *See Channing Real Estate, LLC v. Gates*, 326 Conn. 123, 129 n.2 (2012) (affirming judgment because negligent misrepresentation claim relied on "extrinsic evidence" barred by the parol evidence rule).  This analysis provides yet another reason to enter judgment against ACM in this case.[14]  As just discussed, fee proposals, interfaces, import services, and timelines are all covered in the final Master Agreement.  Thus, the parol evidence rule bars claims based on earlier statements on those topics.

> **(b)     ACM Cannot Base Its Claim on the Demonstration and Proofs of Concept**

The law also prohibits ACM from characterizing SS&C's on-site CAMRA demonstration and two related proofs of concept as negligent misrepresentations.  [ANMs 10, 11, 14.]  Once again, *Western Dermatology* is on point.  *See* 146 Conn. App. at 190–91.  There, the court rejected Western's argument that VitalWorks' on-site software demonstration created an express warranty that VitalWorks breached when it failed to install the software.  *Id.*  Instead, the court held that the demonstration constituted parol evidence that could not "alter[] or be[] used to interpret" the parties' contractual provision limiting the warranty to what was "expressly set forth in this agreement."  *Id.*

---

[14]   *Channing Real Estate* is the most recent statement from the Connecticut Supreme Court about the interaction of the parol evidence rule and negligent misrepresentation claims.  As noted, there is contrary prior authority.  *E.g.*, *Warman v. Delaney*, 148 Conn. 469, 474 (1961).

Doc#: US1:12494020v1

The same rule applies here.  Section 6.2.1 of the Master Agreement includes a disclaimer that states that SS&C "makes no warranties . . . regarding or relating to the Software." (Ex. 1 at 5.)   Section 6.2.3 further provides that representations not contained in the written contract are unauthorized and invalid.  (*Id.*)  Accordingly, ACM cannot base a misrepresentation claim on the CAMRA demonstration or the related proofs of concept.  Its remedy, if any, is a claim for breach of contract.

The Court should also enter judgment against claims based on the demonstration and the proofs of concept because, as discussed, a misrepresentation claim requires a *misstatement of fact*.  *Nazami*, 280 Conn. at 626.  However, ACM has not identified a single statement—the actual words—that it contends was false in any of the demonstration or the proofs of concept.  That is fatal to its position.  If a plaintiff cannot identify the specific statements it claims were false, there is no claim.

Connecticut courts routinely dismiss misrepresentation claims where the Plaintiff fails to identify "particular facts demonstrating what the representations were and how they were false."  *Schifano v. Bank of N.Y. Co.*, 2013 WL 1715731, at *8–9 (Conn. Super. Ct. 2013) (collecting cases); *see*, *e.g.*, *Plotkin v. Barot*, 1999 WL 439291, at *5 (Conn. Super. Ct. 1999) (dismissing case where the plaintiff never identified "what the statements were or the reason they were false"); *Chestnut v. Kent*, 1998 Conn. Super. LEXIS 1086, at *5 (Conn. Super. Ct. 1998) (dismissing case where plaintiff did not allege "particular facts demonstrating what the representations were or how they were false").  This Court should do the same with respect to claims based on the proofs of concept and particularly the demonstration.  It was a forty-five minute live presentation and there is *no record* of what was said.

### 3.    True Statements, By Definition, Are Not Negligent Misrepresentations

There is no dispute that true statements do not qualify as negligent misrepresentations.  *See Nazami*, 280 Conn. at 626.  The remaining six statements on ACM's list of twenty-two alleged negligent misrepresentations are true.

**First Statement.**   ACM alleges that contents of a December 8, 2014 email from Mr. Moore to ACM are false.   [ANM 18.]   There, Mr. Moore wrote:  "Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning Armour to our CAMRA solution."  (Ex. 25.)  As Mr. Moore testified, preparing implementation estimates is a standard practice at SS&C and he, in fact, delivered the first such estimate on December 10, 2014.  There is *no evidence* that Mr. Moore was not, in fact, working on the estimate as of December 8.  (*Id.*)  The December 8 Moore email is not a negligent misrepresentation.

**Second Statement.**   ACM argues that SS&C made a false statement in the June PowerPoint—specifically, that a "large portion" of SS&C's "client base has a significant exposure to MBS," *i.e.*, mortgage-backed securities.  [ANM 6.]  But it is undisputed that numerous SS&C clients trade in mortgage-backed securities, including the seven clients enumerated in the very slide ACM puts at issue:  Annaly, Chimera, Western Asset Mortgage Capital, Apollo Residential Mortgage Trust, CYS, Ares, and New York Mortgage Trust.  (Ex. 15 at 4.)  Many other SS&C clients do so as well.  (56(a)1 ¶ 7.)  Indeed, as of 2014, over 95% of SS&C's CAMRA clients used the software to process transactions in mortgage-backed securities.  (*Id.*)  ACM cannot credibly claim that SS&C misrepresented its clients' exposure to mortgage-backed securities.

**Remaining Four Statements.**  ACM contends that SS&C misrepresented its ability to implement CAMRA, and falsely stated that its Professional Services team had previously

implemented CAMRA for REITs.  [ANMs 9, 17.][15]  In a similar vein, ACM asserts that neither Mr. Sivadas nor Ms. Olszewska possessed "extensive" or "significant" CAMRA implementation experience.  [ANMs 12, 20.]  Plaintiff misstates the facts.  As a preliminary matter, SS&C is qualified to implement CAMRA.  Throughout its thirty-year history, SS&C has successfully implemented its flagship product for hundreds of customers, including REITs.  (56(a)1 ¶ 6.)  No evidence refutes the fact that ACM's Professional Services team had implemented CAMRA for REITs prior to licensing the product to ACM.  (*Id.*)

Finally, both Mr. Sivadas and Ms. Olszewska were qualified to implement CAMRA.  In 2014, Mr. Sivadas had worked for SS&C for more than eighteen years.  (56(a)1 ¶ 35.) He had substantive responsibilities on at least eight CAMRA implementations.  (56(a)1 ¶ 36.) SS&C hired Ms. Olszewska in 2008.  (56(a)1 ¶ 37.)  Prior to ACM's CAMRA implementation, she managed approximately fifty CAMRA implementation, four for REITs.  (*Id.*)  Ms. Olszewska testified that she worked "predominantly" with CAMRA for the two-year period preceding ACM's onboarding.  (*Id.*)  No evidence validates ACM's contention that Mr. Sivadas or Ms. Olszewska lacked sufficient qualifications to implement CAMRA.  Indeed, Plaintiff has not even identified a standard by which the Court could measure qualifications.

*        *        *

In conclusion, the Court should grant summary judgment on ACM's negligent misrepresentation claim.  Under *Western Dermatology*, the Master Agreement's merger clause bars this claim as a matter of law.  And, even setting *Western Dermatology* aside, ACM has not identified any actionable negligent misrepresentations.

---

[15]   To the extent ACM still complains that SS&C said a consultant was unnecessary, that is a non-actionable opinion, and one for which SS&C had a substantial basis.  (56(a)1 ¶ 11–12.)

Doc#: US1:12494020v1

II.   **The Court Should Enter Summary Judgment on the Breach of Contract Claim Because ACM Has No Cognizable Damages**

ACM seeks $2.28 million in damages for breach of contract.  (FAC ¶ 59.)  This figure includes the $1.78 million that ACM paid to SS&C and $500,000 in supposed "lost employee time." (Ex. 36.)  ACM is prohibited from recovering either sum.[16]

*First*, ACM cannot prove any contract damages because Armour and Javelin—not ACM—were responsible for all fees paid to SS&C.  The Master Agreement precludes the type of third-party claim ACM is trying to assert.

*Second*, ACM cannot recover for lost employee time because the contract precludes consequential damages of "any kind."

A.   **ACM Suffered No Loss Because Armour and Javelin Paid the Contract Costs and Fees Due Under the Master Agreement**

ACM negotiated for itself a set of agreements that guaranteed it would not have to bear any charges under the Master Agreement.  Its contracts with the REITs allowed ACM to pass on only specific types of third-party costs.  Thus, ACM deliberately selected a type of CAMRA implementation ("Hosting") so that the expense could be shifted to Armour and Javelin.  If ACM had selected the "Outsourcing" option *it* would have had to pay all of the costs and fees.

ACM's scheme worked.  It is undisputed that, as Armour's co-CEO testified, "all of the professional service fees" under the Master Agreement "were all passed on."  (Ex. 35 at 16:14-23.)  There is *no evidence* that ACM ultimately bore the costs of any amounts charged under the contract.  (56(a)1 ¶ 56–61.)  It suffered no out of pocket loss and therefore has no actual damages.

---

[16]   The amounts quoted come from the FAC.  If the case were to go to trial, Plaintiff might claim other amounts, but the exact figure is irrelevant here.  For the reasons discussed below, ACM has no claim to *any* damages.

In this circumstance, summary judgment is appropriate because ACM cannot establish an essential element of its claim: damages. *Blaszczak v. Slomkowski*, 2003 WL 23178003, at *1 (Conn. Super. Ct. 2003) (citing *Braithwaite v. Lee*, 125 Conn. 10, 14 (1938) ("Damages are an essential element" of a breach of contract claim and they "must be proved with reasonable certainty.")) To permit ACM to recover would violate "the time honored rule that an injured party is entitled to recover only once for the harm suffered." *Peck v. Jacquemin*, 196 Conn. 53, 70 n.19 (1985). ACM has "recovered" from Armour and Javelin; it cannot recover again from SS&C. *See Asher v. Unarco Material Handling, Inc.*, 862 F.Supp.2d 551, 554–55 (E.D. Ky. 2012) (collecting cases and explaining that "the overwhelming majority of jurisdictions" explicitly refuse "to import the collateral source rule into the law of contracts" because contract damages are strictly compensatory in nature).[17]

To the extent ACM is trying to recover damages for Armour and Javelin, it is precluded from doing so. Section 6.2.3 of the Master Agreement provides that "SS&C should have "no contractual or other obligations or liability" to Armour and Javelin.

---

[17] In Connecticut, the "collateral source rule" prevents a tort defendant from arguing that it need not compensate a plaintiff that already received compensation from a collateral source. *Lashin v. Corcoran*, 146 Conn. 512, 515 (1959). It is an open question whether the collateral source rules applies to breach of contract actions in this state, but SS&C submits that it should *not* apply to the facts of this case, for two reasons. *First*, as noted above, that is the majority rule. *Asher*, *supra*. *Second*, according to the *Restatement (Second) of Contracts* ("*Restatement*"), the collateral source rule is "less compelling" in contract cases than in tort actions. *Id.* at § 347 cmt. e (1981). Thus, a plaintiff "is limited to damages based on his actual loss caused by the breach." *Id.* This Court should adopt that rule, and find that the collateral source rule does not apply, given that Connecticut courts regularly look to the Restatement as an authority on questions of contract law. *See, e.g.*, *Weiss v. Smulders*, 313 Conn. 227, 269 (2014) (relying on the factors in §§ 241–42 of the *Restatement* to determine whether a breach of contract was "material"); *Torringford Farms Ass'n v. City of Torrington*, 75 Conn.App. 570, 575 (2003) (following the approach of the *Restatement* that promissory estoppel is "an alternative basis to enforce a contract").

**B.      The Master Agreement Bars ACM's Claim for Consequential Damages (Lost Employee Time)**

The text of the Master Agreement itself bars ACM's claim for lost employee time. Under Section 6.2.2, "SS&C is not liable for any indirect, special, incidental or consequential damages of ***any kind***." (Ex. 1 at 5.)  That is the end of the matter.  And, in any event, there was no loss.  It is undisputed that ACM did not incur any additional employment expenses. (*See*, *supra*, p. 16.)

**III.      The Court Should Enter Summary Judgment on ACM's CUTPA Claim**

ACM also seeks $2.28 million in damages under CUTPA.  This figure includes the $1.78 million that ACM paid to SS&C and $500,000 in lost employee time.  (FAC ¶ 64.)  Once more, ACM is not entitled to either sum.

In order to prevail on its CUTPA claim, ACM has the burden of proving, among other things, (i) a misrepresentation and (ii) an ascertainable loss.  ACM can prove neither.

*First*, by prior order of this Court, "ACM's CUTPA claim may proceed to the extent that it relies on negligent misrepresentations prior to the execution of the Master Agreement."  ECF No. 75 at 16.  *A fortiori*, if ACM fails to prove a negligent misrepresentation, its CUTPA claim will fail.  For the reasons discussed at length above, there are no actionable negligent misrepresentations and, therefore, summary judgment is appropriate on this claim, as well.

*Second*, the CUTPA claim also fails because ACM did not suffer any "ascertainable loss."  *See, e.g.*, *O'Reilly v. BJ's Wholesale Club, Inc.*, 2018 WL 1336128, at *6 (D. Conn. 2018) ("a plaintiff still must marshal *some* evidence of ascertainable loss in support of [its] CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim on summary judgment") (citing *Marinos v. Poirot*, 308 Conn. 706, 713–14 (2013)).  For reasons already discussed, ACM has no ascertainable loss because:

Doc#: US1:12494020v1

- It did not suffer any loss with respect to charges and fees due under the Master Agreement; those were ultimately paid by Armour and Javelin. (*See, supra*, pp. 14–16.)

- Master Agreement Section 6.2.2 bars claims for incidental damages of any kind. (*See, supra*, p. 16–17.)

These are ample grounds for the Court to enter summary judgment on the CUTPA claim.[18]

## IV.    The Court Should Enter Summary Judgment on ACM's Rescission Claim

A court may rescind a contract when a "party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." *Munroe* v. *Great American Ins. Co.*, 234 Conn. 182, 188, n.4 (1995). This Court earlier ruled that the pre-contractual negligent misrepresentations alleged by ACM might serve as a basis for rescission. ECF No. 75, at 16. But, because ACM's negligent misrepresentation claim fails, its alternative request for rescission also fails. SS&C is therefore entitled to summary judgment on the rescission claim.

---

[18]    Additionally, while Connecticut courts have not addressed whether a salaried employee's time may count as an "ascertainable loss" under CUTPA, several courts have rejected similar types of claims outright. In *Wilson v. Marquette Electronics, Inc.*, 630 F.2d 575 (8th Cir. 1980), the court reversed a "lost time" award for "extra time" an employee "was 'forced to spend'" working due to faulty computer equipment purchased by the plaintiff from the defendant. *Id.* at 586. Likewise, in *Liberty Bay Credit Union v. Open Solutions, Inc.*, 905 F.Supp. 2d 389 (D. Mass. 2012), the court refused to award damages for time the plaintiff's employees spent on a failed software implementation because the plaintiff "would have paid these employees' salaries whatever assignment they were given during the relevant period." *Id.* at 400. Here, it is undisputed that ACM's employees received no additional compensation for any time spent on CAMRA-related activities. (56(a)1 ¶¶ 62–63.) And, ACM was not deprived of its employees' services as a result of the time they spent on the CAMRA implementation. (56(a)1 ¶ 64.) This is yet another reason for summary judgment on the CUTPA claim.

Doc#: US1:12494020v1

**Conclusion**

      SS&C's motion for summary judgment should be granted as to all remaining claims in the case.

Dated:  New York, New York
          December 17, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By:  */s/ John F. Baughman*
      John F. Baughman
      Nora Ahmed
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
jbaughman@paulweiss.com
nahmed@paulweiss.com

Kevin J. O'Connor
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 378-4394
koconnor@hinckleyallen.com

Jeffrey J. Mirman
Alexa T. Millinger
Hinckley, Allen & Snyder LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
(860) 331-2762
jmirman@hinckleyallen.com
amillinger@hinckleyallen.com

*Attorneys for Defendant*
*SS&C Technologies, Inc.*

Doc#: US1:12494020v1