UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP,<br><br>                          Plaintiff,<br><br>              - against -<br><br>SS&C TECHNOLOGIES, INC.,<br><br>                          Defendant. | 3:17-cv-00790-JAM |

## LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED MATERIAL FACTS

As required by Local Civil Rule 56(a)1, Defendant SS&C Technologies, Inc. ("SS&C") submits the following statement of material facts as to which there is no genuine issue to be tried.

1. Exhibit 1 is a copy of the parties' "Master Agreement," which is the subject of this litigation. (Ahmed Ex. 1 at 1–16.)[1]

*Defendant SS&C*

2. SS&C was established in 1986. It is a software company that specializes in servicing the financial services industry. (Ahmed Ex. 2 at 4, 6.)

3. The Company's website, as of December 3, 2018, stated: "Over the past 30 years, we have created the most comprehensive powerhouse of software technology in the financial services industry – technology that complements our unrivaled expertise

---

[1] Citations in the form of "Ahmed Ex. ___" refer to exhibits attached to the Declaration of Nora Ahmed in Support of Defendant's Motion for Summary Judgment.

and professionalism in fund administration, insurance and pension funds, and asset and wealth management accounting and operations." (Ahmed Ex. 3 at 1.)

4. SS&C's "flagship" product is CAMRA. (Ahmed Ex. 4 at 2.)

5. CAMRA is a commercial "off-the-shelf" accounting software. (Ahmed Ex. 1 at 1, § 1.6.)

6. Since its inception in 1988, SS&C has successfully implemented CAMRA for over 200 customers, including insurance companies, asset managers, pension funds, and mortgage real estate investment trusts ("mREITs"). (Reilly Dec. ¶¶ 4, 9.)

7. In 2014, over 95% of SS&C's CAMRA client base used CAMRA to process transactions involving mortgage-backed securities. (Reilly Dec. ¶ 5.)

8. CAMRA can be implemented in three different formats: "Licensed Only," "Outsourced," and "Hosted." (Reilly Dec. ¶ 6.)

9. As of fourth quarter 2014, SS&C's "Licensed Only" clients had implemented CAMRA with approximately 465 users as of fourth quarter 2014. (Reilly Dec. ¶ 7.)

10. At that time, SS&C had successfully implemented CAMRA for around thirty-five customers on an Outsourced or a Hosted basis. (Reilly Dec. ¶ 8.)

11. In almost all new Outsourced or Hosted cases, SS&C and the client that purchased CAMRA jointly implement the product, without third party assistance. It is very uncommon to involve third party consultants in the Outsourced or Hosted implementation process. (Reilly Dec. ¶¶ 11–12.)

12. Between 2013 and mid-2017, over 90% of new CAMRA projects were implemented without third party assistance. (Reilly Dec. ¶ 12.)

13. In April 2014, SS&C issued a press release announcing the formation of a new group dedicated to servicing real estate investment trusts ("REITs"). The announcement identified this group as equipped to "help mortgage REITs" produce "fully auditable accounting and reporting processes and eliminate the use of spreadsheets." The press release stated that SS&C had "unique expertise, world-class technology and more than 10 years of experience" in the mREIT space. (Ahmed Ex. 5 at 1.)

14. As of 2014, approximately 500 entities (with over $2 trillion of assets) were using CAMRA for their accounting books and records. (Reilly Dec. ¶ 4.)

*Plaintiff ACM*

15. Plaintiff Armour Capital Management LP ("ACM") is a registered investment advisor that manages over $8.5 billion in assets. (Ahmed Ex. 6 at 1.)

16. In 2014, ACM managed assets for ARMOUR Residential REIT, Inc. ("Armour") and JAVELIN Mortgage Investment Corp. ("Javelin"). (Ahmed Ex. 7 at 3, § 2.1; Ahmed Ex. 8 at 3, § 2.1.)

17. At the time, Armour and Javelin had more than $19 billion in assets under management. (Ahmed Ex. 9 at 3; Ahmed Ex. 10 at 3.)

18. On April 6, 2016, Armour acquired Javelin. (Ahmed Ex. 11 at 33.)

19. Plaintiff was named Armour Residential Management LLC until it changed its name on December 19, 2014. (Ahmed Ex. 12 at 1.)

20. ACM, Armour, and Javelin are all located in Vero Beach, Florida. (Ahmed Ex. 6 at 1; Ahmed Ex. 9 at 1; Ahmed Ex. 10 at 1.)

*Negotiations Prior to Execution of the Parties' Integrated Contract*

21. On May 13, 2014, SS&C was contacted by Jim Mountain. Mr. Mountain's email signature block at the time identified him as the Chief Financial Officer of both Armour and Javelin. (Ahmed Ex. 13 at 1.)

22. That same day, a director of SS&C's business development team, Dennis Moore, responded to Mr. Mountain and asked to "schedule a time for us to speak so I can learn a little more about what you might be looking for." In response, Mr. Mountain explained that Armour and Javelin were "interested in learning about all technologies/services that would potentially be applicable." Mr. Moore told Mr. Mountain that he would get back to him shortly; in the interim, he provided a brochure, titled "Mortgage REIT Accounting and Financial Reporting Specialists." (Ahmed Ex. 13 at 1–2; Ahmed Ex. 13-A at 1–4.)

23. On June 2, 2014, four SS&C representatives met with Mr. Mountain and a colleague of his named Mark Gruber. (Ahmed Ex. 14 at 74:18-23.)

24. At that meeting, SS&C presented a PowerPoint (the "June PowerPoint"), titled "Introduction to SS&C Technologies." The document was addressed to Armour. (Ahmed Ex. 15 at 1–10.)

25. The June PowerPoint discussed SS&C's (i) "accounting and reporting expertise," (ii) "proven systems capable of supporting a broad range of [needs] specific to mortgage REITs," and (iii) "dedicated" REIT services team. It also identified seven CAMRA clients that, like Armour, traded in mortgage-backed securities: Annaly, Chimera, Western Asset Mortgage Capital, Apollo Residential Mortgage Trust, CYS, Ares, and New York Mortgage Trust. (Ahmed Ex. 15 at 3, 4, 9.)

4

26.     Here is a copy of page 4 of the June PowerPoint.

> **Expertise Supporting MBS**
>
> A large portion of our client base has a significant exposure to MBS
> - REITs
>   - Annaly / Chimera
>   - Western Asset Mortgage Capital
>   - Apollo Residential Mortgage Trust
>   - CYS
>   - Ares
>   - New York Mortgage Trust
> - Real Estate Investment Companies
>   - Ladder Capital
>   - Structured Portfolio Management
> - Insurance Companies / Asset Managers
>   - New York Life
>   - TIAA / CREF
>   - Liberty Mutual
>
> SS&C                                                         4

27.     Plaintiff does not dispute that any of the bullets or sub bullets on page 4 of the June PowerPoint are true.

28.     At the June 2 meeting, SS&C also told Armour about its prior experience implementing CAMRA for REITs, including REITs that trade in mortgage-backed securities ("mREITs").  (Ahmed Ex. 15 at 4.)

29.     SS&C stated that CAMRA was a "[p]roven accounting engine." (Ahmed Ex. 15 at 5.)

30.     The June PowerPoint described three deployment options:  (1) "In-House License," described as "[t]he CAMRA application is run in Armour's data center"; (2) "Hosting," described as "SS&C hosts the hardware and software in its Tier 3 data center," along with optional additional services; and (3) "Full Service Outsourcing," described as "SS&C provides comprehensive investment accounting and reporting services on an outsourced basis."  (Ahmed Ex. 15 at 2.)

5

31. Two days after the June PowerPoint presentation, on June 4, 2014, Mr. Moore emailed Messrs. Mountain and Gruber. Mr. Moore conveyed his opinion that, "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for ARMOUR." (Ahmed Ex. 16 at 4.)

32. SS&C prepared three "proofs of concept," testing CAMRA using Armour's data. The first proof of concept was submitted to ACM on August 26, 2014. The second proof of concept was submitted to ACM on September 24, 2014. The third proof of concept was submitted to ACM on October 21, 2014. (Ahmed Exs. 17–19.)

33. On August 27, 2014, SS&C provided a "Demonstration of CAMRA Accounting System & Proof of Concept Results." The meeting lasted two-and-a-half hours and included a forty-five minute demonstration of the CAMRA system. There is no record of what the demonstration included. A PowerPoint was used at the meeting. The PowerPoint is addressed to Armour. (Ahmed Ex. 20 at 0–22.)

34. At that meeting, SS&C introduced Shiv Sivadas, a member of SS&C's Professional Services team. (Reilly Dec. ¶ 13.)

35. Mr. Sivadas, a nineteen-year SS&C veteran, had "extensive experience with client implementations, . . . helping implement SS&C solutions and services, with a focus on CAMRA." (Ahmed Ex. 21.)

36. Mr. Sivadas had a substantive role on at least eight CAMRA implementations, dedicating over 200 hours to each project. His duties included processing day-to-day CAMRA client transactions and performing custodial data reconciliations. (Reilly Dec. ¶ 13.)

Doc#: US1:12494050v1

37. At the time, Iwona Olszewska was the head of SS&C's Professional Services team. She had been responsible for that team since 2008. In that capacity, she oversaw approximately fifty CAMRA implementations, including four for REITs. For the two years preceding ACM's onboarding, she had worked "predominantly" with CAMRA. (Reilly Dec. ¶ 14; Ahmed Ex. 22 at 46:1-13.)

38. On September 9, 2014, SS&C discussed the "Hosting" option with Trevor Spicer and Cory Graley, both of whom worked in ACM's IT department. The next day, Mr. Moore emailed Messrs. Mountain and Gruber. He wrote: "Based on the feedback from Trevor and Corey, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR." (Ahmed Ex. 23.)

39. On November 13, 2014, SS&C provided ACM with a "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" (the "November Proposal"). (Ahmed Ex. 24-A at 1–11.)

40. The cover email noted that SS&C was "open to discussions regarding the expansion or contraction of any operational support services contained in our proposal." The email clarified that the "assumptions" in the November Proposal "may not be 100% correct and also that you may have questions." SS&C told Armour: "We look forward to your feedback and the opportunity to prove ourselves as the best possible partner for ensuring your success with this initiative." (Ahmed Ex. 24 at 1.)

41. The eleven-page attachment includes sections on "Overview and Assumptions" and "Proposed Solution Overview." These sections respectively include the following statements: (i) "SS&C will manage the interface and uploading of information

from custodians of choice," and (ii) "Data Management . . . Import transactions from custodians Citi, and potentially BONY." (Ahmed Ex. 24-A at 5, 6–9.)

42. Another section, "Fee Schedule," proposed a "one-time implementation fee" and prospective "implementation services." (Ahmed Ex. 24-A at 10–11.)

43. On December 8, 2014, SS&C's Mr. Moore emailed people at Armour and ACM. He said that he and SS&C's Jeff Fecteau have been working "to prepare an implementation estimate for transitioning ARMOUR to our CAMRA solution." (Ahmed Ex. 25.)

44. An "implementation estimate" is a "standard document" prepared at SS&C and, in this case, Mr. Moore prepared it in consultation with Mark Gruber at Armour. (Ahmed Ex. 26 at 242:10–243:9.)

45. Two days later, Mr. Moore sent Armour and ACM "a draft implementation budget for our discussion tomorrow." (Ahmed Ex. 27 at 1.)

46. The attached proposal is labeled "Draft – for discussion," and lists "Estimated Budget Hours." It indicates that the start for the proposed project is "January 2015" and that the end date is "May 2015." (Ahmed Ex. 27-A at 1.)

47. SS&C sent a revised proposal on December 11, 2014. It was marked "Draft – for discussion" and included a "Proposed Migration Timeline." The cover email to Mr. Mountain, Mr. Gruber, and Ms. Jonna Terry stated: "Based on our conversation yesterday, Iwona, Jeff, and I have revisited the implementation document and identified tasks where ARMOUR could take on some of the work effort." (Ahmed Ex. 28 at 1; Ahmed Ex. 28-A at 1–3.)

48. During the negotiation process, the parties had at least one conversation about whether to hire a third party consultant to assist in implementing CAMRA.  (Reilly Dec. ¶ 10.)

*The Master Agreement*

49. Between December 15 and 19, 2014, the parties exchanged at least four drafts of the Master Agreement.  Both sides proposed and rejected various contractual provisions.  (Ahmed Exs. 29–33.)

50. On December 16, SS&C proposed a call with Mr. Mountain to discuss key concepts in the contract, including "what constitutes the 'ordinary course of business.'"  On December 19, the parties exchanged emails concerning final revisions to the Master Agreement.  (Ahmed Ex. 30 at 1; Ahmed Ex. 33 at 1–2.)

51. The parties did not reach agreement until December 19, 2014, when ACM and SS&C agreed to the final Master Agreement.  (Ahmed Ex. 1 at 9.)

52. The signed Master Agreement is an integrated agreement. Section 6.7.4 of the Master Agreement provides:

> Entire Agreement.  This Master Agreement (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect thereto.

Sections 6.2.1 and 6.2.5 provide:

> Disclaimer.  Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation.  SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the software and the Documentation.
>
> No Other Warranty.  Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid.  No employee, agent, representative or

affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

Section 6.2.2 provides, in part:

<u>Exclusion of Consequential Damages and Absolute Limitation on SS&C's Liability</u>.  SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder . . . .

Section 6.2.3 provides:

<u>No Third Party Beneficiaries</u>.  SS&C shall have no contractual or other obligations or liability to (i) ARMOUR Residential REIT, Inc. or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.

(Ahmed Ex. 1 at 5, 8.)

53.     Attachment B-1 of the Master Agreement identified specific "Hosting, Process Automation and Data Management Services" that SS&C would provide; and the attached "Work Request One" identified specific "Initial Implementation Services."  (Ahmed Ex. 1 at 12–16.)

54.     The Work Request listed specific tasks for each party and noted that SS&C would provide services "in support of Client's implementation of the Software."  It also listed various "Assumptions," including a "Project Duration of 4-6 months."  It set an "Applicable Rate" that said SS&C will "provide an estimated 1,850 hours of support in relation to the services described . . . at a rate of $225 per person per hour."  (Ahmed Ex. 1 at 15.)

55.     ACM terminated the Master Agreement on May 1, 2017. (First Am. Compl. ¶ 54.)

10

*Armour and Javelin Paid SS&C's Fees*

56. ACM provides services to Armour and Javelin under "Management Agreements." Those agreements state: "The Manager is authorized to retain, for and on behalf of the REIT, the services of third parties." They further note that "costs and expenses related to the retention of third parties shall be the sole cost and expense of the REIT." Reimbursement, however, is not available if ACM outsources "data processing or clerical services" to a third party. (Ahmed Ex. 7 at 6, § 2.4.2; Ahmed Ex. 8 at 7, § at 2.4.2.)

57. If ACM had purchased CAMRA on an "Outsourced" basis, it would have been responsible for all fees paid to SS&C absent specific approval from Armour's and Javelin's Board of Directors. (Ahmed Ex. 14 at 168:14-23.)

58. One of Armour's co-CEO's, Jeff Zimmer, testified:

Q: Okay. But your understanding is that that cost was ultimately borne by Armour Residential REIT, correct?

A: That's what I said, correct.

Q: And all the professional services fees that were charged in connection with Armour's contractual arrangement with SS&C were all passed on to the Armour REIT, correct?

THE WITNESS: Correct.

(Ahmed Ex. 35 at 16:8-20 (objections and attorney instructions omitted).)

59. Further, Mr. Zimmer said: "Who pays the bill and who ultimately is responsible for the bill are two different enterprises. So it doesn't matter whether the LP or the REIT pays directly. It only matters who's ultimately responsible. In this case, the REIT was ultimately responsible." He noted that, whether Armour and Javelin "reimbursed the LP or paid directly, I would not know today." (Ahmed Ex. 35 at 15:10-15, 16:4-5.)

Doc#: US1:12494050v1

60. Mr. Zimmer testified that the case concerned "the damages to the REIT for the fees that they have paid SS&C."  (Ahmed Ex. 35 at 13:19-20.)

61. ACM's Rule 30(b)(6) witness testified that ACM was "here today" to get things "sorted out for the benefit of th[e] ultimate payors [*i.e.*, Armour and Javelin]." (Ahmed Ex. 34 at 33:1-3.)

*ACM Employee Compensation Arrangements*

62. All ACM employees that worked on the CAMRA implementation were salaried.  Their compensation did not depend on the hours they worked.  (Ahmed Ex. 34 at 229:22–230:2.)

63. Mr. Gruber testified: "I don't believe anybody received a bonus specifically due to SS&C's CAMRA implementation."  (Ahmed Ex. 37 at 247:7-8.)

64. There is no evidence that working on CAMRA implementation issues prevented any ACM employee from meeting all of his or her job responsibilities. The employees would have been paid what they were paid no matter what.

Dated: New York, New York
       December 17, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ *John F. Baughman*
    John F. Baughman
    Nora Ahmed
    1285 Avenue of the Americas
    New York, New York 10019
    (212) 373-3000
    jbaughman@paulweiss.com
    nahmed@paulweiss.com

Doc#: US1:12494050v1

13

                        Kevin J. O'Connor
                        Hinckley, Allen & Snyder LLP
                        28 State Street
                        Boston, MA 02109-1775
                        (617) 378-4394
                        koconnor@hinckleyallen.com

                        Jeffrey J. Mirman
                        Alexa T. Millinger
                        Hinckley, Allen & Snyder LLP
                        20 Church Street, 18th Floor
                        Hartford, Connecticut 06103
                        (860) 331-2762
                        jmirman@hinckleyallen.com
                        amillinger@hinckleyallen.com

                        *Attorneys for Defendant*
                        *SS&C Technologies, Inc.*

13