Exhibit 34

```
                        CONFIDENTIAL
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
                     NEW HAVEN DIVISION
                 CASE No. 17-CV-00790-JAM


ARMOUR CAPITAL MANAGEMENT LP,

        Plaintiff,

-vs-


SS&C TECHNOLOGIES, INC.,

        Defendant.
_____
                        CONFIDENTIAL
            ** ATTORNEYS' EYES ONLY TESTIMONY **
                  VIDEOTAPED DEPOSITION OF
              JAMES MOUNTAIN and MARK GRUBER,
       REPRESENTATIVES OF ARMOUR CAPITAL MANAGEMENT
                  FED. R. CIV. P. 30(B)(6)



                    Friday, May 11, 2018
                    10:48 a.m. - 6:41 p.m.




                    701 Brickell Avenue,
                        Suite 3300
                    Miami, Florida 33131




Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1728423
```

```
 1              MR. MAMOUNAS:  Objection.
 2              THE WITNESS:  I think that a portion of them
 3        were charged and reimbursed by Javelin Mortgage
 4        Investment Corporation.  And I think that that
 5        allocation was done on the basis of an equitable
 6        distribution, which, as I sit here today, not
 7        having anticipated that question to be within the
 8        scope of our preparation -- and if that's a fault
 9        of mine, shame on me; we can research that during a
10        break -- but I think that the basis of allocation
11        was relative proportion of gross equity raised,
12        which is the basis for management fee calculations,
13        generally, under the Armour Capital -- or under the
14        Armour Residential REIT and the Javelin Mortgage
15        Investment Corporation management agreements.
16   BY MR. O'CONNOR:
17        Q.   But none of the licenses fees or service fees
18   or other costs charged under the Master Services
19   Agreement and any related work requests have been borne
20   to date by Armour Capital Management, correct?
21              MR. MAMOUNAS:  Objection.
22              THE WITNESS:  I think that all amounts paid
23        directly to SS&C related to the miserably failed
24        CAMRA implementation have been reimbursed by either
25        Armour Capital Management or Javelin Mortgage
```

1       Investment Corporation, and we're here today trying
2       to get that sorted out for the benefit of those
3       ultimate payors.
4  BY MR. O'CONNOR:
5       Q.   And those ultimate payors are the shareholders
6  of the Armour REIT and the Javelin REIT?
7            MR. MAMOUNAS:  Objection.
8            THE WITNESS:  Hard to say how far down the
9       chain you want to go.  I conceptualize Armour
10      Residential REIT and Javelin Mortgage Investment
11      Corporation, when it was a separately publicly
12      traded company, as entities in and of themselves.
13      And I conceptualized that as where the literal and
14      figurative buck stops.  If you want to
15      conceptualize further to shareholders, we can talk
16      about what allocation between shareholders, as
17      common shareholders, preferred shareholders.  We
18      can talk about, you know, the ultimate beneficiary
19      of taxing authorities that tax shareholders'
20      income, whether it's taxable or not.  I think of it
21      as stopping at the entities as corporate
22      individuals.
23           MR. O'CONNOR:  Okay.  I'm inviting Mr. Reilly
24      back into the room.
25           THE WITNESS:  If we're done with this line of

1    of Armour Capital Management, but of all the other
2    employees referred to in this document, I had asked them
3    individually to prepare by year, from the best of -- to
4    the best of their ability, relying on recollection and
5    understanding of their roles and responsibilities in the
6    CAMRA project, as they may have evolved over time, any
7    documents, emails or other resources that they had
8    available to themselves individually, to provide me an
9    estimate by year of the hours that they had devoted to
10   the project.  I, as I say, asked each person
11   individually to do this for themselves alone.  They did
12   not consult with one another in the preparation of these
13   estimates, to the best of my knowledge, and I took them
14   and entered them into this format for the purpose of
15   calculating the figures that we're discussing.
16        Q.   And Armour did not maintain any time sheets
17   with respect to any of the employees in 2015 that will
18   record the actual hours that any of them worked on the
19   implementation project?
20        A.   All of the --
21             MR. MAMOUNAS:  Objection.
22             THE WITNESS:  All of the employees at issue
23        are exempt employees that work on a salary and
24        total compensation basis rather than an hourly
25        basis.  So Armour does not maintain a daily time

1          billing diary in the manner that, say, SS&C
2          professional services might.
3    BY MR. O'CONNOR:
4          Q.   So with respect to the six employees listed on
5    the second page of this exhibit, Armour has no time
6    records upon which to base the estimated CAMRA project
7    hours that are set forth for any of the years --
8               MR. MAMOUNAS:  Objection.
9    BY MR. O'CONNOR:
10         Q.   -- which is listed on page 2 of Exhibit 14?
11              MR. MAMOUNAS:  Objection.
12              THE WITNESS:  I think that the essential
13         missing element of your question is whether the
14         time records that we have were produced
15         contemporaneously.  I would say that this document
16         constitutes a time record.
17   BY MR. O'CONNOR:
18         Q.   So the time records for 2015 that are listed
19   on page 2 of Exhibit 14, were prepared in 2018, correct?
20         A.   Yes.
21         Q.   So they were not contemporaneous, correct?
22         A.   Correct.
23         Q.   And the estimated CAMRA project hours that
24   were -- that are set forth for 2016, on page 2 of
25   Exhibit 14, were prepared in 2018, correct?

1  day to accomplish the CAMRA project, while continuing to
2  meet their other responsibilities, you know, certainly
3  the company's position, that that extra effort above and
4  beyond by individual employees is not something that
5  should be used to reduce or in any way undervalue both
6  the costs and the value of their contribution.
7      Q.   So these are all hours that were expended as a
8  consequence of SS&C's alleged breach of the Master
9  Agreement and other work orders?
10          MR. MAMOUNAS:  Objection.  Are you asking for
11     a legal opinion?
12          MR. O'CONNOR:  No.  I'm just asking his
13     opinion, or for his testimony.
14          THE WITNESS:  Yeah, so --
15          MR. MAMOUNAS:  Objection.
16          THE WITNESS:  -- my testimony is that these
17     are all of the hours that, based on our current
18     best estimate, subject to further analysis, Armour
19     Capital Management personnel spent on the CAMRA
20     project that, but for the CAMRA project, we would
21     not have spent.  We would have been able to do
22     other important, useful things with that time,
23     including allowing employees their regular time
24     off, and that, you know, if it had not been for
25     the -- SS&C's failure on the CAMRA project, we