Exhibit 36

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | January 19, 2018 |
| v. | |
| SS&C TECHNOLOGIES INC., | |
| Defendant. | |

**PLAINTIFF'S AMENDED OBJECTIONS AND RESPONSES
TO DEFENDANT'S INTERROGATORY NOS. 5-10**

Plaintiff, Armour Capital Management LP ("ACM"), pursuant to Federal Rules of Civil Procedure 26 and 33, provides these amended responses to Interrogatory Nos. 5-10 of Defendant, SS&C Technologies, Inc.'s ("SS&C"), First Set of Interrogatories, voluntarily and solely for purposes of resolving a discovery dispute raised by SS&C, the merits of which ACM denies.

**PRELIMINARY STATEMENT**

The answers and objections provided below are based upon information presently available to ACM and, therefore, are given without prejudice to ACM's right to identify additional information which may subsequently be discovered or determined to be relevant to the subject matter of this action. ACM reserves the right to amend, supplement, or change any answer or objection below, if and when such additional information becomes available.

Each answer is subject to all appropriate objections to its admissibility as evidence in this action, and all such objections are reserved.

## SPECIFIC OBJECTIONS TO DEFINITIONS

1.      ACM objects to SS&C's definition of "ACM" because the definition is overly broad and seeks information outside ACM's possession, custody, or control.

## GENERAL OBJECTIONS

1.      ACM objects to the Interrogatories to the extent they seek information or documents protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege, protection, or immunity, on the ground that such interrogatories exceed the permissible scope of discovery under the Federal Rules of Civil Procedure.

2.      ACM objects to the Interrogatories to the extent they, through Definitions, Instructions, or otherwise, are calculated or would operate to annoy, oppress, unduly burden, or unduly cause expense, or would be unduly vexatious or unduly burdensome to respond to, or would require ACM to engage in investigative efforts burdensome to the point of oppression, as such requests exceed the permissible scope of discovery under the Federal Rules of Civil Procedure.

3.      ACM objects to the Interrogatories to the extent they seek information irrelevant to the subject matter or issues of this action and not reasonably calculated to lead to the discovery of admissible evidence, on the ground that such interrogatories exceed the permissible scope of discovery under the Federal Rules of Civil Procedure.

ACM specifically incorporates by reference the General Objections into each individually numbered response below.

<u>**AMENDED ANSWERS AND SPECIFIC OBJECTIONS**</u>

**<u>INTERROGATORY NO. 5</u>**

State the basis for the claim in Count I of the Amended Complaint that SS&C is liable to ACM for

breach of contract.

> <u>**AMENDED ANSWER AND OBJECTIONS**</u>:  Objection.  This contention interrogatory
> is premature, while discovery is ongoing, and burdensome to the extent it seeks information
> that is equally available to SS&C, including information available in documents produced
> in this action.  Subject to and without waiving its objections, ACM states that its breach of
> contract claim (Count I) in the Amended Complaint is based principally on the following
> salient facts currently available to it, which it reserves the right to later supplement:
>
> In December 2014, ACM entered into the Master Agreement (as defined in the Amended
> Complaint ¶26) to license CAMRA and receive hosting, maintenance, and support services
> from SS&C.  Without SS&C's implementation of CAMRA, the product was entirely
> worthless to ACM.  Many facts establish that SS&C was obligated to implement CAMRA
> for ACM by adequately performing numerous tasks assigned to SS&C:
>
> The Master Agreement is between ACM, as the purchaser of certain software and services,
> and SS&C, as the seller of that software and those services.
>
> ACM had no ability to implement CAMRA on its own, a fact which was known to SS&C.
> ACM had never used CAMRA before entering into the Master Agreement.
>
> The Master Agreement does not state that ACM is obligated to implement CAMRA.
>
> The Master Agreement incorporates Work Request ("WR") 1, which makes clear that
> SS&C was obligated to implement CAMRA for ACM and describes the "Initial
> Implementation Services" that SS&C was to provide to ACM to implement CAMRA and
> make it useable for ACM on a hosted basis.
>
> The Master Agreement obligates SS&C to provide ACM with "on-site and remote
> implementation services including business workflow analysis, environment setup, data
> conversion analysis, interface development, and testing."  The only substantive tasks to
> implement CAMRA for ACM in WR 1—consisting of "Project Management, Governance,
> and Business Process Review" and "Environment Set-up, Configuration, and Data
> Conversion" and totaling 17 discrete tasks—were SS&C's obligation to perform.  SS&C
> failed to adequately perform these obligations.
>
> ACM's only obligations in WR 1 were five administrative "assumptions" on which
> SS&C's above-described "services" were "based."  The "assumptions" did not place the
> duty to implement on ACM.  The "assumptions" required ACM to provide SS&C data to
> import into CAMRA, obtain third-party data licenses, and approve CAMRA's end product.

WR 1 also required ACM to "participate in the project as required," not to complete it. ACM satisfied these "assumptions," or alternatively, such performance was excused.

WR 1 provides that "SS&C shall provide an estimated 1,850 hours of support in relation to the services described [in WR 1] on a time and material basis at a rate of $225 per person per hour." This "estimate[]" resulted from negotiations between ACM and SS&C over the cost of SS&C's implementation of CAMRA for ACM, including an agreed hourly rate. As part of those negotiations, on December 10 and 11, 2014, SS&C provided implementation budgets in which SS&C represented that it was capable of implementing CAMRA without ACM's assistance and would charge ACM an incremental amount for doing so.

Another "assumption" in WR 1 is that implementation would take four to six months.

The language "Client's implementation" in WR 1 refers to SS&C's implementation of CAMRA being contracted for by ACM, as distinguished from other implementations SS&C may have performed for others. It does not constitute an assumption of SS&C's contractual obligations by ACM.

Effective March 31, 2016, ACM and SS&C entered into WR 2, which was "issued pursuant to" and "incorporate[d] the terms of" the Master Agreement. WR 2 provided that "[t]he parties intend that this WR establishes a cap on fees for the services set out herein and in Work Request One, which was attached to the [Master] Agreement." In that respect, WR 2 also provided, "SS&C shall provide implementation services described [in WR 2] for a fixed fee of $728,725. The breakdown of this fixed fee is as follows:  ● $421,425 has been paid through April 15, 2016[;] ● $307,300 will be invoiced and payable upon Completion of the Implementation." WR 2 defined "Completion of Implementation" as follows: "Implementation will be considered complete when Client personnel have successfully processed one complete month of transactions using CAMRA as implemented ('Completion of Implementation')." Completion of Implementation never occurred, and ACM did not pay SS&C the $307,300 identified in WR 2.

Even after SS&C and ACM entered into WR 2, and without having achieved Completion of Implementation (which never occurred), SS&C pressured ACM on numerous occasions to make payment. ACM did so as a gesture of its goodwill, to encourage SS&C to finally complete implementation, and due to SS&C's repeated misrepresentations that it would satisfy the criteria for Completion of Implementation.

WR 2 provided that "[i]n addition to the services and assumptions set out in Work Request One, SS&C will provide on-site and remote implementation services for the rolling forward through March and the assistance of April processing." WR 2 set out additional tasks to implement CAMRA for ACM that SS&C was obligated to perform, including "Daily Processing," "Month end Reconciliations," "GL Processing," and "Generating Trial Balances." SS&C failed to adequately perform these obligations.

Effective April 20, 2016, ACM and SS&C entered into WR 3 "pursuant to" the Master Agreement. WR 3 provided that "SS&C will provide on-site and remote implementation services for the application of PGAAP due to the Javelin acquisition by [ACM]." WR 3

set out six additional substantive tasks to implement CAMRA for ACM, tasks SS&C was obligated to perform.  SS&C failed to adequately perform these obligations.

WR 1 and 2 provided that "[i]f there is a change in the services described in this Work Request One that is requested by Client and requires SS&C to perform additional work, such additional work shall be billed to Client on a time and materials basis."  WR 3 provided that "SS&C shall provide an estimated 120 hours of support in relation to the services described [in WR 3] on a time and material basis," also at the $225 rate.

WR 1, 2, and 3 provided that "[i]f Client requests any services in addition to the services specified in this and any other consulting engagement under the Master Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another [WR]."

SS&C is a multi-billion dollar technology company and proclaims itself as the expert in implementing and using CAMRA.  CAMRA is one of SS&C's proprietary products, which it markets as having been in use for over 25 years.  ACM hired SS&C not only to license CAMRA, but also to receive the benefit of SS&C's purported expertise and experience in implementing it, which, according to SS&C, it had done for many other REITs.  ACM would not have hired SS&C, executed three separate work requests for implementation, invested over two years of time and thousands of employee hours, and paid SS&C millions of dollars to implement CAMRA for ACM, if ACM could have done so itself.

SS&C told ACM that SS&C had the duty to implement CAMRA for ACM.  For example, ACM's CFO, James R. Mountain, asked SS&C's Jeff Fecteau if ACM should hire an outside consultant to assist with implementation.  Mr. Fecteau told Mr. Mountain to not do so because it would confuse responsibilities and having SS&C implement CAMRA for ACM would leave ACM with only "one throat to choke" in the event a problem arose.  Moreover, SS&C prevented ACM from modifying the Master Agreement to further explicate that SS&C had the duty to implement CAMRA for ACM.  Indeed, SS&C told ACM that the Master Agreement was a form contract which was not editable.

As detailed in the Amended Complaint, SS&C repeatedly, and falsely, assured ACM that SS&C's completion of implementation of CAMRA for ACM was imminent.

Multiple documents provided by SS&C to ACM and numerous communications between them show that SS&C was responsible for implementation, including, among others:

- SS&C's November 13, 2014 "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" discussing the "one-time implementation fee to cover [ACM's] transition to [SS&C's] proposed solution" and stating that "[t]he implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training."  (SSC002428.)

- December 8, 2014 email from SS&C's Dennis Moore to ACM: "Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning [ACM] to our CAMRA solution." (SSC002801.)

- SS&C's December 10 and 11, 2014 "Implementation Budget" and "Proposed Migration Timeline," in which SS&C committed to completing implementation by May 2015 and listed the tasks SS&C agreed to perform to complete the implementation. These documents show that SS&C represented it was capable of implementing CAMRA for ACM without ACM's assistance and would charge ACM extra to finish any tasks undertaken but not completed by ACM. Although in the December 11 version SS&C suggested allocating a small portion of some tasks to ACM, the December 10 version of the Implementation Budget assigned all of the substantive tasks to SS&C. (SSC002922-24.)

- SS&C's March 23, 2015 "Implementation Charter" a/k/a "ASP Accounting Platform Project," in which SS&C stated that "SS&C has partnered with [ACM] to provide Investment Accounting and Reporting for their mortgage REIT portfolio, leveraging SS&C's project management, implementation conversion services," the "Project Objective" was the "Implementation and utilization of [CAMRA]," and its "Implementation Approach" was to "take[] a solutions based approach to each and every implementation opportunity that is designed to integrate the business processes and workflows of [SS&C's] clients with [its] products and services." (ACM0037940-65.)

- SS&C prepared and sent ACM weekly project status reports, indicating the tasks SS&C had completed towards implementation, the percentage of implementation SS&C had completed, and a color scheme to track the status of SS&C's implementation of CAMRA for ACM. (ACM0003524-29, as an example.)

- February 1, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone: "We need to be all hands getting the 4 problem REIT implementations done." (SSC095414.)

- March 23, 2016 email from SS&C's Daniel Pallone to ACM: "Tomorrow, we will send a fixed price proposal with our rationale at arriving at a fair and equitable implementation cost and schedule a call for Monday to review with you." (ACM0013447.)

- March 24, 2016 email from SS&C's Mr. Pallone to ACM: "We are finalizing the fair and equitable cost of the CAMRA implementation and will have a $ number and rationale on Monday. We can arrange a call on Tuesday or Wednesday to walk through the logic." (ACM0013457.)

- March 28, 2016 email from SS&C's Mr. Pallone to ACM: "[SS&C] analyzed the total actual plus forecasted hourly expenses ($1,129,900) to complete the CAMRA implementation . . . ." (ACM0013462-63.)

- April 6, 2016 email from SS&C's Timothy Reilly to ACM: "[W]e are committing 6 individuals to completing the Armour implementation.  We have consciously ensured 3 individuals on-site at Armour each day until completed." (ACM0013975.)

- Same email as above: "We are also aligned with capping the fees on the project as discussed, which I think you realize in and of itself provides us with significant incentive to wrap-up the project."  (*Id*.)

SS&C failed to adequately perform its obligations as described above and failed to satisfy its duty to implement CAMRA for ACM.  SS&C has admitted that CAMRA was never implemented for ACM.  As a result, ACM is entitled to recover more than $2.28 million in damages, plus pre- and post-judgment interest, from SS&C.

**INTERROGATORY NO. 6**

State the basis for the claim in Count II of the Amended Complaint that SS&C is liable to ACM

for a violation of the Connecticut Unfair Trade Practices Act.

> **AMENDED ANSWER AND OBJECTIONS**: Objection. This contention interrogatory is premature, while discovery is ongoing, and burdensome to the extent it seeks information that is equally available to SS&C, including information available in documents produced in this action. Subject to and without waiving its objections, ACM states that its claim for SS&C's violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count II) in the Amended Complaint is based principally on the following salient facts currently available to it, which it reserves the right to later supplement:
>
> Prior to the execution of the Master Agreement, SS&C made misrepresentations to ACM regarding its ability to implement CAMRA, which constitute unfair and deceptive trade practices because SS&C knew or should have known that it was not qualified to, and could not, implement CAMRA for ACM, but marketed itself as qualified and capable of doing so. SS&C also misrepresented the appropriateness for ACM of the hosting deployment option for CAMRA and the time in which SS&C was capable of implementing CAMRA for ACM, which misrepresentations SS&C knew or should have known were false. After ACM entered into the Master Agreement, SS&C continued to falsely represent that it could implement CAMRA for ACM—for over two years—which it failed to do. SS&C also knew or should have known that these misrepresentations were false. SS&C's conduct is immoral, unethical, unscrupulous, and offends public policy, in violation of CUTPA, because through its misrepresentations, SS&C induced ACM, to its detriment, to enter into the Master Agreement, not terminate the agreement earlier than it did, not make a warranty claim, and continue to pay SS&C money it was not entitled to, including a $200,000 "progress payment," ultimately costing ACM over $2.28 million.
>
> Specifically, SS&C's pre- and post-contractual misrepresentations include, among others:
>
> **Pre-Contractual Misrepresentations**
>
> 1.      SS&C "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operation." (*See* SS&C's website.)
>
> 2.      CAMRA is a "flexible software application that streamlines, automates and simplifies the investment process by providing immediate access to decision-making data." (*See* SS&C's website).
>
> 3.      SS&C's April 24, 2014 Press Release announcing formation of REIT servicing group, stating that SS&C is "the only integrated Mortgage REIT end-to-end solution," and S&C would "help mortgage REITs be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets." (*See* SS&C's website).

4.      "[U]nique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting."  (*Id*.)

5.      May 13, 2014 email from SS&C's Mr. Moore to ACM, attaching brochure entitled "Mortgage REIT Accounting and Financial Reporting Specialists" containing "information on the technology and services [SS&C] offer[s] to publicly-traded mortgage REITs" and stating that  SS&C has "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage-backed securities and structured products." (ACM0048669-74.)

6.      SS&C's June 4, 2014 Power Point, "Introduction to SS&C Technologies, Specialized Solutions for Publicly Traded Mortgage REITs": SS&C has "accounting and reporting expertise," CAMRA is a "proven accounting engine," and a large portion of SS&C's clients trade in mortgage-backed securities, several of which were REITs, like ACM.  (ACM0025350-60.)

7.      "Why SS&C" slide from June 2014 Power Point: "Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs."  (ACM0025359.)

8.      June 4, 2014 email from SS&C's Mr. Moore to ACM: "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for [ACM] and I just wanted to reaffirm our interest in partnering with you."  (SSC000405.)

9.      Messrs. Fecteau and Moore told ACM in a June 2, 2014 meeting and during other in-person meetings on August 27, 2014, and September 25, 2014, and telephone calls on June 6, 2014, July 17, 2014, August 28, 2014, that SS&C had a dedicated team, Professional Services, who were qualified to implement CAMRA, and had done so for other REITs.

10.     August 26, 2014 first proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the portfolio accounting system it was using at the time.  (SSC000694-96.)

11.     August 27, 2014 CAMRA demonstration, in which SS&C showed ACM some of CAMRA's functionality and explained that ACM would be able to use CAMRA in the same manner once SS&C implemented it.  (SSC135290.)

12.     At the same meeting, SS&C gave ACM a document entitled "With You Today" that contained  short biographies of SS&C personnel, including Shiv Shivadas, a Director within SS&C's Professional Services team, who SS&C claimed had "extensive experience with client implementations," including with "REITs, hedge funds and asset managers." (ACM0025372.)

13.     September 10, 2014 email from SS&C's Mr. Moore to ACM:  "Based on the feedback from Trevor and Cory, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR." (SSC000829.)

9

14.     September 24, 2014 second proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the accounting portfolio method it was using at the time.  (SSC001982-83.)

15.     SS&C's November 13, 2014 "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" discussing the "one-time implementation fee to cover [ACM's] transition to [SS&C's] proposed solution" and stating that "[t]he implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training."  (SSC002428.)

16.     SS&C told ACM that it would be able to establish data interfaces with ACM's custodians, BONY and Citi, to obtain data from them to input into CAMRA.  "SS&C will manage the interface and uploading of information from custodians of choice," identified as "Citi (may add BONY in future)," and under "Operational Support Services," SS&C agreed to "Import transactions from custodians Citi, and potentially BONY."  *See id.* (SSC002408 and SSC002411.)

17.     SS&C told ACM that SS&C did not need to hire an outside consultant to assist with implementation because it was qualified to implement CAMRA for ACM on its own. SS&C's Mr. Fecteau told Mr. Mountain that ACM should not hire an outside consultant because it would confuse responsibilities and having SS&C implement CAMRA for ACM would leave ACM with only "one throat to choke" in the event a problem arose.

18.     December 8, 2014 email from SS&C's Dennis Moore to ACM: "Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning [ACM] to our CAMRA solution."  (SSC002801.)

19.     SS&C's December 10 and 11, 2014 "Implementation Budget" and "Proposed Migration Timeline," in which SS&C committed to completing implementation by May 2015 and listed the tasks SS&C agreed to perform to accomplish this.  These documents show that SS&C represented it was capable of implementing CAMRA for ACM without ACM's assistance and would charge ACM for doing so.  Although in the December 11 version SS&C suggested allocating a small portion of some tasks to ACM, the December 10 version of the Implementation Budget assigned all of the substantive tasks to SS&C. (SSC002922-24.)

20.     December 10, 2014 telephone call between SS&C's Messrs. Moore and Fecteau, Iwona Olszewska and Michael Barry from SS&C's Professional Services team and ACM, to discuss implementation. Ms. Olszewska was presented as the head of SS&C's Professional Services team and it was stated that she and the Professional Services Team had significant experience implementing CAMRA for REITs like ACM.

21.　　The Implementation Budget and Implementation Timeline also state that implementation could be completed, and within four to six months of contract execution. (*Id*.)

22.　　Through the statements above, by purporting to have expertise with CAMRA and in accounting for mortgage REITs like ACM and by describing the tasks it would perform to implement CAMRA for ACM, SS&C represented that it had expertise in implementing CAMRA for ACM on a hosted basis, ACM's chosen deployment method, and that it had the ability to implement CAMRA for ACM.　*See* SSC002428, SSC002801 and SSC002922-24, excerpted in response to Interrogatory No. 5, above.　In fact, SS&C has never implemented CAMRA for a mortgage REIT on a hosted basis.

### Post-Contractual Misrepresentations

23.　　SS&C's March 31, 2015 Implementation Roadmap: "Through a series of in-person and WebEx meetings during the week of February 17, 2015, as well as the [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications." (ACM0045386-475.)

24.　　SS&C had "insight and knowledge" to facilitate implementation on a hosted basis because it "is the single biggest user of its own software and services" and detailed its staff's experience, including Ms. Johnson who had experience "working closely with internal and external users to ensure projects are completed on time, on budget and meeting client's expectations." *Id*.

25.　　Fall 2015: SS&C's Messrs. Reilly, Pallone and Tony Gonzalez stated that SS&C had superior qualifications and capabilities to implement CAMRA.　(September 23, 2015 telephone call between ACM and SS&C's Mr. Reilly, October 2, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and David Russell, December 21, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and Mr. Gonzalez.)

26.　　October 2, 2015 email from SS&C's Ms. Johnson to ACM proposing "re-initialization as of 8/31/15," which is a do-over, to achieve implementation.　(SSC042356.)

27.　　December 21, 2015 email from SS&C's Mr. Reilly to ACM that problems were fixable and implementation for ACM was close to completion.　(ACM0001120.)

28.　　April 6, 2016 email from Mr. Reilly to ACM: "We are also aligned with capping the fees on the project as discussed, which I think you realize in and of itself provides us with significant incentive to wrap-up the project." (ACM0013975.)

29.　　August 25, 2016 email from SS&C's Mr. Pallone to ACM: "Josh Brown has informed me we are getting very close to a clean close and there are some best practices we want to share with you." (ACM0017071.)

30.     September 22, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was deploying "expert" personnel, such as Fathima Mahamoon who is "very experienced in the day to day processing of CAMRA in her daily support of a west coast based mREIT." (ACM0017597.)

31.     October 11, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was "committed to satisfying the criteria" to complete implementation.  (ACM0017917.)

32.     February 6, 2017 email from SS&C's Mr. Reilly to ACM:  "Hopefully your team is seeing soon steady improvement." (ACM0022694.)

33.     March 28, 2017 email from SS&C's Mr. Pallone to ACM:  SS&C "continue[s] to make progress but had not "fully met" the "condition of a clean monthly process." (ACM0024437.)

SS&C knew or should have known its misrepresentations, which are aggravating factors supporting ACM's CUTPA claim, were false at the time it made them, based on numerous facts, including but not limited to the following:

1.     SS&C was not capable of implementing CAMRA at all, let alone in four to six months, as evidenced by the fact that CAMRA has never been implemented for ACM as contracted, in spite of over two years and $1.78 million ACM paid to SS&C and over $500,000  of the time of its own employees that was wasted by ACM in connection with SS&C's futile implementation efforts.

2.     SS&C's employees did not have the expertise and qualifications necessary to implement CAMRA for ACM.  For example:

- September 29, 2014 email from SS&C's Iwona Olszewska to SS&C's Mr. Moore: "In general, this is way underway for my team [Professional Services] to be brought in for the first time on this opportunity."  (SSC00170.)

- November 10, 2014 email from SS&C's Ms. Olszewska to SS&C's Messrs. Fecteau and Moore and others: "I heard there was a call on Friday with the prospect. You must be kidding me not to include my team at this point."  (SSC151238.)

- February 19, 2015 email from SS&C's Ms. Johnson to SS&C's Daniel Linehan and others: "[T]here seems to be a disconnect with sales on the amount of internal work needed in order to get clients up and running, training, etc."  (SSC007731.)

- April 16, 2015 email from SS&C's Mr. Brown to SS&C's Mr. Moore: "Implementation team doesn't know what they are doing with [ACM].  Got off a call with them yesterday and I think they are setting their portfolio up completely wrong and it is apparent to me that our own team has no idea what they are doing." (SSC136015.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process. This same situation continues to repeat itself and we have clients that are not happy. We are going through this with [redacted] right now and soon to happen with [redacted]. The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients. . . . [Scott Rice and Andrew Voutsinas, the two SS&C employees in Professional Services who were working directly on ACM's implementation under Adriana Johnson's supervision] are nice guys but need coaching on how to interact with clients and also need to understand the daily and month end processes." (SSC145636, SSC119230-49, SSC141234-37, SSC141254-72.)

3.     SS&C had no basis to represent to ACM that hosting was an appropriate deployment method for ACM and that CAMRA could be implemented in four to six months. At the time SS&C made those representations to ACM, SS&C had never implemented a REIT on a hosted basis and had never implemented a REIT on any deployment option—licensing, hosting or outsourcing—in less than six months. In fact, the average time for implementation of all SS&C's REIT customers is 15 months, with at least one implementation taking 36 months. The initial estimate from Ms. Olszewska for how long it would take SS&C to implement CAMRA was 2,000-4,000 hours, "based on [ACM's] ability to participate." That range was "compressed" in discussions between Ms. Olzsewska and Messrs. Fecteau and Moore to 2,000-3,000 hours. In connection with negotiations between ACM and SS&C over the cost of SS&C's implementation of CAMRA for ACM, including an agreed hourly rate, ACM was presented with a proposal for 2,500 hours for SS&C to implement CAMRA, which was reduced to 1,850. In reality, SS&C had no basis to estimate how long ACM's implementation would take. SS&C had launched its REIT Servicing Division in April 2014—just two months before it started pitching ACM—and because SS&C had never implemented a REIT with CAMRA using a hosted deployment option, ACM was essentially a guinea pig for that option. This was the complete opposite of the breadth of experience implementing REITs that SS&C told ACM it had. In fact, the only other REIT that has purchased CAMRA on a hosted basis from SS&C, Bimini Capital Management, Inc., also was never implemented on a hosted basis and was forced to switch to outsourcing because of SS&C's failure to implement it on a hosted basis. SS&C no longer attempts to sell CAMRA on a hosted basis to potential REIT customers. Finally, SS&C had no written policies and procedures for marketing CAMRA to ACM or determining whether CAMRA was suitable for ACM.

4.     SS&C did not have the ability to establish data interfaces with ACM's custodians, BONY and Citi, and was not able to obtain electronic data from them, a fact which it concealed from ACM for months. (SSC014285-89, SSC019230-49. SSC119028-33.) For example:

- December 18, 2015 email from ACM to SS&C's Mr. Reilly: "Last week it became evident that [SS&C's] folks were having significant issues with the BoNY interface that they had set up this summer. Today, it is sounding like your folks are not able to make progress because the current interface already includes all the information that BoNY can deliver through that particular channel. In [ACM's]

product selection diligence, [ACM was] assured that SS&C had interfaced CAMRA to BoNY successfully before."  (ACM0000401-02.)

- December 21, 2015 email from SS&C's Mr. Reilly to ACM: "[A]s you would expect, [SS&C has] a large number of BONY connections."  (ACM0001120-21.)

- January 14, 2016 email from SS&C's Scott Rice to SS&C's Ruth Ford: "BONY doesn't have anything to give us . . . [r]ight now BONY is not sending us daily cash balances." (SSC031723.)

- February 11, 2016 email from SS&C's Mr. Russell to SS&C's Mr. Pallone: "[I]n the case of [ACM] there was no ability to get the historic custody data we needed in electronic format so we had to process cash manually until we caught up to the date that we had electronic data for CI Manager." (SSC148163.)

5.     ACM's troubled and uncompleted implementation is not an exception.  In fact, SS&C had systemic problems and delays implementing CAMRA for its REIT customers, as evidenced by its internal emails.  These problems were not shared with ACM but were known to SS&C.  For example:

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Reilly and Ms. Olszewska: "We cannot have any more delays on a solution for these asset types."  (SSC136496.)

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Pallone, Ms. Olszewska, and others: "We will soon have 3 implementations at risk because we do not yet have a solution."  (SSC136497.)

- February 1, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone: "We need to be all hands getting the 4 problem REIT implementations done." (SSC095414.)

- February 11, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly and others: "We are cannibalizing our new clients with less than ideal on boarding experiences."  (SSC148165.)

- February 11, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone and others: "We need to get better.  Our lengthy/over budget implementations are 'in the marketplace' and becoming a common negative in our new business discussions."  (SSC148166.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process.  This same situation continues to repeat itself and we have clients that are not happy.  We are going through this with [redacted] right now and soon to happen with [redacted].  The CAMRA client

support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients."  (SSC145346.)

- August 18, 2016 email from SS&C's Mr. Brown to SS&C's Mr. Pallone and others: "Unfortunately, there will be some leaning on the team until we can straighten out the issues with our licensed clients."  (SSC054003.)

- November 17, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We will lose the REIT franchise if we don't address the CS issue with the license clients."  (SSC146951.)

6.      SS&C knew that, even if it could implement CAMRA for ACM, ACM would never be able to use it on a hosted basis due to errors and bugs in the software itself.  SS&C has at least two systems for submitting open issues about CAMRA, TFS and Applix.  SS&C was understaffed and unable to address the open issues.  There are at least 900 open items for CAMRA in TFS and Applix, the average age of which is 688 days, meaning that nearly two years pass before SS&C addresses them, if at all.  To make CAMRA work, SS&C employees routinely must use many different work-arounds to side step these open issues, steps which were not shared with ACM.  SS&C knew about these open issues for CAMRA submitted to TFS or Applix when it made the above misrepresentations to ACM.

7.      SS&C was incentivized to sell CAMRA on a hosted basis to ACM, which SS&C knew was the only deployment method ACM would purchase, regardless of whether CAMRA could be implemented or whether ACM would be able to use it on a hosted basis. SS&C's Messrs. Moore and Fecteau have testified that SS&C is a highly competitive place to work, there is tremendous pressure to meet sales goals because, among other reasons, salespeople are ranked on a weekly list circulated to the entire sales team, and SS&C fires salespeople who do not meet their goals.

## INTERROGATORY NO. 7

State the basis for the claim in Count III of the Amended Complaint that SS&C is liable to ACM

for intentional misrepresentation.

> **AMENDED ANSWER AND OBJECTIONS**: Objection. This contention interrogatory is premature, while discovery is ongoing, and burdensome to the extent it seeks information that is equally available to SS&C, including information available in documents produced in this action. Subject to and without waiving its objections, ACM states that its intentional misrepresentation claim (Count III) in the Amended Complaint is based principally on the following salient facts currently available to it, which it reserves the right to later supplement:
>
> Prior to the execution of the Master Agreement, SS&C made misrepresentations to ACM regarding its ability to implement CAMRA, which SS&C knew to be false at the time it made them. SS&C also misrepresented the appropriateness for ACM of the hosting deployment option for CAMRA and the time in which SS&C was capable of implementing CAMRA for ACM, which misrepresentations SS&C knew were false. After ACM entered into the Master Agreement, SS&C continued to falsely represent that it could implement CAMRA for ACM—for over two years—which it failed to do. SS&C also knew that these misrepresentations were false. Through its misrepresentations, SS&C induced ACM, to its detriment, to enter into the Master Agreement, not terminate the agreement earlier than it did, not make a warranty claim, and continue to pay SS&C money it was not entitled to, including a $200,000 "progress payment," ultimately costing ACM over $2.28 million.
>
> Specifically, SS&C's pre- and post-contractual misrepresentations include, among others:
>
> **Pre-Contractual Misrepresentations**
>
> 1.      SS&C "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operation." (*See* SS&C's <u>website</u>.)
>
> 2.      CAMRA is a "flexible software application that streamlines, automates and simplifies the investment process by providing immediate access to decision-making data." (*See* SS&C's <u>website</u>).
>
> 3.      SS&C's April 24, 2014 Press Release announcing formation of REIT servicing group, stating that SS&C is "the only integrated Mortgage REIT end-to-end solution," and S&C would "help mortgage REITs be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets." (*See* SS&C's <u>website</u>).
>
> 4.      "[U]nique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting." (*Id*.)

5.      May 13, 2014 email from SS&C's Mr. Moore to ACM, attaching brochure entitled "Mortgage REIT Accounting and Financial Reporting Specialists" containing "information on the technology and services [SS&C] offer[s] to publicly-traded mortgage REITs" and stating that  SS&C has "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage-backed securities and structured products." (ACM0048669-74.)

6.      SS&C's June 4, 2014 Power Point, "Introduction to SS&C Technologies, Specialized Solutions for Publicly Traded Mortgage REITs": SS&C has "accounting and reporting expertise," CAMRA is a "proven accounting engine," and a large portion of SS&C's clients trade in mortgage-backed securities, several of which were REITs, like ACM.  (ACM0025350-60).

7.      "Why SS&C" slide from June 2014 Power Point: "Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs."  (ACM0025359.)

8.      June 4, 2014 email from SS&C's Mr. Moore to ACM: "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for [ACM] and I just wanted to reaffirm our interest in partnering with you."  (SSC000405.)

9.      Messrs. Fecteau and Moore told ACM in a June 2, 2014 meeting and during other in-person meetings on August 27, 2014, and September 25, 2014, and telephone calls on June 6, 2014, July 17, 2014, August 28, 2014, that SS&C had a dedicated team, Professional Services, who were qualified to implement CAMRA, and had done so for other REITs.

10.     August 26, 2014 first proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the portfolio accounting system it was using at the time.  (SSC000694-96.)

11.     August 27, 2014 CAMRA demonstration, in which SS&C showed ACM some of CAMRA's functionality and explained that ACM would be able to use CAMRA in the same manner once SS&C implemented it.  (SSC135290.)

12.     At the same meeting, SS&C gave ACM a document entitled "With You Today" that contained  short biographies of SS&C personnel, including Shiv Shivadas, a Director within SS&C's Professional Services team, who SS&C claimed had "extensive experience with client implementations," including with "REITs, hedge funds and asset managers." (ACM0025372.)

13.     September 10, 2014 email from SS&C's Mr. Moore to ACM:  "Based on the feedback from Trevor and Cory, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR." (SSC000829.)

14.     September 24, 2014 second proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the accounting portfolio method it was using at the time.  (SSC001982-83.)

15.     SS&C's November 13, 2014 "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" discussing the "one-time implementation fee to cover [ACM's] transition to [SS&C's] proposed solution" and stating that "[t]he implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training." (SSC002428.)

16.     SS&C told ACM that it would be able to establish data interfaces with ACM's custodians, BONY and Citi, to obtain data from them to input into CAMRA. "SS&C will manage the interface and uploading of information from custodians of choice," identified as "Citi (may add BONY in future)," and under "Operational Support Services," SS&C agreed to "Import transactions from custodians Citi, and potentially BONY." *See id.* (SSC002408 and SSC002411.)

17.     SS&C told ACM that SS&C did not need to hire an outside consultant to assist with implementation because it was qualified to implement CAMRA for ACM on its own. SS&C's Mr. Fecteau told Mr. Mountain that ACM should not hire an outside consultant because it would confuse responsibilities and having SS&C implement CAMRA for ACM would leave ACM with only "one throat to choke" in the event a problem arose.

18.     December 8, 2014 email from SS&C's Dennis Moore to ACM: "Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning [ACM] to our CAMRA solution." (SSC002801.)

19.     SS&C's December 10 and 11, 2014 "Implementation Budget" and "Proposed Migration Timeline," in which SS&C committed to completing implementation by May 2015 and listed the tasks SS&C agreed to perform to accomplish this. These documents show that SS&C represented it was capable of implementing CAMRA for ACM without ACM's assistance and would charge ACM for doing so. Although in the December 11 version SS&C suggested allocating a small portion of some tasks to ACM, the December 10 version of the Implementation Budget assigned all of the substantive tasks to SS&C. (SSC002922-24.)

20.     December 10, 2014 telephone call between SS&C's Messrs. Moore and Fecteau, Iwona Olszewska and Michael Barry from SS&C's Professional Services team and ACM, to discuss implementation. Ms. Olszewska was presented as the head of SS&C's Professional Services team and it was stated that she and the Professional Services Team had significant experience implementing CAMRA for REITs like ACM.

21.     The Implementation Budget and Implementation Timeline also state that implementation could be completed, and within four to six months of contract execution. (*Id.*)

22.     Through the statements above, by purporting to have expertise with CAMRA and in accounting for mortgage REITs like ACM and by describing the tasks it would perform to implement CAMRA for ACM, SS&C represented that it had expertise in implementing CAMRA for ACM on a hosted basis, ACM's chosen deployment method, and that it had the ability to implement CAMRA for ACM.   *See* SSC002428, SSC002801 and SSC002922-24, excerpted in response to Interrogatory No. 5, above.  In fact, SS&C has never implemented CAMRA for a mortgage REIT on a hosted basis.

## Post-Contractual Misrepresentations

23.     SS&C's March 31, 2015 Implementation Roadmap: "Through a series of in-person and WebEx meetings during the week of February 17, 2015, as well as the [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications." (ACM0045386-475.)

24.     SS&C had "insight and knowledge" to facilitate implementation on a hosted basis because it "is the single biggest user of its own software and services" and detailed its staff's experience, including Ms. Johnson who had experience "working closely with internal and external users to ensure projects are completed on time, on budget and meeting client's expectations."  *Id*.

25.     Fall 2015: SS&C's Messrs. Reilly, Pallone and Tony Gonzalez stated that SS&C had superior qualifications and capabilities to implement CAMRA.  (September 23, 2015 telephone call between ACM and SS&C's Mr. Reilly, October 2, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and David Russell, December 21, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and Mr. Gonzalez.)

26.     October 2, 2015 email from SS&C's Ms. Johnson to ACM proposing "re-initialization as of 8/31/15," which is a do-over, to achieve implementation.  (SSC042356.)

27.     December 21, 2015 email from SS&C's Mr. Reilly to ACM that problems were fixable and implementation for ACM was close to completion.  (ACM0001120.)

28.     April 6, 2016 email from Mr. Reilly to ACM: "We are also aligned with capping the fees on the project as discussed, which I think you realize in and of itself provides us with significant incentive to wrap-up the project." (ACM0013975.)

29.     August 25, 2016 email from SS&C's Mr. Pallone to ACM: "Josh Brown has informed me we are getting very close to a clean close and there are some best practices we want to share with you." (ACM0017071.)

30.     September 22, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was deploying "expert" personnel, such as Fathima Mahamoon who is "very experienced in the day to day processing of CAMRA in her daily support of a west coast based mREIT." (ACM0017597.)

31.     October 11, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was "committed to satisfying the criteria" to complete implementation.  (ACM0017917.)

32.     February 6, 2017 email from SS&C's Mr. Reilly to ACM:  "Hopefully your team is seeing soon steady improvement." (ACM0022694.)

33.     March 28, 2017 email from SS&C's Mr. Pallone to ACM:  SS&C "continue[s] to make progress but had not "fully met" the "condition of a clean monthly process." (ACM0024437.)

SS&C knew its misrepresentations were false at the time it made them based on numerous facts, including but not limited to the following:

1.     SS&C was not capable of implementing CAMRA at all, let alone in four to six months, as evidenced by the fact that CAMRA has never been implemented for ACM as contracted, in spite of over two years and $1.78 million ACM paid to SS&C and over $500,000  of the time of its own employees that was wasted by ACM in connection with SS&C's futile implementation efforts.

2.     SS&C's employees did not have the expertise and qualifications necessary to implement CAMRA for ACM.  For example:

- September 29, 2014 email from SS&C's Iwona Olszewska to SS&C's Mr. Moore: "In general, this is way underway for my team [Professional Services] to be brought in for the first time on this opportunity."  (SSC00170.)

- November 10, 2014 email from SS&C's Ms. Olszewska to SS&C's Messrs. Fecteau and Moore and others: "I heard there was a call on Friday with the prospect. You must be kidding me not to include my team at this point."  (SSC151238.)

- February 19, 2015 email from SS&C's Ms. Johnson to SS&C's Daniel Linehan and others: "[T]here seems to be a disconnect with sales on the amount of internal work needed in order to get clients up and running, training, etc."  (SSC007731.)

- April 16, 2015 email from SS&C's Mr. Brown to SS&C's Mr. Moore: "Implementation team doesn't know what they are doing with [ACM].  Got off a call with them yesterday and I think they are setting their portfolio up completely wrong and it is apparent to me that our own team has no idea what they are doing." (SSC136015.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process.  This same situation continues to repeat itself and we have clients that are not happy.  We are going through this with [redacted] right now and soon to happen with [redacted].  The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients. . . . [Scott Rice and Andrew Voutsinas, the two SS&C employees in Professional Services who were working directly on ACM's implementation under

Adriana Johnson's supervision] are nice guys but need coaching on how to interact with clients and also need to understand the daily and month end processes." (SSC145636, SSC119230-49, SSC141234-37, SSC141254-72.)

3.      SS&C had no basis to represent to ACM that hosting was an appropriate deployment method for ACM and that CAMRA could be implemented in four to six months.   At the time SS&C made those representations to ACM, SS&C had never implemented a REIT on a hosted basis and had never implemented a REIT on any deployment option—licensing, hosting or outsourcing—in less than six months.  In fact, the average time for implementation of all SS&C's REIT customers is 15 months, with at least one implementation taking 36 months.  The initial estimate from Ms. Olszewska for how long it would take SS&C to implement CAMRA was 2,000-4,000 hours, "based on [ACM's] ability to participate."  That range was "compressed" in discussions between Ms. Olzsewska and Messrs. Fecteau and Moore to 2,000-3,000 hours.  In connection with negotiations between ACM and SS&C over the cost of SS&C's implementation of CAMRA for ACM, including an agreed hourly rate, ACM was presented with a proposal for 2,500 hours for SS&C to implement CAMRA, which was reduced to 1,850.  In reality, SS&C had no basis to estimate how long ACM's implementation would take.  SS&C had launched its REIT Servicing Division in April 2014—just two months before it started pitching ACM—and because SS&C had never implemented a REIT with CAMRA using a hosted deployment option, ACM was essentially a guinea pig for that option.  This was the complete opposite of the breadth of experience implementing REITs that SS&C told ACM it had.  In fact, the only other REIT that has purchased CAMRA on a hosted basis from SS&C, Bimini Capital Management, Inc., also was never implemented on a hosted basis and was forced to switch to outsourcing because of SS&C's failure to implement it on a hosted basis.  SS&C no longer attempts to sell CAMRA on a hosted basis to potential REIT customers.  Finally, SS&C had no written policies and procedures for marketing CAMRA to ACM or determining whether CAMRA was suitable for ACM.

4.      SS&C did not have the ability to establish data interfaces with ACM's custodians, BONY and Citi, and was not able to obtain electronic data from them, a fact which it concealed from ACM for months. (SSC014285-89, SSC019230-49. SSC119028-33.)  For example:

- December 18, 2015 email from ACM to SS&C's Mr. Reilly: "Last week it became evident that [SS&C's] folks were having significant issues with the BoNY interface that they had set up this summer.  Today, it is sounding like your folks are not able to make progress because the current interface already includes all the information that BoNY can deliver through that particular channel.  In [ACM's] product selection diligence, [ACM was] assured that SS&C had interfaced CAMRA to BoNY successfully before."  (ACM0000401-02.)

- December 21, 2015 email from SS&C's Mr. Reilly to ACM: "[A]s you would expect, [SS&C has] a large number of BONY connections."  (ACM0001120-21.)

- January 14, 2016 email from SS&C's Scott Rice to SS&C's Ruth Ford: "BONY doesn't have anything to give us . . . [r]ight now BONY is not sending us daily cash balances." (SSC031723.)

- February 11, 2016 email from SS&C's Mr. Russell to SS&C's Mr. Pallone: "[I]n the case of [ACM] there was no ability to get the historic custody data we needed in electronic format so we had to process cash manually until we caught up to the date that we had electronic data for CI Manager." (SSC148163.)

5.      ACM's troubled and uncompleted implementation is not an exception.  In fact, SS&C had systemic problems and delays implementing CAMRA for its REIT customers, as evidenced by its internal emails.  These problems were not shared with ACM but were known to SS&C.  For example:

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Reilly and Ms. Olszewska: "We cannot have any more delays on a solution for these asset types."  (SSC136496.)

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Pallone, Ms. Olszewska, and others: "We will soon have 3 implementations at risk because we do not yet have a solution."  (SSC136497.)

- February 1, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone: "We need to be all hands getting the 4 problem REIT implementations done." (SSC095414.)

- February 11, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly and others: "We are cannibalizing our new clients with less than ideal on boarding experiences."  (SSC148165.)

- February 11, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone and others: "We need to get better.  Our lengthy/over budget implementations are 'in the marketplace' and becoming a common negative in our new business discussions."  (SSC148166.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process.  This same situation continues to repeat itself and we have clients that are not happy.  We are going through this with [redacted] right now and soon to happen with [redacted].  The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients."  (SSC145346.)

- August 18, 2016 email from SS&C's Mr. Brown to SS&C's Mr. Pallone and others: "Unfortunately, there will be some leaning on the team until we can straighten out the issues with our licensed clients."  (SSC054003.)

- November 17, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We will lose the REIT franchise if we don't address the CS issue with the license clients."  (SSC146951.)

6.      SS&C knew that, even if it could implement CAMRA for ACM, ACM would never be able to use it on a hosted basis due to errors and bugs in the software itself.  SS&C has at least two systems for submitting open issues about CAMRA, TFS and Applix.  SS&C was understaffed and unable to address the open issues.  There are at least 900 open items for CAMRA in TFS and Applix, the average age of which is 688 days, meaning that nearly two years pass before SS&C addresses them, if at all.  To make CAMRA work, SS&C employees routinely must use many different work-arounds to side step these open issues, steps which were not shared with ACM.  SS&C knew about these open issues for CAMRA submitted to TFS or Applix when it made the above misrepresentations to ACM.

7.      SS&C was incentivized to sell CAMRA on a hosted basis to ACM, which SS&C knew was the only deployment method ACM would purchase, regardless of whether CAMRA could be implemented or whether ACM would be able to use it on a hosted basis.  SS&C's Messrs. Moore and Fecteau have testified that SS&C is a highly competitive place to work, there is tremendous pressure to meet sales goals because, among other reasons, salespeople are ranked on a weekly list circulated to the entire sales team, and SS&C fires salespeople who do not meet their goals.

**INTERROGATORY NO. 8**

State the basis for the claim in Count IV of the Amended Complaint that SS&C is liable to ACM

for negligent misrepresentation.

> **AMENDED ANSWER AND OBJECTIONS**:  Objection.  This contention interrogatory is premature, while discovery is ongoing, and burdensome to the extent it seeks information that is equally available to SS&C, including information available in documents produced in this action.  Subject to and without waiving its objections, ACM states that its negligent misrepresentation claim (Count IV) in the Amended Complaint is based principally on the following salient facts currently available to it, which it reserves the right to later supplement:
>
> Prior to the execution of the Master Agreement, SS&C made misrepresentations to ACM regarding its ability to implement CAMRA, which SS&C knew, or should have known, were untrue. SS&C also misrepresented the appropriateness for ACM of the hosting deployment option for CAMRA and the time in which SS&C was capable of implementing CAMRA for ACM, which misrepresentations SS&C knew or should have known were untrue.  After ACM entered into the Master Agreement, SS&C continued to falsely represent that it could implement CAMRA for ACM—for over two years—which it failed to do.  SS&C also knew or should have known that these misrepresentations were untrue. Through its misrepresentations, SS&C induced ACM, to its detriment, to enter into the Master Agreement, not terminate the agreement earlier than it did, not make a warranty claim, and continue to pay SS&C money it was not entitled to, including a $200,000 "progress payment," ultimately costing ACM over $2.28 million.
>
> Specifically, SS&C's pre- and post-contractual misrepresentations include, among others:
>
> **Pre-Contractual Misrepresentations**
>
> 1.     SS&C "has spent years creating the most comprehensive powerhouse of software technology in the financial services industry – technology that complements [its] unrivaled expertise and professionalism in . . . asset and wealth management accounting and operation."  (*See* SS&C's website.)
>
> 2.     CAMRA is a "flexible software application that streamlines, automates and simplifies the investment process by providing immediate access to decision-making data." (*See* SS&C's website).
>
> 3.     SS&C's April 24, 2014 Press Release announcing formation of REIT servicing group, stating that SS&C is "the only integrated Mortgage REIT end-to-end solution," and S&C would "help mortgage REITs be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets."  (*See* SS&C's website).
>
> 4.     "[U]nique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting."  (*Id*.)

5.      May 13, 2014 email from SS&C's Mr. Moore to ACM, attaching brochure entitled "Mortgage REIT Accounting and Financial Reporting Specialists" containing "information on the technology and services [SS&C] offer[s] to publicly-traded mortgage REITs" and stating that  SS&C has "extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage-backed securities and structured products." (ACM0048669-74.)

6.      SS&C's June 4, 2014 Power Point, "Introduction to SS&C Technologies, Specialized Solutions for Publicly Traded Mortgage REITs": SS&C has "accounting and reporting expertise," CAMRA is a "proven accounting engine," and a large portion of SS&C's clients trade in mortgage-backed securities, several of which were REITs, like ACM.  (ACM0025350-60).

7.      "Why SS&C" slide from June 2014 Power Point: "Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs."  (ACM0025359.)

8.      June 4, 2014 email from SS&C's Mr. Moore to ACM: "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for [ACM] and I just wanted to reaffirm our interest in partnering with you."  (SSC000405.)

9.      Messrs. Fecteau and Moore told ACM in a June 2, 2014 meeting and during other in-person meetings on August 27, 2014, and September 25, 2014, and telephone calls on June 6, 2014, July 17, 2014, August 28, 2014, that SS&C had a dedicated team, Professional Services, who were qualified to implement CAMRA, and had done so for other REITs.

10.     August 26, 2014 first proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the portfolio accounting system it was using at the time.  (SSC000694-96.)

11.     August 27, 2014 CAMRA demonstration, in which SS&C showed ACM some of CAMRA's functionality and explained that ACM would be able to use CAMRA in the same manner once SS&C implemented it.  (SSC135290.)

12.     At the same meeting, SS&C gave ACM a document entitled "With You Today" that contained  short biographies of SS&C personnel, including Shiv Shivadas, a Director within SS&C's Professional Services team, who SS&C claimed had "extensive experience with client implementations," including with "REITs, hedge funds and asset managers." (ACM0025372.)

13.     September 10, 2014 email from SS&C's Mr. Moore to ACM:  "Based on the feedback from Trevor and Cory, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR." (SSC000829.)

14.     September 24, 2014 second proof of concept purporting to show that SS&C was able to use CAMRA to obtain the same results that ACM generated with the accounting portfolio method it was using at the time.  (SSC001982-83.)

15.    SS&C's November 13, 2014 "Comprehensive Mortgage REIT Software and Operational Support Services Proposal" discussing the "one-time implementation fee to cover [ACM's] transition to [SS&C's] proposed solution" and stating that "[t]he implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training." (SSC002428.)

16.    SS&C told ACM that it would be able to establish data interfaces with ACM's custodians, BONY and Citi, to obtain data from them to input into CAMRA. "SS&C will manage the interface and uploading of information from custodians of choice," identified as "Citi (may add BONY in future)," and under "Operational Support Services," SS&C agreed to "Import transactions from custodians Citi, and potentially BONY." *See id.* (SSC002408 and SSC002411.)

17.    SS&C told ACM that SS&C did not need to hire an outside consultant to assist with implementation because it was qualified to implement CAMRA for ACM on its own. SS&C's Mr. Fecteau told Mr. Mountain that ACM should not hire an outside consultant because it would confuse responsibilities and having SS&C implement CAMRA for ACM would leave ACM with only "one throat to choke" in the event a problem arose.

18.    December 8, 2014 email from SS&C's Dennis Moore to ACM: "Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning [ACM] to our CAMRA solution." (SSC002801.)

19.    SS&C's December 10 and 11, 2014 "Implementation Budget" and "Proposed Migration Timeline," in which SS&C committed to completing implementation by May 2015 and listed the tasks SS&C agreed to perform to accomplish this. These documents show that SS&C represented it was capable of implementing CAMRA for ACM without ACM's assistance and would charge ACM for doing so. Although in the December 11 version SS&C suggested allocating a small portion of some tasks to ACM, the December 10 version of the Implementation Budget assigned all of the substantive tasks to SS&C. (SSC002922-24.)

20.    December 10, 2014 telephone call between SS&C's Messrs. Moore and Fecteau, Iwona Olszewska and Michael Barry from SS&C's Professional Services team and ACM, to discuss implementation. Ms. Olszewska was presented as the head of SS&C's Professional Services team and it was stated that she and the Professional Services Team had significant experience implementing CAMRA for REITs like ACM.

21.    The Implementation Budget and Implementation Timeline also state that implementation could be completed, and within four to six months of contract execution. (*Id*.)

22.     Through the statements above, by purporting to have expertise with CAMRA and in accounting for mortgage REITs like ACM and by describing the tasks it would perform to implement CAMRA for ACM, SS&C represented that it had expertise in implementing CAMRA for ACM on a hosted basis, ACM's chosen deployment method, and that it had the ability to implement CAMRA for ACM.   *See* SSC002428, SSC002801 and SSC002922-24, excerpted in response to Interrogatory No. 5, above.  In fact, SS&C has never implemented CAMRA for a mortgage REIT on a hosted basis.

**Post-Contractual Misrepresentations**

23.     SS&C's March 31, 2015 Implementation Roadmap: "Through a series of in-person and WebEx meetings during the week of February 17, 2015, as well as the [proof of concept] materials, [SS&C] obtained sufficient information to scope out the necessary steps and criteria for a successful implementation of SS&C's applications." (ACM0045386-475.)

24.     SS&C had "insight and knowledge" to facilitate implementation on a hosted basis because it "is the single biggest user of its own software and services" and detailed its staff's experience, including Ms. Johnson who had experience "working closely with internal and external users to ensure projects are completed on time, on budget and meeting client's expectations."  *Id*.

25.     Fall 2015: SS&C's Messrs. Reilly, Pallone and Tony Gonzalez stated that SS&C had superior qualifications and capabilities to implement CAMRA.  (September 23, 2015 telephone call between ACM and SS&C's Mr. Reilly, October 2, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and David Russell, December 21, 2015 telephone call between ACM and SS&C's Mr. Reilly, Ms. Johnson and Mr. Gonzalez.)

26.     October 2, 2015 email from SS&C's Ms. Johnson to ACM proposing "re-initialization as of 8/31/15," which is a do-over, to achieve implementation.  (SSC042356.)

27.     December 21, 2015 email from SS&C's Mr. Reilly to ACM that problems were fixable and implementation for ACM was close to completion.  (ACM0001120.)

28.     April 6, 2016 email from Mr. Reilly to ACM: "We are also aligned with capping the fees on the project as discussed, which I think you realize in and of itself provides us with significant incentive to wrap-up the project." (ACM0013975.)

29.     August 25, 2016 email from SS&C's Mr. Pallone to ACM: "Josh Brown has informed me we are getting very close to a clean close and there are some best practices we want to share with you." (ACM0017071.)

30.     September 22, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was deploying "expert" personnel, such as Fathima Mahamoon who is "very experienced in the day to day processing of CAMRA in her daily support of a west coast based mREIT." (ACM0017597.)

31.     October 11, 2016 email from SS&C's Mr. Pallone to ACM: SS&C was "committed to satisfying the criteria" to complete implementation.  (ACM0017917.)

32.     February 6, 2017 email from SS&C's Mr. Reilly to ACM:  "Hopefully your team is seeing soon steady improvement." (ACM0022694.)

33.     March 28, 2017 email from SS&C's Mr. Pallone to ACM:  SS&C "continue[s] to make progress but had not "fully met" the "condition of a clean monthly process." (ACM0024437.)

SS&C knew or should have known its misrepresentations were untrue based on numerous facts, including but not limited to the following:

1.     SS&C was not capable of implementing CAMRA at all, let alone in four to six months, as evidenced by the fact that CAMRA has never been implemented for ACM as contracted, in spite of over two years and $1.78 million ACM paid to SS&C and over $500,000  of the time of its own employees that was wasted by ACM in connection with SS&C's futile implementation efforts.

2.     SS&C's employees did not have the expertise and qualifications necessary to implement CAMRA for ACM.  For example:

- September 29, 2014 email from SS&C's Iwona Olszewska to SS&C's Mr. Moore: "In general, this is way underway for my team [Professional Services] to be brought in for the first time on this opportunity."  (SSC00170.)

- November 10, 2014 email from SS&C's Ms. Olszewska to SS&C's Messrs. Fecteau and Moore and others: "I heard there was a call on Friday with the prospect. You must be kidding me not to include my team at this point."  (SSC151238.)

- February 19, 2015 email from SS&C's Ms. Johnson to SS&C's Daniel Linehan and others: "[T]here seems to be a disconnect with sales on the amount of internal work needed in order to get clients up and running, training, etc."  (SSC007731.)

- April 16, 2015 email from SS&C's Mr. Brown to SS&C's Mr. Moore: "Implementation team doesn't know what they are doing with [ACM].  Got off a call with them yesterday and I think they are setting their portfolio up completely wrong and it is apparent to me that our own team has no idea what they are doing." (SSC136015.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process.  This same situation continues to repeat itself and we have clients that are not happy.  We are going through this with [redacted] right now and soon to happen with [redacted].  The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients. . . . [Scott Rice and Andrew Voutsinas, the two SS&C employees in Professional Services who were working directly on ACM's implementation under

28

Adriana Johnson's supervision] are nice guys but need coaching on how to interact with clients and also need to understand the daily and month end processes." (SSC145636, SSC119230-49, SSC141234-37, SSC141254-72.)

3.    SS&C had no basis to represent to ACM that hosting was an appropriate deployment method for ACM and that CAMRA could be implemented in four to six months.  At the time SS&C made those representations to ACM, SS&C had never implemented a REIT on a hosted basis and had never implemented a REIT on any deployment option—licensing, hosting or outsourcing—in less than six months.  In fact, the average time for implementation of all SS&C's REIT customers is 15 months, with at least one implementation taking 36 months.  The initial estimate from Ms. Olszewska for how long it would take SS&C to implement CAMRA was 2,000-4,000 hours, "based on [ACM's] ability to participate."  That range was "compressed" in discussions between Ms. Olzsewska and Messrs. Fecteau and Moore to 2,000-3,000 hours.  In connection with negotiations between ACM and SS&C over the cost of SS&C's implementation of CAMRA for ACM, including an agreed hourly rate, ACM was presented with a proposal for 2,500 hours for SS&C to implement CAMRA, which was reduced to 1,850.  In reality, SS&C had no basis to estimate how long ACM's implementation would take.  SS&C had launched its REIT Servicing Division in April 2014—just two months before it started pitching ACM—and because SS&C had never implemented a REIT with CAMRA using a hosted deployment option, ACM was essentially a guinea pig for that option.  This was the complete opposite of the breadth of experience implementing REITs that SS&C told ACM it had.  In fact, the only other REIT that has purchased CAMRA on a hosted basis from SS&C, Bimini Capital Management, Inc., also was never implemented on a hosted basis and was forced to switch to outsourcing because of SS&C's failure to implement it on a hosted basis.  SS&C no longer attempts to sell CAMRA on a hosted basis to potential REIT customers.  Finally, SS&C had no written policies and procedures for marketing CAMRA to ACM or determining whether CAMRA was suitable for ACM.

4.    SS&C did not have the ability to establish data interfaces with ACM's custodians, BONY and Citi, and was not able to obtain electronic data from them, a fact which it concealed from ACM for months.  (SSC014285-89, SSC019230-49. SSC119028-33.)  For example:

- December 18, 2015 email from ACM to SS&C's Mr. Reilly: "Last week it became evident that [SS&C's] folks were having significant issues with the BoNY interface that they had set up this summer.  Today, it is sounding like your folks are not able to make progress because the current interface already includes all the information that BoNY can deliver through that particular channel.  In [ACM's] product selection diligence, [ACM was] assured that SS&C had interfaced CAMRA to BoNY successfully before."  (ACM0000401-02.)

- December 21, 2015 email from SS&C's Mr. Reilly to ACM: "[A]s you would expect, [SS&C has] a large number of BONY connections."  (ACM0001120-21.)

- January 14, 2016 email from SS&C's Scott Rice to SS&C's Ruth Ford: "BONY doesn't have anything to give us . . . [r]ight now BONY is not sending us daily cash balances." (SSC031723.)

- February 11, 2016 email from SS&C's Mr. Russell to SS&C's Mr. Pallone: "[I]n the case of [ACM] there was no ability to get the historic custody data we needed in electronic format so we had to process cash manually until we caught up to the date that we had electronic data for CI Manager." (SSC148163.)

5.     ACM's troubled and uncompleted implementation is not an exception.  In fact, SS&C had systemic problems and delays implementing CAMRA for its REIT customers, as evidenced by its internal emails.  These problems were not shared with ACM but were known to SS&C.  For example:

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Reilly and Ms. Olszewska: "We cannot have any more delays on a solution for these asset types."  (SSC136496.)

- September 22, 2015 email from SS&C's Mr. Russell to SS&C's Mr. Pallone, Ms. Olszewska, and others: "We will soon have 3 implementations at risk because we do not yet have a solution."  (SSC136497.)

- February 1, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone: "We need to be all hands getting the 4 problem REIT implementations done." (SSC095414.)

- February 11, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly and others: "We are cannibalizing our new clients with less than ideal on boarding experiences."  (SSC148165.)

- February 11, 2016 email from SS&C's Mr. Reilly to SS&C's Mr. Pallone and others: "We need to get better.  Our lengthy/over budget implementations are 'in the marketplace' and becoming a common negative in our new business discussions."  (SSC148166.)

- August 18, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process.  This same situation continues to repeat itself and we have clients that are not happy.  We are going through this with [redacted] right now and soon to happen with [redacted].  The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients."  (SSC145346.)

- August 18, 2016 email from SS&C's Mr. Brown to SS&C's Mr. Pallone and others: "Unfortunately, there will be some leaning on the team until we can straighten out the issues with our licensed clients."  (SSC054003.)

- November 17, 2016 email from SS&C's Mr. Pallone to SS&C's Mr. Reilly: "We will lose the REIT franchise if we don't address the CS issue with the license clients."  (SSC146951.)

6.      SS&C knew that, even if it could implement CAMRA for ACM, ACM would never be able to use it on a hosted basis due to errors and bugs in the software itself.  SS&C has at least two systems for submitting open issues about CAMRA, TFS and Applix.  SS&C was understaffed and unable to address the open issues.  There are at least 900 open items for CAMRA in TFS and Applix, the average age of which is 688 days, meaning that nearly two years pass before SS&C addresses them, if at all.  To make CAMRA work, SS&C employees routinely must use many different work-arounds to side step these open issues, steps which were not shared with ACM.  SS&C knew about these open issues for CAMRA submitted to TFS or Applix when it made the above misrepresentations to ACM.

7.      SS&C was incentivized to sell CAMRA on a hosted basis to ACM, which SS&C knew was the only deployment method ACM would purchase, regardless of whether CAMRA could be implemented or whether ACM would be able to use it on a hosted basis. SS&C's Messrs. Moore and Fecteau have testified that SS&C is a highly competitive place to work, there is tremendous pressure to meet sales goals because, among other reasons, salespeople are ranked on a weekly list circulated to the entire sales team, and SS&C fires salespeople who do not meet their goals.

**INTERROGATORY NO. 9**

State the basis for your contention in Count V of the Amended Complaint that the contract between

SS&C and ACM should be rescinded.

> **AMENDED ANSWER AND OBJECTIONS**:  ACM's claim for rescission of the Master Agreement (Count V) in the Amended Complaint is pled in the alternative to its breach of contract claim (Count I).  Subject to and without waiving its objections, ACM states that it is entitled to rescission of the Master Agreement due to SS&C's false and misleading pre- and post-contractual representations to ACM, which SS&C knew to be false or, alternatively, at least should have known to be false, and thus made intentionally or at least negligently.  The basis for ACM's rescission claim is described in ACM's responses to Interrogatory Nos. 5, 7, and 8, above.

**INTERROGATORY NO. 10**

State the basis for all damages and other relief that you seek in this Action.

> **AMENDED ANSWER AND OBJECTIONS**: Subject to and without waiving its objections, ACM states that it has incurred damages of more than $2.28 million, consisting of $1.78 million that ACM paid to SS&C for products and services that it has never been able to use and at least $500,000, based on 4,000 hours of lost employee time, and other damages, due to SS&C's failure to implement CAMRA and ACM's resulting inability to use CAMRA.  The $1.78 million that ACM has paid to SS&C includes a $500,000 license fee for CAMRA, $322,568 in maintenance fees, $260,000 in monthly hosting fees, and $695,370 under WR 1, 2, and 3.  In terms of lost employee time, during 2015, 2016 and the first four months of 2017, at least eight of ACM's employees, including executives and staff, assisted SS&C with its efforts to implement CAMRA.  Based on a conservative estimate that this time totals approximately 100 weeks, during which each of the eight employees averaged five hours per week for each of those weeks, ACM lost 4,000 employee hours.  Of those 4,000 hours, ACM estimates that staff worked 3,000 hours—or 1.5 FTE years—for a total of $180,000, and that its executives worked 1,000 hours or approximately $320,000, for a total of $500,000.  This estimate does not include time spent by ACM's two IT personnel, who also dedicated substantial time to the project.  Accordingly, ACM is entitled to no less than $2.28 million, together with pre- and post-judgment interest, punitive damages, and attorney's fees and costs.  ACM reserves the right to modify this information, following expert analysis, and to assert additional damages or other relief, as discovery continues.

Case No. 17-cv-00790-JAM

Dated: January 19, 2018

**As to Objections:**

**HOLLAND & KNIGHT LLP**

By: */s/ Christopher M. Cerrito*
Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

and

By: */s/ Allison Kernisky*
Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

*Counsel for ARMOUR Capital Management LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2018, a true and correct copy of this document was

served by electronic and U.S. mail on all counsel of record.

By:     */s/ Allison Kernisky*
          Allison Kernisky (phv09011)

**As to Answers:**

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that to the best of my knowledge the foregoing answers are true and correct.

Dated: January <u>19</u>, 2018                    By: _____

James Mountain
Chief Financial Officer
ARMOUR Capital Management LP