**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | January 14, 2019 |
| SS&C TECHNOLOGIES INC., | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**ACM'S OPPOSITION TO SS&C'S MOTION FOR SUMMARY JUDGMENT**

**HOLLAND & KNIGHT LLP**

Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tresser Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

*Counsel for ARMOUR Capital Management LP*

ORAL ARGUMENT REQUESTED

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS....................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION  ...........................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

PROCEDURAL HISTORY...............................................................................................2

LEGAL STANDARD.......................................................................................................3

ARGUMENT ..................................................................................................................3

CONCLUSION...............................................................................................................37

CERTIFICATE OF SERVICE .......................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADM Inv'r Servs. Inc. v. Collins*,
515 F.3d 753 (7th Cir. 2008) ................................................................31
*Advanced Thermal Sci. Corp. v. Applied Materials Inc.*,
No. 07-1384, 2010 WL 2015236 (C.D. Cal. May 18, 2010) ....................34
*ALV Events Int'l v. Johnson*,
821 F. Supp. 2d 489 (D. Conn. 2010) ....................................................34
*Am. Collectibles Network Inc. v. Sterling Commerce*,
No. 09-cv-143, 2016 WL 9132294 (E.D. Tenn. Sept. 9, 2016).........6, 8, 11, 14
*Am. Trim LLC v. Oracle Corp.*,
No. 99-cv-7265, 2001 WL 873073 (N.D. Ohio July 12, 2001) ...........6, 25, 26
*AP Constr., LLC v. Hanover Ins. Co.*,
No. 15-cv-1600, 2018 WL 3998971 (D. Conn. Aug. 21, 2018)...........3, 6, 22
*Applied Data Processing Inc. v. Burroughs Corp.*,
394 F. Supp. 504 (D. Conn. 1975)..........................................................34
*In re Aspect Software Parent Inc.*,
578 B.R. 718 (D. Del. 2017).................................................................15
*Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV*,
645 A.2d 505 (Conn. 1994) ..................................................................17
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................20
*Bell Sports Inc. v. Sys. Software Assocs.*,
71 F. Supp. 2d 121 (E.D.N.Y. 1999) ......................................................10
*Botanicals On the Park, Inc. v. Microcode Corp.*,
7 S.W. 3d 465 (Mo. Ct. App. 1999).......................................................13
*Boulevard Assocs. v. Sovereign Hotels Inc.*,
861 F. Supp. 1132 (D. Conn. 1994).....................................................33, 34
*Bridgestone America's Inc. v. IBM Corp.*,
172 F. Supp. 3d 1007, 1011-12 (M.D. Tenn. 2016) ..................................8
*Callahan v. Jursek*,
124 A. 31 (Conn. 1924) ......................................................................19
*Carlton v. Mystic Transp., Inc.*,
202 F.3d 129 (2d Cir. 2000)..................................................................3
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................3
*Channing Real Estate LLC v. Gates*,
122 A.3d 677 (Conn. App. Ct. 2015).....................................................24
*Channing Real Estate LLC v. Gates*,
161 A.3d 1227 (Conn. 2012) ...............................................................24
*Chase Manhattan Bank N.A. v. Edwards*,
450 N.Y.S.2d (N.Y. App. Div. 1982) ......................................................20

*Conn. Printers Inc. v. Baker Perkins PMC Ltd.*,
  No. 86-1507, 1989 WL 107391 (D. Conn. May 11, 1989)....................................................33
*Convoy Co. v. Sperry Rand Corp.*,
  672 F.2d 781 (9th Cir. 1982) ...........................................................................................35
*Cousins v. Howell Corp.*,
  52 F. Supp. 2d 362 (D. Conn. 1999)................................................................................17
*Cyberchron Corp. v. Calidata Sys. Dev. Inc.*,
  47 F.3d 39 (2d Cir. 1995) .................................................................................................34
*Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.*,
  687 F.2d 877 (6th Cir. 1982) ..............................................................................10, 16, 35
*Foley v. Huntington Co.*,
  682 A.2d 1026 (Conn. App. 1996) ..................................................................................19
*Gallo v. Prudential Res. Servs.*,
  22 F.3d 1219 (2d Cir. 1994)...........................................................................................3, 6
*Grindrod v. Shred-It-USA LLC*,
  No. CV156028292S, 2017 WL 3461427 (Conn. Super. Ct. July 5, 2017).................30, 31
*Hinchliffe v. Am. Motors Corp.*,
  440 A.2d 810 (Conn. 1981) .............................................................................................17
*Int'l Brands USA Inc. v. Old St. Andrews Ltd.*,
  349 F. Supp. 2d 256 (D. Conn 2004).............................................................................33
*Invacare Corp. v. Sperry Corp.*,
  612 F. Supp. 448 (N.D. Ohio 1984).......................................................................6, 10, 16
*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005)...............................................................................................3
*Joseph v. Mobileye, N.V.*,
  225 F. Supp. 3d 210, 218 (S.D.N.Y. 2016)......................................................................17
*Kasper v. City of Middletown*,
  352 F. Supp. 2d 216 (D. Conn. 2005)..............................................................................29
*Klewin v. Highland Hills Apartments LLC*,
  No. CV166026603, 2018 WL 1769309 (Conn. Super. Ct. Mar. 15, 2018)...........................28
*Liberty Bay Credit Union v. Open Solutions Inc.*,
  905 F. Supp. 2d 389 (D. Mass. 2012) .............................................................................35
*McGregor v. Uponor, Inc.*,
  No. 09–1136, 2010 WL 55985 (D. Minn. Jan. 4, 2010) ....................................................15
*Methodist Hosp. Inc. v. FTI Cambio LLC*,
  No. 11-cv-36, 2011 WL 6056610 (N.D. Ind. Dec. 5, 2011)...........................................8, 9
*Meyers v. Cornwell Quality Tools Inc.*,
  674 A.2d 444 (Conn. App. 1996) ....................................................................................10
*Mitchell v. Motta*,
  No. 296097, 1992 WL 340685 (Conn. Super. Ct. Nov. 17, 1992) ........................................29
*Estate of Murphy v. Area Co-op Educ. Serv.*,
  127 F. Supp. 2d 297 (D. Conn. 2000)................................................................................3
*N. Atl. Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999)...........................................................................................20, 21
*Nazami v. Patrons Mut. Ins. Co.*,
  910 A.2d 209 (Conn. 2006) ...............................................................................................5

*Neclerio v. Trans Union, LLC*,
   983 F. Supp. 2d 199 (D. Conn. 2013)......................................................................3
*Nielsen Media Res., Inc. v. Microsys. Software Inc.*,
   No. 99 CIV 10876, 2002 WL 31175223 (S.D.N.Y. Sept. 30, 2002)..................................6, 15
*Office Furniture Rental Alliance LLC v. Liberty Mut. Fire Ins. Co.*,
   981 F. Supp. 2d 111 (D. Conn. 2013)..................................................................18, 19
*Omega Eng. Inc. v. Eastman Kodak Co.*,
   908 F. Supp. 1084 (D. Conn. 1995)......................................................................16
*Patell Indus. Mach. Co. v. Toyoda Mach. U.S.A., Inc.*,
   880 F. Supp. 96 (N.D.N.Y. 1995).........................................................................17
*Pearsall Holdings LP v. Mountain High Funding LLC*,
   No. 13-CV-437, 2014 WL 7270334 (D. Conn. Dec. 18, 2014)..............................................19
*Perricone v. Perricone*,
   972 A.2d 666 (Conn. 2009) ..............................................................................19
*Perry v. Allegheny Airlines Inc.*,
   489 F.2d 1349 (2d. Cir. 1974)..........................................................................29
*Perry v. Metro-North Commuter R.R.*,
   716 F. Supp. 61 (D. Conn. 1989).......................................................................31
*Retrofit Partners I L.P. v. Lucas Indus. Inc.*,
   201 F.3d 155 (2d Cir. 2000)............................................................................20
*Richard Parks Corrosion Tech. Inc. v. Plas-Pak Indus. Inc.*,
   No. 10-CV-437, 2012 WL 4471258 (D. Conn. Sept. 27, 2012).............................................19
*Saint Bernard Sch. of Montville Inc. v. Bank of Am.*,
   95 A.3d 1063 (Conn. 2014).........................................................................30, 31
*Scapa Tapes N. Am. Inc. v. Avery Dennison Corp.*,
   384 F. Supp. 2d 544 (D. Conn. 2005)...................................................................33
*Schuman v. Aetna Life Ins. Co.*,
   No. 15-cv-1006, 2017 WL 1053853 (D. Conn. Mar. 20, 2017) ...........................................32
*SS&C Techs. Inc. v. Providence Inv. Mgmt.*,
   582 F. Supp. 2d 255 (D. Conn. 2008)...............................................................6, 13
*Stahl Mgmt. Corp. v. Conceptions Unlimited*,
   554 F. Supp. 890 (S.D.N.Y. 1983).......................................................................35
*Stern v. Trs. of Columbia Univ.*,
   131 F.3d 305 (2d Cir. 1997)..............................................................................3
*Stevens v. Landmark Partners Inc.*,
   No. 09-cv-498, 2012 WL 13026652 (D. Conn. July 27, 2012) ......................................22, 23, 24
*Superior Edge Inc. v. Monsanto Co.*,
   44 F. Supp. 3d 890, 907 (D. Minn. 2014)...............................................................14
*Tallmadge Brothers Inc. v. Iroquois Gas Transmission System L.P.*,
   746 A.2d 1277 (Conn. 2000) ............................................................................21
*Tempo Shain Corp. v. Bertek Inc.*,
   120 F.3d 16 (2d Cir. 1997)............................................................................20
*Trefoil Park LLC v. Key Holdings LLC*,
   No. 14-CV-00364, 2015 WL 1138542 (D. Conn. Mar. 13, 2015) ...................................19, 22, 23, 24
*Warman v. Delaney*,
   172 A.2d 188 (Conn. 1961) .............................................................................19

*Wasilewski v. Abel Womack Inc.*,
    No. 10-cv-1857, 2016 WL 1273164 (D. Conn. Mar. 31, 2016) ..............................................29
*Western Dermatology Consultants P.C. v. VitalWorks, Inc.*,
    78 A.3d 167 (Conn. App. Ct. 2013), *aff'd but criticized*, 153 A.3d 574 (Conn.
    2016) ............................................................................................................................... *passim*
*William Ford Inc. v. Hartford Courant Inc.*,
    657 A.2d 212 (Conn. 1995) ...........................................................................................5, 17
*Wykeham Rise LLC v. Federer*,
    52 A.3d 702 (Conn. 2012) ....................................................................................................28
*Yankee Gas Servs. Co. v. UGI Utilities, Inc.*,
    852 F. Supp. 2d 229 (D. Conn. 2012) .................................................................................31

**Statutes**

Binding Law ..........................................................................................................................18
Conn. Gen. Stat. § 52-225a (2014) .......................................................................................29
Connecticut Unfair Trade Practices Act ..................................................................................2
CUTPA ......................................................................................................................17, 26, 36

**Other Authorities**

L.R. 56(a)(3) .........................................................................................................................29
Local Rule 56(a)(2) .................................................................................................................1
Request 2 .................................................................................................................................5
Rule 30(b)(6) ...........................................................................................................................8

ACM opposes SS&C's MSJ. In support, ACM relies on this incorporated memorandum of law, its SDMF, the Mountain Declaration, and the Kernisky Declaration, and states:[1]

## INTRODUCTION

SS&C misunderstands ACM's claims almost two years after this case began.

Fundamentally, ACM does not *just* "want to argue that SS&C somehow failed to 'implement accounting software for ACM's asset management business," as the MSJ reads.

Granted, SS&C's failed implementation is a direct result of SS&C's misconduct and breaches. But what SS&C ignores is that ACM never would have been forced to the point of the failed implementation—or, before that, entering into the Master Agreement, or paying SS&C more than $1.78 million in fees and costs, or wasting more than $1.4 million on labor costs—had it not been for SS&C's precontractual misrepresentations about itself and its CAMRA software.

SS&C, true to form, tries to diminish its false statements as a "grab bag of estimates, proposals, opinions, and truisms." Not so. The misrepresentations—and what SS&C knew or should have known—reveal their essential character. SS&C told ACM that CAMRA was "proven" but had never delivered the proposed solution before. SS&C told ACM that solution was "suitable" and "automated" but knew it was "not valid" and "manual." SS&C told ACM it had the capability to implement CAMRA, but it lacked necessary resources, had incompetent personnel, and never had delivered a mortgage REIT implementation on time and on budget before. And so on.

---

[1] "ACM" is Plaintiff, ARMOUR Capital Management LP; "SS&C" is Defendant, SS&C Technologies Inc.; the "MSJ" is the December 17, 2018 Motion for Summary Judgment (ECF No. 176); the "SDMF" is ACM's Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment and Additional Material Facts (ECF No. 177-1); the "Mountain Declaration" is the January 14, 2019 Declaration of James R. Mountain (ECF No. 177-2); the "Kernisky Declaration" is the January 14, 2019 Declaration of Allison Kernisky (ECF No. 177-3); the "FAC" is ACM's July 13, 2017 First Amended Complaint and Demand for Jury Trial (ECF No. 35).

ORAL ARGUMENT REQUESTED

The list of SS&C's misrepresentations is as long as the software cases showing the action-ability of ACM's allegations are legion.  This includes a *near-identical* case against SS&C for a failed CAMRA implementation in this very Court.  As in those cases, manifold fact issues exist as to SS&C's misrepresentations.  The jury should decide the parties' "finger-pointing" here.

The balance of the MSJ reflects SS&C's misunderstanding of Connecticut law.

The Master Agreement does not deny ACM reasonable reliance.  As this Court held a little more than three months ago in another case, the Connecticut Supreme Court "has spoken clearly" on the issue, and the Court is "bound to follow its rule," in contrast to the *Western* decision on which SS&C relies.  These and other reasons defeat SS&C's argument against reliance.

With respect to ACM's more than $3.25 million in damages, SS&C is wrong that ACM has not suffered losses.  Moreover, collateral-source evidence is inappropriate on summary judg-ment, and the reason the rule should apply here is obvious:  there is no risk of double recovery.  Finally, the Master Agreement does not prohibit ACM's $1.4 million in wasted labor costs.

The MSJ should be denied in its entirety.

## STATEMENT OF FACTS

ACM incorporates by reference the SDMF in its entirety.

## PROCEDURAL HISTORY

ACM filed this lawsuit in May 2017 and filed the FAC in July 2017.  SS&C moved to dismiss the FAC and, following oral argument, the Court dismissed ACM's fraudulent misrepre-sentation claim and, in large part, sustained ACM's other claims.  (ECF No. 75.)

ACM's existing claims are for Breach of Contract (Count I) (FAC ¶¶55-59), Violations of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count II) (*Id.*  ¶¶60-66), Negligent Mis-representation (Count IV) (*Id.* ¶¶72-77), and Rescission (Count V) (*Id.* ¶¶78-81).

## LEGAL STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *Gallo v. Prudential Res. Servs*., 22 F.3d 1219, 1223 (2d Cir. 1994). The moving party bears the burden of showing the absence of genuine factual disputes. *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 133 (2d Cir. 2000). A fact is material when it might affect the outcome. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

When considering summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. *Id*. The Court does not weigh evidence but only decides whether there are disputed material facts for trial. *Assoc. Constr./AP Constr., LLC v. Hanover Ins. Co*., No. 15-cv-1600, 2018 WL 3998971, at *6 (D. Conn. Aug. 21, 2018). Assessments of credibility and choices between conflicting facts are matters for the jury, not the Court. *Estate of Murphy v. Area Co-op Educ. Serv*., 127 F. Supp. 2d 297, 301 (D. Conn. 2000). The non-movant's evidence must be accepted as true. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Neclerio v. Trans Union, LLC,* 983 F. Supp. 2d 199, 207 (D. Conn. 2013) (citing *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006)).

## ARGUMENT

**I.   GENUINE ISSUES OF MATERIAL FACT EXIST, PRECLUDING SUMMARY JUDGMENT ON ACM'S NEGLIGENT MISREPRESENTATION CLAIM.**

The MSJ should be denied because there is overwhelming evidence that SS&C made pre-contractual misrepresentations to ACM to induce it to enter into the Master Agreement.

SS&C's misrepresentations fall into two primary categories:  (1) misrepresentations about the suitability of CAMRA on a hosted basis as a software solution for ACM, including CAMRA's functionality, integration, and automation, and (2) misrepresentations about SS&C's capabilities, including the expertise and availability of its "Professional Services" team, and its ability to complete the implementation in four to six months, as promised.

The examples of what SS&C knew or should have known, but did not tell ACM, are legion:

SS&C represented that it had implemented its "proven" CAMRA software solution for mortgage REITs on a hosted basis; it had not then and has not since.

SS&C assured ACM it was capable of quickly connecting to ACM's custodians and data providers through established interfaces; yet SS&C knew, or should have known, it had to start from scratch because ACM needed separate interfaces, and it took 11 months of fumbling trial and error to make the first connection, while other connections were never completed.

SS&C recommended "CI Manager" as a module for ACM to reconcile data with its custodians; SS&C knew it should have "strongly recommended" the more powerful RECON instead, otherwise the "solution" SS&C sold was "not valid" and not a "solution" at all.

SS&C assured ACM it could import data from AVM, a third-party provider; SS&C had never worked with AVM before and made no effort to learn enough about AVM.

SS&C touted CAMRA's automated features and integrated capabilities; SS&C knew significant manual work was required across different software, platforms, and providers.

SS&C told ACM that it was capable of implementing CAMRA for ACM within four to six months; SS&C knew its four previous mortgage REIT implementations were delayed and over budget, SS&C had never implemented CAMRA for a mortgage REIT in a shorter span than six months, and SS&C lacked adequate available implementation resources in any event.

SS&C visited ACM's offices and met its staff, but SS&C did not suggest at any time that ACM would need additional resources to assist with the implementation.  In fact, SS&C explicitly discouraged ACM from hiring a third-party implementer for the project.

And the list of SS&C's misrepresentations goes on.  What SS&C told ACM, at the end of the day, portrayed a fantasyland that in reality enjoyed no true basis in fact.

In short[2], SS&C was never able to implement CAMRA for ACM because SS&C was more concerned with "selling software" to ACM than telling it the truth about the viability of its offered CAMRA solution.  (SDMF ¶72.)[3]  The resulting failed implementation is no surprise.

### A.   Similar Software Cases Routinely Turn on Negligent Misrepresentations.

Under Connecticut law, an action for negligent misrepresentation requires a plaintiff to establish that 1) defendant made a misrepresentation of fact; 2) that it knew or should have known was false; 3) plaintiff reasonably relied on the misrepresentation; and 4) suffered damages as a result.  *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 213 (Conn. 2006).[4]

SS&C does not dispute that it made the statements ACM claims are misrepresentations or that ACM was damaged as a result.  Instead, SS&C asks the Court to either ignore the mountains of evidence of SS&C's misrepresentations or do what cannot be done at this stage—weigh that

---

[2] Apart from the facial actionability of the misrepresentations ACM alleges against SS&C and reliance (solely on the basis of section 6.7.4 of the Master Agreement, in any event), SS&C does not challenge the remaining elements of ACM's negligent misrepresentation claim in the MSJ (i.e., whether SS&C knew or should have known of falsity, causation, and damages, (MSJ at 20)).

[3] SS&C disputes that the definition for "Completion of Implementation" in Work Request 2 was not met, (SDMF ¶119), but not that ACM never used CAMRA as book of record, (SDMF ¶121).

[4] *See also William Ford Inc. v. Hartford Courant Inc.*, 657 A.2d 212, 220 (Conn. 1995) ("One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them for their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.").

evidence to decide whether SS&C's statements are "opinions," "proposals," and "true statements," were directed at ACM, or are statements at all.  (MSJ at 17-18.)  *Gallo v. Prudential Res. Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (on summary judgment, court's duty confined to "issue-finding; it does not extend to issue-resolution"); *Assoc. Constr.*, 2018 WL 3998971, at *6.

There is ample precedent for denying summary judgment on negligent misrepresentation claims by customers like ACM against software companies like SS&C for making false statements about their software solutions.[5]  SS&C has cited no binding on-point authority to the contrary.

In fact, in a near-identical action—in this District, against SS&C, by an SS&C customer, involving a failed CAMRA implementation—this Court found that misrepresentations very similar to those ACM alleges against SS&C here presented fact issues for the jury:

> [W]hile a jury may find that **SS&C's representations . . . regarding the capabilities, ease of use, and timetable for implementation of the CAMRA software system** were accurate, truthful, and made in good faith, the court cannot say that such a finding is probable.  **Given the significant, repeated, and continuing problems encountered during the CAMRA implementation process, a jury could find that SS&C did in fact misrepresent their capabilities** . . . in some way.

*SS&C Techs. Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 258-59 (D. Conn. 2008) (emphases added).  The same is true here:  as in other software cases, the analysis SS&C invites the Court to undertake is ill-suited for summary judgment.  The MSJ should be denied.

---

[5] *See, e.g.*, *Am. Collectibles Network Inc. v. Sterling Commerce*, No. 09-cv-143, 2016 WL 9132294, at *5, 12 (E.D. Tenn. Sept. 9, 2016) (denying summary judgment on misrepresentation claim against software provider for failed implementation); *Nielsen Media Res., Inc. v. Microsys. Software Inc.*, No. 99 CIV 10876, 2002 WL 31175223, at *11 (S.D.N.Y. Sept. 30, 2002) (same); *Am. Trim LLC v. Oracle Corp.*, No. 99-cv-7265, 2001 WL 873073, at *3 (N.D. Ohio July 12, 2001) (same); *Invacare Corp. v. Sperry Corp.*, 612 F. Supp. 448, 452 (N.D. Ohio 1984) (same).

**B.      Statements About CAMRA for ACM Are Actionable.**

**1.      SS&C's Misrepresented That CAMRA on a Hosted Basis Was "Proven" for Mortgage REITs.**

SS&C told ACM that CAMRA was "proven," but this was false because before December 2014, SS&C had never implemented a mortgage REIT on a hosted basis.[6]  (SDMF ¶¶29, 86.)

SS&C's purpose in showing ACM a list of other mortgage REIT clients in the June 4, 2014 PowerPoint was to convince ACM that CAMRA would work for it.  (SDMF ¶86.)  What SS&C did not say is that those mortgage REITs all had CAMRA implemented on a licensed basis, where the customer takes on most of the effort, or on an outsourced basis, where SS&C does most of the effort.  (SDMF ¶82.)  Hosting is markedly different, as a hybrid of the two.  (SDMF ¶82.)

The facts alone show the actionability—and falsity—of SS&C's misrepresentations.

But what is so egregious about SS&C's "proven" misrepresentations is the main reason hosting is different—staffing.  (SDMF ¶86.)  At that time, SS&C's other customers, insurance companies[7] and large mortgage REITs, had more staff than ACM.[8]  (SDMF ¶69.)  And SS&C did not consider ACM's staffing.  (SDMF ¶109.)  SS&C visited ACM's offices, saw it had 19 employees, knew no more than four of them might be available for the implementation, and said

---

[6] "Hosted," in addition to "licensed" and "outsourced," was one of three deployment options for the CAMRA solution.  (SDMF ¶8.)

[7] CAMRA was first developed for insurance companies, and many of SS&C's CAMRA customers are insurance companies.  (SDMF ¶69.)

[8] SS&C recognized that "REITs are not staffed to handle CAMRA like insurance companies"— at least one SS&C executive, Daniel Pallone, told Timothy Reilly, SS&C's Senior Vice President with responsibility for CAMRA, during the implementation of CAMRA at ACM that SS&C's simultaneous effort at a hosted implementation of CAMRA for a very similar mortgage REIT[8] should be the "last one."  (SMDF ¶69.)  SS&C long knew that CAMRA is only appropriate for the largest and most sophisticated organizations (i.e., insurance companies).  (SDMF ¶88.)  For these reasons, SS&C's top executives, including its Chief Operating Officer, have admitted SS&C should have sold CAMRA to ACM on an outsourced, not hosted, basis.  (SDMF ¶87.)

7

nothing.  (SDMF ¶64.)  In fact, ACM told SS&C it was not planning to hire any new employees

to staff the CAMRA implementation and the ACM employees that were assigned to the project

would still have regular job duties to complete, including periodic reporting.  (SDMF ¶¶67, 68.)

So, SS&C's statements that it had "proven systems capable of supporting a broad range of

complex security types, accounting methodologies and treatments specific to Mortgage REITs,"

CAMRA was a "proven accounting engine," and a large portion of SS&C's clients traded in mort-

gage-backed securities (which SS&C listed by name in the June 4, 2014 PowerPoint), were false

and misleading, not "opinions" as SS&C argues.[9]  (MSJ at 22-23; Resp. No. 8 ¶¶6, 7.[10])

A misrepresentation is actionable when a software provider tells a prospective customer it

has "extensive experience implementing similar [p]rojects for other clients with similar business

needs and that other customers were using its software successfully."  *Am. Collectibles*, 2016 WL

9132294, at *5, 12, 15 (denying summary judgment where vendor misrepresented it had "prior

experience" in implementation of system with "similar design, size, interfacing, and complexity

of operation" and delivered solution for several identified retailers; also noting court need not "sort

the wheat from the chaff" of all defendant's misrepresentations); *Bridgestone America's Inc. v.

IBM Corp.*, 172 F. Supp. 3d 1007, 1011-12 (M.D. Tenn. 2016) (vendor made misrepresentations

by presenting its software solution as a "proven framework"); *Methodist Hosp. Inc. v. FTI Cambio

LLC*, No. 11-cv-36, 2011 WL 6056610, at *1 (N.D. Ind. Dec. 5, 2011) (misrepresentation to claim

"extensive experience" when vendor had never implemented version sold to plaintiff).

---

[9]  SS&C points out that the June and August PowerPoints were "addressed to Armour, not Plaintiff
ACM."  (MSJ at 5, 8.)  In December 2014, ACM managed Armour and Javelin.  (Mountain Decl.
¶4.)  Messrs. Mountain and Gruber are officers of ACM, Armour, and Javelin, and Trevor Spicer
and Cory Graley work in ACM's, not Armour's, IT department.  (Mountain Decl. ¶¶1, 5-6.)

[10]  ACM cites the correspondingly numbered misrepresentations which SS&C challenges in the
MSJ as "Resp. No. 8 ¶__."  ACM also has identified in the Opposition additional misrepresenta-
tions which were elicited during the May 11, 2018 Rule 30(b)(6) deposition of ACM.

### 2. SS&C Misrepresented That CAMRA on a Hosted Basis Was a Suitable Solution for ACM.

SS&C made a "suitability analysis" during the sales process to educate itself about ACM's "business and operations." (SDMF ¶71.) ACM provided all information SS&C requested. (*Id*.)

SS&C understood from this process that ACM wanted to convert from a mostly manual portfolio accounting process using spreadsheets to one that was "**automated**," and "**easy to use**" with "better **integration** for improved efficiency and control," and "timely and **accurate** accounting and reporting." (SDMF ¶71 (emphases added).)

SS&C presented CAMRA to ACM as such a solution—one that was "**integrated**" and "flexible" that "streamlines, **automates** and **simplifies** the investment process." (SDMF ¶79 (emphases added).) SS&C represented it was the "the only **integrated** Mortgage REIT end-to-end solution," and would "produce **fully auditable** accounting and reporting processes and **eliminate the use of spreadsheets**." (SDMF ¶80 (emphases added).)

Based on its analysis, SS&C made an unqualified recommendation to ACM for CAMRA on a hosted basis. (SDMF ¶81.) SS&C told ACM it was "confident CAMRA is the right fit," based on its "understanding of [ACM's] business and current environment," and that hosting was "really . . . a good deployment option" for ACM. (SDMF ¶¶81, 38.) But SS&C knew that CAMRA, as offered, was not the "right" or "valid" solution for ACM because, among other things, it included "CI Manager," a module with "limited at best functionality" and "operational difficulties," instead of the more powerful RECON, which "should have been strongly suggested" because ACM "need[ed]" it. (SDMF ¶¶101, 102 (describing ACM's solution as "not valid").)

So too, much of the automation and integration that SS&C promised was not available and were in fact manual processes. (SDMF ¶107.) For instance, setting up the initial interfaces and reconciliations is "typically manual," and reconciling data exchanged with AVM, which ACM

used to settle its trades and provide cash management, was "all manual." (SDMF ¶100.) CI Manager was supposed to integrate with CAMRA, but SS&C delayed setting it up for one of ACM's custodians and never even installed it for the other. (SDMF ¶¶101-02.) Much of ACM's user experience was "entirely contrary" to these statements. (SDMF ¶108.)

SS&C discounts these statements as "opinions." (MSJ at 21-23; Response No. 8 ¶¶2, 3, 8, 13.). Still, summary judgment is not appropriate because whether statements are opinions is a question of fact. *Meyers v. Cornwell Quality Tools Inc.*, 674 A.2d 444, 450 (Conn. App. 1996).

But even if the Court were to consider the statements, they are not opinions. Representations that a software solution is suitable for a customer are statements of present facts about the software's capabilities. *See, e.g.*, *Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.*, 687 F.2d 877 (6th Cir. 1982) ("General representations that data processing equipment will be suitable for a customer's operations, based upon familiarity with both the equipment's capabilities and the customer's needs, are statements concerning present facts."); *Invacare Corp.*, 612 F. Supp. at 452 (representations that software could process plaintiff's accounting systems are statements of existing fact because they apply to capabilities of software at time of its delivery).

Moreover, SS&C's "confident" recommendation is more than general sales puffing. SS&C developed CAMRA, claimed to be an expert in implementing it, and recommended it as suitable for ACM after considering ACM's business and requirements. (SDMF ¶71.) *See Invacare Corp.*, 612 F. Supp. at 452 (misrepresentation to recommend software after examining customer's operation and based on understanding of its needs); *Dunn Appraisal*, 687 F.2d at 882 (court summarized "fair import" of defendant's statements as representing that computer system was "best suited" for plaintiff's operations and affirmed misrepresentation); *Bell Sports Inc. v. Sys. Software Assocs.*, 71 F. Supp. 2d 121, 123-24 (E.D.N.Y. 1999) (misrepresentation where defendant knew

10

plaintiff wanted "fully integrated" software and said it was); *Am. Collectibles*, 2016 WL 9132294, at *12 (defendant misrepresented software as "totally integrated and operational system.").[11]

SS&C's statements describing its "software and operational support services" were not "run of the mill sales comments" either.[12]   (*See* Response No. 8 ¶¶15, 16.   *Contra* MSJ at 23.) They were statements by SS&C about CAMRA's specific attributes with knowledge, and in the context, of ACM's stated needs and requirements.   Accordingly, these statements are actionable. *See Am. Collectibles Network*, 2016 WL 9132294, at *14 (statements software had "unique" features including ability to "capture critical information throughout the fulfillment process" and "eliminate the complexity of managing multiple inventory across multiple systems" were misrepresentations because they spoke to software's "specific attributes").

### 3.    SS&C Misrepresented CAMRA's Existing Capabilities.

SS&C also misrepresented CAMRA's functionality, including its third-party data processes ("SS&C will manage the interface and uploading of information from custodians of choice," identified as "Citi (may add BONY in future)"; SS&C will "[i]mport transactions from custodians

---

[11] SS&C's cases are inapposite.  (MSJ at 21-23 (citing *Larobina v. Wells Fargo Bank N.A.*, No. 10-cv-1279, 2012 WL 1032953 (D. Conn. 2012) (general statements by a bank describing itself as "professional and stalwart"); *Ormsby v. Nationwide Mut. Fire Ins. Co.*, No. CV990429984, 2000 WL 739606, at *7 (Conn. Super. Ct. 2000) (insurance company's slogans, such as "Nationwide is on your side"); *Olympic Dreams LLC v. Clark*, No. 11-CV-01103, 2014 WL 4267499 (D. Conn. 2014) (seller's generic puffing statements about horses); *Vezina v. Nautilus Pools Inc.*, 27 Conn. App. 810 (1992) (same about swimming pools).)

[12] The November Proposal included statements about what SS&C could do: "establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training."   (Response No. 8 ¶¶15; SDMF ¶¶41-42.) SS&C also told ACM it had capability to establish data interfaces with ACM's custodians, BONY and Citi, and obtain data from them into CAMRA.  (Response No. 8 ¶16; SDMF ¶¶41-42.)  All of these statements were false and actionable in support of ACM's negligent-misrepresentation claim.

Citi, and potentially BONY,"), and the accuracy of CAMRA's reports (SS&C is equipped to "help mortgage REITs" produce "fully auditable accounting and reporting processes and eliminate the use of spreadsheets.") (Resp. No. 8 ¶¶3, 15, 16.)

SS&C told ACM that SS&C had the capability to quickly establish interfaces to ACM's custodians, Citi and BONY, based largely on its purported prior experience with these custodians.[13] (SDMF ¶94.) Yet, SS&C had never set up interfaces with Citi or BONY for a mortgage REIT, particularly not one with the hosting deployment option. (SDMF ¶95.) And it was SS&C's experience that connecting to custodians can be a difficult and time-consuming process. (SDMF ¶94.) SS&C took no steps to assess whether it had the capability to establish interfaces with Citi and BONY for ACM. (SDMF ¶96.) SS&C did not speak to ACM's custodians or data providers and did not attempt any test connections. (*Id.*) Had SS&C done so, it would have learned that SS&C could not leverage its existing connections for ACM's benefit because, as a hosted customer, ACM needed to have a separate feed, which would require a new connection. (SDMF ¶97.) SS&C's missteps caused an 11-month delay. (SDMF ¶98.)

Similarly, SS&C told ACM that SS&C and CAMRA could import and load data from AVM. (SDMF ¶99.) But SS&C had never attempted to integrate CAMRA with AVM, a fact SS&C withheld from ACM, and SS&C did nothing to validate AVM's capabilities, other than to ask ACM for a list of services AVM provided. (*Id.*)

SS&C also told ACM that CAMRA was capable of generating accurate reports. (SDMF ¶108.) In reality, reports generated in CAMRA often did not match the data in CAMRA or the data ACM generated outside of CAMRA using its existing accounting processes. (*Id.*) Both ACM

---

[13] Manoj Chacko, the head of the SS&C team responsible for connecting to customers' third party data sources, "OTS," at deposition could only recall one other time OTS set up a connection to BONY, and he could not remember having connected to Citi. (SDMF ¶95.)

users and SS&C staff had difficulty with CAMRA's inaccurate output.  (SDMF ¶104.)  SS&C's staff considered CAMRA's reports to be "complete garbage."  (SDMF ¶108.)  SS&C knew its reports "weren't completely accurate" for ACM "the whole time," yet never told ACM.  (*Id.*)

Summary judgment based on SS&C's misrepresentations about its data connectivity and CAMRA's reporting capabilities is not appropriate for at least two reasons.

First, whether CAMRA has the functionality SS&C represented it did is a fact issue not appropriate for summary judgment.  *SS&C Techs., Inc.*, 582 F. Supp. 2d at 259-60 (jury "could find that difficulties encountered are indicative of SS&C and CAMRA's failure, or even inherent inability, to fully provide the services promised.").  There, the District of Connecticut court denied summary ruling on nearly the exact same facts as here—SS&C's customer sued over a failed CAMRA implementation, claiming SS&C misrepresented, among other things, that CAMRA could provide it with "reliable, complete, and accurate financial reports."  582 F. Supp. 2d at 261.

Second, even misrepresenting that software has capabilities without knowing whether it does is actionable.  *Botanicals On the Park, Inc. v. Microcode Corp.*, 7 S.W. 3d 465, 468 (Mo. Ct. App. 1999) (representing software was fully compatible with Windows 95, "without any qualifications or disclosure of risks" or without adequate testing, when it was not, is actionable).

**C.      Statements that SS&C Was Capable of Implementing CAMRA for ACM Are Actionable.**

SS&C's statements about its expertise and experience are also actionable, including about SS&C's dedicated team, Professional Services, which purportedly was qualified to implement CAMRA and has significant experience implementing it for mortgage REITs like ACM.  (Resp.

No. 8 ¶¶9, 20.)[14]  SS&C also touted Shiv Sivadas as having "extensive experience with client implementations," including with "REITs, hedge funds and asset managers."  (Resp. No. 8 ¶12.)

These statements were not true.  (MSJ at 29-30.)  First, Professional Services, led my Ms. Olszewska, had a history of at least four mortgage REIT implementations that were over budget and delayed.  (SDMF ¶37.)  Second, SS&C misrepresented that Mr. Sivadas, or someone with experience like his, was available to work on ACM's implementation.  Mr. Sivadas attended the August 2014 meeting but then did not work on ACM's implementation at all.  (SDMF ¶¶36, 110.)

SS&C also told ACM it had "unrivaled expertise" in "asset and wealth accounting and operation"; "unique expertise" and "more than 10 years of experience and leadership in Mortgage REIT accounting and reporting"; "extensive knowledge and experience meeting the needs of organizations that invest heavily in MBS and structured products"; "accounting and reporting expertise"; and "accounting and operations professionals [with] extensive experience supporting financial reporting requirements of organizations such as [ACM]."  (Response No. 8 ¶¶1, 4, 5, 6.)[15]

SS&C knew, or should have known, these statements were false because SS&C was facing ongoing resource shortages that required it to pull staff off of certain implementations to triage others; this lack of resources ultimately caused delays "across the board" for at least four mortgage

---

[14] These statements were made over the course of the seven-month sales process in meetings and telephone calls with ACM.  (Resp. No. 8 ¶¶9, 20.) While there is no transcript of these conversations, ACM's attendees remember this as the topic of discussion.  (SDMF ¶¶28, 33.)

[15] For the same reasons cited *supra*, these statements are not "opinions."  (*Contra* MSJ at 21-23.) *Am. Collectibles Network*, 2016 WL 9132294, at *12 (misrepresentations that defendant had "consistent project leadership, architecture expertise and business/systems analysis," "dedicate[d] experienced resources," and that it would "[a]ssign the . . . resources necessary for a successful project" were actionable); *Superior Edge Inc. v. Monsanto Co*., 44 F. Supp. 3d 890, 907 (D. Minn. 2014) (representations that software developer had "considerable experience in the agricultural industry," "an infrastructure that allowed [it] to create innovative and complex solutions," and "experience using the Agile Methodology and Agile Process," were misrepresentations relating to its "abilities, skills, and experience" that induced plaintiff to sign contract).

REIT implementations, including ACM's; management believed the staff, including SS&C's project manager, Adriana Johnson, and primary implementer, Scott Rice, assigned to the CAMRA implementation at ACM were not competent; Professional Services "did not know what they were doing"; and implementation ACM was "fugly" because SS&C could not get "basic things." (SDMF ¶¶112-117.)  SS&C's understaffing was so dire that its had to "lie" to customers that their implementations were being handled when in truth they were not.  (SMDF ¶¶105-06.)

In other words, SS&C misrepresented its "experience, expertise and core competencies" to win the ACM contract.  *In re Aspect Software Parent Inc.*, 578 B.R. 718, 724 (D. Del. 2017) (actionable to "repeatedly and deliberately" misrepresent competence to develop and implement software solution); *Nielsen Media Res.*, 2002 WL 31175223, at *11 (denying summary judgment for negligent misrepresentation where defendant told plaintiff it "possessed expertise in the Internet software field, that it kept abreast of the very cutting edge of Internet technology, and that its existing product, CyberPatrol, would require only a simple modification in order to create a software product suitable for Nielsen's needs."); *Bridgestone Am.*, 172 F. Supp. 3d at 1011-12 (vendor misrepresented itself as "uniquely qualified" to implement software); *McGregor v. Uponor, Inc.*, No. 09–1136, 2010 WL 55985, at *4 (D. Minn. Jan. 4, 2010) (statement that plumbing company was "a North American leader in the manufacture of both plumbing and heating products" was false because company had only been in plumbing business for one year and knew it was not manufacturing plumbing systems or brass fittings.).

SS&C also made misrepresentations about Professional Services' capabilities to deliver the budget and timeline estimates it provided to ACM.  (Response No. 8 ¶18.)  Ms. Olszewska's estimates were misrepresentations because SS&C lacked the capabilities to complete the CAMRA implementation within four to six months.  The other mortgage REIT implementations for which

Ms. Olszewska prepared budgets for were all over budget and delayed. (SDMF ¶37.) No surprise then that the estimates in the initial and revised budgets for ACM were off by thousands of hours and millions of dollars, and the four to six months SS&C estimated to complete ACM's implementation was pure fantasy. (Response No. 8 ¶¶19, 21; SDMF ¶89.) SS&C knew this estimate was "never realistic" because in part SS&C's "setups were completely different from the way [ACM's] securities worked." (*Id.*) In other words, SS&C told ACM that SS&C could implement CAMRA in four to six months, without any prior experience doing it that quickly and with no understanding of how it or ACM was going to staff the implementation. (SDMF ¶64, 66-68, 109.)

Additionally, estimates can be misrepresentations. *Omega Eng. Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097-98 (D. Conn. 1995). Similarly, representing that software can be delivered and installed by a date certain knowing that it cannot, or not having a reasonable basis upon which to make an estimate, is a misrepresentation. *See Dunn Appraisal*, 687 F.2d at 882 (affirming trial court's judgment that it was material misrepresentation for software provider to promise to complete implementation by date certain lacking reasonable basis).

Underscoring its duplicity, SS&C told ACM not to hire an outside consultant to assist with the implementation so there would be only "one throat to choke" if a problem arose. (SDMF ¶85; Response No. 8 ¶17; Mountain Decl. at 8.) If ACM had hired a third party implementer, ACM would not have incurred all of the lost labor costs that ACM seeks from SS&C. (Mountain Decl. at 8.) *See Invacare Corp.*, 612 F. Supp. at 452 (misrepresentation to tell customer software works without disclosing need for additional manpower).

For all these reasons, the evidence, as well as a litany of on-point cases, reflect that SS&C has failed to show the absence of genuine issues of material fact as to the numerous misrepresentations ACM alleges SS&C made to it. As such, the Court should deny the MSJ.

## II.    MASTER AGREEMENT SECTION 6.7.4 DOES NOT ELIMINATE ANY GENU-INE ISSUES OF MATERIAL FACT REGARDING ACM'S REASONABLE RE-LIANCE ON SS&C'S MISREPRESENTATIONS.

SS&C also insists that ACM's misrepresentation claim is "bar[red]" and "collapses," (MSJ at 18, 20), on the basis of one case, *Western Dermatology Consultants P.C. v. VitalWorks, Inc.*, 78 A.3d 167 (Conn. App. Ct. 2013), *aff'd but criticized*, 153 A.3d 574 (Conn. 2016). According to SS&C, under that solitary decision, "it is 'unreasonable' for ACM to claim reliance" on SS&C's misrepresentations, and so summary judgment *ipse dixit* should be granted for SS&C.

SS&C's argument suffers from manifold defects and should be rejected.

### A.    Reasonable Reliance Cannot Be Resolved on Summary Judgment.

The nub of SS&C's attack is the reliance element of ACM's negligent misrepresentation claim,[16] namely, "that the reliance on [SS&C's] misstatement[s] was justified or reasonable." *See, e.g.*, *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. 1995).

The Connecticut Supreme Court has "consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances." *Id.* And this Court has recognized that "Connecticut courts have repeatedly held that the reasonableness of a plaintiff's reliance is a question of fact for the jury." *Cousins v. Howell Corp.*, 52 F. Supp. 2d 362, 365 (D. Conn. 1999). This is so because the "reasonableness of reliance" is "always nettlesome" and "so fact-intensive." *Joseph v. Mobileye, N.V.*, 225 F. Supp. 3d 210, 218 (S.D.N.Y. 2016); *Patell Indus. Mach. Co. v. Toyoda Mach. U.S.A., Inc.*, 880 F. Supp. 96, 98 (N.D.N.Y. 1995) ("whether plaintiff was justified in relying on . . . representations is a question of fact that precludes summary judgment").

---

[16] Under Connecticut law, reliance is not an element of ACM's CUTPA claim. *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 815-16 (Conn. 1981) ("The CUTPA plaintiff need not prove reliance."); *Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV*, 645 A.2d 505, 510 (Conn. 1994) (same). SS&C's argument under *Western* thus is inapposite to ACM's CUTPA claim.

Here, SS&C neither argues the absence of fact issues concerning the reasonableness of reliance nor cites any undisputed material facts purportedly in its favor. Instead, SS&C claims that *Western* breathes a sweeping bar into section 6.7.4 that entitles it to summary judgment. (MSJ at 18-20.) But *Western* was not a summary judgment case, and it does not address the existence of fact issues as to reasonable reliance. Importantly, SS&C has cited no Connecticut authorities that are contrary to those above and might deny ACM, on summary judgment, its right for the jury to decide the reasonableness of its reliance. This is because no apposite case law exists.

Because SS&C has not shown the absence of fact issues as to ACM's reasonable reliance, the MSJ should be denied. *Office Furniture Rental Alliance LLC v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 111, 121 (D. Conn. 2013) ("factual dispute" on reasonable reliance precluded summary judgment). The jury should decide whether ACM's reliance was reasonable.

## B.   Binding Law Holds a Merger Clause *Does Not* Defeat Misrepresentations.

SS&C declares *Western* to be "binding" and a "clear, definitive statement of Connecticut law about merger clauses in contracts." (MSJ at 19.) These assertions are false. *Western* cites no Connecticut law on this point and is at odds with a vast body of Connecticut cases, including from this state's supreme court.[17] In fact, Connecticut law *supports* the viability of ACM's claim.

At least as long ago as 1961, the Connecticut Supreme Court recognized that a merger clause does not bar misrepresentations that induced a contract (as opposed to misrepresentations that may alter the contract). As the Connecticut Supreme Court then explained in one case:

> The defendant claims that the contract for the sale of the real estate constituted the entire obligation of the parties, that all terms set forth therein were fulfilled, and that accordingly there could be no fraud or deceit. In making such a claim, the defendant overlooks the fact that in this action the plaintiffs are not seeking to add

---

[17] SS&C essentially acknowledges as much, claiming (yet again) falsely that the *Western* "rule" (no such "rule" existing) is "broadly accepted" while admitting that *Western* only cites "decisions from the Second Circuit, New York, and a standard hornbook." (MSJ at 19.)

> to, subtract from or alter the terms of the written contract itself. They are claiming
> that they were induced to enter into the contract by misrepresentations of material
> facts. This action is concerned solely with material misrepresentation in the in-
> ducement of the contract.

*Warman v. Delaney*, 172 A.2d 188, 190 (Conn. 1961) (affirming misrepresentations findings

against defendants); *Callahan v. Jursek*, 124 A. 31, 33 (Conn. 1924) ("The construction the de-

fendant contends for would be against public policy. Fraud cannot be contracted against.")

This principle—i.e., that a merger clause does not bar a claim for misrepresentations that

induced a contract—has been applied repeatedly by Connecticut courts over the years. As the

District of Connecticut recently observed, "[i]t is well established under Connecticut law that a

plaintiff asserting misrepresentation claims may allege statements made prior to the execution of

an integrated writing without running afoul of the parol evidence rule, even in the presence of a

merger or integration clause."[18] *Trefoil Park LLC v. Key Holdings LLC*, No. 14-CV-00364, 2015

WL 1138542, at *7 (D. Conn. Mar. 13, 2015). And Connecticut courts have cited to this rule to

deny summary judgment. *E.g.*, *Richard Parks Corrosion Tech. Inc. v. Plas-Pak Indus. Inc*., No.

10-CV-437, 2012 WL 4471258, at *4 (D. Conn. Sept. 27, 2012) ("merger clause does not prevent

[plaintiff] from asserting its negligent misrepresentation count because [plaintiff]'s claim is di-

rected at its inducement to enter the contract rather than altering [its] terms").

---

[18] Connecticut case law on this point is legion. *See, e.g.*, *Office Furniture Rental Alliance*, 981 F.
Supp. 2d 111, 119 (D. Conn. 2013) (even in integrated writing, parol evidence admissible to sup-
port negligent misrepresentation claim); *Perricone v. Perricone*, 972 A.2d 666, 673 (Conn. 2009)
(parol evidence allowed despite merger clause "to show mistake or fraud."); *Pearsall Holdings
LP v. Mountain High Funding LLC*, No. 13-CV-437, 2014 WL 7270334, at *6 (D. Conn. Dec. 18,
2014) ("Because all of Plaintiff's claims are premised on its assertion that [defendant] engaged in
misrepresentations to induce Plaintiff's investment, the merger clause does not operate to bar
Plaintiff's claims here."); *Foley v. Huntington Co*., 682 A.2d 1026, 1034-36 (Conn. App. 1996)
(negligent misrepresentation that induced buyer actionable despite fully integrated contract).

Neither SS&C nor the Appellate Court in *Western* makes any effort even to discuss, let alone distinguish, this body of binding Connecticut case law.  Instead, both rely on cases from other courts which either support this body of law or are distinguishable.[19]  *Tempo Shain Corp. v. Bertek Inc.*, 120 F.3d 16, 21 (2d Cir. 1997) ("parol evidence rule does not exclude evidence to show misrepresentation"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (federal securities law); *Retrofit Partners I L.P. v. Lucas Indus. Inc.*, 201 F.3d 155, 162 (2d Cir. 2000) (precontractual misrepresentation contradicted by plain contract terms); *Chase Manhattan Bank N.A. v. Edwards*, 450 N.Y.S.2d (N.Y. App. Div. 1982) (New York law); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 48 (2d Cir. 1999) (New York law; no misrepresentation claim).

Moreover, a little over three months ago, on September 30, 2018, this Court rejected the very argument for which SS&C now relies entirely on *Western*—i.e., that a merger clause will vitiate the reasonable reliance on misrepresentations—to deny summary judgment.

In *Foundation Capital Resources Inc. v. Prayer Tabernacle Church of Love Inc.*, the plaintiff argued that a misrepresentation defense was barred by certain merger clauses stating that "'the Agreement supersedes all prior discussions' and that 'there are no oral representations or agreements which are not set forth herein.'"[20]  No. 17-CV-135 (JAM), 2018 WL 4697281, at *8 (D. Conn. Sept. 30, 2018) (citation omitted).  Like SS&C's reliance on *Western* here, the plaintiff argued that "a 'clear anti-reliance clause' expressly stating that no oral representations have been

---

[19] Notably, no Connecticut court has cited *Western* for the proposition that SS&C advances here, i.e., that a merger clause bars misrepresentation claims based on pre-contractual statements, and the Connecticut Supreme Court was not asked to review that proposition on appeal.

[20] As discussed *infra*, this merger clause, like the one in *Western*, was complete, and thus materially far broader and different from section 6.7.4 of the Master Agreement.

relied upon will" bar a misrepresentation claim.  *Id.* (discussing contracts stating parties "are not relying on any oral representations" and "express disclaimer of such reliance").

Rejecting this argument, this Court wrote:  "However sensible this rule may be, it does not appear to be the law in Connecticut."  *Id.* at *9.  This Court then cited to the Connecticut Supreme Court's decision in *Tallmadge Brothers Inc. v. Iroquois Gas Transmission System L.P.*, 746 A.2d 1277 (Conn. 2000), which "involv[ed] a very similar merger clause with language disclaiming any oral representations" and in which this state's supreme court "held that 'a merger clause, of course, will not operate as a bar to the introduction of evidence of fraud by one of the contracting parties.'"  *Id.* (additional citations omitted).  For this reason, this Court held that "[t]he Connecticut Supreme Court has spoken clearly," this Court was "bound to follow its rule," and this Court could not "say that the merger provisions . . . bar the [defendant's] defense as a matter of law."  *Id.*

Thus, as this Court held last September, the "binding" and "clear, definitive statement" of Connecticut law is that a merger clause, even a complete one as in *Foundation Capital Resources*, does not defeat reasonable reliance.  Here, SS&C's misrepresentations induced ACM to enter into the Master Agreement, and so section 6.7.4 does not render ACM's reliance any less reasonable. This Court should do the same as in *Foundation Capital Resources* and deny the MSJ.

### C.    *Western* Is Not "On Point" in Any Event.

Even if *Western* were "binding" (it is not), SS&C's claim that the decision is "on point" also is wrong.  (MSJ at 19.)  This is because *Western* is distinct in at least two respects.

### 1.    Section 6.7.4 Is Materially Distinct from *Western*.

First, section 6.7.4 is not "functionally identical to the [merger clause] in *Western*."  (*Id.*) The merger clause in *Western* was materially complete and without limitation:

This Agreement and any schedules and attachments attached hereto constitutes the entire agreement between the parties and supersedes all prior or contemporaneous

21

> agreements, representations and proposals, written or oral except for [c]ustomer's
> obligations to pay support or other fees under existing contract(s), if any . . . .

*W. Dermatology*, 78 A.3d at 179; *see Found. Cap. Res.*, 2018 WL 4697281, at *8 ("all prior dis-

cussions and "no oral representations or agreements" also not limited); *Hanover Ins. Co.*, No. 2018

WL 3998968 , at *10 n.4 (describing broadly merger clause in *Western*).

But here, section 6.7.4 is limited, i.e., to the "subject matter" of the Master Agreement:

> This Master Agreement (including any attachments and addenda hereto) contains
> the entire agreement of the parties with respect to **the subject matter hereof** and
> supersedes all previous communications, representations, understandings and
> agreements, either oral or written, between the parties **with respect thereto.**

(Master Agreement § 6.7.4 (emphases added).)

This distinction exposes an additional chasm between *Western* and this case.

In Connecticut, "even if a contract is not completely integrated, it may still be partially

integrated with respect to certain provisions." *Stevens v. Landmark Partners Inc.*, No. 09-cv-498,

2012 WL 13026652, at *5 (D. Conn. July 27, 2012).  A contract is "'integrated and operates to

exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is 'men-

tioned, covered, or dealt with in the writing.'"[21]  *Id.* (citing *Assoc. Catalog Merchandisers Inc. v.

Chagnon*, 557 A.2d 525 (Conn. 1989)).  "'[I]f it is not, then probably the writing was not intended

to embody that element.'"  *Trefoil*, 2015 WL 1138542, at *6 (citing *Neiditz v. Hous. Auth. of City

of Hartford*, 654 A.2d 812 (Conn. Super. 1994), *aff'd* 651 A.2d 1295 (Conn. 1995)).

Connecticut courts routinely find the "subject matter" that is "mentioned, covered, or dealt

with" to be the specific provisions or elements within the contract.  So, in one case, the "subject

matter" was "clearly limited to the terms and obligations between the parties in the performance

---

[21] SS&C's misunderstanding of this issue is underscored by its declaration that "[r]eliance would
have been unreasonable as a matter of law, regardless of what the statement was."  (MSJ at 20.)

of [a] lease," and did not include the "representations and warranties . . . on which the [p]laintiff

relied in agreeing to enter into the [l]ease, which were not memorialize[d]" in the lease. *Id.* Thus,

as here, "allegations of pre-execution discussions" about those "representations and warranties"

were not "barred" for purposes of misrepresentation claims.[22] *See id.*

In another case, the plaintiff's "economic participation in [a f]irm [was] clearly 'mentioned,

covered, or dealt with in writing.'" *Stevens*, 2012 WL 13026652, at *5. So, the plaintiff could not

rely, for purposes of a negligent-misrepresentation claim, on "any misrepresentations that once the

economic participation program was implemented . . . it would be in the form of ownership because

that position [was] contradicted by the clear and unambiguous language of the contract." *Id.* at *9.

On the other hand, "nothing in the [a]greement contradict[ed] the alleged misrepresentations [that

the defendant] made to [the plaintiff] that it planned to revise its economic participation program

and provide him with a 10% participation in the [f]irm." *Id.* Because the terms were not included

in the agreement, the misrepresentations were actionable under that claim. *See id.*

Here, other than the "Four Proposals," SS&C does not dispute that the pre-contractual mis-

representations ACM alleges induced it to enter into the Master Agreement are not "mentioned,

covered, or dealt with" in that contract, as SS&C admits, (*see, e.g.*, MSJ at 11).) And of the Four

Proposals, SS&C admits that "[o]f the three statements in the November Proposal that Plaintiff

contends were 'misrepresentations,' none appears in the final Master Agreement." (*Id.*) SS&C

moreover misunderstands ACM's argument about the December budgets and timelines, proofs of

concept, and CAMRA demonstration. (*See id.* at 24-29.) ACM never has alleged that the contract

---

[22] Notably, the merger clause in that case, as in *Western* and *Foundation Capital Resources*, was complete and not limited in any material respect, unlike section 6.7.4 of the Master Agreement, and still the District of Connecticut held that the representations and warranties not "memorialize[d]" in the agreement were actionable. *See Trefoil*, 2015 WL 1138542, at *7.

terms in those documents misrepresentations are at issue, but instead what SS&C told ACM about

SS&C's and CAMRA's capabilities, including to implement CAMRA for a mortgage REIT like

ACM within four to six months, handle asset classes and accounting methodologies like ACM's

to generate accurate reports, and perform in a manner that was user-friendly and simple.  (Resp.

No. 8 ¶10-11, 14, 19, 21.)  None of these statements about SS&C's and CAMRA's then-existing

capabilities was a contractual obligation that SS&C would do something, as in the Master Agree-

ment.  In fact, the Court already necessarily has decided this issue, in rejecting SS&C's argument

that ACM's misrepresentation claims should be dismissed under the economic loss rule.  (*See* ECF

No. 13-14.)  Thus, the misrepresentations ACM alleges here cannot form the "subject matter" of

the Master Agreement under section 6.7.4, unlike the merger clause in *Western*, which was com-

plete and not limited to any material "subject matter."  *See* 78 A.3d at 179.

Because nothing in section 6.7.4 (or elsewhere in the Master Agreement) contradicts the

misrepresentations ACM alleges, the Court cannot conclude that ACM's reliance is unreasonable,

and the MSJ should be denied.[23]  *See, e.g.*, *Stevens*, 2012 WL 13026652, at *9 (because "nothing

in the [a]greement contradict[ed] the alleged misrepresentations, . . . reliance involve[d] a disputed

issue of material fact") (denying summary judgment); *Trefoil*, 2015 WL 1138542, at *6 (parol-

evidence exclusions are instances where "'evidence . . . does not vary or contradict the contract's

terms'"); *Assoc. Constr.*, 2018 WL 3998968, at *10 & n.4 (denying summary judgment where

---

[23] SS&C's reliance on *Channing Real Estate LLC v. Gates*, 161 A.3d 1227 (Conn. 2012) is mis-placed.  For starters, that case followed New York law.  *Id.* at 1233.  Second, as the Appellate Court's decision below reflects, the trial court "considered extrinsic evidence to vary or contradict the explicit terms" of the contracts at issue, and no exceptions recognized by New York law ap-plied.  *Channing Real Estate LLC v. Gates*, 122 A.3d 677, 690-92 (Conn. App. Ct. 2015).  Here, none of the misrepresentations ACM alleges is contradicted by the Master Agreement.  Third, and finally, because the defendant did not appeal to the Connecticut Supreme Court the trial court's judgment on his negligent-misrepresentation counterclaim, and thus failed to preserve that argu-ment, the court's discussion on that claim is dicta.  *See* 161 A.3d at 1231 n.2.

"alleged misrepresentations may not be used to vary or contradict the language" of contracts and noting absence of "language that explicitly disclaims prior representations" as in *Western*).

### 2. The Misrepresentations at Issue Also Are Distinct.

In addition to the difference between section 6.7.4 of the Master Agreement and the merger clause in *Western*, the misrepresentations in that case are materially distinct from those here.

A central argument in *Western* was that the defendant's precontractual misrepresentations created an express warranty, which the defendant breached.  78 A.3d at 183-94.  Similarly, most misrepresentations the plaintiff alleged to support its negligent misrepresentation claim in *Western* were akin to a warranty about the effect of the software's future performance (e.g., it "would enable [plaintiff] to integrate administrative, billing, and medical records . . . , increase efficiency, reduce personnel needs and result in a return on the investment in two years") or contractual breaches (e.g., the defendant "did not provide adequate or effective training" and "installation was not proper or complete").  *Id.* at 194-95.  Beyond the merger clause, the *Western* court also held that all extra-contractual warranties were barred by the contract's terms.  *Id.* at 189-94.

Here, all of the misrepresentations ACM alleges induced it to enter into the Master Agreement were statements of then-existing fact, and ACM does not argue that they created warranties at variance with the Master Agreement.  SS&C agrees, apart from an "on-site CAMRA demonstration and two related proofs of concept."  (MSJ at 29-30.)  But SS&C misunderstands:  rather than warranties about how CAMRA *will* perform (as potentially to be contradicted by the Master Agreement), ACM cites these communications as misrepresentations about CAMRA's *then-existing* capabilities and qualities.[24]  These differences place the communications outside of *Western* and render it inapposite, further supporting denial of the MSJ.  *See Am. Trim LLC v. Oracle Corp.*,

---

[24] As such, sections 6.2.1 ("Disclaimer") and 6.2.3 ("No Other Warranty") also are inapposite.

No. 99-cv-7265, 2001 WL 873073, at *3 (N.D. Ohio July 12, 2001) (denying summary judgment on misrepresentation claim where defendant gave software demonstration).

## III.   SS&C FAILS TO SHOW THE ABSENCE OF GENUINE ISSUES OF MATERIAL FACT THAT ACM HAS AND MAY RECOVER SIGNIFICANT DAMAGES.

ACM suffered at least $3.25 million in damages, including out of pocket losses, resulting directly from SS&C's misconduct and breaches in this case.  (FAC ¶¶57-59.)  These damages fall into two categories: (1) the fees ACM paid to SS&C; and (2) labor costs for ACM's employees who worked on SS&C's failed implementation.  (FAC ¶¶57-59; SDMF 119.)

SS&C has not challenged ACM's claim for damages under its negligent misrepresentation theory, or to be restored to the *status quo* under ACM's rescission theory.  Thus, assuming any of the misrepresentations ACM alleges survives, ACM's claims for monies under both theories will go to trial irrespective of SS&C's arguments against ACM's damages in the MSJ.

SS&C instead focuses the MSJ on ACM's breach of contract claim (and, later, ACM's CUTPA claim) and asserts that summary judgment is needed because ACM allegedly "has no cognizable damages."[25]  (MSJ at 33.)  SS&C makes two arguments:  (1) the Armour and Javelin REITs were "responsible" for and "paid" SS&C's fees under the Master Agreement, (*id.* at 14-16, 33-34), and (2) ACM's labor costs are prohibited "consequential damages," (*id.* at 16-17, 35).

Neither has any merit.  SS&C misrepresents the facts; collateral-source evidence cannot be considered for the MSJ; SS&C provides no reason the REITs' payments are such evidence; the collateral-source rule should apply here, including because there is no risk of double recovery and otherwise SS&C will be the one enjoying a windfall; and ACM's lost labor costs are allowed.

---

[25] SS&C does not challenge any other elements of ACM's breach claim in the MSJ.

**A.      SS&C Fails to Show the Absence of Genuine Issues of Material Fact as to the Fees and Costs That *ACM* Paid to SS&C Under the Master Agreement.**

First, SS&C attempts to deny ACM damages by manufacturing an alleged Catch-22: on the one hand, the REITs which ACM manages (not ACM) were "responsible for" and "paid" SS&C's fees; on the other, section 6.2.3 of the Master Agreement precludes ACM from "trying to recover damages" for the REITs.  (MSJ at 33-34.)  This argument fails scrutiny.

**1.      SS&C Misrepresents the Material Facts.**

SS&C makes numerous statements of purported fact to convince the Court that Armour and Javelin were liable to SS&C for fees and costs under the Master Agreement.  Not so.

In Count I of the FAC, ACM sues SS&C for breach of the Master Agreement.  (FAC ¶¶55-59.)  Armour and Javelin are not parties to that contract, (*see* Master Agreement at 1), and there is no dispute they have not sued SS&C under it.  There also can be no real dispute that the more than $1.78 million in fees and costs due to SS&C under the Master Agreement was paid to SS&C by ACM—no one else.  (Mountain Decl. ¶12.)  This makes sense because ACM was the only party that could have been "responsible" to SS&C for, and suffered a loss of, such fees and costs.

SS&C tries to use the "Management Agreements" between ACM and the REITs to modify SS&C's own Master Agreement, to support an argument that the REITs "paid," "bore," and were "responsible for" fees and costs under the Master Agreement.  (MSJ at 14-16, 33-34.)  But SS&C is not party to the Management Agreements, ACM has not sued under them here, and their and the Master Agreement's terms have nothing to do with one another.  (*Compare* Master Agreement, *with* Management Agreements.)  No amount of spin by SS&C can change these facts.[26]

---

[26] SS&C's attempted modification of the Master Agreement to include the REITs is barred by sections 6.7.4 and 6.7.5 of that contract.  (Master Agreement §§ 6.7.4, 6.7.5.)  Ironically, SS&C also takes the contrary position that the REITs are not entitled to recover under section 6.2.3.  (*See* MSJ at 16, 34.)  But SS&C cannot have it both ways to deny ACM's requested relief.

The bottom line is that whatever ACM's separate agreements with the REITs, ACM is the party whose rights under the Master Agreement were breached by SS&C and which suffered loss, including the more than $1.78 million *it* paid SS&C.  This is all that matters for Count I.

### 2.  Section 6.2.3 Is Inapposite and Does Not Preclude ACM's Damages.

Further, however SS&C attempts to characterize section 6.2.3, it only provides a limitation on the Armour and Javelin REITs as "third party beneficiaries" to the Master Agreement.

The Connecticut Supreme Court has explained that "[t]he third party beneficiary doctrine provides that 'a third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract.  Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach.'"  *Wykeham Rise LLC v. Federer*, 52 A.3d 702, 718 (Conn. 2012) (citations and modifications omitted).

Connecticut courts have recognized that parties may preclude the formation of third-party beneficiary relationships by contract.  *See, e.g.*, *Klewin v. Highland Hills Apartments LLC*, No. CV166026603, 2018 WL 1769309, at *5 (Conn. Super. Ct. Mar. 15, 2018).  Section 6.2.3, titled "No Third Party Beneficiaries," does so here with respect to the Armour and Javelin REITs alone. (*See* Master Agreement § 6.2.3 ("SS&C shall have no contractual or other obligations or liability to [the REITs] directly or as third party beneficiaries of this Master Agreement . . . .").)

SS&C's argument is a red herring because it is undisputed that Armour and Javelin REITs never have sought to "enforce a contractual obligation" under the Master Agreement, "sue [SS&C] for [its] breach," or impose any type of "obligations or liability" against SS&C, as under the third-party beneficiary doctrine.  *Wykeham Rise*, 52 A.3d at 718.  Instead, there is no dispute ACM always has been the plaintiff suing SS&C under the Master Agreement, and section 6.2.3 does not limit ACM's ability to do so in any way.  As such, section 6.2.3 is irrelevant here.

### 3.  SS&C's Collateral-Source Rule Arguments Fail to Save the MSJ.

SS&C also claims that the collateral-source rule mandates summary judgment against ACM here, to prevent it from recovering from SS&C what ACM has been reimbursed by the REITs.  (MSJ at 14-16, 33-34 & n.17).  This argument lacks merit for several reasons.

### i.  SS&C's Collateral-Source Evidence *Cannot* Support the MSJ.

First, even if collateral-source evidence were appropriate here, it cannot support the MSJ.

Generally, the collateral-source rule is evidentiary and prevents a defendant from claiming that the plaintiff's losses have been satisfied by "a collateral source," (MSJ at 34 n.17).  *E.g.*, *Perry v. Allegheny Airlines Inc.*, 489 F.2d 1349, 1352 (2d. Cir. 1974).  But even in the instances where such evidence ultimately is allowed, as SS&C argues, Connecticut law provides that "'it is not a matter to be tried to the jury or . . . to be raised at trial.'"[27]  *Mitchell v. Motta*, No. 296097, 1992 WL 340685, at *1 (Conn. Super. Ct. Nov. 17, 1992); Conn. Gen. Stat. § 52-225a (2014).

On summary judgment, the Court's review is limited to evidence that would be "admissible at trial."  D. Conn. L.R. 56(a)(3) (emphasis added); *Kasper v. City of Middletown*, 352 F. Supp. 2d 216, 227 (D. Conn. 2005).  Even if SS&C were ultimately correct that the collateral-source rule should not apply—and so evidence of the REITs reimbursement were appropriate—it still would not be "admissible at trial" under Connecticut law.  *See Mitchell*, 1992 WL 340685, at *1.  And therefore, SS&C's collateral-source evidence is irrelevant and cannot support the MSJ here.

Further, SS&C cites no authority providing that the REITs' reimbursements of ACM are the kind of collateral-source payments Connecticut law recognizes.  Collateral-source concepts

---

[27] Instead, such evidence usually is raised in a post-verdict motion to reduce a monetary award. *Wasilewski v. Abel Womack Inc.*, No. 10-cv-1857, 2016 WL 1273164, at *1-4 (D. Conn. Mar. 31, 2016).  If the Court disagrees, SS&C still should be precluded from offering the evidence because it failed to assert any defenses that would make it relevant, such as collateral source or setoff.

may come into play when a plaintiff *recovers* from a collateral source for *damages* it suffered. *Saint Bernard Sch. of Montville Inc. v. Bank of Am.*, 95 A.3d 1063, 1080 (Conn. 2014).  So, for instance, "[e]vidence of an injured person's income or recovery from loss-reducing sources is ordinarily barred by the . . . rule," while "insurance proceeds, medical benefits, and payments made by an employer pursuant to a statutory compensation scheme" is not.  *Grindrod v. Shred-It-USA LLC*, No. CV156028292S, 2017 WL 3461427, at *2 (Conn. Super. Ct. July 5, 2017).

Here, SS&C has proffered no evidence that ACM's reimbursements by the Armour and Javelin REITs were to offset any *damages* or *losses* ACM has claimed, or any such payments even occurred *after* SS&C's implementation failed and ACM sued.  Rather, much like the "income or recovery from loss-reducing sources" that Connecticut courts have recognized to be "ordinarily barred" by the collateral-source rule, *Grindrod*, 2017 WL 3461427, at *2, the reimbursement payments were made in the ordinary course of business, per the Management Agreements.  (Mountain Decl. ¶12.)  So, during the time the Master Agreement was in effect, ACM would have paid SS&C regardless of reimbursement, because it was obligated to do so, and the REITs would have reimbursed ACM regardless of any claim for damages (which were beyond the scope of the Management Agreements).  Thus, these reimbursements are not the types of collateral sources recognized in Connecticut, and for this additional reason, they cannot support the MSJ.

### ii.  If Collateral Sources Could Support the MSJ, They Still Are Barred.

Second, even if the REITs' reimbursement payments could be considered on summary judgment and as collateral-source evidence, Connecticut law still bars them here.

After declaring that ACM "cannot recover again from SS&C," (MSJ at 34), SS&C buries in a footnote its supporting claim that "[i]t is an open question whether the collateral source rule

applies to breach of contract actions in this state," (*id.* at n.17).  But SS&C cites no Connecticut

authorities in support, including any cases declining to follow the rule in contract cases.

On the other hand, Connecticut cases suggest that the rule is plenary.  "Under case law

dating back more than one century, [the Connecticut Supreme Court] has held that 'a defendant is

not entitled to be relieved from paying any part of the compensation due for injuries proximately

resulting from his act where payment comes from a collateral source, wholly independent of him.'"

*Saint Bernard*, 95 A.3d at 1080 (citations omitted).  Connecticut still adheres to the common-law

collateral-source rule, except in medical malpractice and personal injury actions.  *See Yankee Gas*

*Servs. Co. v. UGI Utilities, Inc*., 852 F. Supp. 2d 229, 254 (D. Conn. 2012).

This Court has stated that "[t]he 'collateral source' rule of common law permits a plaintiff

to recover the full measure of his damages, without setoff, even though the plaintiff is also com-

pensated from an independent source such as insurance."  *Perry v. Metro-North Commuter R.R.*,

716 F. Supp. 61, 62 (D. Conn. 1989) (citations omitted).  "'The reason for the rule . . . is that a

windfall ought not to be granted to a defendant. . . .  If there must be a windfall certainly it is more

just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of

his full responsibility for his wrongdoing.'"  *Saint Bernard*, 95 A.3d at 1080 (citations omitted).

Thus, other courts have recognized that where the collateral-source rule applies, how a plaintiff

and a third party "settle accounts between themselves is none of [the defendant]'s business."  *ADM*

*Inv'r Servs. Inc. v. Collins*, 515 F.3d 753, 754-55 (7th Cir. 2008) ("[t]hat a third party reimburses

part of a loss does not disable the injured person from recovering under tort or contract law.").

These cases—and SS&C's lack of contrary Connecticut authority—support the collateral-

source rule's application here, to bar SS&C's use of the REITs' reimbursements in the MSJ.

In case of doubt, so, too, does SS&C's own reference to a comment to section 347 of the Restatement (Second) of Contracts.[28]  SS&C claims the "rule is 'less compelling' in contract cases than in tort actions."  (MSJ at 34 n.17.)  But far from a "scheme" as SS&C alleges, (MSJ at 33), the Management Agreements are publicly available and common for REITs, such as Armour and Javelin.[29]  SS&C's own deposition citations on this point evince not nefarious subterfuge, but rather ACM's intention to return the reimbursements to the REITs if ACM recovers losses from SS&C.  (*See* MSJ at 14-15.)  This is precisely why the collateral-source rule is very "compelling" and *should* apply here:  there will be no double recovery (and if ACM does not make such returns, that is a matter for an action between the REITs and ACM).  If SS&C has its way, however, it will enjoy a windfall despite its misconduct and breaches.  That outcome would be senseless.

### B.     SS&C Fails to Show the Absence of Genuine Issues of Material Fact as to ACM's Ability to Recover Labor Costs Under Its Breach of Contract Claim.

SS&C argues that section 6.2.2 of the Master Agreement "bars" ACM's claim for 5,846 hours, or $1,467,846, in labor costs for work time devoted to SS&C's failed CAMRA implementation.  (MSJ at 16, 35.)  This loss was a cost to ACM, and but for SS&C's breaches, ACM never would have incurred it.  (Mountain Decl. ¶¶6-10.)  But according to SS&C, it "is not liable for any indirect, special, incidental, or consequential damages of any kind," ACM's labor costs are "consequential damages," and "[t]hat is the end of the matter."  (*Id.*)  SS&C again is wrong.

---

[28] SS&C fails to cite a single Connecticut decision adopting or relying on the comment to section 347 of the Restatement.  (*Cf.* MSJ at 34 n.17 (citing cases relying on §§ 90 and 241-42).)

[29] As the purported REIT experts, SS&C should know as much, including the fact that the REITs are regulated by the U.S. Securities and Exchange Commission ("SEC").  The Management Agreements at issue were publicly filed as attachments to the REITs Form 10-Q filings.  To the extent relevant, the Court may take judicial notice of the REITs' SEC filings.  *See Schuman v. Aetna Life Ins. Co.*, No. 15-cv-1006, 2017 WL 1053853, at *11 n.9 (D. Conn. Mar. 20, 2017) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

First, whether damages are direct or consequential is a question of fact.  *Conn. Printers Inc. v. Baker Perkins PMC Ltd.*, No. 86-1507, 1989 WL 107391, at *2 n.3 (D. Conn. May 11, 1989) ("Courts have recognized that the distinction between direct, incidental, and consequential damages is imprecise.  In general, courts have considered the precise demarcation between such damages to be a question of fact.") (quotation omitted).  SS&C has provided no contrary authority or other reason the Court should answer this question on summary judgment.

Second, and likewise, SS&C also has provided no reason ACM's labor costs fall within the scope of section 6.2.2.  That section provides numerous examples of damages that it precludes, including "loss of profits, loss of use, business interruption, loss of data, or cost of cover."  (Master Agreement § 6.2.2.)  SS&C has proffered no evidence, and there can be no reasonable dispute, that ACM's labor costs are not any such damages.  Thus, on its face, section 6.2.2 is inapplicable to ACM's labor costs, and SS&C again has provided no contrary authority.

Third, it is settled "in contract law that . . . an injured party may recover any expenditures that it incurred in preparation for, part performance of, or otherwise in reliance on the contract." *Boulevard Assocs. v. Sovereign Hotels Inc.*, 861 F. Supp. 1132, 1138 (D. Conn. 1994).  "'Contract law protects an injured party's reliance interest by seeking to achieve the position that it would have obtained had the contract never been made, usually through the recovery of expenditures actually made in performance or in anticipation of performance.'"  *Scapa Tapes N. Am. Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 552 (D. Conn. 2005) (citations omitted); *Int'l Brands USA Inc. v. Old St. Andrews Ltd.*, 349 F. Supp. 2d 256, 262 (D. Conn 2004).

"'Courts will allow the recovery of such expenditures if the breach of the contract renders those expenditures valueless to the plaintiff, lost profits cannot be awarded . . . , and those expenses

were reasonably foreseeable by the defaulting party at the time the contract was made.'" *Boule-vard Assocs.*, 861 F. Supp. at 1138. Thus, this Court previously has awarded damages for labor costs incurred in reliance on a contract and anticipation of the breaching party's performance. *See ALV Events Int'l v. Johnson*, 821 F. Supp. 2d 489, 496 (D. Conn. 2010); *Applied Data Processing Inc. v. Burroughs Corp.*, 394 F. Supp. 504, 508 (D. Conn. 1975) (awarding "staff training" and "labor costs" as reliance damages and finding not excluded as consequential damages because "incurred before the breach occurred and in reliance on the promises of the contract"[30]); *see also Cyberchron Corp. v. Calidata Sys. Dev. Inc.*, 47 F.3d 39, 46 (2d Cir. 1995).

Here, section 6.2.2 does not exclude reliance damages, and the MSJ does not contest ACM's damages calculation of labor costs at 5,846 hours, or $1,467,846. (*See* Mountain Decl. ¶¶6-10 (attesting that ACM "expended this effort in reliance on ACM's Master Agreement with SS&C and anticipating that SS&C would implement CAMRA for ACM, as SS&C was obligated").) SS&C presents no evidence that these labor costs were not valueless to ACM given SS&C's breaches of the Master Agreement, or that such costs were not reasonably foreseeable to SS&C at the time of that contract. *See Boulevard Assocs.*, 861 F. Supp. at 1138. Just the opposite, SS&C has insisted repeatedly that not only was ACM required to devote labor to SS&C's failed implementation of CAMRA, but SS&C expected ACM to devote *more* labor. (*See, e.g.*, SDMF ¶66.) As such, SS&C cannot argue that ACM is prevented from seeking the labor costs it incurred in reliance on the Master Agreement and in anticipation of SS&C's performance of it.

Fourth, and finally, SS&C claims "ACM incurred no additional expense" because ACM employees "would have been paid what they were paid no matter what." (MSJ at 16, 35.) SS&C

---

[30] Other courts agree. *Advanced Thermal Sci. Corp. v. Applied Materials Inc.*, No. 07-1384, 2010 WL 2015236, at *55 (C.D. Cal. May 18, 2010) ("There is no aspect of consequential damage in reliance damages. Reliance damages . . . cannot be characterized as consequential or special.").

misses the point.  "[T]he issue 'is not whether [ACM] would have paid [the employees'] salaries if the defendant had not breached the contract, but whether the breach deprived [ACM] of the services it paid for.'"  *Dunn Appraisal*, 687 F.2d at 883-84 (damages as 20% of employee salary for work time "devoted" to "computer problem") (citing *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir. 1982) (damages for "hours . . . salaried personnel spent supervising the unsatisfactory computer system" and "evidence . . .was based on individual employees' estimates on how they spent their time")); *Stahl Mgmt. Corp. v. Conceptions Unlimited*, 554 F. Supp. 890, 895 (S.D.N.Y. 1983) ("lost employee time" recoverable for "substandard . . . program").

In this case, ACM spent $1,467,846 compensating its employees for 5,846 hours of work time devoted to SS&C's failed CAMRA implementation.  (Mountain Decl. ¶¶6-7.)  Because SS&C breached the Master Agreement, ACM was deprived of the "services it paid for" in reliance on that contract—the benefit of 5,846 hours of ACM work time, which ACM employees would have spent on other ACM business.  (*Id.* ¶¶7-10.)  ACM's loss is recoverable.[31]  *See Dunn Appraisal*, 687 F.2d at 883-84; *Convoy Co.*, 672 F.2d at 785; *Stahl Mgmt.* 554 F. Supp. at 895.

Thus, SS&C has failed to show the absence of genuine issues of material fact as to the two damages categories ACM seeks in this case.  The MSJ should be denied.

---

[31] SS&C's two cases on this subject, buried in a footnote on the penultimate page of the MSJ, are distinguishable.  In *Wilson v. Marquette Electronics Inc.*, the physician took time away from his own practice—not the plaintiff—to "devote to problems caused by [the] defendant's equipment"; thus, the plaintiff "suffered no loss because of it."  *Dunn Appraisal*, 687 F.2d at 884 (citing 630 F.2d 575 (8th Cir. 1980)).  As in *Dunn*, the evidence here is the opposite.  And the other case, *Liberty Bay Credit Union v. Open Solutions Inc.*, 905 F. Supp. 2d 389 (D. Mass. 2012), cites no authorities and does not consider whether the plaintiff lost the benefit of the "services it paid for."

## IV.     THE COURT SHOULD DENY THE MSJ AS TO ACM'S CUTPA CLAIM.

SS&C raises no unique challenge to ACM's CUTPA claim in the MSJ; rather, SS&C seeks summary judgment on that claim for the same reasons as other aspects of ACM's claims.  Because those other arguments fail, so too should SS&C's effort at toppling ACM's CUTPA claim.

First, SS&C argues that the MSJ should be granted on the CUTPA claim because "there are no actionable negligent misrepresentations."  (MSJ at 35.)  SS&C admits that the Court has allowed the CUTPA claim "to the extent that it relies on negligent misrepresentations."  (*Id.*)  As ACM has shown above, the misrepresentations ACM alleges indeed are actionable.

Second, SS&C argues that "ACM has no ascertainable loss" for the same reasons SS&C raised as to ACM's more than $3.25 million in damages on its contract claim.  (*Id.* at 35-36.) Again, as ACM has shown above, SS&C's arguments against those damages claims should be rejected.  For these reasons, and as argued above, genuine issues of material fact exist as to ACM's CUTPA claim.  The Court therefore should deny SS&C's MSJ on this basis.[32]

## V.      THE COURT SHOULD DENY THE MSJ AS TO ACM'S RESCISSION CLAIM.

Similar to ACM's CUTPA claim, SS&C also argues that ACM's rescission claim should "fail[]" because "ACM's negligent misrepresentation claim fails."  (MSJ at 36.)  SS&C raises no unique challenges to ACM's rescission claim in the MSJ.

Here again, SS&C admits that the Court "earlier ruled that the pre-contractual negligent misrepresentations alleged by ACM might serve as a basis for rescission."  (*Id.*)  And as ACM has shown above, the misrepresentations it alleges indeed are actionable in this case.

---

[32] Other than the absence of actionable misrepresentations and ascertainable loss, SS&C does not challenge the remaining elements of ACM's CUTPA claim in the MSJ.

For these reasons, and as argued above, genuine issues of material fact exist as to ACM's rescission claim.  The Court therefore should deny SS&C's MSJ on this basis as well.[33]

### CONCLUSION

For all the foregoing reasons, the Court should deny SS&C's MSJ in its entirety.

Dated: January 14, 2019                          Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: *_/s/ Christopher M. Cerrito_*
    Christopher M. Cerrito (ct17183)
    chris.cerrito@hklaw.com
    One Stamford Plaza
    263 Tresser Boulevard, Suite 1400
    Stamford, CT 06901
    Telephone: (203) 905-4500
    Facsimile: (203) 724-3944

and

By: *_/s/ Joseph Mamounas_*
    Joseph Mamounas (phv09010)
    joseph.mamounas@hklaw.com
    Allison Kernisky (phv09011)
    allison.kernisky@hklaw.com
    701 Brickell Avenue, Suite 3300
    Miami, FL 33131
    Telephone: (305) 374-8500
    Facsimile: (305) 789-7799

*Counsel for ARMOUR Capital Management LP*

### CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2019, a true and correct copy of this document was served by electronic and U.S. mail on all counsel of record.

By: *_/s/ Joseph Mamounas_*
    Joseph Mamounas (phv09010)

---

[33] Other than the absence of actionable misrepresentations, SS&C does not challenge the remaining elements of ACM's rescission claim in the MSJ.