**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | |
| SS&C TECHNOLOGIES INC., | January 14, 2019 |
| Defendant. | |

**LOCAL RULE 56(a)(2) STATEMENT OF FACTS
IN OPPOSITION TO SUMMARY JUDGMENT[1]**

Pursuant to Local Civil Rule 56(a)(2), ACM submits the following statement of facts in opposition to SSC&'s MSJ.

1.      Exhibit 1 is a copy of the parties' "Master Agreement," which is the  subject of this litigation.  (Ahmed Ex. 1 at 1–16.)[2]

**RESPONSE:**          ***Denied***, except ***admitted*** that Exhibit 1 to the Declaration of Nora Ahmed (ECF No. 176-3) is a copy of the parties' Master Agreement, and that ACM's claims are based, in part, on SS&C's breach of the Master Agreement.  (FAC at ¶¶ 55-59.)  The Master Agreement is not the entire, or only, subject of this litigation.  ACM also asserts claims for negligent misrepresentation and SS&C's violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), based on SS&C's extensive and serial pre-contractual misrepresentations, which induced ACM to enter into the Master Agreement, or, in the alternative, rescission.  (*Id*. at ¶¶ 60-66, 72-81.)

---

[1] Capitalized terms have the same meaning as in ACM's Opposition to SS&C's Motion for Summary Judgment.  (ECF No. 177.)
[2] In accordance with Local Civil Rule 56(a)(2), the numbered paragraphs and headings correspond to SS&C's Local Rule 56(a)(1) Statement of Undisputed Material Facts.  (ECF No. 176-2.)

*Defendant SS&C*

2.      SS&C was established in 1986. It is a software company that specializes in servicing the financial services industry.  (Ahmed Ex. 2 at 4, 6.)

**RESPONSE:**      *Denied,* except *admitted* that SS&C was established in 1986 and that it purports to specialize in servicing the financial serviced industry.

3.      The Company's website, as of December 3, 2018, stated:  "Over the past 30 years, we have created the most comprehensive powerhouse of software technology  in the financial services industry – technology that complements our unrivaled expertise and professionalism in fund administration, insurance and pension funds, and asset and  wealth management accounting and operations."  (Ahmed Ex. 3 at 1.)

**RESPONSE:**      *Denied*, except *admitted* that SS&C's website contains this statement.  SS&C did not have "unrivaled expertise" or "professionalism" in implementing CAMRA on a hosted basis for mortgage REITs like ACM.  As of December 2014, SS&C had not implemented CAMRA for any mortgage REIT on a hosted basis.  (2/15/18 T. Reilly Tr. at 155:14-156:11; 2/13/18 I. Olszewska Tr. at 213:2-215:12; 10/4/17 D. Moore Tr. at 116:5-7.)

4.      SS&C's "flagship" product is CAMRA.  (Ahmed Ex. 4 at 2.)

**RESPONSE:**      *Denied*.  CAMRA is a "dying product," and SS&C has lost several CAMRA customers in recent years.  (4/30/18 T. Gonzalez Tr. at 126:22-130:3.)

5.      CAMRA is a commercial "off-the-shelf" accounting software.  (Ahmed Ex. 1 at 1, § 1.6.)

**RESPONSE:**      *Denied*.  CAMRA, as sold to ACM, requires customization, which precludes it from being "off-the-shelf" software.  (11/8/18 B. Hilliard Tr. at 126:12-135:25.)

6.      Since its inception in 1988, SS&C has successfully implemented  CAMRA for over 200 customers, including insurance companies, asset managers, pension funds, and mortgage

real estate investment trusts ("mREITs").  (Reilly Dec. ¶¶ 4, 9.)

> **RESPONSE:** ***Denied***, except ***admitted*** that CAMRA came into inception in 1988.

> ACM ***objects*** under Federal Rule of Civil Procedure 56(c)(3), because, other than in Mr. Reilly's unfounded Declaration (ECF No. 176-45), SS&C has not introduced any evidence into the record, and thus will not be able to present any admissible evidence, as to how many CAMRA implementations there have been, the types of clients SS&C has, whether these implementations were "successful," or how SS&C defines "implementation" or "successful."  Depending on whom at SS&C is asked, a "successful" implementation means different things, including meeting the Completion of Implementation standard set forth in Work Request 2, transitioning from Professional Services to Client Support, going "live," signing off on trial balances, or using CAMRA for books and records.  (2/15/18 T. Reilly Tr. at 333:25-334:15; 2/16/18 D. Pallone Tr. at 264:24-265:6; 11/8/18 B. Hilliard Tr. at 274:14-275:25.)

7.     In 2014, over 95% of SS&C's CAMRA client base used CAMRA to process transactions involving mortgage-backed securities.  (Reilly Dec. ¶ 5.)

> **RESPONSE:** ***Denied***, and ACM ***objects*** under Federal Rule of Civil Procedure 56(c)(3), because, other than in Mr. Reilly's unfounded Declaration (ECF No. 176-45), SS&C has not introduced any evidence into the record, and thus will not be able to present any admissible evidence, that "[i]n 2014, over 95% of SS&C's CAMRA client base used CAMRA to process transactions involving mortgage-backed securities."

8.     CAMRA can be implemented in three different formats:  "Licensed Only," "Outsourced," and "Hosted."  (Reilly Dec. ¶ 6.)

> **RESPONSE:** ***Denied***, except ***admitted*** that CAMRA can be implemented as "Licensed Only," "Outsourced," or "Hosted."  CAMRA can also be implemented in other ways, including in a format called "Hosting Plus" or "ASP Plus."  (5/3/18 N. Boulanger Tr. at 116:19-

117:6.)

9.      As of fourth quarter 2014, SS&C's "Licensed Only" clients had implemented CAMRA with approximately 465 users as of fourth quarter 2014. (Reilly Dec. ¶ 7.)

**RESPONSE:**        *Denied* because, in part, ACM does not know what SS&C means by "users."  ACM also *objects* under Federal Rule of Civil Procedure 56(c)(3), because, other than in Mr. Reilly's unfounded Declaration (ECF No. 176-45), SS&C has not introduced any evidence into the record, and thus will not be able to present any admissible evidence, that "[a]s of fourth quarter 2014, SS&C's 'Licensed Only' clients had implemented CAMRA with approximately 465 users as of fourth quarter 2014."  The number of "licensed only" clients that SS&C had in 2014 is irrelevant because ACM licensed CAMRA from SS&C on a hosted basis, not a "licensed only" basis.  (Hosting Agreement at 1 (ACM0048579); 2/15/18 T. Reilly Tr. at 240:4-15, 268:4-9.)

10.      At that time, SS&C had successfully implemented CAMRA for around thirty-five customers on an Outsourced or a Hosted basis.  (Reilly Dec. ¶ 8.)

**RESPONSE:**        *Denied*.  SS&C claims to have implemented CAMRA on a hosted basis for 6-7 clients as of fourth quarter 2014, none of which are mortgage REITs.  (SSC746542; SSC746543.)  It is not clear how SS&C defines "successfully" or "implemented."

11.      In almost all new Outsourced or Hosted cases, SS&C and the client that purchased CAMRA jointly implement the product, without third party assistance. It is very uncommon to involve third party consultants in the Outsourced or Hosted implementation process.  (Reilly Dec. ¶¶ 11–12.)

**RESPONSE:**        *Denied*, and ACM *objects* under Federal Rule of Civil Procedure 56(c)(3), because, other than in Mr. Reilly's unfounded Declaration (ECF No. 176-45), SS&C has not introduced any evidence into the record, and thus will not be able to present any admissible

evidence, that "[i]n almost all new Outsourced or Hosted cases, SS&C and the client that purchased CAMRA jointly implement the product, without third party assistance," or that "[i]t is very uncommon to involve third party consultants in the Outsourced or Hosted implementation process." Further, it is not clear what "uncommon" means in this context or that Mr. Reilly is qualified to render that opinion. SS&C admits that in some new Outsourced or Hosted cases, SS&C and the client that purchased CAMRA implement the product *with* third party assistance, and sometimes a third party consultant *is* involved in the Outsourced or Hosted implementation process.

12.    Between 2013 and mid-2017, over 90% of new CAMRA projects were implemented without third party assistance.  (Reilly Dec. ¶ 12.)

**RESPONSE:**    ***Denied***, and ACM ***objects*** under Federal Rule of Civil Procedure 56(c)(3), because, other than in Mr. Reilly's unfounded Declaration (ECF No. 176-45), SS&C has not introduced any evidence into the record, and thus will not be able to present any admissible evidence, that "[b]etween 2013 and mid-2017, over 90% of new CAMRA projects were implemented without third party assistance." SS&C admits that nearly 10% of new CAMRA projects were implemented *with* third party assistance.

13.    In April 2014, SS&C issued a press release announcing the formation of a new group dedicated to servicing real estate investment trusts ("REITs"). The announcement identified this group as equipped to "help mortgage REITs" produce "fully auditable accounting and reporting processes and eliminate the use of spreadsheets." The press release stated that SS&C had "unique expertise, world-class technology and more than 10 years of experience" in the mREIT space.  (Ahmed Ex. 5 at 1.)

**RESPONSE:**    ***Denied***, except ***admitted*** that SS&C issued a press release in April 2014 that contains these statements. SS&C's first mortgage REIT client was New York Mortgage

Trust, which became a customer in 2005, on an outsourced basis. (SS&C's Supp. Resp. to ACM's First Interrogatories No. 3 at 3; 10/5/17 J. Fecteau Tr. at 132:6-9; 10/4/17 D. Moore Tr. at 115:6-8.) SS&C did not have another mortgage REIT customer until March of 2014, when Annaly became a customer, on a licensed-only basis. (SS&C's Supp. Resp. to ACM's First Interrogatories No. 3 at 3; 10/5/17 J. Fecteau Tr. at 76:20-22; 10/4/17 D. Moore Tr. at 115:11-12.) Meaning, SS&C had one mortgage REIT client in the nine years preceding the release. SS&C touted its "leadership in mortgage REIT accounting and reporting" based on that one mortgage REIT client. (2/15/18 T. Reilly Tr., Ex. 2.)

14.     As of 2014, approximately 500 entities (with over $2 trillion of assets) were using CAMRA for their accounting books and records. (Reilly Dec. ¶ 4.)

**RESPONSE:**     *Denied*. "Entities" are not the same as "clients," which are far fewer in number. As of Q3 2014, there were between 534-646 "companies using CAMRA for accounting and hosting," which SS&C identifies as "clients," and not by their names. (SSC746542; SSC746543.) The "clients," which appear to instead be "entities," are not identified by name, except for six mortgage REIT clients. A "client" may have multiple entities whose data is processed in CAMRA. That does not mean each "entity" goes through its own implementation. For example, SS&C attempted one implementation for ACM, even though it manages two distinct "entities"—Armour and Javelin. (11/29/17 J. Mountain Tr. at 131:25-133:6; 154:25-155:9.) In terms of how many discrete implementations CAMRA has done, what matters is how many "clients" it has, not "entities." As of September 2018, SS&C claims to have 46 CAMRA "clients," one of which is SS&C itself. (SSC746544.)

ACM *objects* under Federal Rule of Civil Procedure 56(c)(3), because SS&C has produced no admissible evidence to show that the "entities" have "over $2 trillion in assets."

*Plaintiff ACM*

15.     Plaintiff Armour Capital Management LP ("ACM") is a registered investment advisor that manages over $8.5 billion in assets.  (Ahmed Ex. 6 at 1.)

**RESPONSE:**        *Admitted*.

16.     In 2014, ACM managed assets for ARMOUR Residential REIT, Inc. ("Armour") and JAVELIN Mortgage Investment Corp. ("Javelin"). (Ahmed Ex. 7 at  3, § 2.1; Ahmed Ex. 8 at 3, § 2.1.)

**RESPONSE:**        *Admitted*.

17.     At the time, Armour and Javelin had more than $19 billion in assets  under management.  (Ahmed Ex. 9 at 3; Ahmed Ex. 10 at 3.)

**RESPONSE:**          *Denied*.  As of June 30, 2014, Armour and Javelin had $18.3 billion in assets under management.  As of September 30, 2014, Armour and Javelin had $14.8 billion in assets under management.  (6/30/14 ARR Form 10-Q at 3; 6/30/14 JMI Form 10-Q at 3; 9/30/14 ARR Form 10-Q at 3; 9/30/14 JMI Form 10-Q at 3.)

18.     On April 6, 2016, Armour acquired Javelin.  (Ahmed Ex. 11 at 33.)

**RESPONSE:**        *Admitted*.

19.     Plaintiff was named Armour Residential Management LLC until it  changed its name on December 19, 2014.  (Ahmed Ex. 12 at 1.)

**RESPONSE:**        *Admitted*.

20.     ACM, Armour, and Javelin are all located in Vero Beach, Florida.  (Ahmed Ex. 6 at 1; Ahmed Ex. 9 at 1; Ahmed Ex. 10 at 1.)

**RESPONSE:**        *Admitted*.

*Negotiations Prior to Execution of the Parties' Integrated Contract*

***Denied****. (See ¶ 52, infra*).

21.     On May 13, 2014, SS&C was contacted by Jim Mountain.  Mr. Mountain's email signature block at the time identified him as the Chief Financial  Officer of both Armour and Javelin.  (Ahmed Ex. 13 at 1.)

**RESPONSE:** *Admitted*.

22.     That same day, a director of SS&C's business development team, Dennis Moore, responded to Mr. Mountain and asked to "schedule a time for us to speak  so I can learn a little more about what you might be looking for."  In response, Mr. Mountain explained that Armour and Javelin were "interested in learning about all  technologies/services that would potentially be applicable."  Mr. Moore told Mr. Mountain  that he would get back to him shortly; in the interim, he provided a brochure, titled  "Mortgage REIT Accounting and Financial Reporting Specialists."  (Ahmed Ex. 13 at 1- 2; Ahmed Ex. 13-A at 1-4.)

**RESPONSE:** ***Denied***, except ***admitted*** that Dennis Moore and Mr. Mountain made the statements in the emails, and that Mr. Moore sent Mr. Mountain a brochure, titled "Mortgage REIT Accounting and Financial Reporting Specialists."  In December 2014, ACM managed Armour and Javelin.  (Mountain Decl. ¶4.)  Mr. Mountain was speaking on behalf of ACM, not Armour, when he wrote, "[w]e manage the two mortgage REITs captioned below," and ACM "[w]ould be  interested  in  learning  about  all  technologies/services  that  would  potentially  be applicable."  (SSC000009.)  Mr. Mountain went on to explain ACM's requirements, including that it "probably" has "similar business requirements as some hedge funds or investment managers, with a couple of potential exceptions (1) SEC rather than individual investor reporting and (2) both accrual book basis reporting and tax-basis reporting are fairly important in addition to fair value," and that "[f]undamentally," ACM was looking for "better end-to-end integration for both improved

efficiency and control." (*Id.*).

23.     On June 2, 2014, four SS&C representatives met with Mr. Mountain and a colleague of his named Mark Gruber. (Ahmed Ex. 14 at 74:18-23.)

**RESPONSE:**          *Admitted*.

24.     At that meeting, SS&C presented a PowerPoint (the "June PowerPoint"), titled "Introduction to SS&C Technologies."  The document was addressed to Armour. (Ahmed Ex. 15 at 1–10.)

**RESPONSE:**          *Denied*, except *admitted* that SS&C presented a PowerPoint at the meeting titled "Introduction to SS&C Technologies" with Armour's logo printed on it. (ACM0025350-60.)

25.     The June PowerPoint discussed SS&C's (i) "accounting and reporting expertise," (ii) "proven systems capable of supporting a broad range of [needs] specific to mortgage REITs," and (iii) "dedicated" REIT services team. It also identified  seven CAMRA clients that, like Armour, traded in mortgage-backed securities: Annaly, Chimera, Western Asset Mortgage Capital, Apollo Residential Mortgage Trust, CYS, Ares, and New York Mortgage Trust. (Ahmed Ex. 15 at 3, 4, 9.)

**RESPONSE:**          *Denied*, except *admitted* that the June PowerPoint contains the quoted language. (ACM0025353; ACM0025355; ACM0025359.)

26.     Here is a copy of page 4 of the June PowerPoint.



**RESPONSE:**          *Denied*, except *admitted* that this is a copy of page 4 of the June

PowerPoint.  (ACM0025354.)  This slide does not state that the entities listed on it use CAMRA.

It is not clear what SS&C means by "large portion" or "significant exposure" to MBS.  Other than

this conclusory slide, SS&C does not present any evidence as to what percentage of its client base

has a significant exposure to MBS or what each client's level of exposure to MBS is.  This slide

does not show that SS&C has anything to do with its clients' exposure to MBS.

27.     Plaintiff does not dispute that any of the bullets or sub bullets on  page 4 of the

June PowerPoint are true.

**RESPONSE:**          *Denied*.  ACM has no basis to know if the entities listed on this slide

are , in fact, clients of SS&C's.  ACM was unable, per Court order, to propound discovery on any

of SS&C's clients to verify SS&C's statements except for Bimini Capital Management, Inc.

("Bimini), a mortgage REIT similar in size to ACM that SS&C was not able to implement CAMRA

for on a hosted basis.  (9/29/17 Hearing Tr. at 28:12-29:11; 4/27/18 Hearing Tr. at 15:15-16:8;

5/7/18 G. Hunter Haas, IV Tr. at 12:24-13:18.)

28.     At the June 2 meeting, SS&C also told Armour about its prior experience implementing CAMRA for REITs, including REITs that trade in mortgage-backed securities ("mREITs").  (Ahmed Ex. 15 at 4.)

**RESPONSE:**          *Admitted*.

29.     SS&C stated that CAMRA was a "[p]roven accounting engine." (Ahmed Ex. 15 at 5.)

**RESPONSE:**          *Denied*, except ***admitted*** that SS&C made this statement.  At the time, SS&C never had had any mortgage REIT clients that licensed CAMRA on a hosted basis and for which CAMRA was implemented.  (2/13/18 I. Olszewska Tr. at 213:2-215:12.)

30.     The June PowerPoint described three deployment options: (1) "In-House License," described as "[t]he CAMRA application is run in Armour's data center"; (2) "Hosting," described as "SS&C hosts the hardware and software in its Tier 3 data center," along with optional additional services; and (3) "Full Service Outsourcing," described as "SS&C provides comprehensive investment accounting and reporting services on an outsourced basis." (Ahmed Ex. 15 at 2.)

**RESPONSE:**          *Admitted*.

31.     Two days after the June PowerPoint presentation, on June 4, 2014, Mr. Moore emailed Messrs. Mountain and Gruber.  Mr. Moore conveyed his opinion that, "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for ARMOUR." (Ahmed Ex. 16 at 4.)

**RESPONSE:**          *Denied* that Mr. Moore's statement is an opinion.

          *Admitted* that Mr. Moore wrote this statement in a June 4, 2014 email to Messrs. Mountain and Gruber.  (SSC000408.)

32.     SS&C prepared three "proofs of concept," testing CAMRA using Armour's data.

The first proof of concept was submitted to ACM on August 26, 2014. The second proof of concept was submitted to ACM on September 24, 2014. The third proof of concept was submitted to ACM on October 21, 2014. (Ahmed Exs. 17–19.)

**RESPONSE:** *Denied*. SS&C prepared two proofs of concept for ACM, one for agency securities and one for non-agency securities, purportedly for the purpose of showing that SS&C was able to use CAMRA to obtain the same results that ACM generated with its existing portfolio accounting system. (10/4/17 D. Moore Tr. at 79:7-16, 219:20-233:15.) SS&C had to re-do the proofs of concept multiple times because of mistakes it made, and difficulties it had correcting discrepancies between its calculations and ACM's. *Id.* It took SS&C several weeks before it was able to use CAMRA to generate accurate proofs of concept for ACM. *Id.* (Response No. 8 at ¶¶ 10, 14.)

33.    On August 27, 2014, SS&C provided a "Demonstration of CAMRA Accounting System & Proof of Concept Results." The meeting lasted two-and-a-half hours and included a forty-five minute demonstration of the CAMRA system. There is no record of what the demonstration included. A PowerPoint was used at the meeting. The PowerPoint is addressed to Armour. (Ahmed Ex. 20 at 0–22.)

**RESPONSE:** *Denied*, except *admitted* that there was a meeting between ACM and SS&C on August 27, 2014, during which SS&C used a PowerPoint, titled "Demonstration of CAMRA Accounting System & Proof of Concept Results." (SSC135920.) At the meeting, SS&C gave a demonstration of "[a] day in the life" of CAMRA's functionality, including a "General Overview and Navigation," "Transaction Processing," "Custodial Reconciliation and Exception Management," and "Reporting," and also discussed the proof of concept results for ACM's agency securities, among other things. *Id.* SS&C told ACM that it would be able to use CAMRA in the same manner once SS&C implemented it. *Id.* At no time during the meeting did SS&C tell ACM

that SS&C had never implemented a REIT on a hosted basis. *Id.* (11/29/17 Mountain Dep. Tr. at 83:4-87:11, 118:25-119:12; ACM Response No. 8 at ¶ 11.)

34.     At that meeting, SS&C introduced Shiv Sivadas, a member of SS&C's Professional Services team.  (Reilly Dec. ¶ 13.)

> **RESPONSE:**          *Admitted*.

35.     Mr. Sivadas, a nineteen-year SS&C veteran, had "extensive experience with client implementations, . . . helping implement SS&C solutions and services, with a focus on CAMRA." (Ahmed Ex. 21.)

> **RESPONSE:**          *Denied*, except *admitted* that Exhibit 21 to the Declaration of Nora
>
> Ahmed contains these statements. (ACM0025372; ACM Response No. 8  ¶ 12.)

36.     Mr. Sivadas had a substantive role on at least eight CAMRA implementations, dedicating over 200 hours to each project.  His duties included processing day-to-day  CAMRA client transactions and performing custodial data reconciliations.  (Reilly Dec. ¶ 13.)

> **RESPONSE:**          *Denied*, because ACM has no basis to know whether Mr. Sivadas
>
> has this experience.  Other than his attendance at the August 27, 2014 meeting, Mr. Sivadas was
>
> not involved in ACM's implementation at all.  (SSC124711.)

37.     At the time, Iwona Olszewska was the head of SS&C's Professional  Services team. She had been responsible for that team since 2008. In that capacity, she  oversaw approximately fifty CAMRA implementations, including four for REITs.  For the  two years preceding ACM's onboarding, she had worked "predominantly" with CAMRA.  (Reilly Dec. ¶ 14; Ahmed Ex. 22 at 46:1-13.)

> **RESPONSE:**          *Denied*, except *admitted* that Iwona Olszewska was the head of
>
> SS&C's Professional Services team in August 2014, that she had been responsible for that team
>
> since 2008, and that prior to December 2014, she oversaw CAMRA implementations for four

REITs.  Prior to December 2014, Ms. Olszewska testified that she oversaw approximately 20 CAMRA implementations, not 50, including preparing three budgets for the four REIT implementations (Western Asset Management, Annaly/Chimera, and Resource).  (6/5/18 I. Olszewska Tr. at 90:9-97:23, 103:21-107:2.)  Annaly/Chimera were two separate implementations but Ms. Olszewska prepared one budget because they were both managed by the same investment adviser.  *Id.*  All four of these implementations were over budget and delayed.  (6/5/18 I. Olszewska Tr. at 90:9-97:23, 103:21-107:2.)

38.    On September 9, 2014, SS&C discussed the "Hosting" option with Trevor Spicer and Cory Graley, both of whom worked in ACM's IT department.  The next  day, Mr. Moore emailed Messrs. Mountain and Gruber. He wrote: "Based on the feedback  from Trevor and Corey, it sounded like hosting the CAMRA application in SS&C's data  center would really be a good deployment option for ARMOUR."  (Ahmed Ex. 23.)

**RESPONSE:**        ***Denied*** that this statement is an opinion.

***Admitted*** that Mr. Moore made this statement in a September 10, 2014 email to ACM.  (SSC000829; ACM Response No. 8 at ¶ 13.)

39.    On November 13, 2014, SS&C provided ACM with a "Comprehensive Mortgage REIT Software and Operational Support Services Proposal"  (the "November Proposal").  (Ahmed Ex. 24-A at 1–11.)

**RESPONSE:**        ***Admitted***.

40.    The cover email noted that SS&C was "open to discussions regarding the expansion or contraction of any operational support services contained in our  proposal."  The email clarified that the "assumptions" in the November Proposal "may not  be 100% correct and also that you may have questions."  SS&C told Armour: "We look  forward to your feedback and the opportunity to prove ourselves as the best possible partner for ensuring your success with this

initiative."  (Ahmed Ex. 24 at 1.)

**RESPONSE:**          ***Denied***, except ***admitted*** that the cover email contains these statements.  (SSC002415.)

41.     The eleven-page attachment includes sections on "Overview and Assumptions" and "Proposed Solution Overview."  These sections respectively include the following statements: (i) "SS&C will manage the interface and uploading of information from custodians of choice," and (ii) "Data Management . . . Import transactions from custodians Citi, and potentially BONY."  (Ahmed Ex. 24-A at 5, 6–9.)

**RESPONSE:**          ***Denied***, except ***admitted*** that the November Proposal contains these sections and these statements.  (SSC002417-28.)  The November Proposal is 12-pages long.  *Id*. Under "Data Management," it states SS&C will "import and load [] trades from [ACM] and AVM," "import market and pricing data from Bloomberg, IDC/SVC, Intex, etc.," "import and export data required for BlackRock Analytics," and "transform and validate data for use in the reconciliation process," in addition to importing transactions from ACM's custodians, Citi and BONY.  *Id*.  (ACM Response No. 8 at ¶¶ 15, 16.)

42.     Another section, "Fee Schedule," proposed a "one-time implementation fee" and prospective "implementation services."  (Ahmed Ex. 24-A at 10–11.)

**RESPONSE:**          ***Denied***, except ***admitted*** that the November Proposal contains these sections and these statements.  (SSC002417-28.)  The November Proposal states that the implementation services SS&C would be providing included the following: "establishing [ACM's] accounting and reporting infrastructure, customizing [ACM's] operating infrastructure, establishing links to all counterparties and market data providers, configuring [ACM's] reporting deliverables, loading and reconciling all of [ACM's] initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training."  (SSC002428.)  (ACM

Response No. 8 at ¶ 15.)

43.     On December 8, 2014, SS&C's Mr. Moore emailed people at Armour and ACM. He said that he and SS&C's Jeff Fecteau have been working "to prepare an implementation estimate for transitioning ARMOUR to our CAMRA solution." (Ahmed Ex. 25.)

**RESPONSE:**          ***Denied***, except ***admitted*** that Mr. Moore emailed Messrs. Mountain and Gruber, and Jonna Terry, ACM's Portfolio Accounting Director, on December 8, 2014. (12/3/17 J. Terry Tr. at 38:25-39:11; SSC002801.)  Mr. Moore stated that he and Mr. Fecteau had been "working with [SS&C's] professional services team to prepare an implementation estimate for transitioning [ACM] to [SS&C's] CAMRA solution."  (SSC002801.)  (ACM Response No. 8 at ¶ 18.)

44.     An "implementation estimate" is a "standard document" prepared at SS&C and, in this case, Mr. Moore prepared it in consultation with Mark Gruber at Armour. (Ahmed Ex. 26 at 242:10–243:9.)

**RESPONSE:**          ***Denied***.  Mr. Moore prepared a "profile document," otherwise known as an "Implementation Questionnaire," "to the best of his ability," by "leverag[ing] an existing implementation questionnaire template and provided that to [ACM] to complete." (10/4/17 D. Moore Tr. at 242:20-243:21; 5/4/18 D. Moore Tr. at 29:7-11.)  The "implementation estimate" Mr. Moore referred to in his December 8, 2014 email to ACM is the same thing as the "implementation budget" he provided to ACM two days later.  (SSC002845.)  Ms. Olszewska prepared the initial implementation budget.  (5/2/18 I. Olszewska Tr. at 334:7-335:8.)

45.     Two days later, Mr. Moore sent Armour and ACM "a draft implementation budget for our discussion tomorrow."  (Ahmed Ex. 27 at 1.)

**RESPONSE:**          ***Admitted***.

46.     The attached proposal is labeled "Draft – for discussion," and lists "Estimated

Budget Hours." It indicates that the start for the proposed project is "January 2015" and that the end date is "May 2015." (Ahmed Ex. 27-A at 1.) (ACM Response No. 8 at ¶ 19.)

**RESPONSE:** *Admitted*.

47.     SS&C sent a revised proposal on December 11, 2014. It was marked "Draft – for discussion" and included a "Proposed Migration Timeline." The cover email to Mr. Mountain, Mr. Gruber, and Ms. Jonna Terry stated: "Based on our conversation yesterday, Iwona, Jeff, and I have revisited the implementation document and identified tasks where ARMOUR could take on some of the work effort." (Ahmed Ex. 28 at 1; Ahmed Ex. 28-A at 1–3.)

**RESPONSE:** *Admitted*.

48.     During the negotiation process, the parties had at least one conversation about whether to hire a third party consultant to assist in implementing CAMRA. (Reilly Dec. ¶ 10.)

**RESPONSE:** *Admitted*.

### The Master Agreement

49.     Between December 15 and 19, 2014, the parties exchanged at least four drafts of the Master Agreement. Both sides proposed and rejected various contractual provisions. (Ahmed Exs. 29–33.)

**RESPONSE:** *Denied*. ACM suggested changes to the Master Agreement, some of which were accepted by SS&C and some of which were rejected. SS&C told ACM that the Master Agreement was a form contract and that certain provisions were not editable. (11/29/17 J. Mountain Tr. at 140:2-144:7.)

50.     On December 16, SS&C proposed a call with Mr. Mountain to discuss key concepts in the contract, including "what constitutes the 'ordinary course of business.'" On December 19, the parties exchanged emails concerning final revisions to the Master Agreement.

(Ahmed Ex. 30 at 1; Ahmed Ex. 33 at 1–2.)

**RESPONSE:**   ***Denied***, except ***admitted*** that on December 19, 2014, the parties exchanged emails concerning revisions to the Master Agreement.  On December 16, 2014, SS&C proposed a call with Mr. Mountain to discuss the "High Water Mark concept," and "what constitutes the 'ordinary course of business' and adding some clarity around that is a means to get both parties comfortable."  (ACM0000290.)  It is unclear what "High Water Mark concept" means in this context or who had proposed it.

51.     The parties did not reach agreement until December 19, 2014, when  ACM and SS&C agreed to the final Master Agreement.  (Ahmed Ex. 1 at 9.)

**RESPONSE:**   ***Admitted***.

52.     The signed Master Agreement is  an  integrated  agreement.  Section 6.7.4 of the Master Agreement provides:

Entire Agreement.  This Master Agreement (including any attachments and  addenda hereto) contains the entire agreement of the parties with respect to  the  subject  matter  hereof  and supersedes all  previous  communications,  representations, understandings and agreements, either oral or written,  between the parties with respect thereto.

Sections 6.2.1 and 6.2.5 provide:

Disclaimer. Except as set forth in this Master Agreement or a relevant  attachment, SS&C makes no warranties, whether express, implied, or  statutory, regarding or relating to the Software or Documentation.  SS&C  specifically  disclaims  all  implied  warranties  of merchantability  and  fitness  for  a  particular  purpose  with respect to the software and the Documentation.

No Other Warranty.  Any written representation or warranty not expressly  contained  in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid. No employee, agent, representative  or affiliate of SS&C has authority to bind SS&C to any oral representations or  warranty concerning the Software.

Section 6.2.2 provides, in part:

Exclusion of Consequential Damages and Absolute Limitation on SS&C's   Liability. SS&C is not liable for any indirect, special, incidental or  consequential  damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or

cost of cover in  connection with or arising out of the furnishing, performance of any  services under the Master Agreement, any Attachment or any Work  Request, or use of the Software furnished hereunder . . . .

Section 6.2.3 provides:

No Third Party Beneficiaries. SS&C shall have no contractual or other obligations  or liability to  (i) ARMOUR  Residential  REIT,  Inc.  or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between  SS&C and Client.

(Ahmed Ex. 1 at 5, 8.)

**RESPONSE:**         *Admitted* that the Master Agreement contains these sections.

*Denied* that it is an "integrated agreement."  This is a legal conclusion.  Additionally, the Master Agreement could only be amended by a written agreement signed by both parties.  (ACM0048575 at § 6.7.5.)  Section 6.7.4 is limited to the "subject matter hereof," and "with respect thereto."  (*Id*. at § 6.7.4.)

53.    Attachment B-1 of the Master Agreement identified specific  "Hosting, Process Automation and Data Management Services" that SS&C would provide;  and  the attached  "Work Request One" identified specific "Initial Implementation  Services."  (Ahmed Ex. 1 at 12–16.)

**RESPONSE:**         *Admitted*.

54.    The Work Request listed specific tasks for each party and noted that  SS&C would provide services "in support of Client's implementation of the Software." It  also listed various "Assumptions," including a "Project Duration of 4-6 months."  It set an  "Applicable Rate" that said SS&C will "provide an estimated 1,850 hours of support in  relation to the services described . . . at a rate of $225 per person per hour."  (Ahmed Ex. 1  at 15.)

**RESPONSE:**         *Denied*, except *admitted* that the Master Agreement contains the quoted language.  Work Request 1 contains responsibilities, or tasks, for SS&C to complete. (2/3/18 I. Olszewska Tr. at 301:21-303:3.)  It does not contain tasks for ACM to complete, only assumptions.  *Id*.  The language "Client's implementation" means SS&C's implementation of

CAMRA, as contracted for by ACM, as distinguished from other implementations SS&C may have performed for other clients. (11/29/17 J. Mountain Tr. at 142:3-143:4.) It does not constitute an assumption of SS&C's contractual obligations by ACM. (2/3/18 I. Olszewska Tr. at 300:9-303:3.)

55.     ACM terminated the Master Agreement on May 1, 2017. (First Am. Compl. ¶ 54.)

**RESPONSE:**     *Admitted*, due to SS&C's material breach of the Master Agreement, and its inability to cure. ( FAC ¶ 54.)

### *Armour and Javelin Paid SS&C's Fees*

56.     ACM provides services to Armour and Javelin under "Management  Agreements." Those agreements state: "The Manager is authorized to retain, for and on  behalf  of  the  REIT, the services of third parties." They further note that "costs and expenses related to the retention of third parties shall be the sole cost and expense of the  REIT."  Reimbursement, however, is not available if ACM outsources "data processing or  clerical services" to a third party. (Ahmed Ex. 7 at 6, § 2.4.2; Ahmed Ex. 8 at 7, § at 2.4.2.)

**RESPONSE:**     *Denied*, except *admitted* that ACM provides services to Armour and Javelin under Management Agreements, and that the Management Agreements contain the quoted language.  In the event ACM receives damages from SS&C in this action for the fees and costs it paid to SS&C under the Master Agreement, ACM intends to repay Armour and Javelin the full amount of the reimbursements. Doing so is consistent with the Management Agreements. (Mountain Decl. ¶12.)

57.     If ACM had purchased CAMRA on an "Outsourced" basis, it would  have  been responsible for all fees paid to SS&C absent specific approval from Armour's  and Javelin's Board of Directors. (Ahmed Ex. 14 at 168:14-23.)

**RESPONSE:**     *Admitted*.

58.    One of Armour's co-CEO's, Jeff Zimmer, testified:

Q:    Okay.  But your understanding is that that cost was ultimately borne  by Armour Residential REIT, correct?

A:    That's what I said, correct.

Q: And all the professional services fees that were charged in connection with Armour's contractual arrangement with SS&C  were all passed on to the Armour REIT, correct?

THE WITNESS:  Correct.

(Ahmed Ex. 35 at 16:8-20 (objections and attorney instructions omitted).)

**RESPONSE:**    *Admitted* that Jeff Zimmer testified as written.

59.    Further, Mr. Zimmer said: "Who pays the bill and who ultimately  is responsible for the bill are two different enterprises.  So it doesn't matter whether the LP  or the REIT pays directly.  It only matters who's ultimately responsible.  In this case, the  REIT was  ultimately responsible."  He noted that, whether Armour and Javelin "reimbursed the LP or paid directly, I would not know today." (Ahmed Ex. 35 at 15:10-15, 16:4-5.)

**RESPONSE:**    *Denied*, except *admitted* that Mr. Zimmer testified as written.  Mr. Zimmer testified that he did not know whether ACM, Armour or Javelin paid SS&C.  (4/9/18 J. Zimmer Tr. at 15:22-16:6.)

The Management Agreements provide that certain costs and expenses incurred by ACM on behalf of Armour, or Javelin, shall be reimbursed in cash monthly to ACM within five business days of receipt by Armour, or Javelin, of a statement of such costs and expenses.  (§ 7.3, Amended and  Restated  Management  Agreement  for  Armour,  dated  Nov.  6,  2009; § 7.3, Management Agreement for Javelin, dated Oct. 5, 2012.)  ACM was reimbursed by Armour and Javelin for the fees it paid to SS&C.  (Mountain Decl. ¶12.)  In turn, ACM intends to repay Armour and Javelin these fees, in the event ACM recovers them from SS&C in this action.  (Mountain Decl. ¶12.)  The Management  Agreements  do  not  prevent  ACM  from  repaying  Armour  or  Javelin  for  any

reimbursements they made to ACM.

ACM has not been reimbursed for labor costs. Under the Management Agreements, compensation of ACM's employees is paid by ACM. (§ 7.1.1, Amended and Restated Management Agreement for Armour, dated Nov. 6, 2009; § 7.1.1, Management Agreement for Javelin, dated Oct. 5, 2012.)

60.     Mr. Zimmer testified that the case concerned "the damages to the REIT for the fees that they have paid SS&C." (Ahmed Ex. 35 at 13:19-20.)

**RESPONSE:**     *Denied*.  When asked by SS&C's counsel, "Who's paying the bills, sir, for this lawsuit?," Mr. Zimmer testified that, "there's two sets of damages.  There's the damages to the REIT for the fees that they have paid SS&C because they've misrepresented their capacities, and then there's the damages to [ACM] for the amount of professional time utilized in this wasteful venture." (4/9/18 J. Zimmer Tr. at 13:15-24.)  Mr. Zimmer testified he did not know whether ACM, Armour or Javelin paid SS&C.  (*Id*. at 16:2-5.)  Armour and Javelin have not paid any money to SS&C.  (Mountain Decl. ¶12.)  All money that has been paid to SS&C that is the subject of this action has been paid by ACM.  (Mountain Decl. ¶12.)

61.     ACM's Rule 30(b)(6) witness testified that ACM was "here today" to get things "sorted out for the benefit of th[e] ultimate payors [*i.e.*, Armour and Javelin]." (Ahmed Ex. 34 at 33:1-3.)

**RESPONSE:**     *Denied*.  ACM's Rule 30(b)(6) witness, Mr. Mountain, testified that he thought "all the amounts paid directly to SS&C related to the miserably failed CAMRA implementation have been reimbursed by either Armour Capital Management or Javelin Mortgage Investment Corporation, and we're here today trying to get that sorted out for the benefit of those ultimate payors." (5/11/18 ACM 30(b)(6) Tr. at 32:22-33:3.)  Mr. Mountain misspoke and meant to say Armour, not "Armour Capital Management." (Mountain Decl. ¶13.)  ACM is the party to

22

the Master Agreement and the plaintiff in this action.  The "ultimate payors" are Armour and

Javelin, per the Management Agreements.  ACM will repay Armour and Javelin all money they

paid to ACM as reimbursement for fees ACM paid to SS&C.  (Mountain Decl. ¶12.)

### *ACM Employee Compensation Arrangements*

62.     All ACM employees that worked on the CAMRA implementation were salaried.

Their compensation did not depend on the hours they worked. (Ahmed Ex. 34 at 229:22–230:2.)

**RESPONSE:** *Denied*.  The ACM employees that worked on the CAMRA

implementation were exempt employees that worked "on a salary and total compensation basis

rather than an hourly basis."  (5/11/18 ACM 30(b)(6) Tr. at 229:22-25.)  The hours they worked

were not contemporaneously recorded but their level of work effort, including their hours, could

factor into how their total compensation is determined.  *Id*.

63.     Mr. Gruber testified: "I don't believe anybody received a bonus specifically due

to SS&C's CAMRA implementation."  (Ahmed Ex. 37 at 247:7-8.)

**RESPONSE:** *Admitted*.

64.     There is no evidence that working on CAMRA implementation issues prevented

any ACM employee from meeting all of his or her job responsibilities.  The employees would

have been paid what they were paid no matter what.

**RESPONSE:** *Denied*.  Many ACM employees, including Jonna Terry, worked

extra hours to fulfill their daily job responsibilities, and their CAMRA-related responsibilities.

(11/30/17 Terry Tr. at 158:10-159:23.)  Ms. Terry often came in to work early, left late, and worked

on weekends or holidays during the period of the failed CAMRA implementation.  *Id*.  Had ACM's

employees not worked on the CAMRA implementation, they would have worked on numerous

other projects for ACM's benefit.  (Mountain Decl. ¶9.)  By way of example only, these other

projects include the implementation of a new general ledger system at ACM, Intacct, including

automating the consolidation of subsidiaries' financial statements and streamlining accounts payable processing; upgrading non-agency and derivatives portfolio accounting by implementing them in TPG; implementing new internally developed management reporting tools for estimating daily net asset value, income forecasting, and portfolio risk statistics; redesigning and reformatting monthly investor information reports; and completing the integration of the TPG portfolio accounting system and the Intacct general ledger with the Wdesk financial reporting system. (Mountain Decl. ¶9.)  A significant part of this 5,846 hours of effort also would have been spent on business-development opportunities for ACM.  (Mountain Decl. ¶9.)  ACM worked 5,846 hours on the failed CAMRA implementation; 5,196 more hours than the 650 hours SS&C represented to ACM that it would need to spend, amounting to $1,467,846 in labor costs.  (Mountain Decl. ¶¶9-10; 5/11/18 ACM 30(b)(6) Tr. at 221:12-223:11; ACM0079836.)

## ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56(a)(2), ACM submits the following additional material facts for which there is a genuine issue to be tried.

*ACM*

65.     In 2014, ACM was a mortgage REIT with 19 employees, which SS&C learned by visiting ACM's offices.  (11/29/17 J. Mountain Tr. at 181:23-183:12.)  Not all of the employees were available to work on the CAMRA implementation.  (*Id.*)

66.     In November 2014, ACM completed the form Implementation Questionnaire that SS&C sent to it.  ACM indicated that it could make four types of resources available to assist with the CAMRA implementation—a project manager, investment accountant, front office person and technology person.  (5/10/18 SS&C 30(b)(6) Tr. at 64:21-65:18; SSC002157.)  SS&C never told ACM that these resources would have to be 100% dedicated to the CAMRA implementation in order for it to be successfully completed.  (5/10/18 SS&C 30(b)(6) Tr. at 65:20-23.)  Even though SS&C never told ACM how many resources it would need, SS&C claims ACM did not devote sufficient resources to the implementation.  (2/15/18 T. Reilly Tr. at 263:20-264:4.)

67.     ACM told SS&C that the employees ACM assigned to work on the CAMRA implementation would keep the same job duties they had, including completing monthly, quarterly, and annual financial statements for Armour and Javelin.  (M. Gruber Tr. at 191:2-194:22; 11/29/17 Mountain Tr. at 64:1-65:6; 5/10/18 SS&C 30(b)(6) Tr. at 69:20-78:1.)  ACM told SS&C it was not planning to hire any new employees to work on the CAMRA implementation.  (M. Gruber Tr. at 44:12-16; 5/10/18 SS&C 30(b)(6) Tr. at 188:19-189:12.)

68.     None of ACM's employees used CAMRA before ACM signed the Master Agreement.  (11/28/17 Gruber Tr. at 28:7-19.)

*SS&C*

69.     SS&C developed CAMRA for use by insurance companies.  (4/30/18 T. Gonzalez Tr. at 115:1-24, 294:16-19.)   Many of SS&C's CAMRA clients are insurance companies. (SSC746544.)   Mortgage REITs are not staffed to handle CAMRA like insurance companies. (SSC166132; 5/2/18 I. Olszewska Tr. at 361:4-366:2.)

70.     SS&C modified CAMRA for use by mortgage REITs.  (5/2/18 I. Olszewska Tr. at 327:5-7.)

### *SS&C's Pre-Contractual Qualification Process*

71.     SS&C made a "suitability analysis" during the sales process to educate itself about ACM's "business and operations."   (10/4/17 D. Moore Tr. at 204:19-213:10; 235:17-239:19; SSC002415.)   SS&C received all the information it needed to be able to recommend CAMRA to ACM.   (11/29/17 J. Mountain Tr. at 122:11-124:5.)   Based on its analysis, SS&C made an unqualified recommendation to ACM for CAMRA on a hosted basis.   (10/4/17 D. Moore Tr. at 239:6-240:10; 2/15/18 T. Reilly Tr. at 148:23-150:8.)

72.     SS&C's primary motivation in proposing CAMRA on a hosted basis to ACM was not with presenting an overall solution that would work for ACM but on making the sale. (SSC002601.)

### *SS&C's Pre-Contractual Misrepresentations*

73.     SS&C did not have "unrivaled expertise and professionalism in . . . asset and wealth management accounting and operation," as it claimed on its website.  (ACM Response No. 8 at 1.) *See* Response to ¶ 3, *supra*.

74.     SS&C did not have "unique expertise, world-class technology" or "more than 10 years of experience and leadership in Mortgage REIT accounting and reporting," as it claimed on its website.  (ACM Response No. 8 at ¶ 4.)  *See* Response to ¶ 13, *supra*.

75.     SS&C did not have "extensive knowledge and experience meeting the needs of

organizations that invest heavily in mortgage-backed securities and structured products," as claimed in a May 13, 2014 email sent by Mr. Moore to ACM.  (ACM0048669-74.)  (ACM Response No. 8 at ¶ 5.)

76.     SS&C did not have "accounting and reporting expertise," and CAMRA was not a "proven accounting engine," as SS&C claimed in the June PowerPoint to ACM.  (ACM0025350-60).  (ACM Response No. 8 at ¶ 6.)  *See* Response to ¶¶ 25, 29, *supra*.

77.     SS&C did not have "[p]roven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs," as SS&C claimed in the June PowerPoint to ACM.  (ACM0025359.)  (ACM Response No. 8 at ¶ 7.)  *See* Response to ¶ 25, *supra*.

78.     SS&C's Professional Services team, led by Ms. Olszewska, did not have significant experience implementing CAMRA for mortgage REITs on budget and on time, as stated during a December 10, 2014 telephone call between SS&C's Messrs. Moore and Fecteau, Ms. Olszewska, and Michael Barry and ACM.  (ACM Response No. 8 at ¶ 20.)

79.     CAMRA was not a "flexible software application that streamlines, automates and simplifies the investment process by providing immediate access to decision-making data," as SS&C claimed on its website.  (ACM Response No. 8 at ¶ 2.)  Many of CAMRA's features that SS&C told ACM could be automated, could not be, and were, in fact, manual processes. (SSC0746806; SSC136509; 6/5/2018 I. Olszewska Tr. at 45:12-47:15.)

80.     CAMRA did not "help mortgage REITs be better equipped to produce fully auditable accounting and reporting processes and eliminate the use of spreadsheets," as SS&C claimed on its website.  (ACM Response No. 8 at ¶ 3.)

81.     SS&C had no basis to tell ACM that "[b]ased on our understanding of your business and current environment, we are confident CAMRA is the right fit for [ACM] and I just wanted to

reaffirm our interest in partnering with you," in a June 4, 2014 email from Mr. Moore to ACM. (SSC000405.) (ACM Response No. 8 at ¶ 8.)  At that time, SS&C had done nothing to understand ACM's business or current environment other than read one of Armour's SEC filings and have one meeting with ACM.  (T. Reilly Tr. at 149:8-13.)

82.     SS&C had no basis to tell ACM that SS&C had a dedicated team, Professional Services, which was qualified to implement CAMRA, and had done so for other REITs.  (ACM Response No. 8 at ¶ 9.)  At that time, Professional Services had only implemented CAMRA for other REITs on a licensed-only basis, where the customer takes on most of the effort, or on an outsourced basis, where SS&C does.  (B. Hilliard Tr. at 172:10-19; SS&C's Supp. Interrog. Resp. No. 3, dated Oct. 10, 2017.)  Hosting is a hybrid of the two.  (B. Hilliard Tr. at 172:20-21.)

83.     SS&C had no basis to tell ACM that SS&C could "quickly" connect to its third party data sources, including ACM's custodians, Citi and BONY, and Bloomberg.  (5/11/18 ACM 30(b)(6) Tr. at 36:18-24.)

84.     SS&C's misrepresentations induced ACM to sign the Master Agreement, including that CAMRA on a hosted basis was appropriate for ACM, SS&C had the experience, qualifications and expertise to implement it, and could complete the implementation in four to six months.  (ACM Response No. 8 at ¶ 22.)

85.     SS&C told ACM not to hire an outside consultant to assist with the implementation so there would be only "one throat to choke" if a problem arose.  (11/29/17 J. Mountain Tr. at 55:7-19; Mountain Decl. ¶8.)  If ACM had hired a third party implementer, ACM's staff would not have incurred all of the lost wages that ACM seeks from SS&C.  (Mountain Decl. ¶8.)

*Hosting*

86.     CAMRA on a hosted basis was not proven for mortgage REITs.  (11/8/18 B. Hilliard Tr. at 206:25-207:1; Response No. 8 at ¶¶ 6, 7.)  SS&C told ACM that it had implemented

CAMRA for other mortgage REITs, for the purpose of convincing ACM that CAMRA would work for it.  (10/4/17 D. Moore Tr. at 182:23-184:8; 202:12-16; 11/29/17 J. Mountain Tr. at 80:7-83:2; 111:22-112:4.)  SS&C knew implementing and using CAMRA on a hosted basis is different than licensing or outsourcing it, particularly as to staffing.  (2/15/18 T. Reilly Tr. at 148:6-161:6; 10/4/17 D. More Tr. at 54:17-62:10; 11/8/18 B. Hilliard Tr. at 168:1-172:24.)

87.     SS&C should have sold CAMRA to ACM on an outsourced basis instead of on a hosted basis.  (5/3/18 N. Boulanger Tr. at 56:12-14; 2/16/18 D. Pallone Tr. at 21:24-26:25.)

88.     CAMRA on a hosted basis is only appropriate for the "largest/most sophisticated" organizations, which does not include ACM.   (5/2/18 I. Olszewska Tr. at 355:7-358:10; SSC152915.)

### Implementation Budget and Timeline

89.     SS&C had no basis to tell ACM it could complete the CAMRA implementation in four to six months.  (ACM Response No. 8 at ¶¶ 19, 21.)  SS&C had not implemented CAMRA for any mortgage REIT in less than six months.  (11/13/18 M. Maffattone Tr. at 265:22-266:3.) SS&C knew that this estimate was "never realistic" because SS&C's "setups were completely different from the way [ACM's] securities worked."  (SSC0747083—3/31/16 S. Rice chat with A. Voutsinas.)

### The Master Agreement

90.     The Master Agreement does not state that ACM is obligated to implement CAMRA.  (2/13/18 I. Olszewska Tr. at 302:22-303:3.)

91.     SS&C was responsible for implementing CAMRA for ACM.  (4/30/18 T. Gonzalez Tr. at 104-105, 337:25-339:24; 2/13/18 I. Olszewska Tr. at 294:6-296:22; 2/15/18 T. Reilly Tr. at 258:16-262:6.)

### Work Request Two

92.     Work Request Two expressly incorporates the terms of the Master Agreement. (ACM006505-06.)  In April 2016, ACM requested that SS&C extend the warranty, but SS&C declined, stating that ACM had "recourse on functionality under the maintenance agreement" and that ACM's maintenance agreement "addresses defects, corrections, improvements, enhancements, fixes, patches and upgrades."  (SSC143786; FAC ¶ 48.)  SS&C also told ACM that "the maintenance agreement also included the right to terminate the license and receive a refund of the license fee if [SS&C] never get[s] the software installed and working satisfactorily." (SSC143785; FAC ¶ 48.)

93.     On April 4, 2016, SS&C met with ACM and presented a PowerPoint, titled "ARMOUR Implementation Cost Review," in which SS&C identified "Issues and Challenges" that it claimed were caused by ACM.  (ACM0013597-13603.)  This PowerPoint was created solely for the purpose of negotiating Work Request Two and to get ACM to agree to sign the work request and pay more money to SS&C.  (T. Gonzalez Tr. at 332:3-11.)  On April 6, 2016, Mr. Reilly wrote to ACM that SS&C was "aligned with capping the fees on the project as discussed, which I think you realize in and of itself provides us with significant incentive to wrap-up the project." (ACM0013975.)   ACM agreed to Work Request Two because of these misrepresentations. (4/11/18 J. Mountain Tr. at 45:20-46:7.)

*ACM's Custodians, Citi and BONY*

94.     Prior to December 2014, SS&C knew that it was difficult and time-consuming to establish a connection with BONY and Citi due to their lack of responsiveness, or to timely receive the correct data from them because they often sent commingled data or data not in "CAMRA format."  (6/28/18 M. Chacko Tr. at 127:14-130:14.)  Yet, SS&C told ACM it could "quickly" establish these connections.  (ACM0048664.)

95.     At that time, SS&C had never set up interfaces with Citi or BONY for a mortgage

REIT, particularly not one with the hosting deployment option.  (6/28/18 M. Chacko Tr. at 93:16-95:9; 132:9-135:10.)  Manoj Chacko, head of OTS, the SS&C team responsible for connecting to customers' third party data sources, could only recall one other time OTS set up a connection to BONY and he could not remember previously connecting to Citi.  (M. Chacko Tr. at 90:14-92:25; 113:16-114:8.)

96.     During the sales process, SS&C took no steps to assess whether it had the capability to establish interfaces with Citi and BONY for ACM.  (5/4/18 J. Fecteau Tr. 108:6-121:14; 6/28/18 M. Chacko Tr. at 110:24-112:5, 149:3-150:7.)  SS&C did not contact Citi or BONY to find out what it would take to establish a connection to obtain ACM's data.  (5/4/18 J. Fecteau Tr. 108:6-121:14; 6/28/18 M. Chacko Tr. at 110:24-112:5, 149:3-150:7.)  SS&C did not attempt to test its connections with Citi and BONY to see if it would be able to acquire ACM's custodial data. (5/4/18 J. Fecteau Tr. 108:6-121:14; 6/28/18 M. Chacko Tr. at 110:24-112:5, 149:3-150:7.)  It would have taken SS&C a "negligible" amount of time to request information about the variables it needed to set up and maintain an interface with Citi and BONY, and yet SS&C did not do it. (6/28/18 M. Chacko Tr. at 37:12-38:10.)

97.     SS&C was required to set up new connections to Citi and BONY to obtain ACM's data because ACM, as a hosted client, could not use a commingled connection for its third-party interfaces for security reasons.  (6/28/18 M. Chacko Tr. at 117:17-118:9, 150:7-153:1.)

98.     SS&C's missteps caused an 11-month delay.  (6/28/2018 M. Chacko Tr. at 150:7-152:23; SSC38247; SSC38242, SSC045584, SSC46214.)  There is no evidence that delays relating to BONY and Citi were caused by ACM.

*AVM*

99.     SS&C told ACM that it could import and load data from AVM, which ACM used to settle trades and provide cash management.  (SSC002425.)  SS&C had never worked with AVM

before and it did nothing to validate AVM's capabilities other than to ask ACM for a list of services AVM provided.  (5/4/2018 J. Fecteau Tr. at 55:15-24.)

100.    SS&C never told ACM that AVM was not compatible with CAMRA, causing extensive manual work for what should have been an automated process to reconcile the data exchanged with AVM.  (6/5/18 I. Olszewska Tr. at 45:12-47:15; SSC136509.)

*CI Manager*

101.    SS&C sold ACM a module called Custodian Interface Manager ("CI Manager"), even though it knew that it provided "limited at best functionality" and could present an "operational difficulty."  (6/5/18 I. Olszewska Tr. at 21:25-29:11; SSC152895.)

102.    SS&C knew that it should have sold ACM a system called Recon, instead of CI Manager, and that CAMRA without RECON was not the "right" or a "valid" solution for ACM. *Id.*  As of July 2015, SS&C should have sold RECON to ACM "a year ago."  (SSC0746982.)

*Problems with Use of CAMRA*

103.    SS&C knew that CAMRA was not suited for a small mortgage REIT with limited staff like ACM.  As Mr. Rice stated, "there is no way on earth [ACM] is going to be able to deal with how our cash flow process has to be run."  (SSC0746881.)

104.    SS&C's Professional Services staff who worked on ACM's implementation had difficulty understanding and using CAMRA.  (5/11/18 ACM 30(b)(6) Tr. at 37:15-22.)

105.    SS&C's staff lied to ACM.  On September 29, 2016, Mr. Rice wrote to Ms. Johnson "[I]'m just kind of done with it all, because everything I am saying to people about the armour issues has been pretty much 100 percent right, but rather than dealing with them its [sic] just, keep researching, keep lying."  (SSC0746853.)

106.    SS&C's staff lied to Bimini too.  Mr. Rice wrote to Ms. Johnson, "I keep lying to Hunter [Haas, Bimini's Chief Operating Officer] every day saying someone is reviewing their

financials and it takes time, but I hate lying … lying to clients I mean, not when they don't deserve it." (SSC0746870.)   Ms. Johnson replied, "I know he is really getting the shaft and we keep charging him monthly and he keeps paying." *Id*.  Mr. Rice responded, "[A]nd all his concerns are legitimate," and Ms. Johnson agreed.  *Id*.

107.    Many of CAMRA's features that SS&C told ACM could be automated, could not be, and were, in fact, manual processes.  (SSC136509.)  Andrew Voutsinas, an SS&C employee in Professional Services, stated "doing it by hand would take the same time."  (SSC747245.)

108.    SS&C also told ACM that CAMRA was capable of generating accurate reports. (SSC002755; 5/11/18 J. Mountain Tr. at 156:7-10.)  CAMRA's reports were inconsistent and often did not match up with the data being shown in CAMRA and ACM was often not able to match CAMRA's reports to data ACM generated using its existing accounting system.  (5/11/18 ACM 30(b)(6) Tr. at 37:19-22; M. Gruber Tr. at 107:5-109:6.)   SS&C knew its reports "weren't completely accurate" for ACM "the whole time," yet never told this to ACM.  (SSC0746931.) SS&C's staff considered CAMRA's reports to be "complete garbage."  (SSC0747277.)

*SS&C's Inadequate Staffing*

109.    SS&C gave no consideration to how it would staff the CAMRA implementation for ACM.  (5/2/18 I. Olszewska Tr. at 353:24-355:1.)  SS&C did not communicate any metric to ACM as to how many employees SS&C thought it would need.  (2/15/18 T. Reilly Tr. at 255:4-257:19.) S&C visited ACM's offices and met its management and staff.  (*Id.* at 245:14-248:14; J. Terry Tr. at 87:20-91:6.)  SS&C understood that ACM had only 19 employees, and that ACM was not planning to assign all of them to work on the CAMRA implementation.  (2/15/18 T. Reilly Tr. at 245:14-248:14.)

110.    Shiv Sivadas, an SS&C employee, was not involved in ACM's implementation. (SSC124711.)

33

111.    SS&C terminated Ms. Olszewska's employment in December 2017, before re-hiring her the very next day.  (2/13/18 I. Olszewska Tr. at 47:14-49:8.)

112.    Adriana Johnson, the Project Manager for ACM's implementation, was not an effective project manager.  (4/30/18 T. Gonzalez Tr. at 214:13-221:21; 5/2/18 D. Pallone Tr. at 328:10-335:20.)

113.    Scott Rice, who worked as a consultant in SS&C's Professional Services team and was the "frontline implementer" for the CAMRA implementation for ACM, did not comprehend how to do certain essential CAMRA functions.  Mr. Gonzalez did not believe he was qualified to do the job but could not replace him because there was no one else and he was not able to hire new staff.  (SSC745743; 4/30/18 T. Gonzalez Tr. at 238:8-18, 327:20-328:3; 2/16/18 D. Pallone Tr. at 66:6-68:18; SSC145636; SSC143938.)

114.    SS&C's Professional Services team had "no idea what they are doing" with ACM's implementation, and set up ACM's portfolio "completely wrong."  (2/16/18 D. Pallone Tr. at 66:6-68:18; SSC136015; 10/4/2017 D. Moore Tr. at 127:21-130:14.)

115.    ACM's implementation was a "trial an[d] error exercise" at SS&C.  (SSC143938.)

116.    SS&C's David LaMonica, who has run Professional Services from late-2016 to the present, described ACM's implementation as "fugly" and told Mr. Rice that he did not understand how SS&C could not "get basic things."  (6/28/18 D. LaMonica Tr. at 11:5-15:10.)

117.    In March 2017, SS&C was "experiencing significant issues across the board with CAMRA license clients in implementation and live status and need[ed] to stabilize the development and client support areas of weakness."  (SSC153912.)  During the sales process, SS&C never disclosed that it would not have sufficient resources to work on ACM's implementation.

   ***SS&C's Failure to Implement CAMRA for ACM***

118.    The Completion of Implementation standard in WR 2 requires ACM to successfully process one month of transactions using CAMRA as implemented.  (ACM0065005-06.)  This acceptance standard was never met.  (4/11/18 J. Mountain Tr. at 12:8-12; 69:10-25.)  SS&C disagrees.  (6/8/18 T. Reilly Tr. at 257:17-25.)  ACM has suffered damages in the form of the fees it paid to SS&C and the labor costs for ACM's employees who worked on SS&C's failed implementation.  (FAC ¶¶ 57-59; 11/29/17; J. Mountain Tr. at 166:10-13, 181:10-183:12; 4/11/18 J. Mountain Tr. at 48:25-49:24.)

119.    ACM's sign off of its April and May 2016 trial balances in May and June 2016 do not qualify as the Completion of Implementation as defined in Work Request Two.  No one from ACM logged onto CAMRA for the purpose of processing daily transactions until June 2016.  ACM never "successfully" processed any months using CAMRA.  (6/6/18 D. Johnson Tr. at 182:23-184:20, 308:7-312:3; SSC0746847.)

120.    CAMRA never became "book of record" for ACM.  (6/8/18 T. Reilly Tr. at 31:11-16.)  ACM never went "live" on CAMRA.  (5/10/18 T. Reilly Tr. at 302:9-303:24; 314:5-16.)

121.    CAMRA was not implemented for ACM.  (5/11/18 ACM 30(b)(6) Tr. at 147:5-148:12; 10/5/17 J. Fecteau Tr. at 114:23-115:2, 277:7-16; 4/30/18 M. Gonzalez Tr. at 107:14-110:24; T. Spicer Tr. 60:18-61:5.)

*Bimini*

122.    CAMRA was not implemented on a hosted basis for Bimini.  (5/7/18 G. Hunter Haas, IV Tr. at 8:6-10:19, 12:24-13:18.)

Dated: January 14, 2019                     Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s Christopher M. Cerrito*
Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com

35

One Stamford Plaza
263 Tresser Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

and

By: */s Joseph Mamounas*
Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

*Counsel for Plaintiff ARMOUR Capital
Management LP*

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2019, a true and correct copy of this document was served by electronic and U.S. mail on all counsel of record.

By: */s Joseph Mamounas*
    Joseph Mamounas (phv09010)

#62596018_v7