# EXHIBIT 1

John Reilly  Confidential
February 15, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF CONNECTICUT

 3                     NEW HAVEN DIVISION

 4    ------------------------------)
                                    )
 5    ARMOUR CAPITAL MANAGEMENT LP, ) Case No. 17-cv-00790-JAM
                                    )
 6             Plaintiff,           )
                                    )
 7        vs.                       )
                                    )
 8    SS&C TECHNOLOGIES, INC.,      )
                                    )
 9             Defendant.           )
                                    )
10    ------------------------------)

11

12                  ** CONFIDENTIAL **

13       VIDEOTAPED DEPOSITION OF JOHN TIMOTHY REILLY

14              DATE:   FEBRUARY 15, 2018

15                     HELD AT:

16              HOLLAND & KNIGHT, LLP
                  One Stamford Plaza
17               263 Tressler Boulevard
                  Stamford, Connecticut
18                     -  -  -

19

20

21

22

23

24    Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25
```

John Reilly  Confidential
February 15, 2018                    155

1       A.    Well, the point, just to be sure there is

2   transparency, is in our data center, we run -- you know,

3   we run a lot of our software in our data center on

4   behalf of our clients, so those are -- all of those

5   relationships would be considered a hosting service that

6   we are providing to our clients, and some clients it

7   stops there.  Some clients, they may ask for slightly

8   more services around reconciliation and data gathering,

9   and then there is other clients that opt to, you know,

10  add onto that much more robust outsourcing.  But all --

11  in this example we are talking about CAMRA, the CAMRA

12  application runs in our data center for, at that point,

13  probably 50-ish clients, 50 or more clients.

14      Q.    Okay.  And we talked about the 15 that only

15  had hosting, and that was their only outsourced service

16  you say?

17      A.    Those people would be licensed clients that

18  had contracted for some partial outsourcing services,

19  which in that case would be the outsourcing of their IT

20  infrastructure.

21      Q.    And those are considered under hosting in this

22  slide, the first subline, subheading; right?

23                MR. O'CONNOR:  Objection.

24      A.    I agree with that.

25      Q.    Okay.  That is the one that says SS&C hosts

John Reilly   Confidential
February 15, 2018                    156

```
 1   the hardware and software in its tier 3 data center;
 2   right?
 3        A.    Right.
 4        Q.    And you told me there were 15 such clients as
 5   of the time of this presentation?
 6        A.    Approximately, approximately yeah.
 7        Q.    And none of them was a mortgage REIT; right?
 8        A.    None of them were mortgage REIT.
 9        Q.    Okay.  And that's the service that ultimately
10   Armour contracted for, is it not?
11        A.    Correct.
12        Q.    Okay.  Now, the next line refers to, under
13   hosting, some level of partial outsourcing; correct?
14        A.    Yes.
15        Q.    And internally at SS&C, SS&C refers to those
16   clients as outsourced clients, does it not?
17                  MR. O'CONNOR:  Objection.
18        A.    The services on the -- we have licensed
19   clients, which are going to be clients that own their
20   own technology, and that's going to be, they are going
21   to own it under either a perpetual or a term license,
22   and license revenue and the associated maintenance
23   revenue gets rolled up and reflected within SS&C as
24   license and maintenance revenue.
25                  To the extent there is additional services
```

John Reilly  Confidential
February 15, 2018                                333

```
 1   CAMRA for Armour was a joint responsibility between SS&C
 2   and Armour?
 3        A.    I'd agree with that.
 4              MR. O'CONNOR:  Objection.
 5        A.    Yeah, I'd agree with that.
 6        Q.    Okay.  And is it also your testimony that
 7   Armour shared in all of the tasks reflected under
 8   Assistance Will Include the Following?
 9        A.    That there is going to be -- I would say
10   Armour would need to have awareness and some level of
11   involvement, even if it's understanding the status of
12   the work, but there is going to be certain areas that
13   SS&C would be predominantly responsible for, and there
14   is going to be areas that Armour would be predominantly
15   responsible for, and there is going to be a lot of
16   things in the middle there.
17        Q.    Okay.  And I think we've already discussed
18   that the assumptions section also identifies tasks that
19   Armour was going to be responsible for as part of
20   implementation; right?
21              MR. O'CONNOR:  Objection.
22        A.    With respect to the implementation, there are
23   assumptions that are built into the contract that what
24   Armour would be responsible for, yes.
25        Q.    Okay.  And as you understand Work Request One,
```

John Reilly   Confidential
February 15, 2018                                     334

```
 1   if all of these tasks were completed by SS&C and Armour,
 2   regardless of who shared in what percentage, is it your
 3   position that implementation would be completed
 4   successfully?
 5               MR. O'CONNOR:  Objection.
 6      A.    I agree with that.  I think if -- again, it
 7   wasn't the software application that was at issue; it
 8   wasn't the hosting infrastructure that was at issue.  It
 9   was the ancillary things that we've discussed, and I
10   think that had everything that had been outlined here
11   been done on a timely basis, the implementation would
12   have been done a long time ago, sure.  And they would
13   have been, in addition to being implemented, they would
14   be processing transactions and CAMRA would be book of
15   record.
16               MR. MAMOUNAS:  Okay.  Let me show you
17   what we will mark as Exhibit 14.
18                    (Exhibit 14, Email and attachment,
19                    Bates Numbers SSC135849 through 135875,
20                    marked for identification.)
21   MR. MAMOUNAS:
22      Q.    And the completion time that we saw in that
23   pre-contract budget was May of 2015; remember?
24               MR. O'CONNOR:  So we've got 9 minutes
25   left in the deposition.
```

John Reilly  Confidential
February 15, 2018                                    240

```
 1      A.    I wasn't involved in the day-to-day discussion

 2   with respect to Armour's IT so I can't answer the

 3   question.

 4      Q.    Well, did you ever hear from anyone at any

 5   point in the Armour relationship that SS&C wanted

 6   additional information from Armour about its IT but just

 7   wasn't receiving it?

 8      A.    I don't recall, quite frankly, any discussions

 9   between September 10th and December about further

10   information.  I just don't recall whether they happened

11   or didn't happen.

12            I was aware as the contract was getting closer

13   to being signed and the implementation estimates were

14   being developed that hosting was the deployment option

15   that Armour had selected.

16      Q.    Did you become aware at any point in time

17   until the contract was signed in December of 2014 that

18   SS&C wanted any additional information from Armour about

19   its resources that it could devote to the project --

20            MR. O'CONNOR:  Objection.

21      Q.    -- but was not receiving that information?

22            MR. O'CONNOR:  Objection.

23      A.    Well, there was, there was a very specific

24   conversation around resource expectations of Armour as

25   part of this project.  There was an implementation
```

John Reilly    Confidential
February 15, 2018                          268

```
 1        Q.    I'm asking --

 2        A.    Basis point driven fees, they did not

 3   purchase.

 4        Q.    I'm asking you with respect to what they did

 5   purchase there were ongoing fees including but not

 6   limited to hosting and maintenance; right?

 7        A.    I think it was limited to hosting and

 8   maintenance.  I don't believe there was any others fees

 9   beyond that.

10        Q.    Okay.  Well, the sentence continues, There

11   will be a one-time implementation fee to cover your

12   transition to our proposed solution.

13        A.    Yes.

14        Q.    Right?  And that was a fee that Armour would

15   pay to SS&C; correct?

16        A.    That's correct.

17        Q.    Okay.  And what this document does is it

18   describes implementation as the transition to SS&C's

19   proposed solution, does it not?

20                    MR. O'CONNOR:  Objection.

21        A.    I think it's describing the implementation

22   services that SS&C would -- related to the transition

23   and proposed solution, I guess that's a fair comment.

24        Q.    It's fair that the fee, as the document reads,

25   was to cover your transition, "your" meaning Armour's,
```

John Reilly   Confidential
February 15, 2018                          148

```
 1        A.     SS&C did prepare it, yes.

 2        Q.     And SS&C chose to put on page 2, as you point

 3   out in this presentation, its four deployment options

 4   for CAMRA; right?

 5        A.     I did -- we did, yes.

 6        Q.     So what was the point, what was SS&C

 7   communicating to Armour by putting the deployment

 8   options here and indicating these are the ways that

 9   CAMRA can be deployed?

10               MR. O'CONNOR:   Objection.

11        A.     I think we are highlighting that there is four

12   options available to Armour, one would be a licensed

13   option, which we have licensed clients for CAMRA; a

14   second would be just a pure hosting relationship where

15   we would provide technology infrastructure that the

16   application would sit on top of.  We'd provide security,

17   disaster recovery, et cetera.  That is an offering that

18   we have and we provide other clients.  And then we have

19   some hybrid relationships where we provide services on

20   top of the hosting short of full outsourcing services.

21   And then lastly, we have clients that are in a full

22   outsourcing perspective.

23        Q.     So in other words, you were -- SS&C was

24   presenting the full waterfront of deployment options

25   that were available without making a commitment one way
```

1   or another whether it could actually deliver any of

2   those to Armour at the time of this meeting; is that

3   fair?

4                  MR. O'CONNOR:  Objection.

5       A.    We weren't making specific commitments to

6   Armour because this was, you know, a brand new

7   grassroots relationship, and we're trying to demonstrate

8   what we have for capability.  So we didn't know Armour

9   other than maybe having read their SEC filing.  I think

10  Jim had sent a brief note to us describing that they had

11  some combination of a third-party vendor and Excel

12  spreadsheets, so this was strictly an educational

13  meeting trying to get to know each other more.  But I

14  don't think we were making any commitments about what we

15  would do for Armour, because we didn't know what Armour

16  may or may not even be asking for here.

17      Q.    Okay.  Did SS&C --

18      A.    But -- go ahead.

19      Q.    Did SS&C ultimately make a recommendation to

20  Armour that hosting CAMRA would work for it?

21                 MR. O'CONNOR:  Objection.

22      A.    We certainly presented that, as we have in

23  here, that hosting was a viable option for CAMRA.  We

24  made -- I think some of the recommendations we made to

25  CAMRA -- I know some of the recommendations we made to

John Reilly  Confidential
February 15, 2018                              150

```
 1   Armour with respect to the CAMRA application initially
 2   were more hosting with some reconciliation services
 3   around them.  But yes, we certainly discussed and
 4   offered hosting as an option for them.
 5        Q.    As a viable option, as you say?
 6        A.    As a viable option, sure.
 7        Q.    Okay.
 8        A.    Sure.
 9        Q.    And prior to this time, had SS&C ever
10   implemented a mortgage REIT on hosting with CAMRA?
11               MR. O'CONNOR:  Objection.
12        A.    Prior to this, you know, hosting, hosting
13   being defined as, you know, the application sits in a
14   server that's not on your premises, right.  So we had --
15   we probably had 15, approximately 15 CAMRA clients that
16   were hosted outside of the client's infrastructure, and
17   then we had probably 40 clients in addition to that, so
18   a total of maybe 50 clients that were -- where the CAMRA
19   application was running on servers in our data center
20   that were either being, you know -- that were being
21   accessed by clients.
22        Q.    And none of them was a mortgage REIT; right?
23        A.    That's not true, no.  We had, we had several,
24   several mortgage REIT clients that were using CAMRA that
25   where the application was not running at the client's
```

John Reilly   Confidential
February 15, 2018                    149

```
 1   or another whether it could actually deliver any of
 2   those to Armour at the time of this meeting; is that
 3   fair?
 4                   MR. O'CONNOR:  Objection.
 5       A.    We weren't making specific commitments to
 6   Armour because this was, you know, a brand new
 7   grassroots relationship, and we're trying to demonstrate
 8   what we have for capability.  So we didn't know Armour
 9   other than maybe having read their SEC filing.  I think
10   Jim had sent a brief note to us describing that they had
11   some combination of a third-party vendor and Excel
12   spreadsheets, so this was strictly an educational
13   meeting trying to get to know each other more.  But I
14   don't think we were making any commitments about what we
15   would do for Armour, because we didn't know what Armour
16   may or may not even be asking for here.
17       Q.    Okay.  Did SS&C --
18       A.    But -- go ahead.
19       Q.    Did SS&C ultimately make a recommendation to
20   Armour that hosting CAMRA would work for it?
21                   MR. O'CONNOR:  Objection.
22       A.    We certainly presented that, as we have in
23   here, that hosting was a viable option for CAMRA.  We
24   made -- I think some of the recommendations we made to
25   CAMRA -- I know some of the recommendations we made to
```

John Reilly  Confidential
February 15, 2018                      255

1  and reconcile it and fix things and correct things and

2  do that realtime with the other system, or you will

3  never be able to get to a point where you can cut over.

4      Q.    Okay.  So yes or no, did SS&C make any

5  determination, as far as the number of employees Armour

6  needed to devote to implementation for it to be

7  completed as of December 2014?

8                  MR. O'CONNOR:  Objection.

9      A.    We clearly communicated responsibilities, but

10 I don't recall where we performed an analysis on

11 Armour's behalf to advise them what they would need to

12 have available on their side.

13     Q.    Did you have any idea as of December of 2014

14 how many employees Armour needed to devote to

15 implementing CAMRA in order for it to be complete?

16                 MR. O'CONNOR:  Objection.

17     A.    I don't recall our discussing that at SS&C.

18     Q.    Okay.  Did you have any thought in that

19 respect yourself, that is, with respect to the number of

20 employees that you believed Armour needed to devote to

21 implementing CAMRA for the implementation to be

22 completed?

23                 MR. O'CONNOR:  Objection.

24     A.    I don't recall, I don't recall thinking about

25 how many people Armour would need.

John Reilly   Confidential
February 15, 2018                              256

```
 1              But like I said, anyone that has been involved
 2    in a system conversion knows there is going to be a
 3    period of compression that you're going to go through to
 4    be able to run parallel books, books of record.  And I
 5    guess our assumption there is Armour would have been --
 6    Armour was responsible for having adequate resources on
 7    their side.
 8        Q.    At any point in time, did SS&C communicate
 9    prior to December of 2014 to Armour how many employees
10    Armour needed to devote to implementation for
11    implementation to be completed?
12              MR. O'CONNOR:  Objection.  It's asked and
13    answered now about three times.
14              MR. MAMOUNAS:  No, it isn't.
15              MR. O'CONNOR:  Yes, it is.
16              MR. MAMOUNAS:  No, it isn't.
17              MR. O'CONNOR:  Yes, it is.
18              MR. MAMOUNAS:  No, it isn't, because the
19    question was whether SS&C made a determination, then it
20    was whether this individual had an idea, and third
21    whether it was communicated.  There are three separate
22    questions, please don't interrupt again, Mr. O'Connor.
23              MR. O'CONNOR:  I will interrupt again --
24              MR. MAMOUNAS:  You've got the realtime.
25              MR. O'CONNOR:  -- as appropriate.
```

John Reilly  Confidential
February 15, 2018                          257

1              MR. MAMOUNAS:  We've got the video and

2     we've got the transcript.  You can see that there are

3     three separate questions.

4        Q.    Sir, again, did SS&C at any point in time

5     communicate to Armour any number of employees that

6     Armour needed to devote to the implementation of CAMRA

7     for the implementation to be completed?

8              MR. O'CONNOR:  Objection.

9        A.    I don't recall a specific conversation that we

10    had where we on Armour's behalf tried to estimate the

11    level of effort that their team would be required.

12             They shared project management

13    responsibilities.  They -- like I said, we laid out the

14    tasks to the extent we had tasks.  We developed what

15    we -- we shared tasks, we shared timelines.  I don't, I

16    don't -- honestly, I can't recall in any implementation

17    where we would take the responsibility to build out a

18    resource plan for a client unless they specifically

19    asked us to.

20       Q.    Did Armour tell you that prior to December of

21    2014 they ever had been involved in the conversion, as

22    you call it, or the conversion process for an investment

23    accounting system?

24             MR. O'CONNOR:  Objection.

25       A.    I know, I know there had been some conversion

John Reilly   Confidential
February 15, 2018                          258

1    that had taken place there to get them on, in part,

2    their system on TPG, so I think we were aware that

3    sometime in their history they had converted to get TPG

4    up and running.

5              I assume Mr. Mountain in his career at

6    Deloitte and Touche would have been -- his clients would

7    have been involved in systems conversions, and he would

8    have had some pretty good awareness around the level of

9    efforts that were there.  But again, I don't recall --

10   again, I don't specifically recall, you know, our coming

11   up with what their reconciliation requirements should

12   be.  We did it instead by outlining the tasks that they

13   were responsible for, and nobody knew their

14   reconciliation requirements better than they do.  It's

15   their, it's their shop.

16       Q.    Where was it that SS&C outlined the tasks that

17   they were responsible for?

18       A.    I think we outlined it in a number of

19   different places.

20       Q.    Okay.  Prior to entering into the contract in

21   December of 2014, where did SS&C outline those tasks?

22       A.    Well, we had a negotiation, as I mentioned,

23   where we went through our budget, our resource

24   allocation estimate of 2,500, and they were -- had very

25   strong points of view that they wanted to take on more

John Reilly   Confidential
February 15, 2018                              259

```
 1    responsibility, so that that's I believe pretty well
 2    memorialized where they -- in probably six or eight
 3    different areas where they said, you know what, we want
 4    to do more in those areas.  So that was -- that
 5    specifically outlined those tasks.
 6                And then in the development of the work
 7    order -- well, in the development of the Master Services
 8    Agreement and the hosting agreement, it highlights the
 9    client's -- expectation on the client for receiving data
10    into the hosted environment.  And then on the second
11    page of Work Request One, there is multiple references
12    to what their responsibilities are.
13      Q.    Okay.  With respect to the budget that you
14    mentioned, is it your testimony that that reflects the
15    tasks that SS&C expected Armour to complete for the --
16                MR. O'CONNOR:  Objection.
17      Q.    -- for the implementation to succeed?
18                MR. O'CONNOR:  Objection.
19      A.    That's not what I said.  What I said is that
20    in part reflects tasks that Armour wanted to assume more
21    responsibility for.  There was additional tasks above
22    and beyond that as part of the implementation that they
23    were responsible for.
24      Q.    And those tasks that are above and beyond, in
25    your words, are not reflected in the implementation
```

John Reilly  Confidential
February 15, 2018                        260

1    budget document?

2        A.    Well, keep in mind the implementation budget

3    is SS&C's budget, so that's what SS&C was responsible

4    for.   That's where we estimated the timeline or the

5    level of effort for us, and so they were really

6    negotiating down our budget by taking -- by agreeing to

7    take on more responsibilities than they were already

8    going to be obligated to perform.   So it was the

9    combination of that plus other responsibilities that we

10   highlighted in the Master Services Agreement and the

11   work request, and then certainly we continued to build

12   that out in more detail in the welcome package and other

13   documents after the contract, and ultimately SS&C ended

14   up making an effort to perform a lot of those on

15   Armour's behalf.

16       Q.    Okay.   The tasks that you stated Armour had

17   asked to take on some responsibility for in the

18   implementation budget were tasks that SS&C initially

19   proposed doing itself; correct?

20       A.    There were, there were tasks that SS&C was

21   going to shoulder, you know, some -- little, some or all

22   of the responsibility, and what Armour requested is that

23   they wanted to reduce those responsibilities and move

24   them over to themselves.

25       Q.    Okay.   But they were initially proposed to be

John Reilly   Confidential
February 15, 2018                    261

```
 1   completed by SS&C; right?
 2       A.     Well, some of them could -- you know, keep in
 3   mind, and if you read the implementation agreement, the
 4   implementation agreement I believe is pretty consistent
 5   throughout there that our role was there to assist
 6   Armour.  We talked about that earlier in the deposition.
 7   So our budget was highlighting the areas that SS&C was
 8   going to assist Armour.  So I think inherent in that
 9   budget is we were weren't assuming 100 percent
10   responsibilities for those areas, we were assisting in
11   some capacity.  It could be more or less and then Armour
12   viewed that and said we have the horses, we have the
13   capability, we have the bandwidth, whatever thought
14   process they went through, and felt that they could do
15   more.
16       Q.     Okay.  So as of the time of the contract, just
17   so I'm clear, the only time that SS&C -- the only times
18   SS&C in your testimony communicated the tasks Armour
19   needed to complete for the implementation to succeed
20   were reflected in the implementation budgets and also in
21   the Master Agreement, the Work Request One included; is
22   that right?
23               MR. O'CONNOR:  Objection.
24   Mischaracterizes the testimony.
25       A.     I mean, those are the documents that I'm aware
```

John Reilly   Confidential
February 15, 2018                              262

```
 1   of that highlight that.

 2            There was a lot of discussions going on in

 3   those couple of months with a lot of different people at

 4   SS&C, so I can't -- I can't say that there weren't other

 5   conversations that were going on around resource

 6   allocation.

 7        Q.   Okay.  Are you aware of any third-party

 8   consultants as of December 2014 that Armour could have

 9   hired to assist with the CAMRA implementation?

10        A.   There is probably a lot of consultants that

11   they could have hired.

12        Q.   Did SS&C ever suggest to Armour that it hire

13   one of those consultants?

14        A.   I don't recall whether we ever suggested it.

15        Q.   Did Armour ever -- excuse me, did SS&C ever

16   discourage Armour from hiring a third-party consultant

17   to assist it with the implementation of CAMRA?

18            MR. O'CONNOR:  Objection.

19        A.   I believe there was some dialogue early on

20   with Jeff Fecteau around third-party consultants, and I

21   think it was more in the context of leading the overall

22   implementation process.

23        Q.   Okay.  And Mr. Fecteau discouraged, did he

24   not, Armour from engaging a third-party consultant to

25   assist with implementing CAMRA?
```

# EXHIBIT 2

John Reilly
May 10, 2018

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION
CASE No. 17-CV-00790-JAM


ARMOUR CAPITAL MANAGEMENT LP,

       Plaintiff,

-vs-


SS&C TECHNOLOGIES, INC.,

       Defendant.

_____
CONFIDENTIAL
** ATTORNEYS' EYES ONLY TESTIMONY **
VIDEOTAPED DEPOSITION OF
JOHN TIMOTHY REILLY
REPRESENTATIVES OF SS&C TECHNOLOGIES INC.
FED. R. CIV. P. 30(B)(6)



Thursday, May 10, 2018
9:13 a.m. - 5:37 p.m.




701 Brickell Avenue,
Suite 3300
Miami, Florida 33131




Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1736260

John Reilly
May 10, 2018                                                    64

```
 1        Q.   Okay.  In reaching that feeling, did SS&C
 2   consider the number of employees that Armour had?
 3             MR. O'CONNOR:  Objection.
 4             THE WITNESS:  Well, I would say we
 5        considered -- we considered several things with
 6        respect to employees of Armour.
 7   BY MR. MAMOUNAS:
 8        Q.   I'm asking whether you considered the number
 9   of employees in determining that, as you say, That was a
10   product and a service that would work for Armour?
11        A.   I don't recall a discussion specific to the
12   number of employees --
13        Q.   Okay.
14        A.   -- at Armour --
15        Q.   And in reaching --
16        A.   -- other than, I was aware that they had 19
17   employees at the time, and I remember a discussion
18   around the amount of management fees and such in
19   relation to the 19 employees.  That's about all I recall
20   speaking about number of employees.
21        Q.   Okay.  And in reaching the feeling that those
22   were a product and a service that should work for
23   Armour, did SS&C consider the availability of Armour's
24   employees?
25        A.   Oh, in part, I believe we did.
```

John Reilly
May 10, 2018                                                    65

1          Q.    How so?

2          A.    There was the client profile that was

3    prepared -- are you asking about availability just

4    generally or for the implementation or?

5          Q.    In any way, sir.

6                MR. O'CONNOR:   Objection.

7                THE WITNESS:   We -- in the company profile

8           that was prepared in December of '14, which the

9           company provides a lot of that input into that and

10          the company reviews that, there was an affirmative

11          acknowledgment that they were going to have, I

12          believe, four dedicated individuals to the

13          implementation; they were going to have a dedicated

14          project manager, they were going to have a

15          dedicated investment accountant, they were going to

16          have a dedicated front office person, and I believe

17          they were going to have a dedicated technology

18          person.

19   BY MR. MAMOUNAS:

20         Q.    What do you mean by "dedicated"?

21         A.    It was dedicated -- when I think of

22   "dedicated," dedicated to me means that's what they do;

23   that would be all they would do.

24         Q.    All they would do?

25         A.    I mean, that's -- I think that would be the

John Reilly
May 10, 2018                                           69

```
 1              MR. O'CONNOR:   It was more than that.
 2         Objection.
 3              MR. MAMOUNAS:   When was it --
 4              Yeah, I don't think so.
 5    BY MR. MAMOUNAS:
 6         Q.   When was it that SS&C communicated to Armour
 7    that its employees needed to work a hundred percent of
 8    their time for the product and service, as you say, to
 9    work for Armour?
10              MR. O'CONNOR:   Objection.  Mischaracterizes
11         the testimony.
12              THE WITNESS:   I don't recall where SS&C told
13         Armour that they had to have a hundred percent of
14         dedicated individuals.  I don't recall that
15         specifically.  But there was, obviously,
16         communications that existed that Armour prepared,
17         and we asked them that question.  I don't know what
18         more -- I've tried to answer three or four times.
19    BY MR. MAMOUNAS:
20         Q.   Okay.  And you believe that the question SS&C
21    asked is whether Armour employees could spend a
22    hundred percent of their time working on SS&C's products
23    and services, such that, as you say, you felt they would
24    work for Armour?
25              MR. O'CONNOR:   Objection.  Mischaracterizes
```

John Reilly
May 10, 2018                                    70

1      testimony.

2           THE WITNESS:  There were many conversations

3      and communications with Armour with respect to

4      specific roles and responsibilities around the

5      implementation, starting before we even signed the

6      contract.  And that ran throughout the duration of

7      the implementation, in terms of roles,

8      responsibilities.

9           Armour has a very sophisticated seasoned

10     management team that has worked on, I suspect,

11     large projects their entire career, so they knew

12     what the roles and responsibilities were.  We laid

13     out the roles and responsibilities.  They made

14     early on assessments, in terms of what their

15     staffing commitments were going to be.  And we had

16     written communications and dialogue around those

17     the duration of the implementation, so I...

18          MR. O'CONNOR:  And can we take a break

19     when it's --

20          MR. MAMOUNAS:  When I'm finished with this

21     line, please.

22          MR. O'CONNOR:  That's fine.

23     BY MR. MAMOUNAS:

24          Q.   Prior to December 19, 2014, sir, was SS&C

25     aware of the individuals the Armour working on CAMRA

John Reilly
May 10, 2018                                    71

```
 1   were not able to dedicate a hundred percent of their
 2   time to the product?
 3              MR. O'CONNOR:  Objection.
 4              THE WITNESS:  Mr. Mountain had just got done
 5         telling us that they were going to dedicate four
 6         people, so I'm not sure why I would have had any
 7         reason to doubt Mr. Mountain's commitment to
 8         dedicate those resources.
 9   BY MR. MAMOUNAS:
10         Q.   But you're not listening to my question.  My
11   question was, when was it -- strike that.
12              Did SS&C know, prior to December 19, 2014,
13   that Armour employees could not dedicate 100 percent of
14   their time to CAMRA?
15              MR. O'CONNOR:  Objection.
16              THE WITNESS:  I don't know.
17   BY MR. MAMOUNAS:
18         Q.   Did SS&C, prior to December 19, 2014,
19   communicate any percentages of employee time that needed
20   to be dedicated to CAMRA?
21              MR. O'CONNOR:  Objection.
22              THE WITNESS:  Well, as I think I've said four
23         or five times now, we provided a questionnaire,
24         concurrent with signing of the Master Services
25         Agreement, to establish the level of dedicated
```

John Reilly
May 10, 2018                                        72

```
 1        resources.  So I don't know how much more explicit
 2        I can be, that that was discussed at the onset of
 3        the implementation, in terms of having dedicated,
 4        so I -- and, again, I had no reason -- we had no
 5        reason to disbelieve Armour management, that they
 6        had said they would dedicate resources when they
 7        maybe didn't intend to or didn't -- weren't willing
 8        to make that commitment down the road.  So I'm --
 9        I've tried to answer the best I can.
10   BY MR. MAMOUNAS:
11        Q.   And my question was, whether there was any
12   communication from SS&C of a percentage of employee time
13   communicated to Armour on or before December 19, 2014,
14   concerning the amount of the time, the percentage of
15   those people's time, that was going to need to be
16   dedicated to CAMRA?
17             MR. O'CONNOR:  Objection.
18             THE WITNESS:  Our focus would be on
19        communicating roles and responsibilities.
20   BY MR. MAMOUNAS:
21        Q.   Okay.  So no percentage of time was
22   communicated; is that fair?
23             MR. O'CONNOR:  Objection.
24             THE WITNESS:  I don't agree with that, for the
25        sixth time, because there was a documentation that
```

John Reilly
May 10, 2018                                                          73

1          asked to highlight dedicated versus not dedicated

2          resources.  And so there was a discussion that took

3          place in a written document around dedication of

4          resources for certain type of skill sets, subject

5          matter experts, and that was -- so there was

6          communication with respect to the dedication or not

7          of certain individuals.

8    BY MR. MAMOUNAS:

9        Q.   And was there communication surrounding the

10   percentage of time of those employees to be dedicated,

11   to be spent on CAMRA by Armour employees?

12              MR. O'CONNOR:  Objection.

13              THE WITNESS:  I think we already established

14          that our perspective is dedicated, would be a

15          hundred percent, so the answer would be yes.

16   BY MR. MAMOUNAS:

17       Q.   So you're saying, in words, a percentage of

18   time was communicated to Armour with respect to the

19   number -- or, I'm sorry -- with respect to the amount of

20   time that their employees are going to have to spend on

21   CAMRA prior to December 19, 2014?

22              MR. O'CONNOR:  Objection.

23              THE WITNESS:  Well, I'm not going to comment

24          again on the dedicated communication, because I

25          think we've already discussed that.

John Reilly
May 10, 2018                                      74

1           Our approach, which I suspect is going to be

2      consistent with any large scale -- is going to be a

3      discussion about roles and responsibilities and

4      deliverables.  And then it's really back in the

5      client's case, in this case Armour's case, who had

6      in multiple occasions, asserted that they were

7      going to have a project manager over the top of

8      this that would be, at least in my view, the

9      project manager would be the one to establish

10     they've got certain roles, responsibilities,

11     deliverables that would be that project manager

12     that would be responsible for determining how much

13     percentage of resource allocation is going to be

14     required.  Because it's only the company is going

15     to know, in terms of availability, how they want

16     to -- how they want to split up assignments,

17     whether people have prior implementation

18     experience, don't have prior implementation

19     experience, have CAMRA experience.  So we're not in

20     a position to dictate -- it wouldn't be effective

21     for us to dictate particular percentages.  It would

22     be roles, responsibilities, and deliverables.

23  BY MR. MAMOUNAS:

24     Q.   Sir, you just told me that you expected a

25  hundred percent of these employees' time on CAMRA,

John Reilly
May 10, 2018                                          75

```
 1    right?
 2             MR. O'CONNOR:  Objection.
 3             THE WITNESS:  We asked the question --
 4    BY MR. MAMOUNAS:
 5        Q.   Okay.
 6        A.   All right.  So, again, you're trying -- that's
 7    not what my testimony was.  Right?
 8        Q.   Well, how much time, then, did SS&C expect for
 9    these employees to work on CAMRA?
10             MR. O'CONNOR:  Objection.
11    BY MR. MAMOUNAS:
12        Q.   How much of their time?  What percentage of
13    their time did they expect?  That's what I'm trying to
14    understand.
15             MR. O'CONNOR:  Objection.  It's been asked and
16          answered about seven times now.
17             THE WITNESS:  Well, again, I feel as though
18          you're trying to get me to give you some
19          percentages specifically.  You've asked me six or
20          seven times that same question.
21             What I've told you, is SS&C will submit the
22          questionnaire to get a sense of subject matter
23          expertise, whether they're dedicated or not
24          dedicated, so that is in the questionnaire.  So
25          that's in the company to say, Okay, are we going to
```

John Reilly
May 10, 2018                                               76

1      have dedicated or not dedicated.  In this case,

2      Armour said they were going to have four people

3      dedicated -- it was either three or four,

4      dedicated.  We certainly looked at that and said,

5      That seems like a reasonable commitment on their

6      part.

7           We don't mandate it.  We don't give specific

8      percentages.  What we do -- and that's throughout

9      all -- multiple communications early on, like I

10     said, is, what is the company's roles,

11     responsibilities, deliverables?  And they need

12     to -- presumably through a project manager, they

13     need to determine how they're going to deliver

14     that.  They're the ones that know their people the

15     best.  They know whether they're going to -- how

16     they're going to -- they know -- they know what

17     their day-to-day responsibilities are.  We don't.

18     We don't know that.

19  BY MR. MAMOUNAS:

20     Q.   And you --

21     A.   How could we be -- possibly know what their

22  responsibilities are?

23     Q.   Did you or did you not tell me -- and I want

24  to understand your testimony -- that SS&C's

25  understanding of the use of the word "dedicated," in the

 1   client profile document you referred to a moment ago,

 2   was a hundred percent of those employees' time?

 3              MR. O'CONNOR:  Objection.

 4              THE WITNESS:  That would be -- you asked me

 5       what my perspective on that, that that -- when the

 6       question is asked, is it dedicated versus not

 7       dedicated.  I would view dedicated as a

 8       hundred percent; not dedicated would be something

 9       less than a hundred percent.

10   BY MR. MAMOUNAS:

11       Q.   Okay.  And you just told me a moment ago

12   percentages were not communicated by SS&C to its clients

13   prior to signing an agreement with them; is that fair?

14              MR. O'CONNOR:  Objection.  You were asking --

15       the inquiry is with respect to Armour Capital

16       Management, so --

17              MR. MAMOUNAS:  No.  The testimony was, We

18       don't give specific percentages.  Right?

19              THE WITNESS:  We would not dictate specific

20       percentages to the client.

21   BY MR. MAMOUNAS:

22       Q.   Okay.  And no specific percentage was given to

23   Armour in this case, correct?

24              MR. O'CONNOR:  Objection.

25              THE WITNESS:  I don't believe we provided any

John Reilly
May 10, 2018                                                78

```
 1       specific percentage to Armour.
 2            MR. MAMOUNAS:  Okay.  We'll take the break
 3       your client requested -- or counsel requested.
 4            THE VIDEOGRAPHER:  Going off the video record
 5       at 10:41 a.m.
 6            (A break was taken.)
 7            THE VIDEOGRAPHER:  And we're back on the video
 8       record at 10:58 a.m.
 9            MR. MAMOUNAS:  Sir, welcome back from the
10       break.
11  BY MR. MAMOUNAS:
12       Q.   Prior to December 19th of 2014, did SS&C ever
13  communicate a specific number of hours to Armour that it
14  would need to spend on CAMRA?
15            MR. O'CONNOR:  Objection.
16            THE WITNESS:  When you say, hours spent on
17       CAMRA, how do you define that?
18  BY MR. MAMOUNAS:
19       Q.   Let's put it this way:  Prior to December 19,
20  2014, did SS&C communicate to Armour a specific number
21  of hours it would need to spend on the implementation of
22  CAMRA?
23       A.   I don't recall if we did or not.
24       Q.   Okay.  You don't recall any specific numbers
25  as you sit here today?
```

John Reilly
May 10, 2018                                        188

```
 1        Q.   Okay.  And that refers to the time commitment
 2   or dedication that we were talking about in the morning
 3   session, right?
 4             MR. O'CONNOR:  Objection.
 5             THE WITNESS:  Well, if -- there's things that
 6        we can't control.  And if Armour wants to embrace
 7        the implementation and be very engaged -- and
 8        whether people are fully dedicated or partially
 9        dedicated, I mean, that's on them to determine how
10        to allocate their resources.  But if they're fully
11        engaged, that's going to help accelerate an
12        implementation.  If they're not engaged or they
13        don't prioritize it or they don't embrace it or
14        they don't follow our guidance, or they're not
15        well-trained and -- that skill set and that
16        resource commitment is going to have an opposite
17        effect.
18   BY MR. MAMOUNAS:
19        Q.   Okay.  Did SS&C, prior to December 19, 2014,
20   tell Armour it would need to hire any new employees for
21   the implementation?
22        A.   I don't recall that.
23        Q.   Did SS&C ever tell Armour that it would
24   hire -- need to hire any third-party consultants in
25   order to assist with the implementation?
```

John Reilly
May 10, 2018                                            189

```
 1        A.   I don't recall that.  Like I said earlier,
 2   what we did is we provide a delineation of roles and
 3   responsibilities for Armour and expected deliverables.
 4   And Armour committed to provided project-planned
 5   resources over the top of that.  Armour was pretty
 6   bullish, when we talked about the allocation of roles,
 7   responsibilities with respect to implementation hours,
 8   in terms of their capabilities and skill sets on being
 9   able to take on things like project management, like
10   data quality, like reconciliation.  So we had every
11   reason to believe that they had capabilities of
12   delivering on that.
13        Q.   Okay.  And when you're talking about that
14   process, that was the implementation budgeting that
15   Ms. Olszewska headed up, right?
16             MR. O'CONNOR:  Objection.
17             THE WITNESS:  Well, there was -- there was a
18        dialogue that took place, which I think has come up
19        in a lot of different testimonies over the last
20        twelve months or ten months, about the dialogue
21        that took place when we first submitted an
22        implementation budget, that Mr. Gruber, I believe,
23        led on behalf of Armour, those discussions around
24        what -- what they -- they could do more --
25             MR. MAMOUNAS:  Okay.
```

John Reilly
May 10, 2018                                                    302

```
1    and it's the workflows around the software.
2         Q.   Okay.  And not only do you say these seem
3    fundamental, you say "Who from Professional Services is
4    on this in a substantive way to support Johnson," right?
5         A.   I see that, yes.
6         Q.   And the Johnson you're referring to is Don
7    Johnson, right?
8         A.   Yes.
9         Q.   Okay.  In other words, you were looking to get
10   him some help from Professional Services; were you not?
11        A.   I was looking to get Armour to go live.  I
12   wanted Armour to go live.  And at this point in time,
13   Armour, as a result of the challenges that were
14   self-imposed by Armour, we had incurred significant
15   amount of time, as we went through today.  I was
16   incentivized in any way we could to get Armour to make
17   that decision to go live and to get these processes,
18   including our willingness to commit significant amount
19   of resources, because we were getting to be in a good
20   spot at this point in time.  I say, "we," Armour and
21   ourselves, we were getting to a point where they were
22   starting to demonstrate the knowledge and build out
23   these processes, and we were trying to get them over the
24   edge to make that decision.  I couldn't make that
25   decision for them.
```

1        Q.    Yet -- yet, the implementation of CAMRA at

2   Armour was still in implementation, as you write in the

3   March 16, 2017, email, right?

4              MR. O'CONNOR:   Objection.   Asked and answered.

5              THE WITNESS:   I think you've asked me the

6        question four times, and I've explained the -- my

7        perspective on the term "implementation" as it

8        relates to this litigation versus the term

9        "implementation" that I've used here with respect

10       to trying to get them to go live.

11  BY MR. MAMOUNAS:

12       Q.    Okay.   So when you use the word

13  "implementation," it has multiple meanings; is that

14  fair?

15       A.    Certainly in light of this litigation, I think

16  we've been pretty clear -- I've been pretty clear, I

17  believe I'm in my 13th hour of depositions on this,

18  between my two depositions, that in my view, the

19  software was in the data center, there was good

20  connectivity, we -- the company was processing

21  transactions on a daily basis, and the company needed to

22  continue to maintain the reconciliations up to date in

23  order for them to make that decision to go live.   But I

24  couldn't -- we couldn't make Armour stay current.

25       Q.    Okay.

John Reilly
May 10, 2018                                    314

```
 1   told me, that had everything in Work Request One been

 2   completed, implementation would have occurred for

 3   Armour?

 4            MR. O'CONNOR:  Objection.

 5            THE WITNESS:  The context with which my answer

 6       was, had they been able to navigate the

 7       responsibilities within Work Request One on a more

 8       timely basis, without the data issues, with the

 9       ability to get information in a CAMRA-ready format,

10       that would have resulted in this implementation

11       effort, and the path to go live, going a lot better

12       and a lot smoother.  And if it had gone better,

13       smoother, faster, my point of view is, they would

14       have been up and running, sitting here on February

15       15th, they would have been up and running as book

16       of record.

17   BY MR. MAMOUNAS:

18       Q.   Okay.  In other words, what you testified to

19   February 15th continues to be your view, as we see in

20   pages 333, line 25, through 334, line 14, is it, the

21   conclusion of the answer?

22            MR. O'CONNOR:  Objection.

23            THE WITNESS:  Again, Mr. Mamounas, I think I

24       get concerned you're trying to take some of my

25       comments out of context.
```

# EXHIBIT 3

Daniel Pallone
February 16, 2018

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF CONNECTICUT

3                   NEW HAVEN DIVISION

4    ------------------------------)
                                   )
5    ARMOUR CAPITAL MANAGEMENT LP, ) Case No. 17-cv-00790-JAM
                                   )
6              Plaintiff,          )
                                   )
7         vs.                      )
                                   )
8    SS&C TECHNOLOGIES, INC.,      )
                                   )
9              Defendant.          )
                                   )
10   ------------------------------)

11

12

13        VIDEOTAPED DEPOSITION OF DANIEL M. PALLONE

14              DATE:  FEBRUARY 16, 2018

15                   HELD AT:

16              HOLLAND & KNIGHT, LLP
                One Stamford Plaza
17              263 Tressler Boulevard
                Stamford, Connecticut
18                   -  -  -

19

20

21

22

23

24   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25

Daniel Pallone
February 16, 2018                                    21

1   I could not speculate as to how he came to that

2   conclusion.

3       Q.    Were you surprised when you heard him express

4   that conclusion on the telephone conference in May of

5   2017?

6               MR. O'CONNOR:  Objection.

7       A.    Yes.

8       Q.    You were.  Is that a yes, sir?

9       A.    Yes.

10      Q.    Did you have any call -- strike that.

11              Did you have any communications with anyone at

12  SS&C after that call about the conclusion Mr. Boulanger

13  expressed?

14      A.    No.

15              MR. O'CONNOR:  Objection.

16      Q.    No?  Did you hear from anyone -- strike that.

17              Independent of the fact that Mr. Boulanger had

18  expressed that conclusion on the call, did you have any

19  discussions at SS&C after the call about whether

20  outsourcing would have been a better alternative for

21  Armour?

22              MR. O'CONNOR:  Objection.

23      A.    I don't recall.

24      Q.    So going back to your communications on that

25  subject with Mr. Reilly, Ms. Johnson and Mr. Johnson --

Daniel Pallone
February 16, 2018                        22

```
 1   I assume no relationship between the two of them --

 2        A.    No relation.

 3        Q.    -- when did those communications occur?

 4        A.    Probably late 2015, fourth quarter of 2015.

 5        Q.    In the fourth quarter of 2015?

 6        A.    Uh-huh.

 7        Q.    And did you have further communications after

 8   the fourth quarter of 2015 on that subject with any of

 9   these three folks at SS&C that you identified?

10              MR. O'CONNOR:  Objection.

11        A.    Most likely.

12        Q.    Okay.  Did you have any such communications in

13   2016?

14              MR. O'CONNOR:  Objection.

15        A.    Yes.

16        Q.    Okay.  With whom?

17        A.    Those same individuals.

18        Q.    And what was the basis -- strike that.

19              Did you have any belief specifically as to

20   whether outsourcing would have been better for

21   alternative -- a better alternative for Armour in 2016?

22              MR. O'CONNOR:  Objection.

23        A.    The suggestion was made based on my

24   observations of the implementation as an alternative for

25   Armour.
```

Daniel Pallone
February 16, 2018                                    23

```
 1        Q.     And when you say "suggestion," you mean that
 2   internally you had suggested to Ms. Johnson and
 3   Mr. Johnson and Mr. Reilly that Armour should move to
 4   outsourcing for CAMRA; is that right?
 5                    MR. O'CONNOR:   Objection, objection.
 6        A.     It was a suggestion, yes.
 7        Q.     Was it a recommendation?
 8        A.     No.
 9        Q.     And so what was the basis for that suggestion
10   that you made in 2016?
11        A.     The lack of a commitment from Armour to fully
12   engage with the process to run CAMRA on a daily basis
13   with the key controls, the key reconciliations, the
14   checklist, clean data, to close their books on a timely
15   basis.
16        Q.     Okay.   Did you express that suggestion to any
17   of these three individuals at SS&C in writing in 2016?
18        A.     I don't believe so.
19        Q.     And was your position, that is, that it was a
20   suggestion that you made, the same during your
21   communications with them in the fourth quarter of 2015?
22                    MR. O'CONNOR:   Objection.
23        A.     Can you rephrase that?   I'm sorry.
24        Q.     Well, we've been talking about 2016, and you
25   said that you expressed a suggestion at that stage that
```

Daniel Pallone
February 16, 2018                                24

```
 1    Armour be outsourced for CAMRA for the reasons that you

 2    just mentioned to me; right?  Is that right, sir?

 3         A.    Correct.

 4         Q.    And you also mentioned that in the fourth

 5    quarter of 2015, you had communications about Armour

 6    being outsourced with these three individuals; correct?

 7                    MR. O'CONNOR:  Objection.

 8         A.    Correct.

 9         Q.    My question is whether you had made a

10    suggestion at that stage, that is, the fourth quarter of

11    2015, about Armour using CAMRA on an outsource basis?

12                    MR. O'CONNOR:  Objection.

13         A.    Yes.

14         Q.    In the fourth quarter of 2015?

15         A.    Correct.

16         Q.    Okay.  And do you recall when it was in 2016

17    that you had these communications with Ms. Johnson,

18    Mr. Johnson and Mr. Reilly in which you expressed this

19    suggestion?

20         A.    It was in the first quarter.

21         Q.    In the first quarter of 2016?

22         A.    Uh-huh.

23         Q.    Did it continue throughout 2016 at any other

24    time?

25                    MR. O'CONNOR:  Objection.
```

Daniel Pallone
February 16, 2018                              25

```
 1        A.    No.

 2        Q.    And why not?

 3        A.    Because I met with Mr. Mountain in -- I

 4   believe it was February.  Jim Mountain was in New York

 5   for a meeting.  We met at the Grace Building, and I

 6   suggested to Jim, as I had suggested internally, that an

 7   alternative could be outsourcing.

 8        Q.    Okay.  And so why didn't your suggestions

 9   continue after that?

10        A.    So when I asked Mr. Mountain whether

11   outsourcing was an alternative, the answer was it was

12   not an alternative because of the economics and the fact

13   that the external manager who was contracted with SS&C

14   was not able to be reimbursed for outsourcing services,

15   if I recall correctly, and the allowable expense for

16   reimbursement was software, not outsourcing cost.  So

17   because of that contractual agreement between the

18   external manager and the REIT, Jim told me outsourcing

19   wasn't available because the external manager they would

20   contract with SS&C to pay for that outsourcing couldn't

21   get reimbursed for that at the REIT level.  But because

22   the external manager contracted with SS&C for software,

23   I was told that software is reimbursable, so as this

24   entity incurs the cost of software, it gets paid back by

25   the REIT.  But if this entity contracted on outsourcing,
```

Daniel Pallone
February 16, 2018                                     26

1   outsourcing is a classification of expense, my

2   understanding was that it wouldn't get reimbursed by the

3   REIT, and then hence, I guess incurring more expenses at

4   the external manager level.

5        Q.    And that came down to, as you say, an economic

6   issue; is that right?

7                    MR. O'CONNOR:   Objection.

8        A.    Well, economic and contractual.

9        Q.    Right.   But at the end of the day, the

10  contractual issue was the ability to get reimbursed for

11  different services versus software.

12       A.    Correct.

13       Q.    Fair?

14       A.    Yes.

15       Q.    And Mr. Mountain told you that that had also

16  been expressed to SS&C during the sales process in 2014,

17  did he not?

18                    MR. O'CONNOR:   Objection.

19       A.    I don't recall that.

20       Q.    Had you ever heard from anyone else that

21  Armour expressed during the sales process to SS&C that

22  it was not interested in outsourcing CAMRA?

23       A.    Never.

24       Q.    Never heard that?

25       A.    No.

Daniel Pallone
February 16, 2018                                    66

1   concerned about these four implementations in particular

2   because they were the implementations that fell within

3   your scope of responsibility in mortgage REITs; right?

4        A.    Correct.

5              MR. O'CONNOR:  Objection.

6        Q.    So when you heard this comment in 2015 that

7   someone believed at SS&C that the implementation team

8   within Professional Services didn't know what it was

9   doing, you already knew that there were four REITs that

10  were -- mortgage REITs, excuse me, that were being

11  implemented and whose implementations were problematic;

12  right?

13             MR. O'CONNOR:  Objection.

14       A.    Implementations that were behind schedule.

15       Q.    Okay.  But we agree that they were

16  problematic, you say because they were behind schedule;

17  right?

18       A.    That's the definition of how I used the word

19  "problematic."

20       Q.    Okay.  So as of the time you heard this

21  comment that the Professional Services team didn't know

22  what it was doing, there were four problematic mortgage

23  REIT implementations; right?

24             MR. O'CONNOR:  Objection.

25       A.    I'm not sure when we signed Bimini, if that

Daniel Pallone
February 16, 2018                                        67

1  had started yet.  I think that started in late '15.

2      Q.    Okay.  So you knew that some were problematic,

3  but maybe not Bimini, as of the time you heard that

4  comment --

5      A.    Yeah.

6      Q.    -- that the Professional Services team didn't

7  know what it was doing; fair?

8                  MR. O'CONNOR:  Objection.

9      A.    Fair.

10     Q.    Okay.  So as of the time you heard the comment

11 that someone within SS&C believed that Professional

12 Services didn't know what it was doing, you had no

13 opinion one way or another with respect to that

14 commentary; is that what you're saying?

15     A.    Correct.

16                 MR. MAMOUNAS:  Let me show you what we

17 will mark as Exhibit 3.

18                 (Exhibit 3, Email, Bates Numbers

19                 SSC136331, marked for identification.)

20 BY MR. MAMOUNAS:

21     Q.    And for clarity, sir, before we get to this

22 document -- apologies for interrupting -- before we get

23 to this document, the comment that someone within SS&C

24 believed that the implementation team didn't know what

25 it was doing, you heard multiple times you said; is that

Daniel Pallone
February 16, 2018                                       68

1    right?

2                MR. O'CONNOR:   Objection.

3        A.    It was probably more than once, but not more

4    than like three times.

5        Q.    And did you hear that from multiple people?

6        A.    Yes.

7        Q.    And did you hear that before or after

8    Ms. Olszewska was moved out of Professional Services?

9        A.    I don't recall.   I can't align the timing on

10   that.

11       Q.    And can you recall who any of those multiple

12   people were that made that comment to you?

13       A.    Josh Brown and Don Johnson.

14       Q.    Anyone else, sir?

15       A.    Not that I recall.

16       Q.    And that aligns with Mr. Brown's comment that

17   we saw here in what we marked as Exhibit 2; right?

18       A.    Yes.

19       Q.    Okay.   Let's turn to Exhibit 3, if you don't

20   mind, please.

21       A.    Sure.

22       Q.    Sir, you see that Exhibit 3 is a July 24, 2015

23   email from you to Adriana Johnson; right?

24       A.    Correct.

25       Q.    The subject is Armour Status; correct?

1   fully met your condition of a clean monthly process,

2   what I'm saying is in the eyes of Jim Mountain, Jim

3   Mountain has communicated to me that Jim Mountain

4   doesn't believe we've had a monthly successful process.

5   I'm not agreeing with that; I'm just reiterating what

6   he's told me.

7           I've told you already, I have a difference of

8   opinion.  When a client starts the process every month,

9   many clients pay and finish the implementation, it's

10  over.  Jim had an addition he wanted to put into the

11  Work Request Two, we put it into the Work Request Two,

12  and to me, it's a subjective condition, and I wasn't

13  going to fight him on it.  I mean, I really wanted Jim

14  and Mark to get the benefit of CAMRA, to reap the

15  benefit.  It was the right system for them, so I'm

16  not -- you know, and again, there was a good faith

17  payment made in October on behalf of Jim, and that

18  indicated to me that things were moving in the right

19  direction.  And I'm not admitting in -- my opinion here

20  is not consistent with Jim.  This does not imply my

21  opinion is consistent with Jim.

22      Q.    Okay.

23      A.    Did I answer your question?

24      Q.    I understand your position.  And your position

25  also was that implementation was complete for Armour at

Daniel Pallone
February 16, 2018                    265

1    that stage?
2         A.    Again, when a client starts the process and
3    they are running the process, that to me constitutes the
4    implementation is over.  We provide assistance, but the
5    implementation is done, and it's in the client's hands
6    now, the client is running the system.
7         Q.    Okay.  And that was as of, in your testimony,
8    April of 2016?
9         A.    I believe so, yes.
10        Q.    And that processing for April of 2016 -- you
11   are talking about processing for April of 2016?
12        A.    The April month end.
13        Q.    In the following month?
14        A.    Correct.
15        Q.    In May of 2016?
16        A.    Correct.
17              MR. MAMOUNAS:  I have a document that
18   walked off, I apologize.
19              Let me show you what we will mark as
20   Exhibit 19.
21              (Exhibit 19, Emails, Bates Numbers
22              ACM0017071, marked for identification.)
23   BY MR. MAMOUNAS:
24        Q.    Please have a look and let me know when you're
25   ready.

# EXHIBIT 4

Daniel Pallone Vol II
May 02, 2018

1           UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2                 NEW HAVEN DIVISION

3

4        DOCKET NUMBER:  17-CV-00790-JAM

5

6  ---------------------------)
                              )
7  ARMOUR CAPITAL MANAGEMENT, )
   LP                         )
8                             )
              Plaintiff(s),   )
9                             )
   VS                         )
10                            )
   SS&C TECHNOLOGIES, INC.    )
11                            )
              Defendant(s).   )
12 ---------------------------)

13

14                Volume II

15            Pages 297 to 341

16

       VIDEO DEPOSITION OF:  DANIEL PALLONE
17

18 DATE:     May 2,2018
   TIME:     2:01 p.m.
19 HELD AT:  Hinckley Allen
             20 Church Street
20           Hartford, Connecticut
                     - - -
21

22

23   Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030

24

25

1              Sir --

2              MR. O'CONNOR:  Attorneys Eyes Only.

3              MR. MAMOUNAS:  The designation has

4         been lifted, Mr. O'Connor.

5              MR. O'CONNOR:  As, as it relates to

6         BenefiX.

7              MR. MAMOUNAS:  That's not what the

8         order says.

9    BY MR. MAMOUNAS:

10        Q    In any event, sir, the updates that were

11   provided to you included updates about Armour, the

12   Armour implementation.  Correct?

13        A    Yes.

14        Q    Okay.  In the first sentence you write,

15   "Here are the updates which don't contain the

16   right information."  Right?

17        A    Yes.

18        Q    What did you mean by "right information"?

19        A    If I recall, I was specifically asking

20   for certain information on the project that she

21   did not include.

22        Q    Which project?

23        A    Armour.

24        Q    The Armour implementation project?

25        A    Yes.

Daniel Pallone Vol II
May 02, 2018                                     329

1      Q   All right.  And then you write, "She is
2  not a strong project manager, and has no idea of
3  when to escalate things."  Right?
4      A   Yes.
5      Q   Okay.  And you continue, "I gave up
6  asking her to add more information.  She never
7  listens and thinks she knows everything."  Do you
8  see that?
9      A   Yes.
10     Q   Okay.  When you say, "I gave up asking
11 her to add more information."  Do you see that?
12     A   Yes.
13     Q   You mean you stopped going to her for
14 information about the Armour implementation; is
15 that right?
16              MR. O'CONNOR:  Objection.
17              THE WITNESS:  No.
18 BY MR. MAMOUNAS:
19     Q   What do you mean?
20     A   I stopped asking her to add more
21 information.
22     Q   Okay.  Why?
23     A   She didn't have it.
24     Q   She wasn't listening to you, in other
25 words?

1        A    Correct.

2        Q    Okay.  And you write that she -- you

3   think she thinks she knows everything; is that

4   right?

5        A    Yes.

6        Q    What were you referring to by

7   "everything"?

8        A    I don't recall specifically.

9        Q    Did you ever have any conversations

10   internally at SS&C about removing Ms. Johnson from

11   the Armour implementation?

12       A    I don't recall.

13       Q    Did you ever have any conversations

14   internally at SS&C about transferring Ms. Johnson

15   to being one of your direct reports?

16       A    I do recall having conversations

17   internally about taking the mortgage REIT

18   professional services team and having them

19   directly report to me.

20       Q    Did you ever have any conversations

21   internally at SS&C about terminating Ms. Johnson?

22            MR. O'CONNOR:  Objection; asked and

23       answered.

24            THE WITNESS:  I don't recall.

25

Daniel Pallone Vol II
May 02, 2018                           331

```
 1  BY MR. MAMOUNAS:
 2      Q   Did it ever occur to you that she should
 3  be removed from the Armour implementation?
 4      A   I don't recall.
 5      Q   Did it ever occur to you that she should
 6  be terminated from SS&C?
 7      A   I think I just answered that question.  I
 8  don't recall.
 9      Q   And just to be clear, one was removing
10  her from the project, and the other was
11  terminating her from the company?
12      A   Yeah, I don't recall having those
13  conversations.
14      Q   Okay.  When you say "she never listens,"
15  did that also refer to her never listening to
16  SS&C's clients?
17               MR. O'CONNOR:  Objection.
18               THE WITNESS:  This was in the
19          context of specifically my request for
20          additional information in the Armour
21          implementation project update which she
22          did not provide.
23  BY MR. MAMOUNAS:
24      Q   You were upset she didn't provide you
25  that information.  Fair?
```

Daniel Pallone Vol II
May 02, 2018                                    332

1      A    No.  I wouldn't say I was upset.  I think
2  I was asking for information, and she did not
3  provide it.
4      Q    Okay.  So why did you feel the need to go
5  and tell your boss, Mr. Reed, all this information
6  about Ms. Johnson?
7      A    It's important to provide feedback on
8  people so that the managers within SS&C are aware
9  of situations when people are not providing
10 information that has been asked for.
11     Q    Okay.  And additional feedback that you
12 provided internally to SS&C about Ms. Johnson is
13 that you believe she wasn't capable as a project
14 manager; isn't that fair?
15     A    I don't recall that.
16     Q    You don't recall ever telling anyone
17 internally at SS&C that Adriana Johnson wasn't
18 capable?
19     A    I believe what I would characterize
20 Adriana was a very strong PMO project manager
21 office person.  Her weakness was the inability to
22 escalate and get things that were required in
23 terms of the implementation.  That was her
24 weakness, but I think she was strong, overall, as
25 a project manager.

Daniel Pallone Vol II
May 02, 2018                                    333

```
 1          And she also did not have the domain
 2 experience within the space, which was a weakness.
 3          So, that's my, my comment.
 4     Q    Okay.  Within that comment you just said
 5 you thought she was a strong project manager.
 6 Right?
 7     A    From a, what I will say is academic
 8 project manager perspective.
 9     Q    Okay.
10     A    Correct.
11     Q    You recognize you write right here that
12 she is not a strong project manager.  Right?
13     A    Right.
14     Q    So which is it, sir?
15     A    Again --
16     Q    She is a strong project manager or not a
17 strong project manager?
18               MR. O'CONNOR:  Objection.
19               THE WITNESS:  It depends on the
20          context.  I think here I was referring to
21          the broader context of the fact that she
22          did not escalate things, which I say in
23          the e-mail she has no idea when to
24          escalate things.
25               And also the fact that she wasn't
```

Daniel Pallone Vol II
May 02, 2018                                    334

```
 1    very strong in the domain of

 2    mortgage-backed securities and

 3    mortgage-backed securities accounting in

 4    the REIT space.

 5         But I would say -- you asked if she

 6    was a strong project manager.  From a PMO

 7    perspective I think she was very strong.

 8         When it comes to the blocking and

 9    tackling, you know, creating timelines,

10    creating issues list, you know,

11    documenting things, I think she was very

12    strong in that perspective.

13         Her two areas of weakness were the

14    fact that she didn't know when -- Armour,

15    let's say for example, didn't provide

16    feedback on a particular reconciliation

17    and it was due, let's say, Wednesday, and

18    then two weeks go by and we still don't

19    get that feedback from Armour.

20         Well, that has a ripple effects on

21    implementation.  She wasn't good at

22    pushing back on a Mark or a John or

23    anyone else at Armour for that

24    information.  And that I fault her for.

25         At times I don't think she
```

Daniel Pallone Vol II
May 02, 2018                                    335

```
 1          understood the complexity of
 2          mortgage-backed securities accounting.  I
 3          mean, it's, it's a very complex base.
 4          So, I am not sure that, you know --
 5               So I would say, from that
 6          perspective, in totality she wasn't
 7          strong, but as a project manager, when
 8          you define project manager as someone who
 9          is, you know, maintaining the project
10          charter, maintaining an implementation
11          plan, scheduling calls, documenting
12          calls, I think she does a good job.
13 BY MR. MAMOUNAS:
14     Q    Okay.  But for what you call the PMO your
15 opinion was that she was not a strong project
16 manager; is that fair?
17               MR. O'CONNOR:  Objection.
18               THE WITNESS:  In a broader sense in
19          terms of the REIT complexities in
20          totality, I would say she was not strong.
21 BY MR. MAMOUNAS:
22     Q    All right.
23     A    In the purest PMO perspective, she was
24 very strong.
25     Q    I understand your distinction.  Did you
```

# EXHIBIT 5

Iwona Olszewska  Confidential
February 13, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF CONNECTICUT

 3                       NEW HAVEN DIVISION

 4     ------------------------------)
                                     )
 5     ARMOUR CAPITAL MANAGEMENT LP, ) Case No. 17-cv-00790-JAM
                                     )
 6              Plaintiff,           )
                                     )
 7         vs.                       )
                                     )
 8     SS&C TECHNOLOGIES, INC.,      )
                                     )
 9              Defendant.           )
                                     )
10     ------------------------------)

11

12                    ** CONFIDENTIAL **

13        VIDEOTAPED DEPOSITION OF IWONA OLSZEWSKA

14               DATE:  FEBRUARY 13, 2018

15                       HELD AT:

16               HOLLAND & KNIGHT, LLP
                  One Stamford Plaza
17               263 Tressler Boulevard
                 Stamford, Connecticut
18                       -  -  -

19

20

21

22

23

24     Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25
```

Iwona Olszewska   Confidential
February 13, 2018                           47

1      Q.      Professional Services had what you say to be
2   the overall responsibility for delivering; right?
3      A.      Yes.
4      Q.      Did you tell me that there came a point in
5   time that you began reporting to Mr. LaMonica?
6      A.      For a brief moment, yes.
7      Q.      When was that brief moment?
8      A.      It was, I want to say late, late 2017 when
9   Christy Bremner went through another reorg and they
10  became -- I don't know the exact name of his
11  responsibility, you know, his title, but I think he
12  was -- became the product owner for CAMRA and Maximus
13  product.
14     Q.      Okay.  And it was part of that reorg that you
15  were laid off from SS&C; correct?
16     A.      No.  That was -- the reduction in force
17  happened in December.
18     Q.      And you ceased being employed by SS&C at that
19  point in time; correct?
20     A.      In December.  December 1st.
21     Q.      Okay.  And there came a point in time that you
22  were rehired by SS&C; right?
23     A.      The termination was revoked.  I wasn't
24  rehired.
25     Q.      Okay.  When was the termination revoked?

Iwona Olszewska   Confidential
February 13, 2018                              48

```
 1        A.    I want to say two weeks into, into December.
 2   Two, three weeks.
 3        Q.    In December you said?
 4        A.    Yeah.
 5        Q.    Okay.
 6        A.    And it was retrospective to December 1st.
 7        Q.    Okay.  So who was it that communicated to
 8   you -- taking a step back -- who was it that
 9   communicated to you that you were being terminated
10   effective December 1st?
11                     MR. O'CONNOR:  Objection.
12        A.    It was HR and Dave LaMonica.
13        Q.    And what was it that Mr. LaMonica told you
14   with respect to your termination?
15                     MR. O'CONNOR:  Objection.
16        A.    That it was a reduction in force across the
17   business unit.
18        Q.    What business unit is that?
19        A.    That was Christy Bremner's, the one that I
20   don't know the name very well.
21        Q.    The Institutional Services business?
22        A.    As you said, yeah.
23        Q.    Okay.  Did you have any understanding of why
24   there was a reduction in force at Institutional Service
25   or, excuse me, across Institutional Services?
```

1    A.    No.  I didn't have any detail on that.

2    Q.    Okay.  So you had no idea, other than this

3  explanation of a reduction in force, for the reason that

4  you were being laid off from the company that you had

5  worked at for 10 years?

6    A.    Yes.  Yeah.

7    Q.    Yes, you had no idea?

8    A.    I had no idea.

9    Q.    Okay.  Did you ask anyone?

10    A.    I asked David at that meeting, and the

11  response was that it was a unit-wide reduction in force,

12  and it was all about the numbers so --

13    Q.    "The numbers" meaning what?

14    A.    I guess the -- managing your bottom line.

15    Q.    You are talking about revenues, profits, et

16  cetera?

17    A.    Everything together.  Running a business unit

18  effectively.

19    Q.    Okay.  So Mr. LaMonica told you that your

20  termination was connected to the fact that Institutional

21  Services was having a numbers issue?

22              MR. O'CONNOR:  Objection.

23    A.    No, he didn't say it that way.

24    Q.    How did he say it?

25    A.    Simply, they need to manage to the bottom

Iwona Olszewska   Confidential
February 13, 2018                          213

```
 1        A.     Yes.
 2        Q.     Okay.   SS&C, as of late 2014, had had mortgage
 3   REIT clients; correct?
 4        A.     Correct.
 5        Q.     And those mortgage REIT clients -- strike
 6   that.
 7               Some of those mortgage REIT clients were CAMRA
 8   clients, were they not?
 9        A.     They were.
10        Q.     But SS&C had never implemented a mortgage REIT
11   client on CAMRA using hosting, had it?
12                    MR. O'CONNOR:   Objection.
13        A.     I don't recall.   I'm not sure what the
14   relevance is, but I'm not sure if any of the mortgage
15   REIT clients were hosted.   No, they were not hosted,
16   yes.
17        Q.     There weren't any that had been deployed on
18   hosting for CAMRA; right?
19        A.     That's correct.
20        Q.     Turn to the front page of Exhibit 5, please.
21        A.     Sure.
22        Q.     Ma'am, just so we are clear -- I'm sorry,
23   before we get to this document -- when I asked you about
24   implementing mortgage REIT clients on hosting, that was
25   as of late 2014; correct?
```

Iwona Olszewska   Confidential
February 13, 2018                              214

```
 1              In other words -- and I can withdraw the
 2    question and rephrase it -- as of late 2014, SS&C had
 3    never had a mortgage REIT client that was implemented on
 4    hosting with CAMRA; correct?
 5                   MR. O'CONNOR:  Objection.
 6         A.    To my recollection, I don't remember.  Dozen
 7    of CAMRA clients, but I'm not specifically sure if they
 8    were mortgage clients, mortgage REITs.
 9         Q.    Okay.  As you sit here today, can you identify
10    for me one mortgage REIT client that was implemented
11    with CAMRA on hosting as of November 2014?
12                   MR. O'CONNOR:  Objection.
13         A.    You know, I don't know the specific -- I don't
14    remember the specifics of some of the implementations,
15    if they were hosted or not, or they had been implemented
16    by that time, so I can't answer for sure.
17         Q.    So as you sit here today, as the former head
18    of Professional Services, you can't think of a single
19    mortgage REIT that was implemented with CAMRA on
20    hosting?
21                   MR. O'CONNOR:  Objection.
22         A.    Yeah, I can't.
23         Q.    Okay.  So it wouldn't surprise you then that
24    Mr. Fecteau sat in that very same seat as you are
25    sitting right now and said that no mortgage REIT client
```

```
 1   has ever been implemented for CAMRA on hosting, would

 2   it?

 3                    MR. O'CONNOR:  Objection.

 4       A.    I would be surprised that he said that, but

 5   that knowledge wasn't that pertinent to me to be

 6   focusing on, so I am not certain if there were or not.

 7   So my answer is I can't answer.

 8       Q.    Right.  You can't think of a single one as you

 9   sit here today; right?

10                    MR. O'CONNOR:  Objection.  Asked and

11   answered.

12       A.    Yeah, I can't.

13       Q.    Okay.  Do you see on the first page here there

14   is an email from you, November 19th, 2014, again, to the

15   same group, the subject Armour Update, question mark.

16             Do you see that?

17       A.    I do.

18       Q.    And you say, When were you planning to share

19   with PS, question mark.

20             You are referring to Professional Services;

21   right?

22       A.    I do.

23       Q.    Is that what PS stands for in your email?

24       A.    Professional Services.

25       Q.    And you're asking when can you expect the work
```

Iwona Olszewska  Confidential
February 13, 2018                            294

1        A.      This is only the estimate that -- of the tasks

2    that we were going to take on on behalf of the

3    implementation of CAMRA for Armour.  This is not a

4    depiction of all work required to implement CAMRA for

5    Armour.

6        Q.      Okay.  So you're saying that there were other

7    tasks outside of the estimated budget -- excuse me,

8    outside of the implementation budget that were required

9    for implementation?

10       A.      Absolutely.

11       Q.      Okay.  Why aren't they on the budget?

12       A.      That's not the general practice, to estimate

13   work that's going to be required on client side.  I

14   can't speculate on that, unless I'm hired to evaluate

15   every step that's required for the client to be

16   effectively participating in that implementation.

17   That's -- we don't do that.

18       Q.      Right, just like a client wouldn't hire a

19   software vendor or a services provider to do something

20   that the client would do itself; right, makes sense?

21               MR. O'CONNOR:  Objection.

22               MR. MAMOUNAS:  I'll withdraw the

23   question.

24               MR. O'CONNOR:  Please.

25       Q.      It reflects on the top of the implementation

Iwona Olszewska   Confidential
February 13, 2018                                    295

```
 1   budget here a start date of January 2015; right?
 2        A.    Yes.
 3        Q.    And an end date of May of 2015; correct?
 4        A.    Correct.
 5        Q.    And under the heading Implementation, there
 6   are three subheadings, Environment set-up, conversion
 7   and configuration; Armour specific interfaces, and
 8   Project management and business process review; right?
 9        A.    Correct.
10        Q.    Okay.  And these are all the tasks that SS&C
11   was going to provide for the implementation of CAMRA at
12   Armour; right?
13                    MR. O'CONNOR:  Objection.
14        A.    These are high level tasks.
15        Q.    Okay.  Was SS&C going to provide any other
16   tasks or tasks for the implementation effort of CAMRA at
17   Armour?
18                    MR. O'CONNOR:  Objection.
19        A.    This is a good high level document.  To give
20   you an example, when environment is set up, there are
21   steps required in order to do that.  That's why when I
22   say there are other tasks assumed or embedded, they are
23   captured within those high level tasks that we
24   identified here.
25        Q.    Okay.  I appreciate the distinction you are
```

Iwona Olszewska  Confidential
February 13, 2018                    296

1    trying to make.

2            Were there any other high level tasks that

3    SS&C estimated it would need to do for the

4    implementation effort?

5        A.    I think we missed the portal deployment,

6    right.

7        Q.    The portal deployment that we saw --

8        A.    Correct.

9        Q.    -- that wasn't in the contract ultimately.

10           Were there any others?

11       A.    Other than that, you know, a quick glance, it

12   sounds reasonable for the purpose of this presentation.

13       Q.    Okay.  Does this document communicate to

14   Armour in any way that Armour had ownership to, as you

15   say, get CAMRA up and running for Armour?

16       A.    It doesn't.  That's not the purpose of the

17   document.  This is specifically the budget that SS&C

18   prepared and forecast for things that we would be taking

19   on, along with the assumptions that came with the

20   estimate.  So that document was not meant to depict any

21   or address any of the tasks that Armour would need to

22   take on.

23       Q.    Okay.  And it's your testimony that the

24   responsibility in your opinion for Armour to implement

25   CAMRA for itself is not reflected in this document?

Iwona Olszewska  Confidential
February 13, 2018                          300

```
 1   walk out.
 2                 MR. O'CONNOR:  Yeah, the witness has said
 3   she's had a migraine all day, and she's asked that we
 4   stop.
 5                 MR. MAMOUNAS:  Okay.  I'm just going to
 6   ask questions about Work Request One.
 7                 MR. O'CONNOR:  Okay.
 8   BY MR. MAMOUNAS:
 9       Q.    Are you ready, ma'am?
10       A.    Yes.
11       Q.    The document in front of you is the Work
12   Request One for implementation of CAMRA at Armour;
13   right?
14       A.    For implementation services, yes.
15       Q.    Okay.  And this is a document that you had
16   ultimate responsibility for approving with respect to
17   its business scope, as you said earlier; correct?
18       A.    Correct.
19       Q.    Okay.  And in fact, you reviewed and edited
20   this document before it was executed; is that right?
21       A.    Correct.
22       Q.    And this is part of the Master Services
23   Agreement between Armour and SS&C, is it not?
24       A.    In this case, yes.
25       Q.    Okay.  And this outlines the tasks that were
```

1   going to be provided by SS&C for implementation;

2   correct?

3       A.    Correct.

4              MR. O'CONNOR:  Objection.

5       Q.    And this document --

6       A.    Well, it's a combination.  Well, yes, even

7   assistance, as we call it in some cases, is a task, yes,

8   so I'll say yes.

9       Q.    Okay.  Okay, thank you.  And this document is

10  based on what we saw -- the budget that we saw in

11  Exhibit 10; is that right?

12             MR. O'CONNOR:  Objection.

13      A.    That document was used in order to prepare

14  that.

15      Q.    Okay.  Does this document identify any tasks

16  that in your opinion Armour was required to provide as

17  part of implementing CAMRA at Armour?

18             MR. O'CONNOR:  Objection.

19      A.    It just identifies assumptions again and how

20  client will provide certain information to us.

21      Q.    Okay.  But as you said earlier, assumptions

22  are not tasks; correct?

23      A.    Correct.

24      Q.    So we agree that there are no tasks reflected

25  in this work request that Armour was required to provide

Iwona Olszewska   Confidential
February 13, 2018                                  302

1    for implementing CAMRA at Armour; correct?

2                  MR. O'CONNOR:   Objection.

3        A.     It is a different spirit than -- the document

4    of this spirit is to identify our responsibility, not --

5        Q.     "Our" meaning --

6        A.     SS&C I should say.

7        Q.     SS&C's responsibilities?

8        A.     Correct.

9        Q.     So your testimony is that Armour's

10   responsibilities with respect to implementing CAMRA at

11   Armour are not reflected in this document; is that

12   right?

13       A.     Some responsibilities are implied through the

14   assumptions.  I don't have a list of tasks.  What this

15   document does not do is it does not identify tasks that

16   Armour was supposed to take on as part of the

17   implementation, then transitioning to production of

18   CAMRA.

19       Q.     Okay.  And as you said earlier, assumptions

20   are not tasks; right?

21       A.     That's correct.

22       Q.     Okay.  And you do not identify in this

23   document in any way that it was Armour's responsibility

24   to get CAMRA up and running, as you say, and implemented

25   for Armour.

Iwona Olszewska  Confidential
February 13, 2018                          303

1                     MR. O'CONNOR:  Objection.

2       Q.    Right?

3       A.    That's not the purpose of the document, yes.

4       Q.    Okay.  It's not reflected anywhere in the

5  document that it was Armour's obligation to implement

6  CAMRA for itself, is it?

7                     MR. O'CONNOR:  Objection.

8       Q.    I'm sorry, ma'am.

9       A.    That is -- again, this document speaks to the

10 services that SS&C will provide.  We will, for example,

11 configure and train on the implementation of the extent,

12 which within itself implies that I am not the party

13 that's going to be implementing that.

14      Q.    Okay.  So my question --

15      A.    This is just an example.

16                    MR. O'CONNOR:  It's now 6:00.

17                    MR. MAMOUNAS:  I want to be clear, I want

18 to be clear on this question.

19                    MR. O'CONNOR:  It's now 6:00 and we are

20 ending the deposition.

21                    MR. MAMOUNAS:  I want to be clear on this

22 question before we break.

23                    MR. O'CONNOR:  No, it's 6:00, and we can

24 resume.  The witness has a migraine headache.  I

25 advised --

Iwona Olszewska  Confidential
February 13, 2018                    302

```
 1    for implementing CAMRA at Armour; correct?
 2                   MR. O'CONNOR:  Objection.
 3        A.    It is a different spirit than -- the document
 4    of this spirit is to identify our responsibility, not --
 5        Q.    "Our" meaning --
 6        A.    SS&C I should say.
 7        Q.    SS&C's responsibilities?
 8        A.    Correct.
 9        Q.    So your testimony is that Armour's
10    responsibilities with respect to implementing CAMRA at
11    Armour are not reflected in this document; is that
12    right?
13        A.    Some responsibilities are implied through the
14    assumptions.  I don't have a list of tasks.  What this
15    document does not do is it does not identify tasks that
16    Armour was supposed to take on as part of the
17    implementation, then transitioning to production of
18    CAMRA.
19        Q.    Okay.  And as you said earlier, assumptions
20    are not tasks; right?
21        A.    That's correct.
22        Q.    Okay.  And you do not identify in this
23    document in any way that it was Armour's responsibility
24    to get CAMRA up and running, as you say, and implemented
25    for Armour.
```

Iwona Olszewska   Confidential
February 13, 2018                    303

```
 1                  MR. O'CONNOR:  Objection.
 2       Q.    Right?
 3       A.    That's not the purpose of the document, yes.
 4       Q.    Okay.  It's not reflected anywhere in the
 5  document that it was Armour's obligation to implement
 6  CAMRA for itself, is it?
 7                  MR. O'CONNOR:  Objection.
 8       Q.    I'm sorry, ma'am.
 9       A.    That is -- again, this document speaks to the
10  services that SS&C will provide.  We will, for example,
11  configure and train on the implementation of the extent,
12  which within itself implies that I am not the party
13  that's going to be implementing that.
14       Q.    Okay.  So my question --
15       A.    This is just an example.
16                  MR. O'CONNOR:  It's now 6:00.
17                  MR. MAMOUNAS:  I want to be clear, I want
18  to be clear on this question.
19                  MR. O'CONNOR:  It's now 6:00 and we are
20  ending the deposition.
21                  MR. MAMOUNAS:  I want to be clear on this
22  question before we break.
23                  MR. O'CONNOR:  No, it's 6:00, and we can
24  resume.  The witness has a migraine headache.  I
25  advised --
```

# EXHIBIT 6

Iwona Olszewska Vol II
May 02, 2018

```
 1               UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2                  NEW HAVEN DIVISION

 3

 4          DOCKET NUMBER:  17-CV-00790-JAM

 5

 6  --------------------------)
                              )
 7  ARMOUR CAPITAL MANAGEMENT, )
    LP                        )
 8                            )
              Plaintiff(s),   )
 9                            )
    VS                        )
10                            )
    SS&C TECHNOLOGIES, INC.   )
11                            )
              Defendant(s).   )
12                            )
    --------------------------)

13

14                    VOLUME II
                  Pages 320 - 386
15
          VIDEO DEPOSITION OF:  IWONA OLSZEWSKA
16

17  DATE:      May 2,2018
    TIME:      10:11 a.m.
18  HELD AT:   Hinckley Allen
               20 Church Street
19             Hartford, Connecticut

20                    - - -

21

22

23

24

25   Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030
```

Page 325

1
2                    IWONA OLSZEWSKA,
3              called as a witness, being duly
4              sworn or affirmed by Jenny C. Ebner,
5              RPR, CSR, CLR, a Notary Public in
6              and for the State of Connecticut,
7              testified as follows.
8
9         DIRECT EXAMINATION, (continued)
10
11 BY MR. MAMOUNAS:
12      Q    Good morning, Ma'am.
13      A    Good morning.
14      Q    Are you still employed at SS&C?
15      A    Yes.
16      Q    What is your position?
17      A    Same as it was the last time we spoke,
18 Vice President of Client Advisor Organization
19 Services.
20      Q    Did you do anything to prepare for
21 today's deposition?
22      A    Just met yesterday.
23      Q    Here at Hinckley Allen's office?
24      A    Yes.
25      Q    Who was present?

Page 326

1       A    Myself, the counsel, I believe Alexa
2 stopped by for a second.
3       Q    That's Alexa Millinger?
4       A    That is.
5       Q    Who else?
6       A    Nobody else.
7       Q    Are you familiar with the document by the
8 name of CAMRA Implementation Manual?
9       A    Implementation manual, yes.
10      Q    The CAMRA Implementation Manual; is that
11 right?
12      A    I do -- You know, I don't remember
13 exactly the name of the document.  It was meant
14 for CAMRA implementations.
15      Q    When was the last time you saw it?
16      A    I don't remember exactly.
17      Q    It's a written document; is it not?
18      A    Yes, it is.
19      Q    To your knowledge, did anyone at SS&C
20 consult the CAMRA Implementation Manual in
21 connection with the implementation of CAMRA at
22 Armour?
23      A    I don't know.
24      Q    You are familiar with CAMRA's
25 functionality; are you not?

Page 327

1       A    Fair.
2       Q    To your knowledge, was CAMRA modified in
3 any way to make it work for Armour?
4       A    I don't believe so.
5       Q    To your knowledge, was CAMRA modified in
6 any way for mortgage REITs generally?
7       A    Absolutely.
8       Q    How so?
9       A    Additional funtionality required to
10 process and support that side of the business.
11      Q    Okay.  How many times was it modified for
12 that purpose?
13      A    I wouldn't be able to answer specifically
14 how many releases or enhancements.  I don't know.
15      Q    How many can you think of, as you sit
16 here today?
17      A    I can't answer that question.
18      Q    Tell me, as you sit here today, all the
19 modifications you have in mind when I asked you
20 just a moment ago whether CAMRA was modified for
21 mortgage REITs generally.
22           MR. O'CONNOR:  Objection.  You can
23      answer.
24           THE WITNESS:  The question is
25      whether CAMRA was modified for mortgage

Page 328

1      REITs; is that correct?
2 BY MR. MAMOUNAS:
3       Q    Correct.
4       A    I want to make sure.  Yes, it was.
5       Q    All right.  What were those
6 modifications?
7       A    For example, funtionality to process
8 effective interest calculations.
9       Q    Can you think of any other examples, as
10 you sit here today?
11      A    Yield calculations.  Specifics of that I,
12 I don't know at this moment.
13      Q    Any others, Ma'am?
14      A    I, I can't answer the question.
15      Q    When was CAMRA modified to process
16 effective interests in relation to mortgage REITs
17 using CAMRA?
18           MR. O'CONNOR:  Objection.
19           THE WITNESS:  I don't remember
20      exactly.  Armour wasn't the first client,
21      so it must have been prior to that.
22 BY MR. MAMOUNAS:
23      Q    What do you base it as -- what do you
24 base your statement on that it must have been
25 prior to that?

Iwona Olszewska Vol II
May 02, 2018                           334

```
 1 spoken -- strike that.
 2        Can you think of anyone from SS&C
 3 Professional Services group that had spoken with
 4 Armour prior to the time you first spoke with them
 5 in December of 2014?
 6     A   I can't.
 7     Q   Prior to your first call with Armour,
 8 several budgets for the CAMRA implementation at
 9 Armour were prepared; is that right?
10     A   Correct.
11     Q   They all were prepared by you; were they
12 not?
13     A   In collaboration with my team; that is
14 correct.
15     Q   But the person who put pen to paper, so
16 to speak, was you; is that right?
17             MR. O'CONNOR:  Objection.
18             THE WITNESS:  For review with the
19         team.  Correct.
20 BY MR. MAMOUNAS:
21     Q   Okay.  As you sit here today, do you know
22 of anyone else, other than yourself, at SS&C who
23 drafted any budgets prior to your first call with
24 Armour?
25     A   Not that I can think of.  Again, this was
```

Iwona Olszewska Vol II
May 02, 2018                                335

1  work with myself and my team.

2        Q    And the first implementation budget that

3  SS&C sent to Armour was in advance of your call,

4  your first call with Armour, on December 10 of

5  2014; was it not?

6                MR. O'CONNOR:  Objection.

7                THE WITNESS:  I believe that is

8            correct.

9  BY MR. MAMOUNAS:

10        Q    Okay.  The last time we met we spoke

11  generally about the information you received about

12  Armour, by the time you prepared that December 10,

13  2014 budget.  Do you remember that?

14        A    I do.

15        Q    You said that information was provided to

16  you by sales.  Right?

17        A    That is correct.

18        Q    Did you receive information about Armour

19  prior to your first call with them from anyone

20  other than sales at SS&C?

21                MR. O'CONNOR:  Objection.

22                THE WITNESS:  I can't think of

23            anybody else providing any additional

24            information.  So sales it is.

25

Iwona Olszewska Vol II
May 02, 2018                           353

1          in the meeting.

2    BY MR. MAMOUNAS:

3        Q    Did do anything prior to the December 10,

4    2014 telephone call with Armour to obtain

5    information about Armour's budget for

6    implementation?

7                    MR. O'CONNOR:  Objection.

8                    THE WITNESS:  I don't recall that.

9    BY MR. MAMOUNAS:

10       Q    Do you have any reason to doubt that you

11   had the opportunity to ask for and receive that

12   information?

13                   MR. O'CONNOR:  Objection.

14                   THE WITNESS:  That is irrelevant

15          from, from estimating the effort.

16   BY MR. MAMOUNAS:

17       Q    How much the client wants to pay is

18   irrelevant as far as estimating the CK?

19       A    Sure.  I need to understand what it's

20   going to take to deliver the solution, and then we

21   have a conversation.

22          It doesn't impact the way we think

23   about the implementation.

24       Q    Prior to the December 10, 2014 telephone

25   call did you do anything to obtain information

Iwona Olszewska Vol II
May 02, 2018                               354

```
 1  about the availability of Armour staff during the
 2  implementation project?
 3              MR. O'CONNOR:  Objection.
 4              THE WITNESS:  I didn't.  But that is
 5          one of the questions that is on the, on
 6          the Client Profile.
 7              I know that in the conversation when
 8          we met, Armour expressed that they had
 9          available and capable staff to do the
10          job.
11  BY MR. MAMOUNAS:
12      Q   Okay.  Did you ask them how many
13  available and capable staff they had to do the
14  job?
15      A   I didn't ask that question specifically.
16      Q   Okay.  Did you ask them why their staff,
17  they believe their staff was capable?
18      A   That's not my job to ask that question.
19      Q   So, the answer is no, you didn't ask that
20  question?
21      A   I didn't ask that question.
22      Q   Did you ask them why they believed their
23  staff was available to do the job?
24              MR. O'CONNOR:  Objection.
25              THE WITNESS:  I didn't ask that
```

Iwona Olszewska Vol II
May 02, 2018                                    355

1          question.

2   BY MR. MAMOUNAS:

3        Q    Did you have -- now you are telling me

4   about the December 10, 2014 phone call you had

5   with Armour; is that right?

6        A    Yes.

7        Q    Okay.  During the course of that

8   conversation did you gain any understanding about

9   the size of Armour's business?

10        A    I knew the size of the business based on

11   the information provided by the sales

12   organization.

13        Q    What was the size?

14        A    I don't remember exactly.

15        Q    When you refer to size what are you

16   referring to?

17        A    Assets under management.  There are other

18   components that we need to assess when estimating

19   the business.  Number of portfolios, number of

20   accounts, types of instruments.

21        Q    Right.  Because that dictates the

22   complexity of the setup for CAMRA software.

23   Right?

24        A    That is one of the elements.  Correct.

25        Q    And CAMRA is operated by human beings at

1 the end of the day; is it not?

2       A   To a certain extent that's correct.

3       Q   And so the number of human beings that

4 are available to operate the software is a factor

5 in determining how you set up the CAMRA software

6 in the first place, isn't it?

7                  MR. O'CONNOR:  Objection.

8                  THE WITNESS:  Can you repeat that

9        question?

10                  THE WITNESS:  Jenny, would you mind

11        reading it back for us, please?

12  (Following Record read by the Court Reporter.)

13                  Question:  "And so the number of

14        human beings that are available to

15        operate the software is a factor in

16        determining how you set up the CAMRA

17        software in the first place, isn't it?"

18                  THE WITNESS:  No.

19 BY MR. MAMOUNAS:

20       Q   So, CAMRA is implemented and set up

21 agnostic and irrespective of the number of people

22 that are available to actually operate it; is that

23 right?

24       A   CAMRA, itself, absolutely.

25       Q   Okay.

Iwona Olszewska Vol II
May 02, 2018                        357

```
 1     A    There's a certain structure to how to set
 2  up CAMRA based on accounts, portfolios and other
 3  elements.  But that is independent of how many
 4  people are available.
 5     Q    So, the number of people that are
 6  available has no -- the number -- strike that.
 7          The number of people that are available
 8  on the client's side has nothing to do with how
 9  CAMRA is implemented; is that your testimony?
10              MR. O'CONNOR:  Objection.
11              THE WITNESS:  That is my testimony.
12              CAMRA, itself -- how CAMRA itself is
13              implemented has nothing to do with the
14              number of resources available on the
15              client side.
16              That is my opinion.
17  BY MR. MAMOUNAS:
18     Q    When you talk about CAMRA itself, are you
19  referring just to the source code or are you
20  referring to something technological, Ma'am?
21          Because a moment you told me that people
22  are required to operate CAMRA; did you not?
23              MR. O'CONNOR:  Objection.
24              THE WITNESS:  I did.  I don't see
25              the connection in your question.  CAMRA,
```

Iwona Olszewska Vol II
May 02, 2018                              358

```
 1              itself, meaning the CAMRA package and the

 2              CAMRA software, CAMRA application.  That

 3              is what I referred to.

 4  BY MR. MAMOUNAS:

 5     Q   Okay.  It's your testimony that the

 6  implementation of CAMRA has nothing to do with the

 7  number of people that are available to operate

 8  CAMRA on the client side; is that right?

 9              MR. O'CONNOR:  Objection.

10              THE WITNESS:  That is my statement.

11  BY MR. MAMOUNAS:

12     Q   Okay.  Let me show you what we will mark

13  as Exhibit 12.

14                    (Exhibit 12:

15              Marked for identification.)

16  BY MR. MAMOUNAS:

17     Q   Have a look at this, please and let me

18  know when you are finished.

19                    (Pause.)

20              THE WITNESS:  Internal chain of

21              e-mails.

22  BY MR. MAMOUNAS:

23     Q   I would like you to focus, Ma'am, on your

24  e-mails starting at the November 5th, 2015 message

25  in the middle of the second page towards the end.
```

# EXHIBIT 7

Iwona Olszewska
June 05, 2018

```
 1                  - IWONA OLSZEWSKA -

 2   UNITED STATES DISTRICT COURT

 3   DISTRICT OF CONNECTICUT - NEW HAVEN DIVISION

 4   ------------------------------- X

 5   ARMOUR CAPITAL MANAGEMENT LP,          )

 6                  Plaintiff,              )   Case No:

 7       -vs-                              )   17-cv-00790-JAM

 8   SS&C TECHNOLOGIES Inc.                 )

 9                  Defendant.             )

10   ------------------------------- X

11

12   DATE:  June 5, 2018

13   TIME:  2:09 p.m.

14                  VOLUME III

15             CONTINUED VIDEOTAPED DEPOSITION OF

16   IWONA OLSZEWSKA, held at the offices of Holland &

17   Knight, 31 West 52nd Street, New York, New York,

18   pursuant to Notice, before Hope Menaker, a

19   Shorthand Reporter and Notary Public of the State

20   of New York.

21

22

23

24

25
```

Iwona Olszewska
June 05, 2018                                    21

```
 1                  - IWONA OLSZEWSKA -

 2        Q.      And does RECON -- and there's an

 3   automated way within RECON to make that

 4   identification, right?

 5                MR. O'CONNOR:  Objection.

 6        A.      That's right.

 7        Q.      And is there also an automated way

 8   the resolve the issue of that missing -- sorry --

 9   that mismatched data?

10        A.      There is a way to make annotations

11   within the software.  There is a way to match some

12   records when there is discrepancy.  It's all based

13   on threshold that's -- that's being used as part

14   of the configuration.

15                So there is some -- some ability to

16   automatically match mismatches.

17        Q.      Okay.  And is there also some ability

18   to automatically resolve an issue of mismatched

19   data between third-party custodian and CAMRA?

20                MR. O'CONNOR:  Objection.

21        A.      When there's a true discrepancy

22   that -- that the resolution doesn't take place

23   within RECON, it's a matter that needs to be taken

24   up with -- with the custodian.

25        Q.      Okay.  What's CI Manager?
```

Iwona Olszewska
June 05, 2018                                          22

```
 1                    - IWONA OLSZEWSKA -

 2          A.      CI Manager, it's a custodial

 3   interface used for a variety of different

 4   functions.

 5          Q.      Okay.  How does CI Manager compare to

 6   RECON?

 7                  MR. O'CONNOR:  Objection.

 8          A.      CI Manager is mostly applied to

 9   provide for automatic settlement.

10          Q.      In other words, CI Manager doesn't

11   allow --

12          A.      For posting -- for posting.

13          Q.      For posting --

14          A.      Uh-huh.

15          Q.      -- of data that comes from a

16   third-party custodian, right?

17                  MR. O'CONNOR:  Objection.

18          A.      Some of it, yes.

19          Q.      Okay.  But it doesn't allow for

20   RECON; is that right?

21                  MR. O'CONNOR:  Objection.

22          A.      It can.  It can be used -- the

23   software was designed to -- to also provide for

24   certain level of reconciliation services.

25          Q.      And how is it designed to provide for
```

Iwona Olszewska
June 05, 2018                                        23

```
 1                    - IWONA OLSZEWSKA -

 2    a certain level of reconciliation services, ma'am?

 3                    MR. O'CONNOR:  Objection.

 4         A.    I don't know the details of -- of how

 5    the software has been designed.  My level of

 6    knowledge is limited to the understanding of -- of

 7    the fact that it can be used for generation of

 8    reconciliation -- holdings reconciliation, for

 9    example.  But the more elegant way is RECON.

10         Q.    When did you first become familiar

11    with that functionality of CI Manager?

12         A.    Probably the same time frame as

13    RECON, it's part of our normal set up.

14         Q.    In other words, in 2008?

15                    MR. O'CONNOR:  Objection.

16         A.    I believe I said nine months into my

17    starting with SS&C.

18         Q.    Okay.  After your start in 2008,

19    right?

20         A.    Yes.

21         Q.    Does CI Manager, in your experience,

22    allow for automated reconciliations in any way?

23         A.    Yes.  There's some clients -- CAMRA

24    clients that use CI Manager for reconciliation.

25         Q.    Does it allow for itself -- strike
```

```
 1                    - IWONA OLSZEWSKA -
 2   that.
 3              Does it -- does CI Manager itself
 4   provide for automated reconciliations?
 5              MR. O'CONNOR:  Objection.
 6       A.     I mean, I'm having a hard time
 7   understanding the difference between the two you
 8   just -- statements you made, so if you can --
 9       Q.     Let's focus on my last question.
10              Does CI Manager provide for automated
11   reconciliations in any way?
12              MR. O'CONNOR:  Objection.
13       A.     Yes.  I believe I responded yes; it
14   can be configured to -- to deliver reconciliation.
15       Q.     Okay.  And you're saying that works
16   in the same automated way as RECON?
17              MR. O'CONNOR:  Objection.
18       A.     Conceptually, from a technical
19   perspective.  I'm sure it's different.
20       Q.     Okay.  Did you ever tell anyone that
21   you believed that CI Manager delivered limited at
22   best functionality to cover for best practice?
23       A.     I could have said that, yes.
24   Possible.
25              MR. MAMOUNAS:  Can I get the exhibit
```

Iwona Olszewska
June 05, 2018                               25

```
 1                  - IWONA OLSZEWSKA -
 2         sticker, please.
 3         Q.      Let me show you what we'll mark as
 4    Exhibit 13.  Have a look at it, ma'am, and let me
 5    know when you're ready.
 6         A.      Is there anything specific?
 7         Q.      Yes, the e-mail at the bottom of the
 8    first page, September 28, 2015, 1:44 p.m. from
 9    you.
10         A.      Okay.
11                 (Whereupon, Olszewska Exhibit 13 was
12         marked at this time.)
13                 THE WITNESS:  Okay.
14         Q.      Ma'am, you see in the second
15    paragraph, the one that I pointed your attention
16    to, at the end of the second sentence you wrote,
17    "CI Manager delivers limited at best functionality
18    to cover for best practice."  Right?
19         A.      I did say that.
20         Q.      Okay.  And that is an opinion that
21    you held as of September 28 of 2015, right?
22                 MR. O'CONNOR:  Objection.
23         A.      Yeah, we push for best practice, and
24    our opinion RECON would have been a more elegant
25    solution.  As I stated before, CI Manager can
```

```
 1                    - IWONA OLSZEWSKA -
 2    offer reconciliation processes as well.
 3         Q.        Okay.  When you say our opinion, who
 4    is the "our" in that response, ma'am?
 5         A.        It is me.
 6         Q.        You personally?
 7         A.        Me personally.
 8         Q.        And others within the professional
 9    services group?
10                   MR. O'CONNOR:  Objection.
11         A.        I think people like -- RECON is a
12    newer -- a newer modules.  So it is more elegant
13    and it is easier to work with.  However, it comes
14    with price so CI Manager can do similar work.
15         Q.        How do you know that it's newer?
16         A.        I know what -- what kind of
17    development we do for different modules that we
18    offer and different softwares that we offer.
19         Q.        Okay.  So are you saying at some
20    point SS&C stopped doing development for CI
21    Manager but continued with RECON?
22         A.        I didn't say that.
23         Q.        Okay.  So how is it that RECON is
24    newer than CI Manager?
25                   MR. O'CONNOR:  Objection.
```

Iwona Olszewska
June 05, 2018                                    27

```
 1                  - IWONA OLSZEWSKA -
 2         A.      It continues to develop in different
 3    directions.  It specifically -- the specific
 4    purpose of RECON is to provide for reconciliation
 5    capability of different kinds of data.  CI Manager
 6    offers that capability that's limited to
 7    transactional information, for example.
 8         Q.      Okay.  You believe that CI Manager
 9    delivered limited at best functionality to cover
10    for which best practice?
11                 MR. O'CONNOR:  Objection.
12         A.      I don't remember specifically.  I
13    would have thought reconciliation.
14         Q.      Okay.  And that was a belief that you
15    held before December of 2014; was it not?
16                 MR. O'CONNOR:  Objection.
17         A.      Yes, there is a lot of different data
18    that can be compared to leveraging -- reconcile
19    leverage in RECON, it just has broader
20    applications.
21         Q.      Okay.  But what I want to confirm is
22    that prior to December 2014, you held the belief
23    that you reflect in this September 28, 2015 e-mail
24    which is that, CI manager delivers limited at best
25    functionality to cover for best practice in
```

Iwona Olszewska
June 05, 2018                              28

```
 1              - IWONA OLSZEWSKA -
 2   respect to reconciliations, right?
 3              MR. O'CONNOR:  Objection.
 4       A.     That's what the e-mail says.
 5       Q.     That's what you wrote here.  But what
 6   I want to understand -- and you held that belief
 7   that you reflect in this e-mail prior to December
 8   of 2014, right?
 9              MR. O'CONNOR:  Objection.
10       A.     I did based on the e-mail, yes.  And
11   best practice is an option, right, and as we
12   recommended in our business process review
13   document, we suggested strongly the reevaluation
14   of the RECON software and that was a specific
15   conversation that we had with our Armour team and
16   the decision was made not to pursue that venue.
17       Q.     Okay.  September 28, 2015 e-mail
18   change concerns Bimini; does it not?
19              If you look at the subject line of
20   the e-mail above, for example, you see it says,
21   Subject Re:  Prep for Bimini kick off?
22       A.     I would think so but I'm not a
23   hundred percent sure.  We had a lot of different
24   projects.  Based on the communication it seems
25   like Bimini.
```

Iwona Olszewska
June 05, 2018                           29

```
1                    - IWONA OLSZEWSKA -
2          Q.     Okay.  So returning to the second
3    sentence of that second paragraph, it starts, "It
4    will create an operational difficulty for the
5    client."
6                  Do you see that?
7          A.     I do.
8          Q.     Okay.  And the client that you were
9    referring to is Bimini, right?
10         A.     I believe so, based on the e-mail --
11   e-mails.
12         Q.     Okay.  And the "it" that you're
13   referring to is the fact that the solution did not
14   include RECON, right?
15                MR. O'CONNOR:   Objection.
16         A.     Based on the e-mail, that's what it
17   sounds.
18         Q.     Okay.  And what you were the reasons
19   for your belief that not including RECON in the
20   solution would create an operational difficulty
21   for Bimini?
22         A.     As I mentioned earlier, it's -- it's
23   a more elegant and more functionally rich
24   software.  And based on what we have seen with
25   Bimini, we found that RECON would fit nicely in
```

Iwona Olszewska
June 05, 2018                              45

```
 1                  - IWONA OLSZEWSKA -

 2        Q.      Then you say, going back up to the

 3   second paragraph, SS&C strongly -- should have

 4   strongly suggested the work flow change.  Right?

 5        A.      Yes.

 6        Q.      And when you say it should have been

 7   suggested, that is, the work flow change should

 8   have been suggested, you're saying it should have

 9   been suggested during sales process; is that

10   right?

11              MR. O'CONNOR:  Objection.

12        A.      Should have been, yes, based on what

13   I read, that's what I had in mind and I understand

14   from Jeff that that conversation did take place.

15        Q.      Which conversation?

16        A.      About the RECON and possible

17   elimination of the third party.

18        Q.      Okay.  But you would agree with me

19   that that was not strongly suggested; that is, the

20   elimination of the third party during the sales

21   process, right?

22              MR. O'CONNOR:  Objection.

23        A.      No, I don't know how strongly it was

24   suggested.  I'm just stating that it should have

25   been; doesn't mean it wasn't.
```

Iwona Olszewska
June 05, 2018                                    46

```
 1                - IWONA OLSZEWSKA -
 2        Q.    Okay.  So you don't know one way or
 3   the other?
 4        A.    My understanding is that it was a
 5   specific point of conversation -- during the sales
 6   process.
 7        Q.    Okay.  That is what was a specific
 8   point of conversation during the sales process?
 9        A.    The RECON -- the RECON tool
10   deployment and possible change of the cash
11   management process.
12        Q.    Okay.  And it's your belief that, as
13   you reflect in the September 23rd, 2015, e-mail,
14   SS&C should have strongly suggested the
15   elimination of the third party; that is, AVM,
16   during the sales process.  Is that right?
17                MR. O'CONNOR:  Objection.
18        A.    I think strongly suggested.  I refer
19   to RECON and work flow is another aspect that we
20   should have talked about during the sales process.
21        Q.    Okay.  And when you talk about the
22   work flow change, I think you said the elimination
23   of the third party.  That is the elimination of
24   AVM, right?
25        A.    Correct.
```

Iwona Olszewska
June 05, 2018                                    47

```
 1                  - IWONA OLSZEWSKA -

 2        Q.      From the solution?

 3        A.      Correct.

 4        Q.      When did you first form your belief

 5   that -- that Armour should have eliminated AVM

 6   from its solution?

 7                MR. O'CONNOR:  Objection.

 8        A.      I don't remember specifically, but

 9   when we were reading the client profile document

10   and the specifics of the current process at that

11   point, and I know this conversation came up.

12                Our sales process is pretty in-depth

13   and there is a lot of communications with sales

14   folks and professional services and everybody, so

15   I'm sure it was discussed several times.

16        Q.      Okay.  And you're saying the first

17   that you heard of AVM in respect of Armour was

18   during the sales process and the client profile

19   document; is that right?

20        A.      It must have been, yes.

21        Q.      Okay.  Were you aware that prior to

22   Armour, SS&C had never worked with AVM?

23                MR. O'CONNOR:  Objection.

24        A.      I wasn't aware of that and I'm not

25   sure that's a statement that's true.
```

Iwona Olszewska
June 05, 2018                                    90

```
 1                  - IWONA OLSZEWSKA -
 2         p.m.  We're going off the record.
 3                  (Whereupon, there was a brief recess
 4         in the proceedings.)
 5                  THE VIDEOGRAPHER:  This begins Media
 6         Unit Number 2.  The time is 4:02 p.m., we're
 7         back on the record.
 8    BY MR. MAMOUNAS:
 9         Q.      Prior to the Armour implementation,
10    how many implementations of CAMRA did you work on
11    at SS&C?
12         A.      I don't know the number.  It's
13    several.
14         Q.      And what does "several" mean?
15         A.      Hard to say I don't know.
16         Q.      Could you provide us a range?
17         A.      20.
18         Q.      Did you prepare implementation
19    budgets for all 20 of those implementations?
20         A.      I worked on all of them, yes.
21         Q.      Okay.  Did you specifically work on
22    the preparation of the budgets for those
23    implementations?
24         A.      Except for one the first project I
25    was working on, that's a true statement.
```

Iwona Olszewska
June 05, 2018                                    91

```
 1                    - IWONA OLSZEWSKA -
 2        Q.      What was the first project that you
 3   were working on?
 4                 THE WITNESS:  Answer?
 5                 MR. O'CONNOR:  The first project --
 6        A.      Project at SS&C?
 7        Q.      Yes.
 8        A.      Deutsche Bank implementation.
 9        Q.      Did you work on the implementation of
10   CAMRA at Ladder Capital?
11                 MR. O'CONNOR:  Objection.
12                 At this point I'm going to ask that
13            the witness leave, if we're going to
14            discuss --
15                 MR. MAMOUNAS:  That's --
16                 MR. O'CONNOR:  Not, the witness, Mr.
17            Mountain.
18                 MR. MAMOUNAS:  Okay.  That's fine, so
19            we don't eat time.  If you don't mind.
20        Q.      Did you work on the Ladder Capital
21   implementation?
22        A.      I don't believe so.
23        Q.      Did you work on the implementation of
24   CAMRA at Apollo?
25        A.      No.
```

Iwona Olszewska
June 05, 2018                                    92

```
 1                  - IWONA OLSZEWSKA -
 2        Q.      Did you work on the implementation of
 3   CAMRA at WAMCO, Western Asset Management company?
 4        A.      Yes.
 5        Q.      Did you prepare the budget for that
 6   implementation?
 7        A.      Yes.  Again, with the help and
 8   collaboration with other members of the team.
 9        Q.      At that time you knew that the assets
10   under management at WAMCO were in excess of $400
11   billion, right?
12        A.      We knew all of the statistics that
13   required for the estimate.
14        Q.      Does that number sound right to you?
15        A.      I don't exactly remember what -- what
16   was the portfolio make up.
17        Q.      Do you recall that it was in excess
18   of $400 billion asset under management?
19        A.      Possible, but I don't -- I don't
20   remember exactly.  We estimate a lot of projects
21   so it's not two or one or ten.
22        Q.      Okay.  Do you recall that Western
23   Asset Management had in excess of 800 employees as
24   of the time of the budget you prepared for their
25   implementation of CAMRA?
```

Iwona Olszewska
June 05, 2018                              93

```
 1                 - IWONA OLSZEWSKA -
 2        A.       Sounds about right.
 3        Q.       They were an outsource client, right?
 4        A.       That's correct.
 5        Q.       Was the implementation of CAMRA at
 6   WAMCO done by the time of the contract between
 7   Armour and SS&C?
 8        A.       I don't remember the timeline.
 9        Q.       You don't recall one way or the
10   other?
11        A.       I don't.
12        Q.       Did you work on preparing the budget
13   for the implementation of CAMRA at Annaly?
14        A.       Yes.
15        Q.       At the time Annaly's assets under
16   management were in excess of a hundred billion
17   dollars, right?
18        A.       Correct.
19        Q.       And Annaly had in excess of 130
20   employees at the time; did it not?
21        A.       I don't know specifically what the
22   numbers were.
23        Q.       The last time we met in Hartford you
24   told me you considered Annaly to be one of the
25   largest/most sophisticated organizations.
```

Iwona Olszewska
June 05, 2018                                    94

```
 1                  - IWONA OLSZEWSKA -
 2              Do you remember that?
 3              MR. O'CONNOR:  Objection.
 4         A.    If that's on the record, yes.  I
 5    don't recall.
 6         Q.    And they were a licensed CAMRA
 7    client, were they not?
 8         A.    That's correct.
 9         Q.    And that implementation took 12
10    months, right?
11              MR. O'CONNOR:  Objection.
12         A.    Sounds about right.
13         Q.    Was it done by the time of the Armour
14    contract with SS&C?
15         A.    I believe so.  But again, I don't
16    remember specifically.
17         Q.    Did you work on the budget for the
18    implementation of CAMRA at Chimera?
19         A.    That was -- that was one and the same
20    effort, yes.
21         Q.    One and same the effort with Annaly?
22         A.    With Annaly, yes.
23         Q.    How is it that it was one and the
24    same effort?
25         A.    It was one company back then in a
```

Iwona Olszewska
June 05, 2018                                    95

```
 1                    - IWONA OLSZEWSKA -
 2    way, so it was one implementation.  There were two
 3    -- two separate implementations and one budget.
 4         Q.    I see.  So there was one budget for
 5    the implementation?
 6         A.    As far as I recall, yes.
 7         Q.    Do you recall that Chimera's assets
 8    under management were in excess of $17 billion
 9    itself?
10         A.    Again, sounds about right.
11         Q.    Okay.  And it had in excess of 30
12    employees, right?
13         A.    That would be for Chimera to answer.
14         Q.    Okay.  But what is your recollection,
15    as you sit here today, as far as the number of
16    employees that Chimera had at the time of the
17    implementation budget you prepared for it at
18    Anally?
19         A.    I don't recall that.  That's not a
20    question that really matters to me as part of the
21    implementation or estimating process.
22         Q.    Okay.  So just like Annaly, since
23    this was one implementation, it was also a
24    licensed implementation, right?
25         A.    That's correct.
```

1                    - IWONA OLSZEWSKA -

2       Q.      Completed in 12 months, right?

3       A.      Same timeline.

4       Q.      And do you recall how long it took

5   for the WAMCO implementation to complete?

6       A.      Probably similar amount of time.  I

7   don't recall specifically.

8       Q.      Okay.

9       A.      It could have been a little over 12

10  months or so but I'm not sure.

11      Q.      Okay.  And do you recall that you

12  were involved in preparing the budget for the

13  implementation of CAMRA at Resource Residential?

14      A.      Yes.

15      Q.      And Resource Residential had 45

16  employees as of the time you prepared its budget,

17  right?

18      A.      Again, the number of employees is --

19  is not a data point that we normally ask about so

20  I don't recall.

21      Q.      Okay.  Is it fair to say, then, that

22  by the time you prepared the budget for the Armour

23  implementation of CAMRA, you had prepared three

24  budgets for mortgage REITS implementation of CAMRA

25  at SS&C?

Iwona Olszewska
June 05, 2018                              97

```
 1                  - IWONA OLSZEWSKA -
 2            MR. O'CONNOR:  Sound about right.
 3        Q.      Can you think of any others that you
 4   prepared, as you sit here today, as of the time of
 5   the Armour implementation budget?
 6        A.      REITs or general implementation of
 7   CAMRA?
 8        Q.      Well, you already told me there were
 9   about 20 implementations of CAMRA that you
10   prepared, right?
11        A.      Absolutely.  And this is not the only
12   type of project we delivered to our clients.
13        Q.      Okay.  But I'm interested in CAMRA.
14   And as far as mortgage REITs are concerned, you
15   told me you had implemented three -- strike
16   that -- you told me you had prepared three
17   implementation budgets by the time you prepared
18   the implementation budget for Armour at SS&C,
19   right?
20            MR. O'CONNOR:  Objection.
21        A.      Based on the timeline which I
22   mentioned, I don't remember specifically; that
23   sounds about right.
24        Q.      Okay.  And Armour as of the time you
25   prepared its implementation budget had $8 billion
```

Iwona Olszewska
June 05, 2018                               103

```
 1                - IWONA OLSZEWSKA -
 2    total of 1,850 hours -- strike that.
 3               MR. O'CONNOR:  Objection.
 4        Q.    Do you recall that the work request
 5    reflected 1,850 hours for the implementation of
 6    CAMRA at Armour?
 7               MR. O'CONNOR:  Objection.
 8        A.    Whatever we agreed upon from a budget
 9    perspective, that's what the request would be.
10        Q.    Okay.  And are you aware that SS&C
11    has claimed in this litigation that it spent
12    8,979.25 hours in the implementation of CAMRA at
13    Armour?
14        A.    I'm not aware of that number.
15        Q.    Okay.  You would agree with me that
16    that number is more than a hundred percent greater
17    than your largest hours estimate for the
18    implementation of CAMRA at Armour, right?
19        A.    I agree.  I don't see a correlation
20    again.
21        Q.    Okay.  Do you recall as you sit here
22    today, that the budget you prepared for the
23    implementation of CAMRA at WAMCO went over budget?
24               MR. O'CONNOR:  Objection.
25        A.    It was a fixed fee.  There was no
```

Iwona Olszewska
June 05, 2018                    104

```
 1                  - IWONA OLSZEWSKA -
 2     budget.  So there are different types of
 3     agreements we write and sometimes we make a
 4     decision to implement a client for certain amount
 5     of fee, doesn't necessarily -- which doesn't
 6     necessarily attribute to the hours we put in.
 7          Q.     Okay.  Do you recall -- let me ask
 8     you this way:  Do you recall that you -- that SS&C
 9     spent more hours on the implementation of CAMRA at
10     WAMCO than you initially budgeted?
11                 MR. O'CONNOR:  Objection.
12          A.     Again, it was a fixed fee.  So I know
13     that project went over a timeline so that
14     definitely associated with some additional hours,
15     yes.
16          Q.     Beyond what you had budgeted?
17          A.     Yes.
18          Q.     Okay.  And do you recall that your --
19     that the implementation of Annaly/Chimera required
20     more hours than what you initially budgeted?
21                 MR. O'CONNOR:  Objection.
22          A.     Very few.
23          Q.     Very few what?
24          A.     Additional hours.
25          Q.     But it exceeded the budget that you'd
```

```
 1                    - IWONA OLSZEWSKA -

 2      prepared, right?

 3               MR. O'CONNOR:  Objection.

 4         A.      Exceeded the budget we agreed upon

 5      with Chimera and Annaly based on what they said

 6      their contributions are going to be.

 7         Q.      Okay.  And do you recall that the

 8      implementation of CAMRA at Annaly/Chimera was

 9      complete by the time of the Armour contract?

10               MR. O'CONNOR:  Objection.

11         A.      I don't recall.  It must have been

12      completed.

13         Q.      Okay.  And do you recall that the

14      implementation of CAMRA at Resource exceeded the

15      number of hours that you originally budgeted?

16               MR. O'CONNOR:  Objection.

17         A.      Yes.

18         Q.      Okay.  Had you ever been wrong by

19      more than a hundred percent in the number of hours

20      you budgeted for an implementation of CAMRA?

21         A.      No, I'm always on point.

22               MR. O'CONNOR:  Objection.

23         A.      The fact that those implementations

24      went over budget needs to consider the situation

25      in which that had happened.  All of those
```

Iwona Olszewska
June 05, 2018                                      106

```
 1               - IWONA OLSZEWSKA -
 2    contracts, including Resource, have assumptions
 3    about clients' participation.  The fact that the
 4    client can't participate and in the way that they
 5    anticipated and agreed upon and then takes months
 6    to continue with the roll forward process, doesn't
 7    get ready to take on, I can't control that.
 8               So for the estimates that we do and
 9    the work that we do, our -- our estimates are
10    pretty much on point.
11         Q.    Okay.  And in the preparation of an
12    implementation budget for any kind of CAMRA
13    client, had you ever been wrong by a hundred
14    percent or more?
15               MR. O'CONNOR:  Objection.
16         A.    No.
17         Q.    Have you ever done any kind of
18    analysis -- strike that.
19               Has any kind of analysis ever been
20    done by anyone, to your knowledge, of the accuracy
21    of the budget you prepared for implementation of
22    CAMRA for Armour?
23               MR. O'CONNOR:  Objection.
24         A.    We always take into respect our
25    experience with estimates and evaluate as a course
```

Iwona Olszewska
June 05, 2018                              107

```
1                    - IWONA OLSZEWSKA -
2    of no wrong business.
3         Q.      Okay.  To your knowledge, did SS&C
4    ever tell Armour that SS&C had never implemented a
5    mortgage REIT on licensing in less than 12 months?
6                MR. O'CONNOR:  Objection.
7         A.      That -- that I don't know.  But
8    again, this is, as you said, the smallest REIT we
9    ever dealt with; so we implemented in 12 hours
10   (sic) Anally which is several times larger.
11        Q.      In 12 months?
12        A.      Yes.
13        Q.      You estimated that the Armour
14   implementation would be complete in four to six
15   months, right?
16        A.      Yes --
17                MR. O'CONNOR:  Objection.
18        A.      -- that it was possible to implement
19   given the assumptions within the work request,
20   part of which was that Armour will be running
21   CAMRA, I believe we said two to three months,
22   whatever the estimate was that -- that SS&C people
23   will provide support with maintaining the CAMRA
24   software while Armour was learning how to operate
25   within the new construct, if you would.  That
```

# EXHIBIT 8

Jeffrey Fecteau   Confidential
October 05, 2017

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF CONNECTICUT

3              NEW HAVEN DIVISION

4    - - - - - - - - - - - - - - - - - - - - - - - - - )
                                                       )
5    ARMOUR CAPITAL MANAGEMENT LP, ) Case No. 17-cv-00790-JAM
                                                       )
6            Plaintiff,              )
                                                       )
7        vs.                        )
                                                       )
8    SS&C TECHNOLOGIES, INC.,        )
                                                       )
9            Defendant.             )
                                                       )
10   - - - - - - - - - - - - - - - - - - - - - - - - - )

11

12              ** CONFIDENTIAL **

13      VIDEOTAPED DEPOSITION OF JEFFREY R. FECTEAU

14              DATE:  OCTOBER 5, 2017

15                 HELD AT:

16             HOLLAND & KNIGHT, LLP
                  One Stamford Plaza
17             263 Tressler Boulevard
                Stamford, Connecticut
18                   - - -

19

20

21

22

23

24   Reporter:  Sandra Semevolos, RMR, CRR, CRC, LSR #74

25

```
 1   to go through these, I'd ask that we go on an Attorneys'
 2   Eyes Only basis.
 3                   MR. MAMOUNAS:   Jim, if you don't mind.
 4              (Mr. Mountain left the room.)
 5   BY MR. MAMOUNAS:
 6       Q.   When did New York Mortgage Trust become an
 7   SS&C customer?
 8       A.   My best guess would be probably in the 2005
 9   range.
10       Q.   And who from sales was involved in securing
11   New York Mortgage Trust as a customer?
12       A.   As I recall, it was Jack Quinn.
13       Q.   Do you know if New York Mortgage Trust was
14   offered hosting for CAMRA?
15       A.   I do not.
16       Q.   Do you know if they ever tried hosting?
17       A.   I do not.
18       Q.   Do you know why they chose outsourcing?
19       A.   I do not.
20       Q.   Do you know, as you sit here today, whether
21   implementation of the CAMRA product for them succeeded?
22       A.   Yes.
23       Q.   How long did it take for implementation for
24   New York Mortgage Trust to succeed?
25       A.   I do not know.
```

Jeffrey Fecteau   Confidential
October 05, 2017                          76

1   don't know the exact number that it ends at.

2       Q.    Okay.  And it's ranked by the closed deal

3   revenues figures, is it not?

4       A.    Yes.

5       Q.    So is it from that report that you learned

6   that Mr. Moore was in the top 10 of sales executives at

7   SS&C?

8       A.    Yes.

9       Q.    Did you have any conversations with him about

10  that to congratulate him or anything else?

11      A.    I assume I would have congratulated him, but

12  nothing specific.

13      Q.    And do you know who he took with him as his

14  honored guest at the Anne Arundel Manor Golf Course?

15      A.    I do not.

16      Q.    So in early 2014, we were talking about the

17  five REIT clients that SS&C had and Annaly was the last

18  of those five; right?

19      A.    Yes.

20      Q.    And do you remember when Annaly hired SS&C?

21      A.    To the best of my recollection, the contract

22  was signed in March of 2014.

23      Q.    Okay.  And you and Mr. Quinn, from a sales

24  perspective, were involved in pursuing that lead, were

25  you not?

# EXHIBIT 9

Jeff Fecteau  Confidential
May 04, 2018

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2                   NEW HAVEN DIVISION

3

4          DOCKET NUMBER:  17-CV-00790-JAM

5

6  ---------------------------)
                               )
7  ARMOUR CAPITAL MANAGEMENT,  )
   LP                          )
8                              )
            Plaintiff(s),      )
9                              )
   VS                          )
10                             )
   SS&C TECHNOLOGIES, INC.     )
11                             )
            Defendant(s).      )
12 ---------------------------)

13

14                   VOLUME II

15               Pages 285 - 430

16

17      VIDEO DEPOSITION OF:  JEFF FECTEAU

18          CONFIDENTIAL TRANSCRIPT

19 DATE:      May 4,2018
   TIME:      1:59 p.m.
20 HELD AT:   Hinckley Allen
              20 Church Street
21            Hartford, Connecticut

22                   - - -

23

24

25   Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030
```

Jeff Fecteau  Confidential
May 04, 2018                        55

```
 1              MR. O'CONNOR:  Objection.

 2              THE WITNESS:  I can't see why we

 3       would.

 4  BY MR. MAMOUNAS:

 5     Q   That wasn't my question.  Was there

 6  anything, as you sit here today, that you were

 7  aware of prior to the execution of the Master

 8  Agreement that prevented SS&C from verifying the

 9  adequacy of the AVM relationship for Professional

10  Services purposes?

11              THE WITNESS:  Armour's --

12              MR. O'CONNOR:  Objection.

13              THE WITNESS:  Armour's permission.

14  BY MR. MAMOUNAS:

15     Q   Okay.  Did you ask for Armour's

16  permission prior to the execution of the Master

17  Agreement to verify the AVM relationship?

18              MR. O'CONNOR:  Objection.

19              THE WITNESS:  We did get a listing

20          of services that AVM was providing

21          from -- I am not sure if it came, if it

22          came from Mark, but it came from somebody

23          within Armour that told us the services

24          that AVM was providing.

25
```

Jeff Fecteau   Confidential
May 04, 2018                              108

1 Remember that?

2      A    I don't recall specifically if we had

3 that service in there.   If we had the manual

4 services in there, yes, it would have included

5 establishing connectivity with the custodian.

6      Q    Okay.   And as part of the sale process

7 you told Armour that CAMRA supports unlimited

8 custodians.   Right?

9      A    Yes.

10      Q    Okay.   During the sales process you

11 learned that one of Armour's custodians was City.

12 Right?

13      A    I believe so, yes.

14      Q    You also learned during the sales process

15 that Armour may use Bony as a custodian.   Right?

16      A    I believe so, yes.

17      Q    Okay.   And of course you understood that

18 Armour required CAMRA to connect to its custodians

19 as part of the implementation.   Right?

20      A    Yes.

21      Q    The purpose of that connection was to

22 import the transactions from the custodians into

23 CAMRA.   Right?

24      A    That would be the purpose.

25      Q    And SS&C specifically told Armour that it

Jeff Fecteau  Confidential
May 04, 2018                    109

```
 1  could connect CAMRA to City Bank for that
 2  purpose -- or City -- I'm sorry.
 3                MR. O'CONNOR:  Objection.
 4                THE WITNESS:  We would be able to --
 5           yes, I believe we have connected already
 6           with City and with Bony.
 7  BY MR. MAMOUNAS:
 8      Q   Okay.
 9      A   Existing links there.
10      Q   As far as what SS&C told Armour during
11  the sales process, one thing was that CAMRA could
12  connect to City for purposes of doing the imported
13  transactions; is that right?
14                MR. O'CONNOR:  Objection.
15                THE WITNESS:  It would be that SS&C
16           could get connectivity established.
17                So it's a function of running that
18           process, getting it to a CAMRA ready
19           format, and then being able to upload it
20           into CAMRA.
21  BY MR. MAMOUNAS:
22      Q   Okay.  So, during the course of the sales
23  process SS&C told Armour that SS&C could get
24  connectivity to City.  Fair?
25                MR. O'CONNOR:  Objection.
```

Jeff Fecteau  Confidential
May 04, 2018                                110

```
 1              THE WITNESS:  I believe that would
 2         accurate, yes.
 3
 4  BY MR. MAMOUNAS:
 5      Q   Okay.  Also SS&C told Armour during the
 6  sales process that CAMRA could connect to Bony as
 7  Armour's custodian to import transactions.  Right?
 8              MR. O'CONNOR:  Objection.
 9              THE WITNESS:   We would have
10         represented if we could get information
11         from Bony into a CAMRA-ready format that
12         can be uploaded into CAMRA, yes.
13  BY MR. MAMOUNAS:
14      Q   That's the connectivity we have been
15  talking about?
16      A   Yes.
17      Q   So we are on the same page, that
18  connectivity is a electronic connection that
19  transfers the information.  Right?
20      A   What we are doing there is we are
21  requesting that the client give us credentials.
22              So we have to get permission from them,
23  as well as their custodian, for us to get log in
24  credentials.
25              We would log in to the custodian's
```

Jeff Fecteau   Confidential
May 04, 2018                          111

1 website or whichever system they would have us

2 access, using those credentials, request the

3 information, extract that information, and then

4 transform it for loading into CAMRA.

5       Q    Okay.  And the "we" i that response is

6 SS&C?

7       A    SS&C.

8       Q    Okay.  Prior to the Master Agreement were

9 you aware of SS&C previously having had any

10 difficulties connecting to City as a custodian?

11      A    I was not.

12      Q    Prior to the Master Agreement did you

13 check whether SS&C previously had any difficulties

14 connecting to City as a custodian?

15      A    Specific to the Armour opportunity, no.

16 But I have, in the past, requested from my, it's a

17 group, OTS, that handles that, a list of

18 custodians where we have existing links.

19      Q    Okay.  My question was a bit different.

20 I asked whether prior to the Master Agreement you

21 ever check, whether respective to Armour or not,

22 whether SS&C previously had any difficulties

23 connecting to City as a custodian?

24      A    No, not difficulties.

25      Q    Prior to the Master Agreement were you

Jeff Fecteau   Confidential
May 04, 2018                        112

1  aware of SS&C doing anything to verify its ability
2  to connect to City as a custodian?
3                    MR. O'CONNOR:  Objection.
4                    THE WITNESS:   Yes, I would have
5           asked for a list of custodians that we
6           have connectivity to.
7  BY MR. MAMOUNAS:
8      Q   Okay.  Were you aware of anything else
9  that SS&C did to verify it's connectivity to City
10 as a custodian?
11     A   As I understand what makes it on to that
12 list is we either currently have an existing link
13 with that custodian or have had a successful link
14 with them.
15          I want to say it's that we have an active
16 link is what makes it on to that list.
17     Q   Okay.  Did you ask, in connection with
18 the Armour deal, during the sale process, what the
19 status of that active link with City was?
20                   MR. O'CONNOR:  Objection.
21                   THE WITNESS:  I don't recall.
22 BY MR. MAMOUNAS:
23     Q   Okay.  Other than requesting the list of
24 custodians, prior to the Master Agreement do you
25 know if SS&C did anything to verify its ability to

 1  connect to City as a custodian for Armour

 2  specifically?

 3       A   I do not.

 4       Q   Prior to the Master Agreement are you

 5  aware of SS&C running any tests to connect to City

 6  as a custodian for Armour?

 7                MR. O'CONNOR:  Objection.

 8                THE WITNESS:  Specific to Armour, I

 9           do not.

10  BY MR. MAMOUNAS:

11       Q   Are you aware of any tests generally,

12  sir?

13       A   I would say if they are on that list,

14  it's being tested all the time, because we are

15  using it for other clients.

16       Q   Okay.  But you don't know specifically,

17  as you sit here today, do you?

18                MR. O'CONNOR:  Objection.

19                THE WITNESS:  I do not.

20  BY MR. MAMOUNAS:

21       Q   Prior to the Master Agreement are you

22  aware of SS&C speaking with anyone at City about

23  connecting to CAMRA for Armour?

24       A   I do not.

25       Q   Prior to the Master Agreement were you

Jeff Fecteau   Confidential
May 04, 2018                          114

1  aware of SS&C developing any scripts for use in

2  connecting CAMRA to City as a custodian for

3  Armour?

4      A   For Armour?

5      Q   Correct.

6      A   I am not.

7      Q   Other than for Armour are you aware of

8  any scripts at SS&C -- were you aware, prior to

9  the Master Agreement, of any scripts at SS&C for

10 connecting to City as a custodian?

11     A   I believe City was on that list.  So, yes

12 there would have been scripts that existed for

13 getting that information.

14     Q   You don't know that specifically, as you

15 sit here today?

16             MR. O'CONNOR:  Objection.

17             THE WITNESS:  I do not.

18 BY MR. MAMOUNAS:

19     Q   You didn't know that specifically prior

20 to the Master Agreement, either, did you?

21             MR. O'CONNOR:  Objection.

22             THE WITNESS:  Specifically, no.

23 BY MR. MAMOUNAS:

24     Q   Prior to the Master Agreement were you

25 aware of SS&C developing any new functionality for

Jeff Fecteau   Confidential
May 04, 2018                     115

```
 1 connecting CAMRA to City as a custodian for
 2 Armour?
 3     A   No.
 4     Q   Prior to the Master Agreement in relation
 5 to connecting CAMRA to City as a custodian for
 6 Armour were you aware of SS&C accounting for the
 7 fact that Armour had chosen the hosting deployment
 8 option for CAMRA?
 9               MR. O'CONNOR:  Objection.
10               Can you read that question back,
11        please?
12 BY MR. MAMOUNAS:
13     Q   Sure.  I can read it.  Prior to the
14 Master Agreement, in relation to connecting CAMRA
15 to City as a custodian for Armour, were you aware
16 of SS&C accounting for the fact, specifically,
17 that Armour had chosen the hosting employment
18 option?
19               MR. O'CONNOR:  Objection.
20               THE WITNESS:  I don't know that the
21        hosting deployment option is relative to
22        connecting to City.
23               The process would be the same if it
24        was an in-house deployment, as well.
25 BY MR. MAMOUNAS:
```

Jeff Fecteau   Confidential
May 04, 2018                                    116

1       Q    Okay.  Did you ever come to have an

2  understanding that there was a distinction between

3  hosting and outsourcing with respect to the

4  custodian feeds that SS&C had established for its

5  customers for CAMRA?

6                    THE WITNESS:   No.

7                    Mr. O'CONNOR:   Objection.

8  BY MR. MAMOUNAS:

9       Q    Prior to the Master Agreement were you

10  aware of SS&C creating any file formats for use in

11  connecting CAMRA to City as a custodian for

12  Armour?

13      A    There would not be the need to create

14  specific formats.  We are looking for every

15  custodian to be able to provide us information in

16  a CAMRA standard format.

17                  So it's a format that we have documented,

18  and that the custodian data would have to adhere

19  to.

20      Q    Did SS&C give City notice of those

21  formats, as far as you are aware, prior to the

22  Master Agreement?

23      A    I do not know.

24      Q    Do you know if SS&C gave Armour notice of

25  those formats prior to the execution of the Master

Jeff Fecteau  Confidential
May 04, 2018                              117

1  Agreement?

2      A    I do not know.

3      Q    Okay.  Apart from what we've seen in the

4  implementation questionnaire -- I can direct your

5  attention to page seven of question 41 -- I'll

6  give you a moment to get there.

7          Other than that information, prior to the

8  Master Agreement are you aware of SS&C gathering

9  any additional information from Armour for use in

10 connecting CAMRA to City as a custodian for

11 Armour?

12                 MR. O'CONNOR:  Objection.

13                 THE WITNESS:  Other than being -- I

14          know Dennis had written down that City

15          was a custodian as part of his

16          information gathering process.

17                 Other than that, I don't think there

18          was anything else.

19 BY MR. MAMOUNAS:

20     Q    Okay.  Prior to the Master Agreement were

21 you aware of SS&C making any determination about

22 the data feed required to connect CAMRA to City as

23 a custodian for Armour?

24     A    Could you repeat the question.

25     Q    Sure.  Prior to the Master Agreement were

Jeff Fecteau   Confidential
May 04, 2018                                118

```
 1 you aware of SS&C making any determinations about
 2 the data feed required to connect CAMRA to City as
 3 a custodian for Armour?
 4          MR. O'CONNOR:  Objection.
 5          THE WITNESS:  Again, it's a CAMRA
 6          standard format, so it's predetermined
 7          what format we are going to be looking to
 8          get the data in from the custodian.
 9          That is a documented format, and
10          it's standard across all CAMRA clients,
11          all deployment methods.
12 BY MR. MAMOUNAS:
13     Q   Okay.  Apart from the format, were you
14 aware of SS&C making any determinations about the
15 data feed specifically that it required in order
16 to connect City and CAMRA for City to be a
17 custodian of Armour?
18          MR. O'CONNOR:  Objection.
19          THE WITNESS:  No.
20 BY MR. MAMOUNAS:
21     Q   Prior to the Master Agreement were you
22 aware of SS&C accounting for whether data from
23 City as a custodian would be comingled with data
24 from other customers of SS&C?
25          MR. O'CONNOR:  Objection.
```

Jeff Fecteau  Confidential
May 04, 2018                              119

```
 1              THE WITNESS:  Data from would be
 2          comingled, no.
 3
 4  BY MR. MAMOUNAS:
 5      Q   Have you ever heard of comingled data,
 6  sir?
 7      A   Yes.
 8      Q   Okay.  That is when data from multiple
 9  customers is included within the same file.
10  Right?
11      A   Yes.
12      Q   Okay.  Have you ever heard anything from
13  SS&C internally about data from custodians being
14  comingled?
15      A   I have not.
16      Q   Okay.  Where have you heard of comingled
17  data in your experience?
18      A   Just industry parlance.
19      Q   Prior to the Master Agreement were you
20  aware of SS&C previously having had any
21  difficulties connecting to Bony as a custodian?
22      A   No.  Actually quite the opposite.  So, we
23  have several large clients that I know definitely
24  are using Bony as their custodian.
25      Q   Okay.  Who are the several large clients?
```

Jeff Fecteau  Confidential
May 04, 2018                           120

```
 1               MR. O'CONNOR:  Objection.
 2  BY MR. MAMOUNAS:
 3     Q   I am focusing on the ones prior to the
 4  Master Agreement, please.
 5     A   I will give you the biggest one.  It Is
 6  Reliance Standard Life.  It is definitely a Bony
 7  client.  I know that there is more.  That's the
 8  one that I can tell you -- and I want to say Excel
 9  Catlin, it's the other one, C-a-t-l-i-n, are both
10  using Bony.  There is more.
11               MR. O'CONNOR:  I designate this
12          transcript as confidential.
13  BY MR. MAMOUNAS:
14     Q   Okay.  So that I have got a clear answer
15  to my question, prior to the Master Agreement were
16  you aware of SS&C previously having had any
17  difficulties connecting to Bony as a custodian?
18     A   No.
19     Q   Prior to the Master Agreement did you
20  check whether SS&C previously had any difficulties
21  connecting to Bony as a custodian?
22     A   No.
23     Q   Prior to the Master Agreement were you
24  aware of SS&C doing anything to verify its ability
25  to connect to Bony as a custodian?
```

Jeff Fecteau   Confidential
May 04, 2018                    121

```
 1                 MR. O'CONNOR:  Objection.
 2                 THE WITNESS:  Other than the fact
 3            that we were getting daily feeds for
 4            existing clients, that would have been
 5            verification that we were gathering
 6            information.
 7  BY MR. MAMOUNAS:
 8      Q    Well, other than that, no, SS&C didn't do
 9  anything to verify.  Right?
10                 MR. O'CONNOR:  Objection.
11                 THE WITNESS:  Other than verifying
12            that the existing feeds for our clients
13            are still running, yes.  There was
14            nothing else done.
15  BY MR. MAMOUNAS:
16      Q    Prior to the Master Agreement in relation
17  to the sales process for Armour, did you do
18  anything to verify whether, for example, Reliance
19  Standard Life or Excel Catlin's Bony feeds were
20  still operational?
21                 MR. O'CONNOR:  Objection.
22                 THE WITNESS:  No.
23  BY MR. MAMOUNAS:
24      Q    So, you just assumed that they were; is
25  that fair?
```

# EXHIBIT 10

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF CONNECTICUT

3                   NEW HAVEN DIVISION

4     ------------------------------)
                                    )
5     ARMOUR CAPITAL MANAGEMENT LP, ) Case No. 17-cv-00790-JAM
                                    )
6              Plaintiff,           )
                                    )
7         vs.                       )
                                    )
8     SS&C TECHNOLOGIES, INC.,      )
                                    )
9              Defendant.           )
                                    )
10    ------------------------------)

11

12                  ** CONFIDENTIAL **

13        VIDEOTAPED DEPOSITION OF DENNIS MOORE

14              DATE:  OCTOBER 4, 2017

15                    HELD AT:

16              HOLLAND & KNIGHT, LLP
                 One Stamford Plaza
17              263 Tressler Boulevard
                Stamford, Connecticut
18                      - - -

19

20

21

22

23

24    Reporter:  Sandra Semevolos, RMR, CRR, CRC, LSR #74

25

Dennis Moore   Confidential
October 04, 2017                    15

```
 1        A.     No.
 2        Q.     And what was the position for which you began
 3  working at SS&C in March of 2013?
 4        A.     Sales associate.
 5        Q.     How did you hear about the position?
 6        A.     I had known about SS&C prior.  I also was
 7  associates with the current CEO, Bill Stone.
 8        Q.     How do you know Mr. Stone?
 9        A.     I grew up with his son.
10        Q.     Who is his son?
11        A.     Rob Stone.
12        Q.     Does Rob Stone work at SS&C?
13        A.     He does.
14        Q.     What does he do there?
15        A.     He is in sales.
16        Q.     How many sales associates -- that was the
17  position that you first started working at, at SS&C;
18  right?
19        A.     Correct.
20        Q.     How many sales associates did SS&C have in
21  2013?
22        A.     I don't know the exact number.
23        Q.     More than 10?
24        A.     Yes.
25        Q.     More than 50?
```

Dennis Moore   Confidential
October 04, 2017                    79

```
 1    outsourcing division was also involved in the sales
 2    pitch; right?
 3         A.    Yes.
 4         Q.    And what did they do?
 5         A.    They assisted with a proof of concept we did
 6    for Armour.
 7         Q.    How many proof of concepts did you do for
 8    Armour?
 9         A.    Two.
10         Q.    They needed to be redone a fair number of
11    times; right?
12         A.    What would you quantify as "a fair number of
13    times"?
14         Q.    They needed to be redone more than once;
15    right?
16         A.    Yes.
17         Q.    They needed to be redone more than twice;
18    right?
19         A.    I don't recall.
20         Q.    Okay, we will look at some documents.
21               Didn't you tell me that hosting was the
22    deployment option that ultimately was selected for
23    Armour?
24         A.    Yes.
25         Q.    Was outsourcing ever considered?
```

Page 114

1     A.   Yes.
2     Q.   Okay.  Do you know who was involved with the
3  other six, or so, that you weren't involved with?
4     A.   To the best of my knowledge, Jeff Fecteau.
5     Q.   And did any of those relationships precede
6  April of 2014?  In other words, did they exist, to your
7  knowledge, as of April of 2014?
8     A.   Yes.
9     Q.   Okay.  Do you know how many of them?
10    A.   I believe at the time of engaging Armour, we
11 had about four or five mortgage REIT clients.
12    Q.   And how many of those mortgage REIT clients
13 were CAMRA clients?
14    A.   Four out of the five.
15    Q.   And who were those clients?
16    A.   Ladder Capital, New York Mortgage Trust,
17 Apollo, CYS, and Annaly.
18    Q.   These were all CAMRA customers?
19    A.   No, I said four out of the five were.
20    Q.   Right.  So my question to you was:  Which of
21 the four are CAMRA customers?
22    A.   Everyone except for CYS.  CYS uses Trade Desk.
23    Q.   Okay.  And these are all relationships as to
24 which you had no involvement; right?
25    A.   Yes.

Page 115

1     Q.   And they existed as of April of 2014; right?
2     A.   Yes.
3     Q.   Okay.  Was Ladder -- strike that.
4          What was Ladder's deployment option for CAMRA?
5     A.   Outsourcing.
6     Q.   What was New York Mortgage Trust's deployment
7  option?
8     A.   Outsourcing.
9     Q.   What was Apollo's deployment option?
10    A.   Outsourcing.
11    Q.   And what was Annaly's deployment option?
12    A.   In-house license.
13    Q.   Okay.  So is it fair to say that as of April
14 of 2014, SS&C had never had a coast -- SS&C had never
15 had a hosted CAMRA customer that was a REIT?
16    A.   I would say that's incorrect because all
17 outsourcing clients are hosted in our data center.
18    Q.   Okay.  Let's go back to the three deployment
19 options.  We've got in-house, on-premises, we've got
20 hosted; right?
21    A.   Uh-huh.
22    Q.   And we've got outsourced; right?  So when you
23 told me that these three, Ladder, New York Mortgage
24 Trust and Apollo were outsourced, you were referring to
25 that deployment option; correct?

Page 116

1     A.   Correct.
2     Q.   And Annaly is the in-house license, and you
3  are referring to that deployment option; correct?
4     A.   Correct.
5     Q.   So as of April of 2014, SS&C had never had a
6  hosted REIT customer for CAMRA; correct?
7     A.   Correct.
8     Q.   And after that time, the only hosted REIT
9  customer that it had, to your knowledge, was Bimini;
10 right?
11    A.   Yes.
12    Q.   Let's start with some documents.
13         MR. MAMOUNAS:  How are we on time?
14         THE VIDEO OPERATOR:  About five minutes,
15 do you want to swap out?
16         MR. MAMOUNAS:  Let's swap out then real
17 quick.  Take a bathroom break and then come back.
18         THE VIDEO OPERATOR:  We're now off the
19 record, the time is 1:17 p.m.
20         (Recess taken from 1:17 p.m. to 1:28 p.m.)
21         (Messrs. Mountain and Gruber reentered the room)
22         THE VIDEO OPERATOR:  This marks the
23 beginning of Tape Number 3 in the deposition of
24 Mr. Dennis Moore.  We are now back on the record.  The
25 time is 1:28 p.m.

Page 117

1  BY MR. MAMOUNAS:
2     Q.   Mr. Moore, welcome back from the break.
3     A.   Thank you.
4     Q.   Did you discuss the subject of your testimony
5  with anyone during the break?
6     A.   No.
7     Q.   I'm hoping you could help me with what we will
8  mark as Exhibit 1.  And for your benefit, since you
9  haven't been deposed before, take a moment to look over
10 the document and familiarize yourself with it, and then
11 let me know when you are ready.
12         (Exhibit 1, Handwritten document, Bates
13         Numbers SSC152488 through 152505, marked
14         for identification.)
15         MR. O'CONNOR:  And this I would designate
16 as Attorneys' Eyes Only, it's my understanding that it
17 was being --
18         MR. MAMOUNAS:  It's been redacted by your
19 side, Mr. O'Connor, a few different pages.
20         MR. O'CONNOR:  Okay.  Excuse me, yeah, I
21 saw the Citi and Bank of New York, they're obviously
22 third party vendor so that's --
23         MR. MAMOUNAS:  Right.
24         MR. O'CONNOR:  This is Moore Exhibit 1?
25         MR. MAMOUNAS:  Right.

Dennis Moore  Confidential
October 04, 2017                    127

1    are ready.

2                         (Pause.)

3        A.    Okay, I'm done.

4        Q.    Have you ever seen this press release before?

5        A.    Yes.

6        Q.    When did you first see it?

7        A.    I don't recall.

8        Q.    Do you see that the by line of it is Servicing

9    Group Address is Growing Mortgage REIT Investment

10   Accounting and Reporting Needs.

11               Do you see that?

12       A.    I see that.

13       Q.    And if you go to the first paragraph, the

14   first line of it reads, SS&C Technology Holdings, Inc.,

15   and then it gives the NASDAQ ticker, a global provider

16   of financial services software and software-enabled

17   services, today announced the establishment of its real

18   estate investment trust servicing group.

19               Do you see that?

20       A.    Yes.

21       Q.    What is the real estate investment trust

22   servicing group?

23       A.    It's a dedicated group within SS&C that

24   comprises, you know, professionals that have expertise

25   in mortgage REITs, many of them are CPAs, many of them

Dennis Moore   Confidential
October 04, 2017                    128

 1   come from big 4 accounting firms.  They were assembled,

 2   you know, due to their, you know, expertise in public

 3   company financial reporting, their technical accounting

 4   knowledge with structured securities like

 5   mortgage-backed securities, and we thought that this was

 6   a market that was probably underserved by other

 7   providers, and we wanted to pursue the remaining

 8   mortgage REITs in that universe of mortgage REITs.

 9        Q.    Were you part of the decision-making process

10   for the formation of that group?

11        A.    No.

12        Q.    When did you first hear about the group?  Was

13   it before or after this press release?

14        A.    I can't say for certain.  I don't recall.

15        Q.    You are part of this group, are you not?

16        A.    I'm not.

17        Q.    You are not part of this group?

18        A.    No.

19        Q.    Is this group -- does this group still exist

20   within SS&C?

21        A.    Yes.

22        Q.    And what's it called?  How do you refer to it?

23        A.    The REIT services group.

24        Q.    The REIT services group, okay.  And does that

25   sit within institutional and investment management?

Dennis Moore   Confidential
October 04, 2017                           129

1        A.    I believe so, yes.

2        Q.    And who is part of the REIT services group?

3   What people, names?

4        A.    There are a few individuals I can recall, but

5   I think we are adding to that group all the time.   Jason

6   Holmes, Ross Piper, Josh Brown, Bobby Jensen -- Robert

7   Jensen, Viana Hiue, Don Johnson, and there is a number

8   of others.

9        Q.    Okay.  None of these folks, with the exception

10  of Mr. Brown, have come up so far in our discussion

11  today of the Armour sales pitch, have they?

12       A.    I don't believe so, no.

13       Q.    So is there a reason that the REIT servicing

14  group, other than Mr. Brown, wasn't consulted with

15  respect to the Armour sales lead?

16       A.    Can you repeat the question?

17       Q.    Okay.  Was the REIT sales group consulted in

18  respect of the Armour sales lead?

19       A.    So the REIT services group was consulted, yes.

20       Q.    Okay.  And who from the REIT services group

21  was consulted?

22       A.    Josh Brown, Ross Piper, Don Johnson, Robert

23  Jensen.  That's it.

24       Q.    All of these folks were consulted in respect

25  of the lead before the contract was executed in December

Dennis Moore  Confidential
October 04, 2017                    130

1    of '14?

2         A.    In one way or another, yes.

3         Q.    And which of these did you personally consult

4    with?

5         A.    All of them.  All of them at one point or

6    another, either individually or as a group.

7         Q.    Okay.  What was Mr. Brown's contribution?

8         A.    Josh Brown spent 10 years in PWC's national

9    practice, in their audit.  He is a CPA, he is probably

10   one of our strongest technical accountants.  He knows

11   the mortgage REIT space, so he was involved in some of

12   our initial discovery, our presentation to Armour, as

13   well as the proof of concept process and the delivery of

14   that back to Armour.

15        Q.    Anything else?

16        A.    Not that I can recall.

17        Q.    Okay.  What was Mr. Piper's contribution as

18   opposed to his experience; what did he actually

19   contribute to the Armour sales lead?

20        A.    I can't recall exactly what he did, but during

21   the proof of concept, there was a process of, you know,

22   accessing our Bloomberg terminal to verify prices and

23   market data and other things, which I believe he helped

24   out with.

25        Q.    Anything else?

Dennis Moore  Confidential
October 04, 2017                    204

```
 1    Armour ultimately engaged SS&C; is that correct?
 2              MR. O'CONNOR:  Objection.
 3        Q.    You can answer.
 4        A.    Yes.  From my summation of why they went with
 5    us, yes.
 6        Q.    Well, that, in fact, is what Ms. Johnson was
 7    asking you in her February 6, 2015, 11:08 a.m. message;
 8    correct?
 9              She says, Is the highlight below correct?  And
10    the highlight is specifically on the issue of mortgage
11    REITs.
12              Do you see that?
13        A.    Yes.
14        Q.    And so you affirmed her understanding that
15    what she said was a key criteria for Armour's engagement
16    of SS&C was the mortgage REIT expertise it said it had;
17    isn't that accurate?
18        A.    Yes.
19        Q.    I'm going to show you what we are going to
20    mark as Moore Exhibit 8.  Please have a look at it and
21    let me know when you are ready.
22                   (Exhibit 8, Emails, Bates Numbers
23                   SSC000276 through 280, marked for
24                   identification.)
25                        (Pause.)
```

Dennis Moore   Confidential
October 04, 2017                          205

1        A.      Okay, I'm done reading.

2    BY MR. MAMOUNAS:

3        Q.      Do you recognize the document we've marked as

4    Plaintiff's Exhibit 8?

5        A.      I do.

6        Q.      It ends with an email at the very top between

7    you and Jim Mountain and Mark Gruber of Armour; correct?

8        A.      Yes.

9        Q.      And in the first paragraph, third sentence,

10   you say, Based on our understanding of your business and

11   current environment.

12            Do you see that?

13       A.      Yes.

14       Q.      By this point in time, you've done at least

15   75 percent of the four to six hours of research that we

16   talked about earlier; right?

17       A.      Personally, yes.

18       Q.      You had the June 2nd meeting in New York City

19   with Armour; right?

20       A.      Yes.

21       Q.      Did you do anything else in order to form an

22   understanding of Armour's business and current

23   environment apart from those two things?

24       A.      Yes.  So if you look at page 78 of Exhibit 8,

25   there is a reference to an introductory call which

Dennis Moore  Confidential
October 04, 2017                                          206

```
 1    includes the person who probably hands-down knows CAMRA
 2    the best at SS&C and was involved in other, you know,
 3    sales of the product, and he was the one who asked
 4    targeted questions about the business and that we
 5    brought in for the demo for continuity purposes.
 6         Q.    Who is that individual?
 7         A.    Mike Doyle.  He is referenced here.
 8         Q.    Okay.  So Mike asked questions; right?
 9         A.    Mike asked very thoughtful discovery
10    questions, yes.
11         Q.    And those were during the context -- strike
12    that.
13               Those were during a call with Armour; right?
14         A.    Yes.
15         Q.    How long did that call last?
16         A.    I don't recall.
17         Q.    Were you on that call?
18         A.    I don't recall.
19         Q.    How do you know his questions were very
20    thoughtful if you can't recall whether you were on the
21    call?
22         A.    So what I would typically do in advance of
23    that call is provide that write-up to Mike so that he
24    can formulate his questions based off of that, and we
25    don't just ask anyone to join those calls.  I've
```

Dennis Moore   Confidential
October 04, 2017                          207

1    attended other calls with him, and he is very thoughtful

2    in his approach, in his discovery, and asking the right

3    questions.

4         Q.    But you don't remember this specific call?

5         A.    I don't remember the specific call, no.

6         Q.    And what did you mean by the write-up that you

7    provided him?

8         A.    The write-up we've been talking about that

9    summarizes my research.

10        Q.    And you didn't write out any questions for him

11   though, did you?

12        A.    I don't recall.

13        Q.    It would be up to Mr. Doyle to come up with

14   whatever questions he wanted to ask Armour; right?

15        A.    Not necessarily, but I don't recall.

16        Q.    Okay.  You don't recall having provided him

17   any questions, however, to ask on the call, do you?

18        A.    I don't, but it's very common for us to do

19   that.

20        Q.    Do you know if anybody else was on this call

21   between Mr. Doyle and Armour?

22        A.    I don't.

23        Q.    So we have at least 75 percent of the four to

24   six hours of research, the June 2nd meeting, and

25   Mr. Doyle's phone call; right?  Going back to page 1,

Dennis Moore  Confidential
October 04, 2017                                      208

```
 1   Based on our understanding of your business and current
 2   environment; right?
 3        A.    I'm just reading.  Just one second.
 4                      (Pause.)
 5        A.    And then we would have gotten IT and
 6   system-related requirements from Trevor Spicer, who is
 7   the IT personnel at Armour who shared his requirements
 8   and that we provided responses to.
 9        Q.    Okay.  Did you analyze Mr. Spicer's responses
10   to the questions?
11        A.    It would have been Trevor Spicer's questions
12   that our IT team provided responses to.
13        Q.    Okay.  And so I mean, how does that have to do
14   with your due diligence of -- or your -- strike that.
15             What does that have to do with your
16   understanding of Armour's business and current
17   environment?
18        A.    Again, it's more than just a business need.
19   It's understanding their current environment from an
20   investment perspective, a software perspective, a
21   process perspective and a technical perspective.  So
22   that was getting a better understanding of their current
23   technical environment and challenges and technical
24   requirements going forward.
25        Q.    Okay.  But what you are telling me is that
```

Dennis Moore   Confidential
October 04, 2017                    209

```
 1   SS&C provided responses to Armour's questions.

 2        A.    Correct.

 3        Q.    Right?  So this was Armour asking about SS&C,

 4   not the other way around; right?

 5        A.    IT questions are typically phrased from the

 6   perspective, can you support our current environment?

 7   So there was a lot of -- from what I recollect, there

 8   was disclosure of this is what we have in place today,

 9   here are our challenges.  So it was as much SS&C

10   providing information as it was learning about the

11   technical environment of Armour.

12        Q.    But the questions were prompted by Armour's

13   side of SS&C; correct?

14                  MR. O'CONNOR:  Objection.

15        A.    Jim Mountain had referenced IT-related

16   questions that Trevor Spicer had, so I asked him to send

17   those along so we can provide responses, and then I

18   offered to have a follow-up call if he felt that was

19   necessary.

20        Q.    Okay.  So back to the first page of this, and

21   again, the words that you wrote, Our understanding of

22   your business and current environment.

23                  What else, if anything, did you do in order to

24   form -- in order for SS&C to form the understanding of

25   Armour's business and current environment?
```

Dennis Moore   Confidential
October 04, 2017                              210

```
 1              MR. O'CONNOR:  Objection.
 2       A.    The meeting in New York on the 2nd, which was,
 3  again, not just one-sided SS&C making a pitch, it was
 4  doing further discovery and highlighting our
 5  understanding and getting confirmation from Armour.
 6       Q.    Anything else?
 7       A.    Not to my knowledge.
 8       Q.    You continue, We are confident CAMRA is the
 9  right fit for Armour, and I just wanted to reaffirm our
10  interest in partnering with you.
11              Do you see that?
12       A.    Yes.
13       Q.    And that was, as the line reads, based on
14  SS&C's understanding of Armour's business and current
15  environment; correct?
16       A.    Yes.
17       Q.    And that was a truthful statement?
18       A.    Yes.
19       Q.    As far as you believe; right?
20       A.    Yes.
21       Q.    Do you stand by that statement?
22       A.    I do.
23       Q.    I show you what we will mark as Plaintiff's
24  Exhibit 9.
25              (Exhibit 9, Armour Write-up, Bates
```

Dennis Moore   Confidential
October 04, 2017                    211

 1                    Numbers SSC000811 through 812, marked for

 2                    identification.)

 3    BY MR. MAMOUNAS:

 4        Q.    Have a look at it and let me know when you are

 5    ready, please.

 6                         (Pause.)

 7        A.    Okay.  I'm done reading.

 8        Q.    Is this the write-up about Armour that you

 9    testified you prepared?

10        A.    Yes.

11        Q.    This is your document; correct?

12        A.    Yes.

13        Q.    No one else was involved in preparing it;

14    right?

15        A.    No one else physically added information to

16    this document, but it's a collection of content from

17    meetings and research and conversations.

18        Q.    Who are all of the individuals that provided

19    the content reflected in this document?

20        A.    Jim Mountain, Mark Gruber, whoever prepares

21    the 10-K on their behalf, Trevor Spicer, whoever

22    prepares their monthly update, whoever provides the

23    content for their website.

24        Q.    So this is all information that you gleaned

25    from Armour; is that what you are saying?

Dennis Moore   Confidential
October 04, 2017                          212

1      A.    Yes.

2      Q.    Okay.  And do you have any reason to believe,

3  as you sit here today, that it's inaccurate in any way?

4      A.    No.  This was me doing research and also

5  listening to them and doing my best to put that down on

6  paper and represent that.

7      Q.    Okay.  And is this a fair and accurate

8  compilation of what you wrote to be the understanding of

9  Armour's business and current environment in Plaintiff's

10  Exhibit 8?

11               MR. O'CONNOR:  May I have that question

12  read back, please.

13          (Record read by the court reporter.)

14      A.    A component of that.

15      Q.    Where are the other components of that

16  memorialized in writing?

17               MR. O'CONNOR:  Objection.

18      A.    Other areas where those were memorialized

19  would have been the IT exchange with Trevor Spicer and

20  the responses to his questions.  They would have been

21  verbally shared.  Again, the intent of a summary

22  write-up is to provide individuals with SS&C with, you

23  know, a high level understanding of Armour so that they

24  can go into a meeting and speak intelligently to their

25  business.  So this wasn't the end all be all that formed

Dennis Moore  Confidential
October 04, 2017                    213

1    our -- that comment that you just mentioned.

2         Q.    Okay.  And apart from the IT questions that

3    you mentioned that SS&C sent back to Mr. Spicer, and of

4    course the summary write-up that we have in Plaintiff's

5    Exhibit 9, is what you wrote to be SS&C's understanding

6    of Armour's business and current environment in writing

7    anywhere?

8         A.    Can you repeat the question?

9              (Record read by the court reporter.)

10        A.    I can't recall specifically.

11        Q.    So after your June 2nd exchange -- I'm sorry,

12   after your June 4th email exchange that we saw in

13   Plaintiff's Exhibit 8, SS&C'S discussions with Armour

14   continued, did they not?

15        A.    Yes.

16        Q.    And one of the next steps was putting together

17   a proof of concept for Armour; is that right?

18        A.    Yes.

19        Q.    And by that point in time, had you had

20   conversations with Armour about whether they would be --

21                   (Telephone rings.)

22              MR. O'CONNOR:  Excuse me, I'm sorry.

23              I apologize for that.

24        Q.    So by June of 2014, had you had conversations

25   with Armour about the deployment option that was being

Dennis Moore  Confidential
October 04, 2017                           219

```
 1    In a hosted environment, that's not applicable.
 2                    THE VIDEO OPERATOR:  Video change?
 3                    MR. MAMOUNAS:  Yes, let's do that.
 4                    Is that okay with you guys?
 5                    MR. O'CONNOR:  It was okay with me 10
 6    minutes ago.
 7                    THE VIDEO OPERATOR:  We are now off the
 8    record, the time is 4:07 p.m.
 9         (Recess taken from 4:07 p.m. to 4:18 p.m.)
10                    THE VIDEO OPERATOR:  This marks the
11    beginning of Tape Number 5 in the deposition of
12    Mr. Dennis Moore.  We are now back on the record.  The
13    time is 4:18 p.m.
14    BY MR. MAMOUNAS:
15         Q.    Mr. Moore, welcome back from the break.
16         A.    Thank you.
17         Q.    Did you discuss your testimony with anyone
18    during the break?
19         A.    No.
20         Q.    After June of 2014, discussions with Armour
21    concerning their potential purchase of CAMRA and related
22    services continued, did they not?
23         A.    Yes.
24         Q.    And the next step in the process was to
25    prepare and present to them a proof of concept; correct?
```

Dennis Moore   Confidential
October 04, 2017                    220

1       A.      I believe that was the next step, yes.

2       Q.      And the purpose of a proof of concept is to

3    use actual data from the potential customer to

4    demonstrate how the product will work; right?

5       A.      Yes, typically a sample of the client's data

6    over a specified period of time.

7       Q.      And in this case, Armour indeed provided you

8    that data; right?

9       A.      Yes.

10      Q.      To do an agency proof of concept; right?

11      A.      Yes.

12      Q.      And also to do a non-agency proof of concept;

13   correct?

14      A.      Yes.

15      Q.      And did you believe that SS&C's representation

16   by presenting those proofs of concept and demonstrating

17   that the CAMRA product would work with Armour's actual

18   data was truthful and accurate?

19      A.      Yes.

20      Q.      Let me show you what we will mark as Exhibit

21   11 to this deposition.

22                       (Exhibit 11, Email and attachment,

23                       Bates Numbers SSC000694 through 696,

24                       marked for identification.)

25   BY MR. MAMOUNAS:

Dennis Moore   Confidential
October 04, 2017                    221

1        Q.      Please take a look at it and let me know when

2    you are ready.

3        A.      Okay, I'm done.

4        Q.      Is this the first proof of concept that SS&C

5    provided to Armour in relation to the Armour sales lead

6    for CAMRA?

7        A.      Yes.

8        Q.      Was this the non-agency or the agency proof of

9    concept?

10       A.      From what I can tell, this is the agency based

11   on the security description on 695 which talks about,

12   you know, Fannie Mae and things of that nature.

13       Q.      Okay.  And did SS&C have discussions with

14   Armour concerning the proof of concept after it sent

15   these results to it?

16       A.      Yes.

17       Q.      Let me show you what we will mark as Exhibit

18   12.

19                       (Exhibit 12, Email and attachment,

20                        Bates Numbers SSC001982 through 1983,

21                        marked for identification.)

22   BY MR. MAMOUNAS:

23       Q.      Please take a look and let me know when you

24   are ready.

25                       (Pause.)

Dennis Moore   Confidential
October 04, 2017                                  222

```
 1        A.    Okay, I'm done reading.

 2        Q.    And this is the non-agency proof of concept

 3   that SS&C provided to Armour concerning the use of CAMRA

 4   with Armour's actual data; right?

 5        A.    Yes.

 6        Q.    And again, the purpose of providing this proof

 7   of concept was to demonstrate to Armour that CAMRA in

 8   fact would work using its data; right?

 9        A.    Yes.

10        Q.    Why is it that you refer to it as the second

11   non-agency proof of concept?

12        A.    I'm specifying that it's the second proof of

13   concept for the non-agency securities.

14        Q.    Okay.  Is the process of generating a proof of

15   concept at SS&C deployment option agnostic?  Do you

16   understand what I mean by that?

17        A.    I do.

18        Q.    Okay.  Is it?

19        A.    Yes.

20        Q.    So in other words, the representation in these

21   proofs of concept to Armour was that irrespective of

22   whatever deployment option they ultimately chose, this

23   is how CAMRA would work with their data; is that right?

24                   MR. O'CONNOR:  Objection.

25        A.    Yes.
```

U.S. LEGAL SUPPORT
(305) 373-8404

Dennis Moore   Confidential
October 04, 2017                           223

```
 1        Q.    To your understanding, was Armour pleased with
 2   the proofs of concept that it received from SS&C?
 3        A.    I think after we had some discussions and
 4   worked through everything and -- I think the ultimate
 5   conclusion was that they were satisfactory.  I don't
 6   think that they would have signed a contract if they
 7   weren't satisfied with the results.
 8        Q.    And what was the nature of those discussions?
 9        A.    It's very iterative, so essentially what we
10   were being asked to do is, you know, a mini
11   implementation with a decent amount of unknowns, so
12   typically, you know, there were certain assumptions we
13   had to make based on the data that was provided to us,
14   based on accounting policy elections that Armour would
15   typically make, and so, you know, we provided reports,
16   provided that to Armour, got their feedback, and then it
17   was a working process until we arrived at numbers that
18   Armour was comfortable with.
19        Q.    So in other words, there were mistakes in the
20   proofs of concept when they were first delivered to
21   Armour, were there not?
22              MR. O'CONNOR:  Objection.
23        A.    I wouldn't classify them as mistakes.  I think
24   I would classify them as a couple of things, one, there
25   were scenarios of incorrect assumptions made on our
```

Dennis Moore   Confidential
October 04, 2017                    224

1    part.  As you can imagine, these are very complex

2    portfolios.  We got as solid of an understanding of how

3    to set these up as possible, but again, without going

4    through a detailed business process review, which is

5    critical to our implementation process, you know, there

6    were some incorrect assumptions made.

7           What we also learned during the process is

8    that, you know, what Armour was -- how Armour was

9    accounting for these differed based on the type of

10   security, whether it was agency or non-agency.  Our

11   technical accounting experts deemed part of that to be

12   non-GAAP.  We continued to process that in a couple of

13   different ways, one, with our sort of calculations and

14   assessment and one based on the way that Armour did

15   things and, you know, we felt we clearly spelled out and

16   identified those variances and discrepancies and were

17   very transparent about that and walked through those

18   variances with Armour.

19       Q.   So it's your testimony today that SS&C was not

20   making mistakes with respect to the proofs of concept

21   that it initially proposed -- presented, excuse me, to

22   Armour?

23       A.   Yes.

24       Q.   Yes, they weren't mistakes; is that what you

25   are saying?

Dennis Moore   Confidential
October 04, 2017                    225

```
 1        A.    Yes, to the best of my knowledge, they were
 2   not mistakes.
 3        Q.    Okay.  Let me show you what we will mark as
 4   Exhibit 13.
 5                        (Exhibit 13, Emails, Bates Numbers
 6                        SSC135495 through 135496, marked for
 7                        identification.)
 8   BY MR. MAMOUNAS:
 9        Q.    Take a look at it, let me know when you are
10   ready.
11                        (Pause.)
12        A.    Okay, I've read it.
13        Q.    Okay.  This email that you wrote to Joshua
14   Brown on September 17, 2014 concerns the proofs of
15   concept that were being presented at Armour; right?
16        A.    Yes.
17        Q.    Okay.  And if we look at bullet point 2,
18   second line from the bottom of that bullet point, you
19   wrote, We can kick around, but that takes away from the
20   fact that we harp on our expertise and we are making
21   simple mistakes.
22                Do you see that?
23        A.    I see that.
24        Q.    Okay.  So SS&C in fact was making simple
25   mistakes with respect to the proofs of concept that it
```

1    presented to Armour for CAMRA; right?

2         A.    So what I meant by that is instead of assuming

3    on what day count bases they were using, we should have

4    just asked, and we made an assumption and made a simple

5    mistake.   Those are things that I wish our team had

6    asked ahead of time, so that's what I meant by mistake.

7         Q.    So the discussions you were talking about

8    earlier with respect to the proofs of concept

9    discussions between SS&C and Armour concerned at least

10   in part simple mistakes SS&C was making on the proofs of

11   concept; right?

12        A.    Yes, based on the example I just gave you.

13        Q.    Okay.  And in fact as part of that, the proofs

14   of concept had to be redone a number of times, did they

15   not?

16        A.    Yes.

17        Q.    Let me show you what we will mark as

18   Plaintiff's 14.

19                    (Exhibit 14, Email, Bates Number

20                    SSC001733, marked for identification.)

21   BY MR. MAMOUNAS:

22        Q.    Let me know when you are ready, please.

23                    (Pause.)

24        A.    Okay.

25        Q.    This is an October 2nd, 2014 email from you to

Dennis Moore   Confidential
October 04, 2017                    227

```
 1   Tim Reilly with a copy to Jack Quinn; right?

 2        A.    Yes.

 3        Q.    Okay.  And Mr. Reilly is not your boss; right?

 4   Excuse me, was not your boss on October 2nd, 2014;

 5   right?

 6        A.    I would class -- he is not my manager, but he

 7   is my boss.  He is a high-up superior that I interact

 8   with on a regular basis.

 9        Q.    Well, he is the head of the institutional and

10   investment management group; right?

11        A.    Which sales rolls into, yes.

12        Q.    And he is -- well, with sales rolling into

13   that group, he is several levels above the food chain

14   from the sales guys; correct?

15              MR. O'CONNOR:  Objection.

16        Q.    Do you understand what I mean by that?

17              MR. O'CONNOR:  Objection.

18        A.    I do.  From my perspective, I reported to him.

19        Q.    You reported directly to him?

20        A.    Jack Quinn was my manager.  Tim Reilly, I've

21   always positioned as my boss.

22        Q.    Like he is your internal customer in a way;

23   right?

24        A.    If that's how you want to categorize it, sure.

25        Q.    I want to categorize it the way you want to
```

Dennis Moore  Confidential
October 04, 2017                                    228

```
 1   categorize it.  Tell me --
 2       A.    Boss.
 3       Q.    -- what is your -- he is your boss?
 4       A.    Yes.
 5       Q.    Okay.  So in this message, you are writing to
 6   your boss Tim Reilly and your manager Jack Quinn, Tim,
 7   we are on our third redo of the agency POC -- that's
 8   proof of concept; right?
 9       A.    Yes.
10       Q.    -- for Armour.  We received Armour's
11   calculations on Friday to reprocess and determine the
12   discrepancy, but according to Dave O, there is no
13   resource assigned to this and we've done nothing on it.
14   I could really use your help on this.
15             Do you see that?
16       A.    Yes.
17       Q.    You were frustrated that no one was working on
18   the third redo of the agency proof of concept; right?
19       A.    Yes.
20       Q.    And you wanted him to throw some resources on
21   it to get it done; right?
22       A.    Yes.  Part of my role in the sales process is
23   to be an advocate for Armour, and if I sense any delays
24   or potential roadblocks that could affect, you know, the
25   success of the process, the proof of concept, et cetera,
```

 1    it's my job to escalate that, and that's what Tim asked

 2    us to do.

 3         Q.    And one of those roadblocks was that SS&C was

 4    making, as you called it in Plaintiff's Exhibit 13,

 5    quote/unquote, simple mistakes; right?

 6         A.    The simple mistakes were, as I mentioned

 7    before, the assumptions that we made in relation to

 8    things like the day count bases.  That could have been

 9    avoided had we asked Armour the day count bases that

10    they preferred to use, again, instead of making an

11    assumption.

12              The other aspect of that is, you know, it's

13    just a very -- it's a very involved process, proof of

14    concepts, and there is complex securities with a lot of,

15    a lot of factors that go into it.  I know we are

16    classifying those as mistakes, but I think those are

17    maybe more assumptions or hindsights.

18         Q.    Sir, I'm just using your language from your

19    email, okay.  You said simple mistakes.  Yes or no, are

20    the roadblocks that you are referencing with respect to

21    the proof of concept issue that you are writing to

22    Mr. Reilly about here, do they at least include the

23    simple mistakes that you mentioned?

24              MR. O'CONNOR:  Objection.

25         A.    Yes.

Dennis Moore  Confidential
October 04, 2017                    230

1       Q.    I'll rephrase.

2             Are the roadblocks -- strike that.

3             Do the roadblocks that you just mentioned with

4    respect to the proof of concept process that you were

5    writing to Mr. Reilly about and Mr. Quinn on October

6    2nd, 2014 include what you referred to as simple

7    mistakes in Plaintiff's Exhibit 13?

8                      MR. O'CONNOR:  Objection.

9                      You can answer.

10   A.    Yes.

11      Q.    And as you write here in this message, this

12   was the third redo of the agency proof of concept for

13   Armour; is that right?

14      A.    From what I remember, yes.

15      Q.    Okay.  Did it take SS&C any additional redos

16   beyond the third in order to get the agency proof of

17   concept right?

18      A.    I don't recall.

19      Q.    And these redos are what led to the

20   discussions that you mentioned a moment ago between SS&C

21   and Armour in order to get the data right, out of CAMRA,

22   to move forward with the sales lead; correct?

23                      MR. O'CONNOR:  Objection.

24   A.    So what I'd like to mention there is just that

25   the proof of concept is something that we've done in the

Dennis Moore  Confidential
October 04, 2017                    231

```
 1  past; it's not something we always do.  It's typically
 2  at the direction of the client.  But it's typically --
 3  it's a two-way effort.  And it's typically clients are
 4  leaning your way, but want to do a proof of concept as
 5  sort of a final step in the process of their evaluation
 6  to make sure that the numbers tie out, but this is very
 7  representative of that proof of concept process.  It's
 8  not give us your data, magically it's done.  There is
 9  work involved.  There is back and forth involved with
10  clarifying questions and here are the numbers, let's
11  revisit them, and so that's what this was a product of.
12       Q.    Okay.  And as a product of the discussions
13  that you mention with respect to the proof of concept,
14  the discussions between Armour and SS&C, did SS&C
15  ultimately arrive at a point where the output from CAMRA
16  was accurate?
17               MR. O'CONNOR:  Objection.
18       A.    Yes.
19       Q.    And what explanation did SS&C give to Armour
20  concerning the reasons why it wasn't accurate prior to
21  that redo of the agency proof of concept?
22       A.    Well, I think a significant portion of that,
23  which we laid out with, I believe it was a two-page PDF
24  document that explained the variances between SS&C
25  following the methodology, the accounting methodology we
```

Dennis Moore   Confidential
October 04, 2017                    232

```
 1   thought was appropriate and then us running those same

 2   results through the methodology that Armour felt was

 3   appropriate, and again, identifying those variances.

 4           We were in a position where, again, we felt

 5   that, you know, based on feedback I got internally, that

 6   maybe Armour's method wasn't necessarily GAAP compliant,

 7   but that's not really our position to tell a client that

 8   they are doing it wrong, especially if their auditors

 9   have been signing off on it for X number of years.  So

10   that was our way of proofing our results, showing them

11   that we felt that they were accurate, and putting all

12   the variances out on the table so that they could be

13   explained.  So to answer your question, yes, I think

14   they were accurate and I think we explained why.

15      Q.    Okay.  And is it your recollection that based

16   on the explanations why that SS&C gave to Armour, Armour

17   was satisfied and agreed to move forward with the sales

18   process?

19           MR. O'CONNOR:  Objection.

20      A.    Can you repeat the question.

21      Q.    Sure.  You just testified to explanations that

22   SS&C gave to Armour in respect to the proofs of concept;

23   right?

24      A.    Yes.

25      Q.    And you referenced specifically certain
```

Dennis Moore  Confidential
October 04, 2017                         233

1    variances between the way SS&C was doing things and the
2    way Armour was doing things; right?
3        A.    Yes.
4        Q.    And as I understand your testimony, you gave
5    me an explanation concerning those variances and reached
6    an agreement as far as moving forward; is that accurate?
7        A.    Yes.
8        Q.    And is it your understanding that based on the
9    explanation for those variances and the agreement to
10   move forward with the sales process that Armour was
11   satisfied, as far as you understood it, with what SS&C
12   told it?
13                   MR. O'CONNOR:  Objection.
14                   You can answer.
15       A.    Yes, I believe Armour was satisfied.
16       Q.    Okay.  And so what was the next step in the
17   sales process once you moved forward past the proofs of
18   concept?
19       A.    I don't recall specifically.
20       Q.    By the time of these proofs of concept, had
21   you reached a decision with Armour concerning a
22   deployment option for CAMRA?
23       A.    I don't recall.
24       Q.    Let me show you what we will mark Plaintiff's
25   Exhibit 15.

Dennis Moore  Confidential
October 04, 2017                              235

```
 1        Q.    So concurrent with the discussions about the
 2   proof of concept, you were also having discussions with
 3   Armour concerning deployment options for CAMRA; right?
 4        A.    Yes.
 5        Q.    Okay.  And in the first paragraph you wrote,
 6   Yesterday our VP of data center services -- who is that?
 7        A.    Chris Brown.
 8        Q.    -- and I had a good conversation with Trevor
 9   and Corey -- from Armour, correct?
10        A.    Those are both from Armour, yes.
11        Q.    -- about our hosting services.  Based on the
12   feedback from Trevor and Corey, it sounded like hosting
13   the CAMRA application at SS&C's data center would really
14   be a good deployment option for Armour.
15              Do you see that?
16        A.    I do.
17        Q.    Okay.  At that point in time, had SS&C made a
18   determination concerning the deployment option for CAMRA
19   at Armour?
20              MR. O'CONNOR:  Can I hear the question
21   back, please.
22              (Record read by the court reporter.)
23              MR. O'CONNOR:  Objection.
24              You can answer.
25        A.    We had not made a determination, but we had
```

Dennis Moore  Confidential
October 04, 2017                         236

```
 1   discussed the suitability of that deployment option.

 2       Q.    Okay.  Who was it that had those discussions

 3   or that was involved in those discussions at SS&C

 4   concerning suitability of the deployment option?

 5       A.    Chris Brown.

 6       Q.    You are saying -- by discussions, you are

 7   referring to Chris Brown having a conversation with

 8   Trevor and Corey?

 9       A.    Yes.

10       Q.    And what is Chris Brown's role as the vice

11   president of data center services in making a

12   determination concerning the suitability of deployment

13   options for a CAMRA customer?

14       A.    Very highly regarded person at SS&C, brings

15   tremendous IT expertise.  He was the chief investment

16   officer at Hartford Investment Management Company before

17   coming to SS&C.  He provisions, he quotes, and he, you

18   know, manages everything that goes into our hosting

19   clients, as well as automated service -- you know, data

20   management services that we provide around that, so I'd

21   say he is the most qualified person to have that

22   conversation and have that conversation with Armour.

23       Q.    Okay.  In other words, if Chris Brown were to

24   determine that hosting CAMRA is suitable for a client,

25   that recommendation carries a good amount of weight;
```

Dennis Moore   Confidential
October 04, 2017                          237

```
 1    right?
 2                    MR. O'CONNOR:  Objection.
 3         A.    If he were to make that recommendation, yes.
 4         Q.    And in fact, as of September of 2014,
 5    Mr. Brown made the recommendation that CAMRA be hosted
 6    for Armour; right?
 7         A.    I guess a couple of things I'll point out.  It
 8    was directly based on feedback from Trevor and Corey
 9    about their challenges and their requirements going
10    forward, and I don't see any recommendation made here.
11    We just talk about hosting would be a good deployment
12    option for Armour.
13         Q.    And so you don't indicate in this letter to
14    Mr. Mountain and Mr. Gruber that hosting would not work
15    for Armour with respect to CAMRA, do you?
16                    MR. O'CONNOR:  Objection.
17         A.    I don't think I understand the question.
18         Q.    Okay.  By the time you wrote this email on
19    September 10th, 2014, had you spoken with Mr. Brown
20    about deployment options for CAMRA at Armour?
21         A.    What was the date you just gave me?
22         Q.    The date of this email, September 10, 2014.
23         A.    Yes, we had discussed it.
24         Q.    And was outsourcing an option?
25         A.    I don't recall.
```

Dennis Moore   Confidential
October 04, 2017                     238

```
 1        Q.    Well, you testified a little bit earlier that
 2   Armour had told you that they weren't interested in
 3   outsourcing; right?
 4        A.    At some point in the sales process, yes.
 5        Q.    Okay.  So your conversations with Mr. Brown
 6   had to involve either licensing or hosting as a
 7   deployment option; right?
 8                  MR. O'CONNOR:  Objection.
 9        A.    Yes.
10        Q.    Okay.  And so in your discussions with
11   Mr. Brown, what did he tell you about hosting CAMRA at
12   Armour?  Or for Armour, excuse me.
13                  MR. O'CONNOR:  Objection.
14        A.    He hadn't told me anything.
15        Q.    So what was the nature of your discussions
16   about deployment options regarding CAMRA for Armour with
17   Mr. Brown?
18                  MR. O'CONNOR:  Objection.
19        A.    The nature of the conversations were we have a
20   prospective CAMRA client.  They have one or two IT
21   experts, and we'd like to set up a call to talk about
22   hosting.
23        Q.    Okay.  And during those discussions, Mr. Brown
24   didn't tell you one way or another whether he believed
25   hosting to be suitable for CAMRA -- for Armour?
```

Dennis Moore   Confidential
October 04, 2017                    239

```
 1      A.    No.
 2      Q.    Did Mr. Brown at any point in the sales
 3  process for Armour say anything about the suitability of
 4  any deployment options for CAMRA?
 5      A.    I don't recall.
 6      Q.    Did anyone at SS&C, to the best of your
 7  recollection, make any recommendations with respect to
 8  the suitability of a deployment option for Armour?
 9              MR. O'CONNOR:  Objection.
10              You can answer.
11              MR. MAMOUNAS:  You can answer.
12              MR. O'CONNOR:  Unless I instruct you
13  don't answer, you can answer.
14              THE WITNESS:  Okay.
15      A.    I don't recall.  It was always positioned as
16  these are the options that Armour can choose.
17      Q.    Okay.  And those options included all three of
18  the deployment options we've discussed today; right?
19      A.    Yes.
20      Q.    And it's your testimony then that Armour was
21  the one that selected the hosting option; right?
22      A.    Yes.
23      Q.    And what you write to Mr. Mountain and
24  Mr. Gruber here is that it sounded like the hosting
25  option -- hosting the CAMRA application at SS&C's data
```

Dennis Moore   Confidential
October 04, 2017                          240

1    center would be a really good deployment option for

2    Armour; right?

3        A.    Yes.

4        Q.    You don't write that hosting would not work

5    for Armour, do you?

6        A.    No.  I'm reiterating, based on direct feedback

7    from his trusted IT resources and aligning them with the

8    right IT expertise at SS&C to have this conversation, it

9    sounded from them like hosting would be a good

10   deployment option.

11       Q.    And those are the same IT resources at Armour

12   that you had interacted with or SS&C had interacted with

13   back in June; right?

14       A.    I believe this is our first interaction with

15   Corey.  From what we understand, Trevor was the main IT

16   person.  Corey was more end user support.

17       Q.    Okay.  So to answer the question, you had

18   interacted with Trevor, one of the IT resources at

19   Armour, back in June; right?

20              MR. O'CONNOR:  Objection.

21       A.    I'd just like to take a minute to take a look

22   at the documents.

23                        (Pause.)

24       A.    Yes, so we spoke to Trevor on June 10th.

25       Q.    And when you wrote this sentence that we've

Dennis Moore   Confidential
October 04, 2017                    242

```
 1                   MR. O'CONNOR:  Objection.
 2        A.    It varies.
 3        Q.    What happened with respect to Armour?
 4        A.    It's kind of a broad question.  Could you
 5   rephrase it?
 6        Q.    Sure.  At what stage of the process did you
 7   introduce SS&C's professional services people to Armour?
 8        A.    It would have been shortly after Armour
 9   requested an implementation estimate from us.
10        Q.    The implementation estimate is part of the
11   proposal, is it not?
12        A.    I don't recall if it was part of that formal
13   proposal, but the estimate was delivered.
14        Q.    Okay.  And is that typical for the sales
15   process at SS&C?
16        A.    Is what typical?
17        Q.    Is it typical for a customer to request an
18   implementation estimate?
19        A.    Yes.
20        Q.    Okay.  And what does SS&C do to put together
21   an implementation estimate?
22        A.    We have a, what we call a -- what do we call
23   it? -- client business profile as a standard document
24   that our professional services group uses that allows
25   them to sort of collect all the information that the
```

Dennis Moore   Confidential
October 04, 2017                              243

```
 1    sales team has gathered throughout the process in
 2    addition to, you know, more granular information we may
 3    not have gathered that we need to go back to the client
 4    and gather, in order to get comfortable the full scope,
 5    size of the portfolio, number and types of holdings,
 6    reporting requirements, accounting treatments, timing of
 7    deliverables.  It's a very thorough and standard
 8    document, so we have that completed and then we give
 9    that to our professional services group.
10         Q.    And you are saying that's called the client
11    business profile?
12         A.    I may not be getting that name 100 percent
13    correct, but it is a profile document.
14         Q.    And is that a document that you've seen with
15    respect to Armour?
16         A.    Yes.
17         Q.    Is that a document that you helped prepare
18    with respect to Armour?
19         A.    Yes.  I filled out what I knew to the best of
20    my ability and then we filled in any missing pieces
21    with, I believe, interaction with Mark Gruber.
22         Q.    Have you ever heard of something called the
23    responsibilities matrix?
24         A.    Yes.
25         Q.    Are they the same thing?
```

# EXHIBIT 11

Dennis Moore
May 04, 2018

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2                 NEW HAVEN DIVISION

 3

 4          DOCKET NUMBER:  17-CV-00790-JAM

 5

 6  --------------------------)
                              )
 7  ARMOUR CAPITAL MANAGEMENT, )
    LP                        )
 8                            )
              Plaintiff(s),   )
 9                            )
    VS                        )
10                            )
    SS&C TECHNOLOGIES, INC.    )
11                            )
              Defendant(s).   )
12  --------------------------)

13

14                    VOLUME II

15               Pages 291 - 341

16

           VIDEO DEPOSITION OF:  DENNIS MOORE
17

18  DATE:      May 4, 2018
    TIME:      10:00 a.m.
19  HELD AT:   Hinckley Allen
               20 Church Street
20             Hartford, Connecticut

21                     - - -

22

23

24
       Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030
25
```

Dennis Moore
May 04, 2018                                    29

```
 1  SS&C.  So we have questionnaires for multiple

 2  products and services and different market

 3  verticals.

 4           And a lot of those have commonalities but

 5  others have variances for specific asset classes

 6  or things like that.

 7      Q    Okay.  You prepared an implementation

 8  questionnaire for Armour?

 9      A    I leveraged an existing implementation

10  questionnaire template and provided that to Armour

11  to complete.

12      Q    Okay.  Were there any other written

13  instructions specific to the Armour opportunity

14  that you followed to qualify the opportunity, sir?

15              MR. O'CONNOR:  Objection.

16              THE WITNESS:  No.  It's not, it's

17           not typical for us to have written

18           instructions on how to.

19  BY MR. MAMOUNAS:

20      Q    Okay.  But then the goal of the

21  qualifying process was to determine the

22  suitability of the product; is that right?

23              MR. O'CONNOR:  Objection.

24              THE WITNESS:  The qualification that

25           that we did on the onset of this
```

# EXHIBIT 12

David  LaMonica
June 28, 2018

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    AT NEW HAVEN

4    CASE NO. 17-CV-00790-(JAM)

5    - - - - - - - - - - - - - - - - X
     ARMOUR CAPITAL MANAGEMENT, LP.,
6                                    :
                         Plaintiff,
7                                    :
           -against-
8                                    :
     SS&C TECHNOLOGIES, INC.,
9                                    :
                         Defendant.
10   - - - - - - - - - - - - - - - - X

11

12

13                  O R I G I N A L

14

15         VIDEO DEPOSITION VIA VIDEOCONFERENCE of

16   Defendant SS&C Technologies, Inc., by DAVID

17   RICHARD LaMONICA, Corporate Designee, taken by

18   Plaintiff, pursuant to Re-Notice, at the offices

19   of Hinckley, Allen & Snyder, LLP, 20 Church

20   Street, Hartford, Connecticut, on Thursday, June

21   28, 2018, commencing at 4:21 p.m., before Margaret

22   Gmerek, a Certified Shorthand (Stenotype) Reporter

23   and Notary Public within and for the State of

24   Connecticut.

25

David   LaMonica
June 28, 2018                                    11

```
 1              (Document was marked as
 2          Deposition Exhibit No. 31 for
 3          identification, as of this date.)
 4
 5      Q    Please review the document and let me know
 6  when you're ready, sir.
 7      A    (Witness perusing documents.)
 8          Okay.
 9      Q    Okay.  For purposes of identification
10  Exhibit 31 is numbered SSC147385 and at the top it
11  reflects an email, March 20th, 2017 from Scott Rice
12  to Andriana Johnson; is that right?
13      A    Yes.
14      Q    And in it is a conversation between you
15  and Mr. Rice; correct?
16      A    Yes.
17      Q    And that conversation occurred via Instant
18  Messaging System; is that right?
19      A    It looks like that, yes.
20      Q    What is the name of the Instant Messaging
21  System?
22      A    I think it's Lync, it's a Microsoft
23  product, that's what we use internally.
24      Q    And apart form -- excuse me.
25      A    I said I believe it's Microsoft Lync.
```

David   LaMonica
June 28, 2018                          12

1      Q    And you would agree with me that this

2   conversation concerns Armour; does it not?

3      A    This does, yes.

4      Q    Apart from this conversation, did you ever

5   have any Microsoft Lync exchange with anyone else

6   at SS&C concerning Armour?

7      A    Not that I recall.

8      Q    Okay.  And the conversation was initiated

9   by you, was it not, it says:  "1:35 p.m. CI Manager

10  for Armour.  Was it ever implemented and if not,

11  why not?"  Those are your words; right?

12     A    To your first question, based on what I

13  see here this is the beginning of that trail but

14  I'm not sure.  There could have been talk before

15  this, I'm not sure, but those are my words, yes.

16     Q    When was the last time you saw this

17  document, sir?

18     A    I've never seen this document.

19     Q    Okay.  Skip down with me to the next entry

20  by your name at 1:38 p.m.

21     A    (The Witness complied with the request of

22  counsel.)

23          Yes.

24     Q    Are you there?

25     A    I am, yes.

David  LaMonica
June 28, 2018                                    13

1     Q    You see it says:  "Wasn't Citi one of

2  their custodians?"  Do you see that?

3     A    It says:  "Wasn't Citi only one of their

4  custodians?"

5     Q    Thank you for the correction.

6     A    Yeah.

7     Q    When you say their, you were referring to

8  Armour's; correct?

9     A    Yes, I was.

10    Q    Okay.  And then jump down to your next

11  entry at 1:42 p.m.

12    A    (The Witness complied with the request of

13  counsel.)

14    Q    Are you there?

15    A    I am.

16    Q    And it reads:  "So we only tried on the

17  one custodian and not BNY?" question mark; right?

18    A    It does say that, yes.  I was trying to

19  get some basic information about the client.

20    Q    Fair enough.  And when you used "we" you

21  were referring to SS&C; correct?

22    A    I'm not sure actually.  We use we a lot,

23  we're big on we, we're big on ownership so it could

24  be we, it could be the team, is usually how we say

25  that.

1      Q    In the last message that you just wrote

2   you referred to Armour using "their," we saw that;

3   right?

4      A    That's true.

5      Q    Okay.  So when you were using "we" in your

6   next message at 1:42 p.m. you were referring to

7   SS&C; right?

8      A    Again, I can't say that for certain.  We

9   use we a lot as the team.

10     Q    And the team refers to SS&C's team; right?

11             MR. O'CONNOR:  Objection.

12     A    I can't say for certain, I don't recall.

13     Q    But what you can say for certain is that

14   "we" in that message includes SS&C; does it not?

15             MR. O'CONNOR:  Objection.

16     A    I think that's fair.

17     Q    Skip down with me to your message at 1:43

18   p.m.

19     A    (The Witness complied with the request of

20   counsel.)

21          Okay.

22     Q    And you write:  "This is fugly dude."

23          Do you see that?

24     A    I do see that.

25     Q    What does fugly mean?

David   LaMonica
June 28, 2018                          15

1        A    I think you know what it means.

2        Q    Does it have a positive connotation?

3        A    No.

4        Q    And you were referring to the

5   implementation of CAMRA at Armour; were you not?

6                 MR. O'CONNOR:   Objection.

7        A    No.

8        Q    No, okay.   You continue:   "I don't

9   understand how we can't get basic things."   Right?

10       A    I do say that.

11       Q    Okay.   And that "we" included SS&C; did it

12   not?

13                MR. O'CONNOR:   Objection.

14       A    So what I was doing in this email was

15   trying, on this IM link, I was trying to understand

16   what exactly was happening and where we stood.

17            So what I did learn outside of this IM,

18   which isn't reflected here, is that, you know, we

19   set up CI Manager alongside with Armour and CI

20   Manager really, our job at SS&C is to teach the

21   clients how to normalize data into a ACM format for

22   upload to CAMRA.

23            Now, it's key that we do that so that when

24   new custodians are brought on and the Professional

25   Services Team is no longer engaged in the project,

# EXHIBIT 13

1

2

UNITED STATES DISTRICT COURT

3 DISTRICT OF CONNECTICUT, NEW HAVEN DIVISION

-----------------------------------------X

4 ARMOUR CAPITAL MANAGEMENT,LP

5                              PLAINTIFF,

6

-against-        Case No:

7                     17-CV-00790-JAM

8

SS&C TECHNOLOGIES, INC.,

9

DEFENDANT.

10 -----------------------------------------X

11 Rough ASCII

12                         DATE: April 30, 2018

13                         TIME: 10:33 A.M.

14

15

16             VIDEO DEPOSITION of ANTHONY

17 MANUEL GONZALEZ, taken by the Plaintiff,

18 pursuant to Subpoena and to the Connecticut

19 Rules of Civil Procedure, held at the offices

20 of Holland & Knight, 31 West 52nd Street, New

21 York, New York 10019, before Robert X. Shaw,

22 CSR, a Notary Public of the State of New

23 York.

24

25

1       Manuel Gonzalez - Confidential

2    insurance companies; right?

3            So, it was tailored for the

4    insurance business.  Um, I can't comment, I'm

5    not an expert on accounting, insurance

6    accounting, accounting for mortgage REITs.

7    It's not, it's not me.  So, I can't -- I'm

8    not, I can't comment on whether or not the

9    product was a good fit for mortgage REITs or

10   not, because I don't know.

11           But its genesis was in the

12   insurance industry.

13       Q.   Do you recall any discussions

14   during your time at SS&C about changes that

15   had been made to CAMRA itself in order to

16   service mortgage REITs?

17       A.   Yes.  For Fortress, I think, there

18   were software changes.

19       Q.   Do you recall what those were?

20       A.   No.

21       Q.   Do you recall anything other than a

22   client specific, that is one specific client,

23   um, requiring a change in the functionality

24   that was made to --

25       A.   Well --

Manuel Gonzalez - Confidential Attorneys' Eyes Only

2      It was pretty much Tim's agenda about some

3      things he wanted to cover.

4          Q.   Was that agenda distributed at any

5      point?

6          A.   Usually handed out on paper.

7          Q.   Do you recall CAMRA implementations

8      ever appearing as agenda items for those

9      meetings?

10         A.   No.  Not really.  Not a topic that

11     people wanted to discuss, anyway.  Sorry.

12     (Indicating) sorry.

13         Q.   You said that financial performance

14     was discussed during the meetings, as well;

15     right?

16         A.   Yes.

17         Q.   Was that displayed, that is the

18     financial performance, was that in any way

19     transmitted in writing to the attendees at

20     those meetings?

21         A.   Sometimes.  Sometimes.  Maybe at a

22     quarter end, or something like that, or maybe

23     the annual.

24         Q.   Okay.  Did you spend, when you

25     joined the company, did you spend any time

Manuel Gonzalez  Confidential
April 30, 2018                    127

Manuel Gonzalez - Confidential Attorneys' Eyes Only

2      learning about CAMRA specifically?

3          A.   You mean, in terms of how to use

4      it, or how to demo it or anything like that?

5          Q.   Yes.

6          A.   Um, very little.  Very little.

7          Q.   Did anyone give you any indication

8      of what its primary benefits were to SS&C's

9      customers or prospective customers?

10             MR. O'CONNOR:  Objection.

11         A.   Not really.  My perception was that

12     it was a dying product and we were trying to

13     revive it through mortgage REITs.

14             MR. O'CONNOR:  Motion to strike.

15             MR. MAMOUNAS:  Opposed.

16         Q.   And when you use the words "dying

17     product," what leads you to conclude, in your

18     opinion, that it was a dying product?

19         A.   So, we were losing clients in

20     insurance.

21             We were losing to a competitor.

22             So, maybe the product itself, you

23     know, was not the product that was dying, but

24     we were not doing well against the

25     competition.  How about that?

Manuel Gonzalez   Confidential
April 30, 2018                    128

Manuel Gonzalez - Confidential Attorneys' Eyes Only

2          Q.    Any other reason for why you

3     concluded that it was a dying product?

4               MR. O'CONNOR:  Objection.

5          A.    No.   I think it's --

6               I don't know if -- I don't know if

7     it was a dying product, but it was a product

8     that was losing market share.  I would rather

9     -- I would rephrase it that way.  We were

10    losing market share and, as a result, we

11    needed to revive the business, the CAMRA

12    business, and the sales team was doing that

13    very actively in insurance and in mortgage

14    REITs.

15         Q.    And you said that you --

16         A.    I think that's fair.

17         Q.    Okay.   And you said that you

18    thought mortgage REITs were the way that SS&C

19    was trying to revive the business; right?

20              MR. O'CONNOR:   Objection.

21         A.    Um, well, yes.

22              Anytime you add a new segment,

23    you're trying to, you know, you're trying to

24    grow.

25              And they were making a big push

Manuel Gonzalez  Confidential
April 30, 2018                    129

Manuel Gonzalez - Confidential Attorneys' Eyes Only

2      with other insurance companies.  Like I

3      mentioned there was an insurer out on the

4      West Coast that was a new client.  So, they

5      were making a big push for growth of the

6      product, but they were not doing very well

7      against the competition because it was an

8      older technology.  And it may have just been

9      salesmanship by the, you know, by the

10     competition.

11             It's hard for me to know how

12     effective, you know, how accurate their

13     arguments and criticisms of, you know, of

14     CAMRA were.

15     Q.    You said adding a new segment, that

16     was the mortgage REIT segment; right?

17     A.    Yes.  Exactly, adding a new

18     segment; that's right.

19     Q.    And you understood that Mr. Reilly

20     had started a mortgage REIT division the year

21     before you joined SS&C; right?

22     A.    I'm not sure who started it.  I

23     assume it was -- I'm not sure that it started

24     with Mr. Reilly or not.

25     Q.    Well, you knew SS&C started it?

Manuel Gonzalez - Confidential Attorneys' Eyes Only

2          A.    Yes.  I knew SS&C started it,

3      and --

4               Yes.  Yes.

5          Q.    Okay.  And other than insurance and

6      mortgage REITs, were there any other segments

7      to which SS&C marketed CAMRA at the time that

8      you were an employee of the company?

9               MR. O'CONNOR:  Objection.

10         A.    Those are the two that I'm aware of

11     that we focused on.

12         Q.    Did you have any direct role in

13     sales when you were at SS&C?

14         A.    I would sometimes provide estimates

15     for implementations as part of the sales

16     process.

17               So, that was my, that was my

18     involvement.

19         Q.    Did you ever go on any pitches?

20         A.    No.  Not that I can think of.

21         Q.    Did you ever hear, when you were at

22     SS&C, that SS&C's lengthy over-budget

23     implementations were in the marketplace?

24               MR. O'CONNOR:  Objection.

25         A.    Could you restate that.  I'm sorry.

1        Manuel Gonzalez ROUGH ASCII

2   /TKPWHR I am referring to the context of what

3   it came up with Andriana Johnson.

4        A.   Yes.

5        Q.   The implementation was not being

6   delivered, correct?

7        A.   Yes.

8             MR. O'CONNOR:  Objection.

9             MR. MAMOUNAS:  I will show you what

10        we will mark as Exhibit 6.

11             ( Plaintiff's Exhibit 6, documents

12        Bates Nos. 713 to 714 , marked for

13        identification as of this date.)

14        Q.   Take a look at it please and let me

15   know when you are ready.

16             MR. MAMOUNAS:  While you are taking

17        a look 8, I will invite Mr. Gruber to

18        rejoin us.  (Mr. Gruber returning to the

19        room (.

20        A.   I a /P-L guys for my French.

21        A.   I /POL guys for my French.

22        Q.   You see that at the bottom of this?

23             MR. MAMOUNAS:  Is the same January

24        -- 2016 message from Mr. Russell to you

25        concerning Ms. Johnson, right (CHECK

1        Manuel Gonzalez ROUGH ASCII

2        SOUND (.

3        A.    Yes.

4        Q.    And then you forwarded to Mr.

5   Reilly the same day, January 6, 216, right?

6        A.    Yes.

7              (Mr. G entering room.

8        Q.    I?

9        Q.    You say I thought /SHAOEFGS good,

10  right?

11       A.    Yes.

12       Q.    Good meaning that she was okay or

13  something else?

14       A.    Capable.  So taking into account

15  what Dave Russell said that I relied on, led

16  me to /KAOPB clewed that she was not being

17  being cable of what I expected a project

18  manager to do.  That is, which is just more

19  than record but engage, drive, be a ,

20  catalyst, yes (CHECK SOUND (.

21       Q.    Did that believe I /TPEFPLT of

22  yours ever /KAEUPBG during the remainder of

23  the time that you were at SS&C?

24       A.    I don't think she ever did anything

25  to change my view.

```
 1          Manuel Gonzalez ROUGH ASCII
 2          Q.   You cot, I am having a Frank and --
 3    no bull shit ^  of the ^ . .   Why?
 4          Q.   Is that the same reference to the
 5    sit down that we saw you wrote to Mr. Russell
 6    about in Plaintiff's Exhibit 5?
 7          A.   Yes (CHECK SOUND.
 8          Q.   You continue I know a lot of
 9    exception /TPHAEL capable P /PH-FPLTS who
10    knowing about /KAPLG /RA and who can fix and
11    deliver these projects, right?
12          A.   Yes.
13          Q.   And what were you trying to
14    communicate /TR to Mr. Reilly?
15          A.
16          Q.   There to Mr. /RAOEUL,?
17          A.   My intention was to communicate
18    that I thought that we needed capable project
19    managers and that knowledge of CAMRA was not
20    essential.
21          Q.   Have you finished your answer?
22          A.   Yes.
23          Q.   Did you ever consider having Ms.
24    Johnson removed from the Armour
25    implementation project?
```

1        Manuel Gonzalez ROUGH ASCII

2        A.   With whom would I have replaced

3   her?  That is a rhetorical question.

4             I had no other option.

5        Q.   Did you have any discussions with

6   anyone at SS&C about removing her from the

7   Armour implementation?

8        A.   I think Pallone and I might have

9   /KAUBGD, talked about that.  I think Pallone

10  also wanted her in his group so he could

11  replace her, potentially.

12       Q.   What do you mean by that?

13            MR. O'CONNOR:  Objection.

14            MR. O'CONNOR:  Move to strike.

15       Q.   Opposed?

16       A.   This is my opinion.  Oh boy, this

17  is my opinion.

18            My opinion was that at point /*R

19  one point he wanted her at, on his team

20  because either he wanted to see if he could

21  get her to be effective, or he wanted to have

22  her as ahead count, a, headcount so that he

23  could bring in somebody else if he got rid of

24  her.  Because he was getting ^ helped ^ head

25  do you want /*R count and I got no headcount

1          Manuel Gonzalez ROUGH ASCII

2    if I wanted to bring somebody in or I wanted

3    to replace her, I felt my hands were tied.

4          Q.   By headcount you meant by being

5    with the higher, more, more people?

6          A.   Order to replace.

7          Q.   When you say he was getting more

8    people that was within the Direct Service

9    Group (CHECK SOUND (?

10         A.   Yes.  He was able to hire, he was

11   growing and hiring.

12              And I was not.  I was, I had no

13   ability to bring in anybody other than kind

14   of an admin person to help with um, you know,

15   resources, you know, resourcing and budgeting

16   and -- and that nature.

17         Q.   My question earlier that you

18   answered was a rhetorical, whether you had

19   ever considered replacing Ms. Johnson as the

20   project manage /ERL on the product.  On the

21   Armour implementation product.  Excuse me.

22         A.   Yes.

23         Q.   Did you ever have that?

24              KEN VAUGHAN:

25         A.   Maybe we could re/TPHRAEUS the.

1       Manuel Gonzalez ROUGH ASCII

2       A.    Maybe we could rephrase the

3    question.  What I would, would I have liked

4    to rephrase her, yes.

5       Q.    That is something that you thought

6    about, considered when you were a SS&C

7    employee; right?

8       A.    Yes.

9       Q.    How is it that you came to

10   understand that you did not have authority to

11   add head count to use your term?

12      A.    I --

13          So, um, I did for example hire

14   someone so I don't want to make it sound like

15   I had zero um, opportunity to hire.

16          But, these would all, so oh Tim

17   would come to me and say, okay, we are going

18   to hire someone or I found someone for you

19   who would be good for your team.

20          So, um, let me rephrase this a bit.

21          I felt that I had very little

22   control over and very little opportunity to

23   grow my team and to hire who I wanted into

24   it.

25          Now, again, there was one person

Anthony Gonzalez
April 30, 2018                              220

1        Manuel Gonzalez ROUGH ASCII

2   that we interviewed that I liked that we

3   hired.

4           So I don't want to make it sound

5   like it was an impossibility.

6           But then there were, you know --

7   there was another who was kind of thrust upon

8   me, who I wasn't too crazy about, but -- I

9   felt that I did not have much say in the

10  matter.

11          But for example, I talked about um,

12  potentially replacing aid /KWRAPB that, and

13  /STPH-PLT CHECK SOUND (and that was not, that

14  was not um, well received and I also talked

15  about potentially replacing others on the

16  team and I just don't think that there was an

17  appetite for firing people, and bringing

18  ^ knew ^ new people in.  Swapping people out,

19  swapping the team to make it better.  That

20  was not something, that was something I

21  wanted to do and not something that I felt I

22  was able to do.

23      Q.   And what was it or who was it that

24  you believe caused you to feel like you did

25  not have the authority to do that?

```
 1          Manuel Gonzalez ROUGH ASCII

 2      A.    I mean I --

 3            I talked to Tim about it and -- if

 4  you read this e-mail, I mean, this is my way

 5  of saying, I know capable project managers

 6  who know knock about CAMRA and can fix these

 7  projects.  Right?

 8            That is in line with my discussions

 9  with him about um, um, you know, swapping her

10  out.  But it is not something that he was, he

11  was comfortable with.

12      Q.    And he told you that?

13            MR. O'CONNOR:  Objection.

14      A.    He

15      A.    He did not say it outright.

16      Q.    What did he say to, that led you to

17  believe that?

18      A.    He, he --

19            He did, so he did something similar

20  to what he did here, where he just asked a

21  different question.  That is okay.  Was was I

22  explicit?  Is not explicit.  I did not ex-

23  police /SEU say that I wanted get rid of aid

24  /KWRAPB ^ that ^ in a, I did not say that but

25  maybe I should have.
```

Anthony Gonzalez
April 30, 2018                                          238

1          Manuel Gonzalez ROUGH ASCII

2    specifics /ST-FPLT.

3          Q.   Did you have any concerns with

4    Scott rice in relation to his capabilities on

5    the Armour project, while you were employed

6    at SS&C?

7               MR. O'CONNOR:  Objection.

8          A.   I did.  Um, I had concerns with um,

9    with Scott rice, yes.

10         Q.   What were those concerns?

11         A.   I um --

12              I did not get the impression from

13   my conversations with him or others on the

14   team that he was as effective as we would

15   have liked him to be.

16         Q.   Effective in what way?

17         A.   Productive and proactive and

18   knowledgeable, if I had to sum it up.

19              Nice guy.  (Indicating).

20         Q.   Did you ever consider taking him

21   off the Armour implementation?

22         A.   It is like the Adriana question,

23   whom am I going to replace him with?

24              MR. O'CONNOR:  Objection.  Move to

25         strike.

Manuel Gonzalez  Confidential
April 30, 2018                    294

```
 1      Manuel Gonzalez - Confidential
 2   from your time at SS&C about transitioning
 3   Bimini to outsourcing?
 4       A.   Yes, I think so.  I think it came
 5   up.  They're a small operation.  Why are they
 6   going to run their own accounting?  But I
 7   think it's a smart idea.  If I were Bimini, I
 8   wouldn't mind it.  I guess it would depend on
 9   the cost; right?  I think it came up.
10       Q.   And to your understanding, what
11   does the fact that they're a small operation
12   have to do with the option that, for
13   deployment issues?
14            MR. O'CONNOR:  Objection.
15       A.   So, if I were running a small
16   business, I'd want to focus on my core, my
17   core competency, and grow that business that
18   way.  And I wouldn't want to spend time or
19   money or attention on a non-core activity.
20   That's me.  But I see that business
21   rationale.  That's what I would want to do.
22       Q.   And a non-core activity you would
23   consider running an accounting activity?
24       A.   Yeah.  Running your accounting,
25   Yes.  I mean, if you want to make money, you
```

1        Manuel Gonzalez ROUGH ASCII

2   primarily was SS&C's resources allegation,

3   issues; right?

4            MR. O'CONNOR:  Objection.

5        A.   (Pause.)

6            Given what I saw and the fact that

7   I was not there the entire time, from the

8   very beginning of the project, it is hard to

9   say, but given what I saw that was one factor

10  was the lack of resources,

11            Assigned at some points.

12            The other was the extra time that

13  it took to do the roll /STPORD process, it

14  took a lot more time than we expected that it

15  would take.

16       Q.   Is that because of category two of

17  the 3 that you gave earlier, that is CAMRA

18  functionality, in your /PEU, sir?

19            MR. O'CONNOR:  Objection.

20       A.   It is either resource, it is

21  resource or CAMRA functionality but I was not

22  the vendor.  It was just -- it was just I am

23  /PHRAOEPL /TAEUGS.  It /KOFPB been -- I am

24  not sure why this, the R O /HR L forward

25  process took us longer than it did.  I am not

```
 1        Manuel Gonzalez ROUGH ASCII

 2   sure if it was our resources or I am not sure

 3   if it was the way that CAMRA was built (CHECK

 4   SOUND.

 5            I still haven't figured that out.

 6   But it was not -- I don't see it as -- I will

 7   leave it at that.

 8        Q.   You don't see it as what, sir?

 9        A.   I will leave it that is.

10        Q.   You don't see it as a client

11   contribution issue, is that right?

12            MR. O'CONNOR:  Objection.

13        A.   If you are going to ask me the

14   question you I don't see it as a client

15   contribution /EUR shoe.

16        Q.   You see the e-mail is addressed to

17   Jim, do you see that?

18        A.   Yes.

19        Q.   Do you recall who that Jim was in

20   the e-mail that you wrote?

21        A.   Yes.  Um, it to have been to have

22   been Jim mountain.

23

24        A.   Jim mountain.  I believe this is a

25   draft of the message prior to having sent it.
```

Manuel Gonzalez   Confidential
April 30, 2018                    332

```
 1        Manuel Gonzalez - Confidential
 2        Q.   Who was Alexandra Mougias?
 3        A.   She was someone that I hired for
 4   helping me with forecasting and all of the
 5   internal admin around resource management,
 6   the resource management sheet, the financial
 7   forecasts -- all kinds of the internal admin
 8   within professional services.
 9        Q.   Did she have any financial or
10   accounting expertise?
11        A.   Um, no.  I didn't view her as that.
12   I viewed her as a -- she had done some work
13   at, in accounting at one of the insurance
14   companies.  But she was not a resource built
15   to a project.  She was an internal assistant
16   to me for, again for resourcing and
17   forecasting the internal operations of the
18   professional services group -- nothing
19   client-focused.
20        Q.   Okay.  And do you see what your
21   write in the first paragraph, which is as
22   follows:  "To be able to recognize what is
23   remaining, including carryover from Q1,
24   Armour staff will need to, quote,
25   successfully process one complete month of
```

# EXHIBIT 14

Normand Boulanger
May 03, 2018

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
 2                NEW HAVEN DIVISION

 3

 4         DOCKET NUMBER:  17-CV-00790-JAM

 5

 6  ---------------------------)
                               )
 7  ARMOUR CAPITAL MANAGEMENT, )
    LP                         )
 8                             )
               Plaintiff(s),   )
 9                             )
    VS                         )
10                             )
    SS&C TECHNOLOGIES, INC.    )
11                             )
               Defendant(s).   )
12                             )
    ---------------------------)
13

14

          VIDEO DEPOSITION OF:  NORMAND BOULANGER
15

16  DATE:       May 3, 2018
    TIME:       1:00 p.m.
17  HELD AT:    Hinckley Allen
                20 Church Street
18              Hartford, Connecticut

19                    - - -

20

21

22

23

24   Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030

25
```

Normand Boulanger
May 03, 2018                                    56

```
 1              sustain, both doing the accounting on a
 2              production basis and doing double duty on
 3              the implementation was a stressor.
 4              Right.
 5                   If that was the case, right, it was
 6              my assessment at the time, may not be
 7              accurate, outsourcing would have been a
 8              better solution, because all those
 9              stressors would go away, the training
10              would go away, and they would just be
11              supervising us effectively.
12                   So that's, that's why I thought
13              outsourcing would have been a better,
14              better solution for them, yes.
15 BY MR. MAMOUNAS:
16      Q    Better solution as compared to hosting --
17 I am sorry -- to licensed CAMRA on a hosting
18 basis; is that right?
19                   MR. O'CONNOR:  Objection.
20                   THE WITNESS:  You know, this
21              again -- it was my opinion, right.
22              Armour was more than capable of doing it
23              any way they want.  Right.  They are a
24              sophisticated organization with a complex
25              portfolio, senior guys in the
```

Normand Boulanger
May 03, 2018                                116

1  basis?

2      A    I don't recall if it was licensed or

3  licensed and hosted.

4      Q    Okay.  Did anyone in 2016 tell you that

5  SS&C was at risk of losing its REIT business?

6      A    The REIT business?  All of our REITs?

7      Q    Correct.

8      A    I don't recall that.

9      Q    Okay.  Do you recall in 2016 the REIT

10 business was important to SS&C?

11     A    The REIT business was important to SS&C

12 as soon as we won our first REIT customer.

13     Q    And it continued throughout 2016 to be

14 important to SS&C?

15     A    Yes.

16     Q    Okay.  It continues to this day to be

17 important to SS&C?

18     A    It's a good nitch market for us.

19     Q    Okay.  And SS&C, as of today, only offers

20 CAMRA to REITs on an outsource basis; isn't that

21 right?

22             MR. O'CONNOR:  Objection.

23             THE WITNESS:  Not that I am aware

24     of.

25 BY MR. MAMOUNAS:

Normand Boulanger
May 03, 2018                                    117

```
 1      Q    No?  Your belief is that it's sold on
 2 what basis, sir?
 3      A    The same basis it's always been.
 4      Q    Okay.
 5      A    Which is either licensed, hosted, hosted
 6 plus or outsourcing.
 7      Q    Okay.  What exhibit number are we on?  I
 8 am sorry.  Five, I believe.
 9           Let me show you what we will mark as
10 Plaintiff's Exhibit 5.
11                         (Exhibit 5:
12                  Marked for identification.)
13 BY MR. MAMOUNAS:
14      Q    Have a look at it and please let me know
15 when you are ready, sir.
16                         (Pause.)
17      A    Okay.
18      Q    Sir, have you had a chance to review
19 Plaintiff's Exhibit 5?
20      A    Yes.
21      Q    Okay.  And do you see at the top there's
22 an e-mail from Mr. Pallone to Mr. Reilly, subject
23 Armour?
24      A    Yes.
25      Q    Okay.  You see in the second paragraph
```

# EXHIBIT 15

Manoj Chacko
June 28, 2018

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    AT NEW HAVEN

4    CASE NO. 17-CV-00790-(JAM)

5    - - - - - - - - - - - - - - - - X
     ARMOUR CAPITAL MANAGEMENT, LP.,

6                                  :
                         Plaintiff,

7                                  :

         -against-

8                                  :
     SS&C TECHNOLOGIES, INC.,

9                                  :
                         Defendant.

10   - - - - - - - - - - - - - - - - X

11

12

13            O R I G I N A L

14

15            VIDEO DEPOSITION VIA VIDEOCONFERENCE of

16   Defendant SS&C Technologies, Inc., by MANOJ JOSEPH

17   CHACKO, Corporate Designee, taken by Plaintiff,

18   pursuant to Re-Notice, at the offices of Hinckley,

19   Allen & Snyder, LLP, 20 Church Street, Hartford,

20   Connecticut, on Thursday, June 28, 2018,

21   commencing at 10:07 a.m., before Margaret Gmerek,

22   a Certified Shorthand (Stenotype) Reporter and

23   Notary Public within and for the State of

24   Connecticut.

25

1    Q   Okay.  You told me earlier that there were

2  business and technical contacts on the vendor side;

3  right?

4    A   Yes, sir.

5    Q   Okay.  Was it your experience before 2015

6  that certain vendors had people that were more

7  responsive within the vendor to inquires that you

8  made or that your direct reports made at OTS than

9  other vendors?

10            MR. O'CONNOR:  Object.

11   A   I don't recall.

12   Q   Before 2015 did you ever request the name

13  of third-party vendors that you would be connecting

14  to before SS&C contracted with a client?

15            MR. O'CONNOR:  Objection.

16   A   No.

17   Q   I'm sorry?

18   A   No, not to my knowledge.

19   Q   And you told me that the transmission

20  method was one variable; right?

21   A   Yes.

22   Q   Okay.  Before 2015 did you ever request

23  the transmission method for a channel that you

24  would have to set up for a client before SS&C

25  contracted with that client?

Manoj Chacko
June 28, 2018                                    90

```
 1        Q    Okay.  What other difficulties do you

 2   recall?

 3                   MR. O'CONNOR:  Objection.

 4        A    Those would be the difficulties that come

 5   to mind at this point.

 6        Q    Okay.  Do you recall connecting to the

 7   wrong platform at a vendor being a difficulty prior

 8   to 2015?

 9        A    Not that I recall.

10        Q    Do you recall missing data being a

11   difficulty with respect to connecting to a vendor?

12                   MR. O'CONNOR:  Objection.

13        A    Not that I recall.

14        Q    You are familiar with Bank of New York

15   Mellon; right?

16        A    Yes.

17        Q    Typically referred to as BNY?

18        A    Yes.

19        Q    Okay.  Prior to 2015 did you ever set up

20   channels with BNY?

21        A    I cannot fully recall.

22        Q    Prior to 2015 did anyone within OTS, to

23   your knowledge, setup channels with BNY?

24                   MR. O'CONNOR:  Objection.

25        A    Yes.
```

Manoj Chacko
June 28, 2018                                    91

```
 1        Q    Who set up those channels?

 2                  MR. O'CONNOR:   Objection.

 3        A    I don't recall.

 4        Q    How do you know, as you sit here today,

 5   that someone within OTS prior to 2015 set up a

 6   channel, set up channels with BNY?

 7        A    We have connection.  We have existing

 8   connections with BNY for different clients and so

 9   that would suggest that on SS&C side on our team

10   someone would have set up connectivity with BNY

11   Mellon or said vendor.

12        Q    But you don't know who it was that set up

13   the channel; right?

14        A    I don't recall exact people.  We have

15   multiple connections with some vendors and so I

16   can't speak to which person set up each connection.

17        Q    In 2014 how many connections did SS&C have

18   set up with BNY?

19        A    I'm not aware.

20        Q    You're not aware of what?

21        A    I'm not aware of the number of connections

22   between SS&C and BNY that were set up prior to

23   2014.

24        Q    Do you recall whether there was more than

25   one connection between SS&C and BNY in 2014?
```

Manoj Chacko
June 28, 2018                                          92

```
 1        A    Yes.

 2        Q    Where there more than five connections

 3   between SS&C and BNY in 2014?

 4        A    I don't recall.

 5        Q    What would you need to do to verify how

 6   many connections SS&C had with BNY in 2014?

 7        A    We would have to review our automation

 8   comprehensively to see where we have points of

 9   connectivity with BNY.

10        Q    Okay.  And what were the clients that SS&C

11   had existing connections with BNY for in 2014?

12                  MR. O'CONNOR:   Objection.

13                  I am going to mark this portion of

14           the transcript "Attorney's Eyes Only:

15                  You can answer.

16        A    I don't recall every clients but an

17   example of a client for which we had connection,

18   connectivity with BNY Mellon for an existing mutual

19   clients would have been Excel Capital.

20        Q    Okay.  Who else?

21        A    That would be the one client that comes to

22   mind.

23        Q    You can't think of any other as you sit

24   there?

25        A    I'm not fully sure.
```

Manoj Chacko
June 28, 2018                                    93

1     Q   Okay.  As of 2014 isn't it a fact that

2  SS&C had not connected to BNY for a mortgage REIT

3  client of SS&C's?

4                MR. O'CONNOR:  Objection.

5     A   I don't recall.

6     Q   Who do you believe at SS&C would have that

7  information?

8     A   That would be information that either the

9  folks on my team could obtain or information that I

10  could obtain.

11     Q   And what would you do to obtain it?

12     A   I would research our processing to see

13  where we had points of connectivity with BNY Mellon

14  with respect to our REIT client.

15     Q   All right.  What REIT clients do you

16  recall at SS&C having in 2014?

17                MR. O'CONNOR:  Objection.

18     A   I recall some of the REIT clients that we

19  have, I don't know how many of them are specific to

20  2014 or earlier.

21     Q   Okay.  Which ones that you recall?

22                MR. O'CONNOR:  Objection.

23     A   The onces that I recall would be Ladder

24  Capital.

25     Q   And what vendors did you connect to for

1  Ladder Capital?

2              MR. O'CONNOR:   Objection.

3      A    I don't fully recall all vendors that we

4  associated with respect to Ladder Capital.

5      Q    Tell me the ones you remember?

6              MR. O'CONNOR:   Objection.

7      A    An can example of one that I remember was

8  JPM.

9      Q    Okay.  Who else?

10     A    That's the only one that comes to mind at

11  this point.

12     Q    Okay.  So as you sit there today you can't

13  recall a single vendor for which SS&C connected to

14  BNY; is that right?

15             MR. O'CONNOR:   Objection.

16     A    No, I do know clients for which we only

17  data for from BNY.

18     Q    I'm sorry, that broke up could you repeat

19  please?

20     A    No, I was saying, yes, I am aware of

21  clients for which we obtained data for from BNY.

22     Q    And who were they, you gave me Excel

23  Capital; who else?

24     A    That's the one client that comes to mind

25  at this point.

Manoj Chacko
June 28, 2018                                          95

1        Q    Okay.  So you're only aware of one client

2    that connects to BNY for purposes of a channel

3    between SS&C and BNY; right?

4                 MR. O'CONNOR:   Objection.

5        A    That is the one that comes to mind but I

6    do know there definitely are others, BNY is one of

7    the bigger custodians that is used to exchange data

8    between...it's one of the bigger custodians that

9    are used to aggregate data from for our clients.

10       Q    And you can't think of any mortgage REITs

11   that connect to BNY as a third-party data source;

12   can you?

13                 MR. O'CONNOR:   Objection.

14       A    I can't recall down to that level of them

15   specifically being a REIT client or not, no.

16       Q    Okay.  And apart from Ladder Capital can

17   you recall any other REIT client at any time?

18                 MR. O'CONNOR:   Objection.

19       A    At any time, yeah, another example would

20   be New York Mortgage Trust.

21       Q    Who else?

22       A    Another one would be Five Oaks.

23       Q    Who else?

24       A    Those are the ones that come to mind at

25   this point.

Manoj Chacko
June 28, 2018                              110

1          A    It's our understanding to, it is our

2    understanding that it's our obligation to normalize

3    data if we are requested to do so.

4          Q    Right.  And that request comes from the

5    internal resource at SS&C; correct?

6                    MR. O'CONNOR:  Objection.

7          A    Yes.

8          Q    Prior to 2015 did you ever experience any

9    delayed responsiveness, I think is the term you

10   used earlier, with respect to BNY specifically?

11                   MR. O'CONNOR:  Objection.

12         A    I don't fully recall.

13         Q    Do you recall at all any delayed

14   responsiveness from BNY prior to 2015?

15                   MR. O'CONNOR:  Objection.

16         A    No, I do not recall.

17         Q    Do you specifically recall BNY being a

18   responsive vendor to SS&C's inquiries prior to

19   2015?

20         A    I don't fully recall as we deal with them

21   in various different instances, I can't speak on

22   aggregate for all of those.

23         Q    After -- strike that.

24              There came a point in time, as you

25   understand it, that Armour became a client of

Manoj Chacko
June 28, 2018                                            111

1   SS&C's; right?

2       A    Yes.

3       Q    And OTS acted to set up a channel between

4   SS&C and BNY for Armour; right?

5       A    Yes.

6       Q    Prior to 2015 did anyone at OTS, to your

7   knowledge, speak to anyone in sales at SS&C about

8   settings up a channel with BNY for Armour?

9       A    Not that I recall.

10      Q    Prior to 2015 did you or anyone else in

11  OTS, to your knowledge, speak to anyone in

12  Professional Services at SS&C about setting up a

13  channel with BNY for Armour?

14                  MR. O'CONNOR:   Objection.

15      A    Not that I recall.

16      Q    Prior to 2015 did you or anyone at OTS

17  speak with anyone at BNY about setting up a channel

18  with BNY for Armour?

19                  MR. O'CONNOR:   Objection.

20      A    Not that I recall.

21      Q    All right.  Prior to 2015 did you have any

22  consideration -- strike that.

23          Prior to 2015 did you give any

24  consideration to any of the variables we have been

25  discussing today with respect to setting up a

Manoj Chacko
June 28, 2018                                    112

```
 1   channel between SS&C and BNY for Armour?
 2                  MR. O'CONNOR:  Objection.
 3       A    That was prior to 2015?
 4       Q    Correct?
 5       A    Not that I am aware of.
 6       Q    Prior to 2015 did OTS, to your knowledge,
 7   set up channels with Citibank?
 8       A    With respect to Armour or in general?
 9       Q    In general, sir.
10       A    Yes.
11       Q    How many times it SS&C set up channels
12   with Citibank?
13       A    I don't recall of a count.
14       Q    How many can you recall as you sit here
15   today?
16       A    One that comes to mind is Excel Capital.
17                  MR. O'CONNOR:  And this is Attorneys
18          eyes only I'm going to ask that Mr. Mountain
19          leave the room.
20                  MR. MAMOUNAS:  Excel Capital is not
21          a REIT; is it?
22                  MR. O'CONNOR:  No, but it's
23          confidential client information.
24                  MR. MAMOUNAS:  All right.  We don't
25          agree but let's just get through this.
```

Manoj Chacko
June 28, 2018                                    113

1       Q    Okay.  What other clients did SS&C set up

2   channels with Citibank for?

3                    MR. O'CONNOR:   Objection.

4       A    I don't fully recall at this point.

5       Q    Excel Capital is the only one you

6   remember?

7       A    That's the one that comes to mind, there

8   could be various other connections.

9       Q    But you can't recall those various other

10  connections; can you?

11                   MR. O'CONNOR:   Objection.

12      A    Not at this point.

13      Q    Who set up the connection between SS&C and

14  Citibank for Excel Capital?

15      A    I don't recall.

16      Q    Prior to 2015 did you or anyone within

17  OTS, to your knowledge, set up a connection with

18  Citibank for a REIT?

19      A    I don't recall.

20      Q    Do you recall Ladder Capital having had a

21  connection with Citi prior to 2015?

22      A    I don't recall.

23      Q    Prior to 2015 do you recall New York

24  Mortgage Trust having had a connection with Citi?

25      A    I don't recall.

Manoj Chacko
June 28, 2018                                          114

1        Q    Prior to 2015 do you recall Five Oaks

2   having a connection with Citi?

3        A    I don't recall.

4        Q    Did you ever setup, prior to 2015, a

5   channel with Citi for any hosted CAMRA client of

6   SS&C's?

7                   MR. O'CONNOR:   Objection.

8        A    I don't recall that.

9        Q    Have you ever heard of a platform by the

10  name Velocity?

11       A    I have heard of the name yes.

12       Q    What is Velocity?

13       A    Velocity is one of Citibank's platforms

14  that is used to transmit...used to exchange data.

15       Q    Where you aware of Velocity prior to 2015?

16       A    I don't recall.

17       Q    How many other city platforms are there to

18  exchange data to your knowledge?

19                  MR. O'CONNOR:   Objection.

20       A    I don't recall the count.

21       Q    How many other platforms of Citi do you

22  recall as you sit there today?

23       A    Velocity is the one that comes to mind

24  aside from others, I don't know.

25       Q    I'm sorry, what was the other one?

Manoj Chacko
June 28, 2018                                          117

```
 1   from the vendor about what you will need to set up
 2   the third-party channel; is that right?
 3                   MR. O'CONNOR:  Objection.
 4        A   Once we have been instructed by the
 5   internal resource to begin reaching out to a said
 6   contact at a vendor, yes, that would be our best
 7   practice, we would provided them with a document,
 8   introduce ourselves, and let them know the client
 9   for which we are seeking to obtain data from.
10        Q   Okay.  And there isn't any historical
11   information that SS&C relies on, to your knowledge,
12   in setting up that third-party channel; right?
13                   MR. O'CONNOR:  Objection.
14        A   Historical knowledge in what sense?
15        Q   So when you go about setting up a channel
16   you told me you send out the document that you have
17   in your best practice; fair?
18        A   Yes.
19        Q   Do you rely on any kind of preexisting
20   information that's kept anywhere internally at SS&C
21   to help you prepare to set up a channel with the
22   third-party vendor?
23                   MR. O'CONNOR:  Objection.
24        A   We check to see if we have existing
25   connectivity with a vendor already upon which we
```

Manoj Chacko
June 28, 2018                                                    118

```
 1   try to see if that connection can be leveraged or
 2   not.
 3       Q    And by leverage do you me see if it can be
 4   borrowed so that it could be used for the client;
 5   right?
 6                    MR. O'CONNOR:   Objection.
 7       A    Yes.
 8       Q    So that you don't have to set up a new
 9   connection; right?
10                    MR. O'CONNOR:   Objection.
11       A    Yes.
12       Q    What else do you do apart from checking to
13   see whether there is an existing connection?
14                    MR. O'CONNOR:   Objection.
15       A    In regards to what?
16       Q    In regards to preparing to set up a
17   connection with a third-party vendor?
18       A    We would check to see if we have an
19   exiting connection and then we would reach out with
20   our best, we would reach out with our document to
21   obtain details on the nature of the transmission,
22   beyond that I'm not sure at this point what other
23   things we would do in preparation.
24       Q    And that was your practice in 2014; was it
25   not?
```

Manoj Chacko
June 28, 2018                                    127

```
 1                  THE REPORTER:  Okay.  There are
 2         multiple documents in the folder.
 3                  MR. MAMOUNAS:  Those are just copies
 4         of the same document.
 5                  THE REPORTER:  Okay.
 6                  (Whereupon Exhibit 1 was
 7             withdrawn and the document contained
 8             within Folder E  was marked as
 9             Deposition Exhibit No. 1 for
10             identification, as of this date.)
11         Q   Sir, please have a look at what has been
12    marked as Exhibit 1.
13         A   (Witness perusing documents.)
14                  MR. MAMOUNAS:  And for the record
15         this is starts SS&C0438285.
16         Q   Sir, have you reviewed what best mark as
17    Exhibit 1?
18         A   I have not.
19         Q   All right, let me know when you're ready?
20         A   Will do.
21             (Witness perusing documents.)
22             I have had a chance to complete read the
23    Exhibit here, the Exhibit 1.
24         Q   Could you turn with me please to the page
25    end in three-zero, it's the last page of the
```

Manoj Chacko
June 28, 2018                                128

1   document?

2       A    (The Witness complied with the request of

3   counsel.)

4            Yes.

5       Q    You see at the top there is an email from

6   Mr. Massih; right?

7       A    Yes.

8       Q    And he was one of your direct reports at

9   the time?

10      A    Yes.

11      Q    And he is writing to Adrianna, that's

12  Adrianna Johnson; do you see that?

13      A    Yes.

14      Q    And you are copied on the email as well;

15  are you not?

16      A    (Witness perusing documents.)

17           I am.

18      Q    Okay.  And do you see that Mr. Massih

19  writes:  "Can you please provide Mitch with the

20  CAMRA layouts or templates, his technology team is

21  not familiar with the CAMRA format;" do you see

22  that?

23      A    Yes.

24      Q    And Mitch was a Citi employee; correct?

25      A    (Witness perusing documents.)

Manoj Chacko
June 28, 2018                                    129

1          Yes.

2      Q    And what Mr. Massih was reporting as of

3    April 13th, 2015 was that Citi was saying that it

4    wasn't familiar with the CAMRA format; correct?

5                MR. O'CONNOR:   Objection.

6      A    Within the context of what I see here,

7    yes.

8      Q    Did you have any reason to doubt the

9    accuracy of what Mr. Massih was reporting?

10     A    No.

11     Q    Did you have any reason to doubt the

12   accuracy of what Citi was saying, that is, that as

13   of April 13th, 2004 they weren't familiar with the

14   CAMRA format?

15                MR. O'CONNOR:   Objection.

16     A    No.

17     Q    Okay.  So as of April 13th, 2015 Citi was

18   not familiar with the CAMRA format; correct?

19                MR. O'CONNOR:   Objection.

20     A    Within the context of this email and for

21   whichever business unit that Mitchell Monaco works

22   at Citi, yes, that would seem to be accurate.

23     Q    Okay.  But tell me which business units

24   within Citi, to your knowledge, were familiar with

25   the CAMRA format as of April 13th, 2014?

Manoj Chacko
June 28, 2018                                        130

```
1                    MR. O'CONNOR:   Objection.

2        A    I cannot recall.

3        Q    Okay.  So as far as you can recall as of

4   April 13th, 2015 no business units at Citi were

5   familiar with the CAMRA format; right?

6                    MR. O'CONNOR:   Objection.

7        A    I cannot recall.

8        Q    Okay.  But you agree with me that in this

9   one, this business unit is telling you -- strike

10  that.

11            You agree with me that in this email Citi

12  is telling you that they're not familiar with the

13  CAMRA format; right?

14                   MR. O'CONNOR:   Objection.

15       A    Based upon the contents of this email,

16  yes.

17       Q    Okay.  Turn with me please to the page

18  ending in two-eight, toward the middle of the

19  document.

20       A    (The Witness complied with the request of

21  counsel.)

22            Okay.

23       Q    Do you recall that prior to 2015 Citi was

24  familiar with the CAMRA format in any respect?

25       A    I don't recall.
```

Manoj Chacko
June 28, 2018                                    132

1   before that, the one ending in two-seven, there is

2   an email that same day from Mr. Massih?

3        A    (Witness perusing documents.)

4             Are you referring to the email dated on

5   April 21st, 2015 at 4:26 p.m.?

6        Q    No, the one in the middle of the page at

7   5:32 p.m.

8        A    Okay.   Thanks.

9        Q    Do you see that?

10       A    Yes, I do.

11       Q    Okay.   And you agree with me that's an

12  hour and fifteen minutes later then the email that

13  we saw from Ms. Johnson where she is asking about

14  CAMRA-ready format from any other client; right?

15                 MR. O'CONNOR:   Objection.

16       A    (Witness perusing documents.)

17            Yeah.   Up or around that time, yes.

18       Q    Okay.   And mr. Massih comes back with two

19  different clients, right, one is Excel Capital, and

20  another one is AEGIS?

21       A    Correct.

22       Q    Does that refresh your recollection that

23  as of April 21st, 2015 the only connections SS&C

24  had with Citi were with two clients, Excel Capital

25  and AEGIS?

Manoj Chacko
June 28, 2018                        133

```
1                    MR. O'CONNOR:  Objection.
2       A   Can you repeat your question again?
3       Q   Does that refresh your recollection that
4   as of April 21st, 2015 SS&C only had two
5   connections with Citi, that is one for AEGIS and
6   one for Excel Capital?
7                    MR. O'CONNOR:  Objection.
8       A   This refreshes my recollection that AEGIS
9   is also another client however there could be other
10  clients as well.  We deal with various different
11  vendors and clients on a daily basis, both from
12  on-boarding and from a daily monitoring
13  perspective, and because I'm not involved with each
14  and every single setup I can't speak to whether
15  there were potentially other clients but given
16  Citi's...I guess for the lack of a better term
17  because they're quite a big custodian they're...I
18  would...they are possibly used in other clients as
19  well beyond the two that are listed here
20  (indicating).
21      Q   Okay.  Who were the other two, who were
22  the other clients beyond the two listed here that
23  SS&C had connections with Citi for as of
24  April 21st, 2015?
25                   MR. O'CONNOR:  Objection.
```

Manoj Chacko
June 28, 2018                              134

```
 1        A    I don't recall.

 2        Q    Okay.  And you agree with me that this is

 3   a response to Ms. Johnson's request that we saw at

 4   4:17 p.m. about other clients and CAMRA-ready

 5   format from Citibank?

 6                     MR. O'CONNOR:  Objection.

 7        A    Daniel's response wasn't a direct response

 8   to Adrianna's email on 4:17 but I believe it was a

 9   response back on email at 5:02 p.m. but

10   essentially, yes, it's along same line of

11   questioning.

12        Q    And what Mr. Massih reported at 5:32 p.m.

13   was that Citi wasn't providing dated in CAMRA

14   format for Excel Capital; right?

15                     MR. O'CONNOR:  Objection.

16        A    Correct.

17        Q    And the way SS&C addresses that was to

18   normalize the data from Citi for Excel Capital;

19   correct?

20                     MR. O'CONNOR:  Objection.

21        A    Yes.

22        Q    And also with respect to AEGIS Mr. Massih

23   says:  "I don't see them in CAMRA-ready format;" do

24   you see that?

25        A    Yes.
```

Manoj Chacko
June 28, 2018                                    135

1     Q    And the way the SS&C addressed the fact

2   that SS&C wasn't receiving CAMRA format data from

3   Citi for AEGIS was also to normalize that data;

4   right?

5               MR. O'CONNOR:  Objection.

6     A    Yes.

7     Q    Okay.  And we agree that Mr. Massih

8   doesn't reference any other clients in his email;

9   right?

10    A    With respect to this email, yes, that is

11  correct, only Excel Capital and AEGIS are

12  referenced.

13    Q    Right.  And so you would agree with me

14  that as of April 21st, 2015 Citi did not provide

15  CAMRA format data for any clients for SS&C has

16  established a connection with Citi; right?

17              MR. O'CONNOR:  Objection.

18    A    I cannot...I do not, I do not know, I

19  can't verify that.

20    Q    Okay.  Well that was Ms. Johnson's

21  request, right, tell me which clients, tell me for

22  which clients we received CAMRA format data from

23  Citi; right?

24    A    (Witness perusing documents.)

25              MR. O'CONNOR:  Objection.

Manoj Chacko
June 28, 2018                                    149

1            MR. O'CONNOR:   Objection.

2       A    I don't recall.

3       Q    Okay.  And prior to 2015 did you or anyone

4  else at OTS, to your knowledge, speak to anyone in

5  sales at SS&C about setting up a channel with Citi

6  for Armour Capital Management?

7       A    I don't recall.

8       Q    Prior to 2015 did you or anyone else at

9  OTS, to your knowledge, speak to anyone in

10  Professional Services at SS&C about setting up a

11  channel for Citi with Armour Capital Management?

12       A    I don't recall.

13       Q    Prior to 2015 did you or anyone at OTS, to

14  your knowledge, speak with anyone at Citi about

15  setting up an interface or a channel with Citi for

16  Armour?

17            MR. O'CONNOR:   Objection.

18       A    I don't recall.

19       Q    And prior to 2015 did you or anyone else

20  at OTS, to your knowledge, consider any of the

21  variables that we've discussed today with respect

22  to setting up a channel between SS&C and Citi for

23  Armour?

24            MR. O'CONNOR:   Objection.

25       A    Can you please restate your question.

Manoj Chacko
June 28, 2018                                    150

1      Q    Yeah.   Prior to 2015 did you or anyone
2  else in OTS, to your knowledge, consider any of the
3  variables that we've discussed today in respect to
4  setting up a channel between SS&C and Citi for
5  Armour?
6                    MR. O'CONNOR:   Objection.
7      A    I do not recall.
8      Q    Do you recall that there were difficulties
9  in setting up a channel between SS&C and BNY for
10 Armour?
11     A    Yes.
12     Q    Okay.   And what were those difficulties?
13     A    I don't recall all the difficulties, that
14 being said one such difficulty was that the data
15 was not, the data wasn't going to be transmitted to
16 SS&C in CAMRA formate.   And the second issue from
17 what I recall from my recollection was that there
18 was commingled data with multiple clients in
19 addition to Armour.
20     Q    Why was the commingled data issue
21 problematic?
22     A    That was problematic because when we
23 receive data from any vendor we stage it into a
24 location that is specific to a particular client,
25 and the client has the ability to go to that

Manoj Chacko
June 28, 2018                                    151

1   location and investigate, if there ever there

2   should be a need to do so, and our concern from a

3   security perspective is that we would not want to

4   expose them to any data outside of their own data.

5       Q   Okay.  And where is it that SS&C stages

6   data from third-party vendors for out-source

7   clients?

8              MR. O'CONNOR:  Objection.

9       A   We stage it to a drop point that is

10  provided to us which is specific to that client.

11      Q   Okay.  But you understand that in an

12  outsourced relationship or environment the client

13  doesn't have that access to that drop point; right?

14      A   Yes.

15      Q   So in an outsourced environment commingled

16  feeds are not problematic; correct?

17             MR. O'CONNOR:  Objection.

18      A   I am not entirely sure.

19      Q   Okay.  But you just told me that clients

20  from a -- strike that.

21          You just told me from a security

22  perspective you wouldn't want one client seeing

23  another client's data from a third-party vendor;

24  right?

25      A   Yes.

      1       Q    Okay.  And in an outsourced environment

      2  that's not an issue because outsourced clients

      3  don't have access to the drop point where the

      4  commingled data come is; correct?

      5       A    Can you repeat that last question?

      6       Q    In and out source environment commingled

      7  fees aren't problematic because the out-source

      8  clients don't have access to the drop point where

      9  the data come in; right?

     10                 MR. O'CONNOR:  Objection.

     11       A    Yes, they're in, the different client

     12  types are in different enclosures so they should

     13  not be able to access other clients data.

     14       Q    So you cannot use a commingled feed then

     15  with a third-party vendor for a hosted client;

     16  correct?

     17                 MR. O'CONNOR:  Objection.

     18       A    Yes.

     19       Q    And the commingled feed issue was resolved

     20  when SS&C requested a separate feed from BNY;

     21  correct?

     22                 MR. O'CONNOR:  Objection.

     23       A    Yes, we requested separate feed from BNY

     24  which would specifically have Armour's data only.

     25       Q    And BNY in response set up a separate

1  feed; did it not?

2      A    It did.

3      Q    Okay.  To your knowledge did anything in

4  January or February of 2015 prevent SS&C from

5  requesting a separate feed from BNY for Armour?

6                  MR. O'CONNOR:  Objection.

7      A    I don't recall.

8      Q    You also told me that data were not in a

9  CAMRA-ready format; right?

10     A    From my recollection.

11     Q    Okay.  And as a result SS&C normalized the

12  data; correct?

13                 MR. O'CONNOR:  Objection.

14     A    Yes.

15     Q    All right.  Do you recall any other

16  difficulties with setting up the feed with BNY?

17     A    I don't recall of other difficulties.

18     Q    Do you recall that the data that BNY were

19  providing contained only net cash movement on a

20  daily basis?

21     A    I don't recall that.

22     Q    All right.  Do you recall that there came

23  a point in time that BNY told SS&C that they needed

24  to connect to Workbench to obtain the data that

25  SS&C wanted for Armour?

# EXHIBIT 16

1                    - DONALD JOHNSON -

2      UNITED STATES DISTRICT COURT

3      DISTRICT OF CONNECTICUT - NEW HAVEN DIVISION

4      ------------------------------- X

5      ARMOUR CAPITAL MANAGEMENT LP,          )

6                    Plaintiff,          )   Case No:

7           -vs-                         )   17-cv-00790-JAM

8      SS&C TECHNOLOGIES, INC.,               )

9                    Defendant.          )

10     ------------------------------- X

11

12     DATE:   June 6, 2018

13     TIME:   10:12 a.m.

14

15              VIDEOTAPED DEPOSITION OF DONALD

16     JOHNSON, held at the offices of Holland & Knight,

17     31 West 52nd Street, New York, New York, pursuant

18     to Notice, before Hope Menaker, a Shorthand

19     Reporter and Notary Public of the State of New

20     York.

21

22

23

24

25

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2       monthly package direct operations?

 3               MR. O'CONNOR:  Objection.

 4          A.    We would have a conversation with the

 5       client after the receipt of the final package.

 6          Q.    Okay.  I'm looking for documents.

 7               What written records would reflect

 8       that there had been sign off from a client for

 9       direct operation?

10               MR. O'CONNOR:  Objection.  Asked and

11           answered.

12          A.    As I said, we don't retain that

13       documentation.  It's more verbal.  We have a

14       constant discussion with our direct clients.  We

15       are, in a way, an extension of their group.

16          Q.    Okay.  And then for a client outside

17       of direct, to your knowledge, are there any

18       documents that reflect whether that client had

19       signed off on a monthly close?

20               MR. O'CONNOR:  Objection.

21          A.    That's not our close.  Why would we

22       retain documentation?

23          Q.    Okay.  In respect of Armour, did you

24       or anyone else at SS&C, to your knowledge, retain

25       any documents that reflected whether Armour had
```

Donald Johnson
June 06, 2018                                        183

```
1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

2     signed off on any monthly closes?

3                MR. O'CONNOR:  Objection.

4         A.     I do not have anything for monthly

5     closes for sign-offs.

6         Q.     Are you aware of any documents that

7     reflected that Armour had sign off -- signed off

8     on any monthly closes?

9         A.     I would not have been involved in the

10    implementation or subsequent assistance that we

11    provided them after that to know what they did or

12    did not do.

13        Q.     Well, let's narrow it to the time,

14    then, that you worked on Armour.

15               Are you aware of any documents that

16    were retained -- strike that.

17               Are you aware of any documents from

18    that time period that reflect that Armour signed

19    off on the monthly closes?

20               MR. O'CONNOR:  Objection.

21        A.     I remember we worked on putting

22    together a monthly close checklist, and I believe

23    that we were working on utilizing that monthly

24    checklist.  But there was a number of clean-up

25    items that's we kept running into as we moved
```

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2        forward, so I don't know if we ever did sign off

 3        on a single month after we went live because of

 4        other various data issues.

 5            Q.    Okay.  So you can't recall from the

 6        time that you say Armour went live through the

 7        time that you worked on Armour having ever had a

 8        sign off on a month for Armour using CAMRA; is

 9        that right?

10                  MR. O'CONNOR:  Objection.

11            A.    -- specifically said I did not work

12        with Armour on the implementation or the

13        subsequent period through which -- the subsequent

14        assistance period, I don't know what happened.

15        So, from the January 2017 -- February 2017, going

16        forward, I am not sure if they signed off on a

17        month.

18            Q.    You're saying from January of '17

19        through the end of the relationship?

20            A.    Yes.

21            Q.    Okay.

22                  MR. MAMOUNAS:  All right.  We'll take

23        that break that your counsel requested for a

24        couple of minutes here.

25                  THE VIDEOGRAPHER:  The time is
```

1      - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

2      sign off or not was not my concern.

3           Q.     Okay.  Was it the concern as you

4      understood it of anyone at SS&C?

5           A.     The concern at SS&C was that they

6      become books and records.

7           Q.     Okay.  And during the time that you

8      worked on Armour, did you believe that any of the

9      months that you worked on had been processed

10     successfully using CAMRA?

11          A.     I believe the processing had improved

12     in the February and March month -- March months,

13     I'm assuming April as well.

14               The client still was showing certain

15     problems with security master set-ups; trade

16     entering, they were still making mistakes such as

17     leaving spaces at that time end of CUSIPS when

18     they tried to upload.  Things I would not expect

19     to be seeing from people who had been using the

20     system for a while.

21               They would -- they would complain

22     about the way the system worked, but they needed

23     to do the work.  Again, that's way the system is

24     designed.

25               So -- but, again, that's -- I put in

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2     place processes that would work.

 3          Q.      Okay.  So no, you don't believe that

 4     any of the months during which you worked on the

 5     Armour account were successfully processed, right?

 6               MR. O'CONNOR:  Objection.

 7          A.      I believe they were processed

 8     successfully in the end.

 9          Q.      In what end?

10          A.      I believe that they were able to put

11     the data in their system successfully.

12          Q.      Okay.  For which months?

13          A.      February, March, April.

14          Q.      So you believe for the month of

15     February, March and April?

16          A.      Maybe March and April.  February may

17     have --

18          Q.      Okay.  So you believe that for the

19     months of March and April, Armour was able to

20     successfully process transactions using CAMRA?

21          A.      They were able to successfully load

22     buys and sells and process MBS payments and

23     reconcile cash.

24          Q.      And you believe that occurred on a

25     monthly basis?
```

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2                  MR. O'CONNOR:   Objection.

 3        A.      From what they were showing me, yes.

 4        Q.      Okay.  Notwithstanding the fact that

 5   we've seen today that the issue of the missing

 6   factors from Bloomberg persisted throughout March

 7   and April 2017?

 8                  MR. O'CONNOR:   Objection.

 9        A.      All of which can be corrected through

10   an update of the information through an upload

11   file.

12                  So, yes, they were still able to

13   process properly and get their data out in a

14   timely -- and they should have been able to do

15   that in a timely manner.

16        Q.      Okay.  You saw that the issue of the

17   missing factors from Bloomberg went from March 8

18   through at least March 30th of 2017, right?

19                  MR. O'CONNOR:   Objection.

20        A.      You're talking about root cause

21   analysis.  You aren't talking about the fixing of

22   the missing factoring.

23        Q.      And there were two root cause

24   analyses, right?

25        A.      Yes.
```

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2             Q.      And there were multiple attempts to

 3      fix it, right?

 4                     MR. O'CONNOR:  Objection.

 5             A.      I'd have to talk to OTS or review

 6      more e-mails.

 7             Q.      In your own document here in

 8      Plaintiff's Exhibit 10, the accuracy of which you

 9      can't confirm, indicates that factors and floating

10      rates were still an issue, right, as of April 18,

11      2017?

12                     MR. O'CONNOR:  Objection.

13             A.      Factors and floating rates both have

14      closed next to them.

15             Q.      Right.  But they also say floating

16      rates are still an issue, right?

17             A.      We talked about this earlier about

18      the accuracy of the comments column as to whether

19      or not comments had been or not been removed.

20             Q.      Okay.  Is it your testimony that

21      Armour was able to successfully close its

22      month-end for accounting during any time using

23      CAMRA that you were working on the Armour account?

24                     MR. O'CONNOR:  Objection.

25             A.      I don't remember.
```

Donald Johnson
June 06, 2018                                    312

```
 1        - DONALD JOHNSON - CONFIDENTIAL - ATTYS' EYES ONLY

 2           Q.     You don't recall?

 3           A.     I don't recall.

 4           Q.     Do you recall there also being a

 5     reporting issue at Armour in the first half of

 6     2017 with respect to CAMRA?

 7           A.     I don't remember.

 8                  MR. O'CONNOR:  And then before we

 9           move on from Exhibit 10, I want to designate

10           the portions of the end of that document that

11           relate to Resource and Apollo as attorneys

12           eyes only.

13                  MR. MAMOUNAS:  Okay.  You produced

14           them.

15           Q.     I'll show you what we'll mark as

16     Exhibit 11.

17                  (Whereupon, Johnson Exhibit 11 was

18           marked at this time.)

19                  MR. O'CONNOR:  I'm still designating

20           them attorneys' eyes only.

21                  Is there a new exhibit?

22                  MR. MAMOUNAS:  There is.  I thought I

23           just gave you a copy of it.

24                  MR. O'CONNOR:  I don't think so.

25                  MR. MAMOUNAS:  I'll give you another
```

# EXHIBIT 17

Brooks Hilliard
November 08, 2018

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
CASE No. 3:17-CV-00790-JAM

ARMOUR CAPITAL MANAGEMENT LP,

      Plaintiff,

-vs-

SS&C TECHNOLOGIES, INC.,

      Defendant.

_____

DEPOSITION OF BROOKS L. HILLIARD, CMC CCP
VIDEOTAPED

Thursday, November 8, 2018
9:33 a.m. - 6:34 p.m.

222 Lakeview Avenue
Suite 1000
West Palm Beach, Florida 33401

Reported By:
Shirley D. King, CRR, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1829560

Brooks Hilliard
November 08, 2018                    126

1   of the life cycle.  The life cycle just relates to the

2   software.

3       Q.   Okay.  Are you familiar with any sources in

4   the software industry that indicate that the software

5   product life cycle indeed does include the

6   implementation of the software?

7            MS. AHMED:  Objection.

8            THE WITNESS:  I haven't looked for that.  I

9        wouldn't rule out that something might exist, but I

10       don't know anything off the top of my head.

11  BY MR. MAMOUNAS:

12      Q.   Okay.  And you're familiar with the term

13  "Commercial off-the-shelf software," are you not?

14      A.   I am.

15      Q.   Typically called COTS, right?

16      A.   That acronym is frequently used.  I mean, it's

17  frequently used within -- among providers.  I don't know

18  that customers use that term.

19      Q.   Okay.  Are you comfortable with us referring

20  to commercial off-the-shelf software as COTS today?

21      A.   Yes.

22      Q.   Okay.  In your experience, can software

23  solutions include COTS?

24      A.   Yes.

25      Q.   Okay.  But a software solution is not

Brooks Hilliard
November 08, 2018                              127

1    synonymous with COTS in your experience; is that right?

2         A.    Correct.

3         Q.    Okay.  Because a software solution could

4    involve COTS, but then have other services as part of

5    it, in your experience, correct?

6         A.    Solution's generally a package of things.

7    Software -- a software solution would be part of that

8    package, and that software could be COTS or it could be

9    something else.

10        Q.    In your experience, is a software package

11   still considered COTS when changes are made to the

12   software for a client?

13        A.    By that you mean the programming is changed?

14        Q.    Any aspect of the software itself, sir, that's

15   changed for a particular client, is the software in that

16   case still considered to be COTS?

17        A.    Generally, yes.

18        Q.    Okay.  At what point in time does the software

19   reach a certain level of change that it's no longer

20   considered COTS in your experience?

21        A.    If it's custom software.

22        Q.    Okay.  And what makes it custom software in

23   your experience?

24        A.    Developed from scratch.

25        Q.    So in other words, anything that is not

Brooks Hilliard
November 08, 2018                                128

1   developed from scratch is considered COTS in your

2   experience?

3        A.   If it's a software, a commercially available

4   software package that is deliverable without software

5   modifications, it's COTS.  That doesn't -- I'll just

6   leave it at that.

7        Q.   Okay.  But if it is commercially delivered

8   with modifications, you would agree with me it's not

9   COTS, right?

10       A.   No.

11            MS. AHMED:  Objection.

12   BY MR. MAMOUNAS:

13       Q.   Okay.  So what level of modification pushes a

14   software package over the line where it's now no longer

15   considered COTS?

16       A.   If it's deliverable without modifications,

17   even if modifications are subsequently made, it's still

18   commercial off-the-shelf software.

19       Q.   Okay.  And in your experience, if software is

20   not deliverable without modifications for a customer, it

21   would not be considered COTS, right?

22            MS. AHMED:  Objection.

23            THE WITNESS:  COTS would typically be a

24       product.  If it's a custom development, that custom

25       development might include modules, which are

Brooks Hilliard
November 08, 2018                          129

```
 1           acquired and incorporated into the custom solution.
 2           But if it's a custom solution, it's not COTS.  It's
 3           not commercial off-the-shelf software.
 4    BY MR. MAMOUNAS:
 5       Q.    Okay.  And if it includes -- strike that.
 6             Are you familiar with scripting?
 7       A.    Yes.
 8       Q.    Okay.  What's scripting?
 9       A.    Scripting is a way of entering information --
10    generally, a way of entering information or instructions
11    that determine how software works or what functions it
12    performs, typically.  There can be other examples of
13    scripting.
14       Q.    Okay.  In your experience, are there instances
15    in which scripting being done for a particular customer
16    renders a software no longer deliverable without
17    modification, and therefore no longer COTS?
18       A.    If it's deliverable without modifications and
19    functions that way, regardless of the im -- of the
20    scripting that's done, it's still commercial
21    off-the-shelf software.
22       Q.    Okay.  And in your experience, if the software
23    requires scripting in order to be deliverable and
24    functional for a client, it would not be considered
25    COTS; fair?
```

Brooks Hilliard
November 08, 2018                              130

1          A.    No.   It would not be considered COTS if it's

2     custom programmed for the customer.

3              If the scripting is just one way of entering

4     instructions as to what functionality -- what -- what

5     portions of the program functionality are going to be

6     utilized or how they're going to be utilized for the

7     customer, it doesn't change the fact that it's still

8     commercial off-the-shelf software.

9          Q.    Okay.

10         A.    There is no amount of scripting that changes

11    commercial off-the-shelf software to something else.

12         Q.    Well, can custom programming in your

13    experience included scripting?

14         A.    Custom programming is different from

15    scripting.

16         Q.    Okay.   And how is it different in your

17    experience, sir?

18         A.    Custom programming is changes -- changes to

19    the code or additions to the code.   Scripting is

20    something that the code uses.

21         Q.    Okay.   And when you refer to code, you

22    refer -- you're referring to any aspect of the code

23    that's included within a software solution?

24              MS. AHMED:   Objection.

25              THE WITNESS:   I believe the master agreement

Brooks Hilliard
November 08, 2018                    131

```
 1          in this case talks about what the -- the software
 2          is in this case, and that's how it -- in this
 3          situation, and that's how I -- and that's
 4          consistent with how I would define it.
 5              MR. MAMOUNAS:  Okay.  Why don't we -- we have
 6          eight minutes on the tape and lunch is here, so why
 7          don't we take our lunch break.  We'll be relatively
 8          quick, but take the time that you need, a half
 9          hour, 40 minutes if you can would be great.
10              MS. AHMED:  Uh-huh, yeah.  No problem.
11              THE VIDEOGRAPHER:  We are now going off video
12          record.  Time on the monitor, 12:48 p.m.
13              (A break was taken.)
14              THE VIDEOGRAPHER:  We are now back on video
15          Record.  Time on the monitor, 1:42 p.m.
16      BY MR. MAMOUNAS:
17          Q.    Sir, welcome back from the break.
18          A.    Thank you.
19          Q.    Did you have any discussions during the course
20      of the break about your deposition today?
21          A.    No.
22          Q.    Did you have any discussions during the break
23      about this case?
24          A.    Nope.
25          Q.    Before we went off, we were talking about
```

1   COTS; do you remember that?

2       A.   Yes.

3       Q.   And just so I'm clear, is it your position

4   that a given software product is either COTS or not

5   COTS, that is, there's no in-between description in --

6   in your experience?

7       A.   There are software -- I think I've seen some

8   definitions of other less commonly used types of

9   software.  But for commercial software, it tends to fall

10  into one or the other of those categories.

11      Q.   One or the other, meaning, either COTS or not

12  COTS?

13      A.   Yes.

14      Q.   Okay.  And just so we're clear, in your mind,

15  COTS means software that is deliverable without

16  modifications?

17      A.   Commercially deliverable without -- it's a

18  software -- generally, a software product that's

19  available commercially and deliverable without

20  modifications.

21      Q.   Okay.  And when you say "available

22  commercially," what do you mean?

23      A.   It's not amateur software.  I don't know that

24  open source software is considered to be COTS.  Because

25  open source software is available, but it's not

1    commercially available, by and large.  So -- but

2    something that's -- it's a software product that's

3    available for sale.

4         Q.   Okay.  And available for sale through any

5    particular --

6         A.   Or licensed -- generally licensed, rather than

7    sale, but, yeah.

8         Q.   Okay.  And is that sale or license subject to

9    any particular method of delivering the software,

10   whether through the Internet or through a purchase at a

11   retail store or otherwise in your experience?

12          MS. AHMED:  Objection.

13          THE WITNESS:  Those are two ways that it could

14        be available.

15   BY MR. MAMOUNAS:

16        Q.   Okay.  But the distinguishing factor between

17   COTS and not COTS is the modification component; is that

18   right?

19        A.   No.  COTS software can be modified.  What I'm

20   talking about is the difference between commercial

21   software that's deliverable without modifications and

22   software that's custom developed.

23        Q.   Okay.  And before the break we talked about

24   the custom development.  And you mentioned to me custom

25   programming, for instance, right?

Brooks Hilliard
November 08, 2018                    134

1          A.    Yes.

2          Q.    Okay.  And we had a discussion about

3    scripting, and you told me that, in your opinion,

4    scripting is not custom programming such that scripting

5    would not make COTS not COTS, right?

6          A.    Correct.

7          Q.    Okay.  And when you talk about custom

8    programming, you're not referring to modifications to a

9    software product's kernel alone, right?

10              MS. AHMED:  Objection.

11              THE WITNESS:  Custom -- when I'm talking about

12         custom programming, I'm talking about software

13         that's developed custom from scratch.

14              Very often COTS software can also be delivered

15         along with modifications or custom programmed

16         additions.  It's still COTS software.

17              So when I'm talking about custom programming,

18         I'm talking about something that would be -- people

19         might -- some people call it POKE, but something

20         that's created uniquely for a particular customer

21         or application.

22    BY MR. MAMOUNAS:

23         Q.    Okay.  You would agree with me, though, that

24    the custom programming or modification that's added on

25    to the COTS, in and of itself wouldn't be considered

Brooks Hilliard
November 08, 2018                          135

1   COTS, right?

2        A.    The product would still be COTS.  The

3   modification would be an add-on.

4        Q.    That would not be COTS, right?

5        A.    It would be an add-on to a COTS product.

6        Q.    Right, but --

7        A.    And it -- custom modifications sometimes get

8   incorporated into the product and become productized.

9   But until it's productized, it's not part of the COTS

10  product.

11       Q.    Right.  And so that component of it is

12  customized, right?

13       A.    I think by definition you just -- I think

14  that's -- you're saying something that's customized is

15  customized, and I agree.

16       Q.    Yes.  And so that customized component of the

17  software itself would not be considered COTS; is that

18  fair?

19       A.    The cus -- it would be an add-on to a COTS

20  package.  It wouldn't be part of the COTS package.

21       Q.    Right.  So the add-on itself would be

22  something that would be considered not COTS; fair?

23       A.    It could be delivered as part of a -- of a

24  solution, which incorporates a COTS software plus

25  modifications.

Brooks Hilliard
November 08, 2018                                     172

1        Q.   And the final difference is the level of SS&C

2   service and support, you say?

3        A.   Yes.

4        Q.   And can you think of any differences as you

5   sit here today that aren't included in your report?

6        A.   Not as I sit here today.

7        Q.   In your experience, how are the level of

8   SS&C's service and support different among the three

9   deployment options for CAMRA?

10       A.   In the -- the licensed deployment option, the

11  customer has basically full control of everything

12  under -- with some support, in most cases, although some

13  clients might choose not to have support, but some

14  support from SS&C.

15            In the outsourced environment, SS&C would take

16  primary responsibility for managing the implementation

17  for controlling who does what and when, and SS&C would

18  be the primary source that might have authorization,

19  pre-authorization to contact third parties and so forth.

20            And in the hosted environment, it's basically

21  a hybrid of the two, in that the customer has the

22  primary responsibility, with the assistance of SS&C, but

23  the software is executing on an SS&C server rather than

24  on a customer-controlled server.

25       Q.   Okay.  And focusing on the hosted deployment

Brooks Hilliard
November 08, 2018                                    206

1        Q.    Yes.

2        A.    I'm not sure about REITs in general, but ACM

3   was the first mortgage REIT.

4        Q.    In other words, prior to December of 2014,

5   SS&C had never implemented a mortgage REIT on hosting of

6   CAMRA, right?

7        A.    That's my understanding.

8        Q.    Okay.  Do you not believe, based on your

9   experience in the industry, that SS&C should have told

10  Armour that it had never implemented CAMRA on a hosted

11  basis for a mortgage REIT before?

12       A.    No.  I don't think that was necessary or

13  something that providers would customarily say, if they

14  had every reason to believe that there would be no

15  difference.

16       Q.    In formulating your opinions, did you consider

17  that as of December 2014, SS&C had never implemented

18  CAMRA for a mortgage REIT on hosting?

19       A.    Did I consider that?

20       Q.    Yes.

21       A.    Yes.

22       Q.    And does that not mean, sir, that hosted CAMRA

23  for a mortgage REIT was untested as of December 2014?

24       A.    It doesn't -- does it mean it was untested?

25             It means that they were the first customer to

1   do it.  I mean, I don't know how you would test

2   something in a -- with a customer, unless it was a Beta

3   test.  But this was not a Beta test because it was the

4   same software that had been used with both other

5   deployment options, the in-house licensed and the

6   outsourced.

7        Q.   Okay.  Well, you have given opinions before

8   about untested software solutions, have you not?

9        A.   Probably.

10       Q.   And that was one of your opinions in the

11  Summit versus IBM case, right, that the software

12  solution there was untested?

13       A.   Well, there was -- it wasn't an analogous

14  situation, but yes.  But you couldn't generalize from

15  that to this.  And I could explain why, if you like.

16       Q.   Well, let me ask you this question.  The fact

17  that the software solution in that case was untested was

18  one of the reasons that you assigned fault to the

19  third-party implementor, that is, IBM in that case;

20  isn't that right?

21       A.   The software solution was un -- it was on a

22  brand new hardware platform that was untested.  So it

23  was not an existing application.  It was a brand new --

24  this software had never run on this particular -- on

25  that particular -- as I recall, on that particular

Brooks Hilliard
November 08, 2018                    274

```
 1   project because of Mr. Gruber, it never -- the
 2   implementation nevertheless succeeded?
 3        A.   No.  I'm saying there was an implementation
 4   completion criteria in Work Request 7, and that was
 5   successfully completed.
 6        Q.   Okay.  So what then does Mr. Gruber's
 7   purported inadequacies have to do with the -- with the
 8   failure or success of the implementation?
 9        A.   We're not talk -- I wasn't talking about the
10   success of the implementation.  There were, obviously,
11   issues that led to this lawsuit, and Mr. Gruber's
12   failures were central to those issues, which resulted in
13   time and costs, and -- and so forth.
14        Q.   But I thought you told me the implementation
15   succeeded?
16        A.   I told you that the implementation completion
17   criteria were successfully completed.
18        Q.   Okay.  So that means, in your opinion, that
19   the implementation was successful, correct?
20        A.   It means exactly what I said, and nothing
21   more, nothing less.
22        Q.   Okay.  So the completion of implementation
23   criteria were -- were met, is what you're saying?
24        A.   There is an implementation completion criteria
25   in Work Order 2.  That implementation completion
```

Brooks Hilliard
November 08, 2018                                     275

1   criteria was ultimately met, yes.

2       Q.   Okay.  And in your mind, is that tantamount to

3   the implementation having been completed successfully?

4       A.   I'm not saying any more or any less than the

5   fact that the implementation criteria in Work Request 2

6   were -- was successfully completed.  I'm not going

7   beyond that; I'm not saying any less than that.

8       Q.   Okay.  And do you have any belief separate and

9   apart from --

10      A.   We're getting back to beliefs, aye?

11      Q.   Well, do you have any kind of belief -- strike

12  that.

13           Have you seen any evidence tending to show

14  that implementation was or was not completed,

15  irrespective of what you're telling me about the

16  contractual standard in Work Request 2?

17      A.   Implementation completion is defined in Work

18  Request 2.  I don't know how I can address anything

19  other than what that definition is.

20      Q.   Okay.  So notwithstanding all of Mr. Gruber's

21  deficiencies that you have told us here that lead you to

22  describe him as the most conspicuous inadequate resource

23  on the implementation, the completion of implementation

24  standard was met?

25      A.   The agreed standard was met.

# EXHIBIT 18

Michael Maffattone
November 13, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF CONNECTICUT

 3      - - - - - - - - - - - - - - - - - - - - - -x

 4      ARMOUR CAPITAL MANAGEMENT, LP,

 5                            Plaintiff,

 6              -against-

 7      SS&C TECHNOLOGIES, INC.,

 8                            Defendant.

 9      - - - - - - - - - - - - - - - - - - - - - -x

10

11              Videotaped deposition of MICHAEL MAFFATTONE,

12      taken pursuant to Subpoena, was held at the Law

13      Offices of HOLLAND & KNIGHT, LLP, 31 West 52nd Street,

14      New York, New York, commencing November 13, 2018,

15      9:02 a.m., on the above date, before Amanda McCredo, a

16      Court Reporter and Notary Public in the State of New

17      York.

18

19

20

21

22

23

24

25
```

```
 1   that so many times, again, for their hosting clients
 2   as well as their outsourced clients, so they have
 3   the experience.
 4       Q    So, in other words, a lot of the tasks that
 5   took you a long time, you're saying, were going to
 6   be SS&C's responsibility under a hosting option
 7   which would save Armour time?
 8       A    Yes.
 9       Q    And then in the next paragraph you say,
10   "I've learned that, prior to signing the ACM
11   contract, seven SS&C clients were able to implement
12   and use CAMRA in less than six months."
13            Do you see that?
14       A    Yes.
15       Q    None of those were mortgage REITs, were
16   they?
17       A    One of them was mortgage REITs, if I
18   recall.
19       Q    That was after the execution of the
20   contract with SS&C and Armour, was it not?
21       A    There was, yes, I believe it was Anworth.
22       Q    Before the execution of the contract, none
23   of those clients that supposedly were implemented in
24   less than six months were mortgage REITs, correct?
25       A    As far as I recall.
```

Michael Maffattone
November 13, 2018                        266

1      Q      As far as you recall no, they were not
2    mortgage REITs, correct?
3      A      That's correct.
4      Q      And none of them was hosted; is that right?
5      A      I don't, I don't recall that.
6      Q      You don't know?
7      A      I don't recall whether they were hosted or
8    not.
9      Q      Do you know --
10     A      Most of them were outsourced clients.
11     Q      Do you know anything about the number of
12   employees those clients had?
13     A      I learned a little from my discussion of
14   them.  Some of them were real small, but I don't
15   know the total employees.
16     Q      Even for the real small ones?
17     A      Yeah, I didn't know what the...
18     Q      What were the skills of their employees?
19     A      I don't know.
20     Q      What were the experience of their
21   employees, including with prior implementations?
22     A      I didn't ask that, so I don't know.
23     Q      What was the availability of those
24   employees who worked on implementation?
25     A      Each of them mentioned that they had at

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION
CASE No. 17-CV-00790-JAM


ARMOUR CAPITAL MANAGEMENT LP,

       Plaintiff,

-vs-


SS&C TECHNOLOGIES, INC.,

       Defendant.

_____

DEPOSITION OF G. HUNTER HAAS, IV
VIDEOTAPED


Monday, May 7, 2018
10:06 a.m. - 2:06 p.m.



3305 Flamingo Drive
Vero Beach, Florida 32963




Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1735254

G. Hunter Haas
May 07, 2018                                          8

1      Q.    Okay.   Apart from what you told me with
2   respect to reviewing documents and speaking with your
3   lawyer, did you do anything else to prepare for today's
4   deposition?
5      A.    No.
6      Q.    Have you ever had conversations with SS&C's
7   lawyers regarding this case?
8      A.    We have.   I have spoken to them over the phone
9   a couple of times.
10      Q.    A couple of times?
11      A.    These two gentlemen here.
12      Q.    How many times -- I'm sorry.   You said it was
13   a couple of times?
14      A.    Yeah.   I believe it was two, maybe three; I
15   don't know.   I can't recall for sure.
16      Q.    When did those communications occur?
17      A.    Just over the course of the last year.   I
18   believe we touched base in the first quarter at some
19   point.  I think that's about it.  Sometime last year.
20      Q.    And what do you recall about the substance of
21   those communications?
22      A.    They just, I think, were trying to, you know,
23   understand, you know, how we felt about our experience
24   dealing with SS&C, having licensed some software from
25   them, and the ultimate, I don't know, level of

G. Hunter Haas
May 07, 2018                                          9

1    satisfaction we had with them and how some of the --
2    some of the experiences we had played out and, you know,
3    I think just to get a better sense of how I felt about
4    those things.
5         Q.   And what did you tell them?
6         A.   You know, it was really more just sort of
7    going over the, you know, the history of what -- of our
8    relationship with them, how it started.  And we had gone
9    back a couple of years.  We had a long discussion with
10   them about the different ways in which we could use
11   their platform and their software.  They explained to us
12   that, you know, there was sort of a continuum of
13   options; one being, where they just strictly license it
14   and turn it over to us to use, and the other extreme
15   being where they do everything for us, up to and
16   including, you know, preparing up tables for financial
17   statements.  And so we selected a -- we selected a --
18   you know, somewhere along that line.  I guess what we
19   ultimately selected was to licenses the software, have
20   them host it on their server so that updates and all
21   that gets -- techy stuff could be taken care of, any
22   internal controls over the technology side of things
23   would be handled by their folks.  We have a relatively
24   small staff.  So, you know, I guess, I don't know that
25   all of that was part of the conversation, but we were

G. Hunter Haas
May 07, 2018                                          10

1    just sort of reviewing the history.  Some of this is

2    explanation to you about the things we were going over.

3             They were aware of the relationship,

4    especially Dan.  So we licensed the software, had it

5    hosted with them for about a year and a half.  We were

6    trying to implement it.  At some point, we pulled the

7    plug on that version of -- of their offering.  And, you

8    know, had some -- had some issues with the product.  Dan

9    and SS&C are aware.  We decided we were going to stop

10   using it.  And then ultimately, opted to kind of switch

11   models and go to more of an outsourced approach, you

12   know, after having discovered that it was going to take

13   more time and energy of my staff than we had initially

14   anticipated, and -- to run the licensed version.  And

15   that, you know, we were certainly were initially

16   displeased with the way things played out, but have

17   ultimately found a resolution that has been satisfactory

18   to me and my staff.  Those are, I think, the things that

19   we covered, more or less.

20        Q.   Understood.  And we're going to go into detail

21   on some of the things that you mentioned.

22        A.   Sure.

23        Q.   Going back to the two to three times that you

24   spoke with SS&C's counsel, is there anything else that

25   you recall that was discussed?

G. Hunter Haas
May 07, 2018                                                    12

1    takeaway from it; I don't know.

2         Q.   Okay.  And you said that you had tried for a

3    year and a half a certain type of SS&C's product.  Do

4    you remember that?

5         A.   Yes.

6         Q.   Okay.  And what do you mean you tried it for a

7    year and a half?

8              MR. O'CONNOR:  Objection.

9              THE WITNESS:  We licensed the product and were

10             in the process of sort of implementing it in a way

11             that -- implementing the product, whereby my staff

12             would sort of run the software program and be

13             responsible for inputting all of the data entry, as

14             well as reviewing reports on a daily basis and

15             reconciling certain -- certain accounts back to our

16             bank statements, and cash activities back to those

17             same bank statements.

18        Q.   And what was the name of the software product?

19        A.   CAMRA.

20        Q.   And what was the name of that -- of that

21   method of using CAMRA as you describe it?

22        A.   I guess I would call it -- we referred to it

23   as a "hosted licensing agreement."

24        Q.   Okay.  And CAMRA was never implemented at

25   Bimini on a hosted basis, was it?

G. Hunter Haas
May 07, 2018                                            13

1          MR. O'CONNOR:  Objection.

2          THE WITNESS:  Not really, not to the point

3     where we were actually sort of independently

4     running the solution on our own.  We were still

5     working with the implementation team when we opted

6     to stop.

7  BY MR. MAMOUNAS:

8     Q.    And that's at the year and a half or so that

9  you said you opted to pull the plug on that version?

10    A.    Yeah, I'd have to --

11         MR. O'CONNOR:  Objection.

12         THE WITNESS:  I'd have to review my notes, but

13    I feel like it was about a year and a half.

14  BY MR. MAMOUNAS:

15    Q.    Okay.  And by that point in time, the software

16  product was not implemented at Bimini, correct?

17         MR. O'CONNOR:  Objection.

18         THE WITNESS:  That's correct.

19  BY MR. MAMOUNAS:

20    Q.    Other than the conversations you had with

21  counsel -- well, strike that.

22         During the conversations that you had with

23  SS&C's counsel, was anybody else on the phone with you?

24    A.    I believe Dan was at one point, and maybe one

25  of your colleagues at -- one of the other attorneys

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CIVIL CASE NUMBER:  3:17cv00790 (JAM)

ARMOUR CAPITAL MANAGEMENT LP,

        Plaintiff,

vs.

SS&C TECHNOLOGIES, INC.,

        Defendant.

_____/


VIDEO DEPOSITION OF JAMES MOUNTAIN


DATE:            November 29, 2017

TIME:            10:04 o'clock a.m.

PLACE:       Vero Beach Court Reporters
               3111 Cardinal Drive, Suite B
               Vero Beach, Florida  32963

TAKEN BY:      Defendant

REPORTER:     Cynthia L. O'Cain

VIDEOGRAPHER:  Ted Hood

55

1    in connection with the implementation of the CAMRA

2    solution?

3         MR. MAMOUNAS:  Objection.

4         THE WITNESS:  Yes.

5    BY MR. O'CONNOR:

6        Q    When did you give that consideration?

7        A    During the sales process, when we had begun to

8    think that, that SS&C was the appropriate solution for

9    our needs, we had a conversation with Jeff Fecteau.  I

10   asked the question of who do I need to contact or hire to

11   assist us with implementation?

12        And very vividly dissuaded me from that thought

13   by saying that, you know, we really didn't want to hire a

14   third party.  That just confuses roles and

15   responsibilities.  And that at the end of the day, what

16   we wanted was just one throat to choke, and that that's

17   what hiring SS&C professional services to implement the

18   CAMRA system would provide, and that would be a superior

19   implementation course of action.

20       Q    You understood Mr. Fecteau was a salesman for

21   SS&C, correct?

22       A    Yes.

23       Q    And when did that conversation occur?

24       A    I believe that was in the fall of 2014.

25       Q    Did you discuss the opinion offered by

83

1        THE WITNESS:  We were comforted by the idea

2      that this is well-trotted ground for SS&C.

3    BY MR. O'CONNOR:

4        Q    When was the next meeting that you had with

5    SS&C?

6        A    I think that the next time we met was a number

7    of weeks later in our offices in Vero Beach.  I may have

8    had some correspondence and calls in the intervening

9    period.  But I think SS&C came to Vero Beach later in the

10   summer.

11       Q    When was that?

12       A    Later in the summer.  I don't recall whether it

13   was late August, early September.  Around Labor Day, as I

14   sit here today, I think.

15       Q    Who attended that meeting?

16       A    I think that Mr. Reilly, Mr. Fecteau, and

17   Mr. Moore were there from SS&C.  Mark Gruber and I were

18   there from ARMOUR.  I don't recall offhand whether some

19   or all of the other staff that we had in ARMOUR might

20   have been invited in to sit for part of it or not.  I

21   don't recall that.

22       Q    How long did that meeting last?

23       A    I think most of the morning.  We might have

24   even had lunch.

25       Q    And tell me everything you remember about that

84

1    meeting.

2        A    I think that there was a reiteration of the

3    qualifications of SS&C.  I think that we also had a

4    little tour of a day in the life of what it would be like

5    for accountants or traders that were using the SS&C

6    system as, you know, as a hosted customer; what that,

7    what that workflow might look like; you know, how one

8    would log in.  And I don't recall offhand, you know, what

9    else we talked about to fill the hour, fill the morning.

10        We probably had some opportunity for our

11    technology people, Trevor Spicer and Cory Graley, to talk

12    about implementation option, particularly as it related

13    to SS&C hosting the implementation as opposed to ARMOUR

14    hosting at its own data center.  And probably talked a

15    bit about that to get information for furtherance of the

16    sales process.

17        Q    When you say they probably had some opportunity

18    point to talk, do you not remember specifically that

19    conversation occurred?

20        A    I don't recall whether I was actually in the

21    room for those conversations or I simply facilitated the

22    introduction and stepped out.

23        Q    And you understood that, with a hosting option,

24    what would be hosted would be the CAMRA software,

25    correct?

85

1          MR. MAMOUNAS:  Objection.

2          THE WITNESS:  Well, I understood hosting to

3     consist of installation of the software operation of

4     the software including scheduling and conduct of,

5     you know, the various overnight processes that are

6     necessary.  That would include interface with third

7     party, both providers and recipients of data; as

8     well as installation of patches and upgrades; timely

9     troubleshooting and resolution of issues to the, to

10    the extent that, you know, particularly they

11    occurred in off hours.  It would include disaster

12    recovery archive and backup.

13          Basically, you know, when we talk about

14    turnkey, it meant to me everything, as a practical

15    matter, where the back of the individual user's

16    computer screen stopped and the system went into an

17    internet wire.  From that point back is what I

18    understood as hosting.  We were going to have a, you

19    know, essentially, infinitesimally thin client.  It

20    wasn't going to be anything to be loaded on

21    individual work station or desktops with the

22    possible exception of a, you know, of a quick key or

23    a button that facilitated log into the system that

24    was running at SS&C's data center.

25    BY MR. O'CONNOR:

86

1    Q   But you never understood that the

2   implementation of CAMRA would be a turnkey --

3    A   Yeah.

4    Q   -- matter?  You did?

5    A   Yeah.

6    Q   You understood that, that your relationship

7   with SS&C involved an implementation where you just would

8   turn the key and everything would work?

9    A   Well, okay.  So that probably is, overstates

10  the case just a little bit.  Because, among other things,

11  as you make the, as you make the gesture, I don't think

12  there's a physical key.

13       But in terms of, sort of the ARMOUR interest at

14  this, at this point it was, here's what we do, here's all

15  our data, here are all our account information.  Do what

16  you need to do to replicate that in CAMRA, and let's

17  bring it up on the screen.  And, you know, once you do

18  that, then we can start going through, you know, does

19  this make sense?  Are there, are there errors that, you

20  know, we can identify that, that need to be corrected and

21  how are they going to be corrected?  You know, is the

22  configuration so that, you know, matching transaction to

23  account numbers, you know, is that, is that working as we

24  expected?

25       Certainly, we would be involved in the, in the

87

1    testing and user acceptance of the implementation to make

2    sure that it was done appropriately and to our

3    satisfaction.  I mean, that's, that's what I understood.

4        Q    That's what you understood in the meeting in

5    August of 2014?

6        A    That's what I understood our ask was, our

7    desire.  And when I understood that that had been

8    reasonably communicated and that the representatives of

9    SS&C at the, at the time was okay, it's good to know.

10   Let's work on that.  We don't have a, we don't have a

11   specific proposal, but that's, that's good to know.

12       Q    So, Mr. Mountain, are you aware of any

13   financial reporting or accounting system that could

14   support a public company that would be a turnkey

15   implementation?

16            MR. MAMOUNAS:  Objection.

17            THE WITNESS:  Well, the current general ledger

18       implementation that we're going through for ARMOUR I

19       think is very, is very much like that.

20   BY MR. O'CONNOR:

21       Q    What general ledger implementation is that?

22       A    Intact.  So that is a product that I think has

23   just been acquired by Sage, if I remember correctly.

24   But, basically, their model is, an implementation

25   specialist is their primary point of contact for sales.

118

1  BY MR. O'CONNOR:

2      Q   ARMOUR would need to know how the use the

3  software, correct?

4      A   ARMOUR would need to be trained to input

5  transactions to specified reports that it wanted,

6  interpret them, and evaluate the output.

7          MR. MAMOUNAS:  Object to the form of the last

8      question.

9  BY MR. O'CONNOR:

10     Q   Okay.  ARMOUR never requested a quote from SS&C

11  for CAMRA on a SAAS model, correct?

12     A   No.

13         MR. MAMOUNAS:  Objection.

14         THE WITNESS:  ARMOUR did.

15  BY MR. O'CONNOR:

16     Q   ARMOUR did?

17     A   Yes.

18     Q   And to whom was that request made?

19         MR. MAMOUNAS:  Objection.

20         THE WITNESS:  Jeff Fecteau.

21  BY MR. O'CONNOR:

22     Q   When was that?

23     A   At one of the meetings that we had in Vero

24  Beach.

25     Q   Was that the meeting in August of 2014?

119

1      A    I actually think -- I don't know whether it was

2    that meeting or a later meeting.  But I think --

3      Q    Tell me everything you remember Mr. Fecteau

4    said at that meeting.

5      A    That's not the way we price it.  You got to buy

6    the software on a license basis, either permanently or

7    for a period of time, and then we'll price the data

8    center and the software upgrades or the software

9    maintenance according to our normal schedule.  But the

10   technical aspects of it, we can meet those.  We can meet

11   those expectations with hosting.  The understanding I

12   took away from that conversation.

13          THE VIDEOGRAPHER:  We got about five minutes.

14   BY MR. O'CONNOR:

15     Q    Did you understand that an SAAS offering would

16   be comparable to the outsourcing employment option that

17   SS&C offered?

18     A    I understood them to be different.

19     Q    How so?

20     A    The outsourcing options, as I understood that

21   SS&C was offering, included the provision of substantial

22   human resources to fill the user roles.

23          THE VIDEOGRAPHER:  Ending Tape 2.

24          (Defendant's Mountain Exhibit Number 12 was

25   marked for identification.)

122

1        MR. MAMOUNAS:  We are remarking these in

2     sequence, as far as what we agreed yesterday.  You

3     told me you were remarking these in sequence.

4        MR. O'CONNOR:  You have the exact document, if

5     you have yesterday's exhibits.

6        MR. MAMOUNAS:  I don't have yesterday's

7     exhibits.  That's why I asked if you were bringing

8     copies of today's exhibits yesterday.  We'll

9     continue.

10    BY MR. O'CONNOR:

11       Q    Do you recall seeing that document, sir?

12       A    I believe I did.

13       Q    And did you provide information in connection

14    with the completion of that document?

15       MR. MAMOUNAS:  Objection.

16       THE WITNESS:  I don't -- I think I did, yes.

17    BY MR. O'CONNOR:

18       Q    Okay.  So you see that it's dated September 26,

19    2014, correct?

20       A    Yes.

21       Q    And it's entitled "Implementation

22    Questionnaire."

23       A    Yes.

24       Q    Do you see that?

25       A    Yes.

123

1      Q    And the questionnaire was prepared by SS&C,

2   correct?

3      A    I don't know who all prepared it, whether SS&C

4   provided it to us with all answers filled in, whether

5   they provided as the blank and we filled in the answers

6   and returned it.

7      Q    Yeah.

8      A    So when you say, "prepared," that's kind of --

9      Q    I mean that SS&C prepared the questions,

10  correct?

11     A    Yes.  This was, this was clearly SS&C's

12  questionnaire.

13     Q    Yes.  And ARMOUR prepared the answers to the

14  questions, correct?

15         MR. MAMOUNAS:  Objection.

16         THE WITNESS:  I have no reason to believe

17     that's not true.

18  BY MR. O'CONNOR:

19     Q    And you've reviewed the answers before --

20     A    Yes.

21     Q    -- you provided it to SS&C, correct?

22     A    Yes.

23         MR. MAMOUNAS:  Objection.

24         THE WITNESS:  Yes.

25  BY MR. O'CONNOR:

124

1      Q    And everything in that document you believe was

2      true?

3      A    Yes.

4      Q    Can I see that, sir?

5      A    Sure.

6      Q    And the -- do you see in the project management

7      detail section, the document indicates that the ARMOUR

8      will be providing a project manager for the

9      implementation?

10     A    Well, I see that the box "yes" is checked off

11     of project manager.  Although, the question says indicate

12     the type of resources that will be dedicated to this

13     project.  And it is actually silent on the question of

14     who will "provide them."  For example, to the extent that

15     auditors were going to be involved, I couldn't provide

16     auditors.

17     Q    Okay.  Did you have an understanding, when you

18     reviewed and approved this documented, that ARMOUR was

19     indicating that it would provide a project manager in

20     connection with the implementation of the CAMRA project?

21          MR. MAMOUNAS:  Objection.

22          THE WITNESS:  My understanding was that we

23     would provide someone to be ARMOUR's representative

24     as it relates to project management.  Again, project

25     managers is plural.  And I had no understanding that

131

1       my lead.  And if he said anything, it would have

2       been, if you need to follow up on anything, give me

3       a call.  But he was largely quiet on that call, to

4       my recollection.

5   BY MR. O'CONNOR:

6       Q    Do you recall anything that any SS&C

7   representatives said during that call?

8       A    Other than, okay, we hear you, I don't recall

9   anything else.

10      Q    So you understood on December 11th that the

11  total estimated hours for the implementation of CAMRA on

12  SS&C's part would be it 2,500 hours, correct?

13          MR. MAMOUNAS:  Objection.

14          THE WITNESS:  I understood that the December

15      10th estimate of the implementation to be conducted

16      by SS&C was submitted to take 2,500 hours and cost

17      $625,000, subject to the assumptions on page 2 of

18      the handout.

19  BY MR. O'CONNOR:

20      Q    Let's mark next the exhibit.  Did you

21  understand, in that discussion, that ARMOUR would have

22  responsibilities associated with the implementation of an

23  enterprise software?

24          MR. MAMOUNAS:  Objection.

25          THE WITNESS:  I understood that the estimate

1    assumed that ARMOUR would provide 12/31/2014

2    positions in electronic format.  And if that was not

3    done, that SS&C could reformat at additional cost.

4    I understood that it was assumed that initial

5    position data would have been reconciled, that we

6    did not have any, other than temporary impairment on

7    securities as of December 13 -- or December 31st,

8    2014, that the implementation was to cover both gap

9    and tax ledgers for two entities, those being Armour

10   Residential REIT and JAVELIN Mortgage Investment.  I

11   understood that Armour would provide a security

12   master file details in electronic format required

13   for SS&C top load into CAMRA.  And if that was not

14   done, SS&C could reformat at additional cost to be

15   determined, that ARMOUR would.  It was assumed that

16   ARMOUR would provide cash flow schedules in

17   electronic format.  And if that was not done, SS&C

18   could reformat that at additional cost; that ARMOUR

19   would be responsible for review and sign-off of

20   initial position reconciliation and financial impact

21   reconciliation, which I understood to be work

22   products that SS&C was going to produce.

23        I understand that it was assumed the general

24   ledger feeds in BlackRock Green Package interfaces

25   were included in the estimate, but assumed to be

133

1    tasks low of complexity; and that it was assumed

2    that ARMOUR would provide third-party trades,

3    principal pay-downs, et cetera, in an appropriate

4    format.  If that was not done, that SS&C could

5    reformat and complete the project at additional

6    costs.  That's what I understood.

7    BY MR. O'CONNOR:

8        Q    Did you just read the last page of Exhibit 14?

9            MR. MAMOUNAS:  Objection.

10           THE WITNESS:  I used the last page of Exhibit

11   14 to refresh my recollection of my understanding at

12   the time, which is the question I believe you'd

13   asked.

14           MR. O'CONNOR:  Okay.  Let's mark this as the

15   next exhibit, Exhibit 15.

16           (Defendant's Mountain Exhibit Number 15 was

17   marked for identification.)

18   BY MR. O'CONNOR:

19       Q    I show you what's been marked as 15 to your

20   deposition, sir.  Would you review it.  Please let me

21   know when you're done.

22           Are you done, sir?

23       A    Yes.

24       Q    You see this is an email from Mr. Moore to you,

25   Mr. Gruber, Ms. Terry, with copies to Mr. Fecteau and

140

1    BY MR. O'CONNOR:

2        Q    Okay.  So you understood, when you executed the

3    Master Agreement on behalf of ARMOUR, that the

4    implementation services that SS&C would provide would be

5    in support of ARMOUR's implementation of the CAMRA

6    software, correct?

7            MR. MAMOUNAS:  Hold on a second.  You got two

8        questions pending, Mr. O'Connor.

9            MR. O'CONNOR:  No, I don't.  You said, let's

10       take a look at it.  He answered.  He responded.

11           Would you read the question back.

12           MR. MAMOUNAS:  So did you respond to the prior

13       question, which was, is that why the Master

14       Agreement does not contain a deadline?  Your

15       response -- did you complete your response when you

16       said, let's take a look at the Master Agreement?

17           THE WITNESS:  No.  My response to that question

18       is incomplete.  So if you want to just let the

19       record show the incomplete answer and move on --

20           MR. O'CONNOR:  Yeah.  Please read, reread my

21       last question, yes.

22           THE WITNESS:  Okay.  So, so that's fine.

23       We'll -- we will not have a complete answer to the

24       question about project deadline.

25           MR. O'CONNOR:  But we'll have a response to the

1    pending question.

2         MR. MAMOUNAS:  What the witness is articulating

3    is that, to your prior question, he was not complete

4    in his answer.  So he's happy to provide you a

5    complete answer, if you give him the opportunity.

6    But as he sees it, there are two pending questions

7    right now.

8         MR. O'CONNOR:  Yeah, I don't think they're

9    mutually exclusive.  I can go back to that question.

10   Ask him --

11        THE WITNESS:  Okay.

12        MR. O'CONNOR:  And ask the question that is

13   pending, and I'd like a response to that.

14        (The court reporter read back the last

15   question.)

16        MR. MAMOUNAS:  Objection.

17        THE WITNESS:  So what I understood at the time

18   that I executed the Master Agreement was that SS&C

19   would be responsible for implementing CAMRA in a

20   hosted basis to be used by ARMOUR; that that

21   implementation was to be done by SS&C on a time and

22   materials basis of a rate of $225 per person per

23   hour; and that on an essential assumption in that

24   agreement, was that the duration of the project

25   would be four to six months from commencement.

142

1    That's what I understood.

2    BY MR. O'CONNOR:

3        Q    Okay.  And that's captured in the description

4    of services to be performed in Work Request One?

5        A    Well, it's captured in the description of

6    services in the applicable rate in the assumptions.  It's

7    also captured in the caption other services.

8        Q    Okay.  So let's unpack that.  So you see under

9    the description of services to be performed in Work

10   Request One, it says, "SS&C will provide on-site and

11   remote implementation services, including business

12   workflow analysis, environment setup, data conversion

13   analysis, interface development and testing in support of

14   client's implementation of the software."  Do you see

15   that?

16       A    Yes.

17       Q    And client is ARMOUR, correct?

18       A    Yes.

19       Q    So that was in support of ARMOUR's

20   implementation of the software, correct?

21            MR. MAMOUNAS:  Objection.

22            THE WITNESS:  And in that context, what I think

23   this sentence says is, in support of the

24   implementation of the software, which ARMOUR is

25   purchasing.

143

1    BY MR. O'CONNOR:

2        Q    Oh, I see.  So the phrase, "In support of

3    client's implementation of the software," means?

4        A    An implementation that ARMOUR is purchasing.

5        Q    Now, when did -- sir, why didn't you include

6    that language in the agreement that you entered into with

7    SS&C?

8        A    Because --

9            MR. MAMOUNAS:  Objection.

10           THE WITNESS:  I'm sorry?

11           MR. MAMOUNAS:  You may answer.  I'm sorry.

12           THE WITNESS:  Okay.  Because when I tried to

13       suggest other changes to the contract, basically the

14       answer came back was, this is our form; this is a

15       our stock contract; it's not really editable.

16   BY MR. O'CONNOR:

17       Q    And you had counsel review this before ARMOUR

18   executed the document, correct?

19       A    Yes.

20       Q    The counsel at Akerman Senterfitt reviewed and

21   advised you in connection with document, correct?

22           MR. MAMOUNAS:  Objection.

23           THE WITNESS:  Yes.

24   BY MR. O'CONNOR:

25       Q    And, and is it your testimony -- Strike that.

VERO BEACH COURT REPORTERS
772-231-2231

144

1          So your understanding, sir, is that the, the

2     statement in the contract that SS&C would provide

3     implementation support services in support of client's

4     implementation of the software was not negotiable,

5     correct?

6          MR. MAMOUNAS:  Objection.

7          THE WITNESS:  That's what I understood.

8     BY MR. O'CONNOR:

9     Q    Okay.  And at the time --

10    A    Let me, let me --

11    Q    You've answered.

12    A    Okay.

13         MR. MAMOUNAS:  No, no, no, no.  The witness

14    didn't finish his answer.

15         THE WITNESS:  Yeah.  So --

16         MR. MAMOUNAS:  He's going to be allowed to do

17    so.

18         THE WITNESS:  So --

19         MR. O'CONNOR:  I'm going to move to strike

20    everything beyond "that's what I understood."

21         MR. MAMOUNAS:  File whatever motion you'd like.

22         THE WITNESS:  Fine.

23         MR. MAMOUNAS:  No, no, no.  Mr. Mountain,

24    please, you were in the middle of an active answer

25    before you were interrupted.  Please complete the

154

1      Q    Okay.  But ARMOUR never asked for a deadline

2   for implementation, correct?

3          MR. MAMOUNAS:  Objection.

4          THE WITNESS:  Not that I recall.

5          MR. O'CONNOR:  Let's mark this as the next

6      exhibit.

7          (Defendant's Mountain Exhibit Number 16 was

8   marked for identification.)

9   BY MR. O'CONNOR:

10     Q    Mr. Mountain, I show you what's been marked as

11  Exhibit 16 to your deposition.  Do you see this?

12     A    Yes.

13     Q    And this is an email from you to Jeff Zimmer

14  and Scott Ulm dated December 19, 2014.  Do you see that?

15     A    Yes.

16     Q    How many times did you have emails with

17  Mr. Zimmer regarding SS&C prior to this email?

18         MR. MAMOUNAS:  Objection.

19         THE WITNESS:  I don't know.  I don't recall

20     having email conversations or email exchanges with

21     him on the subject at all, so I didn't review all

22     the production and didn't recall that I had, I had

23     prepared this email.

24  BY MR. O'CONNOR:

25     Q    Okay.  So focussing on this email.  Do you see

155

1  it says, "We should be in a position to sign the

2  agreement with SS&C today, or at the latest Monday.  To

3  recap, total costs to the REITs over 5 years is in the $2

4  million to $2.2 million range."  Do you see that?

5       A    Yes.

6       Q    And who are the REITs that are referred to in

7  the language I just read back to you?

8       A    ARMOUR Residential REIT and JAVELIN Mortgage

9  Investment Corp.

10      Q    And so ARMOUR's understanding at the time that

11 it entered into the Master Agreement was that, that the

12 expenses would be borne by the shareholders of the REITs,

13 correct?

14           MR. MAMOUNAS:  Objection.

15           THE WITNESS:  Yes.  It was my understanding

16      that.  Pursuant to the terms of the management

17      agreements with ARMOUR Residential REIT and JAVELIN

18      Mortgage Investment Corp., that software for

19      investment accounting for securities positions was a

20      reimbursable expense.

21 BY MR. O'CONNOR:

22      Q    And the same was true with respect to

23 installation and setup assistance?

24      A    That was my understanding.

25      Q    And then the same was true with respect to

181

1          MR. MAMOUNAS:  Objection.

2     BY MR. O'CONNOR:

3          Q     ARMOUR served in this case on or about

4     June 16th, 2017; do you see that?

5          A     Yes.

6          Q     Can you go to page 3.

7          A     Okay.

8          Q     Under "Computation of Damages."

9          A     Yes.

10         Q     Do you see that it says in the second sentence,

11    "ACM has also incurred other losses, including but not

12    limited to at least $500,000, based 4,000 hours of

13    employee time spent trying to assist SS&C with the

14    implementation of CAMRA and other damages flowing from

15    ACM's inability to use CAMRA"?  Do you see that?

16         A     Yes.  That's the highlighted portion on this

17    copy?

18         Q     Oh, is it highlighted?  Yes.

19         MR. MAMOUNAS:  Not my highlights.

20         MR. O'CONNOR:  And is yours highlighted?

21         MR. MAMOUNAS:  It's not.

22    BY MR. O'CONNOR:

23         Q     So the 4,000 hours of employee time referred to

24    there, which employees does that include?

25         A     So when --

VERO BEACH COURT REPORTERS
772-231-2231

182

1        MR. MAMOUNAS:  Objection.

2        THE WITNESS:  When I came up with this

3     preliminary estimate of the damages, I considered

4     the time associated with myself, Mr. Gruber,

5     Ms. Terry, Mr. Rand, Mr. Edwards, Mrs. Smith,

6     Ms. Hill, and Mrs. Davis.  Eight people.  I

7     considered that the project ran from 2015, 2016, and

8     well into 2017, before termination.  Considered

9     that, on a conservative basis, that people were

10    actively working on that project for at least 100

11    weeks during that period of time.  And that on

12    average, on a conservative basis, each one of those

13    people would average five hours a week during those

14    100 weeks.  So eight times 100 times five I think

15    is --

16 BY MR. O'CONNOR:

17    Q    4,000?

18    A    4,000.  I do have a calculator some place.  We

19 can double check that now.  And then the dollar figure,

20 500,000, I divided those 4,000 hours into two classes:

21 Executive and staff.  Staff I valued the 3,000 hours --

22 or one-and-a-half FTE years -- at a loaded average

23 compensation rate, including employer taxes and benefits,

24 of 120,000 per year, for a total of 180,000.  And the

25 1,000 executive hours, at which is a half a year, at a

183

1    loaded annual compensation of $640,000 or $320,000.

2          And, again, I believe all of those, including

3    the number of people, to be conservative.  Because we

4    also have people like Mr. Spicer and Mr. Graley,

5    potentially, participating on elements.  But their

6    participation did not rise to the level of the eight

7    people I included in the calculation.

8          Now, ultimately -- I'm not an expert -- so this

9    was, you know, an estimate on a preliminary basis to lay

10   down the marker.  And, you know, I presume that ARMOUR

11   will refine that estimate and claim on the base, based on

12   work of a forensic expert.

13   BY MR. O'CONNOR:

14       Q    And has ARMOUR retained experts?

15          MR. MAMOUNAS:  Objection.

16          THE VIDEOGRAPHER:  One minute left.

17   BY MR. O'CONNOR:

18       Q    You can answer.

19       A    I don't know.  I have not retained an expert.

20       Q    Has your law firm retained an expert?

21          MR. MAMOUNAS:  Objection.

22   BY MR. O'CONNOR:

23       Q    You can answer.

24          THE WITNESS:  Is that a privileged work product

25   question?

VERO BEACH COURT REPORTERS
772-231-2231

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CIVIL CASE NUMBER:  3:17cv00790 (JAM)

ARMOUR CAPITAL MANAGEMENT LP,

        Plaintiff,

vs.

SS&C TECHNOLOGIES, INC.,

        Defendant.

_____/


VIDEO DEPOSITION OF MARK GRUBER


DATE:         November 28, 2017

TIME:         10:00 o'clock a.m.

PLACE:      Vero Beach Court Reporters
             3111 Cardinal Drive, Suite B
             Vero Beach, Florida  32963

TAKEN BY:      Defendant

REPORTER:      Cynthia L. O'Cain

VIDEOGRAPHER:   Ted Hood

28

1    Q    Is there a difference between a REIT as a

2  general term and a mortgage REIT?

3    A    Yes.  A mortgage REIT would only invest in

4  mortgage securities or mortgages -- doesn't have to be

5  securities -- mortgages.  Whereas a REIT could also

6  invest in direct real estate, its own buildings.

7    Q    When you were employed by Penn Mutual, Penn

8  Mutual used CAMRA as an asset accounting product,

9  correct?

10         MR. MAMOUNAS:  Objection.

11         THE WITNESS:  I believe they did.

12  BY MR. O'CONNOR:

13    Q    Were you aware of that at that time?

14    A    I believe so, yes.

15    Q    Did you have any issues or concerns about CAMRA

16  during the time you were, that you were with Penn Mutual?

17         MR. MAMOUNAS:  Objection.

18         THE WITNESS:  I never used CAMRA at Penn

19     Mutual.

20  BY MR. O'CONNOR:

21    Q    Did you use reports that were generated by or

22  through CAMRA?

23         MR. MAMOUNAS:  Objection.

24         THE WITNESS:  No, not to my knowledge.

25  BY MR. O'CONNOR:

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CIVIL CASE NUMBER:  3:17cv00790 (JAM)

ARMOUR CAPITAL MANAGEMENT LP,

        Plaintiff,

vs.

SS&C TECHNOLOGIES, INC.,

        Defendant.

_____/


VIDEO DEPOSITION OF JONNA TERRY


DATE:            November 30, 2017

TIME:            10:00 o'clock a.m.

PLACE:        Vero Beach Court Reporters
                3111 Cardinal Drive, Suite B
                Vero Beach, Florida  32963

TAKEN BY:       Defendant

REPORTER:       Cynthia L. O'Cain

VIDEOGRAPHER:   Ted Hood

38

1      A    I was employed at ARMOUR, ARMOUR Residential

2    Management.  I am unsure of the exact wording of the name

3    at that time.  I apologize.

4      Q    What position were you hired for at the ARMOUR

5    entity that hired you in September 2010?

6      A    Senior staff accountant.

7      Q    And what were your duties as a senior staff

8    accountant at the ARMOUR entity?

9      A    At ARMOUR my job duties included reconciling

10   the daily bank statements, performing month-end closes

11   for our financial reporting purposes, as well providing

12   financial statements for review.

13           MR. O'CONNOR:  Could you read back that answer,

14       please.

15           (The court reporter read back the last answer.)

16           THE WITNESS:  I also provided audit requests

17       for SOX purposes.

18   BY MR. O'CONNOR:

19       Q    SOX purposes means Sarbanes-Oxley?

20       A    Yes, sir.

21       Q    And how long did you hold the senior staff

22   accountant position from the ARMOUR entity?

23       A    Until approximately -- not sure of the exact

24   date -- September 2013.

25       Q    Then what was your next job?

39

1      A    Senior investment accountant.

2      Q    Is that the position you currently hold?

3      A    Yes, sir.

4      Q    Is that -- I'm sorry.  Go ahead.

5      A    Except my, my job title has changed.

6      Q    What has your job title changed to?

7      A    Portfolio accounting director.

8      Q    When did that happen?

9      A    December 2016.

10     Q    And is that the position you currently hold?

11     A    Yes, sir.

12     Q    What were your duties as a senior investment

13  accountant?

14     A    My duties are to maintain the income

15  spreadsheets for ARMOUR REIT and its subsidiary, which

16  provides data to accounting as well as maintain the

17  portfolio accounting and software.

18     Q    So those were your duties as of September 2013,

19  correct?

20     A    Yes, sir.

21     Q    And have those been your duties at all times

22  since then?

23     A    Yes, sir.

24     Q    Is that a full-time job?

25     A    Yes, sir.

158

1    BY MR. O'CONNOR:

2        Q    -- on the part of ARMOUR, correct?

3            MR. MAMOUNAS:  Objection.

4            THE WITNESS:  Mark and I were on the

5    distribution list.

6    BY MR. O'CONNOR:

7        Q    Who is Adriana Johnson?

8        A    Adriana Johnson is the project manager from

9    SS&C.

10       Q    At this point how many hours a week were you

11   working on the CAMRA implementation?

12           MR. MAMOUNAS:  Objection.

13           THE WITNESS:  That is very hard to assess at

14   this point.  May 22nd, 2015.

15           I'm having a really hard time with being able

16   to give you an amount of hours I was working at this

17   week.  At this point in time, this was May 2015, I

18   can't remember exactly when reinitialization began.

19   Because my hours definitely increased at that time

20   because I was working weekends and early mornings.

21   January catch-up is complete.

22           I would, my best estimate, I would assume

23   between, you know, 25 and 35 hours a week.  A large

24   amount of my time.

25   BY MR. O'CONNOR:

1      Q    From January to May 22nd, 2015.

2           MR. MAMOUNAS:  Objection.

3           THE WITNESS:  I would be -- I mean, estimating

4      70 percent of my time was spent working on this.

5      BY MR. O'CONNOR:

6      Q    But you were still performing your full-time

7      duties?

8      A    Yes, sir.

9      Q    Okay.  And --

10          MR. MAMOUNAS:  Objection.

11     BY MR. O'CONNOR:

12     Q    But 70 percent of your time, of your full-time

13     duties were being spent on the CAMRA implementation?

14          MR. MAMOUNAS:  Objection.

15     BY MR. O'CONNOR:

16     Q    Is that your testimony?

17     A    For preparing the data that I needed to send to

18     them and reviewing the data that came back, and I was

19     working a lot of extra hours.  So 70 percent of, of the

20     time, yes, it was spent on this.

21     Q    So your normal hours are 40 to 50 hours a week,

22     correct?

23     A    Generally.

24          MR. MAMOUNAS:  Objection.

25     BY MR. O'CONNOR:

# EXHIBIT 23

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION
CASE No. 17-CV-00790-JAM


ARMOUR CAPITAL MANAGEMENT LP,

      Plaintiff,

-vs-


SS&C TECHNOLOGIES, INC.,

      Defendant.
_____

CONFIDENTIAL
CONTINUED DEPOSITION OF JAMES MOUNTAIN
VIDEOTAPED


Wednesday, April 11, 2018
1:01 - 2:53 p.m.




3500 Ocean Drive
Vero Beach, Florida 33401




Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1717893-B

1           THE WITNESS:  I think that Mr. Gruber

2       discussed that as well.  He was the one that said

3       that it had been a topic of inquiry by you in other

4       depositions.

5   BY MR. O'CONNOR:

6       Q.   Did he say anything else about SS&C in today's

7   IT Steering Committee meeting?

8       A.   He said that it was his recollection that SS&C

9   and CAMRA had not been the subject of IT Steering

10  Committee deliberations, among other reasons, because

11  CAMRA was never successfully implemented, and that it

12  was in a development or implementation test phase from

13  the formation of the IT Steering Committee going

14  forward, and, you know, unless and until it would have

15  been successfully implemented and moved into production,

16  it was outside the interest -- you know, the subject

17  matter of interest of the IT Steering Committee.

18      Q.   So the IT Steering Committee does not discuss

19  prospective improvements in technology at Armour?

20          MS. KERNISKY:  Objection.

21          THE WITNESS:  They may.  For example, one of

22      the other topics of discussion at the IT Steering

23      Committee was whether or not we ought to renew our

24      annual subscription to the web hosting service that

25      hosts the Armour Residential REIT corporate website

BY MR. O'CONNOR:

Q.   -- correct?

A.   I have not testified about my compensation, and I think others have not testified about their compensation.  And when we complete a more-detailed analysis with the assistance of a -- potentially with the assistance of an economic expert in damages, the detailed calculations, to the extent that they extend beyond this, will be provided.

Q.   Was Mr. Harper involved in the implementation of CAMRA?

MS. KERNISKY:  Objection.

THE WITNESS:  Not that I recall.

BY MR. O'CONNOR:

Q.   Why not?

MS. KERNISKY:  Objection.

THE WITNESS:  Because SS&C's implementation of CAMRA never progressed far enough to warrant the -- his attention, which would have been, if it were -- if we had -- if SS&C would have gotten it to the point where we could successfully use it on a regular basis, then his involvement would have been overseeing the integration with general ledger accounting, controls around the subsequent general ledger account.  He's not an expert in portfolio

# EXHIBIT 24

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION
CASE No. 17-CV-00790-JAM


ARMOUR CAPITAL MANAGEMENT LP,

        Plaintiff,

-vs-


SS&C TECHNOLOGIES, INC.,

        Defendant.
_____

CONFIDENTIAL
** ATTORNEYS' EYES ONLY TESTIMONY **
VIDEOTAPED DEPOSITION OF
JAMES MOUNTAIN and MARK GRUBER,
REPRESENTATIVES OF ARMOUR CAPITAL MANAGEMENT
FED. R. CIV. P. 30(B)(6)



Friday, May 11, 2018
10:48 a.m. - 6:41 p.m.



701 Brickell Avenue,
Suite 3300
Miami, Florida 33131



Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1728423

```
1              MR. MAMOUNAS:  Objection.

2              THE WITNESS:  I think that a portion of them

3         were charged and reimbursed by Javelin Mortgage

4         Investment Corporation.  And I think that that

5         allocation was done on the basis of an equitable

6         distribution, which, as I sit here today, not

7         having anticipated that question to be within the

8         scope of our preparation -- and if that's a fault

9         of mine, shame on me; we can research that during a

10        break -- but I think that the basis of allocation

11        was relative proportion of gross equity raised,

12        which is the basis for management fee calculations,

13        generally, under the Armour Capital -- or under the

14        Armour Residential REIT and the Javelin Mortgage

15        Investment Corporation management agreements.

16   BY MR. O'CONNOR:

17        Q.   But none of the licenses fees or service fees

18   or other costs charged under the Master Services

19   Agreement and any related work requests have been borne

20   to date by Armour Capital Management, correct?

21             MR. MAMOUNAS:  Objection.

22             THE WITNESS:  I think that all amounts paid

23        directly to SS&C related to the miserably failed

24        CAMRA implementation have been reimbursed by either

25        Armour Capital Management or Javelin Mortgage
```

1          Investment Corporation, and we're here today trying

2          to get that sorted out for the benefit of those

3          ultimate payors.

4  BY MR. O'CONNOR:

5          Q.   And those ultimate payors are the shareholders

6  of the Armour REIT and the Javelin REIT?

7          MR. MAMOUNAS:  Objection.

8          THE WITNESS:  Hard to say how far down the

9          chain you want to go.  I conceptualize Armour

10         Residential REIT and Javelin Mortgage Investment

11         Corporation, when it was a separately publicly

12         traded company, as entities in and of themselves.

13         And I conceptualized that as where the literal and

14         figurative buck stops.  If you want to

15         conceptualize further to shareholders, we can talk

16         about what allocation between shareholders, as

17         common shareholders, preferred shareholders.  We

18         can talk about, you know, the ultimate beneficiary

19         of taxing authorities that tax shareholders'

20         income, whether it's taxable or not.  I think of it

21         as stopping at the entities as corporate

22         individuals.

23         MR. O'CONNOR:  Okay.  I'm inviting Mr. Reilly

24         back into the room.

25         THE WITNESS:  If we're done with this line of

 1         THE WITNESS:  So, in the first instance, I

 2    would refer you to our amended complaint and the

 3    interrogatories in this litigation.  And without

 4    sort of limiting otherwise, I would say that the

 5    false-and-misleading statements by SS&C to Armour,

 6    upon which Armour relied to its peril and

 7    detriment, include the -- SS&C's representation

 8    that CAMRA was an appropriate software solution for

 9    the needs of Armour Capital Management in serving

10    Armour Residential REIT and Javelin Mortgage

11    Acceptance Corporation; that SS&C had substantial

12    knowledge and experience in the subject matter

13    of -- you know, the business subject matter to

14    which the software related, and in the

15    implementation and operation of software in this

16    business area in general, and their software

17    products in particular; that, in that particular,

18    the CAMRA product and their hosting solution had

19    data connectivity to important information sources

20    and custodians that we rely on for business

21    process, not the least of which are Bloomberg as a

22    data source, for example, and, more importantly,

23    custodians such as Bank of New York Mellon and

24    Citibank; that, you know, this implementation that

25    they were undertaking on Armour's behalf was

1    something that could be done in four to six months,

2    could be done, you know, therefore comfortably

3    within calendar 2015, and that was fundamentally a

4    project estimated to be about 2500 hours worth of

5    effort; that with a participation by Armour on the

6    order of 500 to 650 hours of contribution towards

7    that 2500 hours total effort, Armour had the

8    opportunity to potentially reduce the costs of

9    implementation, the out-of-pocket cost of the

10   implementation paid to SS&C, but that whether or

11   not Armour, you know, was able to provide 650 hours

12   or 500 or more than that, the success of the

13   implementation was not dependent upon or would be

14   imperiled by any particular level of contribution

15   by Armour; that the -- because SS&C was one of the

16   largest users of the CAMRA system in its provision

17   of fully outsourced services to customers, that

18   they, you know, were expert in the use of their

19   system; that we would have, you know, user

20   experience on a hosted basis, where we could

21   effectively input data into, get reports out of the

22   system remotely; that the hosting delivery method

23   was feasible, tried and true, was appropriate for

24   Armour's circumstance, and, in fact, something that

25   was not untried, was not an experimental procedure,

```
 1          question of the witness so that he can tell you

 2          what the document reflects or doesn't reflect.

 3               If you're asking me whether you'd like to ask

 4          questions on it, we will permit questions on it.

 5               MR. O'CONNOR:  Yeah.  Okay.  What exhibit is

 6          this?

 7               THE COURT REPORTER:  This is going to be

 8          Number 14.

 9               (Defendant's Exhibit No. 14 was marked for

10      identification.)

11      BY MR. O'CONNOR:

12          Q.   Sir, I show you what's been marked as

13      Exhibit 14 to this deposition.  Are you familiar with

14      this document?

15          A.   I am.

16          Q.   Who prepared it?

17          A.   I did.

18          Q.   And what does it show?

19          A.   It shows, in its entirety, a preliminary

20      analysis of the estimated hours that Armour Capital

21      Management staff spent on the CAMRA project through --

22      from inception, in January of 2015, through termination

23      in April 2017.  Schedules also show components of

24      compensation for various staff members and executives

25      whose names are captioned at the top of columns -- on
```

1   pages -- on the second, third and fourth page, as well

2   as a computation based on working days and hours from

3   the penultimate page to get to an applied hourly -- or

4   an hourly cost by person, by year, for all the people

5   listed, which is multiplied by the estimated time

6   commitments of each person by year to aggregate the --

7   an improved estimate of damages that Armour Capital

8   Management suffered as a result of SS&C's breach.

9            So in that regard, as we would point you to

10  page 33 of Exhibit 1, the damage claim of at least

11  $500,000 based on 4,000 hours of lost employee time, has

12  been improved to be estimated $1,467,846, based on 5,846

13  estimated lost hours.

14       Q.    Okay.  The first page sets forth a summary --

15       A.    Yes.

16       Q.    -- is that correct?

17            And then the total claimed damages are

18  1.467 -- strike that.

19            The total payroll costs that are being claimed

20  as damages, $1,467,846, correct?

21       A.    Yes, as of -- as of today, as we sit here,

22  that is our current best estimate.  The note at the

23  bottom of the summary page -- or at the bottom of the

24  table on the summary page, that the hour estimates are

25  subject to further analysis, and that further analysis

```
 1   will include review based on information that we are

 2   waiting to receive, and perhaps maybe just did receive

 3   from SS&C in production; among other things, computer

 4   session logs that they have reflecting utilization --

 5   logged in utilization of the CAMRA system, and other

 6   analyses that we may conduct as a result of that, to

 7   either prove or revise the estimates of ours.

 8        Q.   Okay.

 9        A.   We have no plans that I'm aware of to revisit

10   the compensation calculations and the hourly

11   compensation costs calculations.

12        Q.   Okay.  So the second page sets forth the

13   compensation for...

14        A.   The second page is details that tie to staff,

15   the third page are details that ties to executives, and

16   the fourth page are details that should tie to the IT.

17             If you'd like me to give you an example of how

18   they tie together, I'd be pleased to do that.

19        Q.   Sure.  Thanks.

20        A.   Okay.  So if you look at the second page, the

21   2015 block, at the top right, there's a staff total of

22   estimated CAMRA project hours:  794; cost of CAMRA work,

23   63,504.  If you go back to the first page and look in

24   the preliminary staff hours row of the 2015 column, you

25   see the number 794, so that's the hours.  If you go to
```

1  of Armour Capital Management, but of all the other

2  employees referred to in this document, I had asked them

3  individually to prepare by year, from the best of -- to

4  the best of their ability, relying on recollection and

5  understanding of their roles and responsibilities in the

6  CAMRA project, as they may have evolved over time, any

7  documents, emails or other resources that they had

8  available to themselves individually, to provide me an

9  estimate by year of the hours that they had devoted to

10  the project.  I, as I say, asked each person

11  individually to do this for themselves alone.  They did

12  not consult with one another in the preparation of these

13  estimates, to the best of my knowledge, and I took them

14  and entered them into this format for the purpose of

15  calculating the figures that we're discussing.

16      Q.   And Armour did not maintain any time sheets

17  with respect to any of the employees in 2015 that will

18  record the actual hours that any of them worked on the

19  implementation project?

20      A.   All of the --

21           MR. MAMOUNAS:  Objection.

22           THE WITNESS:  All of the employees at issue

23      are exempt employees that work on a salary and

24      total compensation basis rather than an hourly

25      basis.  So Armour does not maintain a daily time

# EXHIBIT 25

Jeffrey Zimmer
April 09, 2018

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION
CASE No. 17-CV-00790-JAM

ARMOUR CAPITAL MANAGEMENT LP,

       Plaintiff,

-vs-

SS&C TECHNOLOGIES, INC.,

       Defendant.

_____

CONFIDENTIAL
DEPOSITION OF JEFFREY JOHNSON ZIMMER
VIDEOTAPED

Monday, April 9, 2018
9:54 a.m. - 1:09 p.m.

3500 Ocean Drive
Vero Beach, Florida 33401

Reported By:
Shirley D. King, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #1716775

Jeffrey Zimmer
April 09, 2018                                           13

```
 1        are a couple of questions in there.
 2   BY MR. O'CONNOR:
 3        Q.   Who's paying the bills for the lawsuit?
 4             MR. MAMOUNAS:  Okay.  I instruct you not to
 5        answer the question.
 6             MR. O'CONNOR:  You're instructing him not to
 7        answer?
 8             MR. MAMOUNAS:  What's the relevance, sir?  If
 9        you've got a question about who suffered the
10        damages, that's one thing.
11             MR. O'CONNOR:  You're seeking attorneys fees,
12        so it goes directly to that.
13             MR. MAMOUNAS:  Okay.
14   BY MR. O'CONNOR:
15        Q.   Who's paying the bills, sir, for this lawsuit?
16             THE WITNESS:  Counsel, may I answer?
17             MR. MAMOUNAS:  You may answer the question.
18             THE WITNESS:  So there's two sets of damages.
19        There's the damages to the REIT for the fees that
20        they have paid SS&C because they've misrepresented
21        their capacities, and then there's the damages to
22        Armour Residential LP for the amount of
23        professional time utilized in this wasteful
24        venture.
25
```

Jeffrey Zimmer
April 09, 2018                                    15

1          A.    Ultimately or paid for; there is a difference.

2          Q.    Just allow me to finish my question, sir.

3                So you don't know, as you sit here today,

4     whether Armour REIT or Armour Capital Management paid

5     the license fee that was paid to SS&C in connection with

6     the parties' contractual arrangement?

7                MR. MAMOUNAS:  Objection.

8     BY MR. O'CONNOR:

9          Q.    Correct?

10         A.    That's not correct.  Who pays the bill and who

11    ultimately is responsible for the bill are two different

12    enterprises.  So it doesn't matter whether the LP or the

13    REIT pays directly.  It only matters who's ultimately

14    responsible.  In this case, the REIT was ultimately

15    responsible.  Whether they paid you directly or through

16    the LP, of course, are two different visions of the way

17    things get paid.

18         Q.    Okay.

19         A.    Am I clear?

20         Q.    Well, I may -- let's explore that a little

21    bit.

22               So you're not sure whether the Armour REIT or

23    Armour Capital Management paid the license fee to SS&C

24    in connection with the CAMRA software, correct?

25               MR. MAMOUNAS:  Objection.  Asked and answered.

Jeffrey Zimmer
April 09, 2018                                    16

1              You may answer it again.

2              THE WITNESS:  That's not true.  I said,

3        ultimately, the REIT is responsible for paying

4        that.  Whether they reimbursed the LP or paid

5        directly, I would not know today.  You can ask my

6        CFO.

7    BY MR. O'CONNOR:

8        Q.   Okay.  But your understanding is that that

9    cost was ultimately borne by Armour Residential REIT,

10   correct?

11       A.   That's what I said, correct.

12             MR. MAMOUNAS:  Objection.  Same objection.

13   BY MR. O'CONNOR:

14       Q.   And all the professional services fees that

15   were charged in connection with Armour's contractual

16   arrangement with SS&C were all passed on to the Armour

17   REIT, correct?

18             MR. MAMOUNAS:  Same objection.

19   BY MR. O'CONNOR:

20       Q.   Correct?

21             MR. MAMOUNAS:  You may answer the question

22        again.

23             THE WITNESS:  Correct.

24   BY MR. O'CONNOR:

25       Q.   Sir, would you please walk me through your

# EXHIBIT 26

# SS&C TECHNOLOGIES, INC.
## Master Agreement

This Master Agreement for Software, Maintenance and Support, Professional Services, and Other Services (the "Master Agreement") is entered into by and between ARMOUR Capital Management LP, having its principal office at 3001 Ocean Drive, Vero Beach, FL 32963 ("Client") and SS&C Technologies, Inc., a Delaware corporation having its principal office at 80 Lamberton Road, Windsor, CT 06095 ("SS&C"), and describes the terms and conditions pursuant to which SS&C shall license to Client certain Software and provide certain maintenance and other services.

In consideration of the mutual promises and upon the terms and conditions set forth herein, the parties agree as follows:

**1.**    <u>**Certain Definitions**</u>
Capitalized terms are defined as follows unless otherwise indicated:

    1.1     "Application Service" means Software hosted by SS&C provided to Client as a service.

    1.2     "Confidential Information" means this Master Agreement, all Software, Documentation, information, data, drawings, benchmark tests, specifications, trade secrets, object code and machine-readable copies of the Software, source code relating to the Software (whether or not supplied to Client pursuant to this Master Agreement), and any other proprietary information supplied to Client by SS&C.

    1.3     "Documentation" means any instructions regarding the use and functions of the Software, which may be printed manuals, or may be in electronic format, including "on-line" help files that may be included in the disc or other media on which the Software is delivered.

    1.4     "Effective Date" means December 30, 2014 in the case of this Master Agreement and the Attachments and Work Request enumerated in Section 6.7.18. The Effective Date of any additional subsequent Attachment or Work Request shall be the date on which it has been signed by both the Client and SS&C, unless otherwise specified therein.

    1.5     "Master Agreement" means (i) this Master Agreement, (ii) each Attachment, and (iii) each Work Request.

    1.6     "Software" means SS&C's proprietary off-the-shelf computer software program(s) specified in an Attachment to this Master Agreement.

    1.7     "Use" has the meaning given to it in the relevant Attachment or Work Request, as the case may be.

**2.**    <u>**Software Licensing**</u>

    2.1     From time to time SS&C may, subject to the terms and conditions of this Master Agreement, grant licenses to Client for the Software. Such Software licenses will be set forth in attachments attached to this Master Agreement numbered in sequence starting from A.1 (collectively, "Attachment A.x").

    2.2     <u>Limited License.</u> Software licensed by SS&C to Client is specified and restricted in Attachment A.1 or any subsequently added attachment in the Attachment A.x series. Unless specified otherwise in an Attachment A.x, subject to the terms and conditions of this Master Agreement, SS&C hereby grants to Client a limited, perpetual, nonexclusive and nontransferable license to Use the software set forth in Attachment A.x and Documentation only at the designated installation address. Except for the rights expressly granted herein, this license does not transfer to Client title to any proprietary or intellectual property rights to the Software or Documentation, or any copyrights, patents, or trademarks, embodied or used in connection therewith. The license granted to Client hereunder does not include the Software source code.

    2.3     <u>Restrictions.</u> Client will not directly, or indirectly through any affiliate, agent or other third party: (a) sell, lease, license or sublicense the Software or the Documentation to any third party; (b) decompile, disassemble, or reverse engineer the Software, in whole or in part; (c) write or develop any derivative software or any other software program based upon the Software or any Confidential Information; (d) use the Software to provide processing services to third parties, or otherwise use the Software on a 'service bureau' basis; (e) provide, disclose, divulge or make available to, or permit use of the Software by any third party without SS&C's prior written consent. The above stated restrictions shall also apply to all Third Party Software if provided by SS&C. Additional restrictions for specific Software are set forth in the relevant Attachment A.x to this Master Agreement.

    2.4     <u>Right to Copy.</u> Client may make one (1) machine-readable copy of the Software for backup or archival purposes. Client may not copy the Software, except as permitted by this Master Agreement. Client shall maintain accurate and up-to-date records

CONFIDENTIAL      ACM0048568

## SS&C TECHNOLOGIES, INC.
### Master Agreement

of the number and location of all copies of the Software and inform SS&C in writing of such location(s). All copies of the Software and Documentation will be subject to all terms and conditions of this Master Agreement. Whenever Client is permitted to copy or reproduce all or any part of the Software or Documentation, all titles, trademark symbols, copyright symbols and legends, and other proprietary markings must be reproduced.

2.5     Distribution. SS&C shall issue to Client, as soon as practicable for Client's Use: (i) one (1) machine-readable copy of the Software, which shall include one (1) electronic copy of the appropriate Documentation. All Software, interim releases, version releases, error corrections, improvements, enhancements, fixes, patches and upgrades to the Software and related Documentation are only delivered electronically. Delivery occurs at Client's location.

2.6     Third Party Software. Unless otherwise specified, Client is responsible for licensing all third party software required to use the Software ("Third Party Software").

2.7     Outside Services and Other Third Party Software. Client may use outside data services and other third party software products in connection with the Software. Client is responsible for procuring these services and software and for the fees related to their installation and use.

2.8     Indemnification for Infringement. SS&C shall, at its expense, defend or settle any claim, action or allegation brought against Client that the Software, when used within the scope of this Master Agreement, infringes any patent or copyright, misappropriates any trade secret or otherwise infringes any proprietary or intellectual property right of any third party ("Indemnified Claim") and shall pay any final judgments awarded or settlements entered into in connection therewith. Client shall give prompt written notice to SS&C of any such Indemnified Claim and give SS&C the authority to proceed as contemplated herein, provided that settlement of any Indemnified Claim on terms that include an admission of liability by Client or a restriction on the operation of Client's business other than as it relates to the Software shall require Client's prior written consent, which shall not be unreasonably withheld or delayed. SS&C will have the exclusive right to defend any Indemnified Claim and make settlements thereof at its own discretion, and Client may not settle or compromise any Indemnified Claim, except with the prior written consent of SS&C. Client shall give such assistance and information, at SS&C's expense, as SS&C may reasonably require to settle or oppose such Indemnified Claim. In the event any such Indemnified Claim is brought or threatened, SS&C may, at its sole option and expense: (a) procure for Client the right to continue use of the Software or infringing part thereof; or (b) modify or amend the Software or infringing part thereof, or replace the Software or infringing part thereof with other software having substantially the same or better capabilities; or, if neither of the foregoing is commercially practicable, (c) terminate the license granted with respect to the relevant Software and, in the case of a pre-paid perpetual license, refund to Client a portion, if any, of the corresponding License Fee(s) paid by Client equal to the amount paid by Client less one forty-eighth (1/48) thereof for each month or portion thereof that such license has been in effect. SS&C and Client will then be released from any further obligation to the other under this Master Agreement, except for the obligations of indemnification provided for above and such other obligations that survive termination. The foregoing obligations of SS&C shall not apply to the extent any infringement of a third party's intellectual property rights arises as a result of modifications to the Software made by any party other than SS&C or a duly authorized representative of SS&C or Use of the Software other than in accordance with the Documentation. The foregoing states the entire liability of SS&C with respect to any Indemnified Claim.

2.9     Source Code. For purposes of this Master Agreement, the Software source code shall include machine and any related human-readable computer programming code in the programming language in which the source code was written, corresponding to the Software and all subsequent updates and enhancements made generally available in versions of the Software furnished to Software licensees ("Source Code"). The Source Code does not include any source code or object code of third party software, including without limitation, the programming language software used to write the Source Code, and software that may be integrated with the Software.

(a)     Escrow of the Source Code. SS&C shall deposit in escrow with an escrow agent, a copy of the Source Code, reflecting the then current version of the Software, and shall keep such Source Code current by making future deposits in escrow reflecting updates, enhancements and modifications made to the Software, and the escrow agent shall hold the Source Code in accordance with the terms of a written escrow agreement ("Escrow Agreement"). The Escrow Agreement may be a tri-party agreement among SS&C, Client and the escrow agent, or an agreement between SS&C and the escrow agent that provides for the escrow for the benefit of Client and other clients. SS&C reserves the right to terminate any Escrow Agreement, or Client's escrow thereunder, and substitute the escrow with another escrow agent. If (i), (ii), (iii), (iv), or (v) below are not withdrawn, rescinded or corrected, as the case may be, within sixty (60) days of their occurrence, then the Source Code may be released to Client from escrow only upon (i) SS&C's entry of an order for relief under Title 11 of the United States Code; (ii) the making by SS&C of a general assignment for the benefit of creditors; (iii) the appointment of a general receiver or trustee in bankruptcy of SS&C's business or property; or (iv) action by SS&C under any state insolvency or similar law for the purpose of its bankruptcy, reorganization, or liquidation.

CONFIDENTIAL                                                                    ACM0048569

## SS&C TECHNOLOGIES, INC.
### Master Agreement

SS&C is party to a certain Software Escrow Agreement with EscrowTech International, Inc. (the "EscrowTech Escrow Agreement") pursuant to which SS&C may deposit into escrow certain software code for the benefit of clients of SS&C. The escrow of the Source Code shall be pursuant to the EscrowTech Escrow Agreement, subject to SS&C's right to terminate the EscrowTech Escrow Agreement, or Client's escrow thereunder, and to substitute the escrow with another escrow agent provided, however, that at no time will the Source Code not be escrowed with an escrow agent for the benefit of the Client. In addition, if the Escrow Agreement (including the EscrowTech Escrow Agreement) is terminated by the escrow agent, other than for Client's breach, or if the escrow agent suffers bankruptcy, insolvency or the appointment of a receiver or assignee for the benefit of creditors or ceases to provide the escrow services, SS&C shall use reasonable efforts to appoint another escrow agent to hold the Source Code in escrow, in accordance with another Escrow Agreement.

(b) Client's use of the Source Code. If the Source Code is released to Client in accordance with the Escrow Agreement, Client shall treat the Source Code as Confidential Information and shall provide the Source Code the security and protection required by Section 6.3 hereof. Under all circumstances, the Source Code shall remain the property of SS&C and Client shall have no proprietary or intellectual property rights to such Source Code, or any copyrights, patents, or trademarks, embodied or used in connection therewith, except for the rights expressly granted therein. The Source Code shall be subject to the restrictions set forth in Sections 2.2 and 2.3 hereof applicable to Software, except Client may use the Source Code solely to maintain the Software and for no other purpose. Maintaining the Software includes making corrections and fixes to Software bugs and errors and any modifications reasonably necessary in order to use the Software in light of industry developments and Client's internal needs. Client understands and agrees that, upon its release, the Source Code shall be provided "as is" and SS&C shall have no obligation to maintain the Source Code. SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Source Code. SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the Source Code provided hereunder and with respect to the use of any of the foregoing. Client shall have the right to retain possession of and use the Source Code in accordance herewith, and to continue to maintain the Software in-house for five years from the time that the Source Code is released to the Client as set forth herein ("The Period") except under circumstances where satisfactory provision has been made for the continued support of Client or where the cessation of support services is due to material breach of this Master Agreement by Client or Client terminates the maintenance and support services for its convenience. At the end of The Period, Client shall (i) return the Source Code, and all copies, in whole or in part, all documentation relating thereto, and any other information related thereto its possession that is in tangible form, (ii) purge all copies of the Source Code from all computer storage media, and (iii) furnish SS&C with a certificate signed by an executive officer of Client verifying that (i) and (ii) above have been done.

**3.**     **Maintenance and Support**

3.1     Software licensed under an Attachment A.x (or provided as an Application Service under and Attachment B.x) shall be accompanied with a Maintenance and Support Program ("Maintenance Program"). As part of a Maintenance Program, SS&C will provide telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades (collectively "Updates") to the Software and related documentation. SS&C reserves the right, however, (i) to develop and market new modules and add-on modules to the Software and/or new versions of the Software, which in SS&C's judgment contain such added functionality that an additional fee for such modules and/or versions is warranted; and (ii) to exclude such modules and versions from coverage as Updates under the Maintenance Program. Client's Use of the Updates is subject to the terms, conditions and disclaimers of this Master Agreement, but such Updates shall not be covered by any warranty in the Master Agreement. SS&C does not provide maintenance or support for any Third Party Software or any other third party products. All Updates provided by SS&C under the Maintenance Program are owned by SS&C and are Confidential Information.

3.2     Software Releases to be Supported. SS&C will, during the term of the relevant Maintenance Program, support two releases of the Software at any one time: (i) SS&C's generally available current production version of the Software and (ii) the production version immediately preceding such version.

3.3     Telephone Support. Telephone support consists of: (i) providing Software problem resolution, as described below, (ii) responding to Client's questions regarding implementation of such enhancements and modifications as SS&C may provide from time to time; and (iii) responding to Client's questions about use of the Software on a limited basis. Client may not use telephone support about Software use as a substitute for training in the use of the Software. SS&C charges additional fees for such training. SS&C will provide telephone consultation to Client as set forth in the relevant Attachment.

3.4     Problem in Using the Software. If, during the term of the relevant Maintenance Program, Client encounters a problem in using the Software, Client shall notify SS&C. SS&C will diagnose the problem. If SS&C determines that the problem is caused by an error in the Software, SS&C will correct it. If SS&C determines that the problem is not caused by an error in the Software, Client shall pay

CONFIDENTIAL

ACM0048570

# SS&C TECHNOLOGIES, INC.
## Master Agreement

SS&C, at SS&C's then current rates, for all work performed to diagnose and determine its cause plus travel time and reasonable expenses incurred in performing such work.

3.5     Maintenance Program Term and Termination.  Unless otherwise specified in the relevant Attachment, for a perpetual license the initial Maintenance Program term for any Software licensed under an Attachment A.x will be effective on the Effective Date (the "Maintenance Program Effective Date") through and including the following December 31st.  Thereafter, the Maintenance Program term shall be renewed automatically on an annual basis on each January 1st ("Renewal Date"), on the same terms and conditions subject to fee increase, unless terminated by either party by prior written notice of at least thirty (30) days prior to the expiration of the initial term or any renewal term.

In the case of a term license or an Application Service, the term of the Maintenance Program shall be concurrent with the term of the relevant Attachment and renewal shall be in accordance with the terms of Attachment.

3.6     Maintenance Program Fees.  Initial annual Maintenance Program fees will be specified in the relevant Attachment A.x.   SS&C will invoice Client annually on or about the Renewal Date, and Client will pay the Maintenance Program fee within thirty (30) days of receipt of that invoice.  The annual Maintenance Program fee payable hereunder for the second and each subsequent term may increase from the prior year's non pro-rated Maintenance Program fee by an amount which shall not exceed the percentage change in the United States Consumer Price Index (All Urban Consumers) as published by the United States Department of Labor, Bureau of Labor Statistics for the one year ending two months prior to the end of the initial Term or each renewal term (as appropriate) (US CPI).  In no event will the Maintenance Program fee be less than the prior year's non-pro-rated Maintenance Program fee.

In the case of a term license or an Application Service, the Maintenance Program shall be included with the fees and increases shall be in accordance with the terms of Attachment.

3.7     Reinstatement After Client Termination.  After Client has terminated the Maintenance Program for any Software, Client may notify SS&C that it desires to reinstate the Maintenance Program.  SS&C may, in its sole discretion, determine whether or not to reinstate the Maintenance Program.  If SS&C permits reinstatement, Client shall pay SS&C the full Maintenance Program Fees that Client would have paid if such Maintenance Program had remained in effect from the date of termination through and including the date of reinstatement.  After such payment, SS&C will provide Client with the latest generally available release of the Software and related Documentation.

## 4.     Professional Services

4.1     Services.  From time to time SS&C may, subject to the terms and conditions of this Master Agreement, perform certain services and/or provide or develop certain software or other products pursuant to work requests (each a "Work Request").  The terms and conditions of this Master Agreement are incorporated into and made a part of each Work Request.  In the event of any inconsistency between the terms and conditions of this Master Agreement and any Work Request, the terms and conditions of the Work Request shall control.

4.2     Changes.  Client may at any time request a change in any Work Request under this Master Agreement.

4.3     Change Procedure.  To request a change, Client will request a change to a Work Request in writing.  If the change requested is acceptable to SS&C, SS&C will estimate the resources required by the change and the effect of the change on any work in process.  SS&C will then prepare a Work Request or amendment thereto and return it to Client.  No action will be taken by SS&C on any requested change until a Work Request or amendment is signed by both parties.

4.4     SS&C Retains Ownership.  All software, products, and/or deliverables provided by SS&C under any Work Request are owned by SS&C and are Confidential Information.  Client's Use of the software, products, and/or deliverables developed under a Work Request is subject to the terms, conditions and disclaimers of the Master Agreement but such software, products, and/or deliverables shall not be covered by any warranty in the Master Agreement.

4.5     Fees.  All fees are due and payable as specified in each Work Request hereunder.  Where appropriate, each Work Request shall set forth estimated fees for the services to be performed.

4.6     Expenses.  Client shall reimburse SS&C for expenses incurred by SS&C for reasonable travel, lodging, meals, telephone, shipping, duplicating and other direct expenses.  SS&C will provide such supporting documentation for expenses as Client may from time to time reasonably request.

CONFIDENTIAL                                                                                          ACM0048571

## SS&C TECHNOLOGIES, INC.
### Master Agreement

4.7  Timing of Billing. Fees and expenses incurred will be billed to Client on a monthly basis or as stated on the applicable Work Request. Fees and expenses are due and payable by Client upon receipt of SS&C's invoice.

**5.  Other Services.**

From time to time SS&C may, subject to the terms and conditions of this Master Agreement, provide other services such as Application Service, hosting service, data service or business process outsourcing service. Such other services will be described in attachments attached to this Master Agreement numbered in sequence starting from B.1 (collectively, "Attachment B.x").

**6.  General Terms and Conditions**

The following terms and conditions apply with respect to any licenses or services covered by this Master Agreement.

6.1  Fees and Expenses

6.1.1.  Fees and Late Days. Client shall pay SS&C the fees specified in the relevant Attachment or Work Requests issued pursuant to this Master Agreement.

All amounts described herein are in United States dollars and are net of all sales, use, property and related taxes and customs duties. All fees are due and payable as set forth in any Attachment or Work Requests. A late payment charge of one and one-half percent (1½%) per month (annual rate of 18%), or the maximum rate allowed by law, whichever is less, will be added to (i) the License Fee if not paid on the due date and (ii) all amounts due under this Master Agreement if not paid within thirty (30) days of the due date. If it should become necessary to turn this account over for collection, Client is responsible for all of SS&C's collection costs, including reasonable attorney's fees.

6.1.2  Taxes. In addition to all other amounts required by this Master Agreement, Client shall pay or reimburse SS&C for all federal, state, and local sales, excise, use, or similar taxes based on payments to be made hereunder. All taxes owed by Client hereunder shall become due and payable when billed by SS&C to Client, or when assessed, levied or billed by the appropriate tax authority, even if such billing occurs subsequent to expiration or termination of this Master Agreement.

6.2.  Disclaimer and Limitation of Liability

6.2.1  Disclaimer. Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation. SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the Software and the Documentation.

6.2.2  Exclusion of Consequential Damages and Absolute Limitation of SS&C's Liability. SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for breach of this Master Agreement, whether alleged as a breach of contract or tortious conduct, even if SS&C has been advised of the possibility of such damages. SS&C's liability under this Master Agreement for damages will not, in any event, exceed three times  in the aggregate the fees paid by Client to SS&C under the relevant Attachment or Work Request giving  to the claim for damages.

6.2.3  No Third Party Beneficiaries. SS&C shall have no contractual or other obligations or liability to (i) ARMOUR Residential REIT, Inc. or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.

6.2.4  Allocation of Risk. The provisions of this Section allocate risks under this Master Agreement between Client and SS&C. SS&C's pricing reflects this allocation of risks and limitation of liability.

6.2.5  No Other Warranty. Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid. No employee, agent, representative or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

6.3.  Confidential Information

Page 5 of 16

ACM0048572

# SS&C TECHNOLOGIES, INC.
## Master Agreement

6.3.1   <u>Client's Responsibilities.</u>  The Confidential Information constitutes valuable trade secrets of SS&C.  Client shall use Confidential Information solely in accordance with the provisions of this Master Agreement.  Client shall use its best efforts to prevent unauthorized use or disclosure of Confidential Information.  Client will not disclose Confidential Information, or permit it to be disclosed, directly or indirectly, to any third party without SS&C's prior written consent.  Client bears no responsibility for safeguarding information that is (i) publicly available, (ii) already in Client's possession and not subject to a confidentiality obligation, (iii) obtained by Client from third parties without restrictions on disclosure, or (iv) independently developed by Client without reference to Confidential Information.  If Client is legally required to disclose Confidential Information, prior to such disclosure Client shall give notice to SS&C to permit SS&C to seek a protective order requiring that the Confidential Information be kept confidential.

6.3.2   <u>SS&C's Responsibilities.</u>  In the course of SS&C's performance of this Master Agreement, it may become privy to certain Client trade secrets and Client proprietary and confidential information ("Client Confidential Information").  SS&C shall use the Client Confidential Information solely in accordance with the provisions of this Master Agreement.  SS&C shall use its best efforts to prevent unauthorized use or disclosure of Client Confidential Information.  SS&C will not disclose Client Confidential Information or permit it to be disclosed, directly or indirectly, to any third party without Client's prior written consent.  SS&C bears no responsibility for safeguarding the confidentiality of information that is (i) publicly available, (ii) already in SS&C's possession and not subject to a confidentiality obligation, (iii) obtained by SS&C from third parties without restrictions on disclosure, or (iv) independently developed by SS&C without reference to Client Confidential Information.  If SS&C is legally required to disclose Client Confidential Information, prior to such disclosure SS&C shall give notice to Client to permit Client to seek a protective order requiring that the Client Confidential Information be kept confidential.

6.3.3   <u>Notification of Unauthorized Access.</u>  In the event that either party learns that a person or entity has gained unauthorized access to, or made an unauthorized disclosure of, the Confidential Information or the Client Confidential Information, as the case may be, the party learning of such access or disclosure shall immediately notify the other party in writing, providing the full particulars of such access or disclosure.

6.3.4   <u>Injunctive Relief.</u>  In the event of actual or threatened breach of the provisions of Section 6.3.1 or 6.3.2, the nonbreaching party will have no adequate remedy at law and will be entitled to immediate and injunctive and other equitable relief, without bond and without the necessity of showing actual money damages.

6.4.   <u>Term and Termination</u>

6.4.1   <u>Term.</u>  This Master Agreement will take effect on the Effective Date and will remain in force for so long as any attachment is in force or until terminated as set forth below in Section 6.4.2.  An Attachment may be terminated in accordance with its terms without terminating the Master Agreement.  The Maintenance Program for any Software licensed on a perpetual basis may be terminated as set forth in the relevant Attachment A.x without terminating this Master Agreement or the perpetual Software license to which such Maintenance Program relates.

6.4.2   <u>Termination for Material Breach or Insolvency.</u>  SS&C or Client may, by written notice to the other party, terminate this Master Agreement if any of the following events ("Termination Events") occur:  (a) Either SS&C or Client is in breach of any material term, condition or provision of this Master Agreement, or of any other agreement between SS&C (or any affiliate of SS&C) and Client (or any affiliate of Client), which breach, if capable of being cured, is not cured within thirty (30) days after the non-breaching party gives written notice of such breach; or (b) SS&C or Client (i) terminates or suspends its business, (ii) becomes insolvent, admits in writing its inability to pay its debts as they mature, makes an assignment for the benefit of creditors, or becomes subject to direct control of a trustee, receiver or similar authority, or (iii) becomes subject to any bankruptcy or insolvency proceeding under federal or state statutes.  If any Termination Event occurs, termination will become effective immediately or on the date set forth in the written notice of termination.  The provisions of Sections 1, 2.2 (second to last sentence only), 2.3, 2.8, 4.4, and 6 (except for Sections 6.7.14 and 6.7.15) will survive termination of this Master Agreement.

6.4.3   <u>Obligations Upon Termination.</u>  Within thirty (30) days after the date of termination of this Master Agreement or a license granted under an Attachment A.x for any reason whatsoever, Client shall (i) return the Software, and all copies, in whole or in part, all Documentation relating thereto, and any other Confidential Information in its possession that is in tangible form, (ii) purge all copies of the Software from all computer storage media, and (iii) furnish SS&C with a certificate signed by an executive officer of Client verifying that (i) and (ii) above have been done.

6.5.   <u>Assignment</u>

CONFIDENTIAL

ACM0048573

## SS&C TECHNOLOGIES, INC.
### Master Agreement

6.5.1   No Assignment.  Neither this Master Agreement nor any rights under this Master Agreement may be assigned or otherwise transferred by Client, in whole or in part, whether directly or by operation of law, without the prior written consent of SS&C, which consent shall not be unreasonably withheld.  For purposes of this Master Agreement: (i) a change of control of Client, sale of substantially all of the assets of Client and/or a merger or consolidation involving Client or any affiliate of Client effecting, directly or indirectly, a change of control of Client, shall be deemed to be an assignment or transfer of this Master Agreement and the rights under it by operation of law requiring the written consent of SS&C; (ii) a "change of control" shall be deemed to have occurred if any person or entity not in control of the Client before the Effective Date of this Master Agreement, thereafter acquires control of the Client; (iii) an affiliate of a person or entity is a person or entity that controls, is under common control with or is controlled by such other person or entity; (iv) control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise; (v) the terms "person" and "entity" include an individual, a corporation, partnership, association, trust, fund or any organized group of persons, whether incorporated or not and any receiver, bankruptcy trustee or similar official.

Any assignment or other transfer of this Master Agreement or the Software without the prior written consent of SS&C as required above shall constitute a material breach of this Master Agreement under Section 6.4.2(a). Subject to the foregoing, this Master Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and assigns.  Any attempted delegation, transfer or assignment prohibited by this Master Agreement shall be null and void.

6.6.   Notices

6.6.1   Notices.  Any notice required or permitted under the terms of this Master Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by first class certified mail, (c) sent by overnight courier, in each of (b) and (c) properly posted and fully prepaid to the appropriate address set forth below, (d) sent by facsimile, or (e) sent by e-mail. Either party may change its facsimile number, e-mail address or its postal address for notice by notice to the other party given in accordance with this Section.  Notices will be considered to have been given at the time of actual delivery in person, three (3) business days after deposit in the mail as set forth above, or one (1) day after delivery to an overnight courier service, if sent by facsimile, notice will be considered delivered upon confirmation that the facsimile transmission has been successful by the transmission report denoting "OK" or any similar notation or if sent by e-mail, notice will be considered delivered upon confirmation of transmission.

If to SS&C:
SS&C Technologies, Inc.
80 Lamberton Road
Windsor, CT 06095
Attn: Legal Department
Fax:  860-298-4969
Phone: 860-298-4832
E-mail: notices@sscinc.com

| | |
|---|---|
| If to Client: | Client's Billing Address: |
| ARMOUR Capital Management LP | ARMOUR Capital Management LP |
| 3001 Ocean Drive | 3001 Ocean Drive |
| Vero Beach, FL 32963 | Vero Beach, FL 32963 |
| Attn:    Chief Operating Officer | Attn: Accounts Payable |
| Fax:    +1 561-348-2408 | Fax: +1 561-348-2408 |
| Phone:  +1 772-617-4340 | Phone: +1 772-617-4340 |
| E-mail: mrg@armourllc.com | E-mail: accountspayable@armourllc.com |

6.7.   Miscellaneous

6.7.1   Force Majeure.  Neither party will incur any liability to the other party on account of any loss or damage resulting from any delay or failure to perform all or any part of this Master Agreement if such delay or failure is caused, in whole or in part, by events, occurrences, or causes beyond its control and without its negligence, including without limitation, blackouts, acts of God, strikes, lockouts, riots, acts of war, terrorism, cyber-terrorism, earthquake, fire and explosions.  The inability to meet financial obligations is not a force majeure event.

6.7.2   Waiver.  Any waiver of the provisions of this Master Agreement or of a party's rights or remedies under this Master Agreement must be in writing to be effective.  Failure, neglect, or delay by a party in enforcing the provisions of this Master Agreement

CONFIDENTIAL

ACM0048574

## SS&C TECHNOLOGIES, INC.
### Master Agreement

or its rights or remedies will not be construed and will not be deemed to be a waiver of such party's rights under this Master Agreement and will not in any way affect the validity of the whole or any part of this Master Agreement or prejudice such party's right to take subsequent action.

6.7.3   <u>Partial Invalidity.</u>  If any term, condition, or provision in this Master Agreement is found to be invalid, unlawful or unenforceable to any extent, the parties shall endeavor in good faith to agree to such amendments that will preserve, as far as possible, the intentions expressed in this Master Agreement.  If the parties fail to agree on such an amendment, such invalid term, condition or provision shall be severed from the remaining terms, conditions and provisions, which will continue to be valid and enforceable to the fullest extent permitted by law.

6.7.4   <u>Entire Agreement.</u>  This Master Agreement (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect thereto.

6.7.5   <u>Modification.</u>  This Master Agreement may be amended only by written agreement signed by both parties.

6.7.6   <u>Headings.</u>  The headings used in this Master Agreement are for convenience of reference only and are not to be used for interpreting it.

6.7.7   <u>Export Control.</u>  Client shall comply with all applicable export, re-export and foreign policy laws that may be imposed by the Canadian or United States government.

6.7.8   <u>Counterparts.</u>  This Master Agreement and any addendum or Work Request may be executed in counterparts, each of which when so executed will be deemed to be an original.  Such counterparts together will constitute one agreement.  Signatures may be exchanged via facsimile or electronic mail and the parties hereto agree that signatures so exchanged shall be binding to the same extent as if original signatures were exchanged.

6.7.9   <u>Choice of Law; Choice of Forum.</u>  This Master Agreement shall be interpreted, construed and in all respects governed under the laws of the State of Connecticut without regard to conflicts of law principles.  Any action, suit or proceeding related to any dispute, claim or controversy or otherwise related to the rights and obligations of the parties under this Master Agreement shall be brought in the Superior Court of the State of Connecticut, Hartford County or in the United States District Court for the District of Connecticut.  The parties hereto submit to the exclusive jurisdiction of such court.

6.7.10   <u>No Solicitation.</u>  SS&C and Client agree not to directly or indirectly solicit any employee of the other to leave the employ of the other.  The foregoing shall not prohibit either party from soliciting employment through newspaper advertisements or Internet postings so long as such means are not targeted specifically at the other party's employees.

6.7.11   <u>Independent Contractors.</u>  The parties are, and shall remain, independent contractors. Except as provided herein, each party is not, and will not act as, an agent of the other party, nor shall either party or any of its employees be deemed to be employees of the other party and nothing in this Master Agreement shall be construed as creating a partnership, joint venture, an employer/employee relationship, an agent-principal relationship, or any similar relationship.

6.7.12   <u>Authority to enter into Agreement.</u>  Each party warrants that it has all necessary power and authority to enter into this Master Agreement and that this Master Agreement and performance hereunder does not violate the terms of any contract, covenant or agreement between it and any unrelated third party.  Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

6.7.13   <u>Disclosure; Use of Client's Name.</u>  SS&C is subject to United States federal and state securities laws.  SS&C may make disclosures required by such laws.  Subject to the confidentiality provisions of Section 6.3, SS&C may (i) refer to Client in generic client lists, new client announcements and product brochures and marketing materials indicating that Client is a client of SS&C; and (ii) issue a press release, subject to Client's prior reasonable review and consent, announcing that Client has engaged SS&C to provide software.  SS&C may disclose to third party vendors (including software vendors) that provide products and/or services that may be used by Client, or that are used in conjunction with SS&C's products or services, that Client is a client of SS&C and such other information that is reasonably needed by such third party vendors.

6.7.14   <u>Right to Subcontract.</u>  SS&C may subcontract or delegate the performance of any services under this Master Agreement or any Attachment or Work Request.  SS&C shall remain responsible for all its obligations under this Master Agreement or

CONFIDENTIAL

ACM0048575

# SS&C TECHNOLOGIES, INC.
## Master Agreement

any Attachment or Work Request, as the case may be, notwithstanding any subcontracting or delegation of the performance of such obligations. SS&C shall ensure that any third party performing services under this Master Agreement or any Attachment or Work Request on SS&C's behalf complies with all of SS&C's obligations hereunder.

6.7.15   Use of Affiliates. In carrying out its duties pursuant to this Master Agreement or any Attachment or Work Request, some of the services for the Client may be delegated by SS&C to one or more of its affiliates.

6.7.16   Time Limit to Claim Breach. No action arising out of any breach or claimed breach of this Master Agreement or transactions contemplated by this Master Agreement may be brought by either party more than one (1) year after the cause of action has accrued. For purposes of this Master Agreement, a cause of action will be deemed to have accrued when a party knew or reasonably should have known of the breach or claimed breach.

6.7.17   Voidability at SS&C's Option. This Master Agreement shall be voidable at SS&C's option if Client does not enter into and deliver it on or before December 19, 2014.

6.7.18   Attachments and Work Request as of the Master Agreement Effective Date:
- A.1
- B.1
- Work Request One

IN WITNESS WHEREOF, the parties have executed this Master Agreement as of the dates set forth below.

| ARMOUR Capital Management LP | | SS&C Technologies, Inc. | |
|---|---|---|---|
| By | _[signature]_ | By | _[signature]_ |
| Name | James R. Mountain | Name | Normand A. Salonga |
| Title | Chief Financial Officer | Title | President + 100 |
| Date | December 19, 2014 | Date | 12/19/14 |
| Address | 3001 Ocean Drive, Suite 201 | Address | |
| | Vero Beach, FL  32963 | | |

CONFIDENTIAL

ACM0048576

# SS&C TECHNOLOGIES, INC.
## Master Agreement

### ATTACHMENT A.1- License and Maintenance Program

**I.    SOFTWARE LICENSE**

**A.  <u>Software Licensed under this Attachment A.1 (the "Software" for purposes of this Attachment A.1):</u>**

> CAMRA™  for Microsoft® SQL Server™
> The following product modules are included:
> - CI Manager™
> - Impairments Manager™
> - Report Express™
> - Extend™
> - TBA Dollar Roll™
>
> Debt & Derivatives™
> The following product module is included:
> - Swaps™

**B. <u>License Term:</u>** Perpetual as set forth in Section 2.2 of the Master Agreement.

**C. <u>License Fees:</u>**  $500,000, which sum is due and payable prior to the Effective Date of the Master Agreement.  The License Fee is based on the total dollar value of the assets to be managed from time to time by Client using the Software (the "Asset Value").  For the purpose of this Attachment A.1, "manage" shall mean use of the Software in any fashion whatsoever in connection with any asset(s), and "asset(s)" shall mean any long, third-party financial interest of any nature whatsoever managed by the Software.

<u>Additional License Fees:</u>  If the Asset Value appreciates or increases as a result of the operation of Client's business in the ordinary course, then no additional License Fee will be due hereunder.  For purposes of clarity raising of additional capital through the issuance of stock or the use of leverage by ARMOUR Residential REIT, Inc. or JAVELIN Mortgage Investment Corp. shall be considered business in the ordinary course.

However, if the Asset Value increases as a result of the addition of new assets to be managed by Client using the Software resulting from or in connection with (i) a merger, or acquisition of substantially all the stock or assets of another entity, (ii) entering into a management agreement with a new entity where Client will manage assets using the Software, or (iii) any other extraordinary acquisition or occurrence, involving or effected by Client or any affiliate of Client, or otherwise (such new assets shall be referred to herein as the "Incremental Assets", and each such addition a "Triggering Event"), then an additional, incremental license fee (plus an increase in annual maintenance equal to twenty percent (20%) of such license fee regardless of any limitation which may exist in Section 3.6 of the Master Agreement) will be immediately due and owing in an amount equal to SS&C's then standard license fee to use the Software to manage assets equal in amount to the Incremental Assets value (as determined jointly by SS&C and Client based upon the parties' pre-determined criteria).  In the event that Client merges with or acquires substantially all the stock or assets of another entity which is also a licensee of the Software, then no additional license fee shall be owed, but the maintenance fees for each entity shall continue.

Client will report to SS&C the occurrence of a Triggering Event and the Incremental Assets value within thirty (30) days after such an event.  Client will provide SS&C with all backup documentation and other substantiating information of the Incremental Assets value upon request by SS&C.  If Client fails to report a Triggering Event and/or fails to report or underreports the Incremental Assets value, then SS&C may terminate this Attachment A.1 for material breach after the cure period, pursuant to the provisions of Section 6.4.2 of the Master Agreement.

**D.  <u>Additional Restrictions:</u>**

1) Use means use by Client of the Hosted Software and all Third Party Software provided by SS&C, for Client's own internal information processing services and computing needs and for Client to support of ARMOUR Residential REIT, Inc. and JAVELIN Mortgage Investment Corp.

2) Installation Address:
- If the Software is hosted pursuant to Attachment B.1:
  SS&C Technologies, Inc.
  80 Lamberton Rd.

CONFIDENTIAL

ACM0048577

## SS&C TECHNOLOGIES, INC.
### Master Agreement

Windsor, CT 06095

- If the Client takes delivery of the Software pursuant to section G below:
  ARMOUR Capital Management LP*
  3001 Ocean Drive
  Vero Beach, FL 32963

*Use is restricted to a single active server at the installation address above or such other installation address as Client may provide from time to time. Simultaneous use at multiple Sites or on separate servers is authorized only upon payment of SS&C's then standard multi-site licensing fees.*

**E.  Limited Warranty:**  SS&C warrants that as of the Effective Date and for three hundred sixty-four (364) days thereafter, the Software will perform in substantial accordance with the Documentation. If during such period, Client believes that the Software does not perform as warranted, Client shall notify SS&C of the purported failure to perform. SS&C shall investigate such purported failure to perform, and if SS&C determines that the Software does not substantially perform in accordance with the Documentation, then SS&C shall undertake to correct the Software, or replace the Software free of charge. If neither of the foregoing is commercially practicable for either SS&C or Client or is not completed within a reasonable time from the date of the Client's notification of the failure to perform, upon thirty (30) days advance written notice, Client may terminate the license granted with respect to the Software and receive a refund of the corresponding License Fee and any additional license fees paid by the Client, unless otherwise agreed by the parties.     The warranty set forth above is made to and for the benefit of Client only. The warranty will apply only if: (a) the Software has been properly installed and used at all times and in accordance with the instructions for Use; and (b) no alteration, modification or addition has been made to the Software by persons other than SS&C.

**F.  Third Party Software Provided by SS&C.**  SS&C is providing the following Third Party Software:

Crystal Reports Version 2011 (five named user license). Provided by SS&C for no additional fee.. The SAP terms and conditions found on the Crystal Reports software will apply.

Included with the Software for no additional fee is a runtime license in the database management software PFXplus™, which is required to Use the Software (PFXplus is a registered trademark of the POWERflex Corporation of Victoria, Australia).

**G.  Delivery of Software:**  Provided that the Client's license to the Software has not been terminated pursuant to the terms of the Master Agreement, Client may request delivery of the Software at any time.

## II.   MAINTENANCE PROGRAM

**A.  Maintenance Program Fees:**  The initial annual maintenance program fee is $100,000, which sum is due and payable prior to the Effective Date of the Master Agreement. The first Renewal Date is January 1, 2016.

**B.  Support Hours:**  SS&C will provide telephone support to Client with respect to the Software for no additional charge during SS&C's business hours of 8:30 a.m. to 5:30 p.m. Eastern Time Monday through Friday, excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).

CONFIDENTIAL                                                                                                ACM0048578

## SS&C TECHNOLOGIES, INC.
### Master Agreement

### ATTACHMENT B.1- Hosting, Process Automation and Data Management Services ("Hosting Services")

**A. Hosted Software:**    CAMRA™ 'S™ for Microsoft® SQL Server™ (15 named users)
The following product modules are included:
- CI Manager™
- Impairments Manager™
- Report Express™
- Extend™
- TBA Dollar Roll™

Debt & Derivatives™ (15 named users)
The following product module is included:
- Swaps™

**B. Term:** This Attachment B.1 shall remain in full force and effect for a term of five (5) years from the Effective Date (the "Initial Term") and will thereafter automatically renew for additional one (1) year periods (the "Renewal Term"), unless otherwise terminated as provided by the Master Agreement or this Attachment B.1. Either party may terminate this Attachment B.1 following the Initial Term or any Renewal Term by giving the other party written notice at least thirty (30) days prior to the end of the Initial Term or any Renewal Term. Notwithstanding the foregoing, the Client may terminate this Attachment B.1 for any reason or no reason at all by giving SS&C one hundred twenty (120) days prior written notice.

**C. Fees:** The monthly fee for the Hosting Services in Attachment B.1 is $10,000 USD. The first month's payment is due prio to the Effective Date. Subsequent payments are due and payable monthly in advance. If Client requires additional users for the Hosted Software, then an additional, incremental monthly fee will be immediately due and owing in an amount equal to SS&C's then standard fee.

Following the Initial Term, beginning with the first Renewal Term, the Hosting Services fees may be increased by SS&C at the commencement of each Renewal Term. SS&C shall notify Client of any such increase in the Hosting Services fees in writing at least ninety (90) days prior to commencement of the Renewal Term in which such an increase is effective.

**D. Hosting, Process Automation and Data Management Services:** SS&C will maintain for Client the Hosted Software processing environment through SS&C's processing center in Windsor, CT. The Client will have on-line access to the Hosted Software. The description below specifies the Hosting, Process Automation and Data Management Services that SS&C will provide under this Attachment B.1.

1. Provisioning and Maintenance of the Hosted Software in SS&C's Data Center, including:
   - Physical and virtual technology infrastructure for hosting of licensed software as described in this Attachment B.1.
   - Physical and virtual infrastructure allowing network connectivity and remote (user level) access to hosted environments
   - Segregated databases for Client, in a shared infrastructure environment, up to an aggregate total of 50 GB of storage
   - Data center operations staffing and support, including periodic infrastructure maintenance and availability monitoring
   - Environmental support for infrastructure operations including but not limited to data center floor space, power, heating and cooling, physical security systems, UPS systems and diesel generator back-up
   - Data backup and storage as described in this Attachment B.1. Standard services include nightly tape backup stored onsite, weekly tape backup stored at an offsite facility for a rotating five weeks, monthly tape backup stored offsite for twelve months and yearly tape backups stored offsite for ten years and disposed of shortly after the eleventh anniversary. Increased levels of data protection and backup are available at additional cost.
   - Disaster recovery to an alternate data center site (within 48 hours of an outage)

2. System Access Controls
   - Ongoing administration of user access rights in response to client requests. Client is responsible for timely notification to SS&C of relevant user account additions and deletions.
   - Network password administration in accordance with Client standards
   - Network security in accordance with SS&C security policy and standards

CONFIDENTIAL

ACM0048579

## SS&C TECHNOLOGIES, INC.
### Master Agreement

3. Communications
   - Maintenance of internet connectivity for Client access
   - Provisioning of secure, internet-based CITRIX software connectivity for access to the Hosted Software

4. Database and Operating System Maintenance
   - Periodic maintenance updates of operating system and database platform software
   - Installation of database and operating system software releases in accordance with SS&C platform currency standards.

5. Licensed Software Release and Upgrade Support
   - Coordination of upgrade schedules in conjunction with Client
   - Installation of new Hosted Software releases and updates provided that Maintenance Program services pursuant to Section 3 of the Master Agreement have not been terminated
   - Migration of Hosted Software releases and updates to production environment
   - Provide an environment for Client testing of releases

6. Monitoring Services
   - System availability monitoring
   - Network monitoring
   - Server and storage utilization monitoring
   - Antivirus and security monitoring

7. Batch Processing Data Management Operations and Support
   - Daily import and load of trades from Client and AVM
   - Daily import of market pricing from Bloomberg and IDC
   - Daily import of Client-provided cash flows
   - Daily import of transactions from Citibank as custodian
   - Daily export of holdings information to BlackRock Solutions
   - Daily extract of open positions to AVM
   - Monitoring of the nightly process and timely response to interruptions
   - Notification to Client of nightly process status
   - Proactive issue resolution and escalation to Client as required

8. Disaster Recovery
   - Disaster recovery infrastructure will be maintained at an alternate physical location from the primary production data center hosting facility. In the event of a critical primary data center failure, the Client's infrastructure will be made available for access in the alternate location within 48 hours of critical failure declaration, with a maximum data loss of 24 hours worth of processing.
   - SS&C will accommodate one annual DR testing event in partnership with Client, with a minimum of 30 days of notification of the testing event.

## E.  Service levels:

SS&C shall deliver its Services under this Attachment B.1 in a professional and workmanlike manner.
   - "System Availability" is defined as the percentage of time that the Hosted Software is available for processing during Business Hours during a calendar month, outside of scheduled maintenance periods.
   - Regular maintenance periods with corresponding scheduled system unavailability will occur on a monthly basis, every second Sunday of the month, from 6:00AM to 12:00PM Eastern US time.
   - Scheduled Exception maintenance may occur infrequently in addition to regular maintenance periods, and will be performed with a minimum 30 days notice to Client.
   - Unscheduled exception maintenance, with 24 hours of notice or less, may occur in emergency change situations.
   - The System Availability standard shall be 99%.
   - If SS&C fails to provide 99% System Availability for two consecutive months, Client may notify SS&C in writing regarding the specific failure by SS&C. If SS&C fails to provide 98 % System Availability for three consecutive months,

CONFIDENTIAL

ACM0048580

# SS&C TECHNOLOGIES, INC.
## Master Agreement

and Client previously provided SS&C with written notice following the second consecutive month of failed delivery in accordance with this paragraph, then Client may terminate this Attachment B.1 for breach.

- Support for hosting issues is available 24x7 on regular business days
- Application support services are available from 5:00AM to 11:59 PM Eastern US time
- Problem Identification and Resolution

SS&C and Client will each take direct responsibility for notification of selected personnel for the purpose of prompt resolution of processing problems. In the event that Client reports a severe or critical issue, SS&C will respond as quickly as practicable and continue to work with the Client to resolve the issue or develop a work around that allows the Client to continue processing. SS&C and Client will mutually develop and agree to a problem identification process and procedure after execution of the Agreement.

## F. Client Responsibilities:

- Designate responsible system administration liaison with SS&C
- Designate and maintain Client primary and secondary escalation contacts for batch operations issue escalation
- Maintain Hosted Software trained operations staff
- Validate financial results of each new release of the Hosted Software prior to its being placed into production
- Maintain and support appropriate communication facilities at Client site for hosting connectivity
- For Client provided, and client-managed data sources, prepare and upload all required input data in CAMRA™ 'S'™ for Microsoft® SQL Server™ / Debt & Derivatives™, in standard SS&C-defined formats to a designated secure FTP site according to agreed-upon processing schedules.

## G. Return of Data:

- Following termination of this Attachment B.1 SS&C shall upon written request, promptly return to Client, in the format and on the media in use as of the date of request, all, or any requested portion of, the Client Data.

CONFIDENTIAL                                                                          ACM0048581

# SS&C TECHNOLOGIES, INC.
## Master Agreement

### WORK REQUEST ONE- Initial Implementation Services

<u>Description of Services to be Performed.</u>  SS&C will provide on-site and remote implementation services including business workflow analysis, environment setup, data conversion analysis, interface development and testing in support of Client's implementation of the Software.

Assistance will include the following:
- Project Management, Governance and Business Process Review
  - Project Governance including assistance with project management, issue tracking, status reporting, and project and steering committee meetings.
  - Project kickoff and review of the SS&C file formats and conversion processes.
  - Business process review, operational model confirmation and assistance with development of process and procedures for Software usage.
  - Technical Accounting Support to assist the Client in establishing the proper accounting treatments for each asset class.

- Environment Set-up, Configuration and Data Conversion
  - Software installation including technical assistance in the establishment of the operating environment supporting the Software.
  - Assistance with creating Client required interfaces / connections for receiving daily trades, market data, custody feeds, and swaps transactions.
  - Assistance with the mapping of static data to support Clients use of the Software to include, but not limited to; Security Masters, Issuers, Brokers, Security Types, Custodians, etc.
  - Assistance with the establishment of a general ledger chart of accounts and associated posting rules.
  - Create an extract of open positions for BlackRock.
  - Assistance with the conversion of initial open positions as of 12/31/2014.
  - Implementation training.
  - Provide assistance with mapping of source data to SS&C documented upload file formats to facilitate data conversion.
  - Implementation and training support for the Software and following modules:
    - CI Manager™ - Consult with Client on establishing connectivity with Client's custodian for the receipt of daily cash and holdings files.
    - Impairments Manager™ - Assist and consult with Client on establishing their impairment rules in CAMRA.
    - Crystal/Report Express™ - train the Client on the database schema, Crystal Reports and the Report Express module.
    - Extend™ - Configure and train on the implementation of Extend and consult with Client on custom data storage and reporting requirements.
    - TBA Dollar Roll™ - train the Client on the use of the TBA module in CAMRA.
    - Swaps – training on the setup and use of the Swaps module.
  - Perform a production financial analysis and reconciliation of yields and book values as of 12/31/2014 with the Client.
  - Testing support for core software products and module including support for interfaces, cash flow updates, Bloomberg feeds, general ledger and reporting.
  - Production conversion assistance with the loading of 12/31/2014 open positions as provided by Client into the CAMRA database.
  - Transaction catch-up support for an estimated two months until transactions are being processed daily by Client.

<u>Applicable Rate.</u>  SS&C shall provide an estimated 1,850 hours of support in relation to the services described above on a time and material basis at a rate of $225 per person per hour and based on the assumptions set forth below.  Travel time to and from Client's site will not be billable.

<u>Assumptions</u>

The services described above are based on the following assumptions:
- Project duration of 4-6 months
- This is a point in time conversion; no historical activity will be loaded as part of this conversion (all open trade lots as of the agreed upon point in time conversion date will be loaded).
- 2 accounting bases are required by Client, US GAAP and Tax.

Page 15 of 16

ACM0048582

# SS&C TECHNOLOGIES, INC.
## Master Agreement

- The Client will create and support the required SS&C file formats to load the static data, security masters, security attributes, cash flows, yield curves, floating rates, initial conversion positions, ongoing transactions, custodian and market data to the Software.
- The Client will provide the initial positions in the SS&C electronic format.
- A similar General Ledger chart of accounts is being used for each entity.
- Client will obtain all necessary third party data licenses (e.g. Bloomberg, IDC, Intex).
- Client will provide access to month end bank and reconciliation statements for the transaction catch-up process.
- Client will be responsible for completion, review and signoff of monthly reconciliations. SS&C will be available to assist.
- Development of a general ledger interface is not required as part of this effort.
- Standard Report Express reports will be used. Any additional interfaces or reports will be reviewed during the implementation and developed on a time and materials basis.
- Client, including any requisite vendors, will have knowledgeable staff to participate in the project as required.

SS&C will provide information related to the usage of billable hours as part of our project reporting.

If there is a change in the services described in this Work Request One that is requested by Client and requires SS&C to perform additional work, such additional work shall be billed to Client on a time and materials basis at the rates set forth above. All fees and expenses incurred will be billed to Client monthly and are due and payable upon receipt of SS&C's invoice.

Other Services. If Client requests any services in addition to the services specified in this and any other consulting engagement under the Master Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another Work Request.

CONFIDENTIAL

ACM0048583

# EXHIBIT 27

Case No. 17-cv-00790-JAM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | |
| SS&C TECHNOLOGIES INC., | |
| Defendant. | JULY 26, 2017 |

## SS&C TECHNOLOGIES INC.'S RESPONSES
## AND OBJECTIONS TO ARMOUR CAPITAL
## MANAGEMENT LP'S FIRST SET OF INTERROGATORIES

Defendant SS&C Technologies Inc. ("SS&C") hereby serves its objections and responses to Plaintiff ARMOUR Capital Management LP ("ACM") First Set of Interrogatories (the "Interrogatories") dated June 26, 2017.

### PRELIMINARY STATEMENT

The responses set forth below are submitted subject to the objections set forth herein, and are based upon the current knowledge of SS&C. SS&C expressly reserves the right to make such additional or modified responses as may be appropriate in light of further ongoing discovery and/or investigation.

### GENERAL OBJECTIONS AND RESERVATION OF RIGHTS

SS&C interposes the following General Objections to ACM's Interrogatories. These General Objections are made to the Interrogatories in general and as to each individual Interrogatory, and are incorporated by reference in to each of the objections and responses set forth below.

Case No. 17-cv-00790-JAM

1.     SS&C objects to each Interrogatory and/or Instruction in the Interrogatories to the extent that the Interrogatory purports, through definitions or otherwise, to impose duties on SS&C that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure and/or the parties Rule 26(f) Report.

2.     SS&C objects to the Interrogatories to the extent they purport to require SS&C to provide information that is not in SS&C's possession, custody or control.

3.     SS&C objects to the Interrogatories as unduly burdensome to the extent they call for information that does not exist, or would require SS&C to generate or collect information that SS&C does not maintain or generate in the ordinary course of business.

4.     SS&C objects to Instruction No. 5 of the Interrogatories regarding the period applicable to the Interrogatory Responses.  Subject to and without waiving the general and specific objections set forth in these Responses, unless otherwise indicated, SS&C's Responses relate to the beginning of the time period specified by Plaintiff in Instruction No. 5 of the Interrogatories (September 1, 2014) until the date Plaintiff purported to terminate the parties' Master Agreement (May 1, 2017).

5.     Each and every response below to the Interrogatories is made subject to the foregoing General Objections, regardless of whether a General Objection is stated in the discovery response.  The express reference to a General Objection or the making of a specific objection in response to a particular request is not intended to constitute a waiver of General Objections that are not specifically referred to in that response.

## **INTERROGATORIES**

1.     Identify the Contact Information of each Person who participated in preparing the answers to the interrogatories and which interrogatory(ies) each such Person participated in preparing.

**RESPONSE:**

2

Case No. 17-cv-00790-JAM

Daniel Pallone, 80 Lamberton Rd., Windsor, CT 06095; all Responses.
Timothy Reilly, 80 Lamberton Rd., Windsor, CT 06905; Response No. 8.

2.    Identify the Contact Information for all Persons known or believed by You to have
      knowledge or information pertaining to any of the claims or allegations in the Complaint.
      For each Person You identify, describe in detail his/her knowledge.

**OBJECTIONS AND RESPONSE:**

In addition to the General Objections, SS&C objects to Interrogatory No. 2 because it

seeks information about the allegations in the Complaint filed on May 15, 2017 (*see*

Interrogatories, Definitions No. 4), which is no longer operative due to Plaintiff's amendment

on July 13, 2017. SS&C also objects Interrogatory No. 2 because it seeks information

protected by the Attorney-Client Privilege and/or the Attorney Work-Product Doctrine.

Subject to and without waiving the foregoing objections, SS&C refers Plaintiff to the list of

Persons with knowledge of relevant facts in SS&C's Initial Disclosures, as well as such

information contained the documents produced in this action by Plaintiff, and the documents

SS&C will be producing in response to Plaintiff's document requests.

3.    Identify the Contact Information for all Persons, including any mortgage REITs, that ever
      have used or currently are using CAMRA. For each Person You identify, state (a) the
      length of time from the execution of Your contract with such Person until CAMRA was
      fully implemented and (b) whether CAMRA was hosted by such Person, hosted by You,
      operated by You as an outsourced service, or provided by some other mechanism.

**OBJECTIONS AND RESPONSE:**

In addition to the General Objections, SS&C objects to Interrogatory No. 3 on the

grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the

discovery of admissible evidence, calculated to harass, seeks information that is not relevant

to any claim or defense asserted in this matter, seeks confidential and proprietary

information and trade secrets, and is not proportionate to the needs of this case. SS&C also

objects to Interrogatory No. 3 because the phrase "ever have used or currently are using

CAMRA" is vague and unclear.

3

Subject to and without waiving the foregoing objections, SS&C states that Plaintiff

has used CAMRA, and SS&C uses CAMRA.  SS&C also refers Plaintiff to the list of

Persons with knowledge of relevant facts and the categories of facts described in SS&C's

Initial Disclosures, as well as information contained the documents produced in this action

by Plaintiff, and the documents SS&C produces in response to Plaintiff's document

requests.

4.      Identify the Contact Information for all Persons other than ACM for which CAMRA was
         attempted to be, but ultimately was not, fully implemented.  For each Person You identify,
         state (a) the length of time from the execution of Your contract with such Person until work
         to fully implement CAMRA ended, (b) whether CAMRA was (or was intended to be)
         hosted by such Person, hosted by You, operated by You as an outsourced service, or
         provided by some other mechanism, and (c) the reasons that CAMRA was not fully
         implemented.

**OBJECTIONS AND RESPONSE:**

         In addition to the General Objections, SS&C objects to Interrogatory No. 4 on the

grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the

discovery of admissible evidence, calculated to harass, seeks information that is not relevant

to any claim or defense asserted in this matter, seeks confidential and proprietary

information and trade secrets, and is not proportionate to the needs of this case.

5.      Identify the Contact Information for all Persons other than ACM for which You have any
         knowledge or belief about any complaints, failures, accidents, incidents, problems,
         damages, or similar occurrences with CAMRA, including all Persons who have
         discontinued their use of CAMRA. For each Person You identify, state the date of and
         describe each such complaint, failure, accident, incident, problem, damage, discontinuance
         or similar occurrence with CAMRA.

**OBJECTIONS AND RESPONSE:**

         In addition to the General Objections, SS&C objects to Interrogatory No. 5 on the

grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the

discovery of admissible evidence, calculated to harass, seeks information that is not relevant

to any claim or defense asserted in this matter, seeks confidential and proprietary

information and trade secrets, and is not proportionate to the needs of this case. SS&C further objects to interrogatory No. 5 because the terms "complaints," "failures," "accidents," "incidents," "problems," "damages," and "similar occurrences" are unduly vague and unclear.

6.  Identify the Contact Information for all Persons other than ACM who use or used CAMRA on an outsourced basis in which SS&C personnel operate and maintain, or provide substantial direct support for the operation and maintenance of CAMRA. Identify when each Person began using CAMRA on an outsourced basis, whether such Person had previously attempted to implement or use CAMRA on some other basis of operation, and when such attempt began.

**OBJECTIONS AND RESPONSE:**

In addition to the General Objections, SS&C objects to Interrogatory No. 6 on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, calculated to harass, seeks information that is not relevant to any claim or defense asserted in this matter, seeks confidential and proprietary information and trade secrets, and is not proportionate to the needs of this case.

7.  Identify the Contact Information for all Persons who ever have been or are currently are employed or otherwise retained by You to implement CAMRA. For each Person You identify that at present is not employed or otherwise retained by You, state the dates during which such Person was employed or otherwise retained by You.

**OBJECTIONS AND RESPONSE:**

In addition to the General Objections, SS&C objects to Interrogatory No. 7 on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, calculated to harass, seeks information that is not relevant to any claim or defense asserted in this matter, seeks confidential and proprietary information and trade secrets, and is not proportionate to the needs of this case.

Subject to and without waiving the foregoing objections, SS&C states that in its Initial Disclosures SS&C has disclosed a comprehensive list of its employees, former employees, and contractors that were involved in providing implementation services to ACM pursuant to the

Case No. 17-cv-00790-JAM

Master Agreement.  With respect to former employees, SS&C is gathering current contact information and will supplement these Responses shortly.  To the extent ACM seeks anything beyond that, such information is not relevant or material to any claim or defense asserted in this matter and not proportional to the needs for discovery in this case.

8.      Identify whether SS&C has ever been disciplined or charged by the U.S. Securities and Exchange Commission, FINRA, or any other SRO or regulatory agency relating to its products or services. If so, describe the nature of the proceedings and the outcome, including any penalties levied against SS&C.

**OBJECTIONS AND RESPONSE:**

In addition to the General Objections, SS&C objects to Interrogatory No. 8 on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, calculated to harass, seeks information that is not relevant to any claim or defense asserted in this matter, seeks confidential and proprietary information and trade secrets, and is not proportionate to the needs of this case.

Subject to and without waiving the foregoing objections, SS&C states that it has not been disciplined or charged by the U.S. Securities and Exchange Commission, FINRA, or any other SRO or regulatory agency concerning implementation of CAMRA during or since the time period relevant to this action.

9.      Identify the Contact Information for each Person whom You may call as an expert witness at trial, and state in detail the substance of the opinions to be provided by each such Person.

**OBJECTIONS AND RESPONSE:**

SS&C objects to Interrogatory No. 9 to the extent it is beyond the scope of SS&C's responsibilities under the Federal Rules of Civil Procedure and the Scheduling Order entered in this action (*see* Dkt. No. 36).  SS&C will disclose any expert witness it intends to call at trial in accordance with the time limits authorized in the scheduling order in effect in this case.

6

**VERIFICATION**

I, _Daniel Pallone_ , a duly authorized representative of SS&C Technologies, Inc., state under penalty of perjury that:

I have read the foregoing answers to Armour Capital Management, L.P.'s First Set of Interrogatories and hereby verify that the foregoing answers are true and correct to the best of my knowledge and belief.

The Defendant,
**SS&C TECHNOLOGIES INC.**

By: _David Pallone_

Its: _Vice President_

As to Objections:

The Defendant,
**SS&C TECHNOLOGIES INC.**

By _Alex_

Jeffrey J. Mirman (ct05433)
Alexa T. Millinger (ct29800)
HINCKLEY ALLEN & SNYDER, LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
jmirman@hinckleyallen.com
Telephone: (860) 331-2762
Facsimile: (860) 278-3802

Kevin J. O'Connor (_pro hac vice_)
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109-1775
koconnor@hinckleyallen.com
Telephone: (617) 378-4394
Facsimile: (617) 345-9020

Its Attorneys

Case No. 17-cv-00790-JAM

## CERTIFICATE OF SERVICE

This is to certify that on this 26th day of July, 2017, a copy of the foregoing was sent via electronic mail to the following counsel of record:

Christopher M. Cerrito
Holland & Knight, LLP
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Chris.cerrito@hklaw.com

Joseph Mamounas
Allison Kernisky
Holland & Knight, LLP
701 Brickell Ave., Suite 3300
Miami, FL 33131
Joseph.mamounas@hklaw.com
Allison.kernisky@hklaw.com

Alexa T. Millinger

8

# EXHIBIT 28



# SS&C Launches REIT Servicing Group

## Servicing Group Addresses Growing Mortgage REIT Investment Accounting and Reporting Needs

WINDSOR, Conn., April 24, 2014 (GLOBE NEWSWIRE) -- SS&C Technologies Holdings, Inc. (Nasdaq:SSNC), a global provider of financial services software and software-enabled services, today announced the establishment of its real estate investment trust (REIT) servicing group. The solutions and services team provides multiple services to the REIT market.

Customers turn to SS&C for its unique expertise, world-class technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting. The new servicing group's focus is on the expanding area of Residential Mortgage-Backed Securities (RMBS) and Commercial Mortgage-Backed Securities (CMBS).

"Mortgage REITs have traditionally struggled to manage accounting and reporting and often rely on manual processes," said Josh Brown, Senior Director of Technical Accounting and REIT Solutions, SS&C Technologies. "With our recent sales momentum, the growth of RMBS and CMBS investments, and the establishment of our REIT servicing group, we can help Mortgage REITs be better equipped to produce full auditable accounting and reporting processes and eliminate the use of spreadsheets."

"SS&C's number one priority is to address the needs of its customers," said Timothy Reilly, Senior Vice President and General Manager, SS&C Institutional Services division. "As the only integrated Mortgage REIT end-to-end solution, SS&C continues to lead the way by providing Mortgage REIT clients with enhanced capabilities. We're establishing processes and controls around the accounting for complex structured instruments, collateral management, GAAP compliance, REIT compliance and SEC disclosures to ensure they have the tools needed to succeed."

SS&C's REIT servicing offering includes operational assessments, comprehensive audit capabilities, fixed income and trading, collateral management and MBS portfolio management, accounting and reporting. All of these services are underpinned by dedicated client service professionals, including technical accounting, consulting and development with specific Mortgage REIT expertise.

### About SS&C Technologies

SS&C is a global provider of investment and financial software-enabled services and software focused exclusively on the global financial services industry. Founded in 1986, SS&C has its headquarters in Windsor, Connecticut and offices around the world. Some 6,900 financial services organizations, from the world's largest institutions to local firms, manage and account for their investments using SS&C's products and services. These clients in the aggregate manage over $26 trillion in assets.

Additional information about SS&C (Nasdaq:SSNC) is available at www.ssctech.com.

Follow SS&C on Twitter, Linkedin and Facebook.

CONTACT: Patrick Pedonti

        Chief Financial Officer

        Tel: +1-860-298-4738

        E-mail: InvestorRelations@sscinc.com


        Justine Stone

        Investor Relations Coordinator

        Tel: +1-212-367-4705

        E-mail: InvestorRelations@sscinc.com


EXHIBIT
Reilly 2
2-15-18   SS

# EXHIBIT 29

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

☒     QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Quarterly Period Ended June 30, 2014**
OR

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

**ARMOUR RESIDENTIAL REIT, INC.**
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Maryland** | **001-34766** | **26-1908763** |
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3001 Ocean Drive, Suite 201, Vero Beach, FL  32963**
(Address of principal executive offices)(zip code)

**(772) 617-4340**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   YES ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The number of outstanding shares of the Registrant's common stock as of July 30, 2014 was 357,192,562.

ARMOUR Residential REIT, Inc. and Subsidiary
CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands, except per share amounts)
(Unaudited)

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

|  | June 30, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| Cash | $ 433,149 | $ 496,478 |
| Cash collateral posted | 14,134 | 35,917 |
| Agency Securities, available for sale, at fair value (including pledged securities of $16,284,466 and $13,832,482) | 16,962,134 | 14,648,178 |
| Derivatives, at fair value | 169,877 | 508,988 |
| Principal payments receivable | 108 | 70 |
| Accrued interest receivable | 44,901 | 42,034 |
| Prepaid and other assets | 447 | 852 |
| Total Assets | $ 17,624,750 | $ 15,732,517 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Repurchase agreements, net | $ 14,393,580 | $ 13,151,504 |
| Obligations to return securities received as collateral, at fair value | 1,021,484 | — |
| Cash collateral held | 128,168 | 387,845 |
| Payable for unsettled purchases | 38,816 | 159,159 |
| Derivatives, at fair value | 70,472 | 102,795 |
| Accrued interest payable- repurchase agreements | 7,888 | 6,629 |
| Accrued interest payable- U.S. Treasury Securities sold short | 10,256 | — |
| Accounts payable and other accrued expenses | 3,203 | 23,357 |
| Total Liabilities | $ 15,673,867 | $ 13,831,289 |
| | | |
| Commitments and contingencies (Note 9) | | |
| | | |
| Stockholders' Equity: | | |
| Preferred stock, $0.001 par value, 50,000 shares authorized; | | |
| 8.250% Series A Cumulative Preferred Stock; 2,181 issued and outstanding ($54,514 aggregate liquidation preference) at June 30, 2014 and December 31, 2013 | 2 | 2 |
| 7.875% Series B Cumulative Preferred Stock; 5,650 issued and outstanding ($141,250 aggregate liquidation preference) at June 30, 2014 and December 31, 2013 | 6 | 6 |
| Common stock, $0.001 par value, 1,000,000 shares authorized, 357,189 and 357,613 shares issued and outstanding at June 30, 2014 and December 31, 2013 | 357 | 358 |
| Additional paid-in capital | 2,732,647 | 2,734,480 |
| Accumulated deficit | (848,544) | (643,138) |
| Accumulated other comprehensive income (loss) | 66,415 | (190,480) |
| Total Stockholders' Equity | $ 1,950,883 | $ 1,901,228 |
| Total Liabilities and Stockholders' Equity | $ 17,624,750 | $ 15,732,517 |

See notes to condensed consolidated financial statements.

3

# EXHIBIT 30

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

☒     QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Quarterly Period Ended June 30, 2014**
OR

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____**

**JAVELIN MORTGAGE INVESTMENT CORP.**
(Exact name of registrant as specified in its charter)

| **Maryland** | **001-35673** | **45-5517523** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3001 Ocean Drive, Suite 201, Vero Beach, FL  32963**
(Address of principal executive offices)(zip code)

**(772) 617-4340**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  YES ☒   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  YES ☒   NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  YES ☐ NO ☒

The number of outstanding shares of the Registrant's common stock as of August 1, 2014 was 11,999,084.

JAVELIN MORTGAGE INVESTMENT CORP. and Subsidiary
CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands, except per share amounts)
(Unaudited)

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

| | June 30, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash | $ | 22,397 | $ | 41,524 |
| Cash collateral posted to counterparties | | 462 | | 648 |
| Agency Securities, available for sale, at fair value (including pledged securities of $1,180,339 and $770,172) | | 1,196,872 | | 801,777 |
| Non-Agency Securities, trading, at fair value (including pledged securities of $155,783 and $143,080) | | 155,783 | | 143,399 |
| Linked Transactions, net, at fair value (including pledged securities of $126,250 and $140,945) | | 14,448 | | 16,322 |
| Derivatives, at fair value | | 25,474 | | 59,703 |
| Accrued interest receivable | | 3,072 | | 2,336 |
| Prepaid and other assets | | 475 | | 623 |
| Total Assets | $ | 1,418,983 | $ | 1,066,332 |
| **Liabilities and Stockholders' Equity** | | | | |
| Liabilities: | | | | |
| Repurchase agreements | $ | 1,233,195 | $ | 839,405 |
| Cash collateral posted by counterparties | | 23,766 | | 53,314 |
| Accrued interest payable | | 819 | | 611 |
| Accounts payable and other accrued expenses | | 451 | | 1,722 |
| Total Liabilities | $ | 1,258,231 | $ | 895,052 |
| Commitments and Contingencies (Note 11) | | | | |
| Stockholders' Equity: | | | | |
| Preferred stock, $0.001 par value, 25,000 shares authorized, none issued and outstanding at June 30, 2014 and December 31, 2013 | | — | | — |
| Common stock, $0.001 par value, 250,000 shares authorized, 11,999 and 11,993 shares issued and outstanding at June 30, 2014 and December 31, 2013 | | 12 | | 12 |
| Additional paid-in capital | | 244,038 | | 243,951 |
| Accumulated deficit | | (90,974) | | (69,540) |
| Accumulated other comprehensive income (loss) | | 7,676 | | (3,143) |
| Total Stockholders' Equity | $ | 160,752 | $ | 171,280 |
| Total Liabilities and Stockholders' Equity | $ | 1,418,983 | $ | 1,066,332 |

See notes to condensed consolidated financial statements.

3

# EXHIBIT 31

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

☒      QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Quarterly Period Ended September 30, 2014**
OR

☐      TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

**ARMOUR RESIDENTIAL REIT, INC.**
(Exact name of registrant as specified in its charter)

| **Maryland** | **001-34766** | **26-1908763** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3001 Ocean Drive, Suite 201, Vero Beach, FL  32963**
(Address of principal executive offices)(zip code)

**(772) 617-4340**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    YES ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The number of outstanding shares of the Registrant's common stock as of October 28, 2014 was 357,278,432.

**ARMOUR Residential REIT, Inc. and Subsidiary**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share amounts)
(Unaudited)

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| Cash | $ 542,789 | $ 496,478 |
| Cash collateral posted to counterparties | 32,896 | 35,917 |
| Agency Securities, available for sale, at fair value (including pledged securities of $13,253,117 and $13,832,482) | 13,669,810 | 14,648,178 |
| Receivable for unsettled sales (including pledged securities of $2,992,703 in 2014) | 3,002,570 | — |
| Derivatives, at fair value | 223,479 | 508,988 |
| Principal payments receivable | 487 | 70 |
| Accrued interest receivable | 44,436 | 42,034 |
| Prepaid and other assets | 1,345 | 852 |
| Total Assets | $ 17,517,812 | $ 15,732,517 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Repurchase agreements | $ 15,455,085 | $ 13,151,504 |
| Cash collateral posted by counterparties | 137,321 | 387,845 |
| Payable for unsettled purchases | — | 159,159 |
| Derivatives, at fair value | 76,429 | 102,795 |
| Accrued interest payable- repurchase agreements | 9,564 | 6,629 |
| Accounts payable and other accrued expenses | 3,413 | 23,357 |
| Total Liabilities | $ 15,681,812 | $ 13,831,289 |
| Commitments and contingencies (Note 9) | | |
| Stockholders' Equity: | | |
| Preferred stock, $0.001 par value, 50,000 shares authorized; | | |
| 8.250% Series A Cumulative Preferred Stock; 2,181 issued and outstanding ($54,514 aggregate liquidation preference) at September 30, 2014 and December 31, 2013 | 2 | 2 |
| 7.875% Series B Cumulative Preferred Stock; 5,650 issued and outstanding ($141,250 aggregate liquidation preference) at September 30, 2014 and December 31, 2013 | 6 | 6 |
| Common stock, $0.001 par value, 1,000,000 shares authorized, 357,275 and 357,613 shares issued and outstanding at September 30, 2014 and December 31, 2013 | 357 | 358 |
| Additional paid-in capital | 2,732,989 | 2,734,480 |
| Accumulated deficit | (852,126) | (643,138) |
| Accumulated other comprehensive loss | (45,228) | (190,480) |
| Total Stockholders' Equity | $ 1,836,000 | $ 1,901,228 |
| Total Liabilities and Stockholders' Equity | $ 17,517,812 | $ 15,732,517 |

See notes to condensed consolidated financial statements.

3

# Exhibit 32

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

☒      **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended September 30, 2014**
OR

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**JAVELIN MORTGAGE INVESTMENT CORP.**
(Exact name of registrant as specified in its charter)

| **Maryland** | **001-35673** | **45-5517523** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3001 Ocean Drive, Suite 201, Vero Beach, FL  32963**
(Address of principal executive offices)(zip code)

**(772) 617-4340**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  YES ☒   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  YES ☒   NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  YES ☐ NO ☒

The number of outstanding shares of the Registrant's common stock as of October 31, 2014 was 12,002,705.

**JAVELIN MORTGAGE INVESTMENT CORP. and Subsidiary**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share amounts)
(Unaudited)

## PART I. FINANCIAL INFORMATION

### Item 1. Financial Statements

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| Cash | $ 37,495 | $ 41,524 |
| Cash collateral posted to counterparties | 1,939 | 648 |
| Agency Securities, available for sale, at fair value (including pledged securities of $914,147 and $770,172) | 917,156 | 801,777 |
| Non-Agency Securities, trading, at fair value (including pledged securities of $168,701 and $143,080) | 168,701 | 143,399 |
| Linked Transactions, net, at fair value (including pledged securities of $118,721 and $140,945) | 12,571 | 16,322 |
| Receivable for unsettled sales (including pledged securities of $99,559 in 2014) | 102,163 | — |
| Derivatives, at fair value | 24,029 | 59,703 |
| Accrued interest receivable | 2,656 | 2,336 |
| Prepaid and other assets | 825 | 623 |
| Total Assets | $ 1,267,535 | $ 1,066,332 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Repurchase agreements | $ 1,091,000 | $ 839,405 |
| Cash collateral posted by counterparties | 20,911 | 53,314 |
| Accrued interest payable | 908 | 611 |
| Accounts payable and other accrued expenses | 453 | 1,722 |
| Total Liabilities | $ 1,113,272 | $ 895,052 |
| Commitments and Contingencies (Note 11) | | |
| Stockholders' Equity: | | |
| Preferred stock, $0.001 par value, 25,000 shares authorized, none issued and outstanding at September 30, 2014 and December 31, 2013 | — | — |
| Common stock, $0.001 par value, 250,000 shares authorized, 12,003 and 11,993 shares issued and outstanding at September 30, 2014 and December 31, 2013 | 12 | 12 |
| Additional paid-in capital | 244,083 | 243,951 |
| Accumulated deficit | (89,802) | (69,540) |
| Accumulated other comprehensive loss | (30) | (3,143) |
| Total Stockholders' Equity | $ 154,263 | $ 171,280 |
| Total Liabilities and Stockholders' Equity | $ 1,267,535 | $ 1,066,332 |

See notes to condensed consolidated financial statements.

3

# EXHIBIT 33

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 5/13/2014 8:06:38 PM |
| **To:** | Jim Mountain [jrm@armourllc.com] |
| **Subject:** | RE: SS&C inquiry |
| **Attachments:** | SS&C REIT Brochure 2014.pdf |

Jim,

Thanks for the background information and I appreciate you reaching out to us. Let me take this back with my team and I will get back to you shortly with the right personnel and suggestions for next steps.

In the meantime, the attached brochure will provide you with a more information on the technology and services we offer to publicly-traded mortgage REITs.

I look forward to continuing our conversations.

Regards,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com

---

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Tuesday, May 13, 2014 1:56 PM
**To:** Moore, Dennis
**Subject:** RE: SS&C inquiry

We manage the two mortgage REITs captioned below.  Would be interested in learning about all technologies/services that would potentially be applicable.  We probably have similar business requirements as some hedge funds or investment managers, with a couple of potential exceptions (1) SEC rather than individual investor reporting and (2) both accrual book basis reporting and tax-basis reporting are fairly important in addition to fair value.  See monthly company updates on the web sites for our specific portfolio characteristics.  When we started ARR, we did not use a "fund in a box" solution, but rather bootstrapped up using a variety of task-specific solutions from numerous different vendors plus in-house development.  Fundamentally, I am looking for better end-to-end integration for both improved efficiency and control.  Let me know when you have spent a little time figuring out who you need on your side and how they would like to focus the conversation to be most productive on first go around.  If that yields promising results, I may like to see some demos in New York towards the end of the month.

Thanks,

Jim

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
JAVELIN Mortgage Investment Corp.  (NYSE:  JMI)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell

CONFIDENTIAL

+1 561 348 2408  Fax
jrm@armourllc.com
www.armourreit.com
www.javelinreit.com

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Tuesday, May 13, 2014 12:46 PM
**To:** Jim Mountain
**Subject:** Re: SS&C inquiry

Hi James,

I'm one of the directors on SS&C's business development team. I would like to schedule a time for us to speak so I can learn a little more about what you might be looking for.

I am generally available the rest of the week if you want to suggest a date/time.

Regards,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com



SSC000010



**Don't Wonder.**
KNOW.

Anything.
Anytime.
Anywhere.



# Mortgage REIT Accounting and Financial Reporting Specialists

Leading the industry in meeting the accounting, reporting requirements and financial operations of Mortgage REITs.

SS&C provides publicly traded and non-traded mortgage REITs with solutions ranging from consulting on industry best practices to determining the optimal mix of software and services to complete operational and accounting services in support of your MBS and real estate investing activities.

SS&C's capabilities provide a mortgage REIT manager with complete flexibility when it comes to designing the optimal solution to support the specialized accounting and reporting requirements of a publicly traded mortgage REIT. SS&C's mortgage REIT specialists will work with you to identify all of the operational decisions that need to be made to enable you to effectively and accurately meet your accounting and reporting requirements.

Whether you are an established mortgage REIT or looking at the REIT structure as an attractive strategy, SS&C has the specialized knowledge and experience to support your operations. Our staff has extensive knowledge and experience meeting the needs of organizations that invest heavily in mortgage backed securities and structured products.

## SS&C offers a mortgage REIT

### 1. Optimization of your operating environment

SS&C has the operational technology and accounting expertise to provide our existing and prospective clients with a detailed assessment of their current operations to identify areas of inefficiency and opportunities for improvement. Assessments are conducted by experienced industry professionals and cover all aspects of your operations from trading to financial reporting.

### 2. MBS Specific Software Solutions

SS&C has developed a suite of market leading software solutions that address the specific operational and accounting requirements of mortgage REITs inclusive of:

- Fixed Income Trading and Collateral Management
- MBS Portfolio Management, Accounting and Reporting
- Forecasting, Portfolio Analysis and Risk Management

### 3. Operational Support Services

SS&C provides a mortgage REIT manager with a completely outsourced solution in support of your accounting and financial reporting requirements. Our services range from post-trade counterparty communications, trade settlement, valuation, collateral management, reconciliations and exception management, through to the generation of your financial reporting.

### SS&C Unique Strengths

- Highly experienced and knowledgeable staff
- Focused on providing accounting and reporting solutions
- 600+ accounting professionals
- Ownership of all technology used to support our offerings
- MBS and structured security systems and accounting expertise
- Ability to blend MBS specific technology and services into a comprehensive solution

### Clients include

- Mortgage REITs
- Institutional Asset Managers
- Real Estate Investment Firms
- Insurance Companies
- Alternative Investment Managers
- Financial Institutions

### SS&C Worldwide Headquarters
Windsor, Connecticut

### North American Offices
Boston, Chicago, Denver, Hartford, Los Angeles, Minneapolis, Montreal, New York City, Toronto, Yorktown Heights

### International Offices
Amsterdam, Cayman Islands, Curacao, Dublin, Hong Kong, Kuala Lumpur, London, Luxembourg, Mumbai, Sydney, Tokyo

**SS&C Auditors** PricewaterhouseCoopers, LLP

CONFIDENTIAL

# SS&C Mortgage REIT Solution Facts

Key differentiators of SS&C include our singular focus on providing accounting and reporting solutions to the financial services industry, flexibility in how our clients can deploy our solutions and significant expertise supporting firms that invest in complex financial instruments.

## Our Offering

### Operational Assessments

Assessments are conducted by experienced industry professionals and cover all aspects of your operations from trading to financial reporting inclusive of:

- Internal controls
  - Establishing processes and controls around the accounting for complex structured instruments
- Collateral management
- GAAP compliance
- REIT compliance
- SEC disclosures

### Mortgage REIT Specific Solutions

SS&C has developed a suite of market leading software solutions and services that address the specific operational and accounting requirements of mortgage REITs inclusive of:

### Fixed Income Trading and Collateral Management

Supports trading of MBS, CMOs and other complex structured products as well as repurchase agreements and derivatives

- Trade Capture and Broker communications
- Collateral assignment and management
- Daily collateral pricing and margin analysis
- Online collateral browser
- Automated Security Master File creation and maintenance

### MBS Portfolio Management, Accounting and Reporting

Portfolio management, investment accounting and reporting solution that streamlines and automates the processing of structured securities and repurchase agreements

- Online, real time updating of positions
- Calculation of amortization, accruals, realized and unrealized gains and losses
- Yield updates and earned income analysis
- Automated OTTI analysis
- Portfolio valuation
- Net Profit & Loss (Income vs. Financing Costs)

### Mortgage REIT and Public Company Accounting and Reporting Services

A comprehensive full service offering tailored to the specialized accounting and reporting needs of mortgage REITs.

- Accounting system and network administration
- Maintenance and execution of disaster recovery and business continuity plans
- Trade capture and collateral monitoring
- Investment transaction processing
- US GAAP accounting and reporting
- Impairment analysis and tracking
- Tracking of investment classifications for REIT compliance reporting
- Generation of G/L entries and supporting detail schedules
- Preparation of Financial Reports and related footnotes
- Broker / Custodian / Counterparty reconciliation and exception resolution
- Management of interfaces, extracts, and reporting
- Earned income reporting tracking each component of income and how it was derived
- Maintenance of market data
- Calculation and accrual of management fees

### Portfolio Management, Accounting and Reporting Expertise inclusive of:

### Mortgage REIT GAAP Accounting

- Amortization
  - ASC 835 – Interest Method
  - ASC 325 Effective Yield (EITF 99-20)
- ASC 310-30 Treatment of Loans and Debt Securities Acquired with Deteriorated Credit
- ASC 320 – Debt and Equity Securities
  - Held to Maturity
  - Available for Sale
  - Trading

### REIT Disclosures

- ASC 320
  - Cost, Fair Value, Net Premium/Discount, OTTI
  - Securities in a loss position
- ASC 315
- ASC 820
  - Level I, II, and III Investments
  - Level III Reconciliation

### Forecasting, Portfolio Analysis and Risk Management

Forecasting of cash flows over a user specified time horizon combined with the ability to identify, track and manage risk measures

### Forecasting

- Cash flow, income and fair market values
- Financing costs

### Analysis

- Asset Class, Maturity Distribution, Coupon Segmentation

### Risk Measures

- Stochastic and Historical Simulation
- Value at Risk
- Stress Testing
- Effective Duration, Convexity, KRD
- Sensitivities

### Technology and Infrastructure Capabilities

- Industry leading and proven technology platform covering all operational aspects in support of publicly traded mortgage REITs
- State of the art data center offering full Disaster Recovery and Business Continuity
- SSAE 16 Audited control environment

CONFIDENTIAL

## Web Portal

With our state-of-the-art reporting portal, you can get the information you need faster and easier. Key features include:

- Customizable intuitive desktop with market, holdings and relevant data
- Portfolio, Risk and income analyses
- Document Management
- Ad-hoc reporting

## Complete Flexibility investment management and accounting

Designed and configured to meet the diverse needs of your users- provide access to historical, online query capability or dashboard views, the portal can be configured to meet the specific needs of different types of users. To ensure consistency with your overall corporate identity, the portal can be branded and styled to meet the specific look and feel of your organization.

## Simple and Secure

Instantly access secure archived reports and documents – users gain instant access to all historical documents available in the document repository and you have complete control over the amount of history made available.







**With the SS&C 3.0 iPad and iPhone app,** you can manage everyday financial transactions on your iPad and iPhone quickly, easily and safely. Available for download at the iTunes App Store, the SS&C iPad application augments our fund administration platform with a mobile-optimized web portal for Apple's iPad and iPhone.

**Security** – You can be reassured that your privacy and security is protected with SS&C's online security.

**Access** – As long as you're currently a SS&C client, you can use your assigned client login and password to sign on to iPad or iPhone application.

**Convenience with voice commands** – With over 25 voice recognition phrases (and more to come) on your ipad or iphone application, you can easily summon reports and/or powerful graphics to get critical information instantaneously.

CONFIDENTIAL

## Deployment Options: One Size Doesn't Fit All

### License

- Installed/License
- Rental including annual maintenance
- Software upgrades available as part of the annual maintenance program and applied at the client's discretion

### Software as a Service (SaaS)

- Tailored to specific needs
- Monthly fees, AUM basis points model, inclusive of:
  - DR/BCP
  - Software upgrades rolled out to all clients as part of the monthly fee
  - Consulting daily rate

### ASP

- Tailored to specific needs
- DR/BCP included as part of the monthly fees
- Software upgrades rolled out to all clients as part of the monthly fee
- Implementation/Consulting daily rate

## SS&C Cloud Services. Anything. Anytime. Anywhere.



iPhone/iPad Apps/
Voice Recognition

Portals

Mobile Login

### Manage your assets.

Update and monitor investment activities on any device.

### SS&C Cloud stores it.

Your transactions and updates are stored in the Cloud.

### And pushes it to your devices.

Your changes automatically appear on your iPhone/iPad and PC.



**SS&C Technologies** | 80 Lamberton Road Windsor, CT 06095 USA
t: +1-800-234-0556  +1-860-298-4500   f: +1-860-298-4987   solution@sscinc.com   **www.ssctech.com**

© 2014 SS&C Technologies Holdings, Inc.

CONFIDENTIAL

# EXHIBIT 34



# Introduction to SS&C Technologies
Specialized Solutions for Publicly Traded Mortgage REITs



June 2, 2014

ACM0025350

# SS&C Business Overview



- Independent provider of **Software** and **Outsourcing Services** to the global financial services industry
- More than **6,000 clients** worldwide, including:
  - Mortgage REITs
  - Asset Managers
  - Insurance Companies
  - Alternative Investment Managers
  - Banks/Financial Institutions
- **Staff of 4,200+**
- Global Operations
  - North American Offices
    - Boston, Chicago, Denver, Los Angeles, Minneapolis, Montreal, New York City, Toronto, Windsor, CT, Yorktown Heights
  - International Offices
    - Amsterdam, Cayman Islands, Curacao, Dublin, Hong Kong, Kuala Lumpur, London, Luxembourg, Mumbai, Singapore, Sydney, Tokyo



1

ACM0025351

# Deployment Options



- **In-House License**
  - The CAMRA application is run in ARMOUR's data center

- **Hosting**
  - SS&C hosts the hardware and software in its Tier 3 data center
  - In addition to hosting, SS&C can also provide certain services in a SaaS model, including data gathering, reconciliation, etc.

- **Full Service Outsourcing**
  - SS&C provides comprehensive investment accounting and reporting services on an outsourced basis



2

ACM0025352

# REIT Solution Overview



- Accounting and reporting expertise
  - Accounting professionals with extensive Big 4 experience
  - Experience supporting the accounting and financial reporting needs of public companies

- Optimization of your operating environment
  - Process reviews
  - Process improvement recommendations
  - Staff augmentation

- Portfolio Management, Accounting and Reporting software solutions
  - MBS trading and collateral management
  - Portfolio management and accounting
  - Forecasting, analysis and risk management

- Operational support services
  - Ranging from post-trade communications through financial reporting



3

ACM0025353

# Expertise Supporting MBS



A large portion of our client base has a significant exposure to MBS

- REITs
  - Annaly / Chimera
  - Western Asset Mortgage Capital
  - Apollo Residential Mortgage Trust
  - CYS
  - Ares
  - New York Mortgage Trust
- Real Estate Investment Companies
  - Ladder Capital
  - Structured Portfolio Management
- Insurance Companies / Asset Managers
  - New York Life
  - TIAA / CREF
  - Liberty Mutual



4

ACM0025354

# CAMRA – Accounting Platform



- Portfolio Management & Accounting
  - Supports consolidated Book of Record
  - Power and flexibility to manage entire investment process
  - Proven accounting engine

- Over 500 clients worldwide with more than $2 trillion of assets

- Comprehensive MBS processing capabilities

- Robust audit and control tools

- Integrated web reporting





5

ACM0025355

# Investments Subledger

- ▣ Provides Trial Balance and Income Statement to be fed to Corporate GL

- ▣ Real-time generation of general journal entries

- ▣ Chart of Accounts by
  - — Basis
  - — Custodian
  - — Security Group
  - — Security Type

- ▣ Tracking of General Ledger balances to support Trial balance and Income statement





6

ACM0025356

# Cash Flow Elections



- Client controlled elections
  - PSA
  - CPR
  - Cash flow schedules
    - Principal only
    - Principal & Interest
    - Assignment of amortization window

- Automated generation of melded cash flows

- Multiple default levels

- Override at all levels include tax lot by accounting book



7

# Supported Methodologies / Guidance



- Interest Method
  - ASC 310-20 (as defined in ASC 835-30-35) (Formerly FAS 91)

- Retrospective Interest Method
  - ASC 320-10 (Formerly EITF 96-12)

- Effective Yield Method
  - ASC 325-40 (Formerly EITF 99-20)

- Treatment of Loans and Debt Securities Acquired with Deteriorated Credit Quality
  - ASC 310-30



8

ACM0025358

# Why SS&C



- Unique ability to leverage knowledge and expertise across organization
  - Development, licensed clients, outsourcing, professional services

- Highly skilled consulting
  - Process improvements / automation
  - Ability to provide tailored / customized solutions

- Relevant Mortgage REIT expertise and public company reporting

- Dedicated REIT Services team supporting technical accounting, regulatory and tax needs

- Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs

SS&C

9

ACM0025359

## With You Today



**J. Timothy Reilly, CPA** has served as SS&C's Senior Vice President, Institutional Solutions and Services since June 2013. Prior to joining SS&C, Mr. Reilly served in senior financial capacities at PwC for almost 28 years, serving in key roles in PwC's local, regional and national markets, most recently as a Market Leader in the PwC Hartford office. Mr. Reilly also has extensive financial management experience with various clients' organizations ranging from Fortune 500 to smaller entrepreneurial organizations. He is a graduate of Clarkson University, and is a Certified Public Accountant. In addition, Mr. Reilly has been recognized for his contribution to the technology community for his roles in a variety of technology related organizations.

Phone: 860-298-4828 | Email: TReilly@sscinc.com

**Josh Brown, CPA** is the leader of SS&C's REIT Servicing Group and the Senior Director of Accounting Policy and Regulatory Reporting. Previously, Mr. Brown was a senior manager in PwC's Northeast Insurance Services practice and has over 12 years of experience providing auditing and accounting advisory services to REITs as well as life insurance, health insurance and property and casualty insurance entities. He co-led the Northeast Market Leveraged Experienced program which was designed to bring subject matter expertise to the regional markets. He was also the national leader of PwC's insurance training program. He obtained his bachelor's and master's degrees from the University of Connecticut and is a Certified Public Accountant.

Phone: 860-731-5038 | Email: JBrown@sscinc.com

**Jeff Fecteau** is a Relationship Manager responsible for account management and sales for SS&C's REIT client base and has been with the company since 2000. He works in collaboration with SS&C's technology and services teams to develop solutions that are responsive to the needs of our REIT clients. He has worked extensively with organizations that invest in real estate assets and has experience developing solutions that support publicly traded and private REITs. Mr. Fecteau graduated from Marist College with a bachelor's degree in Accounting.

Phone: 860-731-5022 | Email: JFecteau@sscinc.com

**Dennis Moore** has served as a Sales Manager for SS&C Institutional Solutions and Services since March 2013. He has over five years' experience working with a broad range of financial institutions, including asset managers, REITS and specialty finance companies, insurance, banks and credit unions, on addressing their technology needs. He works with SS&C's software development and outsourcing teams to customize the right front, middle and back office solutions for our clients. Mr. Moore graduated Cum Laude from Elon University with a bachelor's degree in Communications.

Phone: 860-298-4763 | Email: Dennis.Moore@sscinc.com



10

ACM0025360

# EXHIBIT 35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ARMOUR CAPITAL MANAGEMENT LP,   :   No. 3:17CV790(JAM)
                                :
                 Plaintiff      :
                                :
         vs.                    :
                                :
SS&C TECHNOLOGIES, INC.,        :
                                :   New Haven, Connecticut
                 Defendant      :   September 29, 2017
                                :
- - - - - - - - - - - - - - - - x


TELEPHONIC DISCOVERY CONFERENCE


B E F O R E:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1  software and that has to be very specifically implemented

2  with particular businesses, it's to the extent that

3  there's peculiarities of businesses and different

4  businesses and multiple factors can make a difference in

5  terms of the problems that arise.  It's not so clear to

6  me, it's not self-evident that the fact that there's been

7  a problem with another customer means that there's also a

8  like problem with the parties in this case or that it

9  supports the claim of essentially a fraud or

10  misrepresentation.  So that's kind of the way I start

11  thinking about this.

12          I am convinced, for purposes of the document

13  requests, now that there should be a limitation.  The

14  parties have agreed on the time limitation over that

15  three-year period from 2014 to 2017.  And I also do think

16  at this time that there should be a limitation as to the

17  mortgage REITs.

18          And so I'm going to order the production as

19  suggested, with some modification, at the bottom of page 3

20  and 4 of Mr. O'Connor's letter, I'm going to require

21  production of a list of SS&C's REIT clients that used

22  CAMRA, licensed, hosted, or outsourced from May 1, 2014,

23  to May 1, 2017.  And secondly, I'll require the production

24  of non-technical documents concerning any or actual

25  threatened lawsuits.  And I understand that there may be

```
1    no documents responsive to that.  And I'll also order as

2    to those mortgage REIT customers any documents,

3    non-technical documents concerning any uncompleted

4    implementation during that time period in which the

5    uncompleted implementation was by reason of a claim by the

6    customer that CAMRA was not functioning or implementing as

7    anticipated by the customer.  So that's meant to exclude

8    the circumstances in which there might have been an

9    uncompleted implementation for reasons idiosyncratic to

10   the customer itself as opposed to a reason that's

11   attributable potentially to SS&C.

12             So that's the ruling on 19 and 20.

13             Let's turn, if we can, to the interrogatories at

14   this point.  And I'll hear from you, if I can,

15   Mr. Mamounas, on Number 3.

16             MR. MAMOUNAS:  Judge, before we move on, may I

17   ask a brief question?

18             THE COURT:  Yes.

19             MR. MAMOUNAS:  And that is whether Your Honor's

20   ruling is without prejudice to further development on the

21   record, including what we learn at the upcoming

22   depositions and also with these document requests.

23             THE COURT:  It is without prejudice.  As I made

24   clear, I think that you would be permitted to ask

25   questions at depositions that go within the broader scope
```

# EXHIBIT 36

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
ARMOUR CAPITAL MANAGEMENT LP,    :   No. 3:17CV790(JAM)
                                 :
              Plaintiff          :
                                 :
         v.                      :
                                 :
SS&C TECHNOLOGIES, INC.,         :
                                 :   New Haven, Connecticut
              Defendant          :   April 27, 2018
                                 :
- - - - - - - - - - - - - - - - x
```

TELEPHONIC DISCOVERY CONFERENCE

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

1   the last.

2                    MS. KERNISKY:  Thank you, Judge.

3                    This is not speculation.  We have SS&C's senior

4   vice president testifying that there was a conversation

5   with Fortress about hosting.  And we know that Fortress

6   ultimately did not choose hosting.  It might be that that

7   conversation has no bearing on our case; it might be that

8   it has huge bearing.  But under the discovery rules, under

9   Rule 26, we are entitled to find out what that

10  conversation was and to test whether or not it impacts the

11  representations that were made to us at the same time.

12                   MR. O'CONNOR:  Your Honor --

13                   THE COURT:  I'm done, thank you.  Thank you.  I

14  said that I just heard the last of it.

15                   So I'm going to rule at this time.

16                   I'm going to sustain the objection of SS&C to

17  the enforcement of the subpoena for documents and

18  testimony from Fortress substantially for the reasons set

19  forth in SS&C's papers.  I feel like I've been down this

20  road before with respect to the discovery that I was going

21  to allow with respect to Fortress and Resource.  I'm a

22  little surprised to see it coming back before me.

23                   And I believe that this lawsuit is about a

24  broken relationship between ARMOUR Capital and SS&C, and

25  it is not a lawsuit in which it privileges ARMOUR to

16

1    inquire into many other client relationships of SS&C

2    beyond what I've already allowed here, and I made my

3    determination about what's proportional in terms of what

4    is appropriate here with respect to discovery as to other

5    clients of SS&C.  And I don't find grounds to reconsider

6    that here.  I don't think there's anything new that I'm

7    hearing that causes me to reconsider that, so I'm

8    sustaining the objection to that.

9            All right.  So thank you all for calling in.

10           Is there anything else to take up at this time?

11           MS. KERNISKY:  No, Your Honor.  Thank you.

12           THE COURT:  Thank you all for calling.  Take

13   care.

14               (Proceedings adjourned at 10:20 a.m.)

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 37

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 6/19/2014 2:37:24 PM |
| **To:** | Jim Mountain [jrm@armourllc.com]; Mark Gruber [mrg@armourllc.com] |
| **Subject:** | RE: SS&C inquiry |
| **Attachments:** | SS&C CAMRA Modules & Systems_ARMOUR_6.19.14.pdf |

Jim & Mark,

Attached please find a consolidated document that will provide you with a high-level overview of each of the CAMRA modules as well as some additional systems we think would be relevant to ARMOUR.

Not all of the modules and systems need to be implemented on Day 1, but this should give you a good flavor of what's available to you.

If you have questions or would like clarification on any of the modules/systems, we would be happy to set up a call.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Mark Gruber [mailto:mrg@armourllc.com]
**Sent:** Monday, June 16, 2014 1:33 PM
**To:** Moore, Dennis; Jim Mountain
**Subject:** RE: SS&C inquiry

Dennis,

Attached is a list of assets and data for the POC. When you are ready to begin, please give me a call and we can walk through the data to make sure we have everything you need and provided the correct data.

Mark Gruber, CFA
Chief Operating Officer & Head of Portfolio Management

ARMOUR Residential Management, LLC
ARMOUR Residential REIT, Inc
JAVELIN Mortgage Investment Corporation

3001 Ocean Drive, Suite 201, Vero Beach, FL 32963
*Office* 772-617-4340  *Fax* 561-348-2408  mrg@armourllc.com

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 13, 2014 2:23 PM
**To:** Jim Mountain
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

SSC000405

Jim,

For the Proof of Concept we discussed on our call last Friday, we wanted to put together a list of data elements for each of the securities you would like us to run through the CAMRA system. In our experience, what has worked best is a sampling of approximately 10-15 unique securities and a POC period of 1 quarter's worth of activity.

For each trade please provide:
- CUSIP
- Original trade and settle dates
- Original cost
- Original face
- Current factor (as of beginning date for the POC)
- Current face (as of beginning date for the POC)
- Accrued interest
- Book value as of POC begin date
- Book yield as of POC begin date
- Either a prepayment speed or schedule of cash flows for the POC begin date and any updates to the cash flows or speeds you would like us to use during the POC period
- Trade details for any subsequent buys or sells that you would like us to process during the period
- Any impairments that were recorded during the period

We would be happy to schedule a follow-up call to further discuss any of the data elements we're looking for as well as expectations for the POC if you would like.

Have a great weekend.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763 ┊ m: (860) 214-9580
dennis.moore@sscinc.com ┊ www.sscinc.com

---

**From:** Moore, Dennis
**Sent:** Monday, June 09, 2014 4:36 PM
**To:** 'Jim Mountain'; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Attached please find a copy of the fully executed NDA.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763 ┊ m: (860) 214-9580
dennis.moore@sscinc.com ┊ www.sscinc.com

CONFIDENTIAL

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, June 06, 2014 4:08 PM
**To:** Moore, Dennis; Mark Gruber
**Subject:** RE: SS&C inquiry


**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 6, 2014 3:48 PM
**To:** Jim Mountain; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Attached is the mutual NDA. Once executed, please return to me for countersignature and then I will provide you with a completed copy for your records.

Let me know if you have any questions.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763   |   m: (860) 214-9580
dennis.moore@sscinc.com   |   www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, June 06, 2014 11:24 AM
**To:** Moore, Dennis; Mark Gruber
**Subject:** RE: SS&C inquiry

OK by us

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 6, 2014 11:23 AM
**To:** Jim Mountain; Mark Gruber
**Subject:** Re: SS&C inquiry

Jim,

How about 3:00pm today? I can send out a calendar invite with a dial-in number shortly.
Dennis


**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Thursday, June 05, 2014 11:50 AM
**To:** Moore, Dennis; Mark Gruber <mrg@armourllc.com>
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

SSC000407

Thank you for the excellent meeting on Monday. We have regrouped internally and continue to be very interested in CAMRA and would like to explore more about it and how we would be able to integrate it in to our operations. Early afternoon Friday would work for us.

Thanks,

Jim

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Wednesday, June 4, 2014 6:00 PM
**To:** Jim Mountain; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim & Mark,

Thank you again taking the time to meet with us in our offices this past Monday. I think there was a lot of good information exchanged, and I hope you found the meeting helpful. Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for ARMOUR and I just wanted to reaffirm our interest in partnering with you.

I know you were interested in receiving an estimated fee range from us, so what we would like to do is schedule a follow-up call for this Friday. We can use this time to share with you the estimated fee range, what that entails, as well as what we view as potential next steps.

Please let me know when you are available Friday and we will do our best to work around your schedule.

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763 | m: (860) 214-9580
dennis.moore@sscinc.com | www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Monday, June 02, 2014 1:00 PM
**To:** Moore, Dennis
**Cc:** Amber Luedke; Trevor Spicer; Jonna K. Terry
**Subject:** Re: SS&C inquiry

Amber is our Chief Accounting Officer
Trevor is our IT Director and
Jonna is Senior Investment Accountant
James R Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive
Vero Beach, FL 32963
jrm@armourllc.com
Office 772-617-4340

CONFIDENTIAL

Cell 862-215-1850
Fax 561-348-2408

---

**From:** "Moore, Dennis" <Dennis.Moore@sscinc.com>
**Date:** Mon, 2 Jun 2014 15:06:52 +0000
**To:** 'jrm@armourllc.com'<jrm@armourllc.com>
**Subject:** Re: SS&C inquiry

Jim,

Do you have a list of names/titles of the folks that will be dialing into the WebEx for the demo?

Dennis

---

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, May 30, 2014 04:36 PM
**To:** Moore, Dennis
**Subject:** Re: SS&C inquiry

Don't need to for us. Mark and I will likely have eaten when we get to your place. Thank you for the offer, however.

Jim
James R Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive
Vero Beach, FL 32963
jrm@armourllc.com
Office 772-617-4340
Cell 862-215-1850
Fax 561-348-2408

---

**From:** "Moore, Dennis" <Dennis.Moore@sscinc.com>
**Date:** Fri, 30 May 2014 20:04:44 +0000
**To:** 'Jim Mountain'<jrm@armourllc.com>
**Subject:** RE: SS&C inquiry

Jim, would you like us to have lunch brought in on Monday?

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

---

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, May 30, 2014 2:10 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

Very good.  Thanks.  Are there webex details that we can provide to others on our side to join the high level demo remotely?

See you on Monday afternoon.

Jim

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
JAVELIN Mortgage Investment Corp.  (NYSE:  JMI)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell
+1 561 348 2408  Fax
jrm@armourllc.com
www.armourreit.com
www.javelinreit.com

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, May 30, 2014 1:54 PM
**To:** Jim Mountain
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

Jim,

I was able to secure Mike Doyle to provide a high-level demo of the CAMRA application towards the end of our discussion on Monday at 3PM. Mike was on the introductory call last Tuesday and is VP Business Solutions for our institutional clients.

Also, attached are responses and supporting documentation for Trevor's IT/System related questions. To the extent you have any questions or would like us to walk through anything with you, we would be happy to set up a call.

Have a great weekend and safe travels.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Wednesday, May 28, 2014 4:16 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

I am fine with spending 1:30 to 3:00 as you suggest. I would like to get a peek at the technology and operational capacity of the system while Mark and I are up there Monday afternoon. So we can stay on for a while after 3 to make it a double header.

I will try to get Trevor to formulate the technical systems questions that he had in mind and forward to you Thursday afternoon.

See you Monday.

Jim

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Tuesday, May 27, 2014 4:03 PM
**To:** Jim Mountain
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Thanks for the update. I will send you a calendar invite for 1:30-3:00pm and include the address for our midtown Manhattan office. We are located on 675 Third Ave (corner of 42nd street). I have already checked you in at security, so all you will have to do is tell security you're here to meet with SS&C on the 17th floor. We would also be happy to have lunch ordered in if you'd like.

As a follow-up to our initial call last week, I think the most effective structure for Monday's meeting will be an executive-level discussion. On my end, I have gotten together a great representation of our REIT expertise. This includes Tim Reilly, CPA, SVP of SS&C's Institutional Solutions and Services, and former partner at PwC for 17 years; Josh Brown, CPA, Head of SS&C's REIT Services group and Senior Director of Accounting Policy & Regulatory Reporting; and Jeff Fecteau, Relationship Manager for SS&C's REIT clients. They will be able to further discuss what we're doing for other REIT clients, what we're seeing in the market place, etc.

As far as the IT discussion and a high-level intro demo of the system, these are two items we could handle through a separate call/WebEx before or after the June 2nd meeting. We can then lay out a plan where we can come on-site and do a deeper dive demonstration of the system with more ARMOUR team members involved.

Thoughts or feedback on the above items?

Thanks,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Tuesday, May 27, 2014 3:21 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

SSC000411

Mark should be able to get in and drop his bag at the hotel in time to be at your place by 1:30. Please confirm your Manhattan address and any tricks on getting checked in at security

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Tuesday, May 27, 2014 8:55 AM
**To:** Jim Mountain
**Subject:** RE: SS&C inquiry

Jim,

I hope you had a nice long weekend. Specific to the IT-related questions you said Trevor had, would Trevor be able to provide me with a list of at least some of those IT questions? I want to make sure I have the right technical resource on my end. I was thinking we could hold an IT discussion on a separate call, either before or after our meeting on June 2nd.

Please let me know your thoughts on this as well as if there has been any progress on Mark's travel plans so we can lock in a time for next Monday.

Thanks,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Wednesday, May 21, 2014 4:59 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

Mark might be able to get to New York in time for an afternoon meeting on Monday.  Will advise when we get settled.

CONFIDENTIAL

# EXHIBIT 38





# Overview of CAMRA Modules and Additional Systems

June 19, 2014



**SS&C Technologies**  |  80 Lamberton Road, Windsor, CT 06095  |  **www.ssctech.com**

SSC000413

# The Core CAMRA Application

SS&C's CAMRA system is a global multi-currency, multi-basis portfolio management, investment accounting and reporting solution that supports the entire investment management lifecycle, including trade capture, portfolio management, securities operations, financial accounting, reporting, and more. CAMRA supports a wide variety of asset types, with an emphasis on complex structured products, such as agency and non-agency mortgage backed securities. CAMRA is supported by Microsoft's SQL Server platform.

## Modules:

ARMOUR will have the flexibility to choose the combination of CAMRA modules below that best meet your business needs:

### Custodian Interface Manager

More advanced and user-friendly than a standard custody interface, CI Manager compares and updates the CAMRA database for cash items that reconcile between your custodian(s) and CAMRA. This tool generates automatic reconciliation for income, principal, settlements, maturities, and holdings transactions which greatly adds to your operational efficiency. With CI Manager installed and integrated with the CAMRA solution suite, it will promote an automated exception-based workflow that will significantly decrease the number of errors encountered between your book of record and custodian(s).

### Report Express

Report Express provides a menu-based, parameter driven approach to report generation that will significantly enhance and simplify your reporting. A single report template can be designed to meet the needs of many, simply by changing the parameters that are selected via the sort and selection "wizard". SS&C delivers and maintains in excess of 30 standard templates that the client is free to use "as-is" or to customize as necessary. The template approach, combined with a completely documented data dictionary, greatly shortens the learning curve and empowers our clients with reporting expertise in an efficient manner. A built-in collating function will organize reports for printing based on Account and Portfolio selections, adding even more efficiency to your internal reporting process.

### TBA Dollar Roll

CAMRA's integrated TBA processing capabilities provide for the straight-through processing of TBA investing activities from entering the commitment all the way to the delivery of and even substitution of the various pools.

The CAMRA TBA Dollar Roll module supports these investments with the following processing tasks:
- Enter the Commitment – this step establishes the delivery rules that will need to be satisfied by the various pools. Commitments are considered pending until they are posted to the General Ledger.
- Allocate the Pools – after the commitment has been entered, pools that satisfy the



SSC000414

delivery rules are entered. Allocations can be made, accepted, and edited up until the transaction has been posted.
- Post the Commitment – this enters the transaction in the General Ledger.
- Close the Commitment – a commitment is considered closed after the pools have been announced and settled. The system checks to make sure that the pools announced satisfy the rules assigned to the commitment.

## Impairments Manager

CAMRA's Impairments Manager will manage and automate the resource intensive tasks of data collection, analysis, present value calculations, and processing of your impairments. A centralized user interface will enable the user to work with a large quantity of data in an efficient manner.

## Intex Data Wizard

The Intex Data Wizard provides a direct connection and automated download of Intex data files and cash flows, and automatically updates the CAMRA system. The Data Wizard also enables users to validate information online prior to updating the CAMRA database.

## Cross Check

Cross Check is an automated process that runs against the CAMRA database to validate a broad range of data elements, and present exceptions of records that are inaccurate, incomplete, or inconsistent with other records. Cross Check provides:
- An independent non-invasive "on-demand" audit of your business and financial data in CAMRA
- Consolidates multiple CAMRA audit / data analysis reports into a single engine to retrieve and analyze information stored in CAMRA
- Universe of 700 + audits to choose from
- Tool set to build your own custom audits.

## Extend

Extend allows for the addition of user defined fields to various tables throughout the CAMRA system. For example, the use of Extend will enable your firm to track specific security master fields within the application, thereby eliminating the need to "add" this information outside of the system which will allow for the creation of management and financial reporting by your desired breakouts directly from within CAMRA.

## SS&C Connector

The SS&C Connector module provides a seamless interface to the Bloomberg Asset and Investment Manager (AIM) system. Trades entered in AIM are sent to the SS&C Connector using the Bloomberg Gateway and then uploaded into CAMRA. In addition, the module can provide users with the ability to produce or accept daily prices, positions and changes to existing Security Master information. The SS&C Connector module incorporates the following features:
- Online exchange of Trading and Security Master information between Bloomberg and CAMRA.



CONFIDENTIAL

SSC000415

- Automated CAMRA Portfolio creation in Bloomberg.
- Automated receipt of daily balance information from Bloomberg for reconciliation to CAMRA.
- Automated exchange of pricing information for use with the Bloomberg analytics calculators.
- Automated acceptance of Bloomberg prices for pricing of CAMRA securities. This is done using Bloomberg pricing or a designated pricing vendor who supplies their pricing to the Bloomberg network.
- Online exchange and creation of Security Master information when a trade involving a new security is executed using Bloomberg AIM.
- Automated issuer creation for security master setup.
- Automated cancel and correct processing.

## NAV

The NAV module calculates asset values for single or multi-class accounts. By taking current pricing, the market value per unit is translated into holding values. Trading, accounting, analytics, and other CAMRA functions and modules are integrated. NAV features include:

Valuation/Accounting:
- Internal pricing update of NAV per share
- Flexible valuation frequency options
- Interest smoothing
- Multi-class fund accounting, including:
  - Class GAV calculation
  - Separate class expense schedules and accruals
  - Class NAV and NAVPS
- Integration of projected tax withholding and reclaims

Expense Accruals:
- Fixed and variable expense accrual and reporting
- Choice of three separate day count conventions for expense accruals
- Choice of direct or proportional expense allocations to portfolios
- Distributions, withdrawals, and other cash flows
- Automated expense payment processing

Processing:
- Integration of captive fund processing with investor accounts
- Internal calculation and allocation of lot level value, income, gain and loss for investor accounts
- Bid /offer processing capabilities
- Net Asset Value (NAV) and Net Asset Value Per Share (NAVPS)
- Importing of fund share transactions



CONFIDENTIAL

## Additional Systems:

Based on our preliminary understanding of ARMOUR and experience working with similar REIT clients, we feel the additional systems described below may be relevant to your firm:

### Debt & Derivatives

SS&C Debt & Derivatives ("D&D") is a specialized derivatives application designed to manage, account for and value OTC and debt instruments. D&D reports full accounting information (year to date, month to date, quarter to date, life to date, etc.) for realized, unrealized, cash, and mark to market. D&D handles Swaps, Credit Default Swaps, Caps, Floors, Collars, Forward Rate Agreements, FX Spots / Forwards / Options, Futures, Options on Futures, Equity and Variance Swaps, and OTC Equity Index Options.

Capabilities include:
- Deal pricing
- Portfolio mark-to-market
- Interest accrual and payment process
- Hedge accounting
- Statutory reporting
- Risk analysis

### TradeDesk

SS&C TradeDesk is an online, real-time trade capture, repo processing and collateral management solution. TradeDesk supports trading for agency and non-agency MBS, CMOs and Repos, offering complete exposure reporting and flexible collateral management functions. TradeDesk's workflow allows for a single point of entry from which all necessary reviews, including any external interfaces, can be performed using our extensive routing slip and workflow functionality. Each stop along the workflow path is electronically time stamped for audit purposes.

By implementing TradeDesk along with CAMRA, SS&C's clients have been able to realize the following workflow improvements:
- Elimination of paper tickets and an inefficient, error prone and manual process with multiple points of input
- Automated workflow routes executed trades to the appropriate resource for review and approval throughout the day
  - Traders must enter trades as executed
  - Moves trade capture/routing to SS&C from an end-of-day task to something that can be accomplished throughout the day
- Automated cancel/correct functionality
  - Workflow can be revised to have executed trades automatically flow to CAMRA
  - Any discrepancies identified in the confirmation can be processed as an automated cancel/correct
- Confirmed trades automatically routed to queue for upload to CAMRA
  - Exports can be scheduled periodically throughout the day or at end-of-day

5   CONFIDENTIAL. Do Not Distribute.



Repo Processing and Collateral Management:
- Online collateral sources as well as spreadsheets
- Designate special collateral (reserved) vs. general collateral pool
- Collateral re-pricing and margin analysis
- Integrated pledging capabilities
- Auto allocation of collateral with customer preferences
- Online collateral browser with drag-and-drop integration to trade ticket for street repos

## Reconciliation & Exception Management

SS&C Recon is a scalable, enterprise-wide reconciliation solution designed to retrieve, capture, validate, match and reconcile data between any parties. Recon automates and streamlines workflow to control the reconciliation process and improve operational efficiency. Management oversight and reconciliation reporting provides full visibility into cash, holdings, transactions, trial balances and security masters, enabling you to focus on critical exceptions.

Recon includes dashboards and audit trails, allowing management to review summaries of breaks by portfolio, group, date, age, and many other attributes. Recon has the tools to conduct auto exception routing, achieve ownership and assignment of breaks, control management escalation, and audit/report the entire cycle.

Capabilities include:
- Assign breaks to appropriate team members for rapid resolution
- Provide sophisticated investigative tools to resolve issues
- Send breaks via email to third parties for further investigation
- Automatically update your system of record once issues are resolved
- Highlight the status of critical exceptions improving risk management
- Centralize all reconciliations to standardize the business process and ensure consistency
- Streamline the delivery and presentation of information to management
- Audit accountability and signoff within the application

## Loan Management

SS&C's Loan Management System ("LMS") is a comprehensive and flexible loan management solution. The integrated design of LMS eliminates inefficient, disparate systems and delivers immediate, accurate information across your loan operations. The logical, user-friendly workflow provides intuitive processing throughout all phases of the loan life cycle.



CONFIDENTIAL

SSC000418

# EXHIBIT 39



Don't Wonder.
KNOW.

## With You Today

**J. Timothy Reilly, CPA, Senior Vice President, Institutional Solutions and Services**
Tim Reilly has served as SS&C's Senior Vice President, Institutional Solutions and Services since June 2013. Prior to joining SS&C, Mr. Reilly served in senior financial capacities at PwC for almost 28 years, serving in key roles in PwC's local, regional and national markets, most recently as a Market Leader in the PwC Hartford office. Mr. Reilly also has extensive financial management experience with various clients' organizations, ranging from Fortune 500 to smaller entrepreneurial organizations. He is a graduate of Clarkson University, and is a Certified Public Accountant. In addition, Mr. Reilly has been recognized for his contribution to the technology community for his roles in a variety of technology related organizations.

Phone: 860-298-4828 | Email: treilly@sscinc.com

**Josh Brown, CPA, Senior Director, Accounting Policy and Regulatory Reporting**
Mr. Brown joined SS&C in 2013 and heads SS&C's Accounting Policy and Regulatory Reporting group in addition to being the leader of SS&C's REIT Solutions and Services Team. Previously, Mr. Brown was a senior manager in PwC's Northeast Insurance Services practice and has over 12 years of experience providing auditing and accounting advisory services to life insurance, health insurance and property and casualty insurance entities, ranging from multi-national to private insurance companies on both a GAAP and statutory basis. He co-led the Northeast Market Leveraged Experienced program which was designed to bring subject matter expertise to the regional markets. He was also the national leader of PwC's insurance training program. He obtained his undergraduate and master's degrees from the University of Connecticut.

Phone: 860-731-5038 | Email: jbrown@sscinc.com

**Michael Doyle, Vice President, Business Solutions and Support**
Mr. Doyle is involved in the development, design and marketing of CAMRA, SS&C's Portfolio Accounting system. He engineers the integration of a number of SS&C applications with CAMRA including derivatives processing, reporting, reconciliation and performance measurement. Mr. Doyle works in collaboration with the SS&C Sales Group, involved in the qualification and strategic pursuit of CAMRA sales. Prior to joining SS&C, Mr. Doyle worked for the Securities Accounting and Information Technology groups at Travelers.

Phone: 860-298-4666 | Email: mdoyle@sscinc.com

**Shiv Sivadas, Director, Professional Services**
Shiv Sivadas is a Director within SS&C's Professional Services team and has been with the company for 19 years. Mr. Sivadas works with insurance companies, REITs, hedge funds and asset managers, helping implement SS&C solutions and services, with a focus on CAMRA. He also has extensive experience with client implementations, training, sales support, and business process reviews for new and existing clients. Mr. Sivadas has a master's degree in Business Administration from the University of Hartford.

Phone: 860-298-4521 | Email: ssivadas@sscinc.com

**Jeff Fecteau, Relationship Manager**
Jeff Fecteau is a Relationship Manager responsible for account management and sales for SS&C's REIT client base, and has been with the company since 2000. He works in collaboration with SS&C's technology and services teams to develop solutions that are responsive to the needs of our REIT clients. He has worked extensively with organizations that invest in real estate assets and has experience developing solutions that support publicly traded and private REITs. Mr. Fecteau graduated from Marist College with a bachelor's degree in Accounting.

Phone: 860-731-5022 | Email: jfecteau@sscinc.com

**Dennis Moore, Institutional Sales Manager**
Dennis Moore has served as a Sales Manager for SS&C since March 2013. He has over five years' experience working with a broad range of investment managers and financial institutions, including hedge funds, private equity firms, REITs, wealth managers, banks and credit unions. He works with SS&C's software development and investment operations teams to customize the right front, middle and back office solutions for our clients. Mr. Moore graduated Cum Laude from Elon University with a bachelor's degree in Communications.

Phone: 860-298-4763 | Email: dennis.moore@sscinc.com

SS&C Technologies    80 Lamberton Road, Windsor, CT 06095    www.ssctech.com

# EXHIBIT 40

Message

| | |
|---|---|
| **From:** | Sivadas, Shiv [SSivadas@sscinc.com] |
| **Sent:** | 9/22/2015 7:26:55 PM |
| **To:** | Tetreault, Paul [PTetreau@sscinc.com]; Rice, Scott [srice@sscinc.com] |
| **Subject:** | RE: Armour Contact |

Sorry Paul, I'm not involved with Armour.

Thanks,
Shiv.

**From:** Tetreault, Paul
**Sent:** Tuesday, September 22, 2015 3:22 PM
**To:** Rice, Scott; Sivadas, Shiv
**Subject:** Armour Contact

Do either of you have someone at Armour I can contact regarding a billing issue?
Or a name and number that will get me started?

Thanks,

*Paul*

*Paul Tetreault, CPA*
**Senior Director** | **SS&C Institutional Outsourcing**



**SS&C Technologies, Inc.**
80 Lamberton Road
Windsor, CT 06095
tel: 860-298-4741
cell: 860-938-0479
fax: 860-298-4972
ptetreau@sscinc.com
www.ssctech.com

**Don't Wonder.** | Anything.
KNOW.          | Anytime.
               | Anywhere.

CONFIDENTIAL

# EXHIBIT 41

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 9/10/2014 5:35:09 PM |
| **To:** | Jim Mountain [jrm@armourllc.com]; Mark Gruber (mrg@armourllc.com) [mrg@armourllc.com] |
| **Subject:** | Summary of SS&C hosting services |

Jim & Mark,

Yesterday, our VP of Data Center Services and I had a good conversation with Trevor and Cory about our hosting services. Based on the feedback from Trevor and Cory, it sounded like hosting the CAMRA application in SS&C's data center would really be a good deployment option for ARMOUR.

Here is a brief recap of key points discussed:
- Having SS&C manage your disaster recovery, database back-up and data retention significantly decreases your risk, especially in the event of a disaster
- Creates a hassle-free environment with faster, simpler data processing and upgrade processes
- Offers a more agile, pay as your grow operating expense consumption model (versus capital expense)
- We have modern, state of the art data center facilities with the flexibility to adapt quickly to scalability needs and growth with your business
- Hosting the application sets the foundation for SS&C to automate additional processes like data gathering, overnight processing, 3rd party interface management, automated reconciliation, etc.

*For example:*
o    Import trades from ARMOUR, AVM, etc.
o    Import market and pricing data from Bloomberg, IDC, Intex, etc.
o    Import positions and transactions from custodians Citi, BONY, etc. (we support unlimited custodians)
o    Import and Export data required for BlackRock analytics

We will include Application Hosting fees in the summary pricing document we are currently preparing for you. In the meantime, please let me know if you have any questions.

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763   m: (860) 214-9580
dennis.moore@sscinc.com   www.sscinc.com

CONFIDENTIAL

SSC000829

# EXHIBIT 42

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 11/13/2014 10:15:43 PM |
| **To:** | Reilly, Timothy [treilly@sscinc.com]; Quinn, Jack [JQuinn@sscinc.com] |
| **Subject:** | FW: SS&C Proposal for ARMOUR |
| **Attachments:** | SS&C Solution Proposal_ARMOUR_11.13.14v1.pdf; SS&C Securities and Derivatives Pricing Services_11.13.14v1.pdf |

Sent.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

---

**From:** Moore, Dennis
**Sent:** Thursday, November 13, 2014 5:15 PM
**To:** Jim Mountain; Mark Gruber; 'Jonna Terry'
**Cc:** Fecteau, Jeff
**Subject:** RE: SS&C Proposal for ARMOUR

Jim, Mark & Jonna,

Attached please find SS&C's solution proposal for ARMOUR, which includes both software and operational support services.  We have attempted to tailor the services in a manner that will allow you to easily compare our proposed services to what AVM is currently providing and make an informed decision on where these are most effectively handled.

We are open to discussions regarding the expansion or contraction of any operational support services contained in our proposal.  We have also prepared a separate document that contains a cost analysis using SS&C's negotiated pricing schedule with IDC for you to compare against your current arrangement to determine if cost savings can be realized through transitioning this to SS&C as well.

From our initial conversations, we learned you were looking for the following:
•   Software that is easy to use and can support all of your asset types
•   Better integration for improved efficiency and control
•   Timely and accurate accounting and reporting
•   Leverage automation to achieve exception-based processing
•   Operational support to streamline key processes and the management of data
•   A strategic partner that can offer institutional-caliber solutions, access to expertise, and flexibility as your business grows and evolves

We appreciate the time you have taken over these past months to educate us on your business and operations, which has only helped us develop a more tailored solution and proposal for you. We understand our assumptions may not be 100% correct and also that you may have questions.

Our recommendation would be to schedule a call for Friday or Monday to walk through the proposal and address any questions you might have.  As part of this call we would also like to introduce you to our Professional Services team and to give them an opportunity to provide an overview of the transition services we would provide to ARMOUR.

We look forward to your feedback and the opportunity to prove ourselves as the best possible partner for ensuring your success with this initiative.

CONFIDENTIAL

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jonna Terry [mailto:jkt@armourllc.com]
**Sent:** Friday, November 07, 2014 1:00 PM
**To:** Moore, Dennis; Fecteau, Jeff
**Cc:** Jim Mountain; Mark Gruber
**Subject:** ARMOUR / JAVELIN requested information

We appreciate you taking the time for the very informative call this morning.  Per your request, you will find a spreadsheet containing our Cusip and  Interest Rate Swap information, the completed contract as well as the organizational chart.   Below are the list of contracts that we currently have for our pricing services.

Contracts:
IDC
Bloomberg Data License
Bloomberg BVAL - Derivatives
Bloomberg BVAL - MBS

Please let us know if you need any other information.

Thank you,

Jonna Terry
ARMOUR Residential Management, LLC
Senior Investment Accountant
3001 Ocean Dr. Ste 201
Vero Beach, FL 32963
Office:  772-617-4340
Fax: 561-348-2408

CONFIDENTIAL





# Comprehensive Mortgage REIT Software and Operational Support Services Proposal

ARMOUR Residential Management LLC

**Date Prepared:** November 13, 2014



Dennis Moore
d: 860-298-4763
m: 860-214-9580
dennis.moore@sscinc.com

Jeff Fecteau
d: 860-731-5022
m: 860-729-5862
jfecteau@sscinc.com

**SS&C Technologies** | 80 Lamberton Road, Windsor, CT 06095 | **www.ssctech.com**

CONFIDENTIAL



November 13, 2014

Mr. James R. Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive, Suite 201
Vero Beach, FL 32963

Dear Jim:

SS&C Technologies, Inc. ("SS&C") strives to partner with its clients and looks forward to establishing a long, trusted relationship with ARMOUR Residential Management LLC ("ARMOUR").

As a public company, we understand the importance of providing transparency and timely, accurate information to our stakeholders and clients. A significant portion of our client base is also publicly traded entities, and our accounting and operations professionals have extensive experience supporting the financial reporting requirements of organizations such as ARMOUR.

SS&C is very focused on the mortgage REIT space, with a substantial client base of publicly-traded mortgage REITs, which continues to grow, in addition to several large, complex clients invested in the same asset classes as ARMOUR.

Over the past 27 years, SS&C has built an extensive portfolio of products and services centered on a transparent, well-architected, scalable and efficient technology infrastructure. We also continue to hire expertise in the areas of accounting policy, tax and financial reporting, and enable clients to leverage our resources as an extension of their staff.

SS&C's solution for ARMOUR is flexible and the form of our relationship can change over time. This flexibility will enable ARMOUR to take on more processes internally or leverage more of our operational support services at the right time.

We appreciate your time and consideration through the due diligence process and are confident SS&C is the best equipped organization to provide comprehensive mortgage REIT software and operational support services to strengthen your investment operations.

Let me close by reiterating that we would be honored to be your business partner and look forward to the opportunity to earn your business.

Sincerely,

J. Timothy Reilly
Senior Vice President
Institutional and Investment Management

**SS&C Technologies** | 80 Lamberton Road, Windsor, CT 06095 | **www.ssctech.com**

CONFIDENTIAL



## Table of Contents

| | |
|---|---|
| **Introduction** | 3 |
| **SS&C Company Background** | 4 |
| **ARMOUR Overview and Assumptions** | 5 |
| **Proposed Solution Overview** | 6 |
| **Fee Schedule** | 10 |

CONFIDENTIAL

SSC002419



## Introduction

SS&C is pleased to provide our mortgage REIT solution overview and pricing proposal to ARMOUR as part of our continued dialogue regarding a partnership between our organizations in support of your investment accounting and reporting requirements.

In addition to industry leading software that is robust in functionality, easy to use and provides an automated straight-through-processing environment, SS&C's proposed solution offers the following advantages:

- Highly automated, world-class operating environment tailored to your requirements.
- Access to SS&C mortgage REIT investment operations expertise.
- A partner with a reputation for transparent and independent services backed by a SSAE16 certification.
- Access to our investment accounting expertise, including technical accounting resources, industry best practices and emerging issues.
- A commitment to technology advances and a significant reinvestment in R&D.

CONFIDENTIAL



## SS&C Company Background

SS&C was founded in 1986 and is headquartered in Windsor, CT. The same management team that helped to build SS&C remains closely involved in the direction and success of the organization, including its Chairman and CEO, Bill Stone.

SS&C is a public, NASDAQ-listed company (Ticker: SSNC) that continues to demonstrate its financial strength through consistent revenue and earnings growth. Revenues in 2013 were $712 million, up 29 percent from 2012, and are projected to reach $775 million in 2014. Nearly 15 percent of the company's annual revenue is reinvested into the development of its products, processes and personnel.

SS&C leverages its technology to deliver superior solutions to REITs, institutional asset managers, insurance companies, hedge funds, private equity funds and hybrid structures worldwide. Exposure to such a diverse client base has provided SS&C personnel with deep expertise and experience with a broad range of asset classes, investment types, fund structures and investment strategies.

Our clients choose SS&C as their preferred partner because we offer the following benefits:

### The Ability to Combine Flexible, Comprehensive Software with Scalable Outsourcing Services
We are able to tailor the services to the unique needs of each client while still providing ARMOUR with the benefits of managing its technology infrastructure and providing operational support services.

### Cost-Effective Solutions that Provide Clients with Online Access to Information
SS&C's solutions are easily and rapidly deployed, enabling clients to realize cost savings while meeting the challenges of a rapidly changing industry and regulatory environment. SS&C's unique shared service model provides clients with immediate access to critical business information.

### Deep Vertical Market Expertise
The depth and breadth of our expertise allows us to provide advanced analytical tools tailored to the unique requirements of particular industry segments and asset classes.

### Scalability and Flexibility
We provide highly scalable and flexible solutions, regardless of client size, organizational structure or number of portfolios, securities types, asset classes, accounting methods or regulatory regimes.



CONFIDENTIAL



## ARMOUR Overview and Assumptions

### Systems Overview

| Category | Current Environment | SS&C Proposed Solution |
|---|---|---|
| Portfolio Accounting | TPG (in-house) and Excel | CAMRA/integrated Derivatives module (hosted). |
| Trade capture | AVM, VCON, manually re-entered into TPG | SS&C management of trade import into CAMRA. |
| Market Data | IDC<br>Bloomberg Data License<br>Bloomberg BVAL - Derivatives<br>Bloomberg BVAL - MBS | Retain contracts with market data providers.<br>SS&C will establish and maintain connectivity to each data provider.<br>SS&C's SVC Securities and Derivatives Pricing Services as an option to IDC (cost analysis provided separately). |
| Portfolio Analytics | BlackRock Green Package | Retain BlackRock Green Package.<br>SS&C will manage the extract process through our data management services. |
| General Ledger | QuickBooks Enterprise | SS&C will customize an extract to your General Ledger of choice as part of the implementation. |
| REPO Placement | AVM (outsourced) | Retain AVM for REPO placement. |
| Trade Affirmation & Settlement | AVM (outsourced) | Retain AVM for REPO and Swap Trades.<br>SS&C Back Office Services for securities trades. |
| Custodial Reconciliation & Exception Resolution | AVM (outsourced) | SS&C will perform custodial reconciliation services. |
| Custodian | Citi (may add BONY in future) | SS&C will manage the interface and uploading of information from custodians of choice. |
| Accounting Bases | US GAAP and TAX | US GAAP and TAX are fully supported. |

### Asset Class Summary

| Investment Type | Number of Issues | Number of Lots | Transactions Per Month |
|---|---|---|---|
| REPOS | 1,500 | 1,500 | 500 |
| Agency MBS | 1,500 | 1,500 | 25 |
| Non-Agency MBS | 50 | 50 | 1 |
| Futures | 3 | | |
| Swaps | 106 | 106 | 1-10 (est.) |
| Swaptions | 0 | 0 | 0 |





## Proposed Solution Overview

SS&C's proposed solution for ARMOUR includes the following components:

- Portfolio accounting software and relevant modules to handle the processing of ARMOUR's current asset types, including Agency and Non-Agency MBS, CMOs, REPOs, interest rate swaps and swaptions, and futures.
- Perpetual or term software license, inclusive of an unlimited number of users (unless otherwise specified) with permitted use covering the operations of both ARMOUR and JAVELIN.
- Application hosting of your CAMRA technical infrastructure in our state-of-the-art data center, inclusive of full disaster recovery and 24x7 monitoring.
- Operational support services, including process automation, data management and back office services (trade settlement and affirmation, and reconciliation, case management and exception resolution).

## I. Software License

CAMRA is a global multi-currency, multi-basis portfolio management, investment accounting and reporting solution that supports the entire investment management lifecycle, including trade capture, portfolio management, securities operations, financial accounting, reporting, and more. CAMRA supports a wide variety of asset types, with an emphasis on complex structured products, such as agency and non-agency mortgage backed securities.

CAMRA's integrated Derivatives module helps to manage, account for and value a broad range of OTC and debt instruments, including Swaps, Swaptions, Credit Default Swaps, Caps, Floors, Collars, Forward Rate Agreements, FX Spots / Forwards / Options, Futures, Options on Futures, Equity and Variance Swaps, and OTC Equity Index Options. The Derivatives application reports full accounting information (year to date, month to date, quarter to date, life to date, etc.) for realized, unrealized, cash, and mark to market.

Below are the proposed CAMRA modules to support ARMOUR's investment operations:

*Swaps*
Handles all types of interest rate and currency swaps, including swaptions and swaps with early terminate options (European as well as Bermudian). Each side of the swap is individually tracked, valued and accounted for in the system general ledger. Embedded caps and floors, basis point spreads and other rate adjustments are available in the rate calculation.

*Custodian Interface Manager*
Compares and updates the CAMRA database for cash items that reconcile between your custodian(s) and CAMRA. This tool generates automatic reconciliation for income, principal, settlements, maturities, and holdings transactions which greatly adds to your operational efficiency.

*Impairments Manager*
Helps you manage the data collection, analysis, calculation, and workflow surrounding impairment processing.



CONFIDENTIAL



*Report Express*
Provides a menu-based, parameter-driven approach to report generation that will significantly enhance and simplify your reporting. A single report template can be designed to meet the needs of many simply by changing the parameters that are selected via the sort and selection "wizard."

*Extend*
Extend allows the addition of user defined fields, thereby eliminating the need to "add" this information outside of the system and reduces downstream reporting efforts.

## II. Application Hosting, Process Automation and Data Management Services

*Technical Infrastructure*
- Server hardware and software
    - ○ ARMOUR will have access to separate and secure Production and Test databases
    - ○ Initial 50GB allocation of disk space
- Data center space, power, cooling and robust physical security
- Processing operations staff and 24x7 system monitoring
- Regular data backups and off-site storage
- High availability server configuration
- Disaster Recovery to secondary data center, utilizing near real-time replication and periodically tested in accordance with client DR testing schedule
- UPS and redundant diesel generators provide reliable and uninterruptable power

*System Access Controls*
- Robust system security
- Ongoing administration of user access rights
- Password administration in accordance with ARMOUR corporate standards

*Communications*
- Maintain Citrix software and connectivity from SS&C to the Internet (or other specified connectivity method)
- Secure online system access

*Database and Operating System Maintenance*
- Installation of new database and operating system software releases and updates
- Coordination of upgrade schedules

*CAMRA Upgrade Services*
- Coordination of upgrade schedules in conjunction with ARMOUR investment accounting operations staff
- Installation of new software releases and updates in a test environment
- Migration of new software releases and updates to production environment
- System troubleshooting expertise

*Network Monitoring*
- Network security and monitoring
- Performance reporting
- Server and storage utilization







*Process Automation and Monitoring*
- Nightly processing automation maintenance and support
- Monitoring of the nightly process and timely response to interruptions
- Notification to ARMOUR of nightly cycle status
- Proactive issue resolution and escalation to ARMOUR as required

*Data Management*
- Import and load of trades from ARMOUR and AVM
  - External trade system interface. Intraday receipt and processing of fully executed trades from external trading system. Open lot position extract at beginning of each trading day available to populate external trading system.
- Import market and pricing data from Bloomberg, IDC/SVC, Intex, etc.
- Import transactions from custodians Citi, and potentially BONY
- Import and Export data required for BlackRock analytics
- Transform and validate data for use in the reconciliation process

### III. Back Office Services

*Trade Affirmation and Settlement*

SS&C can provide post trade custodial notification services in support of your MBS trading activities. The SS&C middle office team will monitor the trade settlement process as well as intervene in addressing any failed MBS trades with the involved counterparties. Services include:

- Collect DTC eligible trade confirm notifications and provide electronic affirmations back to DTC. Provide post trade notification to interested parties as directed by ARMOUR.
- Intraday trade processing
- Affirmation/confirmation
- Custodian settlement Instruction via SWIFT
- Management of standard settlement instructions
- Unmatched trade resolution
  - Investigate non-matching trade confirmations including contacting all parties involved in the transaction with a view to achieving a successful match and settlement
- Failed trade resolution
  - In the event of a failed settlement, SS&C shall commence investigations immediately to determine the reasons and the necessary steps to be taken to ensure a successful settlement takes place on settlement date +1 or an alternative date agreed with the counterparty and ARMOUR

*Custodial Reconciliation and Exception Resolution*

SS&C will perform a daily reconciliation between CAMRA and ARMOUR's custody bank(s). SS&C will establish and maintain connectivity to each custodian, and will be responsible for the gathering of all information required to facilitate the daily reconciliation process. SS&C is responsible for the initial investigation of all cash breaks, unmatched transactions and unmatched holdings with custodians.







Custody Reconciliation:
- Reconciliation of custodial cash movements, including cash transfers, fees assessed and investment related cash transactions
- Reconciliation of trade settlements
- Reconciliation of interest and principal paydowns
- Reconciliation of securities holdings
- Aging of open items for the management of exceptions by both client and SS&C

On a daily basis, SS&C's reconciliation team will identify exceptions, initiate contact with the custodian, and provide exception reports to ARMOUR. SS&C's reconciliation team utilizes CAMRA's integrated reconciliation tools to support its deliverables. ARMOUR will be responsible for researching and reconciling items that SS&C is not able to address directly with the custodian as well as processing any necessary corrections to data in CAMRA.

The above reconciliations will be performed against the custodian(s) only. The services do not contemplate any reconciliations or support related to CAMRA processing, month-end deliverables, derivative (e.g. swaps, futures) counterparties, or REPO counterparties.

CONFIDENTIAL                                                                                                    SSC002426



## Fee Schedule

### I.  Software License

SS&C offers both perpetual and term license options when acquiring our software. Perpetual licensing consists of a one-time software cost for the grant of the license, plus 20 percent annually for maintenance and support. Term licensing includes acquisition and maintenance fees into a single annual fee for the grant of the license for a specified contract term.

| License Options | Fees |
| --- | --- |
| Perpetual license option | $ 495,000 (a) |
| Term license option | $ 245,000 (b) |

(a) Excludes annual maintenance of 20 percent.
(b) Assumes 5-Year term.

### II.  Application Hosting, Process Automation and Data Management Services

| Services | Monthly Fee |
| --- | --- |
| • Application Hosting<br>• Process Automation and Monitoring<br>• Data Management | $ 10,000 |

### III.  Back Office Services

| Services | Annual Fee<br>(Billed 1/12th per month) |
| --- | --- |
| • Trade Affirmation and Settlement<br>• Custodial Reconciliation and Exception Resolution | .25 basis points<br>(Asset Value) |

*Additional Pricing Notes:*
- When calculating your monthly fee for Back Office Services, the determination of your Asset Value will be based on the absolute investment asset value (excluding REPOs) of the investments (being the market value of the investments plus accrued income plus trade date cash as of the last day of each month) multiplied by .25 bps divided by 12.
- Back Office Services subject to a minimum monthly fee of $20,000.
- Trade Affirmation and Settlement services are for securities only – excludes derivative (swaps, futures) instruction, confirmation and payments. Assumes AVM will retain all REPO collateral management functions, including instruction of collateral movements between counterparties.
- Fee for Trade Affirmation and Settlement services includes up to 100 trades per month. Trade volumes over 100 will result in a $500 monthly fee for every block of 100 trades starting at 101.

CONFIDENTIAL



## IV.   Professional Services

In addition to the licensing and on-going fees, there will be a one-time implementation fee to cover your transition to our proposed solution. The cost of this effort is directly related to a number of factors, including the amount of historic data to be converted, the quality of the data provided by ARMOUR and the skillset and resource commitment you can dedicate to this effort.

The implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training.

CONFIDENTIAL                                                                 SSC002428

# EXHIBIT 43

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 12/8/2014 11:09:38 PM |
| **To:** | Jim Mountain [jrm@armourllc.com]; Mark Gruber (mrg@armourllc.com) [mrg@armourllc.com]; Jonna Terry [jkt@armourllc.com] |
| **CC:** | Fecteau, Jeff [JFecteau@sscinc.com] |
| **Subject:** | SS&C implementation estimate |

Hi Jim,

Following up on our implementation discussion last Wednesday, Jeff and I have been working with our professional services team to prepare an implementation estimate for transitioning ARMOUR to our CAMRA solution.

We would like to schedule a call to have our professional services team walk through the main components of the implementation estimate with you. Can you please let me know if you and the team are available tomorrow (Tuesday) afternoon, say 2:00pm or later?

We will be sure to send over the implementation estimate prior to our call.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

CONFIDENTIAL

# EXHIBIT 44

Message

| From: | Moore, Dennis [Dennis.Moore@sscinc.com] |
|---|---|
| Sent: | 12/10/2014 12:37:38 AM |
| To: | Jim Mountain [jrm@armourllc.com]; Mark Gruber [mrg@armourllc.com]; Jonna Terry [jkt@armourllc.com] |
| CC: | Fecteau, Jeff [JFecteau@sscinc.com]; Olszewska, Iwona [iolszewska@sscinc.com] |
| Subject: | RE: SS&C implementation estimate |
| Attachments: | ARMOUR Implementation Budget_12.10.14_DRAFTv1.pdf |

Jim, Mark & Jonna,

Attached please find a draft of the implementation budget for our discussion tomorrow. We look forward to speaking at 9:00am.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763 Â |Â  m: (860) 214-9580
dennis.moore@sscinc.com Â |Â  www.sscinc.com

-----Original Message-----
From: Mark Gruber [mailto:mrg@armourllc.com]
Sent: Tuesday, December 09, 2014 12:45 PM
To: Moore, Dennis
Cc: Jim Mountain; Jonna Terry; Fecteau, Jeff
Subject: RE: SS&C implementation estimate

How does 9am work?

Mark Gruber, CFA
Chief Operating Officer & Head of Portfolio Management

ARMOUR Residential Management, LLC
ARMOUR Residential REIT, Inc
JAVELIN Mortgage Investment Corporation

3001 Ocean Drive, Suite 201, Vero Beach, FL 32963 Office 772-617-4340Â Â  Fax 561-348-2408Â Â  mrg@armourllc.com

-----Original Message-----
From: Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
Sent: Tuesday, December 9, 2014 12:33 PM
To: Mark Gruber
Cc: Jim Mountain; Jonna Terry; Fecteau, Jeff
Subject: Re: SS&C implementation estimate

Mark,

Sure thing, that's fine. Tomorrow morning is fairly open for us so feel free to suggest a time and I'll send along a calendar invite.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763<tel:(860)%20298-4763>  |  m: (860) 214-9580<tel:(860)%20214-9580>
dennis.moore@sscinc.com<mailto:dennis.moore@sscinc.com>  |  www.sscinc.com<http://www.sscinc.com/>

On Dec 9, 2014, at 9:34 AM, "Mark Gruber" <mrg@armourllc.com<mailto:mrg@armourllc.com>> wrote:

If we can wait until tomorrow, Jonna will be back and we'd like her to be on the call.

CONFIDENTIAL

Mark Gruber, CFA
Chief Operating Officer & Head of Portfolio Management

ARMOUR Residential Management, LLC
ARMOUR Residential REIT, Inc
JAVELIN Mortgage Investment Corporation

3001 Ocean Drive, Suite 201, Vero Beach, FL 32963
Office 772-617-4340   Fax 561-348-2408   mrg@armourllc.com<mailto:mrg@armourllc.com>

From: Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
Sent: Monday, December 8, 2014 6:10 PM
To: Jim Mountain; Mark Gruber; Jonna Terry
Cc: Fecteau, Jeff
Subject: SS&C implementation estimate

Hi Jim,

Following up on our implementation discussion last Wednesday, Jeff and I have been working with our
professional services team to prepare an implementation estimate for transitioning ARMOUR to our CAMRA
solution.

We would like to schedule a call to have our professional services team walk through the main components
of the implementation estimate with you. Can you please let me know if you and the team are available
tomorrow (Tuesday) afternoon, say 2:00pm or later?

We will be sure to send over the implementation estimate prior to our call.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com<mailto:dennis.moore@sscinc.com>  |  www.sscinc.com<http://www.sscinc.com/>

CONFIDENTIAL



**ARMOUR**
RESIDENTIAL REIT

**SS&C Implementation Budget**

December 10, 2014
DRAFT – for discussion

| Start Date | End Date | Estimated Budget Hours |
|---|---|---|
| January 2015 | May 2015 | |
| **IMPLEMENTATION** | | |
| **1. Environment set-up, conversion & configuration** | | |
| Environment set-up | | 16 |
| Software configuration/installation | | 24 |
| Static data/initial positions/financial impact | | 340 |
| Set-up GL, chart of accounts, initialize GL reconciliation process | | 240 |
| Tax configuration, set-up and initialization | | 40 |
| ReportExpress set-up, configuration and reporting process deployment | | 80 |
| Catch-up assistance (1 FTE for 8 weeks) | | 320 |
| Reconciliation process (Cash/Par) | | 120 |
| **Environment set-up, conversion & configuration sub-total** | | **1,180** |
| | | |
| **2. ARMOUR specific interfaces** | | |
| Custodial Interface Manager module for 1 Custodian(s) | | 40 |
| Trade file formatting | | 144 |
| Derivatives trade file formatting | | 32 |
| Bloomberg interface (security master, ratings, attributes, etc.) | | 160 |
| Front office / interface (BlackRock Green Package) | | 184 |
| General Ledger development (CAMRA/derivatives module) | | 120 |
| FTP/automation set-up | | 80 |
| **ARMOUR specific interfaces sub-total** | | **760** |
| | | |
| **3. Project management & Business Process Review** | | |
| Project management, testing and analysis | | 280 |
| Business process design/assistance with process & procedures | | 280 |
| **Project management & Business Process Review sub-total** | | **560** |
| | | |
| **Total Estimated Hours** | | **2,500** |
| | | |
| *Implementation Cost Summary* | | |
| **Time and Materials Implementation Estimate at $250/hour** | | **$ 625,000** |
| **Block of Hours Commitment at $225/hour (minimum of 2,000 hours)** | | **$ 562,500** |
| | | |
| **TRAINING** | | |
| CAMRA base application (6 days) | | $ 12,000 |
| Custodial Interface Manager (2.5 days) | | $ 5,000 |
| ReportExpress (2.5 days) | | $ 5,000 |
| General Ledger (2.5 days) | | $ 5,000 |
| **Total Training** | | **$ 27,000** |



1

CONFIDENTIAL

SSC002847


**ARMOUR**
RESIDENTIAL REIT

**SS&C Implementation Budget**

December 10, 2014
DRAFT – for discussion

| ASSUMPTIONS |
|---|
| Client will provide the 12/31/2014 initial positions in the electronic format required for SS&C to upload into CAMRA*. |
| Initial positions data will have been reconciled. |
| No historical deferred GL/OTTI. |
| GAAP and TAX are required for 2 legal entities. |
| Client will provide the security master file details in the electronic format required for SS&C to upload in CAMRA*. |
| Client will provide the cashflow schedules in the electronic format required for SS&C to upload in CAMRA*. |
| Client will be responsible for review and signoff of initial position reconciliation and financial impact reconciliation. |
| GL feeds and BlackRock Green Package interfaces are estimated based on low complexity assumption. |
| Client will provide third party trades, income, principal paydowns, settlements, cash transactions, pricing, FX rates, factors, new security masters and updates, and corporate actions in the format required for upload into CAMRA*. |
| * If not provided in CAMRA standard format SS&C can reformat at an additional cost to be determined. |



CONFIDENTIAL

SSC002848

# EXHIBIT 45

| From: | Fecteau, Jeff |
|---|---|
| To: | Jim Mountain |
| Sent: | 12/16/2014 4:16:49 PM |
| Subject: | RE: Master agreement Comments |

Jim, went through the agreements with the folks here and have been able to address a lot of your points.  I believe we have standard language that will address each of the concepts that you added the commentary on.  Prior to sending a new markup your way I wanted to see if we could have a quick call to discuss the High Water Mark concept?  I want to make sure I am clear about what you are asking for.  In some cases there is confusion about what constitutes the "ordinary course of business" and adding some clarity around that is a means to get both parties comfortable.

Let me know of a convenient time or feel free to reach out to me when you have a free moment.

Thanks,
Jeff

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Monday, December 15, 2014 5:47 PM
**To:** Fecteau, Jeff
**Subject:** Master agreement Comments

Take a look at this.  I am still trying to get Trevor to confirm all the technical specs of the hosting agreement. You will see that I left several comments in there about things we still need to craft.  Let me know if you have standard responses already built or if we need to create from whole cloth.

Thanks,

Jim

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
JAVELIN Mortgage Investment Corp. (NYSE: JMI)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell
+1 561 348 2408  Fax
jrm@armourllc.com
www.armourreit.com
www.javelinreit.com

**From:** Jim Mountain
**Sent:** Sunday, December 14, 2014 10:12 PM
**To:** 'Fecteau, Jeff'
**Subject:** RE: Comments

Lawyers and I have been through.  I sent to Mark and Trevor for technical specs review and will relay what we have when I get in to the office Monday PM.

Jim

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
JAVELIN Mortgage Investment Corp. (NYSE: JMI)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell
+1 561 348 2408  Fax
jrm@armourllc.com
www.armourreit.com
www.javelinreit.com

**From:** Fecteau, Jeff [mailto:JFecteau@sscinc.com]
**Sent:** Friday, December 12, 2014 11:54 AM
**To:** Jim Mountain
**Subject:** Comments

Jim, just curious as to when you think I might get your comments to the agreement?  I have folks here that are asking.

ACM0000290

Any update you can provide is greatly appreciated and will allow me to set the proper expectations here.

Thanks,
Jeff

**Jeff Fecteau**
Account Executive
SS&C Technologies Inc.

t: 860.731.5022 m: 860.729.5862
jfecteau@sscinc.com | www.ssctech.com

CONFIDENTIAL

ACM0000291

# EXHIBIT 46

### CAMRA Project ACM Payroll Costs

| Summary | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|
| Preliminary Staff Hours | 794 | 2,193 | 1,093 | 4,080 |
| Preliminary Executive Hours | 500 | 780 | 400 | 1,680 |
| Preliminary IT Hours | 61 | 7 | 18 | 86 |
| **Total Preliminary CAMRA Project ACM Hours** | 1,355 | 2,980 | 1,511 | 5,846 |
| | | | | |
| Staff Costs | $63,504 | $146,465 | $81,017 | $290,985 |
| Executive Costs | $321,176 | $548,740 | $301,382 | $1,171,298 |
| IT Costs | $3,524 | $556 | $1,483 | $5,563 |
| **Total Estimated CAMRA Project ACM Payroll Costs** | $388,203 | $695,761 | $383,882 | $1,467,846 |

**Note: Hours estimates are preliminary and subject to further analysis**

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079836

| | Davies | Edwards [(2)] | Hill | Rand | Smith | Terry | Staff Total |
|---|---|---|---|---|---|---|---|
| **2015** | | | | | | | |
| W-2 Compensation - Box 1 | $55,055 | $68,350 | $76,160 | $67,937 | $46,115 | $130,864 | $444,482 |
| Retirement Savings - Box 12 D | $945 | $1,650 | $14,840 | $2,062 | $1,380 | $900 | $21,777 |
| Employer Social Security - Box 4 [(1)] | $3,472 | $4,340 | $5,642 | $4,340 | $2,945 | $7,347 | $28,086 |
| Employer Medicare - Box 6 [(1)] | $812 | $1,015 | $1,320 | $1,015 | $689 | $1,911 | $6,761 |
| Employer-paid Health | $19,833 | $9,426 | $9,426 | $9,426 | $18,963 | $9,426 | $76,500 |
| Employer-paid 401k | $1,680 | $2,100 | $2,730 | $2,100 | $1,431 | $3,960 | $14,001 |
| **Total 2015** | $81,797 | $86,881 | $110,118 | $86,881 | $71,522 | $154,408 | $591,607 |
| **Working Hours per Year** | 1,896 | 1,896 | 1,896 | 1,896 | 1,896 | 1,896 | |
| **Hourly Cost** | $43.14 | $45.82 | $58.08 | $45.82 | $37.72 | $81.44 | |
| **Estimated CAMRA Project Hours** | 8 | 10 | 6 | 10 | - | 760 | 794 |
| **Cost of CAMRA Work** | $ 345 | $ 458 | $ 348 | $ 458 | $ - | $ 61,894 | $ 63,504 |
| | | | | | | | |
| **2016** | | | | | | | |
| W-2 Compensation - Box 1 | $58,200 | $65,000 | $77,000 | $95,000 | $57,303 | $128,864 | $481,368 |
| 2016 Bonus paid in 2017 | $0 | $25,000 | $0 | $0 | $0 | $0 | $25,000 |
| Retirement Savings - Box 12 D | $1,800 | $0 | $18,000 | $0 | $2,492 | $900 | $23,192 |
| Employer Social Security - Box 4 [(1)] | $3,720 | $4,030 | $5,890 | $5,890 | $3,707 | $7,347 | $30,584 |
| Employer Medicare - Box 6 [(1)] | $870 | $943 | $1,378 | $1,378 | $867 | $1,882 | $7,316 |
| Employer-paid Health, Life | $24,638 | $9,823 | $9,872 | $9,843 | $19,917 | $9,961 | $84,054 |
| Employer-paid 401k | $1,800 | $1,950 | $2,850 | $2,850 | $1,800 | $3,900 | $15,150 |
| **Total 2016** | $91,028 | $106,746 | $114,989 | $114,960 | $86,086 | $152,854 | $666,664 |
| **Working Hours per Year** | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | |
| **Hourly Cost** | $48.21 | $56.54 | $60.91 | $60.89 | $45.60 | $80.96 | |
| **Estimated CAMRA Project Hours** | 336 | 220 | 499 | 220 | 8 | 910 | 2,193 |
| **Cost of CAMRA Work** | $ 16,200 | $ 12,439 | $ 30,392 | $ 13,396 | $ 365 | $ 73,674 | $ 146,465 |
| | | | | | | | |
| **2017** | | | | | | | |
| W-2 Compensation - Box 1 | $57,667 | $185,000 | $82,000 | $140,000 | $73,348 | $142,364 | $680,379 |
| 2016, 2018 Bonus paid in 2017 | $0 | -$60,000 | $0 | $0 | $0 | $0 | -$60,000 |
| Retirement Savings - Box 12 D | $2,333 | $0 | $18,000 | $0 | $4,788 | $900 | $25,108 |
| Employer Social Security - Box 4 [(1)] | $3,720 | $7,886 | $6,200 | $7,886 | $4,788 | $7,886 | $38,367 |
| Employer Medicare - Box 6 [(1)] | $870 | $2,683 | $1,450 | $2,030 | $1,120 | $2,077 | $10,230 |
| Employer-paid Health, Life | $27,214 | $10,234 | $10,282 | $10,253 | $21,836 | $10,371 | $90,191 |
| Employer-paid 401k | $1,800 | $5,550 | $3,000 | $4,200 | $2,325 | $4,305 | $21,180 |
| **Total 2017** | $93,604 | $151,353 | $120,932 | $164,370 | $107,292 | $167,904 | $805,455 |
| **Working Hours per Year** | 1,880 | 1,880 | 1,880 | 1,880 | 1,880 | 1,880 | |
| **Hourly Cost** | $49.79 | $80.51 | $64.33 | $87.43 | $57.07 | $89.31 | |
| **Estimated CAMRA Project Hours** | 54 | 160 | 317 | 160 | 150 | 252 | 1,093 |
| **Cost of CAMRA Work** | $ 2,689 | $ 12,881 | $ 20,391 | $ 13,989 | $ 8,561 | $ 22,506 | $ 81,017 |
| | | | | | | | |
| **Total Estimated Hours** | 398 | 390 | 822 | 390 | 158 | 1,922 | 4,080 |
| **Total Cost** | $ 19,234 | $ 25,778 | $ 51,131 | $ 27,843 | $ 8,925 | $ 158,074 | $ 290,985 |

(1) Employer portion equals employee portion
(2) Edwards hours assumed to equal Rand hours because they had similar roles & responsibilities

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079837

| | Gruber | Mountain | Executive Total |
|---|---|---|---|
| **2015** | | | |
| W-2 Compensation - Box 1 | $1,091,820 | $1,357,796 | $2,449,616 |
| Retirement Savings - Box 12 D | $18,000 | $13,500 | $31,500 |
| Employer Social Security - Box 4 [1] | $7,347 | $7,347 | $14,694 |
| Employer Medicare - Box 6 [2] | $16,092 | $19,884 | $35,976 |
| Employer-paid Health | $23,435 | $24,435 | $47,871 |
| Employer-paid 401k | $7,950 | $7,950 | $15,900 |
| **Total 2015** | $1,164,645 | $1,430,912 | $2,595,557 |
| **Working Hours per Year** | 1,896 | 1,896 | |
| **Hourly Cost** | $614.26 | $754.70 | |
| **Estimated CAMRA Project Hours** | 400 | 100 | 500 |
| **Cost of CAMRA Work** | $  245,706 | $  75,470 | $  321,176 |
| | | | |
| **2016** | | | |
| W-2 Compensation - Box 1 | $608,854 | $719,252 | $1,328,106 |
| 2016 Bonus paid in January 2017 | $590,000 | $765,000 | $1,355,000 |
| Retirement Savings - Box 12 D | $18,000 | $0 | $18,000 |
| Employer Social Security - Box 4 [1] | $7,347 | $7,347 | $14,694 |
| Employer Medicare - Box 6 [2] | $9,089 | $10,429 | $19,519 |
| Employer-paid Health, Life | $24,744 | $25,744 | $50,488 |
| Employer-paid 401k | $7,950 | $7,950 | $15,900 |
| **Total 2016** | $1,265,984 | $1,535,722 | $2,801,707 |
| **Working Hours per Year** | 1,888 | 1,888 | |
| **Hourly Cost** | $670.54 | $813.41 | |
| **Estimated CAMRA Project Hours** | 600 | 180 | 780 |
| **Cost of CAMRA Work** | $402,326 | $146,414 | $548,740 |
| | | | |
| **2017** | | | |
| W-2 Compensation - Box 1 | $1,200,521 | $1,503,386 | $2,703,907 |
| 2016 Bonus paid in January 2017 | -$590,000 | -$765,000 | -$1,355,000 |
| 2017 Bonus paid in January 2018 | $640,000 | $815,000 | $1,455,000 |
| Retirement Savings - Box 12 D | $18,000 | $0 | $18,000 |
| Employer Social Security - Box 4 [1] | $7,886 | $7,886 | $15,773 |
| Employer Medicare - Box 6 [2] | $17,669 | $21,799 | $39,468 |
| Employer-paid Health, Life | $27,321 | $28,321 | $55,641 |
| Employer-paid 401k | $8,100 | $8,100 | $16,200 |
| **Total 2017** | $1,329,497 | $1,619,492 | $2,948,989 |
| **Working Hours per Year** | 1,880 | 1,880 | |
| **Hourly Cost** | $707.18 | $861.43 | |
| **Estimated CAMRA Project Hours** | 280 | 120 | 400 |
| **Cost of CAMRA Work** | $198,010 | $103,372 | $301,382 |
| | | | |
| **Total Estimated Hours** | 1,280 | 400 | 1,680 |
| **Total Cost** | $846,041 | $325,256 | $1,171,298 |

(1) Employer portion equals employee portion
(2) Employer portion equals employee portion minus employee high surcharge

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079838

|  | Graley | Spicer | IT Total |
|---|---|---|---|
| **2015** | | | |
| W-2 Compensation - Box 1 | $56,167 | $133,000 | $189,167 |
| Retirement Savings - Box 12 D | $8,833 | $18,000 | $26,833 |
| Employer Social Security - Box 4 [1] | $4,030 | $7,347 | $11,377 |
| Employer Medicare - Box 6 [1] | $943 | $2,190 | $3,132 |
| Employer-paid Health | $23,435 | $16,758 | $40,193 |
| Employer-paid 401k | $1,950 | $4,530 | $6,480 |
| **Total 2015** | $95,358 | $181,825 | $277,182 |
| **Working Hours per Year** | 1,896 | 1,896 | |
| **Hourly Cost** | $50.29 | $95.90 | |
| **Estimated CAMRA Project Hours** | 51 | 10 | 61 |
| **Cost of CAMRA Work** | $2,565 | $959 | $3,524 |
| | | | |
| **2016** | | | |
| W-2 Compensation - Box 1 | $78,048 | $115,629 | $193,676 |
| Retirement Savings - Box 12 D | $1,953 | $18,000 | $19,953 |
| Employer Social Security - Box 4 [1] | $4,960 | $7,347 | $12,307 |
| Employer Medicare - Box 6 [1] | $1,160 | $1,938 | $3,098 |
| Employer-paid Health, Life | $24,638 | $17,664 | $42,302 |
| Employer-paid 401k | $2,400 | $4,050 | $6,450 |
| **Total 2016** | $113,158 | $164,627 | $277,785 |
| **Working Hours per Year** | 1,888 | 1,888 | |
| **Hourly Cost** | $59.94 | $87.20 | |
| **Estimated CAMRA Project Hours** | 2 | 5 | 7 |
| **Cost of CAMRA Work** | $120 | $436 | $556 |
| | | | |
| **2017** | | | |
| W-2 Compensation - Box 1 | $83,020 | $188,129 | $271,149 |
| Retirement Savings - Box 12 D | $1,980 | $18,000 | $19,980 |
| Employer Social Security - Box 4 [1] | $5,270 | $7,886 | $13,156 |
| Employer Medicare - Box 6 [1] | $1,233 | $2,989 | $4,221 |
| Employer-paid Health, Life | $27,214 | $19,197 | $46,412 |
| Employer-paid 401k | $2,550 | $6,225 | $8,775 |
| **Total 2017** | $121,267 | $242,426 | $363,693 |
| **Working Hours per Year** | 1,880 | 1,880 | |
| **Hourly Cost** | $64.50 | $128.95 | |
| **Estimated CAMRA Project Hours** | 13 | 5 | 18 |
| **Cost of CAMRA Work** | $839 | $645 | $1,483 |
| | | | |
| **Total Estimated Hours** | 66 | 20 | 86 |
| **Total Cost** | $3,523 | $2,040 | $5,563 |

(1) Employer portion equals employee portion

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079839

|                | 2015  | 2016  | 2017  | Total |
|----------------|-------|-------|-------|-------|
| Days in Year   | 365   | 366   | 365   | 1096  |
| Weekend Days   | (104) | (106) | (106) | (316) |
| Holidays       | (14)  | (14)  | (14)  | (42)  |
| Vacation Days  | (10)  | (10)  | (10)  | (30)  |
| Working Days   | 237   | 236   | 235   | 708   |
|                |       |       |       |       |
| Hours/Day      | 8     | 8     | 8     | 8     |
| Working Hours  | 1,896 | 1,888 | 1,880 | 5,664 |
| Average        |       |       |       | 1,888 |

| Holidays          | 2015 | 2016 | 2017 | Total |
|-------------------|------|------|------|-------|
| New Year's Day    | 1    | 1    | 1    | 3.0   |
| Martin Luther King| 1    | 1    | 1    | 3.0   |
| President's       | 1    | 1    | 1    | 3.0   |
| Good Friday       | 1.5  | 1.5  | 1.5  | 4.5   |
| Memorial Day      | 1.5  | 1.5  | 1.5  | 4.5   |
| Independence Day  | 1.5  | 1.5  | 1.5  | 4.5   |
| Labor Day         | 1    | 1    | 1    | 3.0   |
| Columbus Day      | 1    | 1    | 1    | 3.0   |
| Veteran's Day     | 1    | 1    | 1    | 3.0   |
| Thanksgiving Day  | 1.5  | 1.5  | 1.5  | 4.5   |
| Christmas Day     | 1.5  | 1.5  | 1.5  | 4.5   |
| New Year's Eve    | 0.5  | 0.5  | 0.5  | 1.5   |
| Total             | 14   | 14   | 14   | 42.0  |

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079840

|                        | 2015        | 2016        | 2017        |
|------------------------|-------------|-------------|-------------|
| **Blue Options + Dental** |          |             |             |
| Single (5070)          | $ 6,058.32  | $ 6,255.00  | $ 6,684.24  |
| W/Spouse (5071)        | $ 12,276.72 | $ 12,674.40 | $ 14,970.48 |
| W/Children (5071)      | $ 10,079.64 | $ 10,374.60 | $ 12,206.04 |
| W/Family (5071)        | $ 16,737.12 | $ 17,249.76 | $ 20,329.44 |
|                        |             |             |             |
| **HSA Contributions**  |             |             |             |
| Individual             | $ 3,350.00  | $ 3,350.00  | $ 3,400.00  |
| Family                 | $ 6,650.00  | $ 6,750.00  | $ 6,750.00  |
| Age 55+ Catch-up       | $ 1,000.00  | $ 1,000.00  | $ 1,000.00  |
|                        |             |             |             |
| **Life / ADD**         | nil         | $ 2.412     | $ 2.412     |
| Per $1,000 of Salary   |             |             |             |
| up to $100K            |             |             |             |
|                        |             |             |             |
| **401(K) = 3% of Comp** |            |             |             |
| Not to exceed          | $ 7,950.00  | $ 7,950.00  | $ 8,100.00  |

CONFIDENTIAL - Attorneys' Eyes Only

ACM0079841

# EXHIBIT 47



# SS&C Implementation Questionnaire

| | |
|---|---|
| Contact Name 1: | James R. Mountain, Chief Financial Officer |
| Phone/Email 1: | (772) 617-4340 / jrm@armourllc.com |
| Contact Name 2: | Mark Gruber, Chief Operating Officer & Head of Portfolio Management |
| Phone/Email 2: | (772) 617-4340 / mrg@armourllc.com |
| Contact Name 3: | Jonna K. Terry, Senior Investment Accountant |
| Phone/Email 3: | (772) 617-4340 / jkt@armourllc.com> |

Date Prepared: September 26, 2014



Dennis Moore
d: 860-298-4763
m: 860-214-9580
dennis.moore@sscinc.com

Jeff Fecteau
d: 860-731-5022
m: 860-729-5862
JFecteau@sscinc.com

CONFIDENTIAL



## Table of Contents

TABLE OF CONTENTS ........................................................................... 2
PROJECT BACKGROUND ....................................................................... 3
ORGANIZATIONAL INFORMATION ........................................................ 3
PROJECT MANAGEMENT DETAILS ...................................................... 3
ASSET CLASS SUMMARY .................................................................... 4
ACCOUNTING ....................................................................................... 5
GENERAL LEDGER ............................................................................... 6
SOURCE & MARKET DATA ................................................................... 7
INTERFACES ........................................................................................ 7
OUTPUTS ............................................................................................. 8

CONFIDENTIAL

SSC002156



## Project Background

1. What are the primary reasons for implementing a new solution?
   Dissatisfied with the current solution; need more robust capabilities

2. Who is the lead sponsor of this project in the organization?
   James R. Mountain

3. What is your target/planned project start date?  Live date?
   1/1/15 (ASAP)

## Organizational Information

4. Please provide a high level organizational structure.

5. Please provide a functional chart of your investment accounting/analysis division.

6. Please provide a copy of your legal entities chart.  Please explain legal/investment/product/other rollups.

7. What accounting firm audits the company financials?
   Deloitte & Touche (Miami)

## Project Management Details

8. Please indicate the type of resources that will be dedicated to this project.

| Type of resource | | |
|---|---|---|
| Project Managers | ☑ Yes | ☐ No |
| Information Technology Specialists | ☑ Yes | ☐ No |
| Investment Accountants | ☑ Yes | ☐ No |
| Investment Managers | ☑ Yes | ☐ No |
| Business Analysts/Testers | ☐ Yes | ☑ No |
| Auditors | ☐ Yes | ☑ No |
| Other | ☐ Yes | ☑ No |

CONFIDENTIAL

SSC002157



9.   Is there access to the data from your current provider? ☑ Yes  ☐ No   If yes, please describe and assess the quality of your existing data.

## Asset Class Summary

10.   Please provide information on the following types of investments:

| Investment Type | Number of issues | Number of lots | Number of transactions per month |
|---|---|---|---|
| Short Terms | | | |
|    Commercial Paper | | | |
|    Discount Notes | | | |
|    Treasury Bills | | | |
|    Repurchase Agreements (REPOS) | 1500 | 1500 | 500 |
| Bonds | | | |
|    Callable Bonds | | | |
|    Floating Rate | | | |
|    Convertible | | | |
|    Sinking Fund | | | |
|    Private | | | |
|    Stepped Rate | | | |
|    Treasury Inflation Protected Securities | | | |
|    Debt | | | |
| Syndicated Loans | | | |
|    Revolvers | | | |
|    Delayed Draws | | | |
|    Term Loans | | | |
|    Other Syndicated Loans | | | |
| Mortgage Backed Securities | | | |
|    Freddie Mac/Fannie Mae/ Ginny Mae | 1500 | 1500 | 25 |
|    Interest Only/Principal Only | | | |
|    Non-agency Mortgage Backed Securities | 50 | 50 | 1 |
|    Asset Backed Securities | | | |
|    CMO/CDO/CLO | | | |
|    TBA (To Be Announced) | | | |
|    Dollar Roll | | | |
|    Other Mortgage Backed Securities | | | |
| Exchange Traded Securities | | | |

CONFIDENTIAL



| Investment Type | Number of issues | Number of lots | Number of transactions per month |
|---|---|---|---|
| Common Stock | | | |
| Preferred Stock | | | |
| Options/Rights/Warrants | | | |
| Futures | 3 | | |
| Over the Counter (OTC) Securities - Derivatives | | | |
| Forwards | | | |
| Swaps | 106 | 106 | Varies – 1–10 |
| Swaptions | 0 | 0 | 0 |
| Limited Partnerships | | | |
| FX Forwards/Spots | | | |
| Other Investment Types | | | |

11.　Please list any additional assets the organization is considering investing in:

CMBS, Whole Loans

## Accounting

12.　How often does the organization close the accounting books?　☑ Monthly　☐ Daily

13.　What is the month-end close schedule (e.g. 3 day close, 5 day close)?

5 Business Days

14.　Do all legal entities have the same fiscal year end?　☑ Yes　☐ No

15.　Are there any non-fiscal year end reporting entities?　☐ Yes　☑ No　If yes, please describe: _____

16.　Which of the following accounting bases are required?

| ☑ US GAAP | ☐ US STAT | ☐ LOCAL GAAP　Currency? |
| ☑ US TAX | ☐ IFRS | ☐ LOCAL STAT　Currency? |
| ☐ MGMT | ☐ PURCHASE GAAP | ☐ OTHER　Please specify. |

17.　Do you amortize premium and discount on fixed income securities?　☑ Yes　☐ No　If yes, what amortization methods are used? Proportional

18.　Are assets transferred between accounts and portfolios?　☑ Yes　☐ No　If yes, are gains and losses deferred?
Yes

Page 5 of 8

CONFIDENTIAL

SSC002159



19. How many securities are currently impaired in your portfolio?  0 – We did previously have impaired securities; all were sold

20. If impaired securities are held, are there any Other Comprehensive Income (OCI) balances being tracked?

  ☐ Yes  ☑ No

21. What is the primary lot relief method?

| ☐ FIFO | ☐ LIFO | ☑ SPEC LOT |
|---|---|---|
| ☐ MAX GAIN | ☐ MAX LOSS | ☐ AVG COST |
| ☐ OTHER   Please specify. | | |

22. Are unit values (net asset valuation) calculated?  ☑ Yes  ☐ No   If yes, please describe:

_____

23. Does the organization require tax withholding on foreign securities?  ☐ Yes  ☑ No

24. Please describe any key accounting issues or process shortcomings of your current processes that need to be addressed as part of this transition.

  Timeliness, accuracy, ease of use

## General Ledger

25. What is your corporate General Ledger system(s)?

  QuickBooks Enterprise. Could potentially replace/upgrade to a different GL in the near future.

26. Are General Ledger entries required for more than one book of accounting?  ☑ Yes  ☐ No   If yes, please list the books required.

  GAAP, TAX

27. Does the organization require distinct charts of accounts by accounting basis?  ☐ Yes  ☑ No

28. Do you feed your General Ledger using local or base values or both?  Please explain your FX conversion process.

  Local

29. Please describe the level of detail required by your General Ledger.

  TBD

30. How often are General Ledger feeds required?  ☑ Monthly  ☑ Daily

Daily – Settlement of purchases/sales/P&I receipts.  Monthly – Mark portfolio/book income/amortization

Page 6 of 8

CONFIDENTIAL



## Source & Market Data

31. Are cash flows for Mortgage Backed Securities used presently?   ☑ Yes   ☐ No

   - If yes, for what types of MBS?
   Non-agency securities

   - If yes, are historical cash flows available for the held securities?   ☑ Yes   ☐ No

   - If no, do you plan to use cash flows in the future?   ☐ Yes   ☐ No

32. Are Prepayment Speed Assumptions (PSAs) or Conditional Prepayment Rate (CPRs) tracked presently?

   ☑ Yes   ☐ No   If no, do you plan to use PSAs or CPRs in the future?   ☐ Yes   ☐ No

33. Can original face be provided for the Mortgage Backed Securities?   ☑ Yes   ☐ No

34. Is Mortgage Backed Security factor history available?   ☑ Yes   ☐ No

35. Are multiple pricing vendors used?   ☑ Yes   ☐ No   If yes, please list:  IDC (primary), Bloomberg (secondary and also for derivatives)

36. How frequently are the holdings priced?   ☐ Monthly   ☑ Daily   ☐ Other: _____

37. Please describe your valuation policy.  Provide detail by asset class as needed.

   Agy MBS: IDC is the primary pricing provider. Bloomberg BVAL is secondary source, then Dealer Marks.
   Non-Agy MBS: Internal Pricing; Derivatives: Bloomberg BVAL

## Interfaces

38. Please list the Trade Order Management Systems you use.  If none, please describe how trades are generated.

   Manual entry

39. Please list the Investment Managers (internal/external) you use:  Investing is managed internally, also AVM (Repos)

40. Do you currently receive electronic trade and position files from your investment managers?   ☑ Yes   ☐ No   If yes, which managers and at what frequency?

   Daily file from AVM for Repo

41. Please list the Custodians you use:

   Citi currently, BONY potential addition in the future

42. Please list the Market Data vendors you use and what data they provide:

   Bloomberg (factors and ratings), Intex

43. If you require cash flows for Mortgage Backed Securities, please list the sources:

CONFIDENTIAL

SSC002161



Answer/Intex

44. Please list the Ratings Services you use: **None**

45. Please list the Analytical Systems you use: **BlackRock green package**

46. Do you need SS&C software to produce a downstream feed (such as a data warehouse)? ☑ Yes ☐ No  If yes, please list: **BlackRock (analytics), AVM (Repos & collateral management), others?...**

## Outputs

47. What deliverables do you require daily? Monthly? Quarterly? Annually? Please specify data extract vs. report.

   **Daily – Portfolio with pricing, cashflows, derivative payables and receivables schedule**

48. Are there 3rd parties that will require delivery of reports or data?  If yes, please describe content and frequency of delivery. **BlackRock (analytics), AVM (Repos & collateral management), others?...**

CONFIDENTIAL

SSC002162





# EXHIBIT 48

Message
_____

**From:**      Johnson, Adriana [ajohnson@sscinc.com]
**Sent:**      5/3/2016 10:19:51 PM
**To:**        Pallone, Daniel [DPallone@sscinc.com]; Gonzalez, Tony [TGonzalez@sscinc.com]
**CC:**        Russell, David [DRussell@sscinc.com]
**Subject:**   RE: Bimini escalation


List of delays:

- Initial FI sign off was delayed by 3 weeks, due to changes that took place and Bimini's YE activities – **This initial delay is expected as it is the 1ˢᵗ time the client sees their data**
- October processing was delayed by 2 weeks as not all information needed was received at once – **This delay was due to Hunter depended on his very junior people to gather the data and send to us without his review**
- October sign off was delayed by 2 weeks as adjustments were made until Hunter felt comfortable with the numbers
- It took 3 weeks to achieve November sign off as Hunter was not 100% available
- Currently pending feedback on December recons delivered on 4/25.  Mark is delivering December month end reports today even though we didn't get feedback on the recons.  This is in order to continue to move forward, it's a risk as they could come back with changes


Thanks,
Adriana

_____

**From:** Pallone, Daniel
**Sent:** Tuesday, May 03, 2016 3:32 PM
**To:** Gonzalez, Tony
**Cc:** Johnson, Adriana; Russell, David
**Subject:** Re: Bimini escalation

OK, I will be in the NY office. I am getting very concerned about CAMRA license implementations to REITs. REITs are not staffed to handle CAMRA like insurance companies, let talk about we change the implementation approach for CAMRA REIT clients. I think this should be our last one.

Dan Pallone
973-476-3928

On May 3, 2016, at 12:25 PM, Gonzalez, Tony <TGonzalez@sscinc.com> wrote:

Dan,

We need to talk tomorrow about how we are progressing with Bimini.

We aren't getting timely responses from Hunter and we need to have a heart-to-heart with him about timeline and impact on project costs.

Don't want to be alarmist here and also don't want to suggest we need to go thermo-nuclear on them but we should align internally and agree next steps.

Adriana is preparing a bullet list of instances and delays caused by them.

Many thanks,

Attorneys' Eyes Only

Tony Gonzalez
Vice President, Professional Services
Institutional Consulting & Outsourcing
SS&C Technologies Inc.
1114 Avenue of the Americas I New York, NY 10110
(646) 927-9759
tgonzalez@sscinc.com | www.sscinc.com
Follow us: Twitter | Facebook | LinkedIn

<image001.jpg>

Attorneys' Eyes Only

SSC166133

# EXHIBIT 49

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 11/13/2014 10:15:43 PM |
| **To:** | Reilly, Timothy [treilly@sscinc.com]; Quinn, Jack [JQuinn@sscinc.com] |
| **Subject:** | FW: SS&C Proposal for ARMOUR |
| **Attachments:** | SS&C Solution Proposal_ARMOUR_11.13.14v1.pdf; SS&C Securities and Derivatives Pricing Services_11.13.14v1.pdf |

Sent.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  ┊  m: (860) 214-9580
dennis.moore@sscinc.com  ┊  www.sscinc.com

**From:** Moore, Dennis
**Sent:** Thursday, November 13, 2014 5:15 PM
**To:** Jim Mountain; Mark Gruber; 'Jonna Terry'
**Cc:** Fecteau, Jeff
**Subject:** RE: SS&C Proposal for ARMOUR

Jim, Mark & Jonna,

Attached please find SS&C's solution proposal for ARMOUR, which includes both software and operational support services. We have attempted to tailor the services in a manner that will allow you to easily compare our proposed services to what AVM is currently providing and make an informed decision on where these are most effectively handled.

We are open to discussions regarding the expansion or contraction of any operational support services contained in our proposal. We have also prepared a separate document that contains a cost analysis using SS&C's negotiated pricing schedule with IDC for you to compare against your current arrangement to determine if cost savings can be realized through transitioning this to SS&C as well.

From our initial conversations, we learned you were looking for the following:
- Software that is easy to use and can support all of your asset types
- Better integration for improved efficiency and control
- Timely and accurate accounting and reporting
- Leverage automation to achieve exception-based processing
- Operational support to streamline key processes and the management of data
- A strategic partner that can offer institutional-caliber solutions, access to expertise, and flexibility as your business grows and evolves

We appreciate the time you have taken over these past months to educate us on your business and operations, which has only helped us develop a more tailored solution and proposal for you. We understand our assumptions may not be 100% correct and also that you may have questions.

Our recommendation would be to schedule a call for Friday or Monday to walk through the proposal and address any questions you might have. As part of this call we would also like to introduce you to our Professional Services team and to give them an opportunity to provide an overview of the transition services we would provide to ARMOUR.

We look forward to your feedback and the opportunity to prove ourselves as the best possible partner for ensuring your success with this initiative.

SSC002415

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jonna Terry [mailto:jkt@armourllc.com]
**Sent:** Friday, November 07, 2014 1:00 PM
**To:** Moore, Dennis; Fecteau, Jeff
**Cc:** Jim Mountain; Mark Gruber
**Subject:** ARMOUR / JAVELIN requested information

We appreciate you taking the time for the very informative call this morning.  Per your request, you will find a spreadsheet containing our Cusip and  Interest Rate Swap information, the completed contract as well as the organizational chart.   Below are the list of contracts that we currently have for our pricing services.

Contracts:
IDC
Bloomberg Data License
Bloomberg BVAL - Derivatives
Bloomberg BVAL - MBS

Please let us know if you need any other information.

Thank you,

Jonna Terry
ARMOUR Residential Management, LLC
Senior Investment Accountant
3001 Ocean Dr. Ste 201
Vero Beach, FL 32963
Office:  772-617-4340
Fax: 561-348-2408

SSC002416

# EXHIBIT 50

Message

| | |
|---|---|
| **From:** | Fecteau, Jeff [JFecteau@sscinc.com] |
| **Sent:** | 11/26/2014 2:55:18 PM |
| **To:** | Olszewska, Iwona [iolszewska@sscinc.com] |
| **CC:** | Brown, Christopher [Christopher.Brown@sscinc.com]; Russell, David [DRussell@sscinc.com]; Cossin, Diane [DCossin@sscinc.com]; Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Subject:** | RE: ARMOUR Residential Management LLC Master Agreement and Work Request One |
| **Attachments:** | 20141126 ARMOUR Residential Management LLC Master Agreement INTERNAL REVIEW COPY.docx |

Iwona, updated document with track changes to show minor edit related to our standard language regarding support hours.  Since the D&D hours are shorter I removed the reference to individual products and went with the defined term of Software and changed the times to 8:30 to 5:30 Monday through Friday.  I believe your concern about how they can use Client support is handled in the body of the Master Agreement itself, section 3.3.

Responses to your other questions are noted below.

Let me know when we can discuss.

From: Olszewska, Iwona
Sent: Tuesday, November 25, 2014 5:32 PM
To: Fecteau, Jeff
Cc: Brown, Christopher; Russell, David; Cossin, Diane
Subject: RE: ARMOUR Residential Management LLC Master Agreement and Work Request One

I don't think I have seen this language before or I could have missed it. I feel that it implies that we will provide free consulting as long as they call in within provided coverage hours. Client support is there to offer assistance with trouble shooting. Having said that, I would recommend that we tweak the wording to comment only on hours within which the service is provided. (including Diane to make sure it makes sense to her).

**B.  Support Hours:**  SS&C will provide **telephone consultation** to Client with respect to the CAMRA™ for Microsoft® SQL Server™ Software for no additional charge during SS&C's business hours of (i) 8:30 a.m. to 7:00 p.m. Eastern Time Monday through Thursday and (ii) 8:30 a.m. to 5:30 p.m. on Friday, excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).

SS&C will provide telephone consultation to Client with respect to the Debt & Derivatives™ Software for no additional charge during SS&C's business hours of 8:30 a.m. to 5:30 p.m. Eastern Time Monday through Friday, excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).

**D.  Hosting, Process Automation and Data Management Services:**  SS&C will maintain for Client the Hosted Software processing environment through SS&C's processing **center in Windsor, CT.**  is Windsor correct? Yes – this change was made by Chris as it's my understanding that not everything has been transitioned to Yorktown Heights

-.       Physical and virtual infrastructure allowing network connectivity and remote (user level) access to hosted environments is network cost a pass-through? Not if they use the Internet
-       SS&C shall deliver its Services under this Attachment B.1 in a professional and workmanlike manner. – not sure we need to say that – it's a reasonable standard and one we are comfortable with
-       Application support services are available from 5:00AM to 11:59 PM Eastern US time – is 11:59 real? Is this Client Services? No it's the data center resources

CONFIDENTIAL

We don't identify SMF data as one of the interfaces to be maintained by SS&C. We also don't specify anything about how the handoff if any will happen for this client. I'm open to suggestions on these topics. We can include a statement that Armour will be responsible for loading SMF info because it's so important to the accounting function. A general statement that the parties will agree on a process to handoff between the organizations when exceptions / errors are found.

I believe Recon makes as a module but at this point it appears to me that we are not concerned with the overall solution that much as we are with selling software to these guys.

My assumptions for WR will be that no other activity will be performed by OTS than ETL and scheduling. No Recons of any kind. Correct no recons will be performed by SS&C.

Thanks,
Iwona

---

**From:** Suski, Bob
**Sent:** Monday, November 24, 2014 5:28 PM
**To:** Brown, Christopher; Castiglioni, Jeffrey; Cossin, Diane; Fecteau, Jeff; Moore, Dennis; Olszewska, Iwona; Quinn, Jack; Reilly, Timothy
**Subject:** ARMOUR Residential Management LLC Master Agreement and Work Request One

I accepted all of Chris' comments and added Jeff's.

Please review.

Note we still need all information for the work request.

Bob Suski
Senior Contracts Administrator
SS&C Technologies, Inc.
80 Lamberton Rd.
Windsor, CT 06095
Phone: 860-298-4579
Fax: 860-298-4969
E-mail: bsuski@sscinc.com

**Don't Wonder.**
KNOW.  | Anything.
       | Anytime.
       | Anywhere.

CONFIDENTIAL

SSC002601

# SS&C TECHNOLOGIES, INC.
## Master Agreement

This Master Agreement for Software, Maintenance and Support, Professional Services, and Other Services (the "Master Agreement") is entered into by and between ARMOUR Residential Management LLC, having its principal office at 3001 Ocean Drive, Vero Beach, FL 32963 ("Client") and SS&C Technologies, Inc., a Delaware corporation having its principal office at 80 Lamberton Road, Windsor, CT 06095 ("SS&C"), and describes the terms and conditions pursuant to which SS&C shall license to Client certain Software and provide certain maintenance and other services.

In consideration of the mutual promises and upon the terms and conditions set forth herein, the parties agree as follows:

**1.**   **Certain Definitions**
Capitalized terms are defined as follows unless otherwise indicated:

1.1   "Application Service" means Software hosted by SS&C provided to Client as a service.

1.2   "Confidential Information" means this Master Agreement, all Software, Documentation, information, data, drawings, benchmark tests, specifications, trade secrets, object code and machine-readable copies of the Software, source code relating to the Software (whether or not supplied to Client pursuant to this Master Agreement), and any other proprietary information supplied to Client by SS&C.

1.3   "Documentation" means any instructions regarding the use and functions of the Software, which may be printed manuals, or may be in electronic format, including "on-line" help files that may be included in the disc or other media on which the Software is delivered.

1.4   "Effective Date" means, in the case of this Master Agreement, the later of the dates on which Client and SS&C have signed this Master Agreement. With respect to any Attachment or Work Request the Effective Date shall be the later of the dates on which Client and SS&C have signed the authorizing document if not initially included in this Master Agreement.

1.5   "Master Agreement" means (i) this Master Agreement, (ii) each Attachment, and (iii) each Work Request.

1.6   "Software" means SS&C's proprietary off-the-shelf computer software program(s) specified in an Attachment to this Master Agreement.

1.7   "Use" has the meaning given to it in the relevant Attachment or Work Request, as the case may be.

**2.**   **Software Licensing**

2.1   From time to time SS&C may, subject to the terms and conditions of this Master Agreement, grant licenses to Client for the Software. Such Software licenses will be set forth in attachments attached to this Master Agreement numbered in sequence starting from A.1 (collectively, "Attachment A.x").

2.2   Limited License. Software licensed by SS&C to Client is specified and restricted in Attachment A.1 or any subsequently added attachment in the Attachment A.x series. Unless specified otherwise in an Attachment A.x, subject to the terms and conditions of this Master Agreement, SS&C hereby grants to Client a limited, perpetual, nonexclusive and nontransferable license to Use the software set forth in Attachment A.x and Documentation only at the designated installation address. Except for the rights expressly granted herein, this license does not transfer to Client title to any proprietary or intellectual property rights to the Software or Documentation, or any copyrights, patents, or trademarks, embodied or used in connection therewith. The license granted to Client hereunder does not include the Software source code.

2.3   Restrictions. Client will not directly, or indirectly through any affiliate, agent or other third party: (a) sell, lease, license or sublicense the Software or the Documentation to any third party; (b) decompile, disassemble, or reverse engineer the Software, in whole or in part; (c) write or develop any derivative software or any other software program based upon the Software or any Confidential Information; (d) use the Software to provide processing services to third parties, or otherwise use the Software on a 'service bureau' basis; (e) provide, disclose, divulge or make available to, or permit use of the Software by any third party without SS&C's prior written consent. The above stated restrictions shall also apply to all Third Party Software if provided by SS&C. Additional restrictions for specific Software are set forth in the relevant Attachment A.x to this Master Agreement.

2.4   Right to Copy. Client may make one (1) machine-readable copy of the Software for backup or archival purposes. Client may not copy the Software, except as permitted by this Master Agreement. Client shall maintain accurate and up-to-date

Page [ PAGE ] of [ NUMPAGES ]

SSC002602

## SS&C TECHNOLOGIES, INC.
### Master Agreement

records of the number and location of all copies of the Software and inform SS&C in writing of such location(s). All copies of the Software and Documentation will be subject to all terms and conditions of this Master Agreement. Whenever Client is permitted to copy or reproduce all or any part of the Software or Documentation, all titles, trademark symbols, copyright symbols and legends, and other proprietary markings must be reproduced.

2.5     Distribution.   SS&C shall issue to Client, as soon as practicable for Client's Use: (i) one (1) machine-readable copy of the Software, which shall include one (1) electronic copy of the appropriate Documentation. All Software, interim releases, version releases, error corrections, improvements, enhancements, fixes, patches and upgrades to the Software and related Documentation are only delivered electronically. Delivery occurs at Client's location.

2.6     Third Party Software.   Unless otherwise specified, Client is responsible for licensing all third party software required to use the Software ("Third Party Software").

2.7     Outside Services and Other Third Party Software.   Client may use outside data services and other third party software products in connection with the Software. Client is responsible for procuring these services and software and for the fees related to their installation and use.

2.8     Indemnification for Infringement.   SS&C shall, at its expense, defend or settle any claim, action or allegation brought against Client that the Software, when used within the scope of this Master Agreement, infringes any patent or copyright, misappropriates any trade secret or otherwise infringes any proprietary or intellectual property right of any third party ("Indemnified Claim") and shall pay any final judgments awarded or settlements entered into in connection therewith. Client shall give prompt written notice to SS&C of any such Indemnified Claim and give SS&C the authority to proceed as contemplated herein, provided that settlement of any Indemnified Claim on terms that include an admission of liability by Client or a restriction on the operation of Client's business other than as it relates to the Software shall require Client's prior written consent, which shall not be unreasonably withheld or delayed. SS&C will have the exclusive right to defend any Indemnified Claim and make settlements thereof at its own discretion, and Client may not settle or compromise any Indemnified Claim, except with the prior written consent of SS&C. Client shall give such assistance and information, at SS&C's expense, as SS&C may reasonably require to settle or oppose such Indemnified Claim. In the event any such Indemnified Claim is brought or threatened, SS&C may, at its sole option and expense: (a) procure for Client the right to continue use of the Software or infringing part thereof; or (b) modify or amend the Software or infringing part thereof, or replace the Software or infringing part thereof with other software having substantially the same or better capabilities; or, if neither of the foregoing is commercially practicable, (c) terminate the license granted with respect to the relevant Software and, in the case of a pre-paid perpetual license, refund to Client a portion, if any, of the corresponding License Fee(s) paid by Client equal to the amount paid by Client less one forty-eighth (1/48) thereof for each month or portion thereof that such license has been in effect. SS&C and Client will then be released from any further obligation to the other under this Master Agreement, except for the obligations of indemnification provided for above and such other obligations that survive termination. The foregoing obligations of SS&C shall not apply to the extent any infringement of a third party's intellectual property rights arises as a result of modifications to the Software made by any party other than SS&C or a duly authorized representative of SS&C or Use of the Software other than in accordance with the Documentation. The foregoing states the entire liability of SS&C with respect to any Indemnified Claim.

3.     Maintenance and Support

3.1     Software licensed under an Attachment A.x (or provide as an Application Service under and Attachment B.x) shall be accompanied with a Maintenance and Support Program ("Maintenance Program"). As part of a Maintenance Program, SS&C will provide telephone support, access to SS&C's online Solution Center, releases including major software enhancements and technology updates, typically annually, interim releases to upgrade the relevant Software and correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades (collectively "Updates") to the Software and related documentation. SS&C reserves the right, however, (i) to develop and market new modules and add-on modules to the Software and/or new versions of the Software, which in SS&C's judgment contain such added functionality that an additional fee for such modules and/or versions is warranted; and (ii) to exclude such modules and versions from coverage as Updates under the Maintenance Program. Client's Use of the Updates is subject to the terms, conditions and disclaimers of this Master Agreement, but such Updates shall not be covered by any warranty in the Master Agreement. SS&C does not provide maintenance or support for any Third Party Software or any other third party products. All Updates provided by SS&C under the Maintenance Program are owned by SS&C and are Confidential Information.

3.2     Software Releases to be Supported.   SS&C will, during the term of the relevant Maintenance Program, support two releases of the Software at any one time: (i) SS&C's generally available current production version of the Software and (ii) the production version immediately preceding such version.

Page [ PAGE ] of [ NUMPAGES ]

SSC002603

## SS&C TECHNOLOGIES, INC.
### Master Agreement

    3.3   <u>Telephone Support.</u>  Telephone support consists of: (i) providing Software problem resolution, as described below, (ii) responding to Client's questions regarding implementation of such enhancements and modifications as SS&C may provide from time to time; and (iii) responding to Client's questions about use of the Software on a limited basis.  Client may not use telephone support about Software use as a substitute for training in the use of the Software.  SS&C charges additional fees for such training.  SS&C will provide telephone consultation to Client as set forth in the relevant Attachment.

    3.4   <u>Problem in Using the Software.</u>  If, during the term of the relevant Maintenance Program, Client encounters a problem in using the Software, Client shall notify SS&C.  SS&C will diagnose the problem.  If SS&C determines that the problem is caused by an error in the Software, SS&C will correct it.  If SS&C determines that the problem is not caused by an error in the Software, Client shall pay SS&C, at SS&C's then current rates, for all work performed to diagnose and determine its cause plus travel time and reasonable expenses incurred in performing such work.

    3.5   <u>Maintenance Program Term and Termination.</u>  Unless otherwise specified in the relevant Attachment, for a perpetual license the initial Maintenance Program term for any Software licensed under an Attachment A.x will be effective on the Effective Date (the "Maintenance Program Effective Date") through and including the following December 31st.  Thereafter, the Maintenance Program term shall be renewed automatically on an annual basis on each January 1st ("Renewal Date"), on the same terms and conditions subject to fee increase, unless terminated by either party by prior written notice of at least thirty (30) days prior to the expiration of the initial term or any renewal term.

    In the case of a term license or an Application Service, the term of the Maintenance Program shall be concurrent with the term of the relevant Attachment and renewal shall be in accordance with the terms of Attachment.

    3.6   <u>Maintenance Program Fees.</u>  Initial annual Maintenance Program fees will be specified in the relevant Attachment A.x.  Unless otherwise specified in the Attachment, the first payment is payable upon execution of this Master Agreement or the authorizing document adding the relevant Attachment A.x by Client, prorated from the Maintenance Program Effective Date until December 31st.  SS&C will invoice Client annually on or about the Renewal Date, and Client will pay the Maintenance Program fee within thirty (30) days of receipt of each invoice.  The annual Maintenance Program fee payable hereunder for the second and each subsequent term will increase may increase from the prior year's non pro-rated Maintenance Program fee by an amount which shall not exceed the percentage change in the United States Consumer Price Index (All Urban Consumers) as published by the United States Department of Labor, Bureau of Labor Statistics for the one year ending two months prior to the end of the initial Term or each renewal term (as appropriate) plus three percent (US CPI ÷ 3%).  In no event will the Maintenance Program fee be less than the prior year's non-pro-rated Maintenance Program fee.

    In the case of a term license or an Application Service, the Maintenance Program shall be included with the fees and increases shall be in accordance with the terms of Attachment.

    3.7   <u>Reinstatement After Client Termination.</u>  After Client has terminated the Maintenance Program for any Software, Client may notify SS&C that it desires to reinstate the Maintenance Program.  SS&C may, in its sole discretion, determine whether or not to reinstate the Maintenance Program.  If SS&C permits reinstatement, Client shall pay SS&C the full Maintenance Program Fees that Client would have paid if such Maintenance Program had remained in effect from the date of termination through and including the date of reinstatement.  After such payment, SS&C will provide Client with the latest generally available release of the Software and related Documentation.

**4.**    **Professional Services**

    4.1   <u>Services.</u>  From time to time SS&C may, subject to the terms and conditions of this Master Agreement, perform certain services and/or provide or develop certain software or other products pursuant to work requests (each a "Work Request").  The terms and conditions of this Master Agreement are incorporated into and made a part of each Work Request.  In the event of any inconsistency between the terms and conditions of this Master Agreement and any Work Request, the terms and conditions of the Work Request shall control.

    4.2   <u>Changes.</u>  Client may at any time request a change in any Work Request under this Master Agreement.

    4.3   <u>Change Procedure.</u>  To request a change, Client will request a change to a Work Request in writing.  If the change requested is acceptable to SS&C, SS&C will estimate the resources required by the change and the effect of the change on any work in process.  SS&C will then prepare a Work Request or amendment thereto and return it to Client.  No action will be taken by SS&C on any requested change until a Work Request or amendment is signed by both parties.

Page [ PAGE ] of [ NUMPAGES ]

## SS&C TECHNOLOGIES, INC.
### Master Agreement

4.4     SS&C Retains Ownership.  All software, products, and/or deliverables provided by SS&C under any Work Request are owned by SS&C and are Confidential Information.  Client's Use of the software, products, and/or deliverables developed under a Work Request is subject to the terms, conditions and disclaimers of the Master Agreement but such software, products, and/or deliverables shall not be covered by any warranty in the Master Agreement.

4.5     Fees.  All fees are due and payable as specified in each Work Request hereunder.  Where appropriate, each Work Request shall set forth estimated fees for the services to be performed.

4.6     Expenses.  Client shall reimburse SS&C for expenses incurred by SS&C for reasonable travel, lodging, meals, telephone, shipping, duplicating and other direct expenses.  SS&C will provide such supporting documentation for expenses as Client may from time to time reasonably request.

4.7     Timing of Billing.  Fees and expenses incurred will be billed to Client on a monthly basis or as stated on the applicable Work Request.  Fees and expenses are due and payable by Client upon receipt of SS&C's invoice.

5.      **Other Services.**

From time to time SS&C may, subject to the terms and conditions of this Master Agreement, provide other services such as Application Service, hosting service, data service or business process outsourcing service.  Such other services will be described in attachments attached to this Master Agreement numbered in sequence starting from B.1 (collectively, "Attachment B.x").

6.      **General Terms and Conditions**

The following terms and conditions apply with respect to any licenses or services covered by this Master Agreement.

6.1     Fees and Expenses

6.1.1.     Fees and Late Days.  Client shall pay SS&C the fees specified in the relevant Attachment or Work Requests issued pursuant to this Master Agreement.

All amounts described herein are in United States dollars and are net of all sales, use, property and related taxes and customs duties.  All fees are due and payable as set forth in any Attachment or Work Requests.  A late payment charge of one and one-half percent (1½%) per month (annual rate of 18%), or the maximum rate allowed by law, whichever is less, will be added to (i) the License Fee if not paid on the due date and (ii) all amounts due under this Master Agreement if not paid within thirty (30) days of the due date.  If it should become necessary to turn this account over for collection, Client is responsible for all of SS&C's collection costs, including reasonable attorney's fees.

6.1.2     Taxes.  In addition to all other amounts required by this Master Agreement, Client shall pay or reimburse SS&C for all federal, state, and local sales, excise, use, or similar taxes based on payments to be made hereunder.  All taxes owed by Client hereunder shall become due and payable when billed by SS&C to Client, or when assessed, levied or billed by the appropriate tax authority, even if such billing occurs subsequent to expiration or termination of this Master Agreement.

6.2.    Disclaimer and Limitation of Liability

6.2.1     Disclaimer.  Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation.  SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the Software and the Documentation.

6.2.2     Exclusion of Consequential Damages and Absolute Limitation of SS&C's Liability.  SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for breach of this Master Agreement, whether alleged as a breach of contract or tortious conduct, even if SS&C has been advised of the possibility of such damages.  SS&C's liability under this Master Agreement for damages will not, in any event, exceed in the aggregate the fees paid by Client to SS&C under the relevant Attachment or Work Request giving rise to the claim for damages.

Page [ PAGE ] of [ NUMPAGES ]

SSC002605

## SS&C TECHNOLOGIES, INC.
### Master Agreement

6.2.3   No Third Party Beneficiaries.   SS&C shall have no contractual or other obligations or liability to (i) ARMOUR Residential REIT, Inc. or (ii) Javelin Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.   Client shall indemnify and hold harmless SS&C from and against any and all claims, suits, damages, judgments, costs and expenses (including reasonable attorney's fees) in connection with or arising out of any claim, suit or dispute brought or initiated by (i) ARMOUR Residential REIT, Inc. or (ii) Javelin Mortgage Investment Corp. against SS&C arising out or related to SS&C's obligations under this Master Agreement or any other agreement between SS&C and Client.

6.2.4   Allocation of Risk.   The provisions of this Section allocate risks under this Master Agreement between Client and SS&C.   SS&C's pricing reflects this allocation of risks and limitation of liability.

6.2.5   No Other Warranty.   Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid.   No employee, agent, representative or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

6.3.   Confidential Information

6.3.1   Client's Responsibilities.   The Confidential Information constitutes valuable trade secrets of SS&C.   Client shall use Confidential Information solely in accordance with the provisions of this Master Agreement.   Client shall use its best efforts to prevent unauthorized use or disclosure of Confidential Information.   Client will not disclose Confidential Information, or permit it to be disclosed, directly or indirectly, to any third party without SS&C's prior written consent.   Client bears no responsibility for safeguarding information that is (i) publicly available, (ii) already in Client's possession and not subject to a confidentiality obligation, (iii) obtained by Client from third parties without restrictions on disclosure, or (iv) independently developed by Client without reference to Confidential Information.   If Client is legally required to disclose Confidential Information, prior to such disclosure Client shall give notice to SS&C to permit SS&C to seek a protective order requiring that the Confidential Information be kept confidential.

6.3.2   SS&C's Responsibilities.   In the course of SS&C's performance of this Master Agreement, it may become privy to certain Client trade secrets and Client proprietary and confidential information ("Client Confidential Information").   SS&C shall use the Client Confidential Information solely in accordance with the provisions of this Master Agreement.   SS&C shall use its best efforts to prevent unauthorized use or disclosure of Client Confidential Information.   SS&C will not disclose Client Confidential Information or permit it to be disclosed, directly or indirectly, to any third party without Client's prior written consent.   SS&C bears no responsibility for safeguarding the confidentiality of information that is (i) publicly available, (ii) already in SS&C's possession and not subject to a confidentiality obligation, (iii) obtained by SS&C from third parties without restrictions on disclosure, or (iv) independently developed by SS&C without reference to Client Confidential Information.   If SS&C is legally required to disclose Client Confidential Information, prior to such disclosure SS&C shall give notice to Client to permit Client to seek a protective order requiring that the Client Confidential Information be kept confidential.

6.3.3   Notification of Unauthorized Access.   In the event that either party learns that a person or entity has gained unauthorized access to, or made an unauthorized disclosure of, the Confidential Information or the Client Confidential Information, as the case may be, the party learning of such access or disclosure shall immediately notify the other party in writing, providing the full particulars of such access or disclosure.

6.3.4   Injunctive Relief.   In the event of actual or threatened breach of the provisions of Section 6.3.1 or 6.3.2, the nonbreaching party will have no adequate remedy at law and will be entitled to immediate and injunctive and other equitable relief, without bond and without the necessity of showing actual money damages.

6.4.   Term and Termination

6.4.1   Term.   This Master Agreement will take effect on the Effective Date and will remain in force for so long as any attachment is in force or until terminated as set forth below in Section 6.4.2.   An Attachment may be terminated in accordance with its terms without terminating the Master Agreement.   The Maintenance Program for any Software licensed on a perpetual basis may be terminated as set forth in the relevant Attachment A.x without terminating this Master Agreement or the perpetual Software license to which such Maintenance Program relates.

6.4.2   Termination for Material Breach or Insolvency.   SS&C may, by written notice to Client,  terminate this Master Agreement if any of the following events ("Termination Events") occur:  (a) Client is in breach of any material term, condition or provision of this Master Agreement, or of any other agreement between SS&C (or any affiliate of SS&C) and Client (or any affiliate of Client), which breach, if capable of being cured, is not cured within thirty (30) days after SS&C gives Client written notice of such

Page [ PAGE ] of [ NUMPAGES ]

# SS&C TECHNOLOGIES, INC.
## Master Agreement

breach; or (b) Client (i) terminates or suspends its business, (ii) becomes insolvent, admits in writing its inability to pay its debts as they mature, makes an assignment for the benefit of creditors, or becomes subject to direct control of a trustee, receiver or similar authority, or (iii) becomes subject to any bankruptcy or insolvency proceeding under federal or state statutes.  If any Termination Event occurs, termination will become effective immediately or on the date set forth in the written notice of termination.  The provisions of Sections 1, 2.2 (second to last sentence only), 2.3, 2.8, 4.4, and 6 will survive termination of this Master Agreement.

6.4.3    Obligations Upon Termination.    Within thirty (30) days after the date of termination of this Master Agreement or a relevant Attachment for any reason whatsoever, Client shall (i) return the Software, and all copies, in whole or in part, all Documentation relating thereto, and any other Confidential Information in its possession that is in tangible form, (ii) purge all copies of the Software from all computer storage media, and (iii) furnish SS&C with a certificate signed by an executive officer of Client verifying that (i) and (ii) above have been done.

6.5.    Assignment

6.5.1    No Assignment.    Neither this Master Agreement nor any rights under this Master Agreement may be assigned or otherwise transferred by Client, in whole or in part, whether directly or by operation of law, without the prior written consent of SS&C. Any such consent may be conditioned upon the payment of additional fees to SS&C in such amounts as SS&C may determine. For purposes of this Master Agreement: (i) a change of control of Client, sale of substantially all of the assets of Client and/or a merger or consolidation involving Client or any affiliate of Client effecting, directly or indirectly, a change of control of Client, shall be deemed to be an assignment or transfer of this Master Agreement and the rights under it by operation of law requiring the written consent of SS&C; (ii) a "change of control" shall be deemed to have occurred if any person or entity not in control of the Client before the Effective Date of this Master Agreement, thereafter acquires control of the Client; (iii) an affiliate of a person or entity is a person or entity that controls, is under common control with or is controlled by such other person or entity; (iv) control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise; (v) the terms "person" and "entity" include an individual, a corporation, partnership, association, trust, fund or any organized group of persons, whether incorporated or not and any receiver, bankruptcy trustee or similar official.

Any assignment or other transfer of this Master Agreement or the Software without the prior written consent of SS&C as required above shall constitute a material breach of this Master Agreement. Subject to the foregoing, this Master Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and assigns.  Any attempted delegation, transfer or assignment prohibited by this Master Agreement shall be null and void.

6.6.    Notices

6.6.1    Notices.    Any notice required or permitted under the terms of this Master Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by first class certified mail, (c) sent by overnight courier, in each of (b) and (c) properly posted and fully prepaid to the appropriate address set forth below, or (d) sent by facsimile.  Either party may change its facsimile number or its address for notice by notice to the other party given in accordance with this Section.  Notices will be considered to have been given at the time of actual delivery in person, three (3) business days after deposit in the mail as set forth above, or one (1) day after delivery to an overnight courier service, or if sent by facsimile, notice will be considered delivered upon confirmation that the facsimile transmission has been successful by the transmission report denoting "OK" or any similar notation.

If to SS&C:
SS&C Technologies, Inc.
80 Lamberton Road
Windsor, CT 06095
Attn: Legal Department
Fax: 860-298-4969
Phone: 860-298-4832

If to Client:                                Client's Billing Address:
ARMOUR Residential Management LLC            ARMOUR Residential Management LLC
3001 Ocean Drive                             3001 Ocean Drive
Vero Beach, FL 32963                         Vero Beach, FL 32963
Attn:                                        Attn:
Fax:                                         Fax:

Page [ PAGE ] of [ NUMPAGES ]

# SS&C TECHNOLOGIES, INC.
## Master Agreement

Phone:                                        Phone:

6.7.    Miscellaneous

6.7.1    Force Majeure.  Neither party will incur any liability to the other party on account of any loss or damage resulting from any delay or failure to perform all or any part of this Master Agreement if such delay or failure is caused, in whole or in part, by events, occurrences, or causes beyond its control and without its negligence, including without limitation, blackouts, acts of God, strikes, lockouts, riots, acts of war, terrorism, cyber-terrorism, earthquake, fire and explosions.  The inability to meet financial obligations is not a force majeure event.

6.7.2    Waiver.  Any waiver of the provisions of this Master Agreement or of a party's rights or remedies under this Master Agreement must be in writing to be effective.  Failure, neglect, or delay by a party in enforcing the provisions of this Master Agreement or its rights or remedies will not be construed and will not be deemed to be a waiver of such party's rights under this Master Agreement and will not in any way affect the validity of the whole or any part of this Master Agreement or prejudice such party's right to take subsequent action.

6.7.3    Partial Invalidity.  If any term, condition, or provision in this Master Agreement is found to be invalid, unlawful or unenforceable to any extent, the parties shall endeavor in good faith to agree to such amendments that will preserve, as far as possible, the intentions expressed in this Master Agreement.  If the parties fail to agree on such an amendment, such invalid term, condition or provision will be severed from the remaining terms, conditions and provisions, which will continue to be valid and enforceable to the fullest extent permitted by law.

6.7.4    Entire Agreement.  This Master Agreement (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect thereto.

6.7.5    Modification.  This Master Agreement may be amended only by written agreement signed by both parties.

6.7.6    Headings.  The headings used in this Master Agreement are for convenience of reference only and are not to be used for interpreting it.

6.7.7    Export Control.  Client shall comply with all applicable export, re-export and foreign policy laws that may be imposed by the Canadian or United States government.

6.7.8    Counterparts.  This Master Agreement and any addendum or Work Request may be executed in counterparts, each of which when so executed will be deemed to be an original.  Such counterparts together will constitute one agreement.  Signatures may be exchanged via facsimile or electronic mail and the parties hereto agree that signatures so exchanged shall be binding to the same extent as if original signatures were exchanged.

6.7.9    Choice of Law; Choice of Forum.  This Master Agreement shall be interpreted, construed and in all respects governed under the laws of the State of Connecticut without regard to conflicts of law principles.  Any action, suit or proceeding related to any dispute, claim or controversy or otherwise related to the rights and obligations of the parties under this Master Agreement shall be brought in the Superior Court of the State of Connecticut, Hartford County or in the United States District Court for the District of Connecticut.  The parties hereto submit to the exclusive jurisdiction of such court.

6.7.10    No Solicitation.  SS&C and Client agree not to directly or indirectly solicit any employee of the other to leave the employ of the other.  The foregoing shall not prohibit either party from soliciting employment through newspaper advertisements or Internet postings so long as such means are not targeted specifically at the other party's employees.

6.7.11    Independent Contractors.  The parties are, and shall remain, independent contractors.  Except as provided herein, each party is not, and will not act as, an agent of the other party, nor shall either party or any of its employees be deemed to be employees of the other party and nothing in this Master Agreement shall be construed as creating a partnership, joint venture, an employer/employee relationship, an agent-principal relationship, or any similar relationship.

6.7.12    Authority to enter into Agreement.  Each party warrants that it has all necessary power and authority to enter into this Master Agreement and that this Master Agreement and performance hereunder does not violate the terms of any contract,

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

# SS&C TECHNOLOGIES, INC.
## Master Agreement

covenant or agreement between it and any unrelated third party. Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

6.7.13  Disclosure; Use of Client's Name.  SS&C is subject to United States federal and state securities laws.  SS&C may make disclosures required by such laws.  Subject to the confidentiality provisions of Section 6.3, SS&C may (i) refer to Client in generic client lists, new client announcements and product brochures and marketing materials indicating that Client is a client of SS&C; and (ii) issue a press release, subject to Client's prior reasonable review and consent, announcing that Client has engaged SS&C to provide software.  SS&C may disclose to third party vendors (including software vendors) that provide products and/or services that may be used by Client, or that are used in conjunction with SS&C's products or services, that Client is a client of SS&C and such other information that is reasonably needed by such third party vendors.

6.7.14  Right to Subcontract.  SS&C may subcontract or delegate the performance of any services under this Master Agreement or any Attachment or Work Request.  SS&C shall remain responsible for all its obligations under this Master Agreement or any Attachment or Work Request, as the case may be, notwithstanding any subcontracting or delegation of the performance of such obligations.  SS&C shall ensure that any third party performing services under this Master Agreement or any Attachment or Work Request on SS&C's behalf complies with all of SS&C's obligations hereunder.

6.7.15  Use of Affiliates.  In carrying out its duties pursuant to this Master Agreement or any Attachment or Work Request, some of the services for the Client may be delegated by SS&C to one or more of its affiliates.

6.7.16  Time Limit to Claim Breach.  No action arising out of any breach or claimed breach of this Master Agreement or transactions contemplated by this Master Agreement may be brought by either party more than one (1) year after the cause of action has accrued.  For purposes of this Master Agreement, a cause of action will be deemed to have accrued when a party knew or reasonably should have known of the breach or claimed breach.

6.7.17  Voidability at SS&C's Option.  This Master Agreement shall be voidable at SS&C's option if Client does not enter into and deliver it on or before December 19, 2014.

6.7.18  Attachments as of the Master Agreement Effective Date:
- A.1
- B.1

IN WITNESS WHEREOF, the parties have executed this Master Agreement as of the dates set forth below.

ARMOUR Residential Management LLC        SS&C Technologies, Inc.

By  _____        By  _____

Name  _____     Name  _____

Title  _____      Title  _____

Date  _____      Date  _____

Address  _____   Address  _____

         _____          _____

Page [ PAGE ] of [ NUMPAGES ]

SSC002609

## SS&C TECHNOLOGIES, INC.
### Master Agreement

#### ATTACHMENT A.1- License and Maintenance Program

I.   **SOFTWARE LICENSE**

**A.  Software Licensed under this Attachment A.1 (the "Software" for purposes of this Attachment A.1):**

> CAMRA™ for Microsoft® SQL Server™
> The following product modules are included:
> - CI Manager™
> - Impairments Manager™
> - Report Express™
> - Extend™
>
> Debt & Derivatives™
> The following product module is included:
> - Swaps™

**B. License Term:** Perpetual as set forth in Section 2.2 of the Master Agreement.

**C. License Fees:** $495,000. It is due and payable upon Client's execution of the Master Agreement. The License Fee is based on the total dollar value of the assets to be managed from time to time by Client using the Software (the "Asset Value"). For the purpose of this Attachment A.1, "manage" shall mean use of the Software in any fashion whatsoever in connection with any asset(s), and "asset(s)" shall mean any financial interest of any nature whatsoever managed by the Software. The Asset Value as of the Effective Date is approximately fifteen billion dollars (the "Initial Asset Value") and no part of the License Fee shall be refundable if the Asset Value decreases below the Initial Asset Value.

Additional License Fees: If the Asset Value appreciates as a result of the operation of Client's business in the ordinary course, then no additional License Fee will be due hereunder. However, if the Asset Value increases as a result of (a) the addition of new assets to be managed by Client using the Software resulting from or in connection with a merger, asset acquisition, stock purchase or any other acquisition or extraordinary occurrence, involving or effected by Client or any affiliate of Client, or otherwise, or (b) the addition of assets to be managed which existed as of the Effective Date but were not included in the Initial Asset Value (such new assets shall be referred to herein as the "Incremental Assets", and each such addition a "Triggering Event"), then an additional, incremental license fee (plus an increase in annual maintenance equal to twenty percent (20%) of such license fee regardless of any limitation which may exist in Section 3.6 of the Master Agreement) will be immediately due and owing in an amount equal to SS&C's then standard license fee to use the Software to manage assets equal in amount to the Incremental Assets value (as determined in SS&C's sole discretion). The Initial Asset Value is stated above solely for the purpose of enabling SS&C to monitor the Asset Value from time to time, as it may deem appropriate. Any decrease in the Initial Asset Value or Asset Value shall not reduce any additional license fee.

Client will report to SS&C the occurrence of a Triggering Event and the Incremental Assets value within thirty (30) days after such an event. The determination of the Incremental Assets value will be made using the identical or substantially similar methods used in determining the Initial Asset Value. Client will provide SS&C with all backup documentation and other substantiating information of the Incremental Assets value upon request by SS&C. If Client fails to report a Triggering Event and/or fails to report or underreports the Incremental Assets value, then SS&C may terminate this Attachment A.1 for material breach, pursuant to the provisions of Section 6.4.2 of the Master Agreement.

**D.  Additional Restrictions:**

> 1) Use means use by Client of the Hosted Software and all Third Party Software provided by SS&C, for Client's own internal information processing services and computing needs and for Client to support of ARMOUR Residential REIT, Inc. and Javelin Mortgage Investment Corp.
>
> 2) Installation Address:
> - If the Software is hosted pursuant to Attachment B.1:
>   SS&C Technologies, Inc.
>   80 Lamberton Rd.
>   Windsor, CT 06095

CONFIDENTIAL

## SS&C TECHNOLOGIES, INC.
### Master Agreement

- If the Client takes delivery of the Software pursuant to section G below:
  ARMOUR Residential Management LLC
  3001 Ocean Drive
  Vero Beach, FL 32963

*\*Use is restricted to a single server at the installation address above. Use at multiple Sites or on separate servers is authorized only upon payment of SS&C's then standard multi-site licensing fees.*

**E.  Limited Warranty:**  SS&C warrants that as of the Effective Date and for ninety (90) days thereafter, the Software will perform in substantial accordance with the Documentation.  If during such period, Client believes that the Software does not perform as warranted, Client shall notify SS&C of the purported failure to perform.  SS&C shall investigate such purported failure to perform, and if SS&C determines that the Software does not substantially perform in accordance with the Documentation, then SS&C shall, at its sole option, undertake to correct the Software, replace the Software free of charge or, if neither of the foregoing is commercially practicable, terminate the license granted with respect to the Software and refund to Client the corresponding License Fee paid by the Client.  The foregoing are Client's sole and exclusive remedies for breach of warranty.  The warranty set forth above is made to and for the benefit of Client only.  The warranty will apply only if:  (a) the Software has been properly installed and used at all times and in accordance with the instructions for Use; and (b) no alteration, modification or addition has been made to the Software by persons other than SS&C.

**F.  Third Party Software Provided by SS&C.**  SS&C is providing the following Third Party Software:

Crystal Reports Version 2011 (five named user license).  Provided by SS&C for a fee of $2,350, which is in addition to the License Fee set forth above and which is due and payable by Client to SS&C upon execution of the Master Agreement by Client.  The SAP terms and conditions found on the Crystal Reports software will apply.

Included with the Software for no additional fee is a runtime license in the database management software PFXplus™, which is required to Use the Software (PFXplus is a registered trademark of the POWERflex Corporation of Victoria, Australia).

**G.  Delivery of Software:**  Provided that the Client's license to the Software has not been terminated pursuant to the terms of the Master Agreement, Client may request delivery of the Software at any time.

**II.    MAINTENANCE PROGRAM**

**A.  Initial Annual Maintenance Program Fees:**  $99,000.

**B.  Support Hours:**  SS&C will provide telephone consultation to Client with respect to the ~~CAMRA™  for Microsoft® SQL Server™~~ Software for no additional charge during SS&C's business hours of (i) 8:30 a.m. to ~~7:~~5:00 ~~30~~ p.m. Eastern Time Monday through ~~Thursday and (ii) 8:30 a.m. to 5:30 p.m. on Friday,~~ excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).

~~SS&C will provide telephone consultation to Client with respect to the Debt & Derivatives™ Software for no additional charge during SS&C's business hours of 8:30 a.m. to 5:30 p.m. Eastern Time Monday through Friday, excluding SS&C holidays (as SS&C may modify such service hours from time to time by notices to Client and all other Software licensees).~~

Page [ PAGE ] of [ NUMPAGES ]

SSC002611

## SS&C TECHNOLOGIES, INC.
### Master Agreement

#### ATTACHMENT B.1- Hosting, Process Automation and Data Management Services

**A. Hosted Software:**   CAMRA™ 'S'™ for Microsoft® SQL Server™ (15 named users)
The following product modules are included:
- CI Manager™
- Impairments Manager™
- Report Express™
- Extend™

Debt & Derivatives™ (15 named users)
The following product module is included:
- Swaps™

**B. Term:** This Attachment B.1 shall remain in full force and effect for a term of five (5) years from the Effective Date (the "Initial Term") and will thereafter automatically renew for additional one (1) year periods (the "Renewal Term"), unless otherwise terminated as provided by the Master Agreement or this Attachment B.1. Either party may terminate this Attachment B.1 following the Initial Term or any Renewal Term by giving the other party written notice at least ninety (90) days prior to the end of the Initial Term or any Renewal Term. Notwithstanding the foregoing, the Client may terminate this Attachment B.1 for any reason or no reason at all by giving SS&C six (6) months prior written notice.

**C. Fees:** The monthly fee for the Hosting Services in Attachment B.1 is $10,000 USD. The first month's payment is due upon the Effective Date. Subsequent payments are due and payable monthly in advance. If Client requires additional users for the Hosted Software, then an additional, incremental monthly fee will be immediately due and owing in an amount equal to SS&C's then standard fee.

Following the Initial Term, beginning with the first Renewal Term, the Hosting Services fees may be increased by SS&C at the commencement of each Renewal Term. SS&C shall notify Client of any such increase in the Hosting Services fees in writing at least ninety (90) days prior to commencement of the Renewal Term in which such an increase is effective. Notwithstanding the foregoing, in the absence of such notification from SS&C to Client, the Hosting Services fees for each year of the Renewal Term will increase from the prior term's fee by an amount which shall not exceed the United States Consumer Price Index plus five percent (US CPI + 5%). The United States Consumer Price Index referred to in the preceding sentence is the United States Consumer Price Index (All Urban Consumers) published by the United States Department of Labor, Bureau of Labor Statistics. In no event will the Hosting Services fees for any year be less than the previous year's processing fees.

**D. Hosting, Process Automation and Data Management Services:** SS&C will maintain for Client the Hosted Software processing environment through SS&C's processing center in Windsor, CT. The Client will have on-line access to the Hosted Software. The description below specifies the Hosting, Process Automation and Data Management Services that SS&C will provide under this Attachment B.1.

1. Provisioning and Maintenance of the Hosted Software in SS&C's Data Center, including:
   - Physical and virtual technology infrastructure for hosting of licensed software as described in this Attachment B.1.
   - Physical and virtual infrastructure allowing network connectivity and remote (user level) access to hosted environments
   - Segregated databases for Client, in a shared infrastructure environment, up to an aggregate total of 50 GB of storage
   - Data center operations staffing and support, including periodic infrastructure maintenance and availability monitoring
   - Environmental support for infrastructure operations including but not limited to data center floor space, power, heating and cooling, physical security systems, UPS systems and diesel generator back-up
   - Data backup and storage as described in this Attachment B.1. Standard services include nightly tape backup stored onsite, weekly tape backup stored at an offsite facility for a rotating five weeks, monthly tape backup stored offsite for twelve months and yearly tape backups stored offsite for ten years and disposed of shortly after the eleventh anniversary. Increased levels of data protection and backup are available at additional cost.
   - Disaster recovery to an alternate data center site (within 48 hours of an outage)

CONFIDENTIAL                                                                   SSC002612

## SS&C TECHNOLOGIES, INC.
## Master Agreement

2.  System Access Controls
    - Ongoing administration of user access rights in response to client requests.  Client is responsible for timely notification to SS&C of relevant user account additions and deletions.
    - Network password administration in accordance with Client standards
    - Network security in accordance with SS&C security policy and standards

3.  Communications
    - Maintenance of internet connectivity for Client access
    - Provisioning of secure, internet-based CITRIX software connectivity for access to the Hosted Software

4.  Database and Operating System Maintenance
    - Periodic maintenance updates of operating system and database platform software
    - Installation of database and operating system software releases in accordance with SS&C platform currency standards.

5.  Licensed Software Release and Upgrade Support
    - Coordination of upgrade schedules in conjunction with Client
    - Installation of new Hosted Software releases and updates provided that Maintenance Program serivces pursuant to Section 3 of the Master Agreement have not been terminated
    - Migration of Hosted Software releases and updates to production environment
    - Provide an environment for Client testing of releases

6.  Monitoring Services
    - System availability monitoring
    - Network monitoring
    - Server and storage utilization monitoring
    - Antivirus and security monitoring

7.  Batch Processing Data Management Operations and Support
    - Daily import and load of trades from Client and AVM
    - Daily import of market pricing from Bloomberg and IDC
    - Daily import of Client-provided cash flows
    - Daily import of transactions from Citibank as custodian
    - Daily export of holdings information to BlackRock Solutions
    - Daily extract of open positions to AVM
    - Monitoring of the nightly process and timely response to interruptions
    - Notification to Client of nightly process status
    - Proactive issue resolution and escalation to Client as required

8.  Disaster Recovery
    - Disaster recovery infrastructure will be maintained at an alternate physical location from the primary production data center hosting facility.  In the event of a critical primary data center failure, the Client's infrastructure will be made available for access in the alternate location within 48 hours of critical failure declaration, with a maximum data loss of 24 hours worth of processing.
    - SS&C will accommodate one annual DR testing event in partnership with Client, with a minimum of 30 days of notification of the testing event.

**E.  Service levels:**

SS&C shall deliver its Services under this Attachment B.1 in a professional and workmanlike manner.
- "System Availability" is defined as the percentage of time that the Hosted Software is available for processing during Business Hours during a calendar month, outside of scheduled maintenance periods.
- Regular maintenance periods with corresponding scheduled system unavailability will occur on a monthly basis, every second Sunday of the month, from 6:00AM to 12:00PM Eastern US time.
- Scheduled Exception maintenance may occur infrequently in addition to regular maintenance periods, and will be performed with a minimum 30 days notice to Client.

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

## SS&C TECHNOLOGIES, INC.
### Master Agreement

- Unscheduled exception maintenance, with 24 hours of notice or less, may occur in emergency change situations.
- The System Availability standard shall be 99%.
- If SS&C fails to provide 99% System Availability for two consecutive months, Client may notify SS&C in writing regarding the specific failure by SS&C. If SS&C fails to provide 98 % System Availability for three consecutive months, and Client previously provided SS&C with written notice following the second consecutive month of failed delivery in accordance with this paragraph, then Client may terminate this Attachment B.1 for breach.
- Support for hosting issues is available 24x7 on regular business days
- Application support services are available from 5:00 AM to 11:59 PM Eastern US time
- Problem Identification and Resolution

SS&C and Client will each take direct responsibility for notification of selected personnel for the purpose of prompt resolution of processing problems. In the event that Client reports a severe or critical issue, SS&C will respond as quickly as practicable and continue to work with the Client to resolve the issue or develop a work around that allows the Client to continue processing. SS&C and Client will mutually develop and agree to a problem identification process and procedure after execution of the Agreement.

**F. Client Responsibilities:**

- Designate responsible system administration liaison with SS&C
- Designate and maintain Client primary and secondary escalation contacts for batch operations issue escalation
- Maintain Hosted Software trained operations staff
- Validate financial results of each new release of the Hosted Software prior to its being placed into production
- Maintain and support appropriate communication facilities at Client site for hosting connectivity
- For Client provided, and client-managed data sources, prepare reports and upload all required input data in CAMRA™ 'S'™ for Microsoft® SQL Server™ / Debt & Derivatives™, in standard SS&C-defined formats to a designated secure FTP site according to agreed-upon processing schedules.

CONFIDENTIAL

SSC002614

# EXHIBIT 51





# Introduction to SS&C Technologies
## Specialized Solutions for Publicly Traded Mortgage REITs



June 2, 2014

ACM0025350

# SS&C Business Overview



- Independent provider of **Software** and **Outsourcing Services** to the global financial services industry
- More than **6,000 clients** worldwide, including:
  - Mortgage REITs
  - Asset Managers
  - Insurance Companies
  - Alternative Investment Managers
  - Banks/Financial Institutions
- **Staff of 4,200+**
- Global Operations
  - North American Offices
    - Boston, Chicago, Denver, Los Angeles, Minneapolis, Montreal, New York City, Toronto, Windsor, CT, Yorktown Heights
  - International Offices
    - Amsterdam, Cayman Islands, Curacao, Dublin, Hong Kong, Kuala Lumpur, London, Luxembourg, Mumbai, Singapore, Sydney, Tokyo



1

ACM0025351

# Deployment Options



- In-House License
  - The CAMRA application is run in ARMOUR's data center

- Hosting
  - SS&C hosts the hardware and software in its Tier 3 data center
  - In addition to hosting, SS&C can also provide certain services in a SaaS model, including data gathering, reconciliation, etc.

- Full Service Outsourcing
  - SS&C provides comprehensive investment accounting and reporting services on an outsourced basis



2

ACM0025352

# REIT Solution Overview



- Accounting and reporting expertise
  - Accounting professionals with extensive Big 4 experience
  - Experience supporting the accounting and financial reporting needs of public companies

- Optimization of your operating environment
  - Process reviews
  - Process improvement recommendations
  - Staff augmentation

- Portfolio Management, Accounting and Reporting software solutions
  - MBS trading and collateral management
  - Portfolio management and accounting
  - Forecasting, analysis and risk management

- Operational support services
  - Ranging from post-trade communications through financial reporting



3

ACM0025353

# Expertise Supporting MBS



A large portion of our client base has a significant exposure to MBS

- REITs
  - Annaly / Chimera
  - Western Asset Mortgage Capital
  - Apollo Residential Mortgage Trust
  - CYS
  - Ares
  - New York Mortgage Trust
- Real Estate Investment Companies
  - Ladder Capital
  - Structured Portfolio Management
- Insurance Companies / Asset Managers
  - New York Life
  - TIAA / CREF
  - Liberty Mutual



4

ACM0025354

# CAMRA – Accounting Platform



- ▣ Portfolio Management & Accounting
    - – Supports consolidated Book of Record
    - – Power and flexibility to manage entire investment process
    - – Proven accounting engine

- ▣ Over 500 clients worldwide with more than $2 trillion of assets

- ▣ Comprehensive MBS processing capabilities

- ▣ Robust audit and control tools

- ▣ Integrated web reporting





5

ACM0025355

# Investments Subledger

- Provides Trial Balance and Income Statement to be fed to Corporate GL

- Real-time generation of general journal entries

- Chart of Accounts by
  - Basis
  - Custodian
  - Security Group
  - Security Type

- Tracking of General Ledger balances to support Trial balance and Income statement





6

ACM0025356

# Cash Flow Elections

- Client controlled elections
  - PSA
  - CPR
  - Cash flow schedules
    - Principal only
    - Principal & Interest
    - Assignment of amortization window
- Automated generation of melded cash flows
- Multiple default levels
- Override at all levels include tax lot by accounting book

SS&C

ACM0025357

# Supported Methodologies / Guidance



- Interest Method
  - ASC 310-20 (as defined in ASC 835-30-35) (Formerly FAS 91)

- Retrospective Interest Method
  - ASC 320-10 (Formerly EITF 96-12)

- Effective Yield Method
  - ASC 325-40 (Formerly EITF 99-20)

- Treatment of Loans and Debt Securities Acquired with Deteriorated Credit Quality
  - ASC 310-30



8

ACM0025358

# Why SS&C



- Unique ability to leverage knowledge and expertise across organization
  - Development, licensed clients, outsourcing, professional services

- Highly skilled consulting
  - Process improvements / automation
  - Ability to provide tailored / customized solutions

- Relevant Mortgage REIT expertise and public company reporting

- Dedicated REIT Services team supporting technical accounting, regulatory and tax needs

- Proven systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs

SS&C

9

ACM0025359

## With You Today



**J. Timothy Reilly, CPA** has served as SS&C's Senior Vice President, Institutional Solutions and Services since June 2013. Prior to joining SS&C, Mr. Reilly served in senior financial capacities at PwC for almost 28 years, serving in key roles in PwC's local, regional and national markets, most recently as a Market Leader in the PwC Hartford office. Mr. Reilly also has extensive financial management experience with various company clients' organizations ranging from Fortune 500 to smaller entrepreneurial organizations. He is a graduate of Clarkson University, and is a Certified Public Accountant. In addition, Mr. Reilly has been recognized for his contribution to the technology community for his roles in a variety of technology related organizations.

Phone: 860-298-4828  |  Email: TReilly@sscinc.com

**Josh Brown, CPA** is the leader of SS&C's REIT Servicing Group and the Senior Director of Accounting Policy and Regulatory Reporting. Previously, Mr. Brown was a senior manager in PwC's Northeast Insurance Services practice and has over 12 years of experience providing auditing and accounting advisory services to REITs as well as life insurance, health insurance and property and casualty insurance entities. He co-led the Northeast Market Leveraged Experienced program which was designed to bring subject matter expertise to the regional markets. He was also the national leader of PwC's insurance training program. He obtained his bachelor's and master's degrees from the University of Connecticut and is a Certified Public Accountant.

Phone: 860-731-5038  |  Email: JBrown@sscinc.com

**Jeff Fecteau** is a Relationship Manager responsible for account management and sales for SS&C's REIT client base and has been with the company since 2000. He works in collaboration with SS&C's technology and services teams to develop solutions that are responsive to the needs of our REIT clients. He has worked extensively with organizations that invest in real estate assets and has experience developing solutions that support publicly traded and private REITs. Mr. Fecteau graduated from Marist College with a bachelor's degree in Accounting.

Phone: 860-731-5022  |  Email: JFecteau@sscinc.com

**Dennis Moore** has served as a Sales Manager for SS&C Institutional Solutions and Services since March 2013. He has over five years' experience working with a broad range of financial institutions, including asset managers, REITS and specialty finance companies, insurance, banks and credit unions, on addressing their technology needs. He works with SS&C's software development and outsourcing teams to customize the right front, middle and back office solutions for our clients. Mr. Moore graduated Cum Laude from Elon University with a bachelor's degree in Communications.

Phone: 860-298-4763  |  Email: Dennis.Moore@sscinc.com

SS&C

10

ACM0025360

# EXHIBIT 52

Message

| From: | Olszewska, Iwona [iolszewska@sscinc.com] |
|---|---|
| Sent: | 9/23/2015 2:18:55 PM |
| To: | Johnson, Adriana [ajohnson@sscinc.com] |
| Subject: | FW: And call to catch up |

**From:** Olszewska, Iwona
**Sent:** Wednesday, September 23, 2015 10:16 AM
**To:** Reilly, Timothy
**Subject:** RE: And call to catch up

Tim,
In short. Project is in Red this week until Friday when an updated timeline will be presented at which point it will go to Green.

Roll forward:

D&D is current/parallel with productions
CAMRA :
- January accounting is completed. GL to be wrapped up by end of this week.
- February processing is completed, we are wrapping on ME reporting package, due Thursday. Feb GL – ETA, 10/3
- March processing to commence on Thursday, ETA for completion 10/2 . March GL – ETA, 10/7

Initial delay were caused by :
- limited capacity on clients side
- incorrect data provided for initial positions (we had to re-initialize)
- incorrect/limited data for roll forward from custodians (CITI)

Current challenge – CITI pulled our access to the website. We have logged into their portal and were able to extract correct data for February, however, it is unclear to us (we are working through that piece with CITI and Armour) whether Armour's contract with CITI allows for trade date information).  Anyhow, we are working directly with Citi to resolve.

The objective is to use CAMRA for year-end reporting. To achieve that, we have added more resources on our end, and, will continue to handle the roll forward process until it is feasible for Armour to take on.

Internal challenge on this one is that we didn't sell them the right solution, Recon should have been suggested strongly as well as a workflow change in respect to Cash Management which is now handled via 3rd party.

Current Cash management process in place adds time to the reconciliation and is all manual which will be the workflow for the operation going forward. I am meeting with them next week hopefully (Adriana is working on that) so I can make some suggestions for improvements.

Let me know if you need anything else.

Regards,
Iwona

CONFIDENTIAL

SSC136509

**From:** Reilly, Timothy
**Sent:** Tuesday, September 22, 2015 1:07 PM
**To:** Olszewska, Iwona
**Subject:** Re: And call to catch up

I would like to call him today (tomorrow at latest)

J. Timothy Reilly

On Sep 22, 2015, at 1:06 PM, "Olszewska, Iwona" <iolszewska@sscinc.com> wrote:

> I can. When is your call?
>
> **From:** Reilly, Timothy
> **Sent:** Tuesday, September 22, 2015 1:04 PM
> **To:** Olszewska, Iwona
> **Subject:** Fwd: And call to catch up
>
> Who best to provide update before I call Jim
>
> J. Timothy Reilly
>
> Begin forwarded message:
>
>> **From:** Jim Mountain <jrm@armourcap.com>
>> **Date:** September 22, 2015 at 12:36:26 PM EDT
>> **To:** "treilly@sscinc.com" <treilly@sscinc.com>
>> **Subject: And call to catch up**
>>
>> Tim:  Do you also have a few minutes for a call to talk about status of our CAMRA installation?
>>
>> James R. Mountain, Chief Financial Officer
>> ARMOUR Residential REIT, Inc. (NYSE:  ARR)
>> 3001 Ocean Drive, Suite 201
>> Vero Beach, FL  32963
>>
>> +1 772 617 4340  Office
>> +1 862 215 1850  Cell
>> +1 561 348 2408  Fax
>> jrm@armourcap.com
>> www.armourreit.com

CONFIDENTIAL

SSC136510

# EXHIBIT 53

Message

| | |
|---|---|
| **From:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Sent:** | 6/19/2014 2:37:24 PM |
| **To:** | Jim Mountain [jrm@armourllc.com]; Mark Gruber [mrg@armourllc.com] |
| **Subject:** | RE: SS&C inquiry |
| **Attachments:** | SS&C CAMRA Modules & Systems_ARMOUR_6.19.14.pdf |

Jim & Mark,

Attached please find a consolidated document that will provide you with a high-level overview of each of the CAMRA modules as well as some additional systems we think would be relevant to ARMOUR.

Not all of the modules and systems need to be implemented on Day 1, but this should give you a good flavor of what's available to you.

If you have questions or would like clarification on any of the modules/systems, we would be happy to set up a call.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

---

**From:** Mark Gruber [mailto:mrg@armourllc.com]
**Sent:** Monday, June 16, 2014 1:33 PM
**To:** Moore, Dennis; Jim Mountain
**Subject:** RE: SS&C inquiry

Dennis,

Attached is a list of assets and data for the POC. When you are ready to begin, please give me a call and we can walk through the data to make sure we have everything you need and provided the correct data.

Mark Gruber, CFA
Chief Operating Officer & Head of Portfolio Management

ARMOUR Residential Management, LLC
ARMOUR Residential REIT, Inc
JAVELIN Mortgage Investment Corporation

3001 Ocean Drive, Suite 201, Vero Beach, FL 32963
*Office* 772-617-4340  *Fax* 561-348-2408  mrg@armourllc.com

---

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 13, 2014 2:23 PM
**To:** Jim Mountain
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

Jim,

For the Proof of Concept we discussed on our call last Friday, we wanted to put together a list of data elements for each of the securities you would like us to run through the CAMRA system. In our experience, what has worked best is a sampling of approximately 10-15 unique securities and a POC period of 1 quarter's worth of activity.

For each trade please provide:
- CUSIP
- Original trade and settle dates
- Original cost
- Original face
- Current factor (as of beginning date for the POC)
- Current face (as of beginning date for the POC)
- Accrued interest
- Book value as of POC begin date
- Book yield as of POC begin date
- Either a prepayment speed or schedule of cash flows for the POC begin date and any updates to the cash flows or speeds you would like us to use during the POC period
- Trade details for any subsequent buys or sells that you would like us to process during the period
- Any impairments that were recorded during the period

We would be happy to schedule a follow-up call to further discuss any of the data elements we're looking for as well as expectations for the POC if you would like.

Have a great weekend.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

---

**From:** Moore, Dennis
**Sent:** Monday, June 09, 2014 4:36 PM
**To:** 'Jim Mountain'; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Attached please find a copy of the fully executed NDA.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

CONFIDENTIAL

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, June 06, 2014 4:08 PM
**To:** Moore, Dennis; Mark Gruber
**Subject:** RE: SS&C inquiry

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 6, 2014 3:48 PM
**To:** Jim Mountain; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Attached is the mutual NDA. Once executed, please return to me for countersignature and then I will provide you with a completed copy for your records.

Let me know if you have any questions.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, June 06, 2014 11:24 AM
**To:** Moore, Dennis; Mark Gruber
**Subject:** RE: SS&C inquiry

OK by us

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, June 6, 2014 11:23 AM
**To:** Jim Mountain; Mark Gruber
**Subject:** Re: SS&C inquiry

Jim,

How about 3:00pm today? I can send out a calendar invite with a dial-in number shortly.
Dennis

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Thursday, June 05, 2014 11:50 AM
**To:** Moore, Dennis; Mark Gruber <mrg@armourllc.com>
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

Thank you for the excellent meeting on Monday. We have regrouped internally and continue to be very interested in CAMRA and would like to explore more about it and how we would be able to integrate it in to our operations. Early afternoon Friday would work for us.

Thanks,

Jim


**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Wednesday, June 4, 2014 6:00 PM
**To:** Jim Mountain; Mark Gruber
**Subject:** RE: SS&C inquiry

Jim & Mark,

Thank you again taking the time to meet with us in our offices this past Monday. I think there was a lot of good information exchanged, and I hope you found the meeting helpful. Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for ARMOUR and I just wanted to reaffirm our interest in partnering with you.

I know you were interested in receiving an estimated fee range from us, so what we would like to do is schedule a follow-up call for this Friday. We can use this time to share with you the estimated fee range, what that entails, as well as what we view as potential next steps.

Please let me know when you are available Friday and we will do our best to work around your schedule.

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Monday, June 02, 2014 1:00 PM
**To:** Moore, Dennis
**Cc:** Amber Luedke; Trevor Spicer; Jonna K. Terry
**Subject:** Re: SS&C inquiry

Amber is our Chief Accounting Officer
Trevor is our IT Director and
Jonna is Senior Investment Accountant
James R Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive
Vero Beach, FL 32963
jrm@armourllc.com
Office 772-617-4340

CONFIDENTIAL

Cell 862-215-1850
Fax 561-348-2408

---

**From:** "Moore, Dennis" <Dennis.Moore@sscinc.com>
**Date:** Mon, 2 Jun 2014 15:06:52 +0000
**To:** 'jrm@armourllc.com'<jrm@armourllc.com>
**Subject:** Re: SS&C inquiry

Jim,

Do you have a list of names/titles of the folks that will be dialing into the WebEx for the demo?

Dennis

---

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, May 30, 2014 04:36 PM
**To:** Moore, Dennis
**Subject:** Re: SS&C inquiry

Don't need to for us. Mark and I will likely have eaten when we get to your place. Thank you for the offer, however.

Jim
James R Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive
Vero Beach, FL 32963
jrm@armourllc.com
Office 772-617-4340
Cell 862-215-1850
Fax 561-348-2408

---

**From:** "Moore, Dennis" <Dennis.Moore@sscinc.com>
**Date:** Fri, 30 May 2014 20:04:44 +0000
**To:** 'Jim Mountain'<jrm@armourllc.com>
**Subject:** RE: SS&C inquiry

Jim, would you like us to have lunch brought in on Monday?

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

---

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Friday, May 30, 2014 2:10 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

SSC000409

Very good.  Thanks.  Are there webex details that we can provide to others on our side to join the high level demo remotely?

See you on Monday afternoon.

Jim

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
JAVELIN Mortgage Investment Corp.  (NYSE:  JMI)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell
+1 561 348 2408  Fax
jrm@armourllc.com
www.armourreit.com
www.javelinreit.com


**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Friday, May 30, 2014 1:54 PM
**To:** Jim Mountain
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

Jim,

I was able to secure Mike Doyle to provide a high-level demo of the CAMRA application towards the end of our discussion on Monday at 3PM. Mike was on the introductory call last Tuesday and is VP Business Solutions for our institutional clients.

Also, attached are responses and supporting documentation for Trevor's IT/System related questions. To the extent you have any questions or would like us to walk through anything with you, we would be happy to set up a call.

Have a great weekend and safe travels.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Wednesday, May 28, 2014 4:16 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

SSC000410

I am fine with spending 1:30 to 3:00 as you suggest.  I would like to get a peek at the technology and operational capacity of the system while Mark and I are up there Monday afternoon.  So we can stay on for a while after 3 to make it a double header.

I will try to get Trevor to formulate the technical systems questions that he had in mind and forward to you Thursday afternoon.

See you Monday.

Jim


**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Tuesday, May 27, 2014 4:03 PM
**To:** Jim Mountain
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

Jim,

Thanks for the update. I will send you a calendar invite for 1:30-3:00pm and include the address for our midtown Manhattan office. We are located on 675 Third Ave (corner of 42nd street). I have already checked you in at security, so all you will have to do is tell security you're here to meet with SS&C on the 17th floor. We would also be happy to have lunch ordered in if you'd like.

As a follow-up to our initial call last week, I think the most effective structure for Monday's meeting will be an executive-level discussion. On my end, I have gotten together a great representation of our REIT expertise. This includes Tim Reilly, CPA, SVP of SS&C's Institutional Solutions and Services, and former partner at PwC for 17 years; Josh Brown, CPA, Head of SS&C's REIT Services group and Senior Director of Accounting Policy & Regulatory Reporting; and Jeff Fecteau, Relationship Manager for SS&C's REIT clients. They will be able to further discuss what we're doing for other REIT clients, what we're seeing in the market place, etc.

As far as the IT discussion and a high-level intro demo of the system, these are two items we could handle through a separate call/WebEx before or after the June 2nd meeting. We can then lay out a plan where we can come on-site and do a deeper dive demonstration of the system with more ARMOUR team members involved.

Thoughts or feedback on the above items?

Thanks,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Tuesday, May 27, 2014 3:21 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber
**Subject:** RE: SS&C inquiry

CONFIDENTIAL

Mark should be able to get in and drop his bag at the hotel in time to be at your place by 1:30.  Please confirm your Manhattan address and any tricks on getting checked in at security

**From:** Moore, Dennis [mailto:Dennis.Moore@sscinc.com]
**Sent:** Tuesday, May 27, 2014 8:55 AM
**To:** Jim Mountain
**Subject:** RE: SS&C inquiry

Jim,

I hope you had a nice long weekend. Specific to the IT-related questions you said Trevor had, would Trevor be able to provide me with a list of at least some of those IT questions? I want to make sure I have the right technical resource on my end. I was thinking we could hold an IT discussion on a separate call, either before or after our meeting on June 2nd.

Please let me know your thoughts on this as well as if there has been any progress on Mark's travel plans so we can lock in a time for next Monday.

Thanks,

Dennis Moore

t: 860-298-4763 | m: 860-214-9580
dennis.moore@sscinc.com | www.ssctech.com

**From:** Jim Mountain [mailto:jrm@armourllc.com]
**Sent:** Wednesday, May 21, 2014 4:59 PM
**To:** Moore, Dennis
**Cc:** Mark Gruber; Trevor Spicer
**Subject:** RE: SS&C inquiry

Mark might be able to get to New York in time for an afternoon meeting on Monday.  Will advise when we get settled.

CONFIDENTIAL



# Overview of CAMRA Modules and Additional Systems

June 19, 2014



SS&C Technologies | 80 Lamberton Road, Windsor, CT 06095 | www.ssctech.com

CONFIDENTIAL

SSC000413

# The Core CAMRA Application

SS&C's CAMRA system is a global multi-currency, multi-basis portfolio management, investment accounting and reporting solution that supports the entire investment management lifecycle, including trade capture, portfolio management, securities operations, financial accounting, reporting, and more. CAMRA supports a wide variety of asset types, with an emphasis on complex structured products, such as agency and non-agency mortgage backed securities. CAMRA is supported by Microsoft's SQL Server platform.

## Modules:

ARMOUR will have the flexibility to choose the combination of CAMRA modules below that best meet your business needs:

### Custodian Interface Manager

More advanced and user-friendly than a standard custody interface, CI Manager compares and updates the CAMRA database for cash items that reconcile between your custodian(s) and CAMRA. This tool generates automatic reconciliation for income, principal, settlements, maturities, and holdings transactions which greatly adds to your operational efficiency. With CI Manager installed and integrated with the CAMRA solution suite, it will promote an automated exception-based workflow that will significantly decrease the number of errors encountered between your book of record and custodian(s).

### Report Express

Report Express provides a menu-based, parameter driven approach to report generation that will significantly enhance and simplify your reporting. A single report template can be designed to meet the needs of many, simply by changing the parameters that are selected via the sort and selection "wizard". SS&C delivers and maintains in excess of 30 standard templates that the client is free to use "as-is" or to customize as necessary. The template approach, combined with a completely documented data dictionary, greatly shortens the learning curve and empowers our clients with reporting expertise in an efficient manner. A built-in collating function will organize reports for printing based on Account and Portfolio selections, adding even more efficiency to your internal reporting process.

### TBA Dollar Roll

CAMRA's integrated TBA processing capabilities provide for the straight-through processing of TBA investing activities from entering the commitment all the way to the delivery of and even substitution of the various pools.

The CAMRA TBA Dollar Roll module supports these investments with the following processing tasks:
- Enter the Commitment – this step establishes the delivery rules that will need to be satisfied by the various pools. Commitments are considered pending until they are posted to the General Ledger.
- Allocate the Pools – after the commitment has been entered, pools that satisfy the



CONFIDENTIAL                                           SSC000414

delivery rules are entered. Allocations can be made, accepted, and edited up until the transaction has been posted.
- Post the Commitment – this enters the transaction in the General Ledger.
- Close the Commitment – a commitment is considered closed after the pools have been announced and settled. The system checks to make sure that the pools announced satisfy the rules assigned to the commitment.

## Impairments Manager
CAMRA's Impairments Manager will manage and automate the resource intensive tasks of data collection, analysis, present value calculations, and processing of your impairments. A centralized user interface will enable the user to work with a large quantity of data in an efficient manner.

## Intex Data Wizard
The Intex Data Wizard provides a direct connection and automated download of Intex data files and cash flows, and automatically updates the CAMRA system. The Data Wizard also enables users to validate information online prior to updating the CAMRA database.

## Cross Check
Cross Check is an automated process that runs against the CAMRA database to validate a broad range of data elements, and present exceptions of records that are inaccurate, incomplete, or inconsistent with other records. Cross Check provides:
- An independent non-invasive "on-demand" audit of your business and financial data in CAMRA
- Consolidates multiple CAMRA audit / data analysis reports into a single engine to retrieve and analyze information stored in CAMRA
- Universe of 700 + audits to choose from
- Tool set to build your own custom audits.

## Extend
Extend allows for the addition of user defined fields to various tables throughout the CAMRA system. For example, the use of Extend will enable your firm to track specific security master fields within the application, thereby eliminating the need to "add" this information outside of the system which will allow for the creation of management and financial reporting by your desired breakouts directly from within CAMRA.

## SS&C Connector
The SS&C Connector module provides a seamless interface to the Bloomberg Asset and Investment Manager (AIM) system. Trades entered in AIM are sent to the SS&C Connector using the Bloomberg Gateway and then uploaded into CAMRA. In addition, the module can provide users with the ability to produce or accept daily prices, positions and changes to existing Security Master information. The SS&C Connector module incorporates the following features:
- Online exchange of Trading and Security Master information between Bloomberg and CAMRA.



- Automated CAMRA Portfolio creation in Bloomberg.
- Automated receipt of daily balance information from Bloomberg for reconciliation to CAMRA.
- Automated exchange of pricing information for use with the Bloomberg analytics calculators.
- Automated acceptance of Bloomberg prices for pricing of CAMRA securities. This is done using Bloomberg pricing or a designated pricing vendor who supplies their pricing to the Bloomberg network.
- Online exchange and creation of Security Master information when a trade involving a new security is executed using Bloomberg AIM.
- Automated issuer creation for security master setup.
- Automated cancel and correct processing.

## NAV

The NAV module calculates asset values for single or multi-class accounts. By taking current pricing, the market value per unit is translated into holding values. Trading, accounting, analytics, and other CAMRA functions and modules are integrated. NAV features include:

Valuation/Accounting:
- Internal pricing update of NAV per share
- Flexible valuation frequency options
- Interest smoothing
- Multi-class fund accounting, including:
  - Class GAV calculation
  - Separate class expense schedules and accruals
  - Class NAV and NAVPS
- Integration of projected tax withholding and reclaims

Expense Accruals:
- Fixed and variable expense accrual and reporting
- Choice of three separate day count conventions for expense accruals
- Choice of direct or proportional expense allocations to portfolios
- Distributions, withdrawals, and other cash flows
- Automated expense payment processing

Processing:
- Integration of captive fund processing with investor accounts
- Internal calculation and allocation of lot level value, income, gain and loss for investor accounts
- Bid /offer processing capabilities
- Net Asset Value (NAV) and Net Asset Value Per Share (NAVPS)
- Importing of fund share transactions



CONFIDENTIAL

## Additional Systems:

Based on our preliminary understanding of ARMOUR and experience working with similar REIT clients, we feel the additional systems described below may be relevant to your firm:

### Debt & Derivatives

SS&C Debt & Derivatives ("D&D") is a specialized derivatives application designed to manage, account for and value OTC and debt instruments. D&D reports full accounting information (year to date, month to date, quarter to date, life to date, etc.) for realized, unrealized, cash, and mark to market. D&D handles Swaps, Credit Default Swaps, Caps, Floors, Collars, Forward Rate Agreements, FX Spots / Forwards / Options, Futures, Options on Futures, Equity and Variance Swaps, and OTC Equity Index Options.

Capabilities include:
- Deal pricing
- Portfolio mark-to-market
- Interest accrual and payment process
- Hedge accounting
- Statutory reporting
- Risk analysis

### TradeDesk

SS&C TradeDesk is an online, real-time trade capture, repo processing and collateral management solution. TradeDesk supports trading for agency and non-agency MBS, CMOs and Repos, offering complete exposure reporting and flexible collateral management functions. TradeDesk's workflow allows for a single point of entry from which all necessary reviews, including any external interfaces, can be performed using our extensive routing slip and workflow functionality. Each stop along the workflow path is electronically time stamped for audit purposes.

By implementing TradeDesk along with CAMRA, SS&C's clients have been able to realize the following workflow improvements:
- Elimination of paper tickets and an inefficient, error prone and manual process with multiple points of input
- Automated workflow routes executed trades to the appropriate resource for review and approval throughout the day
  - Traders must enter trades as executed
  - Moves trade capture/routing to SS&C from an end-of-day task to something that can be accomplished throughout the day
- Automated cancel/correct functionality
  - Workflow can be revised to have executed trades automatically flow to CAMRA
  - Any discrepancies identified in the confirmation can be processed as an automated cancel/correct
- Confirmed trades automatically routed to queue for upload to CAMRA
  - Exports can be scheduled periodically throughout the day or at end-of-day



CONFIDENTIAL

SSC000417

Repo Processing and Collateral Management:
- Online collateral sources as well as spreadsheets
- Designate special collateral (reserved) vs. general collateral pool
- Collateral re-pricing and margin analysis
- Integrated pledging capabilities
- Auto allocation of collateral with customer preferences
- Online collateral browser with drag-and-drop integration to trade ticket for street repos

## Reconciliation & Exception Management

SS&C Recon is a scalable, enterprise-wide reconciliation solution designed to retrieve, capture, validate, match and reconcile data between any parties. Recon automates and streamlines workflow to control the reconciliation process and improve operational efficiency. Management oversight and reconciliation reporting provides full visibility into cash, holdings, transactions, trial balances and security masters, enabling you to focus on critical exceptions.

Recon includes dashboards and audit trails, allowing management to review summaries of breaks by portfolio, group, date, age, and many other attributes. Recon has the tools to conduct auto exception routing, achieve ownership and assignment of breaks, control management escalation, and audit/report the entire cycle.

Capabilities include:
- Assign breaks to appropriate team members for rapid resolution
- Provide sophisticated investigative tools to resolve issues
- Send breaks via email to third parties for further investigation
- Automatically update your system of record once issues are resolved
- Highlight the status of critical exceptions improving risk management
- Centralize all reconciliations to standardize the business process and ensure consistency
- Streamline the delivery and presentation of information to management
- Audit accountability and signoff within the application

## Loan Management

SS&C's Loan Management System ("LMS") is a comprehensive and flexible loan management solution. The integrated design of LMS eliminates inefficient, disparate systems and delivers immediate, accurate information across your loan operations. The logical, user-friendly workflow provides intuitive processing throughout all phases of the loan life cycle.



CONFIDENTIAL

# EXHIBIT 54

Message

| | |
|---|---|
| **From:** | Reilly, Timothy [treilly@sscinc.com] |
| **Sent:** | 11/5/2015 9:41:00 PM |
| **To:** | Pallone, Daniel [DPallone@sscinc.com] |
| **CC:** | Quinn, Jack [JQuinn@sscinc.com] |
| **Subject:** | Re: Bimini |

You run REIT practice (......feel free to connect with Dave R).  Pls be sure we don't overcomplicate sales effort.

J. Timothy Reilly

On Nov 5, 2015, at 4:37 PM, "Pallone, Daniel" <DPallone@sscinc.com> wrote:

I was part of the initial meeting with Bimini, does it make sense for me to assist?

For implementation, I want my team engaged and driving from the start on all REIT outsourcing, Five Oaks is a complete disaster

These REITs are like hedge funds and we cannot follow the license approach with BPRs for REIT or private capital outsourcing deals

We should be having the same conversation with Armour

**Daniel M. Pallone**
*Vice President*
Mortgage REITs

<!--[if !vml]--><image001.jpg><!--[endif]-->SS&C Technologies Inc.
1114 Avenue of the Americas, 33th Fl
New York, NY 10036
Tel: 212-659-4631 (NY) / Mobile: 973-476-3928
Email: DPallone@sscinc.com

---

**From:** Reilly, Timothy
**Sent:** Thursday, November 05, 2015 4:20 PM
**To:** Quinn, Jack
**Cc:** Pallone, Daniel
**Subject:** Re: Bimini

Good coaching.....

J. Timothy Reilly

On Nov 5, 2015, at 4:19 PM, "Quinn, Jack" <JQuinn@sscinc.com> wrote:

I just talked to both Jeff and Dennis.  Jeff is going to take the lead.  I forwarded him the background email chain and he is going to get with Russell.

One point that we all need to be conscious of is that we need to equip Dave to be as clear and definitive and to keep it as straightforward as possible.

Attorneys' Eyes Only

SSC152913

He should not talk about architecting or building a solution.  We are the experts in this and here is what provide.

**From:** Quinn, Jack
**Sent:** Thursday, November 05, 2015 3:55 PM
**To:** Reilly, Timothy
**Cc:** Pallone, Daniel
**Subject:** RE: Bimini

Yes.  I will talk to Jeff and Dennis now.  Should Jeff first go to Dave Russell?

**From:** Reilly, Timothy
**Sent:** Thursday, November 05, 2015 3:54 PM
**To:** Quinn, Jack
**Cc:** Pallone, Daniel
**Subject:** Fwd: Bimini

Jack - I think having Dave Russell be point on discussion makes sense, but also need sales person.
Issue is Bimini wants brief proposal for Tuesday and I think Dennis is maxed out.
Question - could we assign Jeff to get this out door and have some commission sharing (in Dennis's favor)?
From my conversation with Dave Russell, Bimini is very serious and they want to decide fast (as it will impact approach
to implementation)

Thoughts?

J. Timothy Reilly

Begin forwarded message:

**From:** "Olszewska, Iwona" <iolszewska@sscinc.com>
**Date:** November 5, 2015 at 2:58:14 PM EST
**To:** "Reid, David" <DReid@sscinc.com>, "Quinn, Jack" <JQuinn@sscinc.com>
**Cc:** "Russell, David" <DRussell@sscinc.com>, "Reilly, Timothy" <treilly@sscinc.com>
**Subject:** RE: Bimini

...another quick note, this is probably 2.5 FTEs operation (inclusive of OTS support). Small transactional volume, 4
portfolio. Since they are hosted, we should think what makes sense from the additional cost perspective.
I can discuss with Dave quickly and get back to this team with a proposed pricing for review. In the meantime, we could
have someone prep a regular BPO proposal. Thoughts?

**From:** Olszewska, Iwona
**Sent:** Thursday, November 05, 2015 1:49 PM
**To:** Reilly, Timothy; Reid, David
**Cc:** Russell, David; Quinn, Jack
**Subject:** RE: Bimini

I would probably suggest we 'equip' Dave with a proposal so that he can send it out. , and start the conversation. We
can then strategize whom to bring in next (?).

**From:** Reilly, Timothy
**Sent:** Thursday, November 05, 2015 1:21 PM
**To:** Olszewska, Iwona; Reid, David
**Cc:** Russell, David; Quinn, Jack
**Subject:** RE: Bimini

Attorneys' Eyes Only

Great!!

Dave Russell and I just discussed as well........makes total sense (who should lead discussion with them....)?

---

**From:** Olszewska, Iwona
**Sent:** Thursday, November 05, 2015 8:33 AM
**To:** Reilly, Timothy; Reid, David
**Cc:** Russell, David
**Subject:** Bimini

Tim/Dave,

The team just got back from an onsite that was focused on future workflows. Dave and I  prepped prior to going out there in context of our experience with how we sale/sold REIT offering in contrast to what the ultimate solution might be. In most cases only the largest/most sophisticated folks will find it manageable to deal with the roll forward process and ultimately the ongoing operation (on their own).
As such, Dave focused the visit on best practice discussion and what that could mean to Bimini, we also said we could help build a business case for a BPO if they would consider our recommendation for a fully outsourced solution which we believe might make more sense for them (if not a BPO than at least an ASP Plus model).

They are open to a discussion and have asked for a pricing proposal in the earlier part of the week. Let us know whom with we can work on this.

Parallel to this conversation, we are moving forward with regular project tasks

Regards,
Iwona

Attorneys' Eyes Only

SSC152915

# EXHIBIT 55

# SS&C Technologies Inc
# Work Request Two

This Work Request No. Two ("WR") is issued pursuant to, and incorporates the terms of, the Processing Services Agreement dated December 19, 2014 as amended (the "Agreement") by and between ARMOUR Capital Management LP, ("Client") SS&C Technologies Inc. ("SS&C"). The parties intend that this WR establishes a cap on fees for the services set out herein and in Work Request One, which was attached to the Agreement.

Effective Date of this WR.  This WR will be effective as of March 31, 2016.

Description of Services to be Performed.  In addition to the services and assumptions set out in Work Request One, SS&C will provide on-site and remote implementation services for the rolling forward through March and the assistance of April processing.

Assistance will include the following:
- Implementation Services:
  - Daily Processing
  - Month end Reconciliations
  - GL Processing
  - Generating Trial Balances

Fixed Fee for Completion.  SS&C shall provide implementation services described above for a fixed fee of $728,725. The breakdown of this fixed fee is as follows:

- $421,425 has been paid thru April 15, 2016
- $307,300 will be invoiced and payable upon Completion of the Implementation

If there is a change in the services described in this WR that is requested by Client and requires SS&C to perform additional work, such additional work shall be billed to Client on a time and materials basis at the rates set forth above and described in a new or updated work request.

Out-of-pocket expenses incurred will be capped at $25,000.  All fees and expenses incurred will be billed to Client as set out above and are due and payable upon receipt of SS&C's invoice.

Completion of Implementation.  Implementation will be considered complete when Client personnel have successfully processed one complete month of transactions using CAMRA as implemented ("Completion of Implementation").

SS&C Obligation.  As part of the Maintenance Program, SS&C is obligated to correct any defects or provide corrections, improvements, enhancements, fixes, patches and upgrades (collectively "Updates") to the Software and related documentation.

Counterparts.  This WR shall be executed in counterparts, each of which when so executed will be deemed to be an original.  Such counterparts together will constitute one agreement.  Signatures may be exchanged via facsimile or electronic email and the parties hereto agree that signatures so exchanged shall be binding to the same extent.

Other Services.  If Client requests any services in addition to the services specified in this and any other consulting engagement under the Agreement, SS&C and the Client shall specify such services and the fees payable therefore, in another Work Request.

Entire Agreement.  This WR (including any attachments and addenda hereto), along with Work Request One and the Agreement, contains the entire agreement of the parties with respect to its subject matter.  Unless otherwise agreed by this WR, the Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this WR as of the date of the last signatory hereof.  Each party warrants that the signatory signing on its behalf has the authority to contractually bind it to the terms and conditions set forth herein.

*(Signatures Follow)*

# SS&C Technologies Inc
## Work Request Two

ARMOUR Capital Management LP

BY:

NAME: James R. Mountain

TITLE: Chief Financial Officer

DATE:  April 19, 2016

SS&C TECHNOLOGIES, INC.

DocuSigned by:

BY:
B6590EB70930465...

NAME: Normand Boulanger

TITLE: President & COO

DATE:  April 20, 2016

2

# EXHIBIT 56

Message

| From: | Jim Mountain [jrm@armourcap.com] |
|---|---|
| Sent: | 4/12/2016 7:48:33 PM |
| To: | Gonzalez, Tony [TGonzalez@sscinc.com]; Reilly, Timothy [treilly@sscinc.com] |
| CC: | Mark Gruber [mrg@armourcap.com]; Pallone, Daniel [DPallone@sscinc.com] |
| Subject: | RE: ARMOUR WR2 040716 (3).docx |

Tony:

Sorry for being hard to get on the phone yesterday.  Deep in the throes of our own quarter close.

It looks like we need to take a different approach on OOPs, starting with coming up with a new acronym. OOPs is what you say when you make a mistake, and we don't want to encourage that word association on this project.

Before we can consider further where we might be able to come to agreement, we need to get a handle on what you have in mind.  So please give us the details of your current plan starting as of yesterday in terms of the number of hours of work you are projecting, the number of people you have in mind and the days that you anticipate they would be on site in Vero vs. working elsewhere.  Also, if you could give us a roll-up estimate of the reimbursable expenses you anticipate incurring, we can start talking about what we both can live with.  Otherwise, it is just a big, scary unknown that we both feel compelled to simply avoid.

Mark said that you talked last night and you told Mark that the maintenance agreement also included the right to terminate the license and receive a refund of the license fee if we never get the software installed and working satisfactorily.  If we can get that confirmed in writing, then the warranty extension would not be necessary.  Otherwise, we will need to continue to work this point.

The question of holdback/timing of payments will be something we resolve after the other two matters are settled.

Thanks,

Jim

-----Original Message-----
From: Gonzalez, Tony [mailto:TGonzalez@sscinc.com]
Sent: Monday, April 11, 2016 2:20 PM
To: Jim Mountain <jrm@armourcap.com>; Reilly, Timothy <treilly@sscinc.com>
Cc: Mark Gruber <mrg@armourcap.com>; Pallone, Daniel <DPallone@sscinc.com>
Subject: RE: ARMOUR WR2 040716 (3).docx

Jim,

On the warranty, our legal has confirmed this is addressed in Armour's maintenance contract and not something we include in work requests.  Armour's maintenance agreement addresses defects, corrections, improvements, enhancements, fixes, patches and upgrades.

We are comfortable with $400k fixed fee cap and taking on the implementation risk assuming that OOP are separate.

Would appreciate anything you can do on getting us the 50% holdback.

Many thanks,

Tony Gonzalez
Vice President, Professional Services
Institutional Consulting & Outsourcing
SS&C Technologies Inc.
1114 Avenue of the Americas I New York, NY 10110
(646) 927-9759
tgonzalez@sscinc.com | www.sscinc.com
Follow us: Twitter | Facebook | LinkedIn

-----Original Message-----
From: Jim Mountain [mailto:jrm@armourcap.com]
Sent: Friday, April 08, 2016 6:34 PM
To: Reilly, Timothy
Cc: Mark Gruber; Pallone, Daniel; Gonzalez, Tony
Subject: RE: ARMOUR WR2 040716 (3).docx

Tim:

So on 1) the extension of warranty was the quid pro quo that I came up with when you asked me to think about hoe to go from the original offer of 100% holdback to your counter offer of 50% up front and 50% holdback.  It sounds like your position is that an extended warranty does not give us anything that we did not already have through the maintenance agreement.  I will say that it is not obvious on their faces that they are the same thing and your reluctance to extend the warranty does make it seem like you think they are different.  In any case, if you don't want to exchange an extended warranty for 50% payment up front, we will revert to the original offer on the basis of the 100% holdback.

And on 2) the phrase "one check for $400,000" was intended to be the final out-the-door payment, all inclusive of tax, title, dealer prep fees, destination charges and all other manner out of pocket expenses.  That is why I clarified the language in the mark-up and signed version I sent back last night.  Sorry if I was somehow unclear in either of those communications.

Let me know if you would like me to do another mark-up Monday or get the group some time on Scott Ulm's calendar on Tuesday.

Best,

Jim

James R. Mountain, Chief Financial Officer ARMOUR Residential REIT, Inc. (NYSE:Â  ARR)
3001 Ocean Drive, Suite 201
Vero Beach, FLÂ  32963

+1 772 617 4340Â  Office
+1 862 215 1850Â  Cell
+1 561 348 2408Â  Fax
jrm@armourcap.com
www.armourreit.com


-----Original Message-----
From: Reilly, Timothy [mailto:treilly@sscinc.com]
Sent: Friday, April 8, 2016 4:54 PM
To: Jim Mountain <jrm@armourcap.com>
Cc: Mark Gruber <mrg@armourcap.com>; Pallone, Daniel <DPallone@sscinc.com>; Gonzalez, Tony <TGonzalez@sscinc.com>
Subject: Re: ARMOUR WR2 040716 (3).docx

Jim - pls see wire instructions below.   There are two items to align on:

1) warranty:  we cannot extend warranty as you detailed. Reason is clients have recourse on functionality under maintenance agreement.   Pls see both the "Ssc obligation" in the WR and your maintenance agreement.   Additionally, we are (I) capping your fees and (II) agreeing with your requested holdback.

2) OOP: I am assuming this OOP was not meant to be included in the cap.

Tim


WIRE TO:

Bank of America

Hartford, CT USA

ABA# 0260-0959-3<tel:0260-0959-3> (wires)

CONFIDENTIAL

ABA# 011900254<tel:011900254> (ACH only)

Beneficiary: SS&C Technologies, Inc.
Account# 0066058692

Sent from my iPad

On Apr 8, 2016, at 10:14 AM, Jim Mountain <jrm@armourcap.com<mailto:jrm@armourcap.com>> wrote:

I am still willing to honor what I signed last night, which already exceeds my instructions from my boss. If you want payment today, I will need countersigned WR and wire instructions by noon.  If you just need to be signed, I am on no time clock.

If we need to continue negotiations, they will happen next week.

Best,

Jim

-----Original Message-----
From: Reilly, Timothy [mailto:treilly@sscinc.com]
Sent: Friday, April 8, 2016 9:29 AM
To: Jim Mountain <jrm@armourcap.com<mailto:jrm@armourcap.com>>
Cc: Gonzalez, Tony <TGonzalez@sscinc.com<mailto:TGonzalez@sscinc.com>>; Mark Gruber <mrg@armourcap.com<mailto:mrg@armourcap.com>>; Pallone, Daniel <DPallone@sscinc.com<mailto:DPallone@sscinc.com>>
Subject: Re: ARMOUR WR2 040716 (3).docx

Jim - our quarter wraps up today.  Anything I could do to facilitate.

J. Timothy Reilly

On Apr 8, 2016, at 9:27 AM, "Jim Mountain" <jrm@armourcap.com<mailto:jrm@armourcap.com>> wrote:

I will try to get Scott's schedule for next week so we can all get on a call to discuss.  We have wandered a ways away from what I discussed with him earlier in the week.  Tuesday early afternoon is what I think will be most likely.

-----Original Message-----
From: Gonzalez, Tony [mailto:TGonzalez@sscinc.com]
Sent: Friday, April 8, 2016 9:15 AM
To: Jim Mountain <jrm@armourcap.com<mailto:jrm@armourcap.com>>; Mark Gruber <mrg@armourcap.com<mailto:mrg@armourcap.com>>
Cc: Reilly, Timothy <treilly@sscinc.com<mailto:treilly@sscinc.com>>; Pallone, Daniel <DPallone@sscinc.com<mailto:DPallone@sscinc.com>>
Subject: Fwd: ARMOUR WR2 040716 (3).docx

Additional change in language related to expenses.

CONFIDENTIAL

# EXHIBIT 57



ACM0013597

## Armour Implementation Cost Overview and Proposal

| One Time Implementation Set Up Fees | | Total | | Billed | | Forecast | | Budget | | Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| Transition to Production | $ | 154,000.00 | $ | - | $ | 154,000.00 | | | $ | (154,000.00) |
| INTERFACING | $ | 37,631.25 | $ | 37,631.25 | $ | - | $ | 150,478.00 | $ | 112,846.75 |
| BUSPROCESS | $ | 36,900.00 | $ | 36,900.00 | $ | - | $ | 41,146.00 | $ | 4,246.00 |
| PROJECT_MGMT | $ | 24,975.00 | $ | 24,975.00 | $ | - | $ | 41,146.00 | $ | 16,171.00 |
| MEETINGS - CLNT | $ | 19,125.00 | $ | 19,125.00 | $ | - | | | $ | (19,125.00) |
| CNVRSN_PLANNING | $ | 11,700.00 | $ | 11,700.00 | $ | - | | | $ | (11,700.00) |
| SFTWR_INSTALL | $ | 9,000.00 | $ | 9,000.00 | $ | - | | | $ | (9,000.00) |
| TRAINING | $ | 8,550.00 | $ | 8,550.00 | $ | - | $ | 25,192.00 | $ | 16,642.00 |
| PROJECT_PLAN | $ | 8,212.50 | $ | 8,212.50 | $ | - | | | $ | (8,212.50) |
| MODULE_IMPLMNTN | $ | 5,962.50 | $ | 5,962.50 | $ | - | | | $ | (5,962.50) |
| DATA_CORRECT | $ | 5,175.00 | $ | 5,175.00 | $ | - | | | $ | (5,175.00) |
| PARALLEL_SUP | $ | 4,275.00 | $ | 4,275.00 | $ | - | | | $ | (4,275.00) |
| IMPLMNTN_PLAN | $ | 2,981.25 | $ | 2,981.25 | $ | - | | | $ | (2,981.25) |
| TECH_CONSULTING | $ | 562.50 | $ | 562.50 | $ | - | | | $ | (562.50) |
| **Subtotal** | $ | 329,050.00 | $ | 175,050.00 | $ | 154,000.00 | $ | 257,962.00 | $ | (71,088.00) |

| Initialization, Conversion and Roll Forward | | Total | | Billed | | Forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rollforward | $ | 678,112.50 | $ | 612,112.50 | $ | 66,000.00 | $ | 158,288.00 | $ | (519,824.50) |
| Data Conversion | $ | 122,737.50 | $ | 122,737.50 | | | $ | - | $ | (122,737.50) |
| **Subtotal** | $ | 800,850.00 | $ | 734,850.00 | $ | 66,000.00 | $ | 158,288.00 | $ | (642,562.00) |

| **Implementation Fees Grand Total** | $ | 1,129,900.00 | $ | 909,900.00 | $ | 220,000.00 | $ | 416,250.00 | $ | (713,650.00) |
|---|---|---|---|---|---|---|---|---|---|---|

| **Less 50% Discount of Initial/Conv/Rollfwd** | $ | 400,425.00 |
|---|---|---|

| **Fair and Equitable Cost of Implementation** | $ | 729,475.00 |
|---|---|---|

| | | Total | | Billed | | Forecast |
|---|---|---|---|---|---|---|
| Out of Pocket Travel Expenses | $ | 52,273.94 | $ | 24,273.94 | $ | 28,000.00 |

SS&C

2

ACM0013598

# Issues and Challenges

1. Incomplete & Incorrect Data

2. Manual Processing & Inability to Automate Workflows

3. Changes to Data Sources and Processes

4. Accounting Methodology Differences



3

ACM0013599

# 1. Incomplete & Incorrect Data

- Duplicate holdings were identified between custodians; re-work in CAMRA was done for correct custodian assignments

- Data not provided in electronic CAMRA-ready format

- Initial positions information provided for 12/31/14 was incomplete, even though Financial Impact was signed off

- Non-securities cash: BONY only sends lump sum cash transactions



4

ACM0013600

## 2. Manual Processing

- Armour does not conduct Holdings reconciliations to the custodians. SS&C has had to perform Armour reconciliation in order to be able to compare to CAMRA

- JPM processing is manual using PDF reports

- P&I is received from both Citi and BONY – information is entered into the system for both and manual work is required to reverse the duplicates

- Repo Daily Pair-off: data analysis needs to take place before processing can begin because custodial indicators not provided and activity not accurately reflected



5

ACM00013601

# 3. Changes to Data Sources and Processes

- Armour holds repos that float based upon a Libor index, not currently provided in the source information for the security masters and the trades on the repos

- Citi holdings transitioned to BONY beginning 2Q15 and issues still ongoing

- Additional workflow item was identified and suspense process workflow will be implemented for April



5

CONFIDENTIAL

ACM0013602

# 4. Accounting Methodology Differences

- Accounting Methodology Differences between CAMRA, AVM and Armour

- Non-agency RMBS securities: ARMOUR income based upon yield; CAMRA interest income and amortization income is booked separately using the interest method of amortization

- ARMOUR calculates Book Value on FNMA DUS securities thru to the end of the month on sale (beyond the settle date in some cases); CAMRA calculates Book Value only thru the settle date on the transaction, resulting in timing differences between the recognition of amortization and the calculation of realized gain/loss. CAMRA's calculation is more accurate.



7

ACM0013603

# EXHIBIT 58

| From: | Moore, Dennis |
|---|---|
| To: | Jim Mountain |
| CC: | Fecteau, Jeff |
| Sent: | 9/29/2014 3:33:16 PM |
| Subject: | SS&C data provider connectivity |
| Attachments: | SS&C Data Provider Connectivity_ARMOUR_9.29.14.pdf |

Jim,

As a follow-up to your conversation with Jeff last Friday, I have attached a list of the custodians, brokers, prime brokers and market data providers to which we currently have connectivity.

This is a working document, as we are continuously adding new providers to this list based on client needs. If you were to need connectivity to a provider outside of this list, we have the ability to quickly establish connectivity with any counterparty / data source on your behalf.

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

ACM0048664

 **Data Provider Connectivity** 

| CUSTODIANS | BROKERS | PRIME BROKERS | MARKET DATA PROVIDERS |
|---|---|---|---|
| A.G. Edwards | Alliance | Banc of America | IDC |
| ABN Amro | Ariel | Barclays Capital | Bloomberg |
| Allfirst | Ark | Bear Stearns | Reuters |
| AM South | Arm | Calyon Financial | SVC |
| Amalbny | Beauchamp | Citibank | S&P |
| Amalbny | BERNSTEIN - ALLIANCE | CSFB | Intex |
| Amalgamated Bank of NY | BERNSTEIN - SANFORD | Deutsche Bank | Rimes |
| Amalgatrust | BLACKROCK | Fidelity | Moody's |
| American Trust | BOSTON | Goldman Sachs | Markit |
| Artis Capital | Brown Capital | JPM Chase | Fitch |
| Bank of America | Canagex | Lehman | CMA |
| Bank of Hawaii | Capital | Mellon Bank | SuperDerivatives |
| Bank of New York | Clifton Group | Merrill Lynch | |
| Bank One | Delaware | Morgan Stanley International | |
| Bear Stearns | Donald Smith | Morgan Stanley NY | |
| Blue Capital Securities, Inc. | DRESDNER | Schwab | |
| Brown Brothers Harriman | Earnest Partners | UBS London | |
| Calyon | Fidelity | UBS New York | |
| Charles Schwab | First Pacific | UBS Warburg | |
| Chase | FRANKLIN | | |
| Chemung Canal Trust Co. | Freiss | | |
| Citibank | GOLDMAN EQUITY | | |
| Citibank Private | Goldman Sachs | | |
| Citigroup | Harris | | |
| Citizens Bank | Intech Janus | | |
| City National Bank | John Hancock | | |
| Comerica | JPMORGAN | | |
| Commerce Bank | Lasalle | | |
| Conifer | Lazard | | |
| Credit Suisse First Boston | Lincoln | | |
| CSFB | Loomis | | |
| Deutsche Bank | Lord Abbett | | |
| eMidas | LSV | | |
| Fidelity | NEAM | | |
| Fidelity National Financial Services | NEUBERGER | | |
| Fifth Third Bank | Northern Trust | | |
| First Citizens Bank | Oaktree | | |

CONFIDENTIAL

ACM0048665

 

## Data Provider Connectivity

| CUSTODIANS | BROKERS | PRIME BROKERS | MARKET DATA PROVIDERS |
|---|---|---|---|
| First Hawaiian Bank | Partner Re Asset Management | | |
| First National Bank of Omaha | PIMCO | | |
| Firstar | SAW | | |
| Gilbert Doniger | Scudder | | |
| Glen Rauch Securities | SHIELDS | | |
| Glenmede | Sparx | | |
| Goldman Sachs | SUFFOLK | | |
| IFS | Voyageur | | |
| Investors Bank and Trust Co. | Wellington | | |
| Janney Montgomery Scott | WPG | | |
| JP Morgan | | | |
| KeyBank | | | |
| Lasalle Bank | | | |
| Lehman | | | |
| Marshall & Ilsley Trust | | | |
| Mellon Bank | | | |
| Mercantile Bank | | | |
| Merchant Trust | | | |
| Merctrust | | | |
| Merrill Lynch | | | |
| Morgan Stanley | | | |
| MT Bank | | | |
| National City Bank | | | |
| Nordpool | | | |
| Northern Trust | | | |
| Optima | | | |
| Pershing | | | |
| PFPC Trust Company | | | |
| PNC Advisors | | | |
| Raymond James | | | |
| RBC Dain Rauscher Inc. | | | |
| RBC Global Service | | | |
| Regions Bank | | | |
| Reliance | | | |
| Rockbay | | | |
| Royal Trust | | | |
| RW Baird | | | |

CONFIDENTIAL                                                    ACM0048666



# Data Provider Connectivity



| CUSTODIANS | BROKERS | PRIME BROKERS | MARKET DATA PROVIDERS |
|---|---|---|---|
| Salem Trust Company | | | |
| Smith Barney Trust | | | |
| Solomon Smith & Barney | | | |
| South Trust Asset Management Co. | | | |
| Spear, Leads, Kellogg | | | |
| State Street Bank | | | |
| Suntrust Bank | | | |
| UBOC | | | |
| UBS | | | |
| UBS PRIME | | | |
| UBSPW | | | |
| UMB Trust Direct | | | |
| Union Bank & Trust | | | |
| US Bank Institutional Trust | | | |
| US Bank Trust | | | |
| US Trust Company | | | |
| Wachovia | | | |
| Wells Fargo | | | |
| Wilmington Trust | | | |

CONFIDENTIAL

ACM0048667

# EXHIBIT 59





# Comprehensive Mortgage REIT Software and Operational Support Services Proposal

ARMOUR Residential Management LLC

**Date Prepared:** November 13, 2014



Dennis Moore
d: 860-298-4763
m: 860-214-9580
dennis.moore@sscinc.com

Jeff Fecteau
d: 860-731-5022
m: 860-729-5862
jfecteau@sscinc.com

**SS&C Technologies** | 80 Lamberton Road, Windsor, CT 06095 | **www.ssctech.com**



November 13, 2014

Mr. James R. Mountain
ARMOUR Residential Management LLC
3001 Ocean Drive, Suite 201
Vero Beach, FL 32963

Dear Jim:

SS&C Technologies, Inc. ("SS&C") strives to partner with its clients and looks forward to establishing a long, trusted relationship with ARMOUR Residential Management LLC ("ARMOUR").

As a public company, we understand the importance of providing transparency and timely, accurate information to our stakeholders and clients. A significant portion of our client base is also publicly traded entities, and our accounting and operations professionals have extensive experience supporting the financial reporting requirements of organizations such as ARMOUR.

SS&C is very focused on the mortgage REIT space, with a substantial client base of publicly-traded mortgage REITs, which continues to grow, in addition to several large, complex clients invested in the same asset classes as ARMOUR.

Over the past 27 years, SS&C has built an extensive portfolio of products and services centered on a transparent, well-architected, scalable and efficient technology infrastructure. We also continue to hire expertise in the areas of accounting policy, tax and financial reporting, and enable clients to leverage our resources as an extension of their staff.

SS&C's solution for ARMOUR is flexible and the form of our relationship can change over time. This flexibility will enable ARMOUR to take on more processes internally or leverage more of our operational support services at the right time.

We appreciate your time and consideration through the due diligence process and are confident SS&C is the best equipped organization to provide comprehensive mortgage REIT software and operational support services to strengthen your investment operations.

Let me close by reiterating that we would be honored to be your business partner and look forward to the opportunity to earn your business.

Sincerely,

J. Timothy Reilly
Senior Vice President
Institutional and Investment Management

---

**SS&C Technologies** | 80 Lamberton Road, Windsor, CT 06095 | **www.ssctech.com**

CONFIDENTIAL

SSC002418



## Table of Contents

Introduction                                    3

SS&C Company Background                          4

ARMOUR Overview and Assumptions                 5

Proposed Solution Overview                       6

Fee Schedule                                    10

CONFIDENTIAL

SSC002419



## Introduction

SS&C is pleased to provide our mortgage REIT solution overview and pricing proposal to ARMOUR as part of our continued dialogue regarding a partnership between our organizations in support of your investment accounting and reporting requirements.

In addition to industry leading software that is robust in functionality, easy to use and provides an automated straight-through-processing environment, SS&C's proposed solution offers the following advantages:

- Highly automated, world-class operating environment tailored to your requirements.
- Access to SS&C mortgage REIT investment operations expertise.
- A partner with a reputation for transparent and independent services backed by a SSAE16 certification.
- Access to our investment accounting expertise, including technical accounting resources, industry best practices and emerging issues.
- A commitment to technology advances and a significant reinvestment in R&D.

CONFIDENTIAL

SSC002420



## SS&C Company Background

SS&C was founded in 1986 and is headquartered in Windsor, CT. The same management team that helped to build SS&C remains closely involved in the direction and success of the organization, including its Chairman and CEO, Bill Stone.

SS&C is a public, NASDAQ-listed company (Ticker: SSNC) that continues to demonstrate its financial strength through consistent revenue and earnings growth. Revenues in 2013 were $712 million, up 29 percent from 2012, and are projected to reach $775 million in 2014. Nearly 15 percent of the company's annual revenue is reinvested into the development of its products, processes and personnel.

SS&C leverages its technology to deliver superior solutions to REITs, institutional asset managers, insurance companies, hedge funds, private equity funds and hybrid structures worldwide. Exposure to such a diverse client base has provided SS&C personnel with deep expertise and experience with a broad range of asset classes, investment types, fund structures and investment strategies.

Our clients choose SS&C as their preferred partner because we offer the following benefits:

*The Ability to Combine Flexible, Comprehensive Software with Scalable Outsourcing Services*
We are able to tailor the services to the unique needs of each client while still providing ARMOUR with the benefits of managing its technology infrastructure and providing operational support services.

*Cost-Effective Solutions that Provide Clients with Online Access to Information*
SS&C's solutions are easily and rapidly deployed, enabling clients to realize cost savings while meeting the challenges of a rapidly changing industry and regulatory environment. SS&C's unique shared service model provides clients with immediate access to critical business information.

*Deep Vertical Market Expertise*
The depth and breadth of our expertise allows us to provide advanced analytical tools tailored to the unique requirements of particular industry segments and asset classes.

*Scalability and Flexibility*
We provide highly scalable and flexible solutions, regardless of client size, organizational structure or number of portfolios, securities types, asset classes, accounting methods or regulatory regimes.

CONFIDENTIAL



# ARMOUR Overview and Assumptions

## Systems Overview

| Category | Current Environment | SS&C Proposed Solution |
|---|---|---|
| Portfolio Accounting | TPG (in-house) and Excel | CAMRA/integrated Derivatives module (hosted). |
| Trade capture | AVM, VCON, manually re-entered into TPG | SS&C management of trade import into CAMRA. |
| Market Data | IDC<br>Bloomberg Data License<br>Bloomberg BVAL - Derivatives<br>Bloomberg BVAL - MBS | Retain contracts with market data providers.<br>SS&C will establish and maintain connectivity to each data provider.<br>SS&C's SVC Securities and Derivatives Pricing Services as an option to IDC (cost analysis provided separately). |
| Portfolio Analytics | BlackRock Green Package | Retain BlackRock Green Package.<br>SS&C will manage the extract process through our data management services. |
| General Ledger | QuickBooks Enterprise | SS&C will customize an extract to your General Ledger of choice as part of the implementation. |
| REPO Placement | AVM (outsourced) | Retain AVM for REPO placement. |
| Trade Affirmation & Settlement | AVM (outsourced) | Retain AVM for REPO and Swap Trades.<br>SS&C Back Office Services for securities trades. |
| Custodial Reconciliation & Exception Resolution | AVM (outsourced) | SS&C will perform custodial reconciliation services. |
| Custodian | Citi (may add BONY in future) | SS&C will manage the interface and uploading of information from custodians of choice. |
| Accounting Bases | US GAAP and TAX | US GAAP and TAX are fully supported. |

## Asset Class Summary

| Investment Type | Number of Issues | Number of Lots | Transactions Per Month |
|---|---|---|---|
| REPOS | 1,500 | 1,500 | 500 |
| Agency MBS | 1,500 | 1,500 | 25 |
| Non-Agency MBS | 50 | 50 | 1 |
| Futures | 3 | | |
| Swaps | 106 | 106 | 1-10 (est.) |
| Swaptions | 0 | 0 | 0 |



SSC002422



# Proposed Solution Overview

SS&C's proposed solution for ARMOUR includes the following components:

- Portfolio accounting software and relevant modules to handle the processing of ARMOUR's current asset types, including Agency and Non-Agency MBS, CMOs, REPOs, interest rate swaps and swaptions, and futures.
- Perpetual or term software license, inclusive of an unlimited number of users (unless otherwise specified) with permitted use covering the operations of both ARMOUR and JAVELIN.
- Application hosting of your CAMRA technical infrastructure in our state-of-the-art data center, inclusive of full disaster recovery and 24x7 monitoring.
- Operational support services, including process automation, data management and back office services (trade settlement and affirmation, and reconciliation, case management and exception resolution).

## I. Software License

CAMRA is a global multi-currency, multi-basis portfolio management, investment accounting and reporting solution that supports the entire investment management lifecycle, including trade capture, portfolio management, securities operations, financial accounting, reporting, and more. CAMRA supports a wide variety of asset types, with an emphasis on complex structured products, such as agency and non-agency mortgage backed securities.

CAMRA's integrated Derivatives module helps to manage, account for and value a broad range of OTC and debt instruments, including Swaps, Swaptions, Credit Default Swaps, Caps, Floors, Collars, Forward Rate Agreements, FX Spots / Forwards / Options, Futures, Options on Futures, Equity and Variance Swaps, and OTC Equity Index Options. The Derivatives application reports full accounting information (year to date, month to date, quarter to date, life to date, etc.) for realized, unrealized, cash, and mark to market.

Below are the proposed CAMRA modules to support ARMOUR's investment operations:

*Swaps*
Handles all types of interest rate and currency swaps, including swaptions and swaps with early terminate options (European as well as Bermudian). Each side of the swap is individually tracked, valued and accounted for in the system general ledger. Embedded caps and floors, basis point spreads and other rate adjustments are available in the rate calculation.

*Custodian Interface Manager*
Compares and updates the CAMRA database for cash items that reconcile between your custodian(s) and CAMRA. This tool generates automatic reconciliation for income, principal, settlements, maturities, and holdings transactions which greatly adds to your operational efficiency.

*Impairments Manager*
Helps you manage the data collection, analysis, calculation, and workflow surrounding impairment processing.

6   CONFIDENTIAL. Do Not Distribute.



SSC002423





*Report Express*
Provides a menu-based, parameter-driven approach to report generation that will significantly enhance and simplify your reporting. A single report template can be designed to meet the needs of many simply by changing the parameters that are selected via the sort and selection "wizard."

*Extend*
Extend allows the addition of user defined fields, thereby eliminating the need to "add" this information outside of the system and reduces downstream reporting efforts.

## II. Application Hosting, Process Automation and Data Management Services

*Technical Infrastructure*
- Server hardware and software
  - ARMOUR will have access to separate and secure Production and Test databases
  - Initial 50GB allocation of disk space
- Data center space, power, cooling and robust physical security
- Processing operations staff and 24x7 system monitoring
- Regular data backups and off-site storage
- High availability server configuration
- Disaster Recovery to secondary data center, utilizing near real-time replication and periodically tested in accordance with client DR testing schedule
- UPS and redundant diesel generators provide reliable and uninterruptable power

*System Access Controls*
- Robust system security
- Ongoing administration of user access rights
- Password administration in accordance with ARMOUR corporate standards

*Communications*
- Maintain Citrix software and connectivity from SS&C to the Internet (or other specified connectivity method)
- Secure online system access

*Database and Operating System Maintenance*
- Installation of new database and operating system software releases and updates
- Coordination of upgrade schedules

*CAMRA Upgrade Services*
- Coordination of upgrade schedules in conjunction with ARMOUR investment accounting operations staff
- Installation of new software releases and updates in a test environment
- Migration of new software releases and updates to production environment
- System troubleshooting expertise

*Network Monitoring*
- Network security and monitoring
- Performance reporting
- Server and storage utilization





*Process Automation and Monitoring*
- Nightly processing automation maintenance and support
- Monitoring of the nightly process and timely response to interruptions
- Notification to ARMOUR of nightly cycle status
- Proactive issue resolution and escalation to ARMOUR as required

*Data Management*
- Import and load of trades from ARMOUR and AVM
  - External trade system interface. Intraday receipt and processing of fully executed trades from external trading system. Open lot position extract at beginning of each trading day available to populate external trading system.
- Import market and pricing data from Bloomberg, IDC/SVC, Intex, etc.
- Import transactions from custodians Citi, and potentially BONY
- Import and Export data required for BlackRock analytics
- Transform and validate data for use in the reconciliation process

### III. Back Office Services

*Trade Affirmation and Settlement*

SS&C can provide post trade custodial notification services in support of your MBS trading activities. The SS&C middle office team will monitor the trade settlement process as well as intervene in addressing any failed MBS trades with the involved counterparties. Services include:

- Collect DTC eligible trade confirm notifications and provide electronic affirmations back to DTC. Provide post trade notification to interested parties as directed by ARMOUR.
- Intraday trade processing
- Affirmation/confirmation
- Custodian settlement Instruction via SWIFT
- Management of standard settlement instructions
- Unmatched trade resolution
  - Investigate non-matching trade confirmations including contacting all parties involved in the transaction with a view to achieving a successful match and settlement
- Failed trade resolution
  - In the event of a failed settlement, SS&C shall commence investigations immediately to determine the reasons and the necessary steps to be taken to ensure a successful settlement takes place on settlement date +1 or an alternative date agreed with the counterparty and ARMOUR

*Custodial Reconciliation and Exception Resolution*

SS&C will perform a daily reconciliation between CAMRA and ARMOUR's custody bank(s). SS&C will establish and maintain connectivity to each custodian, and will be responsible for the gathering of all information required to facilitate the daily reconciliation process. SS&C is responsible for the initial investigation of all cash breaks, unmatched transactions and unmatched holdings with custodians.





Custody Reconciliation:
- Reconciliation of custodial cash movements, including cash transfers, fees assessed and investment related cash transactions
- Reconciliation of trade settlements
- Reconciliation of interest and principal paydowns
- Reconciliation of securities holdings
- Aging of open items for the management of exceptions by both client and SS&C

On a daily basis, SS&C's reconciliation team will identify exceptions, initiate contact with the custodian, and provide exception reports to ARMOUR. SS&C's reconciliation team utilizes CAMRA's integrated reconciliation tools to support its deliverables. ARMOUR will be responsible for researching and reconciling items that SS&C is not able to address directly with the custodian as well as processing any necessary corrections to data in CAMRA.

The above reconciliations will be performed against the custodian(s) only. The services do not contemplate any reconciliations or support related to CAMRA processing, month-end deliverables, derivative (e.g. swaps, futures) counterparties, or REPO counterparties.

CONFIDENTIAL                                                                                      SSC002426



# Fee Schedule

### I. Software License

SS&C offers both perpetual and term license options when acquiring our software. Perpetual licensing consists of a one-time software cost for the grant of the license, plus 20 percent annually for maintenance and support. Term licensing includes acquisition and maintenance fees into a single annual fee for the grant of the license for a specified contract term.

| License Options | Fees |
|---|---|
| Perpetual license option | $ 495,000 (a) |
| Term license option | $ 245,000 (b) |

(a) Excludes annual maintenance of 20 percent.
(b) Assumes 5-Year term.

### II. Application Hosting, Process Automation and Data Management Services

| Services | Monthly Fee |
|---|---|
| • Application Hosting<br>• Process Automation and Monitoring<br>• Data Management | $ 10,000 |

### III. Back Office Services

| Services | Annual Fee (Billed 1/12th per month) |
|---|---|
| • Trade Affirmation and Settlement<br>• Custodial Reconciliation and Exception Resolution | .25 basis points (Asset Value) |

*Additional Pricing Notes:*
- When calculating your monthly fee for Back Office Services, the determination of your Asset Value will be based on the absolute investment asset value (excluding REPOs) of the investments (being the market value of the investments plus accrued income plus trade date cash as of the last day of each month) multiplied by .25 bps divided by 12.
- Back Office Services subject to a minimum monthly fee of $20,000.
- Trade Affirmation and Settlement services are for securities only – excludes derivative (swaps, futures) instruction, confirmation and payments. Assumes AVM will retain all REPO collateral management functions, including instruction of collateral movements between counterparties.
- Fee for Trade Affirmation and Settlement services includes up to 100 trades per month. Trade volumes over 100 will result in a $500 monthly fee for every block of 100 trades starting at 101.

CONFIDENTIAL



IV.   **Professional Services**

In addition to the licensing and on-going fees, there will be a one-time implementation fee to cover your transition to our proposed solution. The cost of this effort is directly related to a number of factors, including the amount of historic data to be converted, the quality of the data provided by ARMOUR and the skillset and resource commitment you can dedicate to this effort.

The implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training.

CONFIDENTIAL

# EXHIBIT 60

Message

| | |
|---|---|
| **From:** | Olszewska, Iwona [iolszewska@sscinc.com] |
| **Sent:** | 9/23/2015 2:18:55 PM |
| **To:** | Johnson, Adriana [ajohnson@sscinc.com] |
| **Subject:** | FW: And call to catch up |

**From:** Olszewska, Iwona
**Sent:** Wednesday, September 23, 2015 10:16 AM
**To:** Reilly, Timothy
**Subject:** RE: And call to catch up

Tim,
In short. Project is in Red this week until Friday when an updated timeline will be presented at which point it will go to Green.

Roll forward:

D&D is current/parallel with productions
CAMRA :
-          January accounting is completed. GL to be wrapped up by end of this week.
-          February processing is completed, we are wrapping on ME reporting package, due Thursday. Feb GL – ETA, 10/3
-          March processing to commence on Thursday, ETA for completion 10/2 . March GL – ETA, 10/7

Initial delay were caused by :
-          limited capacity on clients side
-          incorrect data provided for initial positions (we had to re-initialize)
-          incorrect/limited data for roll forward from custodians (CITI)

Current challenge – CITI pulled our access to the website. We have logged into their portal and were able to extract correct data for February, however, it is unclear to us (we are working through that piece with CITI and Armour) whether Armour's contract with CITI allows for trade date information).  Anyhow, we are working directly with Citi to resolve.

The objective is to use CAMRA for year-end reporting. To achieve that, we have added more resources on our end, and, will continue to handle the roll forward process until it is feasible for Armour to take on.

Internal challenge on this one is that we didn't sell them the right solution, Recon should have been suggested strongly as well as a workflow change in respect to Cash Management which is now handled via 3<sup>rd</sup> party.

Current Cash management process in place adds time to the reconciliation and is all manual which will be the workflow for the operation going forward. I am meeting with them next week hopefully (Adriana is working on that) so I can make some suggestions for improvements.

Let me know if you need anything else.

Regards,
Iwona

**From:** Reilly, Timothy
**Sent:** Tuesday, September 22, 2015 1:07 PM
**To:** Olszewska, Iwona
**Subject:** Re: And call to catch up

I would like to call him today (tomorrow at latest)

J. Timothy Reilly

On Sep 22, 2015, at 1:06 PM, "Olszewska, Iwona" <iolszewska@sscinc.com> wrote:

> I can. When is your call?
>
> **From:** Reilly, Timothy
> **Sent:** Tuesday, September 22, 2015 1:04 PM
> **To:** Olszewska, Iwona
> **Subject:** Fwd: And call to catch up
>
> Who best to provide update before I call Jim
>
> J. Timothy Reilly
>
> Begin forwarded message:
>
>> **From:** Jim Mountain <jrm@armourcap.com>
>> **Date:** September 22, 2015 at 12:36:26 PM EDT
>> **To:** "treilly@sscinc.com" <treilly@sscinc.com>
>> **Subject: And call to catch up**
>>
>> Tim:  Do you also have a few minutes for a call to talk about status of our CAMRA installation?
>>
>> James R. Mountain, Chief Financial Officer
>> ARMOUR Residential REIT, Inc. (NYSE:  ARR)
>> 3001 Ocean Drive, Suite 201
>> Vero Beach, FL  32963
>>
>> +1 772 617 4340  Office
>> +1 862 215 1850  Cell
>> +1 561 348 2408  Fax
>> jrm@armourcap.com
>> www.armourreit.com

CONFIDENTIAL

SSC136510

# EXHIBIT 61

Message

| | |
|---|---|
| **From:** | Olszewska, Iwona [iolszewska@sscinc.com] |
| **Sent:** | 9/29/2015 2:05:23 PM |
| **To:** | Johnson, Adriana [ajohnson@sscinc.com] |
| **Subject:** | RE: Prep for Bimini kick-off |

Ok...somehow when I opened the attachment the timeline did not show (there was an empty page).

**From:** Johnson, Adriana
**Sent:** Tuesday, September 29, 2015 10:00 AM
**To:** Olszewska, Iwona
**Subject:** RE: Prep for Bimini kick-off

The timeline is on slide 9, and I mentioned both approaches listed on slide 7.  The BPR mention, I was going to mention when we met with them.

**From:** Olszewska, Iwona
**Sent:** Tuesday, September 29, 2015 9:58 AM
**To:** Johnson, Adriana
**Subject:** RE: Prep for Bimini kick-off

Hi, you didn't include the timeline?

Also, I thought we were going to mention agile...I know you have a sentence there regarding adjustment to the approach upon BPR completion. I wanted to make sure we make a clear statement that we are not waterfall shop. No need to change anything now, just be prepared if the question comes.

**From:** Johnson, Adriana
**Sent:** Tuesday, September 29, 2015 9:41 AM
**To:** Pallone, Daniel; Moore, Dennis
**Cc:** Olszewska, Iwona; Reilly, Timothy; Fecteau, Jeff
**Subject:** RE: Prep for Bimini kick-off

Sure, see attached.  The focus of the meetings will be on taking them through the implementation process, data requirements, project artifacts and the reconciliation process during catch up.

Thanks,
Adriana

**From:** Pallone, Daniel
**Sent:** Monday, September 28, 2015 4:46 PM
**To:** Johnson, Adriana; Moore, Dennis
**Cc:** Olszewska, Iwona; Reilly, Timothy; Fecteau, Jeff
**Subject:** RE: Prep for Bimini kick-off

Adriana,
Can you please share the presentation and agenda?
Thanks,
Dan

Attorneys' Eyes Only

**From:** Johnson, Adriana
**Sent:** Monday, September 28, 2015 2:39 PM
**To:** Moore, Dennis
**Cc:** Olszewska, Iwona; Reilly, Timothy; Pallone, Daniel; Fecteau, Jeff
**Subject:** Re: Prep for Bimini kick-off

Dennis,

The presentation is our standard kick off presentation.  The data workflow is stated as a draft and won't be finalized until after the BPR.  Same with the timeline.  I will schedule the internal kick off for next week and discuss any concerns and findings from our meeting with them.  Hopefully all participants schedules will allow.

Thanks,
Adriana

On Sep 28, 2015, at 2:32 PM, Moore, Dennis <Dennis.Moore@sscinc.com> wrote:

I feel the internal kick-off meetings we've had for ARMOUR and ███████ have been helpful in transitioning from sales to implementation, providing your team with answers to some unknowns, and ensuring a smooth client kick-off meeting. It's especially beneficial for REIT clients who tend to be more complex. We have not reconciled any of your presentation materials with the sales team's knowledge of Bimini.  There could be inaccurate information.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

On Sep 28, 2015, at 1:44 PM, Olszewska, Iwona <iolszewska@sscinc.com> wrote:

Dennis,
We have met internally several times to discuss this solution, we had to do that if you remember for estimating purposes.  I am not sure what your concern is.

The bigger challenge will be the fact that our solution does not include RECOn as it was recommended by our SMEs. It will create an operational difficulty for the client as CI Manager delivers limited at best functionality to cover for best practice.

Again, we have put together a standard deck, have an agenda which was discussed with the client, and follow our standard process.

Regards,
Iwona

**From:** Moore, Dennis
**Sent:** Monday, September 28, 2015 12:19 PM
**To:** Johnson, Adriana
**Cc:** Reilly, Timothy; Olszewska, Iwona; Pallone, Daniel; Fecteau, Jeff
**Subject:** RE: Prep for Bimini kick-off
**Importance:** High

Adriana,

Attorneys' Eyes Only

SSC152895

We cannot wait to have the internal prep meeting for Bimini until after the kick-off meeting. We need to meet this afternoon to go through the proposed solution, tomorrow's agenda, and presentation materials that plan on being covered. Please book some time on the calendar.

Thank you,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Johnson, Adriana
**Sent:** Tuesday, September 22, 2015 2:10 PM
**To:** Moore, Dennis
**Subject:** RE: SS&C Onsite Visit - Bimini

Dennis,

I will set up the official internal kick off meeting after our external one.  Due to the PS team's schedules, having the internal meeting first did not work out.  Mainly since this is a license client and they're not using OTS the people that need to be brought up to date are part of the PS team.  We've met once already and will meet again on Friday to discuss next week's meeting.  We had a call with Jeff and we've gone back and forth a few times with him with questions.  I think at this point we're ok.  I'll let you know if we have any additional questions though.

Thanks,
Adriana

**From:** Moore, Dennis
**Sent:** Tuesday, September 22, 2015 12:58 PM
**To:** Johnson, Adriana
**Subject:** RE: SS&C Onsite Visit - Bimini

Adriana,

Can we schedule an internal kickoff meeting for Bimini either tomorrow or Friday? I want to make sure we have an opportunity to sync up before the onsite kickoff next week.

Thanks,

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Johnson, Adriana
**Sent:** Monday, September 21, 2015 4:44 PM
**To:** Moore, Dennis
**Subject:** RE: SS&C Onsite Visit - Bimini

Thank you!

Attorneys' Eyes Only

**From:** Moore, Dennis
**Sent:** Monday, September 21, 2015 4:41 PM
**To:** Johnson, Adriana; Fecteau, Jeff; Russell, David; Leyva, Gary
**Cc:** Olszewska, Iwona; Barry, Michael
**Subject:** RE: SS&C Onsite Visit - Bimini

Yes. Just made reservations for 10 of us at Citrus Grill for next Tuesday, Sept. 29th at 6:00pm.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Johnson, Adriana
**Sent:** Monday, September 21, 2015 4:11 PM
**To:** Moore, Dennis; Fecteau, Jeff; Russell, David; Leyva, Gary
**Cc:** Olszewska, Iwona; Barry, Michael
**Subject:** RE: SS&C Onsite Visit - Bimini

Just confirmed with the client for  kick off meeting on Tuesday afternoon (3:30 PM) and all day Wednesday.  He recommended we book the Vero Beach Hotel & Spa as they have good rates this time of year - $166 per night.

Dennis,  I asked if there was a preference in restaurant for dinner and Hunter said Citrus Grill.  Do you want to make reservations for 6PM? There will be 4 people on their side and 6 from our team.

Thanks,
Adriana

**From:** Moore, Dennis
**Sent:** Friday, September 18, 2015 12:22 PM
**To:** Johnson, Adriana; Fecteau, Jeff; Russell, David; Leyva, Gary
**Cc:** Olszewska, Iwona; Barry, Michael
**Subject:** RE: SS&C Onsite Visit - Bimini

Whatever is best for everyone. I would prefer PM Tuesday then all day Wednesday, but that is also the last day of the quarter. Just let me know.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  |  m: (860) 214-9580
dennis.moore@sscinc.com  |  www.sscinc.com

**From:** Johnson, Adriana
**Sent:** Friday, September 18, 2015 12:17 PM
**To:** Fecteau, Jeff; Moore, Dennis; Russell, David; Leyva, Gary
**Cc:** Olszewska, Iwona; Barry, Michael
**Subject:** FW: SS&C Onsite Visit - Bimini

Attorneys' Eyes Only

Bimini confirmed 9/28 – 9/30 availability.  Considering that kick off meeting will take 1 ½ - 2 hours – I figure we can do this one afternoon and then dinner.  Welcome package walk through will take from ½ day to 1 full day, if they have a lot of questions. When does it work best for all to be there? Monday afternoon and Tuesday? Or Tuesday afternoon and Wednesday?

Please let me know so I can finalize with client.
Thanks,
Adriana

---

**From:** hhaas [mailto:hhaas@biminicapital.com]
**Sent:** Friday, September 18, 2015 9:12 AM
**To:** Johnson, Adriana
**Subject:** RE: SS&C Onsite Visit

That works for us.  We will try to get a jump on the package between now and then.

**From:** Johnson, Adriana [mailto:ajohnson@sscinc.com]
**Sent:** Friday, September 18, 2015 8:21 AM
**To:** hhaas <hhaas@biminicapital.com>
**Subject:** SS&C Onsite Visit

Good morning Hunter,

I hope this email finds you well.  I wanted to see if your team had any availability between 9/28 & 9/30 for SS&C to be onsite.  We would like to have our official project kick off meeting, walk through the Welcome Package and the rest of the process.  We would need at least 2 days.

Let me know.
Thanks,

Adriana Johnson, PMP | Professional Services | SS&C Technologies Inc.
675 Third Avenue 14th Floor | New York, NY 10017
☎: 646-213-7111 | Cell: 646-438-0513 | ✉: ajohnson@sscinc.com


<image001.jpg>


<image001.jpg>

Attorneys' Eyes Only

# EXHIBIT 62

Message

| | |
|---|---|
| **From:** | Olszewska, Iwona [iolszewska@sscinc.com] |
| **Sent:** | 9/23/2015 2:18:55 PM |
| **To:** | Johnson, Adriana [ajohnson@sscinc.com] |
| **Subject:** | FW: And call to catch up |

**From:** Olszewska, Iwona
**Sent:** Wednesday, September 23, 2015 10:16 AM
**To:** Reilly, Timothy
**Subject:** RE: And call to catch up

Tim,
In short. Project is in Red this week until Friday when an updated timeline will be presented at which point it will go to Green.

Roll forward:

D&D is current/parallel with productions
CAMRA :
- January accounting is completed. GL to be wrapped up by end of this week.
- February processing is completed, we are wrapping on ME reporting package, due Thursday. Feb GL – ETA, 10/3
- March processing to commence on Thursday, ETA for completion 10/2 . March GL – ETA, 10/7

Initial delay were caused by :
- limited capacity on clients side
- incorrect data provided for initial positions (we had to re-initialize)
- incorrect/limited data for roll forward from custodians (CITI)

Current challenge – CITI pulled our access to the website. We have logged into their portal and were able to extract correct data for February, however, it is unclear to us (we are working through that piece with CITI and Armour) whether Armour's contract with CITI allows for trade date information).  Anyhow, we are working directly with Citi to resolve.

The objective is to use CAMRA for year-end reporting. To achieve that, we have added more resources on our end, and, will continue to handle the roll forward process until it is feasible for Armour to take on.

Internal challenge on this one is that we didn't sell them the right solution, Recon should have been suggested strongly as well as a workflow change in respect to Cash Management which is now handled via 3rd party.

Current Cash management process in place adds time to the reconciliation and is all manual which will be the workflow for the operation going forward. I am meeting with them next week hopefully (Adriana is working on that) so I can make some suggestions for improvements.

Let me know if you need anything else.

Regards,
Iwona

CONFIDENTIAL

SSC136509

**From:** Reilly, Timothy
**Sent:** Tuesday, September 22, 2015 1:07 PM
**To:** Olszewska, Iwona
**Subject:** Re: And call to catch up

I would like to call him today (tomorrow at latest)

J. Timothy Reilly

On Sep 22, 2015, at 1:06 PM, "Olszewska, Iwona" <iolszewska@sscinc.com> wrote:

I can. When is your call?

**From:** Reilly, Timothy
**Sent:** Tuesday, September 22, 2015 1:04 PM
**To:** Olszewska, Iwona
**Subject:** Fwd: And call to catch up

Who best to provide update before I call Jim

J. Timothy Reilly

Begin forwarded message:

**From:** Jim Mountain <jrm@armourcap.com>
**Date:** September 22, 2015 at 12:36:26 PM EDT
**To:** "treilly@sscinc.com" <treilly@sscinc.com>
**Subject: And call to catch up**

Tim:  Do you also have a few minutes for a call to talk about status of our CAMRA installation?

James R. Mountain, Chief Financial Officer
ARMOUR Residential REIT, Inc. (NYSE:  ARR)
3001 Ocean Drive, Suite 201
Vero Beach, FL  32963

+1 772 617 4340  Office
+1 862 215 1850  Cell
+1 561 348 2408  Fax
jrm@armourcap.com
www.armourreit.com

CONFIDENTIAL

SSC136510

# EXHIBIT 63

Message

| | |
|---|---|
| **From:** | Sivadas, Shiv [SSivadas@sscinc.com] |
| **Sent:** | 9/22/2015 7:26:55 PM |
| **To:** | Tetreault, Paul [PTetreau@sscinc.com]; Rice, Scott [srice@sscinc.com] |
| **Subject:** | RE: Armour Contact |

Sorry Paul, I'm not involved with Armour.

Thanks,
Shiv.

---

**From:** Tetreault, Paul
**Sent:** Tuesday, September 22, 2015 3:22 PM
**To:** Rice, Scott; Sivadas, Shiv
**Subject:** Armour Contact

Do either of you have someone at Armour I can contact regarding a billing issue?
Or a name and number that will get me started?


Thanks,



*Paul*


***Paul Tetreault, CPA***
**Senior Director │ SS&C Institutional Outsourcing**



**SS&C Technologies, Inc.**
80 Lamberton Road
Windsor, CT 06095
tel: 860-298-4741
cell: 860-938-0479
fax: 860-298-4972
ptetreau@sscinc.com
www.ssctech.com

**Don't Wonder.** │ Anything.
KNOW. │ Anytime.
│ Anywhere.

CONFIDENTIAL

SSC124711

# EXHIBIT 64

Message

| | |
|---|---|
| **From:** | Pallone, Daniel [DPallone@sscinc.com] |
| **Sent:** | 8/18/2016 12:31:31 PM |
| **To:** | Reilly, Timothy [treilly@sscinc.com]; Reid, David [DReid@sscinc.com] |
| **Subject:** | FW: Armour |

Read below. Josh took a leadership role with Armour CAMRA license implementation. The controller called Adriana on Friday and was threatening to pull the contract given all the issues they are encountering and the lack of support from Scott and Andrew. This took Adriana by surprise who has been relying on Scott and Andrew on client feedback. They are nice guys but need coaching on how to interact with clients and also need to understand the daily and month end process.

We have to change the approach to CAMRA license implementations and leverage the direct team much sooner in the process. This same situation continues to repeat itself and we have clients that are not happy. We are going thru this with ▇▇▇▇ right now and soon to happen with ▇▇▇▇▇▇▇▇ The CAMRA client support model for the mREIT is also broken based on consistent feedback from all the mREIT license clients.

BTW - We are waiting for Armour to sign off which is contingent on final payment of $307K outstanding receivable which was invoiced on June 30th, approaching 60 days past due. I told Josh and Adriana we have to collect the monies by 8/31. I will be calling Jim Mountain.

Daniel M. Pallone
Vice President
Mortgage REITs and Loan Servicing

SS&C Technologies Inc.
1114 Avenue of the Americas, 33th Fl
New York, NY 10036
Tel: 212-659-4631 (NY) / Mobile: 973-476-3928 / 860-298-4980 (CT)
Email: DPallone@sscinc.com


-----Original Message-----
From: Brown, Joshua
Sent: Thursday, August 18, 2016 8:03 AM
To: Pallone, Daniel; Johnson, Adriana
Cc: Doyle, Michael; Holmes, Jason; LaMonica, David
Subject: RE: Armour

Mike and I spoke with Armour yesterday. Here are the next steps from my perspective:

-- They are sending over their reports for us to take a look at. They previously had an issue with them, which has now been fixed but we would like to explain what the issue was in addition to seeing that the logic is correct and to see if some of our current reports used in Direct can be of use to them. We think they might.

We introduce them to Jason, Ross, Fatima, and Taylor. We provided them contact information as additional resources.

-- Jason provided a high level overview of the month end close process and controls we do. They commented that this was very helpful and they are looking for more of this type of interaction.

-- Mike spoke with Sasha. Sasha will be providing formal training at no cost. This was also communicated.

-- I am drafting a best practices document with the help of the team. We told them that we will be providing as soon as it is drafted. The goal is to have something no later than tomorrow (although we left a delivery date to them open).

-- We asked about any immediate issues. They were not concerned with anything specific at this moment, but want a better outlet for answering questions as they arise. There biggest complaint is that something different will come up frequently which they feel they are not getting good answers for what is causing the problems and it causes massive delays. The fact that they now have another outlet for answering questions is a big win.

CONFIDENTIAL

SSC145636

-- We are also working on cleaning up our checklists to make them client friendly and will be sending them along as well.

-- Once they have had time to digest what we send in documentation, they will follow up with us with questions.  We also left it open that we would be happy to have a webex with them to walk them through our processes in more detail.

-- Mike and I are still discussing when we can go out in person for a visit.

-- We are meeting with the PS team today to discuss the true up of the none agency BV's.  We will also provide the PS team with next steps from their perspective.


Joshua Brown, CPA
Senior Director â€" Accounting Policy & Regulatory Reporting

SS&C Technologies, Inc.
80 Lamberton Road
Windsor, CT 06095
Tel:  860.731.5038
Cell:  860.384.9909

JBrown@sscinc.com
www.ssctech.com


-----Original Message-----
From: Pallone, Daniel
Sent: Thursday, August 18, 2016 7:26 AM
To: Johnson, Adriana
Cc: Brown, Joshua; Doyle, Michael; Holmes, Jason; LaMonica, David
Subject: Armour

Adriana,

What are next steps for Armour?

Dan Pallone
973-476-3928

CONFIDENTIAL

SSC145637

# EXHIBIT 65

Message

| | |
|---|---|
| **From:** | Johnson, Adriana [ajohnson@sscinc.com] |
| **Sent:** | 5/3/2016 2:19:17 PM |
| **To:** | Russell, David [DRussell@sscinc.com] |
| **Subject:** | RE: transfer |

Ughh I feel like we're taking 1 step forward and 10 steps back.  I don't think that he remembers what to check off/on in order to fix the various issues and it's a trial an error exercise which this process has been anyway, but we're not making progress and we've lost 2 days of processing.

**From:** Russell, David
**Sent:** Tuesday, May 03, 2016 10:17 AM
**To:** Johnson, Adriana
**Subject:** RE: transfer

Yes

**From:** Johnson, Adriana
**Sent:** Tuesday, May 03, 2016 10:16 AM
**To:** Russell, David
**Subject:** RE: transfer

Does Scott have to reinitialize the whole thing again to fix these?

**From:** Russell, David
**Sent:** Tuesday, May 03, 2016 10:09 AM
**To:** Johnson, Adriana; Rice, Scott
**Cc:** Ford, Ruth
**Subject:** RE: transfer

Everything else looks good, the ones I highlighted in yellow need to be fixed.

**From:** Johnson, Adriana
**Sent:** Tuesday, May 03, 2016 10:08 AM
**To:** Russell, David; Rice, Scott
**Cc:** Ford, Ruth
**Subject:** RE: transfer

Dave,

Are these all the issues that you see? Or are you still reviewing the last iteration?

**From:** Russell, David
**Sent:** Tuesday, May 03, 2016 10:05 AM
**To:** Rice, Scott
**Cc:** Ford, Ruth; Johnson, Adriana
**Subject:** RE: transfer

CONFIDENTIAL

SSC143938

The positions highlighted in yellow look like they are an issue, I thought we had seen this before and you had fixed these.

**From:** Rice, Scott
**Sent:** Tuesday, May 03, 2016 10:01 AM
**To:** Russell, David
**Cc:** Ford, Ruth; Johnson, Adriana
**Subject:** RE: transfer

Revised with the additional check you had (didn't scroll down enough on my first pass)

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Tuesday, May 03, 2016 9:50 AM
**To:** Rice, Scott
**Cc:** Ford, Ruth; Johnson, Adriana
**Subject:** RE: transfer

OK, MGMT and tax look good, what about the GAAP compare to the armour prices for transfer value?

**From:** Rice, Scott
**Sent:** Tuesday, May 03, 2016 9:44 AM
**To:** Russell, David
**Cc:** Ford, Ruth; Johnson, Adriana
**Subject:** RE: transfer

This is what I have put together based off of your previous sheets.

This has the current values

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Tuesday, May 03, 2016 9:26 AM
**To:** Rice, Scott; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Why do we have a difference on the Tax to MGMT book value on one position?

CONFIDENTIAL

**From:** Rice, Scott
**Sent:** Tuesday, May 03, 2016 8:33 AM
**To:** Russell, David; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Holdings after the changes on the one CUSIP

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☏ **Office:** 860-938-4514 | ☏ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Rice, Scott
**Sent:** Tuesday, May 03, 2016 7:14 AM
**To:** Russell, David; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Here is the updated information on the last CUSIP for the transfer.

Please review and let me know

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☏ **Office:** 860-938-4514 | ☏ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Monday, May 02, 2016 3:27 PM
**To:** Rice, Scott; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

The transfer should only change the trade and settle date on a market value transfers, on a book value transfer it will maintain the original trade and settle dates.  If you look at the Gsettle date and trade date on the after transfer holdings you sent me you will see 4/6 because GAAP was market value but if you look at the Msettle and trade date you will see that they are still the original dates form when the lot was purchased.

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 3:20 PM
**To:** Russell, David; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

SSC143940

Just an FYI, the deliver and receives have the same trade date and settlement date as the transfer in and out does.

 **Scott Rice**

Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Monday, May 02, 2016 3:15 PM
**To:** Rice, Scott; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

The problem with receive and deliver is that it changes the trade and settle date.  Did you discuss with Mike Doyle to see if he can get the transfer to work?

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 3:13 PM
**To:** Russell, David; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

We tried a bunch of different iterations with transfer manager and nothing updated the values.  The yield was updated to match the historical yield but still nothing changed.  I ended up doing a receive and a deliver, the receive let's us set the book value.  Please check the currhold record attached and see if you think this is good.

 **Scott Rice**

Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 2:29 PM
**To:** Russell, David; Ford, Ruth
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

This is how the what if looks after using 4/6 settle date and the yield from histhold

CONFIDENTIAL

SSC143941



**SSC** **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☏ **Office:** 860-938-4514 | 📞 **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Monday, May 02, 2016 2:10 PM
**To:** Ford, Ruth; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

I am not sure, what does what if give you for a book value with a settle date of 4/6 and the original yield?

**From:** Ford, Ruth
**Sent:** Monday, May 02, 2016 2:03 PM
**To:** Russell, David; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Please look in CAMRA and tell us what yield we should use.  We put in the yield that was in there for January and February 5.02838657.  That is not the yield that was on the currhold record originally.

CONFIDENTIAL

Please advise what to do as I don't want to play MARCO POLO with this and it is holding us up.  We changed the yield, can't update book values....what should we do?

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 1:58 PM
**To:** Ford, Ruth; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

I am not concerned with the March book value, I am concerned with the book value being calculated as of 4/6 on the transfer.

---

**From:** Ford, Ruth
**Sent:** Monday, May 02, 2016 1:56 PM
**To:** Russell, David; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

We just re-did it and the result is exactly the same.  We could not change the march book value.  This will have to be explained to ARMOUR.
Let me know.

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 1:54 PM
**To:** Ford, Ruth; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

March is final

---

**From:** Ford, Ruth
**Sent:** Monday, May 02, 2016 1:53 PM
**To:** Russell, David; Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

We have the yield put back to what the February yield was....we should update book values before re-transferring.  Is March FINAL?????

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 1:32 PM
**To:** Rice, Scott
**Cc:** Johnson, Adriana; Ford, Ruth
**Subject:** RE: transfer

CONFIDENTIAL

SSC143943

If the yield in what if as of 3/31 does not tie to what is in currhold then you need to restore, fix the yield in currhold, and redo the transfer.

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 1:29 PM
**To:** Russell, David
**Cc:** Johnson, Adriana; Ford, Ruth
**Subject:** RE: transfer

What at this point are we looking to see and how do we fix it.

I ran the what if calculator and come back to the GAAP Book Value.

At this point we need to know exactly what to do in order to proceed





**Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

CONFIDENTIAL                                                                                          SSC143944

**From:** Russell, David
**Sent:** Monday, May 02, 2016 12:56 PM
**To:** Rice, Scott
**Cc:** Johnson, Adriana; Ford, Ruth
**Subject:** RE: transfer

It is amortizing too much, I think the 3/31 yield on the MGMT basis needs to be verified to what is in currhold using the what if calculator.

---

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 12:39 PM
**To:** Russell, David
**Cc:** Johnson, Adriana; Ford, Ruth
**Subject:** RE: transfer

Ruth and I have been going over this.

It looks like your lookup for CUSIP 3137G0AM1 pulled in the price for the 1.25M lot and not the appropriate 5M lot.

On CUSIP 3137G0BK4 your difference in column L is the AMZ year to date on the transfer. Both Ruth and I looked at it and are not able to determine what would need to be done to correct.

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☏ **Office:** 860-938-4514 | ☏ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 11:36 AM
**To:** Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Scott,

There are three position that need to be looked at, two are on the MGMT book value transfer amounts that I sent you before, the book values are moving too much from 3/31 to the transfer date of 4/6. It is most likely an yield issue.

There other issue is on the GAAP basis one position moved at the prior book value instead of the market value.

Dave

---

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 11:04 AM
**To:** Russell, David
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Restored and transferred one more time

CONFIDENTIAL

SSC143945

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 10:37 AM
**To:** Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

No,

I wanted to move MGMT at book and then copy to Tax.

Do not copy GAAP to MGMT after the transfer.

---

**From:** Rice, Scott
**Sent:** Monday, May 02, 2016 10:35 AM
**To:** Russell, David
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

GAAP was moved at market value.  After the transfer was done I then moved GAAP basis to MGMT basis.  I then re initialized tax.  If that was not the right way to do it I can do one more restore and just do the transfer and tax reintiliazation.

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

---

**From:** Russell, David
**Sent:** Monday, May 02, 2016 10:32 AM
**To:** Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Scott,

It looks like MGMT was moved at Market and not Book value.

Dave

---

**From:** Rice, Scott
**Sent:** Sunday, May 01, 2016 8:34 PM

CONFIDENTIAL

SSC143946

**To:** Russell, David
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

I tried the transfer one more time,

One of the two MGMT issues looks like it is cleared on CUSIP 3137G0BK4

The other CUSIP 3137G0AM1 has a price very close to 100 which could be why you see an issue   100.00021000

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Friday, April 29, 2016 11:07 AM
**To:** Rice, Scott
**Subject:** RE: transfer

OK, take a look at the two MGMT issues that I have highlighted on rows 182 and 184, looks like one ran to par.

Dave

**From:** Rice, Scott
**Sent:** Friday, April 29, 2016 11:02 AM
**To:** Russell, David
**Subject:** RE: transfer

Price on the transactions for the transfer are the 3/31 prices and not the 4/6 prices.  Not sure how that would happen if I used the "use market price" function in transfer.  It looks like all Agencies for BONY have the issue.  It looks like it is specific to one custodian and portfolio so it could be that that election on the transfer didn't take.  I could have not checked it, but I doubt it since it was part of my procedure on all of them.  Only solution I know of is to copy another database into FI and try it one more time.

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☎ **Office:** 860-938-4514 | ☎ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

**From:** Russell, David
**Sent:** Friday, April 29, 2016 10:54 AM
**To:** Rice, Scott
**Subject:** RE: transfer

Take a look at the attached column BB

CONFIDENTIAL

**From:** Russell, David
**Sent:** Friday, April 29, 2016 10:52 AM
**To:** Rice, Scott
**Subject:** RE: transfer

Yellow rows

---

**From:** Rice, Scott
**Sent:** Friday, April 29, 2016 10:51 AM
**To:** Russell, David
**Cc:** Johnson, Adriana
**Subject:** RE: transfer

Which highlighted ones am I looking at?  Orange or Yellow ones?

Boarding the plane in 30 min or so, so may have to look at this tonight when I get home, unless someone else is available to look into the BBG database and analyze the transfers while I am en route.  Perhaps we can reach out to Ruth to look at the transfers while Im traveling?  I don't anticipate getting home until after 5 today.

 **Scott Rice**
Consultant | SS&C Technologies, Inc.
80 Lamberton Road | Windsor, CT 06095
☏ **Office:** 860-938-4514 | ☏ **Mobile:** 860-550-4326 | ✉ **Email:** srice@sscinc.com
www.ssctech.com

---

**From:** Russell, David
**Sent:** Friday, April 29, 2016 10:05 AM
**To:** Rice, Scott
**Cc:** Johnson, Adriana
**Subject:** transfer

Scott,

The highlighted positions do not look like they are not moving for GAAP based upon the market price.

Dave

CONFIDENTIAL

# EXHIBIT 66

Message

| | |
|---|---|
| **From:** | Brown, Joshua [JBrown@sscinc.com] |
| **Sent:** | 4/16/2015 3:32:53 PM |
| **To:** | Moore, Dennis [Dennis.Moore@sscinc.com] |
| **Subject:** | RE: Are you in the office today? |

By the way........anything else I should be in the loop on?



*Joshua Brown, CPA*
**Senior Director – SS&C Direct Operations**

**SS&C Technologies, Inc.**
80 Lamberton Road
Windsor, CT 06095
Tel:  860.731.5038
Cell:  860.384.9909
Fax:  860.298.497
JBrown@sscinc.com
www.ssctech.com

---

**From:** Moore, Dennis
**Sent:** Thursday, April 16, 2015 11:30 AM
**To:** Brown, Joshua
**Subject:** RE: Are you in the office today?

Shit.. How do we get in front of this so we don't screw it up? ARMOUR just did us a solid but agreeing to do the press release.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  ¦  m: (860) 214-9580
dennis.moore@sscinc.com  ¦  www.sscinc.com

---

**From:** Brown, Joshua
**Sent:** Thursday, April 16, 2015 11:29 AM
**To:** Moore, Dennis
**Subject:** RE: Are you in the office today?

That's great.  Implementation team doesn't know what they are doing with them.  Got off a call with them yesterday and I think they are setting their portfolio up  completely wrong and it is apparent to me that our own team has no idea what they are doing.



*Joshua Brown, CPA*
**Senior Director – SS&C Direct Operations**

CONFIDENTIAL

SSC136015

**SS&C Technologies, Inc.**
80 Lamberton Road
Windsor, CT 06095
Tel:  860.731.5038
Cell:  860.384.9909
Fax:  860.298.497
JBrown@sscinc.com
www.ssctech.com

---

**From:** Moore, Dennis
**Sent:** Thursday, April 16, 2015 11:25 AM
**To:** Brown, Joshua
**Subject:** RE: Are you in the office today?

I was actually going to email you. The ARMOUR press release went out yesterday. It's on our company website, and we also did an email blast of the release to our universe of target mREIT prospects. I am following up with calls into them today.

I was thinking… Is there any way you could send me the emails/contact information of some of the Big 4 contacts you interact with for our REIT clients? I'd like to email them the release to see if we can drum up some new business.

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  ┊  m: (860) 214-9580
dennis.moore@sscinc.com  ┊  www.sscinc.com

---

**From:** Moore, Dennis
**Sent:** Thursday, April 16, 2015 11:11 AM
**To:** Brown, Joshua
**Subject:** RE: Are you in the office today?

Yes

Dennis Moore

SS&C Technologies, Inc.
t: (860) 298-4763  ┊  m: (860) 214-9580
dennis.moore@sscinc.com  ┊  www.sscinc.com

---

**From:** Brown, Joshua
**Sent:** Thursday, April 16, 2015 11:11 AM
**To:** Moore, Dennis
**Subject:** Are you in the office today?



*Joshua Brown, CPA*
**Senior Director – SS&C Direct Operations**

**SS&C Technologies, Inc.**

CONFIDENTIAL

SSC136016

80 Lamberton Road
Windsor, CT 06095
Tel: 860.731.5038
Cell: 860.384.9909
Fax: 860.298.497
JBrown@sscinc.com
www.ssctech.com

SSC136017

# EXHIBIT 67

Message

| | |
|---|---|
| **From:** | Pallone, Daniel [DPallone@sscinc.com] |
| **Sent:** | 3/14/2017 3:58:41 PM |
| **To:** | Reilly, Timothy [treilly@sscinc.com]; Szczepanik, Stan [SSzczepa@sscinc.com] |
| **Subject:** | RE: In process REITs |

Armour:
    Reports - fixes will be done tomorrow
    Set up issues - close out known issues today
    OTS - putting them on holiday schedule and rates/factor issue resolved
    Continue to educate on processing and handling exceptions which are occurring daily



Bimini:
    CAMRA - behind due to Hunter out of office until tomorrow, Mark W and Tom V on site this week - I will call Hunter tomorrow



We are experiencing significant issues across the board with CAMRA license clients in implementation and live status and need to stabilize the development and client support areas of weakness.

Daniel M. Pallone
Vice President
Mortgage REITs and Loan Servicing

SS&C Technologies Inc.
1114 Avenue of the Americas, 33th Fl
New York, NY 10036
Tel: 212-659-4631 (NY) / Mobile: 973-476-3928
Email: DPallone@sscinc.com

-----Original Message-----
From: Reilly, Timothy
Sent: Tuesday, March 14, 2017 8:42 AM
To: Pallone, Daniel
Subject: In process REITs

Dan - can you provide me an update on all the inprocess Reits.

Thanks


Sent from my iPad

Attorneys' Eyes Only

# EXHIBIT 68

| From | To | Time | Message |
|------|----|------|---------|
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:43:17 PM | just keep CUSIP 3128NJLH0 on the radar in case a book value change happens |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:43:18 PM | thats the last major stumbling block that cant be helped with a sweep |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:43:43 PM | ok |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:44:17 PM | yeah, what im thinking of doing on the TBA's is backing up the database first thing in the morning, pairing them off, checking cash an then re running GL BAL to see if it clears things |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:44:49 PM | becasuse if that works, I will have to do the same things for Javelin |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:48:27 PM | yea |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:50:39 PM | ok, I fixed that issue, you will probably need to pull the unsettled report again, or take that line item off of it and 1200 should tie |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:50:49 PM | running GLBAL now |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:52:04 PM | at least I feel im being a bit more helpful to you this month figuring out some of these breaks |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:54:27 PM | yea definately |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:54:51 PM | not that you werent prior months but the stuff today could have went into next week |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:55:55 PM | yeah, im starting to understand the gl accounts though a bit more, still this whole process is way too manual and stupid |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:56:43 PM | yea its brutal |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 9:56:50 PM | doing it by hand would take the same time |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 9:57:41 PM | i dont get how basically the gl within camra is like a whole different database.  I mean shouldnt it all talk to each other, shouldnt have to update 8 million extra tables and run glbal all the time |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 10:00:23 PM | im also not quite sure why clients like annaly and fortress put up with doing a gl this way |
| srice@sscinc.com | avoutsinas@sscinc.com | 2/25/2016 10:00:41 PM | gl bal is done |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 10:01:36 PM | ok thanks |
| avoutsinas@sscinc.com | srice@sscinc.com | 2/25/2016 10:01:59 PM | yea thats good now |

SSC0747245

| From | To | Time | Message |
|------|-----|------|---------|
| srice@sscinc.com | avoutsinas@sscinc.com | 3/20/2017 6:10:13 PM | why didnt i implement ci manager, well i did but it didnt work |
| | | | |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/22/2017 6:26:05 PM | yeah, also the procedures will have to be updated, going forward in SSRS there is no more earned income report, its all part of the p and l |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/22/2017 6:26:53 PM | so thats what hes asking me about now - i think john told him the right thing on that but i have never used p&amp;l report for anything |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/22/2017 6:27:41 PM | I only found out during bimini, because that guy hunter was asking how he could find hs net ncome, so even the p and l report on the new version has quirks |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/22/2017 6:29:12 PM | don j told me the reports werent completely accurate for armour the whole time, did you hear anything about that? |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/22/2017 6:29:30 PM | yep, repeatedly |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/22/2017 6:30:11 PM | I knew there were issues and kept asking when we could get latest reports and Don J kept saying they werent ready...then we got kicked off the project |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/22/2017 6:31:48 PM | nicr |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/22/2017 6:31:49 PM | nice |
| | | | |
| srice@sscinc.com | ajohnson@sscinc.com | 3/28/2017 3:34:16 PM | so, the supposed factor issues on armour that they are still trying to pin on me, started happening in October and November, of 2016, after I was already pulled. |
| ajohnson@sscinc.com | srice@sscinc.com | 3/28/2017 3:40:01 PM | oh gosh this is the most ridiculous mess EVER!! |
| ajohnson@sscinc.com | srice@sscinc.com | 3/28/2017 3:40:31 PM | and bimini won't b too far along as i heard dd talking about hunter complaining about it |
| srice@sscinc.com | ajohnson@sscinc.com | 3/28/2017 3:40:58 PM | Im sure I will get the blame for that too |
| | | | |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/28/2017 3:35:15 PM | so I guess the factor issue I kepe hearing about with Armour, how stuff isn't getting pulled right from Bloomberg...started in October of 2016, months after we were off the project |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/28/2017 3:36:12 PM | still our fault |
| | | | |

ATTORNEYS EYES ONLY

SSC0746931

| From | To | Time | Message |
|------|-----|------|---------|
| srice@sscinc.com | rford@sscinc.com | 3/10/2016 2:25:55 PM | I can run it since I am in there |
| rford@sscinc.com | srice@sscinc.com | 3/10/2016 2:26:01 PM | cool, thanks |
| rford@sscinc.com | srice@sscinc.com | 3/10/2016 2:26:13 PM | i just want to check to see what the variance is now |
| srice@sscinc.com | rford@sscinc.com | 3/10/2016 2:29:24 PM | sene over the report in email |
| rford@sscinc.com | srice@sscinc.com | 3/10/2016 2:33:57 PM | thanks |
|  |  |  |  |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/10/2016 2:25:01 PM | that same repo has an issue - it is on armour's gl and the camra gl but not on the holdings report in camra |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:25:31 PM | Let me check something |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:26:14 PM | give me the repo number again |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/10/2016 2:27:58 PM | REP001959 |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:30:49 PM | im re running the holdings |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:33:33 PM | i think that is another report issue, awesome |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:35:16 PM | its on a holdings I ran out of REX though |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/10/2016 2:38:25 PM | keeps getting better |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:39:02 PM | I know the issue why it didnt hit the report on this one though, but still stupid because i cant get it fixed |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/10/2016 2:40:10 PM | what was the issue? |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:41:26 PM | the maturity that was unsettled before month end, which I deleted, and which was how we were able to originally reconcile holdings re populated when we rolled the system to February.  I deleted it again, but the report doesnt somehow pick up something from a prior period deleted in the current period |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/10/2016 2:41:53 PM | These reports are complete garbage, and we want the client to sign off each month...stupid us |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/10/2016 2:51:21 PM | so ssrs holdings is no good from now on for javelin/ |

ATTORNEYS EYES ONLY

SSC0747277

| From | To | Time | Message |
|------|-----|------|---------|
| | | | |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:00:38 PM | i meant to ask you if the latest status on bb file was Richard is reviewing |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:01:07 PM | He hasn't responded to me after he said he had to check internally with the javelin fixes...which still arent done |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:01:43 PM | mountain did not accept the invite and is traveling only gruber and jonna are on |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:02:04 PM | and as usual gruber doesn't know where they stand w/july |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:02:21 PM | LOL! and he's saying that in the past few weeks they've accomplished A LOT!! |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:02:45 PM | f-ing moron |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:02:45 PM | cleaning up stuff that was done before - F-U!!!!! |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:03:07 PM | and he's saying that they didn't really close July that JB and team did it |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:03:28 PM | so that means they're prob not going to pay |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:03:51 PM | they didnt do anything, all they did was bv adjustments that andrew and I had ready to go before we got pulled off |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:04:21 PM | i know, it's just them sweet talking and hand holding jonna so she feels progress was made |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:04:41 PM | DP could care less who is doing what, he just asked SO JULY is done correct? |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:04:55 PM | as his next comment will be on when they will pay!!! |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:06:26 PM | JB said that they're investigating the suspense account.  don't know what for |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:06:49 PM | wtf does suspense have to do with anything |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:06:58 PM | who the F knows! |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:07:40 PM | the big test is going to be august close SO i can't wait for that |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:07:58 PM | so they arent paying yet, have to wait another month..lol |

SSC0746847

| From | To | Time | Message |
|------|----|----|---------|
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:08:17 PM | OMG gruber just said that the way they were shown how to process daily was NOT right OMG!!! |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:08:30 PM | what? |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:09:18 PM | investments at par - were told the system couldn't handle it so that was RF!! |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:09:46 PM | investment at a loss - we told them to cancel/correct |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:10:06 PM | and IO they were told to process manually and the heros just told them that there's an upload for it |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:10:21 PM | paydowns at losses, because of how they project through the auto mbs process |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:10:50 PM | they were just told something different |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:11:07 PM | well if its something new in camra it was never conveyed to me |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:11:38 PM | it all comes down to information not being communicated downstream |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:12:13 PM | id like to know about the paydown at losses thing, I Really would, im pissed off now |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:18:51 PM | and they just started buying IOs at the end of June, and I cant find any sort of IO Pmt upload in CAMRA help, |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:21:55 PM |  yeah well, i'm going to send an email to the clown team and ask them to let us know what they've corrected so that we can use for lessons learned.... |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:25:48 PM | I dont appreciate this at all.  If you send it make sure to ask for line by line detail of what they fixed and said was wrong, because I still think they are full of sh&amp;t |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:33:44 PM | of course... i just did.  i'll fwd to you....  i had to beat DP to the email bc he called me right after the armour call screaming and saying that he's sending DL an email as he can't believe what he heard |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:34:44 PM | im glad im going to get probably written up over this |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:34:44 PM | and when I told him that it's not the consultants fault for example the invest at par and RFs recommendations. he was like well I know but this is why doyle and team need to communicate and we need to better handle these implementations for reits |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:35:12 PM | and he mentioned resource and how that's a mess |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:35:32 PM | but i wanted to beat him to sending the email bc i don't know how he's going to word it |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:36:18 PM | im sure its going to all be pointed at me, or most of it, and thats complete bullshit, especially since if they really fixed things then they should tell us what they did, and not keep asking questions |

ATTORNEYS EYES ONLY

SSC0746848

| From | To | Time | Message |
|------|-----|------|---------|
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:37:33 PM | DL is not a fan of D&amp;J bc he knows how they work so he's not taking their full word |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:39:27 PM | yeah, but still, its a very bad situation to be in.  I also at least on 3 calls with Doyle we were all on mentioned how the MBS payments at a loss were being handled and all he said was CI MGR could handle it if we got the right info...which again I told him we dont get on those |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:41:50 PM | the reality is that they pointed these out as AHA! they were done incorrectly and we're fixing them so that the client can feel comfortable BUT they actually don't know the downstream effect |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:43:42 PM | no one knows crap, when we first started that POS Gruber insisted they never had any paydowns with losses even when I proved to him they did |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:44:29 PM | i know but he very firmly said that last september they were told something and now they're told something else by the dream team |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:46:06 PM | sosomething from a year ago, that makes sense |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:48:40 PM | yep and i'm SO amazed by gruber's memory considering he doesn't know shit about anything |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:49:25 PM | donuts just im me asking if a process &amp; procedures doc was created for armour!!! |
| srice@sscinc.com | ajohnson@sscinc.com | 9/9/2016 2:49:39 PM | wtf seriously |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:50:09 PM | i'm going to ask him why does he ask |
| ajohnson@sscinc.com | srice@sscinc.com | 9/9/2016 2:54:32 PM | no answer but i have a call w him at 11:30 and i'm sure it'll be discussed |
| | | | |
| rriggs@sscinc.com | srice@sscinc.com | 9/14/2016 12:04:30 PM | hey did have to complete a doc before armour was transitioned to client services? |
| srice@sscinc.com | rriggs@sscinc.com | 9/14/2016 12:06:04 PM | we had to have a meeting and there was a presentation as well as a policies and procedures doc |
| | | | |
| avoutsinas@sscinc.com | srice@sscinc.com | 9/16/2016 12:21:49 PM | did dan ever call armour? |
| srice@sscinc.com | avoutsinas@sscinc.com | 9/16/2016 12:23:03 PM | i think |
| srice@sscinc.com | avoutsinas@sscinc.com | 9/16/2016 12:23:12 PM | hvent heard back |
| | | | |

ATTORNEYS EYES ONLY

| From | To | Time | Message |
|---|---|---|---|
| jholmes@sscinc.com | cgaylord@sscinc.com | 10/25/2016 4:20:37 PM | was it working in previous months |
| cgaylord@sscinc.com | jholmes@sscinc.com | 10/25/2016 4:20:59 PM | I think its been stale since the handoff |
| cgaylord@sscinc.com | jholmes@sscinc.com | 10/25/2016 4:21:17 PM | we were probably uploading manually in implementation |
| jholmes@sscinc.com | cgaylord@sscinc.com | 10/25/2016 4:21:54 PM | ok |
| | | | |
| cgaylord@sscinc.com | jholmes@sscinc.com | 11/8/2016 9:21:21 PM | jason, do you know if someone recently advised armour to use the autosettle feature? |
| | | | |
| fmahamoon@sscinc.com | jholmes@sscinc.com | 12/30/2016 3:10:43 PM | Hi Jason,  I am taking another week off. Too many e-mails from Armour |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:10:59 PM | ha no way |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:11:03 PM | what are you doing on? |
| fmahamoon@sscinc.com | jholmes@sscinc.com | 12/30/2016 3:11:40 PM | I logged in to add my Kids on my insurance, due to my Pay increase I dont qualify for PHS :-( |
| fmahamoon@sscinc.com | jholmes@sscinc.com | 12/30/2016 3:12:03 PM | Are u working from home |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:12:14 PM | no, i am at the office today |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:12:23 PM | armour is crazy |
| fmahamoon@sscinc.com | jholmes@sscinc.com | 12/30/2016 3:12:48 PM | Yeah I see thatttt |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:15:59 PM | Do you agree with what we are doing for WMC and Armour regarding BAMM trail?? |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:16:08 PM | shutting off BAMM after tonight |
| jholmes@sscinc.com | fmahamoon@sscinc.com | 12/30/2016 3:16:20 PM | and manually rolling each day when we come back on Tuesday? |
| fmahamoon@sscinc.com | jholmes@sscinc.com | 12/30/2016 3:19:42 PM | yes agreed |

ATTORNEYS EYES ONLY

| From | To | Time | Message |
|---|---|---|---|
| srice@sscinc.com | avoutsinas@sscinc.com | 3/30/2016 3:03:22 PM | me too |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/30/2016 3:03:47 PM | in bbg or armour? |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/30/2016 3:04:00 PM | armour |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/30/2016 3:04:03 PM | that explains it |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/30/2016 3:04:48 PM | ok yea 167.34 |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/30/2016 3:05:00 PM | is that better that before? |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/30/2016 3:06:04 PM | close enough.  yea it was 136.40 and we needed to be at 167.87 |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/30/2016 3:06:16 PM | so we are within a dollar now |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/30/2016 3:09:24 PM | ok, so I know what i have to do to fix them, a couple more hours down the tubes |
|  |  |  |  |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/31/2016 11:54:57 AM | im missign 40 factors so far for march, never going to finish anything at this rate |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/31/2016 11:57:25 AM | the timeline was never realistic |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/31/2016 11:58:51 AM | adriana emailed me last night asking how it was going and I told her I havent gotten to do mutch catch up since everything has been dedicated to fixing gl |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/31/2016 12:01:58 PM | our setups were completely different from the way their securities worked |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/31/2016 12:02:29 PM | yeah, im glad we just found that out now after a year. And I didnt do the setups either |
| avoutsinas@sscinc.com | srice@sscinc.com | 3/31/2016 12:02:47 PM | this could have been figured out witha  good bpr |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/31/2016 12:03:15 PM | yeah, gruber thought the bpr was a joke, and never signed off on it |
| srice@sscinc.com | avoutsinas@sscinc.com | 3/31/2016 12:05:52 PM | also, the repo accrual thing makes no sense to me, since when we have been maturing those things they match to what the close is on the client side |
|  |  |  |  |

ATTORNEYS EYES ONLY

SSC0747083

| From | To | Time | Message |
|------|----|----|---------|
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/21/2015 7:29:13 PM | how? |
| matthew.kelly@sscinc.com | srice@sscinc.com | 7/21/2015 7:29:29 PM | put the lid down |
| matthew.kelly@sscinc.com | srice@sscinc.com | 7/21/2015 7:29:45 PM | he's a bottom feeder |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/21/2015 7:30:16 PM | yeah, him and this dennis moore guy are trying to sell armour meats recon when they should have done it a year ago |
|  |  |  |  |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/23/2015 4:04:53 PM | so I may basically have to start armour meats from january again...FML |
|  |  |  |  |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/29/2015 11:47:10 AM | ive been basically going over the same crap for days with no help, im kind of done too, and her asking me every hour what the status is doesnt help |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/29/2015 11:48:07 AM | I mean cash for armour meats is hosed because two statements for the same thing from citi have cash on different days, no way I can reconcile to that |
| matthew.kelly@sscinc.com | srice@sscinc.com | 7/29/2015 11:48:27 AM | get on board |
|  |  |  |  |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/31/2015 2:24:21 PM | is pravin doing anything on fortress..when he isnt on vacation |
| srice@sscinc.com | matthew.kelly@sscinc.com | 7/31/2015 2:27:04 PM | maybe if im lucky I can get jtinkers as my resource on armour meats |
|  |  |  |  |
| srice@sscinc.com | cvaranelli@sscinc.com | 7/31/2015 3:09:22 PM | yeah, tis funny because I had to take over armour all by myself when Mark Williams went on vacation, and then he got pulled to a bunch of other things and no one bothers to help me |
| cvaranelli@sscinc.com | srice@sscinc.com | 7/31/2015 3:10:01 PM | next time you're in ct, go talk to tim. |
|  |  |  |  |
| srice@sscinc.com | wholbrook@sscinc.com | 8/4/2015 4:54:10 PM | Hey Bill, I think you can close my ticket on the unsettled for Armour, not sure if you have already but it looks fine |
| wholbrook@sscinc.com | srice@sscinc.com | 8/4/2015 4:54:26 PM | Awesome!! Thanks for letting me know! |

ATTORNEYS EYES ONLY

SSC0746982

| From | To | Time | Message |
|------|-----|------|---------|
| | | | |
| mmccormick@sscinc.com | srice@sscinc.com | 9/28/2016 7:12:45 PM | so why is fatima supporting armour?  why not client services? |
| srice@sscinc.com | mmccormick@sscinc.com | 9/28/2016 7:13:03 PM | its a long story |
| | | | |
| avoutsinas@sscinc.com | srice@sscinc.com | 9/29/2016 2:11:22 PM | cleaning up johns messes is a time consuming thing and so is doing a month worth of armour work in two days |
| | | | |
| avoutsinas@sscinc.com | srice@sscinc.com | 9/29/2016 2:11:48 PM | doing a month worth of armour in a month was hard enough |
| | | | |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:46:19 PM | but i guess it's QE and i'm excited by the stupidity around here |
| srice@sscinc.com | ajohnson@sscinc.com | 9/29/2016 2:46:52 PM | im just kind of done with it all, because everything I am saying to people about the armour issues has been pretty much 100 percent right, but rather than dealing with them its just, keep researching, keep lying |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:47:25 PM | the fact that NOTHING was done by the dream team really is amazing!! |
| srice@sscinc.com | ajohnson@sscinc.com | 9/29/2016 2:47:43 PM | that keeps getting blown off, to, well what do we do to get august closed |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:47:47 PM | poor mr. doyle his ears must b ringing |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:48:25 PM | the idiots at armour should see right through this but at least gruber is happy! |
| srice@sscinc.com | ajohnson@sscinc.com | 9/29/2016 2:48:43 PM | so happy he didnt return calls for a week |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:48:52 PM | yep |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:49:08 PM | he deserves what he gets for being a dick.... |
| srice@sscinc.com | ajohnson@sscinc.com | 9/29/2016 2:49:47 PM | I lost a year of my life going out of my way to try and make everyone happy on this stupid project and its still a complete mess |
| ajohnson@sscinc.com | srice@sscinc.com | 9/29/2016 2:50:11 PM | yep!!! i'm done with it! |

SSC0746853

| From | To | Time | Message |
|------|-----|------|---------|
| jwilliam@sscinc.com | srice@sscinc.com | 2/9/2017 4:54:53 PM | SSRS is not working for them.  UGH |
| srice@sscinc.com | jwilliam@sscinc.com | 2/9/2017 4:55:16 PM | well Im on emails now from pallone about armour again, and TR is on them so im about to get in trouble somehow |
| jwilliam@sscinc.com | srice@sscinc.com | 2/9/2017 4:55:48 PM | im sorry.  armour fire us yet? |
| srice@sscinc.com | jwilliam@sscinc.com | 2/9/2017 4:56:17 PM | not yet, and now your friend don johnson is saying we need to sell them recon, if they arent paying us anyway why would they buy anything else |
| jwilliam@sscinc.com | srice@sscinc.com | 2/9/2017 4:56:59 PM | they will get it.  DP will make sure of that.  For free of course. |
| | | | |
| ajohnson@sscinc.com | srice@sscinc.com | 2/10/2017 2:16:27 PM | LOL! on the email re: armour blckrock file!! LOL!!! |
| srice@sscinc.com | ajohnson@sscinc.com | 2/10/2017 2:17:39 PM | good lord |
| | | | |
| srice@sscinc.com | ajohnson@sscinc.com | 2/10/2017 2:50:46 PM | someone has to do bimini, because no one has looked at gl in two weeks, and I keep delaying rolling to february because im afraid 12/31 is a mess, I keep lying to Hunter every day saying someone is reviewing their financials and it takes time, but I hate lying |
| srice@sscinc.com | ajohnson@sscinc.com | 2/10/2017 2:52:08 PM | lying to clients I mean, not when they dont deserve it |
| ajohnson@sscinc.com | srice@sscinc.com | 2/10/2017 2:59:06 PM | i know he really is getting the shaft! and we keep charging him monthly and he keeps paying :( |
| srice@sscinc.com | ajohnson@sscinc.com | 2/10/2017 2:59:55 PM | and all his concerns are legitimate |
| ajohnson@sscinc.com | srice@sscinc.com | 2/10/2017 3:00:13 PM | yep |
| srice@sscinc.com | ajohnson@sscinc.com | 2/10/2017 3:01:04 PM | like at least with those guys if I was there for two weeks I think it would actually accomplish something, unlike all those useless trips to armour.  But no way I can convince DD that we should even go, especially not with all the other fires going on |
| ajohnson@sscinc.com | srice@sscinc.com | 2/10/2017 3:01:46 PM | I'll mention it on monday when I see the fool |
| | | | |
| srice@sscinc.com | ajohnson@sscinc.com | 2/13/2017 6:46:58 PM | i wonder whatever happened with DP and TR at armour |

ATTORNEYS EYES ONLY

SSC0746870