UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
ARMOUR CAPITAL MANAGEMENT LP,   :  No. 3:17CV790(JAM)
                                :
              Plaintiff         :
                                :
         v.                     :
                                :
SS&C TECHNOLOGIES, INC.,        :
                                :  New Haven, Connecticut
              Defendant         :  February 21, 2019
                                :
- - - - - - - - - - - - - - - - x
```

MOTION HEARING

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        HOLLAND & KNIGHT
            701 Brickell Ave., Suite 3000
            Miami, Florida 33131
        BY:  JOSEPH J. MAMOUNAS, ESQ.
            ALLISON KERNISKY, ESQ.

    FOR THE DEFENDANT:

        PAUL WEISS RIFKIND WHARTON & GARRISON LLP
            1285 Avenue of the Americas
            Suite 3543
            New York, New York 10019
        BY:  JOHN F. BAUGHMAN, ESQ.
            NORA AHMED, ESQ.

                       Diana Huntington, RDR, CRR
                       Official Court Reporter

1                            **2:08 P.M.**

2               THE COURT:  We're here today for argument on the

3     summary judgment motion in ARMOUR v. SS&C.

4               May I have appearance of counsel, please.

5               MR. MAMOUNAS:  Good afternoon, Judge.  Joe

6     Mamounas and Allison Kernisky from Holland & Knight in

7     Miami.

8               THE COURT:  Welcome to Connecticut.

9               MR. BAUGHMAN:  Good afternoon, Your Honor.  Jack

10    Baughman and Nora Ahmed from Paul Weiss for the defendant.

11              THE COURT:  And equally so.

12              So I guess it looks like you have a PowerPoint

13    all set up; is that right, Mr. Baughman?

14              MR. BAUGHMAN:  I do, Your Honor, because I want

15    to show you some documents.

16              THE COURT:  Sure.

17              Just so you know, I have a jury out in a

18    criminal case.  Just as I was coming in, I got handed a

19    note.  So I'm going to have to attend to that in about 20

20    minutes' time, just so you know.  We're going to have the

21    parties come in.  I'm going to hear from you, but then in

22    about 15 to 20 minutes we're going to have to take a

23    break.  I hope you don't have a train reservation or the

24    like.

25              MR. BAUGHMAN:  No, I do not.

1          There's a very logical breaking point in my

2     presentation in probably 12 or 15 minutes.  Would it be

3     okay if I went to there and then stopped?

4          THE COURT:  Okay, let's do that.  Great.

5          MR. BAUGHMAN:  Your Honor, if I could, I just

6     would like to hand out a couple of things.  I'd like to

7     hand opposing counsel and I'll hand up three copies for

8     the Court.  One is just a copy of the slides, and then the

9     other is an excerpt from the plaintiff's interrogatory

10    answers where they identify the alleged misrepresentations

11    at issue in the case.

12         So what I'm going to do this afternoon is I'm

13    going to talk to you about the negligent misrepresentation

14    claims, why the negligent misrepresentation claims should

15    be dismissed, and then I'm going to hand it over to

16    Ms. Ahmed probably later this afternoon to talk about

17    damages, if I might.

18         THE COURT:  I see.

19         MR. BAUGHMAN:  What I'd like to submit to

20    Your Honor is that on the issue of the negligent

21    misrepresentation claims, there are three independent

22    reasons why Your Honor can confidentially grant summary

23    judgment on the negligent misrepresentation claims.

24         The first is the controlling case of *Western*

25    *Dermatology*, which is the most recent case from the

1    Connecticut --

2              THE COURT:  It's not controlling, right?

3              MR. BAUGHMAN:  It is controlling.  I believe it

4    is.

5              THE COURT:  It is?

6              MR. BAUGHMAN:  It is affirmed by the Supreme

7    Court.

8              THE COURT:  On those grounds?

9              MR. BAUGHMAN:  Well, I can show, Your Honor,

10   what it was was it was -- this is the rescript from the

11   Supreme Court here.  It says that it is affirmed in all

12   other respects.  The issue of the negligent

13   misrepresentation was not specifically argued in the

14   Connecticut Supreme Court, but it is the most recent

15   decision by a Connecticut court and is indeed the only

16   decision on the issue of negligent misrepresentation,

17   okay, that is from any court that has gone to the Supreme

18   Court.

19             And I want to focus right on this because it's

20   very important, Your Honor, that you understand that under

21   the Connecticut law, what the plaintiff is relying on are

22   fraud cases, okay.  They have in their brief, they have a

23   quote of a case called *Warman*, which is the case that

24   they primarily --

25             THE COURT:  Let's just get back to that.  I'll

1    talk about *Warman* and I'll talk about the other cases in a

2    moment.

3           I want to take up this issue of your view that

4    *Western Dermatology* is, as you put the phrase,

5    controlling.

6           MR. BAUGHMAN:  Yes.

7           THE COURT:  As I understand it, under *Erie* I

8    have to look at or predict what the highest court would do

9    in the state of Connecticut.

10          MR. BAUGHMAN:  Yes.

11          THE COURT:  And as I understand it, *Western*

12   *Dermatology* simply does not -- the Supreme Court in

13   *Western Dermatology* simply did not address this issue of

14   the merger clause.  So I can understand why you're here

15   saying it's a recent case, it's a case that is a powerful

16   indicator of what the Connecticut Supreme Court would do,

17   but I guess I don't think that it's controlling.  I don't

18   see that there's a basis.

19          MR. BAUGHMAN:  Let me try to persuade you,

20   Your Honor.  As you said, it is your obligation to predict

21   what the law of Connecticut would be.  And let me break it

22   out for you this way.

23          Let me start with *Warman* because it's important.

24   *Warman* is a fraud case.  I think there's no credible

25   dispute that what *Warman* was discussing --

1          THE COURT:  Can we stick to *Western Dermatology*?

2    *Warman* was back in 1961, right?  So let's come to this

3    century and let's talk about *Western Dermatology*.  The

4    Connecticut Supreme Court doesn't decide the issue, does

5    it?

6          MR. BAUGHMAN:  I'm trying to frame the issue for

7    Your Honor, if I can, as to why I think we can understand

8    it.  Because *Western* is presented to -- it is the most

9    recent decision from any Connecticut court that deals with

10   the interaction of a merger clause and a claim of

11   negligent misrepresentation.  That is undisputed.  There

12   is no decision from any Connecticut court post *Western*

13   *Dermatology* on this subject, okay?

14         It discusses -- and the case is presented in any

15   context, Your Honor.  I think I'm not quite addressing

16   what you want me to address because of the look you're

17   giving me on your face.

18         THE COURT:  Usually when I ask a question of

19   counsel and said they've overstated their case, usually

20   they know enough to say, well, you're right, Your Honor,

21   it's not actually controlling, but what I will say is that

22   the most recent decision in the Connecticut court system,

23   it's at the appellate court level, that reaches this issue

24   points in our direction, we think that's the most powerful

25   indicator in our direction.

1          But unless you can show me that the Connecticut

2   Supreme Court has ruled as you say it's ruled, I don't see

3   how you can be here saying, well, it's controlling, and it

4   doesn't matter what the Connecticut Supreme Court said

5   about fraud in 1961; this is what the Connecticut Supreme

6   Court has done in the *Western Dermatology* case.

7          MR. BAUGHMAN:  What I was trying to show

8   Your Honor is what the rescript from the case says it is

9   was affirmed in all respects.  That is what the Supreme

10  Court said.  That literally is what the Supreme Court said

11  when they affirmed the decision, it is in all respects.

12          Now, the formulation that you're saying, okay, I

13  can accept it.  But it still, as a matter of federal

14  jurisprudence, Your Honor, if you have an intermediate

15  case from the intermediate appellate court that is clear,

16  that is on point, it is not overruled, it is not

17  contradicted, I submit to Your Honor that, as a matter of

18  federal jurisdiction, that effectively is controlling.  I

19  don't think that a federal court would just be free to, in

20  the face of that, adopt some other rule.  And what I would

21  like to show Your Honor is why I believe the rule is clear

22  and it is consistent with all of the prior jurisprudence

23  and why it distinguishes the arguments that the other side

24  is trying to make, if I may, Your Honor.

25          THE COURT:  Certainly.

1          MR. BAUGHMAN:   Okay.   What we see in the cases

2   in Connecticut, there are three types of misrepresentation

3   claims, okay, that have been dealt with by the courts in

4   the context of merger clauses.   There are innocent

5   misrepresentation claims, there are negligent

6   misrepresentation claims, and there are fraudulent

7   misrepresentation claims.

8          There's absolutely clear authority at each end,

9   okay.   Under *Warman*, a fraud claim is not barred by a

10  merger clause.   Under *Gibson v. Capano*, it is absolutely

11  clear that an innocent misrepresentation claim is barred

12  by a merger clause.   So the question is what to do with

13  the negligent misrepresentation clause in the middle.

14  *Western* answers the question.   All right.   *Western* is the

15  most recent only decision of an intermediate appellate

16  court in Connecticut that has gone to the Supreme Court

17  that has answered the question.   And *Western* clearly holds

18  that a negligent misrepresentation claim is barred by a

19  merger clause.   That's just the most clear statement of

20  authority in Connecticut.   They have no other Connecticut

21  state authority holding to the contrary.   All of the cases

22  they cite are fraud cases.

23          And as Your Honor recognized just two days ago,

24  Your Honor, when Your Honor issued your opinion on the

25  motion to dismiss the counterclaims, you actually used the

```
1    words "is important."  You said in your decision that the
2    distinction between fraud and negligence is important.
3    And that's why if we look at the cases that they're
4    relying on, they don't apply.
5              For example, Your Honor, I talked about Warman,
6    which they relied on.  That's a fraud case.  They cited to
7    Your Honor's decision in Foundation Capital.  And
8    Your Honor in Foundation Capital had made an extensive
9    analysis of a case called Tallmadge.  Tallmadge was a
10   fraud case.  What the case dealt with in Tallmadge was a
11   case of fraud --
12             THE COURT:  I remember what I wrote.
13             MR. BAUGHMAN:  -- not negligent
14   misrepresentation.  That's the case in Tallmadge.
15             So I submit to you Connecticut law actually is
16   clear on this point that when you understand the --
17             THE COURT:  So apart from that issue, just to
18   weather it's clear -- and I get your argument there,
19   whether I agree with it, that Western Dermatology is
20   controlling, I get your argument.  So help me understand
21   if I don't agree with you that Western Dermatology is
22   absolutely controlling, help me understand why
23   conceptually we should be looking at why this case is more
24   like Capano and less like a fraud case.
25             MR. BAUGHMAN:  Because the parties are
```

1    sophisticated parties who are represented by counsel and

2    they entered into this bargain.  They agreed to this

3    merger clause.  And the plaintiffs are the ones coming to

4    court and asking you to set aside the bargain that the

5    parties made.

6            The parties in the contract, they have done

7    something important.  They have adjusted their rights with

8    respect to the price of the contract itself.  If you look

9    at Section 6.2, I think it's 6.2.4 says that the

10   allocations of liability within the contract are reflected

11   in the price.  So these things were bargained for, and my

12   client, SS&C, has a right to understand it.

13           And what the courts have held, which I believe

14   Your Honor actually discussed in *Foundation*, is the notion

15   that we will set aside a contract for fraud because fraud

16   is a special thing.  We don't tolerate fraud.  But this

17   isn't a fraud case.  It's not even a recklessness case,

18   Your Honor.  In Your Honor's opinion on the motion to

19   dismiss, you said there were not even allegations of

20   recklessness.  And so we allow people all the time to

21   contract in a way that negligence came to be dealt with

22   with contract.

23           Let me give you the best example I can think of.

24   You can insure against negligence.  You can't insure

25   against fraud.  We allow people to contract for the

1   possibility that people will be negligent.  We don't allow

2   people to contract against fraud.  So that's why you

3   should enforce.  Because it was the parties' bargain and

4   they have not come forward with any reason why that

5   bargain shouldn't be enforced.

6           THE COURT:  Okay.  So basically then, in a

7   nutshell, your conceptual reason is you can contract

8   around negligence; you can't, for public policy reasons,

9   contract around fraud.

10          MR. BAUGHMAN:  Correct, Your Honor.

11          THE COURT:  It doesn't matter, right, to your

12  argument, you started off with this, but it doesn't really

13  matter that the parties were represented by counsel,

14  right?  Because this is generally a broader point here

15  about what can be contracted against.  You can certainly

16  contract against innocent misrepresentation.

17          MR. BAUGHMAN:  Absolutely, Your Honor.

18          THE COURT:  And you can contract against

19  negligence.

20          MR. BAUGHMAN:  Yes, you can.

21          THE COURT:  Especially if you have counsel would

22  be your argument.  Especially if the parties are

23  sophisticated and have counsel.

24          MR. BAUGHMAN:  I mentioned that because there

25  are in the cases occasionally representations about

```
 1   discussions of sophistication of the parties, so on and so
 2   forth.  I think it's relevant in this case.  And so I
 3   think the clause should be enforced.
 4          And Your Honor, I would like to talk to you a
 5   little about the text of the clause to show you that it
 6   does apply, and I want to deal with the argument that the
 7   plaintiff has made as to why they think on the text it
 8   doesn't.
 9          THE COURT:  Okay, so I'm going to hold you there
10   because I see counsel have come for the other case that I
11   have a jury out on.
12          MR. BAUGHMAN:  Of course, Your Honor.
13          THE COURT:  We'll take a recess at this point.
14   My apologies again.  You never know with juries when
15   they'll come back with questions or notes.
16          We'll take a recess.  You'll need to clear off
17   counsel table so I can address the note with the jury at
18   this time.
19          MR. BAUGHMAN:  Very well.
20              (Whereupon, a recess followed.)
21
22                     (3:19 P.M.)
23          THE COURT:  We're back in ARMOUR Capital.
24          Mr. Baughman, if you'd like to continue.
25          MR. BAUGHMAN:  Thank you, Your Honor.
```

1          We were turning to the question of the text, and

2     I'd like to go over the text of the merger clause

3     itself --

4          THE COURT:  Okay.

5          MR. BAUGHMAN:  -- which I have put on the screen

6     if it's helpful for Your Honor to see.

7          And at the top I have the merger clause as it

8     existed which was enforced in *Western Dermatology*.  It

9     says this agreement "supersedes all prior or

10    contemporaneous agreements, representations and

11    proposals."

12         The one in this case, the parties' agreement

13    here, is substantively identical.  It says:  "The Master

14    Agreement ... supersedes all previous communications,

15    representations, understandings and agreements."  I submit

16    that they are essentially the same, and the law in

17    Connecticut, as we were speaking before the break, is that

18    it is the law in the case that the Court will enforce a

19    bargain, even one that might be unwise.  And that's what

20    *Tallmadge* says, which Your Honor has previously cited.  So

21    it should be enforced because that's what the parties

22    agreed.

23         So the plaintiff makes an argument as to why,

24    based on the text, they think the agreement should not be

25    enforced.  And it focuses on the words "subject matter."

1    They say, well, there's a chasm between the two clauses

2    because the one in this case uses the word "subject

3    matter."  Respectfully, I think that argument is missing

4    the point.  Because here's the point:  Their argument is

5    that pre-contractual representations induced their client

6    to enter into the contract.  That's the theory of their

7    case.  Okay.  But if the representations were about some

8    other subject matter, subject matter not covered by the

9    contract, then it wouldn't have induced them to enter into

10   the contract.  So the argument that they're making, they

11   say this clause doesn't apply because the representations

12   are about some other subject matter.  Well, if that's

13   true, then it didn't induce them.  The second point is --

14   so the argument doesn't make any sense.  And on the second

15   point, on the facts, it doesn't apply because they haven't

16   identified any representations that are not on the subject

17   matter of the contract at all.

18            And what I'd like to do, Your Honor, I know

19   we're going to be press for time.  I'll try to do it as

20   quickly as I can, but I'd like to show you the

21   representations at issue here in this case.  Because I

22   think it's important if you look at them in situ, you will

23   see how anodyne, how trivial they really are.

24            So we asked them what are the representations.

25   And we gave them an interrogatory, and I handed it up.  I

1    gave you the interrogatory that they gave.

2              THE COURT:  I have it here.

3              MR. BAUGHMAN:  It's Interrogatory Number 8.  And

4    they identified 22 supposed misrepresentations.  In the

5    briefing, they added two more.  So they have 24.  I'll

6    address all 24 of them even though they shouldn't do it.

7              Set the stage, some basic principles.

8              Things that are not actionable:

9              Things that are true.  Obviously, negligent

10   misrepresentation.

11             Things that are non-statements.  And to be a

12   statement that can be the subject of liability, it has to

13   be capable of being true or false.  You have to be able to

14   evaluate it.  If you can't, it's not a misrepresentation.

15             Opinions are not actionable.

16             Nor are sort of general anodyne favorable

17   comments from sellers.  You go to a store, they say,

18   "Your Honor, this suit, it looks great on you, you'll love

19   it."  You can't sue them for that.  That's the sort of

20   thing you're allowed to say.

21             Similarly, drafts, proposals and estimates,

22   things along the way of contract.  If I give you a draft

23   and you reject it, you do not accept my proposal, you

24   haven't relied on it.  And then that's not a basis for a

25   misrepresentation claim.

1          And lastly, the parol evidence rule.  If you're

2     having things that are the subject matter of the contract,

3     if the contract says it applies to blue widgets, you can't

4     say "I was relying on you saying it applied to red

5     widgets" because you agreed to blue widgets.  All of that

6     applies.

7          So let me go quickly, and I'm going to go in

8     order and I'm going to go in chronological order that

9     these statements were supposedly made.

10          The first two are statements that they say were

11     on the website.  They actually haven't proved this.  We

12     put forward in our papers that Statements 1 and 2 they

13     have no evidence were on the website prior to the

14     contract, and they came forward with nothing in their

15     56(a)(2).  So I think you can cross out Number 1 and

16     Number 2.  But even if you want to look at them, I'll show

17     them to you.  They're just simple statements that weren't

18     even made to them.  They were just on the website maybe.

19          SS&C "has spent years creating the most

20     comprehensive powerhouse of software" and they have

21     "expertise and professionalism."  That's very analogous to

22     the *Larobina* case, Your Honor, where the issue was

23     Wells Fargo had said it was a professional bank, a

24     stalwart bank that made safe investments.  Held to be not

25     actionable.  Very analogous here.

1          Number 2, CAMRA is a "flexible software

2     application that streamlines, automates and simplifies the

3     investment process."  That's just a true statement.  They

4     have come forward with no evidence that it's untrue, that

5     that's not what CAMRA does.  Or Your Honor could look at

6     it as simply our opinion of what it does.  It's not

7     actionable.

8          Number 3 and Number 4.

9          This was a press release that was on the

10    website, I agree, but again, the statements are not

11    positive representations of fact.  They say, "Customers

12    turn to SS&C for its unique expertise, world-class

13    technology and more than 10 years of experience."  They

14    have no evidence that's untrue.

15         We "help mortgage REITs be better equipped to

16    produce full auditable accounting and reporting processes

17    and eliminate the use of spreadsheets."  That's our

18    opinion.  They have not come forward with any evidence

19    that it doesn't have anything to do with spreadsheets.

20    They haven't challenged that.  It's "the only integrated

21    mortgage REIT end-to-end solution."  That's our opinion.

22    We're describing our product.  The only thing -- if you go

23    through their 56(a)(2) statement, Your Honor, the only

24    thing that they take issue with in this statement, as a

25    matter of fact, is they try to argue that we really only

1   were there for nine years, not ten.  That's it.  So come

2   on, that's not the thing we're going to have a trial

3   about, whether or not it should have been nine or ten.

4   That's not material.  They're not going to come in and

5   say, "Oh, I wouldn't have bought it if they said nine."  I

6   think you can cross out 3 and 4.

7                Let's look at Number 5.

8                Number 5, this is an email from a man named

9   Mr. Moore.  This is after ACM had contacted him.

10  Mr. Moore emailed back: "In the meantime, the attached

11  brochure will provide you with more information on the

12  technology and services we offer to publicly-traded

13  mortgage REITs."  That's a true statement.  You know how

14  we know it's true?  Because he attached a brochure that

15  discussed that.  It's a completely true statement,

16  Number 5.  And if you look at the brochure, the only thing

17  that they're complaining about is one little paragraph in

18  a several-page brochure.

19                And I want to point out, Your Honor, on the

20  slides, the things in yellow, that is everything they say

21  is false.  I haven't cherrypicked.  I've highlighted every

22  word they say is false.

23                All this says is "Our staff has extensive

24  knowledge and experience meeting the needs of

25  organizations that invest heavily in mortgage backed

1    securities and structured products."  That's true.  They

2    have admitted on this motion that we had a professional

3    services staff that did that.  They have admitted that

4    we've done this dozens of times.  So what are they

5    contesting?  The use of the word "extensive"?  Then that's

6    an opinion.  It's not an actionable statement.  Number 5 I

7    think you can cross out.

8              Number 6 and Number 7.

9              These are in a brochure.  There was a meeting on

10   June 2, 2014.  And as is common, you go to a meeting, they

11   hand out a PowerPoint.  And I want to show you just how

12   tiny and how picky the statements are in the context of

13   this PowerPoint, if Your Honor goes through it.

14             Page 1, nothing wrong with it, "SS&C Business

15   Overview."  They're fine.

16             Page 2, "Deployment Options."  They're not

17   complaining.  They admit that it's true.

18             Page 3, we get to this.  We have the statement

19   that they claim is false:  "Accounting and reporting

20   expertise."  Well, first of all, I'm not even sure how you

21   would evaluate that as a statement of fact or not.  But

22   it's true.  And the basis is on the slide and they don't

23   contest it.  Look what it says right underneath it.

24   "Accounting professionals with extensive Big 4

25   experience."  They don't contest that that's not true.

1    "Experience supporting the accounting and financial

2    reporting needs of public companies."  That's true.  It's

3    on the slide.  They don't contest it.  It is a fair

4    inference what is being said there.  It should not be

5    considered a misrepresentation.

6          We go to the next page.  They highlight this, it

7    says:  "A large portion of our client base has a

8    significant exposure to MBS."  That's true.  And the

9    evidence, which is uncontested, which we pointed out, is

10   on the slide itself.  The slide lists seven REITs, two

11   real estate investment companies, and three insurance

12   companies, all of which do in fact have exposure to MBS.

13   That's uncontested.  So this statement is true.  And if

14   their issue is with the word "significant," that's clearly

15   just a matter of opinion or the kind of statement a seller

16   can make.  To have a trial about whether it should have

17   said "significant" or "large" just wouldn't make any

18   sense, Your Honor.

19         If we go on through the thing, on the next page

20   they highlight the words "proven accounting engine."  I

21   don't know quite what that is a misrepresentation of.

22   Again, it's true.  The product has been there since 1986

23   and has been implemented over 500 times.  It says so right

24   on the slide, and they don't dispute that that's a true

25   statement on the slide.  The slide is providing its own

1    evidence proving out the statement.

2            Next page, no complaint.

3            Next page, no complaint.

4            Next page, no complaint.

5            Next page, they get to the end, this is a

6    catchall:  "Why SS&C."  This is the sales pitch.  "Proven

7    systems capable of supporting a broad range of complex

8    security types, accounting methodologies and treatments

9    specific to Mortgage REITs."  That's true.  That's what we

10   said.  We're offering this as our services.  It says what

11   we say we can do.  Number 6 and Number 7 I submit are not

12   the types of statements that are actionable.

13           If we go to Number 8 --

14           THE COURT:  Could you imagine that when you say

15   "proven systems" there that essentially is kind of like a

16   guarantee?

17           MR. BAUGHMAN:  I don't believe it is a

18   guarantee, Your Honor.  And again, *Western* goes exactly to

19   that point.  *Western* talks specifically about this.  In

20   *Western* there was a demonstration, in fact.  And the

21   plaintiff in the demonstration tried to say that because

22   of the demonstration I want to get what was in the demo

23   and I didn't get it, so I should have a claim for

24   negligent misrepresentation.  And the Court said no.  The

25   Court said, no, you can't, because what you're trying to

1    do is get a warranty or a guarantee.

2            And if I can jump ahead, Your Honor, the slide

3    here that I have on the warranty claims, the claims in

4    this case again going back to Section 6.2 where the

5    parties structured their affairs, the parties agreed that

6    there would be no warranties that were not in the final

7    contract.  If you look at Number 6.2.5, for example, it

8    says:  "Any written representation or warranty not

9    expressly contained in this Master Agreement or a relevant

10   Attachment or Work Request is not authorized or valid."

11   And Number 6.2.1 is a disclaimer again saying there are no

12   warranties, whether express or implied, about the

13   software.  So respectfully, Your Honor, I don't think,

14   given the parties' agreement here, that you could fairly

15   say that that statement about proven was any type of a

16   guarantee because the parties agreed just as they agreed

17   in the merger clause not to have things that are not in

18   the contract.  That's the deal.

19           We go to Misrepresentation Number 8, this one is

20   clearly an opinion.  This is an email by Mr. Moore on

21   June 4th after that meeting on the 2nd.  What did he say?

22   He said: "Based on our understanding of your business and

23   current environment, we are confident CAMRA is the right

24   fit for ARMOUR and I just wanted to reaffirm our interest

25   in partnering with you."  That's an opinion.  "Based on my

1   understanding."  They don't say he didn't understand that.

2   They have no evidence that he was speaking falsely.  And

3   the case I would cite to Your Honor is *Olympic Dreams*.

4   *Olympic Dreams* is the case that involved the sale of six

5   horses.  In that case the seller of the horses said things

6   like "this would be a wonderful fit for your daughter."

7   Exactly the same analysis.  It's an opinion that it's a

8   good fit.  Number 8 should be struck.

9         Number 9 and Number 20 can be struck because

10  they've admitted these are true statements.  Number 9 was

11  that we had a dedicated professional services team that

12  was qualified.  And Number 20 was that Ms. Olszewska was

13  presented as head of the team.  In the 56(a)(2) they

14  admitted that we do in fact have a professional services

15  team and they admitted that she was in fact the head of it

16  and they admit she had done it at least 20 times.  So I

17  think it is clear that they have given up on Number 9 and

18  Number 20, and you can cross them out.

19        Let me come to Number 10 and Number 14.  These

20  are so-called proofs of concept.  What are the proofs of

21  concept?  It's like a test.  They take some data, they run

22  it through the computer, okay.  They say that the proofs

23  of concept, there are two, were somehow a

24  misrepresentation.  Here's the problem.  They don't

25  identify a single thing in the proof of concept that was

1    false.  Not a single word.  We've put them in the record.

2    They're Number 10, Number 14.  On the declaration,

3    Exhibits 17 and 18.  They don't identify a single word

4    that is false.  Well, you have to have a misrepresentation

5    of fact to have a claim.  So ANMs 10 and 14 should be

6    struck.

7            So should Number 11 for the same reason.  This

8    is the demo.  They did a demo, but there's no record of

9    the demo.  There's no video.  We don't know what was said

10   during the demo, so they can't show us anything that was

11   said in the demonstration that was false.  There's no

12   misrepresentation of a fact, which is required.  Now,

13   concomitant with the demonstration there was a dec that

14   was handed out, 22-page document that was provided at the

15   time of the demonstration.  It's in the record.  It's

16   Ahmed Exhibit 20.  They don't identify a single statement

17   in the demonstration that was false.  Not one.  So they

18   haven't met their burden.  We put forward and said it's

19   true; they have to come forward and show that it's false.

20   They're not showing anything that's false in the

21   demonstration.  They can't redo the words that are false.

22   So Number 11 should be struck, there's no false

23   statements.

24           Now let's go to Number 12.  When they did the

25   demo, they went there and they passed out a piece of paper

1    that said these are the people with you today, and there

2    are six names.  Undisputed that those six people were

3    there.  That's a true statement.  Let me show you,

4    Your Honor, if you look at the screen, the only words on

5    this piece of paper that they claim are false, they're in

6    the biography description of Mr. Shiv Sivadas.  And they

7    only take issue with some tiny phrases.  "Mr. Sivadas

8    works with insurance companies, REITs, hedge funds and

9    asset managers."  And it says he "has extensive experience

10   with client implementations."  That's true.  We put in in

11   our papers a declaration with the evidence that this is

12   true.  They came forward with nothing.  They just said we

13   deny it.  But that's not the way the local rule works on a

14   56 motion.  You have to come forward with evidence

15   contradicting what has been said.  They did not do it with

16   respect to Number 12.  They just denied it.  You can cross

17   it out.

18          Number 13, here's another email by Mr. Moore.

19   They really don't like Mr. Moore.  But Mr. Moore doesn't

20   say very much.  After the demonstration, what did he say?

21   He wrote a thank you email and he said, "Based on the --

22          THE COURT:  I think I have your point on this

23   one.

24          MR. BAUGHMAN:  Okay.

25          Let me go to the proposal.  In November there

1    was a proposal.  This is important, Your Honor.  In

2    November they made an actual written proposal to them for

3    the first time.  But it wasn't accepted.  There were

4    negotiations for another five weeks before ACM accepted

5    the proposal, and so they can't be relying on anything in

6    the proposal.  What they should be relying on is the

7    contract and sue for breach of contract.

8              And look at what they ignore with respect to the

9    proposal.  The cover email demonstrated the limitations:

10   Attached is our proposal.  We are open to discussions

11   regarding the expansion or contraction of any services.

12   We understand our assumptions may not be 100 percent

13   correct and you may have questions.  We look forward to

14   your feedback.

15             This is a proposal, a topic for discussion; it's

16   not a representation of currently existing fact.  And if

17   you go through it, Your Honor, I would like to show you

18   just how nothing the statements are in the context of this

19   proposal.

20             If we turn the pages, first page, no issue.

21             Second page, no issue.

22             Third page, no issue.

23             Fourth page, no issue.

24             Fifth page, we get to a table that says at the

25   top "ARMOUR Overview and Assumptions."  It's not a

1    representation of fact.  It's an assumption.  And there's

2    a box there that says "Citi (may add BONY in future).

3    SS&C will manage the interface and uploading of

4    information from custodians of choice."  It's an

5    assumption about what to do.  It's something to discuss.

6    It's a proposal to discuss.

7              And this subject, in particular, is covered in

8    the contract, so if they have a grievance, their grievance

9    is breach of contract; it's not a misrepresentation here.

10             We keep going through the proposal, Your Honor.

11   If we look at this on the next page, it says the same

12   thing.  On Data Management there's a dot that says import

13   transactions, about BONY, same thing.

14             In their opposition brief they added a new one,

15   okay.  They added something that is not in their

16   interrogatories.  This dot which says "Import and load of

17   trades from ARMOUR and AVM," again, there's no evidence

18   this is false.  And it's an assumption.  It's a proposal

19   that is dealt with later in the contract.  It's not a

20   misrepresentation.

21             We keep going through the doc.  We get to the

22   last page of the proposal, and here's what it says we

23   propose, "a one-time implementation fee to cover your

24   transition."  They rejected that.  They didn't rely on

25   that; they rejected it.  It's not a negligent

1    misrepresentation on which they materially relied.  So 15,

2    16, and 24 you can cross out.

3            Come to 17.  This is something Mr. Mountain, a

4    man from ACM, testified about.  Here's what he said.  He's

5    describing a conversation with someone at SS&C named Jeff

6    Fecteau.  This is the testimony they're relying on.  "We

7    had a conversation with Jeff Fecteau.  I asked the

8    question of who do I need to contact or hire to assist us

9    with implementation?  And very vividly dissuaded me from

10   that thought by saying, you know, we really don't want to

11   hire a third party."  What is that?  He was asked a

12   question, he offered his answer and an opinion.  This is

13   not a representation of fact on which anybody could have

14   relied.

15           If you go on, later on it says, "And that at the

16   end of the day, what we wanted was just one throat to

17   choke, and that's what hiring SS&C professionals services

18   to implement the CAMRA system would provide."  I honestly

19   don't know even what that means.  But to the extent it

20   means anything, it's an opinion about how to structure

21   this.  It is not a representation of currently existing

22   fact.  They agree, they admit in their papers that's what

23   they need to show: an existing fact.  They don't have one.

24   Number 17 should be struck.

25           Number 18 is another email from Mr. Moore.  And

1    this one is as true as true could be.  Look at this.  On

2    the 8th of December, Mr. Moore wrote:  "Following up on

3    our implementation discussion last Wednesday, Jeff and I

4    have been working with our professional services team to

5    prepare an implementation estimate for transitioning

6    ARMOUR to our CAMRA solution."  I'm going to prove to you

7    it's true.  You know how it's true?  There's the budget

8    that was sent two days later.  He sent exactly what he

9    said he was working on.  They have no evidence it wasn't

10   true he was working on it on the 8th.  He was.  He was

11   working it on the 8th.  He sent it on the 10th.  So

12   Number 18, cross it out.  It's not a misrepresentation;

13   it's a true statement.

14          So now we come to the budgets, draft budgets,

15   ANM Number 19.  There's one on the 10th.  They have a

16   discussion about the one on the 10th.  And you know what

17   happens?  ACM rejects it.  It's a proposal that is not

18   accepted.  You can't reject something and then claim later

19   that you were relying on it.  They rejected it.  How do we

20   know?  Because the next day there's a revised one prepared

21   the very next day with different terms.  Compare

22   Exhibit 27-A and 28-A to the Ahmed Declaration.  And the

23   one on December 11, look what it says, "DRAFT - for

24   discussion."  It's not something to be accepted, it's not

25   something to be relied on; it's a proposal.  It's part of

1      a negotiation.  And they rejected that one too.  You know

2      why?  Because the contract a week later has different

3      terms.

4              And here's the last thing.  If you look at the

5      screen, Your Honor, there's no yellow.  Why is there no

6      yellow?  Because there are no words in this proposal that

7      they contend are false.  Not a single one.  They haven't

8      identified any false statements in these proposals.

9      Therefore, they can't be the basis for a misrepresentation

10     claim.

11             Same thing is true of ANM Number 21 which was

12     provided approximately the same time.  Look at what it

13     says.  "Proposed Migration Timeline."  Not a single thing

14     on it did they contend was false.  They can't point to a

15     single word that was an untrue statement of existing fact.

16     This is not a misrepresentation of an existing fact.  If

17     anything, it's a proposal and it's a statement about

18     something in the future which is not the basis for a

19     misrepresentation.

20             Go to Number 22 in the interrogatories.  This is

21     not a statement by us.  This is a synthesis by them where

22     they say "through the statements above" which is not a

23     statement by us.  That can't be a misrepresentation.  You

24     have to identify the actual words.  So you can cross out

25     Number 22.

1           Last one, Number 23.  This was added in the

2    brief.  Now, in the brief, without citations they said

3    that we should have recommended CI Manager as a module for

4    ACM to reconcile data with its custodians when we should

5    have known or something else.  I don't know what the

6    statement they're saying is, that's the first thing.  It's

7    unclear what the statement we should have said is.  They

8    actually seem to be saying some sort of omission here,

9    which is a totally different theory that they haven't used

10   before.  So it's raised in the brief without citations.

11   So I don't think Your Honor should consider it.  But if

12   you go to the 56(a)(2) statement and you trace through the

13   citations and actually spend the 20 minutes it will take

14   you to find the document they're citing, it's this

15   document, Kernisky Exhibit 61 at Page 2, and what you'll

16   see is it's about a different customer.  See it says

17   Bimini?  "Prep for Bimini kick-off."  This document isn't

18   even about ACM.  So I think they have no evidence to

19   support their ANM Number 23.

20           For all these reasons, Your Honor, I submit that

21   summary judgment is appropriate on the negligent

22   misrepresentation claims.  I do believe the *Western*

23   *Dermatology* rule should be applied.  I think it is the

24   applicable law.  It certainly is the law Your Honor should

25   adopt in your discretion as the Court sitting here trying

1    to predict what the law of Connecticut would be.  That's

2    number one.  Number two, it's barred by all of the

3    warranty clauses because that's what the parties agreed

4    to.  As the Supreme Court in Connecticut tells us in

5    *Tallmadge*, we respect what the parties agree to.  And then

6    three, when you go line by line, item by item -- and the

7    reason I did it, Your Honor, I know it took a bit of time,

8    I want to reassure you there's no injustice here.  These

9    are trivial statements.  Mr. Moore's emails saying I'm

10   going to send you a brochure, contracts that are rejected,

11   those are not the types of things that are appropriate

12   misrepresentations.

13          One last point, Your Honor.  If Your Honor

14   grants summary judgment on the negligent misrepresentation

15   claims, it follows like night follows day that you should

16   grant summary judgment on the CUTPA claim and on the

17   recision claim.  Because, as Your Honor has already held

18   on the motion to dismiss, the CUTPA claim depends on

19   pre-contractual negligent misrepresentations.  If there

20   are none, then that claim should be dismissed.  Same for

21   the recision claim: no misrepresentations, no recision

22   claims.

23          I was going to stop there, Your Honor, and I

24   would either turn it over to Ms. Ahmed to conclude our

25   point on damages or take any questions on the

1  misrepresentations.

2          THE COURT:  Just on *Western Dermatology*, is

3  there -- I realize you're raising it now and it's valid to

4  be raised now.  Is there a reason why it wouldn't have

5  been raised at an earlier time, the integration?

6          MR. BAUGHMAN:  I'm not quite -- you mean on the

7  motion to dismiss?

8          THE COURT:  Yes, on the motion to dismiss.  If

9  there's not, that's okay.

10          MR. BAUGHMAN:  I wasn't in the case, Your Honor.

11  I can't tell you.

12          THE COURT:  I don't need to go there then.

13          Okay.  And what do you know about, to the extent

14  if I don't agree that *Western Dermatology* is controlling,

15  as persuasive as it may be, what is it that you know about

16  the law elsewhere in the country?  It seems like, for

17  example, in New York, I guess your home jurisdiction, it

18  seems like New York law would clearly allow a merger

19  clause like this to I think bar --

20          MR. BAUGHMAN:  There was an Eastern District

21  case that they cited.  I'm not sure that's correct.

22          When we were doing this, I did look further

23  afield.  I tried to focus --

24          THE COURT:  I'm not asking you for a 50-states

25  survey.  I was just wondering if you had something.

1          MR. BAUGHMAN:  There's a Third Circuit case I'm

2    aware that would go this way.

3          Can I make one point, though, about their

4    authorities which is very germane here?  Because almost

5    all of the authorities they cite when they're discussing

6    the representations are out-of-state authorities.  They

7    have cases from Ohio, Indiana, Minnesota, Kentucky,

8    Tennessee, and Missouri.  They all stem from I believe a

9    1988 or '89 Sixth Circuit case called *Dunn*, okay?  And

10   *Dunn* is applying a standard that does not exist in

11   Connecticut.  They rely on this *Dunn* line of cases.  And

12   it's actually important, I want to mention it.  In *Dunn*

13   and the cases that follow it, they talk about concept of

14   an implied misrepresentation.  Actually, if you read *Dunn*,

15   it says you can have a misrepresentation that's implied.

16   That's not the law in Connecticut.  There's no law

17   authority, and I have contrary authority I could cite to

18   you, that says that that's not the law in Connecticut.

19   You have to have a positive statement of fact.

20          THE COURT:  Some of the cases I've seen discuss

21   the parol -- frame the issue as parol evidence issue.

22   Which seems to me to be fairly, well, overlapping with the

23   analysis in terms of whether, for purposes of a negligent

24   misrep claim, one can satisfy the reasonable reliance.

25          MR. BAUGHMAN:  Can I take a crack at

1    desegregating it?

2             THE COURT:  Sure.

3             MR. BAUGHMAN:  Here's the way I think -- and I

4    spent a lot time sort of understanding this, okay?

5             The parol evidence rule is a rule about the

6    interpretation of a contract.  Okay.  So that's what it

7    means.  Parol evidence rule says if you have a fully

8    integrated agreement, you can't call -- this is Learned

9    Hand's twenty bishops -- you can't call 20 bishops to say

10   that when the word says "blue widgets" that really means

11   red widgets.  You can't change the terms of how to enforce

12   the contract.

13            The misrepresentation cases are dealing with a

14   different problem.  The different problem in the

15   misrepresentation cases is you made this pre-contractual

16   statement that induced the party to enter into the

17   agreement, okay.  You're not trying to change the terms of

18   the contract with the pre-contractual statement.  What

19   you're doing is you're saying the pre-contractual

20   statement, you know, that's what made me do it.  The parol

21   evidence rule is saying you can't use the pre-contractual

22   statement to vary the terms of the contract.  So that's

23   how they're different.  Let me now explain how they

24   overlap, Your Honor.

25            If Your Honor recalls, back when I was going

1    through the reasons why certain claims are -- certain

2    types of statements are not actionable, I put on the slide

3    the last one is the parol evidence rule.  And that's

4    because it's the subject matter thing.  So if we had

5    discussions about blue widgets versus red widgets and then

6    we agree in the contract it's only going to be blue

7    widgets, you can't introduce that evidence about the red

8    widgets either to change the contract or to have a claim

9    of inducement.  That's how they overlap.  Is that clear?

10                THE COURT:  I see your point there.

11                So to the extent that we have -- is there any

12    reason why a case that concludes that the parol evidence

13    rule bars consideration of particular statements wouldn't

14    be equally applicable to the other context of the

15    reasonable reliance?

16                MR. BAUGHMAN:  No.  I think it would be.  I

17    think it would bar consideration for both purposes.

18                THE COURT:  Okay.  I don't have any other

19    questions at least on the negligent misrepresentation.

20                MR. BAUGHMAN:  My other question is about your

21    jury.  Are they coming back in seven minutes?

22                THE COURT:  They're about to come back.  Maybe

23    this is a logical stopping point.  My apologies if people

24    have trains or planes and things like that to catch.

25    Looks like we'll be going a little later tonight.

 1          MR. BAUGHMAN:  It's fine, Your Honor.  We can

 2  stay as late as the Court is available.

 3          THE COURT:  Ordinarily, the jury would not be

 4  here a very long time, just to bid them a good evening.

 5          We'll take a brief recess.

 6          MR. BAUGHMAN:  Thank you, Your Honor.

 7               (Whereupon, a recess followed.)

 8

 9               (4:02 P.M.)

10          THE COURT:  If you'd like to proceed.

11          MS. AHMED:  Your Honor, there is another reason

12  that SS&C's motion for summary judgment should be granted

13  in its entirety, and that is ACM cannot establish damages.

14  And I think it's helpful for us to take a step back and

15  understand why that's important.  Damages is an essential

16  element of the breach of contract claim and some of the

17  claims that Mr. Baughman talked about earlier.

18          When we look at the Connecticut Supreme case

19  *Ambrogio*, they talked about the Restatement and they said

20  when we look at damages, we divide them into two

21  categories.  The first category, those are our direct

22  damages, the run-of-the-mill, benefit-of-the-bargain

23  damages.  Here, we're talking about costs and fees that

24  were paid to SS&C under the contract.  They also go out of

25  their way to say and then there's the other category:

1    other loss.  Those can be incidental damages,

2    consequential damages, something that the non-breaching

3    party may have done in reliance on the contract or as part

4    of performance with the contract at issue.  That falls

5    into the bucket of "other loss."  Here, with respect to

6    ACM's complaint, we're talking about lost employee time.

7    So we've got two sets of damages at issue here.

8              And Mr. Zimmer -- and you can see this quote on

9    the screen, but I'll walk through it -- Mr. Zimmer is

10   ACM's co-CEO.  And when he sat down, he knew, in all

11   likelihood, he'd be asked about damages.  So what he said

12   was there are two sets of damages.  And he said that the

13   first set of damages "there is the damages to the REIT for

14   the fees that they have paid SS&C."  I think it's

15   important for us to focus on the language here of "to the

16   REIT."  Mr. Zimmer did not say this first bucket of

17   damages is attributable to ACM.  He said they're

18   attributable to the REIT for the fees that they, the REIT,

19   paid SS&C.

20             THE COURT:  And there's two REITs, right?

21             MS. AHMED:  There's two REITs.  There's ARMOUR,

22   there's Javelin.  And in April 2016, ARMOUR acquired

23   Javelin.

24             He then goes to talk about the second set of

25   damages.  And this time he consciously says then there's

1    the damages to ACM for the amount of professional time

2    that they put toward the CAMRA implementation.  And here

3    on the screen you see ACM in brackets, he said ARMOUR

4    Residential LP, that's simply because that was the

5    precursor to ACM.  And in the 56(a)(2) plaintiff also put

6    ACM in brackets for ease of the Court.

7            So these are our two buckets of damages.  And

8    I'd first like to talk about the direct damages at issue

9    here.

10           So during his deposition, Mr. Zimmer was asked

11   whether all -- all -- the professional services fees that

12   were charged in connection with the contract were all

13   passed to the ARMOUR REIT.  And Mr. Zimmer said,

14   "Correct."  At the end of the day, this is a pass-through

15   relationship.  The REITs were paying SS&C.  And that's in

16   accordance with what he said earlier.  The first set of

17   damages were to the REIT for the fees it paid to SS&C.

18           We also look to the 30(b)(6) deposition

19   testimony of Mr. Mountain.  Mr. Mountain is the CFO of

20   ACM, Chief Financial Officer, he understands the finances

21   of the corporation.  He reiterated what Mr. Zimmer had

22   said.  He said "all amounts paid directly to SS&C ... have

23   been reimbursed by either Armour or Javelin."  He then

24   said something very important there.  He was sitting there

25   as the representative of ACM at the 30(b)(6) deposition.

 1    And in this same statement he said "and we're here

 2    today" -- "we're" being ACM -- "trying to get that sorted

 3    out for the benefit of those ultimate payors."  So

 4    Mr. Mountain is the CFO of a ACM and he's at a deposition

 5    representing ACM --

 6                THE COURT:  I think I have your point.

 7                MS. AHMED:  So he's telling us that he's there

 8    on behalf of the REITs, ultimately.

 9                ACM, in their opposition papers, they amend the

10    declaration for Mr. Mountain.  Mr. Mountain in that

11    declaration, he says -- to assure the Court, because ACM

12    has no damages at issue here -- if they do recoup these

13    direct damages, they're going to hand it to ARMOUR and

14    Javelin because they don't know what to do about the fact

15    that they don't have any damages at issue.  So what we

16    start to see is a third-party benefit relationship.  And

17    that is only affirmed by the 56(a)(2) statement.

18                THE COURT:  Are they contractually obliged to do

19    that or are we counting on their goodwill, do you know?

20                MS. AHMED:  They're not contractually obliged to

21    do that.

22                THE COURT:  There's nothing in the record that

23    says, hey, if we recover this, we have to give the money

24    over to --

25                MS. AHMED:  There's no evidence of that in the

1   record, as far as I'm aware.  They could give it to a

2   charity, they could do what they want with it, which is a

3   little bit of what's problematic and unsettling here about

4   the fact that they don't actually themselves have any

5   losses.

6          And in ACM's 56(a)(2) they sort of confirm that

7   the contractual relationship with SS&C was effectively

8   entered into on behalf of the REIT.  It talks about costs

9   and expenses incurred by ACM were incurred on behalf the

10  ARMOUR and Javelin.

11         So what we're left with here is asking ourselves

12  if this is so clearly a third-party beneficiary

13  relationship, and under Connecticut law third-party

14  beneficiaries can sue --

15         THE COURT:  I know we have a contractual

16  provision.

17         MS. AHMED:  Right.  What's going on here?  And

18  that is really -- there's provision 6.2.3 in the contract.

19  And it says that SS&C shall have no contractual or other

20  obligations or liability to ARMOUR or Javelin either

21  directly or as third-party beneficiaries under the

22  contract.  This is the bargain that the parties entered

23  into.

24         And if we look more closely at the section --

25  and I know Mr. Baughman talked about this -- there's

 1   Section 6.2.4, and that's the allocation of risk

 2   provision.  And it says that "The provisions of this

 3   Section allocate risks under the Master Agreement between

 4   Client and SS&C."  And then it says "SS&C's pricing

 5   reflects this allocation of risks and limitation of

 6   liability."

 7            So we have a situation where a bargain was

 8   struck with respect to rights that the REITs could have.

 9   And that bargain was the REITs cannot come forward and sue

10   SS&C.  But the testimony of Mr. Zimmer and the testimony

11   of Mr. Mountain show us what the REITs are trying to do

12   indirectly that this provision precludes them from doing

13   directly.  And that, under the law, is improper.  And

14   there's no evidence that has been put forward by

15   plaintiffs contesting that Mr. Zimmer got it wrong or he

16   misspoke or Mr. Mountain misspoke.  Because we do see in

17   the 56(a)(2) when there was a little bit of a "oh, he

18   didn't mean to say ARMOUR; he meant to say ARMOUR Capital

19   Management."  They correct that.  But they're not

20   correcting the testimony here.  The testimony is what we

21   have.  And what we understand is that this litigation is

22   really being brought for the benefit and on behalf of the

23   REITs.  And the problem with that, as 6.2.3 tells us,

24   that's improper.  And that was the bargain we have here.

25            So as far as we're concerned with that first

1   bucket of damages, direct damages are not at issue for ACM

2   because they're not out a penny here.

3            THE COURT:  Do you have underlying records of

4   payment?

5            MS. AHMED:  We do not have underlying records of

6   payment.

7            THE COURT:  You're relying on the testimony?

8            MS. AHMED:  We're relying on the testimony.  And

9   there was no evidence put in by ACM here showing anything

10  else to the contrary, which would have been their duty to

11  do here.

12           THE COURT:  I understand.

13           MS. AHMED:  Now we should look at whether there

14  are damages attributable to ACM, because Mr. Zimmer told

15  us, okay, the first set of damages, those belong to the

16  REIT.

17           THE COURT:  I got it.

18           MS. AHMED:  There's this issue of lost employee

19  time.  And the concern with lost employee time we have to

20  ask ourselves is, is this something that they can do under

21  the contract.  And this takes us to Provision 6.2.2, and

22  that's the exclusion of consequential damages provision.

23  And it's relatively lengthy and it says that consequential

24  damages of any kind without limitation are precluded

25  "whether alleged as a breach of contract or tortious

1    conduct."

2            So what ACM tries to do here is to try to create

3    a third category of damages that's not really recognized

4    under Connecticut law.  What they're saying is, well,

5    there are these things called reliance damages.  And

6    that's how they frame it in their brief.  Then say ACM was

7    deprived of the services it paid in reliance on the

8    contract.  And what they say is that they spent 5,846

9    hours and that that should be something they're able to

10   recoup.

11           Now, the problem is they also rely on a District

12   of Connecticut case *Boulevard Assocs*.  Here, in *Boulevard*,

13   the Court found that Boulevard was entitled to damages for

14   the expenditures it incurred in reliance on the contract.

15   But in accordance with *Ambrogio* and in accordance with the

16   restatement, that all appears under the heading

17   "Consequential Damages under Contract Law."  So there

18   isn't a question in Connecticut whether reliance damages

19   are consequential damages.  It's true we're not talking

20   about a case of lost employee time that says this is

21   consequential damages, we're not disputing that.  But it

22   is clear that when we're talking about reliance damages,

23   they are consequential damages even under the law that the

24   District of Connecticut followed in *Boulevard Assocs*. that

25   ACM cited.

1          So we're left with the Disclaimer of Limitation

2     of Liability Provision 6.2.3 that says that the REITs

3     can't bring a case against SS&C, and that appears to be

4     the case with respect to the direct damages.  And then we

5     have a consequential damages issue of lost employee time,

6     but that was the bargain that the parties struck.  And so

7     it's our view that there's nothing to rewrite here, that

8     the contract is clear and they cannot seek these damages.

9     Absent damages, being correct or consequential, they're

10    missing an essential element of the breach of contract

11    claim not to mention the other claims that Mr. Baughman

12    talked about.

13          THE COURT:  Can you talk about the collateral

14    source rule?

15          MS. AHMED:  Yes.

16          So we use the collateral source rule in our

17    briefing as an added reason why this Court could take

18    comfort in saying, okay, if ACM has been reimbursed, what

19    does that mean for us when we're dealing with the

20    contract.  So we cited this District of Kentucky case

21    called *Asher*.  It's not a District of Connecticut case.

22    They did a survey of law around the country and they said

23    the majority of courts find that the collateral source

24    rule should not apply to breach of contract actions

25    because when you're talking about breach of contract,

```
 1    we're trying to do something that is completely
 2    compensatory in nature, this is not intended to be
 3    punitive.  We have made a decision with the collateral
 4    source rule under tort law that if there is going to be a
 5    windfall, that that windfall should go to the, quote,
 6    victim and not to the tortfeasor.  But when we're talking
 7    about contract law, we're talking about compensatory
 8    damages.  And so if a party has been compensated fully,
 9    then there's no reason to allow them to bring that claim.
10              And so on summary judgment in Asher, the Court
11    found --
12              THE COURT:  In the Kentucky case.  Judge Thapar,
13    right?
14              MS. AHMED:  Correct.
15              THE COURT:  So he relies I think in that case on
16    the Restatement?
17              MS. AHMED:  Yes.
18              THE COURT:  And hasn't Connecticut similarly
19    relied on that same Restatement principle, do you know?
20              MS. AHMED:  We cited Connecticut cases relying
21    on the Restatement for various principles.  Specifically
22    with respect to the collateral source rule, we did not see
23    that, but we did say the Restatement is skeptical of
24    applying the collateral source rule to breach of contract
25    actions, and then we did discuss those cases in
```

 1    Connecticut that rely on Restatement when trying to assess

 2    whether a breach exists or promissory estoppel.

 3            THE COURT:  I'm thinking the Connecticut Supreme

 4    Court decided a case called *Argentinis v. Gould* which

 5    seems to me -- I'm not sure it's addressed in the parties'

 6    briefing.  It seems to rely on and talks about the

 7    importance of restricting a contractual remedy to

 8    essentially putting the party back in the place that they

 9    were.

10            MS. AHMED:  Right.

11            THE COURT:  And it appears to also specifically

12    rely on Section 347, comment (e) of the Restatement I

13    think Judge Thapar relied on in the Kentucky case.

14            MS. AHMED:  Yes.

15            THE COURT:  It's *Argentinis v. Gould*,

16    592 A.2d 378.  So if the parties have any thoughts about

17    that case, I know we don't have the time to address it

18    right now.  But if either party has thoughts about that

19    case, because this is again -- I'm not following Kentucky

20    law.  I'm looking at Connecticut law.  I'd be interested

21    in knowing -- and it appears to be a Connecticut Supreme

22    Court case, not a Connecticut Appellate Court case.  I'd

23    be interested in hearing the parties' views, if they have

24    any, on the *Argentinis* case and its impact, if any, on the

25    case.

1          MS. AHMED:  Okay.

2          THE COURT:  Anything else?

3          MS. AHMED:  No.  Thank you.

4          THE COURT:  Thank you.

5          Mr. Mamounas.

6          MR. MAMOUNAS:  Yes, Judge.

7          If I might, Judge, there are a number of points

8    in counsel's presentation, so I will try to take them one

9    by one.  And to the extent I overlap or confuse them,

10   please let me know and I'll try to clarify.

11          We've heard a lot -- and picking up just where

12   we left off, we heard a lot of discussion on the issue of

13   damages.  And I'd like to start with the fees and costs

14   that were paid under the contract.  And I have to say it's

15   an awfully sharp tactic to try to deny the plaintiff here

16   a right of recovery under the contract on the basis of

17   some relationships that have nothing to do with the case.

18          The first point is that it's undisputed that

19   obviously ACM, ARMOUR Capital Management, was the party to

20   which SS&C was obligated under the agreement.  It's also

21   undisputed that ACM, the plaintiff in this case, was the

22   entity that paid the 1.78 million in fees and costs for

23   those obligations.  In fact, the testimony by Mr. Mountain

24   that was cited in the 79-page PowerPoint presentation that

25   counsel put up actually confirms that, that it was this

1    plaintiff that paid those fees.

2            THE COURT:  Did they get paid, though, by the

3    REITs?

4            MR. MAMOUNAS:  That's indeed correct, Judge.

5    They were reimbursed.  But as far as the relationship

6    between the parties in this case is concerned --

7            THE COURT:  So what's the damages if they got

8    fully paid?

9            MR. MAMOUNAS:  It all goes to the issue of

10   collateral source.  And that was the issue that was raised

11   by ACM in their opening brief, which is why we spent so

12   much time in our opposition addressing it.  Because, as

13   initial matter, it's an issue of evidence and whether they

14   are able actually to present any evidence of those

15   payments in the first instance.  And the collateral source

16   rule in Connecticut is quite clear that it's a matter

17   that's not to be tried to the jury or to be raised at

18   trial and so therefore it wouldn't be appropriate on

19   summary judgment.  In fact, these typically come up --

20           THE COURT:  Not tried to the jury?

21           MR. MAMOUNAS:  Judge, we --

22           THE COURT:  Are you saying I don't have the

23   authority to look at the issue as a matter of law right

24   now?

25           MR. MAMOUNAS:  That's the point, Judge.  Because

1    it seems that these typically come up on motions for

2    remittitur after the jury has entered a verdict that

3    awards damages and there are considerations given at that

4    point in time to whether you're actually dealing with the

5    collateral source or not.  And I would cite the Court to

6    the *Mitchell v. Motta* decision and others that we cited in

7    our brief on the initial question of whether the

8    collateral source evidence actually gets tried during the

9    course of the case.

10             THE COURT:  So basically I have to go through

11   the whole trial and have a verdict before I can consider

12   this issue of whether in fact your client's been injured?

13             MR. MAMOUNAS:  And that's how Connecticut law

14   explains it, Judge.  As I understand it, the issue of

15   collateral source evidence is not even tried to the jury.

16             THE COURT:  But it would be a standing issue

17   equally, right?

18             MR. MAMOUNAS:  I'm sorry, Judge?

19             THE COURT:  Constitutional standing, right?

20             MR. MAMOUNAS:  Correct.

21             THE COURT:  No injury, no standing, right?  The

22   Court has to raise that at any time.  Can't wait until the

23   end of the case and say now, whoops, plaintiff didn't have

24   an injury.  I'm a little -- I guess I'm a little skeptical

25   that I'm completely disqualified from looking at the

1   issue.

2          MR. MAMOUNAS:  Well, Judge, I think to disabuse

3   you of that concern, I don't think that from a standing

4   perspective there's any question that ARMOUR Capital

5   Management, the plaintiff here, has standing.  At a

6   minimum for a breach of contract, the law would recognize

7   a nominal damage.  Clearly, we're not here on the issue of

8   nominal damages because this is the entity that paid those

9   fees and actually incurred the harm.

10         And if you were to go to the next step and if

11  Your Honor believes that you're able to consider

12  collateral source evidence, the next question is whether

13  the reimbursement payments could be considered collateral

14  sources in the first instance.  And I don't think SS&C

15  addressed that in its reply papers to the argument we

16  raised in our opposition, and I didn't hear it in the

17  presentation just now.

18         THE COURT:  Collateral source ordinarily applies

19  in the tort concept, right?  The idea is you don't want to

20  make the wrongdoer -- as between the wrongdoer and the

21  person who is injured or possibly injured, better to shift

22  the money away from the wrongdoer.  It's not as clear to

23  me that reasoning applies in the contract.

24         MR. MAMOUNAS:  Well, Judge, and first of all, I

25  agree with you on the first point, that is the law of the

1    state of Connecticut.  In fact, coming from the

2    Connecticut Supreme Court there's the *Saint Bernard Sch.*

3    *v. Bank of America* decision which we cited in our papers

4    that actually says that as between a plaintiff and a

5    defendant it's certainly more appropriate for the

6    plaintiff to enjoy a windfall versus a defendant.  I would

7    submit, respectfully, that it's SS&C that's trying to

8    score the windfall in this situation as between the two

9    because, as the Restatement says, it is more compelling in

10   this case than in others, this particular contract case,

11   for the collateral source rule to apply to exclude

12   evidence of what might be considered collateral sources

13   because there's no risk of double recovery.  All of the

14   evidence that has been put in by the defense in this case

15   has been unequivocal that the amounts that were reimbursed

16   by the REITs will be paid back to the extent that they're

17   recovered here.

18            I understand SS&C --

19            THE COURT:  They'll be paid back to the REITs?

20            MR. MAMOUNAS:  They will be paid back to the

21   REITs.  There's no risk of a double recovery.

22            THE COURT:  What's the record on that?  Is there

23   a contractual obligation for ACM to do that?

24            MR. MAMOUNAS:  There is not, Judge.  There is

25   not.  It is a one-way reimbursement provision under the

1   management agreement which has been filed publicly for

2   years even predating this relationship.  It's common in

3   the REIT industry.  SS&C, as the purported REIT expert,

4   should know that.  But it has been the testimony of the

5   witnesses in this case, Mr. Mountain as well as

6   Mr. Zimmer, that the monies would be repaid and therefore

7   there is no risk of double recovery in this case because

8   SS&C's damages that would be awarded --

9         THE COURT:  So it's their testimony that it's

10   their intention to repay even though there's no written

11   obligation on ACM's part to do that?

12         MR. MAMOUNAS:  I assume that they told the truth

13   at their depositions, Judge, and I believe that they

14   would, and I understand that that's the position.  In

15   fact, Mr. Mountain put in a declaration in opposition to

16   the summary judgment motion that indicated that those

17   amounts would be repaid because that is how the management

18   company has determined to proceed with respect to the

19   amounts that were reimbursed in this case.

20         Right to the Restatement point, Your Honor, that

21   means that there is no risk of double recovery.  That

22   means that in this particular case it's certainly

23   compelling for the collateral source rule to apply.

24   However, in the first instance, to Your Honor's earlier

25   point, if you're willing to consider collateral sources,

1    we would submit that the amounts that were reimbursed by

2    the REIT aren't even considered collateral sources in the

3    first place under Connecticut law.  We cited a number of

4    decisions including the *Grindrod v. Shred-It* decision.

5    And the point is that the collateral source has to be

6    wholly independent of the plaintiff.  Clearly, there's no

7    wholly independent nature here as between the REITs and

8    their management company.  But it's not like this is an

9    insurance policy which might be considered a collateral

10   source.  This is a situation in which in the ordinary

11   course of business there was a reimbursement relationship,

12   it's been publicly filed, as I said earlier, and it's been

13   known to all for many, many years predating this

14   relationship, and those amounts that were reimbursed would

15   have been reimbursed irrespective of this case.  They were

16   reimbursed in the ordinary course of business.  And the

17   case law says that evidence of income from recovery from

18   loss reducing sources --

19            THE COURT REPORTER:  I'm sorry, I lost you.

20            THE COURT:  So we've had a lengthy day.  If you

21   can show it down.

22            MR. MAMOUNAS:  I'm just mindful of the fact that

23   we took nearly an hour on counsel's time, and I want to

24   make sure we hit all of our points.

25            THE COURT:  I'm going to let you do that, but

1   above all, our court reporter needs to get everything

2   down.

3        MR. MAMOUNAS:  Of course.  And I had promised

4   beforehand I would be slower today, and so I will live up

5   to that commitment as best I can.

6        My point, Judge, is that there are cases in

7   Connecticut that discuss what are considered collateral

8   sources for purposes of the evidentiary rule.  Income,

9   other recovery from loss-reducing sources aren't so

10  considered.

11       THE COURT:  So are there any cases that are

12  factually analogous in Connecticut or elsewhere in which a

13  company that claims a breach of contract but has been

14  reimbursed fully by another entity, third party, is found

15  to still have essentially a sustainable claim for breach

16  of contract whether it's framed as a standing issue or

17  whether framed as having damages?

18       MR. MAMOUNAS:  I believe, Judge, that there was

19  this one decision not in the state of Connecticut that we

20  came across that didn't involve REITs.  And I apologize, I

21  don't have the cite off the top of my head.

22       THE COURT:  I'm mostly concerned about breach of

23  contract context.  I'm trying to figure out if we have

24  other cases that are really factually analogous.  They

25  don't have to be factually analogous that they were

 1    necessarily REITs, but they would be factually analogous I

 2    think if it's a breach of contract situation for which the

 3    party claiming damages has been fully reimbursed for the

 4    damages that are claimed.

 5              MR. MAMOUNAS:  If Your Honor would indulge, I

 6    would be happy to submit those authorities under a notice

 7    after today's argument.

 8              THE COURT:  I think in addition to the

 9    *Argentinis* case which I mentioned and if you have those

10    authorities, I'll ask that those be submitted.

11              MR. MAMOUNAS:  We'd be happy to do so, Judge.

12              On the issue of the lost employee time, SS&C has

13    tried to shoehorn those damages as consequentials because

14    of the limitation of liability in the Master Agreement.

15    And I think, first thing's first, there's clearly an issue

16    of disputed material fact as far as nature of the damages.

17    The Connecticut courts have recognized that whether

18    damages are consequential or otherwise is typically

19    considered a fact question.  As Ms. Ahmed indicated,

20    ARMOUR is claiming in excess of 5800 hours that were spent

21    by its employees for work time devoted to the

22    implementation.  SS&C claims that they're consequentials

23    but also acknowledges that to be consequentials those

24    damages would have to have been incurred in mitigating or

25    responding to a breach and therefore they'd have to follow

1    the breach.  The evidence that has been put into the

2    record is in fact exactly to the contrary.  Those hours

3    and that time was spent as part of the implementation at

4    SS&C's direction in order to help them complete their

5    obligation.  Those were pre-breach amounts, and I think

6    that goes to the fundamental nature of consequentials.

7             THE COURT:  So how would I -- you're saying

8    essentially whether this particular category of damages is

9    consequential is actually an issue of fact, not an issue

10   of law.

11            MR. MAMOUNAS:  It's an issue of fact in this

12   case, Judge, because SS&C has raised the idea that

13   something about the nature of the hours that were spent

14   makes them different than what we've termed a reliance

15   damage which Connecticut law has recognized as an actual

16   damage.  If in fact they are consequential, that would

17   mean that as a matter of fact they are different than the

18   evidence that's been put in the record.  And that's why I

19   suggest there would at least be a fact issue.  It's SS&C's

20   motion, not ours.

21            THE COURT:  What more facts are needed?

22            MR. MAMOUNAS:  It would have to go to the reason

23   for the time or the damage, and its timing would

24   necessarily be part of that.

25            So the evidence that we've put into the record

1    in opposition to summary judgment motion is that these

2    hours were incurred as part of the implementation on an

3    ongoing basis.  SS&C asked our folks to do things as part

4    of implementation, and they did them.  These were

5    pre-breach activities.  They were not done as a result of

6    the breach.

7            THE COURT:  I guess I understand, though, I

8    think, that SS&C's argument is even accepting all that,

9    what you claim is the 5800-plus hours that you extended

10   trying to get the CAMRA implementation, I think they're

11   saying as a matter of law this category of damages is a

12   consequential one.  So what I can't understand is your

13   argument to the extent it's saying, well, I need a jury to

14   make some further determination if in fact SS&C -- and

15   SS&C will tell me if I'm wrong about that -- but I

16   understood that they would say, look, even if you accept

17   that it's in fact something man-hours spent or woman-hours

18   spent doing this, it's still a category that is properly

19   deemed to be consequential.  And then it's an issue of

20   law.  And I realize you're going to make your argument,

21   well, it's actually not consequential; it's reliance.  But

22   that's an issue of law, not an issue of fact, is it?

23           MR. MAMOUNAS:  And I hear you, Judge.  And I

24   think that would be SS&C's position that as a matter of

25   law you can decide now that these are actually

1   consequential damages.  All of the cases that have been

2   cited in the papers actually say the exact opposite.

3   Ms. Ahmed cited you to the *Boulevard* case which we raised

4   in our opposition, and she pointed to the heading in the

5   damages discussion.  And as it turns out, the

6   consequential damages in that case were denied in favor of

7   the reliance damages.  The Court said we cannot put a

8   value on the equity interest at issue there because it's

9   too speculative, but we can give you reliance damages for

10   any expenditures that were incurred in preparation for,

11   part of performance of, or otherwise in reliance on the

12   contract.

13          And in granting those damages, the District of

14   Connecticut cited to the Restatement at Section 344(b) and

15   also to American Jurisprudence 2d 22 on damages and a

16   Connecticut decision as well as the *Applied Data*

17   *Processing v. Burroughs Corp.* which is a decision out of

18   the District of Connecticut as well.  And we've pointed

19   Your Honor to that decision because it was a software

20   implementation case where the plaintiff was making the

21   exact same argument that we are here; namely, that staff

22   training and labor costs were reliance damages and not

23   consequential damages because they were incurred before

24   the breach in reliance on the promises of the contract.

25   In that case, there was also a contractual limitations

1    provision, the District Connecticut said unequivocally it

2    does not apply because these aren't consequential damages.

3              The third case that we cited Your Honor to was

4    *ALV Events Int'l* out of the District of Connecticut in

5    2010.  That was a situation in which the plaintiff was

6    trying to put on different concerts for Justin Timberlake

7    and others and the defendant who I believe was an events

8    promoter didn't come through.  But as part of putting on

9    all of those events and preparing for it, the plaintiff of

10   course incurred costs.  There were travel expenses and

11   otherwise.  The District of Connecticut indicated those

12   reliance damages were awardable for costs incurred to

13   prepare for the concert, including production staff time.

14   SS&C in their papers -- and I notice they haven't cited to

15   it today -- but in their papers they cited to a Third

16   Circuit decision (1980) called the *Chatlos* decision.

17   Initially they had said that employees' salaries and lost

18   profits were consequentials and they pulled out a quote

19   from that decision, and that was pretty sharp because if

20   they had looked at the decision below from the District of

21   New Jersey they would have seen the promise from the

22   vendor in that software case was to provide a solution

23   that was going to eliminate the amount of employee time

24   that was going to be necessary from the client.  Because

25   the solution wasn't delivered as a consequence of the

1    breach, the client needed to continue employing those

2    people.  Therefore, it was a consequence of the breach, it

3    wasn't in reliance on the promises.

4            So as a matter of law, to the extent Your Honor

5    were going to decide it on SS&C's motion for summary

6    judgment, it's very clear from all the decisions we've put

7    in that these were properly considered reliance damages

8    which are not excluded by Section 6.2.2 of the Master

9    Agreement.  I don't think there's any dispute there.  The

10   reality is they are not consequential damages.  And to the

11   extent that there's a factual issue, clearly that would

12   defeat the summary judgment motion.

13           If Your Honor has any questions on those --

14           THE COURT:  I don't right now, thank you.

15           MR. MAMOUNAS:  On the issue of *Western*, I

16   believe that there was an argument from counsel that as a

17   federal district court sitting in diversity, Your Honor

18   would be obligated to enforce *Western* and no decision

19   since *Western* came down from the appellate court in 2013

20   has done otherwise.  And that's just not an accurate

21   statement, Judge.

22           I would point to the *Trefoil Park v. Key*

23   *Holdings LLC* decision from this Court, March 13, 2015, in

24   which the Court wrote "It is well established under

25   Connecticut law that a plaintiff asserting

1    misrepresentation claims may allege statements made prior

2    to the execution of an integrated writing without running

3    afoul of the parol evidence rule, even in the presence of

4    a merger or integration clause like the Clause here.  As

5    Plaintiff points out in its Opposition, 'no rule of law

6    exists that will deprive the Court of the power to allow

7    oral testimony to prove fraud.'"  And then the Court

8    continued, "The same is true when a plaintiff alleges

9    pre-execution statements to establish a claim for

10   negligent misrepresentation."  And in support of that

11   position, this Court in 2015 cited what is known as the

12   *Hull* decision, *Hull v. Fonck* of the Connecticut Appellate

13   Court in 2010, and it also cited to two District of

14   Connecticut decisions both of which follow the *Western*

15   appellate court decision.  The first is the *Office*

16   *Furniture v. Liberty Mutual* decision from this Court

17   November 1, 2015, also the *Pearsall Holdings* case from

18   December 18, 2014.  All three are federal district court

19   decisions that applied the rule that has been long settled

20   since *Warman* in 1961 which is that if you have less than a

21   fraud claim, the merger clause nonetheless will not defeat

22   the misrepresentation claim.  And I can walk Your Honor

23   through that.

24           THE COURT:  I understand the point.  But I don't

25   know that there has been at the Connecticut Appellate

1    Court level much less the Connecticut Supreme Court level

2    decisions since *Western* on this issue, have there?  You've

3    cited some district court cases from colleagues, Judge

4    Bryant I think in *Trefoil*, but I'm not sure that there

5    have been since *Western Dermatology* Connecticut Appellate

6    or Connecticut Supreme Court decisions.

7              MR. MAMOUNAS:  And I don't disagree with

8    Your Honor there.

9              THE COURT:  Okay.  That's what I understood the

10   argument to be.

11             MR. MAMOUNAS:  My point is simply this.  There

12   are at least six decisions from the Connecticut Supreme

13   Court and Appellate Divisions including the *Martinez*

14   decision that Your Honor relied on in *Foundation Capital*,

15   the *Hull* decision, the *Foley* decision out of the appellate

16   courts.  On the Supreme Court level, there's *Warman*,

17   there's the *Waldman* case, there's also the *Johnson* case,

18   all of which have been routinely cited for the proposition

19   that a negligent misrepresentation claim is not defeated

20   by a merger clause.

21             Now, Counsel for SS&C has said in his papers and

22   also here today that *Western* is a statement of Connecticut

23   law.  And I think there's also a problem with that, Judge.

24   Because, first of all, as I think Your Honor noted and hit

25   the nail on the head earlier, it's clearly not a statement

1   of the Connecticut Supreme Court.  But as far as it being

2   a statement of Connecticut law is just plain wrong.  The

3   Appellate Division in *Western* didn't cite any Connecticut

4   law.  They didn't cite any of the six decisions that we've

5   talked about today.  They didn't cite *Martinez*, they

6   didn't cite *Warman*, they didn't cite anything.  They in

7   fact said that the issue hasn't been fully explored in

8   Connecticut, but then instead of referring to any

9   Connecticut law they adopt what's called the ATSI/Emergent

10  Capital line of cases out of the Second Circuit.

11          THE COURT:  If we back up for a moment and we

12  look at *Warman*, is *Warman* a negligent misrep case?

13          MR. MAMOUNAS:  *Warman* was not a fraud case.  It

14  was admittedly a strange animal, Judge, because in that

15  case the defendant had no intent to deceive or defraud the

16  plaintiffs.  So that would take it outside of the realm of

17  fraud.  The Supreme Court also recognized that she

18  believed her statements to be true and made the statements

19  in ignorance of the true facts and without any reasonable

20  basis.

21          The decision since then has been cited

22  repeatedly, as I mentioned, including by the District of

23  Connecticut but also by the Connecticut Appellate Court

24  for the proposition that in negligent misrepresentation

25  claims a merger clause doesn't act to bar the claim.  It

1   is, as I said, admittedly a strange animal earlier.  But

2   on almost all fours it reflects that it does not -- it was

3   not a fraud case, for one thing.  And it seems that it was

4   a negligence case.  And that's certainly how it's been

5   interpreted since that.  In fact, it and its progeny have

6   been cited at least eight times, four times directly and

7   four times to its progeny, all for the proposition that a

8   merger clause doesn't defeat a negligent misrepresentation

9   claim.

10          On the issue of whether *Western* is a statement

11   of Connecticut law, however, I do want to make the point

12   that it adopted what's known as the ATSI/Emergent Capital

13   line of cases.  Those are federal 10b-5 securities law

14   cases.  And in fact, in *Foundation Capital*, which

15   Your Honor issued an opinion on summary judgment on in

16   September of 2018, Your Honor talked about the tension

17   between the Connecticut state law merger clauses and

18   misrepresentation claims and the Second Circuit federal

19   securities law.  And one of the decisions you cited*, FIH

20   v. Foundation Capital*, specifically discussed the *ATSI*

21   line of cases and the fact that clearly there's a

22   different standard in the Second Circuit for federal

23   securities law, nonetheless in *Foundation Capital*

24   Your Honor recognized that you were bound by the

25   Connecticut Supreme Court rule, and that's what was

1    applied and what was followed in that decision.

2              THE COURT:  As to fraud.

3              MR. MAMOUNAS:  I understand, Judge, that that

4    was a fraud decision.  But the *Tallmadge v. Iroquois Gas*

5    is similarly situated to *Warman* and the other line of

6    cases that have existed in Connecticut for nearly the past

7    60 years and all of which, as I said earlier, were

8    interpreted for the proposition that a merger clause

9    doesn't bar a negligent misrepresentation claim.

10             THE COURT:  Now, you'd agree -- I hope you agree

11   at least as to merger would bar an innocent

12   misrepresentation.

13             MR. MAMOUNAS:  As far as an innocent

14   representation --

15             THE COURT:  Under *Capano*, right?

16             MR. MAMOUNAS:  That's correct.  That's correct.

17             THE COURT:  So I'll ask you the same question I

18   asked Mr. Baughman, which is:  Is a negligent

19   misrepresentation more like an innocent misrepresentation

20   for these purposes or is it more like fraud?

21             MR. MAMOUNAS:  Judge, I think it's more like

22   fraud, frankly.  And for that, I would cite to the

23   Appellate Division's decision in *Hull v. Fonck* which

24   distinguished *Gibson v. Capano* and enforced a similar

25   disclaimer clause to bar actions which -- strike that.

1    The *Gibson* case enforced disclaimer clauses to bar actions

2    for innocent misrepresentations as opposed to negligence.

3    But in the *Hull* decision the Court said as a matter of law

4    the trial court held that cases governing disclaimers for

5    innocent misrepresentations do not govern a case like

6    this, like the present case in which the misrepresentation

7    was negligent.

8         And so the point there is that the Appellate

9    Division had occasion to answer your question

10   specifically.  That is, is it more like negligence -- I'm

11   sorry, is it more like fraud or is it more like innocent.

12   And clearly the Court decided that it was more like fraud.

13   Negligence was more like fraud than it was innocent

14   misrepresentation.

15        THE COURT:  I see.  Okay.

16        MR. MAMOUNAS:  I believe that there was also an

17   argument from counsel, Judge, about the scope of the

18   merger clause.  But before we get there, I do want to make

19   the point that even if *Western* now is the law of

20   Connecticut, it wasn't at the time of the parties'

21   contract.  Your Honor may recall that the contracts at

22   issue in this case were executed in December 2014 as well

23   as March or April of 2016.  The appellate court's decision

24   is all that stood at that point in time, that is in the

25   *Western* case.  At the time those contracts were executed,

1    all of those stand in conflict with *Warman's* and its

2    progeny and the related cases.  So whatever happened in

3    *Western* at the Supreme Court, obviously SS&C has a

4    different view than Your Honor, those cases would control,

5    that is *Warman* and its progeny, and govern the

6    interpretation of the parties' intent in that provision

7    with respect to the merger clause.

8            But getting to the merger clause as text, I

9    believe in the *Foundation Capital* case Your Honor put some

10   emphasis on the fact that there was no explicit

11   anti-reliance language, and that is exactly the situation

12   here.  There is no anti-reliance language anywhere to be

13   found in the parties' agreements.  In fact, what we have

14   is a standard integration or merger clause which would be

15   subject to all of the discussions that we discussed

16   earlier.  But on its face there is an important limitation

17   in the scope of the agreement.  And that is that in the

18   *Western* case it was a fully integrated and complete merger

19   clause, whereas in this case it's clearly limited to the

20   subject matter hereof.

21           In the software world, there's a reason that

22   that's done.  It's because there are going to be multiple

23   agreements between the parties.  They will be having

24   multiple transactions and relationships as time moves

25   forward.  And certainly one agreement should not -- or one

1   subsequent agreement should not be interpreted as somehow

2   limiting any of the parties' prior transactions, the

3   reason being that the focus on the subject matter of the

4   agreement limits it to its terms or its elements.  And for

5   that, Judge, we cited to two decisions that I don't

6   believe were rebutted in the reply papers by SS&C, but the

7   first is the *Trefoil* case, another is the *Stevens v.*

8   *Landmark* case.  They're both District of Connecticut cases

9   but following Connecticut law.

10          THE COURT:  So, as a practical matter, this

11   addition of this clause on the subject hereof, how is that

12   going to make any difference as to any single one of these

13   22 to 24 alleged negligent misrepresentations?

14          MR. MAMOUNAS:  For the simple reason, Judge,

15   that those misrepresentations don't appear anywhere in the

16   contract.  If they were contract terms -- and this is why

17   getting back to the theory behind the merger clause rule

18   and how it interplays with misrepresentations, there's a

19   question of whether the claim is for inducement or to vary

20   any of the terms of the contract.  And SS&C's counsel

21   talks about Learned Hand and blue widgets.  I think on

22   that point we agree that if there is an effort to change

23   any of the specific terms of the contract, that would fall

24   within the merger clause which gives notice and reflects

25   the parties' intent that as far as those particular

1    clauses or claims or terms are concerned, they can't be

2    varied by extrinsic evidence.

3            But the claim in this case has always been about

4    inducement.  Your Honor's order on the motion to dismiss

5    reflects that.  The three categories of misrepresentations

6    that ARMOUR asserts here were all because it was induced

7    to enter into the contract in the first instance, not to

8    vary any of the terms of the agreement itself.  And so

9    SS&C has recognized I believe in their reply papers that

10   the misrepresentations that we allege as framed in our

11   opposition are not terms that actually appear in the

12   contract.

13           THE COURT:  Well, they may not appear in the

14   contract, but to the extent that the merger clause has

15   this subject matter scope, right, on the subject matter

16   hereof, isn't it true that all of these pre-inducement

17   statements, 22 or 24, however many, are on the subject

18   matter of the contract?

19           MR. MAMOUNAS:  Well, I mean, Judge, if you were

20   to take it to its extreme, you would say, well, of course

21   the subject matter is always going to be about software as

22   between SS&C and ARMOUR because that was the purpose of

23   the relationship.  But what the case law says is that the

24   subject matter is the terms and obligations between the

25   parties.  And that gets back to the problem that I

1    mentioned a moment ago --

2              THE COURT:  So does it mean essentially -- does

3    your view basically mean that this merger clause is

4    completely ineffectual because -- isn't the whole idea of

5    the merger clause to preclude a party from saying, hey,

6    there was some other representation, you know, that you

7    told me in the hallway before we signed this contract

8    that's not in the contract.

9              MR. MAMOUNAS:  I think that would be the point

10   of an anti-reliance clause as opposed to a merger clause.

11   As I understand it, the point of the merger clause is to

12   reflect an intention that none of the terms -- that this

13   is an integrated writing and none of the terms here are

14   going to be varied by any of the --

15             THE COURT:  This merger clause, it says

16   "supersedes," right, "all previous communication,

17   representations," right?

18             MR. MAMOUNAS:  But then continues, Judge,

19   "understandings and agreements, either oral or written,

20   between the parties with respect thereto."  And "with

21   respect thereto" clearly refers back to the subject matter

22   hereof that's part of the same clause.

23             THE COURT:  So which of the 22 to 24 alleged

24   negligent misrepresentations fall outside the scope of the

25   subject matter hereof?

1          MR. MAMOUNAS:  Not a one of them appears.  And

2    I'm happy to walk Your Honor through the

3    misrepresentations in a moment.  But not a one of them

4    appears as a contract term of the Master Agreement or its

5    related Work Request.  And that's why the subject matter

6    hereof is so different.

7          And I would cite Your Honor back to *Trefoil* and

8    to the *Stevens* case.  They talk about the subject matter

9    referring to the terms and obligations between the

10   parties.  And so in one of those cases there were prior

11   representations about economic participation in a firm and

12   what was going to happen.  And the court reviewing the

13   agreement between the parties said one of the terms that

14   you discussed actually was memorialized in the agreement

15   that was an obligation between the parties, that can't be

16   a basis for a misrepresentation claim.  But as far as the

17   other terms that you're alleging induced you to enter into

18   the contract, those don't appear, so they're not part of

19   the subject matter, they're not mentioned, dealt with, or

20   address in the writing, so therefore that wouldn't run

21   afoul of the parol evidence rule in your alleging an

22   inducement.  So our point has been that none of the

23   misrepresentations as we allege them actually appears as

24   an obligation between the parties in the agreement.

25          THE COURT:  What would be an example of a

1    misrepresentation that would come within the scope of your

2    restrictive reading of the merger clause?

3           MR. MAMOUNAS:  Well, as a for instance, Judge,

4    the software was meant to be delivered.  They were going

5    to deliver the CAMRA software.  And to the extent that

6    there was -- and this may be a simplistic example, but I

7    hope it meets your question.  The purpose of the agreement

8    was to deliver a license for the CAMRA software.  Let's

9    imagine that before the contract was entered into SS&C

10   said, well, we're going to actually outsource this for

11   you.  And so the delivery of the service was going to be

12   different than what was actually provided under the

13   agreement.

14          THE COURT:  So your argument really is what this

15   clause the subject matter hereof does, is it essentially

16   prevents a claim that conflicts with a specific provision

17   of the agreement, not that is additional to.

18          MR. MAMOUNAS:  Well, it gives effect to the

19   parol evidence rule.  It's the parties' expression of

20   intent that these are the terms with respect to our

21   obligations to one another.  And that's what all of the

22   cases on negligent misrepresentation claims and merger

23   clauses say.  They say if this is an inducement claim,

24   it's different from being a use of the parol evidence to

25   vary the terms of the contract.  In the former case, it's

```
 1    permissible; in the latter case, it's not.  So our point

 2    has been -- and I believe Your Honor recognized this on

 3    your order on the economic loss rule in the motion to

 4    dismiss -- all of the pre-contractual misrepresentations

 5    as we allege them don't appear as contract terms or as

 6    obligations between the parties in the Master Agreement

 7    itself.

 8              THE COURT:  Okay.

 9              MR. MAMOUNAS:  And Judge, finally, if I might

10    take a moment to get a drink of water.

11              THE COURT:  Sure.

12                   (Pause.)

13              THE COURT:  We're going to take a short recess.

14    And if we can make sure to -- your voice, Mr. Mamounas, is

15    a little bit hard to pick up for our court reporter.  It's

16    just something particular about it.  I know you didn't

17    come here planning to be difficult about that, but we're

18    going to take a short recess.  I'm going to give you as

19    much time as you need.  But if you can just slow it to

20    about 80 percent, 85 percent, that would be great.

21              MR. MAMOUNAS:  To 85 percent or by 85 percent?

22              THE COURT:  To 85 percent, if you can.

23              MR. MAMOUNAS:  I'll do what I can.

24              THE COURT:  We'll take a short recess, thank

25    you.
```

```
 1                     (Whereupon, a recess followed.)

 2              THE COURT:  Let's give it another try.

 3              MR. MAMOUNAS:  I hope that's no reflection on

 4     the argument, Judge, just the speed.

 5              THE COURT:  It is.  Just a comment on speed,

 6     yes.

 7              MR. MAMOUNAS:  Thank you.  We'll try to revert

 8     to 85 percent.

 9              THE COURT:  Okay.

10              MR. MAMOUNAS:  On the issue of the negligent

11     misrepresentations, Judge, I think our claim is far less

12     anodyne, to borrow Mr. Baughman's term, than he portrays.

13     And the reason is simple.  It was about seven months in

14     2014 that SS&C spent with its sales force trying to close

15     the deal with ARMOUR.  And in the context of it, they made

16     significant representations about their capabilities,

17     their personnel, and the suitability of the software

18     solution that they were going to deliver.

19              On motion to dismiss, you'll recall SS&C

20     challenged those misrepresentations as not meeting 9(b)

21     and Your Honor disagreed.  And now they challenge them as

22     purportedly not meeting the first element of ARMOUR's

23     negligent misrepresentation claim which is obviously the

24     fact that there's misrepresentation or not.

25              THE COURT:  Let me make sure that I understand
```

1    the universe here.  I think SS&C has tried to reduce it to

2    essentially 22 to 24 misrepresentations; that's the

3    universe, right?

4            MR. MAMOUNAS:  So that is the universe.  We

5    don't agree with the way they've characterized or

6    portrayed them, but those are the statements that we

7    identified.

8            THE COURT:  I'm looking at your own response to

9    the interrogatories that I have a copy of here that were

10   circulated.  Those are the statements, right, that you

11   claim were negligent misrepresentation?

12           MR. MAMOUNAS:  Correct.  The additional two that

13   were identified by counsel actually were identified as

14   evidence of the falsity of other representations that have

15   been identified.

16           THE COURT:  But I should confine my analysis to

17   what you identify in the amended objections and responses

18   to defendant's Interrogatories Numbers 5 and 10.

19           MR. MAMOUNAS:  I believe, Judge, without

20   speaking out of school, I think there were a couple that

21   were identified at the deposition of Mr. Mountain.  So all

22   of them would appear in the statement of disputed material

23   facts --

24           THE COURT:  Okay.

25           MR. MAMOUNAS:  -- as well as in our

1    presentation.

2         THE COURT:  All right.

3         MR. MAMOUNAS:  I believe, just to clarify, I

4    think the first document in which we were asked for

5    misrepresentations was in fact the interrogatory answer.

6    That's why I presume SS&C uses it as a starting point.

7    But of course in opposition to summary judgment we put in

8    a statement of disputed material facts.

9         THE COURT:  Tell me what's your best

10   misrepresentation.  If you had to pick one, say this one

11   is a statement of fact not just mere opinion, it's

12   actionable, at least there's a material issue of fact,

13   what's number one on the list?

14        MR. MAMOUNAS:  Sure.  I would point Your Honor

15   to what we characterize as Number 2 and I believe

16   Your Honor also did on your order on the motion to

17   dismiss.  And that concerns the functionalities of CAMRA

18   as implemented for ARMOUR.  This is the second category,

19   Judge.  And basically SS&C knew that ARMOUR was looking to

20   convert from doing its accounting through mostly manual

21   methods using spreadsheets, so SS&C knew that it was

22   essential for ARMOUR to have a solution that was automated

23   and easy to use.

24        THE COURT:  So which one is this?  The one

25   that's on the website?

1          MR. MAMOUNAS:  Well, this extends to a number of

2     them.

3          The first one -- and I would like to clarify an

4     issue about the website which I think was listed as --

5          THE COURT:  Let's keep it on just what's the

6     date and format of this misrepresentation.

7          MR. MAMOUNAS:  Okay.  So as a for instance,

8     Judge, on the May 13, 2014, brochure that was attached to

9     Mr. Moore's email that was Exhibit 43 to our statement of

10    disputed material facts indicated that SS&C software

11    streamlines and automates and identified CAMRA as

12    automated.  The April 24, 2014, press release which was --

13         THE COURT:  Stick with me one point.  Number one

14    on your list is the May 13?

15         MR. MAMOUNAS:  Well, they said it multiple

16    times, Judge.  I'm just giving you the lay the land.

17         THE COURT:  So May 13, 2014, is your number one

18    strongest argument.

19         MR. MAMOUNAS:  Well, there was also the

20    April 24, 2014, representation to the same effect.

21         THE COURT:  Okay.

22         MR. MAMOUNAS:  And that was an identification of

23    CAMRA as automated.  And SS&C knew, and it's undisputed,

24    that ARMOUR wanted an automated software solution.  They

25    also knew that we wanted one that was integrated and they

1    also knew we wanted one that was accurate.  So all of

2    those we grouped together.

3                THE COURT:  So the falsity is it's automated.

4                MR. MAMOUNAS:  The falsity was that it wasn't

5    automated.

6                THE COURT:  It was not automated.

7                MR. MAMOUNAS:  As CAMRA was delivered, it was

8    not automated, it was not integrated, and it wasn't

9    accurate.  And I can point Your Honor to evidence in the

10   record that demonstrates in fact that it was not.

11               As far as the issue of automation, SS&C's

12   internal records reflected that everything having to do

13   with a third-party provider by the name of AVM was all

14   manual.  They also reflect that initial setup and

15   reconciliations of the CAMRA software solution were

16   typically manual.  The lead implementer for the CAMRA

17   software solution for ARMOUR, Mr. Scott Rice, wrote

18   internally that "the whole process is way too manual and

19   stupid."  Another individual indicated "we were probably

20   uploading manually in implementation."  Mr. Mountain

21   testified that the ACM user experience was entirely

22   contrary to the flexible streamlined and automated

23   solution that SS&C had promised.  That's just on the issue

24   of automated.

25               On the issue of integrated, Judge --

1          THE COURT:  So help me make sure I understand.

2    In terms of your interrogatory responses that we talked

3    about before, where do I find that?

4          MR. MAMOUNAS:  Where do you find --

5          THE COURT:  The reference to automated.

6          MR. MAMOUNAS:  The reference to automated first

7    appears in the May 13, 2014, PowerPoint which I believe

8    that was statement of disputed of material facts

9    Paragraph 79.

10          THE COURT:  Okay.  So I've got your statement of

11    material disputed facts.  I couldn't find it in the -- I

12    think I could find it in the interrogatory responses, but

13    this is a different --

14          MR. MAMOUNAS:  I think, Judge, the problem is

15    that they said "automated" so many times that the

16    reference appears in a lot of different locations.  I'm

17    happy to give them to Your Honor.  They've all been put in

18    the record, they were in our statement.

19          THE COURT:  So basically your claim is every

20    time they used the word "automated," it's false.

21          MR. MAMOUNAS:  Correct, because the

22    representation was that the software solution as delivered

23    would be automated.  They touted that, screamed it from

24    the mountaintops because they knew that it was one of the

25    most important things to ARMOUR in entertaining the

1    possibility of a CAMRA software solution.  So the

2    representation was that CAMRA streamlines and automates.

3    That also appears at Exhibits 34, 38, et cetera.

4         THE COURT:  What is meant by automated versus

5    manual?  I know the general distinction, but in this

6    context.

7         MR. MAMOUNAS:  In this context, Judge, the

8    purpose of the CAMRA software solution was to be automated

9    and also integrated.  Integrated, meaning that the

10   instance for the location of the software was going to

11   pull in data from all sorts of different sources.  That's

12   the integrated component.  The automated component meant

13   that the import of that data was going to happen on an

14   automatic basis.  That is, it wasn't going to be up to

15   individuals to put that information manually into the

16   CAMRA software but, rather, it would happen as a matter of

17   course.  Because what was happening before that was that

18   this was done mostly using what's called a spreadsheet

19   methodology, and a lot of the information had to be

20   retrieved from a third-party data provider and then

21   manually input into it.  So the idea was that CAMRA being

22   integrated and automated would do all of this without

23   requiring some sort of ongoing human involvement, if that

24   makes sense.

25        THE COURT:  I see.  Okay.

1          MR. MAMOUNAS:  So that was very important to

2    ARMOUR when it went out and looked for the software

3    solution.  And SS&C, as I said, represented multiple

4    times, including in Exhibits 34 and 38 to our statement of

5    disputed material facts, that this was automated.

6          SS&C also represented that CAMRA was integrated.

7    And that appears at statement of disputed material facts

8    80, and that representation was false because although

9    SS&C touted its prior experience with custodians,

10   third-party data providers that ARMOUR had preexisting

11   relationships with, their witnesses have testified at

12   deposition that they hadn't ever set up an interface with

13   any of the custodians from a mortgage REIT before.

14         THE COURT:  That's at Number 80 of the statement

15   of material facts?

16         MR. MAMOUNAS:  The statement I believe is

17   referenced at Number 80 in discussing --

18         THE COURT:  I just didn't see that.  I have your

19   statement of material facts, I think.

20         MR. MAMOUNAS:  I believe the reference is to

21   Paragraph 3 of the interrogatory answer.  And we had been

22   discussing that earlier as far as the integrated nature of

23   the software.  And that was a representation that was made

24   on an ongoing basis as well.

25         THE COURT:  Okay.

1           MR. MAMOUNAS:  The falsity of the representation

2    as far as integrated continued with respect to the

3    third-party data custodians which were Citibank and Bank

4    of New York, otherwise known as BONY.  And the SS&C

5    witnesses at deposition testified essentially that they

6    had no reasonable basis to make the representations, they

7    had taken no steps to assess capabilities, they undertook

8    no tests, they understood that ARMOUR required a separate

9    feed separate and apart from other customers of SS&C in

10   order for the data to come in in an integrated fashion.

11   And they also knew it was a difficult and time-consuming

12   process, yet it took them 11 months of trial and error in

13   order to do it, and even before the contract they did

14   nothing to try to assess capabilities or run tests to

15   understand whether that would actually work.

16           With respect to AVM, which was another

17   third-party data provider that I mentioned earlier, SS&C

18   had never worked with it before and they did nothing to

19   validate it, but yet they made the representation that the

20   software solution was integrated and AVM was part of that,

21   and that appears in our papers.

22           There are additional pieces of evidence in the

23   record.  Mr. Rice, again the lead implementer -- and I

24   believe this is at Exhibit 68 to the statement --

25   indicated that CAMRA's GL, which is a general ledger, was

1   like a whole different database and that he was frustrated

2   that they didn't talk to each other.  And all of that just

3   goes to the point, Judge, that when SS&C was making

4   representations pre-contract about the specific attributes

5   of the software they either knew or should have known that

6   it wasn't true.  They should have known that the software,

7   as promised to ARMOUR during the course of the sales

8   cycle, was not integrated as they represented.

9           THE COURT:  So to be clear, number one, not

10  automated as they represented, not integrated.  Anything

11  else?

12          MR. MAMOUNAS:  Correct.

13          And then on that issue concerning specifically

14  the functionality, which was the second category of

15  misrepresentations, they made representations about the

16  accuracy of the software.

17          And on the issue of accuracy, that's also --

18  that also wasn't true, reason being that the reports were

19  wrong, data didn't match.  Again, the lead implementer,

20  Mr. Rice, said that the reports the system was generating

21  were complete garbage.  He also said that SS&C knew that

22  the reports weren't completely accurate for ARMOUR the

23  whole time.  And the second part of the automatic process

24  is the reporting.  And so once the data comes in in an

25  automatic way, another part of making the system automated

1    was that it would generate reports that would reflect

2    ARMOUR's accounting.  And if the reports aren't accurate,

3    obviously that is problematic and reflects incorrect

4    accounting which could lead to a whole host of issues.  So

5    the accuracy of the system was fundamentally important as

6    well.  And given that those capabilities didn't exist at

7    the time of the parties' relationship, it's certainly fair

8    to believe that they didn't exist at the time the

9    representations were made.

10            On that point I would cite Your Honor --

11            THE COURT:  So the claim, I guess, though, is

12   where, on what date and what document did they make a

13   representation about accuracy pre-contractual?

14            MR. MAMOUNAS:  I believe on the issue of

15   accuracy specifically, Judge, it had to do with SS&C's --

16   it was SS&C's knowledge of accuracy being one of ARMOUR's

17   requirements and the statement by SS&C that the system as

18   delivered would meet those requirements.

19            THE COURT:  Which statement?

20            MR. MAMOUNAS:  So to turn Your Honor to another

21   category, there were also representations about the CAMRA

22   solution being the right fit.  And we had seen those

23   earlier.  And the statements that were made by Mr. Moore,

24   we saw those in Mr. Baughman's presentation, and I think

25   those are at statement of disputed material facts

```
 1    Paragraphs 31 and 81, also Paragraph 8 in the

 2    interrogatory answers and Paragraph 13.

 3              THE COURT:  So let me just look at Paragraph,

 4    you said, 8 of the interrogatory answers?

 5              MR. MAMOUNAS:  Yes.

 6              THE COURT:  So that's the one of the June 4,

 7    2014, email that states, "Based on our understanding of

 8    your business and current environment, we are confident

 9    CAMRA is the right fit, and I just wanted to reaffirm our

10    interest in partnering with you."  What part of that is a

11    false --

12              MR. MAMOUNAS:  The representation --

13              THE COURT:  -- statement of fact?

14              MR. MAMOUNAS:  I'm sorry?

15              THE COURT:  What part of that is a false

16    statement of fact?

17              MR. MAMOUNAS:  The representation that CAMRA was

18    suitable for ARMOUR was the false statement of fact, the

19    reason being that the statement was made on SS&C's receipt

20    and understanding of the facts and their intention to

21    relay those facts based on what SS&C had received,

22    understood, and analyzed.

23              THE COURT:  Just to slow you down there, the

24    email, I don't see the word "suitable."

25              MR. MAMOUNAS:  Well, Judge, I believe that's
```

1    what the testimony was as far as what Mr. Moore intended

2    to communicate.  He used the words "right fit."  But the

3    intention --

4              THE COURT:  Okay.  I have to look at what was

5    actually said, right, not some later spin on it in a

6    deposition.

7              MR. MAMOUNAS:  Well, I don't believe it's later

8    spin, Judge.  Because if you follow the Connecticut cases

9    in response to the argument, for example, whether the

10   statements are opinions or fact, the Connecticut courts

11   have said that not only does the analysis depend on the

12   form of the statement but also on the surrounding

13   circumstances and the respective knowledge of the parties.

14   And I would cite Your Honor to the *Meyers v. Cornwell*

15   decision which we cited in our papers for that exact

16   point.

17             THE COURT:  So let me be clear about this.  If

18   we just focus on this one email of June 4, 2014, in which

19   SS&C states that it is confident that CAMRA is the right

20   fit.  That pretty much sweeps everything in, right?  In

21   any way that the integration may not work or the

22   implementation may not work, basically you would say,

23   well, if it doesn't turn out to be just the right fit,

24   because we don't like the way it automated or failed to

25   automate or fails to implement or something like that, you

1    would basically say, you know, that's a negligent

2    misrepresentation, his statement that we are confident it

3    is the right fit.

4              MR. MAMOUNAS:  I don't know that I would

5    necessarily agree with that, Judge, the reason being that

6    the statement begins with an important predicate.  It says

7    "based on our understanding of your business and current

8    environment."  The case law in the software context

9    uniformly says where a vendor takes the time to understand

10   the requirements, the needs, and the limitations of the

11   customer, and then makes a representation about fit or

12   suitability or appropriateness, then the statement that is

13   being made is one of fact because the vendor has done the

14   investigation.

15             THE COURT:  So basically a complete guarantee,

16   right?  Because if it turns out to disappoint the customer

17   in any way, the customer can always go back to that

18   pre-contractual statement of the vendor who said we've

19   looked at your business and the current environment, and

20   we are confident our product is the right fit.  That's

21   basically what you're saying, right?

22             MR. MAMOUNAS:  I don't know that it would

23   operate as a complete guarantee, Judge, because it would

24   depend on what the vendor did, based on, as Mr. Moore

25   wrote, based on our understanding of your business and

1    current environment.  He understood what the requirements

2    were, and he was making a representation that SS&C's

3    solution would meet those requirements.  So the question

4    becomes, well, did he know -- and this goes to the issue

5    of measurability -- did SS&C know that that statement

6    might not be true such that it could be said that it knew

7    or should have known that it was making a

8    misrepresentation.

9            And I would point Your Honor to, as just as an

10   example, the evidence that we put in the record that at

11   that point in time SS&C's head of professional services,

12   Ms. Olszewska, knew that without certain components of the

13   CAMRA solution, the software that was being offered was

14   not valid.  Her own testimony, her own documents reflect

15   that the software solution was not valid without a module

16   called RECON, which is part of the automation and the

17   integration that we talked about before.  It's a method in

18   which the software undertakes what are called

19   reconciliations between different data sources to identify

20   irregularities.  Ms. Olszewska knew, and she again was the

21   head of the team that was going to implement the software,

22   that what was being offered to ARMOUR provided limited at

23   best functionality and would present operational

24   difficulties.  So the question is:  If SS&C pre-contract

25   knew that the solution was not valid and had limited at

1   best functionality, how could they say, based on their

2   understanding of ARMOUR's business and operations, that

3   the CAMRA solution would be the right fit for ARMOUR?

4   That just doesn't add up.  And that's why it's not a

5   statement of opinion; it's a statement of fact.  Because

6   it's clearly measurable.  If SS&C knew that this was not a

7   valid solution, they clearly couldn't have said that it

8   was the right fit.

9           With respect to Mr. Moore's second statement

10  about "Based on the feedback from Trevor and Cory, it

11  sounded like hosting the CAMRA application in SS&C's data

12  center would really be a good deployment option for

13  ARMOUR," that's another one where Mr. Moore undertook

14  specific investigation and factual analysis.  In fact, he

15  testified at deposition that he performed what's called a

16  suitability analysis to determine whether the CAMRA

17  solution was suitable for ARMOUR and in doing so made a

18  recommendation for hosting.  The problem was, of course,

19  and I'm sure Your Honor has seen it in the papers, SS&C

20  had never undertaken hosting for a mortgage REIT in the

21  past.  And so the importance --

22          THE COURT:  So again, your argument is similar,

23  his statement on September 10, 2014, in the email which he

24  says CAMRA would be a really -- would really be a good

25  deployment option for ARMOUR, that's a statement of fact

 1    as well?

 2            MR. MAMOUNAS:   It's a statement of fact, Judge,

 3    again because of the predicate.  He says, "based on my

 4    discussions with ARMOUR representatives."  So following

 5    the case law and specifically in software situations,

 6    general representations the data processing equipment will

 7    be suitable for a customer's operations based upon

 8    familiarity with both the equipment's capabilities and the

 9    customer's needs are statements concerning present facts.

10    And I cite to Your Honor the *Dunn* decision out of Sixth

11    Circuit (1982).  But it's not the only case that so holds.

12    There are decisions where statements very similar to

13    Mr. Moore's were found to be actionable statements of

14    present fact in the software context.  I would cite

15    Your Honor to the *Am. Collectibles* case in our papers, to

16    the *Invacare* case, to the *Nielsen Media* case out of the

17    Southern District of New York in 2012 where the software

18    vendor indicated that it could and would create, design,

19    and deliver software products fit for the particular

20    purpose for which Nielsen would use them.  If SS&C knew,

21    as the evidence indicates, that the software was not

22    suitable or was not the right fit or was not a good

23    deployment option for ARMOUR, then those statements are

24    measurable statements of present fact that would be

25    actionable as pre-contractual misrepresentations.

1            There's also a statement, Judge, that SS&C

2    represented the CAMRA solution to be proven.  That appears

3    in the June 2014 PowerPoint.  Also as referenced in

4    Paragraph 6 in the interrogatory answers, they describe

5    CAMRA as a proven accounting engine.  In the PowerPoint

6    presentation in the next paragraph they say that CAMRA --

7    I'm sorry, SS&C delivers proven systems, and they tie it

8    specifically to the issue of mortgage REITs.  They say

9    that it's proven in respect to mortgage REITs, because if

10   you remember, it was at that point in time they had just

11   launched the mortgage REITs team and were trying to target

12   those types of customers.

13            SS&C also told ARMOUR that very same day that

14   Morgan REITs only could use CAMRA through one of three

15   deployment options, and hosting was one of them.  Of

16   course, the common definition of "proven" is that it's

17   something that's tested and has been shown to be true or

18   something that, you know, is real or effective.  So the

19   question is:  Was CAMRA, as it was being offered to

20   ARMOUR, across one of three deployment options proven?

21   And the fact of the matter is at that point in time it was

22   not.  "Proven" has been upheld to be an actual

23   misrepresentation in a number of software and other cases

24   that we cited to Your Honor including the *Bridgestone*

25   decision, the reason being that in this particular case

1   CAMRA on hosting, one of the three offered deployment

2   options during the course of the June 2014 meeting, had

3   never been done before for a mortgage REIT.  So certainly

4   CAMRA, as it was being represented and presented to ARMOUR

5   during the course of that meeting, was not proven as had

6   been pitched by SS&C.

7          There's also a list of -- in that same meeting,

8   there was a list of successful prior deployments that SS&C

9   represented during the course of the meeting.  There were

10  I believe it was on Page 2 of the PowerPoint presentation

11  they discussed the deployment options, and just two pages

12  later they set out a list of all of the successful

13  deployments.  SS&C obviously was relaying their track

14  record of prior delivery of all those deployment options.

15  Mr. Moore testified that his intention in delivering that

16  PowerPoint was to communicate that because the deployments

17  had worked before, they would work for ARMOUR.  And

18  consistent with the Connecticut case law that I cited

19  earlier, certainly the circumstances around his statement

20  are important in determining whether that's a statement of

21  fact or a statement of opinion.

22         The cases that we've cited in our papers reflect

23  that specific statements about prior experience of

24  projects with similar design, size, interfacing,

25  complexity are actionable and are statements of fact

1   because they reflect whether that experience for that

2   deployment had actually occurred.  And again, CAMRA had

3   never been deployed for a mortgage REIT on hosting before

4   and so the representation of successful prior deployments

5   without an indication as much would be an actionable

6   misrepresentation and it would be false for the reasons

7   that I pointed out.

8           I believe there were some arguments earlier in

9   Mr. Baughman's presentation about demonstrations and

10  proofs of concept that had been delivered during the

11  course of the parties' relationship.  The purpose of

12  those, as testified again by SS&C's witnesses, was to show

13  ARMOUR that CAMRA would work for ARMOUR as represented.

14  That's the point of giving a demonstration.  They showed

15  how the software was going to work for them.  The point of

16  the proof of concept was to show how the software would

17  work for ARMOUR with its data.  So those were statements,

18  and the case law has recognized this, that CAMRA as

19  implemented on hosting for ARMOUR had the capability to

20  process and handle ARMOUR's data using ARMOUR's accounting

21  methodology.  I point Your Honor to the *Am. Trim* decision

22  in which demonstration of a product that was in beta test

23  mode but nonetheless was represented as being live and

24  operational was found to be actionable because that

25  version of the software was not fit for public consumption

1    and ultimately ended up being problematic.

2            Lest I forget it, I know, Judge, we've talked

3    about the issues of integration and automation.  There is

4    a District of Connecticut decision that I think is

5    important to highlight that involved SS&C and another one

6    of its customers.  It's the *Providence* decision out of the

7    Distinct of Connecticut in 2005.  And in that particular

8    case the alleged misrepresentations were near identical,

9    obviously involving the same product.  SS&C in that case

10   was alleged to have represented the capabilities, the ease

11   of use, the timetable, the functionality, and specifically

12   about presenting reliable, complete, and accurate

13   financial reports.  And they also said that the

14   implementation would be relatively easy and could be

15   complete by no later than a certain date that they had

16   provided.  The conclusion in that case was that a jury

17   could find that difficulties they encountered during the

18   implementation were indicative of SS&C's and CAMRA's

19   failure or even inability to provide the services that

20   were represented.  In that particular case, the standard

21   was actually lower; it was for prejudgment remedies.  And

22   as Your Honor knows, that's a probable cause standard

23   which is less than preponderance of the evidence.  So even

24   in that particular instance, the judge, the magistrate

25   judge was unable to find that SS&C had a likelihood to

1   succeed and in fact the Court said on the contrary, that

2   there were misrepresentations and issues of fact that

3   would ultimately go to a jury concerning the exact kind of

4   issues that we're talking about in this case.

5          Again, on the issue of functionality, lest I had

6   forgot it earlier, in the *Am. Collectibles* case that we

7   cite, there were representations about a totally

8   integrated and operational system.  They claim the system

9   had out-of-the-box --

10          THE COURT REPORTER:  I'm sorry, I lost you.

11          MR. MAMOUNAS:  -- interoperability.

12          THE COURT:  And again, 85 percent.

13          MR. MAMOUNAS:  Yeah, it's a long word.

14          And the cases I believe, Judge, we cited, legion

15   cases in our papers about specific software attributes and

16   why those are actionable.

17          And then the third category was that SS&C was

18   obviously saying to ARMOUR that it had the personnel to

19   implement and to do so within four to six months.  Simply

20   put, SS&C didn't have the personnel to support their

21   misrepresentations.  SS&C says all of the statements

22   aren't actionable because they're either true or they're

23   opinions.  And of course whether they're truth or opinion

24   is an issue of fact as reflected in the cases that we

25   cited.  But for purposes of the summary judgment motion,

1    we would submit that the statements were about specific

2    abilities and skill and expertise of SS&C's personnel that

3    just weren't true.

4              THE COURT:  Where is the misrepresentation as to

5    personnel, the best example, in your view, of

6    misrepresentation about personnel?

7              MR. MAMOUNAS:  Sure.  Judge, it starts with the

8    April 24, 2014, press release in which SS&C represented

9    that it had expertise.  It continues in the May 13, 2014,

10   email from Mr. Moore and the attached brochure in which he

11   highlighted extensive knowledge and experience

12   specifically for entities that deal in mortgage backed

13   securities.

14             THE COURT:  I'm sorry, I thought your point was

15   about personnel, that they had the personnel.

16             MR. MAMOUNAS:  Correct, Judge.  The personnel

17   would be --

18             THE COURT:  The expertise?

19             MR. MAMOUNAS:  -- the people that had expertise

20   and experience.

21             THE COURT:  Not the lack of personnel dedicated

22   to the account, servicing the account, but it has to do

23   with the lack of expertise?

24             MR. MAMOUNAS:  Well, and then it continues,

25   Judge.  Because it does also call into question whether

1    they had the amount of personnel that they represented.

2    And so we reflect this in Paragraph 9 of the interrogatory

3    answer.   There were a number of representations about

4    SS&C's professional services team being a dedicated team

5    that was qualified to implement CAMRA and that they had

6    done so for other mortgage REITs.

7           Continuing in Number 20, there were

8    representations about Ms. Olszewska having had significant

9    experience implementing CAMRA for mortgage REITs like

10   ARMOUR.   There were representations from Mr. Fecteau and

11   other of the salespeople, Mr. Mountain, about not choosing

12   a third-party implementer so that ARMOUR only had one

13   throat to choke.

14          And then continuing on to the preparation of the

15   proposals and the estimates and timelines for the

16   implementation itself, the communication that SS&C was

17   relaying to ARMOUR was that it had not only the number of

18   people but also capable people in order to execute that

19   and carry that out.

20          So on those points, Judge, I can point you to a

21   number of cases in which representations that were similar

22   in the software context were found to be actionable.   One

23   is the *Aspect Software* case where there were

24   representations about experience, expertise, and core

25   competencies with cloud-based CRM systems.   The *Nielsen*

1    case where the representation was that they had expertise

2    in the internet software field and that the vendor kept

3    abreast of the varying cutting edge of internet

4    technology.  In *Bridgestone*, the vendor said they were

5    uniquely qualified.  In *Am. Collectibles* they claimed that

6    they had consistent project leadership, architecture

7    expertise in business systems analysis, they had the

8    ability to dedicate experienced resources and to assign

9    the resources necessary for a successful project.  In the

10   *Methodist Hosp.* case, the misrepresentation was that the

11   vendor had extensive experience with the software and was

12   highly qualified to assist the customer in implementing

13   it, but it was actionable because the vendor in reality

14   had never implemented the version that was implemented at

15   that time.

16          These line up very closely to the

17   representations that were made here.  SS&C claimed to have

18   experience and expertise with mortgage REITs.  They

19   claimed to have experience and expertise with implementing

20   CAMRA for mortgage REITs.  They claimed to have the people

21   who would be able to implement within four to six months

22   and, in the first instance, implement at any point in

23   time, and they claimed that they would be able to do it

24   for ARMOUR.  And those representations, as we've reflected

25   in our opposition, simply weren't true.

1            SS&C believed the personnel they assigned to the

2    project, including the project manager and the main

3    implementer, were not competent.  Within the first few

4    months of the implementation, folks internally wrote that

5    professional services didn't know what they were doing.

6    Others said that the implementation internally at SS&C was

7    a trial-and-error exercise.  And yet another person

8    referred to it using the colloquialism "thugly."

9            They also didn't have enough personnel.  They

10    acknowledged that they understaffed the project.  They

11    knew about a lack of resources which caused delays across

12    the board.  There's even a representation in one of the

13    internal documents that the employees had to lie to ARMOUR

14    and Bimini, which was another customer at the time, about

15    working on their projects when in reality they couldn't.

16    Of course, they had never implemented a mortgage REIT

17    customer in fewer than six months before.  They had never

18    delivered a mortgage REIT implementation on time or on

19    budget before, which certainly goes to whether there's a

20    reasonable basis to make that representation here.  And

21    the testimony has been that, in making those

22    representations, SS&C didn't even consider ARMOUR's

23    staffing or address with ARMOUR when planning the

24    implementation what the staffing would look like and what

25    the needs would be when they made their representations

```
 1    about capability to implement within four to six months.

 2              So the point is, Judge, that the representations

 3    all concerned the expertise and personnel that SS&C

 4    claimed they would be able to bring to bear for the

 5    solution and for its implementation, and those statements

 6    weren't true.  And under the case law we've cited, those

 7    also would be actionable.

 8              Any questions, Judge?

 9              THE COURT:  Nothing at this point.

10              MR. MAMOUNAS:  Thank you.

11              THE COURT:  Thank you.

12              MR. MAMOUNAS:  And lest I forget to mention it,

13    and for all of those reasons we would ask that the motion

14    be denied, Judge.

15              THE COURT:  Understand.

16              MR. MAMOUNAS:  In an abundance of caution.

17              MS. AHMED:  Your Honor, so I just want to make

18    three points on the damages issue that was first addressed

19    by Mr. Mamounas.

20              THE COURT:  I see.

21              MS. AHMED:  So in the first instance, we want

22    you to know that it is our view that you can decide the

23    issue as a matter of law whether lost employee time falls

24    into the bucket of consequential damages, which is this

25    other loss category, or direct damages.  If I could, I
```

1    just want to take you back to the language in the

2    Restatement in *Ambrogio* where there was a determination

3    about, you know, what direct damages are and what other

4    loss is.

5         So when we look at the language that the

6    Connecticut Supreme Court cited, they said direct damages

7    are "the loss and value to plaintiff of the other party's

8    performance caused by its failure or deficiency."  So when

9    we're looking at direct damages, this definition tells us

10   that we're talking about SS&C's conduct when we're looking

11   at this area of direct damages.  So that would be the

12   costs and fees as we originally said.

13        Now, this area of other loss, this is "Items of

14   loss other than loss in value of the other party's

15   performance are often characterized as incidental or

16   consequential."  As far as we're concerned, Your Honor,

17   this notion, the lost employee time does not qualify as

18   direct damages under the definition that the Connecticut

19   Supreme Court has adopted.  It falls into this category of

20   other loss.  And we believe that is something Your Honor

21   can decide as a matter of law, that there's no need to

22   send this issue to a jury when we have a clear definition

23   from the Connecticut Supreme Court.

24        The second thing I'd like to take Your Honor's

25   attention to is the provision 6.2.2, the consequential

1   damages provision, because ACM is telling Your Honor that

2   we submit and agree that reliance damages don't fall

3   within this.  And we disagree, just to make that clear.

4   But I want to explain why.  So here what it says is "SS&C

5   is not liable for any indirect, special, incidental or

6   consequential damages of any kind," and then we provide

7   some examples, "including without limitation," we say.  So

8   we're not intending in any way to say this provision only

9   bars loss of profits, loss of use, and whatever we iterate

10  here.

11          But I also want to draw your attention to one

12  other thing.  We talk about incidental or consequential

13  damages of any kind.  And the clause continues, "in

14  connection with or arising out of the furnishing,

15  performance of any services under the Master Agreement,

16  any Attachment or any Work Request."

17          So what Mr. Mamounas had said earlier was that

18  there is an issue of performance that was done by ACM

19  under the contract.  And we would submit, Your Honor, that

20  under the language of this clause, that is covered here.

21  Loss of use, that would be loss of use attributable to

22  ACM.  Loss of profits, if ACM were to bring a claim, it

23  would be their loss of profits.  So when we look at this

24  clause, we're talking about performance of any services

25  that ACM might put toward the CAMRA implementation such as

1    lost employee time.  So even by the language of the

2    clause, lost employee time would fall within here.

3          There's another thing and that's the final thing

4    that --

5          THE COURT:  It falls under performance of any

6    services?

7          MS. AHMED:  Yes.

8          THE COURT:  I see.  Okay.

9          MS. AHMED:  And the final thing I would like to

10   say is Mr. Mamounas kept talking about that these are

11   somehow pre-breach damages, he kept saying pre-breach

12   damages.  So we would submit that those can't be

13   contractual damages because contractual damages flow from

14   the breach.  So by whatever definition he's talking about,

15   he keeps talking about these pre-breach damages, that

16   wouldn't actually fall into any category of damages

17   because then he's saying that they don't flow from the

18   breach.  They're entirely something else.  So either he's

19   arguing that it's consequential damages or he's saying

20   that it's something that happened that is unrelated to the

21   breach.  So in either case, we would still submit that

22   there are no damages at issue for ACM in in this case.

23         THE COURT:  Okay.  Thank you.

24         MR. BAUGHMAN:  Your Honor, thank you.  And thank

25   you to the Court's staff for the late hour.

1          I was just going to try to clear up --

2          THE COURT:  Be brief, if we can.

3          MR. BAUGHMAN:  I'm going to do the best I can.

4          Couple things on sort of jurisprudence and the

5     issue of whether *Western* applies.

6          It's undisputed *Western* is the most recent

7     decision by the intermediate Connecticut court.

8     Connecticut has a unitary appellate court system.  It's

9     not like Mr. Mamounas's state of Florida or my state of

10    New York where there are different departments.  There's

11    only one appellate court, intermediate appellate.  And

12    when it speaks, the most recent statement is the law.  So

13    I know he would prefer to go back to the *Hull* case in

14    2010, but 2013 *Western Dermatology* is the law.

15         Second, he said something incorrect.  He said

16    something incorrect on the law and on the facts.  He said

17    that, well, *Western* hadn't been decided yet at the time

18    this contract was entered into so it shouldn't apply,

19    okay.  That's just factually incorrect.  *Western* is a 2013

20    case.  The contract was entered into in 2014.  And even if

21    it were not, that's not the law.  The United States

22    Supreme Court decided back in 1999 in the Jim Beam

23    Distillery against Georgia and then Harper against

24    Virginia Department of Taxation, and the Connecticut

25    courts have followed in *Campos v. Coleman*, 319 Conn. 36,

1    the idea that in a civil case, unlike a criminal case,

2    civil case decisions are retroactive.  So the law of

3    *Western* would apply in any event.

4            And the idea that *Western* is just not the law or

5    not a statement of Connecticut law, he kept trying to say

6    it's wrong, it's just not for him to say.  The Court was

7    presented with the case, the decision was called to its

8    attention, and it decided the matter as it saw fit.

9            THE COURT:  Did *Western* grapple with *Hull*?

10           MR. BAUGHMAN:  It did not cite *Hull*, to my

11   knowledge.  It simply didn't.

12           THE COURT:  So isn't my task really if I, by

13   chance, disagree with your view that *Western* is, as a

14   matter of law, controlling because the Connecticut Supreme

15   Court didn't deal with it and expressly disclaimed dealing

16   with the issue of Footnote 11 of its ruling, then don't I

17   still have to look at the constellation of Connecticut

18   appellate authority --

19           MR. BAUGHMAN:  I --

20           THE COURT:  Let me finish and then I'll give you

21   a chance to answer.

22           -- and make a determination of, well, what would

23   the Connecticut Supreme Court do if confronted with the

24   issue?

25           MR. BAUGHMAN:  I agree with that, Your Honor.

1    But I would, if I might, slightly expand Your Honor's

2    field of vision.  It's not just grapple with the

3    intermediate authority; it's grapple with the Supreme

4    Court authority too, which we talked about it which lays

5    out the goalposts pretty well.  *Warman*, clearly fraud,

6    rule one.

7              THE COURT:  *Capano*.

8              MR. BAUGHMAN:  *Capano*, innocent

9    misrepresentation, clearly two.

10             So the question is:  Which is this?  Is it

11   closer to *Capano* or closer to *Warman*?  For the reasons

12   discussed, it should be, I submit, closer to *Capano*.

13             And I want to deal with one thing that Counsel

14   said.  He tried to argue that *Warman* is not a fraud claim,

15   that it's not a fraud case, and he tried to argue that it

16   was a negligence case.  I respectfully disagree.  I

17   disagree for two reasons.  One, if you "control F" your

18   way through *Warman*, the word "negligence" does not appear,

19   nor does "negligent."  The concept of negligence is not

20   discussed.  And what it is held is the woman, the

21   defendant Mrs. Ethel Delaney, was reckless.  Your Honor

22   understands that under Connecticut law, reckless is a type

23   of fraud and indeed the holding of the case clearly refers

24   to, it says -- and I'm now reading from 148 Conn. 474 or

25   then it would be 172 A.2d 190 -- it says "The defendant

1   claims that the contract for the sale of the real estate

2   constituted the entire obligation of the parties, that all

3   terms set forth therein were fulfilled, and accordingly

4   there could be no fraud or deceit."  That's what the Court

5   was considering, whether there could be a fraud or deceit.

6   There was no consideration on whether it could be a

7   negligent misrepresentation at all.  That was the actual

8   holding of the case.

9           Turning very briefly to the discussion of the

10  representations, I'm not going to go through all of them

11  again.

12          THE COURT:  Thank you.

13          MR. BAUGHMAN:  I just want to make out this

14  point.  What Counsel was doing -- and I understand he's

15  trying to win a case -- but what he was doing was

16  synthesizing.  He was pulling together a lot of things,

17  maybe this was said here or that was said, and sort of

18  stitching them together in terms of things that were never

19  actually said.  For example, he said they represented,

20  quote, the solution was integrated and AVM was a part of

21  it.  Well, that's just not something that was said.  All

22  that matters are the 22 representations that were in the

23  interrogatory answer which has been submitted.  Those are

24  the only ones that are at issue, Your Honor.

25          And I want to just point out two other things

1   that are important to Your Honor's consideration.  He said

2   a lot about the issue of automation, streamlined in

3   automation.  He said those were representations about

4   automation that were made by SS&C to AVM when we knew

5   about their business.  So he was trying to import this

6   idea of special knowledge.  That's not something that fits

7   in the case and it also doesn't fit the facts.

8          If Your Honor looks at the representations in --

9   the ones that are actually at issue in the

10  interrogatories, the only one about automation is

11  Number 1.  That's the one that was on the website.  The

12  website was not made to them with special knowledge about

13  them, it was made to the world.  Okay.  So the argument

14  that was made does not apply.

15          I think I will submit, Your Honor, I think

16  Your Honor understands the point that we've already made

17  about statements such as "a good fit" or "based on our

18  understanding, we believe."  I don't think I need to

19  repeat.

20          I think it's clear that they have done their --

21  the one I do want to comment on is about the personnel.

22  He took issue with the fact that we said we made

23  statements about personnel that were untrue.  I would like

24  to direct Your Honor to Paragraph 37 of their response on

25  the 56(a)(2) statement where they admit that

1    Iwona Olszewska was the head of SS&C professional services

2    team in August 2014, that she had been responsible for

3    that team since 2008, and that prior to December 2008 she

4    oversaw CAMRA implementations for four REITs.  Prior to

5    December 2014 Ms. Olszewska testified that she oversaw

6    approximately 20 implementations -- not 50 -- including

7    preparing three budgets for the four REIT implementations.

8    So they have admitted that there's a professional team,

9    Ms. Olszewska was the head of it, and that she'd worked on

10   this type of project before.  That's the evidence in this

11   case.

12           So there were no misrepresentations.  No one is

13   happy about the fact that the project failed.  But the

14   issue is was there a breach of contract.  For the reasons

15   Ms. Ahmed said, there was not.  But there certainly was no

16   improper inducement into the contract through the use of

17   negligent misrepresentation.

18           Thank you, Your Honor.

19           THE COURT:  Thank you to all counsel.  I

20   appreciate your coming in today for argument.  I'm going

21   to take the motion under advisement and try to rule as

22   soon as I can.

23           MR. MAMOUNAS:  May I, Judge, before you go, did

24   you still want the additional notices or discussion on the

25   *Argentinis* case, and I believe you asked for some other

1   citations?

2           THE COURT:  You offered to submit something else

3   as well.

4           MR. MAMOUNAS:  Is that fine?

5           THE COURT:  If you do that, any party should to

6   that by next -- end of business on Tuesday, and any reply

7   that you have to each other's submissions by Friday, next

8   Friday.  Okay?

9           MR. BAUGHMAN:  Thank you, Your Honor.

10          THE COURT:  I think that's enough time.

11          MR. MAMOUNAS:  Judge, would you hear further

12  argument on what we heard just a moment ago?

13          THE COURT:  No.  I've heard I think argument at

14  this point from both sides.  I know the motion for summary

15  judgment has been pursued here, and I ordinarily hear from

16  the movant initially and then in rebuttal.

17          MR. MAMOUNAS:  I understand.  Sometimes your

18  practice is to hear further argument.  That's why I asked.

19          THE COURT:  I have.  It's 6:00.  I think I've

20  heard extensive argument from both sides and given both

21  sides ample opportunity to make the points.  Thank you

22  all.

23          MR. MAMOUNAS:  Thank you, Judge.

24          MR. BAUGHMAN:  Thank you.

25              (Proceedings adjourned at 5:50 p.m.)

112

1

2                          C E R T I F I C A T E

3

4          RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
               TECHNOLOGIES, INC., No. 3:17CV790(JAM)

5

6               I, Diana Huntington, RDR, CRR, Official Court

7   Reporter for the United States District Court for the

8   District of Connecticut, do hereby certify that the

9   foregoing pages 1 through 111 are a true and accurate

10  transcription of my shorthand notes taken in the

11  aforementioned matter to the best of my skill and ability.

12

13

14

15

16                     _____/s/_____

17                     DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
18                     United States District Court
                       141 Church Street, Room 147
19                     New Haven, Connecticut 06510
                          (860) 463-3180
20

21

22

23

24

25