UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARMOUR CAPITAL MANAGEMENT LP,
    *Plaintiff*,

v.

SS&C TECHNOLOGIES, INC.,
    *Defendant*.

No. 3:17-cv-00790 (JAM)

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff ARMOUR Capital Management LP (ACM) and defendant SS&C Technologies, Inc. (SS&C) are embroiled in litigation over the failed implementation of financial services software that SS&C sold to ACM. In this latest round of their battle, SS&C moves for summary judgment on all of ACM's claims. Although I will grant SS&C's motion as to ACM's breach of contract claim, I will deny the motion as to ACM's remaining claims.

### BACKGROUND

ACM is a Florida-based registered investment advisor that focuses on mortgage-related securities. SS&C provides software and related services to the financial industry from its headquarters in Connecticut. I take the facts here from both parties' briefs and their Local Rule 56 statements of material fact.

The origins of the parties' dispute dates to early 2014. SS&C was by this time an established provider of financial services software, including the CAMRA software that it had developed in 1988. *See* Doc. #177-1 at 2-3 (¶¶ 3-4, 6). ACM was then a 19-employee mortgage real estate investment trust (REIT). *See* Doc. #177-1 at 25 (¶ 65). ACM managed assets for the similarly-titled ARMOUR Residential REIT, Inc. (ARR), as well as for JAVELIN Mortgage Investment Corporation (which was later purchased by ARR). *Id*. at 7 (¶ 16).

1

Although it had worked with some REITs in the past, SS&C announced in April 2014 that it would form a new group that would specialize in serving REITs. *See* Doc. #177-1 at 5 (¶ 13); Doc. #176-8 at 2. In May 2014, Jim Mountain, who held himself out as the CFO of both ARR and Javelin, contacted SS&C. Doc. #177-1 at 8 (¶ 21). He and his colleague Mark Gruber then met in June 2014 with SS&C representatives, including business development director Dennis Moore. *Id.* at 9 (¶¶ 22-23). At the meeting, SS&C presented a PowerPoint discussing various aspects of itself, its customers, and CAMRA, and Moore then followed up with Mountain and Gruber. *Id.* at 9-11 (¶¶ 23-31).

Discussions between SS&C and the ARMOUR entities continued that summer and fall, including several "proofs of concept" to demonstrate tests of CAMRA on ARR's data. *Id.* at 11-12 (¶ 32). In late August 2014, SS&C met with ACM to show a PowerPoint purporting to demonstrate the first proof of concept of the CAMRA system and to introduce ACM to several SS&C CAMRA staffers. *Id.* at 12-14 (¶¶ 34, 37). Included in that group of staffers was SS&C professional services team member Shiv Sivadas. *Id.* at 13 (¶ 34). SS&C then discussed further aspects of CAMRA implementation with ACM information technology staff in September 2014. *Id.* at 14 (¶ 38).

In mid-November 2014, SS&C provided ACM with a "Comprehensive Mortgage REIT Software and Operational Support Services Proposal," *ibid.* (¶ 39), which contained various details about the potential implementation of CAMRA, *see id.* at 14-15 (¶¶ 39-41); Doc. #176-29 at 10, 13. By December 2014, Moore emailed Mountain, Gruber, and their colleague Joanna Terry to alert them that he and SS&C's Jeff Fecteau had been working "to prepare an implementation estimate for transitioning ARMOUR to our CAMRA solution." Doc. #177-1 at 16 (¶ 43). Two days later, he sent ARR and ACM a "draft implementation budget," and SS&C

then sent a revised proposal the following day. *Id.* at 16-17 (¶¶ 45-48). SS&C proposed a call with Mountain to discuss "what constitutes the 'ordinary course of business.'" *Id.* at 17-18 (¶ 50). The parties have argued about the nature, meaning, and import of the statements by SS&C throughout these negotiations.

ACM and SS&C finally concluded their negotiations and signed what they call the "Master Agreement" on December 19, 2014. *Id.* at 17 (¶ 51). The Master Agreement specifies certain limitations of consequence to this action, including the following clauses:

Section 6.7.4:

> Entire Agreement. This Master Agreement (including any attachments and addenda hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous communications, representations, understandings and agreements, either oral or written, between the parties with respect thereto.

Sections 6.2.1 and 6.2.5:

> Disclaimer. Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation. SS&C specifically disclaims all implied warranties of merchantability and fitness for a particular purpose with respect to the software and the Documentation.

> No Other Warranty. Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid. No employee, agent, representative or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software.

Section 6.2.2:

> Exclusion of Consequential Damages and Absolute Limitation on SS&C's Liability. SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder . . . .

3

Section 6.2.3:

> No Third Party Beneficiaries. SS&C shall have no contractual or other obligations or liability to (i) ARMOUR Residential REIT, Inc. or (ii) JAVELIN Mortgage Investment Corp. directly or as third party beneficiaries of this Master Agreement or any other agreement between SS&C and Client.

*Id.* at 18-19 (¶ 52).

The Master Agreement had several attachments: Attachment B-1, which identified specific "Hosting, Process Automation and Data Management Services" that SS&C would provide; and "Work Request One," which identified specific "Initial Implementation Services." *Id.* at 19 (¶ 53). Work Request One noted that SS&C would provide services "in support of Client's implementation of the Software," and listed "Assumptions," including a "Project Duration of 4-6 months" and an "Applicable Rate" that SS&C would "provide an estimated 1,850 hours of support in relation to the services described . . . at a rate of $225 per person per hour." *Ibid.* (¶ 54).

Alongside its relationship with SS&C, ACM also maintained a relationship with ARR and Javelin. ACM provided services to both ARR and Javelin under what it calls "Management Agreements," which state that "[ACM] is authorized to retain, for and on behalf of the REIT, the services of third parties." *Id.* at 20 (¶ 56). The agreements also provide that "costs and expenses related to the retention of third parties shall be the sole cost and expense of the REIT." *Ibid.* The Management Agreements required ARR and Javelin on a monthly basis to reimburse ACM for its payments to SS&C. *Id.* at 21 (¶ 59).

ARR's co-CEO, Jeff Zimmer, testified that he understood the arrangement between ARR and ACM to be that ARR would ultimately bear the costs of the contractual relationship with SS&C, including paying for all fees that ACM paid to SS&C. *Id.* at 21 (¶ 58). Although it is not contractually bound to do so, ACM claims that it "intends to repay Armour and Javelin the full

4

amount of the reimbursements" to the extent that ACM recovers any damages from SS&C in this action. *Id.* at 20 (¶ 56).

The relationship between ACM and SS&C eventually deteriorated, with each party blaming the other for difficulties implementing CAMRA. ACM terminated the Master Agreement on May 1, 2017. *Id.* at 20 (¶ 55). ACM then sued SS&C, *see* Doc. #1, asserting claims for breach of contract, Doc. #35 at 16-17 (Count I), violation of the Connecticut Unfair Trade Practices Act (CUTPA), *id.* at 17-19 (Count II), intentional misrepresentation, *id.* at 19-20 (Count III), negligent misrepresentation, *id.* at 20-21 (Count IV), and rescission, *id.* at 21-22 (Count V).

Both parties have since engaged in highly spirited litigation. In March 2018, I dismissed ACM's claim for intentional misrepresentation, *see ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 2018 WL 1368908, at *6 (D. Conn. 2018), significantly limited the basis for ACM's breach of contract claim, *id.* at *3-*5, allowed ACM's negligent misrepresentation claim to proceed on the basis of inducement to enter into the Master Agreement, *id.* at *6-*7, and allowed ACM's CUTPA and rescission claims to proceed on the basis of the negligent misrepresentation claim, *id.* at *7-*8. In the meantime, SS&C has filed several counterclaims, *see* Doc. #88, which I dismissed in part and which are not before the Court now. *See ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 2019 WL 688308 (D. Conn. 2019). SS&C has now moved for summary judgment on ACM's remaining claims. Doc. #176.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

5

law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

This case involves state law claims over which the Court has federal diversity jurisdiction. Absent a decision from a state's highest court on a question of state law, a federal court's role is to carefully predict how the state court would rule on the issue presented. *See Haar v. Nationwide Mut. Fire Ins. Co.*, 918 F.3d 231, 233 (2d Cir. 2019). In so doing, the federal court should give proper regard to the relevant rulings of the State's lower courts and may also consider decisions from other jurisdictions on the same or analogous issues. *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (subsequent case history omitted).

### A. *Negligent misrepresentation and related CUTPA and rescission claims*

SS&C argues that ACM's claim for negligent misrepresentation is foreclosed by the so-called "merger" clause of the Master Agreement. As the Second Circuit has recently explained, "[a] merger clause is a provision of a contract signifying that the contract is a complete statement of the parties' agreement, superseding any prior oral or written terms," such that "a merger clause operates to limit the universe of the parties' contractual obligations to the text of the contract itself." *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 143 (2d Cir. 2019).

The merger clause of the Master Agreement (Section 6.7.4) states that the written contract "contains the entire agreement of the parties with respect to the subject matter hereof

6

and supersedes all previous communications, representations, understandings, and agreements, either oral or written, with respect thereto." Doc. #35-1 at 9. According to SS&C, this merger clause forecloses ACM's negligent misrepresentation claim, because such a claim requires proof of reasonable reliance on the misrepresentation, *see Coppola Constr. Co., Inc. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 351-52 (2013), and the merger clause implicitly disclaims reliance on any prior representations, *see* Doc. #176-1 at 18-20.

By way of background, the parties do not dispute that, as a matter of Connecticut law, a contractual merger clause does not preclude a plaintiff from claiming that a defendant's *fraudulent* misrepresentation induced the plaintiff to enter into the contract. *See, e.g.*, *Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, 2018 WL 4697281, at *9 (D. Conn. 2018). At the other end of the spectrum, Connecticut law makes clear that a merger clause precludes a plaintiff from claiming that a defendant's *innocent* misrepresentation induced the plaintiff to enter into the contract. *See Gibson v. Capano*, 241 Conn. 725, 732-33 (1997). The issue presented here falls between a fraudulent misrepresentation and an innocent misrepresentation: whether under Connecticut law a merger clause precludes a plaintiff from claiming that a defendant's *negligent* misrepresentation induced a plaintiff to enter into a contract.

In light of my duty to predict how the state's highest court would rule on this issue, I conclude that the Connecticut Supreme Court would most likely rule that a contract's merger clause does not categorically preclude a negligent misrepresentation claim. Indeed, the Connecticut Supreme Court appears to have said as much in one case. *See Gibson v. Capano*, 241 Conn. at 733 (citing prior precedent in which "[w]e concluded that a seller's misrepresentations as to the boundaries of land to be sold, *if made negligently* or recklessly and

7

relied upon by a buyer without conducting an independent survey, can support an award of damages even if the written contract constitutes the entire agreement of the parties, specifically disclaims any representations of the buyer as to the condition of the land, and contains a contrary description of the land") (emphasis added) (citing *Warman v. Delaney*, 148 Conn. 469, 473-74 (1961)).[1] To similar effect, the Connecticut Appellate Court has repeatedly declined to conclude that a merger clause precludes a claim that a seller's negligent misrepresentation induced a buyer to enter into a contract. *See Hull v. Fonck*, 122 Conn. App. 286, 290-94 (2010); *Martinez v. Zovich*, 87 Conn. App. 766, 778, *cert. denied*, 274 Conn. 908 (2005); *Foley v. Huntington Co.*, 42 Conn. App. 712, 721-22 (1996). More generally, Connecticut law does not favor contract provisions that relieve a party from its own negligence absent unmistakable language in the contract to make clear that the limitation of liability extends to claims for negligence. *See, e.g.*, *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 321-22 (2005).

Against all this, SS&C relies on *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169 (2013), *aff'd*, 322 Conn. 541 (2016), in which the Connecticut Appellate Court ruled that a merger clause precluded a plaintiff's negligent misrepresentation claim. But the Appellate Court did so without citing or acknowledging the Connecticut Supreme Court's decisions in *Gibson* and *Warman*, much less its own prior adverse authority in *Hull*, *Martinez*, and *Foley*, simply observing "[t]he effect of such a merger clause on a common-law misrepresentation claim has not been explored fully by the state of Connecticut." 146 Conn.

---

[1] Admittedly, although *Gibson* characterizes *Warman* to be a case about negligent misrepresentation, *Warman* does not refer to negligence, describing the representation at issue only in terms of it being "made recklessly" and constituting a "reckless deception." *Warman*, 148 Conn. at 473.

8

App. at 196. The Connecticut Appellate Court relied only on decisions from the Second Circuit and New York state courts. *Id.* at 185-86.[2]

Because the Appellate Court's decision in *Western Dermatology* does not acknowledge or reckon with contrary authority of both the Connecticut Appellate Court and the Connecticut Supreme Court, its holding does not undermine my prediction about how the Connecticut Supreme Court would rule if faced with the issue in this case. I predict that the Connecticut Supreme Court would rule that a merger clause does not categorically preclude a plaintiff from establishing reasonable reliance on pre-contractual statements for purposes of a negligent misrepresentation claim. Of course, my conclusion that a merger clause may not preclude a negligent misrepresentation claim as a matter of law does not foreclose a defendant from arguing at trial the significance of the merger clause to the jury's consideration of whether any reliance on pre-contractual representations was indeed reasonable as a factual matter. *See FIH*, 920 F.3d at 144-45.

SS&C next argues that ACM's alleged series of negligent misrepresentations are not sufficiently fact-based, definite, or untrue to be legally actionable. *See* Doc. #176-1 at 25-37. Although SS&C raises some strong arguments to doubt the actionability of some of the statements about which ACM complains, I conclude that these highly fact-bound issues of the actionability of particular statements should remain for the jury to consider in light of the context and circumstances of this case. *Cf. SS&C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 258-59 (D. Conn. 2008) (noting in prejudgment remedy context involving same corporate defendant that "while a jury may find that SS & C's representations to [plaintiff] PIM regarding

---

[2] Although the Connecticut Supreme Court eventually affirmed the Appellate Court's decision in *Western Dermatology*, it refrained from ruling on the negligent misrepresentation claim. *See* 322 Conn. at 552 n.11 (no negligent misrepresentation issue raised before the Supreme Court). Therefore, I attach no significance to the fact that the Connecticut Supreme Court affirmed the Appellate Court's decision.

9

the capabilities, ease of use, and timetable for implementation of the CAMRA software system were accurate, truthful, and made in good faith, . . . [g]iven the significant, repeated, and continuing problems encountered during the CAMRA implementation process, a jury could find that SS & C did in fact misrepresent their capabilities to PIM in some way").

In light of the extended course of the parties' dealings and the possible linkages between one or more statements, it would be premature for me to try to slice-and-dice which particular statements identified by ACM as the basis for its claims are non-actionable as a matter of law. This ruling is without prejudice to the right of SS&C on a fuller trial evidence record to seek jury instructions that limit or preclude the jury from considering particular statements as the basis for ACM's negligent misrepresentation claim.

Accordingly, I will deny SS&C's motion for summary judgment on the negligent misrepresentation claim. I will also deny summary judgment on the related claims under CUTPA and for rescission to the extent that they are predicated on the claim for negligent misrepresentation. *See ARMOUR*, 2018 WL 1368908, at *8. In particular, because of the possibility that ACM suffered damages due to SS&C's negligent misrepresentations, I do not agree with SS&C's argument that there is no genuine fact issue with respect to whether ACM can satisfy CUTPA's "ascertainable loss" requirement.

### B. Breach of contract claim

SS&C also seeks summary judgment on ACM's contract claim on the grounds that ACM has failed to establish that it has suffered any cognizable damages for the alleged breach of contract. See Doc. #176-1 at 38-40. The parties agree that any potential contract damages in this case fall into one of two categories: (1) fees that ACM paid to SS&C under their contract; and

(2) ACM's labor costs from its employees' lost time trying to implement the CAMRA product. *See* Doc. #176-1 at 38; Doc. #177 at 32. I will consider each category in turn.

### 1. *Contract damages for fees paid to SS&C*

SS&C argues that ACM may not claim any contract damages for fees that ACM paid to SS&C, because ACM has already received full reimbursement from ARR and Javelin for all the fees it paid to SS&C. *See* Doc. #177-1 at 20-21 (¶¶ 56-59); Doc. #192 at 48-49. In response, ACM argues that the funds it received from ARR and Javelin should be disregarded under the collateral source rule. *See* Doc. #177 at 35-38.

The collateral source rule generally holds that a defendant may not escape liability for damages that the defendant has proximately caused even if the plaintiff has been compensated for its injuries by an independent source. *See St. Bernard Sch. of Montville, Inc. v. Bank of Am.*, 312 Conn. 811, 841 (2014). The rationale for the rule is that a defendant should not be relieved of responsibility for wrongdoing by the happenstance that the plaintiff has been compensated from another source. *Ibid.*

Still, the collateral source rule runs contrary to a competing principle: that a plaintiff should receive compensation for the same loss only once. As the Connecticut Supreme Court has observed, "[t]he social policy behind this concept is that it is a waste of society's economic resources to do *more* than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste." *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 23-24 (1997).

The Connecticut Supreme Court has repeatedly recognized the applicability of the collateral source rule in tort cases and often described it as a doctrine that applies to tort cases. *See, e.g.*, *Enviro Express, Inc. v. AIU Ins. Co.*, 279 Conn. 194, 203 n.9 (2006); *Haynes*, 243

11

Conn. at 22-23; *Gurliacci v. Mayer*, 218 Conn. 531, 557 (1991); *United Aircraft Corp. v. Int'l Ass'n of Machinists*, 161 Conn. 79, 102 (1971). This longstanding practice and characterization showcase a primary rationale for the collateral source rule: "to fulfill the general tort policy of deterring similar tortfeasors from wrongful conduct." *Haynes*, 243 Conn. at 23 (citing W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 4, pp. 25–26).

In contrast, the justification for the collateral source rule is less compelling in the contract context because—to a far lesser extent than tort law—the purpose of damages in contract law is generally not deterrence and punishment. *See* Restatement (Second) of Contracts § 347 cmt. e (June 2019 Update) ("The principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort."); *compare* Restatement (Second) of Contracts § 356 cmt. a (June 2019 Update) ("The central objective behind the system of contract remedies is compensatory, not punitive.") *with* Restatement (Second) of Torts § 920A cmt. b (June 2019 Update) (noting that "[p]erhaps there is an element of punishment of the wrongdoer involved" in explaining that benefits from collateral sources to the injured party "do not have the effect of reducing the recovery against the [tortfeasor]"); *but see* Marco J. Jimenez*, Retribution in Contract Law*, 52 U.C. DAVIS L. REV. 637 (2018) (arguing that courts frequently adopt a "retributive" approach when determining remedies for a breach of contract, leading to damages awards that are guided by the perceived wrongfulness of the breach).

For example, punitive damages are generally not available for breach of contract. *See, e.g.*, *L.F. Pace & Sons, Inc. v. Travelers Indem. Co.*, 9 Conn. App. 30, 47-48 (1986); *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) (explaining that "punitive awards are not part of the law of contract damages"). Reflecting this compensatory

focus, the plaintiff in a breach of contract case "is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain," and the plaintiff can recover only "damages based on [the injured party's] actual loss caused by the breach." *Argentinis v. Gould*, 219 Conn. 151, 157-58 (1991) (quoting *Vines v. Orchard Hills, Inc.*, 181 Conn. 501, 507 (1980) and 3 Restatement (Second) of Contracts § 347 cmt. e).

In light of these concerns, "the overwhelming majority [of courts to consider the issue] have explicitly refused to import the collateral source rule into the law of contracts," and "[t]his national consensus exists for good reason." *Asher v. Unarco Material Handling, Inc.*, 862 F. Supp. 2d 551, 554-55 & n.1 (E.D. Ky. 2012) (Thapar, J.) (collecting cases); *see also Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 347 (S.D.N.Y. 1999) (Rakoff, J.) (rejecting collateral source rule application to contract claim); *but see Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752 (Va. 2019) (discussing reasons why collateral source rule may potentially apply in some contract cases on a case-by-case basis); Joseph M. Perillo, *The Collateral Source Rule in Contract Cases*, 46 SAN DIEGO L. REV. 705, 721 (2009) (arguing that the collateral source rule should apply to contract claims).

The Connecticut Supreme Court has yet to address whether the collateral source rule should apply not only to tort claims but also to contract claims. Even if I assume that the Connecticut Supreme Court might allow for application of the collateral source rule to some kinds of contract cases, I think it is unlikely that the Connecticut Supreme Court would rule that this is the kind of contract case to which the collateral source rule should apply, given how it has been applied elsewhere. For example, some courts suggest that the collateral source rule should apply to a contract claim where the collateral source of funds was the result of the plaintiff's separate purchase of an insurance contract in the event of the defendant's breach. "'[W]hen a

party has paid valuable consideration before the breach to a collateral source to insure against a loss or otherwise to protect its interest, there is no logical reason to deny that party a benefit it has paid for and grant it to another party who neither negotiated for it, paid for it, nor absorbed the opportunity costs of securing it, but who has precipitated the loss.'" *Dominion Res., Inc*, 825 S.E.2d at 756 (quoting *John Munic Enterprises, Inc. v. Laos*, 235 Ariz. 12, 18 (Ariz. Ct. App. 2014)). Here, ACM's receipt of funds from ARR and Javelin was not pursuant to an insurance-type of relationship for which ACM separately paid valuable consideration.

Nor do the facts here suggest a fraudulent or willful breach distinct from ACM's claims of negligent misrepresentations. "[I]n the case of breaches of contract having a willful or tortious character, as when the breaching party secures the benefit of a contract by fraud, the collateral source rule prevents any further unjust enrichment of the breaching party." *John Munic Enterprises, Inc.*, 235 Ariz. at 19. As noted above, I have previously dismissed ACM's claim for intentional misrepresentation. *See ARMOUR Capital Mgmt. LP*, 2018 WL 1368908, at *6.

The Virginia Supreme Court has observed that "particularly in the contract context, the supposed double recovery [that may result from application of the collateral source rule] often will prove to be more hypothetical than actual," because "[f]requently in contract cases implicating the rule, the plaintiff has either assigned its claims or otherwise is liable to reimburse the collateral source, or the collateral source has a claim of subrogation against the defendant." *Dominion Res., Inc.*, 825 S.E.2d at 757 (quoting *John Munic Enterprises, Inc.*, 235 Ariz. at 19) (internal citations omitted). Here, ACM has not assigned its claims nor agreed to subrogation, and—notwithstanding its unilateral expression of an intent to repay ARR and Javelin, *see* Doc. #171-1 at 20 (¶ 56)—it is not legally obliged to pay ARR and Javelin. *See* Doc. #192 at 53 (at oral argument, plaintiff's counsel responded in the affirmative to the Court's question, "So it's

their testimony [Mountain and Zimmer] that it's their intention to repay even though there's no written obligation on ACM's part to do that?").

In addition, the Master Agreement "allocate[s] risks under th[e] Master Agreement between [ACM] and SS&C," and provides that "SS&C shall have no contractual or other obligations or liability to [ARR or Javelin] directly or as third party beneficiaries of" any agreement between ACM and SS&C. Doc. #176-4 at 6 (¶¶ 6.2.4, 6.2.3). Therefore, it is consistent with the parties' agreement for SS&C to not be liable to pay damages to ACM for the ultimate benefit of ARR and Javelin.

The additional cases cited by ACM are inapposite. In *Ford Motor Credit Co. v. Wintz Cos.*, 184 F.3d 778 (8th Cir. 1999), the Eighth Circuit held that no double recovery would occur in light of the plaintiff's agreement to pay any damages it recovered to a corporate parent that had already reimbursed its losses under a loss-sharing agreement. *See id.* at 780. The loss-sharing agreement in *Ford Motor* was akin to an insurance agreement. It did not involve any contractual provision like the Master Agreement's no-third party beneficiary clause that would have limited the defendant's liability for a loss the reimbursing party suffers, which effectively prevents any ARR or Javelin contract loss from being a cognizable basis for ACM's recovery.

In both *Macey v. Carolina Casualty Insurance Co.*, 2012 WL 6125200 (D. Conn. 2012) (Virginia law), and *Torrington Municipal & Teachers F.C.U. v. Whitford*, 2010 WL 5610900 (Conn. Super. 2010), the plaintiffs either had preexisting agreements to assign their lawsuit's proceeds, *see Macey*, 2012 WL 6125200, at *7, or had sued as fiduciary for a third party, *see Torrington*, 2010 WL 5610900, at *2. And just as in *Ford Motor*, neither case involved a no-beneficiary clause between the plaintiffs and defendants regarding the third party at issue.

15

In short, ACM has already been made whole for the fees it paid to SS&C, and therefore it cannot show damages as to this aspect of its contract claim. The Connecticut Supreme Court would likely not apply the collateral source rule under the circumstances of this case. Accordingly, I conclude that SS&C is entitled to summary judgment as to its contract claim insofar as it seeks damages for the fees that ACM paid to SS&C.

### 2. *Contract damages for loss of employee time*

ACM claims damages of at least $1.4 million for lost employee time of over 5,000 hours in the course of the unsuccessful effort to implement the CAMRA product. Doc. #177 at 38-41. SS&C argues that ACM is barred from recovering any damages for lost employee time because lost employee time is a form of consequential damages, and the Master Agreement provides in relevant part that "SS&C is not liable for any indirect, special, incidental or consequential damages of any kind." Doc. #176-4 at 6 (¶ 6.2.2).

As an initial matter, ACM argues that the Master Agreement's consequential damages exclusion clause lists types of non-recoverable consequential damages to include "loss of profits, loss of use, business interruption, loss of data, or cost of cover," Doc. #176-4 at 6 (¶ 6.2.2), but does not include lost employee time. This argument is unpersuasive, because the clause excludes consequential damages "of any kind" and makes clear that the examples it gives are "include[ed] without limitation." *Ibid.*

ACM next argues that lost employee time is not a form of consequential damages at all. By way of background, the Connecticut Supreme Court recognizes two categories of damages in contract cases: "(1) direct damages, composed of 'the loss in value to him of the other party's performance caused by its failure or deficiency,'" and "(2) 'any other loss, including incidental

or consequential loss, caused by the breach.'" *Ambrogio v. Beaver Road Assocs.*, 267 Conn. 148, 155 (2003) (quoting 3 Restatement (Second) of Contracts § 347(a)-(b)).

According to ACM, lost employee time is a form of direct "reliance" damages that is distinct from the type of consequential damages identified in the Master Agreement's exclusion. Doc. #177 at 39-41. I do not agree. The loss of employee time is not the equivalent of the loss in value to ACM of SS&C's performance caused by its failure or deficiency. ACM stood to lose employee time on implementation regardless of the success of the implementation. Loss of employee time was an indirect result of the alleged breach that falls within the category of consequential damages. *See Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 635 F.2d 1081, 1084 (3d Cir. 1980) (lost employee time due to defendant's failure to timely program a computer system is a form of consequential damages barred by the parties' contract).

ACM cites *Boulevard Associates v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132 (D. Conn. 1994), for the proposition that "an injured party may recover any expenditures that it incurred in preparation for, part performance of, or otherwise in reliance on the contract." *Id.* at 1138. But *Boulevard* is actually a case about *consequential* damages (which are not allowed here) and it supports SS&C's position rather than ACM's position. The *Boulevard* plaintiff had sued the defendant for breach of a lease, but because it had assigned away any future rents, it sued only for "consequential damages" resulting from the breach. *Id.* at 1136. The court awarded reliance damages because the other potential way to measure the plaintiff's consequential recovery—lost profits—was too uncertain. *Id.* at 1138-39.

Other cases from the District of Connecticut support this conclusion. *See, e.g.*, *Scapa Tapes N. Am., Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 552-53 (D. Conn. 2005) (citing cases awarding reliance damages when prospective damages or lost profits prove

17

uncertain); *Int'l Brands USA, Inc. v. Old St. Andrews Ltd.*, 349 F. Supp. 2d 256, 262 (D. Conn. 2004) (same). Especially in light of the Connecticut Supreme Court's clarification that lost profits are typically an appropriate measure of consequential damages, *see Ambrogio*, 267 Conn. at 155, 159, it is apparent that insofar as Connecticut law recognizes reliance damages, it does so as a species of consequential damages that are not the "direct" damages of a breach.

In short, I conclude that ACM's claim for lost employee time while trying to implement the CAMRA product is subject to the parties' agreed-upon exclusion for consequential damages. Accordingly, I will grant summary judgment for SS&C on ACM's contract claim to the extent that it seeks recovery for lost employee time.

All in all, I will grant summary judgment for SS&C on ACM's contract claim because there is no genuine fact issue to show that ACM sustained damages that are subject to recovery by means of a breach of contract claim.

## CONCLUSION

For the reasons set forth above, the Court DENIES in part and GRANTS in part SS&C's motion for summary judgment (Doc. #176). The Court DENIES the motion for summary judgment as to ACM's claims for negligent misrepresentation, CUTPA, and rescission. The Court GRANTS the motion for summary judgment as to ACM's contract claim. The parties shall file their joint trial memorandum on or before November 15, 2019, and jury selection shall proceed on January 2, 2020, with trial evidence to begin on January 6, 2020.

It is so ordered.

Dated at New Haven this 11th day of September 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge