UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

ARMOUR CAPITAL MANAGEMENT LP,

                                  Plaintiff,

                    - against -                                3:17-cv-00790-JAM

SS&C TECHNOLOGIES, INC.,

                                  Defendant.

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## ITS OMNIBUS MOTION *IN LIMINE*

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Robert A. Atkins
Jeannie S. Rhee
Jeffrey J. Recher
Joshua D. Kaye
1285 Avenue of the Americas
New York, New York 10019
ratkins@paulweiss.com
jrhee@paulweiss.com
jrecher@paulweiss.com
jkaye@paulweiss.com
Telephone: (212) 373-3000

Kevin J. O'Connor
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
koconnor@hinckleyallen.com
Telephone:  (617) 378-4394

Jeffrey J. Mirman
Alexa T. Millinger
Hinckley, Allen & Snyder LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
jmirman@hinckleyallen.com
amillinger@hinckleyallen.com
Telephone:  (860) 331-2762

*Attorneys for Defendant*
*SS&C Technologies, Inc.*

## Table of Contents

**Page**

Table of Authorities ....................................................................................................... ii

I. First Motion *In Limine*:  ACM Should Be Precluded From Seeking A Punitive
Damages Award............................................................................................. 1

II. Second Motion *In Limine*:  ACM Should Be Precluded From Seeking Damages
Based On ACM's "Lost Employee Time".......................................................... 2

III. Third Motion *In Limine*:  ACM Should Be Precluded From Characterizing SS&C
As Lying Or Making Intentional Misrepresentations ............................................ 4

IV. Fourth Motion *In Limine*:  ACM Should Be Precluded From Trying a Breach of
Contract or Warranty Case.............................................................................. 5

V. Fifth Motion *In Limine*:  ACM Should Be Precluded From Offering Evidence,
Argument or Testimony Regarding Bimini Capital Management.................................. 9

VI. Sixth Motion *In Limine*:  ACM Should be Precluded From Asserting That Seven
Statements Constitute Actionable Misrepresentations...................................... 12

VII. Seventh Motion *In Limine*:  ACM Should Be Precluded From Introducing
Electronic Chats Exchanged By SS&C Employees.......................................... 15

Conclusion ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Axis Oilfield Rentals, LLC* v. *Mining, Rock, Excavation and Construction*,
223 F. Supp. 3d 548 (E.D. La. 2016) ........................................................................................4

*Barton* v. *City of Bristol*,
294 Conn. 84 (2009) ...............................................................................................................13

*Bellsite Development, LLC* v. *Town of Monroe*,
155 Conn. App. 131 (2015) ...............................................................................................6, 10

*Brown* v. *N. Cent. F.S., Inc.*,
987 F. Supp. 1150 (N.D. Iowa 1997) ...................................................................................7, 9

*DeNuzzo* v. *Yale New Haven Hosp.*,
465 F. Supp. 2d 148 (D. Conn. 2006) ..................................................................................1, 2

*Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*,
279 F. Supp. 2d 235 (S.D.N.Y. 2003) ....................................................................................15

*Gargano* v. *Heyman*,
203 Conn. 616 (1987) ..........................................................................................................1, 2

*Garrett* v. *Music Pub. Co. of Am., LLC*,
740 F. Supp. 2d 457 (S.D.N.Y. 2010) ......................................................................................7

*General Elec. Co.* v. *Specialty Store Lighting Inc.*,
No. CV 9574939, 1996 WL 156010 (Conn. Super. Ct. Mar. 15, 1996) ...................................4

*Int'l CableTel Inc.* v. *Le Groupe Videotron Ltee*,
978 F. Supp. 483 (S.D.N.Y. 1997) ...........................................................................................7

*JP Morgan Chase Bank, N.A.* v. *O'Neil*,
No. FSTCV096002552S, 2015 WL 5894145 (Conn. Super. Ct. Sept. 4, 2015) ......................2

*Kotch* v. *Thompson*,
No. 116973, 1994 WL 29971 (Conn. Super. Ct. Jan. 19, 1994) ...............................................2

*Larobina* v. *Wells Fargo Bank, N.A.*,
No. 3:10cv1279 (MRK), 2012 WL 1032953 (D. Conn. Mar. 27, 2012) ................................14

*Madrigal* v. *Allstate Indemnity Co.*,
No. CV 14–4242 SS, 2015 WL 12746232 (C.D. Cal. Oct. 29, 2015) ....................................12

**Page(s)**

*MF Glob. Holdings Ltd.* v. *PricewaterhouseCoopers LLP*,
   232 F. Supp. 3d 558 (S.D.N.Y. 2017) .................................................................. 5

*Olympic Dreams, LLC* v. *Clark*,
   No. 3:11CV01103(AWT), 2014 WL 4267499 (D. Conn. Aug. 28, 2014) ............ 14

*Rajaravivarma* v. *Bd. of Trustees for Connecticut State Univ. Sys.*,
   272 F.R.D. 315 (D. Conn. 2011) ......................................................................... 11

*Richards* v. *North Shore Long Island Jewish Health Sys.*,
   608 Fed. Appx. 21 (2d Cir. 2015) ....................................................................... 11

*Todi Exports* v. *Amrav Sportswear Inc.*,
   No. 95 Civ. 6701 BSJ, 1997 WL 61063 (S.D.N.Y. Feb. 13, 1997) ................... 6, 9

*Tulsa Zoo Mgmt., Inc.* v. *Guyton Albers & Viets Inc.*,
   No. 17-CV-644-GKF-FHM, 2019 WL 1029544 (N.D. Okla. Mar. 4, 2019) .......... 4

*Vezina* v. *Nautilus Pools, Inc.*,
   27 Conn. App. 810 (1992) ................................................................................... 14

*W. Alliance Ins. Co.* v. *Wells Fargo Alarm Servs., Inc.*,
   965 F. Supp. 271 (D. Conn. 1997) ...................................................................... 15

*Welco Distributors, Inc.* v. *Legere Grp., Ltd.*,
   No. CV030484760S, 2005 WL 2851484 (Conn. Super. Ct. Sept. 29, 2005) .......... 3

**STATUTES**

Conn. Gen. Stat. § 42-110g(a), (g) (2019) ............................................................... 1

Fed. R. Evid. 401 ................................................................................................ 1, 4

Fed. R. Evid. 402 ................................................................................................... 14

Fed. R. Evid. 403 ........................................................................................... 1, 4, 14

Fed. R. Evid. 404(a) .............................................................................................. 11

In accordance with the Court's Instructions for Joint Trial Memorandum, Defendant SS&C Technologies, Inc. ("SS&C") respectfully submits the following motions *in limine* to exclude evidence, testimony, or argument by Armour Capital Management LP ("ACM").[1]

## I.     <u>First Motion *In Limine*</u>:  ACM Should Be Precluded From Seeking A Punitive Damages Award

ACM should not be permitted to introduce evidence, testimony, or argument relating to punitive damages because none of ACM's remaining claims could support an award of punitive damages.  It would therefore be prejudicial to SS&C, wasteful of judicial resources, and risk misleading the trier of fact if ACM were permitted to deploy irrelevant evidence, testimony, or argument relating to a demand for punitive damages.  *See* Fed. R. Evid. 401, 403.  While ACM is not entitled to punitive damages as a matter of law on either its negligent misrepresentation or CUTPA claim as discussed below, it cannot seek or argue for punitive damages before the jury on its CUTPA claim in any event because a request for punitive damages under CUTPA does not go to the jury.  *See* Conn. Gen. Stat. § 42-110g(a), (g) (2019).

The *only* claim on which ACM could have sought punitive damages—intentional misrepresentation—was dismissed from the case more than two years ago.  It is black-letter law that punitive damages are not available unless the defendant acted with "a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  *Gargano* v. *Heyman*, 203 Conn. 616, 622 (1987) (CUTPA); *DeNuzzo* v. *Yale New Haven Hosp.*, 465 F. Supp. 2d 148, 155 (D. Conn. 2006) (Negligent misrepresentation).  Yet ACM pled intentional or reckless conduct only in connection with its claim for intentional misrepresentations.  This Court dismissed that

---

[1]     SS&C has also submitted a separate motion *in limine* to exclude testimony from ACM's expert witness, Steven Kursh.

claim.  (Order Mot. Dismiss 12, ECF No. 75.)  In doing so, it found that ACM has not "pled sufficient facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  Absent such allegations, ACM cannot sustain a request for punitive damages.

The court in *JP Morgan Chase Bank, N.A.* v. *O'Neil*, No. FSTCV096002552S, 2015 WL 5894145, at *11 (Conn. Super. Ct. Sept. 4, 2015) (citing *Carrol* v. *Allstate Insurance Co.*, 262 Conn. 433, 444 (2003)) found:  "[n]egligent misrepresentation cannot provide a basis for an award of common-law punitive damages."  But even where courts have nonetheless considered the availability of punitive damages on a negligent misrepresentation or CUTPA claim, the cases make clear that a plaintiff still must plead and prove that the defendant engaged in reckless or intentional conduct.  *See DeNuzzo*, 465 F. Supp. 2d at 155 (granting motion to strike request for punitive damages on negligent misrepresentation claim because plaintiff did not plead recklessness); *Gargano*, 203 Conn. at 622 (punitive damages on CUTPA claim require same showing).  Here, ACM's complaint does allege or even mention recklessness.  Indeed, the only allegations about supposedly intentional wrongful conduct were appropriately dismissed as insufficient.  ACM therefore has no basis on which to claim punitive damages as a matter of law.  *See Kotch* v. *Thompson*, No. 116973, 1994 WL 29971, at *1 (Conn. Super. Ct. Jan. 19, 1994) (a "plaintiff may only recover exemplary or punitive damages if he has allege[d] reckless indifference to the rights of others or an intentional and wanton violation of those rights").

ACM should thus be precluded from presenting to the jury any evidence, testimony, or argument related to punitive damages.

## II.     <u>Second Motion *In Limine*</u>:  ACM Should Be Precluded From Seeking Damages Based On ACM's "Lost Employee Time"

ACM should not be permitted to introduce evidence, testimony, or argument relating to damages resulting from "lost employee time" that ACM's employees supposedly

devoted to implementing CAMRA.  Section 6.2.2 of the Master Agreement bars ACM from seeking "consequential damages of any kind."  As this Court already held, "ACM's claim for lost employee time while trying to implement the CAMRA product is subject to the parties' agreed-upon exclusion for consequential damages."  (Order Granting and Den. in Part Def's Mot. Summ. J. ("Order Summ. J.") 18, ECF No. 194.)

The Master Agreement expressly precludes *any* consequential damages in connection with or arising out of the relationship between SS&C and ACM.  It therefore bars ACM from seeking consequential damages on its remaining claims just as it barred ACM from seeking such damages on its breach of contract claim for which the Court granted SS&C summary judgment.  Section 6.2.2 provides:

> SS&C is not liable for ***any indirect, special, incidental or consequential damages of any kind***, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for breach of this Master Agreement, ***whether alleged as a breach of contract or tortious conduct***, even if SS&C has been advised of the possibility of such damages.

(Ex. 1 (SS&C's Proposed Ex. 557) at 5 (emphasis added).)  There can be no reasonable dispute that the claims asserted by ACM "arise out of" and are asserted "in connection with" the services provided by SS&C under the Master Agreement.  Indeed, in addition to consequential damages (to which ACM is not entitled), ACM seeks to recover as damages the amounts it paid SS&C for services under that contract.  Section 6.2.2 also is clear that it applies to any claims—however denominated—including allegations of "tortious conduct."  That should end the inquiry.

Moreover, Connecticut courts have recognized that contractual limitations on consequential damages prohibit plaintiffs from recovering such damages in connection with negligent misrepresentation and CUTPA claims.  *See, e.g.*, *Welco Distributors, Inc.* v. *Legere Grp.,*

*Ltd.*, No. CV030484760S, 2005 WL 2851484, at *5 (Conn. Super. Ct. Sept. 29, 2005) (recognizing

that contractual limitation on consequential damages "would have precluded any recovery by the

defendant [a counter-claim plaintiff] of substantially all of the damages claimed in the event that

the defendant had proven" its negligent misrepresentation claim, CUTPA, and other claims);

*General Elec. Co.* v. *Specialty Store Lighting Inc.*, No. CV 9574939, 1996 WL 156010, at *3–4

(Conn. Super. Ct. Mar. 15, 1996) (granting motion to strike CUTPA counterclaim for lost profits

because of Agreement's clear and unambiguous prohibition on lost profits damages).  Other states'

courts reach the same result.[2]

Because there is no legal basis to award ACM damages for "lost employee time,"

ACM should be precluded at trial from presenting evidence concerning "lost employee time" or

asserting its entitlement to such damages.  *See* Fed. R. Evid. 401, 403.

## III.   Third Motion *In Limine*:  ACM Should Be Precluded From Characterizing SS&C As Lying Or Making Intentional Misrepresentations

ACM should be precluded from introducing any evidence, testimony, or argument

that characterizes SS&C as lying, making intentional misrepresentations, or otherwise

intentionally deceiving or misleading ACM.  This Court has already found that ACM failed to

plausibly allege that SS&C made any intentionally false statements to ACM.  (Order Mot. Dismiss

11–12, ECF No. 75.)  ACM's only remaining claims turn on negligence-based theories.  ACM

thus should not be permitted to argue or inject unfounded allegations that SS&C "lied" (or similar

expressions) to communicate to the jury that SS&C knowingly misled ACM.

---

[2]   *See, e.g.*, *Axis Oilfield Rentals, LLC* v. *Mining, Rock, Excavation and Construction*, 223 F. Supp. 3d 548, 561 (E.D. La. 2016) (enforcing contractual bar on consequential damages to preclude plaintiff from seeking consequential damages on negligent misrepresentation claim); *Tulsa Zoo Mgmt., Inc.* v. *Guyton Albers & Viets Inc.*, No. 17-CV-644-GKF-FHM, 2019 WL 1029544, at *25–26 (N.D. Okla. Mar. 4, 2019) (finding contract's consequential damages waiver provision precluded recovery for consequential damages for professional negligence).

The introduction of such argument or testimony would effectively undo the Court's decision on SS&C's motion to dismiss and allow ACM to reap the benefit of claims that were found to be insufficient as a matter of law.  Apart from the manifest prejudice to SS&C, such argument or testimony would have no probative value.  The only effect would be to confuse and, worse, incite the jury.  And the harm cannot be, and need not be, remedied by a corrective jury instruction when the Court already ruled that claims of intentional deception do not belong in the case.  Courts "often prohibit the use of certain pejorative terms when such categorizations were inflammatory and unnecessary to prove a claim and such statements do not bear on the issues being tried."  *See, e.g.*, *MF Glob. Holdings Ltd.* v. *PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) (internal quotations marks omitted).

## IV.     <u>Fourth Motion *In Limine*</u>:  ACM Should Be Precluded From Trying a Breach of Contract or Warranty Case

On September 11, 2019, the Court entered summary judgment and dismissed ACM's breach of contract claim.  (Order Summ. J. 10–18, ECF No. 194.)  The Court also previously dismissed ACM's misrepresentation claims insofar as they were based on post-contractual statements.  (Order Mot. Dismiss 12–14, ECF No. 75.)  In addition, the parties' contract, the Master Agreement, expressly prohibits ACM from bringing a variety of warranty claims.  For example, the Master Agreement provides that:

- "Except as set forth in this Master Agreement or a relevant attachment, SS&C makes no warranties, whether express, implied, or statutory, regarding or relating to the Software or Documentation."  (Ex. 1, § 6.2.1.)

- "Any written representation or warranty not expressly contained in this Master Agreement or a relevant Attachment or Work Request is not authorized or valid. No employee, agent, representative, or affiliate of SS&C has authority to bind SS&C to any oral representations or warranty concerning the Software."  (*Id.*, § 6.2.5.)

Although ACM initially alleged a claim for breach of express warranty, it later dropped that claim when it filed the operative complaint in this case. *Compare* Compl. 11, ECF No. 1 *with* First Am. Compl. ECF No. 35.

The only remaining issue to be tried is whether SS&C made statements prior to entering into the Master Agreement which SS&C knew, or should have known, were false at the time, thereby inducing ACM to enter into the Master Agreement. *Bellsite Development, LLC* v. *Town of Monroe*, 155 Conn. App. 131, 152 (2015) ("The correct standard is whether [defendant] knew, or should have known, her statements were untrue *at the time they were made*" (emphasis in original)).

Notwithstanding the dismissal of, and prohibition against, its breach of contract and breach of warranty claims, ACM intends to press at trial—and invite the jury to hold SS&C liable for—those very claims through the guise of its negligent misrepresentation and CUTPA claims. ACM's exhibit list, witness descriptions, and deposition designations reveal ACM's trial theory: in short, SS&C's alleged pre-contractual representations were false—and SS&C should have known that—because SS&C subsequently breached the contract.

ACM should not be permitted to present such a case to the jury for two reasons:

*First*, the law is clear that an alleged *breach* of contract cannot be the basis for an alleged *inducement* claim—*i.e.*, a party's alleged failure to perform its contractual obligations is not grounds for alleging that its pre-contractual promises and representations were fraudulent or misleading. *See Todi Exports* v. *Amrav Sportswear Inc.*, No. 95 Civ. 6701 BSJ, 1997 WL 61063, at *2-3 (S.D.N.Y. Feb. 13, 1997) (rejecting the argument that failure to perform a contract informed the state of mind inquiry for purposes of misrepresentation claims and noting that "a cause of action for negligent misrepresentation must be based on circumstances extraneous to

performance of the contract" (citing *Rocco* v. *Town of Smithtown*, 645 N.Y.S.2d 187, 189 (App. Div. 1996)); *see also Brown* v. *N. Cent. F.S., Inc.*, 987 F. Supp. 1150, 1157 (N.D. Iowa 1997) (recognizing that "broken promises do not generally give rise to any inference of fraudulent intent at the time the promises were made").  Otherwise, every breach of contract claim would be transformed into a fraud or misrepresentation claim, which the law forbids.  *Garrett* v. *Music Pub. Co. of Am., LLC*, 740 F. Supp. 2d 457, 464 (S.D.N.Y. 2010) (dismissing common law fraud claim where fraud claim was "in substance a claim of breach of contract"); *Int'l CableTel Inc.* v. *Le Groupe Videotron Ltee*, 978 F. Supp. 483, 486 (S.D.N.Y. 1997) (recognizing that "a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations" (internal quotation marks omitted)).

*Second*, ACM's attempt to prove its negligent misrepresentation claims by trying to show that SS&C breached the contract is particularly pernicious and prejudicial since ACM's breach of contract claim was dismissed as a matter of law and its breach of warranty claim was barred by contract.

Yet that appears to be exactly what ACM intends to do at trial.  Its pretrial submissions show that the bulk of the evidence ACM expects to present at trial does *not* relate to SS&C's knowledge before the contract was signed, but instead to SS&C's alleged failure to perform that contract after it was signed:  *e.g.*, that SS&C allegedly did not implement its CAMRA software on the timetable required by the Master Agreement; that SS&C did not perform various tasks required by the Master Agreement, such as collecting data from ACM's banks and third-party data providers; that the software did not perform according to the specifications in the Master Agreement; and that ACM was required to spend time and effort to implement the software that were not required by the Master Agreement.  ACM likewise intends to offer scores of documents

and voluminous testimony that have nothing to do with the supposed misrepresentations—let alone SS&C's state of mind when it made the challenged statements—in an effort to improperly persuade the jury that SS&C poorly performed its obligations under the Master Agreement. ACM's exhibit list amply demonstrates its impermissible approach:  ACM identified more than 125 exhibits that were created *more than a year after* the parties entered into the Master Agreement and, thus, are far removed from the time of the alleged misrepresentations.

It is clear that ACM is planning to try its dismissed breach of contract claim through the backdoor of the negligent misrepresentation claim, which would be (if permitted) confusing to the jury and highly prejudicial to SS&C.  Without the option of finding SS&C liable for breach of the Master Agreement—a cause of action ACM does not have—a jury which believes that SS&C did not comply with its contract may default to finding SS&C liable for negligent misrepresentation as it will have no other choice.  That would, in effect, undo the Court's dismissal of the breach of contract claim and create legal error that would have to be remedied after trial.

ACM's exhibit list, witness list, and deposition designations show that it plans to put on more than two-years' worth of evidence about how, in its view, SS&C allegedly did not live up to its obligations under the Master Agreement.  As a few examples:

- Ex. 2 (ACM's Proposed Ex. 194).  A November 16, 2016 email from Jason Holmes (SS&C) to Sasha DeMarino (SS&C), cc'ing Daniel Pallone (SS&C), relaying a conversation between Holmes and Mark Gruber (ACM) in which Gruber "voiced his displeasure with the Client Support Group, mainly around lapses in communication and his perceived abilities of the individuals [ACM] has been dealing with."  On November 17, Pallone forwarded the email to Timothy Reilly (SS&C) stating "Jason did not say this but [Gruber] said the [Client Support] team is not adding a lot of value."  Yet ACM's satisfaction with, or the performance of, the Client Support team has nothing to do with any alleged misrepresentation.  Nor could that topic shed any light on SS&C's state of mind or the truth or falsity of statements made nearly two years earlier.

- Ex. 3 (ACM's Proposed Ex. 281).  A December 23, 2015 email from Christopher Chagnon (SS&C) to Tony Gonzalez (SS&C) attaching an internal "resource plan"

describing SS&C's allocation of employees to ACM and other clients. But how SS&C intended to staff its client projects tells the jury nothing about whether SS&C's statements to ACM were misrepresentations. Instead, ACM seeks to use this and other documents in an effort to criticize *SS&C's performance*.

ACM's exhibit list contains dozens of similar examples. Yet this evidence—and much of what ACM apparently intends to present to the jury—is not probative of the negligent misrepresentation and CUTPA claims. Whether or not SS&C's performance under the Master Agreement lived up to ACM's expectations in the years following entry into the Master Agreement has no bearing on whether SS&C's statements to ACM were false when made. If this evidence were allowed, the case would morph from a limited inquiry into a discrete set of challenged statements into a disguised breach of contract or warranty case. *See Todi Exports*, 1997 WL 61063, at \*2–3; *Brown*, 987 F. Supp. at 1157.

ACM thus should be precluded from introducing evidence relating to SS&C's alleged failure to perform its obligations under the Master Agreement. The Court should police the line between a breach of contract claim and a misrepresentation claim by requiring that ACM first establish a tight evidentiary connection between specific aspects of SS&C's post-contractual performance it wishes to present to the jury and SS&C's knowledge at the time the alleged misrepresentations were made. Otherwise, any verdict in ACM's favor is likely to be legal error.

## V.   **Fifth Motion *In Limine*: ACM Should Be Precluded From Offering Evidence, Argument or Testimony Regarding Bimini Capital Management**

ACM should be precluded from offering evidence, argument, or testimony concerning a different SS&C mortgage REIT client, Bimini Capital Management ("Bimini"), because Bimini's relationship with SS&C has no relevance to any issue in this case, such evidence would mislead the jury, and the introduction of such evidence would require an unnecessary "mini-trial" on the wholly irrelevant circumstances around the CAMRA implementation process for a client differently situated from ACM.

ACM intends to introduce evidence about SS&C's relationship with and the CAMRA implementation process at Bimini.  ACM's deposition designations and trial exhibits make plain that ACM seeks to introduce evidence about supposed difficulties in Bimini's implementation of CAMRA in an effort to bolster its claims that SS&C's supposed misrepresentations induced ACM into entering into the Master Agreement.  ACM seeks to introduce, for example, various internal and external SS&C communications concerning CAMRA implementation at Bimini as well as the testimony of Hunter Haas, Bimini's CFO and Chief Investment Officer (and former colleague of ACM's co-CEOs).  Bimini's experience with SS&C, however, has no bearing on ACM's claims.  Bimini did not become an SS&C client—and indeed, the sale process at Bimini did not even begin—until *months after* ACM had selected CAMRA and entered into the Master Agreement with SS&C.  Accordingly, SS&C's experience with Bimini cannot be probative of SS&C's knowledge of the truth or falsity of the statements it made to ACM *months before* it engaged with Bimini.  SS&C's dealings with Bimini thus bear no relevance to the principal jury question in this case:  whether SS&C made false statements to ACM that SS&C knew or should have known were false at the time they were made.  *Bellsite*, 155 Conn. App. at 152.

The Bimini evidence that ACM seeks to introduce amounts to propensity evidence designed to invite the jury to find liability because SS&C's sales and CAMRA implementation process at Bimini supposedly faced similar challenges to those alleged at ACM.  As one example, ACM apparently intends to argue that SS&C did not tell Bimini about the commitment of resources that *Bimini* would need to dedicate to the CAMRA implementation.  (Ex. 4, Haas Deposition dated May 7, 2018 ("Haas Dep.") 43:14–44:6.)  Federal Rule of Evidence 404 precludes the introduction of evidence that, as here, would tempt the jury to infer from SS&C's interactions with Bimini that

10

it behaved similarly with respect to ACM.  *See, e.g.*, *Rajaravivarma* v. *Bd. of Trustees for Connecticut State Univ. Sys.*, 272 F.R.D. 315, 319 (D. Conn. 2011) (recognizing that evidence about party's "deficient performance" at a subsequent employer used to infer deficient performance at party's former employer is "precisely the sort of propensity evidence that Federal Rule of Evidence 404(a) prohibits").

The introduction of evidence about Bimini also would inject a wholly unnecessary "mini-trial" into the case as SS&C would be required to defend conduct that has nothing to do with its interactions with ACM.  The implementation process for enterprise software like SS&C's CAMRA turns on each client's unique circumstances, including, for example, the uses to which the client puts the software, the client's accounting elections, the number of client employees responsible for operating the software, and the background and experience of those employees. Not only do the differences between ACM and Bimini further diminish any conceivable relevance to the Bimini evidence that ACM seeks to introduce, they also would require SS&C to introduce substantial evidence about Bimini's unique circumstances to defend against ACM's claims. Among other things, SS&C would be compelled to spend trial time putting on evidence of "the particular accounting method [Bimini] used" which required a "fix" to accommodate "the difference between the way that CAMRA calculated something and the way that we calculated something" (Haas Dep. 104:22, 105:5–7), the particularities of Bimini's data structure (Haas Dep. 52:12–53:7), and the challenges Bimini faced in dealing with its contractual relationship with its data providers who were to interface with CAMRA (Haas Dep. 62:5–11).  The evidence ACM would introduce offers no probative value that could outweigh the delay and confusion imposed by such a detour.  *See Richards* v. *North Shore Long Island Jewish Health Sys.*, 608 Fed. Appx.

21, 22 (2d Cir. 2015) (affirming exclusion of "marginally relevant" testimony where "waste of time and confusion that this witness will lead to far outweighs the probative value").

## VI.  Sixth Motion *In Limine*:  ACM Should be Precluded From Asserting That Seven Statements Constitute Actionable Misrepresentations

ACM identified in discovery 22 pre-contractual statements allegedly made by SS&C that it contends were negligent misrepresentations.  While the Court declined to "slice-and-dice" the actionability of all 22 statements at the summary judgment stage, it recognized that SS&C raised "strong arguments" as to the non-actionability of some of these statements.  (Order Summ. J. 9–10, ECF 194.)  The Court also recognized that SS&C may seek jury instructions at the close of evidence seeking to limit or preclude the jury from considering particular statements as a basis for ACM's negligent misrepresentation claim.  *Id.* at 10.  SS&C will seek such instructions at the appropriate time and continues to believe that none of the statements challenged by ACM are actionable.  SS&C believes, however, that a subset of the 22 statements identified by ACM are so clearly non-actionable that permitting ACM to argue that they constitute negligent misrepresentations would significantly prejudice SS&C.  Courts have recognized that allowing the jury to hear that otherwise non-actionable statements were supposedly false prejudices a defendant. *See, e.g.*, *Madrigal* v. *Allstate Indemnity Co.*, No. CV 14–4242 SS, 2015 WL 12746232, at *10 (C.D. Cal. Oct. 29, 2015) (granting motion in limine to preclude plaintiff from using defendant's advertising statement that "does not make an objectively quantifiable claim" and "does not impose a legal duty or standard" in a way "to imply that it does").

Specifically, ACM should be precluded from arguing that the first 7 of the 22 statements identified in its Amended Interrogatory Responses were negligent misrepresentations. (Ex. 5, Pl.'s Am. Objs. & Resps. Def.'s Interrogs. Nos. 5–10, at 8–9, 24–25, Jan. 19, 2018.)  None of these alleged misrepresentations is an actionable statement of fact.  Rather, each is a perfect

example of a sales pitch—that is, puffery expressing SS&C's high opinion of its software, experience and expertise.  With these highlighted phrases—which ACM claims to be objectionable statements of fact warranting a trial—SS&C presented itself as having:

- "spent years creating the most ***comprehensive powerhouse*** of software technology in the financial services industry—technology that complements [its] ***unrivaled expertise and professionalism*** in . . . asset and wealth management accounting and operation" (*Id.*, Statement 1 (emphasis added));

- "***unique expertise***, ***world-class*** technology and more than 10 years of experience and leadership in Mortgage REIT accounting and reporting" (*Id.*, Statement 4 (emphasis added));

- "***extensive knowledge and experience*** meeting the needs of organizations that invest heavily in mortgage-backed securities and structured products" (*Id.*, Statement 5 (emphasis added));

- services that "***help mortgage REITs*** be better equipped to produce fully auditable accounting and reporting processes" and the "only integrated Mortgage REIT end-to-end solution" (*Id.*, Statement 3 (emphasis added)); and

- "***accounting and reporting expertise***" (*Id.*, Statement 6 (emphasis added)).

Whether in context or even in the abstract, claiming to be a "powerhouse" with "unique" experience and "world-class" technologies is just the type of subjective promotion that courts find *not* to be actionable statements of fact.  The other 3 statements contain typical advertising adjectives and descriptions to express SS&C's pride in its software as:

- a "***flexible*** software application that ***streamlines, automates and simplifies*** the investment process by providing ***immediate access to decision-making data***." (*Id.*, Statement 2 (emphasis added));

- a "***proven*** accounting engine" (*Id.*, Statement 6 (emphasis added)); and

- "***proven*** systems capable of supporting a broad range of complex security types, accounting methodologies and treatments specific to Mortgage REITs" (*Id.*, Statement 7 (emphasis added)).

These are each instances of non-actionable subjective belief, opinion and puffery.

Connecticut courts are clear that such promotional assertions cannot "as a matter of law . . .

constitute negligent misrepresentation." *See Barton* v. *City of Bristol*, 294 Conn. 84, 103–04 (2009). They have regularly barred claims challenging similar promotional materials, such as a bank's boast that it was "professional and stalwart" and made "conservative and wise investments." *Larobina* v. *Wells Fargo Bank, N.A.*, No. 3:10cv1279 (MRK), 2012 WL 1032953, at *4–5 (D. Conn. Mar. 27, 2012); *see also Olympic Dreams, LLC* v. *Clark*, No. 3:11CV01103(AWT), 2014 WL 4267499 (D. Conn. Aug. 28, 2014). And it is "universally accepted" and "expected" that sellers across the marketplace will make similar "puffing" statements every day without "giv[ing] rise to liability." *Vezina* v. *Nautilus Pools, Inc.*, 27 Conn. App. 810, 816 (1992).

ACM should be precluded from asserting that any of these 7 statements constitutes a negligent misrepresentation. To permit ACM to argue that these statements were false and made negligently would prejudice SS&C because the jury would suffer from the misimpression that SS&C acted wrongfully when, as a matter of law, its opinions of itself and its products do not give rise to liability. SS&C likewise will be prejudiced by the cumulative effect of permitting ACM to argue that nearly two dozen statements were wrongful. The introduction of argument about these statements also will inject unnecessary confusion, inefficiency, and delay into the trial as SS&C will be required to defend what is obviously puffery and opinion. But such a diversion at trial is wholly unnecessary. ACM accordingly should be barred under Federal Rules of Evidence 402 and 403 from arguing that these seven statements were actionable or negligent misrepresentations.

Moreover, ACM cannot prove its negligent misrepresentation claim against SS&C unless it proves that SS&C "knew or should have known" that the seven statements at issue were false. SS&C "should have known" the statements were false if it failed to exercise reasonable care as to the truth or falsity of a misstatement—an objective inquiry. *See W. Alliance Ins. Co.* v. *Wells*

*Fargo Alarm Servs., Inc.*, 965 F. Supp. 271, 275-76 (D. Conn. 1997).  But the seven statements at issue were *subjective* statements by SS&C that, by their very nature, SS&C *could not have objectively verified*.  They do not purport to be based on data or science, and thus do not lend themselves to an objective determination of truth or falsity.  Given the nature of these statements, ACM simply cannot prove that SS&C "should have known" they were false, reinforcing the point that ACM should be precluded from relying on them to prove negligent misrepresentation.

## VII.   Seventh Motion *In Limine*:  ACM Should Be Precluded From Introducing Electronic Chats Exchanged By SS&C Employees

ACM seeks to introduce into evidence more than 1,000 electronic chats exchanged between SS&C employees.[3]  The chats, however, suffer from multiple and insurmountable evidentiary problems.  To start, the chats are mostly devoid of context and are largely unintelligible.  By their nature, chats are fragments of inscrutable banter, replete with clipped phrases, half-thoughts, abbreviations, nicknames, sarcasm, invective, and ambiguous pronouns that make it near impossible to discern who is the subject.  The chats that ACM seeks to introduce are no different.  And ACM seeks to lob these chats into evidence wholesale without a witness and with no foundation whatsoever.

None of the principal "chatters" were deposed or are on the trial witness lists.  ACM thus has no evidence from which to establish a foundation for admitting this compendium of chats.  Such documents simply cannot be admitted into evidence without a proper foundation.  *See Duane*

---

[3]   ACM disclosed on its exhibit list two, 600-page documents that contain the entire collection of electronic chats produced by SS&C in this case.  (*See* ACM's Proposed Exs. 246 & 288.)  The chats collectively amount to more than 11,000 lines of text.  We understand from ACM that in fact it only seeks to introduce into evidence 50 pages out of the 600-page document on its exhibit list.  (Ex. 6 (ACM's Proposed Ex. 288) at SSC0746805-06, SSC0746810-11, SSC0746825-30, SSC0746845-49, SSC0746853, SSC0746868-70, SSC0746881, SSC0746921-34, SSC0746981-82, SSC0747007, SSC0747046-54, SSC0747083-84, SSC0747110, SSC0747147-48, SSC0747245, SSC0747277, SSC0747397-99.)

*Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 279 F. Supp. 2d 235, 239 (S.D.N.Y. 2003) (recognizing that "admissions" by a party's representative do not "even appear to constitute admissible evidence, since they lack the necessary foundation and, even taken most favorably to [defendant], suffer from excessive vagueness").

ACM's inability to lay *any* foundation for the introduction of the chats into evidence should end the inquiry. But even the most cursory review of the chats shows that the jury can only be misled by their introduction. In many cases, it is impossible to determine what the "chatter" meant, whether he or she was employing sarcasm, whether the sender was referring to ACM (or another client altogether), what, if any, personal knowledge the sender had about the subject matter, and whether and to what extent the information exchanged was based on hearsay. One exchange, for example, proceeds as follows:



(Ex. 6 at -846.)  ACM would apparently introduce this exchange without any evidence as to what the speakers were discussing (what anyone meant by ███ AEO Material ███ ███ AEO Material ███ who ███ AEO ███ might refer to, or what might ███ AEO Material ███ ), how the speakers obtained any personal knowledge about whatever the subject might be, or even what from this exchange deals with ACM as opposed to some other subject that the "chatters" might have been referencing.  One of the chats says that, ███ AEO Material ███ Without a foundation and without a witness, there is no way for the Court to determine who this person ███ AEO ███ with and whether the resulting out of court statement giving rise to this entire chat is inadmissible hearsay or falls under some exception.  And, of course, there is no way for the Court or the jury to figure what this cryptic message means.

Other exchanges reveal further problems.  In the following conversation, for example, the sender relays something a ███ AEO ███ reported to him about something that ███ AEO ███ supposedly said:



(*Id.* at -049.)  But ACM seeks to introduce this conversation—which reflects multiple levels of hearsay—without any testimony about who ███ AEO ███ is, how he might have come to know what ███ AEO ███ said, whether those conversations are inadmissible hearsay, or whether this report is even reliable.  ACM likewise intends to introduce dozens of chats sent by an SS&C employee named ███ AEO ███ *after* the time when he announced in a chat that he had been ███ AEO ███ the ACM project.  (*Id.* at -847.)  Yet ACM apparently does not plan to establish any foundation to show that

his chats reflect personal knowledge or whether his chats are admissible if he was not authorized to make the "statements."

The introduction of the chats without a witness, without any foundation, and without any means to explain to the jury what might have been meant in these otherwise vague and unintelligible conversations will mislead the jury and work substantial prejudice to SS&C. Nor do the chats offer any probative value.  None of the chats were sent by any individual who supposedly made a misrepresentation to ACM.  Moreover, the earliest chats were exchanged *months after* the alleged misrepresentations and thus hardly bear on whether SS&C knew or should have known that its challenged statements were false.

ACM should thus be precluded from introducing the chats into evidence.

**Conclusion**

The Court should grant SS&C's motions *in limine*.

Dated:   New York, New York
        November 27, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By:   /s/ Robert A. Atkins
        Robert A. Atkins
        Jeannie S. Rhee
        Jeffrey J. Recher
        Joshua D. Kaye
1285 Avenue of the Americas
New York, New York 10019
ratkins@paulweiss.com
jrhee@paulweiss.com
jrecher@paulweiss.com
jkaye@paulweiss.com
Telephone: (212) 373-3000

Kevin J. O'Connor
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
koconnor@hinckleyallen.com
Telephone:  (617) 378-4394

Jeffrey J. Mirman
Alexa T. Millinger
Hinckley, Allen & Snyder LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
jmirman@hinckleyallen.com
amillinger@hinckleyallen.com
Telephone:  (860) 331-2762

*Attorneys for Defendant*
*SS&C Technologies, Inc.*