UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARMOUR CAPITAL MANAGEMENT LP,

                Plaintiff,

v.

SS&C TECHNOLOGIES INC.,

                Defendant.

Case No. 17-cv-00790-JAM

November 27, 2019

**ACM'S MOTION *IN LIMINE* NO. 1: REGARDING EVIDENCE OF
OTHER SS&C CUSTOMERS[1]**

At trial, ACM anticipates that SS&C will seek to introduce evidence of seven other SS&C customers for which SS&C claims to have "successfully" implemented CAMRA.  Because this evidence is inadmissible under well-settled Connecticut law, ACM moves to exclude any evidence, reference, or argument concerning or relating to any allegedly "successful" CAMRA implementations.  Alternatively, evidence of other "successful" implementations should be narrowly tailored, and ACM should be granted leave to conduct additional discovery.

**I.  INTRODUCTION.**

Throughout this case, the relevance of SS&C's other customer has been heavily litigated. On multiple occasions, ACM requested discovery on SS&C's implementation of CAMRA for its other customers.  In every instance, SS&C was unyielding.  It argued that evidence of other customers was **<u>irrelevant</u>**, resulting in the Court issuing four orders precluding ACM's discovery of other SS&C customers (apart from one not at issue here, regarding Bimini).

---

[1] Unless otherwise specified, capitalized terms have the same meaning as in the First Amended Complaint (ECF No. 35) ("FAC").

Following the close of fact discovery, SS&C's two experts[2]—Michael Maffattone ("Maffattone") and Brooks Hilliard ("Hilliard")— relied on seven SS&C customers which allegedly implemented CAMRA successfully to support their opinions in favor of SS&C.  And, after serving its expert reports, SS&C produced 10 new documents on which its experts claim to rely for their opinions.  Three of these documents provide previously undisclosed information about SS&C's other customers, including a list of companies that used CAMRA before ACM (identifying only SS&C's other mortgage REITs customers) and a list of 46 "active" CAMRA clients, including not just mortgage REITs but also asset managers and insurance companies.[3]

On October 3, 2018, ACM moved to preclude SS&C's alleged experts from relying on any information or witnesses as to which ACM was prevented from taking discovery, including SS&C's other customers.  (ECF No. 156.)  ACM argued that the Court's prior orders prevented it from taking discovery on these subjects, and that ACM's inability to plan its case and take full and fair discovery would cause substantial prejudice to ACM leading up to and at trial.

These arguments were raised before the Court on October 18, 2018 (the "October 18 Hearing").  At that hearing, counsel for SS&C indicated that SS&C's experts would be limiting their testimony about other customers to six listed on a June 2, 2014 PowerPoint presentation— Apollo Residential Mortgage Trust ("Apollo"), Western Asset Mortgage Capital ("WAMCO"), Annaly/Chimera, Ladder Capital, and New York Mortgage Trust—as well as a seventh customer, Anworth.  (*See* 10/18/18 Tr. at 89:22-25;[4] ECF No. 157 at 2.)  Over ACM's objections, the Court allowed Maffattone and Hilliard to continue relying on these other customers.  (10/18/18 Tr. 90:25-

---

[2] ACM has moved to exclude the report of Maffattone on multiple bases.  (ACM's Motion In Limine No. 5).  ACM's use of the term "expert" in this motion is not intended to waive its challenges to the alleged experts' qualification and/or opinions.

[3] As explained below, these documents are inadmissible under Federal Rule of Evidence 1006.

[4] The transcript of the October 18 Hearing is attached at Ex. 1.

93:3.)  However, the Court noted that its ruling was "without prejudice to . . . further evidentiary limitations with respect to successful implementations . . . . So I will at the time of trial, in terms of what the expert will be permitted to testify to, be prepared to consider additional renewed motion[s] with respect to the scope of expert testimony at trial." *Id*. at 92:10-23.

Numerous bases exist to exclude evidence of SS&C's successful implementations.

## II.   ARGUMENT.

### a.   SS&C Should Be Precluded From Introducing Evidence Concerning Other Allegedly Successful Implementations.

#### i.   SS&C's Proposed Expert Witnesses Admit Evidence of Successful Implementations Is Irrelevant or Otherwise Inadmissible Under Fed. R. Evid. 403.

In Connecticut, "[a] party attempting to offer . . . 'evidence of the experience of others' has the burden of proving 'that the circumstances were substantially the same as those under which the plaintiff was injured, and that the use by others was substantially similar to that of the plaintiff.'" *Hall v. Burns*, 569 A.2d 10, 16 (Conn. 1990) (quoting *Wray v. Fairfield Amusement Co.*, 10 A.2d 600, 603 (Conn. 1940)).  Therefore, to present evidence of customers for which CAMRA was that successfully implemented, SS&C must show that the customers were in substantially the same circumstances as ACM.  SS&C cannot make this showing.

A review of Connecticut Supreme Court precedent is illustrative.

In *Wray v. Fairfield*, plaintiff was injured while riding on a roller coaster operated by the defendant. 10 A.2d at 602.  "The defendant introduced testimony over the objection of the plaintiff that one hundred and thirteen thousand and eighty-seven passengers had ridden on this particular railway without injury during the season of 1937." *Id*. at 603.  The Court explained that the testimony was only admissible if defendant "show[ed] that [the] conditions were substantially the same." *Id*.  But the plaintiff's claim was that "the particular seat and strap occupied by the plaintiff

#71608821_v3

were defective." *Id*. As a result, "only testimony as to the ride of passengers in the particular seat in question would be proper." *Id*.; *Morgillo v. Evergreen Cemetery Ass'n*, 205 A.2d 368, 370-71 (Conn. 1964) (defendant precluded from introducing evidence of prior instances of use of planks because "there was insufficient evidence of the prior use . . . under substantially the same conditions as existed on the day of the accident to make the testimony admissible").

In *Williams Ford Inc. v. Hartford Courant Co*., the Court weighed the admissibility of evidence concerning defendant's other customers in the negligent misrepresentation context. 657 A.2d 212, 218-19 (Conn. 1995). There, the plaintiffs sought to introduce evidence of other customers to show that defendant had made similar representations in the past and that plaintiffs' reliance on the misrepresentations was reasonable. *Id*. The Court concluded that the "conduct of nonparty dealerships was not relevant to the issues in th[e] case because the [plaintiffs] failed to provide an adequate evidentiary foundation to establish the logical connection between the conduct of the other dealerships in relation to the transactions between the plaintiff dealerships and [defendant] in th[e] case." *Id*. The Court analogized this evidence "to that which a plaintiff in an accident case offers regarding other accidents in order to prove some element of the negligence claim." *Id*. In those circumstances, "the party offering the evidence of the other accident must lay a proper foundation establishing, to the court's satisfaction, a substantial similarity of conditions between the instant and the prior accident." *Id*. If not, "the objecting party is faced with the burden of demonstrating dissimilarities, and the result is likely to be a trial within a trial on the collateral issues of similarity and dissimilarity." *Id*. As a result, evidence concerning other customers is irrelevant, unless "a proper foundation is established." *Id*. The relevancy "test" outlined by the Connecticut Supreme Court requires a showing, *inter alia*, that the nonparties "were in substantially the same circumstances as the plaintiff" (regardless of whether the proponent of the evidence is the plaintiff or the defendant). *Id.* (emphasis added).

4

Case No. 17-cv-00790-JAM

To satisfy the relevance "test," SS&C must show that its other customers "were in substantially the same circumstances as" ACM.  SS&C cannot meet this burden.

SS&C's purported experts, Hilliard and Maffattone, explained during their depositions that each implementation of CAMRA is different and individually tailored to the individual company's business needs and specifications, CAMRA may be appropriate for one type of business but not for another, and SS&C's involvement in the implementation differs significantly based on the type of the customer's deployment option or implementation.  (*E.g*., 11/13/18 Maffattone Dep. 85:10-16 ("Each, each implementation is different.  So usually you would see some sort of procedures, generic, and then it's tailored to the customer."); *id*. 87:2-5 (implementation "procedures" may be "adjust[ed] . . . based on the customer's needs in that situation"); 11/8/18 Hilliard Dep. 123:21-24 ("a vendor will tailor its solution for a particular customer's needs").)[5]

One of the most "important factor[s]" "as far as planning an implementation of CAMRA . . . [is] the availability of the client staff."  (5/3/18 Boulanger Dep. 31:7-23, 34:1-35:17, attached at Ex. 4 (SS&C's then-president and COO testifying that as a "rule of thumb," the labor required to implement CAMRA was "25 percent of the resources would be SS&C and 75 the client").)  Iwona Olszewska, who led SS&C's Professional Services during 2014, believed that "only the largest/most sophisticated folks" were able to use CAMRA on their own.  (ACM Ex. 109, attached at Ex. 11.)  And SS&C's Daniel Pallone believed that mortgage REITs were "not staffed to handle CAMRA like insurance companies."  (ACM Ex. 171, attached at Ex. 12.)  Thus, a customer's size and resulting staffing needs are a significant, if not determinative, variable in tailoring a CAMRA solution for a client.  As Manuel Antonio Gonzalez, another former head of Professional Services explained, it is important for SS&C to know "how many [of a customer's] employees" could work

---

[5] Excerpts of Hilliard's and Maffattone's depositions are attached at Exhibits 2 and 3, respectively.

5

on the CAMRA implementation and "what percentage of their time" could be spent supporting the implementation project.  (Gonzalez 4/30/18 Dep. 296:7-20, attached at Ex. 5.)[6]

In 2014, SS&C knew that ACM had only 19 employees which, as part of their full-time jobs at ACM, were required to complete month-end, quarter end, and year-end financial statements for ACM's two public companies, ARR and JMI.  (5/10/2018 SS&C 30(b)(6) Tr. at 64:1-20; 69:6-76:18, attached at Ex. 6.)  Thus, SS&C knew that ACM employees would be required to spend significant time attending to their day-to-day responsibilities, in addition to any support for SS&C's implementation of CAMRA.  At the time, SS&C never had implemented CAMRA for a mortgage REIT of ACM's size—the mortgage REITs using CAMRA in 2014 had far more staff than ACM and therefore far greater capacity to assist in the implementation process.  For example, Annaly, SS&C's flagship client and the largest publicly traded US mortgage REIT, had approximately 150 employees, a dedicated "business technology team" with over 10 employees, and "more than 10" accountants on staff.  (11/13/18 Maffattone Dep. 101:22-102:7, 105-21-107:17; DX-827, attached at Ex. 13; J. Mountain 11/29/17 Tr. 146:21-25, attached at Ex. 7.)

Another important variable is the CAMRA deployment option recommended by SS&C. As the Court will recall, SS&C offered three different "deployment options" for CAMRA: "in-house license," in which the customer would host the CAMRA software and have "basically full control of everything"; "hosting," in which "SS&C hosts the hardware and software in its Tier 3 data center" and also "provide[s] certain services"; and "full service outsourcing," in which "SS&C provides comprehensive investment accounting and reporting services on an outsourced basis" and "handle[s] the connections, the backup, the disaster recovery, [and] the security," among other things.  (ACM Ex. 9; 11/13/18 Maffattone Dep. 246:4-12; 11/8/18 Hilliard Tr.

---

[6] Nevertheless, SS&C did not take into account ACM's size during its qualification process or when planning the implementation.  5/2/2018 I. Olszewska Tr. at 355:7-358:10, attached at Ex. 8.

170:19-172:14.)  Unlike the full licensed method, in which the client is essentially on its own to implement and use the software, and the outsourced method, in which SS&C is responsible for inputting data into the system, hosting is a hybrid model that requires input from both the client and SS&C.  This distinction is critical because, as Hilliard explained during his deposition, "deployment is . . . a description of how an implementation is going to take place" and dictates "the approach for the implementation."  (11/8/18 Hilliard Dep. 13:23-14:22.)

During the sales process, SS&C told ACM that hosting was appropriate for it, prompting ACM to proceed with that deployment option.  This is significant because none of the seven REITs identified by SS&C at the October 18 Hearing were implemented on a hosting basis (nor had SS&C ever implemented CAMRA for a mortgage REIT the same or similar size as ACM):

- "Apollo was an outsourcing client."  (11/13/18 Maffattone Dep. 192:1-3.)

- "WAMCO also was an outsourced client."  (*Id*. at 193:21-23.)

- "Ladder Capital . . . was outsourced."  (*Id*. at 246:22-24.)

- "Anworth was an outsourced client."  (*Id*. at 268:16-18.)

- "Annaly . . . w[as] the licensed client."  (*Id*. at 317:5-14.)

- "New York Mortgage Trust . . . didn't use CAMRA as hosted."  (*Id*. at 244:21-23.)

- Chimera was a "license[d]" client.  (DX-827.)

Given the distinct nature of these three deployment options, prior successes implementing CAMRA on an outsourced or full licensed basis are irrelevant for purposes of ascertaining SS&C's ability to successfully implement CAMRA on a hosting basis and, in turn, whether SS&C exercised reasonable care in making false, untrue, and/or misleading pre-contractual statements to ACM.  In sum, SS&C cannot show that any of the mortgage REITs that SS&C implemented prior to contracting with ACM were in "substantially the same circumstances" as ACM.

The only customer that was in "substantially the same circumstances" as ACM was Bimini, whose failed implementation of CAMRA suggests that SS&C knew or should have known that its pre-contractual misrepresentations to similarly situated ACM were false.  *Glazer v. Dress Barn Inc.*, 873 A.2d 929, 955-56 (Conn. 2005) ("Subsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made.").

In September 2015, SS&C sold CAMRA on a hosted basis to Bimini, a mortgage REIT relatively similar to ACM.  Like ACM, Bimini told SS&C its requirements and provided SS&C relevant information.  (Haas 5/7/18 Dep. at 28:16-30:11, attached at Ex. 9.)  SS&C recommended that Bimini proceed with hosting, but failed to advise it that SS&C had never implemented a mortgage REIT on a hosted basis or that it had never implemented a REIT as small as Bimini.  (*Id*. at 32:20-33:14.)  After a year and a half of SS&C's failed effort to implement CAMRA on a hosted basis, Bimini decided to "pull the plug."  (*Id.* at 12:2-13:18.)  Hunter Haas, Bimini's President, CFO, and CIO, described the implementation process as a "dumpster fire" and "total nightmare." (*Id*. at 85:2-91:2.)  As ACM argues in its Motion *in Limine* No. 5, SS&C's inability to implement CAMRA on hosting for Bimini is probative of SS&C's exercise of reasonable care in making pre-contractual misrepresentations to ACM.  Indeed, evidence relating to Bimini is the only evidence pertaining to other CAMRA customers that should be admitted at trial.

Nevertheless, if the Court finds that evidence pertaining to SS&C's allegedly successful implementations for the six other identified customers is relevant, then this evidence should be excluded under Federal Rule of Evidence 403, as its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury.  As shown, the probative value of SS&C's successful implementations of other mortgage REITs is, at best, *de minimis*.  Among others, there is significant risk that the jury would mistakenly believe that because SS&C successfully implemented CAMRA for other mortgage REITs on a **licensed** or

**outsourced** basis, SS&C did not act negligently in making false, untrue, and/or misleading statements to ACM about CAMRA on a **hosted** basis.  Additionally, ACM would be burdened with proving the dissimilarities between ACM and the other customers, prompting "a trial within a trial on the collateral issues of similarity and dissimilarity," which is precisely what the Connecticut Supreme Court has held should be avoided.  *Williams*, 657 A.2d 212, 218-19.

As a result, evidence, references, or arguments concerning or relating to any of SS&C's allegedly "successful" CAMRA implementations, as indicated above, should be excluded.

ii.  All Documents Produced by SS&C and Relied Upon By SS&C's Experts
Concerning SS&C's Good Customers Are Inadmissible Summaries.

After serving its expert reports, SS&C produced 10 new documents on which its purported experts claim to rely.  Three of these documents provide previously undisclosed information about SS&C's other customers:

- DX-826: Excel spreadsheet listing the number of companies using CAMRA as of Q3 2014, including whether the clients are licensed, outsourced, or hosted, and the estimated assets under management.  **No client names are provided**.[7]

- DX-827: Excel spreadsheet listing the number of companies using CAMRA as of Q3 2014, including whether the clients are licensed, outsourced, or hosted, and the estimated assets under management.  The names of six mortgage REITs are provided—Chimera, Annaly, New York Mortgage Trust, Apollo, WAMCO, and Ladder Capital—**none of which was implemented on a hosting basis**.

- DX-828: Excel spreadsheet listing 46 of SS&C's active clients by **licensed** products, including asset managers and insurance companies.

---

[7] DX-826 and DX-828 are attached at Exhibits 14 and 15, respectively.

These three documents are summaries and charts under Rule 1006. SS&C has previously admitted that these spreadsheets were prepared by SS&C for the sole purpose of aiding its expert witnesses. (10/18/18 Tr. 88:17-89:15 ("We create[d] [] these spreadsheets, we gave them to our experts, and we're disclosing that.").) As a result, under Rule 1006, SS&C was required to provide ACM the underlying source documents for examination or copying. But expert and fact discovery have been closed since 2018, and more than 14 months have passed since these summaries and charts were first produced. Thus, SS&C is precluded from relying on the exhibits at trial.

Rule 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. "Summary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party." *Tamarin v. Adam Caterers Inc*., 13 F.3d 51, 53 (2d Cir. 1993). "The material must be made available in sufficient time to permit examination, preparation of a response to the summary, and avoidance of surprise and costly delays at trial." *U.S. ex rel. Maris Equip. Co. v. Morganti Inc*., 163 F. Supp. 2d 174, 201 (E.D.N.Y. 2001), *aff'd sub nom. Morganti Inc. v. Liberty Bond Serv. Inc*., 67 F. App'x 68 (2d Cir. 2003). Courts have interpreted this rule as requiring a party intending to use a summary to give "unequivocal notice" of its intent to invoke Rule 1006. *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996); *see also U.S. v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002) (finding "duty to state when and where the documents underlying its summaries could be viewed, without regard to whether [the other party] made a request for these records"). Courts have further applied the rule to exclude summary evidence where the source documents were not first provided to the other parties. *See Air Safety*, 94 F.3d at 7 (affirming exclusion of summary exhibits).

Here, SS&C has given no "unequivocal notice" of its intent to invoke Rule 1006 and has

not provided the underlying source documents to ACM or indicated where and when these records

could be viewed.  This issue was first brought to SS&C and the Court's attention more than a year

ago, when ACM emphasized during the October 18 Hearing that "SS&C [wa]s relying on

summaries, the underlying source materials of which we don't have and the truth of which we

can't possibly hope to test."  (10/18/18 Tr. 95:17-96:1.)  SS&C never offered to produce the

underlying documents and has not produced them to this day.  Of course, discovery has closed and

the parties have already submitted their exhibit and witness lists, making it too late for SS&C to

produce these records now.  As a result, under Rule 1006, SS&C is precluded from relying on this

evidence for any purpose (in addition to the fact that such underlying documents are inadmissible

for the reasons stated in this and ACM's other motions *in limine*).[8]

### b. If SS&C Is Allowed to Introduce Evidence Concerning Other Customers, the Testimony Should Be Narrowly Tailored.

Previously, based on objections by SS&C, the Court limited ACM's ability to conduct

discovery of SS&C's current and past customers, regardless of whether such customers had a

positive or negative experience with SS&C or CAMRA.  SS&C fully embraced these orders,

including by routinely objecting at depositions even to the extremely limited deposition

questioning the Court allowed.  (*See, e.g.,* 5/3/18 N. Boulanger Tr. at 79:21-82:19 (SS&C: "this

[discovery about Annaly] has been deemed irrelevant by the court"); 5/10/18 T. Reilly Tr. at 136:

23-25 (SS&C objecting to "[o]utsourced clients that are not relevant to this case."); 4/30/18 T.

---

[8] Moreover, DX-826, DX-827, and DX-828 are not admissible under the business records exception, Fed. R. Evid. 803(6), as SS&C has not attested that these documents are business records made at or near the time by someone with knowledge, kept in the course of a regularly conducted activity of SS&C, or that making the records was a regular practice of SS&C.  Rather, these documents were admittedly prepared by SS&C and its counsel during expert discovery. 10/18/18 Tr. 88:17-89:15.

Gonzalez Tr. at 211:7-9 (SS&C: "This is a client the judge has deemed to be not relevant to this case.").)  To the extent the Court permits SS&C to introduce evidence concerning other customers, such evidence and testimony should be narrowed in scope to prevent unfair prejudice to ACM.

On September 29, 2017, the parties came before the Court on the issue of SS&C's other customers.  ACM was seeking discovery on three CAMRA customers, Bimini, Resource, and Fortress, after learning that their implementations were incomplete and behind schedule.  SS&C objected to this discovery on relevance and burden grounds.  The Court ordered SS&C to produce "a list of SS&C's REIT clients that used CAMRA, licensed, hosted, or outsourced from May 1, 2014, to May 1, 2017."  (9/29/17 Tr. 28:18-23, attached at Ex. 10.)  Additionally, "as to those mortgage REIT customers," SS&C was ordered to produce "non-technical documents concerning any uncompleted implementation during that time period in which the uncompleted implementation was by reason of a claim by the customer that CAMRA was not functioning or implementing as anticipated by the customer."  *Id*. at 29:1-15.  The Court's ruling was "meant to exclude the circumstances in which there might have been an uncompleted implementation for reasons idiosyncratic to the customer itself as opposed to a reason that's attributable potentially to SS&C."  *Id*.  SS&C produced discovery about only one customer, Bimini.

A similar limitation should be applied to SS&C's successful implementations, to the extent the Court considers allowing testimony about the other SS&C customers whose implementations purportedly succeeded.  That is, to meet its burden of showing that this evidence might be admissible for purposes of arguing that SS&C exercised reasonable care in making pre-contractual misrepresentations to ACM, SS&C should be required to show that the implementations were completed for reasons attributable (or "idiosyncratic") *to SS&C* as opposed to a reason that is attributable potentially to the customer.  In other words, SS&C should be limited to presenting evidence of situations where SS&C clearly was the reason the implementation succeeded.

12

#71608821_v3

Additionally, if SS&C is allowed to present evidence of other customers, ACM should be permitted to introduce reciprocal evidence regarding the "four problem REITs" previously identified by SS&C, but for which discovery was not permitted, including SS&C customers Fortress and Resource.[9]  This evidence would, at a minimum, allow ACM to alleviate some of the prejudice being thrust upon it by SS&C's eleventh-hour decision to rely on unrelated successful CAMRA implementations for which ACM was not allowed to take discovery.

### c.  If SS&C Is Allowed to Introduce Evidence of Other Successful Customers, Then ACM Should Be Allowed to Conduct Discovery.

During the October 18 Hearing, ACM explained that it would sustain "severe and supreme prejudice" by SS&C's reliance on other customers that ACM never had an opportunity to test during discovery.  (10/18/18 Tr. 93:9-94:14.)  ACM requested that it "be permitted to serve document requests geared towards the implementations that SS&C is now putting . . . in their experts, so [ACM would] at least have an opportunity to try to cross-examine the experts when [it] depose[d] them."  *Id.* at 95:3-8.  SS&C objected, and the Court denied the request. (*Id.* 95:9-16.) To the extent SS&C is allowed to introduce evidence regarding other customers, ACM renews its request to take targeted discovery on the issues SS&C is permitted to introduce at trial.

Permitting SS&C to introduce such evidence without first allowing ACM to conduct discovery would cause severe prejudice and prevent ACM from being able to properly challenge any of the assertions made by SS&C regarding these customers during the trial.  At present, ACM has virtually no evidence with which to cross-examine SS&C's witnesses relating to the alleged successful implementations of the seven mortgage REITs.

---

[9] Similarly, because ACM was not permitted to conduct discovery into all of the "four problem REITs," ACM should be permitted limited discovery into these customers, and/or testimony about the customers should remain limited to the facts available to ACM, just as SS&C's evidence and testimony concerning the additional customers addressed herein should be limited in scope.

## III.   CONCLUSION.

For these reasons, ACM respectfully requests that the Court exclude any evidence, reference, or argument concerning or relating to any of SS&C's allegedly successful CAMRA implementations, as discussed above, and award any other relief the Court deems just and proper.

Dated: November 27, 2019

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

By: */s Joseph Mamounas*
Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
Manuel Miranda
*(pro hac vice application forthcoming)*
manuel.miranda@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

Daniel Mateo (phv10323)
daniel.mateo@hklaw.com
2929 Arch Street
Suite 800
Philadelphia, PA  19104
Telephone: (215) 252-9543
Facsimile: (215) 867-6070

*Attorneys for Plaintiff ARMOUR
Capital Management LP*

Case No. 17-cv-00790-JAM

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be send by email to all parties by operation of the Court's electronic filing system or by mail to any counsel or self-represented party unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: */s Allison Kernisky*
    Allison Kernisky (phv09011)

15

#71608821_v3