**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

ARMOUR CAPITAL MANAGEMENT LP,

Plaintiff,

v.

SS&C TECHNOLOGIES INC.

Defendant.

Case No. 17-cv-00790-JAM

December 10, 2019

**ACM'S RESPONSE TO DEFENDANT'S**
**MOTION *IN LIMINE* TO EXCLUDE STEVEN KURSH**

**HOLLAND & KNIGHT LLP**

Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
Manuel Miranda *(admitted pro hac vice)*
manuel.miranda@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

Daniel Mateo (phv10323)
daniel.mateo@hklaw.com
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Telephone: (215) 252-9543
Facsimile: (215) 867-6070

*Attorneys for ARMOUR Capital Management LP*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................ 1

II. ARGUMENT ........................................................ 2

a. Dr. Kursh's Testimony Is Relevant, Reliable, and Will Help the Jury ........................ 3

b. Dr. Kursh Uses an Appropriate Methodology to Define the Standard of Care. ............. 8

c. Dr. Kursh's Testimony on Lost Employee Time Is Relevant and Admissible ............. 12

III. CONCLUSION ........................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d. Cir. 1995)....................2, 3, 11

*Assoc. Constr. / AP Constr., LLC v. Hanover Ins. Co.*,
No. 15-cv-1600, 2018 WL 3998971 (D. Conn. Aug. 21, 2018)....................4

*Charter Practices Int'l, LLC v. Robb*,
No. 12-cv-1768, 2015 WL 13000251 (D. Conn. Mar. 31, 2015)....................12

*Conn. v. McClary*,
541 A.2d 96, 102 (Conn. 1988)....................5

*County of Orange v. Tata Consultancy Svcs. Ltd.*,
No. 13-cv-00683, 2016 WL 3763152 (C.D. Cal. July 25, 2016)....................10

*Dominion Res. SVC Inc. v. Alstom Power Inc.*,
No. 16-CV-544, 2018 WL 3752878 (D. Conn. Aug. 8, 2018)....................7

*Dunham v. Dunham*,
528 A.2d 1123 (Conn. 1987)....................5

*Ellis v. YMCA Camp Mohawk, Inc.*,
No. 12-cv-515, 2014 WL 3906325 (D. Conn. Aug. 11, 2014)....................5

*Glazer v. Dress Barn, Inc.*,
873 A.2d 929 (Conn. 2005)....................4

*Groobert v. President & Dirs. of Georgetown College*,
219 F. Supp. 2d 1 (D.D.C. 2002)....................2

*Heisinger v. Cleary*,
No. X04-HHD-CV-126049497-S, 2015 WL 1589152 (Conn. Super. Ct. Mar. 16, 2015)....................6

*Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. NV*,
14 F. Supp. 2d 391 (S.D.N.Y. 1998)....................7

*Klorczyk v. Sears, Roebuck & Co.*,
No. 13-cv-00257, 2019 WL 1433645 (D. Conn. Mar. 29, 2019)....................3

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................3

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*LePage v. Horne*,
809 A.2d 505 (Conn. 2002) ....................5

*Malik v. Carrier Corp.*,
202 F.3d 97 (2d Cir. 2000)....................5

*Marx & Co. v. Diners' Club Inc.*,
550 F.2d 505 (2d Cir. 1977)....................5

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995)....................11

*Munn v. Hotchkiss School*,
24 F. Supp. 3d 155 (D. Conn. 2014)....................3, 5

*Nimely v. City of N.Y.*,
414 F.3d 381 (2d Cir. 2005)....................2

*Parker v. Shaker Real Estate, Inc.*,
705 A.2d 210 (Conn. App. Ct. 1988)....................5

*Pellet v. Keller Williams Realty Corp.*,
172 A.2d 283 (Conn. App. Ct. 2017)....................6

*Pitterman v. General Motors LLC*,
No. 14-cv-00967, 2018 WL 7118006 (D. Conn. Apr. 18, 2018)....................6

*Santopietro v. New Haven*, 682 A.2d 106 (Conn. 1996))…………………………..…………..5

*SLSJ, LLC v. Kleban*,
277 F. Supp. 3d 258 (D. Conn. 2017)....................7

*TMI Trust Co. v. WMC Mtg. LLC*,
No. 12-cv-1538, 2017 WL 6617050 (D. Conn. Dec. 28, 2017) ....................3

*W. Dermatology Consultants v. VitalWorks Inc.*,
No. CV 06-5001239S, slip op. (Conn. Super. Ct. Sept. 1, 2009) ....................8

*Winsted Land Dev. v. Design Collaborative Architects, P.C.*,
No. CV 960071571, 1999 WL 639942 (Conn. Super. Ct. Aug. 12, 1999)....................6

*In re Xerox Sec. Litig.*,
746 F. Supp. 3d 402 (D. Conn. 2010)....................7

*In re Xerox Sec. Litig.*,
821 F. Supp. 2d 504 (D. Conn. 2010)....................7

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**Other Authorities**

Fed. R. Evid. 702 ........ *passim*

Fed. R. Evid. 704 ........ *passim*

ACM opposes SS&C's Motion *in Limine* to exclude ACM's expert witness, Dr. Steven R. Kursh, Ph.D., CSDP, CLP ("Mot.").  (ECF No. 213.)

## I.    INTRODUCTION

Dr. Steven Kursh is an established expert in computer software and e-commerce, specifically in software implementations.  He was an Executive Professor at Northeastern University for more than 23 years where he developed and taught courses in the College of Engineering and the D'Amore-McKim School of Business.  He was the founder of a successful software company that was acquired by McGraw-Hill and he was actively involved in selling licenses for enterprise software to financial institutions, insurance companies, and attorneys.  Dr. Kursh has more than 30 years of experience in the software field, has personally worked on more than 200 software implementations, has numerous publications related to software, and has been accepted as an expert regarding customs and practices in the software industry by numerous arbitration panels, federal and state courts, including in Connecticut.  He is certified by the IEEE Computer Society, one of the world's leading computer societies, as a software development professional (CSDP).

SS&C does not dispute any of this.

Dr. Kursh has opined here regarding the standard of care applicable to software-solution providers who offer software customization and implementation services, as well as the respects in which SS&C materially deviated from that standard in its offer of such services to ACM.  SS&C does not dispute that specialized testimony on these issues is relevant and appropriate; indeed, SS&C has proffered competing expert testimony on the same issues (albeit in ways that are subject to exclusion on other grounds, as set forth in ACM's Motion *In Limine* No. 5 (ECF No. 220)).

SS&C nevertheless seeks to exclude Dr. Kursh's testimony entirely because: (a) his opinions regarding the applicable standard of care in the software implementation field, the manner in which SS&C deviated from that standard of care, and the lack of reasonableness of SS&C's misstatements to ACM regarding what it could do purportedly usurp the role of the jury; (b) SS&C criticizes Dr. Kursh's references in support of his opinions based on his industry knowledge and experience, including to a widely-recognized computer industry publication that corroborates his explanation of the standard of care; and (c) SS&C dismisses as a mere arithmetic exercise Dr. Kursh's analysis of the reasonableness of the time ACM employees spent on the implementation.

None of SS&C's challenges to Dr. Kursh's testimony raises the kind of concern regarding the relevance or reliability of his testimony that is properly the subject of a motion to exclude. At best, SS&C has described issues that go to the weight to be given to Dr. Kursh's testimony, not its admissibility. SS&C is free to cross-examine Dr. Kursh on those matters at trial. But because SS&C has not articulated any serious challenge to Dr. Kursh's expertise, the relevance of his testimony to the issues before the jury, or the reliability of the methodology he employed in formulating his opinions, its motion to exclude his testimony should be denied.[1]

## II. ARGUMENT

To be admissible under Federal Rule of Evidence 702, expert testimony must be relevant, reliable and "assist the trier of fact." *E.g.*, *Nimely v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005). The standard is a liberal one that depends on the particular facts of the case. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d. Cir. 1995) ("Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid

[1] If the Court excludes Dr. Kursh's testimony from trial, so too should SS&C's proferred experts be excluded. Brooks Hilliard and Michael Maffattone opine solely in rebuttal to Dr. Kursh. (Hilliard Report at 49, attached at Comp. Ex. 1 ("Taken together, these opinions rebut the Kursh Report …."); Maffattone Report at 2, attached at Comp. Ex. 2 ("responding to issues identified in the Kursh report….”). In that event, the jury will be left with no expert help.

and will necessarily vary from case to case."); *see also Groobert v. President & Dirs. of Georgetown College*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) ("[T]he standard under Federal Rule of Evidence 702 is a liberal and 'flexible' one, and . . . personal experience can be a reliable and valid basis for expert testimony. This is particularly true with non-scientific testimony . . . .").

In deciding whether to admit expert testimony, the Court is afforded broad discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). As such, the rejection of expert testimony "is the exception rather than the rule." *See* Fed. R. Evid. 702 advisory committee's note. Issues that go to the weight of an expert's testimony rather than its relevance or reliability are "appropriate grounds for cross-examination, not exclusion." *Munn v. Hotchkiss School*, 24 F. Supp. 3d 155, 200 (D. Conn. 2014); *Amorgianos,* 303 F.3d at 266; *Klorczyk v. Sears, Roebuck & Co.,* No. 13-cv-00257, 2019 WL 1433645, at *9 (D. Conn. Mar. 29, 2019) (Meyer, J.) ("Defendants may object to steps that Heath took or failed to take in his analysis, but those objections go to the weight—rather than the admissibility—of Heath's testimony, and defendants are free to raise these points for impeachment at trial."); *TMI Trust Co. v. WMC Mtg. LLC*, No. 12-cv-1538, 2017 WL 6617050, at *4 (D. Conn. Dec. 28, 2017) (cross-examination preferable to exclusion).

**a. Dr. Kursh's Testimony Is Relevant, Reliable, and Will Help the Jury.**

SS&C argues that Dr. Kursh's testimony should be struck because he purportedly opines on "ultimate questions of liability" and offers "legal conclusions." (Mot. at 2.) Dr. Kursh does neither. SS&C's challenge is merely an invocation of the outdated "ultimate issue" rule that Federal Rule of Evidence 704(a) expressly abolished. *See* Fed. R. Evid. 704(a) ("an opinion is not objectionable just because it embraces an ultimate issue") & advisory committee's note (stating that "the so-called 'ultimate issue' rule is specifically abolished by the instant rule").

The jury in this case will be asked to decide whether SS&C exercised reasonable care in

making representations to ACM regarding, *e.g.*, the functionality of its CAMRA software solution, the results that software was capable of generating for ACM, and SS&C's ability to implement that solution within a particular period of time in a specific type of hardware/software environment. *See Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 954 (Conn. 2005); *Associated Constr. / AP Constr., LLC v. Hanover Ins. Co.*, No. 15-cv-1600, 2018 WL 3998971, at *9 (D. Conn. Aug. 21, 2018). To make that determination, the jury will need to understand what a reasonable software vendor in SS&C's position would have done as a matter of accepted industry practice to appreciate ACM's requirements and determine whether and how it could fulfill them, before making representations to ACM regarding the products and services it could offer. The jury will also need to assess whether and to what extent SS&C deviated from that standard of care when it told ACM what it could deliver and whether SS&C knew or should have known that it could not deliver what it was promising when it made its representations to ACM.

To that end, Dr. Kursh has opined on the standard of care applicable to a software provider who offers software customization and implementation services. (*See, e.g.*, Kursh Report at 15, attached at Comp. Ex. 3 ("A basic industry practice is to understand a prospective client's needs and the project's overall work scope requirements including budget, time, and whether and how the existing software package will be configured and implemented."), 19 ("A critical part of the sales process with enterprise software is determining the needs of the prospective licensee and determining just how much work and related investment would be needed to implement the software successfully at the licensee."), 31 ("One of the critical factors in planning a software implementation is for the software vendor to determine the resources and skill levels it will need to perform the project work.").)

Dr. Kursh further has opined on the extent to which SS&C deviated from that standard of care. (*See, e.g.*, *id.* at 19 ("I believe SS&C's qualification process was deficient in several respects.

First, SS&C did not perform industry-standard due diligence in understanding ACM's business needs and translating them into meaningful requirements . . . . . Second, SS&C did not adequately understand ACM's organization and personnel."), 22 ("I believe there were functionality issues inherent to CAMRA that were inconsistent with the representations SS&C made to ACM during the sales process, particularly concerning CAMRA's accuracy and ease of use."), 29 ("In my opinion, SS&C did not follow the standard of care in respect of the pre-contractual representations it made to ACM about connectivity to third-party data sources and, as a result, ACM's implementation was significantly delayed.").) And, based on his review of documents and testimony, he has opined as to whether a reasonable software provider in SS&C's position, in exercise of reasonable care, would or should have known that the representations SS&C made to ACM were false. (*See id.* at 15 ("I conclude that SS&C did not act reasonably when making a number of pre-contractual representations to ACM, such that SS&C knew or at a minimum should and easily could have known that the representations were false.").)

It is well-established in the Second Circuit that testimony about the customary practices of a trade or business is admissible "to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977). Indeed, opining on the standard of care, to assist a jury unfamiliar with such matters, is one of the primary purposes of expert testimony. *Munn*, 24 F. Supp. 3d at 172 (employing expert testimony "to establish the parameters of what a reasonable school in [defendant's] position 'knew or should have known' regarding the standard of care").[2]

---

[2] In fact, the Connecticut Supreme Court has held that plaintiffs asserting negligent misrepresentation claims are *required* to present expert testimony "to inform the jury either about the applicable standard of professional skill or care or about the conformity of the defendant's conduct to that standard of professional behavior." *Parker v. Shaker Real Estate, Inc.*, 705 A.2d 210, 214 (Conn. App. Ct. 1988) (citing *Dunham v. Dunham*, 528 A.2d 1123 (Conn. 1987)), *abrogated on other grounds by Santopietro v. New Haven*, 682 A.2d 106, 115 (Conn. 1996)). In a federal diversity action such as here, the question of whether expert testimony is required is a

Notably, SS&C does not dispute that expert testimony regarding applicable industry standards, and SS&C's compliance with or deviation from those standards, is relevant and appropriate in this case. Indeed, SS&C has proffered testimony from two experts on those very issues to rebut Dr. Kursh (albeit in ways that are improper and subject to exclusion for different reasons). (*See, e.g.*, Hilliard Report at 3, 5-6, 28-29, attached at Comp. Ex. 1; Maffattone Report at 2, 5, 8-9, attached at Comp. Ex. 2.)

Instead, SS&C complains that in expressing his opinions, Dr. Kursh accepted as true certain facts which he understands to be supported by the evidence, and in view of those presumed facts has opined on the "reasonableness" of SS&C's conduct. These, however, are routine aspects of an expert opining on issues relating to a defendant's negligence. *See, e.g.*, *Pellet v. Keller Williams Realty Corp*., 172 A.2d 283, 300 (Conn. App. Ct. 2017) (crediting expert witness who testified "as to whether or not the defendants met the applicable standard of care of reasonable real estate professionals with respect to this particular transaction"); *Winsted Land Dev. v. Design Collaborative Architects, P.C*., No. CV 960071571, 1999 WL 639942, at *10 (Conn. Super. Ct. Aug. 12, 1999) (expert testimony on "prevailing standard of care among site planning professionals" and what "reasonable and prudent [professionals] would be aware of").

---

matter of state law. *See Ellis v. YMCA Camp Mohawk, Inc.*, No. 12-cv-515, 2014 WL 3906325, at *3 (D. Conn. Aug. 11, 2014). "The Connecticut Supreme Court has stated on multiple occasions that '[e]xpert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors.'" *Id.* (citing *LePage v. Horne*, 809 A.2d 505, 511-12 (Conn. 2002)); *Conn. v. McClary*, 541 A.2d 96, 102 (Conn. 1988) (expert testimony required when a matter is "manifestly beyond the ken of the average trier of fact, be it judge or jury"); *see also Malik v. Carrier Corp.*, 202 F.3d 97, 104 (2d Cir. 2000) (citing *Santopietro*, 682 A.2d at 115)) ("If the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required."); *Pitterman v. General Motors LLC*, No. 14-cv-00967, 2018 WL 7118006, at *12 (D. Conn. Apr. 18, 2018), *vacated on other grounds* (citing *Heisinger v. Cleary*, No. X04-HHD-CV-126049497-S, 2015 WL 1589152, at *9 (Conn. Super. Ct. Mar. 16, 2015)) ("Determination of the appropriate standard of care and the deviation, if any, of the defendants from that standard of care, requires expert testimony.").

Neither Dr. Kursh's summary of the information he understands was available to SS&C when it represented its capabilities to ACM, nor his opinion that SS&C's representations to ACM were unreasonable given what SS&C appeared to know in light of the standard of care that Dr. Kursh has defined, constitutes the kind of "judgmental verdict-by-expert's opinion" (*cf.* Mot. at 5) that courts may properly keep from a jury. *See, e.g.,* Fed. R. Evid. 704 advisory committee's notes (distinguishing, by way of example, improper question of "Did T have capacity to make a will?" from a proper question of "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?"). The mere fact that Dr. Kursh addresses the reasonableness of SS&C's conduct in the context of the appropriate standard of care is not objectionable. *See* Fed. R. Evid. 704(a) ("an opinion is not objectionable just because it embraces an ultimate issue").

The cases that SS&C cites to support its "ultimate issue" objection do not bear on the propriety of Dr. Kursh's testimony. In *In re Xerox Corp. Securities Litigation*, for example, the court held only that to the extent a proffered expert's testimony could be construed as purporting to opine on a defendant's *scienter* in a securities fraud case, the expert would be precluded from offering such testimony. 746 F. Supp. 2d. 402, 415 (D. Conn. 2010).[3] In other cases cited by SS&C, expert testimony was struck where it actually purported to answer ultimate legal questions to find liability (*e.g.*, whether a defendant breached his fiduciary or contractual duties) or purported to assess a party's subjective good faith or state of mind. *See SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 290 (D. Conn. 2017) (excluding expert testimony that defendant breached his fiduciary duty); *Dominion Res. SVC Inc. v. Alstom Power Inc.*, No. 16-CV-544, 2018 WL 3752878, at *11 (D. Conn. Aug. 8, 2018) (excluding expert testimony that defendant breached parties' contract);

[3] Notably, in a separate opinion issued the same day, the *Xerox* court denied a motion to exclude expert testimony that raised various challenges to the weight of the proffered testimony, rather than the admissibility. *See In re Xerox Sec. Litig.*, 821 F. Supp. 2d 504, 510 (D. Conn. 2010).

*Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. NV*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) (excluding expert testimony regarding a party's subjective state of mind).

Dr. Kursh has offered no opinions regarding SS&C's subjective intent, motive or state of mind, nor has he expressed any opinion regarding the legal conclusion of whether SS&C is liable for negligent misrepresentation. Rather, he confines his testimony to analyzing SS&C's conduct as measured against generally accepted industry standards of care, based on his review of relevant documents and testimony—all well-established grounds for expert testimony.

Not surprisingly, other Connecticut courts have accepted Dr. Kursh's expert testimony regarding the reasonable standard of care and lack of compliance with those standards in failed software implementation cases. *See, e.g.*, *W. Dermatology Consultants v. VitalWorks Inc.*, No. CV 06-5001239S, slip op. (Conn. Super. Ct. Sept. 1, 2009), attached at Ex. 8 (accepting Dr. Kursh's testimony that, "[i]n essence, the core functionality of the VitalWorks software, office management, billing and patient electronic records failed to work as VitalWorks had represented that they would to plaintiff . . . and . . . VitalWorks did not follow industry-standard practices when implementing its software and did not adhere to its own installation standards"). SS&C offers no reason why the same sort of testimony on a different software implementation should be inadmissible in this Court.

**b. Dr. Kursh Uses an Appropriate Methodology to Define the Standard of Care.**

As noted above, the jury in this case will be asked to decide whether SS&C exercised reasonable care in making representations to ACM regarding, *e.g.*, the functionality of its proposed software solution, the results that software was capable of generating for ACM, and SS&C's ability to implement that solution within a particular period of time. To make that determination, the jury will need to understand what a reasonable software vendor in SS&C's position would have done as a matter of accepted industry practice to understand ACM's requirements and determine

whether and how it could fulfill them, as a predicate for determining what representations it could reasonably make to ACM regarding the products and services it could offer.

To that end, Dr. Kursh has opined on the standard of care applicable to a software provider which offers software customization and implementation services, such as SS&C in this case.  As he explains in his report, his description of the applicable standard of care is based on his extensive relevant experience in the field, including more than 30 years of software development and implementation experience and his work on more than 200 software implementation projects.  (*See* Kursh Report at 2, attached at Comp. Ex. 3 ("I am not a lawyer and this report provides no legal opinions.  Rather, I have reviewed the facts in this case, and drawing from my knowledge, education, experience and training related to the customs and practices in the computer software industry and also in the financial services field, have provided my opinions relating to this matter."), 20 ("[G]iven my expertise based on active involvement in well over 200 enterprise implementations . . . .")); 8/28/18 Kursh Tr. at 38:23-39:1, attached at Comp. Ex. 4 ("I've been . . . working with financial software for over 25 years, and that's even excluding some of the time at Blackacre.  So Blackacre would be over 30 years.").)

To corroborate and support his explanation of the applicable standard of care, Dr. Kursh cites publications that are recognized guidance documents in the software industry, including the Institute of Electrical and Electronics Engineers Computer Society ("IEEE") *Guide to the Software Engineering Body of Knowledge* ("SWEBOK") and the Project Management Institute's *Project Management Body of Knowledge Guide* ("PMBOK").  These are not controversial citations. SS&C argues, however, that Dr. Kursh's reference to SWEBOK warrants exclusion of his testimony in its entirety because, according to SS&C, SWEBOK is "inherently unsuited to be a standard," is restricted to issues involving software engineering and development, does not provide guidance regarding how to communicate information in connection with the sale or marketing of

a product, and has not been accepted by any court of which SS&C is aware as establishing a standard of care. Mot. at 5-6. None of these arguments warrants exclusion of Dr. Kursh.

First, SWEBOK is a "Technical Report" rather than a "Standard" (as those terms are defined by the International Organization for Standardization ("ISO")) simply because it "lack[s] prescriptive verbs," as SWEBOK itself explains. (See 8/28/18 Kursh Tr. at 163:11-164:17, 166:6-8, attached at Comp. Ex. 4; IEEE, *A Guide to the Software Engineering Body of Knowledge*, Third Edition, (IEEE, Piscataway, NJ, 2014), at B-3, attached at Ex. 5. This does not mean it cannot be used as guidance or as a tool to inform best practices. Indeed, SS&C's own expert agrees that SWEBOK is a "compilation of 'general accepted knowledge' in software development," (Hilliard Report at 9), which he and other software experts have "referred to" in their work as expert witnesses in software cases. (11/8/18 Hilliard Tr. at 146:22-147:11, 151:4-153:20, attached at Comp. Ex. 6.) Other experts have similarly cited SWEBOK as a "globally recognized authority on the practice of software engineering." *See, e.g.*, Expert Report of Jeff C. Parmet, *County of Orange v. Tata Consultancy Svcs. Ltd*., No. 13-cv-00683, 2016 WL 3763152, at n.70 (C.D. Cal. July 25, 2016); *see also* Mobile Medical Applications Guidance for Industry and [U.S. Food & Drug Admin.] Staff, 2013 WL 5634256, at *21 (Sept. 25, 2013) (FDA refers to SWEBOK as "commonly used and accepted good software development practices").

Second, although SS&C argues that SWEBOK applies only to software development and engineering, "development" includes precisely the kind of software customization that SS&C did for its CAMRA customers, including ACM. SS&C's experts opine that each CAMRA implementation is different and is individually tailored to the individual customer's business needs and specifications. (*E.g.*, 11/13/18 Maffattone Tr. at 85:10-16, attached at Comp. Ex. 7 ("Each, each implementation is different. So usually you would see some sort of procedures, generic, and then it's tailored to the customer."); *id*. at 87:2-5 (implementation "procedures" may be "adjust[ed]

. . . based on the customer's needs in that situation"); 11/8/18 Hilliard Tr. at 123:21-24, attached at Comp. Ex. 6 ("a vendor will tailor its solution for a particular customer's needs"). Further, SWEBOK addresses the entire software "life cycle," specifically including the pre-contractual planning phase that is at issue in this case. (*id.* at 124:9-14, 148:5-8). In referring to SWEBOK, Dr. Kursh explains this is exactly the extent to which he considers it relevant – *i.*e., to the extent it bears on pre-contractual planning. *See id.* at 167:23-168:2 ("[T]he issue is not whether [SS&C] follow[s] the SWEBOK . . . [but] whether they follow what … SWEBOK discusses in terms of doing a suitability analysis in terms of pre-work.").

Finally, Dr. Kursh's testimony is about the standard of care applicable to a customized software solutions vendor, not the generic "sale or marketing of a product." Regardless, prior court recognition of an industry accepted guidance is not a requisite for an expert to be able to rely on that guidance. *See, e.g., McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1043 (2d Cir. 1995) (affirming admission of expert testimony despite fact that expert "could not point to a single piece of medical literature" that specifically supported his opinion."). Dr. Kursh cites SWEBOK as an industry publication that corroborates his understanding of the applicable standard of care—an understanding formed in the first instance by his decades of relevant experience. (8/28/18 Kursh Tr. at 101:23-102:4, attached at Comp. Ex. 4 ("I use the SWEBOK because it is a recognized and respected third-party source, but I also have my knowledge, experience, training, and education that I used as well.").)

SS&C's complaints regarding the particular industry publication that Dr. Kursh cites to corroborate his definition of a relevant standard of care are, at best, challenges to the weight to be given his testimony rather than its admissibility. *Amorgianos,* 303 F.3d at 266. SS&C is free to explore those matters with Dr. Kursh on cross-examination.

**c. Dr. Kursh's Testimony on Lost Employee Time Is Relevant and Admissible.**

Dr. Kursh also has analyzed the time that ACM employees spent on tasks related to SS&C's failed implementation of its CAMRA software for ACM, and has concluded that their time was properly and reasonably spent. (*See* Kursh Report at 52-53, attached at Comp. Ex. 3.) In doing so, Dr. Kursh recites the amount of time spent on those tasks and the value of that time (based on application of an hourly rate to the hours spent). (*Id.*) SS&C mischaracterizes Dr. Kursh's work on this issue as a mere arithmetic exercise and demands that his testimony be excluded. (Mot. at 7.)

Dr. Kursh's review of the nature of the work ACM performed, the reasonableness of that work, and the manner in which it was done is not a math equation. Rather, Dr. Kursh analyzed the nature and effectiveness of ACM's work in support of SS&C's implementation of CAMRA for ACM—an issue as to which his specialized knowledge and expertise will aid an otherwise unfamiliar jury. (*See, e.g.,* Kursh Report at 52 ("I understand that ACM users did not keep timesheets for the implementation or use a timeclock or otherwise record their time on a daily basis. In my experience, this is typical of a client organization which has hired a software vendor to undertake an implementation, compared to what one would expect in a services organization such as a software vendor like SS&C."), 56 ("Compared to SS&C's non-executive staff hourly rate, and based on my understanding of and experience with ACM's industry [and] my experience with software implementations, I find ACM's hourly rates to be exceedingly reasonable.").)

To be sure, expert testimony on the amount of damages sought is helpful to a jury and is commonly accepted by courts subject to cross-examination. *Charter Practices Int'l, LLC v. Robb*, No. 12-cv-1768, 2015 WL 13000251, at *7 (D. Conn. Mar. 31, 2015) (expert's opinion "relevant to assisting jury" to determine amount of damages and "any criticisms" can be explored on cross-examination). SS&C offers no reason why the Court should reject such testimony here.

## III. CONCLUSION

Accordingly, the Court should deny SS&C's Motion *In Limine* to Exclude Steven Kursh.

Dated: December 10, 2019

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

By: */s Allison Kernisky*

Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
Manuel Miranda
*(pro hac vice application forthcoming)*
manuel.miranda@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

Daniel Mateo (phv10323)
daniel.mateo@hklaw.com
2929 Arch Street
Suite 800
Philadelphia, PA 19104
Telephone: (215) 252-9543
Facsimile: (215) 867-6070

*Attorneys for Plaintiff ARMOUR Capital Management LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2019, a true and correct copy of this document was served by electronic and U.S. mail on all counsel of record.

By: *<u>/s Allison Kernisky</u>*
Allison Kernisky (phv09011)