# Exhibit 8

NO. CV06-5001239 S

| | |
|---|---|
| WESTERN DERMATOLOGY CONSULTANTS | SUPERIOR COURT |
| V. | JUDICIAL DISTRICT OF DANBURY |
| VITALWORKS INC. a/k/a AMICAS INC. AND CERNER PHYSICIAN ASSOCIATES INC. | SEPTEMBER 1, 2009 |

## MEMORANDUM OF DECISION

By complaint returnable August 15, 2006, plaintiff Western Dermatology Consultants, PC ("WDC"), a medical dermatological clinic located in Albuquerque, New Mexico, brought this action against VitalWorks, Inc. (VitalWorks), located in Ridgefield, Connecticut, and Cerner Physician Associates, Inc. Of Kansas City, Missouri ("Cerner").

SUMMARY OF PLEADINGS

The plaintiff's second amended complaint dated April 26, 2007, contains six counts. In Count I, WDC alleges that VitalWorks marketed and sold a product it claimed to be a software package designed for physicians' offices that would efficiently manage patient appointments and billing, as well as catalog medical records and treatment, that VitalWorks presented this software to WDC at a conference for the American Academy of Dermatology in March 2003, claiming in addition to performing as stated above that the software was functional and user-friendly, easily installed, and would reduce storage, paperwork and personnel needs, the latter resulting in a return on its software investment within two years due to reduced cost and increased productivity. WDC claims that in

1

reliance on the above representations, the parties entered into a written contract on December 19, 2003, in which VitalWorks agreed to provide software, training and professional services necessary for WDC to use VitalWorks' software in its medical practice.   WDC initially paid $24,660 toward a total of $44,170.30 for software and training.

WDC claims that VitalWorks breached its contract with WDC in that it:

1)      misrepresented the cost and extent of new hardware necessary to run the software programs (¶ 15);

2 )     repeatedly installed incorrect and/or defective products including, but not limited to:  system/software that creates needless and duplicative records, inoperable system/software at plaintiff's westside office, system/software that is incompatible with dermatological verbiage, patient management system/software that is unable to transmit information to WDC's electronic medical records and/or billing systems, system/software that does not permit revisions to patient notes, system/software that is incompatible with Medicare filing requirements, system/software that repeatedly locks users out of the system, system/software that produces repeated error codes when performing the scheduling function, billing system/software that is unable to process multiple payments by multiple insurers on a single account, scheduling system/software that permits multiple appointments during a

2

single time slot, and system/software not yet ready for release (¶ 16);

3)    repeatedly billed for products that WDC did not receive, such as operable system/software at WDC's westside office, as well as anti-virus and other software at all of plaintiff's offices (¶ 17);

4)    billed for products that were incompatible with its system including, but not limited to: system/software that was incompatible with a server recommended by VitalWorks, systems/software that would not operate with fractionated T-1 lines recommended by VitalWorks, inoperable system/software installed at WDC's westside office, system/software that is incompatible with dermatological verbiage, patient management system/software that is unable to transmit information to WDC's electronic medical records and/or billing systems, system/software that does not permit revisions to patient notes, system/software that is incompatible with Medicare filing requirements, system/software that repeatedly locks users out of the system, system/software that produces repeated error codes when performing the scheduling function, billing system/software that is unable to process multiple payments by multiple  insurers on a single account, scheduling system/software that permits multiple appointments during a single time slot, and system/software not yet ready for release (¶ 18);

5)    billed for services that WDC did not receive including, but not limited to

3

system/software training for WDC's employees (¶ 19);

6)     billed for services that were incompatible with its system including, but not limited to system/software training for WDC's employees (¶ 20);

Although VitalWorks supplied the initial software pursuant to the contract, it became clear during the training period that the programs purchased by WDC failed to meet the representations made by VitalWorks. VitalWorks' software was unusable due to constant "glitches" and inoperable templates, thus depriving WDC of any consideration for its contractual promises and its payments and causing financial loss.

Count II alleges breach of expressed and implied warranty based on the aforesaid allegations and WDC's further claim that VitalWorks agents and representatives repeatedly represented that its software would function, that it would serve WDC's purposes, and that it would improve WDC's operations. Although VitalWorks knew of the above deficiencies through its agents and representatives, Tiya Williams, Susan Green, Scott Culberson, Cathe Reams and Terri Griesmyer, it failed to correct them despite the fact that they were known to, and acknowledged by VitalWorks representatives through written and oral communications with WDC from April 2004 to January 2005.

In Count III, WDC alleges that the aforesaid conduct constitutes fraud because after consulting with WDC as to its needs, representatives and agents of VitalWorks made fraudulent claims as to the functionality, capacity and applicability of VitalWorks software in order to secure a contract with WDC. WDC's specific allegations of fraud by

4

VitalWorks are that VitalWorks representatives knew that its software would not be able to accomplish any functions, let alone the functions that they had guaranteed WDC because they had sold WDC a "beta version" of their software, or the first version of a software program. A "beta version" is intended for internal demonstrations and test users and not for sale to the general public as a fully evolved software package. By selling a software program that was not fully evolved or mature, WDC alleges that VitalWorks knew that its representatives made fraudulent claims about its product in order to induce plaintiff to purchase VitalWorks software and services. WDC claims that it relied upon VitalWorks fraudulent claims in agreeing to enter into the contract with VitalWorks and, as a result, suffered damages.

Count IV alleges that VitalWorks is liable for negligent misrepresentation in that in addition to the above, VitalWorks representatives and agents made numerous representations to WDC regarding the functionality, capacity and applicability of VitalWorks software in order to secure the subject contract, and that VitalWorks representatives knew or should have known that VitalWorks software did not function and would not be able to perform the functions that they had guaranteed WDC because they had sold WDC a "beta version" or the first version of a software program. WDC alleges that it relied upon VitalWorks' misrepresentations when it agreed to enter into the contract with VitalWorks.

Count V alleges unjust enrichment claiming that VitalWorks received a benefit in the form of all of the payments made by WDC and retained by VitalWorks and Cerner, VitalWorks provided nothing of value to WDC in return for those payments, and that VitalWorks and Cerner have retained the payments and have failed to provide anything of value to WDC to its detriment.

In Count VI, WDC alleges that on the basis of the aforesaid conduct, defendants have, at all times relevant herein, engaged in trade or commerce in the state of Connecticut as those terms are defined pursuant to Connecticut Unfair Trade Practice Act Conn.Gen. Stat. Sec.42-110a et seq. and that the conduct of the defendants violated said statute.

Both defendants VitalWorks and Cerner have denied or pleaded insufficient knowledge to the allegations of the second amended complaint and alleged by special defense that WDC breached its responsibilities under the express/implied warranty provisions of the December 19, 2003 contract. VitalWorks has further alleged by special defense: 1) Plaintiff's claims are barred or reduced because of mutual or unilateral mistake as to the Contract; and 2) Plaintiff failed to mitigate damages.

The case was tried to the court on October 28, 29, 30; November 5, 6, 18, 19; and December 10, 2008. Thereafter, the parties filed post trial proposed findings of fact and arguments of law and agreed to extend the time period for a decision by the court to September 1, 2009. Based on the evidence presented at trial, the court finds the following facts.

6

## FINDINGS OF FACT

Plaintiff Western Dermatology Consultants, P.C. ("WDC") is a dermatology practice with two offices (the eastside and westside offices) located in Albuquerque, New Mexico. WDC's principals are Sara Mills, M.D., Ph.D., Barbara Einhorn, M.D. and Leslie Glass, M.D. From 2003 to present, WDC saw between 80-120 patients per day. In 2003, WDC documented patient visits by transcribing dictated notes for fees of $2,000 - $2,500 per month and used Kiron software to manage the office. WDC experienced some problems with Kiron but was satisfied with Kiron and VitalWorks support service for Kiron.

In March 2003 VitalWorks employee Tim Holman demonstrated its Intuition PM product at a medical conference in San Francisco. WDC was not interested in purchasing a new program at that time because it was satisfied with the Kiron system it had been using for some time. At the same conference where Holman demonstrated the VitalWorks system, the Kiron tech representative indicated that Kiron was going to be "sunsetted," or phased out at some point in the future.

In 2003, VitalWorks employee Tim Holman and Kiron representative Terri Cannady told WDC that it would need to replace the Kiron system because VitalWorks was going to sunset it and would no longer support it. VitalWorks, however, continued to support the Kiron software and took no steps to sunset the Kiron software until 2008, five years after WDC was told it needed to replace the Kiron software. At the time VitalWorks

7

sales representatives told WDC that it needed to replace the Kiron software, they marketed a new software system as a necessary and improved replacement. VitalWorks represented to WDC that its Intuition software with both practice management ("PM") and electronic medical records ("EMR") would increase efficiency and save money. As marketed by VitalWorks, Intuition would allow WDC to: (1) have the receptionist confirm the patient demographics (name, address, date of birth, insurance company); (2) the receptionist would then click a button that would send a note over to the EMR portion of the software that was on the doctors' tablet PC; (3) the doctor would examine the patient and create an electronic medical note; (4) once the medical note was signed, the note would transfer back to the PM and a true bill would be created with the required diagnosis codes; (5) prescriptions would also be generated from the system; and (6) the patient would walk out with a billing statement. In late September 2003, Holman demonstrated the EMR system for the WDC doctors, Carol Shanklin, the office manager, and Janis, the spa manager, and the PM software for the office and spa manager to show how it could save WDC time and money. In marketing Intuition to WDC, VitalWorks called the software "user friendly."

The purpose of Holman's demonstration in September 2003, was to convince WDC that the system was easy to use and would save WDC money. On October 6, 2003, Holman sent a letter (Exh. C) stating, based on the $2,500 transcription expense WDC incurred, "the purchase of Intuition PM and EMR will have a return on investment in two years." At or about this time, Holman also told WDC that the price was going to increase

and that it would have to purchase the VitalWorks system by the end of 2003 in order to avoid the 15 percent price increase. Based on Holman's representations of the VitalWorks software Intuition PM and EMR programs, WDC concluded that the use of the Intuition software would allow WDC to eliminate $2,000-$2,500 per month transcription costs and phase out its medical records employee and would streamline WDC's practice. According to Scott Culberson, Intuition business director for both VitalWorks and Cerner, and Jim Kasper, VitalWorks software engineer, the Intuition developers did not know what the sales department was promising customers which led to the misrepresentations made to WDC, nor was Mr. Culberson aware of any policies to ensure that VitalWorks sales personnel accurately represented Intuition's capabilities to prospective purchasers. Mr. Culberson acknowledged he was under pressure to issue a new release of Intuition software when he took over as business director in December 2003.

Based on the information provided by VitalWorks, WDC thought the Intuition software would be a good fit for the practice, that it would save money for the practice by eliminating transcription service and possibly the medical records secretary and that WDC would receive a discount as a previous Kiron customer. WDC relied upon the promises made by VitalWorks in Exhibit C in deciding to purchase the Intuition software. WDC decided to purchase the Intuition system because: (1) the doctors liked the software as represented by VitalWorks; (2) WDC had been working with Kiron since 1997 and the doctors were satisfied with the Kiron software and support provided by VitalWorks; and

9

(3) Perry Pintzow recommended that the practice stay with the same company. Although WDC did not receive names of other practices using the Intuition software, it relied on its own past experience with Kiron as supported by VitalWorks.

As of 2003, WDC had not sought to replace the existing system. Thus, WDC itself had not researched a replacement which would suit its needs or the electronic medical records component which it did not have. It had not compared alternatives or evaluated whether it should wait. Faced with the representation that system it was using would no longer be supported and the imminent price increase for the program VitalWorks recommended as a replacement, WDC agreed to purchase VitalWorks software. On December 19, 2003, WDC signed the VitalWorks printed form contract. At the time, WDC indicated it did not know what hardware or other upgrades would be required to support the Intuition PM and EMR software and wanted to delay installation and training until mid 2004. In April, 2004, WDC considered cancelling the order when it learned that the VitalWorks software required new hardware and added service installation expenses, which VitalWorks had not explained previously when Holman demonstrated VitalWorks software at the WDC office.

Other than the software program prices, the remaining contract elements and pricing changed, symptomatic of the lack of clarity surrounding the entire contract. WDC rejected VitalWorks initial hardware quote of $117,511.23, which included an approximate $10,000 mark-up. VitalWorks then sent numerous hardware quotes which WDC could not compare

10

because each quote had different specifications for the server, monitors, workstations and other hardware components. In August 2004, VitalWorks told WDC that it could use Infoscan, the scanning portion of the PM software, at no charge until the EMR software was up and running but did not attempt to install Infoscan until November 23, 2004, four months after installation of the PM software. Training on the Infoscan software was not scheduled until December 1, 2004. WDC physicians and staff found that creating notes in the EMR software was more complicated than Holman's product demonstration. WDC's experience with the Intuition PM software did not conform to the presentation made by VitalWorks regarding how the system would work. WDC was never able to get the Intuition PM and EMR software to work as represented. It abandoned the VitalWorks software in May 2005 successfully replacing it with Management Plus software system.

Contrary to the presentation made by salesperson Holman, WDC found the software was neither fast nor user-friendly. Furthermore, WDC was not able to recover the cost of the software within two years, eliminate a records clerk position or eliminate its transcription costs. Prior to purchasing the software, VitalWorks represented to WDC that its medical record secretary would have less to do if WDC purchased the Intuition PM and EMR software. No one from VitalWorks or Cerner told WDC that it would have to change its operations in order to implement the Intuition software. WDC would not have purchased the Intuition software if it had been told that the EMR system would bring drastic changes to its practice. The court made the following findings set forth in eight

11

categories relating to defendants' obligations arising out of the subject software sale.

## 1. Implementation

In December 2003, VitalWorks was selling Intuition software version 5.03. Seven months later, VitalWorks installed version 5.1 on WDC's server. VitalWorks was to configure the server at its office and install the remainder of the hardware on-site. Tiya Williams-Mitchell, VitalWorks senior implementation specialist, was responsible for getting WDC's software and hardware installed, working with WDC through the training and ensuring that WDC was able to use the software. Williams-Mitchell made several critical errors during the implementation process including: failing to timely notify WDC that VitalWorks would need after-hours access to public portions of the building where WDC leased its eastside office; failing to ensure that WDC received its web-based training prior to the on-site PM and EMR training; failing to ensure that all hardware was shipped to WDC; failing to ensure that all software was installed at WDC; failing to provide the Infoscan software and scanner promised by the sales department; and failing to comprehend that WDC already enjoyed adequate internet connectivity to use the Intuition software with the terminal service licenses. VitalWorks employees Williams-Mitchell and Green blame WDC employee Kelly Jorgerson ("Kelly") for "being reluctant" to file claims electronically but both admitted that due to VitalWorks' failure to properly install the RapidServices on WDC's system, WDC was unable to file electronically until the

installation occurred on August 23, 2004.  By this time WDC's medical and support staff as well as its patients were frustrated and much time was wasted due to errors and inefficiency under the VitalWorks Intuition PM program.  Although defendants attributed the problems WDC encountered while using the Intuition PM software to Kelly, many, if not most, of the problems which Kelly experienced were documented software program issues or attributable to inadequate training by VitalWorks.

**2. Network System**

VitalWorks was responsible for accurately telling WDC what was needed to connect its two offices. Prior to the installation, VitalWorks knew that WDC operated two separate office sites, used DSL for internet access at the westside office and at the eastside office.  However, VitalWorks did not inform WDC that it needed to replace the DSL line with a T-1 line to connect the westside and eastside offices until the second day of the installation.   WDC hired Expedius, an Albuquerque phone company, to install a fractionated T-1 line but VitalWorks informed WDC that it could not send a technician to complete the Intuition installation for an undetermined amount of time.  Instead of further delaying the ability to use the system by waiting for a VitalWorks installer, WDC hired Randy Rendon to connect the two offices.  After purchasing two routers at WDC's expense to establish the VPN (virtual private network) connection between the offices, VitalWorks then told WDC it needed to increase the bandwidth from a fractional T-1 to a full T-1 line, at yet more expense to WDC, which WDC did.  Even with the increased bandwidth, the

13

system still did not run.

WDC purchased nine terminal licenses from VitalWorks for $743.58. Because VitalWorks failed to install the licenses, WDC consultant Randy Rendon purchased and installed terminal licenses and used them to connect the two offices. WDC then learned that its original DSL circuit was big enough to run the terminal services which it did not know before because of VitalWorks' failure to install the licenses that it had sold to WDC. If VitalWorks had applied the terminal service licenses when the Intuition software was installed in July 2004, WDC would not have needed to increase its DSL line to a fractionated T-1 line or increase it again to a full T-1 line. Moreover, if the licenses had been installed in July, the westside office would have been able to use the PM software immediately. The westside office was not able to use the PM software until September 2004, months after installation. Due to WDC's inability to use the PM software at the westside office from July 2004 until September 2004, the westside office had to fax the patient schedule to the westside office each morning. This created delay in operations and frustration for staff and patients. If a patient cancelled an appointment at the westside office, the eastside staff had to attempt to fill the appointment time while still performing eastside job duties. If a patient tried to schedule an appointment at the westside office, the patient had to be transferred to the eastside office to schedule the appointment, resulting in inconvenience to the patient, damage to WDC's business, image and reputation. By the time the westside office was able to use the software, WDC's staff and principals had lost

14

confidence in the software's ability and functionality. The staff was frustrated with the system and tired of dealing with angry patients. In October, 2004, Mr. Rendon also installed the Synmantec antivirus software that VitalWorks had sold to WDC but that VitalWorks had failed to install.

### 3. Training - Intuition PM

WDC contracted to receive four hours of web based training prior to the office's on-site training but only received one hour of web based training because the installation of the hardware and software was not completed until 3:30 p.m. on the Friday before the Monday on-site training. Consequently, WDC paid for web-based training that it did not receive. VitalWorks provided one trainer, Susan Green and one workstation to train WDC's 17 employees on the Intuition PM software. WDC cancelled all of its patients for the first three days of training and had reduced patient loads for the remaining two days of training as instructed by VitalWorks. During the July 29, 2004 on-site training, the training was repeatedly interrupted by system errors such as mail merge errors, printer errors, permission errors and scanner errors, thereby making it impossible to utilize the system. These problems were entered into the Connectcare notes at 1:15 p.m. but not corrected until 7:23 p.m.

Vitalworks failed to provide training regarding setting-up practice preferences which would have allowed WDC to limit access to confidential information. For instance, VitalWorks did not instruct WDC employees to minimize scrolling to avoid memory leaks.

15

As a result, the practice preferences set-up by VitalWorks employee LaShawn Jones allowed all users access to confidential patient and business information. Contrary to defendants' assertion that plaintiff's employees were technology resistant and not committed to learning how to use software, after WDC abandoned the Intuition system in May, 2005, two Management Plus trainers effectively trained them in a five day period using four people per workstation and either the WDC database or a training database.

**4. Training – EMR**

WDC contracted with VitalWorks to receive four hours of web-based training for the EMR software which it also did not receive. VitalWorks advised WDC to cancel patients for the first two days of EMR training and reduce patient load for the scheduled three days of EMR training. However, VitalWorks failed to complete hardware installations prior to the July training. On the first day of EMR training in October 2004, the doctors were unable to access or be trained because VitalWorks used six of the eight training hours to properly load and upgrade all of the tablet PCs and some of the work stations with the EMR software. The doctors and medical assistants were not able to participate in any training while the trainer Susan Green worked to install the software which she then discovered she had not previously seen. The interface between PM and EMR systems never worked during the October EMR training, and caused most of the interruptions identified in the training report. WDC did not receive all of the training on the first day of EMR training listed in the training report. Exhibit G.

Ms. Green worked with the doctors during additional EMR training in December 2004 to address problems they were experiencing; she was unable to modify the templates to create notes that were suitably professional.   Once again, there was lack of communication from VitalWorks as to patient scheduling for the third day of EMR training.  As a result, Dr. Mills was not able to participate in the training and was not able to create notes using the software.  Dr. Einhorn signed the training reports after all the training sessions ended but requested additional training due to the amount of training time that was wasted installing the software and calling Birmingham to correct problems with the installation and the system.

## 5. Infoscan

VitalWorks salesman Holman told WDC that its staff could scan fee tickets through the Infoscan software and scanner during the time period between the installation of the software and becoming proficient in the EMR system.  VitalWorks promised to provide the infoscan software and scanner at no charge to WDC.   Based on VitalWorks representations, WDC reasonably believed that it would be able to use the Infoscan product until the EMR software installation was complete.  VitalWorks did not provide the Infoscan scanner until November 2004.  Then, Mr. Rendon attempted to install the scanner but was unable to get it to work troubleshooting the problems with the VitalWorks technical support department.   The scanner that VitalWorks sent never worked. VitalWorks' failure to provide Infoscan to WDC forced the billing department to enter all

17

charges manually rather than through a scanner. Manually entering the charges is very time consuming and requires precision and accuracy. This process led to errors in posting, payment delays and rejection of claims. In March 2005, WDC had to hire another billing specialist, Angel Franco, to audit the VitalWorks billing system and to follow up on unpaid claims, a process which lasted from March 2005 until fall, 2007.

## 6. Software Issues

WDC experienced the following problems with the PM system:

a.   operational – losing access to the system while attempting to schedule appointments; having to change passwords on multiple occasions; the system would log off users; and billing problems;

b.   security – all employees could view the amount of money WDC received from insurance companies;

c.   billing – claims would not close when payments were posted thereby requiring WDC to manually enter secondary billing statements because it would not automatically generate bills, and in January 2005, the PM software generated bills to patients on accounts that did not have a balance.

d.   insurance reimbursement – if payment was received from a patient's secondary insurance before the primary payment was received, the PM software would not indicate that the primary payment had not been received which made it difficult for WDC to track its revenue and accounts

receivable;

e.     insurance recordkeeping – the PM software did not populate the CLIA

number on the HCFA billing forms which caused the claims to be denied.

It would take Ms. Franco five minutes to manually generate secondary billing

statements per claim, far longer than other software she had used.  Medicare bulk EOBs

(Explanation of Benefits) often contained 30 patient claims on one form making the billing

process more time consuming causing wasted time, frustration and lack of reliability as to

billing accuracy.

Ms. Franco personally experienced the problems represented in Exhibit J including

disappearing toolbar buttons, inaccurate patient ledgers and blank screens.  The latter

required Ms. Franco to exit the Intuition software, reboot the system and start the process

over, resulting in lost time and frustration.  Accounts which had been paid appeared on the

aging report creating unnecessary work for the billing department.  Credit balance reports

did not match patient ledgers risking refunds not actually due.  The insurance aging report

listed patients that did not have a balance causing WDC to call either the insurance

company or the patient seeking payment that was not due.  The insurance claim submission

reports also listed open claims that should have been closed requiring follow-up with the

insurance companies even though no money was actually due from the carrier.  The

Intuition system VitalWorks sold to WDC did not allow a user to print a date of service

report which would list all charges for a date of service for each office.  A date of service

report was not available until Intuition version 6.0 was released in the spring of 2005.

Exhibit K, referred to as Kelly's list, identifies specific problems WDC experienced with the Intuition software as of November 2004. WDC sent Exhibit K to VitalWorks because it had previously reported these problems to VitalWorks by phone without receiving help to solve them. In November 2004, WDC asked a relative of one of the doctors, Perry Pintzow, who had computer software experience to participate in a conference call with Scott Culberson, Cathe Reams and other VitalWorks employees in which they reviewed WDC's problems outlined on Kelly's list. VitalWorks and WDC disagreed on the cause of the problems WDC was experiencing. However, there is no dispute that WDC experienced both software and training problems. VitalWorks indicated that the majority of their problems were training issues and attempted to address these significant problems by telephone and continued to blame WDC employees although the problems were primarily software related. VitalWorks provided additional in-person EMR training in December 2004 but only telephone training for the PM software. This training did not resolve the problems identified on Kelly's list sufficiently. VitalWorks eventually admitted to WDC that it would not be able to resolve the secondary billing insurance problem until 2005.

Email communications contemporaneous with events indicate that VitalWorks programmers and quality assurance departments were aware of persistent and significant software problems in the interface between EMR and PM in 2004 and 2005. Scott

Culberson promised that VitalWorks would fix the system remotely and then send trainers to WDC but it failed to do so. The EMR system took far longer than manual to create medical notes. Dr. Mills could see six to eight patients and Dr. Einhorn could see three to four patients in the time that it took them to create a single medical note. Even Susan Green, VitalWorks trainer, took fifteen minutes to create an EMR note. After the EMR training, Dr. Einhorn attempted to use the EMR system for simple notes but continued to dictate most of her medical notes. The doctors were not able to use the EMR system while seeing patients as VitalWorks had represented because in addition to fundamental program flaws, the software did not use dermatology terminology as VitalWorks had represented. Instead, the user had to open several different screens to drag appropriate medical terminology into the notes. Because VitalWorks failed to teach the doctors how to make permanent changes to the template language, they had to apply dermatology verbiage for each note. In addition, the EMR software did not allow users to identify the number and size of lesions and biopsies, the name of the medication being prescribed, the dosage being prescribed and that the patient was informed regarding the risks and benefits of the prescribed medication, all necessary to provide proper medical care and avoid malpractice and insurance fraud claims. The interface between the PM and EMR software was inconsistent and unwieldy. WDC was never able to bill a patient, generate a prescription or complete a real-time checkout while using the EMR software. WDC was committed to learn and use the PM software. However, despite considerable time, money and effort

21

invested in the Intuition PM and EMR software, WDC eventually abandoned the system in May 2005 and replaced it with ManagementPlus. WDC did not experience the same types of problems with ManagementPlus as it did with the Intuition software.

**7. Interface Issues**

As stated above, the interface between Intuition PM and EMR software failed to perform due to both system and training problems for which VitalWorks was responsible. For example, although Susan Green conducted interactive training for the westside office employees, they could not use the system until at least three weeks later when that office was cabled. (Ex. 28B.) Ms. Green also acknowledged that because the hardware was not fully installed, plaintiff received less than the contractually agreed hours of training. Ms. Green herself experienced interface issues on a regular basis during training.

Jim Kasper, the software architect of the Intuition PM and EMR software program, was not able to determine why the interface at WDC would not work primarily because the "arrowhead man" icon he designed was not installed on the desktop of WDC's server. "Arrowhead man" transmits the charges to the listing process on the management side by reading the date from the directory and sending it to a port. If "arrowhead man" is not properly configured, the charges will not move across the interface. During his demonstration of the system in court, it took Jim Kasper over 10 minutes to push information from the EMR to the PM systems. In order to push the information from the EMR to the PM system, Mr. Kasper had to restart the service that receives the data.

22

Kasper "assumed all this stuff was working on WDC's system but it was not, apparently." WDC did not receive any training or documentation regarding "arrowhead man" and were never shown an icon for "arrowhead man" on the server. VitalWorks' Birmingham office had to remotely force data between the PM and EMR systems an unknown number of times.

WDC stopped using Intuition because it was unable to use the software to generate claims for services provided and receive payment. The spreadsheet did not show the patient modification during Kasper's court demonstration because the database was not connected. In order to make the connection he had to configure applications in a manner that users do not access the system. Kasper assumed that the activity recorded in the database was created by the software and that its existence demonstrated that the software worked appropriately. He did not know that Angel Franco had to manually generate claims to secondary insurance carriers, resubmit billing statements to insurance carriers, and write off uncollectible accounts, and that it took two years of work for WDC to reach a zero balance.

## 8. Immature Software Product

Randy Rendon, the computer consultant hired by WDC, testified that Tiya Mitchell-Williams and another VitalWorks technical support employee informed Mr. Rendon that the software version sold to WDC was a beta version. As stated above, beta is a term used to refer to software which has not yet been developed for sale to regular consumers such

23

as WDC. Perry Pintzow testified that Scott Culberson told him that the Intuition software sold to WDC was a new release still under development. Culberson did not respond to an email Pintzow sent to him asserting that the software sold to WDC was a beta version. Both Kasper and Culberson did not know whether the version of the Intuition software that was installed at WDC was ever beta tested. In a November 22, 2004 email, Cathe Reams acknowledged that the password problem WDC employees experienced was not scheduled to be corrected until release of the 6.0 version of the software in spring 2005.

Dr. Stephen Kursh reviewed and analyzed the VitalWorks software and the implementation of the VitalWorks software at Western Dermatology Consultants. In his report (Exhibit NN), Dr. Kursh concluded that the VitalWorks software provided to WDC was not sufficiently mature to be installed and used by WDC, it failed to comply with the warranty offered by VitalWorks and VitalWorks implementation of its software at WDC failed to follow industry-standard practices.

According to Dr. Kursh, the VitalWorks software exhibited many severe bugs some which were demonstrated at the trial, that would indicate it was likely a "beta version" or at a minimum had not been sufficiently vetted by VitalWorks prior to release to WDC. Major "bugs" included a problem exporting data between VitalWorks software modules, scheduling software problems, reporting, and accounting irregularities. In essence, the core functionality of the VitalWorks software, patient electronic records management and billing, and reporting failed to work sufficiently at WDC. There are several examples

24

where the software was not in compliance with the warranty in the license agreement. VitalWorks did not follow industry-standard practices in the implementation of its software at WDC. The documents provided by VitalWorks did not establish that the implementation at WDC was appropriately planned, staffed or supported. In fact, among the available documents, it seems evident that VitalWorks did not follow its own stated requirements.

Dr. Kursh's uncontroverted findings are excerpted as follows (footnotes omitted):

> The VitalWorks Intuition Software Was Deficient and Not in Compliance with the Warranty

> Bugs are an inevitable part of software. It is essentially impossible to develop and implement software that does not have bugs. The issue is not, however, the mere existence of bugs, but the type and frequency of the bugs.

> It is an industry-standard practice to categorize bugs with severity ratings. Microsoft, the world's leading software company, follows such an approach and Microsoft calls its categories Severity numbers 1, 2, 3, and 4 with a Severity 1 being the most severe and a Severity 4 being the least.

> Similarly, it is an industry-standard practice to consider bugs that are "show-stoppers," i.e., Severity 1 and, often Severity 2, to be those that constrain use of the software to make it near or totally inoperable as compared with bugs that are "annoyances," for example, misspelled words on screens to be Severity 4. Software vendors recognize the importance of prioritizing and focusing on Severity 1 and Severity 2 bugs since those bugs effectively make the software inoperable for end-users.

> Based on the testimony of both WDC and VitalWorks witnesses and VitalWorks own case reports, the VitalWorks software was replete with multiple Severity 1 and Severity 2 errors. In other words, it was deficient and did not perform in accordance with the documentation and was, thus, in violation of the warranty contained within. Specifically, the system as sold to WDC exhibited contract and user interface problems, data exchange problems within Intuition Software, appointment problems, numerous types of accounting, billing problems and user role problems.

## 1. User Interface Problems

On January 24, 2005, about six months after the VitalWorks (Intuition) software installation date of July 22, 2004, the VitalWorks software exhibited a number of errors witnessed by WDC's insurance biller. The correspondence between WDC and VitalWorks showed VitalWorks' propensity to deem problems as "training issues" but the following problems described by Carol Shanklin from WDC could not have been training issues, but, instead reflect failures in core software functionality indicating a lack of sufficient testing by the vendor and potentially key fundamental flaws in the software that are typically seen in beta versions:

> The insurance biller is having continuous (everyday) problems in using the system; tool bar not showing up, "buttons" while in a demographic screen or ledger not showing up or not being there at all, screens being completely blank, entering a patient ledger with zero charges or payments yet showing balances at the bottom, etc.

Similarly, in the accounting section of the VitalWorks software; "After too much scrolling, the screen starts to black-out buttons and the font size of letters changes." This type of problem is often typical with software that has not been sufficiently vetted by vendor. WDC's call to VitalWorks regarding this problem was not returned.

Dr. Kursh provided screen shots showing examples of the problems observed in the insurance billing by WDC, e.g., a screen shot showing buttons lacking images, the appearance of dollars in the totals at the bottom of the screen without necessary corresponding claim details – all detailed rows are shown blank on the screen. These screen shots and the documentation indicate that the VitalWorks software failed in one core aspect of its basic functionality – billing. These types of problems with core functionality inevitably reduced confidence in the software among staff personnel, thus making the implementation more difficult and created issues in regard to billing and collection.

## 2. Problems with Data Exchange Within Intuition Software

26

Another Severity Level 1 bug with the software was with the exchange of data between two major components of the VitalWorks system: PM (Practice Management) and EMR (Electronic Medical Records). Patients entered into PM were not crossing automatically into EMR at time of patient check in.... If they did not make the manual transfer, the patient would not cross to EMR for hours or until the next day make EMR impossible to use efficiently.

These bugs effectively meant that users did not have the data they needed and, thus, could not do their job properly until the data showed up some time later. The exchange of data among applications is obviously critical; it provides timesavings through single entry of information as well as, among other benefits, reduction of errors. Yet, the failure of the VitalWorks software to provide this basic functionality resulted in lost time and the possibility of staff dispensing inaccurate information.

3. *Appointment Software Problems*

Well after the software installation date in July, 2004, the Westside office was still not functional in September. "WS [Westside] patients had to call Eastside office to schedule appointments. . . WS charges were being put into the old system to check out patients."

The inability of the offices to communicate, share information or schedule appointments was a critical missing functionality. Putting aside issues of the increased time needed to schedule appointments without having the benefit of an automated scheduling system, this failure in the VitalWorks software effectively reduced the number of patients that the physicians could see, created problems and frustration for patients trying to schedule an appointment and resulted in the inevitable problem of "loss of confidence" among WDC staff personnel in the system.

VitalWork's attribution for the difficulties in communicating between the offices to WDC resistance was inappropriate given the types of problems experienced by WDC, the nature of the VitalWorks' acknowledged software defects, VitalWorks own materials, and industry-standard practices regarding sizing of communications infrastructure.

4. *Problems with Accounting Reports*

27

Accounting accuracy is a crucial functionality of medical practice software. WDC experienced a number of inaccuracies between the data found on individual client screens and reports. In order to effectively use an accounting system, it is essential that the users can trust the data that appeared in the reports. Using screen shots and handwritten comments describing the problems, Dr. Kursh demonstrated significant inaccuracies found in the Vital Works Intuition reports including:

- Patients mistakenly included or excluded in the report. The Aged Receivables Report did not work as described in the *VitalWorks Reports Guide*, thus, indicating that the software did not perform in accordance with the warranty in the license agreement (VitalWorks Reports Guide, p. 57).

- An inability to trust information in accounting reports is a serious obstruction to the use of any system like the one sold to WDC by VitalWorks. Similarly, as shown in the exhibit, WDC had problems with the Insurance Claims Submission Report showing inaccurate or improper information. The proper operation of the report is described in the *VitalWorks Reports Guide*, another example of how the software did not perform in accordance with the warranty in the license agreement. VitalWorks Reports Guide, p. 118, states: This report is designed for analyses and allows you to track outstanding insurance claims, and to generate a list of insurance claims printed or electronically filed that have not been rejected, or are being resubmitted. For example, you can use this report to determine whether you want to resubmit outstanding claims or to review claims submitted for a particular day in question. The VitalWorks Intuition PM system sold to WDC did not perform as described.

*5. Accounting Irregularities*

Dr. Kursh also provided five examples of Intuitions' inability to properly record accounts. All five, referred to as Items a-e, were either Severity 1 or Severity 2 problems and meant WDC could not accurately track the amounts generated by patients and insurance companies. Item "a" details problems with applying a refund. The VitalWorks Intuition PM Application Instruction Guide does not describe how to deal with an insurance write-off, a basic function represented in the documentation. Item "b" shows VitalWorks did not allow a user to see information where it is needed – in this case on the patient ledger which meant WDC needed to take extra time to find the data. Item "c" shows an instance when a credit card payment did not get transferred into the patient's statement history. The inability to record credits means an accounting system cannot

properly perform another core function. Item "d" refers to a previous Kiron function valuable to WDC which Intuition removed. Though the removal of a function in new software versions is not unknown in the software industry, vendors typically inform users and tell them what is needed to replace it. VitalWorks did not advise WDC of any such need. Item "e" shows the Intuition software overwrote important historical data which meant the software did not have the capacity to save important transactional information.

### 6. Medicare Billing Problem

An important segment of WDC's practice involved the billing of Medicare claims to the federal government. Due to the omission of the CLIA # in the electronic claims submission process, WDC had to manually produce paper claims to be compensated incurring additional costs to print the claims and do the necessary mailings. This is another example of core functionality that was missing in the VitalWorks software. One would expect the software developer to be able to run the software he wrote but, in his court demonstration, Jim Kasper was unable to demonstrate that the CLIA number automatically populated the billing statements as the software was marketed.

### 7. Security Problems

The federal government, state governments, and insurance companies have strict requirements regarding security of patient records and other related medical information. My research found, however, the Vital Works software did not have adequate security functionality. For example, WDC accounting personnel noticed several areas where information could be viewed by the wrong person. "Other employees can see how much money is being posted under the batch posting screen. This should be private information." Additionally, VitalWorks software did not have sufficient hacker intrusion control because VitalWorks did not identify what access user logins have. WDC did not know when and how VitalWorks or an authorized person made changes in the system as opposed to a hacker.

### 8. User Role Problems

Three user role problems in VitalWorks software meant extra work for WDC staff that could have been handled by better designed and/or vetted software. Alerts on patient accounts and ledger notes in patient accounts can be deleted or altered by anyone. Payments from insurance companies and patients can be deleted from a ledger even after the batch they were posted under has been closed. Under patient data entry screen anyone can check off boxes of "Assigned" "authorize payment," etc, this affecting claim payment.

29

Finally, Dr. Kursh was unable to conduct further testing because the VitalWorks documentation did not provide information necessary to do so. Based on his examination of the VitalWorks software, Dr. Kursh concluded that it was a beta version, confirming the statement made by VitalWorks employees. He stated that the multitude of Severity 1 and Severity 2 issues, as well as many of the other problems experienced by the VitalWorks software, are indications of poor software quality and a lack of testing by VitalWorks. Many of these problems, moreover, indicate a strong likelihood that the VitalWorks software provided to WDC was not fully vetted by VitalWorks and may well have been a beta version.

Dr. Kursh's opinion based on his knowledge, training and experience was that the VitalWorks software, whether or not termed "beta," was not sufficiently mature to be sold to WDC and not in compliance with the license agreement. In essence, the core functionality of the Vital Works software, office management, billing and patient electronic records failed to work as VitalWorks had represented they would to plaintiff.

Dr. Kursh further concluded that VitalWorks did not follow industry-standard practices when implementing its software and did not adhere to its own installation standards. While the implementation of software varies depending on the software program, the end-user client, and a host of other factors, there are general industry practices that are normally followed. One of those practices is for the software vendor to provide an installation guide that facilitates the implementation process and helps to

30

minimize misunderstandings. Although VitalWorks did have such an installation guide, it did not completely follow its own guidelines. Specifically, the VitalWorks Application Instruction Guide, Exhibit 3, page 4, recommends that six steps be completed "Before You Begin." They are:

(1) Intuition PM must be loaded on your system and ready to use.

(2) Designated staff must understand and have completed Interactive Training. All users must be family with the contents of your VitalWorks Intuition PM Data Entry and Maintenance Guide.

(3) all required data must be entered in the appropriate tables, i.e., insurance carriers and plans, procedure codes, fee schedules, and payment and adjustment codes.

(4) Your scheduler must be set up and ready to use.

(5) Your designated System Administrator must have set up your software users and designated appropriate system security settings.

(6) Each user must be competent with standard Windows functionality.

These six steps embody industry-standard practices. Dr. Kursh found that VitalWorks failed to meet these standards in the WDC installation.

Regarding Step #1, loading the system, it appears that VitalWorks did not meet its

31

own criteria. Although the installation date was July 22, 2004, VitalWorks records document that the westside office was still not functional in September. "WS patients had to call Eastside office to schedule appointments. . . WS charges were being put into the old system to check out patients. . . . WDC has hired local computer installer to get Westside office online. Assume VitalWorks will cover these charges and will honor maintenance contract."

On October 14, 2004, VitalWorks notes, "Randy Rendon discovered that the antivirus software had not been installed on the server. WDC paid for but never received Symantec antivirus software, Sybase SQL. Anywhere Studio software, 15" monitor for server, 8-port switch." October training was delayed because EMR was not installed.

VitalWorks did not adequately meet the criteria for Steps #3, data entry, and #5, system security, covering basic product configuration. VitalWorks also did not meet the criteria of Step #4. The scheduler had been set up but was not working properly for the Westside office. The training for the Westside users was wasted since they did not have the opportunity to use the software after training because their appointments had to be done by the Eastside office due to bandwidth problems.

In violation of industry standards, the VitalWorks software exhibited many severe bugs that indicated it was likely a "beta version" or at least had not been sufficiently vetted

32

by VitalWorks prior to release to WDC.  The VitalWorks software was not sufficiently mature to be provided to WDC and it was not in compliance with the license agreement. In essence, the core functionality of the VitalWorks software, patient electronic records management and billing, and reporting failed to work sufficiently at WDC.  These problems became apparent once WDC began using the software after the training.  WDC lost many hours due to the unproductive software and thus incurred significant extra costs. Significant problem functionalities supported by the evidence were: obvious user Interface problems; problems with data exchange within Intuition software; appointment software problems; problems with accounting reports; accounting irregularities; medicare billing problems; security problems and user role problems.  Dr. Kursh also confirmed that the VitalWorks installation was incomplete with multiple components not installed.  This meant the software was not fully functional for user training and forced WDC to pay extra money to get the system up and running.

Review of Tiya Williams email records (Def. Ex. 22) confirms that WDC was not aware of or prepared for the significant changes required to install and implement the Intuition PM and EMR software programs sold by VitalWorks.  Following execution of the sales contract on December 19, 2003, VitalWorks sent information on December 30, 2003 including guides for implementation, data entry, EMR, Rapidbill form and Rapid Remit documentation. VitalWorks' own internal memos indicate that WDC said it was not ready for installation and training necessary to utilize the programs.  Over the next three

33

months, Ms. Williams only documents two telephone conversations, January 29, 2004 and February 25, 2004. These conversations confirm that WDC did not know what hardware would be required to implement the systems VitalWorks sold back in December, and that WDC was relying on Tim [Holman] about "sending some of it [hardware] here [to VitalWorks] to be staged. Ms. Williams's April 7, 2004 note indicates that Carol Shanklin had been trying to follow up with Tim Holman. However, by April 2004, Tim Holman was no longer employed by VitalWorks. Ms. Williams's April 27, 2004 note indicates that WDC calls had not been forwarded to her. In addition to this lack of communication from VitalWorks, WDC also indicated that "some things were presented [in]accurately and there was miscommunication . . . VW keeps coming back and wants more money . . . ." Several messages then refer to scheduling training. The June 15 note indicates there were multiple problems, out of date sales orders, changes which VitalWorks did not enter, lack of coordination on hardware requirements, purchase and installation and training schedules. VitalWorks did not remain involved on installation issues and scheduled EMR training on dates when the doctors were not available; the two WDC locations had different internet connectivity systems which presented a major issue for implementation of the VitalWorks programs which VitalWorks sold as a unified practice management system. During these conversations there is no reference to the manuals VitalWorks sent in December. This would have given VitalWorks and WDC a common ground for planning the hardware installation and training requirements. One of these manuals, in fact, was the HW

(hardware specs).  Without this, WDC was unable to know what hardware was needed. Similarly, without the Implementation Guide, Data Entry Guide, Users Guide, HCFA, EMR Production Educ. Guide, HW specs, PBHS brochure (Exhs. 1-8), were either not provided or in any event, were not effectively used by VitalWorks to assist plaintiff.

On July 21 at 9:40 a.m. cdt, Williams advised Carol that VitalWorks was going to do the installation, not Scantron, that they would not be landing until 6 p.m. and wanted access to the WDC sites after then.  The July 22 notes consist of five entries which reflect significant items remained to be completed or in some cases corrected with respect to internet cable, service provider systems, hardware required to connect the two WDC offices and numerous installation issues.  As a result, training did not occur in July as WDC had anticipated.  From August 2 to August 11, the parties consulted on scheduling EMR training first for August 23 and August 24, then later to enable training to occur when the offices did not have full patient loads.  However, the main focus during August and September 2004 were the still unresolved hardware issues.  VitalWorks' email notes also indicate that as late as October it still had not sent WDC hardware which it had ordered and internal billing confusion suggested that WDC had been improperly charged.

VitalWorks case reports indicate that at the time it finally conducted EMR training in October, numerous software, license and hardware issues persisted, having remained unresolved since the earlier PM training in July and that although the plaintiffs were extremely frustrated with the Intuition system, they continued to try to use it.

## CONCLUSIONS OF LAW

### BREACH OF CONTRACT (COUNT ONE)

The elements of a cause of action for breach of contract are: "(1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages. See *Rosato* v. *Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004). . . . [T]he nonbreaching party may recover only for damages that are direct[ly] and proximate[ly] caused by a defendant's breach of contract, causation is an element-and a crucial one-of the plaintiff's prima facie case. . . ." (Citation omitted; internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503-504, 890 A.2d 140 (2006).

By contract dated December 19, 2003, plaintiff purchased the VitalWorks Intuition PM and EMR software marketed and sold by VitalWorks as an integrated system designed to enable it to schedule appointments, maintain patient files, bill patients and insurance reimbursement and create electronic medical records. The subject contract also obligated VitalWorks to supply software licenses, certain hardware items, software installation, training and customer support. Based on the facts proven at trial, the evidence established that VitalWorks was in breach of all of the above contractual obligations. Back on March 23, 2004, in response to Ms. Shanklin's questions about transition of existing patient

36

records and the operation of the new system, Holman described how the Intuition PM and EMR software were meant to operate. This description is consistent with testimony by VitalWorks witness Jim Kasper and others as well as WDC's witnesses. It was abundantly clear from the evidence and testimony at trial that neither WDC nor the defendants were ever able to effectively operate the system as described by Holman and others and as represented in Vitalworks promotional and instructional literature. See, for example, Defendants' Exhibits 2, "Getting Started" and 3, 4 and 8.

## BREACH OF EXPRESSED AND IMPLIED WARRANTY (COUNT TWO)

Under Connecticut law, contracts for the development and sale of computer systems are governed by the Uniform Commercial Code (UCC), despite having service aspects to the agreement. *Latham and Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 589 A.2d 337 (1991) (sale of a computer system governed by the UCC even though there were service aspects associated with the agreement.) The court finds that although the subject contract involved both goods and services relating to the purchase of the VitalWorks Intuition PM and EMR software programs, it is properly analyzed as a contract for the sale of goods because as the evidence established, the software product predominates over the training and support services. The Connecticut General Statutes § 42-2-101, et seq., Connecticut's codification of the Uniform Commercial Code governs this case. Furthermore, express warranties are defined in General Statutes §42a-2-313, which states in relevant part: "(1) [e]xpress warranties by the seller are created as follows:

37

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model. (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." General Statutes § 42a-2-313. The burden of proving the existence of an express warranty lies with the buyer. *Vezina* v. *Nautilus Pools, Inc.*, 27 Conn. App. 810, 610 A.2d 1312 (1992).

The exclusion or modification of express warranties is governed by General Statutes § 42a-2-316, which states in relevant part, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence negation or limitation is inoperative to the extent that such construction is unreasonable. . . ." § 42a-2-316 (1). Thus, while express warranties concerning the condition of the goods sold may be waived by an express

38

agreement between the parties; *Bridgeport L.A.W. Corp.* v. *Levy*, 110 Conn. 255, 147 A.2d 841 (1929); the limitation or waiver should not be enforced in factual scenarios where it would be inappropriate to do so.

In *Latham and Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 589 A.2d 337 (1991), the Connecticut Supreme Court explained that where a vendor "by its representation that it would develop a software system that would suitably meet the purchaser's demonstrated needs, had given an express warranty as that term is defined in General Statutes § 42a-2-313. . . . Such an express warranty may be actionable despite provisions in contractual disclaimers and limitation of liability clauses; General Statutes 42a-2-316 (1) and 42a-2-719 (2); if, as the trial court found, the restrictive clauses are factually determined to have been unreasonable or to have failed of their 'essential purpose." The court further stated that "[a]ll of the Notes appended to [§ 42a-2-313] of the Uniform Commercial Code are especially significant, particularly Note 4 which provides in part: 'A clause generally disclaiming 'all warranties, express or implied,' cannot reduce the seller's obligation with respect to (something describable and described) and therefore cannot be given literal effect under § [42a-]2-316.' Note 4 proceeds to point out that 'consideration should be given to the fact that the probability is small that a real price is intended to be exchanged for a pseudo-obligation." *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, supra, 218 Conn. 297.

The creation of the implied warranty of fitness for a particular purpose is governed

39

by General Statutes § 42a-2-315, which states: "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose." Under the provisions of § 42a-2-316, discussed above, such an implied warranty may be modified or excluded by a conspicuous writing.  General Statutes § 42a-2-316 (2), (3), and (4).[1]  Subsections two through four, however, "shall not apply to new or unused consumer goods, except for those clearly marked 'irregular', 'factory seconds' or 'damaged. . . .'" General Statutes § 42a-2-316 (5).  Subsection on further states that "[a]ny language, oral or written, used by a seller or manufacturer of consumer goods, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable."  § 42a-2-316 (5).

In the present case, the agreement between the parties contained provisions concerning both warranty limitations and limitations of liability.  See Plaintiff's Exhibit D. The following two paragraphs appear under the umbrella labeled "9. Warranty."  First, paragraph 9.1, entitled "Warranties" states: "VitalWorks warrants that, during the ninety-day period following the Go Live Date, the VitalWorks Software will substantially conform to the Documentation when used by the Customer in a manner that is consistent

---

[1] General Statutes § 42a-2-316 (4) refers to § 42a-2-718, which governs liquidation or limitation of damages and § 42a-2-719, which governs contractual modifications of remedies.

with the Documentation. VitalWorks does not warrant that the Software described herein will meet the Customer's requirements. Customer's sole and exclusive remedy for breach of the foregoing software warranty will be, at VitalWorks' option, to repair or replace the non-conforming VitalWorks Software or return any payments Customer paid for the non-conforming VitalWorks Software and terminate this Agreement. . . . This warranty is applicable only for new VitalWorks Software licenses purchased pursuant to this Agreement or by Subsequent Order." Paragraph 9.2, entitled "Warranty Limitations" appears in the same font and size, but in all capital letters, and states as follows: "OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, *VITALWORKS DOES NOT MAKE AN EXPRESS OR IMPLIED WARRANTIES TO CUSTOMER*, WITH RESPECT TO THE SOFTWARE, THE DOCUMENTATION, THE HARDWARE, OR ANY SERVICES PROVIDED HEREUNDER OR OTHERWISE REGARDING THIS AGREEMENT. WITHOUT LIMITING THE FOREGOING, *ANY IMPLIED WARRANTY OF* MERCHANTABILITY, INFRINGEMENT *AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED AND DISCLAIMED.*" (Emphasis added.) Plaintiff's Exhibit D.

Paragraph 11.1 of Plaintiff's Exhibit D, entitled "Limitations of Liability," appears in the same font but in bold, and states as follows: "Limitation of Remedy. In no event will VitalWorks be liable for any special, indirect, incidental, speculative, punitive or consequential damages or loss of goodwill in any way relating to this Agreement or

41

resulting from the use of or inability to use the products or the performance or non-performance of any services, including, without limitation damages for loss of profits, data or use incurred by Customer or any third party, even if VitalWorks has been notified of the possibility of such damages."

WDC has alleged that VitalWorks marketed and sold the software package as one specifically designed for physicians' offices to manage patient billing, appointments, medical records and treatment. Specifically, WDC claims that VitalWorks presented the product to it at a conference for the American Academy for Dermatology in March of 2003. At that conference, VitalWorks claimed that the product was not only suitable and functional, inter alia, but also user-friendly with a two-year return on productivity. Such representations by VitalWorks at the March 2003 conference, as well as subsequent correspondences with WDC throughout the remainder or 2003, created an express warranty within the provisions of § 42a-2-313. Accordingly, the limitation of liability created in the waiver of express warranty in the contract between WDC and VitalWorks is unreasonable within the meaning of § 42a-2-316 (1) and is therefore unenforceable.

An implied warranty of fitness for a particular purpose exists in the agreement between the parties since VitalWorks as a software producer marketed and sold its product to WDC for a particular purpose, and WDC relied on the company's skills, as a software producer, to sell them appropriate products. In this case, the VitalWorks product, its installation and training failed utterly to perform as warranted. Moreover, because the

42

goods purchased by WDC were new, the contract language waiving the implied warranty of fitness for a particular purpose is unenforceable.

## FRAUD (COUNT THREE)

"Under the common law . . . it is well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . All of these ingredients must be found to exist. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which . . . we have described as clear and satisfactory or clear, precise and unequivocal." (Citation omitted; internal quotation marks omitted.) *Ferris* v. *Faford*, 93 Conn. App. 679, 692, 890 A.2d 602 (2006).

Although VitalWorks failed to meet its contract obligations, WDC has not met the higher standard of proof required to hold defendant VitalWorks liable for fraud.

## NEGLIGENT MISREPRESENTATION (COUNT FOUR)

To establish a cause of action for negligent misrepresentation, the plaintiff must prove that the defendant both made a misrepresentation, and that the plaintiff relied on that misrepresentation. *Savings Bank of Manchester* v. *Ralion Financial Services, Inc.*, 91 Conn. App. 386, 390, 881 A.2d 1035 (2005). The standard of proof for a negligent

43

misrepresentation claim is preponderance of the evidence. *Rego* v. *Connecticut Insurance Placement Facility*, 22 Conn. App. 428, 430, 577 A.2d 1105 (1990), rev'd on other grounds, 219 Conn. 339, 593 A.2d 491 (1991).

Citing to § 552 of the Restatement Second of Torts (1979), our Supreme Court has described this cause of action as follows: "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 218 (1987). For purposes of a cause of action for negligent misrepresentation, the plaintiff need not prove the misrepresentations were promissory; it is sufficient to allege the representations contained false information. Id. In this case, they were both.

Relying on representations by VitalWorks sales employee Holman that:  1) the Kiron system WDC was using was going to be "sunsetted" and therefore tech support would not continue, and 2) the VitalWorks product, a combination of the Intuition PM and EMR software, would enable WDC to integrate all of its administration scheduling, billing, patient recordkeeping functions with clinical charting by WDC doctors for both its eastside and westside offices.  WDC was satisfied with the Kiron system it had used successfully, but was persuaded to incur the very significant financial expense of purchasing the

44

VitalWorks system consisting of the combined Intuition PM and EMR software programs based on the representation that Kiron would not be supported in the future and that it would enable WDC to consolidate the administrative and medical operations and clinical record functions resulting in recoupment of the VitalWorks system costs in one to two years. When Holman recommended Intuition to Dr. Glass while she was attending a medical conference WDC was only looking at Intuition PM because Holman represented that VitalWorks would require it to upgrade. The July 2, 2003 entry planning for the demonstration expressly states WDC "wants to see Intuition PM. Not interested in EMR . . . possibly down the road. Demo for PM only. . ." Holman conducted a web demonstration of the system on July 14, 2003 and demonstrated the Intuition Practice Manager (PM) and EMR on site at the offices of WDC on October 6, 2003. The three physicians viewed the EMR demonstration and the office and spa managers viewed both.

Exhibit Y is a compilation of case reports documenting WDC's customer history from July 13, 2003 through January 17, 2005, with individual case numbers. Case #2269812 describes multiple continuing problems from December 17, 2004 through January 17, 2005. Although VitalWorks does not identify the actual cause of the problems WDC experienced in this document, it does indicate that it is not a hardware problem and it appears that VitalWorks, now Cerner employees, attempted to install two different software updates, 5.1 and 5.2, on January 17, 2005, a full month after WDC reported this problem. In any business situation, this response is unacceptable. Exhibit Y documents

45

over 100 problems experienced by WDC during Review of Case reports entered during training on July 27, 2004 – July 29, 2004 indicate that onsite training could not test rapid claims or rapid bill on July 27 because WDC had not set up the system. VitalWorks corrected this the following day, but valuable training time was wasted. Serious problems occurred on July 29 during training described as "errors" in mail merge, printer, permission and scanner. The response from Bill Lewis of VitalWorks was that he did not have time to address these issues. He later provided some corrective solutions to the VitalWorks trainer Susan Green, but problems continued throughout the training session. The evidence was uncontradicted VitalWorks did not adequately train the WDC administrative staff despite WDC's efforts to learn. Immediately following the July training on August 6, 2004, WDC experienced significant problems operating the records and billing software. These problems include missing claim information, patient and tax identification, billing problems related to private insurance and medicaid. Some issues are resolved but the administrative billing staff continued to experience serious problems through 2004 as documented on the November 11, 2004 "Kelly's" list (Exh. K) and January 28, 2005 (Exh. O). The EMR training conducted for the physicians from October 20 though 22, 2004 was similarly affected by problems with the VitalWorks software itself and hardware that was not properly planned and/or installed.

There was ample evidence in this case that well before the installation and training, VitalWorks' records reflect significant strain in the relationship between WDC and

46

VitalWorks, as documented in VitalWorks Lead Profile. Exhibit X documents the contact by VitalWorks employees with WDC from the March, 2003 medical conference through September, 2005, and is noteworthy in several respects. First, although VitalWorks minimizes the roles of its sales employee Tim Holman in persuading WDC to purchase its Intuition PM and EMR software program, the Lead Profile contains 80 contact entries by Tim Holman from March 2003 until December 23, 2003, when WDC returned the signed contract. One of the key issues for WDC was the fact that implementation of the Intuition PM and EMR system would require extensive and costly hardware changes. Second, it was evident from the testimony on both sides that WDC's physicians and staff did not have the technical knowledge necessary to analyze their hardware needs or to plan and execute an operational change as extensive as required by the Intuition software. Furthermore, they were not prepared to assume the financial cost of the additional hardware. Because WDC reasonably tried to minimize hardware costs but did not understand the technology, they became increasingly frustrated with each new requirement and quote by VitalWorks as the menu of options and prices constantly changed through 2004. WDC physicians and office manager Shanklin remain confused about the hardware requirements. Despite being aware of continuing questions and the doctors being out of town, on March 18, 2004, Holman pressed for a 30 percent deposit before the end of March 2004. Unfortunately, Holman himself was no longer employed by VitalWorks as of April 2004. His successor, J. P. Winslow, found WDC frustrated, having been "pressured into buying sw and hw (software

47

and hardware) and they are not implemented yet . . . about to send everything back and just bag it until I showed up." Winslow continued as WDC's sales account contact through April 20, 2005 when WDC terminated use of the VitalWorks program.

The court finds that Holman misrepresented the system and pressured WDC to purchase complicated software programs which were sold to WDC as able to be used together, that VitalWorks employees continued these representations made on behalf of VitalWorks to secure the sale and that WDC relied on them.

The necessary elements for a cause of action based on innocent misrepresentation are set forth in *Johnson* v. *Healey*, 176 Conn. 97, 405 A.2d 54 (1978). In that opinion, our Supreme Court noted that "strict liability for innocent misrepresentation was imposed in a construction contract in *E. & F. Construction Co. v.* Stamford, 114 Conn. 250, 158 A. 551 (1932). In *Stamford*, the defendant's erroneous description of subsurface conditions materially affected the plaintiff's excavation costs. This court held the misrepresentation to be actionable, even though there was no allegation of fraud or bad faith, because it was false and misleading . . . . *Stamford* quotes, with approval, from 3 Williston, Contracts § 1512, p. 2689 (1920): If a man makes a statement in regard to a matter upon which his hearer may reasonably suppose he has the means of information . . . and the statement is made as part of a business transaction, or to induce action from which the speaker expects to gain an advantage, he should be held liable for the consequences of reliance upon his misstatement." (Citation omitted.) *Johnson v. Healy*, supra,176 Conn. 101.

48

*Matyas* v. *Minck*, 37 Conn. App. 321, 655 A.2d 1155 (1995).  For purposes of a cause of action for negligent misrepresentation, the plaintiff need not prove the misrepresentations were promissory; it is sufficient to allege the representations contained false information. Id.

In this case, as stated above, the misrepresentations were both promissory and false. VitalWorks sales personnel Holman misrepresented material facts with respect to the Kiron system to induce WDC to purchase the VitalWorks Intuition PM and EMR software. Holman and other VitalWorks employees represented that the system VitalWorks sold to WDC would enable it to integrate the administrative, billing and medical records functions of its two locations increase efficiency, reduce personnel needs and result in a return on the investment in two years.  Additionally, Holman also urged WDC to purchase the system by December 31, 2003 to avoid a 15 percent price increase.  Whether this price increase was actually true is not known.  What is known is that Cerner purchased VitalWorks in November 2004, thus the 2003 year-end sales data would reasonably be one of the factors in the sale.  Because (1) the system was not mature enough to be released for public sale, (2) VitalWorks did not provide adequate or effective training and (3) instillation was not proper or complete, VitalWorks should be held responsible to WDC for losses resulting from these misrepresentations.

49

Although the EMR training was finally conducted in October, 2004, VitalWorks had not resolved the implementation and training issues that were apparent from the previous Intuition PM training.  As late as November 15, 2004, VitalWorks still had not managed to install its system so that it would function as represented by Holman and in its literature.  "There is an issue with the interface between PM and EMR that Dev (development) has been working . . ." (Def. Exh. 22.)

The fact is that the Kiron program continued to be supported long after the unsuccessful installation and training VitalWorks provided for its system.  Prior to agreeing to purchase the VitalWorks system, the doctors and employees of plaintiff indicated they were satisfied with the existing Kiron program and comfortable using it.  But for the representations of Holman, WDC would not have purchased a new system.  There is no indication that WDC was planning to replace the Kiron system.  In fact, the evidence and common sense indicate otherwise, i.e., that but for the sales pressure exerted by VitalWorks, WDC would not have incurred the financial burden of replacing the software, including the additional expense of upgrading the hardware and systems to support the new software program, the need to retrain its medical and administrative staff and reorganize its office functions.

50

**UNJUST ENRICHMENT (COUNT FIVE)**

It is well established "that lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." (Internal quotation marks omitted.) *Bridgeport* v. *Kasper Group, Inc.*, 278 Conn. 466, 472 n. 4, 899 A.2d 523 (2006). "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract . . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573, 898 A.2d 178 (2006). "Although the lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment . . . the existence of a contract, in itself, does not preclude equitable relief which is not inconsistent with the contract." (Citation omitted; internal quotation marks omitted.) *Rent-A-PC, Inc.* v. *Rental Management, Inc.*, 96 Conn. App 600, 605-06, 901 A.2d 720 (2006).

In *Rent-A-PC*, our Appellate Court noted that the trial court found the existence of a contract, but also found that neither side had breached that contract, and thus made no findings with respect to the remedies available under the contract. Based upon the lack of a finding of contractual damages, the court rendered restitution damages pursuant to unjust enrichment. In the present matter, this court has found that there was a breach of contract,

51

and has found that remedies pursuant to that breach should be applied, and are sufficient to make the plaintiff whole. Allowing for damages for unjust enrichment in this matter would create duplicative damages and create a windfall profit for the plaintiff, rather than properly compensating them for the defendant's breach. Accordingly, the plaintiff's claim for unjust enrichment should be denied.

## CUTPA (COUNT SIX)

It is necessary to analyze the position of Cerner prior to addressing plaintiff's claims of violation of CUTPA. Defendant Cerner purchased VitalWorks in January 2005 and was not a party to the original contract. In its answer dated June 4, 2007, Cerner pleads lack of knowledge as to counts V and VI, admitting only that VitalWorks marketed and sold the subject software to WDC, which in turn paid for it. Cerner's position is that it is not responsible to WDC because it purchased VitalWorks after the contract and time in which the actions of which WDC complains occurred. Under Connecticut law, a party who purchases or succeeds to an organization may be liable as a successor-in-interest in addition to its predecessor if certain conditions are met.

A successor-in-interest "refers to a corporation that by process of amalgamation, consolidation or duly authorized legal succession, has become vested with the rights and has assumed the burdens of [another] corporation." *C&J Builders & Remodelers, LLC* v. *Geisenheimer*, 249 Conn. 415, 419, 733 A.2d 193 (1999). "Under Connecticut law, a corporation which purchases the assets of another company does not automatically become

liable for the debts and liabilities of its predecessor unless there exists one of four established exceptions to this general rule. Specifically, the party seeking to impose liability on the basis of a de facto successorship must establish: (1) that the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidations of the two firms; (3) the purchaser is a `mere continuation' of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability . . . Another recognized exception in Connecticut to the general rule is the 'product line' exception, which is generally applied to assess liability where the successor corporation may hold itself out as being the same name or product, operation and sale, thereby receiving the benefit of past goodwill, it should likewise bear the burden of past operation. . . .

"Where a successor corporation is a 'mere continuation' of the predecessor corporation, the 'mere continuation' exception to the general rule 'in effect takes cognizance of what may be called de facto merger,' the requirements for de facto merger being (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. . . . Not every one of these indicia must be established, however, but the court

53

should apply more of a balancing test. . . ." (Citations omitted.) *Peglar & Associates, Inc.* v. *Professional Indemnity Underwriters Corp.*, Superior Court, complex litigation docket at Stamford, Docket No. X05 CV 97 0160824 (June 19, 2002, *Rogers, J.*) (32 Conn. L. Rptr. 359, 363).

"The issue of whether a purchaser is a mere continuation of the selling corporation is a question of fact.' *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 187, 899 A.2d 90 (2006)." *Waterbury* v. *Phoenix Soil, LLC*, Superior Court, complex litigation docket at Waterbury, Docket No. X __ CV 98 0146037 (March 26, 2009, *Cremins, J.*).

In the present case, defendant Cerner claims that it cannot be held liable to WDC for any claims as alleged in the complaint because it only acquired VitalWorks in January 2005, well after the date of the contract and the issues relating to the sale, installation, training and operation of the VitalWorks system. It is true that VitalWorks advised WDC in November 2004 that Cerner was going to acquire it in 2005. When Cerner notified WDC that it had purchased VitalWorks, it stated that it would continue to support the Intuition PM and EMR software system, providing program updates and billing for system maintenance. Review of records from late 2004 through mid 2005 reflect that the same individuals who had been involved on behalf of VitalWorks in training, customer and technical support, etc. continued to perform the same functions with respect to WDC and the subject software system as they had before its purchase in January, 2005. As identified on VitalWorks' email records, these former VitalWorks employees include Jim Kasper,

Cathe Reams, Terri Cannady, Scott Culberson, Susan Green, Tiya Williams, Bill Lewis, J.P. Winslow, Ron J, Chris S, Mitch Henderson and L Jones.

In addition, Cerner continued to develop the VitalWorks Intuition software as shown by the bug reports timeline indicating that Cerner issued an informal bug report on September 19, 2005 and a formal bug report on December 6, 2005, albeit identified as "defect" rather than "bug" reports. Cerner also continued to market Intuition PM and EMR systems developed by VitalWorks and sold to WDC. Exhibit 19. Cerner's Physician Practice brochure identifies "Cerner Physician Practice, Inc. Formerly VitalWorks, Inc. and markets' Intuition System Overview Listing Intuition PM and Intuition EMR the evidence in this case established after Cerner purchased VitalWorks. Thus, the court finds that under the facts of this case, there was a continuity of enterprise as defined in *C & J Builders & Remodelers, LLC*, supra, 249 Conn. 415, and *Peglar & Associates, Inc.*, supra, 32 Conn. L. Rptr. 363.

CUTPA provides that "[n]o person shall engage in unfair methods competition and unfair or deceptive acts or trade practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered lawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is

55

within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Citation omitted; internal quotation marks omitted.)  *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 19, 938 A.2d 576 (2008).  "Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.)  *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 82-83, 873 A.2d 929 (2005).

"The same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation.  *Lester* v. *Resort Camplands International, Inc.*, 27 Conn. App. 59, 71, 605 A.2d 550 (1992).  Not every contractual breach rises to the level of a CUTPA violation.  *Hudson United Bank* v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 571, 845 A.2d 417 (2004)."   *Green* v. *Orsini*, 50 Conn. Sup. 312, 315, 926 A.2d 708 (2007). "There is a split of authority in Superior Court decisions regarding what is necessary to establish a CUTPA claim for breach of contract, the majority of courts [have held] that a simple breach of contract, even if intentional, does not amount to a violation of CUTPA in the absence of substantial aggravating circumstances." (Internal quotation marks omitted.) Id. "[T]he vast majority of courts in Connecticut [have held] that a simple breach

56

of contract is not sufficient to establish a violation of CUTPA, particularly where the count

alleging CUTPA simply incorporates by reference the breach of contract claim and does

not set forth how or in what respect the defendant's activities are either immoral, unethical,

unscrupulous, or offensive to public policy." *Boulevard Associates* v. *Sovereign Hotels,*

*Inc.*, 72 F.3d 1029, 1038-39 (2nd Cir. 1995).

Although a simple breach of contract does not offend traditional notions of fairness,

and standing alone, does not offend public policy so as to invoke CUTPA. A CUTPA

claim lies where the facts alleged support a claim for more than a mere breach of contract.

Depending upon the nature of the assertions, however, the same facts that establish a

breach of contract claim may be sufficient to establish a CUTPA violation. Lester v. Resor

Camplands International, Inc., 27 Conn. App. 59, 71, 605 A.2d 550 (1992). That generally

is so when the aggravating factors present constitute more than a failure to deliver on a

promise. *Tiensham, Inc.* v. *George*, Superior Court, complex litigation docket at

Waterbury, Docket No. X01 CV 04 4006907 (July 28, 2006, *Sheedy, J.*). Depending on

the nature of the assertions, the same facts that establish a breach of contract claim may be

sufficient to establish a Connecticut Unfair Trade Practices Act (CUTPA) violation; that

generally is so when the aggravating factors present constitute more than a failure to

deliver on a promise. *Green* v. *Orsini*, supra, 50 Conn. Supp. 312. A showing of

substantial aggravating circumstances is necessary because "[a] simple breach of contract

does not offend traditional notions of fairness and, standing alone, does not offend public

policy so as to invoke CUTPA." *Greene* v. *Orsini*, supra, 50 Conn. Sup. 315. Consequently, to maintain the CUTPA cause of action in the present case, the plaintiff must demonstrate to this court that there exist sufficient aggravating factors establishing that this case is more than an ordinary breach of contract claim.

"It has been held that a misrepresentation can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation; it would in effect be a deceptive act . . ." (Internal quotation marks omitted.) *Centimark Corp.* v. *Village Manor Associates,* Superior Court, judicial district of Windham, Docket No. CV 03 0070166 (June 21, 2007, *Martin, J.*). While "[n]ot every misrepresentation constitutes a CUTPA violation"; *Calandro* v. *Allstate Ins. Co.*, 63 Conn. App. 602, 617, 778 A.2d 212 (2001); "since CUTPA does not require proof of intent to deceive, mislead or defraud, [even an] innocent misrepresentation can amount to a CUTPA violation." *Friedlander Limited Partnership* v. *Cohen*, Superior Court, judicial district of Fairfield, Docket No. CV 04 0412571 (April 15, 2005, *Skolnick, J.*).

"General Statutes § 42-110g (a) provides in relevant part: 'Any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.' The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a

58

CUTPA action seeking either actual damages or equitable relief. . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an "ascertainable loss" due to a CUTPA violation. . . [T]he words 'any ascertainable loss' [however] . . . do not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case . . .'[L]oss' has a broader meaning than the term 'damage'. . . . An ascertainable loss is a deprivation, detriment, [or] injury that is capable of being discovered, observed or established. . . . On its face, the loss of a contract is an ascertainable loss. . . ." (Citations omitted; internal quotation marks omitted.) *Larobina* v. *Home Depot, USA, Inc.*, 76 Conn. App. 586, 592-593, 821 A.2d 283 (2003). "In order [for the court] to award punitive ... damages [under CUTPA], [the] evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Id.*, 597-598.

In this case, VitalWorks' conduct toward WDC from fall 2003 through spring 2005 was rife with repeated misrepresentations, concealment and false claims which, viewed in the light most favorable to the plaintiff, constitute sufficiently aggravating circumstances to support a CUTPA claim. *Tyson Roller Bearing, Inc.* v. *Accuride Corp.*, Superior Court, complex litigation docket at Hartford, Docket No. X03 CV 06 5009721 (May 7, 2008, *Langenbach, J.*).   Similarly, fraudulent inducement is a sufficiently aggravating circumstance. See *Bubbico* v. *Marinelli*, Superior Court, judicial district of New Britain, Docket No. CV 07 5003642 (December 11, 2007, *Shapiro, J.*).  The evidence provided to

59

this court has established sufficient aggravating circumstances to grant the plaintiff's claim under CUTPA. The Supplementary Report of Steven Kursh is most persuasive in this manner. In his report, and through his testimony, as detailed above, this court finds that the plaintiff has established that the software that VitalWorks sold to the plaintiff was riddled with programming bugs rendering it inoperable as represented and advertised, that the software was not properly tested or maintained by the relevant industry standards, and should not have been marketed or sold in its then-present state. Although VitalWorks induced the plaintiff to purchase the new software based on the claim that their old software would no longer be supported, service was not terminated on the older and properly functioning software for a full five years after the purchase date. Finally, both defendants' conduct with respect to failing to produce QA (quality assurance) records essential to understanding the development of the subject software is inexcusable. The evidence in this case strongly supports plaintiff's claims of CUTPA violations by both defendants. See *Zelencich* v. *American Yacht Services*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 02 0187145 (July 21, 2006, *Jennings, J.*) for a post trial CUTPA decision analysis. ("serious violation of trust" attendant to a breach of contract is a sufficiently aggravating circumstance in a bailor/bailee relationship.).

**VitalWorks' CLAIMS/DEFENSE**

VitalWorks argues that plaintiff has attempted to add new substantive claims after the trial of this action, (See factual findings 34, 35, 37-39) claiming first that they were not

within the allegations of plaintiffs second amended complaint and second, had plaintiff asserted them they would have been subject to dismissal by application of the statute of limitations.

Contrary to VitalWorks's claim, the allegations in WDC proposed findings of fact do not add new substantive claims. Proposed finding 34 is repeated in count III, paragraph 30; count IV, paragraph 34 and by reference in counts V and VI. Defendants had notice of the nature and substance of plaintiffs' claims.

## DAMAGES

WDC alleged that while Dr. Glass was attending a professional conference in San Francisco in early 2003, VitalWorks sales representative Tim Holman advised her that WDC should consider a new software program because the Kiron system it was using would soon not be technically supported. He then told them of the purported benefits of the VitalWorks software system which would integrate the Intuition Practice Management software program and the electronic medical record system known as EMR. Although VitalWorks argues that the Kiron representative Cannady made representations about "sunsetting" the Kiron program in an attempt to distance itself from the facts which led WDC to purchase the VitalWorks system, this claim is not credible. First, VitalWorks own interoffice emails indicate that Tim Holman was responsible for making the sale. Second, the context in which Cannady's name appears in VitalWorks' emails indicates that he was directly involved with the VitalWorks sales team regardless of his actual status. (Def. Exh.

61

install the programs.   A month later in May, VitalWorks finally began to discuss scheduling training but still had not determined exactly what the hardware needs are, which items it will provide, which WDC will purchase directly or what type of internet service will be required.  (Def. Exh. 22.)  In June, VitalWorks scheduled PM training for July 19 and EMR training for August 2 without resolving hardware installation or coordinating the physicians' schedules.  With training set for mid-July, on June 9 WDC decided to purchase hardware from VitalWorks. Mrs. Williams' lengthy June 15 note indicates hardware needs were still not resolved and VitalWorks was relying on WDC's office manager to describe computer systems and support without confirming what was actually on site although it was aware she lacked computer experience.  VitalWorks still had not finalized its quote or coordinated installation of hardware.  VitalWorks had not ordered hardware items that WDC had agreed to purchase from it.  The June 15 note also indicates that WDC either lost or never received materials including the Implementation Guide, Data Entry Guide, User's Guide, HCFAs, EMR Product Education Guide, Hardware specs and PBHS brochure and VitalWorks had not determined how to establish connectivity between the two WDC office sites.  VitalWorks induced WDC to purchase a system at a time when WDC was neither looking to replace nor was it prepared to undertake a change in both administrative and medical functions of the scale required by the VitalWorks system.  It is clear that WDC was not intending to replace the existing Kiron system it was satisfied using.  The representation that VitalWorks would no longer be supporting the Kiron system by

63

VitalWorks salesperson Tim Holman was a significant factor influencing WDC to purchase the VitalWorks Intuition PM and EMR programs. WDC also relied on Holman's representation that the VitalWorks Intuition PM and EMR systems would enable WDC to coordinate administrative functions, including scheduling, improve billing and collection and streamline medical records processing. Holman induced WDC to agree to the purchase by indicating that the price would increase in January, 2004. As a result WDC did not have product information on hardware requirements necessary for its purchase decisions or planning for the implementation and training. VitalWorks did not provide accurate, useful or essential information to WDC either. This lack of communication and coordination continued through July and August, 2004. When the WDC staff was trained on Intuition PM, numerous hardware issues remained because VitalWorks had not corrected or completed the order, and the cabling was not done. As of September 7, the westside WDC office was still not functioning because VitalWorks had not delivered or installed the router. On September 22, VitalWorks learned from WDC's consultant Rendon that WDC had a partial T1 line at each location for phone and data. Significant technical installation and hardware issues remained unresolved.

WDC purchased from VitalWorks Intuition PM and EMR software of $38,920.33 and a server for $17,770.70. From third parties, WDC purchased tablet PCs, printer, scanner, and spare batteries for $19,262.14. Of this, WDC was able to use equipment valued at $6,107.93 when it switched to Management Plus in May 2005. Based on VitalWorks' representations, WDC expected to be able to discontinue medical

64

transcription services once the physicians achieved proficiency with the EMR software. This should have occurred by the end of February, 2005 if the program had performed as represented. Because it did not, defendants are liable to WDC for transcription fees in March, 2005 - $2,300, and April, 2005 - $2,800, a total of $5,100.00.

In addition, WDC paid VitalWorks $2,285.86 in maintenance fees and $5,250 for EMR training. Neither of these in addition to the above items were of any value to WDC due to defendant VitalWorks' breach of contract and warranty of fitness and misrepresentation as well as violation of Connecticut General Statutes § 42-110a by both defendants. Furthermore, as a direct result of VitalWorks failure to install the hardware necessary to support the Intuition system, WDC retained Randy Rendon at a cost of $6,018.72. Although that portion of Mr. Rendon's services regarding installation may have been incurred by WDC separate from VitalWorks' breach of contract and warranty, the failure of the Intuition program to operate was so systemic it is not possible to separate Mr. Rendon's installation and communication services.

LOSSES DUE TO LOST TIME DURING TRAINING, LOST COLLECTION RATES, UNCOLLECTED BILLS

The testimony of WDC's economic loss expert Dr. Henry South was admitted by deposition taken October 3, 2008 (Pl. Exh. GG). Appendixes A-D contain the basis of Mr. South's calculation of various categories of financial loss experienced by WDC as a result of the unfair trade practices of the defendants. Dr. South compared WDC's monthly

65

DAMAGES-SUMMARY

| | | |
|---|---|---|
| Count I | Contract Damages | |
| | | |
| Count II | Warranty | |
| | Intuition PM and EMR software | 38,920.33 |
| | 5 tablet PCs, printer, scanner, spare batteries | 19,262.14 |
| | Server | <u>17,770.70</u> |
| | Total software/hardware | 75,953.17 |
| | Less work stations, cords, printers | |
| | usable with Management Plus | <u>(6,107.93)</u> |
| | Net hardware/software damages | $69,845.24 |
| | | |
| | Intuition maintenance fees | 2,285.86 |
| | Consultant - Rendon | 6,018.72 |
| | VitalWorks training | <u>5,250.00</u> |
| | | $13,554.58 |
| | | |
| Count III | No damages found | |
| | | |
| Count IV | Misrepresentation | |
| | Transcription fees 3/05-$2,800; 4/05-$2,300 | $ 5,100.00 |
| | | |
| Count V | No damages found | |
| | | |
| Count VI | CUTPA | |
| | Training Lost Billing Medical (11 days) | 64,617.46 App D |
| | Spa (6 days) | 12,824.12 App D |
| | Lost Earnings - Collection Rates | <u>80,613.66</u> App C, p.5 |
| | | $158,055.24 |
| | | |
| | 215 unpaid claims – server | $616,685.76 |
| | | |
| | TOTAL | <u>$863,240.82</u> |

Sommer, J.

67