UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, | Case No. 17-cv-00790-JAM |
| Plaintiff, | |
| v. | December 10, 2019 |
| SS&C TECHNOLOGIES INC., | |
| Defendant. | |

**ACM'S RESPONSE TO DEFENDANT'S OMNIBUS MOTION *IN LIMINE***

**HOLLAND & KNIGHT LLP**

Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
Manuel Miranda
*(Admitted pro hac vice)*
manuel.miranda@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

Daniel Mateo (phv10323)
daniel.mateo@hklaw.com
2929 Arch Street
Suite 800
Philadelphia, PA 19104
Telephone: (215) 252-9543
Facsimile: (215) 867-6070

*Attorneys for Plaintiff ARMOUR
Capital Management LP*

# Table of Contents

I.     Standard of Review ...................................................................................................1

II.    Response to SS&C's First Motion In Limine: ACM Should Be Precluded From
       Seeking A Punitive Damages Award. .......................................................................2

III.   Response to SS&C's Second Motion In Limine: ACM Should Be Precluded From
       Seeking Damages Based On ACM's "Lost Employee Time." ....................................7

IV.    Response to SS&C's Third Motion In Limine: ACM Should Be Precluded From
       Characterizing SS&C As Lying Or Making Intentional Misrepresentations. ..................12

V.     Response to SS&C's Fourth Motion In Limine: ACM Should Be Precluded From
       Trying a Breach of Contract or Warranty Case. .............................................14

VI.    Response to SS&C's Fifth Motion In Limine: ACM Should Be Precluded From
       Offering Evidence, Argument or Testimony Regarding Bimini Capital Management .....20

VII.   Response to SS&C's Sixth Motion In Limine: ACM Should be Precluded From
       Asserting That Seven Statements Constitute Actionable Misrepresentations ...................28

VIII.  Response to SS&C's Seventh Motion In Limine: ACM Should Be Precluded From
       Introducing Electronic Chats Exchanged By SS&C Employees ........................................33

IX.    Conclusion ..............................................................................................................37

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*ADL, LLC v. Tirakian*,
    No. CV2006-5076, 2007 WL 1834517 (E.D.N.Y. June 26, 2007) ........................................18

*Dunn ex rel Albery v. State Farm Mut. Auto Ins. Co.*,
    264 F.R.D. 266 (E.D. Mich. 2009) ...................................................................................1, 2

*Andersen v. Griswold Int'l LLC*,
    No. 14-cv-02560, 2014 WL 12694138 (N.D. Cal. Dec. 16, 2014)..........................................31

*Archer Daniels Midland Co. v. Soymet 101, LLC*,
    No. 14-CV-2181, 2016 WL 6157943 (C.D. Ill. Aug. 17, 2016)............................................35

*In re Aspect Software Parent Inc.*,
    578 B.R. 718 (Bankr. D. Del. 2017) ...................................................................................31

*Associated Constr./AP Constr., LLC v. Hanover Ins. Co.*,
    No. 3:15-cv-1600 (MPS), 2018 WL 3998971 (D. Conn. Aug. 21, 2018) ..................16, 21, 28

*Axis Oilfield Rentals LLC v. Mining, Rock, Excavation & Constr. LLC*,
    223 F. Supp. 3d 548 (E.D. La. 2016) ..................................................................................10

*Baker v. Dorfman*,
    239 F.3d 415 (2d Cir. 2000)................................................................................................30

*Bellsite Development LLC v. Town of Monroe*,
    122 A.3d 640 (Conn. App. Ct. 2015)..................................................................................25

*BHC Dev. L.C. v. Bally Gaming Inc.*,
    No. 12-2393, 2014 WL 1875161 (D. Kan. May 9, 2014)......................................................10

*Brent v. Wayne Cty. Dep't of Human Servs.*,
    901 F.3d 656 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1551 (2019)........................................12

*Broadspring Inc. v. Congoo LLC*,
    No. 13-CV-1866, 2014 WL 7392905 (S.D.N.Y. Dec. 29, 2014) .............................................3

*Cal. Bagel Co. v. Am. Bagel Co.*,
    No. CV 97-8863, 2000 WL 35798199 (C.D. Cal. June 7, 2000) ...........................................27

*Chalco v. Belair*,
    No. 15-cv-340 (VLB), 2019 WL 456162 (D. Conn. Feb. 5, 2019) ........................................15

*Clements Auto Co. v. Serv. Bureau Corp.*,
  444 F.2d 169 (8th Cir. 1971) ...............................................................................31

*Coppola Constr. Co. v. Hoffman Enterps. Ltd. P'ship*,
  38 A.3d 215 (Conn. App. Ct. 2012), *aff'd*, 71 A.3d 480 (2013) .............................13

*Cty. of Orange v. Tata Consultancy Servs. Ltd.*,
  No. SACV1300683JLSJCX, 2016 WL 6542728 (C.D. Cal. Apr. 1, 2016) ...........30

*Devine Enters. Inc. v. Sportech Venues Inc.*,
  No. DBDCV186026367S, 2019 WL 718996 (Conn. Super. Ct. Jan. 22, 2019) .....................9

*Dollman v. Mast Indus. Inc.*,
  No. 08-CV-10184, 2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011)...............................3

*Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*,
  687 F.2d 877 (6th Cir. 1982) ...................................................................28, 29, 30, 32

*Dunn v. Peter L. Leepson P.C.*,
  830 A.2d 325 (Conn. App. Ct. 2003)...................................................................4, 14

*Edmands v. CUNO Inc.*,
  892 A.2d 938 (Conn. 2006) .........................................................................................13

*Elliott v. Versa CIC L.P.*,
  349 F. Supp. 3d 1000 (S.D. Cal. 2018)........................................................................3

*Emerald Invs. LLC v. Porter Bridge Loan Co.*,
  No. 05-cv-1598, 2007 WL 1834507 (D. Conn. June 25, 2007) ................................6

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am. Inc.*,
  873 F.3d 85 (2d Cir. 2017).........................................................................................16

*Gallinari v. Kloth*,
  148 F. Supp. 3d 202 (D. Conn. 2015)......................................................................3, 4

*In re Genentech, Inc. Sec. Litig.*,
  No. C-88-4038, 1989 WL 137189 (N.D. Cal. Sept. 15, 1989)...............................28

*General Electric v. Specialty Store Lighting Inc.*,
  No. CV 9574939, 1996 WL 156010 (Conn. Super. Ct. March 15, 1996).................11, 12

*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990)..........................................................................................14

*Glazer v. Dress Barn Inc.*,
  873 A.2d 929 (Conn. 2005) .................................................................... *passim*

iii

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974) ................................................................................. 30

*In re Grand Jury Subpoena Duces Tecum*,
    105 F.3d 659 (6th Cir. 1997) ................................................................................. 34

*Hall v. Burns*,
    569 A.2d 10 (Conn. 1990) ................................................................................. 21

*Hannah v. Wal-Mart Stores, Inc.*,
    No. 3:12-CV-01361 (VAB), 2017 WL 10966338 (D. Conn. Mar. 31, 2017) ........................ 15

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................................. 29

*Kelley v. Bonney*,
    606 A.2d 693 (1992) ................................................................................. 16

*Kilduff v. Adams Inc.*,
    593 A.2d 478 (Conn. 1991) ................................................................................. 8

*Kosiorek v. Smigelski*,
    No. CV074014607S, 2010 WL 5188481 (Conn. Super. Ct. Dec. 1, 2010),
    *aff'd*, 54 A.3d 564 (Conn. App. Ct. 2012) ................................................................................. 6

*Latham & Assocs., Inc. v. William Raveis Real Estate, Inc.*,
    589 A.2d 337 (Conn. 1991) ................................................................................. 30

*Learning Care Grp. Inc. v. Armetta*,
    No. 13-CV-1540, 2016 WL 3248178 (D. Conn. June 12, 2016) ........................................ 8

*Lee v. Axiom Labs., Inc.*,
    No. CV980584562, 2001 WL 128917 (Conn. Super. Ct. Jan. 24, 2001), *aff'd*
    822 A.2d 373 (2003) ................................................................................. 27

*Levinson v. Westport Nat'l Bank*,
    No. 09-CV-1955, 2013 WL 3280013 (D. Conn. June 27, 2013) ........................................ 1

*Luce v. United States*,
    469 U.S. 38 (1984) ................................................................................. 1

*Mavrinac v. Emergency Med. Ass'n of Pittsburgh*,
    No. 04-1880, 2007 WL 2908007 (W.D. Pa. Oct. 2, 2007) ........................................ 2

*MECO Corp. v. MRMC, Inc.*,
    No. 04-cv-431, 2007 WL 9734536 (E.D. Tenn. Jan. 5, 2007) ........................................ 31

*Media Alliance Inc. v. Mirch*,
  No. 09-CV-0659, 2012 WL 162375 (N.D.N.Y. Jan. 19, 2012)................................................2

*Metcoff v. NCT Grp. Inc.*,
  49 A.3d 282 (Conn. App. Ct. 2012)................................................................................7

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017)......................................................................12, 13

*New England Sav. Bank v. FTN Properties Ltd. P'ship*,
  628 A.2d 30 (Conn. App. Ct. 1993)...............................................................................12

*Oppenheimer v. Southwest Airlines Co.*,
  No. 13-cv-260, 2013 WL 3149483 (S.D. Cal. June 17, 2013) ......................................3

*Palmieri v. Defaria*,
  88 F.3d 136 (2d Cir. 1996)...........................................................................................1

*Peregrine Pharm. Inc. v. Clinical Supplies Mgmt. Inc.*,
  No. 12-1608, 2014 WL 3791567 (C.D. Cal. July 31, 2014)........................................10

*Powell v. Schindler Elevator Corp.*,
  No. 14-cv-579, 2015 WL 77204601 (D. Conn. Nov. 30, 2015)..................................26

*Preisner v. Illman*,
  1 Conn. App. 264 (1984) ..............................................................................................16

*Preisner v. Illman*,
  470 A.2d 1237 (1984) ..................................................................................................20

*Rajaravivarma v. Bd. of Trustees for Ct. State Univ. Sys.*,
  272 F.R.D. 315 (D. Conn. 2011)...................................................................................25

*Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*,
  629 F.3d 282 (2d Cir. 2010)..........................................................................................35

*Richard Parks Corrosion Tech. Inc. v. Plas-Pak Indus. Inc.*,
  No. 10-CV-437, 2012 WL 4471258 (D. Conn. Sept. 27, 2012)....................................9

*Rose v. City of Waterbury*,
  No. 12-cv-00291, 2013 WL 1187049 (D. Conn. Mar. 21, 2013) .................................3

*Rosenberg v. Collins*,
  624 F.2d 659 (5th Cir. 1980) ........................................................................................35

*Ryder v. J.P. Morgan Chase Bank*,
  No. 13-CV-01929, 2015 WL 13793263 (D. Conn. Aug. 19, 2015) ..............................9

*Sea-Land Servs. Inc., v. Lozen Int'l LLC*,
  285 F.3d 808 (9th Cir. 2002) ....................................................33

*Sear-Brown Grp. v. Jay Builders Inc.*,
  665 N.Y.S.2d 162 (N.Y. App. Div. 1997) ............................................10

*Sierra v. Williamson*,
  No. 10-cv-00079, 2013 WL 12237672 (W.D. Ky. July 9, 2013) ..........................20

*SLSJ LLC v. Kleban*,
  277 F. Supp. 3d 258 (D. Conn. 2017) .................................................1

*Sovereign Bank v. Licata*,
  977 A.2d 228 (Conn. App. Ct. 2009) ..............................................9, 10

*SS&C Techs. Inc. v. Providence Inv. Mgmt.*,
  582 F. Supp. 2d 255 (D. Conn. 2008) ...........................................17, 29

*Standard Register Co. v. Bolton-Emerson Inc.*,
  649 N.E.2d 791 (Mass. App. Ct. 1995) ..............................................10

*Star Direct Telecom, Inc. v. Global Crossing Bandwidth*,
  Inc., 272 F.R.D. 350 (W.D.N.Y. 2011) ..............................................34

*State v. Paige*,
  974 A.2d 782 (2009), *aff'd in part*, *rev'd in part on other grounds*, 40 A.3d
  279 (2012) ........................................................................16

*Stohlts v. Gilkinson*,
  867 A.2d 860 (Conn. App. Ct. 2005) .................................................4

*Superhighway Consulting Inc. v. Techwave Inc.*,
  No. 98 CV 5502, 1999 WL 1044870 (N.D. Ill. Nov. 16, 1999) .........................34

*Sw. Bell Tel. v. Utex Commc'ns Corp.*,
  No. A-07-CV-435, 2010 WL 11506414 (W.D. Tex. Aug. 18, 2010).......................34

*In re Synchronoss Sec. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010) .................................................29

*Tulsa Zoo Mgmt. Inc. v. Peckham Guyton Albers & Viets Inc.*,
  No. 17-CV-644, 2019 WL 1029544 (N.D. Okla. Mar. 4, 2019) .........................11

*U.S. v. Davis*,
  918 F.3d 397 (4th Cir.), *cert. denied*, 140 S. Ct. 202 (2019)....................33

*U.S. v. Ferguson*,
  246 F.R.D. 107 (D. Conn. 2007).....................................................1

*U.S. v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999)..........................................................................17

*U.S v. Muyet*,
   958 F. Supp. 136 (S.D.N.Y. 1997) ................................................................14

*U.S. v. Skilling*,
   554 F.3d 529 (5th Cir. 2009), *aff'd in part, vacated in part on other grounds,*
   *remanded*, 561 U.S. 358 (2010)....................................................................28

*Ulbrich v. Groth*,
   78 A.3d 76 (Conn. 2013) .........................................................................9, 10, 14

*United States v. Parsee*,
   178 F.3d 374 (5th Cir. 1999) .......................................................................35

*United States v. Tank*,
   200 F.3d 627 (9th Cir. 2000) .......................................................................33

*UOP v. Andersen Consulting*,
   No. CV 950145753, 1997 WL 219820 (Conn. Super. Ct. Apr. 24, 1997) ............28

*Updike, Kelly & Spellacy P.C. v. Beckett*,
   850 A.2d 145 (Conn. 2004) ..........................................................................8

*Utzler v. Braca*,
   972 A.2d 743 (Conn. App. Ct. 2009)..............................................................4

*Ventura v. Town of E. Haven*,
   No. CV085024235S, 2014 WL 4056923 (Conn. Super. Ct. July 10, 2014)...........16

*Vereen v. City of New Haven*,
   No. 17-cv-1509, 2018 WL 6069098 (D. Conn. Nov. 20, 2018).....................33, 36

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).........................................................................28

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
   293 F. Supp. 2d 397 (S.D.N.Y. 2003)...........................................................15

*Welco Distributors Inc. v. Legere Group Ltd.*,
   No. CV030484760S, 2005 WL 2851484 (Conn. Super. Ct. Sept. 29, 2005) ...........11, 12

*Williams Ford Inc. v. Hartford Courant Co.*,
   657 A.2d 212 (Conn. 1995) .........................................................................21

*Williams v. Regus Mgmt. Grp. LLC*,
   No. 10 CIV. 8987 JMF, 2012 WL 1711378 (S.D.N.Y. May 11, 2012) ...................3

*Williams v. Rushmore Loan Mgmt. Servs. LLC*,
No. 15-cv-673, 2017 WL 822793 (D. Conn. Mar. 2, 2017) ....................................................1

*Worcester v. Salzillo*,
No. NNHCV085019588S, 2009 WL 5511544 (Conn. Super. Ct. Dec. 16,
2009) ...............................................................................................................................13

**Statutes**

Conn. Gen. Stat. Ann. § 42-110g(a), (g)......................................................................4, 6

**Other Authorities**

75 Am. Jur. 2d Trial § 44 (2017) .......................................................................................1

Black's Law Dictionary (11th ed. 2019).........................................................................13

Fed. R. Evid. 401 and 402................................................................................................15

Fed. R. Evid. 403 .......................................................................................................14, 15

Fed. R. Evid. 404(b).................................................................................................25, 27

Fed. R. Evid. 901(a)........................................................................................................36

2 Moore's Federal Practice § 12.37[e] (3d ed. 2004) ......................................................3

Rule 8 .................................................................................................................................3

Rule 9(b) ............................................................................................................................2

Rule 12(b)(6)......................................................................................................................3

Rule 30(b)(6)....................................................................................................................22

Rule 404(a).......................................................................................................................25

Rule 801(d)(2)..................................................................................................................33

Rule 901 ...........................................................................................................................34

I.      **Standard of Review**[1]

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *SLSJ LLC v. Kleban*, 277 F. Supp. 3d 258, 263 (D. Conn. 2017).

Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Levinson v. Westport Nat'l Bank*, No. 09-CV-1955, 2013 WL 3280013, at *3 (D. Conn. June 27, 2013). Courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *See U.S. v. Ferguson*, 246 F.R.D. 107, 116 (D. Conn. 2007).

Further, "[a] motion *in limine* is not the proper vehicle for seeking a dispositive ruling on a claim." *Williams v. Rushmore Loan Mgmt. Servs. LLC*, No. 15-cv-673, 2017 WL 822793, at *1 (D. Conn. Mar. 2, 2017) (alteration added) (quoting *Hana Fin. Inc. v. Hana Bank*, 735 F.3d 1158, 1162 n.4 (9th Cir. 2013)). And "[i]t is well settled that [m]otions *in limine* … are inappropriate devices for resolving substantive issues, such as the sufficiency of the evidence to support a claim or defense." *Id.* (first alteration added) (citations omitted).[2]

---

[1] Unless otherwise specified, capitalized terms have the same meaning as in the First Amended Complaint (ECF No. 35) ("FAC"). The "Master Agreement" is the "Master Agreement for Software, Maintenance and Support, Professional Services and Other Services" and incorporated each attachment and Work Request (ECF No. 35-1 at 1, § 4.1; ECF No. 35-2 at 1).

[2] *See generally* 75 Am. Jur. 2d Trial § 44 (2017) (stating that motions *in limine* should not be used as "unnoticed motions for summary judgment or motions to dismiss … . Moreover, deficiencies in pleadings or evidence are not appropriately resolved by a motion in limine. Clearly, a motion in limine may not properly be used as a vehicle to circumvent the requirements of rules of procedure."). *See also Dunn ex rel Albery v. State Farm Mut. Auto Ins. Co.*, 264 F.R.D. 266, 274-75 (E.D. Mich. 2009) ("[M]otions in limine are meant to deal with discrete evidentiary issues related to trial. … The denial of a motion in limine is warranted where the moving party seeks to

#71829593_v1

## II.   Response to SS&C's First Motion In Limine: ACM Should Be Precluded From Seeking A Punitive Damages Award.

SS&C seeks to preclude ACM from "introduc[ing] any evidence, testimony, or argument relating to punitive damages" for three reasons. (Mot. at 1.) None has any merit.

First, SS&C cites the Court's dismissal of ACM's intentional-misrepresentation claim in Count III to suggest that ACM now has no punitive-damages demand. (Mot. at 1-2.) Regardless of the fate of Count III, ACM always *also* has sought punitive damages under its CUTPA (Count II) and negligent-misrepresentation (Count IV) claims. (FAC Cts. II & III.) SS&C *never* challenged those punitive-damages demands,[3] and its motions to dismiss and for summary judgment on those claims failed. (ECF No. 75 at 12-16; ECF No. 194 at 10.) Thus, regardless of ACM's allegations about "intentional or reckless conduct," (Mot. at 1), the sufficiency of ACM's punitive-damages demands in Counts II and IV must be accepted for purposes of trial.

Second, relying on cases in the context of motions to strike or dismiss, SS&C *for the first time* claims "ACM is not entitled to punitive damages as a matter of law." (Mot. at 1-2.)

But a motion *in limine* is not a vehicle for "novel arguments in an effort to obtain dispositive relief." *Media Alliance Inc. v. Mirch*, No. 09-CV-0659, 2012 WL 162375, at *5 (N.D.N.Y. Jan. 19, 2012); *Dunn*, 264 F.R.D. at 274. Rather, motions *in limine* contesting the sufficiency of a claim, including a punitive-damages demand, are "procedurally barred." *Elliott*

---

argue the merits of its case and preclude the non-moving party from presenting its case."); *Mavrinac v. Emergency Med. Ass'n of Pittsburgh*, No. 04-1880, 2007 WL 2908007 at *1 (W.D. Pa. Oct. 2, 2007) ("Motions in limine are inappropriate vehicles to seek a final determination with respect to a substantive cause of action and should not be used as a substitute for a motion for summary judgment").

[3] The language concerning "'conscious misbehavior or recklessness'" that SS&C references from the Court's dismissal order, (Mot. at 2 (citing ECF No. 75 at 12)), related to the Court's review of SS&C's Rule 9(b) argument against Count III and nothing more, (ECF No. 75 at 10-12). In other words, the Court never has found that ACM has no evidence, or somehow is precluded from arguing or offering any evidence, to meet the punitive-damages standard in Connecticut.

*v. Versa CIC L.P.*, 349 F. Supp. 3d 1000, 1002 (S.D. Cal. 2018) (motion implicated "standard for a pleading to survive a motion to dismiss"); *Dollman v. Mast Indus. Inc.*, No. 08-CV-10184, 2011 WL 3911035, at *2 (S.D.N.Y. Sept. 6, 2011) ("[A]lthough styled as a motion to exclude evidence, this is in reality a motion for summary judgment dismissing Dollman's claim for punitive damages. . . . Having failed to raise this issue in its summary judgment motion, this Court will not permit Mast to file a second summary judgment motion under the guise of a motion *in limine*."); *Broadspring Inc. v. Congoo LLC*, No. 13-CV-1866, 2014 WL 7392905, at *8 (S.D.N.Y. Dec. 29, 2014). Here, SS&C argues that ACM's punitive-damages demands are insufficient "as a matter of law"; having failed to make that argument before (e.g., in a motion for summary judgment or otherwise), "the issue of whether [ACM] is entitled to punitive damages must await resolution at trial." *See Williams v. Regus Mgmt. Grp. LLC*, No. 10 CIV. 8987 JMF, 2012 WL 1711378, at *2 (S.D.N.Y. May 11, 2012).

<u>Third</u>, even if the Court made a legal inquiry at this late stage, SS&C would not prevail. A request for punitive damages is not a "separate count" or "freestanding claim" under Rule 8; it is only a form of "remedy" sought under a claim. *Rose v. City of Waterbury*, No. 12-cv-00291, 2013 WL 1187049, at *10 (D. Conn. Mar. 21, 2013); *Gallinari v. Kloth*, 148 F. Supp. 3d 202, 217 (D. Conn. 2015). Because "Rule 12(b)(6) only countenances dismissal for failure to state a claim," it cannot be used to challenge legal sufficiency based on "allegations of damages or [the] theory of damages." *Oppenheimer v. Southwest Airlines Co.*, No. 13-cv-260, 2013 WL 3149483, at *3 (S.D. Cal. June 17, 2013); 2 Moore's Federal Practice § 12.37[e] (3d ed. 2004) ("The absence of allegations supporting a particular theory of recovery should not provide grounds for striking a claim."). Here, the Court concluded that ACM's negligent-misrepresentation and CUTPA claims, under which ACM demands punitive damages, were well-plead. (ECF No. 75 at 12-16.) Nothing

else was required at the pleading stage. *See Gallinari*, 148 F. Supp. 3d at 217 (punitive-damages demand "possesses no viability absent its attachment to a substantive cause of action").

Fourth, even if the Court were to indulge SS&C's invitation to make a dispositive inquiry into ACM's ability to pursue punitive damages, ACM's claims are legally sufficient to support a punitive-damages award.  SS&C cannot dispute that ACM may seek punitive damages under its CUTPA claim.  Conn. Gen. Stat. Ann. § 42-110g(a).  Nor do SS&C's cases provide for anything beyond the general rule that *simple* negligence is insufficient for punitive damages, such as a categorical bar on punitive damages under a negligent-misrepresentation claim. (Mot. at 1-2.)  On the contrary, as in any tort case, the jury here could make such an award if it concludes that "the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation." *Dunn v. Peter L. Leepson P.C.*, 830 A.2d 325, 328 (Conn. App. Ct. 2003).  In fact, the very cases cited by SS&C recognize the availability of punitive damages in the negligent-misrepresentation context.  (Mot. at 2 ("where courts have nonetheless considered the availability of punitive damages [for] negligent misrepresentation," "reckless or intentional conduct" required)); *see Stohlts v. Gilkinson*, 867 A.2d 860, 869 (Conn. App. Ct. 2005) (awarding punitive damages for negligent infliction of emotional distress on proof that "underlying conduct was intentional" and holding that "defendants' argument that the court improperly granted relief on the basis of an unpleaded claim of intentional infliction of emotional distress is without merit").

And there is ample evidence on which the jury could reach such a conclusion.  Among other things, SS&C knew, but was willfully blind to, facts showing that the implementation of CAMRA for ACM was doomed from the start.  There is no stronger evidence of reckless indifference. *E.g.*, *Utzler v. Braca*, 972 A.2d 743, 748, 755-57 (Conn. App. Ct. 2009) (affirming punitive damages where defendant, to induce investment, "created" profit figure on prior project

"without any reasonable basis in fact" and in truth "had sold that property for a loss or a relatively small profit").   And the jury also could decide from the repetitiousness of SS&C's misrepresentations that SS&C's misconduct rises to the level of intentionality and wantonness.

For instance:

While SS&C's sales team was making misrepresentations to ACM in 2014, they also actively excluded SS&C's Professional Services ("PS"), which would implement CAMRA for ACM.   The then-head of PS, Iwona Olszewska, complained repeatedly, conceding she had "no context" for whether SS&C's proposal "even [held] together" and criticizing SS&C as concerned more with just "selling software" than "the overall solution."   (ACM Exs. 52, 58, 65, attached at Exs. 1-3, respectively).   Critically, Olszewska—and, thus, SS&C—knew ACM "needed" a reconciliations module called RECON, which "should have been strongly suggested" to ACM. (6/5/18 I. Olszewska Tr. at 21:25-30:24, 51:11-59:10, attached at Ex. 4.)  Olszewska told SS&C's sales team, but they ignored her and sold ACM the less-expensive CI Manager, which SS&C knew had "limited at best functionality" and caused "operational difficulties."   (*Id.*; ACM Ex. 65.) Failing to include RECON is one reason SS&C later concluded that ACM's "overall solution" was not "right" or valid."   (*Id.*; ACM Exs. 94, 103, 288, attached at Exs. 5-7, respectively.)

Another issue Olszewska flagged for SS&C's sales team was "dependencies of CAMRA functionality."   (ACM Ex. 52.)   SS&C knew ACM required CAMRA to integrate and automate with various third-party platforms, such as AVM, BONY, and Citi.   (5/4/18 J. Fecteau Tr. at 49:10-61:7, 108:6-129:13, attached at Ex. 8.)   Though SS&C also knew it never had worked with AVM, it did nothing to verify its related misrepresentations to ACM.   (6/28/18 M. Chacko Tr. at 147:9-23, attached at Ex. 9.)   SS&C also knew it had never connected to BONY or Citi for a hosted mortgage REIT and that, as a hosted deployment, ACM's CAMRA would require its own

dedicated connections to those platforms.  (6/28/18 M. Chacko Tr. at 37:12-40:21, 110:24-112:5, 149:3-153:17.)  The then-head of SS&C's Operations Technology Services team (which handled such connections)—and, thus, SS&C—knew that testing these connections with Citi and BONY would have taken a "negligible" amount of time, but SS&C did not do so.  (5/4/18 J. Fecteau Tr. 108:6-121:14; 6/28/18 M. Chacko Tr. at 37:12-40:21, 110:24-112:5, 149:3-153:17.)  Instead, SS&C affirmatively misrepresented to ACM that CAMRA was "integrated" and "automated," including because SS&C could connect it with AVM, Citi, and BONY.  SS&C's later difficulty doing so, rendering CAMRA neither "integrated" nor "automated" for ACM, was yet another obstacle.  (5/4/18 J. Fecteau Tr. at 49:10-61:7, 108:6-121:14.)

Fifth, SS&C argues that ACM's "request for punitive damages under CUTPA" (but not negligent misrepresentation, under which SS&C does not dispute the jury may award ACM punitive damages) "does not go to the jury."  (Mot. at 1.)  While true that the "award" of punitive damages under CUTPA is vested in the Court, Conn. Gen. Stat. § 42-110g(a) & (g), it does not follow that ACM should be precluded from "introduc[ing] evidence, testimony, or argument relating to punitive damages" under CUTPA to the jury, (Mot. at 1).  Instead, under standard Connecticut practice, the jury should be asked whether ACM has met the evidentiary threshold necessary for punitive damages.  *Emerald Invs. LLC v. Porter Bridge Loan Co*., No. 05-cv-1598, 2007 WL 1834507, at *7 (D. Conn. June 25, 2007); *Kosiorek v. Smigelski*, No. CV074014607S, 2010 WL 5188481, at *1 (Conn. Super. Ct. Dec. 1, 2010), *aff'd*, 54 A.3d 564 (Conn. App. Ct. 2012) (plaintiff filed motion for punitive damages after "jury found that the plaintiff [wa]s entitled to punitive damages").  (*See* ECF No. 221-16 at 2 (ACM Proposed Verdict Form); ECF No. 221-12 at 17 (ACM Proposed Jury Instruction No. 14).)  The "award" of punitive damages under CUTPA then will be decided by the Court after a post-trial motion on the issue (and a hearing, if

necessary).  *See id.*; *Metcoff v. NCT Grp. Inc.*, 49 A.3d 282, 285 (Conn. App. Ct. 2012) (awarding punitive damages "[a]fter a separate posttrial hearing" where "the jury determined that the plaintiffs should recover punitive damages . . . in an amount to be determined by the court").

### III. Response to SS&C's Second Motion In Limine: ACM Should Be Precluded From Seeking Damages Based On ACM's "Lost Employee Time."

SS&C next moves to exclude "evidence, testimony, or argument" relating to ACM's demand for damages relating to lost-employee time ACM spent in support of SS&C's failed implementation of CAMRA for ACM.  In support, SS&C relies solely on Section 6.2.2 of the Master Agreement.  (Mot. at 2-4.)  SS&C's motion should be denied for numerous reasons.[4]

<u>First</u>, SS&C invoked Section 6.2.2 in its summary-judgment motion to challenge ACM's demand for lost employee time under its non-contract claims.  (ECF No. 176-1 at 40-41 ("ACM has no ascertainable loss because . . . Section 6.2.2 bars claims for incidental damages."); ECF No. 179 at 13 ("[A]s with its contract claim, ACM's NMR claim requires proof of damages. . . .  Absent any actual loss, ACM's NMR claim also fails.").)  SS&C entirely lost those arguments.  (ECF No. 194 at 10 ("[B]ecause of the possibility that ACM suffered damages due to SS&C's negligent misrepresentations, I do not agree with SS&C's argument that there is no genuine fact issue with respect to whether ACM can satisfy CUTPA's 'ascertainable loss' requirement.").)

<u>Second</u>, if that does not end the inquiry, Section 6.2.2 on its face is inapplicable to ACM's CUTPA and negligent-misrepresentation claims.  The provision is confined to the following:

> SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover *in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for*

---

[4] ACM's Motion *in Limine* No. 4: To Exclude Any Reference or Argument Related to Section 6.2.2 of the Master Agreement is incorporate by reference.  (ECF No. 218.)

*breach of this Master Agreement*, whether alleged as a breach of contract or tortious conduct, even if SS&C has been advised of the possibility of such damages.

(Mot. Ex. 1 at 5 (emphasis added).)

Section 6.2.2 does not extend to damages allowed by statute. (*Id.* ("whether alleged as a breach of contract or tortious conduct").) Thus, it is irrelevant to ACM's CUTPA claim.

The provision also cabins its applicability exclusively to certain types of damages only. SS&C generalizes those types as "'aris[ing] out of'" or "'in connection with' the services provided by SS&C under the Master Agreement." (Mot. at 3.) Not so. Specifically, Section 6.2.2's reach is limited to damages "in connection with or arising out of": (i) some unspecified "*furnishing*"; (ii) the "*performance* of any services under the Master Agreement"; (iii) "any Attachment or any Work Request"; (iv) the "*use* of the Software," i.e., CAMRA, "furnished" under the Master Agreement; or (v) "for *breach* of th[e] Master Agreement." (*Id.* (emphases added).)

In Connecticut:

[t]he damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause [including, among other things] (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

*Updike, Kelly & Spellacy P.C. v. Beckett*, 850 A.2d 145, 167 n.25 (Conn. 2004) (quoting Restatement (Second) Torts § 552(b)(1)); *Kilduff v. Adams Inc.*, 593 A.2d 478, 484 (Conn. 1991) (damages are "probable consequence" of misrepresentations); *Glazer v. Dress Barn Inc.*, 873 A.2d 929, 954 (Conn. 2005) (damages are "pecuniary loss caused [by] justifiable reliance upon the [false] information"); *Learning Care Grp. Inc. v. Armetta*, No. 13-CV-1540, 2016 WL 3248178, at *3 (D. Conn. June 12, 2016). Here, ACM seeks lost employee time as damages "in connection with or arising out of" its reliance on SS&C's precontractual misrepresentations. Section 6.2.2

8

does not extend to any such damages, and under Connecticut law, ACM's damages do not flow

from any "furnishing," "performance," "use," or breaches under that provision.[5]

      <u>Third</u>, even if the terms of Section 6.2.2 somehow might make it relevant here, it is

inapplicable to ACM's triable claims as a matter of law.  This is because the whole point of a

negligent-misrepresentation claim is to avoid the underlying contract into which the plaintiff was

induced and provide an independent remedy (as logically also is the case for CUTPA).

      The Connecticut Supreme Court explained that a negligent-misrepresentation claim, even

for inducement to enter into a contract, does not "'arise out of' the breach of any contractual

obligation because it . . . implicate[s] contract formation." *Ulbrich v. Groth*, 78 A.3d 76, 98-99

(Conn. 2013); *Ryder v. J.P. Morgan Chase Bank*, No. 13-CV-01929, 2015 WL 13793263, at *9

(D. Conn. Aug. 19, 2015).   Similarly, Connecticut courts have held that a "negligent

misrepresentation action does not seek to enforce the underlying contract; rather, it seeks damages

for reliance on misrepresentations that may have been made in relation to that contract." *Sovereign*

*Bank v. Licata*, 977 A.2d 228, 242 (Conn. App. Ct. 2009); *see Richard Parks Corrosion Tech. Inc.*

*v. Plas-Pak Indus. Inc*., No. 10-CV-437, 2012 WL 4471258, at *4 (D. Conn. Sept. 27, 2012).  In

other words, "the damages recoverable for negligent misrepresentation do not include the benefit

of the plaintiff's contract with the defendant." *Devine Enters. Inc. v. Sportech Venues Inc*., No.

DBDCV186026367S, 2019 WL 718996, at *6 (Conn. Super. Ct. Jan. 22, 2019).  Thus, "a remedy

on the contract and a remedy for negligent misrepresentation may be independent remedies."

---

[5] It thus is no surprise that the Court's order granting SS&C summary judgment on the basis of
Section 6.2.2 was limited to ACM's contract claim, which has been dismissed.  (ECF No. 194 at
18 ("I will grant summary judgment for SS&C on ACM's *contract claim to the extent that it seeks*
*recovery for lost employee time*.  All in all, I will grant summary judgment for SS&C on ACM's
contract claim because there is no genuine fact issue to show that ACM sustained damages that
are subject to recovery *by means of a breach of contract claim*." (emphases added).)

*Ulbrich*, 78 A.3d at 98-99; *Licata*, 977 A.2d at 242 ("This critical distinction sets the tort action apart from a contract action and makes the claim worthy of independent review.").

Following this reasoning, courts routinely hold that "limitation of liability clauses do not apply to misrepresentations made to induce a party to enter into an agreement." *Sear-Brown Grp. v. Jay Builders Inc.*, 665 N.Y.S.2d 162, 163 (N.Y. App. Div. 1997); *BHC Dev. L.C. v. Bally Gaming Inc.*, No. 12-2393, 2014 WL 1875161, at *6 (D. Kan. May 9, 2014) (provision limiting damages to sum paid by plaintiff for particular hardware or software did not apply to "plaintiffs' claim for negligent misrepresentation" because a "misrepresentation claim stems from defendant's alleged negligence in conveying inaccurate information before plaintiffs entered the Agreement"); *Peregrine Pharm. Inc. v. Clinical Supplies Mgmt. Inc.*, No. 12-1608, 2014 WL 3791567, at *15 (C.D. Cal. July 31, 2014) (decisions uniformly hold that limitation of damages "clauses are inapplicable to . . . claims for negligent misrepresentation"); *Standard Register Co. v. Bolton-Emerson Inc.*, 649 N.E.2d 791, 794 (Mass. App. Ct. 1995) (same).  SS&C has supplied no binding Connecticut case law that would provide for a contrary result.  *Cf. Axis Oilfield Rentals LLC v. Mining, Rock, Excavation & Constr. LLC*, 223 F. Supp. 3d 548, 560 (E.D. La. 2016) (court was not even presented with contract formation or inducement arguments) (Colorado law).

The same principle should apply here.  ACM's triable claims are based on ACM's reliance on misrepresentations that preceded the Master Agreement (and Section 6.2.2) and induced ACM to enter into the contract.  Thus, under Connecticut law, ACM's negligent-misrepresentation (and CUTPA) claims implicate formation, and not enforcement, of the Master Agreement, and so those claims are independent and cannot trigger Section 6.2.2.  In fact, the Court previously noted Section 6.2.2 and also observed that "Connecticut law does not favor contract provisions that relieve a party from its own negligence absent unmistakable language in the contract to make clear

that the limitation of liability extends to claims for negligence" in refusing to enforce Section 6.7.4 of the Master Agreement against ACM's negligent-misrepresentation and CUTPA claims.  (ECF No. 194 at 3, 8.)  It would be inconsistent for the Court to now enforce Section 6.2.2 against the very same claims the Court already has held are actionable.  (*Id.* at 6-10.)  And to be sure, Section 6.2.2 does not "unmistakabl[y]" provide that SS&C is insulated from damages relating to SS&C's precontractual negligent misrepresentations, or any negligence at all.[6]

In the face of all this, SS&C relies on two unhelpful Connecticut decisions.

In the first, *General Electric v. Specialty Store Lighting Inc.*, No. CV 9574939, 1996 WL 156010 (Conn. Super. Ct. March 15, 1996), the counter-plaintiff brought claims for breaches of contract and implied covenant of good faith and fair dealing and CUTPA, all of which were based on the "same facts," including wrongful termination of the contract.  *Id.* at *1, 3.  There was no negligent-misrepresentation claim or CUTPA claim based on negligent misrepresentations.  Here, ACM triable claims sound in negligent misrepresentation and CUTPA based on negligent misrepresentations, and they are not based on the same conduct as any contract claim.

In the second, *Welco Distributors Inc. v. Legere Group Ltd.*, No. CV030484760S, 2005 WL 2851484 (Conn. Super. Ct. Sept. 29, 2005), after trial, the court found that the counter-plaintiff had failed to prove its case.  *Id.* at *3-4.  So, the language for which SS&C offers the case is dicta and moreover did not consider any legal support or arguments on inducement or contract formation.  *Id.* at *5.  In fact, the language is so ambiguous it is impossible to decipher the claims or damages to which the court believed the provision might apply in the first place.

---

[6] The reference in Section 6.2.2 to "tortious conduct" does not equate to an "unmistakable" reference to negligence, much less precontractual negligent misrepresentations.  If anything, SS&C's own case law suggests that language concerns professional negligence based on the same conduct as a breach of contract.  *Tulsa Zoo Mgmt. Inc. v. Peckham Guyton Albers & Viets Inc.*, No. 17-CV-644, 2019 WL 1029544, at *17, 25-26 (N.D. Okla. Mar. 4, 2019).

Fourth, even if Section 6.2.2 is not inapplicable to ACM's claims as a matter of law, it still should not be enforced because SS&C failed to plead any limitation of liability as an affirmative defense to ACM's negligent-misrepresentation and CUTPA (and rescission) claims.  (ECF No. 101 at 18.)  In Connecticut, "a release of liability must be pleaded as a special defense."  *New England Sav. Bank v. FTN Properties Ltd. P'ship*, 628 A.2d 30, 32 (Conn. App. Ct. 1993); *see Gen. Elec.*, 1996 WL 156010, at *1-4 (pleading special defense); *Welco Distributors*, 2005 WL 2851484, at *1 (same).  That is because "[a] limitation of liability, whether contractual or statutory, is, in substance and effect, a partial release of liability."  *New England Sav. Bank*, 628 A.2d at 32.[7] By failing to plead a release of liability as a special defense, SS&C waived any right to wield Section 6.2.2 to limit ACM's damages under its claims that will be tried to the jury.

## IV.   Response to SS&C's Third Motion In Limine: ACM Should Be Precluded From Characterizing SS&C As Lying Or Making Intentional Misrepresentations.

Though the trial in this case obviously will concern SS&C's false and/or misleading statements and other deceptive conduct, SS&C moves to exclude evidence "that characterizes SS&C as lying, making intentional misrepresentations, or otherwise intentionally deceiving or misleading ACM." (Mot. at 4-5.)  SS&C's motion should be rejected for numerous reasons.

First, the terms about which SS&C complains—"lying," "intentional misrepresentations," "intentionally deceiving or misleading," "lied," and "knowingly misled"—are neither pejorative nor inflammatory.  (*Id.*)  ACM has found no decisions suggestions otherwise, and the sole decision SS&C cites is inapposite.  *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp.

---

[7] "Federal law governs whether a defense has been waived in federal court, but state law governs which defenses must be pleaded affirmatively to avoid waiver."  *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 680 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1551 (2019).

3d 558, 570 (S.D.N.Y. 2017) (precluding defendant from referring to claim holders as "vulture funds" or "treasure hunters"). Instead, these terms "bear on the issues being tried." *Id.*

Second, given that ACM's claims against SS&C assert misrepresentations and deceptive conduct, the terms SS&C seeks to exclude could in no way be pejorative, have "no probative value," cause "manifest prejudice," or "confuse" and "incite the jury." (Mot. at 4-5.) The crux of SS&C's concern is that ACM will introduce evidence at trial that shows that SS&C acted not just negligently, but also knowingly or intentionally. (*Id.* at 4.) But to prove that someone "lied" does not require a showing of knowing or intentional conduct. Black's Law Dictionary (11th ed. 2019) ("Lie: To tell an untruth; to speak or write falsely."). And in any event, the first element of ACM's negligent-misrepresentation claim requires a showing that SS&C supplied false information, i.e., perpetrated a lie. *Glazer,* 873 A.2d at 955-56. A CUTPA violation similarly can be based on a showing that SS&C engaged in a "deceptive practice," such as false information. *Edmands v. CUNO Inc.*, 892 A.2d 938, 954 n.16 (Conn. 2006).

Third, evidence of SS&C's knowledge and intentional conduct is probative of SS&C's failure to exercise reasonable care in making misrepresentations to ACM, the second element of ACM's negligent-misrepresentation claim. *Glazer,* 873 A.2d at 955-56. That is because in Connecticut, a plaintiff can show that a defendant failed to exercise reasonable care if it "knew or should have known" that the representation "was false." *Coppola Constr. Co. v. Hoffman Enterps. Ltd. P'ship,* 38 A.3d 215, 218 (Conn. App. Ct. 2012), *aff'd,* 71 A.3d 480 (2013). CUTPA is similar and can be based on proof of "deception." So, ACM can meet its burden by showing that SS&C's conduct was "immoral, unethical, oppressive or unscrupulous" or SS&C made negligent misrepresentations. *Edmands*, 892 A.2d at 954 n.16; *Worcester v. Salzillo*, No. NNHCV085019588S, 2009 WL 5511544, at *3 (Conn. Super. Ct. Dec. 16, 2009). Finally, ACM

is seeking punitive damages under negligent misrepresentation and CUTPA.  The jury here may make such an award if it concludes that "the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation."  *Peter L. Leepson, P.C.*, 830 A.2d at 328; *Ulbrich,* 78 A.3d at 127.  Thus, evidence of SS&C's knowledge and intent bears a direct correlation to all the triable issues in this case.[8]

      <u>Fourth</u>, the Court may only exclude this evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.  *See* Fed. R. Evid. 403.  "Because Rule 403 permits the exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly."  *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990).  Here, the evidence SS&C seeks to exclude is only prejudicial to SS&C "in the sense that it is harmful to [its] case."  *U.S v. Muyet*, 958 F. Supp. 136, 141 (S.D.N.Y. 1997).  Absent a showing of unfair prejudice or risk of confusion (which SS&C has not attempted), the Court should not exclude SS&C's intentional and knowing conduct or that its statements amounted to lies.

### V.     Response to SS&C's Fourth Motion In Limine: ACM Should Be Precluded From Trying a Breach of Contract or Warranty Case.

      SS&C has framed its fourth motion *in limine* as seeking to preclude ACM from presenting to the jury a case based on the previously dismissed claims of breach of contract and breach of warranty.  According to SS&C, ACM seeks to hold SS&C *"liable"* for those claims through the "guise" of its negligent misrepresentation and CUTPA claims. (Mot. at 6.)  Stated differently, SS&C asks this Court to preclude ACM from introducing evidence of SS&C's performance (or, more aptly, failures of performance) to help prove its negligent misrepresentation claim.  The

---

[8] For these reasons, the Court's Order on Motion to Dismiss (ECF No. 75) is irrelevant.

evidence that SS&C seeks to exclude is relevant and probative under Fed. R. Evid. 401 and 402

and SS&C's motion must be denied because it fails to meet its burden under Fed. R. Evid. 403.

First, no breach of contract claims are being tendered to the jury for consideration.[9]  Thus,

SS&C's expressed concern that it will be found "*liable*" on those claims is an obvious

exaggeration.  In addition, the dismissal by the Court of ACM's breach of contract claim does not

alone render evidence related to that claim irrelevant.  *See*, *e.g., Chalco v. Belair*, No. 15-cv-340,

2019 WL 456162, at *8 (D. Conn. Feb. 5, 2019) (denying a motion *in limine* and stating "the Court

does not find that allowing this evidence will force Defendant to litigate a previously dismissed

claim or waste time because this evidence is relevant to Defendant's intent on the [surviving]

claim.").

Here, the evidence that SS&C seeks to exclude is relevant to establishing the falsity of

SS&C's statements and whether SS&C knew or should have known the statements were false.

These are both essential elements of ACM's case.  SS&C's narrow limitation on evidence upon

which ACM could rely to prove its case would make it impossible for ACM to meet its burden.

In effect, SS&C seeks to use its motion *in limine* as another summary judgment motion.[10]  The

limitations sought by SS&C would also mislead the jury concerning when and how ACM

discovered the falsity of the pre-contractual statements and thereby permit SS&C to potentially

escape responsibility for its negligent misrepresentations and CUTPA violations.

---

[9] Of course, SS&C is not permitted to reference dismissed claims, because such reference would serve only to prejudice ACM.  *Hannah v. Wal-Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2017 WL 10966338, at *4 (D. Conn. Mar. 31, 2017) (reference to dismissed legal claims inappropriate).

[10] *See Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 403 (S.D.N.Y. 2003) ("I deny Defendant's motion to 'exclude all evidence' relating to the contract claims for the same reason.  In effect, this is a motion to dismiss the claims.  In limine motions are generally not the appropriate vehicle for effecting dismissal.").

Second, SS&C's argument ignores Connecticut law holding that "[s]ubsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made."[11] *Associated Constr./AP Constr., LLC v. Hanover Ins. Co.*, No. 3:15-cv-1600 (MPS), 2018 WL 3998971, at *9 (D. Conn. Aug. 21, 2018) (quoting *Glazer*, 873 A.2d at 955).

The questions of knowledge and/or state of mind are questions of fact that can be established in a number of ways, including inference from circumstantial evidence. *Kelley v. Bonney*, 606 A.2d 693, 711 (1992) ("'[o]rdinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct.' In one instance, we concluded that a trial court's failure to provide a specific instruction on circumstantial evidence resulted in harmful error." (quoting *State v. Montanez*, 592 A.2d 149 (Conn. 1991)); *State v. Paige*, 974 A.2d 782, 794 (2009), *aff'd in part*, *rev'd in part on other grounds*, 40 A.3d 279 (2012); *Ventura v. Town of E. Haven*, No. CV085024235S, 2014 WL 4056923, at *3 (Conn. Super. Ct. July 10, 2014); *see also Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am. Inc.*, 873 F.3d 85, 122 (2d Cir. 2017) ("[a]ctual knowledge may be proven or disproven by

---

[11] SS&C's objections to that precedent's inclusion in ACM's Proposed Jury Instruction No. 2 likewise avoids the question.

> Second, the statement that "[s]ubsequent conduct may be probative of whether a declarant knew or should have known a statement was untrue at the time it was made" is inappropriate for instructions to the jury because it invades the province of the jury by suggesting the weight that should be given to particular evidence. *See Preisner v. Illman*, 1 Conn. App. 264, 267 (1984) ("It is the privilege of the jury to believe or disbelieve any evidence and to attribute any evidence whatever weight it feels is merited."). This problem is further compounded by the fact that ACM's instructions single out only one category of evidence and therefore suggest it is entitled to more or different weight than other types of evidence. Furthermore, the statement may confuse the jury into finding liability based on a breach of contract—a claim already dismissed by this Court. See ECF No. 194 at 18 ("The Court GRANTS the motion for summary judgment as to ACM's contract claim").

(ECF No. 221-14 at 5.)

direct evidence, circumstantial evidence, or a combination of the two."); *U.S.  v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) ("Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false.").

The general principle regarding admissibility of circumstantial evidence to prove intent and knowledge was recognized in the negligent-misrepresentation context by the Connecticut Supreme Court in *Glazer v. Dress Barn.*  In that case, the plaintiffs alleged that the defendant, Dress Barn, made negligent misrepresentations as to when it anticipated completing due diligence and drafting sale documents and about the expected closing date of an acquisition.  873 A.2d at 954-55.   The plaintiffs presented evidence that Dress Barn subsequently revealed that its consultant's report would be delayed, it had only recently finalized a retention letter for its accounting firm to conduct due diligence, had just retained a merchandising consultant, and a draft acquisition letter did not properly reflect the deal terms.  *Id*. at 956.  Recognizing that subsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made, the Court found that a "jury reasonably could have concluded that Dress Barn should have known the statements were false when made."  *Id.*

The relevance of subsequent conduct and/or circumstantial evidence to the proof of falsity and whether a speaker knew or should have known as much fits well within this Court's prior holding in a similar proceeding also against SS&C.  (ECF No. 194 at 9-10.)  *SS&C Techs. Inc. v. Providence Inv. Mgmt*., 582 F. Supp. 2d 255, 258-59 (D. Conn. 2008) ("Given the significant, repeated, and continuing problems encountered during the CAMRA implementation process, a jury could find that SS & C did in fact misrepresent their capabilities to PIM in some way"); *see*

*also ADL, LLC v. Tirakian*, No. CV2006-5076, 2007 WL 1834517, at *2 (E.D.N.Y. June 26, 2007).

<u>Third</u>, the performance evidence SS&C seeks to exclude directly relates to SS&C's knowledge and awareness of the falsity of the statements when they were made.  SS&C argues that "the bulk of the evidence ACM expects to present at trial does not relate to SS&C's knowledge before the contract was signed, but instead to SS&C's alleged failure to perform that contract after it was signed."  (ECF No. 214-1 at 7.)  It then lists the following:

> e.g., [1] that SS&C allegedly did not implement its CAMRA software on the timetable required by the Master Agreement; [2] that SS&C did not perform various tasks required by the Master Agreement, such as collecting data from ACM's banks and third-party data providers; [3] that the software did not perform according to the specifications in the Master Agreement; and [4] that ACM was required to spend time and effort to implement the software that were not required by the Master Agreement.

(*Id.*)  SS&C ignores how evidence of performance is relevant to establishing the truth or falsity of its statements and SS&C's state of mind/knowledge when it made those statements.

Regarding the first portion of the "bulk" of evidence, SS&C argues that evidence that SS&C "did not implement its CAMRA software on the timetable required by the Master Agreement … does *not* relate to SS&C's knowledge … but instead to SS&C's alleged failure to perform."  (ECF No. 214-1 at 7.)  That is a mischaracterization of ACM's position and evidence. In its summary judgment briefing, ACM made clear that SS&C "made misrepresentations about Professional Services' capabilities to deliver the budget and timeline estimates it provided to ACM."  (ECF No. 177-1 at 15.)  The absolute failure to implement, that is, SS&C's inability to implement the CAMRA system over the entire course of the parties' dealings, is relevant and probative evidence that SS&C's budget and timeline estimates were "never realistic."  (ECF No. 177-1.)  In other words, the failure to implement is at least circumstantial evidence of SS&C's knowledge of, and/or its failure to exercise reasonable care in communicating, the

misrepresentation that the implementation could be completed within the promised deadline. SS&C's argument that the falsity of the pre-contractual statements must be established without any contextual reference leads to an impermissibly limited inquiry by the jury.

Regarding the second portion of the "bulk" of evidence, SS&C argues that evidence of the failure to "perform various tasks required by the Master Agreement, such as collecting data from ACM's banks and third-party data providers," and "the software not perform[ing] according to the specifications in the Master Agreement," relate only to breach, not to misrepresentations. Again, SS&C tries to reshape ACM's claims and evidence. ACM made false statements about implementation prior to execution, including: "implementation services are inclusive of the following: establishing your accounting and reporting infrastructure, customizing your operating infrastructure, establishing links to all counterparties and market data providers, configuring your reporting deliverables, loading and reconciling all of your initial positions as of December 31, 2014, transaction catch-up and parallel processing support, and end-user training." (ECF No. 177-1 at 10, 18.) SS&C's subsequent inability to connect and collect data from banks and third-party providers relates directly to SS&C's knowledge of its ability and capacity to establish those links when it misrepresented to ACM it could do so.

Regarding the third portion of the "bulk" of evidence, SS&C argues that evidence demonstrating that "ACM was required to spend time and effort to implement the software that were not required by the Master Agreement" is irrelevant. That simply is not so. SS&C knew ACM's small staff size and that CAMRA on a hosted basis demanded significant resources. (*See* Ex. 16 at 64:8-65:18; 5/3/2018 N. Boulanger Tr. at 34:1-35:17.) And, "ACM told SS&C it was not planning to hire any new employees to staff the CAMRA implementation and the ACM employees that were assigned … still have regular job duties to complete" (ECF No. 177 at 8

(citing *id.* 177-1 at ¶ 67, 68).)  That evidence is highly relevant to SS&C's misrepresentation that: "Based on our understanding of your business and current environment, we are confident CAMRA is the right fit for [ACM]… ." (ECF No. 177-1 ¶ 31.)  SS&C knew how many employees ACM had and its resources, yet ACM represented that CAMRA on a hosted basis was appropriate – the right fit for a company of ACM's limited size.  Accordingly, the need to devote additional employees, time, and effort to implementation bears directly on SS&C's representation that CAMRA on a hosted basis was the right fit.

Evidence of SS&C's contractual performance should be permitted and is necessary and relevant to ACM's burden of proof.[12]

### VI.   Response to SS&C's Fifth Motion In Limine: ACM Should Be Precluded From Offering Evidence, Argument or Testimony Regarding Bimini Capital Management

SS&C also insists that the Court should preclude ACM from offering evidence, argument, or testimony concerning Bimini Capital Management Inc. ('Bimini'), another SS&C mortgage REIT client, on grounds that such evidence is not relevant and is potentially misleading. (Mot. at 9.)  The Bimini evidence is highly relevant and admissible to establish essential elements of ACM's claims against SS&C.

First, SS&C asserts that because "Bimini did not become an SS&C client . . . until ***months after* ACM,"** evidence relating to Bimini "cannot be probative of SS&C's knowledge of the truth or falsity of the statements it made to ACM" and "thus bear[s] no relevance" here.  (Mot. at 10.) Not so.  According to the Connecticut Supreme Court, "[s]ubsequent conduct may be probative of

---

[12] The Court's jury instructions will guide whatever risk there may be. *See Preisner v. Illman*, 470 A.2d 1237, 1238 (1984) ("It is the privilege of the jury to believe or disbelieve any evidence and to attribute any evidence whatever weight it feels is merited."); *Sierra v. Williamson*, No. 10-cv-00079, 2013 WL 12237672, at *3 (W.D. Ky. July 9, 2013) ("what evidence the jury may consider during certain periods can be guided and corrected by instructions that the Court gives to the jury").

whether a declarant knew or should have known a statement was false at the time it was made." *Glazer*, 873 A.2d at 955-56 (citing *Updike*, 850 A.2d at 166) (same)); *Associated Constr./AP Constr.*, 2018 WL 3998971, at *9.

Second, SS&C is wrong that Bimini evidence calls for any "'mini-trial.'"  (Mot at 9-11.)

For one thing, SS&C misunderstands the standard for admitting "evidence of the experience of others" in Connecticut.  To the point, the inquiry is not whether SS&C "would be required to defend [its] conduct" with respect to Bimini, litigate "the CAMRA implementation process" at Bimini, or explain "fix[es]," "particularities," or "challenges" at Bimini.  (*Id*.)

Rather, as the Connecticut Supreme Court has stated, "[a] party attempting to offer . . . 'evidence of the experience of others' has the burden of proving 'that the circumstances were substantially the same as those under which the plaintiff was injured, and that the use by others was substantially similar.'"  *Hall v. Burns*, 569 A.2d 10, 16 (Conn. 1990) (citation omitted). Because the proponent of the evidence "must lay a proper foundation," the "objecting party" is *not* "faced with the burden of demonstrating dissimilarities" and, in turn, "a trial within a trial on the collateral issues of similarity and dissimilarity," *Williams Ford Inc. v. Hartford Courant Co*., 657 A.2d 212, 218-19 (Conn. 1995).  So, if ACM lays such a "proper foundation," SS&C will not be confronted with a "mini-trial" on "similarity and dissimilarity" (and not on "defend[ing]" SS&C's failed CAMRA implementation at Bimini in any case) (*contra* Mot. at 9-11).

Further, ACM clearly is able to meet its burden for Bimini evidence to be admitted.

Bimini is not *just* another SS&C customer.  The evidence irrefutably reflects instead that Bimini is nearly identical to ACM in every way that might be meaningful here.  That is, Bimini's "circumstances were substantially the same as those under which [ACM] was injured" and its use of CAMRA likewise was "substantially similar," *Hall*, 569 A.2d at 16, to that of ACM:

| | **Bimini** | **ACM** |
|---|---|---|
| Company profile | Management company for mortgage REITs<br><br>(5/7/18 H. Haas Tr. at 15:16-19.)[13] | Management company for mortgage REITs<br><br>(11/29/2017 J. Mountain Tr. at 23:24-24:3; 25:24-26:10.)[14] |
| Clients | Two mortgage REITs<br><br>(*Id.* at 15:22-16:5.) | Two mortgage REITs<br><br>(*Id.*) |
| Stock exchange for principal REIT clients | NYSE | NYSE |
| Size | 7 employees<br><br>(*Id.* at 44:15-21.) | 19 employees<br><br>(*Id.* at 146:21-25.) |
| Software vendor | SS&C<br><br>(*Id.* at 70:5-8.) | SS&C<br><br>(*Id.* at 54:1-4.) |
| Length of sales period | >8 months (*Id.* at 79:8-11, 167:24-168:2.) | >7 months |
| SS&C lead salespeople | Dennis Moore, Jeff Fecteau | Dennis Moore, Jeff Fecteau<br><br>(*Id.* at 74:18-75:4.) |
| Software | CAMRA<br><br>(*Id.* at 12:18-19.) | CAMRA<br><br>(*Id.* at 141:17-25.) |
| Software use | Investment Accounting<br><br>(*Id.* at 15:16-16:18.) | Investment Accounting<br><br>(*Id.* at 28:24-29:20.) |
| Deployment method | Hosting<br><br>(*Id.* at 12:20-23, 33:8-14.) | Hosting<br><br>(*Id.* at 84:23-85:24.) |
| Trade and positions data source | AVM<br><br>(*Id.* at 63:2-15.) | AVM<br><br>(5/4/18 J. Fecteau Tr. at 20:11-21:3, attached at Ex. 12.) |
| Market pricing data source | Bloomberg<br><br>(*Id.* at 43:5-6.) | Bloomberg<br><br>(5/11/18 ACM 30(b)(6) 35:21-38:9.)[15] |

---

[13] Relevant excerpts of Hunter Haas' May 7, 2018 deposition transcript are attached at Ex. 10.

[14] Mountain's November 29, 2017 deposition transcript is attached at Ex. 11.

[15] Relevant excerpts of ACM's May 11, 2018 Rule 30(b)(6) deposition transcript are attached at Ex. 13.

22

|  | **Bimini** | **ACM** |
|---|---|---|
| Custodians | Citi; BONY<br><br>(*Id.* at 64:25-65:16.) | Citi; BONY<br><br>(*Id.*) |
| Reconciliation module | CI Manager[16] | CI Manager<br><br>(6/5/18 I. Olszewska Tr. at 21:25-30:24, 51:11-59:10, Ex. 15.) |
| Representations as to CAMRA solution and implementation | CAMRA was suitable and hosting was appropriate; SS&C had implemented CAMRA for mortgage REITs, without disclosure of no prior hosted implementations for mortgage REITs; CAMRA solution was integrated, automated, and accurate; SS&C had capable and adequate resources.<br><br>(Haas Tr. at 22:4-25, 26:25-33:5, 37:17-38:24, 61:10-64:24.) | CAMRA was suitable and hosting was appropriate; SS&C had implemented CAMRA for mortgage REITs, without disclosure of no prior hosted implementations for mortgage REITs; CAMRA solution was integrated, automated, and accurate; SS&C had capable and adequate resources.<br><br>(5/11/18 ACM 30(b)(6) 35:21-38:9.) |
| Project Managers | 1<br><br>(*Id.* at 45:3-14.) | 1<br><br>(11/29/17 J. Mountain Tr. at 124:6-125:12.) |
| CAMRA users | 4<br><br>(*Id.* at 46:2-11.) | 4<br><br>(5/10/18 SS&C 30(b)(6) Tr. 64:8-65:18, attached at Ex. 16.) |
| IT staff | 1<br><br>(*Id.* at 18:8-14.) | 2<br><br>(11/29/17 J. Mountain Tr. at 83:4-84:16.) |
| Background of CAMRA users | Investment accountants; investment traders<br><br>(*Id.* at 15:1-19.) | Investment accountants; investment traders[17] |
| Initial asset classes | Agency MBS | Agency MBS |

---

[16] ACM-100 at 11, attached at Ex. 14.

[17] *See, e.g.*, 11/28/17 M. Gruber Tr. at 5:25-11:1; 11/30/17 J. Terry Tr. at 23:12-38-12; 4/10/18 S. Rand Tr. at 10:23-12:17; 4/6/18 K. Davies Tr. at 18:24-22:12; 5/8/18 A. Hill Tr. at 9:23-12:9, attached at Composite Ex. 17.

|  | **Bimini** | **ACM** |
|---|---|---|
|  | (*Id.* at 158:19-21.) | (5/11/2018 ACM 30(b)(6) Tr. at 85:25-86:6.) |
| Principle accounting method | Fair value<br><br>(*Id.* at 105:12-15.) | Fair value<br><br>(11/29/2017 J. Mountain Tr. at 98:1-15.) |
| SS&C's attempted hosting implementation period | 20 months<br><br>(*Id.* at 84:7-13.) | 28 months<br><br>(5/11/2018 ACM 30(b)(6) Tr. 221:19-23.) |
| Outcome | Hosting Implementation Failed<br><br>(*Id.* at 12:24-13:6.)[18] | Hosting Implementation Failed<br><br>(5/11/18 ACM 30(b)(6) 146:22-148:12.) |

SS&C addresses none of this evidence in its Motion.  In fact, SS&C fails to proffer *any evidence* of any alleged dissimilarities between ACM and Bimini.  SS&C asserts instead that "[t]he implementation process for enterprise software like SS&C's CAMRA turns on each client's unique circumstances,"[19] (Mot. at 11), but it is the "unique[ness]" of the "substantial similarity" between Bimini and ACM that underscores the probative value of Bimini evidence here.

---

[18] It was for this reason that ACM ultimately was entitled to discovery about Bimini.  (9/27/2017 Hr'g Tr. at 29:1-11, attached at Ex. 18 ("And I'll also order as to those mortgage REIT customers any documents . . . concerning any uncompleted implementation during that time period in which the uncompleted implementation was by reason of a claim by the customer that CAMRA was not functioning or implementing as anticipated by the customer.  So that's meant to exclude the circumstances in which there might have been an uncompleted implementation for reasons idiosyncratic to the customer itself as opposed to a reason that's attributable potentially to SS&C.'").)

[19] As ACM argues in its Motion *in Limine* No. 1, SS&C has admitted that each CAMRA implementation is different and individually tailored to the SS&C customer, and based on the evidence, SS&C's allegedly successful implementations for other customers, whose circumstances are not "substantially similar," are inadmissible.  (*See* ACM Motion *in Limine* No. 1, ECF No. 222, incorporated by reference.)  Assuming the truth of SS&C's further admission that its customers' implementations can be "unique," this is yet another reason the allegedly successful implementations should be excluded, in contrast to Bimini, which clearly is "substantially similar" to ACM.

And the evidence above shows that SS&C's unsupported *potential* dissimilarities between Bimini and ACM—i.e., "the uses to which the client puts the software [i.e., investment accounting], the client's accounting methodology [i.e., fair value], the number of employees responsible for operating the software [i.e., four], and the background and experience of those employees [i.e., investment accountants and traders]," (*id.*)—are not dissimilarities at all.

Third, SS&C argues that Bimini has "no relevance" here and cites to general "evidence about SS&C's relationship with," "the CAMRA implementation process at," and "difficulties" as examples ACM purportedly intends to introduce.  (*Id.* at 9-11.)  SS&C again is wrong.

Because of the "substantial similarity" between Bimini's and ACM's circumstances, the reasons Bimini evidence is relevant here are manifold.[20]  Bimini evidence is directly relevant to the issue of ACM's reasonable and justifiable reliance on SS&C's misrepresentations.  Part of SS&C's defense is that its statements about CAMRA suitability for small mortgage REITs were mere opinion or puffery and/or statements upon which no reasonable or similarly situated person would rely.  Yet, SS&C made nearly identical statements to Bimini, Bimini like ACM relied on those statements, and Bimini entered into a contract with SS&C to provide identical services, with similar failed results.  Therefore, the temporal relevance objection raised by SS&C (i.e. that the Bimini contract was executed after the ACM contract) is not persuasive on the issue of reasonable reliance.  Instead, the jury should understand that ACM's reliance on SS&C's statements was neither a fluke nor based on any lack of diligence or naiveté.  Bimini evidence also goes directly to the issue of SS&C's course of conduct and/or pattern of unscrupulous conduct under CUTPA.  Course of conduct evidence is relevant and probative under CUTPA.

---

[20] ACM incorporates its Motion *in Limine* No. 2 (ECF No. 216), by reference.

Further, Bimini evidence is probative of whether SS&C knew or should have known its representations to ACM were false, such as about CAMRA's suitability and hosting's appropriateness (e.g., because Bimini believes SS&C failed to implement CAMRA).[21]   And Bimini evidence also shows the falsity of SS&C's statements to ACM, such as that SS&C could integrate and automate CAMRA (e.g., because SS&C told Bimini the same, but using AVM turned out to be all "manual").   Evidence relating to Bimini also is probative of the justifiability of ACM's reliance of ACM's damages, particularly in light of SS&C's false insistence that CAMRA was implemented at ACM (e.g., Bimini's reasons for describing the implementation as failed).

Fourth, and finally, Rule 404(a)'s bar on propensity evidence is inapplicable.  (*Contra* Mot. at 10-11.)  For starters, SS&C misapprehends ACM's intended purpose for Bimini evidence.  ACM does not intend to introduce Bimini evidence for SS&C's character or to show that SS&C "behaved similarly with respect to ACM."  (*Cf.* Mot. at 10-11.)  *Cf. Rajaravivarma v. Bd. of Trustees for Ct. State Univ. Sys.*, 272 F.R.D. 315, 319 (D. Conn. 2011) ("performance history" inadmissible if purpose to show "deficient performance" at one job indicative of same at later job).

Rather, Bimini evidence is probative to show that SS&C knew or should have known its misrepresentations were false, *inter alia*.  Fed. R. Evid. 404(b) (knowledge is exception to rule).  *See Powell v. Schindler Elevator Corp.*, No. 14-cv-579, 2015 WL 77204601, at *3 (D. Conn. Nov. 30, 2015) ("[E]vidence of other accidents commonly is received" to prove defendant knew or should have known of the danger) (citing McCormick on Evid. § 200 (7th ed.)).  This evidence includes conduct that follows the misrepresentations in time.  *Glazer*, 873 A.2d at 955-56.

---

[21] SS&C's repeated citations to *Bellsite Development LLC v. Town of Monroe*, 122 A.3d 640, 654 (Conn. App. Ct. 2015), are inapposite.  That case dealt with a "statement of present intention [that] did not come to fruition," not statements of fact.  *Id.*

As discussed above, in *Glazer*, plaintiffs alleged that the defendant, Dress Barn, made negligent misrepresentations relating to an acquisition, including when it anticipated completing due diligence and drafting sale documents and about the closing date. 873 A.2d at 955. Plaintiffs presented evidence that Dress Barn subsequently revealed that its consultant's report would be delayed, it only recently had finalized a retention letter for its accounting firm to conduct due diligence, had just retained a merchandising consultant, and a draft acquisition letter was far from final. *Id.* at 956. "In other words, Dress Barn should have known that it would be unable to meet these deadlines." *Id.* The Connecticut Supreme Court found that a "jury reasonably could have concluded that Dress Barn should have known the statements were false when made." *Id.*

Here, again, Bimini evidence shows that SS&C knew or at least should have known its statements to ACM were false. The substantial similarity of Bimini's and ACM's circumstances and failed CAMRA implementations on hosting is probative of SS&C's failure to exercise reasonable care in ascertaining the truth of its statements to ACM. Equally, statements SS&C made in relation to, or in the context of Bimini, bear on SS&C's knowledge concerning its prior false statements to ACM. For example, when discussing Bimini, SS&C's Iwona Olszewska admitted that SS&C had failed to sell ACM a "valid recon solution" because it consisted of CI Manager instead of the RECON module. (ACM-094.) Ms. Olszewska later stated that "the bigger challenge [with Bimini's implementation] will be the fact that [SS&C's] solution [to Bimini] does not include Recon . . . . It will create an operational difficulty for the client as CI Manager delivers limited at best functionality to cover for best practice." (ACM-103.) Ms. Olszewska was proved correct when SS&C sold CI Manager to Bimini and that implementation failed. These facts are probative of whether SS&C knew or should have known its misrepresentations to ACM on the same subject, including about CAMRA being "automated" despite CI Manager, were false.

None of the remaining reasons ACM intends to introduce Bimini evidence—to show falsity, the justifiability of ACM's reliance, or damages—has anything to do with SS&C's character or to show that SS&C "behaved similarly with respect to ACM," either.  (*Cf.* Mot. at 10-11.)  Thus, Rule 404(b) does cannot act as a bar to Bimini evidence introduced for these purposes.

### VII.   Response to SS&C's Sixth Motion In Limine: ACM Should be Precluded From Asserting That Seven Statements Constitute Actionable Misrepresentations

SS&C's sixth motion *in limine* seeks to preclude ACM from presenting to the jury seven specific misrepresentations on the grounds that they individually are not actionable as a matter of law.  The motion should be denied for two reasons: (1) the evaluation of whether a statement is actionable is a factual determination for the jury, assessed against the context and circumstances including other statements made as the Court already has held in rejecting this argument before; and (2) the seven statements identified are actionable.

First, the factual determination of whether representations are statements of fact should be made by the jury.  *Lee v. Axiom Labs., Inc.*, No. CV980584562, 2001 WL 128917, at *3 (Conn. Super. Ct. Jan. 24, 2001), *aff'd* 822 A.2d 373 (2003) ("There was sufficient evidence in the record to support the jury's conclusion that the statements in question were untrue statements of fact."); *see Cal. Bagel Co. v. Am. Bagel Co.*, No. CV 97-8863, 2000 WL 35798199, at *8 (C.D. Cal. June 7, 2000) ("Whether a statement is non-actionable opinion or an actionable misrepresentation of fact is generally a question of fact for the jury.").  In other words, the "determination as to whether a statement is puffery [or opinion] is generally a question of fact" for the jury's consideration. *UOP v. Andersen Consulting*, No. CV 950145753, 1997 WL 219820, at *2 (Conn. Super. Ct. Apr. 24, 1997); *see generally In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) ("Like "puffery, we therefore treat … [it as] as a question of fact that the district court appropriately put

to the jury to consider, and review the sufficiency of the evidence in support of the jury's determination.").[22]

"The test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion.'" *Associated Constr./AP Constr. LLC*, 2018 WL 3998971, at *7 (citations omitted). The evaluation of a statement depends on the surrounding statements and circumstances. That is because a misrepresentation may be found based on "summarizing the fair import of the various statements made by" SS&C. *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 882 (6th Cir. 1982); *see In re Genentech, Inc. Sec. Litig.*, No. C-88-4038, 1989 WL 137189, at *1 (N.D. Cal. Sept. 15, 1989) (denying motion for reconsideration challenging court's "order that discusses the issue of misleading impressions by reference to a 'mosaic'" … "where statements of a defendant are used to support liability, they are properly considered as part of a relevant context, rather than in isolation" ).

Insofar as SS&C seeks to remove any of the potential misrepresentations identified in the motion, it would prejudice ACM by denying it a holistic evaluation of all of SS&C's statements, which is necessary for consideration of the "fair import" of the collection of statements made by SS&C. *Dunn Appraisal Co.*, 687 F.2d at 882 ("A false representation may be implied as well as actual."). The jury should be permitted to view each statement "as part of a 'mosaic' to see if those statements, in the aggregate, created a misleading impression." *Id.*; *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 397 (D.N.J. 2010) (referencing "the *mosaic representation* thesis" and stating

---

[22] *See also U.S. v. Skilling*, 554 F.3d 529, 552 (5th Cir. 2009), *aff'd in part, vacated in part on other grounds, remanded*, 561 U.S. 358 (2010) (some statements of opinion "cannot, as a matter of law, be deemed immaterial puffery, and the district court was correct to leave the determination of their materiality to the jury").

"a finding of materiality is based on the *total mix of information* available" (emphases added)); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 291 (D.N.J. 2007) (same).

The Court's prior decisions confirm this view. As phrased in the Court's summary judgment order, "these highly fact-bound issues of the actionability of particular statements should remain for the jury to consider in light of the context and circumstances of this case." (ECF No. 194 at 9.) The reason the Court cited to avoid such premature carving of alleged misrepresentations is that the surrounding circumstances and context of each statement should be considered "[i]n light of the extended course of the parties' dealings and *the possible linkages between one or more statements*" which may lead to liability.[23] (*Id.* at 10 (emphasis added).)

<u>Second</u>, all seven statements that SS&C seeks to exclude from consideration by the jury are actionable. To justify their exclusion, SS&C parses the statements and presents only certain words or phrases in isolation – e.g. "powerhouse"; "word-class" "professionalism" – and then argues that entire statement should be excluded. (ECF No. 214-1 at 13-14.) SS&C's approach is wrong and has previously been rejected by the Court. (ECF No. 194 at 10 ("would be premature for me to try to slice-and-dice which particular statements identified by ACM as the basis for its claims are non-actionable as a matter of law").) All seven statements relate, in whole or in part, to actionable misrepresentations about: experience, expertise, a product's core capabilities, customer suitability, proven systems, ability to automate, flexibility, and immediate access to data.

---

[23] SS&C continues to argue for the same slicing-and-dicing that the Court rejected at summary judgment. (ECF No. 194 at 9-10.) The situation here resembles an opinion related to SS&C in a similar context: "while a jury may find that SS & C's representations to [plaintiff] regarding the capabilities, ease of use, and timetable for implementation of the CAMRA software system were accurate, truthful, and made in good faith, *the court cannot say that such a finding is probable*." *SS&C Techs. Inc.*, 582 F. Supp. 2d at 258-59 (emphasis added). Slicing away required context, as SS&C desires, would clearly work substantial prejudice on ACM.

Importantly, statements pertaining to experience, expertise, a product's core capabilities, and customer suitability can qualify as misrepresentations. *Latham & Assocs., Inc. v. William Raveis Real Estate, Inc.*, 589 A.2d 337, 343 (Conn. 1991) (discussing "the vendor's misrepresentation about the *extent of its expertise in the development of comparable computer systems*" (emphasis added)); *Dunn Appraisal Co.*, 687 F.2d at 882 (affirming misrepresentation that product was "*best suited*" for customer);[24] *see Baker v. Dorfman*, 239 F.3d 415, 424 (2d Cir. 2000) (affirming fraud judgment and award of punitive damages based on "material misrepresentations concerning … *experience and expertise*" (emphasis added)); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1032-33 (2d Cir. 1974) ("There was additional evidence from which it could be found that there were *misrepresentations relative to the expertise* of the defendants as to market conditions, prices and types and quality of Scotch investments. For example, defendants' expert advice included a recommendation of the purchase of [product X] rather than what they called the [product Y].  Until recently, however, the *defendants have never had experience in selling* [product Y] and there is other evidence that investments in [product Y] have produced better returns than investments in [product X]." (emphasis added)); *In re Aspect Software Parent Inc.*, 578 B.R. 718, 724 (Bankr. D. Del. 2017) (the court found that the plaintiff "has adequately pled claims for … negligent misrepresentation. The Amended Complaint alleges

---

[24] *Dunn Appraisal Co.*, 687 F.2d at 882 (stating that "the implied representation that the 62/40 [software] would be suitable for the intended use at SIS was a statement regarding a present fact rather than an opinion about the future, because it was a statement regarding the inherent, existing capabilities of the product[;] [g]eneral representations that data processing equipment will be suitable for a customer's operations, based upon familiarity with both the equipment's capabilities and the customer's needs, are statements concerning present facts."); *Cty. of Orange v. Tata Consultancy Servs. Ltd.*, No. SACV1300683JLSJCX, 2016 WL 6542728, at *8 (C.D. Cal. Apr. 1, 2016).  (finding that **statements about "past experience** working with other city and county tax collection agencies (Experience Misrepresentation). … **are not 'puffery'** and, as a result, are actionable." (emphasis added)).

that the Debtor deliberately *misrepresented its experience, expertise and core competencies with cloud-based CRM systems* in order to win the [plaintiff's] contract. … [and it] sufficiently alleges that [the plaintiff] relied on the misrepresentations because it alleges that it *would not have selected* the Debtor *to perform such a crucial project but for its purported expertise*" (emphasis added)).

Statements pertaining to proven systems, the ability to automate, flexibility, and immediate access to decision-making data also have been found to qualify as misrepresentations. *See Andersen v. Griswold Int'l LLC*, No. 14-cv-02560, 2014 WL 12694138, at *5 (N.D. Cal. Dec. 16, 2014) (discussing statements about a product as "*proven*," the court remarked, "a *statement that a computer program can 'work easily* with DWG files created by any version of AutoCAD software' *was actionable despite the fact that 'work easily' is subjective, because 'when viewed as a whole***, [the statement] can be viewed as referring to specific and testable characteristics of a product— specifically, that a consumer can work with files produced by 'any version' of AutoCAD.'" (emphasis added) (citation omitted)); *MECO Corp. v. MRMC, Inc*., No. 04-cv-431, 2007 WL 9734536, at *1 (E.D. Tenn. Jan. 5, 2007) (denying summary judgment due to the dispute fact regarding "[w]hether the defendant … made *material misrepresentations* to the plaintiff *regarding the ability, experience and expertise of the defendants to perform the automation project* at issue in order to induce the plaintiff to enter into a contractual business relationship" (emphasis added)); *see also Clements Auto Co. v. Serv. Bureau Corp*., 444 F.2d 169, 184 (8th Cir. 1971) (affirming liability for fraudulent misrepresentations based on "statements regarding the *overall usefulness of its system, the presence of error-control features*, the properties … and the necessity of *automating [plaintiff's] accounting* were all statements upon which [the plaintiff], with its limited knowledge of computers and data processing systems, could reasonably rely, given the superior knowledge of [the defendant]." (emphasis added)); *Dunn Appraisal Co.*, 687 F.2d at 883 (affirming that

"[a]nother major representation was the *promise to convert* all of SIS's programs" relating to the transition to new a system with augmented capabilities "*with little or no disruption to … customer services*" (emphasis added)).

For these reasons, SS&C's motion to exclude the seven statements should be denied.

### VIII. Response to SS&C's Seventh Motion In Limine: ACM Should Be Precluded From Introducing Electronic Chats Exchanged By SS&C Employees

SS&C's seventh motion *in limine* seeks to exclude the use and introduction at trial of chats between its employees concerning the implementation of CAMRA for ACM.  The motion should be denied because 1) those chats have already been the subject of a discovery dispute, mooting SS&C's complaints about the lack of depositions; and 2) there are multiple means by which the chats could be or already have been authenticated.

First, SS&C's arguments as to the lack of depositions of the 'principal chatters' are unpersuasive. In the October 18, 2018 discovery conference, the Court addressed that issue**.**

> Mr. O'Conner: They didn't depose the person who received the chat. And they didn't depose the person --
>
> THE COURT: That's probably all good reason why if I ordered production of the chats, I wouldn't allow them to depose witnesses now if they came back to you and said, "Hey, now we've got this chat and now I want to ask witnesses questions about that."

(10/18/18 Disc. Conf. at 45:14-24, attached as Ex. 19.)  Moreover, the Court acknowledged that the chats likely would be relevant and responsive to ACM's production requests.  (*Id*. at 51:18-52:2 ("I do think that the chat information basically reveals internal communications that is fair to think would have been relevant and is the kind of information that just probably should have been identified as potentially producible and was within the scope of ACM's request for internal communications of employees.").)

Thus, the Court already has addressed SS&C's qualms regarding deposition testimony and potential relevance.  And that potential relevance has borne fruit – including, for instance, chats revealing that SS&C's implementation at ACM was "fugly" because SS&C could not get "basic things" accomplished.[25] (SSC0746930; *id.* (SS&C's David LaMonica and Scott Rice discussing "armour" and whether it "was ever implemented" and that "it didn't work properly because the data from citi was garbage").) While ACM anticipates hearsay objections by SS&C at trial, to the extent the chats contain hearsay, they fall within one or more exceptions. *See Sea-Land Servs. Inc., v. Lozen Int'l LLC*, 285 F.3d 808 (9th Cir. 2002) (internal company e-mail authored by employee was an admission by party opponent and thus not excludable under Rule 801(d)(2)(B, D)).

Second, ACM has laid or can lay the foundation for the chats that SS&C produced.[26]  To do so, ACM "need only make a prima facie showing of authenticity." *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (citations omitted).  In other words, there must be "sufficient proof … so that a reasonable juror could find in favor of authenticity or identification." *Vereen v. City of New Haven*, No. 17-cv-1509, 2018 WL 6069098, at *8 (D. Conn. Nov. 20, 2018) (quoting *U.S. v. Vayner*, 769 F.3d 125, 129 (2d. Cir. 2014) (citation omitted)).  That proof may be "direct or circumstantial." *Id.* (citing *U.S. v. Al-Moayed*, 545 F.3d 139, 172 (2d Cir. 2008)); *U.S. v. Davis*, 918 F.3d 397, 402 (4th Cir.), *cert. denied*, 140 S. Ct. 202 (2019) ("the burden to authenticate under Rule 901 is not high; the court must merely be able to conclude that the jury could reasonably find that the evidence is authentic, not that the jury necessarily would so find." (citation and internal quotation marks omitted)).

---

[25] We also note that ACM deposed David LaMonica regarding his "fugly" chat. (David LaMonica 6/28/18 11:9-17:5).

[26] The foundational "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Tank*, 200 F.3d at 630 (quoting Fed. R. Evid. 901(a)).

SS&C's production of its own chats may serve to clear that threshold. *In re Grand Jury Subpoena Duces Tecum*, 105 F.3d 659 (6th Cir. 1997) ("Because we find no significant distinction between authentication by oral testimony and authentication by production, we conclude that the required records exception extends to both the physical production of documents and testimony limited to authentication."); *see also Superhighway Consulting Inc. v. Techwave Inc.*, No. 98 CV 5502, 1999 WL 1044870 (N.D. Ill. Nov. 16, 1999).  Moreover, SS&C produced the chats after they "came to light because an employee of SS&C pasted a chat conversation into an email. … [a]nd [ACM] w[as] able to depose one of the individuals authoring the chat and asked if that was a chat in fact, it wasn't clear otherwise.  He confirmed."[27]  (10/18/18 Disc. Conf. at 39:19-24; *see generally* ECF No. 147.)  And the chats clearly identify the sender and receiver of the messages as well as a date and time stamp.  A reasonable juror could find that chats produced by SS&C, with all these identifiable details, are authentic.

If necessary, ACM will question SS&C witnesses to testify about the process of creating and retaining the records at issue.  *See Sw. Bell Tel. v. Utex Commc'ns Corp.*, No. A-07-CV-435, 2010 WL 11506414, at *8 (W.D. Tex. Aug. 18, 2010) ("In responding to Utex's motion, AT&T states it intends to lay the foundation for admission of the computer generated records by calling fact witnesses … to testify as to the process of creating and retaining the records at issue. The Court agrees with AT&T … .").  "Any person in a position to attest to the authenticity of certain

---

[27] "SS&C never disclosed that the chats existed, in its Initial Disclosures or elsewhere, during fact discovery[,] [rather] [t]o the contrary, in response to ACM's inquiries, SS&C certified that its document production was full and complete."  (ECF No. 147-1.)  To the extent that SS&C's withholding and delay prevented authentication earlier in discovery, SS&C should not be rewarded for concealing the chats' existence. *See Star Direct Telecom, Inc. v. Global Crossing Bandwidth*, Inc., 272 F.R.D. 350 (W.D.N.Y. 2011) ("parties should not be permitted to conceal potential sources of responsive information in the hope that the opposing party does not discover their deliberate omission until the discovery deadline has expired").

records is competent to lay the foundation for the admissibility of the records; he need not have

been the preparer of the record, nor must he personally attest to the accuracy of the information

contained in the records." *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980); *United States*

*v. Parsee*, 178 F.3d 374, 380 (5th Cir. 1999) (same).  For example, Fathima Mahamoon's messages

appear repeatedly throughout the chats.  SS&C had identified her as a witness, and she is competent

to authenticate the chats.  (ECF No. 221 at 20.)

Additionally, the chats would be admissible as business records.[28] "To establish a proper

foundation for a document offered into evidence as a business record, the custodian or other

qualified witness must testify that the document was kept in the course of a regularly conducted

business activity and also that it was the regular practice of that business activity to make the

record."  *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282,

289 (2d Cir. 2010).  Fathima Mahamoon could testify, in this respect, as an otherwise qualified

witness regarding the regular practice of chat use and retention.

---

[28] *Archer Daniels Midland Co. v. Soymet 101, LLC*, No. 14-CV-2181, 2016 WL 6157943, at *5
(C.D. Ill. Aug. 17, 2016) ("ADM stated that the document including the instant message chats was
produced by SCB in response to ADM's request for documents related to the parties' negotiations
through SCB. The documents provided by SCB were also provided to Soymet, along with the
affidavit of Ruth Stone, General Counsel of SCB. Stone stated that she was custodian of the records
of SCB and that the documents produced were kept by SCB & Associates LLC in the regular
course of business. Stone also stated that it was the regular course of business of SCB for an
employee or representative [of SCB] with knowledge of the act, event and/or condition recorded
to make the record or to transmit information thereof to be included in such record' and that the
record was made at or near the time of the act, event and/or condition." (citation and internal
quotation marks omitted)).

Lastly, to the extent SS&C has questioned the chats' reliability, "[a]uthentication only concerns the admissibility of the evidence, not its reliability, which is a question for the jury." *Vereen*, 2018 WL 6069098, at *8 (citing *U.S. v. Tropeano*, 252 F.3d 653, 661 (2d. Cir. 2001)).[29]

There are multiple avenues by which ACM can authenticate the chats. SS&C's contention regarding "ACM's inability to lay *any* foundation" is incorrect. (ECF No. 214-1 at 16.) And the content of many of those chats, as discussed throughout ACM's oppositions to SS&C motions *in limine*, directly "bear[s] on whether SS&C knew or should have known that its challenged statements were false." (ECF 2214-1 at 18.)

## IX. Conclusion

ACM respectfully submits that the Court should deny SS&C's Omnibus Motion *In Limine* in its entirety.

---

[29] For example:

> Under Fed. R. Evid. 901(a), evidence may be admitted on a showing sufficient to support a finding that the item is what the proponent claims it is. When applying this rule to web sites, the type and quantum of evidence necessary for authentication depends on context. Whether that evidence is what Plaintiff claims is a matter for the jury. A reasonable jury could conclude from the distinctive characteristics of the Facebook posts – which include profiles matching the names of Plaintiff's coworkers, a comment using an apparent misspelling of Plaintiff's name, and a reference to the Department of Public Works – that the usernames in the screenshots do belong to profiles owned by Vereen's coworkers Honda Smith and Lynwood Dorsey. Plaintiff should be free to present this evidence to the jury, along with testimony from the individuals allegedly depicted or other individuals familiar with the Facebook profiles in question, in order to authenticate the documents.

*Vereen*, 2018 WL 6069098, at *9.

Dated: December 10, 2019           Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

By: */s Joseph Mamounas*
Christopher M. Cerrito (ct17183)
chris.cerrito@hklaw.com
One Stamford Plaza
263 Tressler Boulevard, Suite 1400
Stamford, CT 06901
Telephone: (203) 905-4500
Facsimile: (203) 724-3944

Joseph Mamounas (phv09010)
joseph.mamounas@hklaw.com
Allison Kernisky (phv09011)
allison.kernisky@hklaw.com
Manuel Miranda
*(admitted pro hac vice)*
manuel.miranda@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

Daniel Mateo (phv10323)
daniel.mateo@hklaw.com
2929 Arch Street
Suite 800
Philadelphia, PA  19104
Telephone: (215) 252-9543
Facsimile: (215) 867-6070

*Attorneys for Plaintiff ARMOUR*
*Capital Management LP*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2019, a true and correct copy of this document was

served by electronic and U.S. mail on all counsel of record.

By:     */s Joseph Mamounas*
        Joseph Mamounas (phv09010)

39