UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARMOUR CAPITAL MANAGEMENT LP, *Plaintiff*, <br><br> v. <br><br> SS&C TECHNOLOGIES, INC., *Defendant*. | No. 3:17-cv-00790 (JAM) |

**ORDER RE PENDING MOTIONS *IN LIMINE***

Plaintiff ARMOUR Capital Management LP ("ACM") is a registered investment advisor that focuses on mortgage-related securities. In mid-2014, ACM sought to purchase a package of software and services to assist in managing client portfolios. For several months ACM engaged in discussions for this purpose with defendant SS&C Technologies, Inc. ("SS&C"). The discussions focused on SS&C's software product known as "CAMRA." The parties eventually entered into a Master Agreement in December 2014 but—for reasons hotly disputed by the parties—the implementation of CAMRA with ACM did not succeed after many months of efforts on both sides.

ACM sued SS&C in 2017, and the parties have remained enmeshed in years of litigation about their failed business relationship. I have previously ruled on numerous dispositive motions,[1] and the trial of this action will now proceed next week on two of ACM's claims: (1) that SS&C engaged in pre-contractual negligent misrepresentations, and (2) that SS&C's pre-

---

[1] *See ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.,* 2018 WL 1368908 (D. Conn. 2018) (ruling on motion to dismiss); *ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 2019 WL 688308 (D. Conn. 2019) (ruling on motion to dismiss counterclaims); *ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, -- F. Supp. 3d --, 2019 WL 4307001 (D. Conn. 2019) (ruling on motion for summary judgment).

1

contractual conduct violated the Connecticut Unfair Trade Practices Act ("CUTPA").

On January 3, 2020, I conducted a hearing on the parties' respective motions *in limine*. In light of the parties' arguments at this hearing and my further consideration of the parties' papers, this ruling now addresses seriatim the multiple motions *in limine*. I will first discuss the motions that seek general limitations on the scope of trial evidence before turning to the motions relating to expert testimony.

### *SS&C's first motion in limine to preclude punitive damages (Doc. #214-1)*

SS&C moves *in limine* to preclude evidence, testimony, or argument relating to punitive damages on the ground that none of ACM's remaining claims could support an award of punitive damages. The complaint, however, seeks an award of punitive damages for both the negligent misrepresentation and CUTPA claims. Doc. #35 at 19, 21. A cause of action under CUTPA allows for the recovery of punitive damages if it is shown that the defendant engaged in outrageous conduct, such as with a bad motive or reckless indifference to the rights of others. *See, e.g.*, *Doctor's Assocs., Inc. v. Kaur*, 2019 WL 7290950, at *2 (D. Conn. 2019). Similarly, for a common law claim like negligent misrepresentation, punitive damages may be awarded if the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. *See Dunn v. Peter L. Leepson, P.C.*, 79 Conn. App. 366, 371 (2003). Accordingly, I will deny SS&C's motion without prejudice to renewal at the close of trial evidence if SS&C has grounds at that time to argue that the evidence is not legally sufficient to allow for a jury finding of intentional misconduct or reckless indifference as required to sustain a

claim for punitive damages.[2]

### *SS&C's second motion in limine to preclude evidence of lost employee time (Doc. #214-1)*

SS&C moves *in limine* to preclude evidence, testimony, or argument relating to damages resulting from "lost employee time" that ACM's employees allegedly devoted to trying to implement CAMRA. SS&C relies on the following damages limitation set forth in Section 6.2.2 of the parties' Master Agreement:

> Exclusion of Consequential Damages and Absolute Limitation on SS&C's Liability. SS&C is not liable for any indirect, special, incidental or consequential damages of any kind, including without limitation, loss of profits, loss of use, business interruption, loss of data, or cost of cover in connection with or arising out of the furnishing, performance of any services under the Master Agreement, any Attachment or any Work Request, or use of the Software furnished hereunder or for breach of this Master Agreement, whether alleged as a breach of contract or tortious conduct, even if SS&C has been advised of the possibility of such damages.

For essentially the same reasons that I have previously ruled that the Master Agreement's merger clause does not preclude a claim for negligent misrepresentation stemming from pre-contractual conduct, *ARMOUR Capital Mgmt. LP*, 2019 WL 4307001, at *4-*5, and because of the absence of specific language in Section 6.2.2 purporting to limit SS&C's liability for pre-contractual conduct, I conclude that Section 6.2.2 does not apply to limit the scope of damages that may be awarded as a result of pre-contractual tortious conducting involving negligent misrepresentation and CUTPA violations. If ACM was wrongly induced in the first place to enter into the Master Agreement, it makes little sense to hold ACM to a limitation on damages that it was wrongly induced to agree to as part of the Master Agreement. Accordingly, I will deny SS&C's motion *in*

---

[2] Although as discussed later in this ruling I will grant SS&C's third motion *in limine* to preclude ACM from resting its claims on intentional misrepresentations, I understand that punitive damages may be predicated on evidence of intentional or reckless conduct distinct from intentional misrepresentations.

*limine* with respect to lost employee time.

### SS&C's third motion in limine to preclude characterization of evidence as lies or as intentional misrepresentations (Doc. #214-1)

SS&C moves *in limine* to preclude any evidence, testimony, or argument that characterizes SS&C as lying, making intentional misrepresentations, or otherwise intentionally deceiving or misleading ACM. As SS&C notes, I have previously dismissed ACM's claim for intentional misrepresentation for failure to have pleaded the claim with sufficient particularity as required under Fed. R. Civ. P. 9(b). *See ARMOUR Capital Mgmt. LP,* 2018 WL 1368908, at *6. SS&C argues that ACM should not be allowed to undo this ruling by injecting argument and claims of intentional misrepresentation at trial. I agree. Although I declined to dismiss ACM's negligent misrepresentation claim for failure to comply with the pleading requirement of Rule 9(b), it was on the basis that this claim as pleaded relied solely on negligent—rather than intentional—misrepresentations. *Ibid.*; *see also* Doc. #35 at 20-21. It is true that a claim for negligent misrepresentation may be based not only on statements that a defendant knew to be false but also should have known to be false. *See Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351–52 (2013). Still, a negligent misrepresentation or a CUTPA claim is equally subject to the pleading requirements of Rule 9(b) to the extent that it rests on fraud or intentional misrepresentations, as distinct from negligent or reckless conduct. *See Karazin v. Wright Med. Tech., Inc.,* 2018 WL 4398250, at *6 (D. Conn. 2018) (concluding that Rule 9(b) applies to a negligent misrepresentation claim where it was "couched in fraud-like terms of known falsity"), *reconsideration denied*, 2018 WL 6067235 (D. Conn. 2018); *Milo v. Galante,* 2011 WL 1214769, at *8-*9 (D. Conn. 2011) (discussing how Rule 9(b) applies to negligent misrepresentation and CUTPA claims to the extent they are based on alleged

4

fraudulent statements).

Consistent with my ruling dismissing ACM's claim for intentional misrepresentations and to prevent an end-run of Rule 9(b)'s requirement that allegations of fraud be pleaded with particularity, I will preclude ACM from predicating its negligent misrepresentation or CUTPA claims on an argument that SS&C engaged in intentional misrepresentations. Accordingly, I will grant SS&C's motion *in limine* to the extent that it seeks to preclude ACM from adducing evidence or argument of intentional misrepresentations that resulted in ACM's agreement to purchase CAMRA. This ruling does not preclude ACM from challenging the credibility of SS&C's witnesses or otherwise arguing that SS&C acted intentionally in a manner apart from the making of misrepresentations that serve as the basis for ACM's negligent misrepresentation and CUTPA claims. Nor does this ruling necessarily limit the scope of the Court's jury instructions subject to further discussions with counsel.

### *SS&C's fourth motion in limine to preclude ACM from trying a breach of contract or warranty case (Doc. #214-1)*

SS&C moves *in limine* to preclude ACM from presenting to the jury a case based on the previously dismissed claims of breach of contract and breach of warranty. I will grant this motion on the ground that the breach of contract claim was dismissed and that the parties' contract, the Master Agreement, bars a breach of warranty claim. This ruling, however, is without prejudice to the introduction of post-contractual evidence to the extent that such evidence is shown to be relevant to the pre-contractual negligent misrepresentation and CUTPA claims.

### *SS&C's fifth motion in limine to preclude evidence of Bimini Capital Management (Doc. #214-1)*

SS&C moves *in limine* to preclude adverse evidence, argument or testimony concerning a

5

different SS&C mortgage REIT client known as Bimini Capital Management ("Bimini"). SS&C argues that this evidence is not relevant because SS&C did not contract with Bimini until September 2015—approximately nine months after its entry into the Master Agreement with ACM—and because the Bimini evidence will lead to a "mini-trial within the trial" and will be used for prejudicial propensity purposes. I do not agree.

To begin with, it is well-established that a defendant's subsequent conduct may be relevant to a jury's consideration of the significance or nature of a defendant's prior conduct. *See, e.g.*, *Associated Constr. / AP Constr., LLC v. Hanover Ins. Co.*, 2018 WL 3998971, at *9 (D. Conn. 2018) ("Subsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made.") (quoting *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 76 (2005)). Here, ACM argues that—to the extent that SS&C's implementation of CAMRA failed with Bimini and to the extent that Bimini is substantially similar to ACM—that SS&C should have known that the representations it was making to ACM were false. Given the time lapse of nine months, this inference seems a bit tenuous to me. But I am not prepared to say that such evidence fails altogether to meet the broad standard of relevance, which looks simply to whether "it has *any tendency* to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); *see also* Fed. R. Evid. 402 (all relevant evidence generally admissible).

But beyond the issue of what SS&C should have known, I conclude that the Bimini evidence is relevant to the issue of whether the representations made by SS&C were false at all. ACM argues in essence that it was false for SS&C to claim that CAMRA could be implemented on the basis of a hybrid "hosted" model similar to the model it also pursued with Bimini—a method allegedly distinct from SS&C implementation of CAMRA with other mortgage REIT

customers. If so, then the failed implementation with Bimini is relevant to whether SS&C's specific representations about implementation to ACM were false in the first place (regardless whether it also shows that SS&C should have known this to be so). Moreover, to the extent that the representations made to Bimini were similar to those made to ACM and to the extent that Bimini relied on those representations, the Bimini evidence is relevant to the issue of reasonable reliance on the allegedly false representations.

Having concluded that the Bimini evidence meets the test of relevance under Fed. R. Evid. 401, I conclude that its probative value is not substantially outweighed by unfair prejudice. Rule 403 of the Federal Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As stated by counsel for ACM during the course of the January 3 hearing on the motions *in limine*, the Bimini evidence will be quite limited in scope: it will consist of an approximately two-hour deposition of a Bimini representative and limited other testimony. Although SS&C will be fully entitled to respond to this evidence, I am not convinced that there will be a protracted "mini-trial" about Bimini that would distract or confuse the jury.

Likewise, I conclude that the Bimini evidence is not improper propensity evidence. Rule 404 provides in part that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). The Second Circuit, however, "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under

7

Rule 403 nor irrelevant under Rule 402." *United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013). The factors relevant to determining the admissibility of "other act" evidence include whether (1) the evidence is offered for a proper purpose, (2) the evidence is relevant to a disputed issue pursuant to Rule 402, (3) the probative value of the evidence is substantially outweighed by its potential for unfair prejudice pursuant to Rule 403, and (4) the evidence was admitted in conjunction with an appropriate limiting instruction, if requested. *Ibid.*

Here, I have concluded that the Bimini evidence is offered for a proper non-propensity purpose, as discussed above, that it is otherwise admissible as relevant evidence under Rule 402, that it is not subject to preclusion for reasons of unfair prejudice under Rule 403, and I will give a limiting instruction to the jury that such evidence should not be considered as propensity evidence if SS&C so requests. Accordingly, I will deny SS&C's motion *in limine* to preclude Bimini evidence.

### *SS&C's sixth motion in limine regarding seven statements (Doc. #214-1)*

SS&C moves *in limine* to preclude ACM from relying on seven particular statements it cites, which SS&C argues are non-actionable as a matter of law. SS&C does not argue that these statements would not be admissible for general purposes at trial. Because the statements are admissible at trial, there is no need for me at this time to determine as a matter of law whether these seven statements are non-actionable, and I prefer to see how they are presented in context at trial. Accordingly, I will deny SS&C's motion *in limine* without prejudice to SS&C's renewal of its motion with respect to any non-actionable statements at the time of the final jury instruction charge conference.

### *SS&C's seventh motion in limine to preclude electronic chats (Doc. #214-1)*

SS&C moves *in limine* to preclude ACM's introduction of electronic conversations

8

("chats") produced by SS&C during the course of discovery. As discussed at the January 3 hearing, I cannot rule on this motion until ACM identifies the particular conversations within the compendium of approximately 600 pages of electronic chats that it proposes to introduce.. Accordingly, I will defer ruling on this motion pending ACM's identification of any specific conversations it proposes to introduce and ACM's showing of why each conversation is admissible.

***ACM's motion in limine #1 regarding evidence of other SS&C customers (Doc. #222)***

ACM moves to preclude any evidence, reference, or argument concerning or relating to any allegedly successful CAMRA implementations. I will deny in part and grant in part this motion.

I will deny the motion insofar as SS&C would rely on allegedly successful implementations by the seven mortgage REIT customers that it identified in its PowerPoint presentation of June 2, 2014: Annaly/Chimara, Western Asset Mortgage Capital, Apollo Residential Mortgage Trust, CYS, Ares, and New York Mortgage Trust. Doc. #237-1 at 6. Because ACM's complaint specifically alleges that SS&C made misrepresentations in its presentation of June 2, 2014, Doc. #35 at 5 (¶ 16), and that it made misrepresentations "including its implementation and use for other customers like ACM," *id*. at 8 (¶ 23), I conclude that SS&C is entitled to defend against this claim and that ACM was well on notice that SS&C would very likely rely on its allegedly successful implementations with respect to these customers. Moreover, in view that ACM's own expert (Steven Kursh) identifies reliance on these customers as misleading, *see, e.g.*, Doc. #217 at 23-24 (¶¶ 99-100), this is further reason to allow SS&C to respond with its own evidence about these particular customers.

9

I am not persuaded by ACM's claim that it was blocked from engaging in discovery about these specific customers. As discussed at the prior discovery hearing of October 18, 2018, ACM's prior motions to compel were focused on allegedly *unsatisfied* customers, not allegedly satisfied customers. To the extent that ACM claims that SS&C resisted its discovery with respect to its customers, there is no record that ACM raised this issue with the Court in an effort to specifically pursue discovery as to the seven mortgage REIT customers identified in the June 2, 2014, presentation and despite ACM's knowing that these particular customers were put at issue by the allegations of its complaint.

Nor am I persuaded by ACM's claim that evidence with respect to these customers is not proper because of any alleged dissimilarities with respect to these customers (such as whether the CAMRA product was licensed, hosted, or outsourced). These differences go to the weight of any reliance by SS&C on these customer experiences, not their relevance to ACM's claim of negligent misrepresentations and a CUTPA violation. For the reasons stated by SS&C in its memorandum in opposition and because ACM has put these specific customers at issue in its complaint, ACM's reliance on "experience of others" cases is misplaced. Doc. #237 at 7 (citing *Hall v. Burns*, 569 A.2d 10, 15 (Conn. 1990) and *Williams Ford Inc. v. Hartford Courant Co.*, 657 A.2d 212, 218 (Conn. 1995)).

Nor will I grant ACM's request for further discovery at this time with respect to these customers. The discovery period has closed, and it is time for the trial of this action rather than a continuance to engage in more discovery.

Although I will deny the motion to preclude SS&C from relying on allegedly successful implementations by the seven mortgage REIT customers, I will otherwise grant the motion to preclude evidence concerning SS&C's allegedly successful CAMRA implementations with

respect to all other customers. Evidence about more customers would be cumulative and of far less probative value. Especially as to those customers whom SS&C did not identify in its pre-contractual presentations to ACM, there is a concern about fair notice as well. Accordingly, unless ACM opts to open the door to inquiry about whether CAMRA has been successfully implemented with other customers, SS&C may not adduce testimony or other evidence about other alleged successful implementations with other customers. Although SS&C may adduce evidence of the names and number of customers that used CAMRA as of December 2014, SS&C may not adduce further testimony or evidence concerning whether its customers—other than seven mortgage REIT customers discussed above—had successful implementations of CAMRA. Accordingly, I will deny in part and grant in part ACM's motion to preclude evidence of other customers.

### *ACM's motion in limine #2 to exclude any reference to or argument related to certain post-contractual conduct (Doc. #216)*

ACM moves to categorically preclude any evidence of, reference to, or argument concerning or arising out of the parties' post-contractual conduct unless introduced by ACM to establish the falsity and awareness of SS&C's pre-contractual misrepresentations, to show damages, or to rebut SS&C's arguments.

I will deny this motion for substantially the reasons stated by SS&C in its opposition. Doc. #238. Although both the negligent misrepresentation and CUTPA causes of action involve SS&C's pre-contractual conduct, it is clear that post-contractual conduct of both parties may shed light on the nature and significance of pre-contractual conduct as well as on the issue of any damages ACM ultimately sustained as a result of SS&C's allegedly wrongful pre-contractual conduct. I cannot agree with ACM's categorical request that only ACM be allowed to adduce such post-contractual evidence. Accordingly, I will deny ACM's motion *in limine* as to post-

contractual conduct without prejudice to the right of either party to object to any specific post-contractual evidence to the extent that such evidence is not properly admissible with respect to the negligent misrepresentation and CUTPA claims predicated on pre-contractual representations.

*ACM's motion in limine #3 to exclude any evidence of the management agreements and collateral-source payments (Doc. #219)*

ACM moves to preclude any evidence, reference, or argument concerning or arising out of its management agreements with two other entities—ARMOUR Residential REIT, Inc. and Javelin Mortgage Investment Corp.—on the ground that such evidence of payments to ACM by these two entities is barred under the collateral source rule.

I will deny this motion for substantially the reasons stated by SS&C in its opposition. Doc. #240. As SS&C notes, the management agreements and payment arrangements are relevant and probative of an important issue with respect to ACM's choice of the hosting relationship. The probative value of this information is not substantially outweighed by the potential for prejudice under Fed. R. Evid. 403. This ruling is without prejudice to ACM's adducing evidence that it intends to repay the amounts it received from these entities in the event that it prevails in this action. This ruling is also without prejudice to ACM's proposal of a limiting instruction to the extent that ACM is concerned that the jury might reduce any damages award by the amount received by ACM from these entities.

*ACM's motion in limine #4 to exclude any evidence of Section 6.2.2 of the Master Agreement (Doc. #218)*

ACM moves to preclude any evidence, reference, or argument concerning or arising out of Section 6.2.2 of the Master Agreement and its exclusion of consequential damages. I will grant this motion for the same reasons that I have denied SS&C's motion to preclude evidence of

12

consequential damages, such as lost employee time, as discussed above. Section 6.2.2's exclusion does not limit the measure of tort damages for pre-contractual negligent misrepresentation or pre-contractual CUTPA acts of unfair or deceptive trade practices. *See Ulbrich v. Groth*, 78 A.3d 76, 98 (Conn. 2013) (pre-contractual negligent misrepresentation claim does not "arise out of" the breach of contract). I will not preclude the introduction of the Master Agreement into evidence at trial. But because I am not convinced that Section 6.2.2 has any legal relevance to the measure of damages in this case, there is no good reason for SS&C to devote attention at trial to the particulars of Section 6.2.2 or to argue that the jury should consider Section 6.2.2 relevant to whether ACM may seek recovery for lost employee time. Accordingly, I will grant ACM's motion to exclude specific testimony and reference to Section 6.2.2 of the Master Agreement.

### *ACM's motion in limine #6 to permit reference to all of SS&C's misrepresentations (Doc. #223)*

ACM moves to permit reference to all of SS&C's misrepresentations and not simply those 22 alleged misrepresentations that it identified by means of an interrogatory response during the course of discovery. Although the motion is somewhat vague with respect to what relief ACM seeks, I will grant in part and defer in part the motion based on my understanding of the relief requested.

I will grant the motion to the extent that ACM seeks a ruling that the scope of evidence at trial concerning statements made by SS&C not be limited to the 22 alleged misrepresentations that ACM identified in its interrogatory response. The evidence at trial may well include many statements made by the parties to each other even if some of these statements are not the specific basis for liability as a negligent misrepresentation or under CUTPA. Whether true or untrue, such

13

additional statements may provide important context and background to the jury's understanding of the evidence.

I will otherwise defer consideration of the motion to the extent that it seeks to predicate SS&C's liability for negligent misrepresentation or under CUTPA on the basis of any statement beyond the 22 statements that ACM identified in its interrogatory response. Doc. #214-6. I agree with SS&C that ACM should have seasonably disclosed any such additional statements by means of supplementation of its interrogatory response (not simply by flagging additional statements in its post-discovery summary judgment briefing) and that there is no good reason for ACM to have failed to do so because it should have had peculiar knowledge from the start of this litigation of the pre-contractual statements that it believes were false and resulted in damages. Therefore, it is unlikely that I will allow the jury to consider any additional statement beyond the 22 statements as a predicate for the negligent misrepresentation or CUTPA claims, but it is not necessary at this time for me to conclusively determine how the jury will be instructed.

### *SS&C's motion in limine to preclude expert Steven Kursh (Doc. #213)*

SS&C has moved to preclude or limit the expert testimony of Steven Kursh on multiple grounds. As an initial matter, I will review the major principles that guide a court's consideration whether to allow expert testimony.

Federal Rule of Evidence 702 allows for expert testimony if the following conditions are met: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 703 in turn allows for an expert to rely on "facts or data … that the expert has been made aware of or personally observed." But "if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

Rule 704 provides that an expert opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Yet, as the Second Circuit has made clear, this rule still requires the exclusion of expert testimony that expresses a legal conclusion or that does so by communicating a legal standard—explicit or implicit—to the jury. *See Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). Thus, for example, the Second Circuit has found error in a police-excessive-force case for an expert to testify that the officer's "conduct was not 'justified under the circumstances,' not 'warranted under the circumstances,' and totally improper.'" *Id.* at 364. Similarly, "an expert's testimony that a defendant was 'negligent' should not have been allowed." *Ibid.*; *see also Wilson v. Callahan*, 863 F.3d 144, 153 (2d Cir. 2019) (expert testimony not admissible if it usurps the role of the jury to apply the law to the facts before it); *Nimely v. City of New York*, 414 F.3d. 381, 395-97 (2d Cir. 2005) (general discussion of rules governing admissibility of expert testimony).

In light of this background I turn to SS&C's motion to preclude or limit the testimony of Steven Kursh. As an initial matter, SS&C does not challenge Kursh's general expertise in light of his educational training and involvement in more than 200 software implementations. It is also clear to me that expert testimony in this case could be very helpful because of the highly technical nature of software purchasing and implementation arrangements in the context of sophisticated financial business activities.

15

Nevertheless, based on my review of Kursh's report, I conclude that it well exceeds the bounds of proper expert testimony and that his testimony must be substantially limited in order to be permissible at trial. Indeed, much of Kursh's report resembles a closing argument or summary judgment brief rather than a communication of technical opinion within the proper scope of Kursh's expertise.

I will grant SS&C's motion to the extent that it seeks to preclude Kursh from testifying about what SS&C actually knew, because Kursh is not a fact witness who can testify about what SS&C actually knew. His expertise does not shed light on what SS&C actually knew, and his report argumentatively strays well beyond his expertise when it opines about what SS&C actually knew on the basis of his second-hand review of emails and other documents. Moreover, such testimony from Kursh about what the parties actually knew would unduly intrude on the jury's function to decide what SS&C knew as to any of its statements (and whether any such statements were statements of fact rather than opinion).

I will likewise grant SS&C's motion to preclude to the extent that it would preclude Kursh from testifying about what SS&C should have known or that SS&C did not act reasonably when making certain representations. This type of opinion again expresses a legal conclusion that is actually an elemental part of a negligent misrepresentation claim. It would be akin to allowing an expert to opine on whether a particular defendant was negligent, which an expert generally may not do.

I will also grant SS&C's motion to the extent that it seeks to preclude Kursh from testifying either that SS&C's actions caused the failed implementation of CAMRA or, conversely, that ACM's own actions did *not* cause the failure of the CAMRA implementation. Kursh's background and report does not reflect that he has expertise on factual issues of specific

16

causation, and such testimony would amount to a legal conclusion on the causation aspect of ACM's claims.

Notwithstanding these limitations, there are aspects of Kursh's background and report that amply show his qualification to provide expert testimony. I will deny SS&C's motion to the extent that it would preclude Kursh from testifying on the basis of his expertise about industry standards and customs with respect to the sale of enterprise software and software implementation. For example, based on his extensive experience, Kursh may testify about what was reasonable under then-prevailing industry standards and customs for the disclosures upon sale and implementation of enterprise software as to (1) the software's functionality or technical suitability and specifications (including any technical or functionality requirements specific to mortgage REITs), and (2) the "services capacity" or staffing support requirements for a successful implementation. Although he is not at liberty (as discussed above) to testify about why the implementation failed for ACM, he is free to testify about common reasons why particular enterprise software implementation projects do not succeed.

Moreover, Kursh may testify about ISO Technical Report 19759 (Software Engineering Body of Knowledge, or "SWEBOK") and why he believes the standards of SWEBOK are relevant to his testimony about industry standards. SS&C's objection to the use of the SWEBOK standard goes to weight, not to admissibility, and SS&C is free to cross-examine Kursh about why that standard does not apply, as well as to introduce its own expert testimony about why SWEBOK may not apply.

I will also allow Kursh to testify about the functionality and services support requirements for CAMRA to the extent that a foundation is laid to show his expertise. It will be helpful for the jury to have testimony about the functionality and implementation requirements

17

for sophisticated business software in general but it will be especially helpful to have this testimony as to CAMRA in particular if ACM can lay an adequate foundation. If so, Kursh may testify concerning his opinion of what would be a reasonable amount of resources or number of employee hours for a customer to devote to the implementation of an enterprise software package and to CAMRA in particular.

A significant part of the evidence in this case may be the successful or unsuccessful implementation of CAMRA with several other customers, as previously described in this ruling. In light of ACM's claim that such distinctions are attributable to technical differences and aspects of the method of implementation, I will allow Kursh to testify consistent with paragraphs 53 and 99 of his report about such differences that may explain why an implementation may succeed with one company while not succeeding with another.

In short, Kursh appears to be a qualified expert whose testimony may be helpful to the jury provided that he does not stray from the scope of his expertise. Although Kursh may not testify concerning ultimate legal conclusions or on issues outside the scope of his expertise, he may testify concerning general industry standards for functionality and services support as well as for CAMRA in particular to the extent that an adequate foundation is established. On the basis of this testimony, the jury may then decide if his testimony is credible and—if so—to what extent it is helpful to their resolution of ultimate issues of negligence, knowledge, falsity, deception, and causation (among other issues).

Accordingly, I will grant in part and deny in part the motion to preclude and limit the testimony of Steven Kursh. If the parties believe there is some aspect of Kursh's testimony that I have not adequately addressed or resolved, they are invited to raise this issue with me.

### *ACM's motion in limine to preclude or limit expert testimony of Michael Maffattone and Brooks Hilliard (Doc. #220)*

ACM moves to preclude or otherwise limit the expert testimony of Michael Maffattone and Brooks Hilliard on several grounds. I will grant the motion to the extent that SS&C's experts may not testify about matters for which I have precluded ACM's expert as described above.[3]

I will otherwise deny ACM's motion. ACM argues that Maffattone is not qualified as an expert witness and is in reality a paid fact witness. I do not agree for the reasons stated by SS&C in its opposition. Doc. #242. Maffattone is plainly qualified by reason of his background and experience with more than 100 software implementations and in particular, his familiarity with CAMRA. This CAMRA-specific experience enhances the usefulness of Maffattone's expert testimony. It does not somehow improperly convert Maffattone into a "fact" witness, and there is no indication that he took part in any of the negotiations and attempted implementation at issue in this case. The fact that there may be differences between the types of CAMRA implementations that Maffattone experienced at Annaly and Chimera is grounds for cross-examination but not for preclusion.

Maffattone's analysis and methods, as well as his reliance on the basis of his experience in the field, have not been shown to be any less established than the analysis and methods of ACM's expert, Steven Kursh, whose qualifications have not been challenged. *See Nicholas v. Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (discussing how expert methods need not be scientific but may be premised on practical and specialized experience). Maffattone meets all the

---

[3] As I made clear at the January 3 hearing on the motions *in limine*, my intent is to subject each expert to the same guidelines and limitations as other experts. If for any reason the parties mutually agree that it would be helpful for their experts to offer testimony beyond the scope of the guidelines described in this ruling, then they are invited to raise this issue with me.

requisites for expert testimony under Rule 702. Accordingly, I will deny ACM's motion to the extent that it seeks to altogether preclude the testimony of Maffattone.

Lastly, as to ACM's claim that the testimony of both Maffattone and Hilliard would be duplicative, I will defer consideration of this objection in light of SS&C's statements at the hearing on the motion *in limine* that it may not call Hilliard as an expert witness. Accordingly, I will grant in part and deny in part ACM's motion *in limine* to limit the testimony of SS&C's expert witnesses.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part and DEFERS in part the parties' motions *in limine* as set forth in this ruling.

It is so ordered.

Dated at New Haven this 5th day of January 2020.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge