UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                              :
ARMOUR CAPITAL MANAGEMENT LP, :  No. 3:17CV790(JAM)
                              :
              Plaintiff       :
                              :
         v.                   :
                              :
SS&C TECHNOLOGIES, INC.,      :
                              :  New Haven, Connecticut
              Defendant       :  January 3, 2020
                              :
- - - - - - - - - - - - - - - x
```

<u>PRETRIAL CONFERENCE AND MOTIONS HEARING</u>

B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

                                    Diana Huntington, RDR, CRR
                                    Official Court Reporter

```
 1   A P P E A R A N C E S:

 2

 3        FOR THE PLAINTIFF:

 4            HOLLAND & KNIGHT LLP
                 701 Brickell Ave., Suite 3000
                 Miami, Florida 33131
 5            BY:  JOSEPH J. MAMOUNAS, ESQ.
                 ALLISON KERNISKY, ESQ.
 6
              HOLLAND & KNIGHT LLP
 7                 2929 Arch Street, Suite 800
                 Philadelphia, Pennsylvania 19104
 8            BY:  DANIEL MATEO, ESQ.
                 TRACY ZURZOLO QUINN, ESQ.
 9

10        FOR THE DEFENDANT:

11            PAUL WEISS RIFKIND WHARTON & GARRISON LLP
                 2001 K Street NW
12                 Washington, DC 20006
              BY:  JEANNIE S. RHEE, ESQ.
13
              PAUL WEISS RIFKIND WHARTON & GARRISON LLP
14                 1285 Avenue of the Americas
                 New York, New York 10019
15            BY:  JEFFREY RECHER, ESQ.
                 KRISTINA BUNTING, ESQ.
16                 JOSHUA D. KAYE, ESQ.

17

18

19

20

21

22

23

24

25
```

1 | **9:02 A.M.**

2 | THE COURT:  We're here for pretrial conference

3 in the matter of ARMOUR Capital Management v. SS&C.

4 | Appearance of counsel for ARMOUR, please.

5 | MR. MAMOUNAS:  Good morning, Judge, how are you?

6 Joe Mamounas, Dan Mateo, Tracy Quinn, and Allison Kernisky

7 of Holland & Knight on behalf of the plaintiff.

8 | THE COURT:  Good morning, everybody.

9 | MS. RHEE:  Good morning, Your Honor.  Jeannie

10 Rhee, Jeff Recher, Josh Kaye, and with us today making her

11 first appearance, Kristina Bunting.

12 | THE COURT:  And anybody else?

13 | MS. RHEE:  For purposes of the record, no.  This

14 is our trial support --

15 | THE COURT:  Trial support person.  They never

16 get names.  All right.  They deserve attribution.

17 | MS. RHEE:  Apologies, Your Honor.

18 | THE COURT:  Okay.  I'd like to cover with you, I

19 know we're coming up on the start of evidence in the case

20 and I'd like to start on Monday.  I wanted to talk to you

21 first about some of the mechanics for trial, try to answer

22 questions there that you might have, and then get to talk

23 about the many motions in limine that we have.

24 | So when I start trial, when the jury comes in

25 after they're sworn, my intent is to read to the jury some

1    opening pretrial jury instructions.  I think probably --

2    have they been handed out?  I think so.  You've just

3    gotten them now.  I know you won't have an opportunity

4    right at this moment to review them in detail.  They're

5    mostly boilerplate in terms of guidance to the jury.

6    Parts of them deal with the elements of the causes the

7    action here.  What I've got here is I've put the standard

8    elements in for the negligent misrepresentation claim

9    based in part or based, I should say, on the *Coppola* case

10   from the Connecticut Supreme Court (2013), and then the

11   elements for the CUTPA claim.

12           It wasn't quite clear to me on the CUTPA claim

13   whether ACM is proceeding on both kind of alternative

14   prongs that there was an unfair trade practice and also

15   that there was a deceptive act or whether ACM essentially

16   is proceeding on the basis that there was deception here

17   that coincides with and mirrors the, I'll say, allegedly

18   false representations that form the basis for the

19   negligent misrepresentation claim.  That's a question I

20   have.

21           I don't know, Mr. Mamounas, if you could shed

22   light on that.  Or if you want to think about that, that's

23   fine.  I've got it framed in terms of the broadest way

24   possible, but I'd rather not instruct more broadly than

25   necessary if in fact you're going to be proceeding just on

1   the deceptive prong of CUTPA.

2            MR. MAMOUNAS:  Your Honor, just looking at this

3   right now, we are proceeding on both, and I think the

4   language would capture that.

5            THE COURT:  All right.

6            And then in terms of the rescission claim, it's

7   not clear to me what additional language would be

8   required.  If you have thoughts about that, I'd like to

9   hear from you to the extent that rescission is actually a

10  claim that's distinct from a remedy.

11           MR. MAMOUNAS:  I think, Judge, the position we

12  had taken was that the rescission would be submitted to

13  the Court post trial and it would not go the jury.

14           THE COURT:  So would not need the jury to get

15  talking about that.

16           MR. MAMOUNAS:  Yes, Judge.

17           THE COURT:  So take a look at that.  Maybe, if

18  you can, by the end of the day today forward to my law

19  clerk any concerns that you have about those opening jury

20  instructions.

21           The jury does not get a copy of these opening

22  instructions, they just have them read to them.  They are

23  a prelude to -- and you'll see there's a placeholder

24  towards the end of the instructions in which you will have

25  an opportunity to give your opening statements.

1              And I'm not sure we've talked about that yet,

2       but remind me if we have.  I presume the parties would

3       like to give opening statements in the case; does that

4       sound right?

5              MR. MAMOUNAS:  Yes, please.

6              MS. RHEE:  Of course, Your Honor.

7              THE COURT:  What's your sense in terms of

8       timing?  A 10-minute opening?  A 15-minute opening?

9       Usually they're pretty brief.  They're essentially a

10      preview of what you expect the evidence to show, they

11      don't lapse into actual argument.

12             MR. MAMOUNAS:  Judge, we understand that your

13      preference is for brief openings and would endeavor to

14      reach something closer to the 15- or 20-minute mark.  I

15      think, given the complexity of the evidence and the amount

16      of documents that will be shown to the jury, I think

17      probably 20 minutes would be appropriate if Your Honor

18      would indulge.

19             THE COURT:  Ms. Rhee?

20             MS. RHEE:  We have every intention of giving a

21      very short opening, but of course have to hear what the

22      plaintiff says in its remarks.

23             THE COURT:  So you have up to 20 minutes each

24      side for opening statements.

25             If you intend to use -- for opening statements,

1    do you intend to use any demonstratives?

2              MR. MAMOUNAS:  Yes, sir.

3              THE COURT:  And have they been shared with

4    defendant?

5              MR. MAMOUNAS:  None as yet.  I think the

6    agreement had been to exchange on Sunday.

7              THE COURT:  So you'll need to do that sharing,

8    if you can.  If there's going to be an objection to the

9    demonstratives, you should let chambers know as well so

10   that I can resolve that without delay to the jury.  We can

11   resolve that.  You should be prepared, if necessary -- I'm

12   not sure in terms of your trial tech folks -- to modify

13   any demonstratives that would be used in the event the

14   Court sustains objections to the demonstratives.

15             So that's it in terms of opening statements.

16             Let me talk a little bit about admission of

17   exhibits.  There's lots of ways to do that.  I'd like to

18   try to keep it moving along as much as I can, but also to

19   make clear to the jury what exhibits have actually been

20   admitted into evidence.

21             So my usual practice is when you have an exhibit

22   to show to a witness, that you obviously identify it by

23   exhibit number and that you then make a motion, move it

24   into evidence.  If you know that the exhibit's admission

25   is not going to be contested, and I assume that -- I hope

1     you folks have a broad agreement that many of the exhibits

2     would not be contested, then it's fine simply to say "I

3     move this admission."  I'll check with the opposing side,

4     ask if they have an objection.  I'd rather avoid, if we

5     can, extended evidentiary foundation through all the

6     803(8) or (6) business records, public records

7     foundational requirements.  That uses a lot of time that's

8     unnecessary.  And usually I think most of the time it can

9     be satisfied.  I understand there are some exceptions here

10    and there where you have issues there and it's necessary

11    to go through all of that, but I encourage you to be

12    thinking how it is we can essentially not lose jury time

13    on extensive foundational requirements.  So I encourage

14    you to think about that as you go through.

15             If you have a group of exhibits, I also

16    encourage if basically you have 20 emails that you're

17    going to show a witness and you don't anticipate there's

18    going to be an objection, it's fine to say, "Your Honor,

19    for this witness we'd like to introduce Plaintiff's

20    Exhibits 1 through 20," and then I'll admit those on a

21    group basis.

22             Keep in mind you've got basically with our

23    electronics system, each of the jurors -- or the jurors

24    share juror screens, I don't know if you've done the

25    training on the system.  Have you done the training on the

1 │ system?  You're doing it this afternoon.

2 │　　　　　Are you both using laptops or the Elmo?  How are

3 │ you doing that?

4 │　　　　　MS. RHEE:  Both, Your Honor.

5 │　　　　　MR. MAMOUNAS:  Same, Judge.

6 │　　　　　THE COURT:  So we can switch back and forth.

7 │　　　　　Generally, the most reliable way to know whether

8 │ the jury is looking at a document is to look at the public

9 │ screen over there on the wall.  The jury is seeing exactly

10 │ what's on the public screen on the wall over there.  Once

11 │ you put an exhibit on screen for the witness, it will not

12 │ show to the jury, it won't show to the jury until such

13 │ time as the Court admits the exhibit, okay?  And then

14 │ you're going to want to make sure that you check, take a

15 │ glance at the public screen to make sure the jury is

16 │ getting it.  Sometimes there's a lag time between the

17 │ admission of the exhibit and it showing up on the jury

18 │ screens.

19 │　　　　　You should also be -- and I trust you perhaps

20 │ are in communication with Ms. Gutierrez and my law clerk

21 │ about the preparation of the exhibits in their electronic

22 │ format that will eventually go back to the jury as well,

23 │ for the JERS system.

24 │　　　　　Objections to exhibits or to lines of

25 │ questioning, I do not accept speaking objections.  You

1    just have to rise, say "Objection."  If there's one word,

2    "hearsay," "relevance," that's fine.  Otherwise, please

3    not more than that in terms of speaking objections.

4              I discourage sidebars.  They obviously take a

5    lot of time to resolve.  You will find it most productive

6    if you have antennae for thinking about what are the

7    anticipated objections that are going to rise during a

8    particular witness's testimony and try to work that out

9    among counsel so that we don't basically have a train

10   wreck in the middle of a particular witness's testimony

11   where I have to send the jury out or we're spending 20

12   minutes at sidebar trying to hash out something that could

13   have been raised beforehand and should have been raised

14   beforehand outside of the jury's presence.  You really

15   need to think proactively about that.  Sort of springing

16   something on the other side, if I have a sense that that

17   was just sprung on them with the thought that essentially

18   you were going to try to slip this through when you knew

19   it was going to be objected to, I'll have real questions

20   for the lawyer who does that.  It seems to me you all are

21   experienced enough and you know enough about this case to

22   know where the land mines lie there.  You need to make

23   sure that you are engaging in very active consultation

24   amongst yourselves there in the first instance before we

25   have those kinds of disputes.  Okay.

1          Sequestration is also on my list here.  Do you

2     have -- I take it the parties, are they requesting

3     sequestration of witnesses?

4          MR. MAMOUNAS:  We are not, Judge.

5          THE COURT:  Ms. Rhee?

6          MS. RHEE:  Oh, we are.

7          THE COURT:  So you'll be seeking sequestration

8     of ACM witnesses.

9          Will ACM then have a representative?

10          MR. MAMOUNAS:  We will, Judge.

11          THE COURT:  Who will be the representative?

12          MR. MAMOUNAS:  I believe it will be Mr. James

13     Mountain.

14          THE COURT:  All right.

15          Ms. Rhee.

16          MS. RHEE:  We're seeking sequestration.  In so

17     far as they're also proffering Mr. Mountain as a fact

18     witness, we would ask that he be sequestered for the

19     duration of the trial.

20          THE COURT:  That often happens, usually a party

21     is entitled to a representative witness even if the

22     representative witness is a fact witness.  Is there some

23     exception to that?  For example, in criminal cases, the

24     case agent is oftentimes a witness in the case but also is

25     allowed to sit in court as basically the client

1    representative of sorts.  Is there a reason why that would

2    be different in this case?

3                 MS. RHEE:  Your Honor, just given the primacy of

4    Mr. Mountain as a fact witness and because I think the

5    record is very clear that he was the key decision maker

6    about the contract at issue and all of the representations

7    that led up to the contract is really the heart of this

8    case, we would ask for the sequestration.

9                 I think if we got an indication that

10   Mr. Mountain was either the first witness or the --

11   ideally, the first witness to be put on by ACM, I think we

12   would want to confer here but might not object to then his

13   subsequent presence.

14                THE COURT:  You wouldn't have any grounds then,

15   unless he were to be --

16                MS. RHEE:  A rebuttal witness, right.  But I

17   appreciate that our concern is, for the most part,

18   mitigated if he is the first person out of the box.

19                THE COURT:  How early will Mr. Mountain be?

20                MR. MAMOUNAS:  I was going to say, Judge, I

21   think this may be a non-issue since he likely will testify

22   first.

23                As well, to the extent that they're invoking

24   sequestration, we would ask for the same.  This is the

25   first we're hearing from SS&C that they were intending to

```
 1    invoke --

 2              THE COURT:  It will be reciprocal, of course.

 3              My sense is that Mr. Mountain, it would be

 4    appropriate -- I think each side is allowed essentially a

 5    client representative to be present even if the client

 6    representative is a fact witness in the case.

 7              If you know of law that's contrary to that,

 8    Ms. Rhee -- it looks like you have a lot of legal

 9    resources here to do the research -- let me know.  I've

10    never seen a case where only the lawyers were allowed to

11    be --

12              MS. RHEE:  Again, insofar as we have a

13    representation that Mr. Mountain is going to be the first

14    witness put on by ACM --

15              THE COURT:  We may not have to cross the bridge,

16    okay.

17              MR. MAMOUNAS:  Judge, I think it will be

18    helpful, since this is the first we're hearing that SS&C

19    is invoking the rule, to know who their corporate

20    representative is going to be.

21              THE COURT:  Is there going to be a corporate

22    representative from SS&C?

23              MS. RHEE:  We don't anticipate one.

24              THE COURT:  There you go.

25              That's it in terms of those initial issues.
```

1              Any kind of other questions about kind of trial

2    mechanics and the like?

3              MS. RHEE:  Let me just amend that, Your Honor.

4    We don't anticipate a corporate representative who is also

5    a fact witness being present for the duration of the trial

6    proceeding.

7              THE COURT:  Great.

8              Any other issues, mechanic issues you want to

9    ask about?

10             MR. MAMOUNAS:  None from us, Judge.

11             MS. RHEE:  No, Your Honor.

12             THE COURT:  Great, great.

13             I start every day trial at 8:30.  I generally

14   take the bench at 8:30 just to try to head off issues that

15   may be arising during the trial day.

16             To the extent that issues arise during evening

17   preparations, afternoon and evening preparations, you

18   really need to make sure that our chambers is in the loop

19   on that.  If you file something, especially -- or you

20   anticipate something that the Court will need to address

21   in the morning, that you're in touch with my law clerk

22   about that so that we're ready to address those the

23   beginning of each trial day.  And also to the extent that

24   you have issues that you need to raise during any kind of

25   break in the trial, the same.

1          Okay, let's get to motions in limine.

2          I thought on the motions in limine what I'd like

3    to do is tackle the non-expert motions first from both

4    sides and then move on to the expert-related motions.  I

5    know there's a little bit of overlap here and there.  I'd

6    like to try to do that, if we can.

7          So what I'll do is I think I'll start off with

8    the motions filed by SS&C which are probably, for the most

9    part, implicated earliest in the case because ACM, of

10   course, will be presenting first in the case.  What I'd

11   like to do, SS&C has filed basically an omnibus motion in

12   limine, Document 214-1, and it has, I guess, I think seven

13   different motions in there.

14         And so what I'm going to do is essentially tell

15   you, give you a sense of my initial take on the proper

16   disposition of these motions.  I'll then hear argument

17   from you, additional points that you'd like to make there.

18   But I don't think I want to kind of hear argument as an

19   initial matter before telling you essentially what my kind

20   of read and how I'm leaning based upon the papers that

21   you've given me.

22         The first motion, SS&C's motion in limine that

23   ACM should be precluded from punitive damages award, my

24   inclination on that one is to deny that motion basically

25   for the reasons that are stated by ACM in its opposition.

1    It seems to me to be a bit premature to preclude or reach

2    the conclusion that necessarily ACM's case would not rise

3    to the level where the Court might instruct the jury on

4    the factual requisites that would be necessary to sustain

5    an award of punitive damages, understanding that, for

6    purposes of the common law claim, negligent

7    misrepresentation, I gather the punitive damages would be

8    the common law measure of punitive damages, essentially

9    attorney's fees.

10              For the CUTPA claim, I gather that the Court

11   itself would have discretion to award punitive damages

12   provided certain factual prerequisites were made, which I

13   gather that the parties, assuming the Court were to

14   entertain punitive damages, would wish the jury to make

15   the determination of those initial factual prerequisites

16   for a punitive damages award.

17              All that said, it seems it's too early for me to

18   rule out the possibility of an award of punitive damages

19   or an instruction to the jury to consider the possibility

20   of punitive damages, and so I would intend to deny the

21   motion, but of course without prejudice to renewal at the

22   close of the evidence in the case and with respect to the

23   jury charge conference.

24              I take that, Mr. Mamounas, you would not

25   intend -- I don't know why, as part of your opening

 1     statement, it would be necessary to refer at all to

 2     anything about punitive damages in opening statement.

 3     Again, it's just a preview of what you expect the evidence

 4     will show in the case; it's not argument about anything.

 5     So I would preclude you from arguing or referring to,

 6     during your case, punitive damages.  I think there's no

 7     need for the jury to hear any reference during the case

 8     until closing arguments at such time that the Court has

 9     resolved whether it's going to instruct on punitive

10     damages.  So that's the Court's inclination on SS&C's

11     motion in limine number one.

12               Any party have any further comment on this?

13               MS. RHEE:  Your Honor, that really is the

14     essence of our motion.  We just want to make sure that

15     it's not introduced to the jury up front and that there

16     isn't reference to it all throughout.  We understand the

17     Court's position and really that is what we've been asking

18     for.

19               THE COURT:  Okay.

20               MR. MAMOUNAS:  Judge, the one issue that I would

21     raise on the punitive damages piece, particularly under

22     the negligent misrepresentation claim, the common law, was

23     the question of damages presentation to the jury.

24     Connecticut case law, as we understand it, provides that

25     attorney's fees are the typical measure of damages.  We

1   had proposed a stipulation that were the jury were to find

2   after being properly charged that we are entitled to

3   punitive damages under the common law, that the question

4   of amount be submitted to Your Honor rather than burdening

5   the jury with the tedium of going through invoices --

6           THE COURT:  That's a jury charge issue, I think.

7   So we'll worry about that.

8           MR. MAMOUNAS:  There's also the evidentiary

9   component, whether we would have to present our invoices

10  on the question of amount.

11          THE COURT:  I understand.  Thank you.

12          MR. MAMOUNAS:  And we proposed a stipulation to

13  SS&C on the issue.

14          THE COURT:  What's SS&C's take on that issue in

15  terms of, if the jury were to find the predicates for

16  punitive damages, do you really want attorney's fees and

17  those kinds of billing going to the jury?

18          MS. RHEE:  Our position is we've received

19  literally, as of a couple of days ago, essentially a

20  one-line statement saying these are the total amount of

21  the attorney's fees without any more information.  It's

22  utterly premature.  But obviously we are not in a position

23  to make any determination about what, if anything, should

24  go to the jury, because that one sheet of paper is not

25  sufficient for us to come to a position.  And in light of

1    the Court's ruling, we don't know if we get there.

2              THE COURT:   Okay.   What I'm going to do is ask

3    you, Ms. Rhee, to think about that.   Think about whether,

4    if the Court were to find that the evidence was sufficient

5    to allow an instruction on punitive damages, whether SS&C

6    would agree to the Court's calculation of attorney's fees

7    to the extent that the punitive damages might be

8    measurable for purposes of the common law claim by the

9    Court as opposed to submitting it to the jury.   I

10   understand you're not happy with the level of detail

11   you've been given.   There's an abstract issue apart from

12   this which is essentially is it going to be a jury issue

13   or is it going to be a Court issue.   My experience is

14   usually it's a Court issue, but that's usually because the

15   attorneys agree to it.   But if you decide you want a

16   longer trial and you want to go through the

17   attorney-client billing records that they may produce here

18   and have testimony, then you should let the Court know as

19   well.

20             MS. RHEE:   We can tell you it's highly unlikely,

21   but because we don't know what that number consists of in

22   any real form other than the total number, we think that

23   there are two separate issues, as the Court acknowledges,

24   but they are necessarily related to one another, and so we

25   can't give you a final answer as to our position without

1    having some discussion about what --

2              THE COURT:  Have the discussion.  Have the

3    discussion.

4              Make sure to bring that up again, Mr. Mamounas,

5    if you can.

6              MR. MAMOUNAS:  I'll keep that in mind and I'll

7    set a bookmark for it.

8              Just to be clear, we have said, as part of the

9    stipulation, we would provide the information SS&C wants.

10   They asked for attorney billing records.  In terms of

11   evaluating the stipulation, it doesn't make any sense that

12   particular timekeeper narratives or amounts would have

13   anything to do with it.

14             THE COURT:  I understand that point very much.

15             So let's get to the second motion in limine,

16   number two, which is that ACM should be precluded from

17   damages based on lost employee time.

18             So my inclination here, and I know that there's

19   a similar motion, related kind of motion from ACM with

20   respect to lost employee time, it strikes me as I look at

21   the provision of the Master Agreement Section 6.2.2, it's

22   a preclusion for consequential damages, and understanding

23   SS&C's argument that that somehow precludes any award of

24   lost employee time because lost employee time would be

25   categorizable as a measure of consequential damages, I'm

1    really not convinced that Section 6.2.2 applies to the

2    negligent misrepresentation, in other words, to the

3    pre-contractual representations or pre-contractual tort at

4    issue here.  So at this point I'm leaning towards adopting

5    ACM's view that although consequential damages would be

6    precluded as to the contract claim, the contract claim

7    of course has been dismissed, I don't know that the same

8    reasoning applies to the pre-contractual tort claim that's

9    being tried.

10           So my sense at this point, and I'm leaning

11    towards denying SS&C's motion in limine to preclude any

12    evidence of damages based on lost employee time on the

13    ground of the conclusion that it seems to me to be outside

14    the scope of what is precluded by Section 6.2.2 of the

15    Master Agreement.  I'm happy to hear more argument about

16    that if the parties wish to state anything further.

17           MR. RECHER:  Good morning, Your Honor.  Jeff

18    Recher.

19           I understand the Court's view.  I would just

20    make a few quick points for the Court's consideration.

21           As we read Section 6.2.2 in the Master

22    Agreement, it is a prohibition on consequential damages of

23    any kind and it's linked to how those damages arise.  It's

24    not linked to any type of claim.  To the contrary, it

25    makes clear that consequential damages are precluded,

1    whether they're alleged as part of a breach of contract or

2    they're alleged as part of tortious conduct.  So our

3    reading of that provision in the first instance, it bars

4    consequential damages however raised.  And the question,

5    then, I think, is were the -- is the lost employee time

6    that ACM is claiming incurred in connection with the

7    services furnished under the contract.  And I believe the

8    answer to that question is, yes, for two reasons.  One,

9    you can tell from the type of damages how they're

10   calculating their lost employee time if that's the case.

11   They're only claiming lost employee time from the period

12   during which the contract was in effect.  So starting in

13   December 2014 through the period when the contract is

14   terminated in 2017.  And they've said repeatedly that the

15   lost employee time is incurred in an effort to try and

16   implement CAMRA which is exactly the services that are

17   contemplated in Work Request One, which is attached to the

18   agreement.

19            I would just flag in that respect, I think if we

20   can show Slide 33.

21            So Slide 33 is the declaration on summary

22   judgment from ACM's CFO Jim Mountain.  And he explains the

23   circumstances in which ACM expended its so-called lost

24   employee time.  He says we expended this effort in

25   reliance on ACM's Master Agreement with SS&C and

1   anticipating that SS&C would implement CAMRA for ACM as

2   SS&C was obligated.

3          So we read that, and I think the language is

4   fairly read as stating that the lost employee time was

5   spent in reliance on ACM's Master Agreement.

6          I'll flag one more, Your Honor.  If we can go to

7   the prior slide.

8          This is their first articulation of their lost

9   employee time claim from their complaint.  Now, it's

10  changed quite a bit since then.  The amount of money

11  they're claiming has more than doubled since their

12  complaint.  But they allege, we expended 4000 hours of

13  employee time on trying to assist SS&C's struggling teams

14  with the implementation of CAMRA that's the subject matter

15  of the agreement.

16         So from our point of view, the language in the

17  Master Agreement itself precludes consequential damages of

18  this type.

19         THE COURT:  Do you have a slide with the Master

20  Agreement, 6.2.2?

21         MR. RECHER:  I think we can pull it up.

22         THE COURT:  Maybe magnify 6.2.2, it would be

23  easier to have the discussion.

24         I have 6.2.2 in front of me here.  Just so

25  everybody is working off the same page.

1           So the language there, if you go down to the

2    seventh line of the paragraph, it refers to damages, types

3    of damages.  And then it says "for breach of this Master

4    Agreement, whether alleged as a breach of contract or

5    tortious conduct."

6           So it seems to me it's too simple to say, well,

7    this excludes any tort measure of consequential or any

8    tort measure of damages that could be categorized as a

9    contractual consequential damages, because this language

10   of the agreement has that predecessor clause that refers

11   to "for breach of this Master Agreement, whether alleged

12   as a breach of contract or tortious conduct."

13          So what I'm struggling with is whether this

14   language is sufficiently clear that essentially basically

15   what this is doing, I think your argument is that this

16   exclusion language here is basically a release of

17   liability to ACM -- ACM's release of liability for any

18   kind of pre-contractual misrepresentations for which the

19   damages would fall within the scope, otherwise fall within

20   the scope of this exclusion.  And if we suppose -- and I

21   know this is not what we have in this case because I've

22   dismissed the intentional misrepresentation claim -- but

23   suppose you had an outright fraud here and ACM had then

24   engaged in all sorts of numbers of hours of labor time, I

25   think you'd be also then saying even if this were an

1    outright fraud case, you'd be saying, well, too bad, tough

2    on ACM because ACM agreed after the fraud occurred as a

3    result of the very fraud that occurred to enter into this

4    agreement that has this language.  So that's what I'm

5    struggling with.  That's why I'm at this point not quite

6    convinced by SS&C's interpretation of this provision.

7             MR. RECHER:  Your Honor, just two quick

8    responses to that.

9             The first is, from our perspective, I read the

10   language of 6.2.2 a little bit differently.  As we read

11   it, the provision provides that SS&C is not liable for any

12   indirect, special, incidental, and consequential damages

13   of any kind.  And then it provides some examples of the

14   context in which those consequential damages might arise,

15   one of which -- and I think this is what we're actually

16   talking about here -- is in connection with or arising out

17   of the furnishing, performance of any services under the

18   Master Agreement, any attachment or any work request.  So

19   that's a freestanding basis on which they cannot claim

20   consequential damages.  In addition to that, they couldn't

21   claim them, by way of example, for breach of the Master

22   Agreement.  That's how I read that breach of the Master

23   Agreement part of the language.

24             With respect to the --

25             THE COURT:  What does the term -- it says

1    "whether alleged as a breach of contract or tortious

2    conduct."  Doesn't that clause modify the predecessor

3    clause?

4              MR. RECHER:  I think it modifies the first

5    clause.

6              If you could bring up Slide 30.

7              So this is how I read the language.  SS&C is not

8    liable for consequential damages at any time whether

9    alleged as a breach of contract or tortious conduct.  The

10   intervening clause I believe provides some examples of

11   what those consequential damages might consist of.

12             Just to respond to the fraud point, I think

13   that's a different situation.  I think if they had

14   actually alleged a fraud claim here or an intentional

15   misrepresentation claim, you'd start to run up against

16   case law that provides that liability limitation

17   provisions are in some circumstances unconscionable or

18   unenforceable if they preclude fraud.  That's not what

19   they've alleged here.  They don't have a fraud claim; they

20   do have a negligence claim.  I think in the papers ACM

21   cites no Connecticut case law for this point.  The only

22   Connecticut case law we found enforces a consequential

23   damages provisions or recognizes that a consequential

24   damages provision can be enforced against a

25   negligent misrepresentation --

 1          THE COURT:  Wasn't much of a discussion in that

 2  Connecticut Superior case.

 3          MR. RECHER:  There was not.  You're right about

 4  that, Your Honor.

 5          But if you look at the other cases, and they

 6  move outside the jurisdiction, you'll find all sorts of

 7  jurisdictions that apply consequential damages to

 8  negligent misrepresentation claims and others that don't.

 9  But the danger I think in citing these out-of-state cases

10  is, if you look at, for example, they cite a California

11  case *Peregrine*.  If you read that case -- and they cite it

12  for the proposition that decisions routinely hold that a

13  consequential damages provision can't be applied to a

14  negligent representation claim.  If you read that case,

15  the reason the court reaches that conclusion is because

16  California has a statute that limits the enforceability of

17  liability limitation provisions in the negligence context.

18  Connecticut doesn't do that.  And so, from our

19  perspective, this contractual language does cover a

20  negligent misrepresentation claim.

21          THE COURT:  The last question I have for you,

22  and I'll hear briefly from Mr. Mamounas, consequential

23  damages as a concept is ordinarily a concept that's

24  applied to contract.  Right?  Measures of damages, not

25  tort in the first instance, right?

1          MR. RECHER:  You typically see them come up in

2    that context, but there certainly are cases that apply

3    consequential damages provisions to tort claims.  We cited

4    a number of those cases in the papers, including CUTPA

5    claims.

6          THE COURT:  Thank you.

7          Mr. Mamounas, anything else?

8          MR. MAMOUNAS:  Judge, just very briefly.  May I

9    remain at counsel table?

10         THE COURT:  Yes.

11         MR. MAMOUNAS:  You'll have to forgive me.  This

12   sounds a bit like déjà vu from the summary judgment.  Even

13   though we have a different set of lawyers for SS&C, the

14   argument's the same.

15         THE COURT:  I was looking at the merger clause

16   at that point.

17         MR. MAMOUNAS:  But they're saying were this a

18   fraud claim, it might be different.  That was the same

19   argument they made on summary judgment.  Your Honor, I

20   believe, looked at 6.2.2 and also touched on the issue of

21   a release or an exculpatory clause just like this

22   provision in citing the *Hanks* case which said that if

23   there is going to be a release for a defendant's

24   negligence, it needs to be unmistakable.

25         I think the fact that we're having this

1    conversation and there is so much doubt over the extent of

2    the provision falls right within the Connecticut Supreme

3    Court language that says if it's not unmistakable, there

4    isn't an exculpatory clause, it's not a release, it can't

5    possibly extend to the claim, never mind the fact that

6    SS&C never raised this in the first instance which would

7    constitute a waiver.

8           But beyond that, the language of the provision,

9    we would agree with Your Honor that the clause SS&C cites,

10   whether alleged as a breach or tortious conduct, clearly

11   modifies what is set forth before that is breach of the

12   Master Agreement.  Of course, this is a limit of

13   liability.  In the Master Agreement, it's meant to

14   preclude consequential damages based on a breach of the

15   Master Agreement, as Your Honor found.

16          THE COURT:  Thank you for your arguments on

17   that.  I'm going to continue to consider this issue in

18   light of the additional arguments you've raised.

19          Let me get on to the next motion in limine which

20   is number three.  The argument there is ACM should be

21   precluded from characterizing SS&C as lying or making

22   intentional misrepresentations.

23          A concern I have there is that the very elements

24   of a negligent misrepresentation claim and the second

25   element of a negligent misrepresentation claim extend to

1    representations that a defendant I think framed in terms

2    of "knew or should have known."  So it strikes me it would

3    be difficult for me to preclude evidence that SS&C knew

4    certain conduct -- or knew certain statements to be

5    untrue.  Essentially then I'd be excluding evidence on a

6    permissible element of the negligent misrepresentation

7    claim.  I understand, fully understand I've dismissed the

8    intentional misrepresentation claim.  It's not -- the jury

9    won't be instructed on that.  It strikes me I'm going to

10   instruct the jury on the elements of a negligent

11   misrepresentation claim.  So I'm inclined to deny the

12   motion unless there's something I'm missing here.

13          Do you have anything to add?

14          MS. BUNTING:  Your Honor, just briefly on this

15   point.

16          THE COURT:  Just state your name for the record.

17          MS. BUNTING:  Yeah, sure.  Kristina Bunting.

18   Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MS. BUNTING:  So, Your Honor, I understand your

21   point that the negligent misrepresentation element is knew

22   or should have known.  I think our point is slightly

23   different here, and that is we want to preclude ACM from

24   characterizing of a falsity in a particular way.  So, for

25   example, referring to it as lying or making intentional

1   misrepresentations or otherwise intentionally deceiving or

2   misleading ACM.

3           And I think in this case, Your Honor, ACM can

4   argue that there was knowledge here, but they don't need

5   to characterize it in those pejorative and inflammatory

6   ways that could actually end up confusing the jury and

7   actually leading to the jury applying a standard that

8   isn't applicable to negligent misrepresentation or the

9   CUTPA claim.

10          THE COURT:  If they knew a statement was false,

11  why isn't it appropriate to characterize that as lying?

12          MS. BUNTING:  Your Honor, I think that lying

13  here just has something inflammatory about it.  And

14  actually, in the pleading of ACM they actually rely for

15  the negligent representation claim on should have known

16  that there was falsity here.  So I think, Your Honor, in

17  this case, their case should be based on the reasonable

18  here element rather than knowledge.

19          THE COURT:  You know the way I'm leaning on

20  this.  Thank you.

21          To the extent that there would be concerns about

22  inflammatory rhetoric, then I'm happy to entertain an

23  objection at that point if there is such kind of rhetoric.

24  I'm otherwise probably not inclined to preclude any

25  reference or evidence to intentional misrepresentations

1    whether characterized as lying or otherwise.

2            So that gets me to the next motion, which is

3    number four.  Again, I'm holding that other motion under

4    advisement.  I'll consider again what I've heard today.

5            But number four, which is that ACM should be

6    precluded from trying a breach of contract or a warranty

7    case, my inclination is to grant this motion.  We don't

8    have a breach of contract or a warranty case that's being

9    tried here.  I would be inclined to grant the motion to

10   prevent a cause of action from being tried that's actually

11   not being tried.

12           To the extent that the motion is really directed

13   at trying to limit evidence post -- basically

14   post-contractual evidence that happened, I know that's the

15   subject of other motions as well.  We'll get to those.

16   But to the extent this is narrowly framed, this particular

17   motion is simply a motion to stop, preclude ACM from

18   trying a breach of contract or warranty case, I intend to

19   grant that motion.

20           Are you intending to try causes of action that

21   are not still subject to trial?

22           MR. MATEO:  Your Honor, Dan Mateo from Holland &

23   Knight, good morning.

24           We've told defense counsel repeatedly, and

25   Your Honor's summary judgment motion could not be more

1   clear with respect to the nonexistence of a breach of

2   contract case.  That's not what this motion is really

3   directed at from SS&C.  Nobody's intending to try a case

4   of breach of contract.  The proper title for that motion

5   is SS&C's motion to limit ACM from introducing any

6   performance evidence to prove any of its negligent

7   misrepresentations.  As Your Honor indicated, this is very

8   closely tied to our motion number two, which is subsequent

9   conduct.

10           And Your Honor made an important note at the

11   outset which is surprises.  This entire case, from our

12   perspective, is where are the bounds of potential

13   subsequent conduct that are going to be permissible.

14           THE COURT:  So let me stop you right there, if I

15   can.  I think I already stated I was probably inclined to

16   rule in your favor on this motion.

17           MR. MATEO:  Yes, Your Honor.

18           THE COURT:  I think you're addressing a

19   different motion now in terms of the scope of evidence.

20   I'm going to get to that motion, I'd love to hear from you

21   at that point in time.

22           MR. MATEO:  Thank you, Your Honor.

23           THE COURT:  I don't know that there's more to

24   say with respect to SS&C's motion in limine.  I think

25   you're talking about ACM's motion in limine number two

```
 1    which I'm going to be glad to get to, happy to hear from
 2    you about those evidentiary issues, okay?
 3              All right.  Let's get to --
 4              MR. MAMOUNAS:  Judge, for point of
 5    clarification, I may have misheard Your Honor.  You said
 6    you were inclined to rule in our favor on this motion,
 7    because we understood that you were going to grant SS&C's
 8    motion.
 9              THE COURT:  I'm sorry, I'm -- yes, I intend to
10    grant SS&C's motion to prohibit you from trying a breach
11    of contract case or warranty case.  If you have something
12    geared towards that to tell me, that's great.  If you
13    really are just concerned that somehow there's going to be
14    evidentiary limitations placed on you within the scope of
15    ACM motion in limine number two, I'd like to hear argument
16    when we get to that motion.
17              MR. MAMOUNAS:  Yes, we understand.
18              THE COURT:  Let's get to SS&C's motion in limine
19    number five, which is with respect to Bimini -- is it
20    pronounced Bimini?
21              MR. MAMOUNAS:  Bimini, Judge.
22              THE COURT:  -- Bimini Capital Management.
23              I do want to hear a bit more from the parties
24    about this issue.  It's a bit of a closer issue for me.
25              As I understand it, Bimini's -- the contract at
```

1    issue here between the parties was signed in the Master

2    Agreement I believe in December 2019.  The contract with

3    Bimini went into effect in September of 2015.  So it's

4    approximately a nine-month gap, if I have it right.  It's

5    a little bit hazier for me in terms of to what extent

6    there were negotiations and over what time period that led

7    up to the signing of the Bimini agreement and whether

8    those negotiations and statements by SS&C to Bimini

9    predated the December 2014 contract.  My sense is probably

10   didn't, but I want to hear from you in a moment about

11   that.

12          So if I take it as clear that Bimini occurs

13   afterwards, basically a nine-month gap period, it raises a

14   close question in my mind about whether there's especially

15   a Rule 404 problem, a relevance problem as well embedded

16   in that.  And I'm wondering about the concerns that SS&C

17   has about essentially the Bimini evidence being offered

18   essentially for improper propensity purposes.  So that's

19   one concern I have.

20          On the other side of the coin, with respect to

21   the issue of the negligent misrepresentation claim, I

22   understand the argument by ACM to be, well, this is

23   relevant proving up that claim perhaps in two ways.  The

24   first would be that it's relevant insofar as subsequent

25   occurring conduct can essentially cast retrospective light

1   on prior conduct.  I think the case law is clear, the

2   *Associated Construction* case, Judge Shea's opinion, *Dress*

3   *Barn* case is clear as a general proposition that that can

4   be so.  And it strikes me that there's considerable force

5   to SS&C's argument that whatever SS&C did nine months

6   after the fact would not shed light on whether it knew or

7   should have known that its prior representations were

8   false.  I can see the argument there, I think it's a

9   strong argument.  It seems like the connection there would

10  be somewhat tenuous.

11          My real question, though, is the element here

12  for whether it's known or should have known that it was

13  false also requires proof of falsity.  And there I see a

14  stronger argument of relevance because it strikes me that

15  ACM is arguing in this case essentially that SS&C, given

16  the choice of hosting model -- and I know there's lots of

17  dispute about why this model was implemented in this

18  hosting format as opposed to the licensed or the

19  outsourced -- but it strikes me that to the extent ACM is

20  arguing that this falsity exists because of the choice of

21  hosting model, then this later-occurring evidence does

22  seem to me to be probative as to -- or most powerfully

23  probative in addition to any probative value it has as to

24  state of mind, knowing or should have known, just to the

25  issue of falsity.

1            So suppose, for example, that this were a case

2    about a lawsuit by a homeowner against a painter who

3    painted the house and the house painter claimed that they

4    had special miracle paint and induced the homeowner to

5    agree to a painting of the house with the special miracle

6    paint, and that the paint, of course, turns out not to be

7    miracle paint, maybe it's latex, it's water soluble, or it

8    turns purple or something like that.  If the house owner

9    or, rather, if the painter nine months later paints

10   somebody else's house in the same manner, then a powerful

11   argument might exist that the painter didn't know nine

12   months earlier of the defects of the paint, but an equally

13   powerful argument seems to me that the fact that the

14   second house that's painted turns purple or otherwise

15   fails, the paint job fails, is powerful evidence that

16   there was a defect.  And it seems to me that same

17   reasoning translates to the issue of falsity, not

18   knowledge of falsity, not should have known a falsity so

19   much, although perhaps a little, but principally to the

20   issue of falsity.  In other words, that the Bimini -- the

21   failure of implementation with respect to Bimini, despite

22   the fact that it occurred nine months later, tends to show

23   that there was a falsity/defect here with respect to this

24   kind of hosting arrangement.  So that's a rather lengthy

25   explanation of why.

1          At this point I'm leaning towards allowing

2   Bimini evidence here or I can see why -- that there's a

3   purpose here other than improper propensity evidence and

4   that the purpose goes principally to proving up the issue

5   of falsity as well as, even if somewhat marginally, the

6   issue of mental state accompanying such falsity.

7          So I'd like to hear a bit more from the parties

8   on that.  And I think as a predicate matter, I'd like to

9   understand a bit more about the scope of anticipated

10  evidence as to Bimini because of the additional issues in

11  terms of how lengthy the evidence would be, what extent --

12  concerns I've previously expressed, essentially a mini

13  trial about another implementation that's apart from the

14  one that we have here.

15         Tell me a little more about that, Mr. Mamounas.

16  What's the Bimini evidence going to be?

17         MR. MAMOUNAS:  The Bimini evidence would

18  principally be deposition by designation of the Bimini

19  representation who appeared for deposition in Florida.

20  His name is Hunter Haas.  I believe that the designations

21  total roughly about two hours of run time, if I understand

22  it.

23         THE COURT:  You've got video on that?

24         MR. MAMOUNAS:  There's video.  He would be

25  appearing by videotape.

1           I think under the *Hall* and the *Wray* cases, we

2     indicated our foundation with respect to the substantial

3     similarity of the circumstances.  That could probably be

4     elicited through Mr. Mountain's testimony and other ACM

5     witnesses with respect to ACM's characteristics.  And I

6     think in relatively short order Mr. Haas's deposition will

7     demonstrate why there is substantial similarity for

8     purposes of foundation if Your Honor would require it.  If

9     not, based on the resolution of this motion, that would

10    save additional time.

11          THE COURT:  Do you have additional -- are you

12    introducing primary documents from Bimini?

13          MR. MAMOUNAS:  As I understand it, there are a

14    few exhibits that I think Mr. Haas was questioned on that

15    also go to the issue of substantial similarity and also

16    the outcome that Bimini took with respect to the failed

17    hosting implementation.

18          THE COURT:  I see.

19          MR. MAMOUNAS:  Before I break, Judge, if I've

20    answered your question, or I can go on?

21          THE COURT:  That's fine.  I'll hear from the

22    parties on Bimini generally with respect to the motion in

23    limine number five.

24          MR. MAMOUNAS:  We agree with Your Honor that as

25    to the issues of falsity and knowledge, certainly Bimini

1    evidence would be relevant.  We had included in our

2    papers, and I want to highlight for the Court, that there

3    were at least two other grounds as far as why Bimini would

4    be relevant.

5            The first is the reasonableness of their

6    reliance.  SS&C in its papers on reasonable -- ARMOUR's

7    reliance, pardon me.  SS&C has taken the position in the

8    briefing on the motions in limine that reliance is the

9    heart of their defense, refuting ARMOUR's reliance -- this

10   is coming from their opposition to our third motion

11   in limine -- that there are few pieces of evidence more

12   relevant to and probative of their defense.  What they're

13   getting at there, Judge, is I think what they previewed on

14   summary judgment, that is purportedly the

15   misrepresentations that we allege were sales puffery or

16   somehow incapable of being relied upon.  And what

17   Mr. Haas's deposition on behalf of Bimini demonstrates is

18   the exact same or virtually the exact same representations

19   were made to Bimini.  They relied on them.  They ended up

20   in the same situation as us.  And so therefore, as to the

21   issue of reliance, Bimini would also be relevant, and I

22   believe SS&C has continued to cite cases on that that

23   would support that position in opposition to our motion.

24           Finally, on CUTPA, as Your Honor knows, it

25   requires immoral, unfair, or unethical trade practices.

1    And certainly the fact that Bimini had occurred based on

2    the same representations with the same outcome, very

3    similar to the falsity evidence but also go to the element

4    of CUTPA, that would demonstrate there's a violation given

5    that there's essentially a course of conduct here with

6    respect to hosting implementations for mortgage REITs.

7            In addition to the two bases for relevance that

8    Your Honor cited, we think there are an additional two

9    that are very powerful that would require the admission of

10   Bimini evidence.

11           THE COURT:  Do you plead in your complaint

12   Bimini and this kind of like pattern of unfair trade

13   practices?

14           MR. MAMOUNAS:  I don't believe that we plead

15   specifically as to Bimini in the complaint, Judge.  But I

16   can tell you within our CUTPA claim we do allege an

17   unfair, unscrupulous, and unethical trade practice, which

18   we understand Connecticut law would implicate courses of

19   conduct or patterns of practice such as the failed hosted

20   implementations for mortgage REITs at SS&C.

21           THE COURT:  Thank you.

22           SS&C.

23           MS. RHEE:  Your Honor, just going to your

24   example about why you have this concern about the magic

25   paint, let's just use that example.  Here, I think what's

1   important for the Court to note about the Bimini vignette

2   is that Bimini is still an SS&C client.  And that CAMRA,

3   as applied to Bimini, is to Bimini's current satisfaction

4   because they have outsourced essentially the painting, the

5   putting up on the walls the special magic paint.  This is

6   not a product defect case, really.  Because the paint

7   actually does work.  It's not that it was snake oil and

8   when you put it up on the wall it ruins your walls.  So

9   that's part of the reason why it really becomes its own

10   involved story and that will be a total distraction to the

11   jury and of limited probative value and great prejudice.

12         Just in terms of your example about this

13   knowledge of falsity, the heart of the matter is not about

14   whether or not CAMRA can actually be deployed to work as

15   paint or special paint.  It's really about whose's

16   responsible for doing it, who is responsible for actually

17   making the thing run.  And that is a fight about

18   outsourcing, using the model, the option about whether or

19   not you're going to essentially have a chauffeur drive

20   this thing for you or whether or not after implementation

21   the keys get turned over and you've got to sit in the

22   driver's seat and actually drive the thing yourself.

23         And that has nothing to do with the hosted

24   versus the non-hosted option.  That has to do with

25   outsourcing versus not outsourcing.  Because hosting is

1    really just an issue of, you know, do you want to access

2    this software application where it's on your own server or

3    it's essentially on the cloud that's run by SS&C.  It's a

4    procedural mechanism that is all about who's responsible

5    for the infrastructure around just hosting the software

6    and has nothing to do with does the paint work or doesn't

7    it work, and who is responsible for actually painting.

8    That's -- so it's all a little bit messy in that way, but

9    I think that that's the reason why it underscores for us

10   that the right analysis is as the Court initially

11   articulated, you know, that the way to really think about

12   this is in the bucket of what is the proper scope of

13   post-contractual evidence.

14           And here where you have this contract, it's nine

15   months out, there is no record about there having been

16   these discussions or any of the back-and-forth,

17   coterminous in time or even close in time to when the

18   pre-contract discussions were being had between SS&C and

19   ARMOUR.

20           THE COURT:  Suppose Bimini had happened six

21   months before, right, in June of 2014.  I don't know that

22   you'd be saying that the Bimini evidence was not properly

23   relevant to the issue of falsity.

24           MS. RHEE:  I think what I would be saying is

25   that would really go to the "knew or should have known"

1    and there in terms of the contemporaneous evidence that at

2    the time SS&C was making those statements that it knew or

3    should have known at that time.

4         THE COURT:  So the argument would be much

5    stronger as to "knew or should have known," I get that, if

6    it were pre.  But it seems to me that the falsity aspect

7    is not time dependent in the way that the "knew or should

8    have known" is.  So to the extent that -- and I know you

9    don't agree with ACM's theory here, but I understand ACM's

10   theory to be largely that it was false to the extent that

11   there was a representation that this kind of hosting

12   relationship could be implemented.

13        Is that right, Mr. Mamounas?  Yes or no?

14        MR. MAMOUNAS:  That's right, Judge.

15        THE COURT:  So that's apart from whether they

16   knew or should have known that to be false.  So that's my

17   sense is that's not time dependent.

18        MS. RHEE:  Actually, Your Honor, we would

19   respectfully beg to differ.  Even the falsity element, it

20   is time dependent because it's all about whether or not

21   that evidence is proof that at the time that

22   representation made, that representation was false.

23   Right?

24        And so what happens in the saga of time, and

25   it's not really even nine months, but the Bimini

1    relationship starts to go sideways two-plus years later

2    that the Bimini evidence doesn't really shed light because

3    SS&C had no way of knowing that Bimini was going to

4    present its unique characteristics and have all of its

5    issues with respect to the implementation in terms of even

6    the objective falsity of what SS&C told ARMOUR in 2014.

7    Because in 2014 there is no knowledge of Bimini and what's

8    to come.  And in 2014 when SS&C is making those

9    representations about the suitability of CAMRA under any

10   one of these options, what it knows at that time is that

11   it's got a whole suite of mREIT clients, all of different

12   ranges of different assets under management.  They have

13   gone just the licensing model and they have gone the full

14   outsource model, and it's all worked.  And that's what's

15   relevant in 2014.

16          So I do think there's a temporal element even as

17   to the objective falsity criteria where how that sheds

18   light on the accuracy of those representations in 2014

19   when nobody could appreciate what was going on happen much

20   later on down the line.

21          THE COURT:  Thank you very much.

22          Unless there's anything additional to say, I'm

23   going to hold this motion under advisement and think

24   further about the arguments I've just heard.

25          MR. MAMOUNAS:  Judge, just to make sure the

1    record is clear, in addition to the falsity evidence, we

2    have articulated relevance grounds and the justifiable

3    reliance as to which we didn't hear any opposition from

4    SS&C, on the CUTPA elements concerning pattern and

5    practice as to which we didn't hear any argument in

6    opposition from SS&C.  So we would submit that those also

7    are powerful reasons that the evidence should come in.

8              THE COURT:  I see.  Okay.

9              SS&C, would you like to make an argument on

10   those?

11             MS. RHEE:  Obviously we don't see those points,

12   Your Honor.  That's not the way that this works.  We think

13   that our papers speak to that.  We're happy to give you

14   further argument if you need it, but we don't want to

15   waste the Court's time.

16             THE COURT:  Okay.  Thank you very much.

17             Let me move on to the next SS&C motion in

18   limine.

19             Hold on just a second.

20                 (Pause.)

21             THE COURT:  So the next one is number six, which

22   is that ACM should be precluded from asserting that seven

23   particular statements that are identified in the motion

24   constitute actionable misrepresentations.

25             I have an initial question for the parties on

1    this, whether the claim is going to be with respect to the

2    CUTPA claim.  Is there an argument by ACM that the CUTPA

3    claim is not statement dependent, specific statement

4    dependent in the sense that CUTPA may rely on unfair trade

5    practices we've talked about or deceptive conduct, but is

6    there going to be a difference between the parties about,

7    for the CUTPA claim purposes only, I assume as to the

8    negligent misrepresentation that has to go to specific

9    statements, but is there going to be an argument or a

10   difference between the parties about that with respect to

11   the scope of potential CUTPA liability?

12           MR. MATEO:  Yes, Your Honor.  The whole issue

13   under CUTPA, from our perspective, is contextual.  The

14   statements individually and as a whole add context, but

15   the conduct overall of SS&C is what's going to be put to

16   the jury with respect to ultimate liability under CUTPA.

17   While the statements are certainly relevant to that, the

18   overall conduct, the treatment of SS&C would be relevant.

19           THE COURT:  Put simply this, if SS&C never made

20   any single statement that was false, whether known or

21   actually known to be so or should have been known to be

22   so, are you claiming then that there could still be CUTPA

23   liability even in the absence of a single statement that

24   was actually false?

25           MR. MATEO:  No, Your Honor.  I think you can't

1    divorce the two, from our perspective.  The statements in

2    fact led to ultimate environment under which the deceptive

3    conduct took place.  I don't think that CUTPA is dependent

4    on any single statement, but the totality of the conduct

5    and the treatment, including the statements, are relevant

6    to CUTPA, from our perspective.

7              THE COURT:  I get that your argument would be

8    they'd be relevant, the totality of the circumstances, but

9    I'm just trying to figure out could a jury return a

10   verdict on a CUTPA claim without a finding that any

11   particular statement was false?

12             MR. MATEO:  I think they could, Your Honor.  I

13   think that they could come back and say whether any

14   individual statement was false when presented as a whole,

15   that the conduct was unfair, deceptive in terms of their

16   overall dealings with us.  It could be in the context of

17   omissions, it could have been in the context of their

18   overall disclosures.  It could have been in the failure to

19   bring in implementers, for example, into the discussion.

20   That the overall conduct and the treatment of us was

21   unfair, unscrupulous under CUTPA without relying on the

22   falsity of any single statement.

23             THE COURT:  I see.

24             Does SS&C wish to comment on this sort of

25   sub-issue that I raised?

```
1              MR. RECHER:  I do.

2              Your Honor, we believe that, whether it's a

3   CUTPA claim or whether it's a negligent misrepresentation

4   claim, they have to have falsity.  And what I just heard

5   from ACM's counsel I think is candidly not at all

6   consistent with the way they pled their CUTPA claim in

7   their complaint.  The only basis in their complaint for

8   their CUTPA claim is that SS&C allegedly made

9   misrepresentations to that.  I don't know how you can make

10  a misrepresentation if the information is true.  It's not

11  an omissions case; it's a statements case.  They identify

12  the statements.  If fact, we asked about this in

13  discovery.  As Your Honor knows, they said you made 22

14  false statements to us.  That's what this case is about.

15  I don't think they get to escape that now by saying CUTPA

16  is ambiguous and we're just going to throw a bunch of

17  conduct against the wall and maybe we'll convince the jury

18  they should come back and find CUTPA liability.

19             THE COURT:  I think on that issue there, it's

20  going to be a pretty important one, I think, for me to

21  address.  I'd like you to think about that and submit

22  supplemental authority on this issue of whether a CUTPA

23  claim, as a general matter and in the context of this

24  specific case in light of discovery responses, in light of

25  the way the complaint is pled, can be sustained in the
```

1    absence of a single particular false statement that would

2    be necessary, as I understand it, to sustain a negligent

3    misrepresentation claim.  It seems to me that's going to

4    be really important in terms of how the jury is instructed

5    in the case.  I'm not sure it has consequences so much for

6    the scope of evidence presented in the sense that I'm not

7    sure I'm prepared to limit ACM from adducing, just as an

8    evidentiary matter, statements made by SS&C throughout,

9    false or non-false, for context, background, but it does

10   seem like it would be a very important issue for

11   instructional purposes.

12         So if I could ask the parties to submit on that

13   by next Wednesday, if you can, sort of midway through the

14   trial point, that would be great so that I can think more

15   about that for instructional purposes.  We'll enter a

16   docket order to that effect.

17         MR. RECHER:  Of course, Your Honor.

18         THE COURT:  Coming back to SS&C's motion in

19   limine number six which is that ACM should be precluded

20   from asserting that seven particular statements constitute

21   actionable misrepresentations and understanding that at

22   the least that would be germane to the negligent

23   misrepresentation claim, I'm likely inclined, just for

24   evidentiary purposes, again, to deny that motion on

25   grounds that I'm not prepared really to start limiting the

1    statements, especially pre-contractual statements that

2    were made by SS&C, false or non-false, because it seems to

3    me they're all part of the mosaic of understanding the

4    parties' relationship, go to reliance, understanding.  And

5    I know that SS&C has strong arguments to make about

6    whether particular statements are even actionable as a

7    matter of law.  But I'm prepared to probably deny this

8    motion to the extent that it's construed as an evidentiary

9    motion but without prejudice, of course, to considering at

10   the instructional stage whether any particular statements

11   should be precluded from consideration of the jury as to

12   the predicate for negligent misrepresentation claim and

13   possibly, depending upon your briefing and our further

14   discussion of the issue, with respect to the CUTPA

15   liability claim.

16              Is there anything else the parties want to make

17   of record with respect to SS&C's motion in limine number

18   six?

19              MR. MAMOUNAS:  Not from our side, Judge.

20              MR. RECHER:  No, Your Honor.  We're happy to

21   take that up at the charge conference.

22              THE COURT:  And then the last SS&C motion in

23   limine we'll address now before we take a break is with

24   respect to this number seven and it has to do -- I'm

25   sorry, I misspoke.  SS&C motion in limine, it says ACM

1    should be precluded from introducing electronic chats

2    exchanged by SS&C employees.

3            And I have to say I was a little bit unclear

4    about what specific chats ACM intends to use.  I saw that

5    there was a collection at one point.  Maybe refer me to

6    where it was in the trial evidence materials, but I looked

7    through and there seemed to be very small-print chats

8    going back and forth between various employees.  Has there

9    been a specification of exactly which chats are going to

10   be relied on?

11           MS. QUINN:  Your Honor, Tracy Quinn from Holland

12   & Knight.

13           I think part of the confusion here is the way

14   the chats were produced to us.  They were produced as a

15   single 600-plus-page PDF.

16           THE COURT:  Where is it in our record here?

17           MS. QUINN:  What exhibit number?

18           THE COURT:  Help me.  Is it part of the joint

19   trial memorandum or is it one of your --

20           MS. QUINN:  It is, Your Honor.  It should be

21   either -- there's two different versions of it, 246 and

22   288 of ACM's exhibits.  On the exhibit list under those

23   exhibit numbers.

24           THE COURT:  Is it in what you've given me?

25           MS. QUINN:  The entire document is like a foot

1   of paper, Your Honor.

2            THE COURT:  Goodness.  Okay.  Well, I don't want

3   to look through a foot of paper.

4            MS. QUINN:  The chats were produced to us as a

5   single PDF.  For purposes of what we identified as a trial

6   exhibit, we identified back to SS&C the document that they

7   gave to us.  We don't intend to put a 600-page PDF in

8   front of anybody.  To the extent that we are going to use

9   chats, we'll excerpt then, we'll show the excerpts to SS&C

10  in advance so they can confirm authenticity, and then use

11  those chats with the witness who can lay an appropriate

12  foundation for them.

13           THE COURT:  But you haven't done that yet.

14           MS. QUINN:  For some, we have.  For example, we

15  deposed the head of SS&C's services team.

16           THE COURT:  I understand you've shown it to

17  witnesses.  But have you -- I'm assuming that you're not

18  going to seek or that you're not going to ask the jury to

19  look at 1 foot of documents.

20           MS. QUINN:  Correct, Your Honor.

21           THE COURT:  So basically --

22           MS. QUINN:  To the extent --

23           THE COURT:  Hold on a second.

24           MS. QUINN:  Sorry.

25           THE COURT:  The rule is if I'm speaking, you

1    should wait until I finish the question and then answer,

2    if you can.

3          So wouldn't you simply take the 1 foot of

4    documents and introduce it as -- basically mark it for

5    identification and then choose to try to introduce

6    specific chat exchanges?

7          MS. QUINN:  Correct, Your Honor.  Yes.

8          THE COURT:  But you haven't shared with SS&C

9    which specific chat exchanges.

10          MS. QUINN:  We have identified for them a subset

11    that we believe are most likely the ones that we are going

12    to be using.  And then we further have -- we had proposed

13    to them I think the day before, the night before witnesses

14    testify that the parties produce a list of what exactly

15    they propose to use with each witness.  They declined that

16    stipulation, as I understand it.

17          THE COURT:  How many chats are you proposing?

18          MS. QUINN:  I think we had narrowed that down to

19    about 50 pages that we're contemplating using.  I doubt

20    that we'll even use that full universe.  It would be a

21    handful, basically.

22          THE COURT:  I think what I'm going to ask you to

23    do is to go back and figure out which chats you're really

24    going to use.

25          MS. QUINN:  Sure.

1          THE COURT:  And disclose them to SS&C.  And then

2    to the extent that there's still an objection, I can

3    consider the objection not in the abstract but in the

4    context of particular chats.  So can you make sure to do

5    that by the end of the day Monday --

6          MS. QUINN:  Yes, Your Honor.

7          THE COURT:  -- in contemplation that there would

8    be at least some time period later on.

9          Will that pose a problem if -- are you intending

10   to try to introduce the chats during your early witnesses,

11   say during Mr. Mountain?

12         MS. QUINN:  The chats, there are chats between

13   and among SS&C's employees, so they would come in through

14   the designation of SS&C testimony or through their

15   witnesses.

16         THE COURT:  So you're not going to need to refer

17   to these chats or try to refer to these chats during your

18   first two days of testimony.

19         MS. QUINN:  During our live ARMOUR witnesses,

20   no, Your Honor.

21         THE COURT:  Does that make sense for SS&C, so we

22   know exactly what we're dealing with and then you can

23   raise your objections to the chats?

24         MS. RHEE:  Of course, Your Honor.

25         Just as a preview, and especially in light of

1     the Court's admonition that once we get going in trial it

2     really would be best to try to tee some of this up in

3     advance, just with the Court's indulgence, if we could

4     pull up relevant case law in light of what we saw and read

5     in their opposition to our motion.  This is Slide 22.

6              And we can provide citation for the Court, but

7     this is from the Eastern District of Louisiana in the very

8     well-known BP Horizon spill case.  There is a text message

9     that is, for want of a better term, quite analogous,

10    almost exactly on point to the kind of chatter that you

11    see on these link chats.  That's the text at issue.

12             And the Court's ruling, if we go to the next

13    following relevant pages, I think in a similar way that

14    ARMOUR intends, ACM intends to try to essentially make

15    these self-authenticating without a live witness, without

16    having shown just about 49 of the 50 pages of the chats to

17    anybody, that they're going to try to seek whatever it is

18    out of the 50 pages they want to use either as a business

19    record or as an admission by a party opponent, and this

20    case is just highly on point that, for the reasons

21    articulated in the case law there, they don't have any of

22    the indicia of a business record.

23             And then with respect to the analysis for a

24    party opponent, if you go to Slide 24, similarly no

25    foundation has been laid and can be laid with respect to

```
 1    whether or not this constitutes an admission of a party

 2    opponent unless you have the party opponent who actually

 3    made the statement and the foundation is laid.

 4              THE COURT:  I see.

 5              Your argument then is much more towards -- is it

 6    really an authentication issue, given that this is

 7    information produced by SS&C?

 8              MS. RHEE:  There's three steps.

 9              Authentication is one.  And the mere production

10    doesn't actually just self-authenticate.  So that's one.

11              Step two is, insofar as it's being offered for

12    the truth of the matter asserted, how is that not hearsay.

13    And I take it that there are two arguments on their side,

14    either it's self-admitting as a business record or it's

15    not hearsay because it's a party opponent admission.

16              THE COURT:  Or may not be offered for its truth,

17    right?

18              MS. RHEE:  Well, for purposes of ARMOUR's

19    arguments and the way in which they intend to prove the

20    case, I guess I would want to know and we would need to

21    hear what the proffer is for if they're not being admitted

22    for the truth of the matter asserted, i.e., that the

23    statements ARMOUR made were false and here is evidence

24    offered for the truth of the matter because this statement

25    is what actually happened or what actually is a fact, what
```

1    is its relevance.

2              THE COURT:  I see.  Okay.

3              So is your argument basically that there's

4    something special about chats that make them inadmissible?

5    Suppose we had a chat that was one employee saying to

6    another, gosh, we really duped ACM, we fooled them all

7    along for years now.  Would you say that that would not be

8    admissible, if you had that -- I don't know that we have

9    that kind of bald language here, but that would not be

10   admissible?

11             MS. RHEE:  We're not making a categorical

12   argument, Your Honor.  We're talking about what they're

13   essentially saying as a category here or because they are

14   productions on the part of SS&C we can select out of this

15   giant ream and give you 49 or 50 pages or some selected

16   excerpt in there and we don't need to put on a witness

17   because they just go in for the truth of the matter

18   asserted.  Here, you can see we're not saying they're

19   never admissible, but you have to lay the requisite

20   foundation.  For what you're saying, which is an admission

21   of party opponent, you've got to lay the requisite

22   foundation.  The person has to be in a position to have

23   bound the party.  For a chat like that, it really does

24   matter who the speaker is.  If you have somebody who is a

25   bloviator who happens to work at the company and says

1    something like that and there is no other context --

2           THE COURT:  I see.  Okay.  So it may depend upon

3    the person's position and the ability of ACM to identify

4    that person's position as to whether it could be

5    attributed to SS&C under the party opponent rule.

6           MS. RHEE:  Correct.  And who the person is

7    speaking with and what the context of that larger

8    conversation is.  I mean, I do think you're right,

9    Your Honor, there is on our part something about the

10   quality of chats and the informality of it that requires

11   the party seeking its admission to actually put sufficient

12   context around it.

13          THE COURT:  I see.  Okay.

14          Ms. Quinn, you have your direction here.  Try to

15   identify those specific chats and share them with opposing

16   counsel by end of day Monday.  And let's keep this on our

17   radar screen for the Court to consider in terms of the

18   basis for admissibility.  If there's additional law that

19   you want to call to the Court's attention about the basis

20   for admissibility, that would be helpful.

21          MS. QUINN:  Yes, Your Honor.  Thank you.

22          THE COURT:  All right.  Let's take a -- it's

23   10:30 now.  Let's take a recess now of 15 minutes' time

24   and then we will continue.

25          MS. RHEE:  Thank you, Your Honor.

```
 1                  (Whereupon, a recess followed.)
 2            THE COURT:  It looks like we've gone through the
 3   SS&C motions that are non-expert related.  I'd like to
 4   address the ACM motions that are non-expert related and
 5   then come to the expert-related motions.
 6            The first motion from ACM is motion in limine
 7   number one, Document 222.  This is ACM's motion to
 8   preclude any evidence, reference, or argument concerning
 9   or relating to any allegedly successful CAMRA
10   implementations.
11            Part of this motion depends upon ACM's argument
12   that it was blocked from obtaining discovery concerning
13   the allegedly successful implementations.  I had two kind
14   of predicate inquiries to make to the parties.  As I
15   understand it, from SS&C's perspective, it's seeking to
16   introduce evidence of the successful implementations
17   really for the seven mortgage REIT customers that are
18   identified in the June 2014 PowerPoint presentation, is
19   that right, and not other successful implementations; is
20   that right?
21            MS. RHEE:  The only amendment to that,
22   Your Honor, is there's also an August 2014 presentation
23   and it also discloses roster of existing SS&C customers
24   that have a couple of additional REIT clients.  You're
25   absolutely right, as a proposition what we're seeking to
```

1  introduce are the pre-contractual customer relationships

2  that were disclosed to ACM well before the signing of the

3  contract.

4              THE COURT:  Who are the additional customers

5  from the August --

6              MS. RHEE:  Court's indulgence.

7              THE COURT:  -- 2014?

8              MS. RHEE:  So if we can pull up exhibit or

9  Slide 47.

10             Apologies, Your Honor, you can see it's two

11 different representations and two different times.  It's a

12 fuller list of all of the additional clients here that is

13 being represented in the August presentation.  And then if

14 you can go to, whenever the Court is ready, the earlier --

15             THE COURT:  If I just look at what you've shown

16 for Slide 47 at the top bar, it looks like there's seven

17 companies there.  Those are the mortgage REITs, and I

18 assume other companies like TIAA CREF, et cetera, are

19 non-mortgage REITs.

20             MS. RHEE:  That's correct, but it's a fuller

21 representation of client base that had successful

22 implementations.

23             THE COURT:  In terms of mortgage REITs, it's

24 just seven companies, it sounds like.

25             MS. RHEE:  It's -- yes, Your Honor.

1            THE COURT:  All right.

2            MS. RHEE:  Just double-checking my counting.

3            THE COURT:  And then in terms of the scope of

4    evidence that you would intend to present, I know your

5    experts would comment on this, on the allegedly successful

6    implementations there.  I know that one of your experts,

7    Mr. Maffattone -- I hope I'm pronouncing that correctly --

8    wants to testify, I guess in part, upon his working with

9    both the Annaly and Chimera implementations.

10           Is there other evidence that you intend to put

11   in, other witness testimony?  I suppose you would have

12   SS&C representatives who worked on those projects

13   testifying, but I'm trying to understand kind of the

14   breadth of trial evidence, how much of the trial would be

15   devoted towards testimony one way or the other from

16   whichever experts about these other seven mortgage REITs,

17   allegedly successful implementations.

18           MS. RHEE:  Very little, Your Honor.  In fact,

19   far less than the two hours of depo designations just on

20   Bimini alone.  It really is just about laying the

21   foundation about what SS&C is and why it is that it made

22   the statements that it made in 2014.

23           THE COURT:  I see.

24           MS. RHEE:  And that they were true and that all

25   of the SS&C's employees who were making those

1    representations had reason to believe that those

2    statements were true.

3              THE COURT:  So do you have primary documents

4    that you're introducing?  Say, your Master Agreement with

5    Ares or with Apollo or, you know, favorable

6    recommendations from them about the great job allegedly

7    that SS&C has done for them, nothing like that?

8              MS. RHEE:  Unless it really becomes an issue

9    because of the way in which ACM wants to present its case,

10   we have no intention of creating mini trials with respect

11   to any of these other implementations because then it's a

12   total distraction and it's getting fairly far afield of

13   why it is we're all here.

14             THE COURT:  All right.

15             Then my next predicate question is for ACM.

16             You obviously maintain -- ACM maintains that it

17   was blocked from discovery with respect to these other

18   customers of SS&C generally.  My question is whether you

19   were specifically blocked from pursuing discovery with

20   respect to the allegedly successful implementations as to

21   the seven mortgage REIT customers that were identified in

22   the June presentation, it sounds like again in August.

23   Were you specifically blocked from implementation --

24   rather, for discovery as to those customers?

25             MR. MAMOUNAS:  Judge, I'm reluctant to dredge up

1   ancient history on the issue, but when we came before

2   you --

3               THE COURT:   I remember all this.  But I have to

4   say, I looked at your briefing on this and I looked at the

5   footnote you had where you describe a number of the

6   discovery responses, requests that you made, and we had a

7   pretty detailed conversation about this on October 18,

8   2018, at a discovery conference.  And at that point in

9   time my question had been, well, it looks like you were

10  looking for evidence about unsuccessful implementations

11  and that you didn't pursue evidence of successful

12  implementations notwithstanding the allegations of

13  Paragraph 16 of your amended complaint that refers I

14  believe to the June 2014 presentation and then again to

15  Paragraph 23, the last clause of that paragraph that

16  refers to other customers like ACM I believe is the

17  reference or the language of that.

18              So what I'm struggling with here, I know you're

19  saying and you say, well, SS&C tried to generally -- or

20  resisted discovery about other customers, but do we have

21  anything in this record in which you specifically said,

22  well, you told us you had successful implementations for

23  these seven mortgage REIT customers, you said it on your

24  PowerPoint slide, we want to now -- what's the evidence

25  that you were successful as to those seven mortgage REIT

1    customers?  My sense is you don't have that, you never

2    really pursued it.  Certainly I don't remember it coming

3    up in a discovery conference with me, but I want to make

4    sure I'm not missing something.

5            MR. MAMOUNAS:  Judge, as I recall from that

6    briefing that led to the October 18 conference, we had

7    cited I believe in a footnote that we can pull up the

8    discovery request that we believe fairly called for

9    documents and other evidence that would relate to the

10   other customers that purportedly were successful.  SS&C's

11   position was there is a strident during the course of

12   discovery that we weren't even entitled to evidence about

13   implementations as to which the documents reflected they

14   weren't successful.  They argued ferociously for a

15   standard that we only get evidence about implementations

16   that may have failed for reasons not due to syncretic to

17   the customer.  They argued that all of the other

18   implementations including ones in their documents

19   reflected as problem REITs, Fortress and Resource and

20   others, not be turned over because of proportionality and

21   relevance.

22           And then finally when it came to issue of

23   successful implementations, we cited them to the prior

24   requests that were in our briefing leading to the October

25   conference.  They took the position that they didn't need

1   to turn over successful implementations.  They took the

2   position that the line stopped with Your Honor's limited

3   inquiry that was allowed at depositions concerning other

4   customers that may or may not have been successful as to

5   which the testimony was very limited.

6           Finally, we got to the point, as I recall, at

7   the conclusion of the hearing in October of '18 that I

8   sought leave, given that we were after the fact discovery

9   cutoff, to take discovery on successful implementations

10  because we had no way of knowing whether they were

11  successful or not.  SS&C objected to the discovery and the

12  Court sustained the objection.

13          At that stage, all we could do was follow the

14  Court's instructions which were take the depositions of

15  the experts and establish a predicate that there may be

16  some argument that they're not relevant in the first

17  instance, which is what we did.  We deposed Mr. Maffatone

18  who is an Annaly and Chimera employee, and all of the

19  evidence that we elicited from him as well as from SS&C's

20  other alleged expert, Mr. Hilliard, demonstrated that

21  these CAMRA customers were light years apart from what

22  ultimately was sold to ARMOUR and also to Bimini.  So we

23  weren't able to take the discovery.

24          A year has passed since that time.  If SS&C

25  wanted to put this in, they could have been fair and said

1    we're willing to discuss some level of discovery on the

2    issue, given that you had requested it, we objected, and

3    the Court sustained it, because we ultimately want to put

4    this in.  But they never did.  We raised the issue during

5    the course of the depositions of the experts and we heard

6    nothing, Judge.  So we were blocked from taking discovery

7    on the issue.

8              But I don't want the Court to think that that's

9    our only argument on the matter of these other customers

10   as well, and I'm happy to address that whenever you'd

11   like, Judge.

12             THE COURT:  Well, did you come -- was there any

13   point in time in which you came during the discovery

14   period, that you came to the Court and said, look, here's

15   the June presentation, here's the specific customers they

16   said they were successful with, we want discovery on those

17   specific customers?

18             MR. MAMOUNAS:  Judge, I don't believe that there

19   was a discovery request that said tell me everything about

20   Annaly.  I can tell you that there was deposition

21   questioning about Annaly and it was blocked to the most

22   limited extent possible, to the extent that they forced

23   our corporate representatives to leave the room every time

24   we used the word "Annaly."  The position was strident, it

25   was repeated, it was endless that we were not able to take

1    the discovery.

2            And I would point the Court to Docket Entry 161,

3    Footnote 4, which indicates all of the instances in which

4    we served discovery requests that fairly called for

5    discovery about other purportedly successful CAMRA

6    implementations.  And they were never provided.

7            When we brought those issues before the Court, I

8    agree with Your Honor that we were talking and focused

9    primarily on the issue of the purportedly unsuccessful

10   implementations, but that was because of the point to

11   which we had been pushed in discovery that SS&C wasn't

12   even going to allow discovery as to those.

13           And as I said, I recall standing at the lectern

14   there in October of '18, we of course were trying to prove

15   our case and take discovery on, first and foremost, the

16   unsuccessful implementations, but we never conceded any

17   discovery with respect to the purportedly successful ones.

18           I would point Your Honor again to that Footnote

19   4 of --

20           THE COURT:  I'm familiar with that footnote.

21           MR. MAMOUNAS:  -- as to which we made the

22   request.

23           THE COURT:  Okay.  All right.

24           Other points you wanted to raise on this?

25           MR. MAMOUNAS:  I do, Judge.

1          Keying off of what I said from that conference,

2    we understood that Your Honor would entertain limitations

3    with respect to the other purportedly successful customers

4    depending on how the expert depositions went.  And in our

5    papers we've cited the *Williams Ford* case which was a

6    negligent misrepresentation case dealing with statements

7    that had been made purportedly to other customers.  The

8    Connecticut Supreme Court said that the conduct of the

9    nonparty dealerships, that is what would be the other

10   purportedly successful customers here, was not relevant to

11   the issues in the case because the plaintiff failed to

12   provide an adequate evidentiary foundation to establish a

13   logical connection between the two.

14         SS&C hasn't even tried to meet that evidentiary

15   foundation.  They haven't laid it in any of their papers.

16   They haven't done so today.  They haven't demonstrated a

17   single similarity between these purportedly successful

18   customers and ARMOUR.

19         THE COURT:  I'm actually a bit surprised by the

20   argument that you're making there.  It seems like you're

21   taking that line of cases completely out of context

22   basically for the reasons that SS&C identifies in its

23   opposition briefing because you're overlooking the fact

24   that your complaint alleges that there was a negligent

25   misrepresentation and that misrepresentations occurred

1     about those customers.  So it seems to me SS&C is entitled

2     to defend against that.  And that makes it very different

3     than if SS&C were just coming out of the blue and if, say,

4     this were a product defect case and adducing additional

5     customers that had not had problems with its product.  But

6     you're the one who put this at issue in your complaint.

7     And so I can't see why you think that the substantial

8     similarity of experience cases really has bearing on this

9     issue.

10          MR. MAMOUNAS:  If I might, Judge.  I think that

11     there's a missing link there that I would submit to the

12     Court.

13          At the time that ARMOUR was being presented with

14     these purportedly different customers, it had no evidence,

15     no knowledge or no inkling about the particular

16     characteristics of the implementations that they sought.

17     All they knew was that they were mortgage REITs.  They

18     didn't know whether they had chosen hosting, licensing, or

19     outsourcing.  They were being told by SS&C all of these

20     different deployment options, just as a for instance,

21     apply to these different mortgage REITs.  They weren't

22     told how many employees were responsible for accounting,

23     for IT, the different kinds of third-party dependencies

24     that they may have had.  All of the things that make

25     Bimini, as a for instance, highly relevant because on

1  24 key characteristics, as we put in our papers, it lines

2  up virtually perfectly with ARMOUR, we had no idea what

3  SS&C knew or didn't know in June or August of 2014.  They

4  told us we have other customers.  We said thank you for

5  that representation.  It's material to us insofar as

6  you're representing that you have experience.  The problem

7  is that once we've taken discovery, following the

8  October 2018 discovery conference we came to find out from

9  SS&C's own experts and from Mr. Maffattone himself that

10  they were all materially distinct.

11         Ms. Rhee said, for example, in argument about

12  Bimini that this was a fight about outsourcing.  Well,

13  there's no allegation in the case about outsourcing.  It

14  turns out, as we found through discovery, that half if not

15  more of the customers that were represented to us in the

16  June PowerPoint were outsourcing customers.  How does that

17  establish the logical connection that's required for

18  relevance under *Williams Ford*?

19         So that's the disconnect, Judge.  When we pled

20  the complaint, we would have alleged what was presented to

21  us, you told us you had other customers.  But we didn't

22  know their characteristics and how they were distinctive

23  such that there's no evidentiary foundation for their

24  admission until we took the depositions following the

25  October discovery conference.

1              THE COURT:  Thank you.

2              So essentially on this motion I'm inclined to

3     grant in part and to deny in part ACM's motion.  I'm

4     inclined to deny the motion insofar as it would preclude

5     SS&C from relying, as described, on the seven mortgage

6     REIT customers that are identified in its PowerPoint

7     presentations, it sounds like of June 2014, possibly as

8     well as the August 2014.  The concerns I have there are

9     pretty much what I said when we had this issue come up

10    before about SS&C's entitlement to rely on and defend

11    against this claim that was made about other customers in

12    the complaint.  I note as well, of course, ACM's own

13    expert, Mr. Kursh, identifies reliance on those customers

14    as misleading.

15             I'm not persuaded at this point that SS&C

16    specifically denied discovery and that the Court -- the

17    issue was raised appropriately with the Court with respect

18    to those specific customers.  And I'm also not persuaded I

19    think with respect to the argument that those customers

20    are somehow dissimilar and that that would be grounds for

21    preclusion because that seems to me that's a classic

22    matter for argument between the parties about the extent

23    to which the customers were dissimilar.  So I'm inclined

24    to allow the evidence that's described by Ms. Rhee with

25    respect to the seven other mortgage REIT customers.

1          On the flip side, I'm inclined not to open the

2    door, though, to a blank check as to other customers, SS&C

3    customers, because I think that generally SS&C has, with

4    some justification, been resistant to opening up all of

5    its customer files to, say, non-mortgage REIT customers.

6    And a question I have is since it resisted discovery in

7    that respect since the danger of multiple mini trials on

8    scores of other customers would be confusing to the jury,

9    since I think the parties agree that the mortgage REIT

10   customers are really the most relevant point of reference

11   here, I'm inclined to not allow evidence as to successful

12   implementations.

13          I'll hear more from SS&C on this issue, but to

14   the extent that you want to put on non-mortgage, JP Morgan

15   or TIAA CREF or other nameplate customers you have on that

16   slide there, I'm not convinced that I want to see SS&C

17   representatives getting up and talking about, vouching for

18   how successful they were with respect to those customers.

19   I don't think the slide has to be purged or scrubbed in

20   some manner, but I'm not sure the testimony should be

21   about those other non-mortgage REIT customers.

22          MS. RHEE:  I think as long as we don't have to

23   purge so that there is essentially a false suggestion that

24   that's the entire universe of SS&C customers.  I'm sure

25   there's going to be evidence about what SS&C is and how

 1    big it is and how many people it has and the like and that

 2    similarly, as we said to ACM back in 2014, we made

 3    representations about the kind of business we were in.

 4              THE COURT:  I understand that.  There will be

 5    obviously general issues about the size of the business,

 6    that it has many customers.  But testimony about whether

 7    those customers are satisfied or dissatisfied or whether

 8    there are implementation issues with those other

 9    customers, I think unless the door is opened in some

10    manner by questioning, I'm skeptical that that would be

11    appropriate for the case.

12              MS. RHEE:  Absolutely, Your Honor.  But just to,

13    again, tee up what we expect may be a brewing fight and

14    similarly just so that nobody is sprung, insofar as ACM

15    wants to press on some of the sales pitch material that

16    say things like CAMRA is a proven product, that it has

17    been proven over 25 years with countless of customers,

18    there has to be an opportunity by the SS&C witnesses

19    without getting into a mini trial about each one of those

20    customers or a long recitation essentially in order to

21    have a mini trial about those kinds of generic

22    representations, we clearly have to have an ability just

23    to tell a fair story about why it is we said what we said.

24              THE COURT:  I see.  Okay.  I'll take that up in

25    terms of specific context then that may come up.

1          It looked to me that part of the objection that

2     ACM had was with respect to -- maybe I'll take this up

3     with respect to the spreadsheets and other data relied

4     upon by the expert, is it Mr. Maffattone?  I'll wait to

5     take that up when we deal with Mr. Maffattone's.

6          Let me get to the next motion in limine, ACM's

7     motion in limine number two, Document 216.  It's a motion

8     to exclude any reference or argument related to certain

9     post-contractual conduct.

10         I'll say that on that issue following up I think

11    on my exchange with Mr. Mateo a while back, I'm likely to

12    deny that motion for basically the reasons that are stated

13    by SS&C in its opposition.  It seems to me that it can't

14    be a one-way street here to the extent that there is

15    post-contractual conduct that comes in that would be

16    properly relevant to, number one, it could cast light on

17    what the party's state of mind or what they should have

18    known, SS&C should have known pre-contract, also goes to

19    the issue of damages and the causation issues here.  I

20    don't think I can just hermetically seal off

21    post-contractual conduct from coming into evidence in the

22    case.  And if I'm doing that, I think it has to be good

23    for the goose/good for the gander as to both sides here.

24    And that it seems to me ACM is really asking me just to do

25    essentially a one-way limitation on SS&C's ability to

1    refer to post-contractual conduct but not to be bound by

2    the same limitations itself.  But maybe I'm

3    misunderstanding something, Mr. Mateo.

4                MR. MATEO:  Your Honor, I think the argument is

5    a little bit more nuanced than that that we're advancing.

6                I think the threshold question is whether we are

7    allowed to introduce subsequent evidence or subsequent

8    conduct, post-contractual conduct to prove truth or

9    falsity or to prove knowledge.  I think, based on the

10   rulings and indications from Your Honor, there seems to be

11   no dispute around there.

12               They obviously -- SS&C obviously has the ability

13   and should have the ability, I think our papers concede,

14   to rebut.  So if we introduce, for example, a

15   post-contractual email that says we sold them the wrong

16   product, they get to rebut that by suggesting in fact that

17   they sold us the right product.  So subsequent conduct

18   that addresses truth or falsity for their state of

19   knowledge.  That's the case we intend to try.

20               The reason, Your Honor, I raised it in the

21   context of MIL 5 was because they were seeking to limit us

22   from discussing any performance conduct.  So this is a

23   whole issue about the proper rails under which this case

24   will be tried.

25               The evidence suggests and the documents

1    exchanged, and some in particular that I've highlighted,

2    that they intend not to, in the context of this motion,

3    introduce particular evidence to rebut the truth or

4    falsity of a statement or to rebut their state of the

5    knowledge, but they intend to try a case of alternative

6    causation, that it was our independent acts

7    post-contractual that were the cause of the failure.

8              First of all, Your Honor, there is no

9    contributory negligence or comparative negligence pleaded.

10   It's not in the jury charges.  To the extent that they're

11   in opening or throughout the rest of the case are going to

12   say, oh, no, no, no, no, forget about truth or falsity and

13   forget about knowledge, the reason the implementation was

14   not successful was because Shane Reid forgot to do X, Y,

15   or Z.  In that instance, Your Honor, that is

16   post-contractual performance conduct that does not

17   directly bear on any of the elements of the claim.  And if

18   they are to do that, in other words, suggest that somehow

19   the conduct of another employee much later in performance

20   was the cause, then we are trying a breach of contract

21   case.  Because now we have to rebut that with all of the

22   performance evidence that shows all of the multitude of

23   failures that led up to that error.  For example, if

24   Mr. Reid failed to enter an entry into CAMRA properly and

25   says I'm sorry, and they promised us training and we

1    hadn't got that training at that point and that was one of

2    their failures, now we're trying a breach of contract

3    case.

4              So the intention of this motion, Your Honor, is

5    not to preclude them from rebutting statements we make

6    post-contractually to prove truth or falsity, but instead

7    to make sure that we understand what the bounds of that

8    are going to be.  We're going to be here an awful long

9    time if they begin to introduce evidence of our employee

10   wrongdoing and now we have to rebut all of that.  That is

11   in fact exactly what they ask Your Honor to bar us from

12   doing in their motion in limine number five.  And we are

13   essentially trying a performance-based contract claim.

14             So this is one of the things Your Honor said.

15   No surprises, right?  Let's figure out what they intend to

16   do.  But we have a number of exhibits that they are

17   fighting us on objections that we think are not relevant

18   that have very much to do with performance.  So that is

19   where we need clarity.  And that is what this motion is

20   intended to do.

21             So we agree that to the extent that we introduce

22   evidence post-contractually that goes to their state of

23   knowledge or to the falsity of the statement, they have

24   the right to rebut it.  If they go beyond it, we also have

25   the right to rebut it at the risk of them opening the door

1    to us trying a breach of contract case.

2              THE COURT:  Now, one of the elements of your

3    negligent misrepresentation claim, the fourth element, is

4    that you have to prove you suffered pecuniary harm as a

5    result, right?  So to the extent that SS&C wishes to show

6    or can show that essentially you did not suffer the harm

7    as a result causationally for other reasons, because of

8    your own misfeasance or omissions, why isn't that, just as

9    to causation, why isn't that perfectly appropriate for

10   SS&C to do?  Why should they be hamstrung from being able

11   to essentially put causation of harm and damages into

12   dispute here?

13             MR. MATEO:  Your Honor, I think *Williams Ford*

14   addresses the issue.  What *Williams Ford* says is that

15   contributory negligence, which is essentially what they're

16   saying, or alternative fault, if you will, is only

17   admissible to the extent it goes to the issue of

18   reasonable reliance and not causation.

19             The other issue, Your Honor, is the other thread

20   of their argument is that somehow there's some level of

21   comparative fault.  And they haven't pled a claim for

22   comparative fault.  So those are the two bases,

23   Your Honor, for why in the abstract contributory

24   negligence or alternative causation shouldn't be

25   independently admissible.  The other reason is it is

1  completely inconsistent with their motion in limine asking

2  to limit post-contractual conduct on performance.

3          So all we're asking for is a clarification.  We

4  don't think it is relevant.  If it bears on truth or

5  falsity, if it bears on the state of their knowledge, yes.

6  To the extent that it goes to causation and not reasonable

7  reliance, no.  But if Your Honor were to allow it and they

8  were to insist on it, we have a whole different case and

9  I'm going to have to extend my reservation at the local

10  hotel, because then we are in fact trying performance.

11  For every email they put up showing that Shane Reid did

12  something wrong, I am going to need to put up 25 emails

13  showing what the lead-up was to that and all of the

14  failures of performance along the way that led Mr. Reid to

15  make that mistake or say I'm sorry.

16          THE COURT:  I see.

17          SS&C.

18          MS. RHEE:  Your Honor, from our perspective,

19  this is the pretrial motion that really does tell us and

20  inform us exactly what case are they trying and how long

21  are we going to be here.  And we think that, just as a

22  gating item, the proposition that post-contract evidence

23  may be relevant, which is all that the case law stands as

24  a generic proposition, is all about context.  And the

25  cases that are cited and that are precedential in

1   Connecticut actually take that general proposition and

2   cabin it for when in fact they are relevant.

3           And if you think about what the underlying facts

4   are, for example, in *Dress Barn* or even with respect to

5   *Associated*, they're all really, really close in time,

6   right, because they have a direct and proximate bearing on

7   the nature of the statements that comprise the negligent

8   misrepresentation claim.  So *Dress Barn*, for example, it's

9   about a commitment within essentially a month to do the

10  due diligence and get back to the other side about whether

11  the deal is a go, right?  And the post-contractual

12  evidence that was at issue there about whether or not it

13  came in to shed light on those representations were

14  essentially four days, two weeks, and within that month in

15  which the dispute was arising.  Similarly with *Associated*,

16  the time frame is also quite cabined.  And it's a way

17  prudentially and totally makes sense to make sure that you

18  don't end up with a mess of a trial where a whole ream of

19  post-contractual evidence comes in that has little to no

20  bearing on what was actually known at the time and what

21  was actually true or false at the time the representations

22  were made.

23          And it matters here, Your Honor, because when we

24  received the exhibit list from ACM about the universe of

25  trial exhibits that they intended to introduce in this

1    case, if we could go to Slide 12, it's roughly these

2    numbers because there are some blanks and there are some

3    undated documents, but you can get a sense of how skewed

4    the potential presentation here is.  And that was

5    underscored by the way in which they actually submitted to

6    the Court why all of this evidence was relevant.  They

7    said, in essence, how do we know that SS&C lied in 2014?

8    Well, the proof is in the pudding, because the

9    implementation failed.  And that is how we're going to

10   prove up our negligent misrep case, and the exhibit bears

11   truth to that.  You can see only a quarter of the exhibits

12   are in the time frame that is contemporaneous to the

13   misrepresentations.

14            And we acknowledge, as you've said with respect

15   to Bimini, and we acknowledge the case law, of course

16   there are some post-contractual documents and testimony

17   that may be highly probative and relevant to the truth or

18   the falsity of the pre-contract representations.  But

19   that's because those post-contract statements essentially

20   circle back and acknowledge or say something about what we

21   said in the first instance.  Right?  And you can show that

22   direct and proximate causation.  But it cannot be the case

23   that you've got hundreds and hundreds of exhibits over a

24   28-month timeline and that we've got to put that all in

25   and have a big slog fight in this courtroom about that.

1    And that's not -- that's not the case that we are here to

2    try.  Because those are not the claims that are being

3    brought forward or that remain in this case.

4              THE COURT:  So ACM's motion here, of course, is

5    to -- which you've opposed, is to exclude certain

6    post-contractual conduct.  And I'd understood your

7    position to be to the extent that ACM is going to get into

8    this, you get to get into it as much as they do and that

9    you would be able to get into it for reasons of disputing

10   the causation aspect of the case, right?

11             MS. RHEE:  Absolutely.  Insofar as --

12             THE COURT:  So what's your response to

13   Mr. Mateo's claim that, well, you haven't alleged

14   contributory negligence, you haven't completed these

15   things in such and such a way?

16             MS. RHEE:  As I think made clear in our papers,

17   Your Honor, we're not actually making affirmative

18   defenses.  We're just putting them to their proof.  They

19   have to prove each of the elements of negligent

20   misrepresentation.  One of those elements is causation.

21             THE COURT:  So to the extent that if the Court

22   doesn't agree with your argument about lost employee time,

23   for instance, coming in and evidence of that, then it

24   seems to me that ultimately a lot of evidence comes in

25   post-contractual not just as to the issues of truth and

1     mens rea, but comes in for damages purposes, right?

2              MS. RHEE:  Yes, Your Honor.  I mean, the basic

3     proposition that the Court started with of course is ours,

4     which is if there's a determination that ACM gets to put

5     in basically the entirety of their exhibit list, we

6     absolutely have the right to rebut that.

7              THE COURT:  I see.  Okay.

8              So I'm going to take a look further at the

9     issue, but I'm leaning towards essentially denying the

10    motion as framed, denying motion number two, ACM's motion

11    in limine number two basically for the reasons stated by

12    SS&C.

13             In terms of the, I think, guide rails that have

14    been suggested, I don't know how to make it clearer other

15    than to say the evidence will need -- post-contractual

16    evidence will need to be shown relevant to one or more of

17    the elements of either of the causes of action in the

18    case.  It can't spill over into simply evidence as

19    relevant solely to not to be tried breach of contract or

20    warranty claim, but I'm not sure that I can, in the

21    abstract, resolve that with respect to what I have before

22    me on an exhibit-by-exhibit basis.  It hasn't been framed

23    as such.

24             MS. RHEE:  And Your Honor, we're happy to submit

25    another motion in limine just based on what we saw in

```
 1    their opposition to us, but I do think there's another
 2    Bimini-like example that's been teed up by the way in
 3    which they've responded to the MILs.
 4            Just as a heads-up to the Court, Tony Gonzalez's
 5    testimony, as we understand it, at least in significant
 6    part, is all about the performance issues with respect to
 7    the project manager that SS&C assigned to the case after
 8    the contract, Adrianna Johnson.  Tony Gonzalez, much like
 9    Bimini, doesn't show up on the scene until October of
10    2015.  He is not an SS&C --
11            THE COURT:  Let me do this.  If you can maybe
12    submit a motion on that.
13            MS. RHEE:  Absolutely, Your Honor.
14            THE COURT:  If you can put that in by the end of
15    the weekend, that would be great.  Hopefully people are
16    working over the weekend on this case.
17            MS. RHEE:  Happy to do so.
18            MR. MATEO:  Your Honor, on that motion, we hear
19    you loud and clear.  I just want to be absolutely certain
20    that to the extent that the other side affirmatively
21    introduces evidence of performance to show alternative
22    causation, that we get to rebut that with counter
23    performance evidence.  In other words, the ball is in
24    their court.  If they decide to try a case that points the
25    finger and introduces an alternative causation theory
```

1    unrelated to truth or falsity, they have then opened the

2    door to try a performance case and it is their choice to

3    make, not ours.

4              THE COURT:  I'll take that representation on the

5    record, but I'll have to deal with that as it comes up.

6              Let me get to the next motion in limine, number

7    three from ACM, Document 219.  This is the motion to

8    exclude any evidence of the management agreements and

9    collateral source payments, basically ACM moving to

10   preclude any evidence, reference, or argument concerning

11   ARMOUR Residential REIT and Javelin Mortgage Investment

12   Corp. and the terms of those management agreement that

13   contemplated the payment to ACM.

14             As I looked at this motion, it strikes me, in

15   light of SS&C's response about the reasons that it intends

16   to put in the management agreements and the arrangement

17   for payments there, that SS&C has shown a valid

18   alternative reason other than simply for an improper

19   collateral source payment showing to put in the fact that

20   these payments with respect to SS&C's argument that the

21   choice of hosting method here was a product, in whole or

22   in part, of the payment arrangements that ACM had with

23   these two other REIT entities.

24             So my inclination is to conclude that that's a

25   valid reason to put in the management agreements and the

1   relationship for ACM there.  And that any concern under

2   Rule 403 could be addressed by means of a limiting

3   instruction to the jury making clear that the fact that

4   ACM may have been compensated by other entities is not a

5   ground to reduce or eliminate any award to ACM if it's

6   otherwise proved its case.  That's my inclination at this

7   point.  It seems to me that SS&C's alternative grounds for

8   putting in this information seem to be valid.  I know ACM

9   doesn't agree with those grounds, but I don't know that --

10  I think I have to let SS&C make its case on this.

11          MR. MAMOUNAS:  May I be heard briefly, Judge?

12          THE COURT:  Sure.

13          MR. MAMOUNAS:  I don't know that I would say we

14  disagree with them.  In fact, we proposed a stipulation to

15  resolve the motion.

16          I want to be clear, first of all, what they're

17  actually looking for.  It's not to show that we were

18  reimbursed or that there were reimbursement payments which

19  would be true collateral source.  If you read their

20  motion, they want to put in evidence that there was a

21  choice that ARMOUR was directed to make, and I think the

22  testimony actually shows it was away from outsourcing.

23  They want to show, as far as one of the reasons why we

24  selected hosting, that it had to do whether we could be

25  reimbursed or whether there was an ability to be

1   reimbursed.  There's a distinction there between the

2   collateral source payments themselves, which they're not

3   even seeking to put in and which Your Honor's summary

4   judgment ruling I think made clear under Connecticut law

5   wouldn't come in, which I think as a result there should

6   be agreement they are out.  But with respect to the issue

7   of whether there was an ability for reimbursement, what we

8   had proposed is that they are able to question our

9   witnesses on the issue.  And to the extent that they need

10  to, they could impeach them with their prior testimony or

11  with the management agreements.  The management agreements

12  shouldn't come in substantively because of the prejudice.

13  They are 15-plus-page documents with 28 articles of

14  legalese.  That would be unfairly prejudicial, confusing,

15  and otherwise distracting to the jury.  When we talk about

16  opening the door, extending the trial and having mini

17  trials within the case, it certainly speaks to an issue

18  just like this.

19          If what they want to get out is whether the

20  possibility of reimbursement had anything to do with our

21  reliance, just ask the witnesses.  And that's fine.  They

22  have testimony on it if the witness is testifying

23  inconsistently.

24          What we don't understand is why there's any

25  relevance to actually introducing the management

1    agreements, including of course the fact that we're not

2    trying a breach of contract case.  So why now a collateral

3    contract would be coming in when we don't even have a

4    contract issue in the case.

5              THE COURT:  Thank you.

6              Anything on SS&C's point on this issue?

7              MS. RHEE:  Your Honor, we want to be able to

8    rebut their case.  And insofar as the heart of their claim

9    is that but for the negligent misrepresentations, ACM

10   would never ever have chosen hosting and it was only in

11   reliance to those representations that it said no

12   outsourcing, hosting it is, we should be entitled to put

13   on our best evidence to say huh-uh-uh, what's motivating

14   them here and how do you know, because the proof is in the

15   pudding because in fact they did get reimbursed in full

16   for all of it.

17             We totally agree with the Court's proposed

18   limiting instruction to say that that evidence is relevant

19   to and has bearing only on the proof with respect to the

20   negligent misrepresentation and shouldn't be considered by

21   the jury for purposes of what an actual damages award

22   should be.  But that's the reason why there is a dispute

23   between the parties about how we put that evidence on.

24             THE COURT:  All right, thank you.

25             MR. MAMOUNAS:  But if I might, Judge, the

1    argument is that it's relevant to reliance, which

2    naturally predates the actual reimbursement.  So

3    reimbursement, the fact that it may have actually

4    occurred, has nothing to do with the reliance element.

5    What they want to do right from their papers is about the

6    possibility or the right to reimbursement.  We told them

7    that's fine.  You want to ask the witnesses about that,

8    you can do that.  But you don't need the management

9    agreements for it, you have testimony.

10            THE COURT:  I've got your arguments on that.

11   I'll hold that under advisement.

12            The next motion in limine is number four.  I

13   think we've kind of gone over this ground.  It's ACM's

14   motion in limine to exclude reference to Section 6.2.2 of

15   the management agreement, has to do with the consequential

16   damages issue that we've already discussed.

17            At this point I'm going to study the issue

18   further, but I'm inclined to grant the motion on the

19   ground that that Section 6.2.2 does not appear to me to

20   preclude an award of or limit the extent of award for the

21   negligent misrepresentation claim to the extent that that

22   claim itself is limited to pre-contractual conduct.  I'll

23   look at the issue further on that if the parties have

24   anything else they want to say on this.

25            MS. RHEE:  Your Honor, I actually think there

1  are two slightly different sets of issues that are teed up

2  in that set of motions.

3          THE COURT:  All right.

4          MS. RHEE:  The first is with respect to whether,

5  just as a matter of law, ACM is entitled to punitive

6  damages.  And that's a legal question.  We hear you on

7  where the Court is inclined to go.

8          I think it's a different issue about whether or

9  not, for purposes of rebutting reliance, we can introduce

10  the language of the Master Agreement which was extensively

11  vetted by both parties.  ACM took a look at the contract,

12  vetted it with their attorneys, and then signed it.  So

13  for purposes of actually just introducing as an

14  evidentiary matter that provision and talking about it in

15  the context of rebutting the causation and the reliance

16  elements of their negligent misrep claim, we think that we

17  should be entitled to do so.

18          THE COURT:  Help me on that one, then.  How does

19  the specific language of Section 6.2.2 go to reliance?

20          MS. RHEE:  Which is to say, Your Honor, it's

21  about the insofar as things don't go well under the

22  contract --

23          THE COURT:  Right.

24          MS. RHEE:  -- we're telling you basically this

25  is the agreement in its entirety, all the provisions in

1    the agreement govern our relationship going forward with

2    respect to what happens.

3            THE COURT:  But I think we kind of tread that

4    ground before because the cause of action here is not the

5    contract itself.  So that's my concern in terms of why

6    this particular provision should govern consideration of a

7    pre-contractual tort.  So I'm not sure then that -- it

8    seems to me then to cite this provision, it's a

9    complicated provision, Section 6.2.2 could be pretty

10   confusing to the jury if it's held and it might

11   necessitate me coming forward and issuing some sort of

12   clarification instruction to the jury saying Section 6.2.2

13   doesn't even apply.  So that's my concern with respect to

14   that.  I'm not sure if I'm missing something.  I know you

15   don't agree with the Court's initial view about

16   Section 6.2.2 being applicable, but I'm not sure if I've

17   concluded that it does not operate as a limitation on the

18   tort measure for damages for pre-contractual conduct that

19   it really is appropriate to refer and rely on it in the

20   case.

21           MR. MAMOUNAS:  Judge, this is the first that

22   we've heard this argument that it has anything to do with

23   anything apart from a limitation on liability which they

24   haven't pled and was addressed in the context of the

25   motion.

1          THE COURT:  I'll think more about this as well,

2    ACM motion in limine number four.

3          I'm going to skip over number five because it

4    has an expert aspect to it.  I'll get to the last of the

5    non-expert motions which is motion in limine number six is

6    to permit reference to all of SS&C's misrepresentations.

7          Here, my initial inclination here is to grant in

8    part and deny in part the motion.  I would likely grant

9    the motion, I think, to the extent that ACM wishes not to

10   have a limitation on the evidentiary scope in terms of

11   what is adduced as evidence at trial of the statements

12   that were made by SS&C, false, non-false, or any other

13   contextual background statements by SS&C.  On the other

14   hand, for purposes of jury instructional purposes, I'm

15   inclined likely to deny the motion to the extent, if I

16   understand it -- the motion is not very clear on the

17   point -- but as I understand it, if ACM is seeking some

18   sort of free-ranging authority to rely on statements

19   beyond those 22 specific statements that it identified in

20   its interrogatory response.  I'm particularly concerned

21   that that interrogatory response was never updated, as was

22   ACM's duty to supplement specific statements that it would

23   rely on at the least for purposes of its negligent

24   misrepresentation claim.  And so we haven't instructed the

25   jury yet, but I just want to be clear that I'm having a

1   hard time thinking that I would allow ACM to stray beyond

2   the 22 statements that it identified.  I think it was

3   appropriate for SS&C to try to ask about what statements

4   were going to be the subject of that, to base its

5   discovery on that, and not to be faced essentially with

6   surprise revelations of additional statements that ACM

7   would rely on.

8          Another dimension here is it was really up to

9   ACM, it was peculiarly within ACM's knowledge in fact, I

10  think, to know these are the statements that made the

11  difference to us that caused us damage.  And for ACM to

12  kind of lie in the weeds on this and say, well, no, there

13  were additional statements and more statements here and

14  there that we're going to let you know about at trial or

15  that may pop out of a witness's mouth during trial is

16  problematic to me.

17         So I'm likely to grant the motion in part, allow

18  the witnesses to testify as they are to particular

19  statements, but probably to deny the motion to the extent

20  that it's interpreted or can be interpreted to suggest

21  that ACM would rely on, for liability purposes, on

22  additional statements beyond the 22 it's specifically

23  identified.

24         So I want to make clear that limitation in terms

25  of ACM's not in a position of touting, especially in

1    opening statements, or otherwise relying on statements

2    beyond those 22.  But I'll hear any further argument you

3    want to make on that if I'm misunderstanding something.

4            MR. MATEO:  Thank you, Your Honor.

5            On that issue, Your Honor, there's a couple of

6    concerns.

7            I wasn't here for the summary judgment argument,

8    but we did update all of the statements that we were going

9    to rely on in the context of summary judgment was my

10    understanding the subject of lengthy discussion and

11    colloquy with the Court with respect to whether we were

12    limiting the claim to the 22 statements in that

13    interrogatory, whether in fact discovery had revealed

14    additional statements, and whether fair inferences would

15    be drawn from the statements that were made.

16            Your Honor, we have a situation here where

17    statements fall into some general categories:

18    capabilities, expertise, ease of use, timetable of

19    implementation.  SS&C affirmed those representations in

20    broad categories 25 different ways using different words

21    each time but making the same ultimate point.  The

22    interrogatory response creates those categories, but not

23    every single statement ever made to a witness was

24    contained therein nor should it need to be from a witness

25    testimony perspective.  The witness ought to be able to

1  testify as to all statements as long as the other side is

2  on fair notice of the categories of statements that were

3  made.  That's number one.

4          THE COURT:  Just to be clear, I've basically

5  made clear that I'm going to allow that, ruling in your

6  favor on that issue.  The issue is ultimately one for jury

7  instructional purposes whether you're going to be able to

8  stand up at the end of the case to the jury and say a

9  particular statement was made here that's not one of those

10  22 disclosed statements and rely on that and say that

11  statement by itself should be the basis for a negligent

12  misrepresentation claim.

13          MR. MATEO:  Again, Your Honor, to the extent we

14  also raised this in our statement of undisputed facts, to

15  the extent that we also raised it in the summary judgment

16  motion as a basis to defeat summary judgment motion --

17          THE COURT:  Did you supplement your discovery

18  response?

19          MR. MATEO:  No, Your Honor.  The interrogatory

20  response was not supplemented.  We all know that.

21          THE COURT:  Yes.

22          MR. MATEO:  The question is one of prejudice.

23  The question is one of fair notice.  The question is trial

24  by ambush as they raise it.  That's the defense that

25  they've raised to this, that somehow they don't know what

1    those statements are despite the fact that counsel was

2    here, they were all talked about, that they were part of

3    discovery, that somehow there's a trial by ambush and

4    somebody is going to raise a statement that no one has

5    ever heard.  That is the ultimate defense that they raise

6    to this motion.  And what we're saying is you are on fair

7    notice of all of the variance of the statements that were

8    made.  They were produced in discovery, they were asked of

9    your witnesses, they were presented, they were argued in

10   summary judgment.  You cannot make a trial by ambush or a

11   prejudice claim that would cabin us to those 22 statements

12   going to the jury.

13              THE COURT:  Okay.  I get your argument.

14              Anything on SS&C's --

15              MR. RECHER:  I'll be very brief, Your Honor.

16              I think we agree with the structure you've

17   outlined.  Certainly we don't have a problem if there's

18   otherwise admissible statements that they want to put in

19   evidence about.  I think the issue is, as you pointed out,

20   which statements they get to go and instruct the jury and

21   say you should return a finding of negligent

22   misrepresentation based on X statements.  And we believe

23   largely, for the reasons Your Honor said, it should be the

24   22 statements they identified in discovery.

25              When Mr. Mateo mentioned fair notice, I won't

1    belabor the point, that's why we have discovery, that's

2    why we send them interrogatories that say identify for us

3    the pre-contractual misrepresentations.  They did so.  We

4    prepare our case on that basis.  And if they want to

5    update that, Rule 26 says you have to do that in a timely

6    manner.  Those interrogatory responses were never updated.

7              THE COURT:  Thank you.

8              I'll take this motion under advisement as well.

9              Let me turn to the expert motions.  I'll take up

10   the one first on Steven Kursh.  This is SS&C's motion to

11   preclude Mr. Kursh from testifying.

12             I've looked at that in light of the applicable

13   rules of 702, 703, 704, especially, and the elements

14   principally of the negligent representation as well as

15   CUTPA.  My inclination on this motion is to grant in part

16   and to deny in part along pretty much the following

17   guidelines:

18             First, I'm inclined to preclude Mr. Kursh or,

19   frankly, any expert from testifying about whether SS&C

20   actually knew or didn't know any statements to be false.

21   That issue of actual knowledge, it strikes me as something

22   that is well beyond the scope of the expert's expertise in

23   terms of mind reading.  And it would be hearsay, and I

24   know experts can rely on hearsay evidence but it doesn't

25   mean that they can essentially give opinions about whether

1 trial principal parties in cases were lying or not.  So I

2 would intend to preclude testimony about whether SS&C

3 actually knew or did not know particular statements made

4 were false, number one.

5          Number two, for pretty much similar reasons, I

6 would likely preclude testimony about whether SS&C should

7 have known any statements to be false or, put differently,

8 whether its statements were otherwise reasonable when

9 couched as that by an expert, essentially addressing what

10 is an ultimate conclusion in the case.  Rule 704, of

11 course, allows, it doesn't categorically bar expert

12 testimony about ultimate conclusions, though the law of

13 the Second Circuit I think is clear that experts are not

14 licensed to come testify about matters that essentially

15 embrace legal conclusions or embed legal conclusions

16 within them.  So to have an expert up and testifying about

17 whether a particular statement was reasonable or whether

18 SS&C should have known a particular statement to be false

19 seems to go a step too far in terms of what an expert

20 should be properly testifying about.  That's number two

21 point.

22          Third point is with respect to, that I think I'm

23 likely to grant the motion again, is to preclude Kursh

24 from testifying about the causation of the failed

25 implementation.  We've had lots of argument to the extent

1    to which post-contractual events will be part of the trial

2    in this case, but to the extent that we have experts

3    coming in and essentially giving their prognosis on the

4    basis of their review of documents and emails and the like

5    about whether SS&C's actions caused the failed

6    implementation or, relatedly, whether ACM's own actions

7    did not cause the failure of the CAMRA implementation, it

8    seems to me that this again is well beyond what the

9    expertise is.  The expertise is as to not opine on the

10   specifics of this case here.  So I'm likely to preclude

11   testimony of experts on the issue of causation or

12   non-causation, as the case may be, of the failed

13   implementation.

14        So then that leaves, in terms of, well, what

15   would these experts be able to testify?  I think for

16   Kursh, as I look at Kursh's report, he strikes me that he

17   is an appropriate expert, I don't think his qualifications

18   are challenged at all, or that he has expertise in some

19   areas, I should say, not full scope, but that it seems to

20   me that he has relevant expertise that would be useful to

21   the jury on the issues about industry standards, industry

22   standards, as he puts it, in two contexts:  (1) the

23   functionality or technical suitability of the CAMRA

24   software; (2) on what he frames and describes as the

25   services capacity, which I understand and take to be

1   essentially a reference to the staffing kind of support or

2   other kinds of support requirements for a successful

3   implementation.  It strikes me that expert testimony would

4   be helpful, useful, and appropriate in this very complex

5   case to shed light on exactly those issues in terms of

6   technical functionality and services capacity, and that he

7   could illuminate, importantly illuminate those areas in

8   the context of prevailing industry standards and customs

9   for the sale and implementation of enterprise software as

10  we have in this case.

11          Although I do not intend to allow experts to

12  testify about why the implementation failed in this

13  particular case, I would allow expert testimony on the

14  subject, I tend to allow expert testimony on the subject

15  of why or what are common reasons why implementations may

16  fail, not every implementation will succeed.  So maybe

17  that means that not every failed implementation means that

18  there's been a negligent misrepresentation in the first

19  instance.  So I think it's proper expert testimony to talk

20  about why implementations may fail in some instances

21  consistent with an expert's testimony about technical

22  suitability and about services support requirements for an

23  implementation, because I think it is common ground

24  everybody knows only part of the pieces of the puzzle in a

25  software sale is with respect to what happens at the time

1    that the software is actually purchased, there's a whole

2    implementation phase that's necessary.

3           To the extent that the expert Kursh would

4    testify about what I might call CAMRA-specific aspects, to

5    the extent that he has expertise in that area, I would

6    think that's helpful here in terms of most useful to the

7    jury.  I don't think that somehow an expert testifying

8    about the functionality and services support requirements

9    for CAMRA specifically somehow converts that expert into a

10   fact witness.  I don't think that's true.  I think

11   actually it's very useful to the jury to hear from an

12   expert that not only knows generally about software

13   implementations and requirements but also is CAMRA

14   specific.  So to the extent that Kursh would testify about

15   CAMRA-specific aspects in his testimony and particularizes

16   it to CAMRA that would be helpful and useful to the jury,

17   I would intend to allow that.

18          To the extent that I would likely allow

19   testimony on the issue of the other mortgage REIT

20   customers, the seven identified by SS&C, to the extent

21   that Kursh's report I believe in Paragraphs 53 and 99 of

22   his report refer to those other non-mortgage REIT

23   customers, I'll allow his testimony on that.  That's an

24   issue at play in the case, I think, so I believe he could

25   testify about industry standards with respect to those

1    customers as well.  And then it will be left to the jury

2    to decide the extent to which his testimony is, number

3    one, credible, and the extent to which it also has

4    applicability to the facts of this case.

5           One of the points of dispute between the parties

6    is about his reliance on the ISO Technical Report 19759,

7    acronym SWEBOK.  I intend to deny that motion that would

8    preclude his testimony about that.  I know that the

9    experts from SS&C intend to testify about why SWEBOK is

10   not applicable or fully applicable in this context.  To

11   me, I can't make that call here.  That seems to me to be

12   an issue of expertise.  I can't categorically say that

13   SWEBOK is not fully applicable here and the jury will

14   benefit from hearing the expert's contrasting testimony

15   about SWEBOK's applicability to the case.

16          So those are my general thoughts in terms of how

17   I'm likely to rule with respect to Kursh and to

18   consistently rule in a consistent manner with respect to

19   Maffattone and Hilliard, although there are additional

20   issues with respect to Maffattone and Hilliard.

21          One of the other points of disagreement on the

22   Kursh testimony is as to labor hours.  Essentially, I'm

23   not quite sure what Kursh intends to testify about

24   concerning the labor hours.  It would help me to maybe

25   understand a little bit more about exactly what he's going

1   to testify.  I think I'm going to allow evidence, as I've

2   made clear, on the issue of the alleged lost labor hours

3   here.  I think that I would be inclined to allow Kursh to

4   testify about industry standards concerning the types of

5   labor-hour commitments that are ordinarily required for

6   software implementation of an enterprise sort, especially

7   in the mortgage REIT context to the extent that he can be

8   specific to CAMRA, to the extent he can be specific about

9   the specific mode of implementation.

10          To the extent that he's testifying, and maybe

11  the parties can illuminate me on this, it struck me part

12  of the concern about his testimony is that somehow he's

13  testifying as a summary witness about other documents that

14  substantiate the actual number of labor hours, and I'm not

15  sure if you're trying to introduce Kursh to testify about

16  that.  There's a rule, of course, 1006 for summary

17  evidence testimony.  If that were met, it seems to me it's

18  appropriate to allow testimony by some witness, it could

19  possibly be Kursh if he's the one that's doing the

20  mechanical calculations, to do those calculations of the

21  number of labor hours at least that are claimed to have

22  been expended by ACM towards the implementation and ACM is

23  claiming is a measure of its damages.

24          So that's a lengthy explanation of what I think

25  I'm prepared to allow Kursh to testify in a nutshell.  It

 1   appears to me he's qualified.  It appears that he can

 2   testify about industry standards as to functionality and

 3   to staffing support.  But I have more difficulty with

 4   respect to him testifying and giving an opinion about

 5   whether particular statements were false or should have

 6   been known to be false or with respect to causation here

 7   where he's essentially just trying to interpret the

 8   evidence in this case in a way that's beyond his scope of

 9   expertise here and it would not be so useful to the jury,

10   and that the jury can connect the dots, I think, on the

11   basis of his testimony.  The lawyers are free to help the

12   jury connect those dots.

13          So I'm happy to hear from the parties more with

14   respect to the Kursh testimony here if there's anything

15   I'm overlooking or should be thinking about.

16          MR. RECHER:  Your Honor, I'll just touch briefly

17   on the lost-employee-time piece of Kursh's testimony.

18   Happy to answer any other questions, but I understand

19   Your Honor's ruling.  I think it makes sense.  We

20   understand it will be a two-way street for each side's

21   experts.

22          The issue on the lost employee time, Professor

23   Kursh doesn't actually do any work.  What happens here is,

24   you know -- we understand what Your Honor's shared today

25   about where it's likely to come out on that motion, we

1    think the evidence shouldn't come in.  But if it does, the

2    facts are in 2018 a couple days before his deposition,

3    Mr. Mountain at ACM went around to his employees and said,

4    "How much time did you spend over the last three years

5    working on CAMRA?"  No time records, no time sheets, no

6    diary entries.  All of those employees say, "oh, I

7    spent" -- it varies by employees, but 402 hours, 121

8    hours.  Some of them have ranges.  "I spent between 400

9    hours and a thousand hours."  Mr. Mountain compiles all

10   these and says, okay, my employees spent 5000-some-odd

11   hours working on CAMRA because this is what they told us

12   looking back several years into the past with no actual

13   contemporaneous records.  Kursh then gets this piece of

14   paper, and his testimony, as I understand it, he's simply

15   going to be vouching for the work that ACM's fact witness

16   and their individual employees actually performed.  I

17   don't think that's appropriate expert testimony nor do I

18   think that Kursh has any expertise in this subject.

19          For example, he says, "I kicked the tires on

20   this, here's what I did.  I looked at the numbers of

21   emails sent between SS&C and ACM, there are X thousand

22   emails.  I estimate it takes four minutes to read an email

23   without an attachment and 16 minutes to read an email with

24   an attachment, and I get X number of hours.  That's about

25   what Mr. Mountain calculated; therefore, his estimates are

1    reasonable."  We said, "Where did those four-minute and

2    16-minute estimates come from, Professor Kursh?"  "They

3    just seemed right to me."  There's no basis for this.

4            I do take Your Honor's point.  If they want to

5    put up Professor Kursh to testify about in general we'd

6    expect customers to do work during an implementation that

7    might look like point 1, point 2, point 3, fine, we can

8    deal with that on cross.  I don't think he just gets to

9    get up and vouch for the work that one of their fact

10   witnesses --

11           THE COURT:  I see.

12           It would be helpful maybe to understand more

13   about that issue from ACM's perspective.  It seems to me

14   there's two issues to deal with here, or sub-issues.  The

15   first is the non-hearsay basis for there to be testimony,

16   for example, by Mr. Mountain, if indeed it's as described

17   that he just basically went around and did an informal

18   survey of employees and asked them to give estimates, if

19   he doesn't actually have contemporaneous records of those

20   and doesn't have otherwise business records of those, why

21   even Mr. Mountain's testimony would be permissible on that

22   issue.  And then whether having an expert come in and

23   ratify or somehow approve Mr. Mountain's estimates, why

24   that would be appropriate and also within the scope of

25   expertise.

1          MS. QUINN:  Taking them in order, Your Honor,

2    first, the employee hours are captured in a number of

3    different ways, including in ways that are clearly

4    business records, like the CAMRA access logs.  Those are

5    business records, they're SS&C's business records.  So

6    there will be testimony putting here are the access logs,

7    these access logs reflect X number of hours from these

8    different employees.  A lot of it will come in that way.

9    There are other aspects that Mr. Mountain, for example,

10   will have personal knowledge and we'll lay a foundation

11   for him to talk about how that came in.

12          In terms of individual employees, if we have to

13   call them one at a time for a half hour to say "I spent X

14   hours on CAMRA implementation," we can do that.  We had

15   proposed to the other side, since there was never really

16   any challenge in discovery to the hours that those

17   employees spent or the reasonableness of them, they

18   weren't challenged on that, that we could stipulate

19   employee X worked this number of hours and not subject the

20   jury to a little train of witnesses coming up on that.

21   SS&C so far as not agreed to that.  So we'll either -- if

22   we can't do it by stipulation, we'll put the people on if

23   we have to.

24          THE COURT:  I see.

25          MS. QUINN:  On the question of what Dr. Kursh

1    will testify to, I think SS&C, both when they deposed him

2    and here, they're sort of missing the crux of what he's

3    testifying to.  He's not vouching for or ratifying how

4    much time the witnesses spent.  He's saying I'm looking at

5    the time that I understand was spent, and in my

6    understanding of implementations and the tasks that they

7    were asked to undertake, that time was reasonable, that

8    they spent a reasonable amount of time on the tasks that

9    they were given.

10               THE COURT:  I see.  Okay.

11               MS. QUINN:  In light of his -- so, for example,

12   he says I reviewed SS&C's implementation budget.  SS&C

13   allocated to ARMOUR X number of hours to complete these

14   tasks.  ARMOUR, as I understand it, actually spent this

15   number of hours.  I consider that number of hours for

16   these tasks to be reasonable in light of my experience.

17               THE COURT:  I see.

18               Why couldn't he testify just generally what is

19   the number of hours that would have been reasonable for an

20   implementation of this?

21               MS. QUINN:  Understanding the guidelines

22   Your Honor is setting, I think we can stay on that path if

23   the preference is not --

24               THE COURT:  Rather than basically you putting it

25   forward and having him essentially opine on specific items

1   of evidence in the case.

2         MS. QUINN:  I think we can do that, Your Honor.

3         THE COURT:  And you can connect the dots.

4         Anything else on the Kursh expert issue?

5         MR. RECHER:  No, Your Honor.

6         THE COURT:  I'll think more about that.  Again,

7   as with the other motions in limine, I'm preparing

8   something in writing as well, a ruling to give guidance to

9   you on this.

10        MR. RECHER:  Thank you, Your Honor.

11        MS. QUINN:  Thank you, Your Honor.

12        THE COURT:  Let me get to Maffattone and

13  Hilliard which I think is the last -- I hope the last of

14  our motions to deal with.  That's ACM's motion in limine

15  number five, Document 220.

16        I think I understand that motion -- I have a

17  little bit of a question about the scope of the motion.  I

18  think to the extent that there's a challenge to the

19  qualifications of Mr. Maffattone, it struck me that he

20  looks very qualified, 100-plus implementations of

21  software.  He also seems to me to be quite qualified and

22  knowledgeable about CAMRA specifically, which is of

23  greatest usefulness to the jury to hear something specific

24  to CAMRA.  As I said before, I'm not convinced that

25  somehow the fact that he worked with CAMRA specifically

1    means that he is somehow a fact witness.  It seems to me

2    he's still an expert witness in terms of his knowledge and

3    familiarity with how CAMRA works and its technical

4    functionality requirements and its services support

5    requirements, as Mr. Kursh would describe it.

6         So I'm inclined to deny the motion to preclude

7    Maffattone to the extent it's challenging his

8    qualifications.

9         To the extent it's challenging his methodology,

10   I think I'm also persuaded again by SS&C's response that

11   not every expert that's called has to testify about

12   specific scientific peer review tested methodology and

13   particularly in the realm of business experts that testify

14   on the basis of their experience, that he would be

15   testifying in much the same manner as Kursh would be

16   testifying about his hands-on experience concerning

17   software implementations.  That's of tremendous usefulness

18   to this jury that's by and large not expert certainly in

19   this area.  Indeed, I know that during jury selection I

20   think there were specific objections to particular jurors

21   who were thought to have too much expertise.  Just another

22   reason why it's going to be helpful to have expert

23   testimony in this area.

24        The objection to the extent of cumulative, I'd

25   like to hear a little more about that.  I have some

1    concerns about double-doing it there.

2           And I also had some concerns when I looked at

3    Mr. Maffattone's report, I wanted to highlight as well, if

4    we look at his itemization, Page 3 of his report, of

5    expert areas, he has six different areas that he

6    identifies.

7           The first is about SWEBOK's applicability.  I

8    think I've already made clear on that.

9           The second is as to his knowledge of CAMRA as

10   being widely used.  I understand that.  An expert can be

11   appropriate about that, it's a foundational matter.

12          The third is that he would testify about

13   industry norms concerning the type of information that's

14   gathered.  I can see him testifying about what are the

15   industry norms there.  I don't think, for the reasons I

16   stated before, that it's appropriate for him any more than

17   for Kursh to testify that specifically the amount of

18   information that was gathered was within that norm, unless

19   the parties were to agree on that.

20          If they agree that it's appropriate for their

21   experts -- to the extent that I'm articulating guidelines

22   on the experts, to the extent that the parties come

23   forward and say, based on your greater familiarity with

24   the record in this case, that you want to agree to allow

25   expert testimony into particular areas, so long as there's

1   equal treatment on both sides, I'm happy to hear from you

2   on that if you feel the Court is imposing limitations that

3   are too restrictive on what the expert scope of testimony

4   is.

5           The number four category for Mr. Maffattone is

6   he's preparing to testify that the pre-contractual

7   representations about suitability performance were

8   accurate and reasonable.  Same concerns that I had with

9   Dr. Kursh, that I don't think it's appropriate for him to

10  testify essentially those legal conclusions.

11          Number five is that he testifies about the CAMRA

12  contracts at issue follow industry standards and are

13  typical of those entered into between accounting software

14  vendors and buyers.  It's not clear to me -- this is not a

15  contract case anymore, why would he opine about the

16  contracts?

17          And the last category that he's identified,

18  number six, is that ACM thwarted the long-term

19  implementation of CAMRA by failing to manage the project

20  effectively, just, and follow necessary operational

21  reconciliation and accounting closure processes and

22  provide capable resources during implementations.  I have

23  the same concerns there in terms of an expert coming in

24  and Monday morning quarterbacking the actual evidence in

25  the case to make an opinion about whether ACM thwarted

1    here.  I think he can talk generally about the degree of

2    cooperation there has to be between the vendor and the

3    purchaser, but not to give specific evidence which would

4    basically amount to hearsay evidence smuggled in as expert

5    testimony I think about whether ACM thwarted the

6    implementation here.  Am I clear about this, the

7    distinction?  You're free then to connect the dots from

8    the expert testimony when they talk about what customers

9    are supposed to do, what vendors are supposed to do.

10                So help me out on that.  Any additional comments

11   on Mr. Maffattone?

12                MR. RECHER:  Yes, Your Honor.  I think we can

13   hopefully handle these pretty quickly.

14                In terms of his opinion number five about the

15   contracts at issue in this case, I think that was intended

16   to be responsive to an opinion offered by Professor Kursh

17   in which he says the contract terms of the Work Request

18   Two were met, not met.  Insofar as Kursh isn't going to

19   testify to that, and I understand he's not, we won't

20   pursue testimony by Mr. Maffattone.

21                As to six, I take Your Honor's point, we're

22   happy to have Mr. Maffattone merely testify to general

23   expectations in the context of a software implementation.

24                Finally, as to the cumulativeness objection as

25   between Mr. Maffattone and Mr. Hilliard, I think, from our

1    perspective, that objection is, as we said in our papers,

2    premature and I think, based on our assessment right now,

3    very likely moot.  I will say, absent unforeseen

4    circumstances and depending on how ACM puts its case in,

5    my expectation is that SS&C will only call one of its

6    experts rather than two to streamline the trial, keep

7    things moving.  We'll, of course, once we make a

8    determination about that, we'll disclose witness names in

9    the ordinary course.  But I don't think we'll have an

10   occasion where we'll be offering certainly cumulative

11   testimony.

12           THE COURT:  Are you intending to rely on

13   Maffattone or Hilliard?

14           MR. RECHER:  I believe it's likely to be

15   Maffattone.  I do want to see what expert evidence comes

16   in from Professor Kursh first and make that determination

17   in a final way, but that's my current belief.

18           THE COURT:  All right, thank you.

19           Anything else to put on record with respect to

20   the expert?

21           MS. QUINN:  Thank you, Your Honor.

22           I think that it's certainly helpful to hear that

23   the cumulative objection may be moot, because that was a

24   real concern for us.

25           I think what we can do then is just focus

 1   specifically on the issue unique to Mr. Maffattone which
 2   is that he's also a fact witness.  He's a fact witness who
 3   is going to be sitting in the guise of an expert, a
 4   well-informed expert opining on the wonders of CAMRA from
 5   basically the perspective of a seemingly happy customer.
 6   Really, the only difference between Mr. Maffattone and
 7   Mr. Hilliard was that Mr. Maffattone was a customer.
 8   Mr. Hilliard actually interviewed him as a fact witness
 9   for purposes of forming his own opinions.  So we do think
10   there's still prejudice in having someone in the guise of
11   an expert profess to what's basically fact testimony.
12            THE COURT:  I'm just puzzled by that.  Because
13   it seems like what's most helpful to the jury is somebody
14   who has actually worked with this it sounds like a
15   devilishly complicated software program.  And then to say,
16   well, if we're going to have an expert who knows too much,
17   we don't want that expert because then that expert is
18   somehow a fact witness.  I could understand your objection
19   if Mr. Maffattone had been involved with the
20   implementation in this particular case or the contract
21   negotiation in this particular case.  But to call him a
22   fact witness simply because he knows too many relevant
23   facts about how this particular program works, and I
24   gather he knows many other software programs as well,
25   seems to me that goes to his qualifications and goes to

1   his expertise in a way that you may not like, but that

2   doesn't somehow improperly convert him into a fact

3   witness.

4          MS. QUINN:  In this case, Your Honor,

5   Mr. Maffattone, he is -- we looked at that list of the

6   seven mortgage REITs, he was the customer.

7          THE COURT:  I know, two of them, for Annaly and

8   Chimera.

9          MS. QUINN:  Right.  He's basically saying they

10  implemented it for me and it worked great.  If he had been

11  indicated as a fact witness and they wanted to call him

12  for that evidence, they could have done that.  Instead,

13  they want to at the same time have him say they did it for

14  me, it worked great and, by the way, I'm a real expert in

15  this industry and based on my experience as a customer I'm

16  now going to opine more broadly on the functionality of

17  CAMRA and whether SS&C was qualified.

18         THE COURT:  Is there a case that you could guide

19  me to that would say somehow this type of expert's

20  improper?

21         MS. QUINN:  I think there is not one in our

22  papers, Your Honor, but we'd be happy to supplement.

23         THE COURT:  If you find one, would you let me

24  know?

25         MS. QUINN:  Yes, Your Honor.

1          THE COURT:  Okay.  Anything else?

2          MS. QUINN:  No, Your Honor.  Thank you.

3          THE COURT:  So I think that's maybe enough for

4     the day, unless you have more things you want to talk

5     about.

6          Tell me, give me a rundown who we're going to

7     expect to see Monday.  Mr. Mountain to start us out?

8          MR. MAMOUNAS:  I'm sorry, Judge?

9          THE COURT:  Who are the other expected

10    witnesses?

11         MR. MAMOUNAS:  On Monday?

12         THE COURT:  Mr. Mountain?

13         MR. MAMOUNAS:  Likely Mr. Mountain.  I believe

14    he will take much of the day, given the estimate of time

15    in our witness list as well as SS&C's.

16         THE COURT:  I always find that it really helps

17    for the lawyers to be -- I'm not sure, I think there was

18    some reference to this earlier, but you really want to be

19    talking to each other about what witnesses are coming and

20    when so that there's not a hide-the-ball sort of thing, so

21    the other side can be prepared for the cross-examination I

22    think on both sides.  To the extent that you're able to

23    identify the exhibits, I know that sometimes shifts when

24    you're preparing a witness exactly which exhibits you're

25    able to use, but it's really helpful to identify the

```
 1   exhibits you expect.  Try to get agreement from the other
 2   side about which exhibits are going to come in so that we
 3   streamline things for the jury.  I encourage you to do
 4   that.
 5              MR. MAMOUNAS:  Judge, we had an agreement I
 6   think with respect to disclosure of the witness order the
 7   night before.  We proposed one with respect to disclosure
 8   of exhibits, and it wasn't accepted.  Hopefully in light
 9   of Your Honor's --
10              THE COURT:  In terms of direct examination.
11   Cross-examination, I don't think the other side is
12   compelled to disclose their exhibits.  But for direct
13   examination, it seems like -- try your best, give your
14   best efforts and work in good faith there.
15              MR. MAMOUNAS:  That had been our suggestion,
16   Judge.
17              THE COURT:  Ms. Rhee.
18              MS. RHEE:  Absolutely, Your Honor.  We're happy
19   to have a front run of what SS&C intends to be its case if
20   we got reciprocity.
21              With respect to the exhibits, it really was
22   about the cross-examination documents.  We're not in any
23   position to turn those over the night before.
24              THE COURT:  Of course.  All right.
25              Are there other issues to bring up then?
```

1          MR. MAMOUNAS:  Judge, there was one other we

2     wanted to take up with respect to a witness that was on

3     SS&C's list --

4          THE COURT:  Okay.

5          MR. MAMOUNAS:  -- as to which it was indicated

6     that SS&C's firm represented her.  She's a former employee

7     of the company.  And we had asked them to accept service

8     based on the representation in the joint trial memorandum

9     that they represented her, and we have been told that they

10    now do not or that they are not going to produce her and

11    they are not going to accept service.  It's entirely

12    unclear, but we really can't have it both ways here.  The

13    joint trial memorandum says she's represented by

14    Paul Weiss and can be served and found there at their

15    New York address.  We served trial subpoenas on them for

16    her and have now been told go fish.

17         THE COURT:  Who is the witness?

18         MR. MAMOUNAS:  Her name is Iwona Olszewska.

19         MS. RHEE:  Your Honor, Ms. Olszewska was out of

20    town.  I had been led to believe initially by opposing

21    counsel that they had already served her because they

22    wanted to know whether or not we intended, as we presented

23    in our trial memorandum, to actually call her live.  We

24    have gone ahead and contacted her by email and forwarded

25    the subpoena.  But the time that that's happening, as we

1    understood it, she was actually out of the jurisdiction.

2    We expect her to be back, but we need her to reply as a

3    former employee.

4          THE COURT:  Maybe I'm just unclear.  What is --

5    what's her status then?  Is she going to come and testify?

6          MS. RHEE:  We believe so.  But we can't make

7    that representation here and now until we get confirmation

8    that she received the subpoena and that she is back in

9    Connecticut and that she will be present at the trial.

10         THE COURT:  I see.  Okay.

11         What would you have me do at this point?

12         MR. MAMOUNAS:  Judge, we've been led to believe

13   that they represent her since the joint trial memorandum

14   was filed, it's never been updated.  There's no indication

15   they no longer represent her.  Frankly, that answer is

16   totally unclear.  If she's their witness, they need to

17   bring her.  I appreciate that they facilitated emailing a

18   subpoena, but that doesn't answer the question.

19         THE COURT:  So what would you ask me to do,

20   though?

21         MR. MAMOUNAS:  I think she should be brought to

22   trial.  She's SS&C's witness, as indicated.  She should be

23   required to appear.  I don't know if this has been

24   serviced or if they're taking the position that this is

25   service, it seems like not.  It's SS&C burden and

1      obligation to bring her having said that their law firm

2      represents her.

3                  THE COURT:  Are you calling her as your own

4      witness?

5                  MR. MAMOUNAS:  I think we'd indicated that we

6      would, but she's indicated on their list.

7                  THE COURT:  Why wouldn't you just -- do you need

8      her to testify even if they decide not to call her?

9                  MR. MAMOUNAS:  We would like her to, Judge.  Our

10     position -- their deposition designations that have been

11     put in, we believe her testimony live would be more

12     effective for the jury.

13                 THE COURT:  Ms. Rhee, when did you get in touch

14     with her, do you know, roughly?  A week ago?  Two weeks

15     ago?  Last month?

16                 MS. RHEE:  When Mr. Mamounas intimated that she

17     had already been served, we contacted her.

18                 THE COURT:  I see.

19                 MS. RHEE:  We talked to her.  She told us she

20     was on vacation.  We said, "We don't want to interrupt

21     your vacation, when are you coming back?"  We got a

22     representation when she's coming back.  We said, "We would

23     like to be in touch with you when you get back."  We

24     emailed the subpoena as of yesterday when we received it

25     and said please contact us.

```
1              THE COURT:  Did she say she's going to be back
2   this coming week?
3              MS. RHEE:  Yes.
4              THE COURT:  Can you redouble your efforts maybe
5   to try to get her to come?  It sounds like she's a
6   Connecticut person.
7              MR. MAMOUNAS:  She is, Judge.
8              MS. RHEE:  Yes, Your Honor.
9              THE COURT:  It's on the radar screen.  Maybe you
10  can keep in touch with each other about that.
11             MR. MAMOUNAS:  Will do.  Thank you, Judge.
12             THE COURT:  In terms of deposition designations,
13  since you raise it at this point, I don't know if we're
14  going to have -- how much of a dispute we're going to
15  have, or how much of the case will be deposition
16  dependent, but I probably need to get up to speed on that
17  if you all are unable to agree on the scope of deposition
18  designations.  I trust much of this will be helped by the
19  Court's motion in limine rulings, but once you've done
20  that, if you still have outstanding issues for the Court
21  to resolve, I need to know about those as well.
22             MR. MAMOUNAS:  Very well, Judge.  Thank you.
23             THE COURT:  Is there anything else to take up at
24  this point?
25             MR. MAMOUNAS:  Not from our end.
```

1              MS. RHEE:  No, Your Honor.

2              THE COURT:  See you Monday morning, 8:30.

3              Stand in recess.

4                   (Proceedings adjourned at 12:30 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5        RE:  ARMOUR CAPITAL MANAGEMENT LP v. SS&C
           TECHNOLOGIES, INC., No. 3:17CV790(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 124 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____
                              /s/

18                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
19                    United States District Court
                      141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                            (860) 463-3180
21

22

23

24

25